UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT CHARLES FAILLE JR., Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> ADAPTHEALTH CORP. f/k/a DFB HEALTHCARE ACQUISITIONS CORP., LUKE MCGEE, STEPHEN P. GRIGGS, GREGG HOLST, and JASON CLEMENS, <br><br> Defendants. | Case No. <br><br> <u>CLASS ACTION COMPLAINT</u> <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Robert Charles Faille Jr. ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp. ("DFB," "AdaptHealth," or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired AdaptHealth securities between November 11, 2019 and July 16, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      AdaptHealth, together with its subsidiaries, provides home healthcare equipment, medical supplies, and home and related services in the U.S.

3.      Prior to its business combination with AdaptHealth, as described below, DFB was a special purpose acquisition company ("SPAC"), also known as a blank check company, incorporated for the purpose of entering into a merger, share exchange, asset acquisition, share purchase, recapitalization, reorganization, or similar business combination with one or more businesses or entities.

4.      On July 8, 2019, DFB announced that it had entered into a definitive agreement for a business combination with AdaptHealth Holdings, LLC ("Legacy AdaptHealth"), the third largest distributor of home medical equipment ("HME") in the U.S. (the "Merger").  Upon the closing of the Merger, DFB renamed itself "AdaptHealth Corp." and its Class A common stock began trading on the Nasdaq Global Select market ("NASDAQ") under the ticker symbol "AHCO."

5.      On November 8, 2019, post-market, DFB announced that the Merger had closed, and that "[t]he combined company, which has been renamed AdaptHealth Corp. ("AdaptHealth"), expects that its Class A Common Stock and public warrants will continue to list on the Nasdaq

Capital Market under the new trading symbols "AHCO" and "AHCOW", respectively, starting on or about Monday, November 11, 2019."

6.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) AdaptHealth had misrepresented its organic growth trajectory by retroactively inflating past organic growth numbers without disclosing the changes, in violation of SEC regulations; (ii) accordingly, the Company had materially overstated its financial prospects; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

7.     On July 19, 2021, before the market opened, *Jehoshaphat Research* ("Jehoshaphat") published a report alleging that AdaptHealth is a "roll-up" company, or a company that is built primarily through the acquisition of smaller companies with common services or products, that obscures its organic growth by "[r]etroactively changing past organic growth numbers to be higher, with no disclosure about the change."  Specifically, the report stated that "[w]hile management claims (and consensus estimates reflect) an organic growth trajectory of 8-10%, AHCO is in fact experiencing double-digit organic decline. It is also, in our opinion, taking steps to obscure that decline which are expressly forbidden by the SEC."  Indeed, the report suggested that AdaptHealth's manipulation of its organic growth trajectory was "a blatant violation of non-GAAP disclosure rules, for which companies get into huge trouble."

8.     On this news, AdaptHealth's stock price fell $1.51 per share, or 5.93%, to close at $23.96 per share on July 19, 2021.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  AdaptHealth is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

13.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.      Plaintiff, as set forth in the attached Certification, acquired AdaptHealth securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.      Defendant AdaptHealth is a Delaware corporation with principal executive offices located at 220 West Germantown Pike, Suite 250, Plymouth Meeting, Pennsylvania 19462.  The

Company's common stock trades in an efficient market on the NASDAQ under the ticker symbol "AHCO."

16.     Defendant Luke McGee ("McGee") served as the Company's Chief Executive Officer ("CEO") following the merger until February 2021 and served as Co-CEO from February 2021 until June 2021.

17.     Defendant Stephen P. Griggs ("Griggs") served as Co-CEO from February 2021 until June 2021 and has served as the Company's CEO since June 2021.

18.     Defendant Gregg Holst ("Holst") served as the Company's Chief Financial Officer ("CFO") following the Merger until August 2020.

19.     Defendant Jason Clemens ("Clemens") has served as the Company's CFO since August 2020.

20.     Defendants McGee, Griggs, Holst, and Clemens are sometimes referred to herein as the "Individual Defendants."

21.     The Individual Defendants possessed the power and authority to control the contents of AdaptHealth's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of AdaptHealth's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with AdaptHealth, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

22.     AdaptHealth and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

23.     AdaptHealth, together with its subsidiaries, provides home healthcare equipment, medical supplies, and home and related services in the U.S.

