UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM and BUCKS COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | Civ. Action No. 2:21-cv-03382-HB <u>CLASS ACTION</u> CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | ELECTRONICALLY FILED |
| ADAPTHEALTH CORP. f/k/a DFB HEALTHCARE ACQUISITIONS CORP., LUKE MCGEE, STEPHEN P. GRIGGS, and JASON CLEMENS, FRANK J. MULLEN, RICHARD BARASCH, JOSHUA PARNES, ALAN QUASHA, TERENCE CONNORS, DR. SUSAN WEAVER, DALE WOLF, BRADLEY COPPENS, and DAVID S. WILLIAMS III, | ) ) ) ) ) ) ) ) ) ) ) ) | DEMAND FOR JURY TRIAL |
| Defendants. | ) ) ) ) | |

# TABLE OF CONTENTS

**Page**

I.      SUMMARY OF THE ACTION ........................................................................1

II.     STATEMENT OF THE CASE........................................................................5

        A.      The Class Period Begins – Defendants Laud Extraordinary Organic Growth and M&A Growth at AdaptHealth, Fueled by "Seasoned Management" .......................................................................................7

        B.      Defendants Conceal McGee's Involvement in One of the Largest Tax Frauds in European History .................................................................9

        C.      Defendants Manipulate AdaptHealth's "Organic Growth" Metric to Conceal Its Slowing Business................................................................16

        D.      Investors Learn the Truth.........................................................................20

                1.      AdaptHealth Discloses that Denmark Has Charged Defendant McGee with Tax Fraud and that the Company Is Placing Him on Unpaid Leave .......................................................20

                2.      *Jehoshaphat* Research Issues a Report Revealing the Relevant Truth Regarding AdaptHealth's Decline in Organic Growth ...............................................................................21

III.    JURISDICTION AND VENUE ...................................................................22

IV.     PARTIES ......................................................................................................23

V.      SUBSTANTIVE ALLEGATIONS ..............................................................25

        A.      Special Purpose Acquisition Companies ...................................................25

        B.      DFB Is Created as a SPAC to Acquire a Healthcare Related Business ....................................................................................................26

        C.      DFB Agrees to Merge with AdaptHealth .................................................26

        D.      DFB Issues Proxy Statement for Vote to Approve AdaptHealth Acquisition ...............................................................................................29

        E.      The DFB/AdaptHealth Merger Becomes Final .........................................29

        F.      Materially False and Misleading Statements Issued During the Class Period ..............................................................................................30

**Page**

|   |   | 1. | Statements Made False and Misleading by Defendants' Failure to Disclose Defendant McGee's Involvement in the Tax Scheme | 30 |
|---|---|----|----|----|
|   |   | 2. | Materially False and Misleading Statements and Omissions Regarding Organic Revenue Growth | 48 |
|   | G. |   | The Truth About the Tax Fraud and Organic Growth Is Revealed in a Series of Disclosures | 56 |
|   |   | 1. | McGee is Charged Criminally in Connection with the Largest Fraud in Denmark's History | 56 |
|   |   | 2. | Short Seller *Jehoshaphat* Research Discovers that AdaptHealth is Manipulating Organic Growth | 59 |
| VI. | SCIENTER |   |   | 60 |
|   | A. |   | Defendants Knew or Were Reckless in Not Knowing that Concealing McGee's Criminal Exposure Misled Investors About AdaptHealth's Revenue and Revenue Growth Prospects | 60 |
|   | B. |   | Defendants Knew or Were Reckless in Not Knowing That the Pro Forma "Organic" Growth Metric Obscured the Company's Actual Organic Growth Trends | 61 |
|   | C. |   | Defendant McGee's Insider Selling | 66 |
| VII. | LOSS CAUSATION |   |   | 67 |
| VIII. | APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) |   |   | 69 |
| IX. | NO SAFE HARBOR |   |   | 71 |
| X. | PLAINTIFFS' CLAIM FOR RELIEF UNDER THE SECURITIES ACT OF 1933 |   |   | 71 |
| XI. | PLAINTIFFS' CLASS ACTION ALLEGATIONS |   |   | 74 |
|   | COUNT I |   |   | 75 |
|   | COUNT II |   |   | 78 |
|   | COUNT III |   |   | 80 |

**Page**

COUNT IV.................................................................................................................82

COUNT V .................................................................................................................83

Plaintiffs Delaware County Employees Retirement System and Bucks County Employees' Retirement System ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AdaptHealth Corp. ("AdaptHealth," or the "Company"), formerly known as DFB Healthcare Acquisitions Corp. ("DFB"), analysts' reports and advisories about the Company, and other publicly available information.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.     **SUMMARY OF THE ACTION**

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired AdaptHealth securities between November 8, 2019 and July 16, 2021, both dates inclusive (the "Class Period").  Plaintiffs seek to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under §§11, 12, and 15 of the Securities Act of 1933 (the "Securities Act") and §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     This case involves Defendants' efforts to pass off AdaptHealth, a home medical equipment ("HME") business, as an emerging growth company when they knew but failed to disclose to investors that its two growth inputs – organic growth and mergers and acquisitions ("M&A") growth – were unsustainable.  AdaptHealth began trading publicly after its November

- 1 -

2019 merger with and into DFB, a special purpose acquisition company ("SPAC") that sought to acquire a medical business with the potential for exponential revenue growth and had identified AdaptHealth as an appropriate acquisition target.  Under the leadership of Defendant Luke McGee ("McGee"), AdaptHealth had acquired at least 59 businesses between 2012 and 2019 and had increased revenue 200% in the three years preceding the DFB/AdaptHealth merger, which it accomplished through a combination of organic revenue growth and revenue from the companies AdaptHealth had acquired.  When the Class Period started, AdaptHealth and Defendant McGee, in fact, told investors that "[w]e have a target of doing $100 million in revenue acquired" but emphasized that "we all know that organic growth is more valuable, and we strive to make sure we're accomplishing that."  AdaptHealth then reported strong growth in both metrics each quarter during the Class Period and projected continued organic revenue growth of 6-8%, well above its industry peers.  At every turn, Defendants credited AdaptHealth's "seasoned management" in general and Defendant McGee in particular for AdaptHealth's success.

3.     But AdaptHealth and McGee failed to disclose a fact that jeopardized both components of AdaptHealth's ability to grow and withheld from investors information important to the valuation of AdaptHealth's securities and to Defendants' statements – Defendant McGee was involved in what authorities called the largest tax fraud in European history that bilked Denmark and other European countries out of billions of dollars in tax refunds (the "tax scheme") – and the Denmark authorities were closing in on McGee at the exact same time that he was merging AdaptHealth into DFB and selling investors on his ability to continue leading AdaptHealth's success.  But without telling AdaptHealth's investors, as required by SEC regulations, North Channel Bank, a bank in Germany that McGee co-owned with his co-conspirators in furtherance of the tax scheme, agreed to pay a criminal fine of 110 million Danish Kroner ("DKK") (approximately $16 million) in September 2019 for faking trades to secure tax reimbursements from the Denmark

- 2 -

Treasury to which they were not entitled.[1]  North Channel Bank not only acknowledged its role in the fraud, but months earlier, in May 2019, McGee himself agreed to a settlement with the Danish tax authorities to repay DKK 1.55 billion in proceeds that he and two of his co-conspirators had reaped from the tax scheme.  Importantly, the settlement did not provide immunity from criminal prosecution.

4.      Defendant McGee thus knew that he was a target of Denmark's continued criminal investigation.  In fact, at the beginning of the Class Period, on November 19, 2019, the Kingdom of Denmark filed suit against several pension funds that McGee himself had created to carry out the tax scheme with a $120 million civil complaint (nearly $20 million tied to McGee) for the role that the funds played in the scheme – and it did so right after Danish prosecutors announced in Denmark that they were investigating and pursuing other individuals and companies in connection with the scheme:

> Since 2015, SØIK has received several notifications from the tax authorities in Denmark regarding suspected fraud in relation to illegitimate reimbursement of dividend tax.  In this context, SØIK is investigating several different networks of individuals and companies that have been involved in applications for reimbursement of dividend tax from the Danish state. . . .
>
> The cases still have a particularly very high priority at SØIK – both for the purpose of clarifying whether there is any basis for criminal prosecution of individuals and companies for the purpose of the seizure of dividends from the alleged fraud.  SØIK has thus established several investigative teams that, with assistance from the tax authorities and international business partners, are carrying out targeted work in these.[2]

---

[1]    Regulation S-K, Item 401 requires directors and executive officers to disclose if they have been "convicted in a criminal proceeding or . . . named [a] subject of a pending criminal proceeding" in the past ten years if it is "material to an evaluation of the ability or integrity of any director, person nominated to become a director or executive officer of the registrant."  17 C.F.R. §229.401(f)(2).

[2]    *Tysk bank får bøde på 110 millioner kroner i udbyttesagen* [*German bank fined DKK 110 million in dividend case*] (Sept. 23, 2019) (Certified Translation, Linguistic Systems, Inc., certified November 19, 2021).

5.      With the pressure from Denmark's criminal investigation mounting on Defendant McGee, both components of AdaptHealth's growth strategy suffered.  Unbeknownst to investors, new acquisitions were in jeopardy and organic growth had dried up by late 2020, as AdaptHealth struggled to integrate the large influx of new businesses that McGee was responsible for acquiring. AdaptHealth's management, in fact, was struggling to integrate those businesses when the Board of Directors ("Board") agreed to its largest acquisition yet, AeroCare, in December 2020.  And they appeared to find McGee's replacement in that acquisition.  In fact, AdaptHealth's Board created what analysts described as a "slightly unusual" Co-CEO arrangement between AeroCare's CEO Stephen Griggs ("Griggs") and Defendant McGee when AdaptHealth's acquisition of AeroCare was complete on February 1, 2021 – just eight weeks before AdaptHealth's Board put Defendant McGee on unpaid leave when they announced that McGee had been criminally charged by the Denmark authorities.

6.      Knowing that AdaptHealth's organic growth had dried up and that slowing growth is the death knell of an emerging growth company, Defendants covered up that AdaptHealth's "organic growth" had stalled in late 2020.  And they did so by deliberately changing the definition of the "organic revenue growth" metric that they disclosed to investors on the Company's quarterly earnings calls.  Unbeknownst to investors, Defendants replaced the "organic" revenue growth metric the Company had used since its inception (*i.e.*, revenue growth tied to the Company's existing businesses that specifically excluded revenue growth attributable to recent acquisitions) to a new "pro forma" calculation that was inflated by incorporating revenue tied to AdaptHealth's recent acquisitions.  In truth, Defendants were relying almost entirely on an unsustainable pace of new acquisitions to boost reported "organic" revenue growth.  If Defendants revealed the truth about organic revenues stalling, which they knew, investors would call into question the Company's long-term revenue growth story.  So beginning in Q4 2020, Defendants purposely covered up the organic

- 4 -

revenue growth weakness with a newly engineered "pro forma" number to materially misrepresent and conceal the actual organic revenue growth trend, which had completely stalled, when reporting AdaptHealth's quarterly results. Instead of the definition that AdaptHealth – and every other publicly traded company – had used historically, Defendants misleadingly characterized this new metric as "organic revenue" and reported revenue growth of 6% for Q4 2020, over 11% for Q1 2021, and told investors to expect organic revenue growth of 8-10% going forward.

7.      The reality facing AdaptHealth began to be revealed on April 13, 2021. That day, AdaptHealth announced that it had put Defendant McGee "on unpaid leave from his roles as Co-CEO and a Director of the Company" after claiming that it had "learned that authorities in Denmark have formally charged [him] with alleged tax fraud arising from certain past private activity." AdaptHealth's stock dropped 20% on this news as analysts noted the loss of a "visionary" responsible for AdaptHealth's M&A growth success, damaging investors. The stock dropped significantly even though AdaptHealth's release emphasized that "[t]he alleged personal conduct occurred between March 2014 and August 2015 and had no connection to AdaptHealth's business." And then, three months later on July 19, 2021, *Jehoshaphat Research* discovered and issued a report (the "*Jehoshaphat* Report") revealing that AdaptHealth's true organic revenue growth, when calculated in line with the Company's prior disclosures and industry standards, was actually ***negative*** for the first six months of 2021. The bombshell report, which was corroborated after the Class Period by the Company's own SEC filings, caused AdaptHealth's stock price to decline another 6% on the last day of the Class Period, damaging investors.

## II.      STATEMENT OF THE CASE

8.      AdaptHealth began as DFB, a SPAC created for the stated purpose of acquiring a business in the healthcare industry. Growth was DFB's focus. As its SEC filings described it, DFB

sought to acquire a "Compan[y] with Recurring and Embedded Revenue and Earnings Growth or Potential for Revenue and Earnings Growth" and an "Experienced Management Team."

9.      DFB announced the results of its efforts to find that business in July 2019 – it had agreed to acquire and merge with AdaptHealth. As DFB described it, AdaptHealth was purportedly "[a] Leading Provider of Home Medical Equipment" that had "[a] Record of Growth and Consolidation in an Expanding Industry." In fact, AdaptHealth had successfully executed "a strategy of organic growth [and] accretive acquisitions," growing net revenue 200% and adjusted EBITDA 290% in just three years, with an expectation of reaching 235% and 360%, respectively, by year four. AdaptHealth had accomplished these results with solid "organic growth" – which it described as growth from existing businesses, excluding acquisitions. And when DFB announced its agreement to merge with AdaptHealth, it highlighted organic revenue growth as a key driver of the Company's financial performance:



10.     Key to this growth, and the leader of what DFB boasted was a "management team . . . comprised of seasoned industry and financial professionals" was Defendant McGee in his role as CEO. With McGee's solid M&A background, DFB told investors that "the company believes it can add in excess of $100m of acquired revenue each year." And Defendant McGee was instrumental in AdaptHealth's success, producing both organic growth and growth through acquisitions. DFB's SEC filings even highlighted McGee's experience, stating that he built AdaptHealth "from $7mm of

revenue in first acquisition to nearly $500mm+ today," "[l]ed the Company's proven acquisition track record," and "develop[ed] a scalable platform with robust integration systems that can accommodate future growth." Analysts would later describe Defendant McGee as a "visionary" who had an ability to "see the next trend."

### A.   The Class Period Begins – Defendants Laud Extraordinary Organic Growth and M&A Growth at AdaptHealth, Fueled by "Seasoned Management"

11.    The Class Period starts on November 8, 2019.  That day, after the market closed, DFB announced that the merger with AdaptHealth had closed and that AdaptHealth would begin trading under the new symbol "AHCO" on or about the next business day, November 11, 2019.  The press release again emphasized that AdaptHealth would "continue to be led by its seasoned team of industry and financial professionals, including Chief Executive Officer, Luke McGee," and praised Defendant McGee for building "'one of the industry's leading HME providers through a combination of accretive capital deployment, high-touch customer engagement, and a scalable, purpose-built, technology-enabled operating model.'"  McGee himself was quoted as saying "'[w]e expect to remain an active participant in the consolidation of our industry while providing the highest level of patient care and service, with an over-arching commitment to creating value for all stakeholders.'"   The release emphasized how AdaptHealth had successfully "completed 59 acquisitions since 2012" and explained that it intended "to continue to focus on increasing net revenue and profitability, both organically and via accretive acquisitions."

12.    Defendants continued this refrain throughout the Class Period.  Each quarter, AdaptHealth reported significant increases in revenue and adjusted EBITDA, boasted about the "successful execution of our strategy to grow organically and through accretive acquisitions," and highlighted a robust acquisition pipeline.  And though the acquisition pipeline was robust, organic growth was, according to Defendants, the "most important[]" metric.  Defendants emphasized the

- 7 -

importance of organic revenue growth, even explaining in an August 2020 investor presentation that they prioritized it over growth through acquisitions:

> [McGee]:  We've liked the ability to add scale quickly through acquisition.  We're seeing fantastic, sort of, new growth trends.  And so, we will be a disciplined buyer.
>
> We do think there are a number of assets in the market.  ***But most importantly, we'll continue the growth we've seen organically.***
>
> \*        \*        \*
>
> [McGee]:  [O]ne thing that we haven't talked about, I'm sure we will, Richard, is we have an active M&A funnel, and we've been acquisitive.  This isn't something that we hope to do.  We've done something like 80 deals life to date.  We have a target of doing $100 million in revenue acquired.  ***And so we all know that organic growth is more valuable, and we strive to make sure we're accomplishing that.*** [3]

13.  Defendants were clear that both growth inputs – organic growth from existing businesses and M&A growth – had and would continue to drive the Company's overall revenue growth and were key to their "growth story."  According to Defendants, they had a successful track record of organic and M&A growth and believed revenue growth would reach "approximately 20% each year" with "organic growth of between 6% and 8% and the balance from acquisitions":

> We have a successful track record of growth, organic growth in the high single digits.  We've accretively deployed capital with M&A transactions, and we are very focused on delivering market-leading profitability.  Our target for organic growth is in the 8% to 10% range.  We think that we can nearly double that again with M&A growth.  And so this is a mid- to high teens, maybe low 20% growth story.
>
> \*        \*        \*
>
> We believe we can grow top line by approximately 20% each year with organic growth of between 6% and 8% and the balance from acquisitions.

14.  AdaptHealth again highlighted its "seasoned management team," including Defendant McGee's experience and leadership and emphasized management's efforts in "successfully deploy[ing] a scalable growth model focused on organic sales, acquisitions, [and] accretive capital

---

[3]   Unless otherwise noted, emphasis is added throughout.

deployment." And when the Company filed a prospectus (the "Prospectus") for a secondary offering of shares (the "Secondary Offering") in January 2021, it again emphasized management, stating that "management's experience is a meaningful differentiator relative to our competitors." Of course, the Prospectus also emphasized AdaptHealth's "Proven M&A success" and stated that AdaptHealth "expect[ed] to deploy incrementally more capital and integrate substantially larger targets over time, which in turn we expect will be a source of continued growth for us."

