UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM and BUCKS COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>v.<br><br>ADAPTHEALTH CORP. f/k/a DFB HEALTHCARE ACQUISITIONS CORP., LUKE MCGEE, STEPHEN P. GRIGGS, JASON CLEMENS, FRANK J. MULLEN, RICHARD BARASCH, JOSHUA PARNES, ALAN QUASHA, TERENCE CONNORS, DR. SUSAN WEAVER, DALE WOLF, BRADLEY COPPENS, and DAVID S. WILLIAMS III,<br><br>     Defendants. | Civ. Action No. 2:21-cv-03382-HB |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

SAXTON & STUMP
Steven D. Costello (No. 37288)
100 Deerfield Lane, Suite 240
Malvern, Pennsylvania 19355
(484) 328-8500

WILLKIE FARR & GALLAGHER LLP
Todd G. Cosenza (admitted *pro hac vice*)
Vincent P. Iannece (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000

*Attorneys for Defendants*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES.................................................................................................iii

INTRODUCTION...............................................................................................................1

STATEMENT OF FACTS ...................................................................................................6

    A.   The Parties ...........................................................................................7

    B.   The Challenged Statements ...........................................................................9

    C.   AdaptHealth's Business .................................................................................9

    D.   Mr. McGee's Resignation from AdaptHealth.............................................16

LEGAL STANDARDS ......................................................................................................18

ARGUMENT ......................................................................................................................19

    I.   NO MATERIAL MISSTATEMENTS OR OMISSIONS ARE
        SUFFICIENTLY PLED ...........................................................................20

        A.   Plaintiffs Fail to Plead an Actionable Misstatement or Omission
             Relating to AdaptHealth's Reporting of Organic Growth .........................21

        B.   Plaintiffs Had No Duty to Disclose Defendant Luke McGee's
             Alleged Unrelated Misconduct.................................................................26

    II.   THE COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY
         BECAUSE NO STRONG INFERENCE OF SCIENTER IS PLED....................30

        A.   Plaintiffs Do Not Allege A Plausible Motive And Opportunity...................31

        B.   Plaintiffs Fail to Allege Conscious Misbehavior or Recklessness................35

    III.   PLAINTIFFS HAVE FAILED TO ADEQUATELY PLEAD LOSS
          CAUSATION............................................................................................41

    IV.   PLAINTIFFS' "CONTROL PERSON" CLAIMS FAIL UNDER THE
          1934 ACT................................................................................................42

    V.   THE 1933 ACT CLAIMS SHOULD BE DISMISSED ....................................43

        A.   Plaintiffs Fail to Plead Actionable Misstatements or Omissions..................43

        B.   Plaintiffs Fail to Plead Control Person Claims ...........................................45

CONCLUSION ................................................................................................................45

## TABLE OF AUTHORITIES

**Cases**                                           **Page(s)**

*In re Adams Golf, Inc. Sec. Litig.,*
381 F.3d 267 (3d Cir. 2004) ................................................................ 43, 45

*In re Adolor Corp. Sec. Litig.,*
616 F. Supp. 2d 551 (E.D. Pa. 2009) .......................................................... 26-27

*In re Advanta Corp. Sec. Litig.,*
180 F.3d 525 (3d Cir. 1999) ................................................................ 24, 26, 27

*In re Amarin Corp. PLC.,*
2015 WL 3954190 (D.N.J. June 29, 2015) ....................................................... 22

*Ashcroft v. Iqbal,*
556 U.S. 662 ......................................................................................... 18

*Baraka v. McGreevey,*
481 F.3d 187 (3d Cir. 2007) ..................................................................... 18

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ............................................................................... 18

*Billhofer v. Flamel Techs., S.A.,*
2012 WL 3079186 (S.D.N.Y. July 30, 2012) ............................................... 22-23

*Boca Raton Firefighters & Police Pension Fund v. Bahash,*
506 F. App'x 32 (2d Cir. 2012) ................................................................. 9

*In re Burlington Coat Factory Sec. Litig.,*
114 F.3d 1410 (3d Cir. 1997) ................................................................... 33

*Cal. Pub. Emps. Ret. Sys. v. Chubb Corp.,*
394 F.3d 126 (3d Cir. 2004) ............................................................. 36-38, 45

*In re Cardinal Health Inc. Sec. Litig.,*
426 F. Supp. 2d 688 (S.D. Ohio 2006) ........................................................ 23

*Carmack v. Amaya Inc.,*
258 F. Supp. 3d 454 (D.N.J. 2017) ............................................................. 45

*In re CDNow, Inc. Sec. Litig.,*
138 F. Supp. 2d 624 (E.D. Pa. 2001) .......................................................... 42

*City of Bristol Pension Fund v. Vertex Pharm. Inc.,*
12 F. Supp. 3d 225 (D. Mass. 2014) ........................................................ 33-34

*City of Brockton Ret. Sys. v. Avon Prod., Inc.,*
2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ....................................................................40

*City of Edinburgh Council v. Pfizer, Inc.,*
754 F.3d 159 (3d Cir. 2014) ..............................................................................................19

*City of Pontiac Policeman's & Firemen's Ret. Sys. v. UBS AG,*
752 F.3d 173 (2d Cir. 2014) ..............................................................................................29

*City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.,*
686 F. Supp. 2d 404 (D. Del. 2009) ...................................................................................31

*Dempsey v. Vieau,*
130 F. Supp. 3d 809 (S.D.N.Y. 2015) ................................................................................35

*In re Discovery Labs. Sec. Litig.,*
2007 WL 789432 (E.D. Pa. Mar. 15, 2007) .......................................................................26

*Dronsejko v. Thornton,*
632 F.3d 658 (10th Cir. 2011) ...........................................................................................36

*Dutton v. Harris Stratex Networks, Inc.,*
270 F.R.D. 171 (D. Del. 2010) ..........................................................................................45

*Ernst & Ernst v. Hochfelder,*
425 U.S. 185 (1976).........................................................................................................30

*In re Express Scripts Holding Co. Sec. Litig.,*
2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017) ......................................................................41

*In re First Union Corp. Sec. Litig.,*
128 F. Supp. 2d 871 (W.D.N.C. 2001) ..............................................................................33

*Fogel v. Wal-Mart de Mexico SAB de CV,*
2017 WL 751155 (S.D.N.Y. Feb. 27, 2017) .........................................................................9

*Frankfurt-Tr. Invs. Luxemburg AG v. United Techs. Corp.,*
336 F. Supp. 3d 196 (S.D.N.Y. 2018) ................................................................................33

*Freed v. Universal Health Servs., Inc.,*
2005 WL 1030195 (E.D. Pa. May 3, 2005) ........................................................................37

*Fries v. N. Oil & Gas, Inc.,*
354 F. Supp. 3d 384 (S.D.N.Y. 2018) ...........................................................................28-29

*Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust*
*2006-3*, 825 F. Supp. 2d 1082 (D.N.M. 2011) ..............................................................43-44

iv

*Globis Cap. Partners, L.P. v. Stonepath Grp., Inc.,*
    241 F. App'x 832 (3d Cir. 2007) ...............................................................30

*GSC Partners CDO Fund v. Washington,*
    368 F.3d 228 (3d Cir. 2004) ....................................................................30

*In re H&R Block Sec. Litig.,*
    527 F. Supp. 2d 922 (W.D. Mo. 2007) ....................................................36

*Healey v. Catalyst Recovery of Pennsylvania, Inc.,*
    616 F.2d 641 (3d Cir. 1980) ...................................................................30

*In re Hertz Glob. Holdings, Inc. Sec. Litig.,*
    2017 WL 1536223 (D.N.J. Apr. 27, 2017), *aff'd sub nom. In re Hertz Global
    Holdings, Inc.*, 905 F.3d 106 (3d Cir. 2018) ...........................................34, 35, 39

*Hoey v. Insmed Inc.,*
    2018 WL 902266 (D.N.J. Feb. 15, 2018) .................................................32

*Institutional Investors Grp. v. Avaya, Inc.,*
    564 F.3d 242 (3d Cir. 2009) .............................................................*passim*

*In re Intelligroup Sec. Litig.,*
    527 F. Supp. 2d 262 (D.N.J. 2007) .................................................. 39-40, 41

*Ironworkers Local 580--Joint Funds v. Linn Energy, LLC,*
    29 F. Supp. 3d 400 (S.D.N.Y. 2014) .......................................................22

*Jackson v. Halyard Health, Inc.,*
    2018 WL 1621539 (S.D.N.Y. Mar. 30, 2018) ..........................................37

*Kennilworth Partners L.P. v. Cendant Corp.,*
    59 F. Supp. 2d 417 (D.N.J. 1999) ...........................................................45

*In re Keryx Biopharmaceuticals, Inc. Sec. Litig.,*
    2014 WL 585658 (S.D.N.Y. Feb. 14, 2014) ............................................36

*In re Kulicke & Soffa Indus., Inc. Sec. Litig.,*
    747 F. Supp. 1136 (E.D. Pa. 1990), *aff'd*, 944 F.2d 897 (3d Cir. 1991) ................30

*Lord Abbett Affiliated Fun, Inc. v. Navient Corp.,*
    2017 WL 3891676 (D. Del. Sept. 6, 2017) ................................................9

*Martin v. GNC Holdings,*
    2017 WL 3974002 (W.D. Pa. Sept. 8, 2017) ...........................................42

*Martin v. GNC Holdings, Inc.,*
    757 F. App'x 151 (3d Cir. 2018) .............................................................38

*In re Merck & Co., Inc. Sec. Litig.,*
432 F.3d 261 (3d Cir. 2005) ............................................................................. 43, 44

*In re MobileMedia Sec. Litig.,*
28 F. Supp. 2d 901 (D.N.J. 1998) ..................................................................... 44, 45

*In re NAHC, Inc. Sec. Litig.,*
2001 WL 1241007 (E.D. Pa. Oct. 17, 2001), *aff'd*, 306 F.3d 1314 (3d Cir.
2002) ......................................................................................................................37

*In re NAHC, Inc. Sec. Litig.,*
306 F.3d 1314 (3d Cir. 2002) ..............................................................................27

*Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.,*
720 F. Supp. 2d 517 (D.N.J. 2010) ......................................................................41

*In re Newell Brands, Inc. Sec. Litig.,*
837 F. App'x 869 (3d Cir. 2020) ..........................................................................27

*In re Nutrisystem, Inc. Sec. Litig.,*
653 F. Supp. 2d 563 (E.D. Pa. 2009) ............................................................... 19, 20

*OFI Asset Mgmt. v. Cooper Tire & Rubber,*
834 F.3d 481 (3d Cir. 2016) ................................................................................27

*Omnicare, Inc. v. Laborers District Council Industry Pension Fund,*
575 U.S. 175 (2015) ........................................................................................... 4, 22

*In re Omnicom Grp. Inc. Sec. Litig.,*
2005 WL 734937 (S.D.N.Y. Mar. 30, 2005) ......................................................23

*Oran v. Stafford,*
226 F.3d 275 (3d Cir. 2000) .............................................................................. 29, 39

*Osher v. JNI Corp.,*
256 F. Supp. 2d 1144 (S.D. Cal. 2003) ...............................................................34

*In re Party City Sec. Litig.,*
147 F. Supp. 2d 282 (D.N.J. 2001) ......................................................................35

*Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.,*
572 F. App'x 713 (11th Cir. 2014) .......................................................................25

*Phillips v. Cnty. of Allegheny,*
515 F.3d 224 (3d Cir. 2008) ................................................................................18

*In re Radian Sec. Litig.,*
2010 WL 1767195 (E.D. Pa. Apr. 30, 2010) ......................................................35

*Rahmaln v. Kid Brands, Inc.,*
  736 F.3d 237 (3d Cir. 2013) ............................................................... 32, 35

*In re Rockefeller Cntr. Props., Inc. Sec. Litig.,*
  311 F.3d 198 (3d Cir. 2002) ................................................................ 42-43

*Rubke v. Capitol Bancorp Ltd.,*
  551 F.3d 1156 (9th Cir. 2009) .................................................................44

*In re Sanofi Sec. Litig.,*
  155 F. Supp. 3d 386 (S.D.N.Y. 2016) ......................................................28

*In re Sanofi-Aventis Sec. Litig.,*
  774 F. Supp. 2d 549 (S.D.N.Y. 2011) ......................................................22

*Shields v. Citytrust Bancorp, Inc.,*
  25 F.3d 1124 (2d Cir. 1994) ....................................................................24

*In re Sierra Wireless, Inc. Sec. Litig.,*
  482 F. Supp. 2d 365 (S.D.N.Y. 2007) ......................................................24

*In re Sofamor Danek Grp., Inc.,*
  123 F.3d 394 (6th Cir. 1997) ...................................................................27

*Stein v. Tangoe, Inc.,*
  2014 WL 12767210 (D. Conn. Sept. 30, 2014) ................................... 22, 23

*In re Stonepath Grp., Inc. Sec. Litig.,*
  2006 WL 890767 (E.D. Pa. Apr. 3, 2006) ................................................38

