# Exhibit 20

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

## FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 OR 15(d)**
**Of The Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): June 14, 2021**

---

# AdaptHealth Corp.
(Exact name of registrant as specified in its charter)

| **Delaware** | **001-38399** | **82-3677704** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **220 West Germantown Pike, Suite 250**<br>**Plymouth Meeting, PA** | **19462** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

**(610) 630-6357**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, par value $0.0001 per share | AHCO | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

---

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers**

On June 14, 2021, AdaptHealth Corp. (the "Company") and Luke McGee, the Company's former Co-Chief Executive Officer and a former member of the Company's Board of Directors (the "Board"), agreed that Mr. McGee would resign from all positions with the Company, including as a member of the Board, effective as of June 11, 2021.

As previously disclosed, the Company had placed Mr. McGee on leave on April 13, 2021.

In connection with the resignation of Mr. McGee, the Company and Mr. McGee entered into a Memorandum of Understanding for Settlement (the "MOU"). The MOU provides that Mr. McGee will be entitled to receive: (i) his unpaid base salary from April 13, 2021 (the beginning of his unpaid leave) through June 11, 2021 and (ii) pro rata vesting through June 11, 2021 of Mr. McGee's unvested equity awards that were scheduled to vest as of December 31, 2021. In addition, Mr. McGee has agreed (x) not to sell 40% of the shares of Company Class A Common Stock held by Mr. McGee or his affiliates for nine months and (y) customary standstill restrictions for one year. The MOU includes a mutual release by Mr. McGee and the Company of claims under his Employment Agreement, dated March 20, 2019. Mr. McGee remains subject to the confidentiality and other restrictive covenant obligations set forth in his Restrictive Covenant Agreement, dated March 20, 2019.

The foregoing description of the MOU does not purport to be complete and is qualified in its entirety by reference to the full text of the MOU filed as Exhibit 10.1 to this Current Report on Form 8-K, which is incorporated by reference herein.

On June 14, 2021, the Board appointed Stephen Griggs (the Company's Co-Chief Executive Officer) as Chief Executive Officer, effective immediately.

**Item 7.01. Regulation FD Disclosure**

On June 14, 2021, the Company issued a press release relating to the matters set forth in Items 5.02 and 8.01, a copy of which is furnished as Exhibit 99.1 hereto and incorporated herein by reference. Such exhibit and the information set forth therein shall not be deemed to be filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise be subject to the liabilities of that section, nor shall it be deemed to be incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act.

**Item 8.01 Other Events**

As previously disclosed, a Special Committee of independent directors, established by the Board to oversee a thorough investigation of any connection between Mr. McGee's private activities and the Company, retained DLA Piper, an independent law firm, to conduct this investigation. DLA Piper reported to the Special Committee on June 11, 2021 that the investigation is substantially complete and that they could state with a high degree of confidence that the Company had no involvement in, or connection to, Mr. McGee's alleged conduct.

**Item 9.01. Financial Statements and Exhibits.**

*(d)     Exhibits*

10.1     Memorandum of Understanding for Settlement

99.1     Press release, dated June 14, 2021

104     Cover Page Data File (formatted as inline XBRL document)

- 2 -

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

Dated: June 14, 2021

AdaptHealth Corp.

By:     /s/ Jason Clemens
        Name: Jason Clemens
        Title: Chief Financial Officer

- 3 -

Exhibit 10.1

**MEMORANDUM OF UNDERSTANDING ("MOU") FOR SETTLEMENT BETWEEN
ADAPTHEALTH CORP. AND LUKE MCGEE**

Dated: June 11, 2021

| | |
|---|---|
| **Parties** | Luke McGee ("LM") and AdaptHealth Corp. (together with its subsidiaries, the "Company"). |
| **Termination of Employment** | Reference is made to the Employment Agreement, dated March 20, 2019, by and between AdaptHealth Holdings LLC, a Delaware limited liability company, and LM (the "Employment Agreement") and LM's Restrictive Covenant Agreement, dated March 20, 2019 (the "Restricted Covenant Agreement"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Employment Agreement or the Restrictive Covenant Agreement, as applicable. |

