# Exhibit 25

Use these links to rapidly review the document
TABLE OF CONTENTS
INDEX TO FINANCIAL STATEMENTS
DFB HEALTHCARE ACQUISITIONS CORP. INDEX TO FINANCIAL STATEMENTS
Table of Contents
VERUS HEALTHCARE, INC. AND SUBSIDIARIES Table of Contents
PPS HME HOLDINGS LLC AND SUBSIDIARIES Table of Contents
TABLE OF CONTENTS
TABLE OF CONTENTS

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 14A**

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No.          )

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☒    Preliminary Proxy Statement

☐    **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☐    Definitive Proxy Statement

☐    Definitive Additional Materials

☐    Soliciting Material under §240.14a-12

---

**DFB Healthcare Acquisitions Corp.**

---

(Name of Registrant as Specified In Its Charter)

**N/A**

---

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☐    No fee required.

☒    Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
    (1)    Title of each class of securities to which transaction applies:
        Not applicable
    (2)    Aggregate number of securities to which transaction applies:
        Not applicable
    (3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):
        Not applicable
    (4)    Proposed maximum aggregate value of transaction:
        $515,000,000(1)
    (5)    Total fee paid:
        $62,418(2)

☐    Fee paid previously with preliminary materials.

☐    Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

    (1)    Amount Previously Paid:

    (2)    Form, Schedule or Registration Statement No.:

    (3)    Filing Party:

(4)    Date Filed:

(1)    Our estimate of the transaction value based on $515,000,000 of consideration.

(2)    The amount is the result of applying the SEC's filing fee of $121.20 to the estimated transaction value.

PRELIMINARY PROXY STATEMENT—SUBJECT TO COMPLETION, DATED AUGUST    , 2019

**PROXY STATEMENT FOR SPECIAL MEETING IN LIEU OF THE 2019 ANNUAL MEETING OF
STOCKHOLDERS OF DFB HEALTHCARE ACQUISITIONS CORP.**

Dear Stockholders of DFB Healthcare Acquisitions Corp.:

You are cordially invited to attend a special meeting in lieu of the 2019 annual meeting (the "special meeting") of stockholders of DFB Healthcare Acquisitions Corp. ("DFB," "we," "our" or "us"). At the special meeting, DFB stockholders will be asked to consider and vote on:

1. a proposal (the "Business Combination Proposal") to approve and adopt the Merger Agreement, dated as of July 8, 2019 (as the same may be amended from time to time, the "Merger Agreement"), by and among DFB, DFB Merger Sub LLC ("Merger Sub"), AdaptHealth Holdings LLC ("AdaptHealth Holdings"), certain owners of equity interests in AdaptHealth Holdings (the "Blocker Companies") and, solely for the purposes specified therein, AdaptHealth Holdings Unitholders' Representative named therein, and the transactions contemplated thereby, pursuant to which DFB will acquire a majority, expected to be approximately 65%, of the economic and voting interests of AdaptHealth Holdings through a series of transactions (collectively, the "Business Combination") including:

   • the merger of each of the Blocker Companies with and into DFB, with DFB surviving (the "Blocker Mergers");

   • the merger of Merger Sub with and into AdaptHealth Holdings, with AdaptHealth Holdings surviving (the "AdaptHealth Merger"); and

   • the contribution by DFB (the "DFB Contribution") to AdaptHealth Holdings of all of its available funds (other than cash used to pay certain transaction expenses of DFB) in exchange for equity interests in AdaptHealth Holdings;

2. a proposal (the "Charter Proposal") to approve the amendment of DFB's Amended and Restated Certificate of Incorporation (the "Charter"), including five sub-proposals to:

   • change DFB's name to "AdaptHealth Corp.";

   • create Class A Common Stock and Class B Common Stock as new classes of capital stock of DFB;

   • increase the number of authorized shares of Common Stock from 200,000,000 to 245,000,000 and the number of authorized shares of DFB's preferred stock, $0.0001 per share, from 1,000,000 to 5,000,000;

   • change DFB's classified board of directors from two classes, with directors serving two-year terms, to three classes, with directors serving three-year terms; and

   • make certain other changes to the Charter, including the elimination of certain provisions related to our Initial Business Combination (as defined in this proxy statement) that will no longer be relevant following the closing of the Business Combination (the "Closing");

3. a proposal (the "Nasdaq Proposal") to approve, in connection with the Business Combination, for purposes of complying with applicable listing rules of The Nasdaq Capital Market ("Nasdaq"):

   • the issuance, pursuant to the Merger Agreement, of (i) shares of Class A Common Stock to the Blocker Sellers (as defined in this proxy statement) in the Blocker Mergers, (ii) shares of Class B Common Stock to the Non-Blocker AdaptHealth Members (as defined in this proxy statement) in the AdaptHealth Merger, with the combined number of such shares of Class A Common Stock and Class B Common Stock being up to 51,500,000 and (iii) up to 3,000,000 shares of Class A Common Stock and Class B Common Stock to the Blocker Sellers and the Non-Blocker AdaptHealth Members as Contingent Consideration (as defined in this proxy statement);

- the issuance, in a private placement to be consummated concurrently with the Closing, to Deerfield Private Design Fund IV, L.P. ("Deerfield") of up to 10,000,000 shares of Class A Common Stock pursuant to the terms of the Subscription Agreement, dated as of July 8, 2019, between DFB and Deerfield; and

- the issuance of a number of shares of Class A Common Stock equal to the number of shares of Class B Common Stock issued in connection with the Business Combination pursuant to the Merger Agreement, which shares of Class A Common Stock will be issuable to the holders of such shares of Class B Common Stock in connection with the future exchange of their New AdaptHealth Units and shares of Class B Common Stock in accordance with the Exchange Agreement to be entered into in connection with the Closing;

4. a proposal (the "2019 Plan Proposal") to approve and adopt the AdaptHealth Corp. 2019 Stock Incentive Plan (the "2019 Plan") and the material terms thereunder;

5. a proposal (the "2019 ESPP Proposal") to approve and adopt the AdaptHealth Corp. 2019 Employee Stock Purchase Plan (the "2019 ESPP") and the material terms thereunder;

6. a proposal (the "Director Election Proposal") to elect, effective at the Closing, seven directors to serve staggered terms on our board of directors until the 2020, 2021 and 2022 annual meetings of stockholders, respectively, and until their respective successors are duly elected and qualified; and

7. a proposal (the "Adjournment Proposal" and, together with the Business Combination Proposal, the Charter Proposal, the Nasdaq Proposal, the 2019 Plan Proposal, the 2019 ESPP Proposal and the Director Election Proposal, the "Proposals") to approve the adjournment of the special meeting to a later date or dates, if necessary or appropriate, to permit further solicitation and vote of proxies in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the Charter Proposal, the Nasdaq Proposal, the 2019 Plan Proposal, the 2019 ESPP Proposal and/or the Director Election Proposal.

