UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM and BUCKS COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>         Plaintiffs,<br><br>   vs.<br><br>ADAPTHEALTH CORP. f/k/a DFB HEALTHCARE ACQUISITIONS CORP., LUKE MCGEE, STEPHEN P. GRIGGS, JASON CLEMENS, FRANK J. MULLEN, RICHARD BARASCH, JOSHUA PARNES, ALAN QUASHA, TERENCE CONNORS, DR. SUSAN WEAVER, DALE WOLF, BRADLEY COPPENS, and DAVID S. WILLIAMS III,<br><br>         Defendants. | Civ. Action No. 2:21-cv-03382-HB<br><br>CLASS ACTION<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT<br><br>ELECTRONICALLY FILED |

4877-5957-0962.v2

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION .................................................................................................1

II.  STATEMENT OF FACTS ....................................................................................3

    A.  AdaptHealth Focuses Investors on Its "Organic Growth" and "Acquisition" Strategy Driven by McGee's Leadership .........................................3

    B.  AdaptHealth Highlights Its McGee-Dependent Growth Strategy While Concealing His Involvement in an International Tax Fraud....................................4

    C.  Defendants Highlight McGee's Importance to AdaptHealth's Continued Revenue Growth but Conceal Denmark's Pursuit of McGee in the United States ..........................................................................................6

    D.  AdaptHealth Raises over $200 Million from Investors in a Secondary Public Offering, Highlighting "Proven" Management and M&A Success While Omitting McGee's Criminal Activity ...........................................................7

    E.  Defendants Change the Definition of Organic Growth to Achieve Previous "Organic Growth" Guidance While Concealing Contracting Organic Revenue.............................................................................................8

    F.  McGee Cashes in on His AdaptHealth Stock, Selling $59.9 Million Shortly Before Investors Learned the Truth ...........................................................10

    G.  Investors Finally Learn the Truth ........................................................................11

III.  PLAINTIFFS SUFFICIENTLY PLEAD VIOLATIONS OF SECTION 10(b) AND RULE 10b-5 ..............................................................................................11

    A.  Legal Standards.....................................................................................................11

    B.  Plaintiffs Adequately Plead Material Misrepresentations and Omissions.............12

        1.  AdaptHealth and McGee's False and Misleading Statements Regarding McGee's Background and the Company's Acquisition-Dependent Growth Strategy...................................................................13

            a.  AdaptHealth's Misleading Biographical Statements Concerning McGee's Prior Experience .........................................14

            b.  Defendants' False and Misleading SOX Certifications .................15

            c.  AdaptHealth's Duty to Disclose McGee's Involvement in the Tax Scheme Under Regulation S-K.........................................16

4877-5957-0962.v2

**Page**

d.   AdaptHealth's and McGee's Misleading Statements Concerning the Company's Acquisition-Dependent Growth Strategy and Legal Proceedings ....................................... 17

e.   AdaptHealth's Misleading Risk Disclosures ................................ 19

2.   Defendants' False and Misleading Statements Regarding Organic Growth ...................................................................................... 19

C.   Defendants' Statements and Omissions Were Material ....................................... 23

D.   Defendants' Statements Are Not Protected by the Safe Harbor ........................... 25

E.   The Totality of Allegations Support a Strong Inference of Scienter ..................... 29

1.   Defendants Intentionally Misled Investors by Concealing McGee's Criminal History While Emphasizing How His Experience Was Driving Growth at AdaptHealth .................................................... 30

2.   The Complaint Alleges a Strong Inference that Defendants Purposefully Deceived Investors by Hiding AdaptHealth's Negative Organic Revenue Growth ........................................... 32

3.   Defendants Were Motivated to Commit Fraud ....................................... 36

a.   McGee's Suspicious Stock Sales Contribute to a Strong Inference of Scienter .................................................... 36

b.   AdaptHealth's Sale of $200 Million in Stock Contributes to a Strong Inference of Scienter .......................................... 39

F.   Plaintiffs Adequately Allege Loss Causation ...................................................... 40

IV.   PLAINTIFFS SUFFICIENTLY PLEAD SECTION 11 AND 12(a)(2) CLAIMS ........... 43

A.   Legal Standards ............................................................................................... 43

B.   AdaptHealth's Prospectus Was False and Misleading ......................................... 44

V.   PLAINTIFFS SUFFICIENTLY PLEAD CONTROL PERSON CLAIMS ...................... 45

VI.   CONCLUSION ............................................................................................................ 45

4877-5957-0962.v2

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009), *cert. denied*, 559 U.S. 1116 (2010)..........................................24

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)..........................................................................................33

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)..................................................................................................20

*Asher v. Baxter Int'l Inc.*,
377 F.3d 727 (7th Cir. 2004) .......................................................................................28

*Behrendsen v. Yangtze River Port & Logistics Ltd.*,
No. 19-cv-00024 (DLI)(LB), 2021 WL 2646353 (E.D.N.Y. June 28, 2021)....................42, 43

*Billhofer v. Flamel Techs., S.A.*,
No. 07 Civ. 9920, 2012 WL 3079186 (S.D.N.Y. July 30, 2012) ..........................................23

*Bond v. Clover Health Invs., Corp.*,
No. 3:21-cv-00096, 2022 WL 602432 (M.D. Tenn. Feb. 28, 2022)......................................43

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
No. 17-10467, 2019 WL 3451523 (D.N.J. July 31, 2019) ...................................................20

*City of Bristol Pension Fund v. Vertex Pharms. Inc.*,
12 F. Supp. 3d 225 (D. Mass. 2014) ..............................................................................38

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
No. 11 Civ. 4665(PGG), 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ...............................30

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)....................................................................................18, 21

*City of Providence v. Aeropostale, Inc.*,
No. 11 Civ. 7132(CM)(THK), 2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013)........................37

*Const. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020)..............................................................................13

*Curran v. Freshpet, Inc.*,
No. 16-2263, 2018 WL 394878 (D.N.J. Jan. 12, 2018)................................................. *passim*

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)...............................................................................................40, 41

**Page**

*EP Medsystems, Inc. v. EchoCath, Inc.*,
235 F.3d 865 (3d Cir. 2000)................................................................................................40

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................................41

*Fries v. N. Oil & Gas, Inc.*,
CEO. 354 F. Supp. 3d 384 (S.D.N.Y. 2018)......................................................................15

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)..........................................................................................20, 21

*Gargiulo v. Isolagen, Inc.*,
527 F. Supp. 2d 384 (E.D. Pa. 2007) ................................................................................39

*GSC Partners CDO Fund v. Washington*,
368 F.3d 228 (3d Cir. 2004)..........................................................................................27, 31

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)........................................................................................................43, 44

*Hull v. Glob. Dig. Sols., Inc.*,
No. 16-5153(FLW), 2017 WL 6493148 (D.N.J. Dec. 19, 2017)......................................40

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004)..............................................................................................24

*In re Advance Auto Parts, Inc., Sec. Litig.*,
No. 18-212-RGA, 2020 WL 599543 (D. Del. Feb. 7, 2020) ............................................38

*In re Advanta Corp. Sec. Litig.*,
180 F.3d 525 (3d Cir. 1999)..........................................................................................25, 26

*In re Alpharma Sec. Litig.*,
372 F.3d 137 (3d Cir. 2004)..............................................................................................12

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)................................................................................21

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
93 F. Supp. 2d 424 (S.D.N.Y. 2000)................................................................................39

*In re Amarin Corp. PLC., Sec. Litig.*,
No. 13-CV 6663(FLW)(TJB), 2015 WL 3954190 (D.N.J. June 29, 2015)......................23

**Page**

*In re Bradley Pharms., Inc. Sec. Litig.*,
421 F. Supp. 2d 822 (D.N.J. 2006) ...................................................................................40, 41

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997).................................................................................................45

*In re Cardinal Health Inc. Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) ..................................................................................22

*In re Cell Pathways, Inc. Sec. Litig.*,
No. 99-752, 2000 WL 805221 (E.D. Pa. June 20, 2000)........................................................25

*In re CommVault Sys., Inc. Sec. Litig.*,
No. 14-CV-5628 (PGS), 2016 WL 5745100 (D.N.J. Sept. 30, 2016) .....................................38

*In re Comverse Tech., Inc. Sec. Litig.*,
543 F. Supp. 2d 134 (E.D.N.Y. 2008) ..............................................................................15, 19

*In re Discovery Labs Sec. Litig.*,
No. 06-1820, 2007 WL 789432 (E.D. Pa. Mar. 15, 2007),
*aff'd*, 276 F. App'x 154 (3d Cir. 2008).................................................................................28

*In re Enzymotec Sec. Litig.*,
No. 14-5556(JLL)(MAH), 2015 U.S. Dist. LEXIS 167403
(D.N.J. Dec. 14, 2015) .....................................................................................................26, 45

*In re Enzymotec Sec. Litig.*,
No. 14-5556(JLL)(MAH), 2015 WL 8784065 (D.N.J. Dec. 15, 2015)................12, 13, 28, 39

*In re EROS Int'l. PLC Sec. Litig.*,
No. 19-14125, 2021 WL 1560728 (D.N.J. April 20, 2021).........................................34, 41, 42

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
618 F. Supp. 2d 311 (S.D.N.Y. 2009)....................................................................................21

*In re ForceField Energy Inc. Sec. Litig.*,
No. 15 CIV. 3020 (NRB), 2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017) ..............................14

*In re Great Atl. and Pac. Tea Co.*,
103 F. App'x 465 (3d Cir. 2004) ...........................................................................................30

*In re H&R Block Sec. Litig.*,
527 F. Supp. 2d 922 (W.D. Mo. 2007) ..................................................................................36

4877-5957-0962.v2

**Page**

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
   2017 WL 1536223 (D.N.J. Apr. 27, 2017), *aff'd sub nom.*
   *In re Hertz Global Holdings, Inc.*, 905 F.3d at 106 (3d Cir. 2018) ..........................................38

*In re Hertz Holdings Inc.*,
   905 F.3d 106 (3d Cir. 2018).......................................................................................................32

*In re Honeywell Int'l, Inc. Sec. Litig.*,
   182 F. Supp. 2d 414 (D.N.J. Jan. 15, 2002).............................................................................13

*In re Horsehead Holding Corp. Sec. Litig.*,
   No. CV 16-292-LPS-CJB, 2018 WL 4838234 (D. Del. Oct. 4, 2018),
   *report and recommendation adopted*, No. CV 16-292-LPS-CJB,
   2019 WL 1409454 (D. Del. Mar. 28, 2019) .............................................................................36

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
   No. 17-341, 2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ...................................13, 27, 29, 32

*In re Intelligroup Sec. Litig.*,
   527 F. Supp. 2d 262 (D.N.J. 2007) .....................................................................................32, 41

*In re Keryx Biopharmaceuticals, Inc. Sec. Litig.*,
   No. 13 Civ. 755(KBF), 2014 WL 585658 (S.D.N.Y. Feb. 14, 2014).......................................35

*In re Lucent Techs., Inc. Sec. Litig.*,
   217 F. Supp. 2d 529 (D.N.J. 2002) ...........................................................................................27

*In re MannKind Sec. Actions*,
   835 F. Supp. 2d 797 (C.D. Cal. 2011) ......................................................................................39

*In re Merck & Co., Sec., Derivative and ERISA Litig.*,
   No. 05-1151(SRC), 2011 WL 3444199 (D.N.J. Aug. 8, 2011).........................................18, 20

*In re NAHC, Inc. Sec. Litig.*,
   306 F.3d 1314 (3d Cir. 2002).....................................................................................................13

*In re NAHC, Inc. Secs. Litig.*,
   No. CIV.A. 00-4020, 2001 WL 1241007 (E.D. Pa. Oct. 17, 2001),
   *aff'd*, 306 F.3d 1314 (3d Cir. 2002)..........................................................................................36

*In re Newell Brands, Inc. Sec. Litig.*,
   837 F. App'x 869 (3d Cir. 2020) ...............................................................................................13

*In re Novo Nordisk Sec. Litig.*,
   No. 3:17-cv-209-BRM-LHG, 2018 WL 3913912 (D.N.J. Aug. 16, 2018) .............................27

4877-5957-0962.v2

**Page**

*In re Omnicom Grp., Inc. Sec. Litig.*,
No. 02 Civ. 4483(RCC), 2005 WL 735937 (S.D.N.Y. Mar. 30, 2005)...................................22

*In re Portal Software, Inc. Sec. Litig*,
No. C-03-5138 VRW, 2005 WL 1910923 (N.D. Cal. Aug. 10, 2005)...................................40

*In re Party City Sec. Litig.*,
147 F. Supp. 2d 282 (D.N.J. 2001) .......................................................................................38

*In re PTC Therapeutics, Inc. Sec. Litig.*,
No. 16-1124(KM)(MAH), 2017 WL 3705801 (D.N.J. Aug. 28, 2017) ...........................12, 33

*In re Radian Sec. Litig.*,
No. 07-3375, 2010 WL 1767195 (E.D. Pa. Apr. 30, 2010)......................................................39

*In re Res. Am. Sec. Litig.*,
202 F.R.D. 177 (E.D. Pa. 2001)..............................................................................................41

*In re Res. Am. Sec. Litig.*,
No. CIV. 98-5446, 2000 WL 1053861 (E.D. Pa. July 26, 2000) ...........................................39

*In re Salix Pharms., Ltd.*,
No. 14-CV-8925(KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)...............................28

*In re Sanofi Sec. Litig.*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016)................................................................................15, 23

*In re Sanofi-Aventis Sec. Litig.*,
774 F. Supp. 2d 549 (S.D.N.Y. 2011).....................................................................................23

*In re Schering-Plough Corp./Enhance Sec. Litig.*,
No. 08-CV-397(DMC), 2009 U.S. Dist. LEXIS 78852 (D.N.J. Sept. 2, 2009) .....................12

*In re Sierra Wireless, Inc. Sec. Litig.*,
482 F. Supp. 2d 365 (S.D.N.Y. 2007)......................................................................................25

*In re Sofamor Danek Grp., Inc.*,
123 F.3d 394 (6th Cir. 1997) ..................................................................................................13

*In re Stonepath Grp., Inc. Sec. Litig.*,
No. Civ.A. 04-4515, 2006 WL 890767 (E.D. Pa. Apr. 3, 2006),
*aff'd sub nom. Globis Cap. Partners, L.P. v. Stonepath Grp., Inc.*,
241 F. App'x 832 (3d Cir. 2007) .............................................................................................35

4877-5957-0962.v2

**Page**

*In re Suprema Specialities, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006)................................................................37, 43, 44, 45

*In re Tellium, Inc. Sec. Litig.*,
No. Civ.A. 02CV5878FLW, 2005 WL 2090254 (D.N.J. Aug. 26, 2005)........................41, 42

*In re Urb. Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015) ................................................................40, 41

