UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM and BUCKS COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiffs,<br><br>v.<br><br>ADAPTHEALTH CORP. f/k/a DFB HEALTHCARE ACQUISITIONS CORP., LUKE MCGEE, STEPHEN P. GRIGGS, JASON CLEMENS, FRANK J. MULLEN, RICHARD BARASCH, JOSHUA PARNES, ALAN QUASHA, TERENCE CONNORS, DR. SUSAN WEAVER, DALE WOLF, BRADLEY COPPENS, and DAVID S. WILLIAMS III,<br><br>               Defendants. | Civ. Action No. 2:21-cv-03382-HB<br><br>Hon. Harvey Bartle III<br><br>**<u>ORAL ARGUMENT REQUESTED</u>** |

**<u>REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT</u>**

SAXTON & STUMP
Steven D. Costello (No. 37288)
100 Deerfield Lane, Suite 240
Malvern, Pennsylvania 19355
(484) 328-8500

WILLKIE FARR & GALLAGHER LLP
Todd G. Cosenza (admitted *pro hac vice*)
Vincent P. Iannece (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000

*Attorneys for Defendants*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES..................................................................................................ii

INTRODUCTION.............................................................................................................1

ARGUMENT ...................................................................................................................3

    I.    NO MATERIAL MISSTATEMENTS OR OMISSIONS ARE PLED...................3

        A.    Plaintiffs Fail to Plead an Actionable Misstatement or Omission
            Relating to AdaptHealth's Reporting of Organic Growth ............................3

        B.    Plaintiffs Fail to Plead an Actionable Misstatement or Omission
            Relating to the Success, Experience or Qualifications of Its
            Management Team. ....................................................................................8

    II.    NO STRONG INFERENCE OF SCIENTER IS PLED....................................16

        A.    Plaintiffs Allege No Plausible Motive to Commit Securities Fraud.............16

        B.    Plaintiffs Fail to Allege Conscious Misbehavior or Recklessness................19

    III.    PLAINTIFFS HAVE FAILED TO ADEQUATELY PLEAD LOSS
            CAUSATION.......................................................................................24

    IV.    THE 1933 ACT CLAIMS SHOULD BE DISMISSED.....................................24

CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                                                   **Page(s)**

*In re Adolor Corp. Sec. Litig.,*
   616 F. Supp. 2d 551 (E.D. Pa. 2009) ..................................................................................25

*In re Advanta Corp. Sec. Litig.,*
   180 F.3d 525 (3d Cir. 1999) ...............................................................................................6

*In re Aetna, Inc. Sec. Litig.,*
   617 F.3d 272 (3d Cir. 2010) ...............................................................................................6

*In re Alstom SA Sec. Litig.,*
   406 F. Supp. 2d 433 (S.D.N.Y. 2005) ...............................................................................5

*In re American Bank Note Holographics, Inc. Securities Litigation,*
   93 F. Supp. 2d 424 (S.D.N.Y. 2000) ................................................................................19

*In re American Bus. Fin. Serv., Inc. Sec. Litig.,*
   413 F. Supp. 2d 378 (E.D. Pa. 2005) ..................................................................................6

*In re AstraZeneca Sec. Litig.,*
   559 F. Supp. 2d 453 (S.D.N.Y. 2008) .............................................................................18

*In re Banco Bradesco S.A. Sec. Litig.,*
   277 F. Supp. 3d 600 (S.D.N.Y. 2017) .............................................................................13

*In re Bristol-Myers Squibb Sec. Litig.,*
   312 F. Supp. 2d 549 (S.D.N.Y. 2004) .............................................................................17

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.,*
   394 F.3d 126 (3d Cir. 2004) .............................................................................................25

*City of Brockton Ret. Sys. v. Avon Prods., Inc.,*
   2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ................................................................23

*In re Comverse Tech., Inc. Sec. Litig.,*
   543 F. Supp. 2d 134 (E.D.N.Y. 2008) ....................................................................... 11, 14

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.,*
   433 F. Supp. 3d 515 (S.D.N.Y. 2020) .............................................................................14

*Curran v. Freshpet, Inc.,*
   2018 WL 394878 (D.N.J. Jan. 12, 2018) ........................................................................19

*Curry v. Yelp, Inc.,*
   2015 WL 7454137 (N.D. Cal. Nov. 24, 2015) ...................................................................5

ii

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005) ................................................................................................24

*In re Enzymotec Sec Litig.,*
    2015 WL 8784065 (D.N.J. Dec. 15, 2015) ...............................................................19

*Fain v. USA Techs., Inc.,*
    707 F. App'x 91 (3d Cir. 2017) ...............................................................................20

*In re FBR Inc. Sec. Litig.,*
    544 F. Supp. 2d 346 (S.D.N.Y. 2008) ....................................................................13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
    618 F. Supp. 2d 311 (S.D.N.Y. 2009) ......................................................................5

*In re ForceField Energy Inc. Securities. Litig.,*
    2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017) .........................................................10

*Fries v. N. Oil & Gas, Inc.,*
    354 F. Supp. 3d 384 (S.D.N.Y. 2018) .........................................................11, 12, 13

*Fries v. Northern Oil & Gas, Inc.,*
    285 F. Supp. 3d 706 (S.D.N.Y. 2018) ..............................................................11, 12

*Garfield v. NDC Health Corp.,*
    466 F.3d 1255 (11th Cir. 2006) ...............................................................................21

*Gargiulo v. Isolagen, Inc.,*
    527 F. Supp. 2d 384 (E.D. Pa. 2007) ......................................................................19

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.,*
    2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ..........................................................20

*Institutional Invs. Grp v. Avaya, Inc.,*
    564 F.3d 242 (3d Cir. 2009) ...................................................................................6-7

*In re Intelligroup Sec. Litig.,*
    527 F. Supp. 2d 262 (D.N.J. 2007) .........................................................................21

*Kelsey v. Allin,*
    2016 WL 825236 (N.D. Ill. Mar. 2, 2016)..............................................................9, 10

*Knurr v. Orbital ATK Inc.,*
    294 F. Supp. 3d 498 (E.D. Va. 2018) ......................................................................21

*In re Lions Gate Entm't Corp. Sec. Litig.,*
    165 F. Supp. 3d 1 (S.D.N.Y. 2016) .........................................................................23

*In re MannKind Sec. Actions,*
  835 F. Supp. 2d 797 (C.D. Cal. 2012) ...............................................................................19

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.,*
  2019 WL 5394011 (M.D. Fla. Oct. 16, 2019),
  *reported adopted by* 202 WL 1072582 (M.D. Fl. Feb. 14, 2020) ........................................13

*In re Merck & Co. Sec. Litig.,*
  432 F.3d 261 (3d Cir. 2005) ..............................................................................................24

*Meyer v. Greene,*
  710 F.3d 1189 (11th Cir. 2013) .........................................................................................24

*N.J. & its Div. of Inv. v. Sprint Corp.,*
  314 F. Supp. 2d 1119 (D. Kan. 2004) ...........................................................................14, 15

*Nanopierce Technologies, Inc. v. Southridge Capital Management LLC,*
  2003 WL 22882137 (S.D.N.Y. Dec. 4, 2003).....................................................................10

*OFI Asset Mgmt v. Cooper Tire & Rubber,*
  834 F.3d 481 (3d Cir. 2016) ............................................................................................6, 7

*In re Omnicom Grp., Inc. Sec. Litig.,*
  597 F.3d 501 (2d Cir. 2010) ..............................................................................................24

*In re Portal Software, Inc. Sec. Litig.,*
  2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) ....................................................................19

*In re PTC Therapeutics, Inc. Sec. Litig.,*
  2017 WL 3705801 (D.N.J. Aug. 28, 2017).........................................................................20

*In re Radian Sec. Litig.,*
  612 F. Supp. 2d 594 (E.D. Pa. 2009)..................................................................................17

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,*
  75 F.3d 801 (2d Cir. 1996) ................................................................................................18

*Shah v. Zimmer Biomet Holdings, Inc.,*
  348 F. Supp. 3d 821 (N.D. Ind. 2018) ................................................................................14

