**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM and BUCKS COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiffs,<br><br>v.<br><br>ADAPTHEALTH CORP. f/k/a DFB HEALTHCARE ACQUISITIONS CORP., LUKE MCGEE, STEPHEN P. GRIGGS, JASON CLEMENS, FRANK J. MULLEN, RICHARD BARASCH, JOSHUA PARNES, ALAN QUASHA, TERENCE CONNORS, DR. SUSAN WEAVER, DALE WOLF, BRADLEY COPPENS, and DAVID S. WILLIAMS III,<br><br>               Defendants. | Civ. Action No. 2:21-cv-03382-HB<br><br>Hon. Harvey Bartle III<br><br>**ORAL ARGUMENT REQUESTED** |

<u>**THE ADAPTHEALTH DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO LEAD PLAINTIFFS' MOTION TO CERTIFY CLASS**</u>

**TABLE OF CONTENTS**

Page

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ...........................................................................................v

TABLE OF ABBREVIATIONS .................................................................................. xvi

PRELIMINARY STATEMENT .....................................................................................1

BACKGROUND .............................................................................................................6

I.      OVERVIEW OF PROCEEDINGS.....................................................................6

II.     LEAD PLAINTIFFS' ALLEGATIONS..............................................................9

        A.      The Organic Growth Action (Exchange Act Claims)...............................9

        B.      The McGee Tax Action (Exchange Act & Securities Act Claims). .......10

III.    SUMMARY OF EVIDENCE............................................................................11

        A.      Lawyer-Driven Origins Of This Action..................................................11

        B.      Lead Plaintiffs' Questionable Trading History.......................................12

                1.      Lead Plaintiffs' Investment Decisions Were Made By Emerald. ..............12

                2.      Lead Plaintiffs Were Sophisticated, Valuation-Driven Investors. ..............13

                3.      Lead Plaintiffs Rarely Owned AdaptHealth Stock....................................14

        C.      Lead Plaintiffs' Lack Of Damages Methodology And Damages. ..........15

                1.      Dr. Cain Does Not Know How To Calculate Damages. .............................15

                2.      Lead Plaintiffs Had No Losses During The Organic Growth Period..........16

        D.      Lead Plaintiffs' Lack Of Reliance. ........................................................17

                1.      None Of Lead Plaintiffs' Purchases Of AdaptHealth Stock Were Based Upon Or Because Of The Alleged Misrepresentations. ..............................17

                2.      The Market For AdaptHealth Stock Was Not Efficient. ............................19

                3.      The Organic Growth Statements Had No Price Impact. ............................21

                        a.      No Evidence Of Price Reaction. ....................................................21

b.     Nothing New Revealed By The Jehoshaphat Report......................22

c.     No Link To The July 19, 2021 Price Decline. ..............................24

4.     The Miscellaneous Statements Had No Price Impact. ...............................25

a.     No Nexus To The April 13 Press Release. ...................................25

b.     No Evidence Of Price Reaction When Made. ..............................27

c.     No Link To The April 13, 2021 Price Decline. ...........................27

E.     Lead Plaintiffs' Inability To Represent The Putative Class...................................30

1.     Lead Plaintiffs Do Not Control This Litigation. ........................................30

2.     Lead Plaintiffs Disagree With The Amended Complaint. ..........................31

3.     Lead Plaintiffs Cannot Independently Represent Any Class. .....................32

4.     Lead Plaintiffs Want Any Class To Be Prioritized Over Themselves. .......32

F.     Lack of Traceability Of Lead Plaintiffs' AdaptHealth Stock. ...............................33

LEGAL STANDARD........................................................................................................34

ARGUMENT ....................................................................................................................35

I.     THE COURT SHOULD NOT CERTIFY ANY CLASS FOR LEAD PLAINTIFFS' EXCHANGE ACT CLAIMS. .........................................................................................35

A.     Lead Plaintiffs Must Demonstrate That The McGee Tax Issue And The Organic Growth Issue Are Independently Entitled To Class Certification. ........................35

B.     Lead Plaintiffs Cannot Satisfy The Predominance Requirement Of Rule 23(b)(3) For Their Exchange Act Claims.......................................................36

1.     Lead Plaintiffs Have Failed To Establish Classwide Reliance. ..................36

a.     Lead Plaintiffs Are Not Entitled To The *Basic* Presumption. .......38

i.     The Presumption's Requirements Are Not Satisfied.........38

(1)     The Market For AdaptHealth Stock Was Not Efficient For The Entire Putative Class Period......39

(2)     Lead Plaintiffs Did Not Purchase AdaptHealth Stock During The Organic Growth Period. ...........40

ii.    The Presumption Is Rebutted By Price Impact Evidence. .41

(1)    Organic Growth Statements Had No Price Impact. ...................................................................42

(2)    Miscellaneous Statements Had No Price Impact. ...46

(a)    No Front-End Impact. ...............................46

(b)    No Back-End Impact. ...............................47

(c)    Actual Cause Of Price Decline. .................50

b.    Lead Plaintiffs Cannot Invoke The *Affiliated Ute* Presumption. ...51

i.    The Organic Growth Action. ............................................52

ii.    The McGee Tax Action. ....................................................53

iii.    Disclosure Of The Purportedly Omitted Information Would Not Have Affected Lead Plaintiffs' Purchases. .....56

c.    Absent Either Presumption Of Reliance, Individual Issues Of Reliance Predominate, Preventing Class Certification. .................57

2.    Lead Plaintiffs Have Failed To Establish That Damages Can Be Measured On A Classwide Basis. ............................................................58

C.    Lead Plaintiffs Are Not Adequate Representatives Of The Proposed Class As Required By Rule 23(a)(4)......................................................................................61

1.    Lead Plaintiffs Do Not Exercise Sufficient Control Over This Action.......61

2.    Lead Plaintiffs Have An Incurable Conflict Of Interest With The Proposed Class For The Organic Growth Action.......................................63

D.    Lead Plaintiffs Are Not Typical Members Of The Proposed Class As Required By Rule 23(a)(3)......................................................................................64

1.    Lead Plaintiffs Are Not Eligible To Represent Both Proposed Classes......64

2.    Lead Plaintiffs Did Not Rely On Any Of The Alleged Misrepresentations......................................................................................65

3.    Lead Plaintiffs Were Likely Not Injured By The Alleged Frauds. .............68

E.    Any Proposed Class Must Be Narrower Than Lead Plaintiffs' Proposal.............68

-iv-

II.     THE COURT SHOULD NOT CERTIFY ANY CLASS FOR LEAD PLAINTIFFS' SECURITIES ACT CLAIMS. ......................................................................................70

        A.      Lead Plaintiffs Lack Standing To Assert Their Securities Act Claims. .................70

        B.      Lead Plaintiffs Cannot Satisfy The Predominance Requirement Of Rule 23(b)(3) For Their Securities Act Claims........................................................73

        C.      Lead Plaintiffs Cannot Satisfy Numerosity As Required By Rule 23(a)(1). ..........74

        D.      Lead Plaintiffs Are Not Typical Or Adequate As Required By Rule 23(a)(3–4)..74

        E.      Any Proposed Class Must Be Narrower Than Lead Plaintiffs' Proposal..............74

CONCLUSION.............................................................................................................................75

CERTIFICATE OF SERVICE .....................................................................................................76

## TABLE OF AUTHORITIES

**CASES**                                                                                                                       **Page(s)**

*In re Aetna, Inc. Sec. Litig.*,
    617 F.3d 272 (3d Cir. 2010)..................................................................................................49

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972).................................................................................4, 36, 38, 41

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
    Civ. No. 20-200 (GAM), 2022 WL 3597200 (E.D. Pa. Aug. 23, 2022) ...........................28, 37

*Alpine 4 Holdings Inc. v. Finn Mgmt. GP LLC*,
    No. CV-21-01494 (PHX) (SPL), 2022 WL 3598246 (D. Ariz. Aug. 23, 2022) .....................40

*Ambac Assurance Corp. v. EMC Mortg. Corp.*,
    No. 08 Civ. 9464 (RMB) (THK), 2011 WL 566776 (S.D.N.Y. Feb. 8, 2011)........................66

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)...............................................................................................61, 64

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)..................................................................................37, 65, 66, 67

*Angelastro v. Prudential-Bache Sec., Inc.*,
    113 F.R.D. 579 (D.N.J. 1986).................................................................................37, 57

*In re Ariad Pharm. Sec. Litig.*,
    842 F.3d 744 (1st Cir. 2016)...................................................................................70

*Ark. Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    879 F.3d 474 (2d Cir. 2018),
    *remanding to In re Goldman Sachs Grp., Inc. Sec. Litig.*,
    No. 10 Civ. 3461 (PAC), 2018 WL 3854757 (S.D.N.Y. Aug. 14, 2018),
    *aff'd sub nom. Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    955 F.3d 254 (2d Cir. 2020),
    *vacated and remanded*, 210 L. Ed. 2d 347, 141 S. Ct. 1951 (2021),
    *vacated and remanded sub nom. Arkansas Tchr. Ret. Sys. v. Goldman Sachs
    Grp., Inc.*, 11 F.4th 138 (2d Cir. 2021),
    *remanding to In re Goldman Sachs Grp., Inc. Sec. Litig.*,
    579 F. Supp. 3d 520 (S.D.N.Y. 2021).......................................................................43

*Barnes v. Osofsky*,
    373 F.2d 269 (2d Cir. 1967)................................................................................70, 72

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988).................................................................................. *passim*

*Beck v. Maximus, Inc.*,
    457 F.3d 291 (3d Cir. 2006)..................................................................................64

*Beissinger v. Rockwood Comput. Corp.*,
    529 F. Supp. 770 (E.D. Pa. 1981) ..................................................................49, 52

*In re Bexar Cnty. Health Facility Dev. Corp. Sec. Litig.*,
    130 F.R.D. 602 (E.D. Pa. 1990)...........................................................................57

*In re BP P.L.C. Sec. Litig.*,
    MDL No. 10-md-2185 (KPE), Civ. No. 4:10-md-2185 (KPE),
    2013 WL 6388408 (S.D. Tex. Dec. 6, 2013)...................................................35, 60

*In re BP, P.L.C. Sec. Litig.*,
    758 F. Supp. 2d 428 (S.D. Tex. 2010) ..................................................................69

*Bunnion v. Consol. Rail Corp.*,
    108 F. Supp. 2d 403 (E.D. Pa. 1999),
    *aff'd sub nom. Bunnion v. Consol. RailCorp.*, 230 F.3d 1348 (3d Cir. 2000) ........................53

*In re CDNOW, Inc. Sec. Litig.*,
    138 F. Supp. 2d 624 (E.D. Pa. 2001) ...................................................................55

*In re Celgene*,
    Civ. No. 18-4772 (JMV), 2020 WL 8870665 (D.N.J. Nov. 29, 2020)....................41

*Chiarella v. United States*,
    445 U.S. 222 (1980)..............................................................................................53

*Chudner v. TransUnion Interactive, Inc.*,
    Civ. No. 09-CV-433 (ER), 2010 WL 5662966 (D. Del. Dec. 15, 2010)................58

*In re Cigna Corp. Sec. Litig.*,
    459 F. Supp. 2d 338 (E.D. Pa. 2006) ...................................................................69

*In re Citigroup, Inc. Sec. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004),
    *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*,
    165 F. App'x 928 (2d Cir. 2006) ..........................................................................55

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)..................................................................................54

*Clair v. DeLuca*,
    232 F.R.D. 219 (W.D. Pa. 2005) ..........................................................................65

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013),
*rev'g, Behrend v. Comcast Corp.*, 655 F.3d 182 (3d Cir. 2011)......................................1, 34, 58

*In re Comdisco Sec. Litig.*,
150 F. Supp. 2d 943 (N.D. Ill. 2001) .........................................................................................68

*In re Compaq Sec. Litig.*,
848 F. Supp. 1307 (S.D. Tex. 1993) ..........................................................................................47

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020)........................................................................................55

*Davis v. Bank of Am., N.A.*,
Civ. No. 13-4396 (PBT), 2016 WL 427049 (E.D. Pa. Feb. 3, 2016) .......................................36

*Davis v. Thornburgh*,
903 F.2d 212 (3d Cir. 1990).......................................................................................................72

*De Vito v. Liquid Holdings Grp., Inc.*,
Civ. No. 15-6969 (KM) (JBC), 2018 WL 6891832 (D.N.J. Dec. 31, 2018) ............................71

*Dewey v. Volkswagen Aktiengesellschaft*,
681 F.3d 170 (3d Cir. 2012),
*remanded sub nom. Dewey v. Volkswagen of Am.*,
909 F. Supp. 2d 373 (D.N.J. 2012) ............................................................................................63

*Dirks v. SEC*,
463 U.S. 646 (1983).....................................................................................................................66

*Dotson v. Portfolio Recovery Assocs., LLC*,
Civ. No. 08-3744 (NLS), 2009 WL 1559813 (E.D. Pa. June 3, 2009).....................................61

*In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*,
Civ. No. 3:17-cv-6436 (PGS) (DEA),
2019 WL 1299673 (D.N.J. Mar. 21, 2019)...........................................................................65, 66

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005),
*remanded sub nom. In re Dura Pharms., Inc. Sec. Litig.*,
452 F. Supp. 2d 1005 (S.D. Cal. 2006)......................................................................................65

*In re DVI Inc. Sec. Litig.*,
249 F.R.D. 196 (E.D. Pa. 2008),
*aff'd sub nom. In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011),
*abrogated on other grounds by Amgen Inc. v. Connecticut Ret. Plans & Tr.
Funds*, 568 U.S. 455 (2013)........................................................................................................37

*In re DVI, Inc. Sec. Litig.*,
　919 F. Supp. 2d 498 (E.D. Pa. 2013) .......................................................................53

*In re DVI, Inc. Sec. Litig.*,
　Civ. No. 2:03-cv-05336, 2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) ....................44

*In re EHang Holdings Ltd. Sec. Litig.*,
　21 Civ. 1392 (GBD), 2022 WL 17718546 (S.D.N.Y. Dec. 15, 2022) ....................44

*In re Elan Corp. Sec. Litig.*,
　543 F. Supp. 2d 187 (S.D.N.Y. 2008) ......................................................................54

*Erica P. John Fund, Inc. v. Halliburton Co.*,
　563 U.S. 804 (2011),
　*remanded to Erica P. John Fund, Inc. v. Halliburton Co.*,
　718 F.3d 423 (5th Cir. 2013),
　*vacated and remanded to* 571 U.S. 1020 (2013) ................................................36, 65

*Ernst & Ernst v. Hochfelder*,
　425 U.S. 185 (1976).................................................................................................53

*In re eSpeed Inc. Sec. Litig.*,
　232 F.R.D. 95 (S.D.N.Y. 2005) ...............................................................................63

*Faktor v. Am. Biomaterials Corp.*,
　Civ. No. 90-2018 (JWB), 1991 WL 336922 (D.N.J. Aug. 14, 1991)......................57

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
　281 F.R.D. 174 (S.D.N.Y. 2012) .............................................................................40

*Fila v. Pingtan Marine Enter. Ltd.*,
　195 F. Supp. 3d 489 (S.D.N.Y. 2016)......................................................................44

*In re Finisar Corp. Sec. Litig*,
　No. 5:11-cv-01252 (EJD), 2017 WL 6026244 (N.D. Cal. Dec. 5, 2017)...............42

*In re FleetBoston Fin. Corp. Sec. Litig.*,
　253 F.R.D. 315 (D.N.J. 2008).............................................................................72, 74

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
　301 F.R.D. 116 (S.D.N.Y. 2014) .........................................................................58, 60

*Fries v. N. Oil & Gas, Inc.*,
　285 F. Supp. 3d 706 (S.D.N.Y. 2018)......................................................................55

*Gallup v. Clarion Sintered Metals, Inc.*,
　489 F. App'x 553 (3d Cir. 2012) .........................................................................46, 51

*George v. China Auto. Sys., Inc.*,
   No. 11 Civ. 7533 (KBF), 2013 WL 3357170 (S.D.N.Y. July 3, 2013)............................34, 68

*In re Glob. Brokerage, Inc.*,
   17-CV-916 (RA) (BCM), 2021 WL 1160056 (S.D.N.Y. Mar. 18, 2021),
   *report and recommendation adopted sub nom. In re Glob. Brokerage, Inc.*
   *f/k/a FXCM Inc. Sec. Litig.*, 2021 WL 1105367 (S.D.N.Y. Mar. 23, 2021)............................40

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
   141 S. Ct. 1951 (2021),
   *vacated and remanded sub nom. Arkansas Tchr. Ret. Sys. v. Goldman Sachs*
   *Grp., Inc.*, 11 F.4th 138 (2d Cir. 2021),
   *remanded to In re Goldman Sachs Grp., Inc. Sec. Litig.*,
   579 F. Supp. 3d 520 (S.D.N.Y. 2021)............................................................. *passim*

*Gonzalez v. Corning*,
   317 F.R.D. 443 (W.D. Pa. 2016),
   *aff'd*, 885 F.3d 186 (3d Cir. 2018)...................................................................64

*Gonzalez v. Corning*,
   885 F.3d 186 (3d Cir. 2018)..............................................................................34

*Gordon v. Sonar Cap. Mgmt. LLC*,
   92 F. Supp. 3d 193 (S.D.N.Y. 2015)...................................................................59

*Gruber v. Price Waterhouse*,
   776 F. Supp. 1044 (E.D. Pa. 1991) ..............................................................51, 53

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014),
   *remanded sub nom. Erica P. John Fund, Inc. v. Halliburton Co.*,
   765 F.3d 550 (5th Cir. 2014),
   *remanded to* 309 F.R.D. 251 (N.D. Tex. 2015),
   *leave to appeal granted*, 2015 WL 10714013 (5th Cir. Nov. 4, 2015)............................ *passim*

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharm. Indus. Ltd.*,
   529 F. Supp. 3d 385 (E.D. Pa. 2021) ..................................................................68

*Hayes v. Wal-Mart Stores, Inc.*,
   725 F.3d 349 (3d Cir. 2013)..............................................................................64

*Higginbotham v. Baxter Int'l Inc.*,
   495 F.3d 753 (7th Cir. 2007) ............................................................................54

*Holmes v. Pension Plan of Bethlehem Steel Corp.*,
   213 F.3d 124 (3d Cir. 2000)...........................................................................68, 70

*Howard v. Arconic Inc.*,
  395 F. Supp. 3d 516 (W.D. Pa. 2019)................................................................53

*Hoxworth v. Blinder, Robinson & Co.*,
  903 F.2d 186 (3d Cir. 1990)....................................................................4, 37

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008)..........................................................34, 36, 58

*IBEW Loc. 98 Pension Fund v. Best Buy Co.*,
  818 F.3d 775 (8th Cir. 2016) .................................................................41, 42

*In re Ikon Off. Sols., Inc. Sec. Litig.*,
  131 F. Supp. 2d 680 (E.D. Pa. 2001),
  *aff'd sub nom. In re Ikon Off. Sols., Inc.,* 277 F.3d 658 (3d Cir. 2002)....................................44

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
  No. 2:20-cv-02155 (SRC) (CLW), 2021 WL 4191467 (D.N.J. Sept. 15, 2021) ....................54

*In re Initial Pub. Offerings Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006)................................................................57, 73

*In re Initial Public Offering Sec. Litig.*,
  227 F.R.D. 65 (S.D.N.Y. 2004),
  *vacated on other grounds and remanded by* 471 F.3d 24 (2d Cir. 2006)..........................72, 74

*Iron Workers Loc. No. 25 Pension Fund v. Credit-Based Asset Servicing &*
  *Securitization, LLC*,
  616 F. Supp. 2d 461 (S.D.N.Y. 2009).....................................................62

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011)................................................................................69

*Jaroslawicz v. M&T Bank Corp.*,
  962 F.3d 701 (3d Cir. 2020)..................................................................54

*Jasin v. Kozlowski*,
  Civ. No. 1:04-cv-2188 (YK), 2010 WL 4536973 (M.D. Pa. Nov. 3, 2010),
  *reconsideration granted,* 2011 WL 3627322 (M.D. Pa. Aug. 17, 2011)................................70

*Johnston v. HBO Film Mgmt. Inc.*,
  265 F.3d 178 (3d Cir. 2001)................................................................ *passim*

*Joseph v. Wiles*,
  223 F.3d 1155 (10th Cir. 2000) ...........................................................53

*Kirkwood v. Taylor*,
  590 F. Supp. 1375 (D. Minn. 1984).....................................................72

*Klein v. Gen. Nutrition Cos.*,
   186 F.3d 338 (3d Cir. 1999)......................................................................................65

*In re Kosmos Energy Ltd. Sec. Litig.*,
   299 F.R.D. 133 (N.D. Tex. 2014) .........................................................................61, 73

*Kraus v. Paterson Parchment Paper Co.*,
   65 F.R.D. 368 (S.D.N.Y. 1974) ...............................................................................68

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) .............................................................................52

*In re Lehman Bros. Sec. & ERISA Litig.*,
   Nos. 11 Civ. 4278 (LAK), 11 Civ. 5112 (LAK), 09 MD 2017 (LAK),
   2013 WL 5730020 (S.D.N.Y. Oct. 22, 2013).............................................................51

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005).....................................................................................43

*Li v. Aeterna Zentaris, Inc.*,
   324 F.R.D. 331 (D.N.J. 2018),
   *aff'd sub nom. Vizirgianakis v. Aeterna Zentaris, Inc.*,
   775 Fed. Appx. 51 (3d Cir. 2019).............................................................................41

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
   Civ. No. 16-112 (MN), 2020 WL 5026553 (D. Del. Aug. 25, 2020)......................................40

*Malack v. BDO Seidman, LLP*,
   617 F.3d 743 (3d Cir. 2010).....................................................................................34

*Marcus v. BMW of N. Am., LLC*,
   687 F.3d 583 (3d Cir. 2012).....................................................................................34

*McNair v. Synapse Grp. Inc.*,
   672 F.3d 213 (3d Cir. 2012)..................................................................................65, 74

*In re Merck & Co. Sec. Litig.*,
   432 F.3d 261 (3d Cir. 2005)............................................................................28, 36, 44

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ................................................................................44

*In re Monster Worldwide, Inc. Sec. Litig.*,
   251 F.R.D. 132 (S.D.N.Y. 2008) ..............................................................................61

*In re Moody's Corp. Sec. Litig.*,
   274 F.R.D. 480 (S.D.N.Y. 2011) ........................................................................42, 44, 57

*N.J. Carpenters Health Fund v. Rali Series 2006-QO1 Tr.*,
   477 F. App'x 809 (2d Cir. 2012) ................................................................67, 73

*Neale v. Volvo Cars of N. Am., LLC*,
   794 F.3d 353 (3d Cir. 2015)..........................................................................58, 70

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001).................................................................5, 34, 36, 58

*In re NutriSystem, Inc. Sec. Litig.*,
   653 F. Supp. 2d 563 (E.D. Pa. 2009) ..................................................................65

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
   No. 4:08CV0160 (BYP), 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018)..................42, 59, 60