24.     DFB was an SPAC, also known as a blank check company, incorporated for the purpose of entering into a merger, share exchange, asset acquisition, share purchase, recapitalization, reorganization, or similar business combination with one or more businesses or entities.

25.     On July 8, 2019, DFB announced that it had entered into a definitive agreement for a business combination with Legacy AdaptHealth, the third largest distributor of HME in the U.S. Upon the closing of the Merger, DFB renamed itself "AdaptHealth Corp." and its Class A common stock began trading on the NASDAQ under the ticker symbol "AHCO."

26.     On November 8, 2019, post-market, DFB announced that the Merger had closed, and that "[t]he combined company, which has been renamed AdaptHealth Corp. ("AdaptHealth"), expects that its Class A Common Stock and public warrants will continue to list on the Nasdaq Capital Market under the new trading symbols "AHCO" and "AHCOW", respectively, starting on or about Monday, November 11, 2019."

### Materially False and Misleading Statements Issued During the Class Period

27.     The Class Period begins on November 11, 2019, the first trading session after DFB issued a press release, post-market, announcing that the Merger had closed.  The press release stated, in relevant part:

"On behalf of the team at DFB and Deerfield, I am thrilled to announce the closing of this transaction," said Richard Barasch, who will serve as Chairman of the Board of AdaptHealth. "[Defendant McGee] and his team have built one of the industry's leading HME providers through a combination of accretive capital deployment, high-touch customer engagement, and a scalable, purpose-built, technology-enabled operating model. We believe AdaptHealth will continue to occupy an increasingly distinct position in the home-based healthcare value chain as the most efficient provider in the space."

"We look forward to this next, exciting phase of our growth as a public company," said Mr. McGee. "We expect to remain an active participant in the consolidation of our industry while providing the highest level of patient care and service, with an over-arching commitment to creating value for all stakeholders."

28.    On March 6, 2020, AdaptHealth filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2019 (the "2019 10-K"). With respect to the Company's business strategy, the 2019 10-K stated, in relevant part:

AdaptHealth's strategy is to grow its revenue while expanding margins through targeted strategies for organic growth as well as opportunistic acquisitions that take advantage of AdaptHealth's scalable, integrated technology platform.

- **<u>Drive Market Share Gains in the HME Market</u>**: AdaptHealth plans to leverage its technological and clinical advantages as well as its relationships with key constituents across the HME supply chain to deepen its presence in the HME market. AdaptHealth has built a strong network of highly diversified referral relationships that its sales force will continue to grow to help expand market penetration in certain geographies. Primary referral sources include acute care hospitals, sleep laboratories, pulmonologist offices, skilled nursing facilities and hospice operators, with no one source accounting for greater than 2% of its revenue as of December 31, 2019. AdaptHealth believes that maintaining and broadening these relationships will drive organic growth. AdaptHealth's ability to provide many products across its contracted payors is particularly valuable, especially to providers and facilities that discharge patients with a variety of product needs and insurance coverages. While some of its HME competitors focus on certain specific product lines, AdaptHealth is able to offer a wide array of products to its customers. AdaptHealth believes that its strong referral relationships and its broad product portfolio will help drive market share growth.

29.     Further, with respect to the Company's sales and marketing activities, the 2019

10-K stated, in relevant part:

> Sales activities are generally carried out by AdaptHealth's full-time sales representatives with assistance from on-site liaisons in certain markets who interact directly with hospital discharge coordinators and patients. AdaptHealth's sales team works closely with AdaptHealth's trained respiratory therapists in carrying out their daily sales activities. AdaptHealth primarily acquires new patients through referrals. Sources of referrals include acute care hospitals, sleep laboratories, pulmonologist offices, skilled nursing facilities and hospice operators, among others. AdaptHealth's sales representatives maintain continual contact with medical professionals across these facilities. AdaptHealth believes that its relationships with its referral sources are strong and that these entities will continue to be a source of organic growth through new patients. While AdaptHealth views its referral sources as fundamental to its business, no single referral source accounted for more than 2% of its revenues as of December 31, 2019.