**B.      Defendants Conceal McGee's Involvement in One of the Largest Tax Frauds in European History**

15.     Defendants' statements were materially false and misleading. While highlighting AdaptHealth's growth and crediting McGee's leadership for it, Defendants failed to disclose that McGee – the executive instrumental to AdaptHealth's past success and ability to continue to grow both organically and through acquisitions – had a secret. He was involved in one of the largest tax fraud schemes in European history. The bank McGee co-owned to conduct the scheme, North Channel Bank, was criminally fined and acknowledged its role in the scheme, and he, and other co-conspirators, had agreed to pay back DKK 1.55 billion in illicit proceeds from the fraud to the Danish tax authorities while being investigated by Denmark on criminal charges. He also faced a civil suit by Denmark for his role in the scheme, which sought recovery of $120 million, and was being investigated for his role in the scheme in other countries in Europe, including the Kingdom of Belgium. Defendants disclosed none of these facts. Instead, AdaptHealth's SEC filings remained silent about Defendant McGee's legal and criminal exposure even as they repeatedly described the legal proceedings that the Company and its subsidiaries faced and made generic risk disclosures about the potential loss of key personnel. By omitting these material facts, Defendants' statements were materially false and misleading as they withheld from investors information important to the valuation of AdaptHealth's securities and to Defendants' statements and violated Regulation S-K, Item 401.

16.     McGee's legal troubles surfaced when he was merging AdaptHealth with and into DFB.  According to a September 25, 2019 article from the German Newspaper *Suddeutsche Zeitung*, entitled: "One bank hopes for a fresh start," the owners of North Channel Bank in Germany were part of "one of the biggest tax scandals in Europe."[4]  After Denmark later charged McGee criminally with tax fraud and AdaptHealth announced that they were putting McGee on unpaid leave, articles revealed that he was a co-owner of North Channel Bank who, along with his co-conspirators, was accused of faking trades through the bank to secure tax reimbursements to which they were not entitled:

> The scheme that they and others involved are alleged to have pursued is similar to that of the Cum-Ex transactions in Germany.  In Germany, banks, investors, and other parties involved are alleged to have traded shares with (cum) and without (ex) dividends over several years and then received multiple tax refunds for money they had only paid once.  ***At North Channel Bank, those involved took this scheme quite a bit further.  Instead of trading in shares, the participants allegedly faked transactions via U.S. pension funds, which the actual owners transferred to them, and then received multiple tax refunds.***[5]

17.     The damage in the two separate countries was substantial – McGee and others through North Channel Bank bilked Denmark out of 550 million euros and Belgium out of 70 million euros between 2012 and 2015.  The same post-charge article that identified McGee as a co-owner of North Channel Bank involved in the tax scheme also reported that he agreed to pay back illicit proceeds from the fraud.[6]  And a September 23, 2019 press release from the State Prosecutor

---

[4]     *Eine Bank hofft auf einen Neuanfang* [*One bank hopes for a fresh start*] (Sept. 25, 2019) (Certified Translation, Linguistic Systems, Inc., certified November 19, 2021).

[5]     *Id.*

[6]     *Præsidenternes pengemand har tætforbindelse til tiltalte i danmarkshistori-ens største svindelsag* [*Moneyman to the presidents has close ties to the accused in the largest fraud case in Danish history*] (Oct. 25, 2021) (Certified Translation, Linguistic Systems, Inc., certified November 19, 2021) ("The Three Americans" who had bought North Channel Bank – Matthew Stein, Jerome Lhote, and Luke McGee – "entered a settlement with the Danish Customs and Tax Administration [in 2019] to reimburse DKK 1.55 billion that they had received for the presumed fraud.").

for Serious Economic and International Crime ("SEIC") in Denmark made it clear that the fine imposed on the bank was a "criminal ruling" and that its investigation was continuing:

> Germany's North Channel Bank has been fined DKK 110 million for the bank's role in the fraud against the Danish State in the so-called dividend case.
>
> The bank has been issued the fine for having participated in the illegitimate payout of approximately DKK 1.1 billion from the Danish Treasury, on which the bank earned DKK 55 million in charges and fees.
>
> ***The fine is the first criminal ruling in the dividend cases***, in which Denmark was defrauded of more than DKK 10 billion through the illegitimate payout of dividend tax.
>
> \*        \*        \*
>
> "***It is excellent to see that we have now the first court ruling in the dividend cases***, in which the Danish State has been defrauded into payouts of dividend taxes. All told, this is the largest fraud case in Denmark's history, and it has inflicted a very significant loss on both society and the Treasury. ***For this reason, we at SØIK are continuing an intensive investigation into whether there is a basis to pursue charges against other players in the case***."[7]

18.    AdaptHealth and McGee were silent about this criminal fine, which not only made Defendants' statements false and misleading but was also a violation of Regulation S-K, Item 401, which requires disclosure that a director or executive officer "was convicted in a criminal proceeding or is a named subject of a pending criminal proceeding" "during the past ten years and that [is] material to an evaluation of the ability or integrity of any director, person nominated to become a director or executive officer of the registrant."  17 C.F.R. §229.401(f)(2).  Defendant McGee's involvement in the tax scheme, and Denmark's ongoing criminal investigation of McGee, was material to an evaluation of his ability and integrity.

19.    McGee's tax fraud scheme through North Channel Bank, however, was just the tip of the iceberg.  And the rope had tightened on Defendant McGee at the beginning of the Class Period.  At the same time that DFB and AdaptHealth's public filings were highlighting McGee's business

---

[7]    *German bank fined DKK 110 million in dividend case* (Certified Translation).

experience to complete DFB's merger with AdaptHealth, the Danish authorities were closing in on other entities that Defendant McGee had created to carry out the tax fraud scheme.  In fact, on November 19, 2019, less than two weeks after DFB completed the merger with AdaptHealth and just six days before AdaptHealth credited McGee for its strong 3Q 2019 financial results, Denmark through its tax agency Skatteforvaltningen ("SKAT") filed a complaint in the United States District Court for the Southern District of New York against a number of defendants, including the 2321 Capital Pension Plan ("2321 Capital") and Lion Advisory Inc. Pension Plan ("Lion Advisory") that Defendant McGee owned and controlled, in connection with a tax scheme identical to that committed by Defendant McGee and his co-conspirators through North Channel Bank.[8]

20.     The Denmark Complaint alleged that "[t]his case stems from a fraudulent tax return scheme that deceived SKAT into paying out over 12.7 billion Danish Kroner ("DKK"), the equivalent of approximately $2.1 billion (US), of allegedly withheld dividend tax."  The Danish government alleged that over 300 entities were involved in the scheme and "pretended to own shares in Danish companies" to submit applications for tax refunds that "were fraudulent because the claimants did not own the shares that they claimed to own, they did not earn the dividends they claimed to have earned, and they were not entitled to the tax returns they claimed."  The scope of the fraud was breathtaking; it involved hundreds of entities, spanned throughout the world, and amounted to outright theft:

> The claimants effectuated the scheme by appointing agents to apply to SKAT for refunds in respect of shares in Danish companies that ***they did not own.  The agents submitted the fraudulent applications on behalf of the claimants and their authorized representatives, with false documentation representing that the claimants owned substantial shares in Danish companies, had earned substantial dividends for which tax had been withheld, and other documentation representing that the claimants were entitled to a tax refund.  The agents obtained over $2.1 billion in refunds from SKAT***, and distributed the proceeds of the scheme to the

---

[8]     *Skatteforvaltningen v. Merkensteijn et al.*, No. 1:19-cv-10713-UA (ECF No. 1) (S.D.N.Y. Nov. 19, 2019) (the "Denmark Complaint").

claimants and other participants in the fraud.  During the period 2012 to 2015, SKAT received fraudulent requests for tax refunds from several agents on behalf of 277 pension plans in the United States, as well as entities in the United Kingdom, Canada, Malaysia, and Luxembourg.

21.     Nearly $20 million was tied to Defendant McGee through his 2321 Capital and Lion Advisory pension plan entities.  Although not personally named as a defendant or otherwise identified in the Denmark Complaint, Defendant McGee was the sole owner and controlled both plans.  In fact, a footnote in a Form 8-K filed with the SEC by AdaptHealth on November 14, 2019 – almost contemporaneously with the Denmark Complaint – identified "2321 Capital LLC" as the entity through which Defendant McGee held AdaptHealth shares and stated expressly that it was an "entit[y] controlled by Mr. McGee" but did not mention its role or Defendant McGee's role in the tax scheme.  The Denmark Complaint alleges that 2321 Capital involved a "sole participant, or member" that "is a citizen of a State of the United States" and that it "listed its address as 23 East 10th Street, Apartment 220, New York, NY 10003," which was an address that public records associate with Defendant McGee.  Similarly, a complaint filed in July 2021 for an identical fraudulent scheme in the Kingdom of Belgium names Defendant McGee and Lion Advisory, among others, as defendants, alleging that McGee "dominated and controlled Lion Advisory in order to perpetrate a fraud against FPSF Belgium."[9]  Like 2321 Capital, the Denmark Complaint alleges that Lion Advisory involved a "sole participant, or member" that "is a citizen of a State of the United States" and that it "listed its address as 45 Perry Street, Suite BW, New York, NY 10014," which was another address that public records associate with Defendant McGee.  The Belgium Complaint

---

[9]     *Kingdom of Belgium, Fed. Pub. Serv. Fin. v. Lion Advisory Inc. Pension Plan*, No. 1:21-cv-06402 (ECF No. 1) (S.D.N.Y July 27, 2021) ("Belgium Complaint"), ¶24.

alleges that "[i]n submissions to FPSF Belgium, Lion Advisory listed its address as 45 Perry Street, New York, NY 10014" and states that it was "McGee's personal residence at the time."[10]

22. The Denmark Complaint details how McGee, through 2321 Capital and Lion Advisory, siphoned nearly $20 million out of the Danish Treasury. For 2321 Capital, it alleges that it "made twenty-three (23) separate withholding tax refund claims, . . . represented that it was entitled to refunds totaling DKK 59,259,338.98," and that [b]ased on the false refund claims … SKAT made payments totaling DKK 59,259,338.98 to Defendant 2321 Capital." The same was true for Lion Advisory, whose fraudulent claims were higher than 2321 Capital. According to the Denmark Complaint, Lion Advisory "made twenty-eight (28) separate withholding tax refund claims, . . . represented that it was entitled to refunds totaling DKK 71,184,845.65," and that [b]ased on the false refund claims … SKAT made payments totaling DKK 71,184,845.65 to Defendant Lion Advisory." Using the 6.7986 conversion rate used in the Denmark Complaint, Defendant McGee bilked the Denmark Treasury out of $8.7 million through 2321 Capital and another $10.5 million through Lion Advisory.[11]

23. The tax scheme was as simple as it was brazen. Defendant McGee, through 2321 Capital and Lion Advisory, used third parties to submit fabricated transaction documents to SKAT, received the tax refunds through those third parties, and then distributed the payments throughout the conspiracy. The Denmark Complaint used 2321 Capital's activities as an example:

---

[10]   Belgium Complaint, ¶¶10, 25. The Belgium Complaint also alleges that the "supposed sponsoring entity of Lion Advisory is another shell entity called Lion Advisory Inc." *Id.*, ¶26. That entity's Certificate of Incorporation lists McGee as its incorporator and identifies its address as 40 West 57th Street, 20th Floor, New York, NY 10019, which was an address associated with Defendant McGee's co-conspirators in the tax scheme. *Id.* Public records reveal that Luke McGee is listed as the Agent for Service of Process for "Lion Advisory Inc."

[11]   Property records also associate Defendant McGee with the address listed in the Denmark Complaint for Bowline Management Pension Plan, which also is alleged to have involved "a sole participant, or member" that "is a citizen of a State of the United States" and that pulled another DKK 32,623,807.40 ($4.8 million at the 6.7986 conversion rate) out of the Danish Treasury.

For example, one of the Authorized Representatives executed on behalf of Defendant 2321 Capital a "Special Power of Attorney" dated March 26, 2013, that granted to non-party Acupay authority "to pursue and file for reductions in rates of tax withholding in [the plan's] name for which [the plan is] eligible, to oversee this process, and to collect refunds of excess withholding tax to which [the plan is] entitled on [the plan's] behalf.  The Authorized Representative described himself as the "authorised signer" of Defendant 2321 Capital.

*       *       *

Each entity claiming a withholding tax refund submitted to SKAT a "credit advice," "income advice," "tax voucher" or similar document from a Broker-Custodian that purported to show the claimant's ownership of shares in Danish companies listed on the OMX Copenhagen 20 Index.

By way of example, with respect to Defending 2321 Capital, one example of a "Dividend Credit Advice":

a.  is made out by Solo Capital Partners LLP;

b.  is dated August 13, 2014;

c.  purports to certify the plan's ownership of 3,340,952 shares in TDC A/S (a genuine company), whose shares were (and are) publicly traded on the OMX Copenhagen 20 Index in Denmark; and

d.  states an International Securities Identification Number ("ISIN" for TDC A/S shares as "DK0060228559".  An ISIN is a twelve-character alpha-numeric code that uniquely identifies securities for trading and settlement purposes.

Defendant 2321 Capital never owned the shares described above, never received any dividends from Danish companies in which it was a purported shareholder and was not entitled to claim a refund of dividend withholding tax.

24.    Defendant McGee's legal and criminal exposure was required to be disclosed by SEC regulations and by omitting the information, made Defendants' statements about AdaptHealth's past and future revenue growth (both organic and by acquisition) and the "seasoned management" that McGee had led false and misleading.  By failing to disclose McGee's legal and criminal exposure, Defendants withheld from investors information important to the valuation of AdaptHealth's securities and to Defendants' statements and violated Regulation S-K, Item 401.

**C.     Defendants Manipulate AdaptHealth's "Organic Growth" Metric to Conceal Its Slowing Business**

25.     As AdaptHealth emerged as a new public company, its message to investors was clear: the Company would continue to grow its revenues through successful acquisitions of new companies *and* through organic revenue growth from its existing businesses.  From the start of the Class Period through Q3 2020, AdaptHealth provided an organic revenue growth metric that was standard within the Company's industry and throughout corporate finance, in which revenue growth from recent acquisitions is specifically excluded from the calculation.  AdaptHealth's organic revenue growth metric was consistent with the following common description:

> What Is Organic Growth?
>
> Organic growth is the growth a company achieves by increasing output and enhancing sales internally.  ***This does not include profits or growth attributable to mergers and acquisitions but rather an increase in sales and expansion through the company's own resources.*** [12]

26.     During the Class Period, AdaptHealth consistently differentiated "internal" organic revenue growth from "external" inorganic revenue growth attributable to recent acquisitions.  Defendants highlighted this distinction on several occasions early in the Class Period.  For example, on the Q4 2019 earnings call in February 2020, Defendants explained that the Company's total revenue growth projection of 20% for FY 2020 was a ***"combination"*** of projected *organic* revenue growth of 6-8% *and* revenue growth attributable to *recent acquisitions*:

> I think we're very comfortable and we're previously out there saying, we think ***we can grow the business on a long-term basis at 20% plus per year.***  As you said, ***it's a combination of organic growth,*** we saw for 2019 organic growth full year at the top end of our previously disclosed guidance of 6% to 8%.  We are optimistic that we'll stay within that range if not exceed it for 2020.  ***We also have the benefit in 2020 of getting the full-year impact of acquisitions that we did.  We're busy this year, we did 18 deals throughout the whole year*** and so as we get the full-year

---

[12]  James, Chen, *What is Organic Growth?*, Investopedia, (Apr. 30, 2021), https://www.investopedia.com/terms/o/organicgrowth.asp.

impact, we're coming in and getting the benefit of that throughout 2020, but I think ***we're very comfortable that we can do that 20% top line . . . .***

27.     Defendants represented organic growth in this manner throughout the Class Period. Like AdaptHealth's Q4 2019 earnings call, a July 2020 investor presentation distinguished between organic revenue growth ***and*** M&A growth – *i.e.*, revenue growth from acquisitions – as two separate "growth levers" of the Company's 20% annual revenue growth target:



28.     Defendants reiterated the same concept in early 2021, reiterating in public documents that AdaptHealth could achieve approximately 20% top line growth – "with organic growth between 6% and 8% and the balance from acquisitions":

- "Our target for ***organic growth*** is in the 8% to 10% range. We think that we can nearly double that again with ***M&A growth***. And so this is a mid- to high teens, maybe low 20% growth story."

- ***"We believe we can grow top line by approximately 20% each year with organic growth of between 6% and 8% and the balance from acquisitions."***

29.     From the start of the Class Period through Q3 2020, AdaptHealth's public disclosures were clear that organic revenue growth excluded revenue growth attributable to any recent acquisitions.  The chart below reflects AdaptHealth's reported organic revenue growth in each period and the corresponding descriptions from quarterly earnings calls:

| | FY 2019 | Q2 2020 | Q3 2020 |
|---|---|---|---|
| Total Revenue Growth (excluding B2B) | $          184.3 | $          79.6 | $          147.9 |
| Less: Revenue Growth From Acquisitions | $        (156.3) | $        (77.0) | $        (146.2) |
| Organic Revenue Growth | $            28.0 | $            2.6 | $              1.7 |
| % Organic Revenue Growth | 8.1% | 2.1% | 1.2% |
| | | | |
| Company's Disclosure of Organic Revenue Growth on Quarterly Earnings Call | "we saw for 2019 organic growth full year at the top end of our previously disclosed guidance of 6% to 8%" | "...for the quarter... the organic growth was a couple of percent -- 2%" | "The organic growth for the third quarter was a little over a point [1%]" |

30.     By the time AdaptHealth released its Q4 2020 earnings on March 4, 2021, however, Defendants faced a dilemma: the Company's organic revenue growth, which Defendants had been emphasizing since the start of the Class Period, had stalled.  Defendants knew that if they disclosed this truth, investors would call into question the Company's long-term growth prospects. Defendants' solution? They decided to change the organic revenue growth metric to which investors had become accustomed and engineer a brand new "pro forma" growth metric that, for the first time, incorporated revenue from recent acquisitions.[13]  This sudden change inflated reported organic revenue growth and kept AdaptHealth's long-term growth story intact.