*In re Suprema Specialties, Inc. Sec. Litig.,*
  438 F.3d 256 (3d Cir. 2006) ....................................................................44

*In re Synchronoss Sec. Litig.,*
  705 F. Supp. 2d 367 (D.N.J. 2010) .........................................................35

*Teamsters Local 456 Pension Fund v. Universal Health Servs.,*
  396 F. Supp. 3d 413 (E.D. Pa. 2019) ......................................................28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007) ..................................................................19, 20, 30-31

*In re Tellium, Inc. Sec. Litig.,*
  2005 WL 2090254 (D.N.J. Aug. 26, 2005) .............................................41-42

*Thor Power Tool Co. v. Comm'r,*
  439 U.S. 522 (1979) .................................................................................23

*In re Tseng Labs, Inc. Sec. Litig.,*
   954 F. Supp. 1024 (E.D. Pa. 1996), *aff'd*, 107 F.3d 8 (3d Cir. 1997) ....................................27

*In re Vonage IPO Sec. Litig.,*
   2009 WL 936872 (D.N.J. Apr. 6, 2009) ...............................................................................44

*Wietschner v. Monterey Pasta Co.,*
   294 F. Supp. 2d 1102 (N.D. Cal. 2003) ......................................................................... 33-34

*Williams v. EMC Mortg. Corp.,*
   2013 WL 1874952 (E.D. Pa. May 3, 2013) ..........................................................................45

*Williams v. Globus Med., Inc.,*
   869 F.3d 235 (3d Cir. 2017) ...................................................................................................29

*In re Wilmington Tr. Sec. Litig.,*
   29 F. Supp. 3d 432 (D. Del. 2014) .........................................................................................44

*Winer Fam. Tr. v. Queen,*
   503 F.3d 319 (3d Cir. 2007) ...................................................................................................40

**Statutes**

15 U.S.C. § 78u-4(b)(2) ......................................................................................................... 30, 40

15 U.S.C. § 78u-4(b)(3)(A) .........................................................................................................30

15 U.S.C. § 78u-5(i)(1) ...............................................................................................................25

**Other Authorities**

17 C.F.R § 229.103(a) .................................................................................................................29

17 C.F.R. § 229.401(f)(2) ...........................................................................................................28

H.R. Conf. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 730 ..............................19

Defendants AdaptHealth Corp. ("AdaptHealth" or the "Company"), Luke McGee, Stephen P. Griggs, Jason Clemens (the "Executive Defendants"), Frank J. Mullen, Richard Barasch, Joshua Parnes, Alan Quasha, Terence Connors, Dr. Susan Weaver, Dale Wolf, Bradley Coppens, David S. Williams III (together with the Executive Defendants, the "Individual Defendants," and, collectively, the "Defendants") hereby move pursuant to Fed. R. Civ. P. 8, 9(b), and 12(b)(6) to dismiss the Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint" or "Compl.") for failure to state a claim upon which relief can be granted.

## INTRODUCTION

This case is premised on a wildly speculative and inaccurate July 19, 2021 report issued by an admittedly self-interested and anonymous short seller (the "Short-Seller Report"), which claimed that AdaptHealth had made inaccurate statements with respect to its "organic" growth. The goal of such short sellers is to profit from driving down AdaptHealth's stock price by creating doubt in the minds of investors regarding its financial performance and value. As detailed below, the underlying analysis in the Short-Seller Report was itself inaccurate and misleading (as a number of analysts have noted). Despite the lack of foundation, this litigation does little more than attempt to piggyback on those specious allegations, and the unrelated recent departure of the Company's Co-CEO, to support purported violations of the securities laws.

For background, AdaptHealth, headquartered in Plymouth Meeting, Pennsylvania is a leading provider of home healthcare equipment, medical supplies to the home and related services. Since its founding in 2012, AdaptHealth[1] has grown from $7 million to over $2.3 billion in annual revenue (as of December 31, 2021). As it has disclosed to investors since 2019,

---

[1] For the avoidance of doubt, the terms "AdaptHealth" and the "Company" also refer to QMES Holdings, LLC, which was renamed AdaptHealth Holdings, LLC in 2018.

AdaptHealth strives "to grow its revenue while expanding margins through targeted strategies for organic growth as well as opportunistic acquisitions that take advantage of AdaptHealth's scalable integrated technology platform."[2]  Since becoming a public company, AdaptHealth has continuously disclosed to investors that its expectation was to grow its revenue by 20% year over year.  To achieve that goal, over the past nine years, AdaptHealth has employed a successful M&A approach that has resulted in more than 100 transactions, including the recent acquisition, in February 2021, of AeroCare Holdings, Inc. ("AeroCare"), one of its major competitors in the national home medical equipment ("HME") industry.

Public companies (like AdaptHealth) provide investors with numerous metrics related to revenue growth each quarter as part of their required public filings.  A statement of the company's revenue calculated under generally accepted accounting principles ("GAAP"), which is compared to prior quarters and/or years, generally accompanies such reporting.[3]  However, GAAP revenue reporting often fails to address specific investor questions concerning specific aspects of the Company's growth.  As a result, AdaptHealth—again, like other public companies—enhances such reporting with additional non-GAAP metrics that provide more detailed, or nuanced, information. [4]  One of those additional metrics—particularly for acquisitive companies—often provided to investors is generically referred to as "organic" revenue growth.[5] This metric attempts to present the market with information on how existing operations are growing without the impact of the revenue from the new locations or acquisitions.

---

[2] *See* Ex. 1 at 5; Ex. 2 at 7.

[3] *See, e.g.*, Ex. 3 at 1-8 ("The consolidated interim financial statements . . . have been prepared in accordance with . . . U.S. GAAP"); Ex. 4 at 1-10 (same); Ex. 5 at 1-11 (same).

[4] *See, e.g.*, Ex. 6 at 1,7 (explaining its use of "Non-GAAP Financial Measures"); Ex. 7 at 1, 8-9 (same); Ex. 8 at 1, 9-10 (same); *see also* Ex. 9 at 1-2 (same); Ex. 10 at 1, 13 (same).

[5] *See, e.g.*, Ex. 11 at 4; Ex. 12 at 2.

Due to the volume of AdaptHealth's acquisitions and its practice of quickly integrating newly acquired companies into its legacy businesses, AdaptHealth made the decision, in the fourth quarter of 2020, to modify the way it reports its "organic" growth to provide a more comprehensive picture of how its businesses were actually growing—and it began reporting what it has called "pro forma net revenue growth."[6] Plaintiffs allege that this change in methodology was not adequately disclosed. As a result, Plaintiffs (like the Short-Seller Report) assert that the reported growth numbers misleadingly and materially misreported AdaptHealth's "actual" organic growth.[7] Critically, Plaintiffs do not contend that AdaptHealth's reported "pro forma net revenue growth"—calculated using its new methodology—was false or inaccurate. These allegations cannot sustain a securities claim for the reasons stated herein.

Contrary to the allegations in the Complaint, the Company's "pro forma net revenue growth" methodology was clearly disclosed and well-understood by the market.[8] As noted above, this change in methodology was also entirely appropriate, especially given that there is no GAAP guidance with respect to "organic" growth reporting and no universally accepted definition of how to report such growth. In fact, after the change in revenue growth reporting, the Company's calculation was a frequent topic of discussion on its investor earnings calls. Indeed, during these calls, the Company responded to analyst questions and thoroughly explained its approach and justification even prior to the Short-Seller Report. Indeed, one analyst stated: "While we too would appreciate a true 'same store' growth number, **we also agree with management when they highlight that this type of figure simply doesn't provide a clear representation of the business**."[9]

---

[6] *See, e.g.*, Ex. 13 at 7; Ex. 14 at 7; Ex. 15 at 7; Ex. 16 at 7-8.
[7] *See* Compl. ¶¶ 30-33, 115, 117.
[8] *See* pp. 12-13, *infra*.
[9] *See* p. 13, *infra*.

While alternative approaches to revenue growth reporting would have yielded higher or lower reported "organic" growth during the class period than that calculated under the Company's pro forma metric, AdaptHealth's public statements have consistently demonstrated that it reasonably believed this metric more accurately and comprehensively reflected the Company's actual revenue growth. To be sure, since January 2020, AdaptHealth has consistently met its growth benchmarks—regularly doubling its net revenue as compared to the same quarter the previous year and growing more than 20% quarter over quarter—and has increased its year-end guidance in six of the last seven quarters.[10] Additionally, time has revealed that the Short-Seller Report drastically understated the Company's organic growth and completely fabricated that AdaptHealth was experiencing "organic decline." Rather, "organic" growth (even under a more traditional definition) continues to trend in line with stated expectations despite the impact of COVID-related disruptions and supply chain delays.[11]

Given the lack of any misleading disclosure in the first place, Plaintiffs simply cannot predicate a securities fraud claim on AdaptHealth's approach to calculating revenue growth. Further, in light of this fundamental deficiency with their claims, it should come as no surprise that Plaintiffs also fail to allege with particularity that either the Defendants did not believe their reported organic growth or misstated the basis for those opinions, which requires dismissal under the Supreme Court's decision in *Omnicare, Inc. v. Laborers District Council Industry Pension Fund*, 575 U.S. 175 (2015). Next, the Complaint also unsuccessfully challenges statements concerning AdaptHealth's organic growth trends that constitute nonactionable corporate optimism and forward-looking statements protected by the Private Securities Litigation Reform Act ("PSLRA") safe harbor. In addition to those fundamental pleading defects regarding the

---

[10] *See* pp. 10-11, *infra.*
[11] *See* pp. 15-16, *infra.*

lack of any misstatements or actionable omissions regarding organic growth, the Complaint has yet another incurable problem: the Complaint independently fails because it does not allege a strong inference of scienter. Plaintiffs have failed to adequately plead contemporaneous knowledge or recklessness, and mistakenly rely on fraud by hindsight, the core business doctrine, and purported anonymous witnesses. Finally, Plaintiffs fail to plead loss causation because the Short-Seller Report was not a "corrective disclosure," as it was entirely speculative and untrue.

Perhaps understanding that reliance on the allegations in the Short-Seller Report cannot sustain a securities fraud claim, Lead Plaintiffs modified the original complaint to allege additional claims, based on an April 2021 Danish criminal indictment brought against the Company's former Co-CEO, Mr. McGee, in connection with purported tax fraud he is alleged to have personally committed. Plaintiffs do not claim that Mr. McGee's alleged misconduct was at all related to AdaptHealth or its business. Nor can they. In fact, after conducting a thorough internal investigation on behalf of a Special Committee of independent directors of the AdaptHealth Board, a white-collar investigation team of the law firm DLA Piper reported "with a high degree of confidence that [AdaptHealth] had no involvement in, or connection to, Mr. McGee's alleged conduct." Additionally, and once again, Plaintiffs do not even allege that any of the Defendants' statements themselves are inaccurate. Rather, to turn this entirely unrelated and unadjudicated alleged misconduct into a securities fraud claim, Plaintiffs contend that the failure to disclose information related to Mr. McGee rendered certain of AdaptHealth's statements concerning the experience, qualifications and success of its management team, as well as its future and past revenue growth, false and misleading. Plaintiffs demonstrably fail to come close to pleading these theories with the factual particularity required by Rule 9(b) and the PSLRA, and thus cannot maintain a securities fraud claim premised on these allegations.

- 5 -

*First*, Plaintiffs fail to sufficiently link Mr. McGee's alleged misconduct to the challenged statements, and well-settled law provides that Defendants do not otherwise have a duty to disclose alleged corporate mismanagement or uncharged criminal conduct.[12] Tellingly, nowhere in the Complaint do Plaintiffs allege that Mr. McGee was charged with any crime or personally named in any legal proceeding at the time the challenged statements were made. *Second*, dismissal is independently warranted because Plaintiffs do not, and cannot, establish the required "strong inference" of scienter as to any Defendant. Plaintiffs rely almost exclusively on dispositions of AdaptHealth stock by Mr. McGee, but fail to allege, as the law requires, facts establishing that such dispositions were unusual or suspicious. Nor do Plaintiffs allege that any of the Defendants other than Mr. McGee was aware of the purported misconduct, or any facts showing that any of the Defendants—including Mr. McGee—intentionally misled shareholders as to any of the so-called misstatements or omissions alleged in the Complaint. *Finally*, Plaintiffs fail to plead loss causation because there was no disclosure revealing any wrongdoing or fraud that corrected any prior misstatements upon which AdaptHealth's stock price dropped.

Plaintiffs' remaining claims are equally without merit. Plaintiffs' "tag-along" control person claim must be dismissed for failure to plead any primary violation by AdaptHealth. Their claims under the 1933 Act should also be dismissed because Plaintiffs fail to allege a material misstatement or omission. And Plaintiffs' control person claim under the 1933 Act likewise fails absent a primary violation by AdaptHealth.