LM hereby resigns his employment without Good Reason, effective immediately upon notice of resignation, on the date of signing of this MOU (the "Effective Date"). As part of this MOU, LM acknowledges that he has no further rights to any other compensation or other benefits under the Employment Agreement or otherwise (other than vested benefits under qualified retirement plans, indemnification and advancement rights referred to below, and his right to COBRA coverage under the Company's group health plans) as of the Effective Date. The Company agrees that it has not made, and shall not subsequently make, any determination that LM's employment could have been terminated for Cause (which LM denies).

Upon termination, LM will be deemed to have resigned from any and all directorships, committee memberships, and any other positions LM holds with the Company and agrees to execute any documents that the Company reasonably determines necessary to effectuate such resignations.

Within fifteen days from the Effective Date, LM shall receive his base salary from the date of his suspension through June 11, 2021. LM's equity awards scheduled to vest as of December 31, 2021 will vest proportionately through, and on, June 11, 2021 (as example, if Effective Date had been 6/1/21, the vested amounts would have been 173,516 of his 416,667 options and 20,821 of his 50,000 shares of restricted stock).

The Company will process the exercise of LM's vested options promptly following receipt of cash from LM to cover the exercise price and withholding taxes due upon exercise prior to the 90th day following the Effective Date. The Company acknowledges LM's intention to sell shares of Class A Common Stock of the Company to fund such expenses.

The Company will instruct its transfer agent to remove the restrictive legends on the shares of Company stock owned beneficially by LM, subject to the delivery of a reasonable undertaking which shall include the requirement that the sale of any such shares be in compliance with Rule 144 under the Securities Act. The Company will confirm in writing, upon request, that LM is no longer an affiliate (as defined under Rule 144 under the Securities Act of 1933, as amended) of the Company upon the Effective Date and, assuming no change in facts and circumstances between the date hereof and September 11, 2021, as of September 11, 2021 LM will, for purposes of Rule 144(b)(1)(i), be a person who is not an affiliate of the issuer and has not been an affiliate during the preceding three months.

LM acknowledges that the securities laws prohibit the buying or selling of securities while in possession of material, nonpublic information about the security.

AdaptHealth shall promptly cooperate in good faith to allow LM to use his FSA balance.

| | |
|---|---|
| **Lockup** | LM agrees that, for a period of nine months (the "Lockup Period"), neither he nor any of his affiliates will voluntarily Transfer more than 60% of the Equity Securities beneficially owned by LM. |

"Equity Securities" means any shares of common stock of the Company or any securities convertible into or exchangeable for such shares (or options or warrants to purchase any of the foregoing).

"Transfer" means (a) any voluntary direct or indirect sale, lease, assignment, lien, disposition or other transfer (by operation of law or otherwise), or entry into any contract, option or other arrangement or understanding with respect to any sale, lease, assignment, lien, disposition or other transfer (by operation of law or otherwise) of any Equity Security or (b) to enter into any derivative instrument, swap or any other contract, agreement, transaction or series of transactions that hedges or transfers, in whole or in part, directly or indirectly, the economic consequence of ownership of any Equity Security, whether any such derivative instrument, swap, contract, agreement, transaction or series of transactions is to be settled by delivery of securities, in cash or otherwise.