Each of the Proposals is more fully described in this proxy statement, which each DFB stockholder is encouraged to review carefully.

DFB's equity securities trade on Nasdaq. Each of DFB's units consists of one share of Common Stock and one-third of one redeemable warrant and trades under the symbol "DFBHU." DFB's Common Stock and public warrants trade under the symbols "DFBH" and "DFBHW," respectively. Each whole warrant entitles the holder to purchase one share of Common Stock at a price of $11.50 per share, subject to adjustment. The units that have not previously been separated at the election of holders will automatically separate into the component securities upon the Closing and, as a result, will no longer trade as a separate security. In connection with the Closing, our name will be changed from "DFB Healthcare Acquisitions Corp." to "AdaptHealth Corp.." We intend to apply to continue the listing of our Class A Common Stock and public warrants on Nasdaq under the symbols "AHCO" and "AHCOW," respectively.

Pursuant to our Charter, we are providing the holders of shares of Common Stock originally sold as part of the units issued in our initial public offering, which closed on February 21, 2018 (the "IPO" and such holders, the "public stockholders"), with the opportunity to redeem, upon the Closing, shares of Common Stock then held by them for cash equal to their pro rata share of the aggregate amount on deposit (as of two business days prior to the Closing) in the trust account (the "Trust Account") that holds the proceeds (including interest not previously released to us to pay our franchise and income taxes and up to $250,000 annually to fund working capital requirements) from the IPO and a concurrent private placement of warrants to Deerfield/RAB Ventures, LLC (our "Sponsor"). For illustrative purposes, based on the fair value of marketable securities and cash held in the Trust Account as of June 30, 2019 of approximately $254.9 million, the estimated per share redemption price would have been approximately $10.19.

Public stockholders may elect to redeem their shares even if they vote for the Business Combination Proposal. Notwithstanding the foregoing, a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended), will be restricted from seeking redemption rights with respect to more than 15% of the shares of Common Stock included in the units sold in our IPO, which we refer to as the "15% threshold." Accordingly, all such shares in excess of the 15% threshold beneficially owned by a public stockholder or group will not be redeemed for cash. Holders of DFB's outstanding public warrants sold in the IPO do not have redemption rights in connection with the Business Combination. Our Sponsor, officers and directors have agreed to waive their redemption rights in connection with the Closing with respect to any shares of Common Stock they may hold, including the shares of Common Stock initially purchased by our Sponsor in a private placement prior to our IPO (the "founder shares"), and Deerfield has agreed not to redeem any public shares owned by it in connection with the Closing. The founder shares will be excluded from the pro rata calculation used to determine the per share redemption price. As of the date of this proxy statement, our Sponsor, officers and directors and Deerfield collectively own 8,780,000 shares of Common Stock, representing approximately 28% of the outstanding shares of Common Stock. Our Sponsor, officers and directors have agreed to vote any shares of Common Stock owned by them in favor of the Business Combination Proposal. In addition, Deerfield has agreed to vote the 2,500,000 shares of Common Stock owned by it in favor of each of the Proposals.

DFB is providing this proxy statement and the accompanying proxy card to its stockholders in connection with the solicitation of proxies to be voted at the special meeting and any adjournments or postponements thereof, if applicable. **Your vote is very important. Whether or not you plan to attend the special meeting in person, please submit your proxy card without delay.**

We encourage you to read this proxy statement carefully. In particular, you should review the matters discussed under the caption "Risk Factors" beginning on page 44 of this proxy statement.

Our board of directors recommends that DFB stockholders vote FOR each of the Proposals. When you consider the recommendation of DFB's board of directors in favor of each of the Proposals, you should keep in mind that DFB's directors and officers have interests in the Business Combination that may conflict with your interests as a stockholder. Please see the section entitled "Proposal No. 1—The Business Combination Proposal—Interests of Certain Persons in the Business Combination."

Approval of each of the Business Combination Proposal and the Charter Proposal requires the affirmative vote of the holders of a majority of the outstanding shares of Common Stock entitled to vote thereon at the special meeting. Approval of each of the Nasdaq Proposal, the 2019 Plan Proposal, the 2019 ESPP Proposal and the Adjournment Proposal requires the affirmative vote of holders of a majority of the shares of Common Stock represented in person or by proxy and entitled to vote thereon and actually cast at the special meeting. Approval of the election of each director nominee pursuant to the Director Election Proposal requires the affirmative vote of the holders of a plurality of the outstanding shares of Common Stock entitled to vote and actually cast thereon at the special meeting.

If you sign, date and return your proxy card without indicating how you wish to vote, your proxy will be voted FOR each of the Proposals presented at the special meeting. If you fail to return your proxy card or fail to submit your proxy by telephone or over the Internet, or fail to instruct your bank, broker or other nominee how to vote, and do not attend the special meeting in person, the effect will be that your shares will not be counted for purposes of determining whether a quorum is present at the special meeting and, if a quorum is present, will have no effect on the Nasdaq Proposal, the 2019 Plan Proposal, the 2019 ESPP Proposal, the Director Election Proposal or the Adjournment Proposal, but will have the same effect as a vote AGAINST the Business Combination Proposal and the Charter Proposal. If you are a stockholder of record and you attend the special meeting and wish to vote in person, you may withdraw your proxy and vote in person.