*In re Violin Memory Sec. Litig.*,
No. 13-CV-5486 YGR, 2014 WL 5525946 (N.D. Cal. Oct. 31, 2014)...................................17

*In re Viropharma Inc. Sec. Litig.*,
21 F. Supp. 3d 458 (E.D. Pa. 2014) .......................................................................38

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)...........................................................................12, 13

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2nd Cir. 2016)...........................25

*In re Wilmington Tr. Sec. Litig.*,
29 F. Supp. 3d 432 (D. Del. 2014)........................................................................44

*In re Winstar Commc'ns*,
No. 01 CV 11522, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ......................................42, 43

*Institutional Investors Grp. v. Avaya*,
564 F.3d 242 (3d Cir. 2009)..................................................................... *passim*

*Ironworkers Local 580—Joint Funds v. Linn Energy, LLC*,
29 F. Supp. 3d 400 (S.D.N.Y. 2014).......................................................................22

*Kelsey v. Allin*,
No. 14 C 7837, 2016 WL 825236 (N.D. Ill. Mar. 2, 2016)..........................................14, 31

*Lapin v. Goldman Sachs Grp., Inc.*,
506 F. Supp. 2d 221 (S.D.N.Y. 2006).......................................................................21

*Martin v. GNC Holdings, Inc.*,
757 F. App'x 151 (3d Cir. 2018) ............................................................................34

*Martin v. GNC Holdings, Inc.*,
No. 2:15-cv-01522, 2017 WL 3974002 (W.D. Pa. Sept. 8, 2017) .........................................43

4877-5957-0962.v2

**Page**

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)..................................................................................................23, 26

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*,
  No. 6:19-cv-619-Orl-40LRH, 2019 WL 5394011 (M.D. Fla. Oct. 16, 2019).........................16

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*,
  No. 6:19-cv-619-Orl-40LRH, 2020 WL 1072582 (M.D. Fla. Feb. 14, 2020)...................16, 31

*McDermid v. Inovio Pharms., Inc.*,
  520 F. Supp. 3d 652 (E.D. Pa. 2021) ......................................................................31, 37, 39, 40

*McIntire v. China MediaExpress Holdings, Inc.*,
  927 F. Supp. 2d 105 (S.D.N.Y. 2013)..................................................................................42

*Mill Bridge V, Inc. v. Benton*,
  No. 08-2806, 2009 WL 4639641 (E.D. Pa. Dec. 3, 2009)......................................................34

*Nanopierce Techs., Inc. v. Southridge Cap. Mgmt. LLC*,
  No. 02 CIV. 0767 (LBS), 2003 WL 22882137 (S.D.N.Y. Dec. 4, 2003)................................14

*Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) ........................................................................................41

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
  834 F.3d 481 (3d Cir. 2016)...................................................................................................13

*Omanoff v. Patrizio & Zhao LLC*,
  No. 14-723, 2015 WL 1472566 (D.N.J. Mar. 31, 2015) .......................................................40

*Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)..........................................................................................................22, 23

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000)...................................................................................................32

*Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*,
  572 F. App'x 713 (11th Cir. 2014) .........................................................................................27

*Phillips v. Cnty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008)...................................................................................................11

*Rahman v. Kid Brands, Inc.*,
  736 F.3d 237 (3rd Cir. 2013) .................................................................................................36

4877-5957-0962.v2

**Page**

*Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004)................................................................................36

*Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012)...........................................................29, 32

*Rubke v. Capital Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) ..........................................................................44

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
   351 F. Supp. 3d 874 (E.D. Pa. 2018) ................................................................30

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000)..........................................................................27, 28

*Shah v. Zimmer Biomet Holdings, Inc.*,
   348 F. Supp. 3d 821 (N.D. Ind. 2018) ...............................................................19

*Shapiro v. UJB Fin. Corp.*,
   964 F.2d 272 (3d Cir. 1992)..........................................................................24, 25

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2nd Cir. 1994).........................................................................25, 26

*Siemers v. Wells Fargo & Co.*,
   No. C05-04518 WHA, 2007 WL 1140660 (N.D. Cal. Apr. 17, 2007)....................15

*Snellink v. Gulf Res., Inc.*,
   870 F. Supp. 2d 930 (C.D. Cal. 2012) ........................................................ *passim*

*Stein v. Tangoe, Inc.*,
   No. 3:13-cv-00286(VLB), 2014 WL 12767210 (D. Conn. Sept. 30, 2014)............22

*Teamsters Local 456 Pension Fund v. Universal Health Servs.*,
   396 F. Supp. 3d 413 (E.D. Pa. 2019) ................................................................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..............................................................................11, 29, 36

*Thor Power Tool Co. v. Comm'r of Internal Revenue*,
   439 U.S. 522 (1979)..........................................................................................22

*U.S. S.E.C. v. Brown*,
   740 F. Supp. 2d 148 (D.D.C. 2010) ...................................................................18

4877-5957-0962.v2

**Page**

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
985 F.2d 1190 (2d Cir. 1993)....................................................................................21

*Utesch v. Lannett Co., Inc.*,
385 F. Supp. 3d 408 (E.D. Pa. 2019) ..................................................................33, 42

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
No. CIV.A. 13-6731, 2015 WL 3755218 (E.D. Pa. June 16, 2015).........................42

*Weiner v. Quaker Oats Co.*,
129 F.3d 310 (3d Cir. 1997)......................................................................................23

*Wietschner v. Monterey Pasta Co.*,
294 F. Supp. 2d 1102 (N.D. Cal. 2003) ...................................................................38

*Williams v. Globus Med., Inc.*,
869 F.3d 235 (3d Cir. 2017)..................................................................12, 19, 28, 30

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
§77k....................................................................................................................43, 44, 45
§77l(a)(2) ...........................................................................................................43, 44, 45
§78j(b)............................................................................................................11, 20, 44, 45
§78u-4 ...........................................................................................................................12, 26
§78u–5(c)(1)(A)(i) ............................................................................................................26

Federal Rules of Civil Procedure
Rule 8 ............................................................................................................................45
Rule 9(b) ..............................................................................................................12, 40, 44, 45

17 C.F.R.
§229.401........................................................................................................................16
§229.401(e)(1) ...............................................................................................................17
§229.401(f)(2)................................................................................................................17
240.10b-5 .......................................................................................................................11

Plaintiffs Delaware County Employees Retirement System and Bucks County Employees' Retirement System ("Plaintiffs") submit this Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint (ECF Nos. 37, 37-1) ("Motion" or "Mtn.").[1]

## I.      INTRODUCTION

This case involves outright deception, a complete disregard of U.S. Securities and Exchange Commission ("SEC") regulations, and allegations that far surpass the pleading requirements for claims under the antifraud provisions of the Securities Exchange Act of 1934 (the "Exchange Act") and claims for strict liability under the Securities Act of 1933 (the "Securities Act").  AdaptHealth accessed the capital markets through a lenient Special Purpose Acquisition Company ("SPAC") process while concealing that its founder and CEO Luke McGee ("McGee"), the executive publicly responsible for implementing the Company's acquisition strategy that was driving record revenue growth, was mired in "one of the biggest tax scandals in Europe." Defendants misleadingly hid McGee's connection to the criminal tax scheme – in direct violation of SEC Reg. S-K, Item 401 – while highlighting his mergers and acquisition ("M&A") experience to complete AdaptHealth's SPAC merger and then remained silent about his growing criminal exposure as they repeated each quarter how McGee's acquisition strategy was driving (and would continue to drive) record revenue growth.  Then, as AdaptHealth's existing organic business *contracted* under the weight of McGee's legal troubles, Defendants concealed this clearly material development and instead told investors that AdaptHealth's organic business was actually growing – and did so as they delivered $38 million in cash to McGee for 1.3 million shares (25% of his

---

[1]   "Defendants" collectively are AdaptHealth Corp. ("AdaptHealth" or the "Company"), Luke McGee, Stephen P. Griggs, Jason Clemens, and AdaptHealth's Board of Directors ("Board"). ¶¶47-58.  The Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 19) (the "Complaint") pleads Securities Act claims against Defendants collectively and Exchange Act claims against AdaptHealth and McGee, Griggs, and Clemens (the "Officer Defendants").  ¶¶59-60.  References herein to "Defendants" concerning Plaintiffs' Exchange Act claims includes only the Officer Defendants during the time when they held their positions.

- 1 -

4877-5957-0962.v2

holdings) and fleeced investors for another $200 million through AdaptHealth's secondary offering. These allegations plainly establish that Defendants misled investors when they completed the SPAC merger, reported AdaptHealth's quarterly and annual results, and issued the Prospectus for its secondary offering, and alone are sufficient to deny Defendants' Motion as to Plaintiffs' Securities Act claims.

For Plaintiffs' Exchange Act claims, Defendants' fraudulent intent is difficult to dispute. The allegations reveal that Defendants were fully aware of Denmark's pursuit of McGee for his role in the tax scheme both when AdaptHealth completed the SPAC process, and while they trumpeted McGee's acquisition strategy and resulting revenue growth throughout the Class Period. Their Motion even concedes McGee's knowledge. The allegations also reveal that Defendants purposely changed AdaptHealth's established organic growth metric, obfuscated this change, and removed critical data from AdaptHealth's SEC filings, all to hide the truth about AdaptHealth's declining organic business. McGee would sell off another $21 million (17%) of his stock before investors would learn the complete truth. And when they did, through AdaptHealth's announced removal of McGee following his indictment and a *Jehoshaphat Research* report (the "*Jehoshaphat* Report") – later confirmed credible – which revealed the Company's negative organic revenue growth, AdaptHealth's stock collapsed.

Defendants do not seriously dispute that these misstatements and omissions were material. McGee indeed helmed the Company during its expansion into a billion dollar enterprise and was responsible for its acquisition growth strategy. And, according to McGee, AdaptHealth's organic growth, a key component of the Company's "20% growth story," was even "more valuable" than its acquisition growth. Defendants instead impermissibly and incorrectly argue that Plaintiffs' organic growth allegations simply got it "wrong," despite the Company's post-Class Period concession regarding the inadequacy of its disclosures on the issue and confirmation that true

- 2 -

organic revenue was negative. Defendants' arguments concerning McGee's "uncharged" wrongdoing are equally misguided. They ignore McGee's connection to criminal proceedings in Denmark before the Class Period, seek to continue the façade that McGee created to disguise his scheme, and overlook that courts routinely hold that concealing negative information concerning an executive's background is materially misleading, regardless of whether there was "adjudicated" criminal conduct. And, in any case, before the Class Period, a court *did* find McGee's scheme illegal. Defendants raise only disputed issues of fact to resolve at trial, not on a motion to dismiss.

Defendants' remaining challenges to scienter and loss causation fare no better. Defendants' concession about McGee's knowledge is sufficient to establish scienter for both McGee and the Company, at a minimum. And Quasha, an AdaptHealth Board member, too, admitted that he knew about the "'problems in Denmark'" before the Class Period. Nor do Defendants credibly address the allegations showing that Griggs and Clemens also knew about Denmark's pursuit when they signed and certified AdaptHealth's 2020 Form 10-K, just four weeks before the Board announced McGee's unpaid leave. Defendants further ignore that their organic growth manipulation purposefully concealed AdaptHealth's contracting organic revenue. And regarding loss causation, Defendants do not dispute that the alleged corrective disclosures that caused AdaptHealth's stock price to decline directly relate to the information Plaintiffs allege was concealed by the fraud. Nothing more is required. Defendants' Motion should be denied.

## II.    STATEMENT OF FACTS

### A.    AdaptHealth Focuses Investors on Its "Organic Growth" and "Acquisition" Strategy Driven by McGee's Leadership

AdaptHealth began as DFB Healthcare Acquisitions Corp. ("DFB"), a SPAC created for the stated purpose of acquiring a business in the healthcare industry. ¶¶2,8.[2] DFB was expressly

---

[2]    "¶__" or "¶¶__" are references to paragraphs in the Complaint. "Britton Decl." refers to the Declaration of Douglas R. Britton in Support of Plaintiffs' (1) Opposition to Defendants' Request

4877-5957-0962.v2

focused on locating a target that would have "Recurring and Embedded Revenue and Earnings Growth or Potential for Revenue and Earnings Growth" and an "Experienced Management Team," both of which were critical to a growth objective that depended solely on the target and its management for DFB's success. *Id.*

DFB announced AdaptHealth as its target in July 2019, before the Class Period. ¶9. AdaptHealth fit DFB's description of the ideal target – it was "[a] Leading Provider of Home Medical Equipment," had "[a] Record of Growth and Consolidation in an Expanding Industry," and "proven management." ¶¶2, 8, 9, 105. DFB's accompanying presentation focused on McGee, stating that he doubled AdaptHealth's revenue and EBITDA in just three years using "a strategy of organic growth [and] accretive acquisitions." ¶9. McGee, a "visionary" that could "see the next trend," had driven AdaptHealth's growth largely through M&A activity, building AdaptHealth "from $7mm of revenue in first acquisition to nearly $500mm+ today" and "[l]ed the Company's proven acquisition track record." ¶10. No other executive was credited with AdaptHealth's acquisition strategy.

### B. AdaptHealth Highlights Its McGee-Dependent Growth Strategy While Concealing His Involvement in an International Tax Fraud

On November 8, 2019, at the start of the Class Period, DFB announced that it had completed its merger with AdaptHealth, stating that AdaptHealth would "continue to be led by its seasoned team of industry and financial professionals, including Chief Executive Officer, Luke McGee." ¶11. McGee, himself, emphasized that M&A activity was an important source of growth, telling investors that "[w]e have a target of doing $100 million in revenue acquired." ¶¶2,

---

for Judicial Notice; and (2) Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint, filed concurrently herewith. Emphasis is added and internal citations are omitted throughout, unless otherwise noted.

- 4 -

11. But, he acknowledged acquisition growth was unsustainable, stating that "we all know that organic growth is more valuable, and we strive to make sure we're accomplishing that." *Id.*

AdaptHealth continued throughout the Class Period to characterize McGee as the engine behind AdaptHealth's revenue growth. *Id.* On November 20, 2019, just a week after announcing that the merger had closed, AdaptHealth reposted the DFB presentation from July 2019 on its website to emphasize that AdaptHealth had a "[p]roven, seasoned management team and Board of Directors," that McGee "built [the] business from $7mm of revenue in [the] first acquisition" and "[l]ed the Company's proven acquisition track record," and highlighted McGee's prior experience "in the investment banking groups at Deutsche Bank and Merrill Lynch" and at Quadrant Management, Inc. ("Quadrant") – a private equity firm where McGee held "director positions" and "executive level roles" "in certain of Quadrant's portfolio companies." ¶¶78, 86.