*Siemers v. Wells Fargo & Co.,*
  2007 WL 1140660 (N.D. Cal. Apr. 17, 2007) .....................................................................11

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.,*
  248 F. Supp. 3d 428 (S.D.N.Y. 2017) ................................................................................22

*Snellink v. Gulf Resources, Inc.,*
  870 F. Supp. 2d 930 (C.D. Cal. 2012) ...........................................................................10, 15

*Stein v. Tangoe, Inc.,*
    2014 WL 12767210 (D. Conn. Sept. 30, 2014) ........................................................ 3, 4, 20

*In re Suprema Specialties, Inc. Sec. Litig.,*
    438 F.3d 256 (3d Cir. 2006) ...................................................................................25

*Teamsters Local 456 Pension Fund v. Universal Health Servs.,*
    396 F. Supp. 3d 413 (E.D. Pa. 2019) ....................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)........................................................................................... 16, 17

*United Paperworkers Int'l. Union v. Int'l Paper Co.,*
    985 F.2d 1190 (2d Cir. 1993) .................................................................................5

*United States v. Yeaman,*
    194 F.3d 442 (3d Cir. 1999) ..................................................................................16

*Utesch v. Lannett Co.,*
    385 F. Supp. 3d 408 (E.D. Pa. 2019) ....................................................................20

*In re Violin Memory Sec. Litig.,*
    2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) .......................................................15

*Williams v. Globus Med., Inc.,*
    869 F.3d 235 (3d Cir. 2017) ...................................................................................9

## Other Authorities

17 C.F.R. § 229.401(e)(1) ............................................................................... 14, 15

17 C.F.R. § 229.401(f)(2) ....................................................................................15

Defendants hereby submit this memorandum in further support of their motion to dismiss the Complaint.[1]

## INTRODUCTION

Plaintiffs' Opposition only further demonstrates that their Complaint cannot satisfy the heightened pleading requirements that Congress has mandated must be met before a securities fraud claim can proceed, and that they have certainly not carried their heavy burden of pleading that AdaptHealth somehow deceived its investors by making misleading statements about its "organic growth" or its former Co-CEO's "biographical information."

With respect to "organic growth," Plaintiffs claim that AdaptHealth changed the way it calculates and reports its organic growth, deviating from the industry standard methodology, in order to conceal that its organic growth was actually contracting. In doing so, Plaintiffs seek to—piggybacking off of an admittedly biased short-seller—take advantage of an unprecedented global pandemic, which, in addition to causing the death of hundreds of thousands of Americans, resulted in significant supply chain issues that seriously threatened companies across the world's—including AdaptHealth's—ability to operate. However, Plaintiffs ignore several factors that make such a claim dead on arrival. *First*, "organic growth" is not a GAAP measure and federal courts, in response to similar allegations, have clearly stated that companies are permitted to use their own judgment in making such calculations—including the addition of acquisition revenue into the calculation. *Second*, AdaptHealth clearly disclosed its new "pro forma net revenue growth" metric, and analysts understood and accepted its rationale for the change after extensive questioning. *Third*, despite the extraordinary economic challenges, which AdaptHealth explicitly warned could affect its business, AdaptHealth's revenue has grown

---

[1] Except as otherwise noted, capitalized terms used herein have the same meanings ascribed to them in the Motion to Dismiss.

considerably, and the Company has consistently met and/or exceeded its guidance to the market. *Finally*, AdaptHealth's disclosures demonstrate that it reasonably believed its "pro forma growth" metric more accurately and comprehensively reflected its actual revenue growth.

Even more confoundingly, Plaintiffs also claim that AdaptHealth misled investors by failing to disclose that its former Co-CEO was alleged to have participated in a purported tax fraud, which is not alleged to have been related to AdaptHealth or its business. Abandoning their theory that disclosures attributing AdaptHealth's success to its "seasoned management team" were rendered misleading by such omissions, Plaintiffs now claim that references to Mr. McGee's prior work experience obligated AdaptHealth to disclose these uncharged, unadjudicated, and unrelated allegations. However, as explained in the Motion to Dismiss,[2] this theory ignores well settled law providing that companies do not have a duty to disclose uncharged criminal conduct, and misconstrues federal case law on omissions of supposed "biographical information." Contrary to Plaintiffs' assertions, companies are not required to disclose unadjudicated alleged misconduct in connection with an executive's unrelated personal business interests, so long as there are no statements amounting to a denial of such alleged misconduct.

In sum, the Opposition,[3] like the Complaint, rests on unwarranted assumptions and mischaracterizations of the facts and the law. For all of the reasons stated in the Motion to Dismiss, and for all the reasons stated below, Plaintiffs' claims under Section 10(b) and 20(a) of the 1934 Act and Sections 11, 12(a)(2), and 15 of the 1933 Act should be dismissed.

---

[2] References to "Motion to Dismiss" or "MTD" are to the Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint. *See* ECF No. 37-1.

[3] References to "Opposition" or "Opp." are to Plaintiffs' Opposition to Defendants Motion to Dismiss the Consolidated Class Action Complaint. *See* ECF No. 40.

## ARGUMENT

### I.    NO MATERIAL MISSTATEMENTS OR OMISSIONS ARE PLED

####    A.    <u>Plaintiffs Fail to Plead an Actionable Misstatement or Omission Relating to AdaptHealth's Reporting of Organic Growth</u>

Plaintiffs' allegation that AdaptHealth's reporting of organic growth was materially misleading fails to state a legally cognizable claim. (*See* MTD at I.A.) Their attempt to second-guess Defendants' good faith judgment on how to calculate and report a non-GAAP metric is plainly not actionable. (*See id.* at 22.) To properly plead that such statements were materially misleading, Plaintiffs must allege with particularity provable facts to demonstrate that such judgments are both objectively and subjectively false. (*Id.*) Plaintiffs have failed to do so.

####    1.    **AdaptHealth Accurately Disclosed Its Reporting Methodology**

As explained in the Motion to Dismiss, there is no precise way to calculate organic growth under GAAP and no universally accepted definition of the term. (*See id.* at 22-23 (citing *Stein v. Tangoe, Inc.*, 2014 WL 12767210, at *10 (D. Conn. Sept. 30, 2014)).) Rather, companies are permitted to use their own judgment in making such calculations. In *Stein*, plaintiffs filed a federal securities action alleging that defendants "artificially inflated [the company's] organic growth figure, thereby understating the acquired companies' contributions to revenue." 2014 WL 12767210, at *5. The *Stein* court undertook a review of academic literature, other public companies' disclosures, analyst reports, and plaintiffs' proposed definitions, and concluded that "there is no one specific definition or construction of 'organic growth'" and "there is no GAAP rule dictating how such growth should be calculated." *Id.* at *9-10. In confirming that there are "several acceptable constructions" of organic growth, including the inclusion of "revenue from transitioning or growing the acquired companies," the court held that "[d]efendants cannot be held liable for a misstatement for merely calculating organic growth in a

manner different from the method used by [others]."[4]  *Id*. at *10.  The same result is compelled here.

Having failed to establish that Defendants' "pro forma growth" calculation was itself misleading, Plaintiffs next claim that what was misleading was AdaptHealth's "changing the metric without adequately informing investors and while concealing the Company's contracting organic revenue." (Opp. at 21-22.)[5]  This theory relies on several faulty premises.  *First*, there is no one formulaic method for calculating organic growth.  *Next*, any purported "contracting" of "organic growth" was not misleading (or concealed) in the context and midst of a global pandemic that caused major operational and supply chain issues.  *Finally*, Defendants did contemporaneously disclose this methodology change to the market. (MTD at 21.)