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)..............................................................................44

*In re Paulsboro Derailment Cases*,
   Civil Nos. 13-784 (RBK/KMW), 12-7586 (RBK/KMW), 12-7648
   (RBK/KMW), 13-410 (RBK/KMW), 13-721 (RBK/KMW), 13-761
   (RBK/KMW), 2014 WL 4162790 (D.N.J. Aug. 20, 2014) ......................................35

*Pickett v. Iowa Beef Processors*,
   209 F.3d 1276 (11th Cir. 2000) ..........................................................................63

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021) ..................................................................................54

*Pub. Interest Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*,
   123 F.3d 111 (3d Cir. 1997)................................................................................70

*In re Puda Coal Sec. Inc. Litig.*,
   No. 11 Civ. 2598 (KBF), 2013 WL 5493007 (S.D.N.Y. Oct. 1, 2013)...................72

*In re Qualcomm Inc. Sec. Litig.*,
   No. 17cv121 (JO) (MSB), 2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) .............50

*In re Quarterdeck Office Sys., Inc. Sec. Litig.*,
   No. CV 92-3970 (DWW) (GHKx), 1993 WL 623310
   (C.D. Cal. Sept. 30, 1993).................................................................................72

*In re RAIT Fin. Tr. Sec. Litig.*,
   No. 2:07-cv-03148 (LDD), 2008 WL 5378164
   (E.D. Pa. Dec. 22, 2008) ...................................................................................72

*Rocco v. Nam Tai Elecs., Inc.*,
   245 F.R.D. 131 (S.D.N.Y. 2007) ........................................................................67

*Roe v. Operation Rescue*,
123 F.R.D. 506 (E.D. Pa. 1988)............................................................................61

*Roman v. Korson*,
152 F.R.D. 101 (W.D. Mich. 1993)........................................................................35

*In re Safeguard Scis.*,
216 F.R.D. 577 (E.D. Pa. 2003)........................................................................64, 66

*In re Sanofi Sec. Litig.*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016),
*mot. for reconsideration denied*, 2016 WL 3566233 (S.D.N.Y. June 24, 2016),
*appeal dismissed*, No. 16-2573 (2d Cir. 2016). .......................................................55

*Schwab v. E\*TRADE Fin. Corp.*,
752 F. App'x 56 (2d Cir. 2018) .............................................................................51

*Schwartzman v. Morningstar, Inc.*,
Civ. No. 12-1647 (BMS), 2014 WL 3843875 (E.D. Pa. Aug. 5, 2014) ......................51, 52, 57

*Semerenko v. Cendant Corp.*,
223 F.3d 165 (3d Cir. 2000).................................................................................38

*Shiring v. Tier Techs., Inc.*,
244 F.R.D. 307 (E.D. Va. 2007) ............................................................................61

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
No. 05 Civ. 1898 (SAS), 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006),
*aff'd*, 546 F.3d 196 (2d Cir. 2008).........................................................................57

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
546 F.3d 196 (2d Cir. 2008)..................................................................................40

*Teamsters Loc. 456 Pension Fund v. Universal Health Servs.*,
396 F. Supp. 3d 413 (E.D. Pa. 2019) .....................................................................43

*Value Drug Co. v. Takeda Pharms., U.S.A, Inc.*,
Civ. No. 21-3500 (MAK), 2023 WL 2314911 (E.D. Pa. Feb. 28, 2023) .................................74

*Vignola v. Fat Brands, Inc.*,
No. CV 18-7469 (PSG) (PLAx), 2020 WL 1934976
(C.D. Cal. Mar. 13, 2020) .....................................................................................73

*Villella v. Chem. & Mining Co. of Chile Inc.*,
15 Civ. 2106 (ER), 2018 WL 2958361 (S.D.N.Y. June 13, 2018)........................................67

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
Civ. No. 13-6731 (BMS), 2014 WL 1395059 (E.D. Pa. Apr. 10, 2014)................................63

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
    Civ. No. 13-6731 (BMS), 2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ................................41

*Waggoner v. Barclays P.L.C.*,
    875 F.3d 79 (2d Cir. 2017).................................................................................................52

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011),
    *rev'g, Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010*)* .................................1, 34

*In re Warner Commc'ns Sec. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985),
    *aff'd, In re Warner Commun. Securities Litig.*, 798 F.2d 35 (2d Cir. 1986) ...........................58

*In re Xerox Corp. Sec. Litig.*,
    935 F. Supp. 2d 448 (D. Conn. 2013),
    *aff'd sub nom. Dalberth v. Xerox Corp.*, 766 F.3d 172 (2d Cir. 2014) .................................44

*Zenith Lab'ys, Inc. v. Carter–Wallace, Inc.*,
    530 F.2d 508 (3d Cir. 1976).................................................................................................64

*Zlotnick v. TIE Commc'ns, Inc.*,
    123 F.R.D. 189 (E.D. Pa. 1988).........................................................................................61

## STATUTES & RULES

15 U.S.C. § 77a (1933) ............................................................................... *passim*

15 U.S.C. § 78a (1934) ............................................................................... *passim*

15 U.S.C. § 78j(b) (1934) ............................................................................6, 36, 65

15 U.S.C. § 78t(a) (1934).........................................................................................6

15 U.S.C. § 77k(a) (1998).................................................................................70, 73

15 U.S.C. § 77l(a)(2) (2000).............................................................................70, 73

Fed. R. Civ. P. 23 ....................................................................................... *passim*

Fed. R. Civ. P. 23(a) ...............................................................................................1

Fed. R. Civ. P. 23(a)(1)..........................................................................................74

Fed. R. Civ. P. 23(a)(3)......................................................................................64, 74

Fed. R. Civ. P. 23(a)(4)......................................................................................61, 74

Fed. R. Civ. P. 23(b)(3).................................................................................2, 5, 36, 73

17 C.F.R. § 240.10b-5 (2022) .................................................................................6, 58

**OTHER**

MCLAUGHLIN ON CLASS ACTIONS § 4:20 (16th ed. 2021)                                    67

**TABLE OF ABBREVIATIONS**

| Term | Definition |
|---|---|
| A.C. | Amended Complaint |
| Action | *Delaware County Employees Retirement System v. AdaptHealth Corp.*, No. 2:21-cv-03382-HB |
| Amended Complaint | Lead Plaintiffs' Consolidated Complaint for Violations of the Federal Securities Laws Against Defendants, dated November 22, 2021 [Dkt. 19] |
| AdaptHealth | AdaptHealth Corp. |
| AdaptHealth Defendants | AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., Stephen P. Griggs, Jason Clemens, Frank J. Mullen, Richard Barasch, Joshua Parnes, Alan Quasha, Terence Connors, Dr. Susan Weaver, Dale Wolf, Bradley Coppens, and David S. Williams III |
| *Affiliated Ute* Presumption | Presumption of reliance for omissions established in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) |
| Appx. | Appendix |
| April 13 Press Release | Ex. 8, AdaptHealth Press Release, AdaptHealth Corp.'s Board of Directors' Statement on Co-Chief Executive Officer Luke McGee (Apr. 13, 2021) |
| AWTV | Average Weekly Trading Volume |
| *Basic* Presumption | Presumption of reliance based on the market efficiency theory established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) |
| ███ Aff. | Ex. 21, Affidavit of ███████, dated November 18, 2022 |

| Term | Definition |
|---|---|
| Bucks County | Bucks County Employees' Retirement System |
| Bucks Tr. | Ex. 17, Transcript of Bucks County Employees' Retirement System 30(b)(6) Deposition, dated February 10, 2023 |
| Cain Report | Expert Report of Dr. Matthew D. Cain, Ph.D., dated July 26, 2022 [Dkt. 65–3] |
| Cain Tr. | Ex. 20, Transcript of Matthew D. Cain Deposition, dated February 28, 2023 |
| Cont. Aff. | Ex. 22, Affidavit of Michael Mullings of the Continental Stock Transfer & Trust Co., dated February 15, 2023 |
| Continental | Continental Stock Transfer & Trust Co., the Transfer Agent and Registrar of AdaptHealth |
| Defendants | AdaptHealth Defendants and Luke McGee |
| Del. Tr. | Ex. 18, Transcript of Delaware County Employees Retirement System 30(b)(6) Deposition, dated February 13, 2023 |
| Delaware County | Delaware County Employees Retirement System |
| Denmark Authorities | The Danish State Prosecutor for Serious Economic and International Crime |
| deSPAC | The process of taking a company public using a Special Purpose Acquisition Company |
| DFB | DFB Healthcare Acquisitions Corp. |
| Dkt. | Docket Entry in this Action |

*-xvii-*

| Term | Definition |
|---|---|
| DTC | The Depository Trust Company |
| DTCC | The Depository Trust & Clearing Corporation, the parent company of DTC |
| DTCC Aff. | Ex. 24, Affidavit of Ann Marie Bria of The Depository Trust & Clearing Corporation, dated March 7, 2023 |
| Emerald | Emerald Advisers, LLC (Lead Plaintiffs' investment manager) |
| Emerald Tr. | Ex. 19, Transcript of Emerald Asset Management 30(b)(6) Deposition, dated February 15, 2023 |
| Exchange Act | Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (1934) |
| Ex. or Exhibit | Exhibit to Declaration of Todd G. Cosenza In Support of the AdaptHealth Defendants' Memorandum of Law in Opposition to Lead Plaintiffs' Motion to Certify Class |
| Jefferies Aff. | Ex. 23, Affidavit of James Persico of Jefferies LLC, dated February 16, 2023 |
| Jefferies | Jefferies LLC, Co-Lead Underwriter for the Secondary Offering |
| Jehoshaphat Report | Ex. 90, Jehoshaphat Research, *Not Just a Roll-Up, But a Coverup: Is AHCO the Next MDCA?* (July 19, 2021) |
| Lead Plaintiffs | Delaware County and Bucks County |
| Lewis Report | Ex. 12, Expert Report of Dr. Craig Lewis, dated March 29, 2023 |
| Markel Report | Ex. 13, Expert Report of Susan G. Markel, dated March 29, 2023 |

| Term | Definition |
|---|---|
| McGee Tax Issue | Lead Plaintiffs' allegations that Defendants made false and misleading statements because the Miscellaneous Statements did not reference that Defendant McGee had allegedly been involved in an alleged tax fraud between March 2014 and August 2015 unrelated to AdaptHealth |
| McGee Tax Period | November 11, 2019 through April 12, 2021 |
| Miscellaneous Statements | Alleged misrepresentations made between November 2019 to March 2021 related to (i) the experience, qualifications, and success of AdaptHealth's management team, (ii) AdaptHealth's ongoing legal proceedings, and (iii) AdaptHealth's performance and future strategy. (*See* A.C. ¶¶ 76–114) |
| Motion | Lead Plaintiffs' Motion to Certify Class, dated July 28, 2022 [Dkt. 65] |
| MTD Decision | Memorandum of Law Denying Defendants' Motion to Dismiss the Amended Complaint, dated June 9, 2022 [Dkt. 50] and Order Denying Defendants' Motion to Dismiss the Amended Complaint, dated June 9, 2022 [Dkt. 51] |
| Organic Growth Issue | Lead Plaintiffs' allegations that Defendants made false and misleading statements regarding AdaptHealth's organic growth by implementing a new methodology for calculating organic growth that allegedly concealed that AdaptHealth's "actual" organic growth "has stalled and even declined" |
| Organic Growth Period | March 4, 2021 through July 16, 2021 |
| Organic Growth Statements | Alleged misrepresentations made between March 2021 and May 2021 related to AdaptHealth's refined methodology for calculating organic growth (*See* A.C. ¶¶ 115–127) |
| Robbins Geller | Robbins Geller Rudman & Dowd LLP, Lead Plaintiffs' counsel |
| Rule 23 | Federal Rule of Civil Procedure 23 |

| Term | Definition |
|---|---|
| Savoldelli Report | Ex. 14, Expert Report of Fabio Savoldelli, dated March 29, 2023 |
| SEC | U.S. Securities and Exchange Commission |
| SDNY Compl. | Complaint filed in *Skatteforvaltningen v. Merkensteijn*, No. 1:19-cv-10713 (S.D.N.Y. Nov. 19, 2019) |
| Secondary Offering | AdaptHealth's public offering that closed on January 8, 2021 |
| Securities Act | Securities Act of 1933, 15 U.S.C. § 77a *et seq.* (1933) |
| Turki Report | Ex. 15, Expert Report of L. Adel Turki, dated March 29, 2023 |
| Value-relevant information | Information that changes the total mix of information regarding the present value of a company's expected future cash flows |
| Wiener Report | Ex. 16, Expert Report of Jack R. Wiener, dated March 29, 2023 |

## PRELIMINARY STATEMENT[1]

This Action is not certifiable as a class under Federal Rule of Civil Procedure 23. Class certification is no longer a perfunctory, check-the-box exercise for securities litigation. Rather, the Supreme Court's recent decisions have shifted the landscape, making clear, among other things, that plaintiffs must "affirmatively demonstrate" that Rule 23 is satisfied, that defendants can successfully challenge class certification through certain legal and factual arguments, and that the district court must perform a "rigorous analysis" to assess plaintiffs' conformance with Rule 23. *See, e.g.*, *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1960–61 (2021) (vacating and remanding grant of class certification; holding that a mismatch between the alleged misrepresentations and the alleged corrective disclosures is "important evidence of a lack of price impact"); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283–84 (2014) ("*Halliburton II*") (vacating and remanding grant of class certification; holding "[d]efendants may seek to defeat the *Basic* Presumption at that stage through direct as well as indirect price impact evidence"); *Comcast Corp. v. Behrend*, 569 U.S. 27, 35, 38 (2013) (reversing grant of class certification; holding that damages must be "consistent with [the] liability case" and "measure only those damages attributable to that theory"); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–52, 367 (2011) (reversing grant of class certification; holding "proof of commonality necessarily overlap[ped] with [the] merits" and required resolving multiple cases within a case).[2]

---

[1] All capitalized terms are defined in the Table of Abbreviations.

[2] *Goldman*, 141 S. Ct. at 1960-61 ("As we have repeatedly explained, a court has an obligation before certifying a class to 'determin[e] that Rule 23 is satisfied, even when that requires inquiry into the merits.'" (citation omitted)); *Halliburton II*, 573 U.S. at 275 ("[*Walmart*] and [*Comcast*] have made clear that plaintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23 . . . ."); *Comcast*, 569 U.S. at 33 ("Repeatedly, we have emphasized that it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, and that certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." (internal quotation marks omitted)); *Wal-Mart*, 564 U.S. at 350 ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.").

Nevertheless, Lead Plaintiffs appear to be reading from the old playbook. Less than two weeks into what ultimately became an eight-month period of discovery into class certification issues, Lead Plaintiffs filed an entirely boilerplate and superficial opening brief in support of their class certification motion. That motion hinges on a "market efficiency" report that was dusted off the shelf by an expert (Dr. Matthew Cain) who has made a career of filing near-verbatim versions of the same exact report for plaintiffs' law firms, including more than a handful of times for Robbins Geller. And—not surprisingly given that Lead Plaintiffs thumbed their noses at class discovery—Lead Plaintiffs otherwise offer nothing but bald assertions as their so-called "proof" that each and every requirement of Rule 23 is satisfied. This is woefully insufficient.

Under any scrutiny of Lead Plaintiffs' class certification motion, it becomes incredibly obvious that Lead Plaintiffs have failed (several times over) to meet their burden with respect to multiple Rule 23 requirements. With respect to their Exchange Act claims, Rule 23(b)(3) requires Lead Plaintiffs to establish that reliance can be resolved through common proof. Lead Plaintiffs need not offer evidence that any potential class members actually relied on the alleged misrepresentations at issue in this Action; rather, pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), this Court can presume that such reliance exists as long as Lead Plaintiffs can satisfy a few straightforward requirements such as market efficiency (the "*Basic* Presumption"). But even that shortcut is too much for Lead Plaintiffs. Dr. Cain's market efficiency opinion is flawed and unreliable for several reasons, including because, as supported by the AdaptHealth Defendants' economics expert (Dr. L. Adel Turki), Dr. Cain completely ignored whether lockup agreements in the months following AdaptHealth's deSPAC transaction rendered the market for AdaptHealth's stock inefficient for at least nine months. Having failed to offer any other evidence of market efficiency, Lead Plaintiffs cannot invoke the *Basic* Presumption.

Further, even assuming the *Basic* Presumption was somehow properly invoked (and it was not), the AdaptHealth Defendants can easily rebut that presumption and thus it is still unavailable to Lead Plaintiffs.  As supported by multiple experts offered by the AdaptHealth Defendants, none of the alleged misrepresentations at issue in this Action had any impact on AdaptHealth's stock price.  Specifically, with respect to the organic growth claims, AdaptHealth's stock price never reacted to the alleged misrepresentations regarding organic growth as Lead Plaintiffs allege—not when they were first made, and not when Lead Plaintiffs contend the "truth" was revealed to the market by an anonymous short-seller report.  This is fatal but not surprising:  the short-seller report was based entirely on previously disclosed, publicly available information; the market understood the changes to AdaptHealth's organic growth methodology; and the mere publication of the short-seller report, rather than its substance, precipitated any price movement.

Similarly, with respect to the McGee claims, AdaptHealth's stock price never reacted to the miscellaneous (and mostly generic) statements alleged to be false and misleading by Lead Plaintiffs.  Investors were either unaware of or completely ignored those statements, and there was no movement in AdaptHealth's stock price indicative of reliance when they were made.  And, when Lead Plaintiffs contend the "alleged" truth was revealed by AdaptHealth's press release on April 13, 2021 (*i.e.*, that Defendant McGee was allegedly involved in an alleged foreign tax fraud), the decline in AdaptHealth's stock price that occurred that day had nothing to do with that supposed revelation.  The market was already aware of that information through multiple news articles and court filings that were released over a period of years.  Assuming Lead Plaintiffs' efficient market theory were correct, that information would already have been reflected in AdaptHealth's stock price prior to April 13, 2021, and could not have precipitated any price movement on April 13, 2021.  Furthermore, there can be no finding of price impact under the

-3-

Supreme Court's recent holding in *Goldman Sachs Group., Inc. v. Arkansas Teacher Retirement System*, 141 S. Ct. 1951 (2021), due to the multiple, obvious "mismatch[es]" between the alleged misrepresentations—*i.e.*, statements concerning AdaptHealth's business performance and strategy, ongoing legal proceedings against AdaptHealth, and the strength of AdaptHealth's management team—and the alleged corrective disclosure—*i.e.*, AdaptHealth's press release announcing Defendant McGee's criminal indictment and transition to unpaid leave.

Potentially foreseeing these insurmountable hurdles, Lead Plaintiffs also seek to invoke an omissions-based presumption under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), to prove classwide reliance (the "*Affiliated Ute* Presumption"). That fails too. Lead Plaintiffs must select one, and only one, presumption applicable to the entire Action; they cannot invoke both. *See Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 202 (3d Cir. 1990) ("[A] unitary burden of proof on the reliance issue [is required]."). Moreover, this Action is premised on misrepresentations, not omissions, and is thus clearly ineligible for the *Affiliated Ute* Presumption. Any argument to the contrary is belied by the fact that the Amended Complaint repeatedly and solely points to affirmative statements for both the organic growth claims and McGee claims. (*See, e.g.*, "[W]e will continue to find ways to drive organic growth." (A.C. ¶ 117); "AdaptHealth will continue to be led by its seasoned team of industry and financial professionals[.]" (A.C. ¶ 76).) In any event, even if the *Affiliated Ute* Presumption were properly invoked (and it was not), it is rebutted by the evidence that additional disclosures would not have affected Lead Plaintiffs' investments in AdaptHealth's stock. All of Lead Plaintiffs' purchases were the product of their investment manager's sophisticated, valuation-driven investment strategy, which completely ignored the purported integrity of AdaptHealth's stock price.

Remarkably, this is the tip of the iceberg of Lead Plaintiffs' failures to satisfy the Rule 23 requirements, any one of which dooms class certification on its own. Lead Plaintiffs also have failed to satisfy the predominance requirement of Rule 23(b)(3) because individualized issues with respect to damages overwhelm issues common to the class. Lead Plaintiffs are required to prove that damages can be measured on a classwide basis in a manner consistent with their allegations, and yet they have not presented any damages methodology at all. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 187–88 (3d Cir. 2001) (affirming rejection of plaintiffs' attempt to "gloss over" the requirement by merely claiming a formula *could be* devised to measure damages). Once again, Lead Plaintiffs rely exclusively on Dr. Cain, and yet his Report does not present anything other than an assurance that classwide damages can be calculated. In fact, in his Report and deposition, Dr. Cain made clear that he has not even considered how his hypothetical ideas about damages would account for the complexities of this Action, including information that was already known to the market prior to any alleged corrective disclosures, confounding information, the apparent mismatch between the alleged misrepresentations and alleged corrective disclosures, or the two different (not alternative) theories of liability.

Lead Plaintiffs are also plagued by incurable and unmistakable adequacy and typicality failures. For example, Lead Plaintiffs are not members of any class related to their organic growth claims ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉—and, indeed, Bucks County actually benefited from that alleged fraud. Robbins Geller has been driving this litigation since day one such that Lead Plaintiffs only learned about their allegations when preparing for depositions last month and they even disagree that certain misrepresentations alleged in the Amended Complaint are "false and misleading." And Lead Plaintiffs' investment manager, which was solely responsible for all of

Lead Plaintiffs' purchases of AdaptHealth's stock, did not rely on any of the alleged misrepresentations at issue in this Action in its purchasing decisions and was in fact unaware of almost all of them.

Lead Plaintiffs' claims under the Securities Act share the same fate. Lead Plaintiffs are unable to trace their purchases of AdaptHealth's stock to shares newly sold in connection with AdaptHealth's Secondary Offering and thus lack standing to even assert claims on behalf of (let alone represent) any putative class—thereby requiring dismissal of those claims. Moreover, Lead Plaintiffs' Securities Act claims are also unsuitable for certification due to individualized issues with respect to knowledge that overwhelm issues common to the class. The public availability of information concerning Defendant McGee's alleged involvement in an alleged foreign tax fraud prior to and during AdaptHealth's Secondary Offering creates circumstances under which the "actual knowledge" defense and/or element bars certain potential class members from any recovery and thus necessitates individualized knowledge inquiries to resolve.

Accordingly, the Court should deny Lead Plaintiffs' Motion to Certify Class. The Court should also disqualify Delaware County and Bucks County from serving as lead plaintiffs in this Action and dismiss Lead Plaintiffs' Securities Act claims with prejudice.