30.     Next, with respect to governmental regulation, the 2019 10-K stated, in relevant

part:

> AdaptHealth maintains a Compliance Program that meets the guidelines set forth by the Office of Inspector General of CMS, and provides ongoing compliance training designed to keep AdaptHealth's officers, directors and employees well-educated and up-to-date regarding developments on relevant topics and to emphasize AdaptHealth's policy of strict compliance. Federal and state laws require that AdaptHealth obtain facility and other regulatory licenses and that AdaptHealth enroll as a supplier with federal and state health programs.

31.     In addition, with respect to net revenue for the year, the 2019 10-K stated, in

relevant part:

> ***Net Revenue***.  Net revenue for the year ended December 31, 2019 was $529.6 million compared to $345.3 million for the year ended December 31, 2018, an increase of $184.4 million or 53.4%. The increase in net revenue was driven primarily by acquisitions, which increased revenue by approximately $156.3 million.  ***The remaining increase in net revenue was attributable to organic growth resulting from demographic growth in core markets and CPAP resupply sales and marketing initiatives***.

(Emphasis added.)

32.     Appended to the 2019 10-K as an exhibit was a signed certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants McGee and Holst, attesting that "[t]he information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

33.     On May 5, 2020, AdaptHealth issued a press release announcing the Company's Q1 2020 financial results.  The press release stated, in relevant part:

Luke McGee, Chief Executive Officer of AdaptHealth, commented, "Despite significant and sudden challenges brought on by the COVID-19 pandemic, our strong first quarter performance reflects the extraordinary hard work, resilience and dedication of our outstanding AdaptHealth team. Due in large measure to their efforts, we are continuing to successfully deploy a scalable growth model focused on organic sales, acquisitions, accretive capital deployment, margin expansion, and cash generation. Our HME business performed well, and ahead of our internal budgets despite the historical softness of this three-month period during which patients are often managing through reset deductibles and insurance changes.

"We closed and fully integrated two significant and accretive HME business acquisitions during the quarter that are also expected to add an aggregate $91 million in net revenue in 2020. Advanced expands the Company's currently underpenetrated presence in the Southeast and Healthline strengthens our presence in Texas. I could not be more excited about these two scaled acquisitions.

"Our home medical supplies business, Patient Care Solutions (PCS), generated net revenue of $33.9 million for the quarter and negative EBITDA of $4.5 million. As previously disclosed, PCS is a turn-around situation and as part of our investment we expect $15 million in one-time restructuring and operational losses in 2020. We are pleased with our progress in addressing and curing various issues at PCS, and in the first quarter we exceeded our internal revenue and operational projections. We continue to believe PCS will be profitable in the fourth quarter of 2020. We are particularly excited about growth in the continuous glucose monitoring business at PCS and expect this will evolve into a growing and increasingly significant new product offering for AdaptHealth."

34.     On May 8, 2020, AdaptHealth filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2020 (the "Q1 2020 10-Q").  The Q1 2020 10-Q stated, in relevant part:

     ***Net Revenue***.  Net revenue for the three months ended March 31, 2020 was $191.4 million compared to $119.5 million for the three months ended March 31, 2019, an increase of $71.9 million or 60.2%. The increase in net revenue was driven primarily by acquisitions, which increased revenue by $57.9 million (including $33.9 million generated by PCS). ***The remaining increase in net revenue was primarily attributable to organic growth resulting from stronger CPAP resupply sales and demographic growth in core markets***. Net revenue, excluding PCS, was $157.5 million for the three months ended March 31, 2020.

(Emphasis added.)

35.     Appended to the Q1 2020 10-Q as an exhibit was a substantively similar SOX certification as referenced, *supra*, in ¶ 32, signed by Defendants McGee and Holst.

36.     On August 4, 2020, AdaptHealth hosted an earnings call with investors and analysts to discuss the Company's Q2 2020 results (the "Q2 2020 Earnings Call").  During the Q2 2020 Earnings Call, in response a question regarding Q2 2020 organic growth, Defendant Holst stated, in relevant part:

> for the quarter organic growth was extraordinary, because of the B2B revenue. So it was in excess of 25%. If you exclude it B2B with the weakness and some of the -- related to COVID, the organic growth was a couple of percent or at 2%. So -- and then for -- going forward, we've essentially projected the kind of the same, a very steady amount of new businesses and kind of a lower level because of COVID.