---

[13]   Defendants' new metric measured "Pro forma net revenue" which measured revenue growth "*as if* acquired companies were owned by the Company" in the prior year.  Defendants then labeled this "pro forma" revenue metric as "organic revenue," by claiming that the metric showed, hypothetically, how much the Company's *organic* revenue *would have* grown *if* the Company had owned these newly acquired businesses in the prior year.  This hypothetical growth analysis was materially different than the calculation to derive organic revenue growth utilized by the Company historically, as well as the calculation commonly used by other companies in AdaptHealth's industry and throughout the corporate finance world (*i.e.*, *organic* revenue growth excludes revenue growth attributable to recent acquisitions).

31.     Beginning in Q4 2020, Defendants misleadingly referred to this new metric as "Organic Revenue Growth."   Defendants buried in a footnote in AdaptHealth's Financial Supplement for Q4 2020 the calculation for a "Pro Forma Growth" number, stating that "[o]rganic growth as shown is defined as current period net revenue plus current period acquisition revenue divided by prior period net revenue plus prior period revenue for acquisition revenue" but made no mention of the fact that they were changing how the Company historically measured its organic growth.  Other than the calculation of this "pro forma" growth metric, investors were left in the dark as to: (i) the fact that organic revenue growth metric had been replaced with a new "pro forma" growth metric; (ii) the underlying calculation behind the new "pro forma" revenue growth metric; and (iii)  the Company's actual organic revenue growth as measured by the predecessor organic growth metric.

32.     Defendants did not disclose that they had meaningfully changed the organic revenue growth metric, and that the new metric was not comparable to what the Company had reported previously.  In fact, as part of the undisclosed "switch", Defendants **_retroactively_** changed its prior organic revenue growth figures.  The chart below compares the Company's historical organic revenue growth disclosures from earning calls for full year ("FY") 2019 through Q3 2020 to the updated disclosure provided by the Company in Q4 2020, which was based on the new "pro forma" revenue growth metric.  For each of the prior periods, Defendants retroactively increased reported organic revenue growth significantly:

| | FY 2019 | Q1 2020 | Q2 2020 | Q3 2020 |
|---|---|---|---|---|
| Original Disclosure of Organic Revenue Growth on Quarterly Earnings Call | "we saw for 2019 organic growth full year at the top end of our previously disclosed guidance of **6% to 8%**" | "For the quarter, organic growth was at the high end of our previous guidance of **6% to 8%**." | "...for the quarter... the organic growth was a couple of percent -- **2%**" | "The organic growth for the third quarter was a little over a point [**1%**]" |
| Retroactive Revision of Organic Revenue Growth at Q4 2020 Based on New "Pro-Forma" Growth Calculation | **9.3%** | **9.5%** | **5.5%** | **3.2%** |

33.     Armed with a newly engineered metric designed to inflate reported organic revenue growth, Defendants did just that.  In the Company's Q4 2020 and Q1 2021 earnings calls and SEC filings, Defendants misrepresented and concealed *declining* organic revenue and instead highlighted "better than expected" organic revenue growth.  Defendants then used the inflated revenue to keep the long-term growth story intact – promising investors continued organic revenue growth of 8-10%.

**D.     Investors Learn the Truth**

**1.     AdaptHealth Discloses that Denmark Has Charged Defendant McGee with Tax Fraud and that the Company Is Placing Him on Unpaid Leave**

34.     On April 13, 2021, just after the market opened, AdaptHealth issued a press release over the Business Wire with the headline "AdaptHealth Corp.'s Board of Directors' Statement on Co-Chief Executive Officer Luke McGee."  The release revealed that the Kingdom of Denmark had formally charged Defendant McGee with tax fraud, emphasized that "[t]he alleged personal conduct occurred between March 2014 and August 2015 and had no connection to AdaptHealth's business," and stated that AdaptHealth had placed McGee "on unpaid leave from his roles as Co-CEO and a Director of the Company while this matter is pending."

35.     The market was surprised and reacted harshly to the news.  The Company's stock price dropped $7.30 per share (19.7%) in a single day of trading.  Analysts were caught off guard, noting that they were "disappointed in hearing [the] announcement" and that it was "hard to handicap if this news will impact the company's ability to close future M&A transactions."  Either

way, as one analyst described it, McGee was a "driving force behind the company's growth and the potential that this temporary leave becomes permanent is a clear negative for the company."

> **2.** ***Jehoshaphat* Research Issues a Report Revealing the Relevant Truth Regarding AdaptHealth's Decline in Organic Growth**

36. Then, on July 19, 2021, before the market opened, *Jehoshaphat* published a report alleging that AdaptHealth's organic revenue growth had stalled, and had started to significantly decline. The report revealed that AdaptHealth had intentionally inflated and obscured its organic revenue growth figures in Q4 2020 and Q1 2021 by changing the calculation it used to derive the metric to include revenue growth attributable to recent acquisitions. Specifically, the report stated that:

> While management claims (and consensus estimates reflect) an organic growth trajectory of 8-10%, AHCO is in fact experiencing double-digit organic decline.
>
> \*        \*        \*
>
> • AHCO claims on its earnings calls that it had 6% organic growth in FY20 and that this accelerated to 12% in Q121. The Street accepts this characterization fully, and projects 8%+ organic growth going forward. But nowhere does management provide investors with numeric inputs for these numbers.
>
> \*        \*        \*
>
> • AHCO recently took highly unusual steps to make it harder for investors to see organic growth. Some of these include:
>
>> • Failing to disclose contributions from all acquisitions on a quarterly basis (even meaningful ones)
>>
>> • Offering its own organic growth "estimate" with no quantitative inputs available and confusing wording
>>
>> • Changing organic growth calculations without disclosure
>>
>> • Retroactively changing the organic number without disclosing such change
>>
>> • Removing certain inorganic contribution disclosures from one SEC filing to the next, etc.

- 21 -

37.     Following the release of the *Jehoshaphat* Report, AdaptHealth's stock price fell $1.51 per share, or 5.93%, to close at $23.96 per share on July 19, 2021.

38.     Pressed by analysts and investors regarding the Company's actual organic growth trends, Defendants acknowledged during AdaptHealth's next earnings call on August 11, 2021 the need for "increased disclosure":

> I would say we appreciate externally and we're listening . . . certainly to investors[,] to the sell side community to others on the same-store metric. We have listened and responded with increased disclosure in our public filings. I think you'll see that certainly in the most recent public filing as we closed the quarter and reported to the SEC.

39.     The public filing referenced by Defendants on the call, the Form 10-Q for Q2 2021, revealed that the Company's organic revenue growth, when calculated in line with the Company's prior disclosures and industry standards, was indeed negative for the first six months of 2021 – acquisition revenue increased $711.2 million while total net revenue increased only $695.2 million:

> [N]et revenue was $1,089.2 million and $394.0 million for the six months ended June 30, 2021 and 2020, respectively, ***an increase of $695.2 million.*** The increase in net revenue was driven primarily by ***acquisitions*** completed after January 1, 2020, which ***increased net revenue by $711.2 million***.

40.     The chart below depicts the organic revenue decline, as disclosed in the Form 10-Q, for the first and second quarters of 2021 and the first six months of 2021:

|  | Q1 2021 | Q2 2021 | 1H 2021 |
|---|---|---|---|
| Total Revenue Growth | $  290.5 | $  404.7 | $    695.2 |
| Revenue Growth From Acquisitions | $  305.9 | $  405.3 | $    711.2 |
| Organic Revenue Growth (Decline) | $  (15.4) | $    (0.6) | $    (16.0) |
| % Growth (Decline) | -8.0% | -0.3% | -4.0% |

## III.    JURISDICTION AND VENUE

41.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§77k, 77l and 77o) and §§10(b) and 20(a) of the Exchange Act (15

U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

42.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the Securities Act, and §27 of the Exchange Act.

43.     Venue is proper in this Judicial District pursuant to §22 of the Securities Act, §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). AdaptHealth is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

44.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.     PARTIES

45.     Plaintiffs, as set forth in the Certification attached as Exhibit B to the Declaration of Naumon A. Amjed in Support of Motion for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel (ECF No. 5-4), acquired AdaptHealth securities at artificially inflated prices during the Class Period, including in AdaptHealth's January 2021 Secondary Offering, and were damaged upon the revelation of the corrective disclosures alleged herein.

46.     Defendant AdaptHealth is a Delaware corporation with principal executive offices located at 220 West Germantown Pike, Suite 250, Plymouth Meeting, Pennsylvania 19462. The Company's common stock trades in an efficient market on the NASDAQ under the ticker symbol "AHCO."

47.     Defendant Luke McGee ("McGee") served as the Company's Chief Executive Officer ("CEO") following the merger until February 2021 and served as Co-CEO from February 2021 until June 2021.

48.     Defendant Stephen P. Griggs ("Griggs") served as Co-CEO from February 2021 until June 2021 and has served as the Company's CEO since June 2021.

49.     Defendant Jason Clemens ("Clemens") has served as the Company's Chief Financial Officer ("CFO") since August 2020.

50.     Defendant Frank J. Mullen ("Mullen") served as the Company's Chief Accounting Officer in December 2020.

51.     Defendant Richard Barasch ("Barasch") served as Chairman of the Board and one of the Company's Directors in December 2020.

52.     Defendant Joshua Parnes ("Parnes") served as the Company's President and one of the Company's Directors in December 2020.

53.     Defendant Alan Quasha ("Quasha") served as one of the Company's Directors in December 2020.

54.     Defendant Terence Connors ("Connors") served as one of the Company's Directors in December 2020.

55.     Defendant Dr. Susan Weaver ("Weaver") served as one of the Company's Directors in December 2020.

56.     Defendant Dale Wolf ("Wolf") served as one of the Company's Directors in December 2020.

57.     Defendant Bradley Coppens ("Coppens") served as one of the Company's Directors in December 2020.

58.     Defendant David S. Williams III ("Williams") served as one of the Company's Directors in December 2020.

59.     Defendants McGee, Griggs, and Clemens are sometimes referred to herein as the "Officer Defendants."

60.     Defendants McGee, Griggs, Clemens, Mullen, Barasch, Parnes, Quasha, Connors, Weaver, Wolf, Coppens, and Williams are sometimes referred to herein as the "Registration Statement Defendants."

61.     The Officer Defendants possessed the power and authority to control the contents of AdaptHealth's SEC filings, press releases, and other market communications.   The Officer Defendants were provided with copies of AdaptHealth's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.   Because of their positions with AdaptHealth, and their access to material information available to them but not to the public, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.   The Officer Defendants are liable for the false statements and omissions pleaded herein.

## V.      SUBSTANTIVE ALLEGATIONS

### A.      Special Purpose Acquisition Companies

62.     According to the SEC, a "SPAC" is a "special purpose acquisition company" (commonly referred to as "blank check companies") that have become a popular vehicle for various transactions, including transitioning a company from a private company to a publicly traded company.   Unlike an operating company that becomes public through a traditional IPO, however, a SPAC is a shell company when it becomes public.   It does not have an underlying operating business and does not have assets other than cash and limited investments, including the proceeds from the initial public offering ("IPO").   Instead, investors in a SPAC rely on the management team that formed the SPAC, often referred to as the sponsor(s), as the SPAC looks to acquire or combine with

an operating company.   That acquisition or combination is known as the initial business combination.

63.     The combined company following the transaction is a publicly traded company and carries on the target operating company's business.  According to the SEC, SPACs are typically priced at a nominal $10 per unit in the IPO and will trade for some time after the IPO until the initial business combination, at which point the acquired company begins trading under a new symbol.

### B.     DFB Is Created as a SPAC to Acquire a Healthcare Related Business

64.     As explained in DFB's 2018 Form 10-K filed with the SEC on March 29, 2019, AdaptHealth began as DFB, a SPAC created "for the [stated] purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses" in an industry "that complement[s] our management team's background in healthcare or healthcare related industries."  DFB's strategy was "to identify, acquire and, after our initial business combination, build, a healthcare or healthcare related business."

65.     DFB identified a number of "general criteria and guidelines" for a suitable acquisition, including, among others: (i) "Companies with Recurring and Embedded Revenue and Earnings Growth or Potential for Revenue and Earnings Growth;" and (ii) an "Experienced Management Team."  According to its SEC filings, DFB sought "to acquire one or more businesses that have achieved or have the potential for significant revenue and earnings growth through a combination of organic growth, [and] synergistic add-on acquisitions" and "one or more businesses with a complete, experienced management team that provides a platform for us to further develop the acquired business's management capabilities."

### C.     DFB Agrees to Merge with AdaptHealth

66.     On July 8, 2019, DFB announced that it had entered into a definitive agreement for its initial business combination.  In a Form 8-K filed that day, DFB explained that it had agreed to

4882-0632-7300.v1

combine with AdaptHealth and that AdaptHealth would become a partially owned subsidiary of DFB. The Form 8-K also attached a press release issued that day announcing the agreement and a "DFB/AdaptHealth Investor Presentation," which highlighted the benefits of the business combination in general and AdaptHealth's business in particular.

67. The press release announcing the business combination highlighted AdaptHealth as "[a] Leading Provider of Home Medical Equipment" and emphasized "[a] Record of Growth and Consolidation in an Expanding Industry," stating that it had successfully executed "a strategy of organic growth, accretive acquisitions, and market-leading profitability in a highly fragmented industry landscape." DFB told investors that "Adapt intends to continue to focus on increasing net revenue both organically and via accretive acquisitions and has identified a significant volume of potential acquisition opportunities it will target in late 2019 and early 2020."

68. Through the press release, investors learned that AdaptHealth had developed an HME business that had grown quite remarkably. In just three years, this business had grown net revenue 200% and adjusted EBITDA 290% and expected those figured to reach 235% and 360%, respectively, by the end of year four:

> Adapt's net revenue has grown from $174 million in 2016 to an estimated $522 million in 2019. Adjusted EBITDA has increased from $33 million in 2016 to an estimate of more than $130 million in 2019. For 2020, net revenue is expected to rise to $583 million with Adjusted EBITDA expected to increase to approximately $152 million.

69. Investors also learned that the key to this growth was a "[s]easoned Management Team and Board," which was led by Luke McGee as CEO. In fact, the press release highlighted that under McGee's leadership, "the company believes it can add in excess of $100m of acquired revenue each year" and quoted Defendant McGee to emphasize that AdaptHealth would "remain an active participant in the consolidation of our industry":

**Seasoned Management Team and Board**

   Adapt's management team is comprised of seasoned industry and financial professionals, led by Chief Executive Officer, Luke McGee, President, Josh Parnes, and Chief Financial Officer, Gregg Holst.

        *   *   *

   "We believe that in order to be successful in the evolving HME marketplace, companies must possess scale and technological expertise without sacrificing service and product diversity," said Mr. McGee. "***We expect to remain an active participant in the consolidation of our industry***, while adhering to our core principles of providing tailored healthcare products and services that empower patients to live their best lives***.***  We look forward to this next, exciting phase of our growth."

   70. The "DFB/AdaptHealth Investor Presentation" attached to the July 8, 2019 Form 8-K filing was equally complimentary and bullish about AdaptHealth's past and future growth.  It identified AdaptHealth as a "Compelling Investment Opportunity" based on a "[s]uccessful track record of growth" and the "complet[ion of] 56 acquisitions since 2012, which ha[d] contributed to ~37% revenue CAGR from 2016 to 2018" and EBITDA growth of nearly 200% during the same period.  All of this was "[l]ed by a proven, seasoned management team with extensive industry knowledge," the leader of which was Defendant McGee.  In fact, the presentation described Defendant McGee as the primary executive with acquisition related experience:

   Luke McGee

   [Chief Executive Officer]

   ● Chairman and CEO of AdaptHealth since 2012; ***built business from $7mm of revenue in first acquisition to nearly $500mm+ today***

   ● ***Led to Company's proven acquisition track record and developing a scalable platform with robust integration systems that can accommodate future growth***

   ● Prior to AdaptHealth, worked in the investment banking groups at Deutsche Bank and Merrill Lynch.

71.     Defendant McGee's experience was clearly crucial to AdaptHealth's revenue growth strategy.  Analysts, in fact, have lauded his ability to see trends and described him as the "visionary" behind AdaptHealth's growth trajectory.

**D.     DFB Issues Proxy Statement for Vote to Approve AdaptHealth Acquisition**

72.     On August 19, 2019, DFB filed a Schedule 14A Proxy Statement to enable DFB's stockholders to consider and vote on the AdaptHealth merger.  The Proxy Statement made it clear that AdaptHealth's future remained in the hands of current AdaptHealth management, explaining that "[f]ollowing the consummation of the Business Combination, the current management of AdaptHealth will become the management of DFB" and that "[n]one of [DFB's] current officers will be officers of DFB after the Closing."[14]

73.     The Proxy Statement addressed other matters of importance to investors.  Given DFB's lack of operating history, the Proxy Statement assured investors that it was not subject to any investigation by any governmental authority:

> None of the Company or the Company Subsidiaries have been charged with or received notice that it is under investigation with respect to a material violation of any applicable Law that remains unresolved as of the date hereof.