## STATEMENT OF FACTS

While spanning over 217 paragraphs across 85 pages, the Complaint reduces to two core allegations of purported securities fraud: (1) AdaptHealth improperly changed its method of

---

[12] *See* Section I.B., *infra*.

calculating and reporting organic growth, which, according to Plaintiffs, misreported the business's actual organic growth trends[13] and (2) AdaptHealth's statements related to the experience, qualifications and success of its management team were rendered false and misleading by its failure to disclose certain information related to Mr. McGee's alleged misconduct (which is wholly unrelated to AdaptHealth and its business).[14] Relevant factual background for evaluating these allegations is provided below.[15]

A.     **The Parties**

AdaptHealth, headquartered in Plymouth Meeting, Pennsylvania, is a "national leader in providing patient-centric and technology-enabled chronic disease management solutions including home healthcare equipment, medical supplies to the home and related services in the United States."[16] AdaptHealth's business focuses primarily on "providing (i) sleep therapy equipment, supplies and related services . . . to individuals suffering from obstructive sleep apnea, (ii) medical devices and supplies to patients for the treatment of diabetes, (iii) home medical equipment ("HME") to patients discharged from acute care and other facilities, (iv) oxygen and related chronic therapy services in the home, and (v) other home medical equipment medical devices and supplies on behalf of chronically ill patients with wound care, urological, incontinence, ostomy and nutritional supply needs."[17]

---

[13] *See* Compl. ¶ 6.

[14] *See* Compl. ¶ 3.

[15] The facts are based on the allegations in the Complaint, documents referenced or incorporated in the Complaint, and other judicially noticeable materials. *See* Request for Judicial Notice in Support of Motion to Dismiss Consolidated Class Action Complaint ("RJN") filed herewith. References to exhibits ("Ex. ") are to exhibits to the declaration of Vincent Iannece accompanying the RJN. The Defendants accept the allegations of the Complaint as true solely for purposes of this motion to dismiss.

[16] Ex. 2 at 5; *see* Compl. ¶¶ 2, 46.

[17] Ex. 2 at 5.

AdaptHealth was originally formed in November 2017 as a special purpose acquisition company under the name DFB Healthcare Acquisitions Corp. ("DFB").[18] On November 8, 2019, it was announced that DFB had completed its business combination with AdaptHealth Holdings LLC, a Delaware limited liability company, pursuant to an Agreement and Plan of Merger, dated July 8, 2019 (the "Merger Agreement"), after which DFB became known as AdaptHealth and began trading on the NASDAQ under the symbol "AHCO."[19]

Defendant McGee served as the Company's CEO from 2012 until February 2021, at which time he became the Company's Co-CEO until his resignation on June 11, 2021.[20] Mr. McGee also served as a Director on AdaptHealth's Board from November 7, 2019 until his resignation.[21] Defendant Griggs joined AdaptHealth in February 2021 upon its acquisition of AeroCare, and served as the Company's Co-CEO from that time until June 11, 2021, when he was appointed the sole Chief Executive Officer.[22] Defendant Parnes joined AdaptHealth in 2013 upon its acquisition of Ocean Home Health, and has served as the Company's President since that time. [23] Mr. Parnes has also served as a Director on AdaptHealth's Board since November 7, 2019.[24] Defendant Clemens has served as the Company's CFO since August 3, 2020.[25] Defendant Mullen has served as the Company's Chief Accounting Officer since September 21, 2020.[26] Defendants Barasch,[27] Quasha,[28] Connors, Weaver, and Wolf have each served as a

---

[18] Ex. 2 at 5; see Compl. ¶¶ 2, 8.

[19] Ex. 2 at 5; Ex. 17 at 1; *see also* Compl. ¶¶ 2, 8-9, 11, 46.

[20] *See* Compl. ¶ 47; *see also* Ex. 18 at Ex. 99.1, p. 5; Ex. 19 at 4; Ex. 20 at Ex. 99.1.

[21] *See* Ex. 21 at 12; *see also* Ex. 20 at Ex. 99.1.

[22] *See* Compl. ¶ 48; *see also* Ex. 19 at Ex. 99.1; Ex. 20 at Ex. 99.1.

[23] *See* Compl. ¶ 52; *see also* Ex. 18 at Ex. 99.1, p. 5.

[24] *See* Ex. 21 at 12.

[25] *See* Compl. ¶ 49; *see also* Ex. 22 at Ex. 99.1.

[26] *See* Compl. ¶ 50; *see also* Ex. 23 at Ex. 99.1. AdaptHealth announced on November 19, 2021 that Mr. Mullen would be leaving the Company effective May 16, 2022 due to personal reasons, and that "his departure is not the result of any dispute or disagreement" with the Company. Ex. 24 at 2.

[27] Mr. Barasch has, at all times, served as Chairman of the Board. *See* Compl. ¶ 51. He previously served as Chairman and CEO of DFB prior to the Merger Agreement. *See* Ex. 25 at 165-66.

Director on AdaptHealth's Board since November 7, 2019.[29]  Defendants Coppens and Williams III have each served as a Director on AdaptHealth's Board since July 2020.[30]

Plaintiffs Delaware County Employees Retirement System and Bucks County Employees' Retirement System were appointed "Lead Plaintiff" in October 2021, and purport to have purchased AdaptHealth Common Stock during the class period, including shares in "AdaptHealth's January 2021 Secondary Offering."[31]

### B.      **The Challenged Statements**

A complete list of the statements challenged in the Complaint is included in Appendix A.[32]  *See Fogel v. Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at *18 (S.D.N.Y. Feb. 27, 2017) (accepting similar appendices as "organizational tools").

### C.      **AdaptHealth's Business**

#### 1.      **AdaptHealth's Experienced Management**

Throughout the class period, AdaptHealth disclosed the significant industry experience of its proven management team, which has enabled it to "provide high-quality products and services

---

[28] AdaptHealth announced on August 30, 2021 that Mr. Quasha had submitted a notice of resignation effective as of September 1, 2021, and that "Mr. Quasha had no disagreement with the Company in connection with his resignation." *See* Ex. 26 at 2.

[29] *See* Compl. ¶¶ 51, 53-58; *see also* Ex. 21 at 12.

[30] *See* Ex. 27 at 2; Ex. 28 at Ex. 99.1.

[31] Compl. ¶ 45.

[32] Though Defendants have attempted to put together a comprehensive list of what they believe to be the statements Plaintiffs are challenging, it is a difficult task given Plaintiffs' lack of specificity about which statements are at issue and its method of "puzzle pleading." "Puzzle pleading," which is the practice of offering lengthy block quotations, sometimes with random words or sentences bolded and italicized, followed by a list of known or disregarded information that is repeatedly referenced but without any corresponding explanation of the basis for the plaintiff's claims, is itself an independent basis for dismissal. *See Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37–38 (2d Cir. 2012) (holding that puzzle pleading fails to "demonstrate with specificity why and how each statement is materially false or misleading"); *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 2017 WL 3891676, at *3 (D. Del. Sept. 6, 2017) (dismissing puzzle pleading complaint).

to its customers and [ ] create value."[33]  The experience and track record of AdaptHealth's

officers cannot be disputed.

For example, among others:

- Mr. McGee, prior to joining AdaptHealth, had extensive experience working in the investment banking groups at Deutsche Bank and Merrill Lynch, and in his nine years at AdaptHealth led its proven acquisition track record and built the business from $7 million in revenue to over $1 billion.[34]

- Mr. Griggs founded AeroCare in 2000 to provide oxygen, respiratory therapy services and HME to the home and healthcare market and at AeroCare achieved 20 years of consecutive revenue growth.[35]  Prior to AeroCare, Mr. Griggs served as the CFO, COO and President of Rotech Medical Corporation.[36]

- Mr. Parnes, prior to joining AdaptHealth, built Ocean Home Health from a startup to a successful HME provider, and has over 16 years of operating experience in the HME industry.[37]

- Mr. Clemens has more than two decades of operations-focused financial leadership experience, and previously served as the Senior Vice President and Operations CFO of MEDNAX, Inc., a publicly traded company and provider of health solutions to hospitals, health systems and healthcare facilities.[38]

- Mr. Mullen has more than 25 years of public company accounting and finance leadership experience, and most recently served as the Vice President and Controller of Ryder System, a leading global logistics and transportation company.[39]

### 2.    AdaptHealth's Business Strategy

AdaptHealth's stated business strategy is "to grow its revenue while expanding margins

through targeted strategies for organic growth as well as opportunistic acquisitions that take

advantage of AdaptHealth's scalable, integrated technology platform."[40]  As a result,

AdaptHealth has consistently disclosed that it looks to drive revenue through both acquisitions

---

[33] *See, e.g.*, Ex. 2 at 8-9; *see also* Ex. 1 at 6.
[34] *See* Ex. 18 at Ex. 99.1, pp. 5; Ex. 29 at 11; *see also* Ex. 2 at 45.
[35] *See* Ex. 20 at Ex. 99.1.
[36] Compl. ¶ 133.
[37] *See* Ex. 18 at Ex. 99.1, p. 5
[38] *See* Ex. 22 at Ex. 99.1.
[39] *See* Ex. 23 at Ex. 99.1.
[40] *See* Ex. 1 at 5; Ex. 2 at 7.

and organic growth.[41]  In fact, AdaptHealth has publicly stated its belief that the company will grow, on a long-term basis, approximately 20% a year, with a target of 8% to 10% coming from organic growth.[42]  And, indeed, as shown in the table below, the Company has grown significantly since 2017 and, more recently, has increased its year-end net revenue guidance to analysts in six of the last seven quarters.[43]

| | FY2017[44] | FY2018[45] | FY2019[46] | FY2020[47] | FY2021[48] (Projected) | 9M[49] FY2020 | 9M[50] FY2021 |
|---|---|---|---|---|---|---|---|
| Total Net Revenue | $192.6 million | $345.3 million | $529.6 million | $1.06 billion | $2.41 billion | $1.75 billion | $708 million |
| Year-over-Year Growth | | +79.3% | +53.4% | +99.5% | +127.4% (estimated) | | +$147.5% |

Premised on allegations contained in the Short-Seller Report, Plaintiffs allege that, beginning in the fourth quarter of 2020, AdaptHealth changed the way it—"and every other publicly traded company"[51]—had historically calculated and reported its organic growth revenue and trends without adequate disclosure, and, in doing so, caused its reported organic growth numbers to be artificially inflated.[52]  Rather than proffering any required standard of reporting this metric under GAAP—which it cannot do—Plaintiffs cite to the so-called "traditional" definition of organic growth, which they allege refers to "an increase in sales and expansion through the company's own resources" as opposed to "profits or growth attributable to mergers

---

[41] *See* Ex. 1 at 5; Ex. 2 at 7.

[42] *See, e.g.*, Ex. 30 ("[W]e think we can grow the business . . . at 20% plus per year.") at 4; Ex. 31 at 7 ("[W]e remain confident in our organic growth prospects of between 8% and 10%.").

[43] *See* Ex. 34 at 3; Ex. 35 at 2; Ex. 36 at 2.; Ex. 37 at Ex. 99.1.; Ex. 38 at Ex. 99.1; Ex. 32 at Ex. 99.1.

[44] *See* Ex. 2 at 45.

[45] *See* Ex. 2 at 45.

[46] *See* Ex. 2 at 45.

[47] *See* Ex. 2 at 45.

[48] *See* Ex. 32 at Ex. 99.1 (increasing guidance for year-end 2021).

[49] *See* Ex. 33 at 5.

[50] *See* Ex. 33 at 5.

[51] Compl. ¶ 6.

[52] *See, e.g.*, Compl. ¶¶ 30, 33, 115, 127, 134.

and acquisitions."[53]   However, as explained further below, there is no precise way to calculate organic growth under GAAP, or even any universally accepted definition of the term. [54]

As AdaptHealth has explained, the traditional definition of organic growth is commonly reported on what is known as a "same-store" basis, which measures how a particular store or product line has performed over a certain period.[55]  However (again, as has been publicly disclosed), this was very challenging for AdaptHealth to accurately track or report—and could be viewed as an incomprehensive portrayal of its growth—particularly given how quickly it was acquiring and integrating new businesses.[56]  In fact, AdaptHealth does not operate in the classic "same-store" sense, but rather immediately integrates acquired businesses with legacy businesses, and vice versa.[57]  Moreover, since its founding, AdaptHealth has completed more than 100 transactions, including, most notably, its recent purchase of AeroCare, one of its largest competitors, which was announced on December 1, 2020.[58]  To more comprehensively account for this rapid integration, AdaptHealth, beginning in the fourth quarter of 2020, started reporting a "pro forma net revenue" metric as a more appropriate reflection of its actual growth.[59]

Contrary to the allegations in the Complaint, this change was disclosed and understood by the market months before the Short-Seller Report was issued.  For example, in the Financial Supplement provided in connection with the earnings call for year-end 2020, AdaptHealth

---

[53] *See* Compl. ¶ 25 (citing *Investopedia*).

[54] *See* pp.22-23, *infra*.