On the last business day of each month during the Lockup Period, at the Company's written request, LM shall provide a written certification that he is in compliance with this covenant along with reasonable supporting documentation, including account statements, evidencing his ownership of Equity Securities.

| | |
|---|---|
| **Restrictions on Interfering** | Subject to the below, LM affirms his obligations under the Restrictive Covenant Agreement, including his obligations: |

(i)     for a period of two years following termination:

      a.     not to directly or indirectly, individually or on behalf of any person, company, enterprise, or entity, or as a sole proprietor, partner, shareholder, director, officer, principal, agent, or executive, or in any other capacity or

relationship engaged in any Competitive Activities within the United States or any other jurisdiction in which the Company is actively engaged in business. For the avoidance of doubt, for purposes of the definition of "Competitive Activities" under the Restrictive Covenant Agreement, "then-current or demonstrably planned business activities of the Company Group" shall mean those business activities current on the Effective Date or demonstrably planned during the six-month period preceding the Effective Date, and Verustat is not deemed to be engaged in Competitive Activities; and

    b.   not to directly or indirectly for his own account or for the account of any other individual or entity, engage in Interfering Activities.

    (ii)   not to make any disparaging or defamatory comments regarding the Company or its respective current or former directors, officers, employees or shareholders in any respect or make any comments concerning any aspect of his relationship with the Company or any conduct or events which precipitated any termination of employment from the Company, except as required by applicable law, regulation, or order of a court or governmental agency or in response to any governmental or regulatory inquiry or investigation or in connection with the defense of any action, claim, or suit.

    (iii)   to keep the Confidential Information confidential.

- 3 -

The Company shall instruct its directors and "named executive officers" (having the meaning ascribed to such term in the Securities Act) not to make any disparaging or defamatory comments regarding LM; provided, however, that for the avoidance of doubt, the foregoing prohibition shall not apply to (A) statements by such persons required by applicable law, regulation, or order of a court or governmental agency, or in response to any governmental or regulatory inquiry or investigation or in connection with the defense of any action, claim, or suit or (B) any disclosure made by the Company in good faith pursuant to applicable securities laws if the Company has received the advice of counsel that such disclosure is appropriate or advisable. Notwithstanding clause (ii) immediately above, LM shall have the right to make truthful statements in response to any disparaging or defamatory comments regarding him by the Company or its directors or executive officers.

**Standstill**    LM agrees that, for a period of one year, neither he nor any of his affiliates will, directly or indirectly, (i) acquire beneficial ownership of any additional Equity Securities, (ii) propose to any person or take substantial steps to effect or enter into any business combination, restructuring, recapitalization or the sale or other disposition outside of the ordinary course of business of any material portion of the assets of the Company or other extraordinary transaction involving the Company, (iii) seek election to or seek to place a representative on the Board of Directors, (iv) solicit proxies or stockholder consents or participate in any such solicitation for any purpose within the meaning of the SEC's proxy rules under the Securities Exchange Act of 1934, as amended, or otherwise seek to control or influence the Board of Directors, (v) form, join or participate in a "group" in connection with any of the foregoing, (vi) assist or encourage any other person in connection with any of the foregoing, or (vii) make or cause the Company to make a public announcement regarding any intention of LM to take any action which would be prohibited by any of the foregoing.

**Disclosure**    LM acknowledges that the Company will file a Form 8-K disclosing the material terms of this agreement. LM shall have the opportunity to review the Form 8-K, and the Company shall reasonably consider any comments made by LM prior to filing.

**Cooperation**    LM reaffirms his obligations under Section 10 of the Restrictive Covenant Agreement.

- 4 -

**Expenses/Property**    Each party will pay its own expenses in connection with the negotiation and drafting of this MOU. LM may retain any Company-issued and/or paid for devices he possesses (*e.g.,* cell phone and laptop) and retain his cell phone number in each case provided that: (i) LM makes such devices available to a mutually acceptable third party for the purpose of ensuring that all Company Confidential Information is deleted from such devices, (ii) the Company receives confirmation that a complete and unaltered images of such devices as of April 13, 2021 (the "Pre-Leave Images") have been obtained by, and shall be maintained for a period of not less than 6 years following the date hereof by, Akin Gump Strauss Hauer & Feld LLP, all at the Company's expense and (iii) LM undertakes to promptly delete any Company Confidential Information (including emails) that he forwarded to personal email addresses or is otherwise in LM's possession. For the avoidance of doubt, the Company shall not be restricted from seeking production on or after the date hereof of the Pre-Leave Images in any appropriate legal forum.