TO EXERCISE YOUR REDEMPTION RIGHTS, YOU MUST ELECT TO HAVE DFB REDEEM YOUR SHARES FOR A PRO RATA PORTION OF THE FUNDS HELD IN THE TRUST ACCOUNT AND TENDER YOUR SHARES TO DFB'S TRANSFER AGENT AT LEAST TWO BUSINESS DAYS PRIOR TO THE VOTE AT THE SPECIAL MEETING. YOU MAY TENDER YOUR SHARES BY EITHER DELIVERING YOUR SHARE CERTIFICATE TO THE TRANSFER AGENT OR BY DELIVERING YOUR SHARES ELECTRONICALLY USING THE DEPOSITORY TRUST COMPANY'S DWAC (DEPOSIT WITHDRAWAL AT CUSTODIAN) SYSTEM. IF THE BUSINESS COMBINATION IS NOT COMPLETED, THEN THESE SHARES WILL NOT BE REDEEMED FOR CASH. IF YOU HOLD THE SHARES IN STREET NAME, YOU WILL NEED TO INSTRUCT THE ACCOUNT EXECUTIVE AT YOUR BANK OR BROKER TO WITHDRAW THE SHARES FROM YOUR ACCOUNT IN ORDER TO EXERCISE YOUR REDEMPTION RIGHTS.

Thank you for your consideration of these matters.

Sincerely,

Richard A. Barasch
*Chief Executive Officer and Chairman*
DFB Healthcare Acquisitions Corp.

Whether or not you plan to attend the special meeting, please submit your proxy by signing, dating and mailing the enclosed proxy card in the pre-addressed postage-paid envelope or by using the telephone or Internet procedures provided to you by your broker or bank. If your shares are held in an account at a brokerage firm or bank, you must instruct your broker or bank on how to vote your shares or, if you wish to attend the special meeting and vote in person, you must obtain a proxy from your broker or bank.

**Neither the Securities and Exchange Commission nor any state securities commission has passed upon the adequacy or accuracy of this proxy statement. Any representation to the contrary is a criminal offense.**

This proxy statement is dated            , 2019 and is first being mailed to DFB stockholders on or about            , 2019.

# DFB HEALTHCARE ACQUISITIONS CORP.

**780 Third Avenue**
**New York, NY 10017**

**NOTICE OF SPECIAL MEETING IN LIEU OF 2019 ANNUAL MEETING OF STOCKHOLDERS**
**OF DFB HEALTHCARE ACQUISITIONS CORP.**

**To Be Held On          , 2019**

To the Stockholders of DFB Healthcare Acquisitions Corp.:

NOTICE IS HEREBY GIVEN that a special meeting in lieu of the 2019 annual meeting (the "special meeting") of stockholders of DFB Healthcare Acquisitions Corp. ("DFB," "we," "our" or "us") will be held at          a.m., local time, on          , 2019, at          , for the following purposes:

1. The "Business Combination Proposal"—to approve and adopt the Merger Agreement, dated as of July 8, 2019 (as the same may be amended from time to time, the "Merger Agreement"), by and among DFB, DFB Merger Sub LLC ("Merger Sub"), AdaptHealth Holdings LLC ("AdaptHealth Holdings"), certain owners of equity interests in AdaptHealth Holdings (the "Blocker Companies") and, solely for the purposes specified therein, AdaptHealth Holdings Unitholders' Representative named therein, and the transactions contemplated thereby, pursuant to which DFB will acquire a majority, expected to be approximately 65%, of the economic and voting interests of AdaptHealth Holdings through a series of transactions (collectively, the "Business Combination") including:

   - the merger of each of the Blocker Companies with and into DFB, with DFB surviving (the "Blocker Mergers");

   - the merger of Merger Sub with and into AdaptHealth Holdings, with AdaptHealth Holdings surviving (the "AdaptHealth Merger"); and

   - the contribution by DFB (the "DFB Contribution") to AdaptHealth Holdings of all of its available funds (other than cash used to pay certain transaction expenses of DFB) in exchange for equity interests in AdaptHealth Holdings.

2. The "Charter Proposal"—to approve the amendment by virtue of the AdaptHealth Merger, of DFB's amended and restated certificate of incorporation (the "Charter"), including five sub-proposals to:

   - change DFB's name to "AdaptHealth Corp.";

   - create Class A Common Stock and Class B Common Stock as new classes of capital stock of DFB;

   - increase the number of authorized shares of Common Stock from 200,000,000 to 245,000,000 and the number of authorized shares of DFB's preferred stock, $0.0001 per share, from 1,000,000 to 5,000,000;

   - change DFB's classified board of directors from two classes, with directors serving two-year terms, to three classes, with directors serving three-year terms; and

   - make certain other changes to the Charter, including the elimination of certain provisions related to our Initial Business Combination (as defined in this proxy statement) that will no longer be relevant following the Closing.

3. The "Nasdaq Proposal"—to approve, in connection with the Business Combination, for purposes of complying with applicable listing rules of The Nasdaq Capital Market ("Nasdaq"):

   - the issuance, pursuant to the Merger Agreement, of (i) shares of Class A Common Stock to the Blocker Sellers (as defined in this proxy statement) in the Blocker Mergers, (ii) shares of Class B Common Stock to the Non-Blocker AdaptHealth Members (as defined in this proxy statement) in the AdaptHealth Merger, with the combined number of such shares of

Class A Common Stock and Class B Common Stock being up to 51,500,000 and (iii) up to 3,000,000 shares of Class A Common Stock and Class B Common Stock to the Blocker Sellers and the Non-Blocker AdaptHealth Members as Contingent Consideration (as defined in this proxy statement);

- the issuance, in a private placement to be consummated concurrently with the Closing, to Deerfield Private Design Fund IV, L.P. ("Deerfield") of up to 10,000,000 shares of Class A Common Stock pursuant to the terms of the Subscription Agreement, dated as of July 8, 2019, between DFB and Deerfield; and

- the issuance of a number of shares of Class A Common Stock equal to the number of shares of Class B Common Stock issued in connection with the Business Combination pursuant to the Merger Agreement, which shares of Class A Common Stock will be issuable to the holders of such shares of Class B Common Stock in connection with the future exchange of their New AdaptHealth Units and shares of Class B Common Stock in accordance with the Exchange Agreement to be entered into in connection with the Closing.