But the statements about McGee and AdaptHealth's revenue growth omitted important information: McGee's future with AdaptHealth was, at best, uncertain given his status as a ringleader in, and a target of Denmark's criminal investigation into, "one of the biggest tax scandals in Europe." ¶¶3, 15, 16, 34, 79. In fact, in May 2019 – six months *before* the start of the Class Period – McGee and his co-conspirators "entered a settlement with Danish Customs and Tax Administration to reimburse DKK 1.55 billion [over US $230 million (estimated using May 2019 dollar exchange rates)] that they had received for the presumed fraud." ¶¶15-24, 79. And in September 2019, just one month *prior* to the start of the Class Period, a court in Denmark made a "criminal ruling" against North Channel Bank, the German bank owned by McGee and his co-conspirators used to facilitate the scheme by faking trades to fraudulently secure hundreds of millions of dollars in tax reimbursement proceeds to which they were not entitled. ¶¶3, 15-17, 79. The bank, through its new management, even acknowledged its role in the fraud. ¶¶3, 15. AdaptHealth and McGee, of course, kept this aspect of McGee's experience quiet.

- 5 -

4877-5957-0962.v2

C.      Defendants Highlight McGee's Importance to AdaptHealth's
        Continued Revenue Growth but Conceal Denmark's Pursuit of
        McGee in the United States

In each quarter during the Class Period – from Q3 2019 to Q4 2020 – AdaptHealth and McGee's public statements focused investors on its continued growth, making clear that AdaptHealth was growing both organically and through acquisitions.  ¶¶77, 80-82, 88-89, 93-94, 99-100, 108-109.  They repeatedly attributed strong financial performance to "the successful execution of our strategy to grow organically and through accretive acquisitions," and boasted about a "robust" "potential acquisition pipeline."  ¶¶12, 77.  AdaptHealth's results "reflect[ed] our success in deploying a scalable growth model focused on organic sales, acquisitions, [and] accretive capital deployment."  ¶80.

AdaptHealth and McGee's statements made it clear that acquisitions – McGee's specialty – were central to AdaptHealth's current results and its future growth.  In fact, AdaptHealth reported that it had "closed on a near record number of acquisitions" that were "immediately accretive to our earnings" and that it was "poised for exciting organic and acquisition-related growth over the next few years," even telling investors that it could "accretively acquire an additional $100 million HME revenue in 2020 in addition to already announced transactions."  ¶¶76, 80, 81, 89.

Again, AdaptHealth highlighted McGee's prior experience, reiterating in AdaptHealth's April 29, 2020 Proxy Statement McGee's investment banking and private equity background.  ¶86.  AdaptHealth then described in its Forms 10-Q for each ensuing quarter "legal proceedings, . . . investigations, claims, lawsuits and other proceedings" facing AdaptHealth, including those that were "not expect[ed] [to] . . . have a material adverse effect on its financial condition or results of operations."  ¶¶90, 96, 102, 112.  But the Denmark legal proceedings that would result in McGee's termination did not appear in these filings.  Yet, each quarter, McGee certified that those SEC filings "[did] not contain any untrue statement of a material fact or omit to state a material fact"

- 6 -

that made their statements not misleading, even though AdaptHealth acknowledged that "any major change in our board of directors or management" could "affect[] the trading price of [AdaptHealth's] . . . Stock." ¶¶84, 91, 97, 103, 106, 113, 166.

And although the walls closed in on McGee, Defendants chose to make only generic warnings about the "risk" that "[t]he loss of . . . key personnel could negatively impact our operations and financial results." ¶¶15, 95, 101, 106, 110, 166.  AdaptHealth's disclosures omitted that on November 19, 2019 – just *one week after* McGee completed AdaptHealth's SPAC merger to make it publicly traded and *the day before* AdaptHealth reposted to its website the DFB presentation from July 2019 that boasted about McGee – Denmark filed a complaint in a U.S. federal court against 2321 Capital Pension Plan ("2321 Capital") and Lion Advisory Inc. Pension Plan ("Lion Advisory"), the very sham pension plans that McGee created to carry out the tax scheme.  ¶¶19-20.  The Denmark complaint indirectly identified McGee, but his involvement remained concealed from investors, as it alleged that both sham pension plans involved a "sole participant, or member" that "is a citizen of a State of the United States" and that they operated out of McGee's personal residence.  ¶¶21,138.  The Denmark complaint alleged that the pension plans' applications for tax refunds, like McGee's bank, "were fraudulent because the claimants did not own the shares that they claimed to own, they did not earn the dividends they claimed to have earned, and they were not entitled to the tax returns they claimed." ¶20.  The Denmark complaint tied, at least, $20 million to McGee.  ¶¶3, 15, 19-21, 79.

**D.      AdaptHealth Raises over $200 Million from Investors in a Secondary Public Offering, Highlighting "Proven" Management and M&A Success While Omitting McGee's Criminal Activity**

On January 5, 2021, AdaptHealth conducted a secondary offering, issuing 7.25 million shares at $33.00 per share for over $200 million.  ¶¶105, 165-166, 202.  The Prospectus incorporated by reference the Company's 2019 Form 10-K and 2020 Q1-Q3 Forms 10-Q and the

- 7 -

2019 Proxy, which was itself incorporated by reference into the 2019 Form 10-K (Britton Decl., Exs. 1 at 4, 2 at 3; ¶111) and further highlighted that AdaptHealth was "led by a proven management team" and emphasized that "management's experience is a meaningful differentiator relative to our competitors." ¶¶105, 165. AdaptHealth spoke of "[p]roven M&A success." ¶¶105, 165. The Company also emphasized the importance of its M&A activity, stating that "we plan to continue to evaluate acquisitions and execute upon attractive opportunities to help drive growth." ¶¶105, 165. The Prospectus did not mention McGee's criminal activity or legal jeopardy, even while generically warning that "[i]t is possible that AdaptHealth will lose some key personnel, the loss of which could negatively impact our operations and profitability." ¶¶106, 166.

### E.   Defendants Change the Definition of Organic Growth to Achieve Previous "Organic Growth" Guidance While Concealing Contracting Organic Revenue

With the Denmark investigation weighing on McGee, AdaptHealth's organic business began to suffer for the first time since the SPAC merger closed in 2019. ¶¶5, 6, 127. As information the Company later provided confirmed, organic revenue growth had contracted beginning in at least Q1 2021 – organic revenue, excluding acquisitions, declined $15.4 million (or 8%) in Q1 2021 and another $0.6 million (.3%) in Q2 2021. *Id.* The organic growth component of AdaptHealth's "20% growth story" had thus turned into a story of contraction. ¶¶13, 40, 127.

Rather than tell the truth, however, Defendants misleadingly reported, beginning on March 3, 2021, AdaptHealth's "organic revenue growth" of 6% for Q4 2020, over 8% for FY 2020, and over 11% for Q1 2021. ¶¶6, 116, 122. They claimed to be "remain[ing] confident in our organic growth prospects between 8% and 10% for 2021," added that "we feel rock-solid about our organic growth," and emphasized that "we will continue to find ways to drive organic growth." ¶¶116-118. Each of AdaptHealth's disclosures treated acquisition and organic revenue, as it always had, as separate inputs to AdaptHealth's overall revenue growth, confirming (falsely) that

- 8 -

AdaptHealth's organic revenue growth – excluding acquisition revenue – was continuing in line with the "6% to 8%" and "7-10%" true organic growth that AdaptHealth projected. ¶¶26-28, 120, 124, 126. Defendants even highlighted "better than expected" organic revenue growth. ¶33.

But what was once a "20% growth story" involving both organic and acquisition growth now depended almost entirely on an unsustainable pace of new acquisitions. ¶6. Rather than disclose contracting organic revenue, Defendants engineered a brand new revenue growth metric for Q4 2020, FY 2020, and Q1 2021, and included for the first time "acquisition revenue" in the calculation of "organic revenue growth." ¶¶6,31,32,127. Instead of clearly explaining the new approach, much less flagging the change, Defendants buried it in a footnote in an unfiled "earnings supplement" each quarter, defining a new "Year-on-Year Pro Forma Growth" metric, and then proceeded to discuss "organic growth" publicly as they always had. ¶¶6, 31, 115-126. By doing so, Defendants concealed that instead of the 11.5% organic growth that AdaptHealth reported for Q1 2021 (using the engineered metric), true organic growth *contracted* 8.0% that quarter. ¶¶40, 127. Even now, AdaptHealth withholds information to calculate how much Defendants obscured Q4 2020 and FY 2020 "organic growth." A post-Class Period filing, however, confirmed that true organic growth contracted again in Q2 2021. *Id.*

AdaptHealth's 2020 Form 10-K and Q1 2021 Form 10-Q would later reveal that Defendants intended to deceive investors by changing the organic growth metric. ¶140. Before Q4 2020, AdaptHealth's SEC filings had disclosed total revenue and broke out revenue attributable to *all* recent acquisitions, allowing investors to calculate organic revenue growth from the businesses that AdaptHealth already owned and that McGee projected to grow anywhere from 6% to 10% in FY 2020. ¶¶12, 26-28. But when Defendants changed the organic growth formula – just when true organic revenue contracted – they stopped disclosing *all* recent acquisitions as follows:

- Q1 2020 Form 10-Q: "The increase in net revenue was driven *primarily by acquisitions*, which increased revenue by $57.9 million."

- 9 -

- Q1 2021 Form 10-Q: "The increase in net revenue was driven primarily by (i) acquisitions *completed during the three months ended March 31, 2021*, which contributed net revenue of $142.6 million during the period, (ii) *net revenue contributed by acquisitions completed after March 2020* and prior to the beginning of the current reporting period . . . ."

¶140.  Reading the first disclosure, an investor could subtract $57.9 million in acquisition revenue from total net revenue, calculate the resulting organic revenue, and then calculate the growth rate. *Id.*  But the second disclosure prohibited that calculation by withholding the amount of "net revenue contributed by acquisitions completed after March 2020." *Id.*  By changing the disclosure, Defendants purposely withheld information investors needed to understand AdaptHealth's true organic revenue growth as it was defined when Defendants originally projected a 20% growth story.  ¶¶33, 116-127, 140-144.

### F.    McGee Cashes in on His AdaptHealth Stock, Selling $59.9 Million Shortly Before Investors Learned the Truth

Investors would learn the truth about McGee and AdaptHealth in April 2021 and July 2021, respectively.  ¶¶128,134.  Before then, however, McGee cashed in on his AdaptHealth stock knowing of his involvement in the tax scheme and impending criminal charges and the truth about the Company's organic growth.  ¶¶145-148.  On December 7, 2020, just over three months before investors learned about his tax scheme, AdaptHealth made a cash delivery to McGee of $38.5 million for 1,312,808 shares (25.3% of his AdaptHealth holdings).  ¶146.  And, on June 22, 2021, just over three weeks before investors learned about declining organic growth, McGee sold $21.4 million (another 17% of his holdings).  ¶147.  McGee, who had not previously sold his shares, maximized his SPAC access to the capital markets and sold 35.9% of his holdings for proceeds of $59.9 million.  ¶¶146-148.

4877-5957-0962.v2

### G.    Investors Finally Learn the Truth

On April 13, 2021, AdaptHealth announced that it had placed McGee on "unpaid leave" because Denmark had formally charged him with tax fraud. ¶¶34, 128. AdaptHealth's stock dropped $7.30 per share (19.7%) in response. ¶¶35, 129.

On July 19, 2021, the *Jehoshaphat* Report revealed that "[w]hile management claims . . . an organic growth trajectory of 8-10%, AHCO is in fact experiencing double-digit organic decline" and that "AHCO recently took highly unusual steps to make it harder for investors to see organic growth." ¶¶36,134. AdaptHealth's stock fell $1.51 per share (5.93%) in response.

Defendants later confirmed the credibility of *Jehoshaphat's* critique of AdaptHealth's organic growth, reporting on August 11, 2021 – just weeks after the *Jehoshaphat* Report – "[w]e have listened and responded with increased disclosure in our public filings." ¶142. Defendants explained, for the first time, that AdaptHealth's new "pro forma organic growth" was not an industry-standard calculation but rather an engineered "weighted average equation" and that instead of the straightforward calculation that once defined organic growth, investors should "at the end of the day, . . . think of organic growth as a weighted average of a couple of big buckets." *Id.*

### III.    PLAINTIFFS SUFFICIENTLY PLEAD VIOLATIONS OF SECTION 10(b) AND RULE 10b-5

### A.    Legal Standards

On a motion to dismiss, the court must treat the allegations as true and draw all reasonable inferences in favor of the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321, 324 (2007). Rather than parse the allegations individually, the "court[] must consider the complaint in its entirety" to determine if the claims are properly stated. *Id.* at 322. Dismissal is inappropriate even if "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

- 11 -

Defendants argue that the Complaint fails to allege only the falsity, scienter, and loss causation elements of a securities fraud claim.  Their arguments lack merit.

### B.    Plaintiffs Adequately Plead Material Misrepresentations and Omissions

To satisfy the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rule of Civil Procedure 9(b), a plaintiff must specify each statement alleged to be misleading and the reason why the statement is misleading, setting out the "'first paragraph of a newspaper story' – that is, the 'who, what, when, where and how.'"  *Curran v. Freshpet, Inc.*, No. 16-2263, 2018 WL 394878, at \*3 (D.N.J. Jan. 12, 2018) (quoting *In re Alpharma Sec. Litig.*, 372 F.3d 137, 147 (3d Cir. 2004)).  The standards are clear.  "'[O]nce a company has chosen to speak on an issue – even an issue it had no independent obligation to address – it cannot omit material facts related to that issue so as to make the disclosure misleading.'"  *In re PTC Therapeutics, Inc. Sec. Litig.*, No. 16-1124(KM)(MAH), 2017 WL 3705801, at \*14 (D.N.J. Aug. 28, 2017) (quoting *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017)).  "'[A] statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue.'"  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016).