For example, in the Financial Supplement provided in connection with the earnings call for year-end 2020—the quarter the change was implemented—AdaptHealth expressly stated that its organic growth was being calculated by a "pro forma growth" metric, which was explicitly defined on the only slide covering organic growth.[6]  (MTD at 12-13.)  Plaintiffs' claim that this information was "buried" in a "vague footnote" is dishonest.  (Opp. at 21 & n.8.)  Throughout the class period, Defendants have only shared organic growth and "pro forma growth" rates in earnings reports and on earnings calls—not documents filed with the SEC.[7]  Therefore, such information cannot be said to be "buried" when it can be reliably found in one document always made publicly available prior to earnings calls, particularly where the information is typed in

---

[4] Ignoring this, Plaintiffs claim that AdaptHealth's traditional organic growth calculation is the "precise way" to calculate "organic growth" and is "consistent with investment community standards." *See* Opp. at 21. However, Plaintiffs cite no opinion or treatise on what the "investment community standard" is (or that one exists) and proffer no definition of their own. In any event, it is clear that "companies are permitted to exercise some freedom in their accounting methodology even though it may then not 'calculate organic growth in the same way that [their] competitors [do] and in the manner that analysts and investors expect.'" MTD at 23.

[5] In so arguing, Plaintiffs seemingly admit that the change alone was not misleading. *See* Opp. at 22 n.9.

[6] *See* Ex. 13 at 7.

[7] *See, e.g.*, Ex. 39 at 6; Ex. 40 at 17-18; Ex. 41 at 15-19.

bold directly on the only slide related to "organic growth."[8]  Moreover, the footnote very clearly defines the organic growth calculation "as shown" and includes the addition of, among other things, "current period acquisition revenue."[9]  (*See* MTD at 13; *see also* Opp. at 21 & n.8.) Indeed, the new "pro forma growth" calculation was the subject of analyst questioning on the Company's very next earnings call.[10]  (*See* MTD at 13 (analysts acknowledging the change).)

The Complaint does not allege that Defendants could not (and did not) reasonably believe that they could report "organic" growth using these disclosed methods and calculations.  (*See id.* at 22-23.)  Moreover, Plaintiffs made no showing that these statements were not "fairly aligned" with the information in AdaptHealth's possession at the time the opinions were expressed. Rather, AdaptHealth's unchallenged disclosures suggest that its reporting of "organic" growth was directly in line with its tremendous net revenue growth throughout the class period.  (*See id.* at 23.)  Thus, the Complaint offers no basis to conclude that AdaptHealth's methodology was unreasonable and that AdaptHealth did not reasonably believe the metrics reported to the market.

> **2.      Plaintiffs Fail to Rebut That Many of the Alleged False or Misleading Statements Are Mere Statements of Corporate Optimism**

Plaintiffs fail to meaningfully address the argument that the challenged statements merely reflect Defendants' expressions of belief during the class period about its organic growth

---

[8] *See* Ex. 13 at 7. This clearly distinguishes the facts here from the cases Plaintiffs cite. *See United Paperworkers Int'l. Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) (information found in corporate documents not distributed to shareholders); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 325 (S.D.N.Y. 2009) (disclosures were scattered across various documents); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) (disclosures were set forth in two separate places).

[9] *See* Ex. 13 at 7.

[10] To be sure, contrary to Plaintiffs' assertion, this is not a "truth-on-the-market" defense. *See* Opp. at 20-21. Rather, these refer to the very words of disclosures challenged by Plaintiffs—within their four corners— that respond to the contention that AdaptHealth misled investors about its "organic growth" rates. *See Curry v. Yelp, Inc.*, 2015 WL 7454137, at *8 n.4 (N.D. Cal. Nov. 24, 2015) ("Because this disclosure existed within the four corners of a statement that Plaintiffs allege was false or misleading, the Court need not analyze whether" truth on the market defense is properly considered."). The only time a truth-on-the-market defense would come into play is if the Defendants were arguing that a disclosure viewed in isolation was misleadingly incomplete on account of a failure to disclose material facts, but those facts were otherwise disclosed by Defendants at an earlier point during the class period. For the avoidance of doubt, the Defendants advance no such argument.

trends. (*See* MTD at I.A.2.) Instead, Plaintiffs only dispute whether *Advanta* supports Defendants' argument and claim Defendants "put AdaptHealth's organic revenue growth 'in play' and thus were duty-bound not to mislead." (Opp. at 25.) That argument ignores the *Advanta* court's holding that "[s]uch statements, even if arguably misleading, do not give rise to a federal securities claim because they are not material." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999). Plaintiffs also ignore that courts routinely conclude that statements like those issued here—such as "we are optimistic" or "we remain confident"—are inactionable as a matter of law, because they are incapable of objective verification. (*See* MTD at 24.)[11]

### 3. AdaptHealth's Forward-Looking Statements Are Protected by the PSLRA Safe Harbor

As detailed in the Motion to Dismiss (*see id.* at 25-26), many of the challenged statements are prototypical "forward-looking" statements about the Company's financial projections and future performance, which are immunized from liability by the PSLRA's safe harbor provisions. *See OFI Asset Mgmt v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016). Plaintiffs assert that these statements are not forward-looking because they were mixed statements of the present and future, which materially misrepresented then existing facts. (Opp. at 26.) A mixed present/future statement must be analyzed to determine if its present-tense and historical portions can be separated from the statement's assertions about the future—if not, the safe harbor applies. *See In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 281 (3d Cir. 2010). Viewed in context, if any of the challenged statements are mixed, they are forward-looking because they

---

[11] Further, the challenged statements here are no more specific than statements that courts in this circuit have found are inactionable puffery. *Compare e.g.*, Compl. ¶ 116 ("With our PAP census rebuilding after the depressed new starts in midyear, increase in oxygen business in Q4, continued market expansion in CGM, we remain confident in our organic growth prospects between 8% and 10% for 2021.") *with In re American Bus. Fin. Serv., Inc. Sec. Litig.*, 413 F. Supp. 2d 378, 400 (E.D. Pa. 2005) ("I am very proud that we have been able to maintain our pace of securitizations for ten straight quarters, and now have more than $2 billion in securitized loans . . . . These accomplishments demonstrate our continued focus on credit quality, the application of uniform underwriting standards, and our retail origination strategy. These practices are critical to our ongoing success, and central to our strategy of managed growth.").

"cannot meaningfully be distinguished from the future projection of which they are a part." *Institutional Invs. Grp v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009). For instance, just as the statement in *Avaya*, "our first quarter results position us to meet our goals for the year," could not be distinguished from the future projection of which it was part because the assertions of current fact were too vague, the statement "we'll continue the growth we've seen organically" is similarly vague. *Id.* at 254. The statement says only that, "whatever that situation is" with respect to organic growth, "it makes the future projection attainable." *Id.* at 255.

Moreover, Plaintiffs' cursory assertion that AdaptHealth's extensive warnings regarding its forward-looking statements were "boilerplate" is deficient. (Opp. at 27-28.) AdaptHealth specifically warned of the precise risks underlying Plaintiffs' claims: that current projections are just that and may not come to fruition, and that organic growth could be lower than expected.[12] (MTD at 25.) Additionally, Plaintiffs maintain that the cautionary language remained the same throughout the time period, yet they rely completely on cases in which the cautionary language remained the same while "the risks changed." (Opp. at 28.) Here, there was no changing in the risks that would necessitate updates to the cautionary language. Finally, Plaintiffs also contend that the warnings were insufficient because Defendants were aware that "potential risks" had already materialized. (Opp. at 28.) This argument misconstrues the PSLRA safe harbor. "The provisions of the safe harbor . . . are disjunctive; they immunize any forward-looking statement that either is 'accompanied by meaningful cautionary statement[s],' or 'the plaintiff fails to prove the forward-looking statement . . . was made with actual knowledge . . . that the statement was false or misleading. Thus, where a future-looking statement is accompanied by sufficient cautions, then 'the state of mind of the individual making the statement is irrelevant.'" *OFI*, 834

_____

[12] In fact, AdaptHealth specifically warned that the COVID-19 pandemic could harm its business. *See* MTD at 15 n.107. These explicit warnings are far from boilerplate, and are particularly important given that this unprecedented pandemic has impacted nearly every company's growth figures over the past two years.

- 7 -

F.3d at 502.  In any event, Plaintiffs have not sufficiently alleged that any forward-looking statements were made with the necessary "actual knowledge."  (MTD at 26.)