## BACKGROUND

### I.   OVERVIEW OF PROCEEDINGS.

This Action was commenced in July 2021 for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b–5 thereunder related to AdaptHealth Corp.'s ("AdaptHealth"; and its stock, "AdaptHealth Stock") disclosures regarding organic growth. (Dkt. 1.) At that time, Delaware County Employees Retirement System ("Delaware County") and Bucks County Employees' Retirement System ("Bucks County") had no knowledge that they had ever purchased AdaptHealth Stock, let alone that they had any

complaints about AdaptHealth's disclosures. (Ex. 17, Bucks Tr. 65:11–19, 70:19–71:24, 72:7–18; Ex. 18, Del. Tr. 32:17–33:2, 35:21–36:10, 85:12–18.)  All of this information was brought to their attention in September 2021 by Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), which informed them of their potential claims and left them with the impression that pursuing this litigation would require "very little work" and "no additional cost." (Bucks Tr. 65:11–19, 81:15–83:16, 84:13–85:1; Del Tr. 35:21–36:16, 71:2–13; Ex. 53 at 2.)  Delaware County and Bucks County were named as lead plaintiffs in October 2021 (hereinafter, "Lead Plaintiffs") and filed their complaint (the "Amended Complaint" or "A.C.") in November 2021. (Dkts. 12, 19.)

The Amended Complaint drastically changed the scope of this Action.  Eight individual defendants were added.  The claims were expanded to include alleged violations of the Securities Act of 1933 (the "Securities Act") related to AdaptHealth's offering that closed on January 8, 2021 ("Secondary Offering").  (A.C. ¶¶ 163–68.)  And most importantly—as Lead Plaintiffs have conceded[3]—***two class actions*** were alleged involving distinct legal theories and time periods:

- **The Organic Growth Action (Exchange Act Claims).**  Lead Plaintiffs allege that, from March 4, 2021 through July 16, 2021 (the "Organic Growth Period"), certain Defendants allegedly made materially false and misleading statements regarding AdaptHealth's organic growth by implementing a new methodology for calculating organic growth that allegedly concealed that AdaptHealth's "actual" organic growth "had stalled and even declined" (the "Organic Growth Issue").

- **The McGee Tax Action (Exchange Act & Securities Act Claims).**  Lead Plaintiffs allege that, from November 8, 2019 (though AdaptHealth was not a publicly traded issuer until November 11, 2019)[4] through April 12, 2021 (the "McGee Tax Period"), certain Defendants allegedly made materially false and misleading statements regarding AdaptHealth's management team, legal proceedings, and business strategy by not referencing that Defendant McGee had allegedly been involved in an alleged foreign tax fraud between March 2014 and August 2015 unrelated to AdaptHealth's business (the "McGee Tax Issue").

---

[3]  *See* A.C. ¶¶ 76–127; *see, e.g.*, Ex. 53 at 2 ("two different claims that are unique"); Bucks Tr. 97:1–16 ("the two different claims in this case"); Del. Tr. 33:25 ("The claim is twofold."); *see also* MTD Decision at 6–7 ("two grounds for violations of federal securities law").

[4]  A.C. ¶¶ 11, 75 n.15; Ex. 1.

On July 28, 2022, Lead Plaintiffs filed their Motion to Certify Class (the "Motion"). (Dkt. 65.)  Thereafter, for eight months, the AdaptHealth Defendants actively engaged in class certification discovery (even though Lead Plaintiffs refused to search for and produce responsive documents)[5] and other efforts to develop an extensive record on critical issues that prevent class certification in this Action, including:

- Thousands of documents from various third parties, including Lead Plaintiffs' investment manager (Emerald Advisers, LLC ("Emerald")) and individuals and entities connected to the short-seller report (the "Jehoshaphat Report") at issue in the Organic Growth Action;

- Deposition testimony of Dr. Cain, 30(b)(6) representatives for Delaware County and Bucks County, and a 30(b)(6) representative for Emerald's parent company;

- An affidavit from ████████████████████████████████████████;

- Affidavits regarding the mechanics of AdaptHealth's Secondary Offering from Continental Stock Transfer & Trust Co. (transfer agent and registrar), Jefferies LLC (co-lead underwriter), and The Depository Trust & Clearing Corporation (parent of the clearance and settlement company, DTC); and

- Reports from five experts (listed below and opinions summarized in Ex. 11).

| Expert | Qualifications | Subject Matter |
|---|---|---|
| Dr. L. Adel Turki | Senior Managing Director at Compass Lexecon with 31 years of consulting experience | Market Efficiency<br>Price Impact – Organic Growth<br>Price Impact – McGee Tax |
| Susan G. Markel | Managing Director of AlixPartners and former Chief Accountant of the Enforcement Division of the U.S. Securities & Exchange Commission ("SEC") | Price Impact – Organic Growth |
| Fabio Savoldelli | 25 years of experience as a hedge fund-focused Chief or Deputy Chief Investment Officer | Price Impact – Organic Growth |
| Dr. Craig Lewis | Professor of Finance at the Owen Graduate School of Management at Vanderbilt University and former Chief Economist at the SEC | Price Impact – McGee Tax |
| Jack R. Wiener | CEO of Financial Services Consulting with 17 years of experience at DTC | Tracing |

---

[5] The AdaptHealth Defendants have twice brought this issue to the Court's attention, requesting permission in early February 2023 to seek a further extension of the class discovery deadline. (Exs. 59–60.) The Court denied this request in a telephonic conference held on February 9, 2023. (Dkt. 98.)

## II.    LEAD PLAINTIFFS' ALLEGATIONS.[6]

### A.    The Organic Growth Action (Exchange Act Claims).

Prior to March 4, 2021, AdaptHealth disclosed limited information regarding its organic growth,[7] none of which is challenged by Lead Plaintiffs. (A.C. ¶ 29 (conceding pre-March 4, 2021 disclosures were "clear").)  However, on March 4, 2021, in connection with the release of its Q4 2020 earnings, AdaptHealth announced a refined methodology for calculating organic growth. AdaptHealth not only described for the first time how it calculated organic growth, but it also provided for the first time a written summary of its organic growth results, which detailed results using the refined methodology for FY 2020 and retrospectively for all prior quarters. (Ex. 6 at 7.) The market understood that AdaptHealth had changed its methodology and would use the refined methodology from Q4 2020 forward. (*See* Ex. 7 at 11–12, 15; Ex. 15, Turki Report ¶ 58.)



Ex. 98

Nevertheless, Lead Plaintiffs allege that on March 4, 2021, and three subsequent dates, AdaptHealth misrepresented its organic growth by reporting results calculated using the refined methodology in order to conceal that its "organic revenue growth had stalled and even declined" (the "Organic Growth Statements"). (A.C. ¶¶ 115–27.)  In reality, the Organic Growth Statements

---

[6] The putative class period is alleged to be from November 8, 2019 (*i.e.*, days before AdaptHealth Stock began trading *and* over a year before options began trading) through July 16, 2021. (A.C. ¶¶ 1, 11; Turki Report ¶ 48(f) & n.63.)

[7] Organic growth is a metric that companies may use to quantify certain aspects of their growth, but there is no uniform or standard methodology for calculating that metric. *Compare* Ex. 78 at 6 *with* Ex. 93 at 17.

clearly reported AdaptHealth's organic growth results using the refined methodology and never represented what AdaptHealth's organic growth results would have been had AdaptHealth applied the pre-Q4 2020 methodology. (*See id.*; Exs. 6 at 7; 7 at 7; 10 at 6.) Lead Plaintiffs further allege that, on July 19, 2021, an anonymous short seller named Jehoshaphat Research published a short-seller report that revealed for the first time (*i.e.*, the alleged corrective disclosure) that AdaptHealth had "chang[ed] the calculation it used to derive the metric to include revenue growth attributable to recent acquisitions" and that AdaptHealth's organic growth "had started to significantly decline." (A.C. ¶ 134.) Lead Plaintiffs are wrong about that timing, as the Jehoshaphat Report was published online at www.valuewalk.com on July 16, 2021, ███████████████████████████. (Ex. 89; Ex. 21, █████ Aff. ¶ 13.) Nevertheless, on July 19, 2021, the price of AdaptHealth Stock decreased $1.51 per share. (A.C. ¶¶ 135, 154.)

### B. The McGee Tax Action (Exchange Act & Securities Act Claims).

On April 13, 2021, at 2:51 a.m. ET, the Danish State Prosecutor for Serious Economic and International Crime ("Denmark Authorities") announced that it had charged Defendant McGee with criminal tax fraud. (Exs. 86–88.) That same day, at 9:48 a.m. ET, AdaptHealth issued a press release announcing, *inter alia*, Defendant McGee's indictment unconnected to AdaptHealth's business and that he was placed on unpaid leave (the "April 13 Press Release"):

> *AdaptHealth Corp. has learned that authorities in Denmark have formally charged Co-Chief Executive Officer Luke McGee with alleged tax fraud arising from certain past private activity. The alleged personal conduct occurred between March 2014 and August 2015 and had no connection to AdaptHealth's business.*
>
> *AdaptHealth has placed Mr. McGee on unpaid leave from his roles as Co-CEO and a Director of the Company while this matter is pending. . . .*

(Ex. 8.) The price of AdaptHealth Stock fell $7.30 per share that day. (A.C. ¶¶ 129, 153.)

Lead Plaintiffs allege that the April 13 Press Release revealed for the first time that Defendant McGee was allegedly involved in an alleged foreign tax fraud (*i.e.*, the McGee Tax

Issue), and that numerous statements by AdaptHealth are "false and misleading" simply because they do not reference the McGee Tax Issue (A.C. ¶¶ 76–114, 128)—irrespective of whether the McGee Tax Issue was required to be disclosed, would have been disclosed in the particular statements at issue, or was even known by the AdaptHealth Defendants.[8] The statements at issue were made on 15 dates from November 2019 to March 2021 and relate to (i) the experience, qualifications, and success of AdaptHealth's management team, (ii) AdaptHealth's ongoing legal proceedings, and (iii) AdaptHealth's past performance and future strategy (collectively, the "Miscellaneous Statements").[9] (A.C. ¶¶ 76–114.)

## III.    SUMMARY OF EVIDENCE.

### A.    Lawyer-Driven Origins Of This Action.

Jehoshaphat Research and plaintiffs' law firms orchestrated this Action. ███████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

(████ Aff. ¶ 20; Ex. 90 at 1 n.1 ("We are, obviously, short AHCO."); Ex. 96 ("[W]e are biased, and actively manage financial assets in accordance with our research views.")), but also, as Mr. Savoldelli explains, requires a stock price decrease (Ex. 14 ¶ 37). ███████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ (████ Aff.

¶ 13; Ex. 89), █████████████████████████████████████

███████████████████████████████████████████ (████ Aff. ¶ 13).

---

[8] ███████████████████████████████████████████████████████████████

████████████ (Exs. 26–27.) ███████████████████████████████████

████████████████████████████████████████████████████ (Ex. 26.)

[9] This includes a November 8, 2019 statement made by DFB Healthcare Acquisitions Corp. ("DFB") prior to the public trading of AdaptHealth Stock. (A.C. ¶ 76.)

-11-

Lead Plaintiffs also became involved in this Action due to a plaintiffs' law firm. Lead Plaintiffs are serial litigants—having served or sought to be appointed as a lead plaintiff or class representative in seven actions over the past three years—that have retained multiple plaintiffs' law firms, including Robbins Geller, to review their investments for the sole purpose of identifying opportunities to bring securities class actions.[10] (Dkt. 5–4 at 2, 4; Bucks Tr. 8:17–9:24, 104:9–106:4, 109:3–111:16; Del. Tr. 80:5–81:23, 82:20–25, 84:16–86:16, 86:24–87:25.) *Lead Plaintiffs were unaware they had purchased AdaptHealth Stock, had suffered any alleged losses, or even had any complaints about AdaptHealth's disclosures until they were so informed by Robbins Geller in September 2021,*[11] and yet both decided to participate in this Action with little deliberation, no independent research, ███████████████████████████████ (Bucks Tr. 65:11–19, 70:19–71:24, 72:7–18, 81:15–83:16, 87:1–5; Del. Tr. 32:17–33:2, 35:21–36:16, 46:11–47:6, 85:12–18, 53:3–54:4; Exs. 53; 54 ¶ 2; 55 ¶ 2; 91.) Tellingly, Lead Plaintiffs disagree with the Amended Complaint's allegations, and Emerald—which was never contacted regarding its role by Lead Plaintiffs or Robbins Geller—contradicts them. (*See infra* pp. 17–18, 31–32.)

**B.    Lead Plaintiffs' Questionable Trading History.**

**1.    Lead Plaintiffs' Investment Decisions Were Made By Emerald.**

Lead Plaintiffs are defined benefit pension plans that typically engage multiple investment advisers to manage and invest their assets. (Bucks Tr. 17:1–14, 53:16–54:19, 62:19–63:21; Del. Tr. 17:13–23, 28:13–29:12, 141:6–22.) ███████████████████████████

████████████████████████████████████████████████████████

---

[10]  Specifically, Lead Plaintiffs ████████████████████████████████████████████████████████ (Exs. 31–32.)

[11]  Lead Plaintiffs testified they "wouldn't have known of" the alleged fraud nor brought the lawsuit but for Robbins Geller bringing the potential lawsuit to them. (Bucks Tr. 123: 8–21; Del. Tr. 32:17–33:2, 35:21–36:10, 85:6–18.)



█████████████████████████████ (Ex. 19, Emerald Tr. 55:15–57:1, 86:2–87:2; Bucks Tr. 176:4–177:14, 197:16–23; Del. Tr. 173:19–174:20; Exs. 28 at 10; 29 ¶ 4.) ███████

████████████████ (Emerald Tr. 28:11–20, 55:15–57:1, 86:20–87:8, 138:25–139:7, 149:3–14, 152:15–153:2.) *Lead Plaintiffs similarly testified that they played no part in any decision related to AdaptHealth Stock.* (Bucks Tr. 176:4–177:14, 197:16–23; Del. Tr. 173:19–174:20.)

### 2. Lead Plaintiffs Were Sophisticated, Valuation-Driven Investors.

█████████████████████ (Emerald Tr. 43:14–44:15, 80:8–81:16; Exs. 30, 51–52, 57–58, 97.) ████████

████████████████ (Ex. 97; Emerald Tr. 116:6–117:24, 123:3–24:11.)

████████████████[12]████████

████████████████ (Emerald Tr. 105:15–24, 113:6–114:15, 117:10–24, 118:19–121:18, 122:7–124:11.) ████████

████████████████[13] (*Id.* 220:12–222:9.) ████

---

[12] ████████████████ (Ex. 97; Emerald Tr. 127:15–131:6.)

[13] ████████████████ (*Id.* 190:13–91:8, 195:6–17, 195:21–196:7, 220:12–221:10, 232:23–233:16.)

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ (*Id.* 42:6–43:9.)

### 3.   Lead Plaintiffs Rarely Owned AdaptHealth Stock.

████████████████████████████████████████████████

███████████████████████████████ (Exs. 57–58.) ████████

████████████████████████████████████████████████

(*Id.*) ██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ (*Id.*; Emerald Tr. 303:8–

14.) ████████████████████████████████, and at no point in

time purchased or acquired AdaptHealth options.  (Exs. 57–58; Dkt. 5–4.)



C.    **Lead Plaintiffs' Lack Of Damages Methodology And Damages.**

1.    <u>**Dr. Cain Does Not Know How To Calculate Damages.**</u>

Dr. Cain (Lead Plaintiffs' expert)[14] opines that damages can be calculated on a classwide basis using the "out-of-pocket" method, which calculates damages formulaically as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale. (Cain Report ¶ 85.)  Dr. Cain vaguely states that "the quantification of artificial inflation . . . is based upon a detailed loss causation analysis" and that "[e]vent studies are widely employed to calculate artificial inflation." (*Id.* ¶¶ 87–88, 90.)  ***But he does not present any damages model or otherwise explain how he will calculate damages*** given the different legal theories and time periods raised by the Organic Growth and McGee Tax Issues. (*Id.* Section VI.)

That Dr. Cain did not tailor his Report to this Action is consistent with his approach to the entire Report, including his damages opinion. (*See infra* pp. 19–21.)  Dr. Cain conceded in his deposition that the paragraphs in the damages section "look either very similar or almost identical to . . . [his] other reports." (Cain Tr. 256:24–257:2.)  ***In fact, a redline comparing Dr. Cain's Report in this Action against an expert report that he recently submitted in In re QuantumScape Securities Litigation, 3:21-cv-00058 (N.D. Cal. Sept. 20, 2022)—just four days prior to the Report submitted here—confirms that the damages sections are word-for-word the same***, apart from three references to the defendant company's name and a single sentence regarding the Securities Act.[15] (Ex. 77.)  Unsurprisingly, during his deposition, Dr. Cain could not recall the

---

[14]  Dr. Cain testified that "all of the opinions reflected in the [R]eport" are his own, his Report contains a "complete" description of and explanation for his opinions, and that there have been no "changes in [his] opinion since [he] submitted [his] [R]eport." (Ex. 20, Cain Tr. 38:11–16, 314:1–11.)  Should this change, the AdaptHealth Defendants respectfully request leave to submit a rebuttal report and/or sur reply and further depose Dr. Cain.

[15]  Not only does the sentence concerning damages under the Securities Act not present Dr. Cain's independent opinion, Dr. Cain could not even remember Lead Plaintiffs' alleged claims under the Securities Act during his deposition until he was reminded by Robbins Geller during a break. (*See* Cain Tr. 262:5–21, 298:16–299:17.)

extent to which he tailored his damages analysis to Lead Plaintiffs' two theories of liability, and, indeed, he had no independent recollection of those theories outside of reading into the record what he had written in the background section of his Report.  (*See* Cain Tr. 255:8–257:2, 260:13–261:3, 262:5–21, 263:20–264:2.)  In short, Dr. Cain asserts his ability to calculate damages based on "the specific set of facts and circumstances" here (Cain Report ¶ 85), but does not describe or provide that methodology so it can be assessed by the AdaptHealth Defendants.

Other defects with Dr. Cain's damages opinion were also revealed in his deposition, including:  (i) Dr. Cain's proffered method of measuring artificial inflation in the share price of AdaptHealth Stock (termed the "backcasting methodology")[16] is flawed because there is a mismatch between the April 13 Press Release and the Miscellaneous Statements (*see infra* pp. 25–26); (ii) Dr. Cain has offered no reliable means to control for the confounding information at issue in this case (namely, to what extent the mere publication of the Jehoshaphat Report impacted the stock price and which information in the April 13 Press Release impacted the stock price) (*see infra* pp. 24–25, 29–30), which also undermines his backcasting methodology;[17] and (iii) Dr. Cain has not explained how he would separately calculate damages attributable to the Organic Growth Issue and the McGee Tax Issue (Cain Tr. 269:14–24, 270:14–271:9, 273:13–276:10).

### 2. Lead Plaintiffs Had No Losses During The Organic Growth Period.

As Dr. Turki explains, and consistent with Dr. Cain's understanding, neither Lead Plaintiff realized any loss in connection with the Organic Growth Issue.  ***Delaware County realized no loss because*** ████████████████████████████████████████████

████████████████████████████████████████████ (Turki Report ¶¶

---

[16]  The backcasting methodology looks to the back-end price drop on the dates of the alleged corrective disclosures, disaggregates confounding information, and then backcasts the remaining artificial inflation through prior trading days potentially to the beginning of the putative class period.  (Cain Tr. 296:19–297:9, 309:6–310:20.)

[17]  Dr. Cain did not consider whether there was any confounding information here.  (*Id.* 281:16–282:3.)

82, 84, Appx. Q.)  ***Bucks County, however, realized a net benefit of $2,724.15***.  (*Id.* ¶ 83, Appx. Q.) ██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████  (*Id.* ¶ 83; Cain Tr. 90:5–23, 91:17–21.)

**D.      Lead Plaintiffs' Lack Of Reliance.**

**1.      None Of Lead Plaintiffs' Purchases Of AdaptHealth Stock Were Based Upon Or Because Of The Alleged Misrepresentations.**

Lead Plaintiffs have repeatedly denied having any knowledge of Emerald's investment decisions with respect to AdaptHealth Stock.  (Bucks Tr. 176:15–22, 197:16–198:13; Del. Tr. 173:19–174:15; Ex. 25 at 5.)  As directed by Lead Plaintiffs, the AdaptHealth Defendants obtained discovery from Emerald, which has revealed ██████████████████████████

██████████████████████████████████████████████████

████  (Emerald Tr. 236:9–248:1, 271:10–285:19.)  ██████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████  (*Id.*)  █████████████

██████████████████████████████████████████████████

██████████████████████████  (*Id.* 105:6–24, 123:3–124:11, 220:12–221:10.)

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████  (*Id.* 201:16–203:2, 208:20–209:13.)  █████

██████████████████████████████████████████████████

██████████████████████████████████████████████████



██ (*id.* 224:15–227:3, 228:4–230:1, 236:9–247:8, 271:10–273:25; Exs. 1, 2, 4)—██████

██████████████████████████[18]

██████████████████████ (Emerald Tr. 250:19–251:23, 255:24–256:13.)[19] ██████

██████████████████████████████

---

## 2.    The Market For AdaptHealth Stock Was Not Efficient.

Dr. Cain opines that the market for AdaptHealth Stock was efficient during the putative class period.[20]  (Cain Report ¶¶ 24–79.)  Dr. Cain reached his conclusion based on his analysis of the following factors (each measured on average or in total):  (i) Average Weekly Trading Volume; (ii) Analyst Coverage; (iii) Market Makers; (iv) SEC Form S-3 Filing Eligibility; (v) Cause and Effect Relationship Between Company Information and Stock Prices; (vi) Market Capitalization; (vii) Bid-Ask Spread; (viii) Public Float; (ix) Institutional Ownership; (x) Autocorrelation; and (xi) Options Trading.   (*See id.* Section IV.)   For each factor, Dr. Cain analyzed the "full overarching class period."  (*Id.* ¶¶ 24–79; Cain Tr. 121:23–122:3.)

As highlighted by Dr. Turki's Report, Dr. Cain's market efficiency analysis is flawed. (Turki Report ¶ 28(a).)  ***The factors that Dr. Cain analyzed are necessary but not sufficient indicators of market efficiency*** and "academic literature typically does not use th[ose] factors" to assess market efficiency.  (*Id.* ¶ 43.)   Moreover, Dr. Cain makes a critical error by ignoring academic literature that indicates companies emerging from deSPAC transactions (like AdaptHealth) typically experience inefficiency in the market for their stocks for months following the transactions, in some cases due to lockup agreements (*i.e.*, restrictions on stock sales).  (*Id.* ¶¶ 34–35, 44–45.)  Though Dr. Cain testified that he was aware of this literature (Cain Tr. 117:18–24), that "the actual efficiency of the market for any given company [] depends on the circumstances for that company" (*id.* 107:15–18), and that companies can be "not efficient at certain points in time or over certain time periods" (*id.* 46:20–23), ***Dr. Cain admitted that he did not consider AdaptHealth's deSPAC transaction and that he did not undertake any effort to tailor his analysis to AdaptHealth, which had lockup agreements*** (*id.* 119:23–120:1, 121:1–13).

---

[20]  Dr. Cain begins his analysis on November 11, 2019, the first trading day, not November 8, 2019, when Lead Plaintiffs allege the putative class period begins.  (Cain Report ¶ 7 n.1; Cain Tr. 42:18–43:17.)