In response to the same question, Defendant McGee stated, in relevant part:

> to add a little bit more context around that. I mean, so even for the first half, you're going to see organic growth year-over-year, well within the guidance, that 6% to 8%, we've included obviously Q2, given COVID to have any even positive organic growth. We're actually very proud of that B2B.

> And then, for the rest of the year, again, if you look at where we are in July, and obviously, it's just one month does not make a quarter. But we're seeing very nice sort of growth in the respiratory categories, in most of the bent metal. And the weakness really is isolated to just PAP new starts and the orthotic business. So I think we're confident, that we can be back on that 6% to 8%, in Q3.

37.     On August 7, 2020, AdaptHealth filed a Quarterly Report on Form 10-Q with the

SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2020

(the "Q2 2020 10-Q").  The Q2 2020 10-Q stated, in relevant part:

> **Net Revenue**. Net revenue for the three months ended June 30, 2020 was $232.1 million compared to $124.1 million for the three months ended June 30, 2019, an increase of $108.0 million or 87.0%. The increase in net revenue was driven primarily by (i) acquisitions, which increased net revenue by $77.0 million (including $33.0 million generated by PCS), **(ii) organic growth resulting from stronger CPAP resupply sales and demographic growth in core markets**, and (iii) net revenue of approximately $28.4 million from referral partners and healthcare facilities in support of their urgent needs for ventilation and oxygen equipment for COVID-19 patients.

(Emphasis added.)

38.     Appended to the Q2 2020 10-Q as an exhibit was a substantively similar SOX

certification as referenced, *supra*, in ¶ 32, signed by Defendants McGee and Clemens.

39.     On November 4, 2020, AdaptHealth hosted an earnings call with investors and

analysts to discuss the Company's Q3 2020 results (the "Q3 2020 Earnings Call").  In response to

a question regarding the Company's Q3 2020 organic growth, Defendant Clemens stated:

> [t]he organic growth for the third quarter was a little over a point. So, again, in the face of COVID, we're actually pretty pleased with those results. As you heard in our prepared remarks, starts, particularly around sleep, are coming back. As you know, there's a bit of a compounding effect on that. So as Q2 hit in the midst of COVID, and starts were down materially, there is a compounding effect of that, that we're in the middle of that we're starting to see pull through going in a positive direction.

Later during the Q3 2020 Earnings Call, in response to a question regarding how the Q3 2020

organic growth rate compared to the Company's expectations, Defendant McGee stated:

> I think we're pretty happy with – in the quarter at 1% is still positive year-to-date in light of COVID. We knew Q3 and frankly the early part of Q4 the hardest hit from the compounding of top rental revenues. And so to be able to deliver that, yes, I'm incredibly proud of the team. I think we're setting up for a higher number in Q4 and as we go into 2021, back to our previously forecast range.

Finally, in response to a question regarding how to assess organic growth, Defendant McGee stated, in relevant part:

> Obviously, we've been so acquisitive with even 2019 as the hard baseline. Obviously, we do expect to see growth and core growth in 2020, despite COVID. Obviously, if you look year-to-date, I think we're sort of in the low to mid-single digits, certainly higher than 1% and that excludes B2B. And so, we can follow-up offline about how to model it, but I don't think that starting in 2019 is going to be the easiest exercise, just given how acquisitive we've been. On the second piece, diabetes is a fast growing market. And so we would expect our diabetes business, and there's some blend to get to 7 to 10 of above market diabetes growth, diabetes should be a mid-teens grower for us in 2021. I think that's probably somewhat conservative. And if you look at percentage of revenue, you're going to get to some mid-20s, as we continue to grow that and that is just with what we own today. Again, we like the acquisition landscape in diabetes. We think that there's a similar playbook to execute there that we've done in core HME. And so with those it could even skew higher.