**E.     The DFB/AdaptHealth Merger Becomes Final**

74.     On November 7, 2019, DFB announced that DFB's stockholders had approved the business combination with AdaptHealth.

75.     The next day, November 8, 2019 – after the market closed and before the Company began its first day of trading under the new trading symbol AHCO – DFB announced that the transaction had closed:

---

[14]    The Proxy also announced that Richard Barasch, DFB's CEO, would become Chairman of the Board.

DFB Healthcare Acquisitions Corp. ("DFB") (NASDAQ: DFBH, DFBHU, DFBHW), a special purpose acquisition company sponsored by Deerfield Management ("Deerfield") and Richard Barasch, today announced that it has closed its business combination with AdaptHealth Holdings LLC, the third largest provider of home medical equipment ("HME") in the United States.  As previously announced, the transaction was approved at a special meeting of DFB's shareholders held on November 7, 2019.

The combined company, which has been renamed AdaptHealth Corp. ("AdaptHealth"), expects that its Class A Common Stock and public warrants will continue to list on the Nasdaq Capital Market under the new trading symbols "AHCO" and "AHCOW", respectively, starting on or about Monday, November 11, 2019.[15]

### F.   Materially False and Misleading Statements Issued During the Class Period

#### 1.   Statements Made False and Misleading by Defendants' Failure to Disclose Defendant McGee's Involvement in the Tax Scheme

76.   The November 8, 2019 press release announcing that the transaction had closed did not stop with the announcement of the transaction.  Defendants used the announcement as an opportunity to repeat many of the same statements they had made in July and August about AdaptHealth's seasoned management team, led by Defendant McGee, the industry leading business that "'Luke [McGee] and his team [had] built,'" and AdaptHealth's history of acquisitions and growth through "'accretive capital deployment,'" including the expectation that AdaptHealth will "'remain an active participant in the consolidation of [AdaptHealth's] industry.'"

AdaptHealth will continue to be led by its seasoned team of industry and financial professionals, including Chief Executive Officer, Luke McGee; President, Josh Parnes; and Chief Financial Officer, Gregg Holst.

"On behalf of the team at DFB and Deerfield, I am thrilled to announce the closing of this transaction," said Richard Barasch, who will serve as Chairman of the Board of AdaptHealth.  "Luke and his team have built one of the industry's leading

---

[15]   The Company's warrants, which also began trading under a new symbol AHCOW on November 11, 2019, were suspended from trading on December 6, 2019 after the Listing Qualifications Department determined that the Company was not in compliance with NASDAQ Listing Rule 5515(a)(4), which was a decision the Company elected not to appeal.  *See* DFB Healthcare Acquisition Corp, Form 8-K (Dec. 3, 2019).

4882-0632-7300.v1

HME providers through a combination of accretive capital deployment, high-touch customer engagement, and a scalable, purpose-built, technology-enabled operating model.  We believe AdaptHealth will continue to occupy an increasingly distinct position in the home-based healthcare value chain as the most efficient provider in the space."

"We look forward to this next, exciting phase of our growth as a public company," said Mr. McGee.  "We expect to remain an active participant in the consolidation of our industry while providing the highest level of patient care and service, with an over-arching commitment to creating value for all stakeholders."

\*       \*       \*

AdaptHealth has completed 59 acquisitions since 2012 and intends to continue to focus on increasing net revenue and profitability, both organically and via accretive acquisitions.  AdaptHealth has identified a significant volume of potential acquisition opportunities and based on the current pipeline of acquisitions, believes it can add approximately $100 million of acquired revenue each year.

77.     A week later, on November 13, 2019, AdaptHealth announced its financial results for 3Q 2019.  The release highlighted what Defendant McGee described as a "'significant increases in revenue and Adjusted EBITDA'" that he attributed to "'the successful execution of our strategy to grow organically and through accretive acquisitions.'"  He also affirmed previous expectations, stating that AdaptHealth's "'potential acquisition pipeline is more robust than it has been at any point in the last three years,'" adding that "'we are truly excited about executing on these opportunities.'"

**CEO Commentary**

Luke McGee, the Company's Chief Executive Officer, commented, "We are very pleased with AdaptHealth Holdings' year-to-date 2019 financial results, which included significant increases in revenue and Adjusted EBITDA that demonstrate the successful execution of our strategy to grow organically and through accretive acquisitions.  The third quarter of 2019 represented the best quarter in our history in terms of Net revenues, Adjusted EBITDA and Adjusted EBITDA Less Patient Equipment Capex."

"Our team has been heavily focused on acquisition integration and I am confident these efforts will be fruitful in Q4'19 and 2020.  We are affirming the Company's previously reported expectation that Adjusted EBITDA and Adjusted EBITDA Less Patient Equipment Capex for the twelve months ended December 31, 2019 will approximate $75 million and $123 million, respectively.  Our potential

acquisition pipeline is more robust than it has been at any point in the last three years, and we are truly excited about executing on these opportunities."

78.    On November 20, 2019, AdaptHealth filed a Form 8-K with the SEC explaining that it had made available on its website "a presentation relating to the Company's business and operations that, among other things, updates information concerning the Company."   That presentation made it clear that AdaptHealth's acquisition strategy, and in particular Defendant McGee's involvement in developing that strategy, was instrumental in AdaptHealth's growth:

> The 3rd Largest Provider of HME in the United States
>
> *       *       *
>
> + Successful track record of growth, accretive capital deployment, and market-leading profitability
>
> *       *       *
>
> +Proven, seasoned management team and Board of Directors
>
> *       *       *

AdaptHealth Leadership Team

> Luke McGee
>
> Chief Executive Officer
>
> ● Chairman and CEO of AdaptHealth since 2012; built business from $7mm

of revenue in first acquisition

> ●·Led the Company's proven acquisition track record and developing a

scalable platform with robust integration systems that can accommodate future

growth

> ● Prior to AdaptHealth, worked in the investment banking groups at Deutsche

Bank and Merrill Lynch.

79.    With the numerous filings relating to AdaptHealth and the many public proclamations about the success of AdaptHealth's management team in general, and Defendant McGee in

4882-0632-7300.v1

particular, Defendants failed to disclose important information – its leader, Defendant McGee, was implicated in "one of the great financial crimes in [Denmark's] history." [16] In fact, at the same time that Defendants were completing the DFB/AdaptHealth merger and highlighting Defendant McGee's success in implementing AdaptHealth's growth by acquisition strategy, as alleged in ¶¶76-78 above, Defendants concealed that: (i) the bank McGee co-owned to conduct the tax scheme, North Channel Bank, had already been criminally fined DKK 110 million for its participation in a fraud against the Danish state regarding unjustified payments of dividend tax of DKK 1.1 billion; (ii) McGee himself, along with other co-conspirators, had agreed to pay DKK 1.55 billion in proceeds from the tax scheme to the Danish tax authorities; and (iii) Denmark had filed a complaint (the Denmark Complaint) on November 19, 2019 in the United States District Court for the Southern District of New York to recover for "a fraudulent tax refund scheme that deceived SKAT into paying out over 12.7 billion Danish Kroner ("DKK"), the equivalent of approximately $2.1 billion (US) of allegedly withheld tax." By omitting these material facts, Defendants' statements alleged in ¶¶76-78 became, through their context and manner of presentation, materially false and misleading as they withheld from investors information important to the valuation of AdaptHealth's securities and to Defendants' statements and violated Regulation S-K, Item 401, such that a reasonable investor would be given a false impression of AdaptHealth's business.

80.     On February 25, 2020, AdaptHealth issued a press release entitled: "AdaptHealth Corp. Announces Fourth Quarter and Full Year 2019 Financial Results." The release reported strong financial results that Defendant McGee attributed to a record number of acquisitions and strong organic growth:

---

[16]   David Segal, *Where in the World Is Denmark's $2 Billion?*, N.Y. Times (Oct. 5, 2018).

CEO Commentary

Luke McGee, Chief Executive Officer of AdaptHealth, commented, "we are very pleased with our 2019 performance, which we believe reflects our success in deploying a scalable growth model focused on organic sales, acquisitions, accretive capital deployment, margin expansion, and cash generation.  We reported a record 2019 across key financial metrics, closed on a near record number of acquisitions, and generated strong organic top line growth."

81.     The same day, AdaptHealth held its Q4 2019 earnings call to discuss the Company's results.  During that call, Defendant McGee highlighted that AdaptHealth was poised for organic and acquisition-related growth with an acquisition pipeline that "remains robust":

Strategically, closing the merger transaction with DFB Healthcare in November 2019, and entering the public markets was an important milestone.  We are thrilled to have partnered with Deerfield Management and Richard Barasch in that transaction and appreciate their continuing support and the support of all our new shareholders.  We believe we've got the best business model in home medical equipment and are poised for exciting organic and acquisition-related growth over the next few years.

*       *       *

Our acquisition pipeline remains robust, and we expect to be active throughout 2020.  We believe we can accretively acquire an additional $100 million HME revenue in 2020 in addition to already announced transactions.  We will continue to look at opportunities to expand our product offering particularly for products that help patients with chronic diseases stay at home such as continuous glucose monitors, insulin pumps and other supply categories that were part of the PCS acquisition.

82.     On March 6, 2020, AdaptHealth filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2019 (the "2019 Form 10-K").  With respect to the Company's business strategy, the 2019 Form 10-K stated, in relevant part:

AdaptHealth's strategy is to grow its revenue while expanding margins through targeted strategies for organic growth as well as opportunistic acquisitions that take advantage of AdaptHealth's scalable, integrated technology platform.

*       *       *

- 34 -

**Acquisitions**

Continuing to grow through accretive acquisitions is a key element of AdaptHealth's growth strategy, and AdaptHealth continuously reviews its pipeline of potential acquisition candidates. AdaptHealth maintains a dedicated M&A integration team and leverages its scalable front-end and back-office technology platform to facilitate acquisition integration to help realize short-term cost saving synergies and longer-term revenue growth synergies.

\*       \*       \*

AdaptHealth's strategic plan also contemplates continued growth from future acquisitions of home medical equipment providers. AdaptHealth may face increased competition for attractive acquisition candidates, which may limit the number of acquisition opportunities available to AdaptHealth or lead to the payment of higher prices for its acquisitions. Without successful acquisitions, AdaptHealth's future growth rate could decline. In addition, AdaptHealth cannot guarantee that any future acquisitions, if consummated, will result in further growth.

83.      In Part III, AdaptHealth referred investors to its upcoming Proxy Statement for the required information relating to its executive officers:

**Item 10.  Directors, Executive Officers, and Corporate Governance**

The information required by this item will be set forth in our definitive proxy statement with respect to our 2020 annual meeting of the stockholders to be filed on or before April 29, 2020 and is incorporated herein by reference.

84.      Appended to the 2019 Form 10-K as an exhibit was a certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant McGee, attesting that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

85.      The statements alleged in ¶¶80-84 became, through their context and manner of presentation, false and misleading. By not disclosing that the bank Defendant McGee co-owned to conduct the tax scheme had already been fined criminally by the Danish authorities, and that McGee was named indirectly in the Denmark Complaint and remained under criminal investigation in Denmark, Defendants violated Regulation S-K, Item 401 and withheld from investors information

- 35 -

important to the valuation of AdaptHealth's securities and to Defendants' statements and violated

Regulation S-K, Item 401, such that a reasonable investor would be given a false impression of

AdaptHealth's business.

86.     On April 29, 2020, AdaptHealth filed its Schedule 14D Proxy Statement with the

SEC.   The Schedule listed McGee's biographical information under "PROPOSAL NO. 1 —

ELECTION OF DIRECTORS":

PROPOSAL NO. 1 — ELECTION OF DIRECTORS:

*       *       *

Luke McGee has served as the Chief Executive Officer of AdaptHealth
Holdings since 2012 and as a member of our board of directors since the Closing.
Mr. McGee joined Quadrant Management, Inc. in 2010 and holds director positions
in certain of Quadrant's portfolio companies along with executive level roles at
certain times.  Prior to joining Quadrant, Mr. McGee was in the investment banking
group at Deutsche Bank and before that Merrill Lynch.  He holds a bachelor's degree
in Economics from Duke University.

87.     The Schedule 14D identified other information related to AdaptHealth's executives,

including Defendant McGee, concerning executive compensation, executive employment

agreements, incentives, health and welfare plans, retirement plans, certain relationships and related

transactions, and beneficial ownership; but mentioned nothing about Defendant McGee's

involvement in the Denmark tax fraud, including the criminal fine imposed on the bank McGee and

his co-conspirators used to conduct the scheme, North Channel Bank, in September 2019, that

McGee and other co-conspirators had agreed to repay DKK 1.55 billion in proceeds from the scheme

to the Danish tax authorities, the fact that the entities that he created and controlled were named as

defendants in the Denmark Complaint, and that he remained under criminal investigation by the

Danish authorities.  Defendants' statements were thus, through their context and manner of

presentation, materially false and misleading as they withheld from investors information important

to the valuation of AdaptHealth's securities and to Defendants' statements and violated Regulation

4882-0632-7300.v1

S-K, Item 401, such that a reasonable investor would be given a false impression of AdaptHealth's business.

88.      On May 5, 2020, AdaptHealth issued a press release announcing the Company's Q1 2020 financial results.  McGee himself attributed "our strong first quarter performance" to "the extraordinary hard work, resilience and dedication of our outstanding AdaptHealth team" and credited management for "continuing to successfully deploy a scalable growth model," which focused among other things on acquisitions and accretive capital deployment:

> Luke McGee, Chief Executive Officer of AdaptHealth, commented, "Despite significant and sudden challenges brought on by the COVID-19 pandemic, our strong first quarter performance reflects the extraordinary hard work, resilience and dedication of our outstanding AdaptHealth team.  Due in large measure to their efforts, we are continuing to successfully deploy a scalable growth model focused on organic sales, acquisitions, accretive capital deployment, margin expansion, and cash generation.

89.      The same day, AdaptHealth held its Q1 2020 earnings call to discuss the Company's results.  During that call, Defendant McGee highlighted the importance of the Company's acquisitions, stating that they were continuing to "look for opportunities to expand" through acquisitions and that AdaptHealth maintained a "strong pipeline of acquisition opportunities":

> Importantly, [recent acquisitions] were immediately accretive to our earnings. We will continue to look for opportunities to expand our product offerings, deepen our penetration within markets, and offer geographic expansion.  Of particular interest are companies that provide products which help chronically ill patients stay at home, such as continuous glucose monitors, insulin pumps, incontinence, and other supply categories that were part of the PCS acquisition.

> Now withstanding the continued impact and challenges of the COVID-19 pandemic, we have maintained a strong pipeline of acquisition opportunities and we will continue to pursue our M&A growth strategy for the balance of 2020.

90.      On May 8, 2020, AdaptHealth filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2020 (the "Q1 2020 Form 10-Q").  The Company purported to describe legal proceedings, including investigations, claims, lawsuits and other proceedings, as follows:

- 37 -

AdaptHealth is involved in investigations, claims, lawsuits and other proceedings arising in the ordinary course of its business. These matters involve personnel and employment issues, regulatory matters, personal injury, contract and other proceedings arising in the ordinary course of business, which have not resulted in any material losses to date. Although AdaptHealth does not expect the outcome of these proceedings will have a material adverse effect on its financial condition or results of operations, such matters are inherently unpredictable. Therefore, AdaptHealth could incur judgments or enter into settlements or claims that could materially impact its financial condition or results of operations.

In addition, on July 25, 2017, AdaptHealth Holdings was served with a subpoena by the U.S. Attorney's Office for the United States District Court for the Eastern District of Pennsylvania ("EDPA") pursuant to 18 U.S.C. §3486 to produce certain audit records and internal communications regarding ventilator billing. The investigation appears to be focused on billing practices regarding one payor that contracted for bundled payments for certain ventilators. AdaptHealth Holdings has cooperated with investigators and, through agreement with the EDPA, has submitted all information requested. An independent third party was retained by AdaptHealth Holdings that identified overpayments and underpayments for ventilator billings related to the payor, and a remittance was sent to reconcile that account. AdaptHealth Holdings has cooperated and fully complied with the subpoena. On October 3, 2019, AdaptHealth received a follow-up civil investigative demand from the EDPA regarding a document previously produced to the EDPA and patients included in the review by the independent third party. AdaptHealth has responded to the EDPA and supplemented its production as requested. At this time, AdaptHealth Holdings cannot provide any assurance as to whether the EDPA will seek additional information or pursue this matter further.

91.     Appended to the Q1 2020 Form 10-Q as an exhibit was a certification pursuant to SOX signed by Defendant McGee, attesting that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

92.     The statements alleged in ¶¶86-91 were, through their context and manner of presentation, false and misleading. By not disclosing that the bank Defendant McGee co-owned to conduct the tax scheme had already been fined criminally by the Danish authorities, and that McGee was named indirectly in the Denmark Complaint and remained under criminal investigation in Denmark, Defendants withheld from investors information important to the valuation of

- 38 -

AdaptHealth's securities and to Defendants' statements and violated Regulation S-K, Item 401, such that a reasonable investor would be given a false impression of AdaptHealth's business.

93.     On August 4, 2020, AdaptHealth issued a press release entitled: "AdaptHealth Corp. Announces Second Quarter 2020 Financial Results."  The release reported "strong year-to-date 2020 performance" that Defendant McGee attributed to organic sales, acquisitions, and accretive capital deployment:

> Luke McGee, Chief Executive Officer of AdaptHealth, commented, "Our strong year-to-date 2020 performance reflects the extraordinary hard work, resilience and dedication of our outstanding AdaptHealth team and their support of our patients and healthcare partners.  We are continuing to successfully deploy a scalable growth model focused on organic sales, acquisitions, accretive capital deployment, and cash generation.