[55] *See, e.g.*, Ex. 39 at 8 ("I think . . . when you say traditional organic growth, you might be alluding to same store."); Ex. 40 at 17-18 ("I mean, so there's no real kind of classic same-store to even compare against because we don't operate that way.").

[56] *See* Ex. 39 at 8-9 (explaining that AdaptHealth's integration process "makes it extremely difficult, I would argue almost impossible, to calculate a same-store growth because there's no more same stores. They've all been merged together"); Ex. 40 at 17-18 (explaining that it is "a little difficult in this sector of healthcare" to use a traditional organic growth calculation because "the whole part of AdaptHealth is that we are going to resupply smarter and more efficiently to the patient . . . .").

[57] *See* Ex. 39 at 8-9 ("So when you talk about same-store growth, we just don't manage that way, and we don't account for it that way.").

[58] *See* Ex. 2 at 5-9.

[59] *See* Ex. 13 at 7; Ex. 14 at 7; Ex. 15 at 7.

- 12 -

indicated that its organic growth was being calculated by a "pro forma growth" metric, explicitly defined on the organic growth slide as "current period net revenue plus current period acquisition revenue divided by prior period net revenue plus prior period revenue for acquisition revenue."[60] Also, AdaptHealth's Form 10-Q for the first quarter of 2021 disclosed that the pro forma net revenue reported in its financial statements was being amended to "include[] all acquisitions completed in the period as opposed to just material acquisitions, which were previously disclosed."[61]

In fact, this very issue was the subject of an analyst's question on May 6, 2021 (also prior to the Short-Seller Report), during the earnings call for the first quarter of 2021.[62] On the call, an analyst asked: "appreciat[ing] the comments on organic growth and the pro forma way you do that[;] I am curious . . . do you have the more traditional calculation on organic growth where a company would just take out all the deals you have to annualize and look at the base business that was intact 365 days prior?"[63] AdaptHealth then explained why it was now reporting organic growth this way.[64] The analyst responded, "**Yes . . . I get it.**"[65] Moreover, a July 19, 2021 report by Deutsche Bank Research noted that "[w]hile we too would appreciate a true 'same store' growth number, **we also agree with management when they highlight that this type of figure simply doesn't provide a clear representation of the business**."[66]

---

[60] *See* Ex. 13 at 7.

[61] Ex. 39 at 6; *see also* Ex. 41 at 15-19.

[62] *See* Ex. 40 at 17-18.

[63] *See* Ex. 40 at 17.

[64] *See* Ex. 40 at 17-18.

[65] *See* Ex. 40 at 18.

[66] *See* Ex. 42 at 1 (emphasis added); *see also* Ex. 43 at 1 ("[AdaptHealth] does not provide a same-store figure because once acquisitions are completed the offices are typically consolidated and extremely (or impossible) to really track. Thus, the proforma calculation is the best indication of organic performance.").

### 3. Jehoshaphat Research Launches a "Short Attack"

On July 19, 2021, before the market opened, Jehoshaphat Research ("Jehoshaphat"), a blog run by anonymous investors that had taken a short position on AdaptHealth, published the Short-Seller Report, titled "Not Just a Roll-Up, But a Cover-up: Is AHCO the Next MDCA?"[67] Jehoshaphat disclaims on its website that "[i]nvestors should realize that we are biased, and actively manage financial assets in accordance with our research views,"[68] and the Short-Seller Report itself provides that "[t]his entire report consists of opinions as outsiders of the company[; w]e are, obviously short [AdaptHealth]."[69] The Short-Seller Report alleges, generally, that AdaptHealth had intentionally inflated and obscured its organic growth figures in Q4 2020 and Q1 2021 by changing the calculation it used to derive the metric to include revenue growth attributable to recent acquisitions.[70] Additionally, the Short-Seller Report argues that "while management claims . . . an organic growth trajectory of 8-10%, [AdaptHealth] is in fact experiencing double-digit organic decline."[71]

Even putting aside the disclosed and inherent bias of the Short-Seller Report, it is also fundamentally wrong.[72] To begin with, as explained above, AdaptHealth only began disclosing in its financial statements net revenue acquired from "all acquisitions," as opposed to revenue from "all *material* acquisitions," as of January 1, 2021, and thus the Short-Seller Report did not have all of the necessary financial data required to make organic growth calculations under the

---

[67] *See generally* Ex. 44

[68] *See* Ex. 45.

[69] *See* Ex. 44 at 1 n.1.

[70] *See* Ex. 44 at 2-3.

[71] *See* Ex. 44 at 1.

[72] *See* Ex. 46 at 3 ("[W]e believe the Bark is less than the Bite from this anonymous short seller."); Ex. 47 at 1 ("[A]ll of these concerns have been refuted by the company's Q2 earnings release . . . .").

traditional definition throughout the entire class period. [73] Additionally, as outlined in a July 19, 2021 report by Deutsche Bank Research, the calculations in the Short-Seller Report are "[d]isprovable with 2Q [2021] results"[74]—which, of course, include all acquisitions in its disclosure of "pro forma net revenue." A follow-up analyst report by Deutsche Bank Research on August 11, 2021 goes on to say "[o]rganic growth is critical for healthcare service companies, and we appreciate the concern around slowing organic growth. However, the strong end market and our deep dive into the disclosures **makes us confident that [AdaptHealth] is seeing the organic growth they are reporting**."[75] Further, the Short-Seller Report completely ignores AdaptHealth's disclosures concerning the impact of the COVID-19 pandemic, including, specifically, impacts of lock downs and supply chain disruptions, on its growth metrics.[76] Finally, the allegations certainly do not comport with AdaptHealth's continuing growth story, in spite of COVID-related challenges, including its ability to meet or exceed its net revenue targets each quarter during (and since) the class period.[77]

---

[73] Understanding that this provided the short-seller with the opportunity to undersell AdaptHealth's organic growth, AdaptHealth decided to enhance its disclosures. *See* Ex. 39 at 6. For example, prior to its Q2 2021 earnings call, AdaptHealth added to its financial supplement "a continued bridge of organic growth," which walks investors through its calculation of "organic net revenue growth" from total "reported net revenue growth." Ex. 39 at 8; *see also* Ex. 15 at 7. Moreover, prior to its Q3 2021 earnings call, AdaptHealth added to its financial supplement a slide that detailed and broke out AdaptHealth's "Acquired Net Revenue" as opposed to its "Non-Acquired Net Revenue" to provide the market with what the organic growth numbers would be under a more "traditional" definition of organic growth. *See* Ex. 16 at 8 (showing that, even under this more "traditional" definition, AdaptHealth's non-acquired net revenue increased nearly 4%, and more than 7% when excluding its Patient Care Solutions ("PCS") business, which has been disclosed as a "turn-around situation" expected to incur "operational losses" in the short term). *See* Ex. 8 at 1. Nevertheless, AdaptHealth has maintained that its pro forma calculation provides the most comprehensive measure of its revenue growth. *See, e.g.*, Ex. 40 at 17-18; Ex. 39 at 8-9.

[74] Ex. 42 at 3; *see also* Ex. 46 at 1 ("[T]he author (who is short the stock and pushing the story to move the stock down) clearly only gives one side of the issue . . . ."); Ex. 47 at 1.

[75] Ex. 46 at 3.

[76] Ex. 2 at 17-26 (disclosing the risk that "the recent coronavirus pandemic and the global attempt to contain it may harm our business, results of operations and ability to execute on our business plan"); Ex. 48 at 4 ("Like most other companies, parts of our business were negatively impacted by the COVID-19 pandemic."); Ex. 49 at 5, 7, 13 (describing COVID-related challenges); Ex. 50 at 2, 3, 6 (same).

[77] *See* p. 4, *supra*.

D.      **Mr. McGee's Resignation from AdaptHealth**

On April 13, 2021, AdaptHealth announced that it "learned that authorities in Denmark had formally charged Co-Chief Executive Officer Luke McGee with alleged tax fraud arising from certain past private activity.  The alleged personal conduct occurred between March 2014 and August 2015 and had no connection to AdaptHealth's business."[78]  Upon learning the news of the criminal indictment, AdaptHealth immediately placed Mr. McGee on unpaid leave from his roles as Co-CEO and Director while the matter is pending.[79]  AdaptHealth also formed a Special Committee of independent directors to oversee a thorough investigation—which it retained the law firm DLA Piper to conduct—of any connection between Mr. McGee's private actions and the Company, which resulted in a finding "with a high degree of confidence that [AdaptHealth] had no involvement in, or connection to, Mr. McGee's alleged conduct."[80]

On June 14, 2021, AdaptHealth and Mr. McGee reached an agreement under which Mr. McGee would resign from all positions with the Company, effective June 11, 2021.[81]  In connection with the resignation, the Company and Mr. McGee entered into a Memorandum of Understanding (the "MOU"), which was simultaneously disclosed to the public along with the announcement of Mr. McGee's resignation and provided, among other things, that Mr. McGee would be entitled to receive (i) his unpaid base salary from the beginning of his unpaid leave through June 11, 2021 and (ii) pro rata vesting through June 11, 2021 of Mr. McGee's unvested equity awards scheduled to vest as of December 31, 2021.[82]  Pursuant to the MOU, AdaptHealth was to "process the exercise of [Mr. McGee's] vested options promptly following receipt of the cash from [Mr. McGee] to cover the exercise and withholding taxes . . . [and] [t]he Company

---

[78] Ex. 51 at 1.
[79] Ex. 51 at 1.
[80] Ex. 20 at Ex. 99.1.
[81] Ex. 20 at Ex. 99.1.
[82] Ex. 20 at Ex. 10.1.

acknowledge[d] [Mr. McGee's] intention to sell shares of Class A Common Stock of the Company to fund such expenses."[83] Upon Mr. McGee's resignation, Mr. Griggs was appointed AdaptHealth's sole Chief Executive Officer.[84] Plaintiffs do not (and cannot) allege that Mr. McGee's alleged wrongdoing was adjudicated in the Danish proceeding during the class period.

Throughout the class period, including in connection with its February 2021 follow-on securities offering, AdaptHealth provided to investors specific warnings that "the loss of key personnel" could negatively impact its "operations and financial results."[85] These disclosures identified the risk that presented itself when AdaptHealth was informed of Mr. McGee's indictment. Specifically, AdaptHealth's risk factors provide that "it is highly dependent on the performance and continued efforts of its senior management team" and that "[i]t is possible that AdaptHealth will lose some key personnel, the loss of which could negatively impact our operations and profitability."[86] The substance of this disclosure has been repeated in AdaptHealth's public disclosures since the beginning of the class period,[87] including, notably, in AdaptHealth's Prospectus Supplement in connection with AdaptHealth's follow-on offering.[88]

In any event, contrary to the allegations in the Complaint,[89] even in the immediate aftermath of Mr. McGee's departure, analysts continued to express faith in AdaptHealth's remaining management team and its ability, in the long-term, to acquire and integrate deals.[90] For instance, an April 14, 2021 report by BofA Global Research noted: "[I]f ever there was a company that is well positioned to deal with an issue like this, we think it would be AHCO . . .

---

[83] Ex. 20 at Ex. 10.1.

[84] Ex. 20 at Ex. 99.1.

[85] Ex. 2 at 24; Ex. 52 at S-24; *see also* Ex. 1 at 23-24.

[86] Ex. 2 at 24; Ex. 52 at S-24; *see also* Ex. 1 at 23-24.

[87] *See, e.g.*, Ex. 2 at 24; Ex. 52 at S-24; Ex. 1 at 23-24.

[88] Ex. 52 at S-24.

[89] *See* Compl. ¶¶ 130-33.

[90] Indeed, AdaptHealth has completed 10 additional acquisitions since July 1, 2021. *See* Ex. 53 at 4.

with Steve Griggs . . . creating an obvious replacement and minimizing what otherwise could have been an operational leadership vacuum . . . [and] we have a high regard for the company's COO, Josh Parnes, giving us confidence that there should be little impact on the company's operations . . . . [W]e have no concerns about the company's ability to acquire and integrate deals . . . ."[91] Similarly, an April 13, 2021 report by Canaccord Genuity Capital Markets affirmed that it "has full confidence in the go-forward management of AdaptHealth, with Steve Griggs and Josh Parnes."[92] Further, an April 13, 2021 report by Deutsche Bank Research made clear that even "in the near-term" it believed "the strength of Parnes, Griggs and Clemens can keep AHCO operating at peak efficiency" and that "AHCO is in an excellent position today."[93] Finally, an April 13, 2021 report by Jefferies explained its belief that "Steve's breadth of experience in the industry, Josh's deep knowledge of the company, and Jason's public company experience will enable [ ] them to present the company's story to investors successfully."[94]

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), plaintiffs must allege sufficient factual matter "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009. While plaintiffs' factual allegations should be viewed as true, *see Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008), a court need not "accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).

---

[91] Ex. 54 at 1.
[92] Ex. 55 at 1.
[93] Ex. 56 at 1-2.
[94] Ex. 57 at 1.