**Governing Law**    This MOU will be governed by and construed and enforced in accordance with the law of New York.

**Releases**    Except as provided in this MOU, LM and the Company mutually release each other solely of their respective rights and obligations under the Employment Agreement. Notwithstanding the foregoing and for the avoidance of doubt, LM does not release any rights under the Company by-laws, his rights of indemnification and advancement, his rights under D&O and/or insurance policies, all of which he retains, and the Company reserves all of its rights and/or claims and defenses with respect thereto. Neither party releases their respective rights under this MOU. The Company does not release LM for any potential shareholder or derivative claims asserted against LM, and LM does not release any defenses and/or claims with respect thereto.

**AdaptHealth Corp.**

Date: June 14, 2021

By:   /s/ Stephen Griggs
_____
Name: Stephen Griggs
Title: Co-Chief Executive Officer

**Luke McGee**

/s/ Luke McGee

--------------------------------------------------------------------

- 5 -

Case 2:21-cv-03382-HB    Document 38-21    Filed 01/20/22    Page 6 of 8

**Luke McGee**

/s/ Luke McGee

**Exhibit 99.1**

**PRESS RELEASE**

**AdaptHealth Appoints Stephen Griggs Chief Executive Officer**

**Plymouth Meeting, PA – June 14, 2021** – AdaptHealth Corp. (NASDAQ: AHCO) ("AdaptHealth" or the "Company") announced today that its Board of Directors (the "Board") has appointed Stephen Griggs as Chief Executive Officer of the Company, effective immediately. Mr. Griggs, who is also a member of the Board, joined AdaptHealth in February 2021 as Co-CEO following the Company's acquisition of AeroCare Holdings, Inc., which Mr. Griggs founded and led as President and CEO.

The Company also announced that Luke McGee has resigned from his positions as Co-CEO of AdaptHealth and a member of the Board.

A Special Committee of independent directors, established by the Board to oversee a thorough investigation of any connection between Mr. McGee's private activities and the Company, retained DLA Piper, an independent law firm, to conduct this investigation. DLA Piper reported to the Special Committee on June 11, 2021 that the investigation is substantially complete and that they could state with a high degree of confidence that the Company had no involvement in, or connection to, Mr. McGee's alleged conduct.

"Steve's extensive management experience, along with health sector expertise and a proven record building high-growth companies, has already been instrumental in bolstering AdaptHealth's growth trajectory. The board has complete confidence in his ability to lead the company to even greater success as CEO," AdaptHealth Board Chair Richard Barasch said. "I thank the Special Committee for moving quickly and diligently to establish the facts, and we now look forward to dedicating our full energies to achieving our strategic and operational objectives."

Mr. Griggs said, "I look forward to leading AdaptHealth into the next phase of its growth with some of the best management talent in the business – President Josh Parnes, CFO Jason Clemens and the rest of our senior team. AdaptHealth has never been stronger and with the integration of AeroCare firmly on course, we can focus our full attention on delivering strong organic growth in our core business, enhancing our role in chronic disease management and deploying capital on strategic M&A opportunities."

Mr. Griggs founded AeroCare in 2000 to provide oxygen, respiratory therapy services and home medical equipment to the home and healthcare market. Under his leadership, AeroCare achieved 20 years of consecutive revenue growth, driven by a combination of strong organic growth and targeted acquisitions. Mr. Griggs received his B.S.B.A. in Business Management from East Tennessee State University, and his B.S.B.A. in Accounting (Summa Cum Laude) from the University of Central Florida.