4.    The "2019 Plan Proposal"—to approve and adopt the AdaptHealth Corp. 2019 Stock Incentive Plan (the "2019 Plan") and the material terms thereunder;

5.    The "2019 ESPP Proposal"—to approve and adopt the AdaptHealth Corp. 2019 Employee Stock Purchase Plan (the "2019 ESPP") and the material terms thereunder;

6.    The "Director Election Proposal"—to elect, effective at the Closing, seven directors to serve staggered terms on our board of directors until the 2020, 2021 and 2022 annual meetings of stockholders, respectively, and until their respective successors are duly elected and qualified; and

7.    The "Adjournment Proposal"—to approve the adjournment of the special meeting to a later date or dates, if necessary or appropriate, to permit further solicitation and vote of proxies in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the Charter Proposal, the Nasdaq Proposal, the 2019 Plan Proposal, the 2019 ESPP Proposal and/or the Director Election Proposal.

Only holders of record of shares of Common Stock, at the close of business on          , 2019, are entitled to notice of the special meeting and to vote at the special meeting and any adjournments or postponements thereof. A complete list of DFB's stockholders of record entitled to vote at the special meeting will be available for 10 days before the special meeting at DFB's principal place of business for inspection by stockholders during ordinary business hours for any purpose germane to the special meeting.

Pursuant to our Charter, we are providing the holders of shares of Common Stock originally sold as part of the units issued in our initial public offering, which closed on February 21, 2018 (the "IPO" and such holders, the "public stockholders"), with the opportunity to redeem, upon the Closing, shares of Common Stock then held by them for cash equal to their pro rata share of the aggregate amount on deposit (as of two business days prior to the Closing) in the trust account (the "Trust Account") that holds the proceeds (including interest not previously released to us to pay our franchise and income taxes and up to $250,000 annually to fund working capital requirements) from the IPO and a concurrent private placement of warrants to Deerfield/RAB Ventures LLC (our "Sponsor"). For illustrative purposes, based on the fair value of marketable securities held in the Trust Account as of June 30, 2019 of approximately $254.9 million, the estimated per share redemption price would have been approximately $10.19. Notwithstanding the foregoing, a holder of the public shares, together with any of its affiliates or any other person with whom it is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended), will be restricted from seeking redemption rights with respect to more than 15% of the shares of Common Stock included in the units sold in our IPO, which we refer to as the "15% threshold." Accordingly, all such shares in excess of the 15% threshold beneficially owned by a public stockholder or group will not be redeemed for cash. Holders of DFB's outstanding public warrants sold in the IPO, each of which is exercisable to purchase

one-third of one share of Common Stock under certain circumstances, do not have redemption rights in connection with the Business Combination. Our Sponsor, officers and directors have agreed to waive their redemption rights in connection with the Closing with respect to any shares of Common Stock they may hold, including the shares of Common Stock initially purchased by our Sponsor in a private placement prior to our IPO (the "founder shares"), and Deerfield has agreed not to redeem any public shares owned by it in connection with the Closing. The founder shares will be excluded from the pro rata calculation used to determine the per share redemption price. As of the date of this proxy statement, our Sponsor, officers and directors and Deerfield own 8,780,000 shares of Common Stock, representing 28% of the outstanding shares of Common Stock. Our Sponsor, officers and directors have agreed to vote any shares of Common Stock owned by them in favor of the Business Combination Proposal. In addition, Deerfield has agreed to vote the 2,500,000 shares of Common Stock owned by it in favor of each of the Proposals.

The Closing is conditioned on the approval of each of the Business Combination Proposal, the Charter Proposal, the Nasdaq Proposal, the 2019 Plan Proposal and the 2019 ESPP Proposal. Approval of each of the Business Combination Proposal and the Charter Proposal requires the affirmative vote of the holders of a majority of the outstanding shares of Common Stock entitled to vote thereon at the special meeting. Approval of each of the Nasdaq Proposal, the 2019 Plan Proposal, the 2019 ESPP Proposal and the Adjournment Proposal requires the affirmative vote of holders of a majority of the shares of Common Stock represented in person or by proxy and entitled to vote thereon and actually cast at the special meeting. Approval of the election of each director nominee pursuant to the Director Election Proposal requires the affirmative vote of the holders of a plurality of the outstanding shares of Common Stock entitled to vote and actually cast thereon at the special meeting.

If you have any questions or need assistance voting your shares, please call our proxy solicitor, Morrow Sodali LLC, toll free at (800) 662-5200; banks and brokers call collect at (203) 658-9400.

, 2019

By Order of the Board of Directors

Richard A. Barasch
*Chief Executive Officer and Chairman*
DFB Healthcare Acquisitions Corp.

**Important Notice Regarding the Availability of Proxy Materials for the Special Meeting of Stockholders to be held on       , 2019:** This notice of meeting and the related proxy statement will be available at      .