Under these standards, the Complaint clearly pleads a viable securities fraud claim.  As required, it identifies each of the alleged misrepresentations and omissions, who was responsible, the date, and the reason why it was false.  Nothing more is required.  *See In re Schering-Plough Corp./Enhance Sec. Litig.*, No. 08-CV-397(DMC), 2009 U.S. Dist. LEXIS 78852, at \*13 (D.N.J. Sept. 2, 2009); *In re Enzymotec Sec. Litig.*, No. 14-5556(JLL)(MAH), 2015 WL 8784065, at \*15 (D.N.J. Dec. 15, 2015) ("*Enzymotec I*") ("whether disclosure was required is best left to the trier

- 12 -

4877-5957-0962.v2

of fact, since whether a prior disclosure is inaccurate, incomplete, or misleading in light of all of the evidence is a mixed question of law and fact").[3]

### 1. AdaptHealth and McGee's False and Misleading Statements Regarding McGee's Background and the Company's Acquisition-Dependent Growth Strategy

Throughout the Class Period, AdaptHealth and McGee made repeated statements about AdaptHealth's organic and acquisition revenue growth and emphasized that McGee and his experience were instrumental to that growth. ¶¶11-24, 76-114. But they misled investors by omitting any reference to the unfavorable (criminal) aspects of McGee's background that would deprive AdaptHealth and investors of McGee's leadership and threaten continued revenue growth. *Id.* As discussed below, Defendants' statements, as well as SEC regulations, triggered a duty to disclose the "unfavorable" aspects of McGee's experience to make those statements "not misleading." *Vivendi*, 838 F.3d at 239-40.[4]

---

[3] Defendants' "puzzle pleading" complaint is belied by their targeted arguments challenging the very statements they claim are not specified. Mtn. at 9, n.32. "The Complaint certainly is not short, but if it is a puzzle, it is meant for a child and can be assembled readily." *In re Honeywell Int'l, Inc. Sec. Litig.*, 182 F. Supp. 2d 414, 416 (D.N.J. Jan. 15, 2002). Unlike Defendants' authority, the Complaint here identifies the false and misleading statements (in a separate section) and specifies which statements are at issue when explaining why they were false and misleading. ¶¶76-127. The Complaint is not a puzzle. *See Const. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020) (rejecting "puzzle pleading" characterization where complaint "identifies statements and omissions, describes relevant predicate events, and alleges how those events make the statements and omissions false or misleading").

[4] Defendants' Motion is based on the oft-rejected contention that only "inaccurate" statements can be actionable. Mtn. at 26-27. But even "literally accurate" statements "can become, through their context and manner of presentation, devices which mislead investors." *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, No. 17-341, 2020 WL 1479128, at *15 (E.D. Pa. Mar. 25, 2020). Defendants' authority is in accord. *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401-02 (6th Cir. 1997) (characterizing "illegal promotion" as soft information that must be disclosed if "'virtually as certain as hard facts'"); *In re Newell Brands, Inc. Sec. Litig.*, 837 F. App'x 869, 875-77 (3d Cir. 2020) (recognizing duty to disclose information necessary to not mislead); *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 498 (3d Cir. 2016) ("bald assertion that the date was 'most likely' earlier" insufficient to show "claim that their internal controls were operating normally was materially misleading"); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1328 (3d Cir. 2002) (same).

4877-5957-0962.v2

### a.    AdaptHealth's Misleading Biographical Statements Concerning McGee's Prior Experience

"Having touted [McGee's] prior experience, Defendants had a duty to disclose all of the experience, including any negative experience." *Kelsey v. Allin*, No. 14 C 7837, 2016 WL 825236, at *4 (N.D. Ill. Mar. 2, 2016).   But here, AdaptHealth's SEC filings highlighted McGee's "extensive" (Mtn. at 10) background as an investment banker and as a director and executive at Quadrant, and attributed AdaptHealth's success to that experience, yet remained silent about McGee's connection to tax fraud and the advancing Denmark proceedings.  ¶¶69, 76, 78, 79, 83, 86, 105, 165.  Courts routinely find biographical statements like these materially misleading where, as here, positive experience is highlighted while negative information about links to even *suspected* or "unadjudicated" fraudulent misconduct is omitted.  *See Kelsey,* 2016 WL 825236, at *3-*4 (biographical information misleadingly omitted that CEO previously led a company that "was involved with 'notorious convicted stock fraudsters'"); *In re ForceField Energy Inc. Sec. Litig.*, No. 15 CIV. 3020 (NRB), 2017 WL 1319802, at *11 (S.D.N.Y. Mar. 29, 2017) (executives' prior experience misleadingly omitted history at companies accused of fraud); *Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 940 (C.D. Cal. 2012) (SEC filings misleadingly concealed CEO's past association with "a suspect company with a record of dealings with fraudulent Chinese companies"); *Nanopierce Techs., Inc. v. Southridge Cap. Mgmt. LLC*, No. 02 CIV. 0767 (LBS), 2003 WL 22882137, at *4-*5 (S.D.N.Y. Dec. 4, 2003) (biographical statements in SEC filings about CEO misleadingly concealed previous securities fraud settlement with SEC and that CEO's prior company went bankrupt).

AdaptHealth and McGee therefore misleadingly omitted important information from the Company's SEC filings about McGee's central involvement in "the largest tax fraud in European history" (¶¶3, 10), including that: (1) criminal charges were adjudicated against North Channel Bank for McGee's conduct; (2) McGee agreed to return to Denmark DKK 1.55 billion in illicit

- 14 -

4877-5957-0962.v2

proceeds for the same conduct; (3) Germany removed McGee from further influencing the bank; and (4) Denmark sued the sham pension plans that McGee created to carry out the scheme.  ¶¶3-4, 15-23, 79; Britton Decl., Ex. 3 at 5 ("They are no longer permitted to have any influence on the current business.").  These omitted facts made those filings materially misleading because "[t]he integrity of management is always of importance to investors." *Siemers v. Wells Fargo & Co.*, No. C05-04518 WHA, 2007 WL 1140660, at *8 (N.D. Cal. Apr. 17, 2007); *see In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 151 (E.D.N.Y. 2008) ("it is plainly material to investors that executives of a company are acting fraudulently").  Defendants are therefore mistaken that "there is no link between the challenged statements and the alleged omissions." Mtn. at 27-28.[5]

> **b.      Defendants' False and Misleading SOX Certifications**

Defendants' failure to disclose McGee's central role in the tax scheme also rendered their Sarbanes-Oxley Act of 2002 ("SOX") certifications false and misleading.  ¶¶84, 91, 97, 103, 113, 121.  In those certifications, McGee, Griggs and Clemens attested that: "This report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make

---

[5]   Defendants' contention that McGee's conduct was not adjudicated ignores the North Channel Bank allegations.  Mtn. at 27, n.115.  Moreover, whether McGee's involvement in the tax fraud was formally adjudicated is irrelevant.  The falsity arises from Defendants' concealment of the negative parts of McGee's prior experience. *See Snellink*, 870 F. Supp. 2d at 940 ("The Court does not need to probe whether Liu or China Finance were involved with fraudulent securities schemes.").  And Defendants' repeated representations expressly tying McGee and his experience to AdaptHealth's acquisition strategy contradicts their argument that "one has nothing to do with the other." *Id.*  Defendants' authority supports Plaintiffs' allegations.  In *Universal Health*, the Court held that "affirmative characterizations of the source driving the company's performance" were misleading where, like here, the source of that revenue was engaged in improper practices. *Teamsters Local 456 Pension Fund v. Universal Health Servs.*, 396 F. Supp. 3d 413, 457-58 (E.D. Pa. 2019).  And in *Fries v. N. Oil & Gas, Inc.*, the company actually disclosed an SEC investigation into its CEO.  354 F. Supp. 3d 384, 391 (S.D.N.Y. 2018).  Here, Defendants misled investors about McGee, the source of AdaptHealth's acquisition revenue, and concealed all aspects of Denmark's proceedings.  The charged and adjudicated proceedings involving North Channel Bank further distinguish this case from the alleged illegal conduct in *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016), which, like all of Defendants' other cases, did not involve misleading statements concerning an executive's background.

- 15 -

the statements made . . not misleading." *Id.* The SOX certifications, which Plaintiffs put at issue in the Complaint, further certified that McGee, Griggs and Clemens disclosed "[a]ny fraud, whether or not material, that involves management" to the Company's auditors and the Board's audit committee. *See, e.g.*, Defs.' Exs. 1 at 22, 2 at 27-30, 3 at 13, 15, 4 at 19, 21, 5 at 19-21.

By omitting information about McGee's tax scheme and the advancing Denmark proceedings, these statements misled investors by creating the impression that McGee was not involved in the type of fraudulent misconduct at issue in the tax scheme. *See MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, No. 6:19-cv-619-Orl-40LRH, 2020 WL 1072582 (M.D. Fla. Feb. 14, 2020) (SOX certifications materially misleading where they omitted CEO's involvement in a "pump and dump" scheme). Defendants' SOX certifications "would clearly be false and misleading to a reasonable investor." *MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, No. 6:19-cv-619-Orl-40LRH, 2019 WL 5394011, at *11 (M.D. Fla. Oct. 16, 2019), *report adopted by* 2020 WL 1072582. Defendants' SOX certifications attesting to the accuracy of AdaptHealth's SEC filings were also false and misleading for the additional reason that they contained the other false and misleading statements alleged in the Complaint. *See* ¶¶82, 83, 86, 90, 95-96, 101-102, 110-112, 120, 126-127.

**c.**   **AdaptHealth's Duty to Disclose McGee's Involvement in the Tax Scheme Under Regulation S-K**

Defendants violated their duty to disclose McGee's tax fraud and Denmark's advancing legal proceedings in AdaptHealth's SEC filings under Item 401 of Regulation S-K. 17 C.F.R. §229.401; ¶¶3-4, 15-24, 79, 85, 92, 98, 104, 114. Two separate provisions triggered a duty to disclose these material facts.

*First*, Item 401(e)(1), which Defendants' Motion does not address, "requires registrants to describe the business experience of each director and officer during the past five years, and if material, the disclosure should cover more than the past five years and include information about

- 16 -

the person's particular areas of expertise or other relevant qualifications." *Snellink*, 870 F. Supp. 2d at 940 (citing 17 C.F.R. §229.401(e)(1)).  Item 401(e)(1) "requires disclosure of [the CEO's] prior work experience and ***competence***." *In re Violin Memory Sec. Litig.*, No. 13-CV-5486 YGR, 2014 WL 5525946, at *16 (N.D. Cal. Oct. 31, 2014).  McGee's connection to the tax fraud, Denmark's advancing legal proceedings, and his removal from influencing North Channel Bank by German regulators (¶¶3-4, 15-23, 79; Britton Decl., Ex. 3 at 5) all concerned his experience and competence.  Defendants misled investors by violating these disclosure requirements.

*Second*, Item 401(f)(2) requires the disclosure of whether any director, person nominated to become a director, or executive officer "is a named subject of a pending criminal proceeding," if the event is "material to an evaluation of the ability or integrity of" the officer or director.  17 C.F.R. §229.401(f)(2).  Defendants are wrong that Plaintiffs do not allege that McGee was a "'named subject'" in the ongoing criminal proceeding.  Mtn. at 27, n.115.  He personally agreed to return the funds fraudulently obtained through North Channel Bank.  ¶¶3-4, 15.  And shortly thereafter, the bank was criminally fined for McGee's conduct while Danish prosecutors sought "other players in the case" (¶¶16-18), and the tax authorities pursued McGee's sham pension plans in lawsuits filed in the United States.  ¶¶17-23.  Defendants' argument that McGee was not a "'named subject'" is mistaken.  They misled investors by violating these disclosure requirements.[6]

> **d.    AdaptHealth's and McGee's Misleading Statements Concerning the Company's Acquisition-Dependent Growth Strategy and Legal Proceedings**

Having chosen to speak out regarding AdaptHealth's acquisition strategy, attributing the Company's strong financial performance to the execution of that strategy by McGee (¶¶11-14, 76-

---

[6]   Defendants accuse Plaintiffs of "misleadingly fail[ing] to mention that McGee was not named in the Denmark Complaint."  Mtn. at 28, n.116.  To the contrary, Plaintiffs allege particular facts showing that while McGee was not a named party, his sham pension plans were and "involved a 'sole participant, or member," which was McGee.  ¶¶21, 22, 138.  Defendants' attempt to continue to hide behind the web of shell entities that McGee used to carry out the scheme should fail.

- 17 -

78, 80-82, 88-89, 93-94, 99-100, 108-109), and discussing the "legal proceedings, including investigations, claims, lawsuits and other proceedings" facing AdaptHealth (¶¶90, 96, 102, 112), Defendants were required "to speak truthfully about" those subjects. *In re Merck & Co., Sec., Derivative and ERISA Litig.*, No. 05-1151(SRC), 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011) ("Once a defendant makes an affirmative statement or characterization about its business, it puts that subject 'in play' and assumes a duty, under the securities laws, to speak truthfully about that subject."). Defendants misled investors by concealing that the architect of AdaptHealth's successful acquisition strategy – which with contracting organic revenue had become AdaptHealth's primary source of revenue growth by Q4 2020 – was at the center of an international tax fraud and facing severe and growing legal risks. ¶¶15-24, 79.[7]

Defendants wrongly argue that statements concerning the Company's legal proceedings cannot be actionable because the Complaint "does not allege that AdaptHealth or any of its subsidiaries is the subject of any undisclosed legal proceedings" in violation of Regulation S-K, Item 103. Mtn. 28, n.117. Defendants' statements on the issue, however, can still be misleading (and actionable) even if Regulation S-K did not impose an independent duty to disclose. *See U.S. S.E.C. v. Brown*, 740 F. Supp. 2d 148, 155, 160 (D.D.C. 2010) ("[a]lthough Item 401 of Regulation S-K did not impose a duty on Defendant Brown to disclose Prince's legal background after June 23, 2002, it is certainly possible that the omission could have affected the 'total mix of information' in Integral's filings, rendering them misleading and giving rise to a duty to disclose").

---

[7]   Defendants' reliance on *City of Pontiac* to argue that "there is no 'duty to disclose uncharged, unadjudicated wrongdoing'" (Mtn. at 29) is misplaced, as Defendants put McGee's conduct at issue. And that case involved the very type of disclosure – the existence of an ongoing investigation – that is missing in this case. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014). Defendants' other cases stand for unremarkable disclosure principles. Mtn. at 29.

- 18 -

4877-5957-0962.v2

e.        **AdaptHealth's Misleading Risk Disclosures**

Defendants argue that "AdaptHealth . . . put investors on notice of the potential risks that could – and ultimately did – materialize." Mtn. at 29. But in the Third Circuit, warning about a material risk that has already come to fruition is securities fraud. *Williams*, 869 F.3d at 242. AdaptHealth's generic risk disclosures warning of the potential loss of "key personnel of AdaptHealth" were particularly misleading. ¶¶15, 95, 101, 106, 110, 166. The generic description, none of which disclosed the specific risks facing McGee in connection with the tax scheme, actually created the impression that their exposure to this risk was like any other investment, since the risk of losing key personnel is present at every company.

The truth, however, was that McGee's removal was not just a "potential" risk. The omitted facts rather made it "entirely predictable." *See Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 839 (N.D. Ind. 2018) (failure to disclose internal audit made pre-inspection statements misleading because results made it "entirely predictable" that company would receive a Form 483 once the inspection occurred). Denmark's advancing legal proceedings (both in Denmark and the U.S.), combined with McGee's agreement to return illicit proceeds obtained through North Channel Bank, and Denmark's promise to pursue "other players" in the scheme likewise made McGee's "departure entirely predictable." *See Comverse*, 543 F. Supp. 2d at 151 ("executives who commit fraud are likely to be terminated" and "[w]hen those executives are valuable to a company's continued success," as McGee was, "this possibility is plainly material to investors"). AdaptHealth's risk disclosures were therefore misleading.