B. **Plaintiffs Fail to Plead an Actionable Misstatement or Omission Relating to the Success, Experience or Qualifications of Its Management Team**

Unable to dispute that AdaptHealth's disclosures concerning the success, experience or qualifications of its management team, including Mr. McGee, and its "past and future revenue growth" were completely accurate or that the supposed omissions had nothing to do with those statements, Plaintiffs pivot to a new theory.  Rather than continue to focus on how AdaptHealth's repeated crediting of its success to its "proven management team" and representations concerning its "past and future revenue growth" was supposedly rendered misleading by the purported omission of Mr. McGee's alleged misconduct—as the Complaint portends[13]— Plaintiffs focus their Opposition almost exclusively on purported "biographical statements concerning McGee's prior experience"[14] (Opp. at III.B.1.a) and claim the inclusion of such information obligated AdaptHealth to disclose all aspects of his involvement in interests outside of AdaptHealth, including unrelated and uncharged alleged criminal misconduct.[15]  (*Id.*)  This theory fails because the law does not require such disclosures.  Perhaps understanding the specious nature of its argument, Plaintiffs also advance a similarly unavailing alternative theory that certain rules and regulations created an independent duty to disclose the alleged misconduct.

---

[13] *See* Compl. ¶¶ 24, 105, 165.

[14] In fact, Plaintiffs' Opposition would have the Court forget that any other individuals comprised AdaptHealth's management team, along with the vast disclosures describing these individuals' prior work experience and attributing AdaptHealth's success to their work. *See, e.g.*, Ex. 20 at Ex. 99.1; Ex. 18 at 99.1, p. 5; Ex. 22 at Ex. 99.1. Because Plaintiffs have abandoned the theory that any statements other than references to Mr. McGee's supposed "biographical" information were rendered false or misleading by AdaptHealth's purported omissions, the Court should dismiss any claims regarding these statements. *See* Compl. ¶ 2, 11, 14, 24, 69, 70, 76, 78, 105, 165; App'x A at Statement Nos. 6, 8, 22.

[15] Plaintiffs do not deny that Mr. McGee had not been charged of any crime at the time of any challenged statement, and that, to this day, the charges against him have not been adjudicated. While Plaintiffs continue to direct the Court's attention to supposed "criminal fines" levied against North Channel Bank (not Mr. McGee) (Opp. at 15 n.5), Plaintiffs appear to have abandoned this line of argument – instead stating that "whether McGee's involvement in the tax fraud was formally adjudicated is irrelevant." *Id.*

1.     **Plaintiffs Establish No Duty to Disclose Mr. McGee's Alleged Unrelated Misconduct**

It is well settled law that to be actionable, an omission—including omissions of uncharged criminal conduct—must, among other things, be sufficiently related to false or misleading statements. (*See* MTD at 28.)  Absent such a link, there is no "duty to disclose uncharged, unadjudicated wrongdoing."[16]   (*Id.* at 29.)  This is simply an application of the well-established principle that "Section 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information."   (*Id.*)

Plaintiffs have failed to link the challenged statements to the alleged omissions.   (*See id.* at 28-29.)  Instead, Plaintiffs now attempt to argue that, by disclosing some of Mr. McGee's supposed "biographical information," AdaptHealth somehow inherited a duty to disclose any alleged fraudulent misconduct related to Mr. McGee's personal interests.  (Opp. at 14-15.)  However, the cases Plaintiffs cite in support are entirely distinguishable, and their argument rests on both a misreading of those cases as well as a conflation of the distinction between "work experience" and personal interests or business ventures.  Moreover, despite Plaintiffs' express contention, none of the cases they cite even arguably stands for the proposition that the omission of the existence of "*suspected* or 'unadjudicated' fraudulent misconduct" may itself render biographical information false or misleading.  (Opp. at 14 (emphasis in original).)

For example, Plaintiffs lean heavily on *Kelsey v. Allin*, 2016 WL 825236 (N.D. Ill. Mar. 2, 2016), for the proposition that where an individual's alleged "positive experience" is highlighted, a company has a "duty to disclose all of the experience, including any negative

---

[16] Plaintiffs confusingly argue that the "Defendants' Motion is based on the oft-rejected contention that only 'inaccurate' statements can be actionable." *See* Opp. at 13 n.4. However, Defendants make clear that AdaptHealth's statements were both "literally accurate" and not rendered misleading through any context or omissions. *See* MTD at 27-29. The Motion to Dismiss (and all of the cases cited therein) acknowledges the unremarkable proposition that, when a company chooses to speak, it must not mislead. *See Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017).

- 9 -

experience." *Id.* at *4.  In that case, the plaintiffs challenged, among other things, biographical information published in disclosures surrounding the company's IPO, which listed a number of positions its CEO had previously held with the notable exception of the company he worked at (as the CEO and CFO) immediately prior to his current position—a company allegedly involved with known fraudsters and at which the CEO himself was allegedly accused of fraud by auditors. *See id.* at *3.  The court held that, because the company listed most of its CEO's former business experience—seemingly in chronological order—it was misleading for it to not list his position "immediately preced[ing]" his current tenure.  *Id.* at *4 ("The way the biography was worded suggests that [the CEO] was at PricewaterhouseCoopers immediately before starting [at the company].").  Contrary to Plaintiffs' position, the *Kelsey* court took issue with the defendants' failure to provide an accurate resume for its CEO when undertaking to do so, **not** the purported failure to disclose that the CEO's former (and entirely unrelated) company was apparently mired in scandal—a point which the court only considered in connection with the scienter element. [17]

Here, there are no allegations that any of Mr. McGee's work experience was misleadingly omitted from AdaptHealth's disclosures.  Rather, the Complaint merely alleges that Mr. McGee was one of the owners of North Channel Bank—not that he ever held any position

---

[17] The other cases Plaintiffs' cite to support their argument are similarly unavailing. In *In re ForceField Energy Inc. Securities. Litig.*, 2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017), plaintiffs claimed a proxy statement was misleading because it disclosed certain executives' work experience without disclosing their histories at companies accused of fraud. *Id.* at *11. Once again, the court took issue with the failure to make complete and accurate disclosures concerning the executives' work experience rather than the failure to disclose any alleged fraud. Likewise, in *Snellink v. Gulf Resources, Inc.*, 870 F. Supp. 2d 930 (C.D. Cal. 2012), plaintiffs challenged defendants' failure to disclose that its CEO was previously employed as the CFO of a firm alleged of fraud. *Id.* at 940. There, the court went so far as to say that it need not probe any involvement in fraudulent schemes, but that "[t]he falsity . . . concerns the concealment of [the CEO's] employment history." *Id.* Finally, in *Nanopierce Technologies, Inc. v. Southridge Capital Management LLC*, 2003 WL 22882137 (S.D.N.Y. Dec. 4, 2003), plaintiffs claimed that defendants' disclosure of its CEO's professional record was false and misleading because it failed to disclose that another company for which he is an executive went bankrupt during his tenure and that he had previously signed a consent decree with the SEC permanently banning him (personally) from committing further securities violations and temporarily barring him from practicing before the SEC. *Id.* at *3-5. The court did not, as Plaintiffs suggest, find that the biographical statement was "misleading" but rather held that whether such already-adjudicated information and conduct should have been disclosed is a mixed question of fact and law. *Id.* at *4-5.

with the company.[18]  Accordingly, such involvement would more properly be classified as a business venture than as work experience, and would not be expected to be on a resume. Nevertheless, Plaintiffs contend that Defendants should have disclosed alleged facts relating to investigations and civil lawsuits that did not name AdaptHealth, did not name Mr. McGee directly, and do not render his disclosed work experience false or misleading.  (Opp. at 14-15.)

Plaintiffs then argue that "[t]hese omitted facts made those filings materially misleading because '[t]he integrity of management is always of importance to investors.'"  (Opp. at 15.) Putting aside Plaintiffs' failure to connect the alleged omissions to specific statements, the cases Plaintiffs cite analyze only the materiality of integrity concerns involving conduct *at the specific company* the plaintiffs invested in.  *See Siemers v. Wells Fargo & Co.*, 2007 WL 1140660, at *8 (N.D. Cal. Apr. 17, 2007) (allegations of misappropriating the common fund); *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134 (E.D.N.Y. 2008) (allegations of a fraudulent stock option backdating scheme within the company).  In any event, "the failure to disclose material information does not amount to an actionable misrepresentation, absent a duty to disclose." *Fries v. N. Oil & Gas, Inc.*, 354 F. Supp. 3d 384, 390 (S.D.N.Y. 2018) [hereinafter *Fries II*].