-19-

Instead, as he admitted in his deposition, Dr. Cain submitted a Report that is almost verbatim to reports on market efficiency that he has submitted in other distinguishable actions involving markedly different companies.[21] (Cain Tr. 35:12–36:3; *compare* Cain Report *with* Exs. 74 (*Recro Pharma*), 75 (*Bond*), 76 (*In re Quantumscape*).)  More importantly, ***had Dr. Cain analyzed market efficiency properly for this Action, he would have found that over half of the factors he considered are substantially different during the months following AdaptHealth's deSPAC transaction than he calculated and/or below the thresholds that were the basis for his market efficiency conclusion***. (*See* Turki Report ¶ 48.) Consistent with Dr. Cain's own admission that "if the majority of factors weighed against market efficiency, then [he] would not be able to conclude that a market was efficient for a given company" (Cain Tr. 104:4–8), Lead Plaintiffs have not offered any reliable economic evidence that the market for AdaptHealth Stock was efficient for the entire putative class period (Turki Report ¶¶ 43–49).

Other defects with Dr. Cain's market efficiency analysis include that:

- ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████ (Emerald Tr. 116:6–23, 121:2–18, 123:11–18);

- Dr. Cain acknowledged that his analysis was often guided by court instruction as opposed to economic principles (Cain Tr. 123:13–124:13, 138:19–24, 166:4–16, 170:21–171:5);

- Dr. Cain admitted that he only performed a cursory review of publicly available information to get a sense for the amount of information available for purposes of examining market efficiency (*id.* 42:10–13, 61:24–62:8);

---

[21] Dr. Cain admitted that he "almost always" uses a pre-written template for his market efficiency reports. (Cain Tr. 35:12–16.)  Perhaps this is because Dr. Cain is a professional expert—almost exclusively for plaintiffs (*id.* 17:15–18:12)—and apparently a busy one at that: in addition to the 25 cases he listed on his CV in which he has served as an expert (Cain Report Appx. A, pp. 45–46), Dr. Cain has been retained in at least four matters since July 2022 (when he last updated his CV) (Cain Tr. 16:16–17:3, 21:3–17), has been retained "between ten and twenty times" by Robbins Geller alone (*id.* 33:7–9), and has "provided market efficiency reports on a number of other cases for other law firms" (*id.* 49:19–25).  Dr. Cain also teaches law students how to be expert witnesses in a course titled "Economic Expert Witnesses: Depositions and Testimony." (Cain Tr. 29:20–30:2; Cain Report Appx. A, p. 44.)

- Despite repeatedly being asked during his deposition, Dr. Cain could not articulate how he weighs each of the factors or how he determines whether there is enough support based on his analyses of the factors to reach a finding of market efficiency (*id.* 100:14–106:19);

- ***Dr. Cain could not identify objective criteria in determining how to analyze certain factors but made the remarkable claim that his analysis was "objective because [he's] looking very objectively"*** (*id.* 110:11–25, 277:17–24);

- Dr. Cain admitted in his deposition that he did not run any tests to examine the most appropriate estimation period for his event study for Cammer Factor 5, nor did he consider any alternative estimation periods (*id.* 207:24–208:2, 209:1–6);

- Dr. Cain made no attempt to verify the accuracy of the Jehoshaphat Report's allegations, which he analyzed in connection with Cammer Factor 5 (*id.* 236:25–237:2; Cain Report ¶ 62); and

- Dr. Cain did not perform any analysis whatsoever regarding, *inter alia*, whether the alleged corrective disclosures corrected any prior statements made by AdaptHealth, whether any of the information contained in the alleged corrective disclosures were value-relevant or had been previously disclosed, whether any of the alleged misrepresentations affected AdaptHealth's stock price, whether any disclosures should have been made at any point during the class period, whether there was any actual artificial inflation or loss causation, or whether there was a connection between the corrective disclosures and the alleged misrepresentations (Cain Tr. 39:21–40:21, 70:9–19, 157:20–158:14, 159:23–160:2, 198:17–21, 199:23–201:17).

### 3. The Organic Growth Statements Had No Price Impact.

#### a. No Evidence Of Price Reaction.

As Dr. Turki explains in his Report, if the market for AdaptHealth Stock was efficient, as Lead Plaintiffs allege, then the disclosure of new and unexpected value-relevant information would be quickly and fully incorporated into AdaptHealth's stock price causing "statistically significant price increases on the days of the alleged misrepresentations *and* statistically significant price decreases on the days of the alleged corrective disclosures." (*Id.* ¶¶ 29–33, 39; *see also* Cain Tr. 72:13–18, 74:22–75:2, 80:9–12.) On the other hand, previously disclosed, expected, or any other non-value-relevant information cannot move a stock price. (Turki Report ¶¶ 30–33, 39.)

Here, there is no economic evidence that the Organic Growth Statements ever affected the price of AdaptHealth Stock. Assuming market efficiency, Dr. Turki performed an event study to assess AdaptHealth's stock price on the four dates when the Organic Growth Statements were

made.  (*Id.* ¶ 51, Appx. N.)  Dr. Turki determined that there was no statistically significant movement in the price of AdaptHealth Stock on three dates (March 4, March 16, and May 10)—meaning there was normal volatility or no evidence of any reaction—and a statistically significant decrease on the fourth date (May 6)—which is the exact opposite of the direction required to indicate reliance.  (*Id.* ¶ 51.)  Therefore, ***Dr. Turki concluded that "there is no reliable economic basis to conclude that the [Organic Growth Statements] contained new and unexpected value-relevant information for AdaptHealth investors."*** (*Id.*)

Dr. Turki also performed an event study to assess AdaptHealth's stock price on the date of the alleged corrective disclosure for the Organic Growth Issue.  (*Id.* ¶ 53.)  Dr. Turki determined that there was no statistically significant movement in the price of AdaptHealth Stock on July 19, 2021.  (*Id.*)  Again, the price of AdaptHealth Stock experienced normal volatility, not movement reflective of the market reacting to the Jehoshaphat Report; therefore, ***Dr. Turki concluded "there is no reliable economic basis to conclude the Jehoshaphat Report contained new and unexpected value-relevant information about AdaptHealth's organic growth methodology and organic growth calculations that allegedly revealed the 'truth' to the market."*** (*Id.*)

### b.      Nothing New Revealed By The Jehoshaphat Report.

The absence of any economic evidence consistent with an alleged fraud involving the Organic Growth Issue is not surprising.  It is indisputable that the Jehoshaphat Report, which purported to report on AdaptHealth's organic growth results using the pre-Q4 2020 methodology, did not reveal any new and unexpected information regarding AdaptHealth's organic growth generally or the Organic Growth Statements specifically.  ███████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████ (█████ Aff. ¶¶ 3, 7 (emphasis added).) And █████████ sworn statements are consistent with the findings set forth in the Report submitted by Ms. Markel, a former Chief Accountant for the SEC's Enforcement Division. After analyzing every sentence, graphic, and calculation in the Jehoshaphat Report, *Ms. Markel concluded that the organic growth calculations in the Jehoshaphat Report were derived solely from publicly available information and can be reproduced using publicly available information*. (Ex. 13, Markel Report ¶ 14.) Ms. Markel was able to reproduce each calculation in the Jehoshaphat Report (*id.* ¶ 16), and in doing so even identified at least one potential math error (*id.* ¶ 17). Indeed, this evidence is consistent with the testimony of Lead Plaintiffs' own expert, Dr. Cain, who admitted that he has "seen many examples" of the market not reacting to information because it is not new. (Cain Tr. 72:13–73:8.)

Furthermore, as noted earlier, the refined methodology reflected in the Organic Growth Statements was disclosed to and understood by the market *prior to* the publication of the Jehoshaphat Report. AdaptHealth described the refined methodology and provided results from that methodology in, *inter alia*, both the Q4 2020 Financial Supplement and Q1 2021 Financial Supplement. (Exs. 6 at 7; 9 at 7.) In addition, analysts acknowledged the refined methodology during AdaptHealth's earnings calls and in analyst reports.

| Analyst Discussions of AdaptHealth's Refined Methodology (Turki Report ¶¶ 57–58) | | |
|---|---|---|
| **Date** | **Source** | **Relevant Language** |
| **Mar. 4, 2021** | Ex. 7 at 11–12 (Q4 2020 Earnings Call Tr.) | In the context of AdaptHealth explaining that AdaptHealth's 2021 organic growth guidance included revenue from recent acquisitions, a Deutsche Bank analyst stated: "On the 2021 guidance raise, you talked about the 8% to 10% organic growth rate. So just to double check, is the guidance raise solely coming from M&A done since your last guidance?" Mr. McGee replied: "[T]he revenue raise is related to the acquisitions." |
| **May 6, 2021** | Ex. 10 at 17–18 (Q1 2021 Earnings Call Tr.) | An analyst from Baird acknowledged AdaptHealth's refined methodology and asked whether AdaptHealth had a more "traditional calculation on organic growth." Mr. Clemens explained why AdaptHealth adjusted its methodology for calculating organic growth, to which the analyst responded, "Yes . . . I get it." |

| Date | Source | Relevant Language |
|---|---|---|
| Mar. 4, 2021 | Ex. 62 at 1 (Baird Analyst Report) | Baird reported that AdaptHealth guidance "increased" and that drivers include a press release "not[ing] incremental 4Q and 1Q-to-date tuck-in acquisitions." |
| Mar. 4, 2021 | Ex. 61 at 1 (Jefferies Analyst Report) | Jefferies reported that "AHCO's guidance raise is driven by continued organic growth strength, as well as contributions from recently-completed acquisitions." |
| Mar. 4, 2021 | Ex. 64 at 4 (RBC Analyst Report) | When reporting AdaptHealth's current organic growth as 8–10%, RBC specified the following: "Guidance includes only contributions from completed acquisitions or announced acquisitions." |
| Mar. 4, 2021 | Ex. 63 at 1 (Canaccord Analyst Report) | Canaccord reported that "AHCO raised 2021 guidance with revenue moving higher on recent M&A transactions and adj-EBITDA from acquisitions and better-than-expected AeroCare integration cost synergies ($30M annualized versus $25M targeted previously) in 2020." |

### c.    No Link To The July 19, 2021 Price Decline.

Even assuming that the decline in the price of AdaptHealth Stock can be attributed to an information event, that decline was not caused by any revelations in the Jehoshaphat Report that purportedly concerned the Organic Growth Statements. Not only was the content of the Jehoshaphat Report publicly available (*see supra* pp. 22–24), but ***the mere publication of the Jehoshaphat Report can account for all of the price decline that day*** (which as discussed above was equivalent to normal volatility (*see supra* p. 22)). (Ex. 14, Savoldelli Report ¶¶ 60–82.) As Mr. Savoldelli explains, the Jehoshaphat Report bears the same characteristics as short-seller reports that cause short-term negative impacts on a target company's stock price based solely on their publication, separate and apart from their content. (*Id.*) For example, the Jehoshaphat Report was issued by a little-known, anonymous short seller; contained no material, nonpublic information; and used sensationalistic language in an effort to drive down AdaptHealth's stock price.[22]  (*Id.* ¶¶ 61–77.) Also, reputable sell-side analysts dismissed the Jehoshaphat Report's contents, and there was no meaningful increase in short-selling activity on July 19, 2021, neither of which would be true if the Report contained material, nonpublic information. (*Id.* ¶¶ 72–83.)

---

[22] Dr. Cain concurred that it was a "typical prediction" for the Jehoshaphat Report to negatively impact AdaptHealth's stock price because it had a "very clear negative sentiment." (Cain Tr. 240:24–241:23.)

| Analyst Reactions to the Jehoshaphat Report | | |
|---|---|---|
| **Date** | **Source** | **Relevant Language** |
| **July 19, 2021** | Ex. 70 at 1 (Deutsche Bank Analyst Report) | "Below we highlight what we see as the key inconsistencies in the [anonymous short report's] conclusion. . . . While we too would appreciate a true 'same store' growth number, we also agree with management when they highlight that this type of figure simply doesn't provide a clear representation of the business." |
| **July 27, 2021** | Ex. 71 at 1 (Baird Analyst Report) | "We received a flurry of inbound requests for AHCO discussion and model requests . . . following a lengthy short report anonymously issued by a firm called Jehosaphat [sic]. Our mindset is not to get in a lengthy battle of wits with authors who hide under anonymity, inappropriately state opinions as facts, bias interpretations with limited data sets when broad data sets are readily available, distort reality and make many claims based on off-base assumptions and guesses." |
| **Aug. 5, 2021** | Ex. 72 at 1 (Canaccord Analyst Report) | "ACHO [sic] also came under scrutiny in mid-July from a short report that questioned its organic growth . . . [w]e are encouraged that the 'noise' is not impacting AHCO's operations and execution." |
| **Aug. 11, 2021** | Ex. 73 at 1 (Deutsche Bank Analyst Report) | "[T]he author (who is short the stock and pushing the story to move the stock down) clearly only gives one side of this issue. To point out the obvious here, AHCO is a roll-up . . . . So to spend 100% of your time on 33% of the business means that you miss the whole picture." |



(Emerald Tr. 316:22–317:12.)

(*Id.* 316:22–319:8.)

(*Id.*; Ex. 50.)

### 4.    The Miscellaneous Statements Had No Price Impact.

#### a.    No Nexus To The April 13 Press Release.

Despite being a critical requirement for Lead Plaintiffs' price-maintenance inflation theory, there is a mismatch between the Miscellaneous Statements and the April 13 Press Release. As a preliminary matter, none of the information disclosed in the April 13 Press Release—*i.e.*, that Defendant McGee was allegedly involved in an alleged foreign tax fraud, that Defendant McGee had been indicted for criminal tax fraud in Denmark, and that Defendant McGee had been placed

-25-

on unpaid leave—is even addressed by the Miscellaneous Statements, let alone contradicted by those alleged misrepresentations. (*See* A.C. ¶¶ 76–78, 80–83, 86–90, 93–96, 99–102, 105–06, 108–12.) Those statements—most of which do not even reference (explicitly or not) Defendant McGee—concern completely unrelated topics.[23]

In any event, Dr. Craig Lewis, an expert in investor decision-making, has examined the Miscellaneous Statements to determine whether investors would have connected the information in the April 13 Press Release to those Statements. (Ex. 12, Lewis Report ¶ 17.) The clear answer from his analysis is no. The Miscellaneous Statements were either generic, boilerplate statements and/or redundant statements of previously disclosed information, such that investors would have ignored them when they were made. (*Id.* ¶¶ 38–52, 59–60, 64–68.) Furthermore, given the specific information contained in the April 13 Press Release, ***investors would neither connect the AdaptHealth Press Release to the Miscellaneous Statements nor conclude that the AdaptHealth Press Release revealed any information that implicated the accuracy of the Miscellaneous Statements***. (*Id.* ¶¶ 55–57, 61–62, 69–74.) Nor would investors expect to find statements about Defendant McGee's personal conduct, unrelated to AdaptHealth's business, among the Miscellaneous Statements. (*Id.* ¶ 72.) Notably, as Dr. Lewis observes, ***not a single analyst during the McGee Tax Period quoted or otherwise referenced the Miscellaneous Statements in an analyst report, not even when discussing AdaptHealth after the issuance of the April 13 Press Release***. (*Id.* ¶¶ 53–54, 62, 73.)

---

[23] Examples include "AdaptHealth will continue to be led by its seasoned team of industry and financial professionals, including Chief Executive Officer, Luke McGee; President, Josh Parnes; and Chief Financial Officer, Gregg Holst" (A.C. ¶ 76), "AdaptHealth is involved in investigations, claims, lawsuits and other proceedings arising in the ordinary course of its business" (*id.* ¶ 90), and "We are very pleased with AdaptHealth Holdings' year-to-date 2019 financial results, which included significant increases in revenue and Adjusted EBITDA that demonstrate the successful execution of our strategy to grow organically and through accretive acquisitions" (*id.* ¶ 77). (*See* Exs. 1, 2, 5.)

### b.       No Evidence Of Price Reaction When Made.

There is no economic evidence that the Miscellaneous Statements affected the price of AdaptHealth Stock when they were made.  Assuming market efficiency, Dr. Turki performed an event study to assess the price of AdaptHealth Stock on 15 dates when the Miscellaneous Statements were made.  (*Id.* ¶¶ 67–68.)  Dr. Turki determined that none of those dates were associated with a statistically significant movement in the price of AdaptHealth Stock.  (*Id.*)  As such, ***Dr. Turki concluded that the price of AdaptHealth Stock experienced normal volatility, not any movement that would be reflective of or attributable to the market relying on the Miscellaneous Statements (i.e., a statistically significant increase)***.  (*Id.*)

This is consistent with Dr. Lewis's observation that no analyst ever quoted or otherwise referenced the Miscellaneous Statements in an analyst report.  As Dr. Lewis explains, ***investors would not have considered such Statements with respect to their equity investment decisions and likely would have ignored them altogether due to their content***—generic, boilerplate statements that were consistent with the types of statements made by comparable companies and redundant statements of historical fact.  (Lewis Report ¶ 17.)

(*See, e.g.*, Exs. 33–43, 45.)

(*See supra* pp. 17–18.)

### c.       No Link To The April 13, 2021 Price Decline.

***The McGee Tax Issue Was Publicly Available Information.***  The McGee Tax Issue—*i.e.*, that Defendant McGee was allegedly involved in an alleged foreign tax fraud—was publicly available information prior to the April 13 Press Release *and* prior to all except one Miscellaneous

Statement.[24]    As analysts acknowledged following the April 13 Press Release,[25] there were

multiple news articles disclosing this information to the market.

| Date | Source | Quote |
|------|--------|-------|
| Nov. 21, 2019 | Ex. 81 (Berlingske) | "The newspapers' reports show that the two financiers have played key roles in the alleged fraud as close business partners of the alleged ringleader of the dividend scam, Sanjay Shah, who has been charged in the case. . . . The company also included Jerome Lhote and Matthew Stein, . . . who have settled with the Danish Tax Agency along with a third partner, Luke McGee." |
| Nov. 21, 2019 | Ex. 80 (Børsen) | "Earlier this year[], Matthew Stein, Jerome Lhote and the previously unknown business partner Luke McGee, entered into a settlement with the Danish Tax Agency to repay the money that they had received through Shah, the former Shah people and North Channel Bank." |
| Nov. 21, 2019 | Ex. 82 (DR) | "A number of John van Merkensteijn's and Richard Markowitz's pension funds were among the very first—in collaboration with Sanjay Shah—to start embezzling money from the tax authorities in late summer 2012, when the alleged billion-dollar fraud against Denmark began . . . The same company also included Jerome Lhote and Matthew Stein . . . as accomplices in the case, and who earlier this year settled with the IRS along with a third partner, Luke McGee." |
| Jan. 24, 2020 | Ex. 83 (DR) | "The three, Matt Stein, Jherome Lhote and Luke McGee, are via a large number of front men, behind a total of 61 American pension funds, which in the period between August 2012 to August 2015, received a total of 2.9 billion kroner paid out via the total of 12.7 billion kroner that the Danish Tax Agency (then called Skat) collectively was meant to have been cheated out of through fictitious equity trading scams, so-called cum-ex transactions." |
| Feb. 7, 2020 | Ex. 84 (Politiken) | "While the bank's former management are now behind bars in Germany, the bank's main shareholders, Americans Matthew Stein, Jerome Lhote and Luke McGee, are free. . . . However, TV 2 and Politiken revealed in September 2019 that both Larosa and Donaldson were simple middlemen. The actual people behind it were hiding behind them: Matthew Stein, Jerome Lhote and Luke McGee, who are also the hidden main shareholders in North Channel Bank." |
| Feb. 21, 2020 | Ex. 85 (Reporter) | "In 2009, they took over a small private bank based in Mainz. Between 2012 and 2015, North Channel Bank is alleged to have been part of a network that defrauded Denmark and Belgium of millions in taxes. . . . According to the Danish television station TV2, Jérôme Lhote, Matthew Stein and Luke McGee admitted to the transactions and have reached an agreement with the Danish tax authorities to pay back the equivalent of 210 million euros." |

In addition, on November 19, 2019, Denmark commenced a U.S. civil action that concerned the

same alleged foreign tax fraud and named as defendants two entities linked to Defendant McGee.[26]

(Ex. 79.)  That action was accessible on the public docket and had over 150 filings during the

McGee Tax Period.  (Ex. 95.)

---

[24]  The Court may take judicial notice of publicly available documents showing information available to the markets. *See Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 2022 WL 3597200, at *15 n.13 (E.D. Pa. Aug. 23, 2022) (The court "may take judicial notice of news articles in order 'to indicate what was in the public realm at the time.'"); *see also In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 264 n.3 (3d Cir. 2005) (noting that the court "can take judicial notice of [publicly traded] stock prices").

[25]  *See, e.g.*, Exs. 69 at 3–4; 48; 49 at 4.

[26]  The SDNY Complaint identified a "sole participant" connected to 2321 Capital LLC and Lion Advisory Inc. with addresses in New York associated in public records with Mr. McGee.  (Ex. 79 ¶¶ 21, 29.)  Additionally, AdaptHealth stated in a Form 8-K filed on November 14, 2019 that Mr. McGee controlled 2321 Capital LLC.  (Ex. 3 at 9.)

-28-

***The April 13, 2021 Stock Decline Is Not Attributable To The McGee Tax Issue.***  Dr. Turki performed an event study to assess the price of AdaptHealth Stock on April 13, 2021, the date of the alleged corrective disclosure for the McGee Tax Issue.  (*Id.* ¶ 69.)  Because Dr. Turki concluded that there was a statistically significant decrease in the price of AdaptHealth Stock—which merely indicates that the market was reacting to value-relevant information—Dr. Turki also performed additional analysis to determine whether the McGee Tax Issue was value-relevant information that contributed to that price decline.  (*Id.*)  Dr. Turki concluded, however, that the McGee Tax Issue did not cause any portion of that decline because information concerning the McGee Tax Issue was "stale information at the time of the April 13 Press Release" and thus "could not have elicited a negative stock price reaction."  (*Id.* ¶¶ 69–75.)

Dr. Turki further concluded there were other pieces of information besides the McGee Tax Issue disclosed in the April 13 Press Release that were new and unexpected value-relevant information and explain the entirety of the price decline that day.  (*Id.* ¶¶ 76–81.)  First, the April 13 Press Release disclosed that Defendant McGee was criminally indicted in Denmark.  This information was new—and only a few hours old—because the Denmark Authorities had charged him only earlier that day (*see* Exs. 86–88) and the type of information that can have a negative impact on a company's stock price (Turki Report ¶¶ 77–78).  Second, the April 13 Press Release disclosed that Defendant McGee was placed on unpaid leave.  This too was new and unexpected information, and it is well established that the unexpected departure of a company's CEO (as was the case here) can by itself cause a statistically significant decrease in the company's stock price.  (*Id.* ¶¶ 79–80.)  Indeed, in the analyst reports issued in the wake of the April 13 Press Release, analysts focused almost exclusively on Defendant McGee's departure.  (*See, e.g.*, Exs. 65–68.)