40.     On November 6, 2020, AdaptHealth filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2020 (the "Q3 2020 10-Q"). The Q3 2020 10-Q stated, in relevant part:

> ***Net Revenue***. Net revenue for the three months ended September 30, 2020 was $284.4 million compared to $136.5 million for the three months ended September 30, 2019, an increase of $147.9 million or 108.4%. The increase in net revenue was driven primarily by (i) acquisitions, which increased net revenue by $146.2 million, ***(ii) organic growth resulting from stronger CPAP resupply sales and demographic growth in core markets***, and (iii) net revenue of approximately $4.3 million from referral partners and healthcare facilities in support of their urgent needs for ventilation and oxygen equipment for COVID-19 patients.

(Emphasis added.)

41.     Appended to the Q3 2020 10-Q as an exhibit was a substantively similar SOX certification as referenced, *supra*, in ¶ 32, signed by Defendants McGee and Clemens.

42.     On March 4, 2021, AdaptHealth hosted an earnings call with investors and analysts to discuss the Company's Q4 and full year 2020 results (the "Q4 2020 Earnings Call"). During the scripted portion of the Q4 2020 Earnings Call, Defendant Clemens stated, in relevant part:

Synthesize all of the trends above and a detailed on the slide in our Q4 2020 earnings supplement, our organic growth for full year 2020 was 8.6%, when including the COVID B2B business and 5.6% when excluding B2B.

For the fourth quarter, organic growth was 5.7% when compared to the fourth quarter of 2019, including the COVID B2B business, and 4.9% when excluding B2B. With our PAP census rebuilding after the depressed new starts in mid-year, increase in oxygen business in Q4 and continued market expansion in CGM, we remain confident in our organic growth prospects between 8% and 10% for 2021.

43.     Later during the scripted portion of the Q4 2020 Earnings Call, Defendant McGee stated, in relevant part, "we will continue to find ways to drive organic growth. We will learn from AeroCare best practices and also seek to capitalize on growth opportunities as life returns to a more normal cadence throughout the course of 2021."  Finally in response to a question regarding the Company's revenue guidance, Defendant Clemens stated, in relevant part, "[s]o on the revenue side [. . .] we increased the organic growth in the revenue guide when we came out with the Aero announcement in late 2020. So no real change there, just kind of confirming evidence that we feel rock-solid about our organic growth."

44.     On March 16, 2021, AdaptHealth filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2020 (the "2020 10-K").  The 2020 10-K contained substantively similar descriptions of the Company as discussed, *supra*, in ¶¶ 28-30.  In addition, with respect to revenue, the 2020 10-K stated, in relevant part:

> ***Net Revenue***. Net revenue for the year ended December 31, 2020 was $1.06 billion compared to $529.6 million for the year ended December 31, 2019, an increase of $526.7 million or 99.5%. The increase in net revenue was driven primarily by (i) acquisitions completed during 2020, which contributed net revenue of $450.2 million during the year, ***(ii) organic growth resulting from stronger CPAP resupply sales and demographic growth in core markets***, and (iii) net revenue of $36.5 million from referral partners and healthcare facilities in support of their urgent needs for ventilation and oxygen equipment for COVID-19 patients.

(Emphasis added.)

45.     Appended to the 2020 10-K as an exhibit was a substantively similar SOX certification as referenced, *supra*, in ¶ 32, signed by Defendants McGee, Griggs, and Clemens.

46.     On May 6, 2021, AdaptHealth hosted an earnings call with investors and analysts to discuss the Company's Q1 2021 results (the "Q1 2021 Earnings Call").  During the scripted portion of the Q1 2021 Earnings Call, Defendant Griggs stated, in relevant part:

> Despite the ongoing effects of the pandemic on certain product lines, we're very pleased with our organic growth rate of 11.5%. With the recent return of referral volumes in our sleep and hospital discharge business to pre-pandemic levels and current organic growth in diabetes and resupply, we feel confident that the balance of 2021 will meet our organic growth expectations.

Later in the scripted portion of the Q1 2021 Earnings Call, Defendant Clemens stated, in relevant part:

> For the first quarter ending March 2021, AdaptHealth reported net revenue of $482.1 million, an increase of 152% from the first quarter of 2020. The substantial increase is a result of our company-wide focus, driving organic growth and the efficient integration of our 2020 and 2021 acquisitions, including the acquisition of AeroCare, which was completed on February 1, 2021
>
> ***
>
> As detailed in our Q1 2021 earnings supplement, our organic growth for the quarter was very strong at 11.5%, up significantly against Q4 2020 organic growth and led by new starts in our diabetes product line.