94.     The same day, AdaptHealth held its Q2 2020 earnings call to discuss the Company's results.  During that call, Defendant McGee emphasized that "identifying attractive acquisition candidates" was important in helping further the Company's strategic long-term goals:

> We had an extraordinarily busy and productive second quarter.  Our core business performed well, and we were active in identifying attractive acquisition candidates to help further our strategic long-term goals.  As previously announced, we closed to strategically important acquisitions on July 1, 2020, Solara medical supplies and ActivStyle Inc Solara is a leading independent distributor of continuous glucose monitors in the U.S.  This is a transformative transaction that will establish AdaptHealth as a leader in the fast-growing diabetes management business.

95.     On August 7, 2020, AdaptHealth filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2020 (the "Q2 2020 Form 10-Q").  The Q2 2020 Form 10-Q stated, in relevant part:

> ***Our ability to successfully operate our business is largely dependent upon the efforts of certain key personnel of AdaptHealth, including the key personnel of AdaptHealth who have stayed with us following the Business Combination.  The loss of such key personnel could negatively impact our operations and financial results.***  (Emphasis in original)

96.     The Company also purported to describe legal proceedings, including investigations, claims, lawsuits and other proceedings, as follows:

AdaptHealth is involved in investigations, claims, lawsuits and other proceedings arising in the ordinary course of its business. These matters involve personnel and employment issues, regulatory matters, personal injury, contract and other proceedings arising in the ordinary course of business, which have not resulted in any material losses to date. Although AdaptHealth does not expect the outcome of these proceedings will have a material adverse effect on its financial condition or results of operations, such matters are inherently unpredictable. Therefore, AdaptHealth could incur judgments or enter into settlements or claims that could materially impact its financial condition or results of operations.

In addition, on July 25, 2017, AdaptHealth Holdings was served with a subpoena by the U.S. Attorney's Office for the United States District Court for the Eastern District of Pennsylvania ("EDPA") pursuant to 18 U.S.C. §3486 to produce certain audit records and internal communications regarding ventilator billing. The investigation appears to be focused on billing practices regarding one payor that contracted for bundled payments for certain ventilators. AdaptHealth Holdings has cooperated with investigators and, through agreement with the EDPA, has submitted all information requested. An independent third party was retained by AdaptHealth Holdings that identified overpayments and underpayments for ventilator billings related to the payor, and a remittance was sent to reconcile that account. AdaptHealth Holdings has cooperated and fully complied with the subpoena. On October 3, 2019, AdaptHealth received a follow-up civil investigative demand from the EDPA regarding a document previously produced to the EDPA and patients included in the review by the independent third party. AdaptHealth has responded to the EDPA and supplemented its production as requested. At this time, AdaptHealth Holdings cannot provide any assurance as to whether the EDPA will seek additional information or pursue this matter further.

97.     Appended to the Q2 2020 Form 10-Q as an exhibit was a certification pursuant to SOX signed by Defendant McGee, attesting that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

98.     The statements alleged in ¶¶93-97 were, through their context and manner of presentation, false and misleading. By not disclosing that the bank Defendant McGee co-owned to conduct the tax scheme had already been fined criminally by the Danish authorities, and that McGee was named indirectly in the Denmark Complaint and remained under criminal investigation in Denmark, Defendants withheld from investors information important to the valuation of

AdaptHealth's securities and to Defendants' statements and violated Regulation S-K, Item 401, such

that a reasonable investor would be given a false impression of AdaptHealth's business.

99.     On November 4, 2020, AdaptHealth issued a press release entitled: "AdaptHealth

Corp. Announces Third Quarter 2020 Financial Results." The release reported "strong year-to-date

financial performance" that Defendant McGee attributed primarily to recent acquisitions:

CEO Commentary

> Luke McGee, Chief Executive Officer of AdaptHealth, commented, "Our strong year-to-date financial performance and improved outlook for the remainder of 2020 reflects the tremendous efforts of our employees and their dedication to our patients and healthcare partners. We have remained opportunistic throughout the quarter, acquiring several diabetes management and home medical equipment businesses in high-growth areas. Additionally, on October 1, 2020, we acquired Pinnacle Medical Solutions, a leading distributor of medical devices and supplies to patients for the treatment of diabetes, including continuous glucose monitors and insulin pumps.

100.    The same day, AdaptHealth held its Q3 2020 earnings call to discuss the Company's

results. During that call, Defendant McGee highlighted that AdaptHealth had accelerated its growth

through acquisitions:

> We ended 2019 as a fast-growing and profitable home medical equipment company with a small medical supplies business. With acquisitions in 2020, we have not only accelerated the growth of our home medical equipment business but, importantly, have added a large and growing supplies business with a concentration in advanced diabetes supplies and management.

> We continue to be active acquirers of traditional HME businesses in the third quarter. When we acquired the HME assets of Advanced Home Care and Healthline Medical in March, we noted that there would be merit to adding additional density in the Southeast and Southwest. To that end, we acquired Family Medical, a $40 million revenue HME in Eastern North Carolina in mid-August and closed on another acquisition in Texas in early October. These additions add important scale in high-growth geographies. We also made several smaller HME acquisitions in the Mid-Atlantic, Midwest and New England during the quarter. We are excited about the key operational leadership from these acquired companies and have retained many as leaders within AdaptHealth.

101.     On November 6, 2020, AdaptHealth filed a Quarterly Report on Form 10-Q with the

SEC, reporting the Company's financial and operating results for the quarter ended September 30,

2020 (the "Q3 2020 Form 10-Q").  The Q3 2020 Form 10-Q stated, in relevant part:

> *Our ability to successfully operate our business is largely dependent upon the efforts of certain key personnel of AdaptHealth, including the key personnel of AdaptHealth who have stayed with us following the Business Combination.  The loss of such key personnel could negatively impact our operations and financial results.*  (Emphasis in original).

102.     The Company again purported to describe legal proceedings, including investigations,

claims, lawsuits and other proceedings, as follows:

> AdaptHealth is involved in investigations, claims, lawsuits and other proceedings arising in the ordinary course of its business.  These matters involve personnel and employment issues, regulatory matters, personal injury, contract and other proceedings arising in the ordinary course of business, which have not resulted in any material losses to date.  Although AdaptHealth does not expect the outcome of these proceedings will have a material adverse effect on its financial condition or results of operations, such matters are inherently unpredictable.  Therefore, AdaptHealth could incur judgments or enter into settlements or claims that could materially impact its financial condition or results of operations.
>
> In addition, on July 25, 2017, AdaptHealth Holdings was served with a subpoena by the U.S. Attorney's Office for the United States District Court for the Eastern District of Pennsylvania ("EDPA") pursuant to 18 U.S.C. §3486 to produce certain audit records and internal communications regarding ventilator billing.  The investigation appears to be focused on billing practices regarding one payor that contracted for bundled payments for certain ventilators.  AdaptHealth Holdings has cooperated with investigators and, through agreement with the EDPA, has submitted all information requested.  An independent third party was retained by AdaptHealth Holdings that identified overpayments and underpayments for ventilator billings related to the payor, and a remittance was sent to reconcile that account.  AdaptHealth Holdings has cooperated and fully complied with the subpoena.  On October 3, 2019, AdaptHealth received a follow-up civil investigative demand from the EDPA regarding a document previously produced to the EDPA and patients included in the review by the independent third party.  AdaptHealth has responded to the EDPA and supplemented its production as requested.  At this time, AdaptHealth Holdings cannot provide any assurance as to whether the EDPA will seek additional information or pursue this matter further.

103.     Appended to the Q3 2020 Form 10-Q as an exhibit was a certification pursuant to

SOX signed by Defendant McGee, attesting that "this report does not contain any untrue statement

of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

104.    The statements alleged in ¶¶99-103 were, through context and manner of presentation, false and misleading.  By not disclosing that the bank Defendant McGee co-owned to conduct the tax scheme had already been fined criminally by the Danish authorities, and that McGee was named indirectly in the Denmark Complaint and remained under criminal investigation in Denmark, Defendants withheld from investors information important to the valuation of AdaptHealth's securities and to Defendants' statements and violated Regulation S-K, Item 401, such that a reasonable investor would be given a false impression of AdaptHealth's business.

105.    AdaptHealth conducted a Secondary Offering on January 5, 2021, issuing 7.25 million shares of the Company's common stock to the public at the Offering price of $33.00 per share.  The Secondary Offering took place pursuant to a Form S-3 filed with the SEC on December 18, 2020 (the "Registration Statement") and the Prospectus on Form 424B5 filed with the SEC on January 4, 2021, which incorporated and formed part of the Registration Statement (the Prospectus together with the Registration Statement are the "Offering Documents").  The Prospectus highlighted the importance of management in general and its M&A activity in particular:

**Management**

> We are led by a proven management team with experience in the HME industry across a variety of healthcare organizations.  We have a centralized approach for key business processes, including M&A activity, revenue cycle management, strategic purchases, payor contracting, finance, compliance, legal, human resources, IT and sales management. . . .

> Following the closing of the AeroCare Acquisition, Stephen Griggs will join Luke McGee as co-Chief Executive Officer of AdaptHealth.

*     *     *

Proven M&A success: Our integrated technology platform includes scalable and centralized front-end and back office processes that facilitate the effective onboarding of potential acquisitions and help achieve cost synergies. We have demonstrated our ability to execute upon acquisitions, completing 86 transactions from our date of founding through December 31, 2020. As we continue to grow, we expect to deploy incrementally more capital and integrate substantially larger targets over time, which in turn we expect will be a source of continued growth for us.

Experienced management team: We are led by a proven management team with significant experience in the HME and healthcare services industries. The team has domain knowledge within the industry having been employed at various healthcare organizations throughout their careers. Multiple members of the management team have also built independent HME companies and have the proven ability to scale a business within the HME industry. Additionally, several members of the management team have experience within their specific roles in both private and public company settings. Given the complexity of the highly regulated industry in which we operate, we believe that management's experience is a meaningful differentiator relative to our competitors.

\*       \*       \*

Grow through acquisitions: The HME industry is highly fragmented, with more than 6,000 unique suppliers. We believe that ongoing reimbursement changes will continue the consolidation trend in the HME industry that has accelerated in recent years. We believe that, in the current environment, companies with the ability to scale operations possess competitive advantages that can drive volume to their platforms. As one of a limited number of national HME companies, we plan to continue to evaluate acquisitions and execute upon attractive opportunities to help drive growth.

106.   The Prospectus also contained a risk factor section and, in particular, described "Risks Relating to the Offering and Our Class A Common Stock," including unspecified litigation, unidentified management changes, and the possibility of losing unidentified key personnel:

Factors affecting the trading price of our Class A Common Stock may include:

\*       \*       \*

- commencement of, or involvement in, litigation involving us;

\*       \*       \*

- any major change in our board of directors or management.

\*       \*       \*

- 44 -

***Our ability to successfully operate our business is largely dependent upon the efforts of certain key personnel of AdaptHealth, including the key personnel of AdaptHealth who have stayed with us following the Business Combination. The loss of such key personnel could negatively impact our operations and financial results.*** (Emphasis in original)

Our ability to successfully operate our business is dependent upon the efforts of certain key personnel of AdaptHealth. It is possible that AdaptHealth will lose some key personnel, the loss of which could negatively impact our operations and profitability.

107. The statements alleged in ¶¶105-106 were, through their context and manner of presentation, false and misleading. By not disclosing that the bank Defendant McGee co-owned to conduct the tax scheme had already been fined criminally by the Danish authorities, and that McGee was named indirectly in the Denmark Complaint and remained under criminal investigation in Denmark, Defendants violated Regulation S-K, Item 401 and withheld from investors information important to the valuation of AdaptHealth's securities and to Defendants' statements and violated Regulation S-K, Item 401, such that a reasonable investor would be given a false impression of AdaptHealth's business.

108. On March 4, 2021, AdaptHealth issued a press release entitled: "AdaptHealth Corp. Announces Fourth Quarter and Full Year 2020 Financial Results." In the release, McGee credited "our continued investment in accretive acquisitions" for the Company's performance:

CEO Commentary

Luke McGee, Co-CEO of AdaptHealth, commented, "We are very pleased with our 2020 performance, which we believe is a testament to our relentless focus on our patients and referral sources and our ability to drive growth through process improvements and technology solutions. In the fourth quarter, our diabetes business drove substantial growth as the result of high ordering patterns in December and our continued investment in accretive acquisitions. We are increasing guidance for 2021 as a result of these acquisitions as well as from our prospects for organic growth in 2021.

109.    The same day, AdaptHealth held its Q4 2020 earnings call to discuss the Company's results.  During that call, Defendant McGee highlighted that AdaptHealth had accelerated its growth through acquisitions:

> We continue to grow our business with accretive acquisitions through the year, including the transformational acquisition of AeroCare that closed on February 1, 2021.  In total, we acquired 22 companies in 2020.
>
> As we've demonstrated over the past several years, our team has the ability to integrate acquisitions into a cohesive and comprehensive platform to deliver health care in the home.  The acquisition of AeroCare will only enhance and accelerate our goals here.  Our management teams have shared a common view of success for a long time, a business that is powered by technology, connectivity and ease of doing business with our referring providers, efficient logistics and turnaround times, and patient satisfaction with our products and services.  We continue to invest in these important areas, and the team will talk about progress in our prepared remarks.
>
> Following the AeroCare closing, we remain focused on strengthening our geographic footprint, product mix and patient access through strategic and accretive acquisitions.  In late February, we closed on the acquisition of Allina Health Home Oxygen & Medical Equipment in Minneapolis.  And earlier this week, we closed on 2 other acquisitions, further complementing our existing HME businesses in the Midwest and Southern California.

110.    On March 16, 2021, AdaptHealth filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2020 (the " 2020 Form 10-K").  The 2020 Form 10-K stated, in relevant part:

> ***Our ability to successfully operate our business is largely dependent upon the efforts of certain key personnel of AdaptHealth, including senior management. The loss of such key personnel could negatively impact our operations and financial results.***  (Emphasis in original)

111.    In Part III, AdaptHealth referred investors to its upcoming Proxy Statement for the required information relating to its executive officers:

### Item 10.  Directors, Executive Officers, and Corporate Governance

> The information required by this item will be set forth in our definitive proxy statement with respect to our 2021 annual meeting of the stockholders to be filed on or before April 30, 2021 and is incorporated herein by reference.

112.    The Company again purported to describe legal proceedings, including investigations,

claims, lawsuits and other proceedings, as follows:

AdaptHealth is involved in investigations, claims, lawsuits and other proceedings arising in the ordinary course of its business. These matters involve patient complaints, personnel and employment issues, regulatory matters, personal injury, contract and other proceedings arising in the ordinary course of business, which have not resulted in any material losses to date. Although AdaptHealth does not expect the outcome of these proceedings will have a material adverse effect on its financial condition or results of operations, such matters are inherently unpredictable. Therefore, AdaptHealth could incur judgments or enter into settlements or claims that could materially impact its financial condition or results of operations.

For example, on July 25, 2017, AdaptHealth Holdings was served with a subpoena by the U.S. Attorney's Office for the United States District Court for the Eastern District of Pennsylvania ("EDPA") pursuant to 18 U.S.C. §3486 to produce certain audit records and internal communications regarding ventilator billing. The investigation appears to be focused on billing practices regarding one payor that contracted for bundled payments for certain ventilators. AdaptHealth Holdings has cooperated with investigators and, through agreement with the EDPA, has submitted all information requested. An independent third party was retained by AdaptHealth Holdings that identified overpayments and underpayments for ventilator billings related to the payor, and a remittance was sent to reconcile that account. AdaptHealth Holdings has cooperated and fully complied with the subpoena. On October 3, 2019 AdaptHealth received a follow-up civil investigative demand from the EDPA regarding a document previously produced to the EDPA and patients included in the review by the independent third party. AdaptHealth has responded to the EDPA and supplemented its production as requested. On November 9, 2020, the EDPA indicated to the Company that the investigation remained ongoing. The EDPA also requested additional information regarding certain patient services and claims refunds processed by AdaptHealth in 2017. The Company is compiling this information in coordination with the EDPA. While AdaptHealth cannot provide any assurance as to whether the EDPA will seek additional information or pursue this matter further, it does not believe that the investigation will have a material adverse effect on the Company.

Additionally, in March 2019, prior to its acquisition by AdaptHealth, AeroCare was served with a civil investigative demand ("CID") issued by the United States Attorney for the Western District of Kentucky ("WDKY") The CID seeks to investigate allegations that AeroCare improperly billed, or caused others to improperly bill, for oxygen tank contents that were not delivered to beneficiaries. The WDKY has requested documents related to such oxygen tank content billing as well as other categories of information. AeroCare has cooperated with the WDKY and has produced documents and provided explanations of its billing practices. In September 2020, the WDKY indicated the investigation includes alleged violations of the federal False Claims Act and as well as alleged violations of state Medicaid false claims acts in ten states. AeroCare has cooperated fully with the investigation

- 47 -

and has indicated to the WDKY that concerns raised do not accurately identify Medicare coverage criteria and that state Medicaid coverage requirements generally do not provide for separate reimbursement for portable gaseous oxygen contents in the circumstances at issue**.** While AdaptHealth cannot provide any assurance as to whether the WDKY will seek additional information or pursue this matter further, it does not believe that the investigation will have a material adverse effect on AdaptHealth.