## ARGUMENT

To state a claim for securities fraud under Section 10(b) and Rule 10b-5 of the 1934 Act, a plaintiff must allege "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014).

Since Plaintiffs assert a claim for securities fraud, they "must state with particularity the circumstances constituting fraud." Fed R. Civ. P. 9(b); *see also In re Nutrisystem, Inc. Sec. Litig.*, 653 F. Supp. 2d 563, 576-77 (E.D. Pa. 2009). The PSLRA imposes "[e]xacting pleading requirements." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); H.R. Conf. Rep. No. 104-369, at 41 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 740 (Congress enacted very "stringent" pleading requirements to "curtail the filing of meritless lawsuits"). Specifically, the PSLRA imposes on plaintiffs asserting securities law violations "two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss." *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009).

First, the complaint must "'specify each allegedly misleading statement, [and] why the statement is misleading.'" *Id* at 252-53; *Nutrisystem*, 653 F. Supp. 2d at 576-77 (citing 15 U.S.C. § 78u-4(b)(1)(B) and *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007)). Where, as here, a plaintiff asserts Section 10(b) claims against multiple defendants, the complaint "must specify the role of each defendant and their connection to the misstatements or omissions." *Id*. at 577. Moreover, the standard "'requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story.'" *Avaya*, 564 F.3d at 253 (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999)). Also, "Rule 9(b)

- 19 -

requires that a plaintiff show that the person responsible for the misstatement or omission alleged had knowledge of its false or misleading character at the time." *Nutrisystem*, 653 F. Supp. 2d at 577 (citing *In re Rockefeller Cntr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002)).

Second, the complaint must, "'with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Avaya*, 564 F.3d at 253 (quoting 15 U.S.C. § 78u-4(b)(2)). For securities fraud actions, the required state of mind is scienter – "the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 313 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976)). A "strong inference" of scienter is one that is "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314.

## I.   NO MATERIAL MISSTATEMENTS OR OMISSIONS ARE SUFFICIENTLY PLED

*First*, Plaintiffs attack AdaptHealth's reporting of organic growth during the class period.[95] Plaintiffs present three primary explanations for why AdaptHealth's reporting of organic growth was purportedly false and misleading: (1) AdaptHealth concealed the fact that it had replaced its prior organic growth metric with a new "pro forma" growth metric, which was inconsistent with industry standards and historical reporting;[96] (2) AdaptHealth concealed the underlying calculation behind the new "pro forma" revenue growth metric;[97] and (3) AdaptHealth concealed that actual organic growth, as measured by the predecessor metric, was actually declining, and was significantly lower than pro forma growth.[98]

---

[95] S*ee, e.g.*, Compl. ¶¶ 6, 25-33, 38-39, 115-127, 140; *see also* App'x A, Statement Nos. 2-5, 26-29.
[96] *See, e.g.*, Compl. ¶¶ 30-33, 115, 127.
[97] *See, e.g.*, Compl. ¶¶ 31-32, 115, 127.
[98] *See, e.g.*, Compl. ¶¶ 31-32, 115, 127, 140.

*Second*, Plaintiffs contend that certain of AdaptHealth's statements related to the experience, qualifications and success of its management team, as well as its future and past revenue growth, were rendered false and misleading by its failure to disclose facts related to Mr. McGee's alleged unrelated criminal misconduct.[99]

None of these allegations pleads an actionable misstatement with particularity. As explained in detail below, the Complaint is subject to several deficiencies specific to both of the major categories of alleged misstatements.

A. **Plaintiffs Fail to Plead an Actionable Misstatement or Omission Relating to AdaptHealth's Reporting of Organic Growth**

1. **AdaptHealth's Reporting of Organic Growth Was Reasonable**

As explained above, beginning in the fourth quarter of 2020, AdaptHealth began using a "pro forma growth" calculation in order to quantify and present its "organic" revenue growth.[100] Critically, Plaintiffs do not contend that AdaptHealth falsely reported its "pro forma growth," as calculated using its new methodology. Instead, they allege that Defendants materially misreported and concealed what the Short-Seller Report alleged was AdaptHealth's "actual" organic growth revenue by using this new methodology, which resulted in organic growth revenue numbers that were purportedly "significantly" higher than those when calculated according to AdaptHealth's previous methodology or industry-standard methodologies.[101] However, contrary to Plaintiffs' allegations, the change in methodology was contemporaneously disclosed, was the subject of extensive questioning by analysts well in advance of the Short-Seller Report, and was understood by the market.[102]

---

[99] *See* Compl. ¶¶ 11-14, 76-113; *see also* App'x A, Statement Nos. 1, 2, 6-25.
[100] *See* p. 13, *supra*.
[101] *See, e.g.*, Compl. ¶¶ 31-32, 115, 127, 140.
[102] *See* p. 3, *supra*.

Moreover, there is no precise way to calculate organic growth under GAAP, or, for that matter, even any universally accepted definition of the term. *See Stein v. Tangoe, Inc.*, 2014 WL 12767210, at *10 (D. Conn. Sept. 30, 2014) (discussing organic growth). Rather, companies are permitted to use their own judgment in making such calculations. As a result, calculations of organic growth revenue are essentially no different from opinions because reasonable persons may disagree over how they should be calculated and neither lends itself to objective conclusions. *See Ironworkers Local 580--Joint Funds v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 426-28 (S.D.N.Y. 2014) ("It is not fraudulent for a reporting entity to calculate metrics that are not defined under GAAP . . . taking (or not taking) into account whatever factors the reporting entity thinks appropriate—as long as the public is told exactly what the company is doing."). Accordingly, to properly plead that such statements were materially misleading, Plaintiffs must allege with particularity, pursuant to the Supreme Court's decision in *Omnicare*, provable facts to demonstrate that the judgments used by AdaptHealth are both objectively and subjectively false. *See* 575 U.S. at 182-184, 194-195; *see also In re Amarin Corp. PLC.*, 2015 WL 3954190, at *7 n.14 (D.N.J. June 29, 2015) (assuming *Omnicare* applies in the Section 10(b) context); *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 567 (S.D.N.Y. 2011).

Plaintiffs have failed to plead any such facts.[103] The Complaint has no allegations that Defendants could not reasonably believe and did not believe that they could report "organic" growth using the methods and calculations disclosed by AdaptHealth. *See Billhofer v. Flamel Techs., S.A.*, 2012 WL 3079186, at *10 (S.D.N.Y. July 30, 2012) (finding insufficient pleading where plaintiff did not "ple[a]d any support from any document, email or witness testimony" that

---

[103] Plaintiffs challenge statements related to organic growth such as, "[o]rganic growth as shown is defined as current period net revenue plus current period acquisition revenue divided by prior period net revenue plus prior period revenue for acquisition revenue," App'x A., Statement No. 5, and "at the end of the day, you could think of organic growth as a weighted average of a couple of big buckets." App'x A, Statement No. 30.

opinions were subjectively disbelieved). Moreover, Plaintiffs made no showing that these statements were not "fairly aligned" with the information in AdaptHealth's possession at the time the opinions were expressed. Rather, AdaptHealth's unchallenged disclosures suggest that its reporting of "organic" growth was directly in line with its tremendous net revenue growth throughout the class period.[104] In any event, courts have held that no one method of calculation exists for organic growth; instead companies are permitted to exercise some freedom in their accounting methodology even though it may then not "calculate organic growth in the same way that [their] competitors [do] and in the manner that analysts and investors expect." *In re Omnicom Grp. Inc. Sec. Litig.*, 2005 WL 734937, at *1 (S.D.N.Y. Mar. 30, 2005); *see also Stein*, 2014 WL 12767210, at *9.

Further, AdaptHealth's decision to change accounting methods is not actionable because accounting rules generally are subject to a range of reasonable judgments. *See Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979); *see also In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 772 (S.D. Ohio 2006). This is because "[a]ccountants long have recognized that [GAAP] are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions." *Thor Power Tool Co.*, 439 U.S. at 544 (internal quotation marks omitted). Since accounting methods are flexible and tolerate a range of reasonable treatments, the choice among alternatives is left to management. *Id.* Such is the case here.

Thus, based on the facts alleged, the Complaint offers no basis to conclude that AdaptHealth's methodology was unreasonable and that AdaptHealth did not believe the metrics it was reporting.

---

[104] *See* p. 4 , *supra.*

### 2. AdaptHealth's Statements of Corporate Optimism Are Not Actionable

Plaintiffs broadly challenge the Defendants' expressions of belief during the class period about its organic growth trends (e.g., "I am confident these efforts will be fruitful," "we are optimistic we'll stay within that range," "we remain confident in our organic growth prospects.").[105]  However, as set forth below, a mountain of case law makes clear that these kinds of opinions are not actionable under the federal securities laws.

As the Third Circuit has explained, "Vague and general statements of optimism constitute no more than puffery and are understood by reasonable investors as such." *Advanta*, 180 F.3d at 538 (quotation marks omitted) (citing *Burlington Coat Factory*, 114 F.3d 1410, 1428 n.14 (3d Cir. 1997) (Alito, C.J.)).  Therefore, "[s]uch statements, even if arguably misleading, do not give rise to a federal securities claim because they are not material:  there is no substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Id*. (upholding dismissal of statements touting the quality of the company's credit as non-actionable puffery).

The reason that these statements are non-actionable is that the securities laws "neither require corporate officers to adopt a crabbed, defeatist view of the company's business prospects nor permit dissatisfied shareholders to assert serious allegations of fraud based on . . . hindsight[.]"  *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 367 (S.D.N.Y. 2007). Rather, corporate officers are "expected to be confident about their stewardships and the prospects of the business that they manage."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994).  Plaintiffs' attacks on these generalized statements casting AdaptHealth's organic growth trends in a favorable light thus fail in the face of well-settled law.

---

[105] *See, e.g.*, Compl. ¶¶ 26, 28, 77, 116, 122; *see also* App'x A, Statement Nos. 2, 3, 7, 26, 28.

### 3. AdaptHealth's Forward-Looking Statements Are Protected by the PSLRA Safe Harbor

Plaintiffs' claims also fail because many of the challenged statements are forward-looking statements protected by the PSLRA safe harbor.[106]  *See* 15 U.S.C. § 78u-5(i)(1).  Under the PSLRA safe harbor, a party is not liable with respect to three protected categories: (1) forward-looking statements accompanied by "meaningful cautionary statements," (2) forward-looking statements that are "immaterial" *or* (3) forward-looking statements made without "actual knowledge of its falsehood."  *See Avaya*, 564 F.3d at 254.  Defendants' statements concerning AdaptHealth's organic growth trends are protected under all three.

*First*, statements made by AdaptHealth about AdaptHealth's organic growth trends and/or outlook are classic forward-looking statements.  They depend on, among other things, future financial results and general market conditions;  as such, they are merely "business prospects and expected financial results . . . [which are] subject to the PSLRA's safe harbor provisions."  *Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*, 572 F. App'x 713, 717 (11th Cir. 2014).  Here, AdaptHealth cautioned that current projections may not come to realization and that organic growth metrics could be lower than expected.[107]  AdaptHealth thus put investors on notice of the potential risks that could prevent its optimistic forward-looking statements from being realized.  *See Avaya*, 564 F.2d at 258.

---

[106] Plaintiffs challenge multiple forward-looking statements about AdaptHealth's organic growth outlook. *See* App'x A, Statement Nos., 1-3, 26, 28, 30. Plaintiffs challenge statements like "we remain confident in our organic growth prospects between 8% and 10% for 2021," No. 26; "we feel confident that the balance of 2021 will meet our organic growth expectations," No. 28; and "[w]e have put a 10% to 12% expectation on diabetes growth in the market," No. 30. None of these statements support a claim.

[107] *See, e.g.*, Ex. 1 at 24-25 (disclosing the risk that "AdaptHealth's strategic growth plan, which involves the acquisition of other companies, may not succeed"); Ex. 2 at 17-26 (disclosing the risk that "the recent coronavirus pandemic and the global attempt to contain it may harm our business, results of operations and ability to execute on our business plan"); Ex. 34 at 3 (warning that "it is impossible to predict the duration of the COVID-19 crisis or the full impact on the Company's business"); Ex. 50 at 6 (same).

*Second*, the statements of corporate optimism challenged by Plaintiffs each has a forward-looking dimension, and therefore is protected by the PSLRA safe harbor for the same reasons as stated above:[108]  they are immaterial as a matter of law. *See Advanta*, 180 F.3d at 538.

*Finally*, Plaintiffs fall far short of pleading "actual knowledge," which requires proof of knowing of the falsity of their statements at the time the statements were made. *See Avaya*, 564 F.3d at 274 (liability for forward-looking statements "attaches only upon proof of knowing falsity"); *In re Discovery Labs. Sec. Litig.*, 2007 WL 789432, at *2 (E.D. Pa. Mar. 15, 2007) ("[T]he burden is on plaintiffs to show that defendants knew the statement was false or misleading."). This is a "scienter requirement for forward-looking statements [that] is stricter than that for statements of current fact." *Avaya*, 564 F.3d at 274. Plaintiffs have failed to plead facts demonstrating the objective or subjective falsity of any forward-looking statements.