**About AdaptHealth Corp.**

AdaptHealth is a leading provider of home healthcare equipment, medical supplies to the home and related services in the United States. AdaptHealth provides a full suite of medical products and solutions designed to help patients manage chronic conditions in the home, adapt to life and thrive. Product and services offerings include (i) sleep therapy equipment, supplies and related services (including CPAP and bi PAP services) to individuals suffering from obstructive sleep apnea, (ii) medical devices and supplies to patients for the treatment of diabetes (including continuous glucose monitors and insulin pumps), (iii) home medical equipment (HME) to patients discharged from acute care and other facilities, (iv) oxygen and related chronic therapy services in the home, and (v) other HME medical devices and supplies on behalf of chronically ill patients with wound care, urological, incontinence, ostomy and nutritional supply needs. The Company is proud to partner with an extensive and highly diversified network of referral sources, including acute care hospitals, sleep labs, pulmonologists, skilled nursing facilities, and clinics. AdaptHealth services beneficiaries of Medicare, Medicaid and commercial insurance payors. AdaptHealth services approximately 1.8 million patients annually in all 50 states through its network of 269 locations in 41 states. Learn more at www.adapthealth.com.

**Forward-Looking Statements**

This press release includes certain statements that are not historical facts but are forward-looking statements for purposes of the safe harbor provisions under the United States Private Securities Litigation Reform Act of 1995. Forward-looking statements generally are accompanied by words such as "believe," "may," "will," "estimate," "continue," "anticipate," "intend," "expect," "should," "would," "plan," "predict," "potential," "seem," "seek," "future," "outlook," and similar expressions that predict or indicate future events or trends or that are not statements of historical matters. These forward-looking statements include, but are not limited to, statements regarding projections, estimates and forecasts of revenue and other financial and performance metrics and projections of market opportunity and expectations and the Company's acquisition pipeline. These statements are based on various assumptions and on the current expectations of AdaptHealth management and are not predictions of actual performance. These forward-looking statements are provided for illustrative purposes only and are not intended to serve as, and must not be relied on, by any investor as, a guarantee, an assurance, a prediction or a definitive statement of fact or probability. Actual events and circumstances are difficult or impossible to predict and will differ from assumptions. Many actual events and circumstances are beyond the control of the Company.

These forward-looking statements are subject to a number of risks and uncertainties, including the outcome of judicial and administrative proceedings to which the Company may become a party or governmental investigations to which the Company may become subject that could interrupt or limit the Company's operations, result in adverse judgments, settlements or fines and create negative publicity; changes in the Company's clients' preferences, prospects and the competitive conditions prevailing in the healthcare sector; and the impact of the recent coronavirus (COVID-19) pandemic and the Company's response to it. A further description of such risks and uncertainties can be found in the Company's filings with the Securities and Exchange Commission. If the risks materialize or assumptions prove incorrect, actual results could differ materially from the results implied by these forward-looking statements. There may be additional risks that the Company presently knows or that the Company currently believes are immaterial that could also cause actual results to differ from those contained in the forward-looking statements. In addition, forward-looking statements reflect the Company's expectations, plans or forecasts of future events and views as of the date of this press release. The Company anticipates that subsequent events and developments will cause the Company's assessments to change. However, while the Company may elect to update these forward-looking statements at some point in the future, the Company specifically disclaims any obligation to do so. These forward-looking statements should not be relied upon as representing the Company's assessments as of any date subsequent to the date of this press release. Accordingly, undue reliance should not be placed upon the forward-looking statements.

**Contacts**

**AdaptHealth Corp.**
Jason Clemens, CFA
Chief Financial Officer
jclemens@adapthealth.com

Brittany Lett
Vice President, Marketing
(646) 394-9207
blett@adapthealth.com

**The Equity Group Inc.**
Devin Sullivan
Senior Vice President
(212) 836-9608
dsullivan@equityny.com

Kalle Ahl, CFA
Vice President
(212) 836-9614
kahl@equityny.com

### #