**TABLE OF CONTENTS**

CERTAIN DEFINED TERMS

ii

SUMMARY TERM SHEET

1

QUESTIONS AND ANSWERS ABOUT THE PROPOSALS FOR DFB STOCKHOLDERS

10

SUMMARY OF THE PROXY STATEMENT

24

SELECTED HISTORICAL FINANCIAL INFORMATION OF DFB

38

SELECTED HISTORICAL FINANCIAL INFORMATION OF ADAPTHEALTH

39

CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

42

RISK FACTORS

44

UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION OF DFB

77

NOTES TO UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS

82

COMPARATIVE SHARE INFORMATION

95

SPECIAL MEETING IN LIEU OF 2019 ANNUAL MEETING OF DFB STOCKHOLDERS

96

PROPOSAL NO. 1—THE BUSINESS COMBINATION PROPOSAL

101

OUR BOARD OF DIRECTORS RECOMMENDS THAT OUR STOCKHOLDERS VOTE "FOR" THE BUSINESS COMBINATION PROPOSAL

122

PROPOSAL NO. 2—THE CHARTER PROPOSAL

137

PROPOSAL NO. 3—THE NASDAQ PROPOSAL

141

PROPOSAL NO. 4—THE 2019 PLAN PROPOSAL

143

PROPOSAL NO. 5—THE 2019 ESPP PROPOSAL

152

PROPOSAL NO. 6—THE DIRECTOR ELECTION PROPOSAL

155

PROPOSAL NO. 7—THE ADJOURNMENT PROPOSAL

157

INFORMATION ABOUT DFB

158

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF DFB

172

INFORMATION ABOUT ADAPTHEALTH

178

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF ADAPTHEALTH

189

EXECUTIVE COMPENSATION

216

MANAGEMENT AFTER THE BUSINESS COMBINATION

223

DESCRIPTION OF SECURITIES

228

BENEFICIAL OWNERSHIP OF SECURITIES

242

MARKET PRICE AND DIVIDENDS

247

INDEPENDENT REGISTERED ACCOUNTING FIRM

248

HOUSEHOLDING INFORMATION

248

SUBMISSION OF STOCKHOLDER PROPOSALS

248

FUTURE STOCKHOLDER PROPOSALS

248

WHERE YOU CAN FIND ADDITIONAL INFORMATION

249

INDEX TO FINANCIAL STATEMENTS

F-1

i

to effectuate redemptions of their public shares in connection with the Closing. The approval of our stockholders of the Business Combination Proposal is also a condition to the Closing in the Merger Agreement.

**Q:** **What will happen in the Business Combination?**

**A:** At the Closing, DFB will acquire a majority, expected to be approximately 65%, of the economic and voting interests in AdaptHealth Holdings through a series of transactions, including the Blocker Mergers and the AdaptHealth Merger. Pursuant to the terms of the Merger Agreement, at the Closing, the Blocker Sellers and the Non-Blocker AdaptHealth Members will receive consideration consisting of an aggregate of up to 51,500,000 shares of Class A Common Stock and New AdaptHealth Units, and a number of shares of Class B Common Stock equal to the number of New AdaptHealth Units, subject to upward or downward adjustment pursuant to the AdaptHealth Merger as described in this proxy statement. The AdaptHealth Merger Consideration will be allocated among the Blocker Sellers and the Non-Blocker AdaptHealth Members in accordance with the terms of the Merger Agreement and the AdaptHealth Holdings LLC Agreement, which allocation will be determined prior to the Closing. Each New AdaptHealth Unit (other than those held by DFB), together with one share of Class B Common Stock, will be exchangeable in the future, subject to certain conditions, for one share of Class A Common Stock or, at our election, the cash equivalent to the market value of one share of Class A Common Stock, pursuant to the terms of the Exchange Agreement, as described in this proxy statement.

For additional information about the Blocker Mergers, the AdaptHealth Merger, the consideration to be received in the Business Combination and the Business Combination generally, see the section entitled "Proposal No. 1—The Business Combination Proposal."

**Q:** **What conditions must be satisfied to complete the Business Combination?**

**A:** There are a number of closing conditions in the Merger Agreement, including (i) the approval by our stockholders of the Business Combination Proposal, the Charter Proposal, the Nasdaq Proposal, the 2019 Plan Proposal and the 2019 ESPP Proposal and (ii) that DFB have available funds at the Closing of at least $225 million. For a summary of the conditions that must be satisfied or waived prior to completion of the Business Combination, see the section entitled "Proposal No. 1—The Business Combination Proposal—The Merger Agreement—Conditions to the Closing of the Business Combination."

**Q:** **How will AdaptHealth Holdings and DFB be managed and governed following the Business Combination?**

**A:** Following the consummation of the Business Combination, DFB will hold a majority, expected to be approximately 65%, of the economic and voting interests in AdaptHealth Holdings and will be the sole manager of AdaptHealth Holdings. AdaptHealth Holdings will hold 100% of the limited liability company interests in AdaptHealth. As such, we, through our directors and officers, will be responsible for all operational and administrative decisions of AdaptHealth Holdings and the day-to-day management of AdaptHealth's business. DFB does not currently have any management-level employees, other than its current officers. Following the consummation of the Business Combination, the current management of AdaptHealth will become the management of DFB and Richard Barasch, our current Chief Executive Officer, will become Chairman of the Board. None of our current officers will be officers of DFB after the Closing.

DFB is, and after the Closing will continue to be, managed by our board of directors. Following the completion of the Business Combination, the size of our board of directors will be expanded from five directors to seven, and our board of directors will consist of Richard Barasch,

12

Luke McGee, Joshua Parnes, Alan Quasha, one director designated by BlueMountain, one director designated by Deerfield and one independent director. It is expected that all the directors except for Luke McGee and Joshua Parnes will be independent under applicable Nasdaq rules.

Please see the section entitled "Management After the Business Combination."

**Q:**    **Are there any other arrangements to help ensure that DFB will have sufficient available funds to satisfy the condition to the Closing that DFB have at least $225 million of available funds at the Closing?**

**A:**    In connection with our entry into the Merger Agreement, DFB entered into the Deerfield Subscription Agreement. Under the Deerfield Subscription Agreement, on the Closing Date, subject to the occurrence of the Closing and certain other conditions, Deerfield will purchase from DFB, for a purchase price of $10.00 per share, (i) if the amount of Available Cash is $200 million or less, 10,000,000 shares of Class A Common Stock, or (ii) if the Available Cash is more than $200 million, such number of shares of Class A Common Stock (rounded up to the nearest whole number) equal to (A) $300 million *minus* the amount of Available Cash, *divided by* (B) ten; provided that in no event will the number of shares purchased be less than 5,000,000. For more information about the Deerfield Subscription Agreement, see the section entitled "Proposal No. 1—The Business Combination Proposal—Related Agreements—Deerfield Subscription Agreement."