2.        **Defendants' False and Misleading Statements Regarding Organic Growth**

As McGee's legal troubles closed in, AdaptHealth's organic business suffered. ¶¶5, 30. But rather than disclose the Company's stalling organic growth, Defendants began reporting "organic growth" using a new "pro forma" metric, without telling investors. ¶¶25-30, 115-127.

- 19 -

Defendants' statements were designed to mislead – they buried the change in an indecipherable footnote and then spoke of organic growth, without mentioning that this admittedly "valuable" metric now included revenue tied to recent acquisitions (*i.e.*, revenue from "inorganic" sources), which was inconsistent with AdaptHealth's historic use of that metric. ¶¶30-33, 127.  Importantly, Defendants had specifically excluded acquisition revenue early in the Class Period when they projected "8% to 10%" organic revenue growth as a key component of AdaptHealth's "low 20% growth story."  ¶13, 26, 28.  But, when telling investors about "organic growth" in and after Q4 2020, and expressing "confiden[ce] in our organic growth prospects between 8% and 10% for 2021," Defendants misled investors by not also explaining that the metric had changed, and that actual organic growth was negative, nowhere near the 8% to 10% range that Defendants told investors was needed for AdaptHealth's "20% plus per year" "growth story."  ¶¶26, 40, 116, 127.  Defendants' statements were thus false and misleading.  *See Merck*, 2011 WL 3444199, at *9 ("'[s]ome statements, although literally accurate, can become through their context and manner of presentation, devices which mislead investors'").

Defendants' truth-on-the-market defense that "the change in methodology was contemporaneously disclosed" and was "the subject of extensive questioning by analysts well in advance of the Short-Seller Report" (Mtn. at 3, 21) is misguided.  This defense "'is intensely fact-specific and is rarely an appropriate basis for dismissing a §10(b) complaint.'"  *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, No. 17-10467, 2019 WL 3451523, at *9 (D.N.J. July 31, 2019); *see also Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 481-82 (2013).  And when the issue becomes ripe, Defendants will not meet their burden of proving that they disclosed the truth "'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).  In fact, as Defendants note, analysts did not even begin to question

- 20 -

the change until May 6, 2021 – two months after the earliest purported "contemporaneous[]" disclos[ure]" they cite on March 4, 2021. Mtn. at 12-13, n.60-61, 21. They do not even dispute that the change in methodology helped conceal negative organic growth as the Company used that term before Q4 2020. *Id.* Their concealment of the disclosure in a vague footnote in a separate earnings supplement never filed with the SEC, their unqualified references to "organic growth," and their failure to disclose contracting organic revenue will leave them short of their burden. ¶¶31-33, 116-126.[8] *See Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (rejecting truth-on-the-market defense where public information "was counteracted by contemporaneous statements"); *Ganino*, 228 F.3d at 167.

Defendants argue that GAAP actually condones this misleading activity, claiming that "there is no precise way to calculate organic growth" and that "calculations of organic growth revenue are essentially no different from opinions." Mtn. at 22. Defendants are mistaken on both fronts and miss the point. There was, in fact, a "precise way to calculate organic growth" at AdaptHealth and one consistent with investment community standards – its reporting before Q4 2020 set the calculation. ¶¶26-29. And what made Defendants' statements misleading was not simply the change; it was changing the metric without adequately informing investors and while

---

[8]    The footnote buried in a slide in AdaptHealth's earnings supplement was so vague as to be meaningless. ¶¶31, 119. Appended to the term "Pro Forma" was an asterisk (*) noting only the following: "Organic growth as shown is defined as current period net revenue plus current period acquisition revenue divided by prior period net revenue plus prior period revenue for acquisition revenue." *Id.* The slide did not reveal that the Company was redefining how AdaptHealth would be using the term "Organic Revenue Growth" going forward. *Id. See United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) ("buried" information is insufficient to constitute adequate disclosure); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 325 (S.D.N.Y. 2009) ("This Court cannot rule that the scattered disclosures in various amendments, annexes and exhibits to the Prospectus and Registration Statement were sufficient as a matter of law to disclose the material facts to reasonable investors."); *In re Alstom SA*, 406 F. Supp. 2d 433, 453, n.11 (S.D.N.Y. 2005) ("An investor should not be called upon to piece together buried information from distinct parts of financial statements in order to understand basic aspects of a company's finances.").

- 21 -

concealing the Company's contracting organic revenue.  Defendants' case law is in accord.  *See*

*Ironworkers Local 580—Joint Funds v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 426-28 (S.D.N.Y.

2014) (non-GAAP metrics can include "whatever factors the reporting entity thinks appropriate –

*as long as the public is told exactly what the company is doing*").[9]

Defendants' attempt to characterize organic growth as an opinion is simply not credible.

Mtn. at 22.  The Supreme Court in *Omnicare* clarified the distinction between an opinion and a

fact, explaining that "[a] fact is 'a thing done or existing' or '[a]n actual happening . . . [whereas]

[a]n opinion is 'a belief[,] a view,' or a 'sentiment which the mind forms of persons or things.'"

*Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 182 (2015).

AdaptHealth's historic use of the traditional metric confirms that organic growth is a statement of

fact.  But Defendants' argument fails even if the metric is considered an opinion, as even an

opinion is actionable if it does not "fairly align[] with the information in the issuer's possession at

the time."  *Id.* at 189.  Defendants' "organic growth" statements in and after Q4 2020 were

inconsistent with the information in their possession showing negative revenue growth.[10]

---

[9]   Defendants cite inapposite cases to argue that "companies are permitted to use their own judgment in making [organic growth] calculations" and "AdaptHealth's decision to change accounting methods is not actionable because accounting rules generally are subject to a range of reasonable judgments."  Mtn. at 22-23.  Those cases do not hold that accounting rules removed the obligation to not mislead when Defendants changed the metric.  *See, e.g., Thor Power Tool Co. v. Comm'r of Internal Revenue*, 439 U.S. 522, 543-44 (1979) (goal of financial accounting is to give "shareholders and creditors an accurate picture of the firm's overall financial health"); *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 771 (S.D. Ohio 2006) (noting that "Cardinal ***announced*** that it had decided to change its classification of these cash discounts").

[10]   Defendants essentially argue that the revenue from organic sources is irrelevant as long as they accurately reported "tremendous net revenue growth" from inorganic sources.  Mtn. at 23.  But McGee told investors the exact opposite at the beginning of the Class Period: "we all know that organic growth is more valuable."  ¶¶2,12.  Defendants were duty bound to disclose material information for investors to make this assessment on their own. Defendants' authority is inapposite.  Mtn. at 23.  Neither *Stein* nor *Omnicom* involved the definitional change at issue in this case.  *Stein v. Tangoe, Inc.*, No. 3:13-cv-00286(VLB), 2014 WL 12767210, at *10 (D. Conn. Sept. 30, 2014) ("[d]efendants cannot be held liable for a misstatement for merely calculating organic growth in a manner different from the method used by some"); *In re Omnicom Grp., Inc. Sec. Litig.*, No. 02 Civ. 4483(RCC), 2005 WL 735937, at *1 (S.D.N.Y. Mar. 30, 2005)(same).

4877-5957-0962.v2

Defendants argue that the Complaint "has no allegations that Defendants could not reasonably believe and did not believe that they could report 'organic' growth using the methods and calculations disclosed by AdaptHealth." Mtn. at 22. This misguided statement simply ignores the admitted importance of true organic growth at AdaptHealth. ¶¶140-144. And, the Complaint **does** plead facts showing Defendants knew they could not sustain the 8%-10% true organic growth component of the "low 20% growth story" – they took steps to conceal AdaptHealth's contracting organic revenue when growth was admittedly necessary to the story. §§II(B), II(E), *supra*, III(E)(2), *infra*.[11]

### C.     Defendants' Statements and Omissions Were Material

A misrepresentation is material if there is "'a substantial likelihood that the disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011). This is "'a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact.'" *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997). "'Only if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court

---

[11] Defendants cite inapposite cases to support the argument that Plaintiffs have not pled "subjective[] disbelie[f]." Mtn. at 22. These cases do not help Defendants for two reasons. First, those cases involve actual opinions – Defendants' views and interpretations of various subjects. *In re Amarin Corp. PLC., Sec. Litig.*, No. 13-CV 6663(FLW)(TJB), 2015 WL 3954190 at *7, n.14 (D.N.J. June 29, 2015) (challenging defendants' view that "a long-term outcomes study . . . was not required to be completed" for approval); *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 567 (S.D.N.Y. 2011) (challenging defendants' "interpretations of the results of various clinical studies"); *Billhofer v. Flamel Techs., S.A.*, No. 07 Civ. 9920, 2012 WL 3079186 (S.D.N.Y. July 30, 2012) (challenging Flamel's view that "'[i]nterest in [its products] has never been higher'"). Plaintiffs here do not challenge defendants' views or interpretations of organic revenue growth. Second, two of the cases – *Flamel* and *Sanofi* – predate and are inconsistent with *Omnicare's* opinion standards. Plaintiffs here meet the standards under *Omnicare*. *See* §§II(C), II(E), *supra*.

- 23 -

4877-5957-0962.v2

to rule that the allegations are inactionable as a matter of law.'" *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 275 (3d Cir. 2004).

Defendants' false and misleading statements and omissions were undeniably important to reasonable investors – they all related to AdaptHealth's revenue growth and the integrity of its "visionary" CEO.  Defendants, in fact, repeatedly reported AdaptHealth's revenue metrics in conference calls, press releases, and SEC filings throughout the Class Period. *See* §§II((B)-(C)). McGee's statement that organic growth was "more valuable" combined with Defendants' efforts to manipulate AdaptHealth's disclosures to hide that organic growth turned negative reveals the importance of the information.  *See Adams Golf*, 381 F.3d at 274 (act of highlighting distribution network indicated it was material to the company).  That AdaptHealth's stock price suffered steep drops when the fraud was revealed (¶¶34-37, 128-129, 134-135) further confirms the importance of this information to investors.  *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009) (materiality "self-evident when we look at the market's negative reaction" to the truth), *cert. denied*, 559 U.S. 1116 (2010).

Defendants' argument that three statements admittedly "about [AdaptHealth's] organic growth trends" were non-actionable puffery and unimportant to investors – "I am confident these efforts will be fruitful" (¶77); "we are optimistic that we'll stay within that range" (¶26); and "we remain confident in our organic growth prospects" (¶116) (Mtn. at 24) – is misguided and overlooks McGee's statement that the metric was "more valuable" than acquisition growth.  ¶¶2, 12.  Defendants cannot tell investors that particular information is "valuable," embed statements about that information with optimism, and then argue that investors would not have relied on those statements.  *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) ("By addressing the quality of a particular management practice, a defendant declares the subject . . . to be material to the reasonable shareholder, and thus is bound to speak truthfully.").  Where, as here, indefinite

- 24 -

terms are embedded with concrete statements about one of the most important aspects of the Company's business – acquisitions and organic revenue growth (¶¶26,77,116) – they cannot be dismissed as irrelevant to investors. Defendants put AdaptHealth's organic revenue growth "in play" and thus were duty-bound to not mislead. *Shapiro*, 964 F.2d at 282; *see also In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 572 (S.D.N.Y. 2011) ("[T]he mere fact that a statement uses conclusory, indefinite, and unverifiable terms, rather than expressing a reason in dollars and cents, does not compel a conclusion that it is immaterial as a matter of law."), *aff'd*, 838 F.3d at 223.[12]

### D.     Defendants' Statements Are Not Protected by the Safe Harbor

Defendants argue that the safe harbor protects several organic growth statements, including those before and after they changed the definition. Mtn. at 25-26, n.106 (citing Defs.' App'x A, Statement Nos. 1-3, 26, 28, 30). But "allegations based upon omissions of existing facts or circumstances," like those here, "do not constitute forward looking statements protected by the safe harbor." *In re Cell Pathways, Inc. Sec. Litig.*, No. 99-752, 2000 WL 805221 at *11 (E.D. Pa. June 20, 2000). For statements before Q4 2020 (Statement Nos. 1-3), Defendants concealed

---

[12]   Considered in context, these statements are far more specific than the general statements in the cases Defendants cite. Mtn. at 24. *Compare e.g.*, ¶26 ("We are optimistic that we'll stay within that range ['*of 6% to 8%'*] if not exceed it for 2020."); ¶77 ("I am confident [integration] efforts will be fruitful" while "***affirming . . . previously reported expectation [that EBITDA metrics] will approximate $75 million and $123 million . . . .***"); ¶116 ("we remain confident in our organic growth prospects ***between 8% and 10%*** for 2021") *with In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 537-38 (3d Cir. 1999) ("enviable credit quality" "among the best in the industry"); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 367, 369 (S.D.N.Y. 2007) (OEM business will "'continue to be a strong segment [and] healthy business'"); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2nd Cir. 1994) (loan portfolio was "'extremely healthy'" and record net income was "'a solid performance'"). Beyond these statements, Defendants cite a list of other paragraph references and statement numbers from their Appendix but do not identify which statements they consider puffery. Mtn. at 24 (citing without discussion ¶¶28, 122; Defs.' App'x A, Statement Nos. 2, 3, 7, 26, 28). Like the statements they actually identify, the statements in these sources are also all embedded within discussions of the admittedly "valuable" organic revenue growth metric and cannot be dismissed as immaterial as a matter of law.

McGee's tax fraud and Denmark's advancing proceedings and investigations. ¶¶15-24, 79, 85, 92, 98, 104, 107. And for statements after Q4 2020 (Statement Nos. 26, 28), Defendants concealed both the tax proceedings and that organic growth was negative. ¶¶114, 127. The safe harbor does not apply to these omissions. *Freshpet*, 2018 WL 394878, at *4-*5 ("Defendants' statements . . . are not subject to the PSLRA safe harbor for forward-looking statements because they . . . were made misleading by material omissions."). When Defendants chose to speak, they undertook the duty to speak fully and accurately. *See Matrixx Initiatives*, 563 U.S. at 44-45.

Defendants argue that these statements are forward-looking without analyzing a single statement or discussing how each statement was, in fact, forward-looking. Mtn. at 25. They do the same with what they call "statements of corporate optimism," which they conclude without analysis "has a forward-looking dimension." *Id.* at 26.[13] Defendants also ignore that the safe harbor requires that forward-looking statements be identified as such. 15 U.S.C.A. §78u–5(c)(1)(A)(i). Defendants' lack of analysis is understandable. Their Appendix A, in fact, reveals that each statement was a "statement[] of present or historical fact . . . not entitled to PSLRA's safe harbor at [the motion to dismiss] stage." *In re Enzymotec Sec. Litig.*, No. 14-5556(JLL)(MAH), 2015 U.S. Dist. LEXIS 167403, at *35 (D.N.J. Dec. 14, 2015) ("*Enzymotec II*"). In each instance, Defendants' discussion of future organic growth was inextricably interwoven with a discussion about AdaptHealth's present business condition.[14] The safe harbor does not apply to these

---

[13] Defendants also cite *Advanta* without discussing how it supports their argument. Mtn. at 26 (citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3rd Cir. 1999)). It offers no help, holding only on the page Defendants cite that statements of "positive portrayals" were unimportant to investors. *Id.* Organic growth and McGee's contribution to AdaptHealth's revenue growth are not similar. *See* §§II(B)-(C), II.E, III.(C), *supra*.