The facts here are much more analogous to those in *Fries v. Northern Oil & Gas, Inc.*, 285 F. Supp. 3d 706 (S.D.N.Y. 2018) [hereinafter *Fries*].  In *Fries*, plaintiff argued that defendants misled investors by emphasizing in disclosures its CEO's knowledge and experience in the industry as well as his importance to the company,[19] but omitting facts concerning his

---

[18] *See* Compl. ¶¶ 3, 15-17, 79, 137, 145.

[19] In a footnote, Plaintiffs claim that Mr. McGee was the "source of AdaptHealth's acquisition revenue" and, thus, Defendants were required to disclose that he was engaged in alleged improper activities. Opp. at 15 n.5 (citing *Teamsters Local 456 Pension Fund v. Universal Health Servs.*, 396 F. Supp. 3d 413, 457-458 (E.D. Pa. 2019)). Plaintiffs cite no case law in which an individual was found to be such a source. In any event, in *Universal Health*, the court held that defendants attributed their success to "high occupancy rates," which was allegedly artificially inflated by improper practices. *Id.* at 458-459. Accordingly, the "affirmative characterizations of the source driving the company's performance" were only potentially rendered misleading because the alleged misconduct was directly responsible for the company's performance. *Id.* Putting aside

- 11 -

alleged fraudulent activity with a wholly unrelated company that he owned. *Id.* at 712, 718-19. With respect to this alleged misconduct, the company's CEO received a Wells Notice and was immediately thereafter terminated, resulting in a stock drop. *Id.* at 712. The *Fries* court granted defendants' motion to dismiss because, like here, the alleged omitted facts did not undermine the CEO's knowledge or pedigree and none of the statements suggested that he was not engaged in any of the undisclosed misconduct so as to be rendered misleading. *See id.* at 719-20.

Plaintiffs' attempt to distinguish this case is puzzling. (Opp. at 15 n.5.) In a footnote, Plaintiffs claim that *Fries* actually "supports [their] allegations" because there "the company actually disclosed an SEC investigation into its CEO." (*Id.*) However, there is nothing in the *Fries* court's opinion that even references any prior disclosure of the investigation, let alone that such disclosure played any role in the court's decision. In fact, the *Fries* court expressly stated that defendants had no duty to disclose anything concerning the SEC's investigation into the CEO's alleged misconduct with an unrelated company. 285 F. Supp. 3d at 719. Plaintiffs seemingly seek to confuse the Court by conflating the allegations and ultimate holdings in *Fries* and *Fries II*, the latter of which involved newly pled allegations that disclosure of the SEC investigation itself was misleading because it did not disclose the full extent of the CEO's involvement in the unrelated company or his alleged participation in the purportedly fraudulent conduct. *See Fries II*, 354 F. Supp. 3d at 391-392. But even applying *Fries II* to the present facts completely undermines Plaintiffs' argument. According to the *Fries II* court's decision, even if Defendants had disclosed Mr. McGee's affiliation with North Channel Bank, including that North Channel Bank was subject to various investigations, Defendants still would not have

whether Mr. McGee can be classified as the "source of AdaptHealth's acquisition revenue"—which is a stretch—even if the allegations against Mr. McGee were true, his misconduct (entirely unrelated to AdaptHealth or its business) is not alleged to have had an effect on AdaptHealth's performance. Thus, this argument fails.

- 12 -

any obligation to disclose Mr. McGee's uncharged and unadjudicated participation in any purported wrongdoing. *Id.* at 392-393 (holding that "a reasonable investor would not interpret [a company's] description of [its CEO] as an 'initial investor' of [an unrelated company]—an accurate description—to preclude [the CEO] from having done criminal acts" and thus the "statements did not amount to a denial of illegal conduct" rendering it false or misleading).[20]

Nevertheless, it is undisputed that once AdaptHealth was ultimately made aware of Mr. McGee's alleged misconduct, and that he would be indicted by the Danish authorities, AdaptHealth placed Mr. McGee on an indefinite unpaid leave and initiated an internal investigation, which ultimately led to Mr. McGee's resignation. (MTD at 16, 29.) Throughout the class period, AdaptHealth cautioned "it is highly dependent on the performance and continued efforts of its senior management team" and that "[i]t is possible that AdaptHealth will lose some key personnel, the loss of which could negatively impact our operations and profitability." (*Id.* at 17, 29.) AdaptHealth thus put investors on notice of the potential risks that could (and did) materialize. Plaintiffs' claims that such risk disclosures were themselves

---

[20] Plaintiffs' allegations that "Defendants' failure to disclose McGee's central role in the tax scheme also rendered their [SOX] certifications false and misleading" similarly fails. Opp. at 15-16. To begin, Plaintiffs for the first time challenge the Executive Defendants' SOX certification that "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting" has been disclosed to AdaptHealth's auditors and the audit committee. *Id.* However, it is well settled that to state a claim based on this certification, plaintiffs must "allege with particularity the basis for the belief that the individual defendants did not disclose the [alleged fraud] to [the company's] auditors and its audit committee." *See, e.g., In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 363 (S.D.N.Y. 2008). Here, the Complaint contains no allegations as to whether any alleged fraud was disclosed to the auditors nor the actions and obligations of the auditors, and thus the argument cannot be sustained. In any event, the case on which Plaintiffs rely is easily distinguishable. In *MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, 2019 WL 5394011 (M.D. Fla. Oct. 16, 2019), *reported adopted by* 2020 WL 1072582 (M.D. Fl. Feb. 14, 2020), the purported fraud allegedly not disclosed to auditors involved a "pump and dump" scheme perpetrated by management in connection with the defendant company. *Id.* at *11. Here, the alleged fraud was entirely unrelated to AdaptHealth and AdaptHealth's business, and thus not required to have been disclosed in order to comply with SOX certifications. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 654 (S.D.N.Y. 2017) (acknowledging that a substantively identical SOX certification "could fairly be read to encompass only fraud that is related to [the internal controls over financial reporting]" within the company itself).

misleading is unconvincing.[21] (Opp. at 19.) It is true that "[r]isk disclosures are actionable half-truths when the company warns about a risk that could have an impact on its business when, in fact, that risk has already materialized." *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 536 (S.D.N.Y. 2020). However, whether Mr. McGee's departure was "imminent" or "entirely predictable" is conclusory and "insufficient to render the risk disclosures misleading." *Id*. at 537. Even if the risk of Mr. McGee's departure increased as allegations of misconduct escalated, these disclosures were not misleading because "they never quantified the likelihood that [he] would depart, whether under a cloud or voluntary. An increase in risk does not mean the risk has already come to pass, such that a disclosure that simply identifies the risk would be misleading. It cannot be that every time a risk increases or decreases, a company must precisely quantify the increase or decrease in its disclosures identifying that risk." *Id*. at 538.

### 2.    **No Rule or Regulation Created an Independent Duty to Disclose**

Having failed to sufficiently plead that AdaptHealth had a duty to disclose Mr. McGee's alleged misconduct in order to not render certain of its disclosures false or misleading, Plaintiffs additionally allege that an independent duty to disclose these alleged facts exists under Regulation S-K, Items 401(e)(1) and 401(f)(2).[22] (Opp. at 16-17.) These allegations also fail.

*First*, Plaintiffs contend that Item 401(e)(1) "requires disclosure of [the CEO's] prior work experience and *competence*."[23] (Opp. at 16-17.) As Plaintiffs correctly describe, Item

---

[21] The cases Plaintiffs cite do not support their position. In fact, *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821 (N.D. Ind. 2018), does not even involve any allegations of a false or misleading risk disclosure and *Comverse* addresses only the materiality element. *See In re Comverse*, 543 F. Supp. 2d at 151.