Once again, Dr. Turki's conclusion is consistent with documents and testimony from Emerald.



(Emerald Tr. 290:16–292:3),

(Exs. 46–47)

(Emerald Tr. 289:24–290:5, 291:8–293:5).

(*Id.* 292:4–293:5.)

### E.   Lead Plaintiffs' Inability To Represent The Putative Class.

#### 1.   Lead Plaintiffs Do Not Control This Litigation.

Since Delaware County and Bucks County were appointed as Lead Plaintiffs, this Action has proceeded consistent with its origins:  Robbins Geller, who stands to gain the largest portion of any recovery,[27] directs this Action, while Lead Plaintiffs merely serve as the vessels for Robbins Geller to litigate.[28]  Lead Plaintiffs, by their own testimony, have rubber-stamped filings and passively received intermittent case updates (Bucks Tr. 71:21–73:6, 151:9–152:7, 243:5–20; Del. Tr. 107:11–108:18), have conducted overly narrow and haphazard searches for discovery purposes (Bucks Tr. 237:3–241:20; Del. Tr. 209:20–210:9, 210:22–211:3), and have developed only a

---

[27] Far more than any class member it represented, Robbins Geller earned the most of any plaintiffs' law firm in 2022 from securities settlements, totaling over $1.75 billion.  (Ex. 94.)

[28] Lead Plaintiffs have retained Robbins Geller under terms that disincentivize them from being involved in this Action.

(Exs. 54–55.)

superficial, highly coached understanding of their claims based entirely on their deposition preparations (Bucks Tr. 66:1–67:3, 71:21–24, 72:15–18; Del. Tr. 33:22–34:21).  For example:

- Bucks County only became aware of the purported misrepresentations and corrective disclosures when its representative "began to prepare for the deposition" (Bucks Tr. 71:21–24, 72:15–18), while Delaware County still does not know the dates of the putative class period it is alleging (Del. Tr. 39:17–40:9);

- Lead Plaintiffs provided responses almost verbatim to the Amended Complaint regarding their purported knowledge of this Action, and yet when pressed to explain the terminology or import of their responses, they could not do so (Bucks Tr. 66:1–71:24; Del. Tr. 33:22–34:21, 188:4–189:3);

- Neither Lead Plaintiff has read the AdaptHealth disclosures at issue (Bucks Tr. 86:10–87:5, 201:22–202:5; Del. Tr. 186:12–22);

- Lead Plaintiffs' respective boards are not involved in this Action, and since September 2021, have only discussed this Action at two board meetings each, all in connection with their appointment as Lead Plaintiffs and/or retention of Robbins Geller (Exs. 53, 56, 91–92); and

- Since September 2021, Robbins Geller has initiated 80–90% of its communications with Delaware County and most of its communications with Bucks County  (Del. Tr. 94:12–95:8; Bucks Tr. 137:6–18).

### 2.    <u>Lead Plaintiffs Disagree With The Amended Complaint.</u>

The Amended Complaint identifies 34 alleged misrepresentations by AdaptHealth as "materially false and misleading."  (A.C. ¶¶ 76–126.)  However, both Lead Plaintiffs revealed during their depositions that the Amended Complaint's allegations are not consistent with their own understanding of AdaptHealth's disclosures.[29]  For example, regarding a Miscellaneous Statement about Mr. McGee's career history, Bucks County testified that it "d[id not] believe" that *any* of the sentences in Paragraph 86 of the Amended Complaint were "false or misleading." (Bucks Tr. 215:14–217:13.)   Similarly, regarding a Miscellaneous Statement about two acquisitions that closed during Q2 2020, Delaware County testified that it did not view most of the

---

[29]  This is another issue that the AdaptHealth Defendants would have liked to explore in class discovery but did not become aware of until after the Court denied any further extension of the deadline.

sentences in Paragraph 94 of the Amended Complaint to be "false or misleading." (Del. Tr. 190:24–191:20, 195:2–23.)

### 3. Lead Plaintiffs Cannot Independently Represent Any Class.

Both Delaware County and Bucks County have experience serving as the sole lead plaintiff and/or class representative. (Bucks Tr. 10:11–20, 154:14–155:10; Del. Tr. 80:15–90:8.) Yet, for reasons that they could not explain at their depositions, they are wedded to proceeding together and are unwilling to commit to being able to proceed independently. For instance, Delaware County's representative testified it would "benefit both counties" to serve as co-Lead Plaintiffs and that "acting together made sense" (Del. Tr. 41:20–25, 61:24–62:5, 64:24–65:5), while Bucks County's representative testified that it "ma[de] sense" and was a "good fit" because both counties had retained Robbins Geller and acknowledged that it "could probably do a better job" with Delaware County as a co-Lead Plaintiff (Bucks Tr. 78:6–79:24). Perhaps Bucks County's preoccupation with doing "very little work" (Ex. 53) and Delaware County's inability to involve senior management in discovery sheds light on the situation (Del. Tr. 209:9–25).

### 4. Lead Plaintiffs Want Any Class To Be Prioritized Over Themselves.

Although Lead Plaintiffs have a fiduciary duty to county employees who deposit money in their respective retirement funds *and* seek to recover their losses[30] (Bucks Tr. 54:20–56:8, 88:8–89:19, 244:10–245:8; Del. Tr. 28:13–29:12), Lead Plaintiffs contend they are committed to prioritizing the best interests of any putative class over their own. For example, Bucks County testified that: "Robbins Geller should protect the class. They're not just in it for Bucks County. So if our interest was different than the rest of the class' interest, they should do what is right for the entire class." (Bucks Tr. 114:21–115:18; *see also id.* 112:21–115:18 (when asked about potential

---

[30] Their "best outcome" is to recover losses and minimize costs. (Bucks Tr. 89:7–19; Del Tr. 72:23–73:7, 79:10–17.)

conflicts with Delaware County, "Robbins Geller is going to protect and do what is best for the entire class").)   Similarly, Delaware County testified that "just having Delaware County paid would not be sufficient" to satisfy Delaware County's interest in the litigation because it must also ensure that other putative class members recover.  (Del. Tr. 98:6–99:9; *see also id.* 67:25–68:15 (when asked about potential conflicts with any class, "[w]e expect Robbins Geller to act in the best interest of the class, including Delaware County").)

F.     **Lack Of Traceability Of Lead Plaintiffs' AdaptHealth Stock.**

There is no evidence that Lead Plaintiffs acquired any of the shares sold in connection with the Secondary Offering. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████ (Emerald Tr. 261:7–263:5.)  But, as Mr. Wiener, former DTC counsel, explains in his Report, that is not proof of which of the over 55 million indistinguishable shares of AdaptHealth Stock held by DTC when the Secondary Offering closed—only 9.2 million of which were sold in the Secondary Offering—were actually acquired by Lead Plaintiffs.  (Ex. 22, Cont. Aff. ¶¶ 4, 10, 13, 16; Ex. 16, Wiener Report ¶¶ 52, 54–55.)  For example, Jefferies had numerous shares of AdaptHealth Stock unconnected to the Secondary Offering.  (Ex. 23, Jefferies Aff. ¶ 4.)  Also, there was no unique identifier for the Secondary Offering; ███████████████████████████████████

███████████████████████████████████████████████ (Cont. Aff. ¶¶ 4, 10, 16; Ex. 24, DTCC Aff. ¶¶ 3–6; Wiener Report ¶¶ 53, 68; Exs. 44, 57, 58.)

Nevertheless, Mr. Wiener reconstructed the flow of interests in shares for the Secondary Offering based on his knowledge of DTC's intermediated securities holding system, Lead Plaintiffs' trading history, and affidavits provided by AdaptHealth's transfer agent and registrar (Continental), DTCC, and Jefferies.  (Wiener Report ¶¶ 57–63.)  Mr. Wiener concluded that (i) the

-33-

9.2 million shares sold in the Secondary Offering were held at DTC (not at Emerald or Jefferies) and DTC held those shares in a single undifferentiated fungible aggregate bulk and commingled them with over 46 million identical and indistinguishable shares (*id.* ¶¶ 16, 51–63, 71–73), and (ii) *no "method exists by which Lead Plaintiffs . . . would be able to show that they acquired AdaptHealth Stock traceable to the Secondary Offering"* (*id.* ¶ 73).

## LEGAL STANDARD

Class actions are "the exception," not the rule. *Comcast*, 569 U.S. at 33. No class can be certified unless Lead Plaintiffs "affirmatively demonstrate" "by a preponderance of the evidence" that they have met all of the requirements of Rule 23 as to all of their claims. *Wal-Mart*, 564 U.S. at 350; *Marcus v. BMV of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012). The district court must conduct a "rigorous analysis" to assess whether there is actual, rather than presumed, conformance with Rule 23. *See Wal-Mart*, 564 U.S. at 350–51; *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309, 318, 322 (3d Cir. 2008). And that analysis must include carefully considering *all* of the "relevant evidence and arguments" presented by the AdaptHealth Defendants opposing class certification, resolving "*all* factual or legal disputes relevant to class certification, even if they overlap with the merits" or otherwise require "prob[ing] beyond the surface of [Lead Plaintiffs'] allegations," and disregarding Lead Plaintiffs' unsupported assertions. *Id.* at 307 (emphasis added); *Newton*, 259 F.3d at 168–69. Should Lead Plaintiffs fail to meet their burden as to any Rule 23 requirement, as is the case here, the Court must deny class certification. *See, e.g.*, *Gonzalez v. Corning*, 885 F.3d 186, 201 (3d Cir. 2018) (affirming denial of class certification due to failure to satisfy predominance); *Malack v. BDO Seidman, LLP*, 617 F.3d 743, 745 (3d Cir. 2010) (same); *Johnston v. HBO Film Mgmt. Inc.*, 265 F.3d 178, 193–94 (3d Cir. 2001) (same); *George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *7 (S.D.N.Y. July 3, 2013) (denying class certification due to failure to satisfy adequacy, typicality, and predominance).

**ARGUMENT**

I.    **THE COURT SHOULD NOT CERTIFY ANY CLASS FOR LEAD PLAINTIFFS' EXCHANGE ACT CLAIMS.**

Lead Plaintiffs have failed to establish by a preponderance of the evidence that a class should be certified for their Exchange Act claims.

A.    **Lead Plaintiffs Must Demonstrate That The McGee Tax Issue And The Organic Growth Issue Are Independently Entitled To Class Certification.**

Putting aside the myriad flaws with Lead Plaintiffs' Motion, there is an issue that must be addressed at the outset:  Lead Plaintiffs have shoehorned two separate and distinct class actions into a single request for class certification.  Lead Plaintiffs—as they have admitted—are pursuing two different (not alternative) theories of liability premised on two different sets of facts, two different timelines, and two different courses of conduct that allegedly violated the securities laws.  Yet, Lead Plaintiffs completely ignore this issue and its obvious implications for the Rule 23 requirements, instead contending that they are seeking a single, continuous class period with no subclasses.  This is not permissible.  Lead Plaintiffs must satisfy Rule 23 as to both the Organic Growth Action (*see supra* pp. 9–10) and the McGee Tax Action (*see supra* pp. 10–11).  *See, e.g.*, *In re BP P.L.C. Sec. Litig.*, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013);[31] *In re Paulsboro Derailment Cases*, 2014 WL 4162790, at \*12–14 (D.N.J. Aug. 20, 2014) (denying class certification where one subclass failed to satisfy the predominance requirement); *Roman v. Korson*, 152 F.R.D. 101, 106 (W.D. Mich. 1993) (denying class certification where court "separately" considered certification of "multiple classes and subclasses" and determined some did not "independently satisfy the class action criteria").

---

[31]  In *In re BP P.L.C. Securities Litigation*, plaintiffs asserted "four broad categories" of alleged misstatements.  *Id.* at \*1–2.  Plaintiffs sought to certify a court-imposed subclass to account for "concerns that the two groups had articulated significantly different theories of the alleged fraud," but the court found adequacy was not satisfied for particular periods and plaintiffs and denied class certification based on lack of predominance.  *Id.* at \*3, 11–12, 15, 18.

**B.      Lead Plaintiffs Cannot Satisfy The Predominance Requirement Of Rule 23(b)(3) For Their Exchange Act Claims.**

Predominance requires that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  It is a "significantly . . . demanding" inquiry that requires more than a common claim.  *Newton*, 259 F.3d at 187; *Davis v. Bank of Am., N.A.*, 2016 WL 427049, at *4 (E.D. Pa. Feb. 3, 2016).  Indeed, if any "essential element[] of [a] cause of action requires individual treatment, then class certification is unsuitable."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311; *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*") (predominance analysis "begins, of course, with the elements of the underlying cause of action").  That is exactly the case here.  As set forth below, individual issues overwhelm common issues with respect to two crucial elements of Lead Plaintiffs' Section 10(b) claims:  reliance and damages.  Lead Plaintiffs have thus failed to prove predominance.

**1.      Lead Plaintiffs Have Failed To Establish Classwide Reliance.**

There are two avenues for Lead Plaintiffs to establish classwide reliance:  the *Basic* (or "fraud on the market") Presumption—*i.e.*, that investors who buy securities in "an impersonal, well-developed market" do so "in reliance on the integrity of th[e] price" and "[b]ecause most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations . . . may be presumed," *Basic*, 485 U.S. at 247; *Goldman*, 141 S. Ct. at 1957; *In re Merck*, 432 F.3d at 270 n.8—and the *Affiliated Ute* Presumption—*i.e.*, that proof of "reliance on a negative would be practically impossible to prove," *Johnston*, 265 F.3d at 193; *Affiliated Ute*, 406 U.S. at 153.

-36-

Lead Plaintiffs may invoke only one reliance presumption,[32] which must apply to this entire Action; and if that presumption is inapplicable, predominance is defeated. *See Goldman*, 141 S. Ct. at 1958–59 ("[W]ithout the *Basic* [P]resumption, individualized issues of reliance ordinarily would defeat predominance and preclude certification of a securities-fraud class action." (internal quotation marks omitted)); *Halliburton II*, 573 U.S. at 281–82 ("[W]ithout the presumption of reliance . . . [e]ach plaintiff would have to prove reliance individually."); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 462–63 (2013) ("Absent the fraud-on-the-market theory, . . . reliance would ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class."); *Johnston*, 265 F.3d at 191 n.6, 193–94 (individual issues predominate where neither the *Affiliated Ute* Presumption nor *Basic* Presumption is applicable); *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 217–18 (E.D. Pa. 2008) (same); *Angelastro v. Prudential-Bache Sec., Inc.*, 113 F.R.D. 579, 585 (D.N.J. 1986) ("Since the plaintiff here cannot rely on a presumption of reliance, she and each of the 190,000 class members would have to come into court individually and prove that issue at trial.").

Here, Lead Plaintiffs vaguely but impermissibly invoke both the *Basic* Presumption and the *Affiliated Ute* Presumption. (Mot. §§ III.B.1.a & III.B.1.b.) Nevertheless, as set forth below, Lead Plaintiffs' strategy is futile. Neither the *Basic* Presumption nor the *Affiliated Ute* Presumption is applicable to *both* the Organic Growth Action and the McGee Tax Action, leaving some if not all issues of reliance unable to be resolved through common proof. This, of course, is the hallmark of an action that fails to satisfy the predominance requirement and cannot be certified.

---

[32] The Third Circuit has recognized that "a unitary burden of proof on the reliance issue" is required, such that one presumption—*Basic* or *Affiliated Ute*—will be applied to a case as a whole, not both. *Hoxworth*, 903 F.2d at 202; *see, e.g.*, *Johnston*, 265 F.3d at 192 (declining to apply *Affiliated Ute* Presumption where *Basic* Presumption applied); *Energy Transfer LP*, 2022 WL 3597200, at *2 n.2 (same).

##### a.      Lead Plaintiffs Are Not Entitled To The *Basic* Presumption.

###### i.      *The Presumption's Requirements Are Not Satisfied.*

The *Basic* Presumption arises out of an economic principle known as the efficient market theory.  As Dr. Turki explains in his Report, that theory provides that:  "In an efficient market, the disclosure of any new and unexpected value-relevant information—whether in SEC filings, earnings releases, presentations, news articles, court filings, etc.—is quickly and fully incorporated into the company's stock price at the time the disclosure is made."  (*Id.*  ¶ 30); *Halliburton II*, 573 U.S. at 270 (the "efficient capital markets hypothesis" posits that "the market price of shares traded on well-developed markets reflects all publicly available information").  The *Basic* Presumption extends the efficient market theory to securities litigation by allowing plaintiffs to presume reliance instead of proving it "on the theory that investors rely on the market price of a company's security, which in an efficient market incorporates all of the company's public misrepresentations." *Goldman*, 141 S. Ct. at 1957; *Basic*, 485 U.S. at 247 ("Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations . . . may be presumed.").

To invoke the *Basic* Presumption, Lead Plaintiffs must prove, *inter alia*, that (i) AdaptHealth Stock "traded on an efficient market," and (ii) they "traded the shares between the time the misrepresentations were made and the time the truth was revealed."  *Basic*, 485 U.S. at 248 n.27; *Goldman*, 141 S. Ct. at 1958; *see Semerenko v. Cendant Corp.*, 223 F.3d 165, 178–81 (3d Cir. 2000).  Neither requirement is satisfied here.  Therefore, the *Basic* Presumption is inapplicable and does not satisfy Lead Plaintiffs' burden to establish classwide reliance.

### (1)    The Market For AdaptHealth Stock Was Not Efficient For The Entire Putative Class Period.

Lead Plaintiffs are not entitled to the *Basic* Presumption because they have not satisfied their burden of showing that the market was efficient for the entire putative class period. Lead Plaintiffs contend that the market for AdaptHealth Stock was efficient based upon Dr. Cain's Report, wherein Dr. Cain concludes that the market for AdaptHealth Stock was efficient. (Cain Report ¶¶ 10, 27–79.) But Dr. Cain's Report is flawed in many serious respects (*see supra* pp. 19–21),[33] most notably because he fails to analyze the lockup agreements in effect following AdaptHealth's deSPAC transaction and does not otherwise consider their potential impact on the lack of efficiency of the market for AdaptHealth Stock. (Cain Tr. 119:23–120:1, 121:10–13.) Dr. Cain admitted to these oversights—testifying that a market may be inefficient at "certain points in time" (*id.* 46:15–23) and that a market efficiency analysis requires considering the company's specific facts and circumstances (*id.* 107:15–18), and yet he evaluated the "full overarching class period" and did not tailor his analysis to AdaptHealth (*id.* 121:1–24, 176:11–16, 255:20–25).

As Dr. Turki explains in his Report, analyzing the lockup periods using the same market efficiency factors as Dr. Cain and the same methodology as Dr. Cain yields results that are not indicative of market efficiency. Indeed, the results for 7 of the 11 market efficiency factors are markedly less favorable than Dr. Cain calculated, with multiple factors even falling below the

---

[33] Not only is the substance of his Report identical to reports that he has submitted in other distinguishable matters, but he relies on his understanding of court decisions, not economic principles, to determine how to analyze market efficiency (Cain Tr. 122:25–123:16, 124:8–13) and applies no objective criteria in determining how to analyze particular market efficiency factors (*id.* 101:18–23), what thresholds or results would be indicative of market efficiency (*id.* 110:11–21), or even the results required across all market efficiency factors to warrant a conclusion of market efficiency (*id.* 103:6–106:19). All of this—as Dr. Cain repeatedly stated he could not explain during his deposition—was in his discretion as an expert who teaches law students to be expert witnesses (*id.* 29:20–30:2), who "almost always" shapes his market efficiency report around a pre-written template (*id.* 35:12–16), who had no independent recollection of Lead Plaintiffs' theories apart from the scant paragraphs in the background section of his Report (*id.* 263:20–264:2), and who is a hired gun for plaintiffs' law firms (*id.* 18:6–12, 33:5–9). Moreover, the factors that Dr. Cain analyzed are necessary but not sufficient indicators of market efficiency. (Turki Report ¶ 43.)

minimum thresholds that Dr. Cain contends are necessary for market efficiency.[34]  (Turki Report ¶ 48.)  These and other glaring deficiencies render Dr. Cain's opinion unreliable and inaccurate.

Having failed to prove market efficiency for the entire putative class period, Lead Plaintiffs cannot rely on the *Basic* Presumption to establish classwide reliance.[35]  *See, e.g.*, *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 210 (2d Cir. 2008) (no *Basic* Presumption where market efficiency not proved); *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 2020 WL 5026553, at *4 (D. Del. Aug. 25, 2020) (same); *In re Glob. Brokerage, Inc.*, 2021 WL 1160056, at *18–19 (S.D.N.Y. Mar. 18, 2021) (same); *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 182 (S.D.N.Y. 2012) (same).

### (2)   *Lead Plaintiffs Did Not Purchase AdaptHealth Stock During The Organic Growth Period.*

Lead Plaintiffs are also not entitled to the *Basic* Presumption with respect to the Organic Growth Action for an additional reason.  Lead Plaintiffs did not purchase any AdaptHealth Stock during the Organic Growth Period (*see supra* pp. 14, 16–17), and thus were never in a position to have relied on the Organic Growth Statements.  There can be no presumption of reliance given these circumstances.  *See Halliburton II*, 573 U.S. at 278 ("[I]f the plaintiff did not buy or sell the stock after the misrepresentation was made but before the truth was revealed, then he could not be said to have acted in reliance on a fraud-tainted price."); *see, e.g.*, *Alpine 4 Holdings Inc. v. Finn Mgmt. GP LLC*, 2022 WL 3598246, at *3 (D. Ariz. Aug. 23, 2022) (applying *Halliburton II*).

---

[34]  For example, with respect to Average Weekly Trading Volume ("AWTV"), Dr. Cain states that the threshold to justify a strong presumption of market efficiency is 2% or more.  (Cain Report ¶ 28.)  Dr. Cain found AWTV was 3.56% during the entire putative class period.  (*Id.* ¶ 29.)  However, Dr. Turki found during the three, six, and nine months following the deSPAC transaction that AWTV was equal to 0.88%, 1.01%, and 1.54%, respectively—all of which are under Dr. Cain's 2% threshold.  (Turki Report ¶ 48(a).)

[35]  Carving out the inefficient time periods would not remedy the situation for Lead Plaintiffs.  There would be a period of potentially nine months—from November 11, 2019, through August 11, 2020—when Lead Plaintiffs would be required to prove reliance on an individualized basis, which runs afoul of the predominance requirement.