47.     On May 10, 2021, AdaptHealth filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2021 (the "Q1 2021 10-Q").  With respect to revenue, the Q1 2021 10-Q stated, in relevant part:

> ***Net Revenue***. Net revenue for the three months ended March 31, 2021 was $482.1 million compared to $191.4 million for the three months ended March 31, 2020, an increase of $290.7 million or 151.8%. The increase in net revenue was driven primarily by (i) acquisitions completed during the three months ended March 31, 2021, which contributed net revenue of $142.6 million during the period, (ii) net revenue contributed by acquisitions completed after March 2020 and prior to the beginning of the current reporting period, and (iii) ***organic growth resulting from stronger CPAP resupply sales and demographic growth in core markets***.

(Emphasis added.)

48.     Appended to the Q1 2021 10-Q as an exhibit was a substantively similar SOX certification as referenced, *supra*, in ¶ 32, signed by Defendants Griggs and Clemens.

49.     The statements referenced in ¶¶ 27-48 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) AdaptHealth had misrepresented its organic growth trajectory by retroactively inflating past organic growth numbers without disclosing the changes, in violation of SEC regulations; (ii) accordingly, the Company had materially overstated its financial prospects; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

50.     On July 19, 2021, before the market opened, *Jehoshaphat* published a report alleging that AdaptHealth is a "roll-up" company, or a company that is built primarily through the acquisition of smaller companies with common services or products, that obscures its organic growth by "[r]etroactively changing past organic growth numbers to be higher, with no disclosure about the change."   Specifically, the report stated that "[w]hile management claims (and consensus estimates reflect) an organic growth trajectory of 8-10%, AHCO is in fact experiencing double-digit organic decline. It is also, in our opinion, taking steps to obscure that decline which are expressly forbidden by the SEC."   Indeed, the report suggested that AdaptHealth's manipulation of its organic growth trajectory was "a blatant violation of non-GAAP disclosure rules, for which companies get into huge trouble."   The report explained that:

- AHCO claims on its earnings calls that it had 6% organic growth in FY20 and that this accelerated to 12% in Q121. The Street accepts this characterization fully, and projects 8%+ organic growth going forward. But nowhere does management provide investors with numeric inputs for these numbers.

- In Q420 alone, organic revenues declined by more than -$20m year-over-year.

- AHCO recently took highly unusual steps to make it harder for investors to see organic growth. Some of these include:

  o Failing to disclose contributions from all acquisitions on a quarterly basis (even meaningful ones)
  o Offering its own organic growth "estimate" with no quantitative inputs available and confusing wording
  o Changing organic growth calculations without disclosure
  o Retroactively changing the organic number without disclosing such change
  o Removing certain inorganic contribution disclosures from one SEC filing to the next, etc.

51.     *Jehoshaphat* explained that AdaptHealth's practices were in violation of SEC

regulations, stating, in relevant part:

> **We believe that some of these actions are prohibited by the SEC's rules on non-GAAP disclosures.**
> - We don't think it's a coincidence that management decided to take its organic growth disclosure from "translucent" to "totally opaque" in 2H20: this was just as true organic growth was going from negative to very negative. This was also when they decided to do their biggest deal ever, and to set up the company for an exit of the CEO.

(Emphasis in original.)  The report further explained:

> Apparently in Q420, AHCO's management discovered that time travel can be lucrative (perhaps they watched Timecop?), so they went back and changed history:

> - Q1 organic growth went from 8% to 9.9%
> - Q2 went from 2% to 5.5%
> - Q3 went from 1% to 3.2%

> Q2 and Q3 transcripts both mentioned the number being ex-B2B. Q1 did not mention this distinction, as B2B, or emergency sales of respiratory equipment during the hospital crisis, was not a major factor yet.

(According to one former employee, "Luke knew what he was doing. He was going to push this to the limits of the envelope." Changing historical growth numbers fits the characterization painted by formers.)

Doubling or tripling your historical organic growth rate by waving a wand is nice work if you can get it. We were unable to find any disclosure to investors of the fact that these organic growth measurement numbers had been changed. Management still has never quantified the inputs for either the old or the new numbers. (The only change has been the addition of this "Consistent Strength in Year-on-Year Revenue Growth," which by the way is an insanely ironic title.)