113.    Appended to the 2020 Form 10-K as an exhibit was a certification pursuant to SOX signed by Defendant McGee, attesting that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

114.    The statements alleged in ¶¶108-113 were, through their context and manner of presentation, false and misleading.  By not disclosing that the bank Defendant McGee co-owned to conduct the tax scheme had already been fined criminally by the Danish authorities, and that McGee was named indirectly in the Denmark Complaint and remained under criminal investigation in Denmark, Defendants violated Regulation S-K, Item 401 and withheld from investors information important to the valuation of AdaptHealth's securities and to Defendants' statements and violated Regulation S-K, Item 401, such that a reasonable investor would be given a false impression of AdaptHealth's business.

### 2.    Materially False and Misleading Statements and Omissions Regarding Organic Revenue Growth

115.    As detailed herein, Defendants materially misrepresented and concealed AdaptHealth's actual organic revenue growth trend by changing the organic growth metric in Q4 2020 while failing to disclose to investors: (i) the fact the organic revenue growth metric had been replaced with a new "pro forma" revenue growth metric; (ii) the underlying calculation behind the new "pro forma" revenue growth metric; and (iii) the Company's actual organic revenue growth as

measured by the predecessor organic revenue growth metric.  Defendants' materially misleading

statements and omissions regarding organic revenue growth are set forth below.

116.     On March 4, 2021, AdaptHealth hosted an earnings call with investors and analysts to

discuss the Company's Q4 and FY 2020 results (the "Q4 2020 Earnings Call").  During the call,

Defendant Clemens stated, in relevant part:

> To emphasize all of the trends above and as detailed on the slide in our Q4
> 2020 earnings supplement, our organic growth for full year 2020 was 8.6% when
> including the COVID B2B business and 5.6% when excluding B2B.  For the fourth
> quarter, organic growth was 5.7% when compared to the fourth quarter of 2019,
> including the COVID B2B business and 4.9% when excluding B2B.
>
> With our PAP census rebuilding after the depressed new starts in midyear,
> increase in oxygen business in Q4, continued market expansion in CGM, we remain
> confident in our organic growth prospects between 8% and 10% for 2021.

117.     Later, during the scripted portion of the Q4 2020 Earnings Call, Defendant McGee

stated: "[W]e will continue to find ways to drive organic growth."

118.     In response to an analyst question regarding the Company's revenue guidance,

Defendant Clemens stated, in relevant part:

> So on the revenue side . . . we increased the organic growth in the revenue guide
> when we came out with the Aero announcement in late 2020**.** So no real change
> there, just kind of confirming evidence that we feel rock-solid about our organic
> growth.

119.     The earnings call supplement included the following slide which purported to

describe "Consistent Strength in . . . Organic Revenue Growth":



120.    On March 16, 2021, AdaptHealth filed an Annual Report on Form 10-K with the

SEC, reporting the Company's financial and operating results for the year ended December 31, 2020

(the "2020 Form 10-K").  With respect to revenue growth, the 2020 Form 10-K stated, in relevant

part:

> *Net Revenue.*  Net revenue for the year ended December 31, 2020 was $1.06
> billion compared to $529.6 million for the year ended December 31, 2019, an
> increase of $526.7 million or 99.5%.  The increase in net revenue was driven
> primarily by (i) acquisitions completed during 2020, which contributed net revenue
> of $450.2 million during the year, (ii) organic growth resulting from stronger CPAP
> resupply sales and demographic growth in core markets, and (iii) net revenue of
> $36.5 million from referral partners and healthcare facilities in support of their urgent
> needs for ventilation and oxygen equipment for COVID-19 patients.

121.    Appended to the 2020 Form 10-K as exhibits were SOX certifications as referenced,

*supra*, in ¶113, signed by Defendants McGee, Griggs, and Clemens.

122.    On May 6, 2021, AdaptHealth hosted an earnings call with investors and analysts to

discuss the Company's Q1 2021 results (the "Q1 2021 Earnings Call").  On the call, Defendants

again used their newly engineered "pro forma" growth metric to misrepresent the organic revenue

growth.  During the scripted portion of the Q1 2021 Earnings Call, Defendant Griggs stated, in

relevant part:

> Despite the ongoing effects of the pandemic on certain product lines, we're very
> pleased with our organic growth rate of 11.5%.  With the recent return of referral
> volumes in our sleep and hospital discharge business to pre-pandemic levels and
> current organic growth in diabetes and resupply, we feel confident that the balance of
> 2021 will meet our organic growth expectations.

123.    Later in the scripted portion of the Q1 2021 Earnings Call, Defendant Clemens made

the following statement about organic revenue growth:

> As detailed in our Q1 2021 earnings supplement, our organic growth for the
> quarter was very strong at 11.5%, up significantly against Q4 2020 organic growth
> and led by new starts in our diabetes product line.

124.    Later in the scripted portion of the Q1 2021 Earnings Call, Defendant Clemens

attributed the strong Q1 2021 revenue increase to organic revenue growth *and* revenue growth from

recent acquisitions, implying that revenue from acquisitions was separate and apart from the organic

revenue growth component:

> For the first quarter ending March 2021, AdaptHealth reported net revenue of $482.1
> million, an increase of 152% from the first quarter of 2020.  The substantial increase
> is a result of our company-wide focus, driving organic growth and the efficient
> integration of our 2020 and 2021 acquisitions, including the acquisition of AeroCare,
> which was completed on February 1, 2021.

125.    The  Q1  2021  Earnings  Call  supplement  included  the  following  slide,  which

Defendants referenced on the earnings call as reflecting organic revenue growth:



126.    On May 10, 2021, AdaptHealth filed a Quarterly Report on Form 10-Q with the SEC,

reporting the Company's financial and operating results for the quarter ended March 31, 2021 (the

"Q1 2021 Form 10-Q").  With respect to revenue growth, the Q1 2021 Form 10-Q stated, in relevant

part:

> *Net Revenue*.  Net revenue for the three months ended March 31, 2021 was
> $482.1 million compared to $191.4 million for the three months ended March 31,
> 2020, an increase of $290.7 million or 151.8%.  The increase in net revenue was
> driven primarily by (i) acquisitions completed during the three months ended March
> 31, 2021, which contributed net revenue of $142.6 million during the period, (ii) net
> revenue contributed by acquisitions completed after March 2020 and prior to the
> beginning of the current reporting period, and (iii) organic growth resulting from
> stronger CPAP resupply sales and demographic growth in core markets.

127.    Defendants' Class Period statements regarding organic revenue growth, set forth

above at ¶¶116-126, were materially misleading and/or omitted material information, which caused

the statements made to be materially misleading for the following reasons:

(a)    Defendants concealed the fact the Company's organic growth metric had been

replaced with a new "pro forma" growth metric.  As detailed herein, unbeknownst to investors,

Defendants abruptly changed the organic revenue growth metric in Q4 2020 to conceal the fact that

the Company's organic revenue growth had stalled and even declined.  Defendants engineered a brand new "pro forma" growth metric, that incorporated revenue from recent acquisitions, in order to inflate reported organic revenue growth and keep their long-term growth story intact.  *See* ¶¶30-33, *supra*.  The new metric was not comparable to the Company's historical organic revenue growth metric.  *Id.*

(b)     Defendants concealed and misrepresented the underlying calculation behind the new pro forma growth metric.  Other than a vague footnote describing the new metric, investors were left in the dark as to the underlying calculation behind the new "pro forma" revenue growth metric**.**  Although Defendants did not disclose the fact it had meaningfully changed the organic revenue growth metric and that the new metric was not comparable to the Company's historical organic revenue growth metric.  In fact, as detailed at ¶32, Defendants even retroactively changed its prior organic revenue growth figures – without any detailed explanation for the change.  After the change was brought to light by the *Jehoshaphat* Report, analysts acknowledged the negative investor reaction to the lack of transparency.  For example, an August 10, 2021 Jefferies analyst report noted that "some [investors] have questioned AHCO's organic growth math."  Likewise, an August 5, 2021 Cannacord Genuity report noted:  "Organic growth transparency: There have been questions regarding the transparency of AHCO's organic growth (or perceived lack thereof)."

(c)     Defendants concealed the Company's actual organic growth as measured by the predecessor organic growth metric.  In particular, Defendants concealed the fact that actual organic revenue growth, excluding revenue growth attributable to recent acquisitions, was actually declining.  After the Class Period, as detailed at ¶¶38-40, Defendants acknowledged the need for "increased disclosure" and provided updated disclosures that confirmed the negative organic growth trends highlighted in the *Jehoshaphat* Report.  The chart below depicts the organic revenue decline,

as disclosed by Defendants after the Class Period, for the first and second quarters of 2021 and the first six months of 2021:

| | Q1 2021 | Q2 2021 | 1H 2021 |
|---|---|---|---|
| Total Revenue Growth | $ 290.5 | $ 404.7 | $ 695.2 |
| Revenue Growth From Acquisitions | $ 305.9 | $ 405.3 | $ 711.2 |
| Organic Revenue Growth (Decline) | $ (15.4) | $ (0.6) | $ (16.0) |
| % Growth (Decline) | -8.0% | -0.3% | -4.0% |

(d)     The Company's revenue disclosures in the 2020 Form 10-K, as detailed in ¶120, misrepresented revenue growth attributable to recent acquisitions. As detailed at ¶140, in the FY 2020 Form 10-K, the Company only disclosed revenue from acquisitions that had occurred during FY 2020 and excluded revenue growth attributable to FY 2019 acquisitions despite the fact that these earlier acquisitions also contributed to the year-over-year revenue growth during 2020. For example, an acquisition that occurred on June 30, 2019 contributed six months of incremental revenue to the Company's FY 2019 results but contributed 12 months of incremental revenue to the FY 2020 results, and thus contributed to FY 2020 revenue *growth* as compared to FY 2019. By disclosing total FY 2020 revenue growth of "*$526.7 million*" and only disclosing a subset of the revenue growth that was attributable to recent acquisitions (*i.e.*, only acquisitions that occurred during FY 2020) which totaled *$450.2 million*, as well as "*other*" unrelated B2B revenue of $36.5 million, Defendants misleadingly implied that *$40.0 million* of revenue growth was *not* attributable to recent acquisitions. This disclosure painted an incomplete and materially misleading picture of FY 2020 revenue growth. Omitting this material information in the 2020 Form 10-K allowed the Company's false claim on the Q4 2020 earnings call that FY 2020 organic revenue growth was 5.6% (*see* ¶120) to go unchecked, as investors had no way of verifying what portion of revenue growth was actually *organic* vs. "acquired." In reality, as later disclosed (*see* ¶¶38-40), actual organic

revenue growth in FY 2020, excluding revenue attributable to recent acquisitions, was significantly lower.

(e)      The Company's revenue disclosures in the 2021 Form 10-Q, as detailed at ¶126, misrepresented revenue growth attributable to recent acquisitions.  As detailed at ¶140, in the 2021 Form 10-Q, the Company only quantified revenue from acquisitions "***completed during the three months ended March 31, 2021.***"  The Company referenced, but did not quantify, "***revenue contributed by acquisitions completed after March 2020***" but prior to Q1 2021.  This latter category of acquisitions, completed between April 1, 2020 and December 31, 2020, also contributed to the year-over-year revenue growth in Q1 2021.  For example, an acquisition that occurred on September 30, 2020 contributed $0 of revenue to the Company's Q1 2020 results but contributed 3 months of incremental revenue to the Q1 2021 results, and thus contributed to the Q1 2021 revenue ***growth***.  By disclosing total Q1 2021 revenue growth of "***$290.7 million***" and only disclosing a subset of the revenue growth that was attributable to recent acquisitions (*i.e.*, only acquisitions that occurred during the prior 3 months) which totaled ***$142.6 million***, while specifically not quantifying revenue attributable to other recent acquisitions, Defendants painted an incomplete and materially misleading picture of Q1 2021 revenue growth.  Omitting this material information in the 2021 Form 10-Q allowed the Company's false claim on the Q1 2021 earnings call that organic revenue growth was 11.5% (*see* ¶¶122-23) to go unchecked, as investors had no way of verifying what portion of revenue growth was actually ***organic*** vs. "acquired."  In reality, as later disclosed (*see* ¶36), organic revenue growth in Q1 2021, excluding revenue attributable to recent acquisitions, was significantly lower.

**G.      The Truth About the Tax Fraud and Organic Growth Is Revealed in a Series of Disclosures**

**1.      McGee is Charged Criminally in Connection with the Largest Fraud in Denmark's History**

128.      On April 13, 2021, just after the market opened, AdaptHealth issued a press release over the Business Wire with the headline: "AdaptHealth Corp.'s Board of Directors' Statement on Co-Chief Executive Officer Luke McGee."  The release revealed that the Kingdom of Denmark had formally charged Defendant McGee with tax fraud, emphasized that "[t]he alleged personal conduct occurred between March 2014 and August 2015 and had no connection to AdaptHealth's business," and stated that AdaptHealth had placed McGee "on unpaid leave from his roles as Co-CEO and a Director of the Company while this matter is pending":

> The Board of Directors of AdaptHealth Corp. (NASDAQ: AHCO) ("AdaptHealth" or the "Company") today issued the following statement:
>
> AdaptHealth Corp. has learned that authorities in Denmark have formally charged Co-Chief Executive Officer Luke McGee with alleged tax fraud arising from certain past private activity.  The alleged personal conduct occurred between March 2014 and August 2015 and had no connection to AdaptHealth's business.
>
> AdaptHealth has placed Mr. McGee on unpaid leave from his roles as Co-CEO and a Director of the Company while this matter is pending.
>
> The Board of Directors of AdaptHealth takes this matter very seriously and is monitoring the situation closely in consultation with its legal advisors.  The Board has full confidence in the Company's management team, led by current Co-CEO Steve Griggs and President Josh Parnes, and in its ability to ensure that AdaptHealth's business remains strong and to maintain the Company's growth trajectory.

129.      AdaptHealth's stock dropped $7.30 per share (19.7%) in response to this news, from a closing price of $36.99 per share on April 12, 2021 to a closing price of $29.69 per share on April 13, 2021 on extremely heavy trading volume.

130.      Analysts were caught off guard.  Many expressed disappointment and concern about the Company's M&A growth strategy:

- *Canaccord Genuity* – "AdaptHealth's Board of Directors has immediately placed Co-CEO, Luke McGee, on unpaid leave from his role of Co-CEO and Board Director after learning that he has been charged with alleged tax fraud by Denmark officials.  While we are disappointed in hearing this announcement, we remain confident in Adapt's operations.  It is hard to handicap if this news will impact the company's ability to close future M&A transactions."

- *B of A Securities* – "Yesterday, AHCO's stock traded off 20% on news that Luke McGee, the company's co-CEO, was being placed on leave after being indicted for personal tax fraud by the Danish government related to stock trades in the 2014/15 time period.  We view McGee as a driving force behind the company's growth and the potential that this temporary leave becomes permanent is a clear negative for the company, in our view."

- *Deutsche Bank* – "Never a good headline, Co-CEO placed on unpaid leave. . . . Luke McGee has been the face of AHCO to investors for years, so the headline that CEO McGee was placed on unpaid leave is particularly difficult for us to read.  We believe the markets will need to digest the news and learn more around the personal conduct that occurred between March 2014 and 2015; what exactly occurred, and full confirmation that it had nothing to do with the company.  Since McGee has been the face of AHCO, investors will have to get to know either the CFO, President or Co-CEO.  And the final questions will be who steps in and takes the reigns in the near-term, and does that convert into a permanent position?"

- *Truist Securities* – "AHCO's Board Of Directors Issues A Statement, Co-CEO Placed On Leave.  This morning, the Board of Directors of AdaptHealth issued a statement indicating that the company "has learned that authorities in Denmark have formally charged Co-Chief Executive Officer Luke McGee with alleged tax fraud arising from certain past private activity.  The alleged personal conduct occurred between March 2014 and August 2015 and had no connection to AdaptHealth's business."  The company has placed Mr. McGee on unpaid leave from his position as both Co-CEO and Director while the issue is pending.  While we continue to like sector tailwinds and view AHCO as fortunate to have its current Co-CEO structure following the recent AeroCare deal, we await additional details and expect the news to remain an overhang as investors seek more clarity."

131.   While analysts also expressed confidence in the remaining management on a go-forward basis, McGee's departure was obviously negative news for the Company.  Indeed, a Canaccord Genuity analyst recognized that "[t]he addition of Mr. Griggs as Co-CEO was slightly unusual" and McGee's absence created a gap on the M&A side for AdaptHealth, acknowledging that "McGee was stronger on the capital markets/M&A side of the business and Griggs was stronger on the operational side":

4882-0632-7300.v1

**AdaptHealth to be led by Co-CEO Steve Griggs and President Josh Parnes.** We have full confidence in the go-forward management of AdaptHealth, with Steve Griggs and Josh Parnes. Steve Griggs joined AdaptHealth as Co-CEO after the acquisition of AeroCare in Feb. 2021. The addition of Mr. Griggs as Co-CEO was slightly unusual, but we found it to be a good fit considering McGee was stronger on the capital markets/M&A side of the business and Griggs was stronger on the operational side.  Now that Adapt has several large acquisitions under its belt in recent years, we view Mr. Griggs['] operational strengths as important to successfully integrating the acquired businesses. Josh Parnes has been President of AdaptHealth since 2017, and joined the company in 2013 after the acquisition of Ocean Home Health which Mr. Parnes had founded as a start-up.

132.    Analysts at Deutsche Bank expressed a similar sentiment.  McGee's departure created

M&A uncertainty that raised multiple questions for AdaptHealth over the long-term:

1.    McGee has done an excellent job rapidly evolving the AHCO business model, but we are in a time-period of consolidation from the recent acquisitions and therefore, in our view, McGee's ability to see the next trend isn't critical to the company's success in the short term.