### B. Plaintiffs Had No Duty to Disclose Defendant Luke McGee's Alleged Unrelated Misconduct

Plaintiffs allege that AdaptHealth's disclosures relating to the success, experience or qualifications of its management team, including, specifically, Mr. McGee,[109] and its "past and future revenue growth" [110] were "false and misleading."  It is, of course, black letter law that, to allege an actionable misstatement, plaintiffs must plead facts establishing that each challenged statement was false when made. *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 565 (E.D. Pa. 2009) (holding that a statement is considered false or misleading under Rule 10b-5 if "it is

---

[108] *See* Section I.A.2., *supra*.

[109] *See, e.g.*, Compl. ¶¶ 76-78, 81-84, 86-91, 93-97, 99-103, 105-106, 108-113; *see also* App'x A, Statement Nos. 6-8, 10-25. Such challenged statements include "Proven, seasoned management team," No. 8; "Luke McGee . . . Led the Company's proven acquisition track record and developing a scalable platform with robust integration systems that can accommodate future growth," No. 8; "Our ability to successfully operate our business is largely dependent upon the efforts of certain key personnel of AdaptHealth," Nos. 18, 21-22, 25; and "We are led by a proven management team with significant experience in the HME and healthcare services industries," No. 22.

[110] *See, e.g.*, Compl. ¶¶ 76-77, 80-82, 88-89, 99-100, 105, 108-109.

factually inaccurate, or additional information is required to clarify it"). Yet, Plaintiffs do not allege—nor could they—a single fact showing that any of these statements was false. Nothing in the Complaint even suggests that AdaptHealth, for example, was not led by a "proven, seasoned management team" or that its revenue-reporting—outside of certain disclosures relating to organic growth[111]—was inaccurate. Plaintiffs' theory of fraud should be dismissed for this reason alone.[112] *See, e.g.*, *In re Newell Brands, Inc. Sec. Litig.*, 837 F. App'x 869, 875 (3d Cir. 2020) (affirming dismissal because allegations failed to refer to contemporaneous sources showing statements were false or misleading); *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 498 (3d Cir. 2016); *In re NAHC, Inc. Sec. Litig.,* 306 F.3d 1314, 1328 (3d Cir. 2002).

Plaintiffs, however, try to turn AdaptHealth's truthful and accurate disclosures on their head by claiming that each of these statements "***became***, *through their context and manner of presentation*, false and misleading."[113] The "context," of course, is alleged to be various facts relating to Mr. McGee's alleged criminal misconduct overseas unrelated to AdaptHealth.[114] As their theory goes, these truthful and accurately reported disclosures were misleading because, without disclosure of Mr. McGee's alleged criminal misconduct, "a reasonable investor would be given a false impression of AdaptHealth's business."[115] But this theory of fraud should also be

---

[111] *See* pp. 20-21, *infra*.

[112] This is especially true with respect to AdaptHealth's statements concerning its past revenue growth. *See* Compl. at ¶¶ 77, 80, 88-89, 99-100, 108. A "violation of federal securities laws cannot be premised upon a company's disclosures of accurate historical data." *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997); *Advanta*, 180 F.3d at 538. Nor is it sufficient to plead merely that the additional information would have been of interest to investors who cared about the metrics. *See In re Tseng Labs, Inc. Sec. Litig.*, 954 F. Supp. 1024, 1027 (E.D. Pa. 1996), *aff'd*, 107 F.3d 8 (3d Cir. 1997).

[113] *See* Compl. ¶¶ 79, 85 (emphasis added).

[114] To be sure, there is not a single allegation in the Complaint that Mr. McGee's alleged criminal misconduct was related at all to AdaptHealth or Mr. McGee's role at AdaptHealth.

[115] *See* Compl. ¶¶ 85, 87, 92, 98, 104, 107, 114. Plaintiffs also allege that such omissions resulted in a violation of Regulation S-K, Item 401 ("Reg S-K"). *See, e.g.*, Compl. ¶¶ 87, 167. Reg S-K requires disclosures if a director or officer "was convicted in a criminal proceeding or is a named subject of a pending criminal proceeding . . . during the past ten years and that [is] material to an evaluation of the ability or integrity of any director . . . or executive officer of the registrant." 17 C.F.R. § 229.401(f)(2).

dismissed.  None of these so-called undisclosed facts is relevant to the challenged statements supposedly rendered inaccurate.

It is well settled law that to be actionable, an omission—including omissions relating to corporate mismanagement or uncharged criminal conduct—must, among other things, be sufficiently related to false or misleading statements.  *See Teamsters Local 456 Pension Fund v. Universal Health Servs.*, 396 F. Supp. 3d 413, 457-58 (E.D. Pa. 2019) (citing *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at \*10 (D.N.J. Dec. 6, 2018)); *see also In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016).  Here, there is no link between the challenged statements and the alleged omissions.

For example, Plaintiffs assert that Defendants failed to disclose that "Denmark had filed a complaint . . . on November 19, 2019 in the United States District Court for the Southern District of New York [(the "Denmark Complaint")] to recover for 'a fraudulent tax refund scheme that deceived SKAT into paying out over . . . approximately $2.1 billion (US) of allegedly withheld tax.'"[116] Even if that assertion was adequately pled—which it is not—it does not contradict any of the challenged statements about the experience or qualifications of AdaptHealth's management team, or AdaptHealth's past and future revenue growth.  Indeed, one has nothing to do with the other.  Similarly, the existence of the Denmark Complaint does not contradict the disclosure that AdaptHealth has a "seasoned management team."[117] *See, e.g.*, *Fries v. N. Oil &*

---

However, Plaintiffs do not (and cannot) allege that Mr. McGee was ever "convicted in a criminal proceeding" or "a named subject of a pending criminal proceeding" at the time any of the challenged disclosures were made.  Accordingly, Defendants have not violated Reg S-K, and, thus, such claims cannot be the basis for securities fraud.

[116] *See* Compl. ¶ 79.  While admitted in the background section of the Complaint (*see* Compl. ¶ 21), Plaintiffs misleadingly fail to mention that Mr. McGee is not named in the Denmark Complaint, nor is he even mentioned by name.

[117] Plaintiffs' attempt to point to AdaptHealth's disclosures of legal proceedings in various SEC filings is unavailing.  *See* Compl. ¶¶ 90, 96, 102, 112. Regulation S-K, Item 103 only requires companies to disclose material pending legal proceedings "to which the registrant or any of its subsidiaries is a party

*Gas, Inc.,* 354 F. Supp. 3d 384, 391 (S.D.N.Y. 2018) (finding defendants "were under no obligation to disclose [CEO's] misconduct . . . as the omitted fact did not render Defendants' general representations as to his role in [the company] untrue").

Absent such a link, it is well settled that there is no "duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policeman's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014). This is simply an application of the well-established principle that "Section 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017). Therefore, "[e]ven non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information." *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000). Here, it is undisputable that Mr. McGee had not been charged with any misconduct at the time of any of the alleged statements, and, to this day, none of the charges levied against him by foreign authorities has been adjudicated.

Once AdaptHealth was ultimately made aware of Mr. McGee's alleged misconduct, and that he would be indicted by the Danish authorities, AdaptHealth placed Mr. McGee on an indefinite unpaid leave and initiated an internal investigation, which ultimately led to Mr. McGee's resignation.[118] Throughout the class period, AdaptHealth cautioned "it is highly dependent on the performance and continued efforts of its senior management team" and that "[i]t is possible that AdaptHealth will lose some key personnel, the loss of which could negatively impact our operations and profitability."[119] AdaptHealth thus put investors on notice of the potential risks that could—and ultimately did—materialize.

---

or to which its property is the subject." 17 C.F.R § 229.103(a). The Complaint, however, does not allege that AdaptHealth or any of its subsidiaries is the subject of any undisclosed legal proceedings.

[118] *See* Ex. 51 at 1; Ex. 20 at Ex. 99.1.

[119] *See* p. 17, *supra*; *see, e.g.*, Ex. 2 at 24.

Accordingly, these allegations cannot support a securities fraud claim as a matter of law.

## II.   THE COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY BECAUSE NO STRONG INFERENCE OF SCIENTER IS PLED

An essential element of any securities case is scienter—"a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). In the Third Circuit, scienter also encompasses recklessness, defined as conduct that is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004). This is a "demanding standard" that requires a mental state akin to "conscious deception." *Globis Cap. Partners, L.P. v. Stonepath Grp., Inc.*, 241 F. App'x 832, 835 (3d Cir. 2007) (quoting *In re Digital Island Sec. Litig.*, 357 F.3d 322, 332 (3d Cir. 2004)). Negligence or even "inexcusable negligence" does not suffice. *GSC Partners*, 368 F.3d at 239. Even then, courts have been cautious about imposing liability for securities fraud based on reckless conduct. *See Healey v. Catalyst Recovery of Pennsylvania, Inc.*, 616 F.2d 641, 649 (3d Cir. 1980); *In re Kulicke & Soffa Indus., Inc. Sec. Litig.*, 747 F. Supp. 1136, 1143 (E.D. Pa. 1990), *aff'd*, 944 F.2d 897 (3d Cir. 1991), and *aff'd sub nom. Zlotnick v. Kulicke & Soffa Indus., Inc.*, 944 F.2d 899 (3d Cir. 1991).

To survive dismissal, a complaint must state with particularity facts giving rise to a "strong inference" of scienter for *each* defendant. 15 U.S.C. §§ 78u-4(b)(2), b(3)(A). Failure to do so is ground for dismissal. *See id*. § 78u-4(b)(3)(A). To qualify as "strong," the inference of scienter must be "more plausible than merely possible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

Stated differently, "an inference of scienter [must be] *at least as likely* as any plausible opposing inference." *Id*. at 328-29.

With respect to the scienter of a corporate defendant like AdaptHealth, an inference of scienter based upon statements made by the Executive Defendants often can be imputed to AdaptHealth at the pleading stage "because a corporation is liable for statements by employees who have apparent authority to make them." *Avaya*, 564 F.3d at 252; *City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 421 (D. Del. 2009) (a corporation "will not be held liable absent a showing that at least one individual officer who made, or participated in the making of, a false or misleading statement did so with scienter"). Hence, absent a compelling inference that Mr. McGee, Mr. Griggs, or Mr. Clemens acted with scienter, the claims against all of the Defendants—including AdaptHealth—must be dismissed.

Here, the Complaint lacks well-pleaded allegations giving rise to any inference that any Defendant acted with scienter.

### A.      **Plaintiffs Do Not Allege A Plausible Motive And Opportunity**

Without any specific allegations concerning the Defendants' scienter, Plaintiffs recycle putative "motives" for why AdaptHealth would have deceived investors that have been rejected repeatedly by the courts. As the Third Circuit has stressed, in rejecting alleged motives of scienter in securities fraud actions like those proffered here, "motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a *concrete and personal benefit* to the individual defendants resulting from this fraud." *Avaya*, 564 F.3d at 278-79 (quoting *GSC Partners*, 368 F.3d at 237 (emphasis added)). Moreover, "[c]orporate officers always have an incentive to improve the lot of their companies, but this is not, absent unusual circumstances, a motive to commit fraud." *Id*. at 279.

Here, the Complaint contains virtually *no* allegations that even attempt to establish motive and opportunity. It does not even aver, generically, that the Executive Defendants were personally motivated to make false statements and/or omit material information necessary to make the statements not misleading to obtain some personal benefit. The absence of such a motive is a "significant" factor undercutting an inference of scienter. *Rahmaln v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013); *Hoey v. Insmed Inc.*, 2018 WL 902266, at *21 (D.N.J. Feb. 15, 2018). Rather, the only factual allegations it contains to support a compelling inference of scienter is that Mr. McGee engaged in two stock sales during the class period that were allegedly "suspicious in timing and amount."[120] In fact, though, analysis of these stock trades in the context of Mr. McGee's practices and standing with the Company establishes that neither the scope nor timing of these trades was unusual.

*First*, Plaintiffs allege that, on December 7, 2020, "AdaptHealth made a Cash Delivery to Defendant McGee of $38,544,043 for 1,312,808 shares . . . of AdaptHealth stock at the price of $29.36 per share" – which represented 25.3% of Mr. McGee's holdings at the time.[121] As the Complaint states, Mr. McGee did not in fact sell these shares on the open market.[122] Rather, pursuant to the Exchange Agreement, dated November 9, 2019, entered into between AdaptHealth Corp., AdaptHealth Holdings, LLC and holders of the Company's Common Units (the "Exchange Agreement"), Mr. McGee was exchanging his AdaptHealth Class B Common Stock for shares of AdaptHealth's Class A Common Stock.[123]

---

[120] *See* Compl. ¶¶ 145-148.
[121] *See* Compl. ¶ 146.
[122] *See* Compl. ¶ 146.
[123] *See* Compl. ¶ 146; *see also* Ex. 58; Ex. 21 at Ex. 10.1.