**Q:**    **What equity stake will current DFB stockholders and other persons hold in DFB following the consummation of the Business Combination?**

**A:**    It is anticipated that, upon completion of the Business Combination and based on the assumptions described under "Certain Defined Terms," the ownership of DFB will be as follows:

- the public stockholders will own 22,500,000 shares of our Class A Common Stock, representing an approximate 42% economic interest and an approximate 27% voting interest;

- our Sponsor will own 3,545,652 shares of our Class A Common Stock, representing an approximate 7% economic interest and an approximate 4% voting interest;

- the Blocker Sellers collectively will own 18,173,356 shares of our Class A Common Stock, representing an approximate 34% economic interest and an approximate 22% voting interest;

- the Non-Blocker AdaptHealth Members collectively will own 1,863,427 shares of our Class A Common Stock and 28,963,217 shares of our Class B Common Stock, representing an approximate 3% economic interest and an approximate 38% voting interest;

- Deerfield will own 7,500,000 shares of our Class A Common Stock, representing an approximate 14% economic interest and an approximate 9% voting interest; and

- certain members of DFB's existing management collectively will own (excluding securities owned by our Sponsor that may be deemed to be beneficially owned by Mr. Barasch) 204,348 shares of Class A Common Stock, representing less than a 1% economic and voting interest.

The numbers of shares and the economic and voting interests set forth above are based upon the assumptions set forth under "Certain Defined Terms." If the actual facts differ from our assumptions, the numbers of shares and economic and voting interests set forth above will be different. The exercises of redemption rights by our public stockholders in connection with the Business Combination could cause the numbers of shares and economic and voting interests at the Closing to be different from those set forth above.

13

paying public stockholders from the Trust Account prior to addressing the claims of creditors. We cannot assure you that claims will not be brought against us for these reasons.

Our public stockholders will be entitled to receive funds from the Trust Account only upon the earlier to occur of: (i) the completion of our Initial Business Combination, (ii) the redemption of any public shares properly tendered in connection with a stockholder vote to amend any provisions of our Charter relating to stockholders' rights or pre-Initial Business Combination activity, and (iii) the redemption of all of our public shares if we are unable to complete an Initial Business Combination by February 21, 2020, subject to applicable law. In no other circumstances will a stockholder have any right or interest of any kind to or in the Trust Account. In the event that we seek stockholder approval in connection with our Initial Business Combination, a stockholder's voting in connection with the business combination alone will not result in a stockholder's redeeming its shares to us for an applicable pro rata share of the Trust Account. Such stockholder must have also exercised its redemption rights described above.

## Facilities

We currently maintain our principal executive offices at 780 Third Avenue, New York, NY 10017. The cost for this space is included in the $10,000 per month fee our Sponsor began charging us for office space, utilities and secretarial and administrative services on February 16, 2018, pursuant to a letter agreement between us and our Sponsor. We consider our current office space adequate for our current operations.

## Employees

We currently have two executive officers. Members of our management team are not obligated to devote any specific number of hours to our matters, but they intend to devote as much of their time as they deem necessary to our affairs until we have completed our Initial Business Combination. The amount of time that Mr. Barasch and Mr. Wolfe or any other members of our management team will devote in any time period will vary based on whether a target business has been selected for our Initial Business Combination and the current stage of the business combination process, but we expect that Mr. Barasch and Mr. Wolfe will devote a substantial portion of their professional time to our affairs. We do not intend to have any full-time employees prior to the completion of our Initial Business Combination.

## Directors and Executive Officers

Our current directors and officers are as follows:

| Name | Age | Title |
| --- | --- | --- |
| Richard Barasch | 65 | President, Chief Executive Officer and Chairman |
| Christopher Wolfe | 39 | Chief Financial Officer |
| Steven Hochberg | 57 | Director |
| Dr. Mohit Kaushal | 40 | Director |
| Dr. Gregory Sorensen | 56 | Director |
| Dr. Susan Weaver | 58 | Director |

**Richard Barasch** has served as our President, Chief Executive Officer and Chairman since our formation. Mr. Barasch was Chief Executive Officer of Universal American Corp., a publicly-traded health insurance and services company focused on the senior market and government programs, from 1995 until Universal American's acquisition by WellCare Health Plans in May 2017. Mr. Barasch has developed an extensive network of contacts throughout the healthcare industry and speaks regularly at industry conferences as a healthcare services expert. He is currently on the Board of Directors of

165

ELMC Risk Management Inc., HouseWorks, LLC and Quest Analytics. He is on the Board of Advisors of the Health Policy and Management program at the Columbia University School of Public Health, where he is also an Assistant Adjunct Professor, and the Brown School of Public Health. He also serves on the Board of Trustees of the Maimonides Medical Center in Brooklyn, New York. Mr. Barasch graduated from Swarthmore College and Columbia University Law School.

**Christopher Wolfe** has served as our Chief Financial Officer since our formation. Mr. Wolfe was a partner of Capital Z Partners, a middle market private equity firm, from June 2003 until December 2017. He was responsible for sourcing, structuring, execution and monitoring of private equity transactions across a variety of verticals. Mr. Wolfe served on the board of directors of Universal American Corp. from 2009 to 2014. Prior to joining Capital Z in 2003, Mr. Wolfe worked in the mergers and acquisitions group at Credit Suisse First Boston. Mr. Wolfe graduated magna cum laude from Harvard College.