[14] Defs.' App'x A, Statement No. 1 ("we'll continue ***the growth we've seen*** organically"; "organic growth ***is more valuable***"); *id.*, Statement No. 2 ("***[w]e have a*** successful track record of growth"); ¶81 ("[o]ur acquisition pipeline ***remains robust***"); Britton Decl., Ex. 10 at 3 ("We ***are seeing*** a robust pipeline of opportunities to acquire solid businesses."); Defs.' App'x A, Statement No. 3 ("[w]e also ***have the benefit*** in 2020 of getting the full-year impact of acquisitions that we did"); *id.*, Statement No. 26 ("we ***remain confident*** in our organic growth prospects"; "we will

statements. *See In re Novo Nordisk Sec. Litig.*, No. 3:17-cv-209-BRM-LHG, 2018 WL 3913912, at \*9 (D.N.J. Aug. 16, 2018) (no safe harbor where statement was based on representations about existing contracts); *Freshpet*, 2018 WL 394878, at \*4 (no safe harbor where statements incorporated representations about current manufacturing capacity).[15]

Defendants' cautions also fail the safe harbor.  Mtn. at 25.  They assume, again without analysis, that any caution – no matter how generic – invokes the safe harbor.  *Id.*  It does not. Forward-looking statements must be accompanied by "[meaningful] cautionary language [that is] 'extensive and specific.'"  *Innocoll*, 2020 WL 1479128, at \*17 (quoting *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243, n.3 (3d Cir. 2004)).  "'[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation.'"  *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000).  "'[C]autionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge.'"  *Id.*[16]

Here, if Defendants' cited cautions are sufficient to invoke the safe harbor, any caution would meet the standard.  Mtn. at 25, n.107.  AdaptHealth's cautions did not "prevent misinformation."  *Compare id. with Cendant Corp.*, 223 F.3d at 182.  They were either boilerplate references to the COVID-19 pandemic, or nondescript references that AdaptHealth's growth plan

---

*continue to* find ways to drive organic growth"); *id.*, Statement No. 28 ("[w]ith the *recent return* of referral volumes . . . and *current organic growth* . . . , we feel confident [about] organic growth expectations").

[15] Defendants' reliance on *DJSP* to argue that their statements are forward-looking is misplaced. Mtn. at 25.  There, the Eleventh Circuit affirmed dismissal, in part, under the safe harbor, holding that DJSP's financial guidance was forward-looking.  *Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*, 572 F. App'x 713, 717 (11th Cir. 2014).  It did not analyze the situation presented here, where statements about future growth were inextricably linked to statements about the company's present business condition.

[16] "The question whether any cautionary language is sufficiently 'meaningful' raises fact issues that are improperly resolved on this motion to dismiss."  *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 557 (D.N.J. 2002).

- 27 -

may not succeed, without explanation as to why. *Id.* AdaptHealth even repeated the identical "growth plan . . . may not succeed" caution in each quarter's SEC filing (Defs.' Ex. 2 at 18**,** Defs.' Ex. 33 at 14; Britton Decl., Exs. 6 at 3, 7 at 3, 8 at 3, 9 at 3), which is the classic example of boilerplate that does not invoke the safe harbor. *See Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734-35 (7th Cir. 2004) ("complaint could not be dismissed under the safe harbor" where "the cautionary language remained fixed even as the risks changed"); *In re Salix Pharms., Ltd.*, No. 14-CV-8925(KMW), 2016 WL 1629341, at *12 (S.D.N.Y. Apr. 22, 2016) ("failure to update cautionary language over time . . . supports the conclusion that such statements are merely boilerplate").[17]

Nevertheless, no amount of cautionary language would suffice here – Defendants had actual knowledge of McGee's tax fraud and the Company's negative organic revenue growth. *See* §III(E), *infra*. Defendants, moreover, knew that those purported "potential risks" had already materialized. *Williams*, 869 F.3d at 241-42; *Enzymotec I*, 2015 WL 8784065 at *11 ("generalized warnings [insufficient] when Defendants knew, or should have known, of the specific regulations and their likely effect").[18]

---

[17]   *Avaya* does not support the conclusion that AdaptHealth's generic cautions meet the PSLRA's standards. Mtn. at 25. In *Avaya*, the Court held that the "cautionary language here was extensive and specific," including in a list of "'risks and uncertainties' the very 'price and product competition' Shareholders assert was responsible for Avaya missing its projections." *Institutional Investors Grp. v. Avaya*, 564 F.3d 242, 256-57 (3d Cir. 2009). The cautionary language here was the opposite. It omitted any reference to McGee's tax fraud or that the organic growth component of AdaptHealth's growth story had turned negative. *See* §II((B)-(E)), *supra*.

[18]   Defendants cite *In re Discovery Labs* and *Avaya* to argue that Plaintiffs cannot show that Defendants knew their statements were false or misleading. Mtn. at 26. Both cases are inapposite. In *Discovery Labs*, plaintiffs "attempt[ed] to reverse the burden of proof" rather than showing that "defendants **knew** the statement was false or misleading." *In re Discovery Labs Sec. Litig.*, No. 06-1820, 2007 WL 789432, at *2 (E.D. Pa. Mar. 15, 2007), *aff'd*, 276 F. App'x 154 (3d Cir. 2008). And in *Avaya*, plaintiffs pled recklessness but did not identify the "precise means by which McGuire would have learned of the discounting." *Avaya*, 564 F.3d at 274. Here, by contrast, Defendants' knowledge is indisputable and even admitted as to McGee. §III(E)(1), *infra*.

- 28 -

### E. The Totality of Allegations Support a Strong Inference of Scienter

Pleading scienter "requires plaintiffs to allege facts giving rise to a 'strong inference' of 'either reckless or conscious behavior.'" *Avaya*, 564 F.3d at 267. While Defendants cite pre-PSLRA cases to argue that "courts have been cautious about imposing liability for securities fraud based on reckless conduct," they concede, as they must, that current Third Circuit law holds that scienter "encompasses recklessness." Mtn. at 30. Recklessness is conduct that constitutes "'an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Avaya*, 564 F.3d at 267, n.42. A plaintiff must "'specifically allege facts constituting strong circumstantial evidence that "defendants knew, or, more importantly, should have known that they were misrepresenting material facts related to the corporation."'" *Innocoll*, 2020 WL 1479128, at *8.

Analyzing scienter requires a "comparative assessment of plausible inferences, while constantly assuming the plaintiff's allegations to be true." *Tellabs*, 551 U.S. at 326-27. The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,'" but must merely be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314, 324. The question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323. When comparing competing inferences, a "tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

Defendants argue that Plaintiffs are "[w]ithout any specific allegations concerning the Defendants' scienter." Mtn. at 31. As demonstrated below, that argument is baseless.

- 29 -

### 1.    Defendants Intentionally Misled Investors by Concealing McGee's Criminal History While Emphasizing How His Experience Was Driving Growth at AdaptHealth

Defendants, and, through them, AdaptHealth, intended to mislead investors. They accessed the capital markets through the SPAC process and then artificially inflated AdaptHealth stock by highlighting McGee's acquisition and business experience (and the benefit to revenue growth that this experience added to an investment in AdaptHealth), while omitting McGee's misconduct. McGee, of course, knew that Denmark was pursuing him criminally and that a court found his scheme at North Channel Bank violated the law. Denmark forced McGee to return his ill-gotten gains obtained through North Channel Bank in May 2019 (¶¶3, 15, 137), criminally fined the bank in September 2019 for his conduct (¶3), announced that it was pursuing "other players in the case" (¶17), and pursued his sham entities in the United States. ¶¶19-23, 138. *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 905 (E.D. Pa. 2018) ("Knowledge under a recklessness theory can be established by demonstrating that the fact '"was so obviously material that defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors."'"); *In re Great Atl. and Pac. Tea Co.*, 103 F. App'x 465, 468-69 (3d Cir. 2004) ("evidence that the defendants had actual knowledge of the facts is sufficient to show scienter"). Defendants, in fact, do not dispute McGee's knowledge, which ends the analysis for McGee and AdaptHealth. Mtn. at 38.[19]

Defendants' bald assertion that "Plaintiffs allege no specifics regarding how, when or why Mr. McGee knew that he would be criminally charged in Denmark" ignores these allegations. Mtn. at 40. It is also beside the point, since McGee "knew those statements were misleading

---

[19]    These allegations refute Defendants' denial of scienter for each statement by McGee. Mtn. at 40-41. AdaptHealth's general warnings certainly do not "defeat[] an inference of scienter," as Defendants contend. Mtn. at 40 (citing *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11 Civ. 4665(PGG), 2014 WL 4832321, at *24 (S.D.N.Y. Sept. 29, 2014). Under these facts, Third Circuit precedent holds that they enhance it. *Williams*, 869 F.3d at 242.

- 30 -

4877-5957-0962.v2

because he was directly involved in the undisclosed [tax fraud] scheme." *MAZ Partners LP*, 2020 WL 1072582, at *4. And "[w]hen alleging conscious withholding of material information, 'it is certainly true that . . . any required element of scienter is satisfied where,'" like here, "'the defendant had actual knowledge of the material information.'" *McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652, 668 (E.D. Pa. 2021) (quoting *GSC Partners*, 368 F.3d at 239). Therefore, the Court need go no further, as scienter is adequately pled on that basis. Defendants' failure to disclose the "lone 'negative'" in McGee's professional background, while highlighting other "prior" experience "suggests an intent to deceive." *Kelsey*, 2016 WL 825236, at *4. The omission "appears to be intentional" as Defendants offer "no explanation why it was not mentioned," and it "was likely omitted because its inclusion would have sullied [AdaptHealth's] reputation—thus, the purpose in omitting the connection is manifest." *Snellink*, 870 F. Supp. 2d at 941.

Defendants argue that there are no particularized allegations that Griggs and Clemens, who, with McGee, signed and filed AdaptHealth's 2020 Form 10-K on March 16, 2021, were "aware of Mr. McGee's alleged misconduct." Mtn. at 38. They are wrong. The circumstances surrounding McGee's termination strongly indicate that both Griggs and Clemens intentionally withheld this material information. ¶¶5, 139. The timing was too perfect to be a coincidence. AdaptHealth's acquisition of AeroCare in December 2020 and the Board's approval of the "slightly unusual" Co-CEO arrangement in February 2021 all occurred just two months before Denmark officially charged McGee with tax fraud. *Id.* When AdaptHealth announced McGee's effective termination – an undeniably reactionary decision if the Board was not previously aware of McGee's predicament – Griggs was already there as the all too convenient replacement. *Id.* In fact, Quasha, a member of AdaptHealth's Board with longstanding business ties to McGee and his co-conspirators at North Channel Bank, admitted "that he first heard about the 'problems in Denmark' sometime in *2016*." Britton Decl., Ex. 4 at 7, 9. These allegations raise a strong

- 31 -

inference that Griggs and Clemens (and the Company's Board) knew about McGee's tax fraud when they signed and certified the 2020 Form 10-K. This case is thus unlike the "generalized imputations of knowledge" cited in *Oran v. Stafford*, 226 F.3d 275, 290 (3d Cir. 2000). Mtn. at 39. And their improper attempt to introduce a factual dispute that "the Co-CEO model has only become more common in recent years" refutes any suggestion that the allegations are not particular. Mtn. at 39.[20]

### 2. The Complaint Alleges a Strong Inference that Defendants Purposefully Deceived Investors by Hiding AdaptHealth's Negative Organic Revenue Growth

Here, Defendants' use of the "pro forma" organic growth metric to conceal negative organic revenue growth starting in Q4 2020 was itself deceptive and evidence of scienter. *See Avaya*, 564 F.3d at 271 (The actual and "perceived importance of [organic revenue growth]" supports scienter because it indicated that defendants were "paying close attention to these numbers."). They each knew (or were reckless in not knowing) about this troubling development from their respective positions in the Company, which gave them direct access to the individual components of AdaptHealth's revenue. ¶¶26-33, 61, 140-144. *See Innocoll*, 2020 WL 1479128, at *8, *12 ("'securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements'"). Defendants even spoke about organic revenue each quarter and, before Q4 2020, included the components of AdaptHealth's revenue in its SEC filings, which these Defendants signed and/or certified as accurate. ¶¶2, 6, 9, 11-14, 26-28, 32, 67, 80-82,

---

[20] Defendants' reliance on *In re Hertz Holdings Inc.*, 905 F.3d 106, 119 (3d Cir. 2018) and *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 347-48 (D.N.J. 2007) for the proposition that "[c]orporate resignations do not strengthen an inference of scienter" is misplaced. Mtn. at 39. This case does not involve "resignations." It involves a termination due to an indictment. Whether the Co-CEO arrangement was a "good fit" is beside the point. Mtn. at 40. If it was "just as likely" "to be based on a legitimate business purpose than for a nefarious one," as Defendants contend, their Motion fails. *Lockheed*, 875 F. Supp. 2d at 372 (a "tie on scienter goes to the plaintiff").

4877-5957-0962.v2

84, 88, 91, 93, 97, 103, 108, 113, 116-127, 140. *Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 422–23 (E.D. Pa. 2019) ("[I]t is reasonable to infer that [Defendants] had knowledge of pricing in the industry when they spoke of such matters publicly—which supports an inference of scienter."); *PTC Therapeutics*, 2017 WL 3705801, at *16 (holding "most persuasive" that "[d]uring conference calls, public remarks, and in quarterly reports," defendants "explicitly and repeatedly" discussed subject matter of the fraud with investors). And when that organic revenue growth turned negative, Defendants changed the calculation of that metric without a clear disclosure and at the same time spoke publicly as if no change had been made. *Avaya*, 564 F.3d at 269 ("the most powerful evidence of scienter is the content and context of [defendants'] statements themselves"). The danger of misleading investors under these circumstances was clearly "so obvious that [Defendants] must have been aware of it." *Id.* at 267, n.42.