[22] Plaintiffs acknowledge that Item 103 did not create an independent duty to disclose. Opp. at 18 ("[S]tatements on the issue [within the Company's legal proceedings], however, can still be misleading (and actionable) even if Regulation S-K did not impose a duty to disclose."). In any event, any such claim fails for the reasons set forth in the Motion to Dismiss. *See* MTD at 28-29 n.117.

[23] Plaintiffs oddly choose to highlight (in bold) the word "competence" when Item 401(e)(1) clearly states that the duty to disclose information about an executive's "competence" extends only to executives who have been "employed by the [company] . . . for less than five years," which does not apply to Mr. McGee. *See* 17 C.F.R. § 229.401(e)(1); *N.J. & its Div. of Inv. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1137 (D. Kan. 2004).

- 14 -

401(e)(1) requires registrants to "describe the business experience during the past five years of each . . . executive officer . . . including [ ] each person's principal occupations and employment during the past five years . . . [and] [i]f material . . . more than the past five years." 17 C.F.R. § 229.401(e)(1). But Plaintiffs again conflate "business experience" with personal business ventures. The regulation very clearly identifies that the type of information it contemplates are "principal *occupations* and *employment*." *Id.* (emphasis added). Unsurprisingly, both cases Plaintiffs cite involve instances of a failure to disclose information related to an executive's former employment. *See Snellink*, 870 F. Supp. 2d at 940 (alleging failure to disclose previous employment as CFO at prior firm); *In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *16 (N.D. Cal. Oct. 31, 2014) (alleging failure to disclose basis for termination from prior company). Contrary to Plaintiffs' position, "[n]othing in the language of the regulation suggests that [D]efendants were required to disclose information about the financial affairs of [Mr. McGee]." *See Sprint Corp.*, 314 F. Supp. 2d at 1137 (no duty to disclose executives' improper tax shelters).

*Second*, Item 401(f)(2) requires disclosures if a director or officer "was convicted in a criminal proceeding or is a named subject of a pending criminal proceeding . . . during the past ten years and that [is] material to an evaluation of the ability or integrity of any director . . . or executive officer of the registrant." 17 C.F.R. § 229.401(f)(2). Plaintiffs, admitting (as they must) that Mr. McGee has not been "convicted in a criminal proceeding," focus on whether Mr. McGee was a "named subject" of a pending criminal proceeding. (Opp. at 17 & n.6.) However, once again, Plaintiffs' efforts are meritless. To begin, regardless of whether Mr. McGee can be said to have been named in the lawsuits filed by the foreign tax authorities in the U.S.—and he certainly cannot—those actions are inarguably *civil lawsuits* and not subject to Item 401(f)(2). Similarly, while it is alleged that Mr. McGee agreed to a settlement with Danish tax authorities,

- 15 -

there are no particularized allegations that this was the result of any criminal investigation or proceeding.[24]  Indeed, outside of the eventual indictment, the only particularized allegation of any criminal investigation or penalty was the purported "criminal fine" imposed on North Channel Bank itself.[25]  Plaintiffs allege no particularized facts supporting that Mr. McGee was himself a named subject or target of any criminal investigation at the time of any of the challenged statements.  It is not enough that Mr. McGee be affiliated with a company that is the subject of a pending criminal investigation; he himself must have been named specifically.  *See United States v. Yeaman*, 194 F.3d 442, 450 (3d Cir. 1999) (explaining the significant distinction between "named subject" in Item 401(f)(2) and "subject" in Item 401(f)(3) & (4)).

## II.   NO STRONG INFERENCE OF SCIENTER IS PLED

Scienter is an essential element of a § 10(b) claim.  And yet, fatally, the allegations of the Complaint, taken as a whole, fail to give rise to a cogent inference of scienter.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).  Plaintiffs have failed to (i) allege a plausible motive (MTD at 31-35), (ii) plead particularized facts giving rise to a strong inference that any purported misstatements were made with the requisite scienter (*id*. at 30-31), and (iii) show that an inference of scienter is at least as compelling as an inference of non-fraudulent intent (*id*.).  Because nothing in the Opposition changes that result, dismissal remains warranted.

### A.   <u>Plaintiffs Allege No Plausible Motive to Commit Securities Fraud</u>

In a clear attempt to obfuscate the fact that their Complaint fails to adequately plead motive and opportunity, Plaintiffs implore that "the absence of a motive allegation is not fatal." (Opp. at 36.)  That is a straw man.  Plaintiffs confusingly purport that Defendants rely solely on this failure while simultaneously citing Defendants' statement expressly claiming that the

---

[24] *See* Compl. ¶¶ 3, 15, 79.
[25] *See id*. ¶¶ 3, 17-18, 87, 137-138, 145.

absence of such a motive is merely "*a significant factor* undercutting an inference of scienter." (*Id.* (emphasis added).) Nothing in the Opposition can refute this well-established principle.

Plaintiffs propound two theories that allegedly "contribute to a strong inference of scienter": (i) two stock sales during the class period, allegedly "suspicious in timing and amount," and (ii) AdaptHealth's secondary offering. (Opp. at III.E.3.) Neither is compelling.

### 1.    **Mr. McGee's Stock Sales Were Not Suspicious in Timing or Amount**

As described in the Motion to Dismiss, neither of Mr. McGee's challenged stock sales were suspicious in timing nor amount in light of the context in which they were made and, importantly, in light of the contemporaneous disclosures surrounding them. (*See* MTD at 32-35.) Plaintiffs allege that whether such sales were suspicious or not is a "factual issue inappropriate for resolution on a motion to dismiss." (Opp. at 37.) This ignores well settled law that courts must consider plausible opposing inferences to determine whether pleaded facts meet the PSLRA's strong inference standard. *See Tellabs*, 551 U.S. at 324. It also ignores the express, contemporaneous disclosures as to the purpose of each sale, which leave nothing to question.

*First*, various Form 4s filed with the SEC make clear that Mr. McGee had engaged in several share exchanges throughout the class period, including three others on the day of the first challenged sale. (MTD at 32-33.) *Second*, the Form 4 describing the first challenged sale specifically provides that AdaptHealth "elected to deliver cash in lieu of shares of Class A Common Stock." (*Id.* at 33.) *Third*, Plaintiffs overlook AdaptHealth's disclosure in its Form 10-K that this cash delivery was made "in order to provide for the payment of capital gains tax obligations" incurred by Mr. McGee resulting from other exchanges on the very same day.[26]

---

[26] Plaintiffs' argument that stock sales to cover tax liabilities are still indicative of scienter is misplaced and defies reason—exercising options and paying taxes are inherently legitimate reasons to sell stock. *See In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 611 (E.D. Pa. 2009) ("sales to cover tax liabilities . . . weigh[ ] against an inference of scienter"); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).

(*Id.*) *Finally*, pursuant to the MOU in connection with Mr. McGee's resignation, it was contemplated and agreed that Mr. McGee would sell shares of AdaptHealth stock to fund "the exercise price and withholding taxes due upon exercise" of his vested options—which resulted in the second challenged stock sale.[27] (MTD at 34.) Plaintiffs contention that Mr. McGee's post-resignation stock sale is inconsistent with cases finding that stock sales upon an executive's departure are customary (MTD at 33-34) because Mr. McGee was allegedly "forced out following his indictment" (Opp. at 37-38) is factually incorrect (and irrelevant)—Mr. McGee did resign and none of the cases draws such a distinction.[28] (*See* MTD at 16.)

### 2. AdaptHealth's Secondary Offering Does Not Provide a Motive

In its Opposition, Plaintiffs present a new (but unoriginal) theory—not alleged in the Complaint—that AdaptHealth's "secondary offering [itself] provided yet another motive to mislead investors." (Opp. at 39.) However, this theory ignores long-standing Third Circuit precedent finding alleged motives of scienter in securities fraud actions, like those proffered here, "that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a ***concrete and personal benefit*** to the individual defendants resulting from this fraud." (MTD at 31 (emphasis added).) As another court elaborated: "Any potential motive to keep the share price high in order to have a more successful placement is just an example of a generalized motive that any officer or director who desires to operate a successful company will have." *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 469 (S.D.N.Y. 2008) (secondary placement reaping over $1 billion for company was insufficient).