-40-

### ii. The Presumption Is Rebutted By Price Impact Evidence.

Even if, as Lead Plaintiffs erroneously contend, the *Basic* Presumption applies here, the AdaptHealth Defendants can rebut that presumption by demonstrating that the Organic Growth Statements and the Miscellaneous Statements did not artificially inflate[36] or maintain[37] the price of AdaptHealth Stock. *See Goldman*, 141 S. Ct. at 1955 ("[D]efendants may rebut the *Basic* [P]resumption at class certification 'by showing . . . that the particular misrepresentation at issue did not affect the stock's market price.'" (citation omitted)); *Halliburton II*, 573 U.S. at 269 ("[I]f a defendant could show that the alleged misrepresentation did not, for whatever reason, actually affect the market price . . . then the [*Basic*] presumption of reliance would not apply."). The AdaptHealth Defendants may offer "any" evidence—quantitative or qualitative, direct or indirect, or even pertinent to the merits—that "severs the link between the alleged misrepresentation[s] and . . . the price . . . paid[] by [Lead Plaintiffs]." *Basic*, 485 U.S. at 248; *Goldman*, 141 S. Ct. at 1960 (instructing courts to "be open to *all* probative evidence on [price impact]"). For example, courts have been receptive to, among other things, evidence "demonstrating that the market had already reacted to the news," evidence "explain[ing] why [a] price drop occurred," and event studies. *In re Celgene*, 2020 WL 8870665, at *12 (D.N.J. Nov. 29, 2020); *Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 345 (D.N.J. 2018); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at *14 (E.D. Pa. Aug. 4, 2016).

Here, as set forth below, neither the Organic Growth Statements nor the Miscellaneous Statements artificially inflated or maintained the price of AdaptHealth Stock—that is, they had no "price impact." This necessarily rebuts the *Basic* Presumption and defeats class certification.

---

[36] *IBEW Loc. 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782–83 (8th Cir. 2016) (finding "overwhelming evidence of no front-end price impact rebutted the *Basic* [P]resumption" where the "allegedly inflated price" was unrelated to the alleged misrepresentation).

### (1)    *Organic Growth Statements Had No Price Impact.*

The evidence is overwhelming that the Organic Growth Statements had no price impact on AdaptHealth Stock.  With respect to the front-end impact—*i.e.*, what happened at the time the Organic Growth Statements were made—there was none.  The efficient market theory dictates that if investors relied on information, that information should be associated with a statistically significant price increase.  (Turki Report ¶¶ 39, 54); *see Best Buy*, 818 F.3d at 782–83 (front-end price impact requires alleged misrepresentations to have "immediate impact on [the stock] price"); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 492–93 (S.D.N.Y. 2011) (no front-end impact where there is "no date on which any alleged misrepresentation caused a statistically significant increase in the price").  Dr. Turki's event study, however, determined that AdaptHealth Stock experienced normal volatility—*i.e.*, no statistically significant movement at all—on three dates, and a statistically significant decrease—*i.e.*, the exact opposite of the expected direction—on the fourth date.  (*Id.* ¶¶ 51–52.)  As such, the evidence indicates that the Organic Growth Statements did not inflate the price of AdaptHealth Stock when they were made.  (*Id.*); *see, e.g.*, *Best Buy*, 818 F.3d at 779–80, 782–83 (presumption rebutted where event study showed no "front-end" price impact); *In re Moody's*, 274 F.R.D. at 492–93 (same); *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *18 (N.D. Ohio Aug. 14, 2018) (presumption rebutted by economic expert "demonstrat[ing] that the alleged misstatements in the case at bar did not impact [defendant's] stock price"); *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *6–9 (N.D. Cal. Dec. 5, 2017) (same).

The evidence is the same with respect to the back-end impact—*i.e.*, the showing critical to the price-maintenance theory that here requires that the Organic Growth Statements were

---

[37]  *Goldman*, 141 S.Ct. at 1959 ("Under this [inflation maintenance] theory, a misrepresentation causes a stock price 'to remain inflated by preventing preexisting inflation from dissipating from the stock price.'").

-42-

responsible for the decrease in the price of AdaptHealth Stock when the alleged "truth" was revealed on July 19, 2021, by the Jehoshaphat Report. As a preliminary matter, there is no price movement here that can be attributed to any information event, whether the Organic Growth Statements or otherwise. Dr. Turki's event study determined that there was no statistically significant movement in the price of AdaptHealth Stock on July 19, 2021, such that the decrease on that date is no different than zero and merely reflects normal volatility. (*Id.* ¶¶ 53–54.)

Irrespective of the economic evidence, none of the small, no-different-than zero decrease in the price of AdaptHealth Stock on July 19, 2021, can be attributed to the Organic Growth Statements. The content of the Jehoshaphat Report regarding organic growth was based entirely on publicly available information. █████████████████████████████

███ (█████ Aff. ¶ 7.) A former Chief Accountant of the SEC has reconstructed the organic growth calculations in the Jehoshaphat Report using publicly available information. (Markel Report ¶¶ 8, 14.) And a simple review of AdaptHealth's public filings confirms that its adoption and use of its refined methodology was repeatedly disclosed prior to July 19, 2021. (*See supra* pp. 9–10, 23–24.) The implications here are twofold, both fatal to the price-maintenance theory.

*First*, the Organic Growth Statements are not a potential cause of the price decline on July 19, 2021, because the Jehoshaphat Report did not reveal any "truth" about them. The basis for linking the Organic Growth Statements to the price decline on July 19, 2021, hangs on the Jehoshaphat Report being a corrective disclosure (*i.e.*, a disclosure of "new information" about the "falsity" of the alleged misrepresentation).[38] But that falls apart here. There was no new and unexpected *factual* information regarding organic growth in the Jehoshaphat Report. *See, e.g., In*

---

[38] *See Teamsters Loc. 456 Pension Fund v. Universal Health Servs.*, 396 F. Supp. 3d 413, 477 n.43 (E.D. Pa. 2019); *Ark. Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 480 n.3 (2d Cir. 2018); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005).

*re Merck*, 432 F.3d at 270–71 (reporter's mathematical analysis of information in company's filings was not a corrective disclosure); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) (a "negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure"); *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) ("repackaging of already-public information by an analyst or short-seller" not a "corrective disclosure"); *Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 497 (S.D.N.Y. 2016) (no corrective disclosure where an article merely "summarize[d] and interpret[ed] [] SEC filings" and was a "negative journalistic characterization of previously disclosed facts").  Nor did any of the information in the Jehoshaphat Report (factual or not) indicate that the Organic Growth Statements were false or misleading when they were made.  *In re DVI Inc. Sec. Litig.*, 2010 WL 3522090, at *6 (E.D. Pa. Sept. 3, 2010) ("[A] 'corrective disclosure' must reveal at least part of the falsity of the alleged misrepresentation.").  Specifically, the Jehoshaphat Report purportedly reports on the pre-Q4 2020 methodology (using publicly available information), whereas all of the Organic Growth Statements are based on the refined methodology and contained no representation regarding what AdaptHealth's organic growth results would have been using the pre-Q4 2020 methodology.  There is simply no nexus to warrant treating the latter as actually corrected by the former.  *See, e.g.*, *In re EHang Holdings Ltd. Sec. Litig.*, 2022 WL 17718546, at *12 (S.D.N.Y. Dec. 15, 2022) (no corrective disclosure where short-seller report did not reveal "an undisclosed fact possessing a sufficient nexus to the challenged statements"); *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 494–96 (D. Conn. 2013) (no corrective disclosure where analyst and company statements lacked "new fraud-related information").[39]

---

[39] *In re Ikon Off. Sols., Inc. Sec. Litig.*, 131 F. Supp. 2d 680, 690 (E.D. Pa. 2001) (no corrective disclosure where "no evidence that the market recognized any relationship between the dividend cut and the fraud"); *In re Moody's*, 274 F.R.D. at 493 (no corrective disclosure where "no revelation of new information").

*Second*, and in any event, if the market for AdaptHealth Stock were efficient, the market could not have been reacting to the "truth" about the Organic Growth Statements that was allegedly revealed by the Jehoshaphat Report because that information was already known. It is a fundamental principle of market efficiency that new and unexpected value-relevant information is immediately incorporated into the stock price. (Turki Report ¶ 30.) To the extent it was value-relevant, the previously disclosed information regarding AdaptHealth's methodology and organic growth results was already reflected in the price of AdaptHealth Stock on July 19, 2021, and thus its re-release could not have precipitated any stock reaction, let alone a price decrease. (*Id.* ¶ 31.)

Furthermore, there is a clear explanation for the small, no-different-than zero decrease on July 19, 2021, and it has nothing to do with the Organic Growth Statements. As Mr. Savoldelli explains in his Report, short sellers like ███████ are notorious for releasing biased assessments with the goal of negatively impacting a company's stock price. (*Id.* ¶¶ 29–37.) ███████ achieved that objective here through issuing a short-seller report with all of the hallmarks of a report whose mere publication can drive down a stock price irrespective of the report's content—namely, issued by little-known, anonymous short sellers; contains no material, nonpublic information; uses sensationalistic language; elicits dismissive responses from reputable sell-side analysts; and results in no meaningful increase in short-selling activity. (*Id.* ¶ 60.) Consistent with Mr. Savoldelli's opinion, analysts criticized the Jehoshaphat Report, and Emerald neither immediately reviewed the Jehoshaphat Report nor sold Lead Plaintiffs' AdaptHealth Stock because of it. (*See supra* pp. 24–25.)

### (2)   *Miscellaneous Statements Had No Price Impact.*

The Miscellaneous Statements also had no price impact on AdaptHealth Stock.

### (a)   *No Front-End Impact.*

With respect to the issue of front-end price impact, there is compelling evidence that the Miscellaneous Statements never artificially inflated the price of AdaptHealth Stock. Dr. Turki's event study determined that AdaptHealth Stock experienced normal volatility on each of the 15 dates on which the Miscellaneous Statements were made—*i.e.*, there was no statistically significant movement in the price of AdaptHealth Stock. (*Id.* ¶¶ 67–68.) Thus, there was absolutely no reaction by the market to the Miscellaneous Statements, let alone a reaction that would be indicative of reliance if the market were efficient. (*See supra* p. 27.)

Furthermore, Dr. Turki's conclusions are consistent with Dr. Lewis's conclusion that investors would have never relied on the Miscellaneous Statements. As Dr. Lewis explains, none of the Miscellaneous Statements would have been "pertinent to equity investment decisions" because they are: (i) statements about AdaptHealth's personnel and the strength of its management team that are generic, boilerplate statements and/or redundant statements of historical fact (*see id.* at Sections IV.A–C); (ii) statements related to AdaptHealth's ongoing legal proceedings that contain redundant recountings of historical fact (*see id.* at Section V.A); or (iii) statements characterizing AdaptHealth's historical business performance and/or generic or redundant statements of company strategy (*see id.* at Section VI.A). In fact, based on Dr. Lewis's review of all analyst reports published during the McGee Tax Period, which are a reliable proxy for the market's knowledge, not a single analyst quoted or otherwise referenced any Miscellaneous Statements. (*Id.* ¶¶ 33, 53–54.) As such, investors were either not aware of or completely ignored the Miscellaneous Statements, and in both cases it defies logic to presume reliance. *See, e.g.*, *Gallup v. Clarion Sintered Metals, Inc.*, 489 F. App'x 553, 557 (3d Cir. 2012) (no reliance by

investors that "did not read financial statements and reports" containing alleged misrepresentations); *In re Compaq Sec. Litig.*, 848 F. Supp. 1307, 1316 (S.D. Tex. 1993) (reliance "missing" where investors relied on information outside of alleged misrepresentations).

### (b)　　*No Back-End Impact.*

With respect to the issue of back-end price impact, there is compelling evidence that the Miscellaneous Statements never maintained the price of AdaptHealth Stock. Lead Plaintiffs point to the decrease in the price of AdaptHealth Stock on April 13, 2021, the same date that the April 13 Press Release was issued (A.C. ¶ 129), as their proof that there was embedded inflation due to the Miscellaneous Statements. But that theory does not hold water because the price decline on April 13, 2021, was neither indicative of nor the result of the market's reaction to the Miscellaneous Statements (which is what the law requires) or even the McGee Tax Issue (a more generous view of Lead Plaintiffs' allegations).

As Dr. Turki explains, the McGee Tax Issue—or the alleged revelation of the "truth" of the Miscellaneous Statements—did not cause the decline in the price of AdaptHealth Stock on April 13, 2021. (*Id.* ¶¶ 69–75.) Dr. Turki's event study found that the price movement on April 13, 2021, was statistically significant (*id.* ¶ 69), which means there was an information event to which the market was reacting, but additional analysis is required to determine whether that event was the McGee Tax Issue or something else entirely (*id.* ¶ 38). Dr. Turki performed that additional analysis and easily eliminated the McGee Tax Issue as the culprit. The April 13 Press Release revealed multiple pieces of information, not only the McGee Tax Issue (*id.* ¶ 71), and the McGee Tax Issue was stale information on April 13, 2021, given that multiple news articles and court filings had revealed the existence of the McGee Tax Issue on over 160 prior occasions (*see supra* pp. 27–28; Turki Report ¶ 73). In fact, on November 21, 2019—a few weeks into the McGee Tax Period—three articles linked Defendant McGee to the alleged fraud by name. (Exs. 80–82.)

Assuming an efficient market, as Lead Plaintiffs and Dr. Cain contend, it was necessarily the case that those prior disclosures of the McGee Tax Issue were immediately reflected in the price of AdaptHealth Stock as they were made, and thus the McGee Tax Issue could not have precipitated any market reaction, let alone a statistically significant decrease. (Turki Report ¶ 74.)

Nor were any of the Miscellaneous Statements, by themselves, the cause of the decline in the price of AdaptHealth Stock on April 13, 2021.[40] Not only is there no explicit reference to the Miscellaneous Statements in the April 13 Press Release to justify linking those alleged misrepresentations to the decline, but none of the information in the April 13 Press Release (including the McGee Tax Issue) "corrected" the Miscellaneous Statements. *First*, there is a subject matter mismatch. (*See supra* pp. 25–26.) Whereas the McGee Tax Issue concerns the mere existence of the fact that Defendant McGee was allegedly involved in an alleged foreign tax fraud, the Miscellaneous Statements concern completely different topics—namely, the strength of AdaptHealth's management team, ongoing legal proceedings against AdaptHealth, and AdaptHealth's business performance and strategy. (*See supra* pp. 11, 25–26.) The Miscellaneous Statements do not even address or provide any information remotely close to the McGee Tax Issue, such as details regarding the existence or absence of Defendant McGee's personal life or business endeavors, the absence or existence of any potential or actual allegations (tax related or not) against him, or the business activities of any other persons or entities with a relationship with him. (*See supra* p. 26.) This alone is fatal to any corrective disclosure inquiry. (*See supra* pp. 25–26.)

---

[40]   The availability of public information regarding the McGee Tax Issue as early as November 19, 2019, also undermines any potential causal connection. Except for the statement on November 13, 2019, all of the Miscellaneous Statements were made after the alleged "truth" became publicly known and thus could not have been false or misleading due to the market's lack of information about that truth. There is, of course, nothing that links an isolated statement on November 13, 2019, to the April 13 Press Release or the McGee Tax Issue.

*Second*, there is a specificity mismatch.  As the Supreme Court recently held in *Goldman*, "[t]he generic nature of a misrepresentation often will be important evidence of a lack of price impact."  141 S. Ct. at 1961.  In *Goldman*, plaintiffs alleged that Goldman's generic statements concerning its conflict-of-interest policies and practices (*e.g.*, "[w]e have extensive procedures and controls that are designed to identify and address conflicts of interest") were false and misleading based on subsequent disclosures revealing Goldman had engaged in allegedly conflicted transactions without disclosing them.  *Id.* at 1959–60.  The Supreme Court vacated and remanded the grant of class certification, directing the lower court to, among other things, consider the "mismatch" between the alleged misrepresentations and the alleged corrective disclosures:

> [T]hat final inference [in plaintiffs' inflation maintenance theory]—
> that the back-end price drop equals front-end inflation—starts to
> break down when there is a mismatch between the contents of the
> misrepresentation and the corrective disclosure.  That may occur
> when the earlier misrepresentation is generic . . . and the later
> corrective disclosure is specific . . . . Under those circumstances, it
> is less likely that the specific disclosure actually corrected the
> generic misrepresentation, *which means that there is less reason to
> infer front-end price inflation—that is, price impact—from the back-
> end price drop.*

*Id.* at 1961 (emphasis added).  That decision is instructive here.  Whereas the McGee Tax Issue is "highly specific as to Mr. McGee's private conduct unrelated to AdaptHealth's business," the Miscellaneous Statements largely consist of "generic, boilerplate statements,"[41] the language of which could have been and in fact was used by AdaptHealth's peers.  (Lewis Report ¶¶ 34–52, 66.)  This is yet another reason that the Miscellaneous Statements are not "corrected" by the

---

[41] Such puffery or statements of corporate optimism are not actionable because no reasonable investor would rely on them.  *See In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010) ("[G]eneral statements of optimism . . . constitute no more than puffery and are understood by reasonable investors as such." (citations and internal quotation marks omitted)).  The same is true of previously disclosed historical facts; the repeated disclosure of the same information is not information that a reasonable investor would rely on.  *See Beissinger v. Rockwood Comput. Corp.*, 529 F. Supp. 770, 782 (E.D. Pa. 1981) (finding that no "reasonable investor would have viewed [s]tatements" that contained the "same information . . . already available to the public" through the defendant's SEC filings as "having significantly altered the total mix of information available to the public" (internal quotation marks omitted)).

April 13 Press Release, severing any link between the Miscellaneous Statements and the price decline on April 13, 2021. *See In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at \*12–14 (S.D. Cal. Mar. 20, 2023) (specificity mismatch rebutted price impact).

Notably, and as supported by Dr. Lewis's Report, these mismatches also would have prevented investors from viewing the April 13 Press Release as "corrective" of the Miscellaneous Statements. Regardless of whether investors were aware of the Miscellaneous Statements on April 13, 2021 (which is unlikely), Dr. Lewis concludes, based on his analysis of the April 13 Press Release, the Miscellaneous Statements, and his expertise in investor decision-making, that investors would not have connected any of the information in the April 13 Press Release (including the McGee Tax Issue) to the Miscellaneous Statements. Nor would investors have viewed the information in the April 13 Press Release (including the McGee Tax Issue) as implicating the accuracy of the Miscellaneous Statements. (Lewis Report ¶¶ 55–57, 61–62, 69–74.) In fact, as part of his analysis, Dr. Lewis found that no analyst made any reference to the Miscellaneous Statements in their discussions of the April 13 Press Release. (*Id.* ¶¶ 53–54, 62, 73.)

### (c)     Actual Cause Of Price Decline.

In any event, as Dr. Turki explains in his Report, there is an explanation for the decline on April 13, 2021. (*Id.* ¶¶ 76–80.) There were two other pieces of information in the April 13 Press Release besides the McGee Tax Issue: (i) the fact of Defendant McGee's criminal indictment by Denmark Authorities; and (ii) the fact that AdaptHealth had placed Defendant McGee on unpaid leave. Both pieces of information were new and unexpected, as Defendant McGee was charged only hours prior and the change in his status with the Company was related to that development. (*See supra* pp. 10–11, 29; Turki Report ¶¶ 77, 79.) Both pieces of information are likely to have had a substantial negative impact on a company's stock price. (Turki Report ¶¶ 77, 79.) Furthermore, Defendant McGee's unexpected departure was the market's focus following the

April 13 Press Release. Sophisticated market participants almost exclusively focused on the sudden and unexpected change in AdaptHealth's leadership, not other pieces of information in the April 13 Press Release, when evaluating AdaptHealth's future cash flows (*i.e.*, the only information that is value-relevant and thus can precipitate a price decline). (*See supra* pp. 29–30.) Accordingly, as Dr. Turki concludes, it was information other than the McGee Tax Issue that "explain[s] some or all of the price decline on April 13, 2021." (*Id.* ¶¶ 78, 80.)

> **b.** **Lead Plaintiffs Cannot Invoke The *Affiliated Ute* Presumption.**

The *Affiliated Ute* Presumption applies only to actions that consist of *only or "primarily"* omissions. *Affiliated Ute*, 406 U.S. at 153; *Johnston*, 265 F.3d at 192. Omissions are distinguishable from misrepresentations because they involve the absence of a "positive statement[]." *Gruber v. Price Waterhouse*, 776 F. Supp. 1044, 1050–51 (E.D. Pa. 1991); *see also Schwab v. E\*TRADE Fin. Corp.*, 752 F. App'x 56, 59 (2d Cir. 2018) (quoting *Waggoner v. Barclays P.L.C.*, 875 F.3d 79, 95 (2d Cir. 2017)). But even if the *Affiliated Ute* Presumption applies, it is rebuttable—and becomes unavailable to establish classwide reliance—if Lead Plaintiffs "did not rely on the [alleged] omission in making the investment decision." *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 5730020, at \*3 (S.D.N.Y. Oct. 22, 2013) (quoting *DuPont v. Brady*, 828 F.2d 75, 76 (2d Cir. 1987)); *see also Gallup*, 489 F. App'x at 557 ("clearly no reliance" where "even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was" (internal quotation marks omitted)); *Schwartzman v. Morningstar, Inc.*, 2014 WL 3843875, at \*22 (E.D. Pa. Aug. 5, 2014) (same). Here, as explained below, Lead Plaintiffs cannot avail themselves of the *Affiliated Ute* Presumption. There are no omissions at issue in either the Organic Growth Action or the McGee Tax Action, and, even if Lead Plaintiffs' allegations could be stretched to constitute omissions, the *Affiliated Ute* Presumption would be rebutted by the reasons Lead Plaintiffs purchased AdaptHealth Stock.

### i.    *The Organic Growth Action.*

The Organic Growth Statements consist of ten positive statements regarding AdaptHealth's organic growth, each of which is quoted in the Amended Complaint, uses the term "organic growth," and contains information regarding organic growth results and/or the organic growth methodology. (A.C. ¶¶ 116–26.)  Regardless of how Lead Plaintiffs now seek to characterize these statements—though their own allegations notably call them "misrepresent[ations]" (*id.* ¶ 33)—there was clearly information about organic growth that Lead Plaintiffs could have relied on (though as explained at *supra* pp. 17–24, they did not).  (*See supra* pp. 9–10, 23.)  In fact, it is because of the purported discrepancies between the results reported in the Organic Growth Statements and the results purportedly calculated by Jehoshaphat Research that Lead Plaintiffs allege the Organic Growth Statements are "false and misleading."  (A.C. ¶¶ 115–27.)  As such, the Organic Growth Action is a misrepresentation case.  *See, e.g.*, *Johnston*, 265 F.3d at 193–94 (*Affiliated Ute* did not apply to claims based on untrue statements); *Waggoner*, 875 F.3d at 96 (*Affiliated Ute* did not apply to omission that was the inverse of the misrepresentation); *Schwartzman*, 2014 WL 3843875, at *22 (*Affiliated Ute* did not apply to claims "based primarily on Morningstar's statements"); *Beissinger*, 529 F. Supp. at 785 (*Affiliated Ute* did not apply despite "some information [being] omitted" from company's annual report because "nondisclosures were []accompanied by [] representations" and "it was entirely possible" for plaintiffs to have relied upon statements); *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (*Affiliated Ute* did not apply where plaintiffs alleged that defendant "has distorted the truth by making true but misleading incomplete statements" (internal quotation marks omitted)).