To our knowledge this is a blatant violation of non-GAAP disclosure rules, for which companies get into huge trouble. Longtime followers of US stock frauds will remember MDC Partners (ticker MDCA), a company whose CEO was eventually banned for five years from serving as an officer or director of a public company, and which cost its shareholders over 90% of their investment in a relatively short period of time as the rollup's fraud unraveled. In 2017 the SEC brought charges against MDCA, in part for violating rules that sound pretty relevant here[.]

52.     In addition, the report highlighted that Jehoshaphat's findings of misrepresentation were confirmed by former employees, stating:

- Our key findings above were consistent with what former employees told us in interviews. Former executives described a chaotic, understaffed business, failing to do substantial M&A diligence in a race to accumulate assets.

- One interviewee said that the company's M&A department was "like a barn fire. There were two acquisitions happening a month. They didn't have the ability to disaggregate [organic growth], trust me. They had no f****ng clue. There was no concept of what organic growth actually was." He described the overall company as a "house of cards."

- One common refrain was disbelief at the idea that this business grows meaningfully faster than GDP.

53.     On this news, AdaptHealth's stock price fell $1.51 per share, or 5.93%, to close at $23.96 per share on July 19, 2021.

54.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired AdaptHealth securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

56.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, AdaptHealth securities were actively traded on the NASDAQ.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by AdaptHealth or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

57.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

58.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of AdaptHealth;

- whether the Individual Defendants caused AdaptHealth to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of AdaptHealth securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

60.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

61.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- AdaptHealth securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold AdaptHealth securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

62.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

63.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

64.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

65.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

66.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of AdaptHealth securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire AdaptHealth securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

67.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for AdaptHealth securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about AdaptHealth's finances and business prospects.

68.     By virtue of their positions at AdaptHealth, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants

acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

69.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of AdaptHealth, the Individual Defendants had knowledge of the details of AdaptHealth's internal affairs.

70.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of AdaptHealth.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to AdaptHealth's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of AdaptHealth securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning AdaptHealth's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired AdaptHealth securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

71.     During the Class Period, AdaptHealth securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of AdaptHealth securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of AdaptHealth securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of AdaptHealth securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

72.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

73.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

74.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

75.     During the Class Period, the Individual Defendants participated in the operation and management of AdaptHealth, and conducted and participated, directly and indirectly, in the conduct of AdaptHealth's business affairs.  Because of their senior positions, they knew the adverse non-public information about AdaptHealth's misstatement of income and expenses and false financial statements.

76.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to AdaptHealth's financial condition and results of operations, and to correct promptly any public statements issued by AdaptHealth which had become materially false or misleading.

77.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which AdaptHealth disseminated in the marketplace during the Class Period concerning AdaptHealth's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause AdaptHealth to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of AdaptHealth within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of AdaptHealth securities.

78.     Each of the Individual Defendants, therefore, acted as a controlling person of AdaptHealth.  By reason of their senior management positions and/or being directors of AdaptHealth, each of the Individual Defendants had the power to direct the actions of, and

exercised the same to cause, AdaptHealth to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of AdaptHealth and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

79.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by AdaptHealth.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  July 29, 2021                                    Respectfully submitted,

                                                THE ROSEN LAW FIRM, P.A

                                                */s/ Jacob A. Goldberg*
                                                Jacob A. Goldberg
                                                Gonen Haklay
                                                101 Greenwood Avenue, Suite 440
                                                Jenkintown, PA 19046
                                                Telephone: (215) 600-2817
                                                Facsimile: (212) 202-3827

Email: jgoldberg@rosenlegal.com
Email: ghaklay@rosenlegal.com

*Liaison Counsel for Plaintiff*

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
Thomas H. Przybylowski
(*pro hac vice* application forthcoming)
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
tprzybylowski@pomlaw.com

and

HOLZER & HOLZER, LLC
Corey D. Holzer
(*pro hac vice* application forthcoming)
211 Perimeter Center Parkway, Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com

*Attorneys for Plaintiff*