2.    Josh Parnes is the operator behind AHCO's strong growth trajectory, and while he hasn't gotten the investor attention . . . .   we think the McGee/Parnes combination is one of the best parts about AHCO.  McGee is the visionary and Parnes executes the vision.  So in the near-term, we would expect limited impact to core operations or integrations due to Parnes' operational excellence[.]

*        *        *

6.    What we can't answer is the long-term question; does McGee come back to AHCO or will new leadership emerge.  If McGee isn't able to return, we believe the question is if Parnes or Griggs takes over.  It could become a debate of operations versus a visionary view and honestly it's too early for us to opine on this.

133.    The same was true for analysts at UBS.  Organic growth would be unaffected by

McGee's departure but the impact on AdaptHealth's growth by acquisition strategy was unclear

given their view that "McGee was instrumental in M&A":

McGee founded AHCO in 2012, Co-CEO Steve Griggs has 20+ years HME leadership experience

McGee is well respected by investors and has been instrumental in the growth of AHCO.  Co-CEO Steve Griggs joined the company in January following the AeroCare transaction.  Griggs founded AeroCare in 2000 and acted as CEO until the merger with AHCO, so disruption in leadership should be minimized somewhat. Prior to founding AeroCare, Griggs served as COO and CFO at RoTech Medical.

- 58 -

While operations may not be impacted by today's news and organic growth should be unaffected, it is unclear how it might impact AHCO's non-organic growth in the near term as we believe McGee was instrumental in M&A.  In our model, acquired revenues represent ~10% of 2022E revenues.

> **2.    Short Seller *Jehoshaphat* Research Discovers that AdaptHealth is Manipulating Organic Growth**

134.    On July 19, 2021, before the market opened, *Jehoshaphat* published a report alleging that AdaptHealth's organic revenue growth had stalled, and had started to significantly decline.  The report revealed that AdaptHealth had intentionally inflated and obscured its organic revenue growth figures in Q4 2020 and Q1 2021 by changing the calculation it used to derive the metric to include revenue growth attributable to recent acquisitions.  Specifically, the report stated that AdaptHealth was experiencing a "double-digit organic decline":

> While management claims (and consensus estimates reflect) an organic growth trajectory of 8-10%, AHCO is in fact experiencing double-digit organic decline.
>
> *            *            *
>
> •    AHCO claims on its earnings calls that it had 6% organic growth in FY20 and that this accelerated to 12% in Q121.  The Street accepts this characterization fully, and projects 8%+ organic growth going forward.  But nowhere does management provide investors with numeric inputs for these numbers.
>
> *            *            *
>
> •    AHCO recently took highly unusual steps to make it harder for investors to see organic growth**.**  Some of these include:
>
>> •    Failing to disclose contributions from all acquisitions on a quarterly basis (even meaningful ones)
>>
>> •    Offering its own organic growth "estimate" with no quantitative inputs available and confusing wording
>>
>> •    Changing organic growth calculations without disclosure
>>
>> •    Retroactively changing the organic number without disclosing such change
>>
>> •    Removing certain inorganic contribution disclosures from one SEC filing to the next, etc.

- 59 -

135.    Following the release of the *Jehoshaphat* Report, AdaptHealth's stock price fell $1.51 per share, or 5.93%, to close at $23.96 per share on July 19, 2021.

136.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## VI.    SCIENTER

### A.    Defendants Knew or Were Reckless in Not Knowing that Concealing McGee's Criminal Exposure Misled Investors About AdaptHealth's Revenue and Revenue Growth Prospects

137.    Defendant McGee, and through him AdaptHealth, had actual knowledge of his criminal activities in the tax scheme, that the authorities in Denmark were closing in on his personal involvement, that he was a subject in Denmark's investigation and that this information was important concerning his involvement in AdaptHealth.  As an initial matter, McGee was personally involved in the agreement to pay back DKK 1.55 billion in proceeds from the tax scheme to the Danish tax authorities, and the bank he co-owned at the center of the scheme, North Channel Bank, had been criminally fined DKK 110 million and acknowledged its role in the fraud.  He therefore knew that the authorities were investigating the underlying crime and had sufficient evidence to fine the bank criminally.  And in connection with the criminal fine, the Denmark authorities not only described the very activities in which McGee knew he engaged, but announced that they were still vigorously pursuing the individuals and other entities connected to the scheme.

138.    At the same time, McGee had actual knowledge that Denmark's investigation had reached as far as the 2321 Capital and Lion Advisory pension plans that he created to engage in the very same acts that triggered the criminal fine against North Channel Bank.  Denmark filed its action on November 19, 2019 and described the scheme in detail.  Counsel for Denmark served the complaints with waivers of service, which counsel for 2321 Capital, Lion Advisory, and Bowline

Management Pension Plan executed acknowledging receipt on February 18, 2020.  From that Denmark Complaint, McGee, and through him AdaptHealth, knew that Denmark had identified him individually.  His pension plans were, in fact, named as defendants in the Denmark Complaint and the complaint alleged that both 2321 Capital and Lion Advisory involved a "sole participant, or member" that "is a citizen of a State of the United States."  The Denmark Complaint also connected those pension plan entities to addresses with which McGee was associated.  He therefore knew, or recklessly disregarded, that the Denmark authorities would soon identify and charge him personally.

139.    There is also a strong inference that AdaptHealth through its Board knew about and failed to disclose McGee's involvement in the tax scheme and Denmark's criminal investigation into McGee.  In fact, AdaptHealth's Board approved in February 2021 what analysts described as a "slightly unusual" Co-CEO arrangement between AeroCare's CEO Stephen Griggs and Defendant McGee just eight weeks before Denmark officially charged McGee with tax fraud.  This unusual arrangement and the suspicious timing raise a strong inference that AdaptHealth's Board knew that Denmark's criminal investigation had reached a point where McGee would be charged personally.  Defendant Griggs was the coincidental replacement, as analysts noted when discussing McGee's departure.  Yet AdaptHealth filed its 2020 Form 10-K with the SEC on March 16, 2021 and failed to disclose Defendant McGee's situation or its effect on AdaptHealth's business.

### B.    Defendants Knew or Were Reckless in Not Knowing That the Pro Forma "Organic" Growth Metric Obscured the Company's Actual Organic Growth Trends

140.    In addition to disclosures regarding organic revenue growth that were made on quarterly earning calls during the Class Period, as detailed above, Defendants also made revenue disclosures in the Company's quarterly SEC filings.  These disclosures included total revenue growth and revenue growth attributable to recent acquisitions.  Early in the Class Period, the disclosures were consistent with the organic revenue disclosures on the earning calls.  The Company

disclosed total revenue growth with a breakout revenue growth attributable to all recent acquisitions, which allowed investors to calculate *organic* revenue growth.  However, when Defendants abruptly switched their earnings call disclosures to a pro forma growth metric in Q4 2020, they also altered the format and content of the Company's SEC disclosures in order to impede investors' ability to calculate actual organic revenue growth.  As shown in the chart below, Defendants began modifying their disclosures in Q4 2020 by not disclosing revenue from *all* recent acquisitions – a key piece of information for investors trying to calculate organic revenue growth.  Tellingly, following the release of the *Jehoshaphat* Report, the Company's post-Class Period SEC disclosures have reverted back to disclosing all acquisition revenue.  The abrupt change, shown in red below, coincided with the Company's misleading claims about organic revenue growth in Q4 2020 and Q1 2021, as detailed herein.  By intentionally altering the Company's SEC disclosures during these periods, it is apparent that that Defendants knew or were reckless in not knowing that the pro forma revenue growth metric obscured the Company's actual organic growth trends:

| | **Disclosed Revenue Growth** | **Disclosed Revenue Growth Tied to Acquisitions** | **Does disclosure include revenue attributable to _ALL_ recent acquisitions that had an impact on disclosed revenue growth ?** | **Is format and content of disclosure consistent with prior period?** |
|---|---|---|---|---|
| **2019 10-K** | $184.4 million | "The increase in net revenue was *driven primarily by acquisitions*, which increased revenue by approximately *$156.3 million*." | *Yes* | *N/A* |
| **Q1 2020 10-Q** | $71.9 million | "The increase in net revenue was *driven primarily by acquisitions*, which increased revenue by *$57.9 million*." | *Yes* | *Yes* |
| **Q2 2020** | $108.0 | "The increase in net revenue was *driven primarily by (i)* | *Yes* | *Yes* |

| | | | | |
|---|---|---|---|---|
| **10-Q** | million | *acquisitions*, which increased net revenue by ***$77.0 million*. . . .*"* | | |
| **Q3 2020 10-Q** | $147.9 million | "The increase in net revenue *was driven primarily by (i) acquisitions*, which increased net revenue by ***$146.2 million*. . . .*"* | *Yes* | *Yes* |
| **2020 10-K** | $526.7 million | "The increase in net revenue was ***driven primarily by (i) acquisitions completed during 2020***, which contributed net revenue of ***$450.2 million*** during the year. . . ." | *No* | *No* |
| **Q1 2021 10-Q** | $290.7 million | The increase in net revenue was ***driven primarily by (i) acquisitions completed during the three months ended March 31, 2021***, which contributed net revenue of ***$142.6 million*** during the period, (ii) ***net revenue contributed by acquisitions completed after March 2020 and prior to the beginning of the current reporting period* . . .*"* | *No*<br><br>[Note: no quantification provided for acquisitions completed prior to Q1 2021] | *No* |
| **Q2 2021 10-Q** | $404.7 million | "The increase in net revenue was ***driven primarily by acquisitions completed after April 1, 2020***, which increased net revenue by ***$405.3 million*."* | *Yes* | *No* |
| **Q3 2021 10-Q** | $372.8 million | "The increase in net revenue was driven primarily by ***acquisitions completed after July 1, 2020,*** which increased net revenue by ***$362.4 million*."* | *Yes* | *Yes* |

141.    Defendants' revisions to AdaptHealth's SEC filings after the *Jehoshaphat* Report raise a strong inference that they knew their prior disclosures were false and misleading.  In response to additional questioning by analysts and investors regarding the Company's organic growth following the *Jehoshaphat* Report, Defendants in fact acknowledged the need for "increased disclosure" and admitted that its pro forma "organic" growth disclosure was actually an engineered calculation consisting of several components, including non-organic revenue growth.  Importantly, Defendants admitted that its pro forma "organic" revenue growth disclosure included revenue from new acquisitions, which previously had been explicitly excluded from its organic revenue growth metric.

142.    Defendants admitted that "increased disclosure" was necessary, an admission that early disclosures were insufficient.  On the Company's August 11, 2021 earnings call, Defendants stated, "[w]e have listened and responded with increased disclosure in our public filings."  Defendants then explained, for the first time, that the pro forma organic growth metric disclosed by the Company starting in Q4 2020 was not an industry-standard organic growth calculation but rather a "weighted average equation" engineered by Defendants:

> [A]t the end of the day, you could think of organic growth as a weighted average of a couple of big buckets.  I mean, there is the base business, legacy units that we own and operated a year ago.
>
> *        *        *
>
> And you've got AeroCare, that was a much heavier Southern footprint, kind of the Southern states. . . .  And the [n] finally, you've got the diabetes business.  We have put a 10% to 12% expectation on diabetes growth in the market.
>
> And at the end of the day, it's a weighted average equation.  And that's the 10.1% we're very happy with.

143.    In Q3 2021, Defendants once again increased the level of disclosure surrounding the Company's "organic" revenue growth.  In the earnings call supplement, Defendants broke out "non-acquired" revenue growth from "acquired" revenue growth.  As shown in the slides below, the

"acquired" revenue growth made up the majority of the Company's revenue growth in Q3 2021.

The Company did not provide this level of disclosure during the Class Period:





144.    Information contained in the *Jehoshaphat* Report confirms that Defendants knew or

recklessly disregarded that the publicly disclosed pro forma growth metrics painted a misleading

picture of the Company's actual organic growth.  The report stated "our key findings above were consistent with what former employees told us in interviews.  Former executives described a chaotic, understaffed business, failing to do substantial M&A diligence in a race to accumulate assets."  The report highlighted several of the interviews, including:

- One interviewee said that the company's M&A department was "like a barn fire.  There were two acquisitions happening a month.  They didn't have the ability to disaggregate [organic growth], trust me.  They had no f****ng clue.  There was no concept of what organic growth actually was."  He described the overall company as a "house of cards."

                    *        *        *

- According to one former employee, "Luke knew what he was doing.  He was going to push this to the limits of the envelope."

### C.   Defendant McGee's Insider Selling

145.   During the Class Period, Defendant McGee sold AdaptHealth at artificially inflated prices while in possession of material, nonpublic information about the Denmark tax scheme, including the criminal fine levied against North Channel Bank for activities that occurred while Defendant McGee co-owned the bank with his co-conspirators in the tax scheme, SEIC's statement that it was continuing to pursue individuals and entities in the tax scheme, the civil suit brought by Denmark against the pension plans that McGee created to carry out the scheme, and Denmark's continued investigation into McGee.

146.   As reflected in the chart below, based on the Form 4 filed with the SEC following this sale, on December 7, 2020, AdaptHealth made a Cash Delivery to Defendant McGee of $38,544,043.00 for 1,312,808 shares (25.3% of his holdings) of AdaptHealth stock at the price of $29.36 per share:

| Date | Number of Shares | Share Price | Total Proceeds |
|------|------------------|-------------|----------------|
| 12/7/2020 | 1,312,808 | $29.36 | $38,544,043.00 |

147.    According to the *Jehoshaphat* Report, McGee sold another $21.4 million of his AdaptHealth stock on June 22, 2021, representing another 17% of his holdings at the time. Combined, McGee liquidated 35.9% of his AdaptHealth holdings shortly before the corrective disclosures alleged herein.

148.    Defendant McGee's trades were suspicious in timing and amount. They occurred as AdaptHealth's Board was bringing on a Co-CEO as Denmark's criminal investigation continued to close in on McGee. They were also suspicious in amount, as they represented 25.3% and 17%, respectively, of McGee's holdings and he had not previously sold AdaptHealth shares. Defendant McGee was incentivized to conceal the truth concerning the tax scheme and Denmark's criminal investigation to maintain AdaptHealth's stock at artificially inflated prices.

## VII.    LOSS CAUSATION

149.    During the Class Period, as detailed herein, Defendants' statements and omissions artificially inflated the price of AdaptHealth's stock.

150.    When the truth of AdaptHealth's organic growth numbers and McGee's criminal exposure were revealed, AdaptHealth's stock price fell precipitously and materially, as the prior artificial inflation came out of the price, causing substantial damage to Plaintiffs and the Class. Defendants' fraudulent conduct thus directly and proximately caused Plaintiffs and the Class to suffer substantial losses as a result of purchasing AdaptHealth's stock at the artificially inflated prices.

151.    Defendants' misleading statements and omissions of material facts, identified herein in §V.F., caused AdaptHealth's stock to trade at artificially inflated prices during the Class Period. As a direct result of the April 13, 2021 and July 19, 2021 disclosures, AdaptHealth's stock price suffered significant declines.

4882-0632-7300.v1

152.     The misrepresentations and omissions that Defendants had concealed from the market were disclosed beginning on April 13, 2021, when new information was revealed to the market regarding Defendant McGee.  At or around 9:48 a.m. ET, AdaptHealth issued a press release over the Business Wire with the headline "AdaptHealth Corp.'s Board of Directors' Statement on Co-Chief Executive Officer Luke McGee."  This release revealed to the market for the first time that the Kingdom of Denmark had formally charged McGee with tax fraud for his involvement in the tax scheme.  AdaptHealth announced in this release that it had placed McGee "on unpaid leave from his roles as Co-CEO and a Director of the Company while this matter is pending."  Analysts' responses to this news and the stock price reaction demonstrated that the information was unknown to the market prior to April 13, 2020.

153.     The disclosure of Denmark's formal charge against McGee for bank fraud, and AdaptHealth's decision to place McGee on unpaid leave had a direct impact on AdaptHealth's stock price.  The price of AdaptHealth's stock dropped from a closing price of $36.99 per share on April 12, 2021 to a closing price of $26.69 per share on April 13, 2021, a $7.30 per share (19.7%) decline on heavy trading volume.

154.     The disclosure prior to the market opening on July 19, 2021, when *Jehoshaphat* published its report that AdaptHealth had been misrepresenting its organic growth numbers, also had a direct impact on AdaptHealth's stock price.  As a direct result of the report's disclosures of the truth of AdaptHealth's organic growth numbers, AdaptHealth's stock fell $1.51 per share, or 5.93%, to close at $23.96 per share on July 19, 2021.

155.     The declines in AdaptHealth's stock price on April 13, 2021 and July 19, 2021 were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors and the market.

156.     The timing and magnitude of AdaptHealth's stock price decline negate any inference that the losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' fraudulent conduct.  In fact, on April 13, 2021, the NASDAQ was up 1.1%, with the Russell 2000 Healthcare Index up 1.6%.  And on July 19, 2021, the NASDAQ declined only 1.1% and the Russell 2000 Healthcare Index was flat.

157.     The economic losses suffered by Plaintiffs and other members of the Class were a direct result of Defendants' statements and omissions that inflated AdaptHealth's stock price and the subsequent, significant declines in the value of that stock when Defendants' prior misrepresentations and omissions were revealed.

## VIII.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

158.     Plaintiffs are entitled to a presumption of reliance for Defendants' material misrepresentations under the fraud-on-the-market doctrine because the market for AdaptHealth's publicly traded securities was open, well-developed, and efficient at all times.  As a result of Defendants' materially false and misleading statements, AdaptHealth's publicly traded securities traded at artificially inflated prices during the Class Period.  Plaintiffs and the other members of the Class purchased or otherwise acquired AdaptHealth's publicly traded securities relying upon the integrity of the market price of those securities and the market information relating to AdaptHealth and have been damaged thereby.