However, in this particular instance, AdaptHealth, as permitted under the Exchange Agreement, "elected to deliver cash in lieu of shares of Class A Common Stock."[124] Indeed, AdaptHealth explained that this cash delivery was made "in order to provide for the payment of capital gains tax obligations" incurred by Mr. McGee resulting from three other exchanges of shares on the very same day.[125] Mr. McGee engaged in other similar exchanges throughout the class period that resulted in share exchanges as opposed to a cash delivery (all of which were contemporaneously disclosed) – none of which are alleged to support an inference of scienter.[126] Under these circumstances, this alleged "sale" is hardly suspicious.[127] *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997) ("A large number of today's corporate executives are compensated in terms of stock options . . . . It follows that these individuals would trade those securities in the normal course of events.").

*Second*, Plaintiffs point to a stock sale allegedly occurring on June 22, 2021—just 11 days after Mr. McGee formally resigned from all positions with AdaptHealth.[128] The Complaint avers that on this day Mr. McGee sold $21.4 million of his AdaptHealth stock, representing 17% of his holdings at the time.[129] However, courts have consistently recognized that it is customary for executives to make stock sales as they are departing a senior position at a company. *City of Bristol Pension Fund v. Vertex Pharm. Inc.*, 12 F. Supp. 3d 225, 240 (D. Mass. 2014) (even though "substantial trades" by defendant were "unusual on their face," no strong inference of

---

[124] *See* Ex. 58; Ex. 21 at Ex. 10.1, § 2.1.

[125] *See* Ex. 2 at 103.

[126] *See, e.g.*, Ex. 58; Ex. 59.

[127] The fact that these shares were "purchased" by AdaptHealth itself, as opposed to sold on the open market, further undermines any inference of scienter. Stock repurchases by a company generally suggest that the company "believe[s] its stock [to be] undervalued," *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 899 (W.D.N.C. 2001), and thus "*negate* a finding of scienter." *Frankfurt-Tr. Invs. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018) ("[I]t would make no economic sense for a company to buy back its stock at a price it knows to be inflated.").

[128] *See* Compl. ¶ 147.

[129] *See* Compl. ¶ 147.

scienter pled because "[i]t is not unusual for individuals leaving a company, like [defendant], to sell shares"); *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1116 (N.D. Cal. 2003) (sale of 37.7% of holdings not "sufficiently suspicious" where insider was departing company). Moreover, pursuant to the MOU entered into between Mr. McGee and AdaptHealth in connection with his resignation—which was contemporaneously disclosed—it was contemplated and agreed that Mr. McGee would, in the near-term, sell shares of AdaptHealth stock to fund "the exercise price and withholding taxes due upon exercise" of Mr. McGee's vested options.[130] This stock sale is, thus, directly tied to that contractually agreed-upon exercise of options.

Moreover, Plaintiffs allege that the timing of this particular sale was suspicious because it occurred shortly before the Short-Seller Report was issued.[131] However, the Complaint fails to allege how Mr. McGee, or any of the Defendants, could have known when the report would be issued, or that it would be issued at all. Thus, this alleged sale is neither suspicious in timing nor amount, especially given the detailed disclosures surrounding Mr. McGee's resignation.

*Finally*, the Complaint does not allege any stock sales by the other two Executive Defendants, which further undercuts any scienter argument based on the stock sales. *See In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *22 (D.N.J. Apr. 27, 2017), *aff'd sub nom. In re Hertz Global Holdings, Inc.*, 905 F.3d 106 (3d Cir. 2018) (failure to "make [any] mention of [the other defendants'] trading during the class period . . . cast[ ] doubt on their theory at the outset"). In fact, neither Mr. Griggs nor Mr. Clemens traded AdaptHealth stock

---

[130] Ex. 20 at Ex. 10.1; *see also* p. 17, *supra*. Pursuant to the MOU, Mr. McGee agreed to a lock-up, whereby he was not permitted to sell more than 60% of the AdaptHealth stock that he beneficially owned. Ex. 20 at Ex. 10.1. This similarly cuts against any claim of scienter. *See Osher v. JNI Corp.*, 256 F. Supp. 2d 1144, 1165 (S.D. Cal. 2003) (finding allegations of scienter insufficient where defendants entered into lock-up agreements, particularly when they sold less than they were permitted).

[131] *See* Compl. ¶ 147.

during the class period and each only increased their holdings.[132]    These facts further undermine any inference that the Executive Defendants were supposedly defrauding investors.  *See In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) ("Low aggregate sales and large retained aggregate holdings  rebut an inference of motive, even where some defendants have sold significant  percentages."); *In re Radian Sec. Litig.*, 2010 WL 1767195,  at *12 (E.D. Pa. Apr. 30, 2010).

Accordingly,  the Complaint  does not establish any inference of scienter through motive and opportunity.

### B.      Plaintiffs Fail to Allege Conscious Misbehavior or Recklessness

A complaint  must contain allegations  of "strong circumstantial  evidence of either conscious  behavior or recklessness" for the case to proceed.  *Hertz*, 2017 WL 1536223,  at *15. Further, inferences of scienter "may be made only when the fact pattern *unambiguously indicates* that the defendant was acting with the requisite  state of mind."  *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 399 (D.N.J. 2010).  Moreover, where, as here, the motive  behind the supposed fraud "is not apparent," the "strength of the circumstantial  allegations  [of fraudulent intent] must be correspondingly  greater." *Dempsey v. Vieau*, 130 F. Supp. 3d 809, 814-15 (S.D.N.Y. 2015) (quoting  *Kalnit v. Eichler*, 264 F.3d 131,  142 (2d Cir. 2001)); *see also Rahmaln v. Kid Brands, Inc.*, 736 F.3d 237, 245-46 (3d Cir. 2013) (absence of individual  motive  weighs against inference of scienter).  The Complaint  falls far short of this standard.

### 1.      Statements Relating to AdaptHealth's Reporting of Organic Growth

*First*, Plaintiffs allege that the Defendants knew or were reckless in not knowing that its reporting of the "pro forma revenue growth metric" was misleading  because it "obscured the

---

[132] *Compare* Ex. 60 (listing  1,808,366 shares held) *with* Ex. 61 (listing 3,498,585 shares held directly and indirectly); *Compare* Ex. 62 (listing 59,418 shares held) *with* Ex. 63 (listing 80,209 shares held).

Company's actual organic growth trends," was an "abrupt change" from how AdaptHealth had previously reported organic growth, and contravened industry standards.[133]  The question is not whether AdaptHealth's use of the "pro forma revenue growth metric" was wrong, negligent, or even grossly negligent; rather it is whether its use was *reckless.  See Dronsejko v. Thornton*, 632 F.3d 658, 670 (10th Cir. 2011) (affirming dismissal against outside auditor who misinterpreted accounting standard where auditor's reading was not reckless).  However, "[f]ailure to follow industry standards—without more—is not itself sufficient to support scienter."  *In re Keryx Biopharmaceuticals, Inc. Sec. Litig.*, 2014 WL 585658, at *12 (S.D.N.Y. Feb. 14, 2014).  That is because "it might [just] as easily be due to mismanagement than conscious or reckless disregard of the truth."  *Id.*  For the reasons stated above,[134] Plaintiffs allege no particularized facts that Defendants did not believe in their reported organic growth metrics at the time they were made or possessed information that was not aligned with its disclosures.

*Second,* Plaintiffs claim that "Defendants' revisions to AdaptHealth's SEC filings" and its public statements that "increased disclosures" were necessary, after the Short-Seller Report, "raise a strong inference that they knew their prior disclosures were false and misleading."[135]  However, such post-class period remedial measures are not evidence of scienter, but rather only create an inference that the company tried to make more detailed disclosures—not that the company had been purposefully hiding something unlawful.[136]  *See In re H&R Block Sec. Litig.*, 527 F. Supp. 2d 922, 929 (W.D. Mo. 2007).  Plaintiffs' allegation is nothing more than an attempt to plead "fraud by hindsight" which is insufficient under the PSLRA.  *See, e.g.*, *Cal.*

---

[133] *See* Compl. ¶¶ 140, 142.

[134] *See* pp. 4, 22-23, *supra.*

[135] *See, e.g.*, Compl. ¶ 141.

[136] Since a much more compelling inference is that Defendants decided more disclosures were necessary to clear up any confusion arising from the Short-Seller Report—as opposed to correcting prior misstatements—Plaintiffs have failed to meet the standard outlined in *Tellabs.  See* p. 31, *supra.*

*Pub. Emps. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 158 (3d Cir. 2004) ("We have long rejected attempts to plead fraud by hindsight."). As this Court has held, to violate the securities laws, the alleged misstatement or omission of material fact "must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 2001 WL 1241007, at *11 (E.D. Pa. Oct. 17, 2001), *aff'd*, 306 F.3d 1314 (3d Cir. 2002).

*Third*, Plaintiffs rely on allegations by unnamed witnesses published in the Short-Seller Report to support an inference of scienter as to the Defendants. Here, Plaintiffs recite that a purported former AdaptHealth executive described the company as a "chaotic, understaffed business, failing to do substantial M&A diligence in a race to accumulate assets;" a former employee stated that AdaptHealth "didn't have the ability to disaggregate [organic growth] . . . [and had] no concept of what organic growth actually was;" and another former employee stated that "Luke knew what he was doing . . . [and] was going to push this to the limits  . . . ."[137]

However, there is no allegation that these unnamed individuals were privy to information about what any of the Executive Defendants actually knew about AdaptHealth's organic growth. *See Freed v. Universal Health Servs., Inc.*, 2005 WL 1030195, at *8 (E.D. Pa. May 3, 2005) (dismissing complaint that relied on former employees but did not say "how they would have had access to information regarding [defendant's] operations nationwide"). None of these unnamed witnesses is even alleged to have ever communicated with—or even met—any of the Individual Defendants. *See Jackson v. Halyard Health, Inc.*, 2018 WL 1621539, at *9 (S.D.N.Y. Mar. 30, 2018) (dismissing claims where complaint failed to allege that confidential witnesses attended any meetings with individual defendants where alleged issues were discussed). Thus, none of these claims "are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information

---

[137] *See* Compl. ¶ 144.

alleged." *Cal. Pub. Emps. Ret. Sys.*, 394 F.3d at 146 (citation omitted). These allegations are the equivalent of water-cooler gossip and do not support a federal securities claim.

*Finally*, Plaintiffs' attempt to bolster their scienter allegations through the "core business" doctrine likewise fails. While not alleged directly in the "Scienter" section, the Complaint generally avers that organic growth was AdaptHealth's "most important" metric.[138] Even if this were true, the core operations doctrine does not allow a plaintiff to conjure a strong inference of scienter simply by tying purported misstatements to an important metric. Instead, Plaintiffs must provide an "additional allegation of specific information conveyed to management and related to the alleged fraud" to signal fraudulent intent—again, something Plaintiffs have not done. *Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 155 (3d Cir. 2018); *see also In re Stonepath Grp., Inc. Sec. Litig.*, 2006 WL 890767, at *12 (E.D. Pa. Apr. 3, 2006) (refusing to impute to corporate officer any alleged "knowledge" that statements they made about their company's core business were allegedly false or misleading "absent particularized allegations showing that defendants had ample reason to know of the falsity of their statements").

2. **Purported Omissions Relating to Mr. McGee's Alleged Misconduct and Criminal Exposure**

With respect to the statements allegedly rendered misleading by AdaptHealth's failure to disclose facts related to Mr. McGee's alleged misconduct, the Complaint contains no particularized allegations that Mr. Griggs or Mr. Clemens actually knew that any of the alleged statements and omissions were false and misleading at the time they were made. There is not one factual allegation even suggesting that either Mr. Griggs or Mr. Clemens (or anyone at AdaptHealth other than Mr. McGee) was aware of Mr. McGee's alleged misconduct—which was "wholly unrelated" to AdaptHealth and with which Mr. Griggs and Mr. Clemens had no

---

[138] *See, e.g.,* Compl. ¶ 12.

affiliation.   Plaintiffs' reliance on the boilerplate allegation that Mr. Griggs and Mr. Clemens possessed scienter "by virtue of their positions at AdaptHealth"[139] makes no sense in this context (there is no reason why their positions at AdaptHealth would give them insight into Mr. McGee's personal investments and tax strategies overseas), and, unsurprisingly, it is also flatly contrary to law and cannot establish scienter.  *See, e.g., Oran v. Stafford*, 226 F.3d 275, 290 (3d Cir. 2000) (holding that "generalized imputations of knowledge" based on "defendants' position with the company" are inadequate) (quoting *Advanta*, 180 F.3d at 539).