**Steven Hochberg** has served as a director since February 2018. As one of the leaders of the private transactions group at Deerfield Management, Mr. Hochberg joined Deerfield Management in 2013 to work on structured transactions. Mr. Hochberg has been a co-founder and manager of many healthcare companies and led the merger of two New York City based hospital systems, which created a healthcare delivery system in New York City with revenues in excess of $5 billion. Mr. Hochberg has also led investments in more than 50 healthcare companies including rollups of companies within the services and the medtech sectors. Since 2004, Mr. Hochberg has managed Ascent Biomedical Ventures, a leading venture capital firm he co-founded focused on early stage investment and development of biomedical companies. Since 2011, Mr. Hochberg had been the Chairman of the Board of Continuum Health Partners until its merger with Mount Sinai in 2013, where he is the Senior Vice Chairman of the Mount Sinai Health System, a non-profit healthcare integrated delivery system in New York City with over $5 billion in annual revenues. Mr. Hochberg serves on the boards of Solar Capital Ltd. and Solar Senior Capital Ltd., two publicly-traded business development companies, and on the board of SCP Private Credit Income BDC LLC, a privately-owned business development company. Mr. Hochberg is also a member of the Board of the Cardiovascular Research Foundation, an organization focused on advancing new technologies and education in the field of cardiovascular medicine. Mr. Hochberg graduated from the University of Michigan and earned his M.B.A. from Harvard Business School.

**Dr. Mohit Kaushal** has served as a director since February 2018. He has had an extensive career within investing, clinical medicine and public policy. Dr. Kaushal has served as a special advisor to General Atlantic since 2015. He was a partner in Aberdare Ventures from 2013 to 2014. During his time in the Obama administration, he was a member of the White House Health IT task force; a cross agency team implementing the technology aspects of the ACA and testified to Congress on the application of technology and payment reform to the Medicare population. He also built and led the first dedicated healthcare team at the Federal Communications Commission, where his team initiated collaboration with the Food and Drug Administration for the regulatory streamlining of converged telecommunications, data analytics and medical devices leading to the release of the mobile medical applications guidance by the FDA. In addition, his team reformed the Rural Healthcare fund to create the Healthcare Connect Fund, which aligned the funding mechanism with wider healthcare payment policy and technology reform. Dr. Kaushal is a lead investor, board member or advisor to numerous transformational healthcare companies. Dr. Kaushal is an emergency room physician, holds an MBA from Stanford and an MD with distinction from Imperial College of Science, Technology and Medicine, London. He is an Adjunct Professor at Stanford University with a joint position within the newly created Biomedical Data Science Department and the medical school's Clinical Excellence Research Center.

**Dr. Gregory Sorensen** has served as a director since February 2018. He served as the president and CEO of Siemens Healthcare North America from June 2011 to September 2015. Prior to Siemens, he

served as Professor of Radiology and Health Sciences & Technology at Harvard Medical School; a faculty member of the Harvard-MIT Division of Health Sciences and Technology; and co-director of the A.A. Martinos Center for Biomedical Imaging at Massachusetts General Hospital, as well as a visiting Professor of Neuroradiology at Oxford University. Leading up to his appointment with Siemens, Dr. Sorensen was a practicing Neuroradiologist and active researcher with significant experience in clinical care, clinical trials, and translational research. His research and techniques are utilized by numerous centers throughout the world in phase II and III trials in cancer, stroke, and other illnesses. He holds a B.S. in biology from California Institute of Technology, Pasadena, CA, a M.S. in computer science from Brigham Young University, Provo, Utah, and a medical degree from Harvard Medical School, Boston, Massachusetts. Dr. Sorensen has served as the Executive Chairman of the Board of Directors for IMRIS, Inc., the leader in image-guided therapy solutions, the President and Chief Executive Officer of DeepHealth, Inc. since April 2017, the Chairman of Fusion Healthcare Staffing, LLC, and a member of the board of directors of Inviero LLC since December 2017.

Dr. Susan Weaver has served as a director since February 2018. She has served as the Chief Executive Officer of C 3 HealthcareRX, a healthcare and pharmacy services company, since July 2016, and as the Founder and President of Transformation Health Partners, LLC since September 2015. Dr. Weaver was the Chief Medical Officer for Blue Cross Blue Shield of North Carolina from 2014 to 2015 after serving as the Vice President, Health Delivery Redesign from December 2012 to early 2014. Prior to joining Blue Cross Blue Shield of North Carolina, Dr. Weaver was the Executive Vice President, Medical Affairs for WakeMed Health & Hospital from September 2011 to December 2012 and the Senior Vice President, Medical Affairs and Physician Practices from January 2009 to September 2011. Dr. Weaver also served as an Executive Director and Physician and founding member for Alliance Medical Ministry, a 501(c)(3) providing medical care to the working uninsured of Wake County, North Carolina. She holds an M.D. from Duke University School of Medicine and a B.S. in Psychology from Duke University.

**Number and Terms of Office of Officers and Directors**

Our board of directors is currently divided into two classes with only one class of directors being elected in each year and each class (except for those directors appointed prior to our first annual meeting of stockholders) serving a two-year term. If the Director Election Proposal is approved, the term of office of the first class of directors, consisting of Drs. Kaushal and Sorensen, will expire at the special meeting. If the Director Election Proposal is approved, the term of office of the second class of directors, consisting of Messrs. Barasch and Hochberg, will expire at the special meeting.

Our officers are elected by the board of directors and serve at the discretion of the board of directors, rather than for specific terms of office. Our board of directors is authorized to appoint persons to the offices set forth in our bylaws as it deems appropriate. Our bylaws provide that our officers may consist of a Chief Executive Officer, President, Chief Financial Officer, Vice Presidents, Secretary, Assistant Secretaries, Treasurer and such other offices as may be determined by the board of directors.

**Committees of the Board of Directors**

Our board of directors currently has two standing committees: an audit committee and a compensation committee. Both our audit committee and our compensation committee are composed solely of independent directors.

***Audit Committee***

Our audit committee currently consists of Dr. Weaver, Dr. Kaushal and Dr. Sorensen. Dr. Sorensen currently serves as chairman of the audit committee. Under Nasdaq listing standards and

consummate the Transactions. The execution and delivery of this Agreement by the Company and the consummation by the Company of the Transactions have been duly and validly authorized by all members of the Company Board and the requisite members of the Company holding all the outstanding Company Membership Units entitled to vote, and no other proceedings on the part of the Company or its members are necessary to authorize this Agreement or to consummate the Transactions (other than, with respect to the Merger, the filing and recordation of appropriate merger documents as required by the DLLCA). This Agreement has been duly and validly executed and delivered by the Company and, assuming due authorization, execution and delivery by DFB Healthcare and Merger Sub, constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, by general equitable principles (the "*Remedies Exceptions*").