The allegations, indeed, reveal a state of mind here that was not just reckless, but intentional; Defendants purposely sought and took steps to hide the truth. In and after Q4 2020, they removed from AdaptHealth's SEC filings information about revenue attributable to *all* recent acquisitions, and then refused to provide the information when analysts inquired months after realizing that Defendants had changed the metric, falsely claiming that "***there's no real kind of like classic same-store to even compare against because we don't operate that way.***" Defs.' Ex. 40 at 18. AdaptHealth had, in fact, "operat[ed] that way" before Defendants changed the metric (¶¶26-28), and even provided that very information after the Class Period (¶¶141-143). This overt attempt to hide the truth about contracting revenue from organic sources (when it was supposed to be 8%-10% of AdaptHealth's "growth story") raises a compelling inference of scienter. *See, e.g., Freshpet*, 2018 WL 394878, at *5 ("Plaintiffs properly allege scienter based on Defendants' conscious decision to omit presently known facts."); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72,

4877-5957-0962.v2

83 (1st Cir. 2002) ("defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter").[21]

Defendants cannot claim that they did not know the truth.  Revenue growth, and the two separate inputs that AdaptHealth had highlighted for that growth – organic and acquisition revenue – were critical to AdaptHealth's operations.  ¶¶2,12.  It was thus directly within the realm of matters on which these senior officers were focused.  *See Avaya*, 564 F.3d at 271 ("'[T]here can be a number of special circumstances which, taken together with an officer's position, may support a strong inference of scienter.'").  This importance permits the court to infer Defendants' knowledge.  *Mill Bridge V, Inc. v. Benton*, No. 08-2806, 2009 WL 4639641, at *31 (E.D. Pa. Dec. 3, 2009) ("where the information relates to the organization's core business, such facts are powerful circumstantial evidence of scienter").[22]

---

[21]   Defendants argue that unnamed individuals from the *Jehoshaphat* Report cannot support a securities fraud claim.  Mtn. at 37-38.  Defendants' motion repeatedly impugns the integrity of the *Jehoshaphat* analyst, suggesting that the motivation of a short-seller raises credibility issues that should somehow influence the Court's decision on their Motion.  *See* Mtn., *passim*.  It does not.  Courts have recognized that short-seller reports are not inherently unreliable.  *In re EROS Int'l. PLC Sec. Litig.*, No. 19-14125, 2021 WL 1560728, at *9 (D.N.J. April 20, 2021) ("many courts 'have held that a short-seller report . . . "does not implicate the same skepticism as a 'traditional' anonymous source"'").  Nevertheless, Lead Counsel's forensic accountants have independently verified the accuracy of the allegations in the Complaint, some but not all of which overlap with the information in the *Jehoshaphat* Report.  Importantly, Defendants' post-Class Period "increased disclosure" confirms the accuracy of the overlap between the two.  ¶¶141-143.  And the testimonials from the unnamed Company insiders in that report and in the Complaint are consistent with and add further support to Plaintiffs' scienter allegations.  So while Plaintiffs by no means rely exclusively on those witnesses to meet the PSLRA's standards, these facts further distinguish this case from those that Defendants cite.  Mtn. at 37-38.

[22]   Defendants argue that Plaintiffs can only "bolster their scienter allegations through the 'core business' doctrine" if they "provide an 'additional allegation of specific information conveyed to management and related to the alleged fraud' to signal fraudulent intent."  Mtn. at 38.  Plaintiffs have done exactly that – their signatures on AdaptHealth's SEC filings confirm their direct access to the truth.  *See e.g.*, ¶¶84, 91, 97, 103, 113, 121, 140, 178; *See, e.g.*, Defs.' Exs. 1 at 22, 2 at 27-30, 3 at 13, 15, 4 at 19, 21, 5 at 19-21, 41 at 13-15.  That access combined with organic growth's status as the admittedly "more valuable" revenue metric is sufficient to infer knowledge.  *See* §II(B), *supra*.  Defendants' authority does not involve the same access to the truth that exists in this case.  *See Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 155 (3d Cir. 2018) ("complaint vaguely alleges that the reports 'stimulated significant concern and discussion within GNC'" about

- 34 -

Defendants' reliance on the *Keryx* case is misplaced.  Mtn. at 36-38.  This case does not involve a similar "[f]ailure to follow industry standards" or "mismanagement."  *In re Keryx Biopharmaceuticals, Inc. Sec. Litig.*, No. 13 Civ. 755(KBF), 2014 WL 585658, at *12 (S.D.N.Y. Feb. 14, 2014)).  Defendants instead inadequately disclosed the change to the organic growth metric, yet still spoke of "organic growth" publicly without qualification and without disclosing that AdaptHealth's actual organic revenue growth was negative.  *See* §§II(E); III(B)(2), *supra*.

Defendants argue that AdaptHealth's admitted need for "increased disclosures" and its "post-class period remedial measures are not evidence of scienter, but rather only create an inference that the company tried to make more detailed disclosures" because they "were necessary to clear up any confusion arising from the Short-Seller Report – as opposed to correcting prior misstatements."  Mtn. at 36 & n.136.  The only way to draw that inference is to ignore the contents of the "increased disclosure," which is what Defendants' Motion does entirely. Considering the additional information disclosed, the only reasonable inference – which is a compelling one – is that Defendants acknowledged that their statements misled investors by concealing declining revenue growth.  What Defendants call "post-class period remedial measures" was an admission of the truth that AdaptHealth's actual organic revenue ***declined*** 8% in Q1 2021 when Defendants had highlighted 11.5% ***growth***.  ¶127.  What Defendants "cleared up" was the confusion caused by their new and inadequately disclosed definition of "organic growth" and the truth about AdaptHealth's declining organic revenue.  ¶¶140-144.  Defendants are wrong that post-class period admissions of this type cannot support a securities fraud claim.  *Compare* Mtn. at 36-37

---

product but did not allege that defendants received them); *In re Stonepath Grp., Inc. Sec. Litig.*, No. Civ.A. 04-4515, 2006 WL 890767, at *12 (E.D. Pa. Apr. 3, 2006) (no allegations that parent company executives had reason to know of a subsidiary's financial reporting problems), *aff'd sub nom. Globis Cap. Partners, L.P. v. Stonepath Grp., Inc.*, 241 F. App'x 832 (3d Cir. 2007).

- 35 -

*with Avaya*, 564 F.3d at 249, n.13 ("'[B]oth post-class-period data and pre-class data could be used to "confirm what a defendant should have known during the class period"'").[23]

### 3.   Defendants Were Motivated to Commit Fraud

### a.   McGee's Suspicious Stock Sales Contribute to a Strong Inference of Scienter

Defendants puzzlingly claim that "the Complaint contains virtually no allegations that even attempt to establish motive and opportunity" and "does not even aver, generically" that Defendants were "motivated to make false statements . . . to obtain some personal benefit." Mtn. at 32. Even if this were true, and it is not, the Supreme Court held that "the absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325. Yet Defendants still claim that "[t]he absence of such a motive [to obtain a personal benefit] is a 'significant' factor undercutting an inference of scienter." Mtn. at 32 (quoting *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3rd Cir. 2013). That, however, is not the law. Defendants selectively quote *Rahman*, which actually reads: "it is not necessary to plead motive to establish that a defendant acted with scienter, [though] its presence can be persuasive when conducting a holistic review of the evidence." *Id.*; *see In re Horsehead Holding Corp. Sec. Litig.*, No. CV 16-292-LPS-CJB, 2018 WL 4838234, at *20 (D. Del. Oct. 4, 2018) (motive allegations "not required"), *report and recommendation adopted*, No. CV 16-292-LPS-CJB, 2019 WL 1409454 (D. Del. Mar. 28, 2019).

---

[23]   Defendants' authority addressing "fraud by hindsight" is inapposite. Mtn. at 36-37. Those cases did not involve the type of admissions of fact that related back to the Class Period that exist in this case. *In re H&R Block Sec. Litig.*, 527 F. Supp. 2d 922, 929 (W.D. Mo. 2007) (remedial measures to lending product did not address circumstances when statement was made and "only creates an inference that the Company [later] decided it needed to improve a bad product"); *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 158 (3d Cir. 2004) (later statement did not contradict earlier statement where "[p]laintiffs' attempt to characterize these statements as amounting to a representation that the [rate] initiative was already 'contributing to a strong bottom line in the first quarter' is not reasonable"); *In re NAHC, Inc. Secs. Litig.*, No. CIV.A. 00-4020, 2001 WL 1241007, at *11 (E.D. Pa. Oct. 17, 2001) ("claim is not cognizable" where "plaintiffs plead that NovaCare was under a duty to disclose these events prior to their occurrence"), *aff'd*, 306 F.3d 1314 (3d Cir. 2002).

- 36 -

Here, Defendants had the opportunity to mislead investors, and they do not suggest otherwise.   McGee and, through him, AdaptHealth, also had a motive to mislead investors. Defendants do not dispute that McGee sold $59 million worth of AdaptHealth stock, amounting to 35.9% of his holdings, in two trades that occurred shortly before the two corrective disclosures in this case.   ¶¶146-147.   *See In re Suprema Specialities, Inc. Sec. Litig.*, 438 F.3d 256, 279 (3d Cir. 2006) (stock sales of over 30% that were not normal or routine were suspicious).   And, adding to the suspicion, McGee had not previously sold any of his AdaptHealth holdings.   ¶148.   *See McDermid*, 520 F. Supp. 3d at 664 (motive to sell stock "when Inovio's stock price was artificially inflated by investors' optimism . . . supports scienter" where defendants had not "sold stock in the year-and-a-half leading up to their 2020 sales").

Defendants try to negate the inference of scienter from McGee's first transaction by claiming that the cash delivery was made for the "'payment of capital gains tax obligations'" and that McGee engaged in a handful of "other similar exchanges" during the Class Period.   Mtn. at 33.   But that merely raises a factual issue inappropriate for resolution on a motion to dismiss. *Snellink*, 870 F. Supp. 2d at 941 (a countervailing inference, "merely raises a factual dispute"). And as Defendants concede, those other transactions were share exchanges – not an all cash delivery for over $34 million, like the transaction at issue.   Mtn. at 33; ¶146.   The Forms 4 reflecting the transactions indeed make no mention that the payment was made for taxes or that taxes were actually paid.   Defs.' Exs. 58, 59.   But even if McGee did use the funds to pay taxes, a reduced tax liability is still a personal financial benefit indicative of scienter.   *See City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132(CM)(THK), 2013 WL 1197755, at *16 (S.D.N.Y. Mar. 25, 2013) (planned stock sale to address tax liability provides a financial motive).

Defendants' arguments regarding McGee's second transaction fare no better.   They impermissibly challenge Plaintiffs' well-pled allegations, claiming that it is common for large

- 37 -

stock sales to take place when an executive is "departing a senior position at a company." Mtn. at 33. But McGee, unlike the executives in the cases cited by Defendants, was not merely retiring from his position – he was forced out following his indictment.[24] And, like McGee's first sale, how he used the proceeds is a fact issue inappropriate for resolution on a motion to dismiss that does not exculpate McGee. *See In re CommVault Sys., Inc. Sec. Litig.*, No. 14-CV-5628 (PGS), 2016 WL 5745100, at *8 (D.N.J. Sept. 30, 2016) ("To the extent that Defendants contend that this [insider selling] was merely an exercise of options that were set to expire, this is a factual question outside the Complaint.").

Defendants' suggestion that McGee could not have known the *Jehoshaphat* Report was about to be issued when he sold (Mtn. at 34) is a red herring; it remains that McGee sold AdaptHealth stock on the basis of material, non-public information. ¶¶146-148. That other insiders did not sell their own stock is not, as stated above, necessary for demonstrating scienter and does not negate the inference of scienter for McGee from his sales. *See In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 474 (E.D. Pa. 2014) (insider sales by some defendants "still support the strong [scienter] inference" for the selling defendants, even where other defendants did not engage in selling). And acquisitions of AdaptHealth stock by Griggs and Clemens do not otherwise negate the inference of scienter, especially where, as here, the shares appear to have been acquired automatically as part of their executive compensation. *See In re Advance Auto Parts, Inc., Sec. Litig.*, No. 18-212-RGA, 2020 WL 599543, at *8-*9 (D. Del. Feb. 7, 2020).[25]

---

[24] *See* Mtn. at 33-34 (citing *City of Bristol Pension Fund v. Vertex Pharms. Inc.*, 12 F. Supp. 3d 225, 240 (D. Mass. 2014) (the insider sales were made in connection with retirement, not due to a resignation resulting from an indictment) and *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1116 (N.D. Cal. 2003) (unlike here, corporate insider was retiring and sales were not unusual; he sold a proportional number of shares in the months leading up to the class period)).

[25] Defendants authority is inapt. In *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, unlike here, the "trades [were] not temporally suspicious" because "all of their Class Period sales except one was made pursuant to Rule 10b5–1 trading plans." 2017 WL 1536223, at *22 (D.N.J. Apr. 27, 2017), *aff'd sub nom. In re Hertz Global Holdings, Inc.*, 905 F.3d at 106. And in *In re Party City Sec.*

- 38 -

**b.     AdaptHealth's Sale of $200 Million in Stock Contributes to a Strong Inference of Scienter**

AdaptHealth's secondary offering provided yet another motive to mislead investors.  In fact, Defendants raised over $200 million from investors to finance the transformative AeroCare acquisition – funds they likely would not have been able to raise had investors known that McGee's remaining tenure with AdaptHealth would be short-lived.  *See In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 444 (S.D.N.Y. 2000) ("ABN had the most to win by inflating the price of the IPO, and was thus motivated to make statements or omit facts that would result in a higher price.").  Courts hold that stock offerings provide ample motive for executives to commit securities fraud under these circumstances, especially as AdaptHealth set the $33 offering price just below the $38 high.  ¶105.  *See Freshpet*, 2018 WL 394878, at *6 (motive sufficiently pled where the "[i]ndividual [d]efendants timed their Secondary Offering at just below Freshpet's peak price"); *McDermid*, 520 F. Supp. 3d at 664 (motive "to raise capital through at-the-market stock offerings" "helps Plaintiffs' scienter claims survive dismissal"); *In re Res. Am. Sec. Litig.*, No. CIV. 98-5446, 2000 WL 1053861, at *6 (E.D. Pa. July 26, 2000) ("the desire to raise capital by means of a secondary public offering" gave rise to strong inference of scienter).  Plaintiffs have therefore "alleged with particularity that Defendants had the motive and opportunity to commit fraud in the form of insider sales and corporate securities offerings."  *See Gargiulo v. Isolagen, Inc.*, 527 F. Supp. 2d 384, 390 (E.D. Pa. 2007).[26]

---

*Litig.*, unlike here, the CEO's class period trading "was consistent with his stock sales in previous years," and he "sold less than five percent of his . . . Stock."  147 F. Supp. 2d 282, 313 (D.N.J. 2001).  In *In re Radian Sec. Litig.*, unlike here, the court found allegations of stock sales to be insufficiently suspicious because "both of the non-defendants resigned from their positions . . . early into the class period," and "defendants retained 88.6% of their [company] securities during the class period."  No. 07-3375, 2010 WL 1767195, at *12 (E.D. Pa. Apr. 30, 2010).