---

[27] Plaintiffs argue that Mr. McGee's lack of knowledge that the Short-Seller Report would be issued is a "red herring." Opp. at 38. However, Plaintiffs put timing squarely at issue when they alleged the stock sale occurred "shortly before the corrective disclosures alleged herein." Compl. ¶ 147. Accordingly, Mr. McGee's lack of knowledge weighs against an inference of scienter.

[28] Plaintiffs admit that they have failed to plead any inference of motive as to the other Executive Defendants or the Company. *See* Opp. at 38; *see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) ("[T]he fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive.")

Instead, Plaintiffs cite cases—representing a limited exception to the principle that the need to raise capital does not provide a motive—that have no application here. (*See* Opp. at 39 & n.26.) In each of these cases, plaintiffs alleged with particularity a personal benefit the individual defendants received through the offering or an unusual or discrete need for the company to raise capital.[29] However, Plaintiffs here fail to plead any unusual need for financing, or any particular personal benefit to the Executive Defendants resulting from the offering. As AdaptHealth explained at the time of the offering, the money was raised not to keep AdaptHealth afloat, but to finance the anticipated AeroCare acquisition, and for general corporate purposes.[30]

Accordingly, the Opposition does not revive the Complaint's failure to establish any inference of scienter through motive and opportunity.

B.  **Plaintiffs Fail to Allege Conscious Misbehavior or Recklessness**

Where, as here, the motive behind the supposed fraud "is not apparent," the "strength of the circumstantial allegations [of fraudulent intent] must be correspondingly greater." (MTD at 35.) However, the Opposition only further demonstrates Plaintiffs' failure to establish scienter.

1.  **Statements Relating to AdaptHealth's Reporting of Organic Growth**

Abandoning the theory pled in the Complaint that Defendants intentionally or recklessly misled investors by reporting a "pro forma revenue growth metric" that contravened industry

---

[29] For example, in *In re American Bank Note Holographics, Inc. Securities Litigation*, 93 F. Supp. 2d 424 (S.D.N.Y. 2000), the court held that the company was motivated to make statements or omit facts that would result in a higher price because of the unusual situation in which it was effectuating a spin-off and the proceeds could resolve its debt problems. *Id.* at 432, 444. *See also In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 813 (C.D. Cal. 2012) (financing arrangement conditioned on stock price created non-generic motive); *In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923 at *12 (N.D. Cal. Aug. 10, 2005) (funding necessary to keep defendant a "going concern"). Relatedly, in *Curran v. Freshpet, Inc.*, 2018 WL 394878 (D.N.J. Jan. 12, 2018), plaintiffs alleged that defendants sold personally-held common stock in the secondary offering, earning gross proceeds of $131.1 million. *Id.* at *2. *See also Gargiulo v. Isolagen, Inc.*, 527 F. Supp. 2d 384, 390 (E.D. Pa. 2007) (allegations that individual defendants sold their securities at the time of the offering for "a considerable gain"); *In re Enzymotec Sec Litig.*, 2015 WL 8784065, at *17 (D.N.J. Dec. 15, 2015) (same).

[30] *See* Ex. 52 at S-11.

- 19 -

standards[31] (Opp. at 35 ("This case does not involve a . . . [f]ailure to follow industry standards")), Plaintiffs argue that scienter can be inferred from allegedly inadequate disclosures concerning the change in methodology that obscured the Company's actual organic growth trends. (*Id.*) Such arguments are unavailing.

*First*, Plaintiffs argue that, by virtue of their positions, the Executive Defendants had "direct access to the individual components of AdaptHealth's revenue," which allegedly contradicted AdaptHealth's reported "pro forma organic growth" metric. (*Id.* at 32.) "If plaintiffs rely on allegations that defendants had access to facts contradicting their public statements, the plaintiffs must 'specifically identify the reports or statements containing this information.'" *Stein*, 2014 WL 12767210, at *19; *see also In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *8, *12 (E.D. Pa. Mar. 25, 2020). Here, Plaintiffs have failed to detail with the required specificity the reports viewed by Defendants that contained inputs to the organic growth metric or allege any facts showing that information contained in such reports contradicted the publicly disclosed "pro forma growth" figures. *See Stein*, 2014 WL 12767210, at *19; *see also Fain v. USA Techs., Inc.*, 707 F. App'x 91, 96 (3d Cir. 2017).[32]

*Second*, Plaintiffs' attempt to bolster their scienter allegations through the "core business" doctrine likewise fails. The core operations doctrine does not allow a plaintiff to conjure a strong inference of scienter simply by tying purported misstatements to an important metric. (*See* MTD at 38.) Instead, Plaintiffs must provide an "additional allegation of specific

---

[31] Plaintiffs were smart to do so. In *Stein*, the court held that "even assuming that the Defendants had access to the information from which their organic growth calculation was made, there are insufficient pleadings to show that they were acting recklessly by adopting a more liberal construction of the term, rather than the conservative definition espoused by the Plaintiff." 2014 WL 12767210, at *19.

[32] Plaintiffs' citations in support are misplaced. In *Utesch v. Lannett Co.*, 385 F. Supp. 3d 408 (E.D. Pa. 2019), which concerns an alleged price-fixing scheme, plaintiffs do plead particularized allegations of specific information conveyed, including phone calls and meetings directly before raising prices. *Id.* at 422-423. Similarly, in *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *16 (D.N.J. Aug. 28, 2017), plaintiffs allege defendants received specific feedback from the FDA undermining public disclosures. *Id.*

information conveyed to management and related to the alleged fraud" to signal fraudulent intent. (*Id.*) Plaintiffs have not done so. Their attempt to point to the Executive Defendants' "signatures on AdaptHealth's SEC filings [to] confirm their direct access to truth" is unconvincing and wholly unsupported. (Opp. at 34 n.22); *see In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 356-57 (D.N.J. 2007); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1265-66 (11th Cir. 2006) (filing certifications are "only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements.").

*Finally,* Plaintiffs claim that AdaptHealth "purposely sought and took steps to hide the truth" from investors by amending revenue disclosures in its SEC filings. (Opp. at 33.) However, this argument rests on a fundamental misunderstanding of AdaptHealth's disclosures – AdaptHealth's modifications actually ***increased*** the information made available to investors.[33] (*See* MTD at 36.) Contrary to Plaintiffs' contentions, prior to Q1 2021, AdaptHealth only reported in its financial statements net revenue from all ***material*** acquisitions, which was later amended to report revenue from "all acquisitions." (*Id.* at 13.) Thus, until this change, it was not possible for investors to just deduct acquisition revenue from total net revenue in order to calculate a "traditional" organic growth number, since such a calculation would have undersold AdaptHealth's acquisition revenue. Similarly, Plaintiffs' assertion that AdaptHealth's reasoning for the change was false because AdaptHealth had "operated that way" before, and provided that information again after the class period, conflates AdaptHealth's operations with its reporting. (Opp. at 33-34.) AdaptHealth has never operated in the classic same-store sense, and thus, its

---

[33] Moreover, Plaintiffs' claim that Defendants' post-class period remedial measures create a compelling inference that Defendants acknowledged their statements misled investors is unpersuasive. *See* Opp. at 35; *but see* MTD at 15 n.73. This ignores that AdaptHealth has maintained that its pro forma calculation provides the most comprehensive measure of its revenue growth (*see* MTD at 4) and, thus, this increased disclosure actually cuts against an inference of scienter. *See Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 505 (E.D. Va. 2018) ("To argue that a publicly reported accounting practice is fraudulent is to adopt the unsupportable conclusion that you can deceive the public while simultaneously telling the public exactly what you are doing.").

decision to change its reporting to a "pro forma growth" methodology was made in an attempt to more accurately and comprehensively reflect the Company's actual revenue growth.[34] (MTD at 12.) Moreover, Plaintiffs' claim that the change was an "overt attempt to hide the truth about contracting revenue from organic sources" ignores unprecedented pandemic-related disruptions that negatively impacted AdaptHealth's "organic" business. (Opp. at 33.)