That Lead Plaintiffs refer to "omissions" throughout the Amended Complaint and their Motion (*see, e.g.*, A.C. ¶¶ 115, 136), does not change the outcome here.  Lead Plaintiffs cannot transform misrepresentations into omissions through "clever pleading," regardless of whether

Lead Plaintiffs frame the alleged wrongdoing here as a "failure to disclose" or point to missing information. *See, e.g.*, *Gruber*, 776 F. Supp. at 1050–51 (rejecting attempt to recast inaccurate financial statements); *Johnston*, 265 F.3d at 193 (rejecting attempt to recast allegedly false marketing materials); *Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000) (rejecting attempt to recast allegedly false financial statements).

### ii.     The McGee Tax Action.

There is a fundamental problem with the McGee Tax Action that prevents it from qualifying as an omission case:  Lead Plaintiffs have not identified an affirmative duty that required the AdaptHealth Defendants to disclose the McGee Tax Issue prior to the April 13 Press Release.[42] *See Chiarella v. United States*, 445 U.S. 222, 229 (1980) ("[T]he party charged with failing to disclose market information must be under a duty to disclose it." (internal quotation marks omitted)); *In re DVI, Inc. Sec. Litig.*, 919 F. Supp. 2d 498, 509 (E.D. Pa. 2013) (reliance presumption "applicable only when material information is withheld from investors by a defendant having an affirmative duty of disclosure").

As a preliminary matter, to be required to disclose the McGee Tax Issue, the AdaptHealth Defendants had to have been aware of the McGee Tax Issue well before the April 13 Press Release. (A.C. ¶¶ 128, 137–39.)  *See Bunnion v. Consol. Rail Corp.*, 108 F. Supp. 2d 403, 417 (E.D. Pa. 1999) (Bartle, J.) ("Defendants surely had no duty to disclose something which was not known[.]"); *Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 528 (W.D. Pa. 2019) (dismissing claims because plaintiffs "failed to adequately, plausibly plead that Defendants had knowledge of the facts they allegedly failed to disclose"); *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197

---

[42]  The question of whether the AdaptHealth Defendants had an affirmative duty to voluntarily disclose the McGee Tax Issue—which, prior to the Denmark Authorities' indictment (Ex. 86) was merely uncharged conduct—was not resolved by the Court's MTD Decision.  This question of law must be decided in connection with this Court's consideration of the *Affiliated Ute* Presumption.

(1976) (Section 10(b) "proscribe[s] [only] knowing or intentional misconduct").    There are, however, no allegations in the Amended Complaint that, even if assumed true, establish that each AdaptHealth Defendant in fact knew about the McGee Tax Issue at the time of each Miscellaneous Statement.    And, indeed, limited merits discovery has already revealed that ███████████

████████████████████████████████████████████████████

███████████████ (*see supra* note 8), and even then "[d]efendants are permitted a reasonable amount of time to evaluate potentially negative information and to consider appropriate responses before a duty to disclose arises." *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 217 (S.D.N.Y. 2008); *see also Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 761 (7th Cir. 2007) ("Taking the time necessary to get things right is both proper and lawful.  Managers . . . are entitled to investigate for a reasonable time.").

But even putting aside the knowledge issue, black letter law dictates that there was no duty for AdaptHealth to voluntarily disclose the McGee Tax Issue prior to the April 13 Press Release. "[C]ompanies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (internal quotation marks omitted); *see also id.* (company not required to disclose an ongoing tax evasion scheme because "[d]isclosure is not a rite of confession" (internal quotation marks omitted)); *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 98–99 (2d Cir. 2021) (company not required to disclose employees' uncharged money laundering because "accurately reported financial statements do not automatically become misleading by virtue of the company's nondisclosure of suspected misconduct"); *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 713 (3d Cir. 2020) (citing with favor *Pontiac*); *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 2021 WL 4191467, at *11 (D.N.J. Sept. 15, 2021) (company not required to

-54-

disclose unadjudicated potential regulatory action); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp.

2d 367, 377 (S.D.N.Y. 2004) (company not required to disclose full extent of its allegedly illegal

conduct).  Mere allegations are never enough to trigger a disclosure obligation.  *See In re Sanofi*

*Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016) ("Courts . . . regularly hold that the securities

laws do not impose a general duty to disclose corporate mismanagement or uncharged criminal

conduct.").  Nor is Lead Plaintiffs' (or an investor's) mere interest in an executive's personal

affairs.  *See In re CDNOW, Inc. Sec. Litig.*, 138 F. Supp. 2d 624, 633 (E.D. Pa. 2001)

("[C]orporation is not required to disclose a fact merely because a reasonable investor would like

to know that fact." (citation omitted)).  Yet, that is exactly what the McGee Tax Issue was—

conduct that, as to Defendant McGee, was uncharged, unadjudicated, and, more importantly,

completely unconnected to AdaptHealth's business.  And, consistent with the law, once its co-

CEO was indicted on the morning of April 13, 2021 (Ex. 86), AdaptHealth promptly informed the

market (Ex. 8).  Therefore, as a matter of law, there was no conduct that AdaptHealth was obligated

to voluntarily disclose prior to the April 13 Press Release.

Nor was there any duty that arises from the fact that the Miscellaneous Statements were

somehow false or misleading because they did not reference the McGee Tax Issue.  The

"mismatches" between the Miscellaneous Statements and the McGee Tax Issue undermine that

argument.  (*See supra* pp. 25–26.)  The AdaptHealth Defendants could not have been required to

disclose information that would have had no bearing on the accuracy or completeness of the

Miscellaneous Statements.  *See, e.g.*, *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433

F. Supp. 3d 515, 535–38 (S.D.N.Y. 2020) (no duty to disclose risk that CEO could be ousted over

sexual misconduct allegations where that "[had] nothing to do with" prior statements about CEO's

importance to company); *Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 712, 719 (S.D.N.Y.

2018) (no duty to disclose CEO's alleged misconduct involving unrelated company because it lacked the requisite connection to the company's statements regarding CEO's biography and its reliance "on executives' knowledge and expertise in the industry, and specifically [] on [the CEO's] relationships with industry participants").

In any event, the McGee Tax Action also qualifies as a misrepresentation case. The McGee Tax Action is premised on 24 positive statements concerning various information regarding (i) the experience, qualifications, and success of AdaptHealth's management team, (ii) AdaptHealth's ongoing legal proceedings, and (iii) AdaptHealth's past performance and future strategy (*i.e.*, the Miscellaneous Statements). (A.C. ¶¶ 76–114.) Lead Plaintiffs do not point to these statements to illustrate that the McGee Tax Issue was not disclosed prior to the April 13 Press Release, which might be indicative of an omissions case. Rather, Lead Plaintiffs contend that each of these statements is itself "false and misleading" because each should have informed the market about the McGee Tax Issue. (*Id.*) For the same reasons explained *supra* pp. 51–53, the fact that Lead Plaintiffs have identified statements that could have been relied upon is determinative.

### iii.   Disclosure Of The Purportedly Omitted Information Would Not Have Affected Lead Plaintiffs' Purchases.

Were the Court to find that both the Organic Growth Action and the McGee Tax Action primarily involved omissions (which it should not do), the *Affiliated Ute* Presumption is nevertheless rebutted because additional disclosures would not have affected Lead Plaintiffs' decisions to purchase AdaptHealth Stock. With respect to the Organic Growth Action, neither Lead Plaintiff purchased AdaptHealth Stock during the Organic Growth Period; thus there is no relevant transaction to consider. (*See supra* pp. 14, 16–17.) ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



(*See supra* pp. 17–18.)

(*See supra* pp. 13–14.)

(Emerald Tr. 292:17–293:5.)  Any presumption

of reliance is therefore rebutted here.  *See, e.g.*, *Schwartzman*, 2014 WL 3843875, at *22 (*Affiliated Ute* Presumption rebutted by "showing that the investor would have invested even if the defendant had disclosed the omitted fact"); *In re Bexar Cnty. Health Facility Dev. Corp. Sec. Litig.*, 130 F.R.D. 602, 611 (E.D. Pa. 1990) (*Affiliated Ute* Presumption rebutted where plaintiffs had not read the offering statement in which the allegedly omitted information should have been disclosed).

> c.  **Absent Either Presumption Of Reliance, Individual Issues Of Reliance Predominate, Preventing Class Certification.**

Where, as here, "[Lead Plaintiffs] cannot rely on either the *Affiliated Ute* or the fraud on the market presumptions of [reliance], [Lead Plaintiffs] cannot prove reliance on a class-wide basis."  *Bombardier*, 2006 WL 2161887, at *12.  Accordingly, individualized questions will predominate over common questions, and this Court must deny class certification.  *See, e.g.*, *id.* (denying class certification where neither *Affiliated Ute* nor *Basic* applied); *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 42–43 (2d Cir. 2006) (denying class certification where *Basic* inapplicable); *In re Moody's*, 274 F.R.D. at 493–94 (denying class certification where neither *Affiliated Ute* nor *Basic* applied); *Faktor v. Am. Biomaterials Corp.*, 1991 WL 336922, at *12–13 (D.N.J. Aug. 14, 1991) (denying class certification where *Basic* inapplicable); *Angelastro*, 113 F.R.D. at 584–85 (denying class certification where *Affiliated Ute* inapplicable).

**2.      Lead Plaintiffs Have Failed To Establish That Damages Can Be Measured On A Classwide Basis.**

To satisfy the predominance requirement, Lead Plaintiffs must also set forth a methodology for calculating damages on a classwide basis in a manner consistent with their theories of liability.[43]  *Comcast*, 569 U.S. at 35; *see also Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 375 n.10 (3d Cir. 2015) ("[A]t class certification, the damages calculation must reflect the liability theory.").  The Supreme Court has rejected the notion that "*any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be." *Comcast*, 569 U.S. at 35–36.  Rather, it is necessary that a reliable methodology is specifically articulated—not merely "a formula that could be used" or "assurance[s]" of what is "intend[ed] or plan[ned]." *Chudner v. TransUnion Interactive, Inc.*, 2010 WL 5662966, at *1 n.1 (D. Del. Dec. 15, 2010); *see also Comcast*, 569 U.S. at 34 ("Questions of individual damage calculations will inevitably overwhelm [common] questions[.]"); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 318.

Here, Lead Plaintiffs have not presented any damages methodology whatsoever.  Lead Plaintiffs rely exclusively on Dr. Cain's Report, which, in addition to being nearly identical to his reports submitted in other actions, does not go beyond his assurances that classwide damages can be calculated using an event study and different models.  (*Id.*)  But that is not enough.  *Newton*, 259 F.3d at 187–88 (rejecting plaintiffs' attempt to "gloss over" the requirement by claiming a formula *could be* devised to measure damages); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141–42 (S.D.N.Y. 2014) ("[W]ithout assurance beyond [plaintiffs'

---

[43]  Damages arising from a Rule 10b–5 violation are calculated as the price inflation caused by the company's alleged misrepresentations at the time an investor purchased shares, less "inflation" remaining in the stock at the time the investor sold those shares, with "inflation" being the price of the stock less what the price of the stock would have been if the company had not misled the market.  *See In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 744 (S.D.N.Y. 1985); *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 201 (S.D.N.Y. 2015).

expert's] say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis."). Dr. Cain does not—not even in his six hours of deposition testimony—explain how he will configure and implement his "tools." (Cain Tr. 288:17–289:1.) This is particularly concerning because there are differing theories of artificial inflation across different time periods for the Organic Growth Action and the McGee Tax Issue Action. Dr. Cain's so-called methodology is so "vague, indefinite, and unspecific" that it amounts to "no damages model at all." *See Ohio Pub. Emps. Ret. Sys.*, 2018 WL 3861840, at \*19. Specifically:

- Dr. Cain has not presented a damages methodology that would allow him to assess what incremental information could and should have been disclosed throughout the putative class period that was not already known to the market and therefore could contribute to alleged inflation. Dr. Cain admitted that he did not conduct a thorough review of the information in the public domain and has not considered what disclosures should have been made during the class period. (*See* Cain Tr. 42:10–13, 61:24–62:8, 157:20–158:14, 159:23–160:2.)

- Dr. Cain's proposed backcasting methodology is incapable of reliably calculating damages because of the mismatches between the April 13 Press Release and the Miscellaneous Statements. (*See supra* pp. 25–26.) The Supreme Court has cautioned that the inference that "the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman*, 141 S. Ct. at 1961. Yet, Dr. Cain admitted that he does not have any specific conclusions or opinions on this issue and, in fact, conducted no analysis of the statements. (*See* Cain Tr. 199:23–201:17.)

- Dr. Cain's proposed backcasting methodology includes no reliable means to control for the confounding information at issue here and isolate the impact of the alleged fraud. (Cain Report ¶¶ 88–92.) Dr. Cain needs to develop a methodology that can reliably measure (i) the portion of the July 19, 2021 decline that was attributable to any purported inflation by the Organic Growth Statements as opposed to the Jehoshaphat Report's mere publication, and (ii) the portion of the April 13, 2021 decline that was attributable to any purported inflation by the Miscellaneous Statements as opposed to new information in the April 13 Press Release. But he could not explain how this will be accomplished, other than representing that he has a variety of unspecified tools he can use.

- Dr. Cain's damages methodology ignores that Lead Plaintiffs allege two different theories of liability, and Dr. Cain has not explained how he would calculate inflation for each theory (*e.g.*, time periods of inflation, number of inflation ribbons, number of look-back periods, etc.). (*See* Cain Tr. 269:14–24, 270:14–271:9, 273:13–276:10.)

Courts faced with similarly flawed damages methodologies have found them insufficient to satisfy the predominance requirement, just as this Court should do here.  For example, in *Ohio Public Employees Retirement System*, the plaintiff's expert asserted that he could calculate out-of-pocket damages based on inflation, claiming there was nothing unusual about the case, but he did not provided specifics on which model to use.  2018 WL 3861840, at *19.  The court found that merely referencing "unspecified 'valuation tools'" did not establish that damages could be measured on a class-wide basis.  *Id.* at 19–20.  Similarly, in *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, plaintiffs asserted that damages could be calculated in a formulaic manner but their expert had not created a model or explained with specificity the methodology he would employ.  301 F.R.D. at 141–42.  While the court acknowledged that the plaintiffs did not need to perform calculations, the court found that the plaintiffs had failed to present a precise enough "specification of the damages calculation method . . . to assure that the model is in fact linked with the theory of liability."  *Id.*  Finally, in *In re BP P.L.C. Securities Litigation*, the plaintiffs contended that classwide damages would be calculated by use of an event study.  2013 WL 6388408, at *15.  The court concluded that the plaintiffs failed to show that damages could be measured in a manner consistent with their two theories of liability because "[s]imply invoking the event study methodology . . . does not assuage the Court that the class-wide damages methodology proposed will track Plaintiffs' theories of liability," and "[w]ithout a more complete explication of how [p]laintiffs propose to use an event study to calculate class members' damages, and how that event study will incorporate—and, if necessary, respond to—the various theories of liability, the Court cannot certify this litigation for class action treatment."  *Id.* at *17.

**C.    Lead Plaintiffs Are Not Adequate Representatives Of The Proposed Class As Required By Rule 23(a)(4).**

Adequacy requires Lead Plaintiffs to "fairly" protect the interests of *all* members of any class. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 626 (1997) (citing Fed. R. Civ. P. 23(a)(4)). As explained below, Lead Plaintiffs neither have the "ability [nor] incentive to represent the claims of the [proposed] class vigorously," and their stake in this Action conflicts with the best interests of any class. *Roe v. Operation Rescue*, 123 F.R.D. 506, 507 (E.D. Pa. 1988); *see Dotson v. Portfolio Recovery Assocs., LLC*, 2009 WL 1559813, at *2 (E.D. Pa. June 3, 2009). These faults defeat class certification *and* require their disqualification as lead plaintiffs.[44]

**1.    Lead Plaintiffs Do Not Exercise Sufficient Control Over This Action.**

Lead Plaintiffs cannot be adequate class representatives if they are "no more than [] pawns of attorneys." *Dotson*, 2009 WL 1559813, at *4; *see In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 135–36 (S.D.N.Y. 2008) (plaintiff that was "the willing pawn of counsel" was inadequate). Lead Plaintiffs must possess "minimal knowledge" so they can "make informed decisions," *Dotson*, 2009 WL 1559813, at *4, and demonstrate that they "are themselves—and not the lawyers—actually directing the litigation," *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 141 (N.D. Tex. 2014); *see, e.g.*, *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 316 (E.D. Va. 2007) (plaintiff that did not sufficiently supervise and "elected to pursue litigation only after responding to a press release" and "based only on [counsel's] investigation" was inadequate). Lead Plaintiffs are nowhere close. This Action has been lawyer-driven since day one.

Some of the most compelling evidence of Lead Plaintiffs' "pawn" status is their lack of a basic understanding of their claims. Despite having been involved in this Action for well over a

---

[44]   *See, e.g.*, *Zlotnick v. TIE Commc'ns, Inc.*, 123 F.R.D. 189, 194 (E.D. Pa. 1988) (failure to demonstrate adequacy necessitated "disqualification"); *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. at 136 (same).

year, much of Lead Plaintiffs' purported knowledge stems from preparing for their depositions, not continuously monitoring and/or directing this Action. (*See supra* pp. 30–31.) Nevertheless, during their depositions, Lead Plaintiffs repeatedly revealed how shockingly little they know about this Action, including admitting that they have never reviewed the AdaptHealth disclosures on which their allegations are based and that they disagree with their own allegations regarding whether certain disclosures were false and misleading. (*See supra* pp. 30–32.)

In addition, the circumstances surrounding Lead Plaintiffs' involvement in this Action further evidences their "pawn" status. Lead Plaintiffs had a monitoring agreement with Robbins Geller, a fact that by itself establishes that this Action is "lawyer-driven litigation" of the type "that the PSLRA was designed to curtail." *Iron Workers Loc. No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*, 616 F. Supp. 2d 461, 464 (S.D.N.Y. 2009). In addition, Lead Plaintiffs have testified that they would not have even known about this Action, let alone become involved, but for Robbins Geller.[45] And nothing has changed as this Action has proceeded. Lead Plaintiffs retained Robbins Geller under terms that ensure this Action is "very little work" and requires "no additional cost," including ████████████████████████████ ██████████████████████████████████████████ ██████ and a sizable recovery for Robbins Geller. (*See supra* pp. 7, 12, 30 and notes 27–28.) And, during their depositions, Lead Plaintiffs could only testify to being entirely reactionary when asked about their role in this Action (*e.g.*, rarely initiating communications with Robbins Geller, not substantively contributing to filings, waiting for updates, etc.) (*see supra* pp. 30–31), presumably because they have never actually directed Robbins Geller to do anything.

---

[45] Robbins Geller told them they could assert securities claims based on disclosures they have still yet to review and should proceed as co-Lead Plaintiffs for the first time in their long history as serial plaintiffs. (*See supra* pp. 30–32.)

## 2.    Lead Plaintiffs Have An Incurable Conflict Of Interest With The Proposed Class For The Organic Growth Action.

"[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012). Lead Plaintiffs cannot be adequate class representatives where there is a "significant divergence of [such] interests." *Id.* at 184–85 ("A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class."); *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (decertifying class based on a "fundamental" conflict).

Here, Lead Plaintiffs' financial interests diverge incurably[46] from those of any class for the Organic Growth Action. Having suffered no loss from that alleged fraud (Turki Report ¶ 84), Delaware County is not eligible for any potential recovery and thus has no financial interest in maximizing any class recovery for the Organic Growth Action. Bucks County's situation is even more precarious because it benefitted from the alleged fraud by $2,724.15. (*Id.* ¶ 83.) Not only does Bucks County have no financial interest in maximizing any class recovery for the Organic Growth Action, Bucks County actually has an interest in *minimizing or even eliminating* any such class recovery. This is so because Bucks County's gains during the Organic Growth Period will reduce its total alleged damages and thus potential recovery, including gains that result from greater inflation being attributed to the Organic Growth Action.[47] In short, Lead Plaintiffs are incentivized to undermine the Organic Growth Action, making them directly adverse to any class.

---

[46] That Lead Plaintiffs are purportedly committed to any class is of no consequence. Such assertions are not credible because they also testified that they always comply with their fiduciary duties and they want to recover their losses. (*See supra* p. 32.) There is no precedent for remedying or ignoring this conflict.

[47] To determine a plaintiff's trading position, courts apply a "netting" approach to offset any gains the plaintiff realizes due to fraud-related inflation in the price of the stock. *See W. Palm Beach Police Pension Fund*, 2014 WL 1395059, at *3, *5 (using method that takes into account gains during the class period); *In re eSpeed Inc. Sec. Litig.*, 232 F.R.D. 95, 100 (S.D.N.Y. 2005).

**D.**      **Lead Plaintiffs Are Not Typical Members Of The Proposed Class As Required By Rule 23(a)(3).**

Typicality "screen[s] out class actions in which the legal or factual position of the [proposed] representative[] is markedly different from that of other members of the class." *Gonzalez v. Corning*, 317 F.R.D. 443, 495 (W.D. Pa. 2016) (citations omitted).  No typicality exists where a would-be "class representative . . . is subject to a unique defense that is likely to become a major focus of the litigation."  *Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006). In fact, as long as the defense is "arguable," there is a sufficient risk to defeat class certification. *Id.* at 296–97; *see, e.g.*, *Zenith Lab'ys, Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508, 512 (3d Cir. 1976) (finding fact defendant could arguably assert unique res judicata defense sufficient to render lead plaintiff atypical and defeat class certification); *In re Safeguard Scis.*, 216 F.R.D. 577, 582– 83 (E.D. Pa. 2003) (defendants could assert plausible unique defenses regarding lead plaintiffs' lack of reliance, credibility concerns, and trading history, rendering lead plaintiffs atypical and defeating class certification).  As set forth below, Lead Plaintiffs are subject to *multiple* meritorious defenses that, whether considered collectively or in isolation, render them atypical.[48]

**1.**      <u>**Lead Plaintiffs Are Not Eligible To Represent Both Proposed Classes.**</u>

Before even reaching the Rule 23 requirements, the Court should consider whether Lead Plaintiffs are eligible to represent the proposed classes.  Lead Plaintiffs must be a member of the proposed classes that they seek to represent, which here requires identifying a "purchase[] or other[] acqui[sition]" of AdaptHealth Stock or options (A.C. ¶ 1) during the relevant putative class period. *See Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 360 (3d Cir. 2013) ("It is axiomatic that the lead plaintiff must fit the class definition.").  Also, Lead Plaintiffs must have standing on their

---

[48]  The unique defenses discussed herein also make Lead Plaintiffs inadequate class representatives. *See Amchem*, 521 U.S. at 626 n.20 (typicality and adequacy requirements "tend[] to merge" (citation omitted)); *In re Safeguard Scis.*, 216 F.R.D. at 582 (finding unique defenses rendered lead plaintiffs both atypical and inadequate).

own to assert their Exchange Act claims, which requires identifying a purchase *after* the allegedly fraudulent activity. *See McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) ("It should be obvious that there cannot be adequate typicality between a class and a named representative unless the named representative has individual standing to raise the legal claims of the class." (citation omitted)); *Klein v. Gen. Nutrition Cos.*, 186 F.3d 338, 345 (3d Cir. 1999) ("[P]ost-purchase statements cannot be a basis for [Exchange Act] liability.").[49]

But Lead Plaintiffs fall short as to both requirements. Lead Plaintiffs did not purchase or otherwise acquire AdaptHealth Stock or AdaptHealth options during the Organic Growth Period. (*See supra* pp. 14, 16–17.) And all of the Organic Growth Statements—which were issued from March 4, 2021 to May 10, 2021 (see *supra* pp. 9–10, 22)—postdate Lead Plaintiffs' final purchase of AdaptHealth Stock—which occurred on February 8, 2021 (*see supra* p. 14). As such, Lead Plaintiffs can neither assert the claims alleged in the Organic Growth Action nor represent the proposed class, rendering them atypical. *See, e.g.*, *Clair v. DeLuca*, 232 F.R.D. 219, 228 (W.D. Pa. 2005) (not viable lead plaintiffs where none purchased stock during the class period).