159.     At all relevant times, the market for AdaptHealth's securities was an efficient market for the following reasons, among others:

(a)     AdaptHealth's securities met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

- 69 -

(b)     As a public company, AdaptHealth filed periodic public reports with the SEC and/or the NASDAQ;

(c)     AdaptHealth regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     AdaptHealth was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

160.    As a result of the foregoing, the market for AdaptHealth's securities promptly digested current information regarding AdaptHealth from all publicly available sources and reflected such information in AdaptHealth's securities price.  Under these circumstances, all purchasers of AdaptHealth's securities during the Class Period suffered similar injury through their purchase of AdaptHealth's securities at artificially inflated prices and a presumption of reliance applies.

161.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because this action involves Defendants' failure to disclose material adverse information regarding AdaptHealth's business, operations and risks, positive proof is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' omissions set forth above, that requirement is satisfied here.

IX.    **NO SAFE HARBOR**

162.    The statutory safe harbor provided for forward-looking statements under the Private Securities Litigation Reform Act of 1995 does not apply to any of the false statements alleged herein.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of AdaptHealth who knew that the statement was false or misleading when made.

X.    **PLAINTIFFS' CLAIM FOR RELIEF UNDER THE SECURITIES ACT OF 1933**

163.    In this part of the complaint, Plaintiffs assert a series of strict liability and negligence claims based on the Securities Act on behalf of purchasers in or traceable to the Secondary Offering. Plaintiffs expressly disclaim any allegations of knowing or reckless misconduct.

164.    As discussed above, the Secondary Offering of AdaptHealth common stock took place pursuant to the Offering Documents.   The Registration Statement was signed by the Registration Statement Defendants.

165.    The Prospectus highlighted the importance of management in general and its M&A activity in particular as follows:

**Management**

We are led by a proven management team with experience in the HME industry across a variety of healthcare organizations.  We have a centralized approach for key business processes, including M&A activity, revenue cycle management, strategic purchases, payor contracting, finance, compliance, legal, human resources, IT and sales management. . . .

Following the closing of the AeroCare Acquisition, Stephen Griggs will join Luke McGee as co-Chief Executive Officer of AdaptHealth.

\*      \*      \*

Proven M&A success: Our integrated technology platform includes scalable and centralized front-end and back office processes that facilitate the effective onboarding of potential acquisitions and help achieve cost synergies.  We have demonstrated our ability to execute upon acquisitions, completing 86 transactions from our date of founding through December 31, 2020.  As we continue to grow, we expect to deploy incrementally more capital and integrate substantially larger targets over time, which in turn we expect will be a source of continued growth for us.

Experienced management team: We are led by a proven management team with significant experience in the HME and healthcare services industries.  The team has domain knowledge within the industry having been employed at various healthcare organizations throughout their careers.  Multiple members of the management team have also built independent HME companies and have the proven ability to scale a business within the HME industry.  Additionally, several members of the management team have experience within their specific roles in both private and public company settings.  Given the complexity of the highly regulated industry in which we operate, we believe that management's experience is a meaningful differentiator relative to our competitors.

\*      \*      \*

Grow through acquisitions: The HME industry is highly fragmented, with more than 6,000 unique suppliers.  We believe that ongoing reimbursement changes will continue the consolidation trend in the HME industry that has accelerated in recent years.  We believe that, in the current environment, companies with the ability to scale operations possess competitive advantages that can drive volume to their platforms.  As one of a limited number of national HME companies, we plan to continue to evaluate acquisitions and execute upon attractive opportunities to help drive growth.

166.    The Prospectus also contained a risk factor section and, in particular, described

"Risks Relating to the Offering and Our Class A Common Stock," including unspecified litigation,

unidentified management changes, and the possibility of losing unidentified key personnel:

Factors affecting the trading price of our Class A Common Stock may include:

\* \* \*

- commencement of, or involvement in, litigation involving us;

\* \* \*

- any major change in our board of directors or management.

\* \* \*

***Our ability to successfully operate our business is largely dependent upon the efforts of certain key personnel of AdaptHealth, including the key personnel of AdaptHealth who have stayed with us following the Business Combination. The loss of such key personnel could negatively impact our operations and financial results.*** (Emphasis in original)

Our ability to successfully operate our business is dependent upon the efforts of certain key personnel of AdaptHealth. It is possible that AdaptHealth will lose some key personnel, the loss of which could negatively impact our operations and profitability.

167.    The Offering Documents were defective and inaccurate, contained untrue statements of material fact and omitted to state facts required to be disclosed by Regulation S-K, Item 401, and necessary to make the statements in the Offering Documents, including the statements identified in ¶¶165-166, not misleading, and omitted to state material facts required to be stated therein.  By not disclosing that Defendant McGee had already been fined criminally by the Danish authorities, was named indirectly in the Denmark Complaint, and remained under criminal investigation in Denmark, Defendants violated Regulation S-K, Item 401, and withheld from investors information important to the valuation of AdaptHealth's securities and to Defendants' statements, such that a reasonable investor would be given a false impression of AdaptHealth's business.

168.    Neither AdaptHealth nor the Registration Statement Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were accurate and complete in all material respects.  Had they

- 73 -

exercised reasonable care, these Defendants could have known of the material misstatements and omissions alleged herein.

## XI.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

169.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired AdaptHealth securities during the Class Period (the "Class") and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

170.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, AdaptHealth securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by AdaptHealth or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

171.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' conduct in violation of federal law that is complained of herein.

172.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

173.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of AdaptHealth;

- whether the Officer Defendants caused AdaptHealth to issue false and misleading statements about AdaptHealth's organic revenue growth during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements about AdaptHealth's organic revenue growth;

- whether the prices of AdaptHealth securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

174.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against AdaptHealth and the Officer Defendants)

175.    Plaintiffs repeat and reallege each and every allegation in ¶¶1-162 above as if fully set forth herein.

176.    This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

- 75 -

177.    During the Class Period, AdaptHealth and the Officer Defendants, during the time with which they held their positions at AdaptHealth, engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of AdaptHealth securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire AdaptHealth securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Officer Defendants, and each of them, took the actions set forth herein.

178.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Officer Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for AdaptHealth securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about AdaptHealth's finances and business prospects.

179.    By virtue of their positions at AdaptHealth, the Officer Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the Officer Defendants acted with reckless disregard for the truth in that they failed or refused to

- 76 -

ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Officer Defendants. Said acts and omissions were committed willfully or with reckless disregard for the truth. In addition, each of the Officer Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

180.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Officer Defendants' knowledge and control. As the senior managers and/or directors of AdaptHealth, the Officer Defendants had knowledge of the details of AdaptHealth's internal affairs.

181.    The Officer Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Officer Defendants were able to and did, directly or indirectly, control the content of the statements of AdaptHealth. As officers and/or directors of a publicly-held company, the Officer Defendants had a duty to disseminate timely, accurate, and truthful information with respect to AdaptHealth's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of AdaptHealth securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning AdaptHealth's business and financial condition which were concealed by the Officer Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired AdaptHealth securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Officer Defendants, and were damaged thereby.

182.    During the Class Period, AdaptHealth securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading

- 77 -

statements described herein, which the Officer Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of AdaptHealth securities at prices artificially inflated by the Officer Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of AdaptHealth securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of AdaptHealth securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

183.    By reason of the conduct alleged herein, the Officer Defendants knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

184.    As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of §20(a) of the Exchange Act
### (Against the Officer Defendants)

185.    Plaintiffs repeat and reallege each and every allegation in ¶¶1-162, 175-184 above as if fully set forth herein.

186.    During the Class Period, the Officer Defendants, during the time with which they held their positions at AdaptHealth, participated in the operation and management of AdaptHealth, and

conducted and participated, directly and indirectly, in the conduct of AdaptHealth's business affairs. Because of their senior positions, they knew the adverse non-public information about AdaptHealth's business as alleged herein.

187.    As officers and/or directors of a publicly owned company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to AdaptHealth's financial condition and results of operations, and to correct promptly any public statements issued by AdaptHealth which had become materially false or misleading.

188.    Because of their positions of control and authority as senior officers, the Officer Defendants were able to, and did, control the contents of the various reports, press releases and public filings which AdaptHealth disseminated in the marketplace during the Class Period concerning AdaptHealth's business and results of operations.  Throughout the Class Period, the Officer Defendants exercised their power and authority to cause AdaptHealth to engage in the wrongful acts complained of herein.  The Officer Defendants, therefore, were "controlling persons" of AdaptHealth within the meaning of §20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of AdaptHealth securities.

189.    Each of the Officer Defendants, therefore, acted as a controlling person of AdaptHealth.  By reason of their senior management positions and/or being directors of AdaptHealth, each of the Officer Defendants had the power to direct the actions of, and exercised the same to cause, AdaptHealth to engage in the unlawful acts and conduct complained of herein.  Each of the Officer Defendants exercised control over the general operations of AdaptHealth and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

190.    By reason of the above conduct, the Officer Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by AdaptHealth.

## COUNT III

### For Violations of §11 of the Securities Act
### (Against AdaptHealth and the Registration Statement Defendants)

191.    Plaintiffs repeat and reallege each and every allegation in ¶¶163-168 above relating to the Securities Act claims as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.  Plaintiffs do not allege, and do not intend to allege, fraud, recklessness, or intentional misconduct, and any implication of fraud, recklessness, or intentional misconduct is expressly disclaimed.

192.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, and is asserted against AdaptHealth and the Registration Statement Defendants.

193.    This Count is asserted by Plaintiffs and members of the Class who purchased or acquired AdaptHealth securities traceable to the Offering Documents issued in connection with AdaptHealth's January 4, 2021 Secondary Offering.

194.    The Offering Documents were defective and inaccurate, contained untrue statements of material fact and omitted to state facts necessary to make the statements in the Offering Documents made not misleading, and omitted to state material facts required to be stated therein.

195.    AdaptHealth is the registrant for the Offering Documents.  As such, AdaptHealth is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate.  By virtue of the Offering Documents containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, AdaptHealth is liable under §11 of the Securities Act to Plaintiffs and the Class.

4882-0632-7300.v1

196.     The Registration Statement Defendants did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omission of any material facts and were not misleading.

197.     At the time they purchased shares in the Secondary Offering, neither Plaintiffs nor any member of the Class knew, or by the reasonable exercise of care could have known, of the material misstatements and omissions alleged herein.

198.     In connection with the Secondary Offering and sale of the AdaptHealth common stock, these Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

199.     This claim was brought within one year after the discovery of the untrue statements in the Registration Statement and within three years after the AdaptHealth stock was sold to Class members in connection with the Secondary Offering.

200.     By reason of the misconduct alleged herein, these Defendants violated §11 of the Securities Act and are liable to Plaintiffs and the members of the Class who acquired AdaptHealth stock in the Secondary Offering, each of whom has been damaged as a result of such violations.

201.     None of the untrue statements or omissions of material fact in the Offering Documents alleged herein were forward-looking statements.  Rather, each such statement concerned existing facts.  Moreover, the Offering Documents did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

202.     The Registration Statement Defendants caused the issuance of the Offering Documents and/or signed the Offering Documents, either personally or through an Attorney-in-Fact. The Registration Statement Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents.  They had a

duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements misleading. The Registration Statement Defendants did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Documents were true, were without omission of any material facts, and/or were not misleading.

**COUNT IV**

**For Violations of §12(a)(2) of the Securities Act in Connection with the Offering (Against Defendant AdaptHealth)**

203.    Plaintiffs repeat and reallege each and every allegation in ¶¶163-168, 191-202, above relating to the Securities Act claims as if fully set forth herein. For the purposes of this Count, Plaintiffs assert only strict liability and negligence claims, and expressly exclude from this Count any allegations of fraud or reckless or intentional misconduct.

204.    This claim is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77k, against Defendant AdaptHealth on behalf of members of the Class who purchased or otherwise acquired AdaptHealth common stock pursuant and/or traceable to the Offering Documents, and were damaged by acts alleged herein.

205.    By means of the Offering Documents and by using the means and instruments of transportation and communication in interstate commerce and of the mails, Defendant AdaptHealth, through a public offering, solicited and sold AdaptHealth securities to members of the Class.

206.    The Offering Documents materially misstated, omitted to state facts necessary to make the statements made not misleading, and concealed or failed to adequately disclose material facts as alleged herein.

207.    Members of the Class purchased AdaptHealth securities by means of the materially misstated Offering Documents. At the time they purchased shares in the Offerings, no member of

the Class knew, or by the reasonable exercise of care could have known, of the material misstatements in and omissions from the Offering Documents, including the Prospectus.

208.    By virtue of the conduct alleged herein, AdaptHealth violated §12(a)(2) of the Securities Act.

209.    Accordingly, members of the Class who purchased or otherwise acquired AdaptHealth securities have a right to rescind and recover the consideration paid for their securities and hereby elect to rescind and tender their securities to AdaptHealth. Members of the Class who have sold their AdaptHealth securities issued in or traceable to the Offerings are entitled to recissory damages.

210.    This claim is brought within one year after the discovery of the misstatements and omissions contained in the Offering Documents and within three years after the Offerings.

## COUNT V

### For Violations of §15 of the Securities Act
### (Against the Registration Statement Defendants)

211.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, excerpt for any allegations of fraud, recklessness, or intentional misconduct.  Plaintiffs do not allege, and do not intend to allege, fraud, recklessness, or intentional misconduct, and any implication of fraud, recklessness, or intentional misconduct is expressly disclaimed.

212.    This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of Plaintiffs and other members of the Class who purchased or otherwise acquired AdaptHealth securities pursuant to the Secondary Offering and who were damaged thereby against the Registration Statement Defendants.

213.    As set forth more specifically above at ¶¶163-168, 191-202, 203-210, the Prospectus included untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of the circumstances in which they were made, not misleading.

4882-0632-7300.v1

214.    Plaintiffs and the members of the Class did not know, nor could they have known, of the untruths or omissions contained in the Prospectus.

215.    The Registration Statement Defendants acted as controlling persons of AdaptHealth within the meaning of §15 of the Securities Act by virtue of their positions as a director and/or senior officer of AdaptHealth.  By reason of their senior management positions and/or directorships at the Company, as alleged above, the Registration Statement Defendants, individually and acting pursuant to a common plan, had the power to influence and exercise the same to cause AdaptHealth to engage in the conduct complained of herein.  The Registration Statement Defendants were able to and did control the contents of the Offering Documents, which contained materially false statements and omitted material financial information.  By reason of such conduct, the Registration Statement Defendants are liable pursuant to §15 of the Securities Act to Plaintiffs and other members of the Class.

216.    The Registration Statement Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.  The Registration Statement Defendants did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Prospectus were accurate and complete in all material respects.

217.    This claim was brought within one year after the discovery of the untrue statements and omissions in the Prospectus and within three years after the AdaptHealth common stock was sold to the Class in connection with the Secondary Offering.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

4882-0632-7300.v1

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED:  November 22, 2021          ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                                   DOUGLAS R. BRITTON (admitted *pro hac vice*)
                                   KEVIN A. LAVELLE


                                           s/ DOUGLAS R. BRITTON
                                     DOUGLAS R. BRITTON
                                   655 West Broadway, Suite 1900
                                   San Diego, CA  92101
                                   Telephone:  619/231-1058
                                   619/231-7423 (fax)
                                   dougb@rgrdlaw.com
                                   klavelle@rgrdlaw.com

                                   Lead Counsel for Plaintiffs

                                   KESSLER TOPAZ MELTZER
                                     & CHECK, LLP
                                   ANDREW L. ZIVITZ (PA #76554)
                                   HELEN J. BASS (PA # 330646)
                                   280 King of Prussia Road
                                   Radnor, PA  19087
                                   Telephone:  610/667-7706
                                   610/667-7056 (fax)
                                   azivitz@ktmc.com
                                   hbass@ktmc.com

                                   Local Counsel for Plaintiffs

4882-0632-7300.v1

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on November 22, 2021, I authorized the

electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will

send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List,

and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to

the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ DOUGLAS R. BRITTON
DOUGLAS R. BRITTON

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dougb@rgrdlaw.com

4882-0632-7300.v1

# Mailing Information for a Case 2:21-cv-03382-HB FAILLE JR. v. ADAPTHEALTH CORP. F/K/A DFB HEALTHCARE ACQUISITIONS CORP. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **LEE ALBERT**
  lalbert@glancylaw.com,lee-albert-5832@ecf.pacerpro.com,info@glancylaw.com

- **MICHAEL ALBERT**
  malbert@rgrdlaw.com

- **NAUMON A. AMJED**
  namjed@ktmc.com,ksauder@ktmc.com,hpaffas@ktmc.com,iyeates@ktmc.com,4980043420@filings.docketbird.com,mswift@ktmc.com

- **DOUGLAS R. BRITTON**
  dougb@rgrdlaw.com,e_file_sd@rgrdlaw.com,mwaligurski@rgrdlaw.com

- **Helen Jane Bass**
  hbass@ktmc.com

- **JENNIFER N. CARINGAL**
  jcaringal@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **VINCENT A COPPOLA**
  vcoppola@pribanic.com,gregory@pribanic.com

- **STEVEN D. COSTELLO**
  sdc@saxtonstump.com,alb@saxtonstump.com,slj@saxtonstump.com,msf@saxtonstump.com

- **JACOB A. GOLDBERG**
  jgoldberg@rosenlegal.com,etexidor@rosenlegal.com

- **DANIELLE S. MYERS**
  danim@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **JUAN CARLOS SANCHEZ**
  jsanchez@rgrdlaw.com

- **ANDREW L. ZIVITZ**
  azivitz@ktmc.com,3949407420@filings.docketbird.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)