Understanding this deficiency, Plaintiffs allege that a strong inference can be drawn that AdaptHealth, through its Board, "knew about and failed to disclose McGee's involvement in the tax scheme and Denmark's criminal investigation into McGee" from the Board's approval of a Co-CEO arrangement between Mr. McGee and Mr. Griggs upon AdaptHealth's acquisition of AeroCare in February 2021.[140]  However, this conclusory allegation lacks any factual specification and falls far short of giving rise to strong circumstantial evidence of actual knowledge.  While Plaintiffs cite to various analyst reports' descriptions of the arrangement as "slightly unusual," the Co-CEO model has only become more common in recent years.[141]  This theory fails because the adoption of a Co-CEO model is just as likely—and perhaps significantly more likely—to be based on a legitimate business purpose than for a nefarious one.  *See Hertz*, 905 F.3d at 119 ("Corporate resignations do not strengthen an inference of scienter when . . . the allegations do not cogently suggest the resignations resulted from the relevant executives' knowing or reckless involvement in a fraud."); *In re Intelligroup Sec. Litig.,* 527 F. Supp. 2d

---

[139] *See* Compl. ¶ 179.
[140] *See* Compl. ¶ 139.
[141] Ex. 64 (discussing the increased adoption of the co-CEO model); Ex. 65 ("The truth is the archetype of the omnipotent CEO—the lone commander atop the corporate pyramid—is increasingly a relic of 20th century management thinking."); Ex. 66 (citing Netflix, KKR, Workday, Waymo, and Salesforce as examples of recent companies to adopt the co-CEO model).

262, 347-48 (D.N.J. 2007). In fact, the very analyst report that Plaintiffs cite found the Co-CEO arrangement "to be a good fit considering McGee was stronger on the capital markets/M&A side of the business and Griggs was stronger on the operational side."[142]

Having pled no scienter, with respect to these omissions, as to Messrs. Griggs and Clemens, or the AdaptHealth Board as a whole, the only way that Plaintiffs could theoretically establish a strong inference of scienter as to AdaptHealth is through Mr. McGee, its former CEO. This they cannot do. Plaintiffs generally allege that, prior to the class period, Mr. McGee engaged in a tax fraud scheme overseas not purported to be related to AdaptHealth, and that Mr. McGee was aware during the class period, or recklessly disregarded, that he could soon be charged personally relating to that misconduct.[143] Plaintiffs allege no specifics regarding how, when or why Mr. McGee knew that he would be criminally charged in Denmark. And, importantly, the Complaint contains no allegations that Mr. McGee possessed information that contradicted any of the challenged statements. Since none of these allegations presents any cognizable inference that Mr. McGee intended to mislead AdaptHealth's shareholders, they do not help Plaintiffs establish Mr. McGee's scienter for the alleged misrepresentations regarding AdaptHealth during the class period. Similarly, AdaptHealth's robust risk disclosures—including, most notably, warning investors of the risks associated with the loss of key personnel—also defeats an inference of scienter. *See City of Brockton Ret. Sys. v. Avon Prod., Inc.*, 2014 WL 4832321, at *24 (S.D.N.Y. Sept. 29, 2014).

Moreover, the PSLRA demands that plaintiffs plead facts establishing scienter "with respect to each act or omission"—i.e., as to each alleged misstatement or omission—that forms the basis of their securities fraud claim. *See* 15 U.S.C. § 78u-4(b)(2); *Winer Fam. Tr.*, 503 F.3d

---

[142] Ex. 55 at 1.
[143] *See, e.g.*, Compl. ¶¶ 137-138.

at 335. Again, this means that Plaintiffs must plead "factual allegations demonstrating that Defendants had knowledge of any specific contradictory information" to their public statements. *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at \*18 (S.D.N.Y. Aug. 1, 2017). For the reasons stated above, Plaintiffs fail to do so here.[144] Ultimately, while Plaintiffs try to portray Mr. McGee as having engaged in some unrelated bad acts, they plead no facts demonstrating that he intended to deceive shareholders or possessed the requisite scienter for a securities fraud claim. They, therefore, have not established—nor can they—a strong inference of scienter as to AdaptHealth or any of the Executive Defendants with respect to these claims.

## III.    PLAINTIFFS HAVE FAILED TO ADEQUATELY PLEAD LOSS CAUSATION

To plead loss causation, "a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*, 720 F. Supp. 2d 517, 559 (D.N.J. 2010) (quoting *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d at 297). "In other words, the plaintiff is required to plead that the decline in the stock price was caused by the market's discovery of defendant's fraud." *Id.*

Courts have dismissed claims for failure to plead loss causation when the alleged corrective statement does not also disclose the alleged fraud. Simply disclosing bad news, without disclosing that there was some sort of fraud, is not sufficient. *See Intelligroup*, 527 F. Supp. 2d at 325-27 (no loss causation where alleged corrective disclosure addressed other issues that were not the actual cause of the particular injury alleged by plaintiffs); *Nat'l Junior Baseball League*, 720 F. Supp. 2d at 561; *In re Tellium, Inc. Sec. Litig.*, 2005 WL 2090254, at \*4 (D.N.J.

---

[144] *See* pp. 36-37, 39-40, *supra*.

Aug. 26, 2005) ("[L]oss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud.").

Plaintiffs identify two supposed corrective disclosures: (1) AdaptHealth's April 13, 2021 press release (the "April 13 Release"), which disclosed that Mr. McGee had been formally charged with tax fraud by the Kingdom of Denmark and that Mr. McGee would be placed on an unpaid leave from all roles;[145] and (2) the July 19, 2021 Short-Seller Report, which alleged that AdaptHealth had been intentionally inflating and obscuring its organic growth revenue.[146] Neither event disclosed new facts that corrected any previously undisclosed falsehood.

For example, the April 13 Release did not reveal any wrongdoing or fraud that corrected any prior misstatements.[147] Rather, it simply disclosed that Mr. McGee had been charged by a foreign government of criminal misconduct and was being placed on unpaid leave—which made evident that his position with AdaptHealth was in jeopardy[148]—that caused the stock to drop. Similarly, the Short-Seller Report was not a corrective disclosure because it contains untrue wild speculation. *Martin v. GNC Holdings*, 2017 WL 3974002, at *18-19 (W.D. Pa. Sept. 8, 2017).

Plaintiffs therefore fail to plead loss causation.

## IV.    PLAINTIFFS' "CONTROL PERSON" CLAIMS FAIL UNDER THE 1934 ACT

To state a prima facie case of control person liability under Section 20(a) of the 1934 Act, the plaintiff must establish (1) an underlying violation by a control person or entity; (2) that the defendants are controlling persons; and (3) culpable participation in the fraud by the controlling persons "in some meaningful sense." *See, e.g.*, *In re CDNow, Inc. Sec. Litig.*, 138 F. Supp. 2d 624, 644 (E.D. Pa. 2001). For all the reasons stated above, no primary violation by any of the

---

[145] *See* Compl. ¶¶ 152-153.

[146] *See* Compl. ¶ 154.

[147] *See* p. 16, *supra*.

[148] As explained above, the possibility of which has been repeatedly disclosed by AdaptHealth in its risk factors. *See* pp. 17, 30, *supra*.

Defendants has been alleged.  Since Plaintiffs' control person claim rises and falls with its Rule 10b-5 claim, it must also be dismissed.  *Avaya*, 564 F.3d at 252 ("[L]iability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person."); *see also In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 211 (3d Cir. 2002) (same); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 276 (3d Cir. 2005) (same).

## V.      THE 1933 ACT CLAIMS SHOULD BE DISMISSED

Plaintiffs present one primary basis for their claims under the 1933 Act: that AdaptHealth made false or misleading statements in the prospectus supplement filed with the SEC on January 4, 2021.[149]  However, the alleged misstatements are the exact same as many of those challenged by Plaintiffs with respect to their 1934 Act claims, namely that AdaptHealth's failure to disclose facts related to Mr. McGee's alleged unrelated criminal conduct rendered statements about AdaptHealth's management false and misleading.[150]

### A.      **Plaintiffs Fail to Plead Actionable Misstatements or Omissions**

To state a claim under Section 11 of the Securities Act, 15 U.S.C. § 77k(a), "plaintiffs must allege that they purchased securities pursuant to a materially false or misleading registration statement." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273 (3d Cir. 2004). Similarly, to state a claim under Section 12(a)(2), 15 U.S.C. § 77l(a)(2), "plaintiffs must allege that they purchased securities pursuant to a materially false or misleading prospectus or oral communication." *Id.* "There can be no liability under section 11 or 12(a)(2) of the Securities Act unless the plaintiff can identify, within the four corners of the offering documents, some

---

[149] *See* Compl. ¶ 193.
[150] *Compare* Compl. ¶¶ 165-167 *with* Compl. ¶¶ 105-107.

false or misleading statement."[151] *Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082, 1125 (D.N.M. 2011); *see also Merck & Co.*, 432 F.3d at 273.

Thus, as with Rule 10b-5 claims, it is not enough for the statement or omission to be merely false; rather, it must have been false at the time that the document containing it was created. *See In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 923 (D.N.J. 1998) ("To state a claim under Section 11, a plaintiff must allege . . . the registration statement, at the time it became effective, contained a material misstatement or omission.").

Although the PSLRA's heightened pleading requirements do not apply to claims under the 1933 Act, "plaintiffs are required to allege their claims with increased particularity under Federal Rules of Civil Procedure 9(b) if their complaint 'sounds in fraud.'" *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (internal quotation omitted); *see also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) ("[W]here the plaintiff grounds these Securities Act claims in allegations of fraud—and the claims thus 'sound in fraud'—the heightened pleading requirements of Rule 9(b) apply."); *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 451 (D. Del. 2014). A complaint "sounds in fraud" where, as here,[152] it "employs the exact same factual allegations to allege violations under section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act." *Rubke*, 551 F.3d at 1161. Because Rule 9(b) thus applies to Plaintiffs' 1933 Act claims, their Complaint must "state with particularity the circumstances constituting fraud . . . ." Fed R. Civ. P. 9(b).

As a result, Plaintiffs' 1933 Act claims should be dismissed for failure to plead a material misstatement or omission based on the same reasons discussed above.[153]

---

[151] "For analytical purposes, claims arising out of Section 11 and 12 involve the same legal scrutiny" and are analyzed together. *In re Vonage IPO Sec. Litig.*, 2009 WL 936872, at *5 (D.N.J. Apr. 6, 2009).

[152] *Compare* Compl. ¶¶ 165-167 *with* Compl. ¶¶ 105-107.

[153] *See* Section I.A., *supra*.

B.        **Plaintiffs Fail to Plead Control Person Claims**

Section 15 is a "control person" provision, similar to Section 20(a) of the Exchange Act.

*See MobileMedia*, 28 F. Supp. 2d at 940; *see also Carmack v. Amaya Inc.*, 258 F. Supp. 3d 454,

466 (D.N.J. 2017) (listing similar elements of control person claims under both Section 15 and

Section 20(a)). Although worded differently, the control person provision of Section 15 and

Section 20(a) are interpreted the same. *See Dutton v. Harris Stratex Networks, Inc.*, 270 F.R.D.

171, 181 (D. Del. 2010) ("The elements of a Section 20 claim under the Exchange Act are the

same as the elements required to establish a claim under Section 15 of the Securities Act.").

Hence, liability under Section 15 is predicated on (1) a primary violation of Section 11 or

Section 12(a)(2) of the Securities Act and (2) control over the primary violator by the alleged

controlling person. *See Adams Golf*, 381 F.3d at 273 n.3.

For all the reasons stated above, no primary violations under Sections 11 and 12(a)(2)

have been alleged. Because Plaintiffs' Section 15 claim rises and falls with their Section 11 and

12(a)(2) claims, it must also be dismissed. *See Cal. Pub. Emps. Ret. Sys.*, 394 F.3d at 142

(affirming dismissal of control person liability under Section 15 when there was no predicate

violation of the 1933 Act); *Kennilworth Partners L.P. v. Cendant Corp.*, 59 F. Supp. 2d 417, 430

(D.N.J. 1999) (same).

**CONCLUSION**

For the reasons stated above, the Complaint should be dismissed as to the Defendants.

Because the defects in the Complaint are substantive and Plaintiffs have already had the

opportunity to submit a consolidated complaint, dismissal should be with prejudice. *See*

*Williams v. EMC Mortg. Corp.*, 2013 WL 1874952, at *5 (E.D. Pa. May 3, 2013) (dismissing

claims with prejudice when plaintiff's amended complaint had substantive defects and failed to

plead viable claims).

- 46 -

Dated: January 20, 2022

SAXTON & STUMP

By: /s/ Steven D. Costello_____
Steven D. Costello (No. 37288)
100 Deerfield Lane, Suite 240
Malvern, Pennsylvania 19355
(484) 328-8500

WILLKIE FARR & GALLAGHER LLP
Todd G. Cosenza (admitted *pro hac vice*)
Vincent P. Iannece (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I, Steven D. Costello,  Esquire, hereby certify that on this date, a true and correct copy of the foregoing  was served electronically  via the Court's ECF system, where this document is available  for downloading  and viewing.


/s/ Steven D. Costello_____
Steven D. Costello

Dated:  January 20, 2022

- 47 -