SECTION 3.05    *No Conflict; Required Filings and Consents.*

(a)   The execution and delivery of this Agreement by the Company does not, and the performance of this Agreement by the Company will not: (i) conflict with or violate the Organizational Documents of the Company or any Company Subsidiary; (ii) assuming that all consents, approvals, authorizations and other actions described in *Section 3.05(b)* have been obtained and all filings and obligations described in *Section 3.05(b)* have been made, conflict with or violate any United States federal or state, or non-United States, statute, law, ordinance, regulation, rule, code, restriction, executive order, injunction, judgment, directive, decree or other order ("*Law*") applicable to the Company or any Company Subsidiary or by which any property or asset of the Company or any Company Subsidiary is bound or affected; or (iii) result in any breach of, or constitute a default (or an event which, with notice or lapse of time or both, would become a default) under, or give to others any right of termination, amendment, acceleration or cancellation of, or result in the creation of a lien or other encumbrance on any property or asset of the Company or any Company Subsidiary pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, (including any Company Permit) franchise or other instrument or obligation binding on the Company or any Company Subsidiary, except, with respect to clauses (ii) and (iii), for any such conflicts, violations, breaches, defaults or other occurrences which would not reasonably be expected to have a Company Material Adverse Effect.

(b)   The execution and delivery of this Agreement by the Company does not, and the performance of this Agreement by the Company will not, require any material consent, approval, authorization or permit of, or filing with or notification to, any United States federal, state, county or local or non-United States government, governmental, regulatory or administrative authority, agency, instrumentality or commission or any court, tribunal, or judicial or arbitral body (a "*Governmental Authority*"), except (i) for applicable requirements, if any, of the Exchange Act, state securities or "blue sky" laws ("*Blue Sky Laws*") and state takeover laws, the pre-merger notification requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "*HSR Act*"), and filing and recordation of appropriate merger documents as required by the DLLCA, and (ii) such consents, approvals, authorizations, permissions, filings or notifications which, if not made or obtained, would not, individually or in the aggregate, materially impair or delay the Company's ability to consummate the transactions contemplated hereby.

SECTION 3.06    *Permits; Compliance.*    Each of the Company and the Company Subsidiaries is in possession of all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals and orders of any Governmental Authority necessary for each of the Company or the Company Subsidiaries to own, lease and operate its properties or to carry on its business as it is now being conducted (the "*Company Permits*"), except where failure to have such Company Permits would not, individually or in the aggregate, be material to the Company and the Company Subsidiaries, taken as a whole. The Company Permits held by the Company and the

A-10

Company Subsidiaries are valid and in full force and effect in all material respects, and no suspension, revocation, involuntary termination or cancellation of any of the Company Permits is pending or, to the knowledge of the Company, threatened in writing. Neither the Company nor any Company Subsidiary is or during the past three (3) years has been, in material conflict with, or in material default, breach or violation of, (a) any Law applicable to the Company or any Company Subsidiary or by which any property or asset of the Company or any Company Subsidiary is bound or affected, or (b) any note, bond, mortgage, indenture, contract, agreement, lease, license, Company Permit, franchise or other instrument or obligation to which the Company or any Company Subsidiary is a party or by which the Company or any Company Subsidiary or any property or asset of the Company or any Company Subsidiary is bound, in each case, except for any such conflicts, defaults, breaches or violations that would not reasonably be expected to have a Company Material Adverse Effect. None of the Company or the Company Subsidiaries have been charged with or received notice that it is under investigation with respect to a material violation of any applicable Law that remains unresolved as of the date hereof. The Company and the Company Subsidiaries have filed all material reports required to be filed with any Governmental Authority on or prior to the date hereof.

SECTION 3.07    *Financial Statements.*

(a)   The Company has delivered to DFB Healthcare true and complete copies of the audited consolidated balance sheet of the Company and the consolidated Company Subsidiaries as of December 31, 2016, December 31, 2017 and December 31, 2018 and the related audited consolidated statements of income and cash flows of the Company and the consolidated Company Subsidiaries for each of the years then ended (collectively, the "*Audited Financial Statements*"), which are attached as *Section 3.07(a)* of the Company Disclosure Schedule, and which contains an unqualified report of the Company's auditors. Each of the Audited Financial Statements (including the notes thereto) was prepared in accordance with United States generally accepted accounting principles ("*GAAP*") applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto) and each fairly presents, in all material respects, the financial position, results of operations and cash flows of the Company and the consolidated Company Subsidiaries as at the date thereof and for the period indicated therein, except as otherwise noted therein.

(b)   The Company has made available to DFB Healthcare a true and complete draft of the consolidated unaudited balance sheet of the Company and the Company Subsidiaries as of March 31, 2019 (the "*2019 Balance Sheet*"), and a draft of the related unaudited consolidated statements of income and cash flows of the Company and the Company Subsidiaries for the 3-month period then ended, which are attached as *Section 3.07(b)* of the Company Disclosure Schedule. Such unaudited financial statements were prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated (except for the omission of footnotes and subject to year-end adjustments) and fairly present, in all material respects, the financial position, results of operations and cash flows of the Company and the Company Subsidiaries as at the date thereof and for the period indicated therein, except as otherwise noted therein and subject to normal year-end adjustments and the absence of footnote disclosure.

(c)   Except as and to the extent set forth on the 2019 Balance Sheet, neither the Company nor any Company Subsidiary has any liability or obligation of a nature (whether accrued, absolute, contingent or otherwise) required to be reflected on a balance sheet prepared in accordance with GAAP, except for: (i) liabilities that were incurred in the ordinary course of business or in connection with the Transactions since the date of such 2019 Balance Sheet; (ii) obligations for future performance under any contract to which the Company or any Company Subsidiary is a party; or (iii) liabilities and obligations which are not, individually or in the aggregate, material to the Company and the Company Subsidiaries taken as a whole.

A-11