[26]  *See, e.g., In re Enzymotec I*, 2015 WL 8784065, at *19 ("Crucially, Lead Plaintiffs specifically tie together the timing of [the Secondary Offering] with the core of the alleged misrepresentations"); *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 813 (C.D. Cal. 2011) ("Defendants' motive to artificially inflate the company's stock price stems not merely from the

4877-5957-0962.v2

###### F.       Plaintiffs Adequately Allege Loss Causation

"'[L]oss causation' [is] a causal connection between the material misrepresentation [or omission] and the loss [suffered]." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). To adequately plead it, the Complaint need only provide a "short and plain statement" giving Defendants "some indication of the loss and the causal connection that [they have] in mind." *Id.* at 346-47; *In re Bradley Pharms., Inc. Sec. Litig.* , 421 F. Supp. 2d 822, 829 (D.N.J. 2006) ("'pleading rules are not meant to impose a great burden upon a plaintiff'"). "Importantly, alleging loss causation or economic loss does not require a plaintiff to satisfy the heightened pleading standard under Rule 9(b)." *Hull v. Glob. Dig. Sols., Inc.*, No. 16-5153(FLW), 2017 WL 6493148, at *11 (D.N.J. Dec. 19, 2017).  A plaintiff need only allege "'that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.'" *McDermid*, 520 F. Supp. 3d at 665.[27]

The Complaint adequately alleges loss causation.  Defendants do not dispute that the alleged disclosures about McGee's indictment for tax fraud and the truth about AdaptHealth's organic revenue growth caused its stock to decline, nor do they dispute that the disclosure revealed new information related to the same subject matter as the alleged misrepresentations and omissions, which analyst commentary confirms.  ¶¶34-37, 128, 135, 149-157.  Defendants even admit the news of McGee's indictment "caused the stock to drop." Mtn. at 42.  Nothing more is

---

'generic desire' to raise capital, but also from a need to . . . maintain access to much-needed operating capital. . . .  [S]uch motive evidence buttresses a finding of scienter."); *In re Portal Software, Inc. Sec. Litig*, No. C-03-5138 VRW, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) ("[P]laintiffs' contention that defendants were motivated to inflate artificially [the company's] stock price in the short term in order to conduct a successful secondary public offering and obtain much-needed operating capital does allege facts of a palpable motive for fraud.").

[27]   "[T]he issue of causation is 'usually reserved for the trier of fact.'"  *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655 (E.D. Pa. 2015) (quoting *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000)); *Omanoff v. Patrizio & Zhao LLC*, No. 14-723, 2015 WL 1472566, at *6 (D.N.J. Mar. 31, 2015) ("[t]he Third Circuit has repeatedly cautioned that [the loss causation] determination is a fact-sensitive inquiry typically left to the trier of fact").

- 40 -

required. *Bradley Pharms.*, 421 F. Supp. 2d at 829 ("significance of the market reaction" following alleged disclosure supports loss causation allegations).

AdaptHealth's announcement about McGee revealed his involvement in fraudulent misconduct, which had been concealed by Defendants' statements about his experience and AdaptHealth's acquisition-related revenue growth.  ¶¶76-114, 128-129, 149-153, 155-157.  And *Jehoshaphat's* disclosure about organic growth directly contradicted Defendants' statements about that very metric.  ¶¶115-126, 134-135, 154-157.  *See In re Res. Am. Sec. Litig.*, 202 F.R.D. 177, 190 (E.D. Pa. 2001) (when public information is "presented in such a way as to hide its true meaning," a later disclosure that allowed the market "to determine the existence of potential wrongdoing . . . and react to it" constitutes "new information"); *Urb. Outfitters*, 103 F. Supp. 3d at 655 (a corrective disclosure need only be "related to the same subject as the misrepresentation, and not some other adverse facts about the company").  These allegations are sufficient.

Defendants nevertheless argue that the disclosures purportedly did not "disclose the alleged fraud." Mtn. at 41.  But "there is no requirement that the disclosure mirror the earlier misrepresentation." *Urb. Outfitters*, 103 F. Supp. 3d at 655; *In re Eros*, 2021 WL 1560728, at *15 (same).  "Thus, the 'relevant truth' required under *Dura* is **not** that a fraud was committed per se, but that the 'truth' about the company's underlying condition, when revealed, causes the 'economic loss,'" as Plaintiffs have pled here.  *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010).[28]

---

[28]  Defendants' reliance on *Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*, 720 F. Supp. 2d 517, 559 (D.N.J. 2010), *Intelligroup*, 527 F. Supp. 2d at 347-48, and *In re Tellium, Inc. Sec. Litig.*, No. Civ.A. 02CV5878FLW, 2005 WL 2090254, at *4 (D.N.J. Aug. 26, 2005) is misplaced.  The corrective disclosure in *Nat'l Junior Baseball League* concerned a "business problem which was frequently discussed," not, as here, facts that Defendants concealed.  720 F. Supp. 2d at 561.  The alleged corrective disclosures in *Intelligroup*, unlike here, did not reveal information related to the alleged fraud. 527 F. Supp. 2d at 347-48.  And in *Tellium*, the disclosure at the end of the class period that "Tellium needed a new customer" to meet earlier projections was not inconsistent with or undermine fact that earlier projections were based on contractual

- 41 -

Defendants' contention that the *Jehoshaphat* Report cannot constitute a corrective disclosure because it is based on "untrue wild speculation" is mistaken. Mtn. at 42. Whether it "in fact, contained false information is a factual dispute that cannot be resolved at the motion to dismiss stage." *Behrendsen v. Yangtze River Port & Logistics Ltd.*, No. 19-cv-00024 (DLI)(LB), 2021 WL 2646353, at *15 (E.D.N.Y. June 28, 2021); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013). Credibility "is of no consequence at this juncture, as loss causation may 'be grounded in disclosure couched as opinions, or in other statements that are not verifiably truthful at the time they are made.'" *Behrendsen*, 2021 WL 2646353, at *15. Courts thus hold that "[a]llegations that the market reacted negatively to an opinion or speculation which in fact exposes the falsity of defendants' representations can be sufficient to plead loss causation." *In re Winstar Commc'ns*, No. 01 CV 11522, 2006 WL 473885, at *14-*15 (S.D.N.Y. Feb. 27, 2006). Courts do so because "Defendants' argument would mean that loss causation could only be proven through a criminal conviction – the point at which the fraud is no longer 'speculative.' But that is not the law." *Utesch*, 385 F. Supp. 3d at 425. *See In re Eros*, 2021 WL 1560728, at *9 (crediting allegations based on a short seller report).

In any event, the *Jehoshaphat* Report is not "wild speculation," but a detailed analysis that may properly form the basis of a corrective disclosure. *See W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. CIV.A. 13-6731, 2015 WL 3755218, at *17 (E.D. Pa. June 16, 2015) (a misrepresentation or omission may be revealed through "analysts questioning financial results"). Here, the *Jehoshaphat* Report provides more than sufficient indicia of credibility for two reasons. First, it contained 44 pages of thorough analysis citing documentary sources, including the Company's financial statements and interviews with former employees. *See* ¶144; Defs.' Ex. 44

---

commitments. 2005 WL 2090254, at *2, *4. The disclosures here revealed information that was inconsistent with and undermined earlier representations and disclosures.

4877-5957-0962.v2

(*Jehoshaphat* Report); *Winstar Commc'ns*, 2006 WL 473885, at *14-*15 (short seller report based on an analysis of the company's financial reports revealed insufficient cash flow to fund operations constituted a corrective disclosure). Second, Defendants' later disclosures corroborated the report's conclusions concerning the decline in AdaptHealth's organic growth, acknowledged the need for "increased disclosure" and admitted its pro forma "organic" growth disclosure was an engineered calculation. ¶¶141-143. Defendants' Motion even attributes the "increased disclosure" to the report. Mtn. at 36, n.136. It is therefore sufficiently credible to constitute a corrective disclosure. *See Bond v. Clover Health Invs., Corp.*, No. 3:21-cv-00096, 2022 WL 602432, at *18 (M.D. Tenn. Feb. 28, 2022) (market research report deemed credible where "[i]t appears that the market itself agreed, reacting negatively to the Report in a way that would not make sense if the Report had lacked credibility in the eyes of reasonable, knowledgeable investors" and was corroborated by CWs and "defendants' own response conceding (but placing a positive spin on) aspects of the Report"); *Snellink*, 870 F. Supp. 2d at 942 ("A short seller report may be used to establish loss causation.").[29]

## IV. PLAINTIFFS SUFFICIENTLY PLEAD SECTION 11 AND 12(a)(2) CLAIMS

### A. Legal Standards

Section 11 "places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). Plaintiffs need only allege that they purchased a security issued pursuant to a registration statement that contained a material misstatement or omission. *See Suprema*, 438 F.3d at 269. Scienter, loss causation, and reliance are not required.

---

[29] Defendants' reliance on *Martin v. GNC Holdings, Inc.*, No. 2:15-cv-01522, 2017 WL 3974002, at *18-*19 (W.D. Pa. Sept. 8, 2017), is unavailing. There, the corrective disclosure amounted to the mere announcement of an investigation. Here, the *Jehoshaphat* Report credibly exposed facts that contradicted Defendants' statements. *See Behrendsen*, 2021 WL 2646353, at *16 (analyses of a company by a short seller that "'contradict representations made by defendants[,]'" can "form an adequate basis for loss causation").

*Huddleston*, 459 U.S. at 381-82.  Liable parties include "the issuer of securities, its directors or partners, underwriters, and accountants who prepared or certified the registration statement." *Suprema*, 438 F.3d at 269; 15 U.S.C. §77k.  Liability of the issuer is "virtually absolute, even for innocent misstatements."  *Huddleston*, 459 U.S. at 382.

Section 12(a)(2) imposes liability on anyone who offers or sells a security with a false or misleading prospectus.  15 U.S.C. §77l(a)(2).  The plaintiff need only allege "the purchase of securities pursuant to a materially false or misleading prospectus or oral communication." *Suprema*, 438 F.3d at 269-70.  "Like Section 11, Section 12(a)(2) is a 'virtually absolute' liability provision that does not require an allegation that defendants possessed scienter."  *Id.* at 269.

## B.    AdaptHealth's Prospectus Was False and Misleading

The Complaint pleads that the Prospectus, and its incorporated documents, (*see* §II(D)), contained untrue statements and omissions of material fact.  ¶¶163-168.  Defendants argue otherwise, stating that they "should be dismissed . . . based on the same reasons discussed above." Mtn. at 43-44.  Defendants' arguments fail for the reasons discussed.  *See* §III(B), (C), *supra*.

Defendants also argue based on Ninth Circuit precedent that Rule 9(b) governs because the Complaint "sounds in fraud" by "employ[ing] the exact same factual allegations to allege violations [under] section 11 as it uses to allege fraudulent conduct under Section 10(b) of the Exchange Act."  Mtn. at 44 (quoting *Rubke v. Capital Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009)).  But in this Circuit, when "defendants are accused in separate claims of the same complaint of having violated Section 11, Section 12(a)(2), and Section 10(b), the Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims." *Suprema*, 438 F.3d at 272-73.  Defendants cite *Suprema*, but omit this language.  Mtn. at 44.  They also cite *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 451 (D. Del. 2014) without noting

- 44 -

that it too holds that "if the allegations are pled separately and plaintiffs expressly premise the Securities Act claims on negligence rather than fraud, Rule 9(b) is held inapplicable." *Id.*

Rule 8 governs the Securities Act claims here since the Complaint follows the requirements of *Suprema*, pleading strict liability and negligence in a separate section while disclaiming allegations of fraud. ¶¶163-168. *Enzymotec II*, 2015 U.S. Dist. LEXIS 167403, at \*68-\*69 (plaintiffs avoided "triggering Rule 9(b)" by pleading §10(b) claims before the §§11 and 12(a)(2) claims and disclaiming allegations of fraud). The Complaint meets Rule 8's standards.

## V.   PLAINTIFFS SUFFICIENTLY PLEAD CONTROL PERSON CLAIMS

Defendants concede Plaintiffs' control allegations, arguing only the existence of a primary violation. Mtn. at 42-43, 45. Since the Complaint sufficiently alleges primary violations, Defendants' Motion for these claims should be denied.

## VI.   CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss should be denied in its entirety. If the Court grants any aspect of Defendants' motion, Plaintiffs respectfully request leave to amend. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1435 (3d Cir. 1997).

DATED: March 21, 2022          Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
DOUGLAS R. BRITTON (admitted *pro hac vice*)
KEVIN A. LAVELLE


s/ DOUGLAS R. BRITTON
DOUGLAS R. BRITTON

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dougb@rgrdlaw.com
klavelle@rgrdlaw.com

Lead Counsel for Plaintiffs

- 45 -

- 46 -

KESSLER TOPAZ MELTZER
  & CHECK, LLP
ANDREW L. ZIVITZ (PA #76554)
HELEN J. BASS (PA # 330646)
280 King of Prussia Road
Radnor, PA  19087
Telephone:  610/667-7706
610/667-7056 (fax)
azivitz@ktmc.com
hbass@ktmc.com

Local Counsel for Plaintiffs

4877-5957-0962.v2

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on March 21, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ DOUGLAS R. BRITTON
DOUGLAS R. BRITTON

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Email:  dougb@rgrdlaw.com

4877-5957-0962.v2

# Mailing Information for a Case 2:21-cv-03382-HB DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM v. ADAPTHEALTH CORP. F/K/A DFB HEALTHCARE ACQUISITIONS CORP. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **MICHAEL ALBERT**
  malbert@rgrdlaw.com

- **NAUMON A. AMJED**
  namjed@ktmc.com,ksauder@ktmc.com,hpaffas@ktmc.com,iyeates@ktmc.com,4980043420@filings.docketbird.com,mswift@ktmc.com

- **Lee Albert**
  lalbert@glancylaw.com,lee-albert-5832@ecf.pacerpro.com,info@glancylaw.com

- **DOUGLAS R. BRITTON**
  dougb@rgrdlaw.com,e_file_sd@rgrdlaw.com,mwaligurski@rgrdlaw.com

- **Helen Jane Bass**
  hbass@ktmc.com

- **JENNIFER N. CARINGAL**
  jcaringal@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **VINCENT A COPPOLA**
  vcoppola@pribanic.com,gregory@pribanic.com

- **TODD G. COSENZA**
  TCosenza@wilkie.com

- **STEVEN D. COSTELLO**
  sdc@saxtonstump.com,dmk@saxtonstump.com,tah@saxtonstump.com

- **STEPHEN J. FLEURY , JR**
  sjf@saxtonstump.com,dmk@saxtonstump.com

- **VINCENT P. IANNECE**
  VIANNECE@WILLKIE.COM

- **DANIELLE S. MYERS**
  danim@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **JUAN CARLOS SANCHEZ**
  jsanchez@rgrdlaw.com

- **ANDREW L. ZIVITZ**
  azivitz@ktmc.com,3949407420@filings.docketbird.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)