### 2. Purported Omissions Relating to Mr. McGee's Alleged Misconduct

Unable to point to any particularized allegations that Messrs. Griggs or Clemens actually knew that any of the alleged omissions rendered AdaptHealth's disclosures misleading when they were made, Plaintiffs turn to "circumstances surrounding McGee's termination" to infer scienter—i.e., the Co-CEO arrangement and Mr. McGee's "effective termination." (Opp. at 31-32.) However, such conclusory allegations lack the required specification giving rise to strong circumstantial evidence of actual knowledge. (MTD at 39.) Specifically, the claim that Mr. McGee's "effective termination" was an "undeniably reactionary decision if the Board was not previously aware of McGee's predicament" ignores the facts (and the calendar). (Opp. at 31.)

As Defendants' disclosed, once AdaptHealth learned about Mr. McGee's impending indictment, it placed him on leave and retained a law firm to conduct an independent, internal investigation.[35] (*See* MTD at 5, 16, 29.) After a nearly two-month investigation, and a finding "with a high degree of confidence that [AdaptHealth] had no involvement in, or connection to,

---

[34] Plaintiffs ignore Defendants' argument that they have failed to plead sufficient facts from which the unnamed individuals cited in the Short-Seller Report can support an inference of scienter. MTD at 37-38. Instead, Plaintiffs seek to defend the credibility of the Short-Seller Report itself – which misses the point. Moreover, the Court should disregard Plaintiffs' conclusory and unsupported contention that its own expert has validated the allegations in the Complaint, which is wholly inappropriate to meet a pleading standard, least of all the heightened pleading standard under the PSLRA. *See* Opp. at 34 n.21.

[35] Plaintiffs' attempt to refute this point with an alleged admission of knowledge of Mr. McGee's "problems in Denmark" by a former member of AdaptHealth's Board does nothing to change the outcome. Opp. at 31. Putting aside that this was not alleged in the Complaint, federal courts have held that "it is insufficient to separately allege misstatements by some individuals and knowledge belonging to some others where there is no strong inference that, in fact, there was a connection between the two." *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 440-41 (S.D.N.Y. 2017).

Mr. McGee's alleged conduct," AdaptHealth and Mr. McGee reached an agreement that Mr. McGee would resign from all positions—this was hardly "reactionary." (*Id*. at 16.) Moreover, any inference of scienter as to the Co-CEO arrangement is defeated by the much more likely competing inference that the decision to bring on a Co-CEO—one with significant experience upon acquiring his former company—was for a legitimate business purpose. (*Id*. at 39-40.)

Accordingly, Plaintiffs can only theoretically establish a strong inference of scienter as to AdaptHealth through Mr. McGee. (*Id*. at 40.) Nothing in the Opposition establishes such an inference. Plaintiffs argue that Mr. McGee's knowledge of Denmark's investigation, including his alleged settlement with tax authorities and the fine levied on North Channel Bank, and its civil actions in the U.S. against various pension plans "ends the [scienter] analysis for McGee and AdaptHealth." (Opp. at 30.) This misses the point entirely. None of these allegations relates at all to AdaptHealth or suggests any cognizable inference that Mr. McGee intended to mislead AdaptHealth's shareholders. (MTD at 40.) Rather, Plaintiffs are advancing the circular and self-defeating argument that scienter is predicated on the purported failure to disclose allegedly material information—which they have failed to plead. *See In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 24 (S.D.N.Y. 2016). The fact remains that once Mr. McGee received the indictment, AdaptHealth placed him on leave, and initiated an internal investigation that ultimately resulted in his resignation. (MTD at 29.) This undermines scienter. *See City of Brockton Ret. Sys. v. Avon Prods., Inc.*, 2014 WL 4832321, at \*24 (S.D.N.Y. Sept. 29, 2014) (commencement of internal investigation tends to undermine any inference of scienter).

Plaintiffs, therefore, have not established—nor can they—a strong inference of scienter as to AdaptHealth or any of the Executive Defendants with respect to these claims.[36]

---

[36] Plaintiffs' Section 20(a) claim should similarly be dismissed because Plaintiffs have failed to allege a primary violation under Rule 10b-5, as shown above. *See also* MTD at 42-43; Opp. at 45.

### III.   PLAINTIFFS HAVE FAILED TO ADEQUATELY PLEAD LOSS CAUSATION

Plaintiffs fail to plead loss causation because neither of the events they call a "corrective disclosure"—the April 13 Release or the Short-Seller Report—revealed the truth about a previously undisclosed falsehood. (*See* MTD at 41-42.) That pleading defect entitles Defendants to dismissal; it is not (as Plaintiffs would have it (*see* Opp. at 40 n.27)) a fact-intensive inquiry for trial. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-48 (2005).

For example, the April 13 Release did not reveal any wrongdoing or fraud that corrected any prior misstatements. Rather, it simply disclosed that Mr. McGee now has been charged by a foreign government of criminal misconduct and was placed on unpaid leave. (*See* MTD at 42.)

Similarly, the Short-Seller Report was not a corrective disclosure because it contains untrue wild speculation. (*See id.*) Moreover, federal courts have held that "a negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure" for purposes of the loss causation analysis. *See, e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010); *see also In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 270-271 (3d Cir. 2005) (analysis of publicly available information was not a corrective disclosure even when it conducted complex mathematical calculations); *Meyer v. Greene*, 710 F.3d 1189, 1197-98 (11th Cir. 2013). Plaintiffs ignore that the material portions of the Short-Seller Report are gleaned entirely from publicly available information. *Id.* at 1199 (corrective disclosures based on public information would allow "every investor who suffers a loss in the financial markets to sue under § 10(b) using an analyst's negative analysis of public filings").

### IV.   THE 1933 ACT CLAIMS SHOULD BE DISMISSED

Plaintiffs contend that, in the Third Circuit, 1933 Act claims are always governed by the notice pleading standard set forth in Federal Rule of Civil Procedure 8(a), so long as the complaint "plead[s] strict liability and negligence in a separate section while disclaiming

- 24 -

allegations of fraud." (Opp. at 44-45.) This ignores long-standing Third Circuit precedent holding that a "one-sentence disavowment of fraud contained within Plaintiffs' section 11 Count . . . does not require us to infer that the claims are strict liability or negligence claims, and in this case is insufficient to divorce the claims from their fraudulent underpinnings." *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 160-61 (3d Cir. 2004) [hereinafter *CALPERS*]; *see also In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 577 (E.D. Pa. 2009).[37]

Instead, this Court must look past the self-serving disclaimer and assess whether "a core theory of fraud permeates the entire Complaint and underlies all of Plaintiffs' claims." *CALPERS*, 394 F.3d at 160. And where, as here, the "linchpin of plaintiffs' action is their allegations that the Defendants knowingly and intentionally . . . issued a series of false and misleading statements . . . and omitted critical information" from stockholders, the allegations sound in fraud and must meet the heightened Rule 9 pleading standard. *Id.* If the fact that identical alleged false statements in the offering materials were being challenged to support both the 1934 Act and 1933 Act claims was not enough, the opening line of Plaintiff's Opposition gives the game away: "This case involves outright deception." (Opp. at 1.)

Even so, regardless of which pleading standard applies, the 1933 Act claims should be dismissed for failure to plead a material misstatement or omission.[38] (*See* MTD at 26-30, 43-45.)

## CONCLUSION

For the reasons stated above, the Complaint should be dismissed with prejudice.

---

[37] The Third Circuit, in *Suprema*, expressly held that it was adopting "a position that is consistent with . . . *Shapiro* and *CALPERS*." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 274 (3d Cir. 2006).

[38] Because Plaintiffs have failed to allege a primary violation under Section 11 or 12(a)(2) as shown above, their Section 15 claim must also be dismissed. *See* MTD at 45; Opp. at 44-45.

Dated: April 15, 2022

SAXTON & STUMP

By: /s/ Steven D. Costello_____
Steven D. Costello  (No. 37288)
100 Deerfield Lane, Suite 240
Malvern, Pennsylvania   19355
(484) 328-8500

WILLKIE FARR & GALLAGHER LLP
Todd G. Cosenza (admitted *pro hac vice*)
Vincent P. Iannece (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York   10019-6099
(212) 728-8000

*Attorneys for Defendants*