### 2.    <u>Lead Plaintiffs Did Not Rely On Any Of The Alleged Misrepresentations.</u>

Reliance is an "essential element" of a Section 10(b) claim. *Halliburton I*, 563 U.S. at 810. It "ensures that there is a proper connection between a defendant's [alleged] misrepresentation and a plaintiff's [alleged] injury," *Amgen*, 568 U.S. at 461 (citation omitted)—"namely, that the plaintiff has not just lost money as a result of the [alleged misrepresentation], but that he was actually *defrauded* by it." *Halliburton II*, 573 U.S. at 286 (Thomas, J., concurring); *see Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) ("[A]llowing recovery in the face of affirmative

---

[49]  *See also In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*, 2019 WL 1299673, at \*13–14 (D.N.J. Mar. 21, 2019) (a lead plaintiff can only bring claims concerning alleged fraudulent activity occurring before its last sale or purchase); *In re NutriSystem, Inc. Sec. Litig.*, 653 F. Supp. 2d 563, 580 (E.D. Pa. 2009) (same).

evidence of nonreliance . . . would effectively convert Rule 10b–5 into a scheme of investor's insurance."); *Dirks v. SEC*, 463 U.S. 646, 666 n.27 (1983) ("[T]here always are winners and losers; but those who have 'lost' have not necessarily been defrauded."). Here, however, no reliance exists. The evidence is indisputable that the Organic Growth Statements and the Miscellaneous Statements played no role in any of Lead Plaintiffs' purchases of AdaptHealth Stock.

As a preliminary matter, the timing of Lead Plaintiffs' purchases of AdaptHealth Stock prevents any finding of reliance with respect to the Organic Growth Action. It is settled law (not to mention common sense) that Lead Plaintiffs cannot establish that they relied on alleged misrepresentations to purchase a particular stock when they have not in fact purchased any stock. *See Amgen*, 568 U.S. at 472–73 (when purchases "were not executed between the time the misrepresentation was [allegedly] made and the time the truth was revealed, [that plaintiff] cannot be said to have indirectly relied on the misrepresentation through its reliance on the integrity of the market price"); *see, e.g., In re Dr. Reddy's Lab'y*, 2019 WL 1299673, at *13 (dismissing post-purchase claims because plaintiffs "cannot rely on statements made subsequent to their purchases in order to state a securities fraud claim" (citation omitted)); *Ambac Assurance Corp. v. EMC Mortg. Corp.*, 2011 WL 566776, at *3 (S.D.N.Y. Feb. 8, 2011) (dismissing claims where plaintiff "did not purchase" the securities). Yet, that is exactly what Lead Plaintiffs seek to do here. Having purchased all of their AdaptHealth Stock *prior* to March 4, 2021, Lead Plaintiffs cannot establish reliance (because they could not have had any) on any of the Organic Growth Statements.

In any event, there is overwhelming evidence that Lead Plaintiffs did not in fact rely on the Organic Growth Statements or the Miscellaneous Statements. During its deposition, Emerald— the entity solely responsible for Lead Plaintiffs' investments in AdaptHealth Stock[50]— ▮▮▮▮

---

[50] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮ (see *supra* pp. 12–13), Emerald's knowledge is imputed to Lead Plaintiffs. *See Villella v. Chem. &*

██████████████████████████████████████████████████

███████████████████ (*See supra* pp. 13–14.) █████████████

████████████████████████████████ (*See supra* pp. 13–14.)

█████████████████████████████████████████████████

██████████████████████ (*See supra* pp. 17–18.) ██████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████ (*See supra* pp. 17–18.) ██████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████[51] (*See supra* p. 18.)

Accordingly, Lead Plaintiffs' lack of reliance renders them atypical and thus defeats class certification. *See, e.g., In re Safeguard Scis.*, 216 F.R.D. at 582 (lack of reliance was a unique defense that rendered lead plaintiff atypical); *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (same).

---

*Mining Co. of Chile Inc.*, 2018 WL 2958361, at *5 (S.D.N.Y. June 13, 2018) (where a plaintiff "outsources their decision making to an investment adviser," that adviser's "decision-making calculus" is imputed to the plaintiff); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 168–69 (S.D.N.Y. 2011) (same), *aff'd*, 477 F. App'x 809 (2d Cir. 2012); MCLAUGHLIN ON CLASS ACTIONS § 4:20 (16th ed. 2021) (Investment manager's "knowledge and actions are imputed to [plaintiffs] when determining its suitability to serve as a class representative").

[51] ████████████████████████████████████████████████████
████████ (Emerald Tr. 285:20–286:18.) Reliance as to those alleged misrepresentations is impossible. *Amgen*, 568 U.S. at 472 ("A security's market price cannot be affected by a misrepresentation not yet made[.]").

### 3.     Lead Plaintiffs Were Likely Not Injured By The Alleged Frauds.

Finally, Lead Plaintiffs' trading history raises important issues concerning whether they were in fact harmed by the alleged frauds.[52]  For example, with respect to the Organic Growth Action, neither Lead Plaintiff could have been adversely affected ███████████████ ██████████████████████████████, as their trading history indicates that Bucks County realized a benefit due to its net sales and Delaware County suffered no loss.  (*See supra* pp. 14, 16–17.)  These circumstances prevent Lead Plaintiffs from proving the injury element for the claims asserted in the Organic Growth Action, which renders Lead Plaintiffs atypical and once again casts doubt on their eligibility to represent the proposed class.  *See, e.g.*, *Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharm. Indus. Ltd.*, 529 F. Supp. 3d 385, 407 (E.D. Pa. 2021) ("unique defense" based on lack of injury barred lead plaintiff appointment).[53]

### E.     Any Proposed Class Must Be Narrower Than Lead Plaintiffs' Proposal.

In the event the Court certifies a class with respect to Lead Plaintiffs' Exchange Act claims (which it should not do), Lead Plaintiffs' proposed class—*i.e.*, "[a]ll persons and entities other than Defendants that purchased or otherwise acquired AdaptHealth securities between November 8, 2019 and July 16, 2021" (A.C. ¶ 1)—is overbroad and unsupported by law.  There cannot be a single, continuous class period as Lead Plaintiffs seek.  While it is common for plaintiffs to allege multiple corrective disclosures, this Action is different because the alleged corrective disclosures

---

[52]  *See infra* note 55.  Lead Plaintiffs are not members of any class for the McGee Tax Action, making them inadequate and atypical for the same reasons set forth in Argument Sections I.C.2, I.D.1, and I.D.3.

[53]  *See also Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135 (3d Cir. 2000) ("[A] plaintiff who lacks the personalized, redressable injury required for standing to assert claims on his own behalf would also lack standing to assert similar claims on behalf of a class."); *George,* 2013 WL 3357170, at *7 (denying class certification where plaintiffs were subject to "unique inquiries" regarding profit from trades); *Kraus v. Paterson Parchment Paper Co.*, 65 F.R.D. 368, 369 (S.D.N.Y. 1974) (denying class certification where net seller was "a beneficiary of the alleged fraud," and "[this] put[] him in a different position from the other victims of the alleged fraud whom he seeks to represent"); *In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 945–46 (N.D. Ill. 2001) (finding that a net seller was "totally out of the running for designation as lead plaintiff").

are not part of the same alleged fraud.  That is, Lead Plaintiffs are not alleging that the truth leaked out, but rather two separate and distinct frauds that unfolded over completely different timelines. (*See supra* pp. 7, 9–11.)  Consequently, two delineated class periods (or potentially subclasses) are necessary:  one for the Organic Growth Action and another for the McGee Tax Action.  *See, e.g.*, *In re BP, P.L.C. Sec. Litig.*, 758 F. Supp. 2d 428, 441–43 (S.D. Tex. 2010) (allegations of significantly different legal theories with different time periods warranted two class periods).[54]

For the Organic Growth Action, any class period should run from March 4, 2021, through July 16, 2021.  The start date reflects the first date of an Organic Growth Statement, and the end date reflects the last potential date when investors could have acquired AdaptHealth Stock before the "truth" was allegedly revealed by the Jehoshaphat Report.

For the McGee Tax Action, any class period for AdaptHealth Stock should run from November 13, 2019, through April 12, 2021.[55]  The start date reflects the earliest date that AdaptHealth Stock could have been artificially inflated due to a Miscellaneous Statement. Although the Amended Complaint identifies a Miscellaneous Statement made on November 8, 2019 (A.C. ¶ 76), that statement was made by DFB[56] before AdaptHealth Stock began publicly trading, and even Dr. Cain agrees that it is not a viable start date (Cain Tr. 42:22–43:17).  The end date reflects the last potential date when investors could have acquired AdaptHealth Stock before the "truth" was allegedly revealed by the April 13 Press Release.  However, for AdaptHealth options, any class period cannot begin until November 25, 2020, when options first began to trade.

---

[54]  The class period must be tailored to Lead Plaintiffs' allegations, which requires a start date whenever the alleged fraud began and end date whenever that same fraud ended.  *See In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 339 n.1 (E.D. Pa. 2006) ("[The] 'class period' in a securities fraud case is generally the period of time during which plaintiffs allege that the stock price of the defendant corporation was inflated due to fraudulent statements made by company management, and ends when corrective statements are made (usually accompanied by a drop in price).").

[55]  Publicly available information on the McGee Tax Issue should limit the class period to November 13 to 21, 2019.

[56]  *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142, 144 (2011) ("For purposes of Rule 10b–5, the maker of a statement is the . . . entity with ultimate authority over the statement . . . .  [W]e will not expand liability beyond the . . . entity that ultimately has authority over a false statement.").

## II.    THE COURT SHOULD NOT CERTIFY ANY CLASS FOR LEAD PLAINTIFFS' SECURITIES ACT CLAIMS.

Lead Plaintiffs have failed to satisfy Rule 23's requirements by a preponderance of the evidence as to their Securities Act claims, and no class can be certified as to those claims.

### A.    Lead Plaintiffs Lack Standing To Assert Their Securities Act Claims.

Standing is a "threshold jurisdictional" requirement to assert any claim that must exist "at all stages of the litigation," including at class certification. *Pub. Interest Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 117 (3d Cir. 1997); *see Neale*, 794 F.3d at 358 (standing challenge to class certification order was a "threshold question of law"); *Holmes*, 213 F.3d at 135 ("[A] plaintiff who lacks . . . standing to assert claims on his own behalf . . . lack[s] standing to assert similar claims on behalf of a class."). To establish standing for their Section 11 and Section 12(a)(2) claims, Lead Plaintiffs must prove that they purchased AdaptHealth Stock that is "traceable" to the Secondary Offering—that is, they must show that the shares of AdaptHealth Stock that they purchased are the same shares of AdaptHealth Stock that were newly issued by AdaptHealth in connection with the Secondary Offering.[57] *See In re Ariad Pharm. Sec. Litig.*, 842 F.3d 744, 755–56 (1st Cir. 2016) ("[T]raceability is an element of a Section 11 claim."); *Barnes v. Osofsky*, 373 F.2d 269, 271–72 (2d Cir. 1967) (investors that "could not so trace their purchases" to the relevant offering excluded from Section 11 settlement).

Yet, Lead Plaintiffs have offered no evidence on this threshold issue. Their bald assertions that they "purchased or acquired AdaptHealth securities traceable to the Offering Documents" are insufficient. (A.C. ¶¶ 191–217.) Lead Plaintiffs must prove that they specifically purchased one of the millions of shares of AdaptHealth Stock that AdaptHealth sold in connection with the

---

[57] Lead Plaintiffs lack Section 15 standing because they do "not have standing to pursue [their] section 11 and 12(a)(2) claims." *See Jasin v. Kozlowski*, 2010 WL 4536973, at *10 (M.D. Pa. Nov. 3, 2010).

Secondary Offering.  *See De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at \*16–17 (D.N.J. Dec. 31, 2018) ("[P]laintiff must prove that [its] shares were issued under the allegedly false or misleading registration statement.").  There were, after all, tens of millions of identical shares of AdaptHealth Stock that were outstanding during the Secondary Offering, any one of which could have been sold to Lead Plaintiffs.  (Wiener Report ¶¶ 54–56.)

Lead Plaintiffs are silent for a reason:  As Mr. Wiener explains in his Report, it is impossible for Lead Plaintiffs to trace their purchases of AdaptHealth Stock to the Secondary Offering given the structure of DTC's intermediated securities holding system.  AdaptHealth Stock is electronically held and managed such that (i) every share ever issued by AdaptHealth has the same CUSIP number (or identifier), (ii) DTC aggregates and commingles those shares—including 100% of those sold in connection with the Secondary Offering—in a single, fungible bulk that leaves them indistinguishable from each other, (iii) DTC participants (such as Jefferies (Emerald's broker)) own a *pro rata* interest of DTC's fungible bulk of commingled shares, and (iv) customers of DTC participants (here, Emerald on behalf of Lead Plaintiffs) own a *pro rata interest* of the *pro rata interest* owned by the DTC participant (here, Jefferies).  (*Id.* ¶¶ 52–56, 58–63.)  As a result, Lead Plaintiffs have never owned a specific share of AdaptHealth Stock at any time during the putative class period, let alone shares that can be identified as originating from the Secondary Offering.[58]  (*Id.* ¶¶ 16, 32–34, 42, 56, 72–73.)

Indeed, courts have repeatedly found in similar circumstances that the tracing requirement was not satisfied and no standing existed, and this Court should do the same.  *See, e.g., De Vito*,

---

[58]  A small percentage of AdaptHealth Stock is held outside DTC via Direct Registration System, but that system was not used in connection with the Secondary Offering (Wiener Report ¶ 67) and was never used for any of Lead Plaintiffs' early 2021 purchases (Cont. Aff. ¶ 5; Emerald Tr. 188:21–189:13, 193:25–194:9).  Also, AdaptHealth did not issue any physical stock certificates to Lead Plaintiffs or any other shareholder in connection with the Secondary Offering.  (Wiener Report ¶ 66; Cont. Aff. ¶¶ 6, 11.)

2018 WL 6891832, at *16–17 (no standing where "plaintiffs' shares could have come from the [first] offering" or "from the pool of [secondary shares]"); *In re RAIT Fin. Tr. Sec. Litig.*, 2008 WL 5378164, at *4 (E.D. Pa. Dec. 22, 2008) (no standing where "no named plaintiff purchased any securities traceable to" the offering); *In re FleetBoston Fin. Corp. Sec. Litig.*, 253 F.R.D. 315, 345–46, 350 (D.N.J. 2008) (beneficial owners were unable to satisfy Section 11 tracing where shares stemmed from more than one offering); *see also In re Puda Coal Sec. Inc. Litig.*, 2013 WL 5493007, at *8 (S.D.N.Y. Oct. 1, 2013) ("The steps necessarily involving the DTCC are fatal to traceability."); *In re Initial Public Offering Sec. Litig.*, 227 F.R.D. 65, 118 (S.D.N.Y. 2004) (commingling of shares from various offerings "in fungible bulk, makes it virtually impossible . . . to trace shares").

Accordingly, Lead Plaintiffs lack the standing required to both assert their Securities Act claims and represent any class, which bars certification *and* requires dismissal of their claims. *See, e.g.*, *Davis v. Thornburgh*, 903 F.2d 212, 222 (3d Cir. 1990) (affirming denial of class certification where plaintiff "did not have individual standing" and thus could not "be regarded as a member of the class she sought to represent"); *In re Quarterdeck Office Sys., Inc. Sec. Litig.*, 1993 WL 623310, at *2–3 (C.D. Cal. Sept. 30, 1993) (denying class certification for Section 11 claim where plaintiffs "[could not] trace their stock directly to the registration statement"); *Kirkwood v. Taylor*, 590 F. Supp. 1375, 1378, 1382, 1387 (D. Minn. 1984) (decertifying class for Section 11 claim where plaintiffs "might have purchased [the] offering stock" but could not trace their shares).[59]

---

[59] Any concerns about the tracing requirement is an issue to be addressed by Congress, not the courts. *See, e.g.*, *Barnes*, 373 F.2d at 272–73 ("Appellant's broader reading [of Section 11] would be inconsistent with the over-all statutory scheme."); *In re FleetBoston*, 253 F.R.D. at 347 ("[A] literal and rigid application of the tracing requirement is a product of Congress' decision to balance the low-burden substantive proof by high-burden standing requirement[.]" (citation omitted)).

**B.      Lead Plaintiffs Cannot Satisfy The Predominance Requirement Of Rule 23(b)(3) For Their Securities Act Claims.**

"Actual knowledge"—*i.e.*, when an investor had knowledge of the truth that was allegedly misrepresented in a registration statement or prospectus prior to purchasing—is an absolute defense to liability for Section 11 and 12(a)(2) claims. *See* 15 U.S.C. § 77k(a) (providing a defense if "it is proved that at the time of [] acquisition [the plaintiff] knew of such untruth or omission"); 15 U.S.C. § 77l(a)(2) (requiring proof of no knowledge of the misrepresentation). Regardless of whether ultimately successful, the actual knowledge defense defeats class certification where "individual knowledge inquiries *might* be necessary" to resolve it. *In re Kosmos Energy*, 299 F.R.D. at 144, 153 (emphasis added) (quoting *N.J. Carpenters Health Fund v. Rali Series 2006-QO1 Tr.*, 477 F. App'x 809, 813 (2d Cir. 2012)); *see, e.g.*, *In re Initial Pub. Offerings*, 471 F.3d at 43 (predominance defeated where individualized knowledge inquiries required); *Vignola v. Fat Brands, Inc.*, 2020 WL 1934976, at *5–6 (C.D. Cal. Mar. 13, 2020) (same).

Here, the predominance requirement is unsatisfied because individual knowledge inquiries are *necessary*. Lead Plaintiffs allege that the Miscellaneous Statements made on December 18, 2020, and January 4, 2021, (*i.e.*, the registration and prospectus) were "false and misleading" because they did not reference the McGee Tax Issue. (A.C. ¶¶ 163–68.) But, as explained *supra* pp. 27–28, that precise information was publicly available. Not only was some information public well before December 2020, other information became public contemporaneous with the Secondary Offering. Given these circumstances, investors may have had knowledge of the McGee Tax Issue before purportedly purchasing AdaptHealth Stock in the Secondary Offering. Individualized issues are thus inevitable and defeat class certification. *See, e.g.*, *N.J. Carpenters*, 477 F. App'x at 813–14 (affirming denial of class certification where "knowledge defenses would require extensive individual proceedings"); *In re Kosmos Energy*, 299 F.R.D. at 153–54 (same).

**C.      Lead Plaintiffs Cannot Satisfy Numerosity As Required By Rule 23(a)(1).**

Numerosity is usually satisfied by "demonstrat[ing] that the potential number of [the proposed class] exceeds 40." *Value Drug Co. v. Takeda Pharms., U.S.A, Inc.*, 2023 WL 2314911, at *7 (E.D. Pa. Feb. 28, 2023). Here, however, Lead Plaintiffs seek to certify a class of zero. For the reasons set forth in Argument Section II.A, the tracing requirement for Lead Plaintiffs' Securities Act claims cannot be satisfied by any alleged participant in the Secondary Offering, making it impossible to identify any members of the proposed class. Therefore, Lead Plaintiffs have failed to prove numerosity. *See, e.g.*, *id.* at *4–5 (denying class certification absent numerosity); *In re FleetBoston*, 253 F.R.D. at 350–51 (no numerosity where plaintiffs' inability to trace was also applicable to proposed class).

**D.      Lead Plaintiffs Are Not Typical Or Adequate As Required By Rule 23(a)(3–4).**

For the reasons set forth in Argument Sections I.C.1, I.C.2, I.D.1, and I.D.3, Lead Plaintiffs are atypical and inadequate class representatives of any class involving their Securities Act claims. *See, e.g.*, *McNair*, 672 F.3d at 223 (no "adequate typicality" without "individual standing" (citation omitted)); *In re Initial Pub. Offering*, 227 F.R.D. at 120 (same).

**E.      Any Proposed Class Must Be Narrower Than Lead Plaintiffs' Proposal.**

In the event the Court certifies a class for the Securities Act claims (which it should not), the Court should narrow Lead Plaintiffs' proposed class. A class of "all persons and entities other than Defendants that purchased or otherwise acquired AdaptHealth securities between November 8, 2019 and July 16, 2021" (A.C. ¶¶ 1, 170) is overbroad (*see supra* pp. 68–69), including because (i) it begins before the first date of the Secondary Offering (*i.e.*, January 8, 2021), (ii) it ends after the alleged fraud ended (*i.e.*, April 13, 2021), and (iii) it includes purchasers that did not purportedly participate in the Secondary Offering and cannot satisfy the tracing requirement.

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs' Motion to Certify Class should be denied in its entirety, Delaware County and Bucks County should be disqualified as Lead Plaintiffs, and Lead Plaintiffs' Securities Act claims should be dismissed with prejudice.

Dated: March 30, 2023

**WILLKIE FARR & GALLAGHER LLP**

By: /s/ *Todd G. Cosenza*
Todd G. Cosenza (admitted *pro hac vice*)
Zeh S. Ekono (admitted *pro hac vice*)
Vincent P. Iannece (admitted *pro hac vice*)
Margot G. Mooney (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York  10019–6099
(212) 728–8000

**SAXTON & STUMP**
Steven D. Costello (No. 37288)
100 Deerfield Lane, Suite 240
Malvern, Pennsylvania  19355
(484) 328–8500

*Attorneys for AdaptHealth Corp., Stephen P. Griggs, Jason Clemens, Frank J. Mullen, Richard Barasch, Joshua Parnes, Alan Quasha, Terence Connors, Dr. Susan Weaver, Dale Wolf, Bradley Coppens, and David S. Williams III*

## <u>CERTIFICATE OF SERVICE</u>

I, Todd G. Cosenza, Esquire, hereby certify that on this date, a true and correct copy of the foregoing was served via e-mail and electronically via the Court's ECF system, where this document is available for downloading and viewing.

/s/ *Todd G. Cosenza*

Todd G. Cosenza

Dated:  March 30, 2023

-76-