# Exhibit 3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C.  20549**

---

# FORM 8-K

---

**CURRENT REPORT**
**Pursuant to Section 13 or Section 15(d) of the**
**Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): **November 7, 2019**

# AdaptHealth Corp.
(Exact name of registrant as specified in its charter)

| **Delaware** | **001-38399** | **82-3677704** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**220 West Germantown Pike, Suite 250**
**Plymouth Meeting, PA**
(address of principal executive offices)

**19462**
(zip code)

**(610) 630-6357**
(Registrant's telephone number, including area code)

---

(Former name or former address, if changed since last report.)

**Check the appropriate box below if the Form 8-K is intended to** simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communication pursuant to Rule 425 under the Securities Act (17 UR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CPR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencements communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter). Emerging growth company  ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.  ☐

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, par value $0.0001 per share | AHCO | The Nasdaq Stock Market LLC |
| Warrants, each whole warrant exercisable for one share of Class A Common Stock at an exercise price of $11.50 | AHCOW | The Nasdaq Stock Market LLC |

**Introductory Note**

On November 8, 2019 (the "**Closing Date**"), the registrant consummated the previously announced business combination pursuant to that certain Merger Agreement, dated as of July 8, 2019, by and among DFB Healthcare Acquisitions Corp., a Delaware corporation ("**DFB**"), BM AH Holdings, LLC, a Delaware limited liability company (the "**BM Blocker**"), Access Point Medical, Inc., a Delaware corporation (the "**A Blocker**" and, together with the BM Blocker, the "**Blockers**"), DFB Merger Sub LLC, a Delaware limited liability company ("**Merger Sub**"), AdaptHealth Holdings LLC, a Delaware limited liability company ("**AdaptHealth Holdings**"), AH Representative LLC, a Delaware limited liability company (the "**Company Unitholders' Representative**"), solely for purposes of Section 7.20 thereof, the BlueMountain Foinaven Master Fund L.P., a Cayman Islands exempted limited partnership, BMSP L.P., a Delaware limited partnership, and BlueMountain Fursan Fund L.P., a Cayman Islands exempted limited partnership (collectively, "**BM Blocker Sellers**") and, solely for purposes of Section 7.21 thereof, Clifton Bay Offshore Investments L.P., a British Virgin Islands limited partnership (the "**A Blocker Seller**" and together with the BM Blocker Sellers, the "**Blocker Sellers**" (as amended on October 15, 2019, the "**Merger Agreement**"), pursuant to which the Company has acquired 56% of the economic and voting interests of AdaptHealth Holdings through a series of transactions (collectively, the "**Business Combination**"), including: (i) the merger of each of the Blockers with and into DFB, with DFB surviving; (ii) the merger of Merger Sub with and into AdaptHealth Holdings, with AdaptHealth Holdings surviving (the "**AdaptHealth Merger**"); and (iii) the contribution by DFB to AdaptHealth Holdings of all its available funds (other than cash used to pay certain transaction expenses of DFB) in exchange for equity interests in AdaptHealth Holdings.

Following the completion of the Business Combination (the "**Closing**"), substantially all of the Company's assets and operations are held and conducted by AdaptHealth Holdings and its subsidiaries, and the Company's only assets are equity interests in AdaptHealth Holdings. The Company owns a majority of the economic and voting interests of AdaptHealth Holdings and is the sole manager of AdaptHealth Holdings. In connection with the Closing, the registrant changed its name from "DFB Healthcare Acquisitions Corp." to "AdaptHealth Corp." Unless the context otherwise requires, "**we**," "**us**," "**our**," "**AdaptHealth Corp.**" and the "**Company**" refer to the combined company and its subsidiaries, including AdaptHealth Holdings and its subsidiaries. "**DFB**" refers to the registrant prior to the Closing, and "**AdaptHealth Holdings**" refers to the AdaptHealth Holdings business before it became a partially owned subsidiary of AdaptHealth Corp. upon the Closing.

The foregoing description of the Merger Agreement is a summary only and is qualified in its entirety by reference to the Merger Agreement and Amendment No. 1 to the Merger Agreement, dated as of October 15, 2019, by and among DFB, the Blockers, Merger Sub, AdaptHealth Holdings, the Company Unitholders' Representative and the Blocker Sellers, copies of which are filed as Exhibit 2.1 and Exhibit 2.2, respectively, to this Current Report on Form 8-K. A more detailed description of the Business Combination and related transactions can be found in DFB's definitive proxy statement in connection with the solicitation of proxies from DFB's stockholders to approve the Business Combination and related transactions filed with the Securities and Exchange Commission (the "**SEC**") on October 23, 2019 (the "**Proxy Statement**").

1

**Item 1.01.  Entry into a Material Definitive Agreement.**

*Registration Rights Agreement*

Concurrently with the Closing, DFB, Deerfield/RAB Ventures LLC (the "**Sponsor**"), the Blocker Sellers, the owners of the units representing limited liability company interests in AdaptHealth Holdings prior to the Closing other than the Blockers (the "**Non-Blocker AdaptHealth Members**"), Deerfield Private Design Fund IV, L.P. ("**Deerfield**") and RAB Ventures (DFB) LLC ("**RAB Ventures**") and certain other holders entered into a Registration Rights Agreement (the "**Registration Rights Agreement**"). The Registration Rights Agreement amended, restated and replaced the registration rights agreement entered into by DFB with the Sponsor on February 15, 2018 to provide registration rights to each of the Sponsor, the Blocker Sellers, the Non-Blocker AdaptHealth Members, Deerfield and RAB Ventures, and certain other holders pursuant to which the Company will be required to register for resale shares of Class A Common Stock held by those parties upon the Closing, including the shares of the Company's Class A Common Stock, par value $0.0001 per share (the "**Class A Common Stock**"), issuable pursuant to the amended and restated subscription agreement, dated October 15, 2019, by and between DFB, Deerfield and RAB Ventures (the "**Subscription Agreement**"), or issuable upon the future exercise of private placement warrants or upon the future exchange of common units representing limited liability company interests in AdaptHealth Holdings from and after the Closing pursuant to Exchange Agreement (as defined below) and the Fifth Amended and Restated AdaptHealth Holdings LLC Agreement (as defined below) (the "**New AdaptHealth Units**") and shares of shares of the Company's Class B Common Stock, par value $0.0001 per share (the "**Class B Common Stock**"), in each case held by them upon the Closing (collectively, "**Registrable Securities**"). There are approximately 76 million Registrable Securities.

The Company is obligated to file a shelf registration statement registering the resale of all of the Registrable Securities. In addition, pursuant to the terms of the Registration Rights Agreement and subject to certain requirements and customary conditions, the equityholders may demand, at any time or from time to time, that the Company file a registration statement on Form S-1, or any similar long-form registration statement, or if available, on Form S-3 to register the shares of the Company's Class A Common Stock held by such equityholders. The Registration Rights Agreement will also provide the equityholders with "piggy-back" registration rights, subject to certain requirements and customary conditions. Under certain circumstances, additional payments may be assessed with respect to the shares of Class A Common Stock included in the Registrable Securities in the event that: (i) a resale shelf registration statement has not been declared effective by the SEC by the earlier of (a) 60 days following the Company's deadline to file a resale shelf registration statement, or (b) ten (10) business days after the SEC notifies the Company that it will not review the resale shelf registration statement, subject to certain potential timing adjustments; or (ii) the resale shelf registration statement is declared effective by the SEC but thereafter ceases to be effective prior to the expiration of a designated effective period.

The Company will be required to bear all expenses incurred in connection with the filing of any such registration statements and any such offerings, other than underwriting discounts and

2

commission on the sale of Registrable Securities and the fees and expenses of counsel to holders of Registrable Securities. The Registration Rights Agreement includes customary provisions regarding indemnification and contribution.

The foregoing description of the Registration Rights Agreement does not purport to be complete and is qualified in its entirety by the terms and conditions of the Registration Rights Agreement, which is filed as Exhibit 4.1 to this Current Report on Form 8-K and is incorporated herein by reference.

*Exchange Agreement*

Concurrently with the Closing, the Company, AdaptHealth Holdings and the Non-Blocker AdaptHealth Members entered into an Exchange Agreement (the "**Exchange Agreement**"), which provides that, subject to certain conditions and limitations, holders of New AdaptHealth Units, other than the Company, have the right to exchange their New AdaptHealth Units (and a corresponding number of shares of Class B Common Stock) for shares of Class A Common Stock at an exchange ratio of one share of Class A Common Stock for each New AdaptHealth Unit (and corresponding share of Class B Common Stock) exchanged, subject to conversion rate adjustments for stock splits, stock dividends and reclassifications, among other things. Under the Exchange Agreement, a holder of New AdaptHealth Units may not exchange New AdaptHealth Units more than once per fiscal quarter. In addition, the minimum number of New AdaptHealth Units (and corresponding number of shares of Class B Common Stock) that may be exchanged in any one exchange is the lesser of (A) 10,000 New AdaptHealth Units and (B) all of the New AdaptHealth Units then held by such person, except that this minimum may not apply if such exchange is in connection with the exercise of any incidental registration rights pursuant to the Registration Rights Agreement.

Additionally, the Exchange Agreement provides that, in connection with the occurrence of a "change of control" (as defined therein) of the Company, the Company has the right to require each holder of New AdaptHealth Units (other than the Company) to effect an exchange of some or all of such holder's New AdaptHealth Units and a corresponding number of shares of Class B Common Stock, in each case, effective immediately prior to the consummation of the change of control.

The foregoing description of the Exchange Agreement does not purport to be complete and is qualified in its entirety by the terms and conditions of the Exchange Agreement, which is filed as Exhibit 10.1 to this Current Report on Form 8-K and is incorporated herein by reference.

*Tax Receivable Agreement*

Concurrently with the Closing, AdaptHealth Corp. entered into a Tax Receivable Agreement with AdaptHealth Holdings, the Blocker Sellers and the Non-Blocker AdaptHealth Members (the "**Tax Receivable Agreement**"). The Tax Receivable Agreement provides for the payment by the Company to the Blocker Sellers and the Non-Blocker AdaptHealth Members of 85% of the net cash savings, if any, in U.S. federal, state and local income tax that AdaptHealth Corp. actually realizes (or is deemed to have realized in certain circumstances) in periods after the Closing as a result of: (i) certain tax attributes of the A Blocker existing prior to the Business

3

Combination; (ii) certain increases in tax basis resulting from exchanges of New AdaptHealth Units; (iii) imputed interest deemed to be paid by AdaptHealth Corp. as a result of payments it makes under the Tax Receivable Agreement; and (iv) certain increases in tax basis resulting from payments AdaptHealth Corp. makes under the Tax Receivable Agreement.

The foregoing description of the Tax Receivable Agreement does not purport to be complete and is qualified in its entirety by the terms and conditions of the Tax Receivable Agreement, which is filed as Exhibit 10.2 to this Current Report on Form 8-K and is incorporated herein by reference.

### Fifth Amended and Restated AdaptHealth Holdings LLC Agreement

Concurrently with the Closing, AdaptHealth Holdings, the Company and the Non-Blocker AdaptHealth Members entered into the Fifth Amended and Restated AdaptHealth Holdings LLC Agreement (the "**A&R AdaptHealth Holdings LLC Agreement**") which sets forth, among other things, the rights and obligations of the holders of New AdaptHealth Units following the Business Combination. Under the A&R AdaptHealth Holdings LLC Agreement, the Company is the sole manager of AdaptHealth Holdings and will be able to control all of the day-to-day business affairs and decision-making of AdaptHealth Holdings without the approval of any member unless otherwise stated in the A&R AdaptHealth Holdings LLC Agreement.

The foregoing description of the A&R AdaptHealth Holdings LLC Agreement does not purport to be complete and is qualified in its entirety by the terms and conditions of the A&R AdaptHealth Holdings LLC Agreement, which is filed as Exhibit 10.3 to this Current Report on Form 8-K and is incorporated herein by reference.

### Indemnification Agreements

Concurrently with the Closing, the Company entered into indemnification agreements with Luke McGee, Joshua Parnes, Alan Quasha, Terence Connors, Richard Barasch, Christopher Joyce, Shaw Rietkerk, Gregg Holst, Dr. Susan Weaver and Dale Wolf each of whom became or continued as an executive officer and/or director of the Company at Closing. Each indemnification agreement provides that, subject to limited exceptions, and among other things, the Company will indemnify the director or executive officer to the fullest extent permitted by law for claims arising in his or her capacity as our director or officer.

The foregoing description of the indemnification agreements does not purport to be complete and is qualified in its entirety by the terms and conditions of the indemnification agreement, a form of which is filed as Exhibit 10.4 to this Current Report on Form 8-K and is incorporated herein by reference.

### Board Designee Rights Letter Agreement

Concurrently with the Closing, the Company and AdaptHealth Holdings entered into the Board Designee Rights Letter Agreement with each of BlueMountain Summit Opportunities Fund II (US) L.P., BMSP L.P., BlueMountain Foinaven Master Fund L.P. and BlueMountain Fursan Fund L.P. (collectively, the "**BlueMountain Entities**") (the "**Board Designee Rights Letter Agreement**"), pursuant to which the BlueMountain Entities or their permitted transferees holding

4

a majority of the outstanding principal amount under the promissory notes made by AdaptHealth Holdings to the BlueMountain Entities (the "**BM Notes**") were granted the right, commencing on the Closing Date and ending on the date on which the BM Notes have been paid in full, to designate and nominate for election one person to serve on the Company's board of directors.

The foregoing description of the Board Designee Rights Letter Agreement does not purport to be complete and is qualified in its entirety by the terms and conditions of the Board Designee Rights Letter Agreement, which is filed as Exhibit 10.5 to this Current Report on Form 8-K and is incorporated herein by reference.

*Amendment to Credit Agreement*

Concurrently with the Closing, AdaptHealth LLC, an indirect subsidiary of the Company, entered into Amendment No. 2 (the "Credit Agreement Amendment") to its Third Amended and Restated Credit and Guaranty Agreement, originally dated March 20, 2019 (as amended on August 22, 2019, the "Credit Agreement"), by and among AdaptHealth LLC, the guarantors named therein, CIT Finance LLC as administrative agent, and the lenders party thereto. The Credit Agreement Amendment primarily (i) increased the amount available under the delayed draw term loan from $50,000,000 to $100,000,000, and (ii) revised the consolidated total leverage ratio thresholds and lowered the applicable margin to determine the variable quarterly interest rate under the Credit Agreement.

The foregoing description of the Credit Agreement Amendment does not purport to be complete and is qualified in its entirety by the terms and conditions of the Credit Agreement Amendment, which is filed as Exhibit 10.8 to this Current Report on Form 8-K and is incorporated herein by reference.

**Item 2.01.   Completion of Acquisition or Disposition of Assets.**

The disclosure set forth under "**Introductory Note**" above is incorporated in this Item 2.01 by reference. The material provisions of the Merger Agreement are described in the Proxy Statement, in the section entitled "**Proposal No. 1: The Business Combination Proposal**", beginning on page 100, which is incorporated herein by reference. On November 7, 2019, the Business Combination was approved by DFB's stockholders at the Special Meeting in Lieu of 2019 Annual Meeting of DFB's stockholders (the "**Special Meeting**"). The Business Combination was completed on November 8, 2019.

As of the Closing Date:

- Each Blocker merged with and into DFB (collectively, the "**Blocker Mergers**"), whereupon the separate existence of each Blocker Company ceased, and DFB continued as the surviving entity of the Blocker Mergers. Pursuant to the Blocker Mergers, the outstanding equity interests of the Blockers converted into the right to receive, and the Company issued to the Blocker Sellers, a number of shares of Class A Common Stock determined in accordance with the Merger Agreement and, in the case of the BM Blocker, one or more promissory notes issued by AdaptHealth Holdings in favor of the BM Blocker in exchange for common units representing limited liability company interests in AdaptHealth Holdings prior to the Closing (the "**AdaptHealth Holdings Common Units**"). 17,386,200 shares of Class A Common Stock were issued to the Blocker Sellers pursuant to the Blocker Mergers. As a result of the Blocker Mergers, immediately after the Blocker Mergers, DFB owned the limited liability company interests in AdaptHealth Holdings (the "**Existing AdaptHealth Units**") previously owned by the Blockers (the "**DFB Acquired Existing AdaptHealth Units**").

5

- Immediately after the Blocker Mergers, Merger Sub merged with and into AdaptHealth Holdings, whereupon the separate limited liability company existence of Merger Sub ceased and AdaptHealth Holdings survived the AdaptHealth Merger as a partially owned subsidiary of DFB.

- At the effective time of the AdaptHealth Merger, DFB caused the trustee to distribute the proceeds of the trust fund established by DFB for the benefit of its public stockholders, and DFB contributed the proceeds from the issuance of Class A Common Stock pursuant to the Subscription Agreement to AdaptHealth Holdings in exchange for a number of AdaptHealth Holdings Common Units equal to the aggregate number of shares of common stock par value $0.0001 per share (the "**Common Stock**") of DFB outstanding after giving effect to the number of shares of Common Stock redeemed prior to the Closing and the shares of Common Stock issued pursuant to the Subscription Agreement (but excluding any shares of Class A Common Stock issued as consideration pursuant to the Blocker Mergers).

- Pursuant to the AdaptHealth Merger, all of the outstanding Existing AdaptHealth Units (other than the DFB Acquired Existing AdaptHealth Units) converted into the right to receive, and AdaptHealth Holdings issued to the Non-Blocker AdaptHealth Members, a number of New AdaptHealth Units and an equal number of shares of Class B Common Stock determined in accordance with the Merger Agreement and the AdaptHealth Holdings LLC Agreement. 32,133,799 New AdaptHealth Units and 32,133,799 shares of Class B Common Stock were issued to the Non-Blocker AdaptHealth Members pursuant to the AdaptHealth Merger.

Prior to the Closing, DFB was a shell company (as defined in Rule 12b-2 of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**")) with no operations, formed as a vehicle to effect a business combination with one or more operating businesses. After the Closing, the Company became a holding company whose only asset consists of equity interests in AdaptHealth Holdings.

*Cautionary Note Regarding Forward-Looking Statements*

Certain statements in this Current Report on Form 8-K may constitute "forward-looking statements" for purposes of the federal securities laws. Our forward-looking statements include, but are not limited to, statements regarding our or our management team's expectations, hopes, beliefs, intentions or strategies regarding the future. In addition, any statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intends," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. Forward-looking statements in this proxy statement may include, for example, statements about:

- the benefits of the Business Combination;

- our future financial performance following the Business Combination;

6

- changes in our strategy, future operations, financial position, estimated revenues and losses, projected costs, prospects and plans;

- our ability to complete acquisitions of other businesses;

- expansion plans and opportunities; and

- the outcome of any known and unknown litigation and regulatory proceedings.

These forward-looking statements are based on information available as of the date of this Current Report on Form 8-K, and current expectations, forecasts and assumptions, and involve a number of judgments, risks and uncertainties. Accordingly, forward-looking statements should not be relied upon as representing our views as of any subsequent date, and we do not undertake any obligation to update forward-looking statements to reflect events or circumstances after the date they were made, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

As a result of a number of known and unknown risks and uncertainties, our actual results or performance may be materially different from those expressed or implied by these forward-looking statements. Some factors that could cause actual results to differ include:

- the ability to maintain the listing of our Class A Common Stock on NASDAQ following the Business Combination;

- the risk that the Business Combination disrupts current plans and operations as a result of the our consummation of the transactions described herein;

- our ability to recognize the anticipated benefits of the Business Combination, which may be affected by, among other things, competition and the ability of the Company to grow and manage growth profitably following the Business Combination;

- costs related to the Business Combination;

- changes in applicable laws or regulations;

- the possibility the Company may be adversely affected by other economic, business, and/or competitive factors; and

- other risks and uncertainties including those set forth in the "**Risk Factors**" section in the Proxy Statement beginning on page 44 of the Proxy Statement, which is incorporated herein by reference.

### *Business and Properties*

The business and properties of AdaptHealth Holdings prior to the Business Combination are described in the Proxy Statement in the section entitled "**Information About AdaptHealth**" beginning on page 178, which is incorporated herein by reference. The business of DFB prior to the Business Combination is described in the Proxy Statement in the section entitled "**Information About DFB**" beginning on page 158, which is incorporated herein by reference.

### *Risk Factors*

The risk factors related to the Company's business and operations are described in the Proxy Statement in the section entitled "**Risk Factors**" beginning on page 44, which is incorporated herein by reference.

*Selected Historical Financial Information of the Company*

The selected historical financial information of AdaptHealth Holdings for the years ended December 31, 2018, 2017 and 2016, and the nine months ended September 30, 2019 and 2018 is set forth in Exhibit 99.1 hereto and is incorporated herein by reference.

*Unaudited Pro Forma Condensed Consolidated Combined Financial Information*

The unaudited pro forma condensed consolidated combined financial information of DFB for the year ended December 31, 2018 and the nine months ended September 30, 2019 is set forth in Exhibit 99.2 hereto and is incorporated herein by reference.

*Management's Discussion and Analysis of Financial Condition and Results of Operations*

Management's discussion and analysis of financial condition and results of operations of AdaptHealth Holdings for the nine months ended September 30, 2019 and 2018 is set forth in Exhibit 99.3 hereto and is incorporated herein by reference.

*Security Ownership of Certain Beneficial Owners and Management*

The following table sets forth information known to the Company regarding the beneficial ownership of Common Stock immediately following consummation of the Business Combination by:

- each person who is the beneficial owner of more than 5% of the outstanding shares of our Common Stock;

- each of our officers and directors as of the Closing; and

- all current officers and directors of the Company, as a group.

Beneficial ownership is determined according to the rules of the SEC, which generally provide that a person has beneficial ownership of a security if he, she or it possesses sole or shared voting or investment power over that security or has the right to acquire securities within 60 days, including options and warrants that are currently exercisable or exercisable within 60 days.

The beneficial ownership of our Common Stock as of the Closing Date is based on 40,296,166 shares of Class A Common Stock and 32,113,799 shares of Class B Common Stock issued and outstanding in the aggregate as of November 8, 2019.

Unless otherwise indicated, the Company believes that all persons named in the table below have sole voting and investment power with respect to all shares of voting stock beneficially owned by them.

8

**Beneficial Ownership Table**

| Name and Address of Beneficial Owner(1) | Class A Stock | | Class B Stock | | % of Total Voting Power(2) |
|---|---|---|---|---|---|
| | Number of Shares | % | Number of Shares | % | |
| Deerfield/RAB Ventures, LLC (3) | 6,315,833 | 14.7% | — | — | 8.4% |
| Richard Barasch(4) | 6,415,833 | 14.9% | — | — | 8.5% |
| Steven Hochberg(4) | 6,335,833 | 14.8% | — | — | 8.4% |
| Dr. Susan Weaver | 20,000 | * | — | — | * |
| Alan Quasha(5) | — | — | — | — | — |
| Terence Connors | — | — | — | — | — |
| Dale Wolf(6) | — | — | — | — | — |
| Luke McGee(7) | 744,951 | 1.8% | 4,626,028 | 14.4% | 7.4% |
| Joshua Parnes | 73,125 | * | — | — | * |
| Gregg Holst(8) | 137,834 | * | 688,334 | 2.1% | 1.1% |
| Christopher Joyce(9) | 83,218 | * | 266,331 | * | * |
| Shaw Rietkerk(10) | 31,034 | * | 239,793 | * | * |
| Deerfield Management Company, L.P.(11) | 22,010,905 | 50.3% | — | — | 29.0% |
| Everest Trust(12) | 15,105,280 | 36.8% | 856,044 | 2.7% | 21.8% |
| Still Water Nevada Trust(13) | 1,079,189 | 2.7% | 8,338,659 | 26.0% | 12.9% |
| The Mykonos 2019 NGCG Nevada Trust(14) | 525,586 | 1.3% | 5,613,851 | 17.5% | 8.4% |
| McLarty Capital Partners SBIC, L.P.(15) | — | — | 4,526,189 | 14.1% | 6.3% |
| Richardson M. Roberts(16) | — | — | 4,222,598 | 13.1% | 5.8% |
| BlueMountain Capital Management, LLC(17) | 3,647,353 | 9.1% | 150,581 | * | 5.2% |
| Highbridge Capital Management, LLC(18) | 1,999,998 | 5.0% | — | — | 2.8% |
| All directors and executive officers as a group (10 individuals) | 7,505,995 | 17.4% | 5,820,486 | 18.1% | 17.7% |

---

\*       Less than 1%.

(1)    Unless otherwise noted, the business address of each of the listed entities or individuals is c/o AdaptHealth LLC, 220 West Germantown Pike, Suite 250, Plymouth Meeting, PA 19462.

(2)    The Class A Common Stock and Class B Common Stock vote together as a single class, except as required by law or the A&R Charter.

(3)    Includes shares underlying 2,643,333 warrants that will become exercisable 30 days following the Closing.

(4)    Represents 6,315,833 shares held directly by Deerfield/RAB Ventures, LLC, and, in the case of Mr. Hochberg, 20,000 shares held directly by Mr. Hochberg and, in the case of Mr. Barasch, 100,000 shares held directly by RAB Ventures. RAB Ventures and Deerfield constitute the members of Deerfield/RAB Ventures, LLC and Messrs. Barasch and Hochberg constitute the managers of Deerfield/RAB Ventures, LLC. Consequently, Messrs. Barasch and Hochberg may be deemed to share voting and dispositive control over the securities held by the Sponsor, and thus to share beneficial ownership in such securities. Each of Messrs. Barasch and Hochberg disclaims beneficial ownership over any securities owned by Deerfield/RAB Ventures, LLC in which he does not have any pecuniary interest. The business address of each of Deerfield/RAB Ventures, LLC and Messrs. Barasch and Hochberg is 780 Third Avenue, New York, NY 10017.

(5)    The business address of Mr. Quasha is c/o Quadrant Management, Inc., 320 Park Avenue, New York, NY 10022.

(6)    The business address of Mr. Wolf is c/o Molina Healthcare, Inc., 200 Oceangate, Suite 100, Long Beach, California 90802.

(7)    Includes shares and warrants held directly by Fresh Pond Investment LLC ("Fresh Pond"), 2321 Capital LLC ("2321 Capital") and LBM DME Holdings LLC ("LBM"), entities controlled by Mr. McGee. Fresh Pond holds 209,766 shares of Class A Common Stock (including 78,525 shares of Class A Common Stock underlying warrants that will become exercisable 30 days following the Closing) and 1,620,815 shares of Class B Common Stock. 2321 Capital holds 249,000 shares of Class A Common Stock (including 93,212 shares of Class A Common Stock underlying warrants that will become exercisable 30 days following the Closing) and 1,923,964 shares of Class B Common Stock. LBM holds 139,935 shares of Class A Common

9

Stock (including 52,384 shares of Class A Common Stock underlying warrants that will become exercisable 30 days following the Closing) and 1,081,249 shares of Class B Common Stock.

(8)     Includes shares and warrants held directly by Wheatfield LLC, an entity controlled by Mr. Holst. The number of shares of Class A Common Stock includes shares underlying 33,348 warrants that will become exercisable 30 days following the Closing.

(9)     Includes shares and warrants held directly by Mayaid2001 LLC, an entity controlled by Mr. Joyce. Includes shares of Class A Common Stock underlying 12,903 warrants that will become exercisable 30 days following the Closing.

(10)    Includes shares of Class A Common Stock underlying 11,617 warrants that will become exercisable 30 days following the Closing.

(11)    According to a Schedule 13D filed with the SEC on March 5, 2018 and Schedule 13D/As filed with the SEC on April 4, 2018,  July 15, 2019, on October 22, 2019 on behalf of Deerfield Mgmt IV, L.P. ("Deerfield Mgmt IV"), Deerfield, Deerfield Management Company, L.P. ("Deerfield Management"), James E. Flynn and Mr. Hochberg, each of which share voting and dispositive power with respect to certain of the reported shares. Mr. Flynn is the sole member of the general partner of each of Deerfield Mgmt IV and Deerfield Management. Deerfield Mgmt IV is the general partner, and Deerfield Management is the investment manager, of Deerfield Private Design Fund IV. Mr. Hochberg, an employee of Deerfield Management, also serves as a manager of the Sponsor. The total number of shares consists of (i) 15,733,333 shares held by Deerfield (including shares underlying 833,333 warrants that will become exercisable 30 days following the Closing), (ii) 6,251,485 shares held by the Sponsor (including shares underlying 2,643,333 warrants that will become exercisable 30 days following the Closing) and (iii) 26,087 shares held by Mr. Hochberg. The business address of this stockholder is 780 Third Avenue, 37th Floor, New York, New York 10017.

(12)    Includes shares and warrants held directly by Clifton Bay Offshore Investments L.P. ("Clifton Bay Investments") and Quadrant Management, Inc. ("QMI"). Clifton Bay Investments holds 15,025,135 shares of Class A Common Stock (including shares of Class A Common Stock underlying 665,628 warrants that will become exercisable 30 days following the Closing). QMI holds 80,145 shares of Class A Common Stock (including 41,473 shares of Class A Common Stock underlying warrants that will become exercisable 30 days following the Closing) and 856,044 shares of Class B Common Stock. The general partner of Clifton Bay Investments is Clifton Bay Management Ltd. ("Clifton Bay Management"), which is indirectly owned by the Trustee of the Everest Trust ("Everest"), a trust settled by Mr. Wayne Quasha. Q Management Services (PTC) Ltd., as Trustee of Everest Trust, owns all of the shares of Everest Hill Group Inc., which indirectly controls Clifton Bay Management. Vicali Services (BVI) Inc., a British Virgin Islands company ("Vicali"), is the sole director of Everest Hill Group Inc. and Q Management, and Susan V. Demers, a United States citizen, and Andrea J. Douglas, a citizen of New Zealand, are the directors of Vicali and each of them has voting power over Vicali and thus power over investment and voting determinations made by Clifton Bay Management. QMI is owned by Everest Hill Group Inc. Mr. Wayne Quasha, ultimately beneficially owns all of the shares of Everest Hill Group Inc., and as such, is in a position, indirectly, to determine the investment and voting decisions made by Everest Hill Group Inc. and Clifton Bay Management. The business address of Clifton Bay Investments and Clifton Bay Management is Tropic Isle Building, P.O. Box 3331, Road Town, Tortola, British Virgin Islands VG 1110. The business address of Mr. Wayne Quasha is c/o PFD Corporate Services (BVI) Limited, Tropic Isle Building, P.O. Box 3331, Road Town, Tortola, British Virgin Islands VG 1110. The business address of Everest Hill Group Inc. is Tropic Isle Building, P.O. Box 3331, Road Town, Tortola, British Virgin Islands VG 1110.

(13)    Includes shares and warrants held directly by Blue River NJ LLC ("Blue River"), and Quad Cap LLC ("Quad Cap"). Blue River holds 733,997 shares of Class A Common Stock (including 274,768 shares of Class A Common Stock underlying warrants that will become exercisable 30 days following the Closing) and 5,671,441 shares of Class B Common Stock. Quad Cap holds 345,192 shares of Class A Common Stock (including 129,221 shares of Class A Common Stock underlying warrants that will become exercisable 30 days following the Closing) and 2,667,218 shares of Class B Common Stock. The trustee of the trust is Peak Trust Company—NV, with a principal business address of 1840 East Warm Springs Road, Suite 105, Las Vegas, Nevada 89119.

(14)   Includes shares and warrants held directly by Ocean Rock NJ LLC ("Ocean Rock") and Plains Capital LLC ("Plains Capital"). Ocean Rock holds 464,888 shares of Class A Common Stock (including 240,568 shares of Class A Common Stock underlying warrants that will become exercisable 30 days following the Closing) and 4,965,525 shares of Class B Common Stock. Plains Capital holds 60,698 shares of Class A Common Stock (including 31,410 shares of Class A Common Stock underlying warrants that will become exercisable 30 days following the Closing) and 648,326 shares of Class B Common Stock. The trustee of the trust is Peak Trust Company—NV, with a principal business address of 1840 East Warm Springs Road, Suite 105, Las Vegas, Nevada 89119.

(15)   Includes shares held directly by McLarty Capital Partners SBIC, L.P. ("McLarty Capital Partners"). The general partner of McLarty Capital Partners is McLarty Capital Partners SBIC, LLC. The business address of McLarty Capital Partners is c/o The Firmament Group, 1 Rockefeller Plaza Suite 1203, New York, NY 10020.

(16)   Includes shares held directly by Verus Equity Holding Company LLC ("Verus Equity Holding") and Verus Note Holding Company LLC ("Verus Note Holding"). Verus Equity Holding holds 1,851,469 shares of Class B Common Stock. Verus Note Holding holds 2,371,129 shares of Class B Common Stock. Richardson M. Roberts is the managing member of each of Verus Equity Holding and Verus Note Holding. The business address of Mr. Roberts is 1569 Mallory Lane Building 200, Brentwood, TN 37027.

(17)   Includes shares held directly by investment funds for which BlueMountain Capital Management, LLC is the investment manager. The business address of BlueMountain Capital Management, LLC is 280 Park Avenue, 12th Floor, New York NY 10017.

(18)   According to a Schedule 13G/A filed with the SEC on February 14, 2019, on behalf of Highbridge Capital Management, LLC and 1992 MSF International Ltd. As the trading manager of 1992 MSF International Ltd., Highbridge Capital Management, LLC may be deemed to beneficially own all of the shares, which are held directly by 1992 MSF International Ltd. The business address of this stockholder is 40 West 57th Street, 32nd Floor, New York, New York 10019

11

*Directors and Executive Officers*

Information with respect to the Company's directors and executive officers immediately after the Closing is set forth in the Proxy Statement in the section entitled "**Management After the Business Combination**" beginning on page 224 of the Proxy Statement, which is incorporated herein by reference.

On November 7, 2019, each of Richard Barasch, Alan Quasha, Terence Connors, Dale Wolf, Luke McGee, Joshua Parnes and Dr. Susan Weaver was elected by DFB stockholders to serve as a director of the Company effective upon consummation of the Business Combination. Messrs. Barasch, Quasha and McGee were elected to serve as Class I directors with a term expiring at the Company's annual meeting of stockholders in 2020. Messrs. Parnes and Connors were elected to serve as Class II directors with a term expiring at the Company's annual meeting of stockholders in 2021. Mr. Wolf and Dr. Weaver were elected to serve as Class III directors with a term expiring at the Company's annual meeting of stockholders in 2022. The size of the board of directors is seven members. Biographical information for these individuals is set forth in the Proxy Statement in the section entitled "**Management After the Business Combination**" beginning on page 224 of the Proxy Statement, which is incorporated herein by reference.

*The Committees of the Board of Directors*

The board of directors appointed Messrs. Wolf, Quasha and Connors to serve on the Audit Committee, with Mr. Connors serving as its Chairman. The board of directors appointed Messrs. Barasch, Wolf and Quasha to serve on the Compensation Committee, with Mr. Quasha serving as its Chairman. The board of directors appointed Messrs. Connors and Barasch and Dr. Weaver to serve on the Nominating and Governance Committee, with Mr. Barasch as its Chairman. The board of directors appointed Dr. Weaver and Messrs. Barasch and Wolf to serve on the Compliance Committee with Dr. Weaver serving as its Chairman. Information with respect to the Company's Audit Committee, Compensation Committee, Nominating and Governance Committee and Compliance Committee is set forth in the Proxy Statement in the section entitled "**Management After the Business Combination — Committees of the Board of Directors**" beginning on page 226 of the Proxy Statement, which is incorporated herein by reference.

In connection with the consummation of the Business Combination, on November 8, 2019 Luke McGee was appointed to serve as the Chief Executive Officer, Joshua Parnes was appointed to serve as President, Gregg Holst was appointed to serve as Chief Financial Officer, Shaw Rietkerk was appointed to serve as Chief Revenue Officer and Christopher Joyce was appointed to serve as General Counsel. Biographical information for these individuals is set forth in the Proxy Statement in the section entitled "**Management After the Business Combination**" beginning on page 224 of the Proxy Statement, which is incorporated herein by reference.

In connection with the Closing, on November 8, 2019 each executive officer of DFB immediately prior to the Closing resigned from his or her respective position as an executive officer of the post-combination company.

12

*Independence of Directors*

NASDAQ listing standards require that a majority of the board of directors be independent. An "independent director" is defined generally as a person other than an officer or employee of a company or its subsidiaries or any other individual having a relationship which in the opinion of the board of directors of such company, would interfere with the director's exercise of independent judgment in carrying out the responsibilities of a director.

All directors, except for Mr. McGee and Mr. Parnes, are independent under applicable NASDAQ rules.

### Director and Executive Officer Compensation

*Pre-Closing Compensation of Executive Officers and Directors*

The compensation of AdaptHealth Holdings' named executive officers and directors before the consummation of the Business Combination is set forth in the Proxy Statement in the section titled "**Executive Compensation**" beginning on page 217, which is incorporated herein by reference.

*Post-Closing Compensation of Executive Officers and Directors*

The compensation of the Company's named executive officers and directors after the consummation of the Business Combination is set forth in the Proxy Statement in the section titled "**Executive Compensation-Compensation of Executive Officers and Directors after the Business Combination**" beginning on page 221, which is incorporated herein by reference.

*2019 Stock Incentive Plan*

On November 7, 2019, the stockholders of DFB approved the AdaptHealth Corp. 2019 Stock Incentive Plan (the "**2019 Plan**"), effective upon Closing. The description of the 2019 Plan is set forth in the Proxy Statement section titled "**Proposal No. 4—The 2019 Plan Proposal**" beginning on page 144 of the Proxy Statement, which is incorporated herein by reference. A copy of the full text of the 2019 Plan is filed as Exhibit 10.12 to this Current Report on Form 8-K.

*2019 Employee Stock Purchase Plan*

On November 7, 2019, the stockholders of DFB approved the AdaptHealth Corp. 2019 Employee Stock Purchase Plan (the "**2019 ESPP**"), effective upon Closing. The description of the 2019 ESPP is set forth in the Proxy Statement section titled "**Proposal No. 5—The 2019 ESPP Proposal**" beginning on page 165 of the Proxy Statement, which is incorporated herein by reference.

*Director Compensation*

The Compensation Committee will determine the annual compensation to be paid to the members of the board of directors of the Company.

*Founder Shares and Founders Warrants*

Pursuant to the Amended and Restated Assignment Letter Agreement dated October 15, 2019, by and between the Sponsor and AdaptHealth Holdings, the Sponsor and certain directors and officers of DFB transferred and assigned an aggregate of 2,437,500 of the founder shares and 1,690,000 of the founder warrants to purchase shares of our Class A Common Stock to certain members of AdaptHealth Holdings and to certain of its employees.

Messrs. McGee, Parnes, Holst, Rietkerk and Joyce (or entities controlled thereby) were transferred and assigned 520,830 shares and 224,121 warrants, 73,125 shares, 104,486 shares and 33,348 warrants, 19,417 shares and 11,617 warrants, and 70,315 shares and 12,903 warrants, respectively.

13

Information about related party transactions of DFB is set forth in the Proxy Statement in the section entitled "**Management's Discussion and Analysis of Financial Condition and Results of Operations of DFB — Related Party Transactions**" beginning on page 174 of the Proxy Statement and in Item 1.01 of this Current Report on Form 8-K, which is incorporated herein by reference.

Information about related party transactions of AdaptHealth Holdings is set forth in the Proxy Statement in the section entitled "**Management's Discussion and Analysis of Financial Condition and Results of Operations of AdaptHealth — Related Party Transactions**" beginning on page 215 of the Proxy Statement and in Item 1.01 of this Current Report on Form 8-K, which is incorporated herein by reference.

### *Legal Proceedings*

Information about legal proceedings of AdaptHealth Holdings is set forth in the Proxy Statement in the section entitled "**Business of AdaptHealth — Legal Proceedings**" beginning on page 185, which is incorporated herein by reference.

### *Market Price and Dividends*

DFB's units, shares of Common Stock and warrants were historically quoted on NASDAQ under the symbols "DFB" "DFBU", "DFBW", respectively. DFB units commenced public trading on February 15, 2018, and the shares of Common Stock and warrants each commenced separate trading on April 16, 2018. On July 5, 2019, the trading date before the public announcement of the Business Combination, the Common Stock traded at $10.15.

On November 8, 2019, in connection with the Closing, all of the units of the Company separated into their component parts of one share of Class A Common Stock and one warrant to purchase one-half of one share of Class A Common Stock, and the units ceased trading on NASDAQ. As of the Closing Date, there were 29 holders of record of the Class A Common Stock.

The Class A Common Stock and warrants are listed on the NASDAQ under the new trading symbols of "AHCO" and "AHCOW," respectively.

Historical market information regarding AdaptHealth Holdings is not provided because there has been no public market for AdaptHealth's equity securities.

DFB has not paid any cash dividends on the Common Stock to date. The board of directors is not currently contemplating, and does not anticipate declaring, any stock dividends in the foreseeable future. Further, our ability to declare dividends may be limited by restrictive covenants contained in any existing or future indebtedness of the Company.

**Recent Sales of Unregistered Securities**

In addition to the below, information about unregistered sales of DFB's equity securities is set forth in "**Item 15. Recent Sales of Unregistered Securities**" of DFB's Registration Statement on Form S-1 (File No. 333-222376) filed with the SEC on December 29, 2017 as amended on January 31, 2018, as amended as amended on February 7, 2018, as amended on February 12, 2018.

*Subscription Agreement*

Pursuant to the Subscription Agreement, the Sponsor and RAB Ventures subscribed for and purchased 12,400,000 shares and 100,000 shares, respectively, of Class A Common Stock in a private placement which was consummated concurrently with the Closing.

In connection with the Closing, the Company also issued (i) 17,386,201 shares of Class A Common Stock and (ii) 32,113,799 shares of Class B Common Stock to the Blocker Sellers and the Non-Blocker AdaptHealth Members, respectively, pursuant to the Merger Agreement.

The issuances of shares of Class A Common Stock and Class B Common stock discussed above were not registered under the Securities Act in reliance on the exemption from registration provided by Section 4(a)(2) of the Securities Act.

*Description of the Company's Securities*

A description of the Company's common stock and the Company's warrants is included in the Proxy Statement in the section entitled "**Description of Securities**" beginning on page 229 of the Proxy Statement, which is incorporated by reference herein.

As of the Closing, the Company has authorized 255,000,000 shares of capital stock, consisting of (a) 250,000,000 shares of common stock, including (i) 210,000,000 shares of Class A Common Stock, (ii) 35,000,000 shares of Class B Common Stock, and (iii) 5,000,000 shares of undesignated preferred stock, par value $0.0001 per share.

As of the Closing Date, there were:  (a) 29 holders of record of Class A Common Stock and 40,296,166 shares of Class A Common Stock outstanding; (b) 19 holders of record of Class B Common Stock and 32,113,799  shares of Class B Common Stock outstanding; (c) no shares of preferred outstanding; and (d) 16 holders of record of warrants and 12,666,666 warrants outstanding.

*Financial Statements and Supplementary Data*

The information set forth under Item 9.01 of this Current Report on Form 8-K is incorporated herein by reference.

**Item 2.03. Creation of a Direct Financial Obligation under an Off-Balance Sheet Arrangement of a Registrant**

The information set forth under the "Amendment to Credit Amendment" in Item 1.01 of this Current Report on Form 8-K is incorporated herein by reference.

15

**Item 3.02.  Unregistered Sales of Equity Securities.**

The information set forth under Item 2.01 of this Current Report on Form 8-K is incorporated in this Item 3.02 by reference.

**Item 3.03.  Material Modification to Rights of Security Holders.**

The information set forth under Item 5.03 of this Current Report on Form 8-K is incorporated in this Item 3.03 by reference.

**Item 4.01.  Changes in Registrant's Certifying Accountant.**

On November 8, 2019, WithumSmith + Brown, PC ("**Withum**") was dismissed by vote of the board of directors as the Company's independent registered public accounting firm. On the same date, the board of directors engaged in discussions regarding and voted to retain KPMG as the Company's independent registered public accounting firm subject to completion of KPMG's standard client acceptance procedures and execution of an engagement letter.

Withum's reports on DFB's financial statements as of December 31, 2018 and 2017, and the related statements of operations, changes in stockholders' equity and cash flows for the year ended December 31, 2018 and for the period from November 22, 2017 (inception) through December 31, 2017 did not contain any adverse opinion or a disclaimer of opinion. The report was not qualified or modified as to uncertainty, audit scope, or accounting principles, except that such audit report contained an explanatory paragraph in which Withum expressed substantial doubt as to DFB's ability to continue as a going concern if it did not complete a business combination by February 21, 2020.

During the period from November 22, 2017 (inception) through December 31, 2018, and any subsequent interim period preceding such dismissal, there were no disagreements with Withum on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreement(s), if not resolved to the satisfaction of the former accountant, would have caused it to make reference to the subject matter of the disagreement(s) in connection with its report.

The Company provided Withum with a copy of the disclosures it is making in this Item 4.01 of this Current Report on Form 8-K and requested that Withum furnish a letter addressed to the Securities and Exchange Commission stating whether it agrees with the statements above, and, if not, stating the respects in which it does not agree. A copy of Withum's letter dated November 13, 2019 is filed as Exhibit 16.1 hereto.

**Item 5.01.  Changes in Control of Registrant.**

The information set forth under the "Introductory Note" and in Item 2.01 of this Current Report on Form 8-K is incorporated herein by reference.

16

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers**

The information set forth under Item 2.01 of this Current Report on Form 8-K is incorporated herein by reference.

**Item 5.03. Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.**

*Amended and Restated Charter*

On the Closing Date, the Company's charter was amended and restated (as amended and restated, the "**A&R Charter**") to, among other things:

- change DFB's name to "AdaptHealth Corp.";

- create Class A Common Stock and Class B Common Stock as new classes of capital stock of the Company;

- increase the number of authorized shares of Common Stock from 200,000,000 to 245,000,000 and the number of authorized shares of the Company's preferred stock, $0.0001 per share, from 1,000,000 to 5,000,000;

- change the Company's classified board of directors from two classes, with directors serving two-year terms, to three classes, with directors serving three-year terms; and;

- make certain other changes to the existing charter, including the elimination of certain provisions related to the Company's initial business combination that will no longer be relevant following the Closing.

A copy of the A&R Charter is filed with this Current Report on Form 8-K as Exhibit 3.1, and the foregoing description of the A&R Charter is qualified in its entirety by reference thereto.

*Amendment to the Bylaws*

On the Closing Date, the Company's bylaws were amended and restated (as amended and restated, the "**A&R Bylaws**"). A copy of the A&R Bylaws is filed with this Current Report on Form 8-K as Exhibit 3.2, and the foregoing description of the A&R Bylaws is qualified in its entirety by reference thereto.

**Item 5.06. Change in Shell Company Status.**

As a result of the Business Combination, which fulfilled the definition of an initial business combination as required by the Charter, DFB ceased to be a shell company, as defined in Rule 12b-2 of the Exchange Act, as of the Closing Date. The material terms of the Business Combination are described in the Proxy Statement in the section entitled "**Proposal No. 1—The Business Combination Proposal**" beginning on page 100, which is incorporated herein by reference.

**Item 5.07 Submission of Matters to a Vote of Security Holders.**

Present at the Special Meeting on November 7, 2019 were holders of 28,486,501 shares of Common Stock stock in person or by proxy, representing 75.16% of the voting power of the shares

17

of the Common Stock as of October 15, 2019, the record date for the Special Meeting, and constituting a quorum for the transaction of business.

The stockholders of DFB voted on the following items at the Special Meeting; each proposal is described in more detail in the Proxy Statement and incorporated by reference in this Current Report on Form 8-K:

1. To adopt the Merger Agreement and approve the transactions contemplated thereby, including the Business Combination (such proposal the "**Business Combination Proposal**");

2. To approve the amendment by virtue of the AdaptHealth Merger, of the Company's amended and restated certificate of incorporation (as described in Item 5.03 of this Current Report on Form 8-K) (the "**Charter Proposal**");

3. To approve, for purposes of complying with applicable NASDAQ listing rules, (such proposal, the "**NASDAQ Proposal**"); the issuance of

- shares of Class A Common Stock to the Blocker Sellers in the Blocker Mergers, (ii) shares of Class B Common Stock to the Non-Blocker AdaptHealth Members in the AdaptHealth Merger, with the combined number of such shares of Class A Common Stock and Class B Common Stock being up to 51,500,000 and (iii) up to 3,000,000 shares of Class A Common Stock and Class B Common Stock to the Blocker Sellers and the Non-Blocker AdaptHealth Members as Contingent Consideration (as defined in the Proxy Statement);

- up to 12,500,000 shares of Class A Common Stock pursuant to the terms of the Subscription Agreement, in a private placement;

- a number of shares of Class A Common Stock equal to the number of shares of Class B Common Stock issued in connection with the Business Combination pursuant to the Merger Agreement, which shares of Class A Common Stock will be issuable to the holders of such shares of Class B Common Stock in connection with the future exchange of their New AdaptHealth Units and shares of Class B Common Stock in accordance with the Exchange Agreement to be entered into at the Closing.

4. To approve and adopt the AdaptHealth Corp. 2019 Stock Incentive Plan and the material terms thereunder (such proposal, the "**2019 Plan Proposal**");

5. To approve and adopt the AdaptHealth Corp. 2019 Employee Stock Purchase Plan and the material terms thereunder (such proposal, the "**2019 ESPP Proposal**");

6. To elect, effective at Closing, seven directors to serve staggered terms on our board of directors until the 2020, 2021 and 2022 annual meetings of stockholders, respectively, and until their respective successors are duly elected and qualified (such proposal, the "**Director Election Proposal**"); and

7. To approve the adjournment of the special meeting to a later date or dates, if necessary or appropriate, to permit further solicitation and vote of proxies in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination

18

Proposal, the Charter Proposal, the NASDAQ Proposal, the 2019 Plan Proposal, the 2019 ESPP Proposal and/or the Director Election Proposal (such proposal, the "**Adjournment Proposal**");

The voting results for each of these proposals are set forth below.

1.     Approval of the Business Combination Proposal

| For | Against | Abstain |
| --- | --- | --- |
| 21,067,450 | 2,419,051 | 0 |

Based on the votes set forth above, the stockholders adopted the Merger Agreement and the transactions contemplated thereby, including the Business Combination.

2.     Approval of the Charter Proposal, to approve five sub-proposals

(a) to change DFB's name to "AdaptHealth Corp.".

| For | Against | Abstain |
| --- | --- | --- |
| 21,067,450 | 2,419,051 | 0 |

(b) To create Class A Common Stock and Class B Common Stock as new classes of capital stock of DFB.

| For | Against | Abstain |
| --- | --- | --- |
| 20,567,920 | 2,918,551 | 30 |

(c) To increase the number of authorized shares of Common Stock from 200,000,000 to 245,000,000 and the number of authorized shares of DFB's preferred stock, $0.0001 per share, from 1,000,000 to 5,000,000.

| For | Against | Abstain |
| --- | --- | --- |
| 21,067,420 | 2,419,051 | 30 |

(d) To change DFB's classified board of directors from two classes, with directors serving two-year terms, to three classes, with directors serving three-year terms.

| For | Against | Abstain |
| --- | --- | --- |
| 20,192,420 | 3,294,051 | 30 |

19

(e) To make certain other changes to DFB's charter, including the elimination of certain provisions related to DFB's initial business combination that will no longer be relevant following the closing of the business combination.

| For | Against | Abstain |
|---|---|---|
| 21,067,420 | 2,419,148 | 30 |

Based on the votes set forth above, the stockholders approved the A&R Charter.

3.      Approval of the NASDAQ Proposal

| For | Against | Abstain |
|---|---|---|
| 21,067,420 | 2,419,051 | 30 |

Based on the votes set forth above, the stockholders approved the issuances of shares in accordance with the NASDAQ Proposal.

4.      Approval of the 2019 Plan Proposal

| For | Against | Abstain |
|---|---|---|
| 21,067,420 | 2,419,081 | 0 |

Based on the votes set forth above, the stockholders approved and adopted the AdaptHealth Corp. 2019 Stock Incentive Plan.

5.      Approval of the 2019 ESPP Proposal

| For | Against | Abstain |
|---|---|---|
| 21,067,420 | 2,419,081 | 0 |

Based on the votes set forth above, the stockholders approved and adopted the AdaptHealth Corp. 2019 Employee Stock Purchase Plan.

6.      Approval of the Director Election Proposal

| Name | Class | For | Withheld |
|---|---|---|---|
| Mr. Richard Barasch | I | 22,486,501 | 1,000,000 |
| Mr. Luke McGee | I | 21,067,450 | 2,419,051 |
| Mr. Joshua Parnes | II | 21,067,450 | 2,419,051 |
| Mr. Alan Quasha | I | 21,046,513 | 2,439,988 |
| Mr. Terence Connors | II | 21,067,450 | 2,419,051 |
| Dr. Susan Weaver | III | 23,486,501 | 0 |
| Mr. Dale Wolf | III | 21,067,420 | 2,419,081 |

20

Based on the votes set forth above, each director nominee was duly elected, each Class I director to serve until the Company's annual meeting of stockholders in 2020, each Class II director to serve until the Company's annual meeting of stockholders in 2021 and each Class III director to serve until the Company's annual meeting of stockholders in 2022, or in each case until their respective successors are duly elected and qualified, or until their earlier resignation, removal or death.

7.    Approval of the Adjournment Proposal

| For | Against | Abstain |
|---|---|---|
| 21,067,420 | 2,419,081 | 0 |

Based on the votes set forth above, the stockholders approved the Business Combination Proposal, the Charter Proposal, the NASDAQ Proposal, the 2019 Plan Proposal, the 2019 ESPP Proposal, the Director Election Proposal and the Adjournment Proposal.

**Item 7.01 Regulation FD Disclosure**

On November 7, 2019, DFB issued a press release announcing the results of the Special Meeting, a copy of which is attached hereto as Exhibit 99.4 and incorporated herein by reference.

On November 8, 2019, the Company issued a press release announcing the completion of the Business Combination, a copy of which is attached hereto as Exhibit 99.5 and incorporated herein by reference.

**Item 9.01. Financial Statements and Exhibits.**

*(a)    Financial Statements of Businesses Acquired*

The unaudited financial statements of AdaptHealth Holdings for the nine months ended September 30, 2019 and 2018 are set forth in Exhibit 99.3 hereto and are incorporated herein by reference.

The audited financial statements of AdaptHealth Holdings for the years ended December 31, 2018, 2017 and 2016 are set forth in the Proxy Statement beginning on page F-62 and are incorporated herein by reference.

*(b)    Pro Forma Financial Information*

The unaudited pro forma condensed consolidated combined financial information of DFB for the year ended December 31, 2018 and the nine months ended September 30, 2019 is set forth in Exhibit 99.2 hereto and is incorporated herein by reference.

21

*(d)*     *Exhibits*

| | |
|---|---|
| 2.1 | Merger Agreement, dated as of July 8, 2019, by and among DFB, BM Blocker, A Blocker, Merger Sub, AdaptHealth Holdings, Company Unitholders' Representative, and, solely for purposes of Section 7.20 thereof, the BM Blocker Sellers and, solely for purposes of Section 7.21 thereof, the A Blocker Seller (incorporated by reference to Exhibit 2.1 of DFB's Current Report on Form 8-K filed with the SEC on July 12, 2019). |
| 2.2 | Amendment No. 1 to the Merger Agreement, dated as of October 15, 2019, by and among DFB, BM Blocker, A Blocker, Merger Sub, AdaptHealth Holdings, Company Unitholders' Representative, the BM Blocker Sellers and the A Blocker Seller (incorporated by reference to Exhibit 2.2 of DFB's Current Report on Form 8-K filed with the SEC on October 17, 2019). |
| 3.1* | Amended and Restated Certificate of Incorporation of the Company. |
| 3.2* | Amended Bylaws of the Company, dated November 8, 2019. |
| 4.1* | Registration Rights Agreement dated as of November 8, 2019, by and between AdaptHealth Holdings, the Company and the persons listed on Schedule of Investors therein. |
| 10.1* | Exchange Agreement, dated November 8, 2019, by and between the Company, AdaptHealth Holdings and the Non-Blocker AdaptHealth Members. |
| 10.2* | Tax Receivable Agreement dated as of November 8, 2019, by and among the Company, AdaptHealth Holdings, the Non-Blocker AdaptHealth Members, and the Blocker Sellers. |
| 10.3* | Fifth Amended and Restated Limited Liability Company Agreement of AdaptHealth Holdings, dated as of November 8, 2019, by and between the Company and the Members stated therein. |
| 10.4* | Form of Indemnification Agreement. |
| 10.5* | Board Designee Rights Letter Agreement, dated as of November 8, 2019, by and between the Company, AdaptHealth Holdings and the BlueMountain Entities. |
| 10.6* | Third Amended and Restated Credit and Guaranty Agreement, dated as of March 20, 2019, by and among AdaptHealth LLC, the guarantors named therein, CIT Finance LLC as administrative agent, and the lenders party thereto. |
| 10.7* | Amendment No. 1 to Third Amended and Restated Credit and Guaranty Agreement, dated as of August 22, 2019, by and among AdaptHealth LLC, the guarantors named therein, CIT Finance LLC as administrative agent, and the lenders party thereto. |
| 10.8* | Amendment No. 2 to Third Amended and Restated Credit and Guaranty Agreement, dated as of November 8, 2019, by and among AdaptHealth LLC, the guarantors named therein, CIT Finance LLC as administrative agent, and the lenders party thereto. |
| 10.9* | Employment Agreement, dated as of March 20, 2019, by and between AdaptHealth Holdings and Luke McGee. |
| 10.10* | Employment Agreement, dated as of March 20, 2019, by and between AdaptHealth Holdings and Joshua Parnes. |
| 10.11* | Employment Agreement, dated as of November 10, 2019, by and between AdaptHealth Holdings and Gregg Holst. |
| 10.12* | AdaptHealth Corp. 2019 Stock Incentive Plan. |

22

| 10.13* | Form of Restricted Stock Grant Notice and Agreement under the AdaptHealth Corp. 2019 Stock Incentive Plan. |
| 10.14* | Form of Option Grant Notice and Agreement under the AdaptHealth Corp. 2019 Stock Incentive Plan. |
| 16.1* | Letter from Withum. |
| 21.1* | Subsidiaries of the Registrant. |
| 99.1* | Selected historical financial information of AdaptHealth Holdings for the three years ended December 31, 2018 and the nine months ended September 30, 2019 and 2018. |
| 99.2* | Unaudited pro forma condensed consolidated combined financial information of DFB for the year ended December 31, 2018 and the nine months ended September 30, 2019. |
| 99.3* | Unaudited financial statements of AdaptHealth Holdings for the nine months ended September 30, 2019 and 2018 and Management's Discussion and Analysis of Financial Condition and Results of Operations of AdaptHealth Holdings for the nine months ended September 30, 2019 and 2018. |
| 99.4* | Press Release announcing results of the Special Meeting dated November 7, 2019. |
| 99.5* | Press Release announcing the completion of the Business Combination dated November 8, 2019. |

*Filed herewith.

23

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

AdaptHealth Corp.

Date: November 13, 2019

By:    /s/ Gregg Holst
Name: Gregg Holst
Title: Chief Financial Officer

24

**EXECUTION VERSION**

**SECOND AMENDED AND RESTATED**
**CERTIFICATE OF INCORPORATION**
**OF**
**DFB HEALTHCARE ACQUISITIONS CORP.**

November 8, 2019

DFB Healthcare Acquisitions Corp., a corporation organized and existing under the laws of the State of Delaware (the "*Corporation*"), DOES HEREBY CERTIFY AS FOLLOWS:

1.      The name of the Corporation is "*DFB Healthcare Acquisitions Corp.*" The original certificate of incorporation of the Corporation was filed with the Secretary of State of the State of Delaware on November 22, 2017 (the "*Original Certificate*").

2.      The Original Certificate was amended and restated on February 15, 2018 (the "*First Amended and Restated Certificate of Incorporation*").

3.      This Second Amended and Restated Certificate of Incorporation (the "*Second Amended and Restated Certificate*"), which both restates and amends the provisions of the First Amended and Restated Certificate of Incorporation, was duly adopted in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware, as amended from time to time (the "*DGCL*").

4.      This Second Amended and Restated Certificate shall become effective on the date of filing with Secretary of State of Delaware.

5.      The text of the First Amended and Restated Certificate of Incorporation is hereby restated and amended in its entirety to read as follows:

**ARTICLE I**
**NAME**

The name of the corporation is AdaptHealth Corp. (the "*Corporation*").

**ARTICLE II**
**PURPOSE**

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL. In addition to the powers and privileges conferred upon the Corporation by law and those incidental thereto, the Corporation shall possess and may exercise all the powers and privileges that are necessary or convenient to the conduct, promotion or attainment of the business or purposes of the Corporation.

**ARTICLE III**
**REGISTERED AGENT**

The address of the Corporation's registered office in the State of Delaware is 251 Little Falls Drive, Wilmington, New Castle County, Delaware, 19808, and the name of the Corporation's registered agent at such address is Corporation Service Company.

**ARTICLE IV**
**CAPITALIZATION**

Section 4.1    Authorized Capital Stock. The total number of shares of all classes of capital stock which the Corporation is authorized to issue is 250,000,000 shares, consisting of (a) 245,000,000 shares of common stock, par value $0.0001 per share (the "***Common Stock***"), which shall include (i) 200,000,000 shares of Class A Common Stock (the "***Class A Common Stock***") and (ii) 50,000,000 shares of Class B Common Stock (the "***Class B Common Stock***") and (b) 5,000,000 shares of preferred stock, par value $0.0001 per share (the "***Preferred Stock***"). Subject to the rights of the holders of any one or more series of Preferred Stock then outstanding, the number of authorized shares of any of the Class A Common Stock, Class B Common Stock or Preferred Stock may be increased or decreased, in each case by the affirmative vote of the holders of a majority in voting power of the stock of the Corporation entitled to vote thereon irrespective of the provisions of Section 242(b)(2) of the DGCL, and no vote of the holders of any of the Class A Common Stock, Class B Common Stock or Preferred Stock voting separately as a class will be required therefor.

Section 4.2    Existing Common Stock. Upon this Second Amended and Restated Certificate becoming effective pursuant to the DGCL, each share of the Corporation's common stock, par value $0.0001 per share, issued and outstanding or held in treasury, shall automatically and without any action on the part of the holder thereof be renamed as and become one share of Class A Common Stock.

Section 4.3    Preferred Stock. The Board of Directors of the Corporation (the "***Board***") is hereby expressly authorized to provide out of the unissued shares of the Preferred Stock for one or more series of Preferred Stock and to establish from time to time the number of shares to be included in each such series and to fix the voting rights, if any, designations, powers, preferences and relative, participating, optional, special and other rights, if any, of each such series and any qualifications, limitations and restrictions thereof, as shall be stated in the resolution or resolutions adopted by the Board providing for the issuance of such series and included in a certificate of designation (a "***Preferred Stock Designation***") filed pursuant to the DGCL, and the Board is hereby expressly vested with the authority to the full extent provided by law, now or hereafter, to adopt any such resolution or resolutions.

Section 4.4    Common Stock.

(a)    Voting.

(i)    Except as otherwise required by law or this Second Amended and Restated Certificate (including any Preferred Stock Designation), the holders of

2

the shares of Common Stock shall exclusively possess all voting power with respect to the Corporation.

(ii)    Except as otherwise required by law or this Second Amended and Restated Certificate (including any Preferred Stock Designation), the holders of shares of Common Stock shall be entitled to one vote for each such share on each matter properly submitted to the stockholders of the Corporation on which the holders of the shares of Common Stock are entitled to vote. The holders of Common Stock shall vote together as a single class on all matters on which the holders of the shares of Common Stock are entitled to vote.

(iii)    Except as otherwise required by law or this Second Amended and Restated Certificate (including any Preferred Stock Designation), at any annual or special meeting of the stockholders of the Corporation, the holders of the shares of Common Stock shall have the exclusive right to vote for the election of directors and on all other matters properly submitted to a vote of the stockholders of the Corporation. Notwithstanding the foregoing, except as otherwise required by law or this Second Amended and Restated Certificate (including any Preferred Stock Designation), the holders of the shares of Common Stock shall not be entitled to vote on any amendment to this Second Amended and Restated Certificate (including any amendment to any Preferred Stock Designation) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series of Preferred Stock are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Second Amended and Restated Certificate (including any Preferred Stock Designation) or the DGCL.

(b)    Dividends. Subject to applicable law and the rights, if any, of the holders of any outstanding series of the Preferred Stock, the holders of the shares of Class A Common Stock shall be entitled to receive such dividends and other distributions (payable in cash, property or capital stock of the Corporation) when, as and if declared thereon by the Board from time to time out of any assets or funds of the Corporation legally available therefor and shall share equally on a per share basis in such dividends and distributions. Dividends shall not be declared or paid on the Class B Common Stock, except with respect to stock dividends as set forth in Section 4.4(d).

(c)    Liquidation Dissolution or Winding Up of the Corporation. Subject to applicable law, to the rights of the holders of Class B Common Stock to exchange their shares of Class B Common Stock and Common Units for shares of Class A Common Stock in accordance with the Exchange Agreement (or for the consideration payable in respect of shares of Class A Common Stock in such voluntary or involuntary liquidation, dissolution or winding up), and the rights, if any, of the holders of any outstanding series of the Preferred Stock, in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation, the holders of the shares of Class A Common Stock shall be entitled to receive all the remaining assets of the Corporation available for distribution to its stockholders, ratably in proportion to the number of shares of Class A Common Stock held by them. Except as otherwise provided above with respect to the exchange rights of holders of the Class B Common Stock under the terms of the Exchange Agreement, the holders of shares of Class B Common Stock, as such, shall not be

3

entitled to receive any assets of the Corporation in the event of any liquidation, dissolution or winding-up of the affairs of the Corporation.

(d)    Reclassification. In no event will any stock dividends, stock splits, reverse stock splits, combinations of stock, reclassifications or recapitalizations be declared or made on any Class A Common Stock or Class B Common Stock, as the case may be, unless contemporaneously therewith (i) all shares of Class A Common Stock and Class B Common Stock at the time outstanding are treated in the same proportion and the same manner and (ii) the stock dividend, stock split, reverse stock split, combination of stock, reclassification or recapitalization has been reflected in the same economically equivalent manner with respect to all Common Units. Stock dividends with respect to Class A Common Stock may be paid only with Class A Common Stock. Stock dividends with respect to Class B Common Stock may be paid only with Class B Common Stock; provided, that the deemed transfer and retirement of shares of Class B Common Stock to the Corporation in accordance with terms and conditions of the Exchange Agreement shall not be a transaction subject to this Section 4.4(d).

Section 4.5    Restrictions on Transfer and Issuances.

(a)    No shares of Class B Common Stock may be issued except to a holder of Common Units (other than the Corporation or any subsidiary of the Corporation that is a holder of Common Units), such that after such issuance of Class B Common Stock such holder holds an identical number of Common Units and shares of Class B Common Stock. The Corporation shall take all actions necessary so that, for so long as the Class B Common Stock is outstanding, the number of shares of Class B Common Stock outstanding shall equal the number of Common Units outstanding.

(b)    No shares of Class B Common Stock may be transferred by the holder thereof except (i) for no consideration to the Corporation, upon which transfer of such shares shall, to the full extent permitted by law, automatically be retired or (ii) the holder thereof also transfers a corresponding number of Common Units (as such numbers may be adjusted to reflect equitably any stock split, subdivision, combination or similar change with respect to Class B Common Stock of Common Units) in accordance with the terms of the Exchange Agreement, dated as of the date hereof, between the Corporation, AdaptHealth Holdings LLC ("*AdaptHealth*") and the other persons from time to time party thereto (as may be amended, the "*Exchange Agreement*"), copies of which will be provided to any stockholder of the Corporation upon written request therefor. The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Class A Common Stock the number of shares of Class A Common Stock that shall be issuable pursuant to the Exchange Agreement to satisfy its obligations under the Exchange Agreement; provided that nothing contained herein shall be construed to preclude the Corporation from satisfying its obligations in respect of any such exchange by delivery of (x) shares of Class A Common Stock which are held in the treasury of the Corporation or (y) cash in lieu of shares of Class A Common Stock in the amount permitted by the Exchange Agreement. All shares of Class A Common Stock issued upon any such exchange will, upon issuance, be validly issued, fully paid and non-assessable. Any stock certificates representing shares of Class B Common Stock shall include a legend referencing the transfer restrictions set forth herein. As used in this Second Amended and Restated Certificate of

4

Incorporation, "***Common Units***" has the meaning assigned to such term in the Fifth Amended and Restated Limited Liability Agreement of AdaptHealth, as may be amended.

(c)     Pursuant to the Exchange Agreement, each holder of Class B Common Stock has the right to surrender a Common Unit together with a share of Class B Common Stock to AdaptHealth in exchange for one fully paid and non-assessable share of Class A Common Stock (or the cash equivalent). Any shares of Class B Common Stock surrendered in such an exchange shall automatically be deemed canceled without any action on the part of any person, including the Corporation. Any such canceled shares of Class B Common Stock shall no longer be outstanding, and all rights with respect to such shares shall automatically cease and terminate.

(d)     Transfer Taxes. The issuance of shares of Class A Common Stock upon the exchange of Class B Common Stock and Common Units under the terms of the Exchange Agreement will be made without charge to the holders of the shares of Class B Common Stock and of the Common Units for any stamp or other similar tax in respect of the issuance, unless any such shares of Class A Common Stock are to be issued in a name other than that of the then record holder of the shares of Class B Common Stock and Common Units being exchanged, in which case the person or persons requesting the issuance thereof will pay to the Corporation the amount of any tax that may be payable in respect of any transfer involved in the issuance or will establish to the reasonable satisfaction of the Corporation that the tax has been paid or is not payable.

Section 4.6     Rights and Options. The Corporation has the authority to create and issue rights, warrants and options entitling the holders thereof to acquire from the Corporation any shares of its capital stock of any class or classes, with such rights, warrants and options to be evidenced by or in instrument(s) approved by the Board. The Board is empowered to set the exercise price, duration, times for exercise and other terms and conditions of such rights, warrants or options; provided, however, that the consideration to be received for any shares of capital stock issuable upon exercise thereof may not be less than the par value thereof.

**ARTICLE V**
**BOARD OF DIRECTORS**

Section 5.1     Board Powers. The business and affairs of the Corporation shall be managed by, or under the direction of, the Board. In addition to the powers and authority expressly conferred upon the Board by statute, this Second Amended and Restated Certificate or the Bylaws of the Corporation ("***Bylaws***"), the Board is hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, subject, nevertheless, to the provisions of the DGCL, this Second Amended and Restated Certificate, and any Bylaws adopted by the stockholders of the Corporation; provided, however, that no Bylaws hereafter adopted by the stockholders of the Corporation shall invalidate any prior act of the Board that would have been valid if such Bylaws had not been adopted.

Section 5.2    Number, Election and Term.

(a)    The number of directors of the Corporation, other than those who may be elected by the holders of one or more series of the Preferred Stock voting separately by class or series, shall be fixed from time to time exclusively by the Board pursuant to a resolution adopted by a majority of the Board.

(b)    Subject to Section 5.5 hereof, the Board shall be divided into three classes, as nearly equal in number as possible and designated Class I, Class II and Class III. The Board is authorized to assign members of the Board already in office to Class I, Class II or Class III. The term of the initial Class I Directors shall expire at the first annual meeting of the stockholders of the Corporation following the effectiveness of this Second Amended and Restated Certificate, the term of the initial Class II Directors shall expire at the second annual meeting of the stockholders of the Corporation following the effectiveness of this Second Amended and Restated Certificate and the term of the initial Class III Directors shall expire at the third annual meeting of the stockholders of the Corporation following the effectiveness of this Second Amended and Restated Certificate. At each succeeding annual meeting of the stockholders of the Corporation, beginning with the first annual meeting of the stockholders of the Corporation following the effectiveness of this Second Amended and Restated Certificate, each of the successors elected to replace the class of directors whose term expires at that annual meeting shall be elected for a three-year term or until the election and qualification of their respective successors in office, subject to their earlier death, resignation, retirement, disqualification or removal. Subject to Section 5.5 hereof, if the number of directors that constitutes the Board is changed, any increase or decrease shall be apportioned by the Board among the classes so as to maintain the number of directors in each class as nearly equal as possible, but in no case shall a decrease in the number of directors constituting the Board shorten the term of any incumbent director. Subject to the rights of the holders of one or more series of Preferred Stock, voting separately by class or series, to elect directors pursuant to the terms of one or more series of Preferred Stock, the election of directors shall be determined by a plurality of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon. The Board is hereby expressly authorized, by resolution or resolutions thereof, to assign members of the Board already in office to the aforesaid classes at the time this Second Amended and Restated Certificate (and therefore such classification) becomes effective in accordance with the DGCL.

(c)    Subject to Section 5.5 hereof, a director shall hold office until the annual meeting for the year in which his or her term expires and until his or her successor has been elected and qualified, subject, however, to such director's earlier death, resignation, retirement, disqualification or removal.

(d)    Unless and except to the extent that the Bylaws shall so require, the election of directors need not be by written ballot. The holders of shares of Common Stock shall not have cumulative voting rights.

Section 5.3    Newly Created Directorships and Vacancies. Subject to Section 5.5 hereof, newly created directorships resulting from an increase in the number of directors and any vacancies on the Board resulting from death, resignation, retirement, disqualification, removal or other cause may be filled solely and exclusively by a majority vote of the remaining directors then in office, even if less than a quorum, or by a sole remaining director (and not by

6

stockholders), and any director so chosen shall hold office for the remainder of the full term of the class of directors to which the new directorship was added or in which the vacancy occurred and until his or her successor has been elected and qualified, subject, however, to such director's earlier death, resignation, retirement, disqualification or removal.

Section 5.4    Removal. Subject to Section 5.5 hereof, any or all of the directors may be removed from office at any time, but only for cause and only by the affirmative vote of holders of a majority of the voting power of all then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class.

Section 5.5    Preferred Stock - Directors. Notwithstanding any other provision of this *Article V*, and except as otherwise required by law, whenever the holders of one or more series of the Preferred Stock shall have the right, voting separately by class or series, to elect one or more directors, the term of office, the filling of vacancies, the removal from office and other features of such directorships shall be governed by the terms of such series of the Preferred Stock as set forth in this Second Amended and Restated Certificate (including any Preferred Stock Designation) and such directors shall not be included in any of the classes created pursuant to this *Article V* unless expressly provided by such terms.

## ARTICLE VI
## BYLAWS

In furtherance and not in limitation of the powers conferred upon it by law, the Board shall have the power and is expressly authorized to adopt, amend, alter or repeal the Bylaws by the affirmative vote of a majority of the total number of directors present at a regular or special meeting of the Board at which there is a quorum or by unanimous written consent. The Bylaws also may be adopted, amended, altered or repealed by the stockholders of the Corporation; provided, however, that in addition to any vote of the holders of any class or series of capital stock of the Corporation required by law or by this Second Amended and Restated Certificate (including any Preferred Stock Designation), the affirmative vote of the holders of at least a majority of the voting power of all then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required for the stockholders of the Corporation to adopt, amend, alter or repeal the Bylaws; and provided further, however, that no Bylaws hereafter adopted by the stockholders of the Corporation shall invalidate any prior act of the Board that would have been valid if such Bylaws had not been adopted.

## ARTICLE VII
## SPECIAL MEETINGS OF STOCKHOLDERS; ACTION BY WRITTEN CONSENT

Section 7.1    Special Meetings. Subject to the rights, if any, of the holders of any outstanding series of the Preferred Stock, and to the requirements of applicable law, special meetings of stockholders of the Corporation may be called only by the Chairman of the Board, the Chief Executive Officer of the Corporation, or the Board pursuant to a resolution adopted by a majority of the Board, and the ability of the stockholders of the Corporation to call a special

7

meeting is hereby specifically denied. Except as provided in the foregoing sentence, special meetings of stockholders of the Corporation may not be called by another person or persons.

Section 7.2        Advance Notice. Advance notice of stockholder nominations for the election of directors and of business to be brought by stockholders before any meeting of the stockholders of the Corporation shall be given in the manner provided in the Bylaws.

Section 7.3        Action by Written Consent. Except as may be otherwise provided for or fixed pursuant to this Second Amended and Restated Certificate (including any Preferred Stock Designation) relating to the rights of the holders of any outstanding series of Preferred Stock, any action required or permitted to be taken by the stockholders of the Corporation must be effected by a duly called annual or special meeting of such stockholders and may not be effected by written consent of the stockholders of the Corporation.

**ARTICLE VIII**
**LIMITED LIABILITY; INDEMNIFICATION**

Section 8.1        Limitation of Director Liability. A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the DGCL as the same exists or may hereafter be amended unless a director violated his or her duty of loyalty to the Corporation or its stockholders, acted in bad faith, knowingly or intentionally violated the law, authorized unlawful payments of dividends, unlawful stock purchases or unlawful redemptions, or derived improper personal benefit from his or her actions as a director. Any amendment, modification or repeal of the foregoing sentence shall not adversely affect any right or protection of a director of the Corporation hereunder in respect of any act or omission occurring prior to the time of such amendment, modification or repeal.

Section 8.2        Indemnification and Advancement of Expenses.

(a)        To the fullest extent permitted by applicable law, as the same exists or may hereafter be amended, the Corporation shall indemnify, defend and hold harmless each person who is or was made a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (a "***proceeding***") by reason of the fact that he or she is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, other enterprise or nonprofit entity, including service with respect to an employee benefit plan (an "***indemnitee***"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent, or in any other capacity while serving as a director, officer, employee or agent, against all liability and loss suffered and expenses (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes and penalties and amounts paid in settlement) reasonably incurred by such indemnitee in connection with such proceeding. The Corporation shall to the fullest extent not prohibited by applicable law pay the expenses (including attorneys' fees) incurred by an indemnitee in defending or otherwise participating in any proceeding in advance

8

of its final disposition; provided, however, that, to the extent required by applicable law, such payment of expenses in advance of the final disposition of the proceeding shall be made only upon receipt of an undertaking, by or on behalf of the indemnitee, to repay all amounts so advanced if it shall ultimately be determined that the indemnitee is not entitled to be indemnified under this Section 8.2 or otherwise. The rights to indemnification and advancement of expenses conferred by this Section 8.2 shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of his or her heirs, executors and administrators. Notwithstanding the foregoing provisions of this Section 8.2(a), except for proceedings to enforce rights to indemnification and advancement of expenses, the Corporation shall indemnify and advance expenses to an indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Board.

(b)    The rights to indemnification and advancement of expenses conferred on any indemnitee by this Section 8.2 shall not be exclusive of any other rights that any indemnitee may have or hereafter acquire under law, this Second Amended and Restated Certificate, the Bylaws, an agreement, vote of stockholders or disinterested directors, or otherwise.

(c)    Any repeal or amendment of this Section 8.2 by the stockholders of the Corporation or by changes in law, or the adoption of any other provision of this Second Amended and Restated Certificate inconsistent with this Section 8.2, shall, unless otherwise required by law, be prospective only (except to the extent such amendment or change in law permits the Corporation to provide broader indemnification rights on a retroactive basis than permitted prior thereto), and shall not in any way diminish or adversely affect any right or protection existing at the time of such repeal or amendment or adoption of such inconsistent provision in respect of any proceeding (regardless of when such proceeding is first threatened, commenced or completed) arising out of, or related to, any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision.

(d)    This Section 8.2 shall not limit the right of the Corporation, to the extent and in the manner authorized or permitted by law, to indemnify and to advance expenses to persons other than indemnitees.

## ARTICLE IX
## CORPORATE OPPORTUNITY

The Corporation renounces, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any Excluded Opportunity pursuant to Section 122(17) of the DGCL. An "***Excluded Opportunity***" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of (i) any director of the Corporation who is not an employee of the Corporation or any of its subsidiaries, or (ii) any holder of Common Stock or Preferred Stock or any partner, member, director, stockholder, employee or agent of any such holder, other than someone who is an employee of the Corporation or any of its subsidiaries (collectively, "***Covered Persons***"), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person

9

expressly and solely in such Covered Person's capacity as a director of the Corporation, such opportunity is one the Corporation is legally and contractually permitted to undertake and would otherwise be reasonable for the Corporation to pursue, and to the extent the director is permitted to refer that opportunity to the Corporation without violating any legal or contractual obligation. Any amendment, repeal or modification of the foregoing provisions of this *Article IX* shall not adversely affect any right or protection of any director, officer or other agent of the Corporation existing at the time of such amendment, repeal or modification.

**ARTICLE X**
**AMENDMENT OF AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

The Corporation reserves the right at any time and from time to time to amend, alter, change or repeal any provision contained in this Second Amended and Restated Certificate (including any Preferred Stock Designation), and other provisions authorized by the laws of the State of Delaware at the time in force that may be added or inserted, in the manner now or hereafter prescribed by this Second Amended and Restated Certificate and the DGCL; and, except as set forth in *Article VIII*, all rights, preferences and privileges of whatever nature herein conferred upon stockholders, directors or any other persons by and pursuant to this Second Amended and Restated Certificate in its present form or as hereafter amended are granted subject to the right reserved in this Article X.

**ARTICLE XI**
**EXCLUSIVE FORUM FOR CERTAIN LAWSUITS**

Section 11.1    Forum. Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the DGCL or this Second Amended and Restated Certificate or the Bylaws, (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine or (v) any action to interpret, apply, enforce or determine the validity of this Second Amended and Restated Certificate, except for, as to each of (i) through (iv) above, any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction.

Section 11.2    Consent to Jurisdiction. If any action the subject matter of which is within the scope of Section 11.1 immediately above is filed in a court other than a court located within the State of Delaware (a "**Foreign Action**") in the name of any stockholder, such stockholder shall be deemed to have consented to (i) the personal jurisdiction of the state and federal courts located within the State of Delaware in connection with any action brought in any

10

such court to enforce Section 11.1 immediately above (an "**FSC Enforcement Action**") and (ii) having service of process made upon such stockholder in any such FSC Enforcement Action by service upon such stockholder's counsel in the Foreign Action as agent for such stockholder.

## ARTICLE XII
## SEVERABILITY

If any provision or provisions (or any part thereof) of this Second Amended and Restated Certificate shall be held to be invalid, illegal or unenforceable as applied to any person, entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, (i) the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Second Amended and Restated Certificate (including, without limitation, each portion of any paragraph of this Second Amended and Restated Certificate containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby, and (ii) the provisions of this Second Amended and Restated Certificate (including, without limitation, each portion of any paragraph of this Second Amended and Restated Certificate containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to permit the Corporation to protect its directors, officers, employees and agents from personal liability in respect of their good faith service or for the benefit of the Corporation to the fullest extent permitted by law.

11

IN WITNESS WHEREOF, DFB Healthcare Acquisitions Corp. has caused this Second Amended and Restated Certificate to be duly executed and acknowledged in its name and on its behalf by an authorized officer as of the date first set forth above.

DFB HEALTHCARE ACQUISITIONS CORP.

By:    /s/ Christopher Wolfe

Name: Christopher Wolfe
Title: Chief Financial Officer

12

**AMENDED AND RESTATED BY LAWS**
**OF**
**ADAPTHEALTH CORP. (THE "CORPORATION")**

**ARTICLE I**
**OFFICES**

Section 1.1.  **Registered Office**. The registered office of the Corporation within the State of Delaware shall be located at either (a) the principal place of business of the Corporation in the State of Delaware or (b) the office of the corporation or individual acting as the Corporation's registered agent in Delaware.

Section 1.2.  **Additional Offices**. The Corporation may, in addition to its registered office in the State of Delaware, have such other offices and places of business, both within and outside the State of Delaware, as the Board of Directors of the Corporation (the "***Board***") may from time to time determine or as the business and affairs of the Corporation may require.

**ARTICLE II**
**STOCKHOLDERS MEETINGS**

Section 2.1.  **Annual Meetings**. The annual meeting of stockholders shall be held at such place, either within or without the State of Delaware, and time and on such date as shall be determined by the Board and stated in the notice of the meeting, provided that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 9.5(a). At each annual meeting, the stockholders shall elect those directors of the Corporation to fill any term of a directorship that expires on the date of such annual meeting and may transact any other business as may properly be brought before the meeting.

Section 2.2.  **Special Meetings**. Subject to the rights, if any, of the holders of any outstanding series of the Preferred Stock, and to the requirements of applicable law, special meetings of stockholders of the Corporation may be called only by the Chairman of the Board, the Chief Executive Officer of the Corporation, or the Board pursuant to a resolution adopted by a majority of the Board. Except as provided in the foregoing sentence, special meetings of stockholders of the Corporation may not be called by another person or persons.  Special meetings of stockholders shall be held at such place, either within or without the State of Delaware, and time and on such date as shall be determined by the Board and stated in the Corporation's notice of the meeting, provided that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 9.5(a).

Section 2.3.  **Notices**. Written notice of each stockholders meeting stating the place, if any, date, and time of the meeting, and the means of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting, shall be given in the manner permitted by Section 9.3 to each stockholder entitled to vote

thereat as of the record date for determining the stockholders entitled to notice of the meeting, by the Corporation not less than 10 nor more than 60 days before the date of the meeting unless otherwise required by the General Corporation Law of the State of Delaware (the "*DGCL*"). If said notice is for a stockholders meeting other than an annual meeting, it shall in addition state the purpose or purposes for which the meeting is called, and the business transacted at such meeting shall be limited to the matters so stated in the Corporation's notice of meeting (or any supplement thereto). Any meeting of stockholders as to which notice has been given may be postponed, and any meeting of stockholders as to which notice has been given may be cancelled, by the Board upon public announcement (as defined in Section 2.7(c)) given before the date previously scheduled for such meeting.

Section 2.4.  **Quorum**. Except as otherwise provided by applicable law, the Corporation's Certificate of Incorporation, as the same may be amended or restated from time to time (the "*Certificate of Incorporation*") or these By Laws, the presence, in person or by proxy, at a stockholders meeting of the holders of shares of outstanding capital stock of the Corporation representing a majority of the voting power of all outstanding shares of capital stock of the Corporation entitled to vote at such meeting shall constitute a quorum for the transaction of business at such meeting, except that when specified business is to be voted on by a class or series of stock voting as a class, the holders of shares representing a majority of the voting power of the outstanding shares of such class or series shall constitute a quorum of such class or series for the transaction of such business. If a quorum shall not be present or represented by proxy at any meeting of the stockholders of the Corporation, the chairman of the meeting may adjourn the meeting from time to time in the manner provided in Section 2.6 until a quorum shall attend. The stockholders present at a duly convened meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum. Shares of its own stock belonging to the Corporation or to another corporation, if a majority of the voting power of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the Corporation, shall neither be entitled to vote nor be counted for quorum purposes; provided, however, that the foregoing shall not limit the right of the Corporation or any such other corporation to vote shares held by it in a fiduciary capacity.

Section 2.5.  **Voting of Shares**.

(a)    Voting Lists. The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least 10 days before every meeting of stockholders, a complete list of the stockholders of record entitled to vote at such meeting; provided, however, if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date, arranged in alphabetical order and showing the address and the number of shares registered in the name of each stockholder. Nothing contained in this Section 2.5(a) shall require the Corporation to include electronic mail addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours for a period of at least 10 days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation. In the event that the Corporation determines to make the list

2

available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation. If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be examined by any stockholder who is present. If a meeting of stockholders is to be held solely by means of remote communication as permitted by Section 9.5(a), the list shall be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of meeting. The stock ledger shall be the only evidence as to who are the stockholders entitled to examine the list required by this Section 2.5(a) or to vote in person or by proxy at any meeting of stockholders.

(b)    Manner of Voting. At any stockholders meeting, every stockholder entitled to vote may vote in person or by proxy. If authorized by the Board, the voting by stockholders or proxy holders at any meeting conducted by remote communication may be effected by a ballot submitted by electronic transmission (as defined in Section 9.3), provided that any such electronic transmission must either set forth or be submitted with information from which the Corporation can determine that the electronic transmission was authorized by the stockholder or proxy holder. The Board, in its discretion, or the chairman of the meeting of stockholders, in such person's discretion, may require that any votes cast at such meeting shall be cast by written ballot.

(c)    Proxies. Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. Without limiting the manner in which a stockholder may authorize another person or persons to act for such stockholder as proxy, either of the following shall constitute a valid means by which a stockholder may grant such authority.

(i)    A stockholder may execute a writing authorizing another person or persons to act for such stockholder as proxy. Execution may be accomplished by the stockholder or such stockholder's authorized officer, director, employee or agent signing such writing or causing such person's signature to be affixed to such writing by any reasonable means, including, but not limited to, by facsimile signature.

(ii)    A stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of an electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, provided that any such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the stockholder.

3

Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission authorizing another person or persons to act as proxy for a stockholder may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used; provided that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

(d)    Required Vote. Subject to the rights of the holders of one or more series of preferred stock of the Corporation ("**Preferred Stock**"), voting separately by class or series, to elect directors pursuant to the terms of one or more series of Preferred Stock, at all meetings of stockholders at which a quorum is present, the election of directors shall be determined by a plurality of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon. All other matters presented to the stockholders at a meeting at which a quorum is present shall be determined by the vote of a majority of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon, unless the matter is one upon which, by applicable law, the Certificate of Incorporation, these By Laws or applicable stock exchange rules, a different vote is required, in which case such provision shall govern and control the decision of such matter.

(e)    Inspectors of Election. The Board may, and shall if required by law, in advance of any meeting of stockholders, appoint one or more persons as inspectors of election, who may be employees of the Corporation or otherwise serve the Corporation in other capacities, to act at such meeting of stockholders or any adjournment thereof and to make a written report thereof. The Board may designate one or more persons as alternate inspectors to replace any inspector who fails to act. If no inspectors of election or alternates are appointed by the Board, the chairman of the meeting shall appoint one or more inspectors to act at the meeting. Each inspector, before discharging his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability. The inspectors shall ascertain and report the number of outstanding shares and the voting power of each; determine the number of shares present in person or represented by proxy at the meeting and the validity of proxies and ballots; count all votes and ballots and report the results; determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors; and certify their determination of the number of shares represented at the meeting and their count of all votes and ballots. No person who is a candidate for an office at an election may serve as an inspector at such election. Each report of an inspector shall be in writing and signed by the inspector or by a majority of them if there is more than one inspector acting at such meeting. If there is more than one inspector, the report of a majority shall be the report of the inspectors.

Section 2.6.  **Adjournments**. Any meeting of stockholders, annual or special, may be adjourned, from time to time, whether or not there is a quorum, to reconvene at the same or some other place. Notice need not be given of any such adjourned meeting if the date, time, and place, if any, thereof, and the means of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken. At the adjourned meeting the

4

stockholders, or the holders of any class or series of stock entitled to vote separately as a class, as the case may be, may transact any business that might have been transacted at the original meeting. If the adjournment is for more than 30 days, notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date for stockholders entitled to vote is fixed for the adjourned meeting, the Board shall fix a new record date for notice of such adjourned meeting in accordance with Section 9.2, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.

Section 2.7.  **Advance Notice for Business**.

(a)  Annual Meetings of Stockholders. No business (other than nominations of individual(s) for election to the Board) may be transacted at an annual meeting of stockholders, other than business that is either (i) specified in the Corporation's notice of meeting (or any supplement thereto), (ii) otherwise properly brought before the annual meeting by or at the direction of the Board or (iii) otherwise properly brought before the annual meeting by any stockholder of the Corporation (x) who is a stockholder of record on the date of the giving of the notice provided for in this Section 2.7(a) and on the record date for the determination of stockholders entitled to vote at such annual meeting and (y) who complies with the notice procedures set forth in this Section 2.7(a). Notwithstanding anything in this Section 2.7(a) to the contrary, only persons nominated for election as a director to fill any term of a directorship that expires on the date of the annual meeting pursuant to Section 3.2 will be considered for election at such meeting.

(i)  In addition to any other applicable requirements, for business (other than nominations) to be properly brought before an annual meeting by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Secretary of the Corporation and such business must otherwise be a proper matter for stockholder action. Subject to Section 2.7(a)(iii), a stockholder's notice to the Secretary with respect to such business, to be timely, must be delivered to the Secretary at the principal executive offices of the Corporation not later than the close of business on the 90th day nor earlier than the close of business on the 120th day before the anniversary date of the immediately preceding annual meeting of stockholders; provided, however, that in the event that the annual meeting is more than 30 days before or more than 70 days after such anniversary date, notice by the stockholder to be timely must be so delivered not earlier than the close of business on the 120th day before the meeting and not later than the later of (x) the close of business on the 90th day before the meeting or (y) the close of business on the 10th day following the day on which public announcement of the date of the annual meeting is first made by the Corporation. The public announcement of an adjournment or postponement of an annual meeting shall not commence a new time period (or extend any time period) for the giving of a stockholder's notice as described in this Section 2.7(a).

(ii)  To be in proper written form, a stockholder's notice to the Secretary with respect to any business (other than nominations) must set forth as to each such matter such stockholder proposes to bring before the annual meeting (A)

5

a brief description of the business desired to be brought before the annual meeting, the text of the proposal or business (including the text of any resolutions proposed for consideration and in the event such business includes a proposal to amend these By Laws, the language of the proposed amendment) and the reasons for conducting such business at the annual meeting, (B) the name and record address of such stockholder and the name and address of the beneficial owner, if any, on whose behalf the proposal is made, (C) the class or series and number of shares of capital stock of the Corporation that are owned beneficially and of record by such stockholder and by the beneficial owner, if any, on whose behalf the proposal is made, (D) a description of all arrangements or understandings between such stockholder and the beneficial owner, if any, on whose behalf the proposal is made and any other person or persons (including their names) in connection with the proposal of such business by such stockholder, (E) any material interest of such stockholder and the beneficial owner, if any, on whose behalf the proposal is made in such business and (F) a representation that such stockholder (or a qualified representative of such stockholder) intends to appear in person or by proxy at the annual meeting to bring such business before the meeting.

(iii)    The foregoing notice requirements of this Section 2.7(a) shall be deemed satisfied by a stockholder as to any proposal (other than nominations) if the stockholder has notified the Corporation of such stockholder's intention to present such proposal at an annual meeting in compliance with Rule 14a-8 (or any successor thereof) of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), and such stockholder has complied with the requirements of such Rule for inclusion of such proposal in a proxy statement prepared by the Corporation to solicit proxies for such annual meeting. No business shall be conducted at the annual meeting of stockholders except business brought before the annual meeting in accordance with the procedures set forth in this Section 2.7(a), provided, however, that once business has been properly brought before the annual meeting in accordance with such procedures, nothing in this Section 2.7(a) shall be deemed to preclude discussion by any stockholder of any such business. If the Board or the chairman of the annual meeting determines that any stockholder proposal was not made in accordance with the provisions of this Section 2.7(a) or that the information provided in a stockholder's notice does not satisfy the information requirements of this Section 2.7(a), such proposal shall not be presented for action at the annual meeting. Notwithstanding the foregoing provisions of this Section 2.7(a), if the stockholder (or a qualified representative of the stockholder) does not appear at the annual meeting of stockholders of the Corporation to present the proposed business, such proposed business shall not be transacted, notwithstanding that proxies in respect of such matter may have been received by the Corporation.

(iv)    In addition to the provisions of this Section 2.7(a), a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth herein. Nothing in this Section 2.7(a) shall be deemed to affect any rights of stockholders

6

to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act.

(b) <u>Special Meetings of Stockholders</u>. Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the Corporation's notice of meeting. Nominations of persons for election to the Board may be made at a special meeting of stockholders at which directors are to be elected pursuant to the Corporation's notice of meeting only pursuant to <u>Section 3.2</u>.

(c) <u>Public Announcement</u>. For purposes of these By Laws, "**public announcement**" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated Press or comparable national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Sections 13, 14 or 15(d) of the Exchange Act (or any successor thereto).

**Section 2.8. Conduct of Meetings**. The chairman of each annual and special meeting of stockholders shall be the Chairman of the Board or, in the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) or, in the absence (or inability or refusal to act of the Chief Executive Officer or if the Chief Executive Officer is not a director, the President (if he or she shall be a director) or, in the absence (or inability or refusal to act) of the President or if the President is not a director, such other person as shall be appointed by the Board. The Board may adopt such rules and regulations for the conduct of the meeting of stockholders as it shall deem appropriate. Except to the extent inconsistent with these By Laws or such rules and regulations as adopted by the Board, the chairman of any meeting of stockholders shall have the right and authority to convene and to adjourn the meeting, to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board or prescribed by the chairman of the meeting, may include, without limitation, the following: (a) the establishment of an agenda or order of business for the meeting; (b) rules and procedures for maintaining order at the meeting and the safety of those present; (c) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chairman of the meeting shall determine; (d) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (e) limitations on the time allotted to questions or comments by participants. Unless and to the extent determined by the Board or the chairman of the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure. The secretary of each annual and special meeting of stockholders shall be the Secretary or, in the absence (or inability or refusal to act) of the Secretary, an Assistant Secretary so appointed to act by the chairman of the meeting. In the absence (or inability or refusal to act) of the Secretary and all Assistant Secretaries, the chairman of the meeting may appoint any person to act as secretary of the meeting.

7

**ARTICLE III**
**DIRECTORS**

Section 3.1.  **Powers**. The business and affairs of the Corporation shall be managed by or under the direction of the Board, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these By Laws required to be exercised or done by the stockholders. Directors need not be stockholders or residents of the State of Delaware.

Section 3.2.  **Advance Notice for Nomination of Directors**.

(a)    Only persons who are nominated in accordance with the following procedures shall be eligible for election as directors of the Corporation, except as may be otherwise provided by the terms of one or more series of Preferred Stock with respect to the rights of holders of one or more series of Preferred Stock to elect directors. Nominations of persons for election to the Board at any annual meeting of stockholders, or at any special meeting of stockholders called for the purpose of electing directors as set forth in the Corporation's notice of such special meeting, may be made (i) by or at the direction of the Board or (ii) by any stockholder of the Corporation (x) who is a stockholder of record on the date of the giving of the notice provided for in this Section 3.2 and on the record date for the determination of stockholders entitled to vote at such meeting and (y) who complies with the notice procedures set forth in this Section 3.2.

(b)    In addition to any other applicable requirements, for a nomination to be made by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Secretary of the Corporation. To be timely, a stockholder's notice to the Secretary must be delivered to the Secretary at the principal executive offices of the Corporation (i) in the case of an annual meeting, not later than the close of business on the 90th day nor earlier than the close of business on the 120th day before the anniversary date of the immediately preceding annual meeting of stockholders; provided, however, that in the event that the annual meeting is more than 30 days before or more than 70 days after such anniversary date, notice by the stockholder to be timely must be so delivered not earlier than the close of business on the 120th day before the meeting and not later than the later of (x) the close of business on the 90th day before the meeting or (y) the close of business on the 10th day following the day on which public announcement of the date of the annual meeting was first made by the Corporation; and (ii) in the case of a special meeting of stockholders called for the purpose of electing directors, not later than the close of business on the 10th day following the day on which public announcement of the date of the special meeting is first made by the Corporation. In no event shall the public announcement of an adjournment or postponement of an annual meeting or special meeting commence a new time period (or extend any time period) for the giving of a stockholder's notice as described in this Section 3.2.

(c)    Notwithstanding anything in paragraph (b) to the contrary, in the event that the number of directors to be elected to the Board at an annual meeting is greater than the number of directors whose terms expire on the date of the annual meeting and there is no public announcement by the Corporation naming all of the nominees for the additional directors to be elected or specifying the size of the increased Board before the close of business on the 100th day prior to the anniversary date of the immediately preceding annual meeting of stockholders, a stockholder's notice required by this Section

8

3.2 shall also be considered timely, but only with respect to nominees for the additional directorships created by such increase that are to be filled by election at such annual meeting, if it shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the close of business on the 10th day following the date on which such public announcement was first made by the Corporation.

(d)     To be in proper written form, a stockholder's notice to the Secretary must set forth (i) as to each person whom the stockholder proposes to nominate for election as a director (A) the name, age, business address and residence address of the person, (B) the principal occupation or employment of the person, (C) the class or series and number of shares of capital stock of the Corporation, if any, that are owned beneficially or of record by the person, (D) any other information relating to the person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder, without regard to the application of the Exchange Act to either the nomination or the Corporation; and (ii) as to the stockholder giving the notice (A) the name and record address of such stockholder as they appear on the Corporation's books and the name and address of the beneficial owner, if any, on whose behalf the nomination is made, (B) the class or series and number of shares of capital stock of the Corporation that are owned beneficially and of record by such stockholder and the beneficial owner, if any, on whose behalf the nomination is made, (C) a description of all arrangements or understandings relating to the nomination to be made by such stockholder among such stockholder, the beneficial owner, if any, on whose behalf the nomination is made, each proposed nominee and any other person or persons (including their names), (D) a representation that such stockholder (or a qualified representative of such stockholder) intends to appear in person or by proxy at the meeting to nominate the persons named in its notice and (E) any other information relating to such stockholder and the beneficial owner, if any, on whose behalf the nomination is made that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder. Such notice must be accompanied by a written consent of each proposed nominee to being named as a nominee and to serve as a director if elected.

(e)     If the Board or the chairman of the meeting of stockholders determines that any nomination was not made in accordance with the provisions of this Section 3.2 or that the information provided in a stockholder's notice does not satisfy the information requirements of this Section 3.2, then such nomination shall not be considered at the meeting in question. Notwithstanding the foregoing provisions of this Section 3.2, if the stockholder (or a qualified representative of the stockholder) does not appear at the meeting of stockholders of the Corporation to present the nomination, such nomination shall be disregarded, notwithstanding that proxies in respect of such nomination may have been received by the Corporation.

(f)     In addition to the provisions of this Section 3.2, a stockholder shall also comply with all of the applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth herein. Nothing in this Section

9

3.2 shall be deemed to affect any rights of the holders of Preferred Stock to elect directors pursuant to the Certificate of Incorporation.

**Section 3.3.  Compensation**. Unless otherwise restricted by the Certificate of Incorporation or these By Laws, the Board shall have the authority to fix the compensation of directors, including for service on a committee of the Board. The directors may be reimbursed their expenses, if any, of attendance at each meeting of the Board. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of committees of the Board may be allowed like reimbursement of expenses for service on the committee.

**ARTICLE IV**
**BOARD MEETINGS**

**Section 4.1.  Annual Meetings**. The Board shall meet as soon as practicable after the adjournment of each annual stockholders meeting at the place of the annual stockholders meeting unless the Board shall fix another time and place and give notice thereof in the manner required herein for special meetings of the Board. No notice to the directors shall be necessary to legally convene this meeting, except as provided in this Section 4.1.

**Section 4.2.  Regular Meetings**. Regularly scheduled, periodic meetings of the Board may be held without notice at such times, dates and places (within or without the State of Delaware) as shall from time to time be determined by the Board.

**Section 4.3.  Special Meetings**. Special meetings of the Board (a) may be called by the Chairman of the Board or President and (b) shall be called by the Chairman of the Board, President or Secretary on the written request of at least a majority of directors then in office, or the sole director, as the case may be, and shall be held at such time, date and place (within or without the State of Delaware) as may be determined by the person calling the meeting or, if called upon the request of directors or the sole director, as specified in such written request. Notice of each special meeting of the Board shall be given, as provided in Section 9.3, to each director (i) at least 24 hours before the meeting if such notice is oral notice given personally or by telephone or written notice given by hand delivery or by means of a form of electronic transmission and delivery; (ii) at least two days before the meeting if such notice is sent by a nationally recognized overnight delivery service; and (iii) at least five days before the meeting if such notice is sent through the United States mail. If the Secretary shall fail or refuse to give such notice, then the notice may be given by the officer who called the meeting or the directors who requested the meeting. Any and all business that may be transacted at a regular meeting of the Board may be transacted at a special meeting. Except as may be otherwise expressly provided by applicable law, the Certificate of Incorporation, or these By Laws, neither the business to be transacted at, nor the purpose of, any special meeting need be specified in the notice or waiver of notice of such meeting.

**Section 4.4.  Quorum; Required Vote**. A majority of the Board shall constitute a quorum for the transaction of business at any meeting of the Board, and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board, except as may be otherwise specifically provided by applicable law, the Certificate of Incorporation or these By Laws. If a quorum shall not be present at any meeting, a majority of the directors present

10

may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.

**Section 4.5.  Consent In Lieu of Meeting**. Unless otherwise restricted by the Certificate of Incorporation or these By Laws, any action required or permitted to be taken at any meeting of the Board or any committee thereof may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions (or paper reproductions thereof) are filed with the minutes of proceedings of the Board or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

**Section 4.6.  Organization**. The chairman of each meeting of the Board shall be the Chairman of the Board or, in the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) or, in the absence (or inability or refusal to act) of the Chief Executive Officer or if the Chief Executive Officer is not a director, the President (if he or she shall be a director) or in the absence (or inability or refusal to act) of the President or if the President is not a director, a chairman elected from the directors present. The Secretary shall act as secretary of all meetings of the Board. In the absence (or inability or refusal to act) of the Secretary, an Assistant Secretary shall perform the duties of the Secretary at such meeting. In the absence (or inability or refusal to act) of the Secretary and all Assistant Secretaries, the chairman of the meeting may appoint any person to act as secretary of the meeting.

### ARTICLE V
### COMMITTEES OF DIRECTORS

**Section 5.1.  Establishment**. The Board may by resolution of the Board designate one or more committees, each committee to consist of one or more of the directors of the Corporation. Each committee shall keep regular minutes of its meetings and report the same to the Board when required by the resolution designating such committee. The Board shall have the power at any time to fill vacancies in, to change the membership of, or to dissolve any such committee.

**Section 5.2.  Available Powers**. Any committee established pursuant to Section 5.1 hereof, to the extent permitted by applicable law and by resolution of the Board, shall have and may exercise all of the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it.

**Section 5.3.  Alternate Members**. The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee. In the absence or disqualification of a member of the committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he, she or they constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in place of any such absent or disqualified member.

**Section 5.4.  Procedures**. Unless the Board otherwise provides, the time, date, place, if any, and notice of meetings of a committee shall be determined by such committee. At meetings of a committee, a majority of the number of members of the committee (but not including any alternate member, unless such alternate member has replaced any absent or disqualified member at the time of, or in connection with, such meeting) shall constitute a quorum for the transaction of business. The act of a majority of the members present at any meeting at which a quorum is present shall be the act of the committee, except as otherwise specifically provided by applicable law, the Certificate of Incorporation, these By Laws or the Board. If a quorum is not present at a meeting of a committee, the members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present. Unless the Board otherwise provides and except as provided in these By Laws, each committee designated by the Board may make, alter, amend and repeal rules for the conduct of its business. In the absence of such rules each committee shall conduct its business in the same manner as the Board is authorized to conduct its business pursuant to Article IV of these By Laws.

## ARTICLE VI
## OFFICERS

**Section 6.1.  Officers**. The officers of the Corporation elected by the Board shall be a Chairman of the Board, a Chief Executive Officer, a President, a Chief Financial Officer, a Secretary and such other officers (including without limitation, Vice Presidents, Assistant Secretaries and a Treasurer) as the Board from time to time may determine. Officers elected by the Board shall each have such powers and duties as generally pertain to their respective offices, subject to the specific provisions of this Article VI. Such officers shall also have such powers and duties as from time to time may be conferred by the Board. The Chief Executive Officer or President may also appoint such other officers (including without limitation one or more Vice Presidents and Controllers) as may be necessary or desirable for the conduct of the business of the Corporation. Such other officers shall have such powers and duties and shall hold their offices for such terms as may be provided in these By Laws or as may be prescribed by the Board or, if such officer has been appointed by the Chief Executive Officer or President, as may be prescribed by the appointing officer.

(a)      Chairman of the Board. The Chairman of the Board shall preside when present at all meetings of the stockholders and the Board. The Chairman of the Board shall have general supervision and control of the acquisition activities of the Corporation subject to the ultimate authority of the Board, and shall be responsible for the execution of the policies of the Board with respect to such matters. In the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) shall preside when present at all meetings of the stockholders and the Board. The powers and duties of the Chairman of the Board shall not include supervision or control of the preparation of the financial statements of the Company (other than through participation as a member of the Board). The position of Chairman of the Board and Chief Executive Officer may be held by the same person.

(b)      Chief Executive Officer. The Chief Executive Officer shall be the chief executive officer of the Corporation, shall have general supervision of the affairs of the Corporation and general control of all of its business subject to the ultimate authority

12

of the Board, and shall be responsible for the execution of the policies of the Board with respect to such matters, except to the extent any such powers and duties have been prescribed to the Chairman of the Board pursuant to Section 6.1(a) above. In the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) shall preside when present at all meetings of the stockholders and the Board. The position of Chief Executive Officer and President may be held by the same person.

(c)    President. The President shall make recommendations to the Chief Executive Officer on all operational matters that would normally be reserved for the final executive responsibility of the Chief Executive Officer. In the absence (or inability or refusal to act) of the Chairman of the Board and Chief Executive Officer, the President (if he or she shall be a director) shall preside when present at all meetings of the stockholders and the Board. The President shall also perform such duties and have such powers as shall be designated by the Board. The position of President and Chief Executive Officer may be held by the same person.

(d)    Vice Presidents. In the absence (or inability or refusal to act) of the President, the Vice President (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Board) shall perform the duties and have the powers of the President. Any one or more of the Vice Presidents may be given an additional designation of rank or function.

(e)    Secretary.

(i)    The Secretary shall attend all meetings of the stockholders, the Board and (as required) committees of the Board and shall record the proceedings of such meetings in books to be kept for that purpose. The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board and shall perform such other duties as may be prescribed by the Board, the Chairman of the Board, Chief Executive Officer or President. The Secretary shall have custody of the corporate seal of the Corporation and the Secretary, or any Assistant Secretary, shall have authority to affix the same to any instrument requiring it, and when so affixed, it may be attested by his or her signature or by the signature of such Assistant Secretary. The Board may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing thereof by his or her signature.

(ii)    The Secretary shall keep, or cause to be kept, at the principal executive office of the Corporation or at the office of the Corporation's transfer agent or registrar, if one has been appointed, a stock ledger, or duplicate stock ledger, showing the names of the stockholders and their addresses, the number and classes of shares held by each and, with respect to certificated shares, the number and date of certificates issued for the same and the number and date of certificates cancelled.

13

(f)    Assistant Secretaries. The Assistant Secretary or, if there be more than one, the Assistant Secretaries in the order determined by the Board shall, in the absence (or inability or refusal to act) of the Secretary, perform the duties and have the powers of the Secretary.

(g)    Chief Financial Officer. The Chief Financial Officer shall perform all duties commonly incident to that office (including, without limitation, the care and custody of the funds and securities of the Corporation, which from time to time may come into the Chief Financial Officer's hands and the deposit of the funds of the Corporation in such banks or trust companies as the Board, the Chief Executive Officer or the President may authorize).

(h)    Treasurer. The Treasurer shall, in the absence (or inability or refusal to act) of the Chief Financial Officer, perform the duties and exercise the powers of the Chief Financial Officer.

**Section 6.2.  Term of Office; Removal; Vacancies**. The elected officers of the Corporation shall hold office until their successors are duly elected and qualified or until their earlier death, resignation, retirement, disqualification, or removal from office. Any officer may be removed, with or without cause, at any time by the Board. Any officer appointed by the Chief Executive Officer or President may also be removed, with or without cause, by the Chief Executive Officer or President, as the case may be, unless the Board otherwise provides. Any vacancy occurring in any elected office of the Corporation may be filled by the Board. Any vacancy occurring in any office appointed by the Chief Executive Officer or President may be filled by the Chief Executive Officer, or President, as the case may be, unless the Board then determines that such office shall thereupon be elected by the Board, in which case the Board shall elect such officer.

**Section 6.3.  Multiple Officeholders; Stockholder and Director Officers**. Any number of offices may be held by the same person unless the Certificate of Incorporation or these By Laws otherwise provide. Officers need not be stockholders or residents of the State of Delaware.

**ARTICLE VII**
**SHARES**

**Section 7.1.  Certificated and Uncertificated Shares**. The shares of the Corporation may be certificated or uncertificated, subject to the sole discretion of the Board and the requirements of the DGCL.

**Section 7.2.  Multiple Classes of Stock**. If the Corporation shall be authorized to issue more than one class of stock or more than one series of any class, the Corporation shall (a) cause the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights to be set forth in full or summarized on the face or back of any certificate that the Corporation issues to represent shares of such class or series of stock or (b) in the case of uncertificated shares, within a reasonable time after the issuance or transfer of such

14

shares, send to the registered owner thereof a written notice containing the information required to be set forth on certificates as specified in clause (a) above; provided, however, that, except as otherwise provided by applicable law, in lieu of the foregoing requirements, there may be set forth on the face or back of such certificate or, in the case of uncertificated shares, on such written notice a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences or rights.

**Section 7.3. Signatures**. Each certificate representing capital stock of the Corporation shall be signed by or in the name of the Corporation by (a) the Chairman of the Board, the Chief Executive Officer, the President or a Vice President and (b) the Chief Financial Officer, Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary of the Corporation. Any or all the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, such certificate may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar on the date of issue.

**Section 7.4. Consideration and Payment for Shares**.

(a)    Subject to applicable law and the Certificate of Incorporation, shares of stock may be issued for such consideration, having in the case of shares with par value a value not less than the par value thereof, and to such persons, as determined from time to time by the Board. The consideration may consist of cash, tangible or intangible property or any benefit to the Corporation or any combination thereof.

(b)    Subject to applicable law and the Certificate of Incorporation, shares may not be issued until the full amount of the consideration has been paid, unless upon the face or back of each certificate issued to represent any partly paid shares of capital stock or upon the books and records of the Corporation in the case of partly paid uncertificated shares, there shall have been set forth the total amount of the consideration to be paid therefor and the amount paid thereon up to and including the time said certificate representing certificated shares or said uncertificated shares are issued.

**Section 7.5. Lost, Destroyed or Wrongfully Taken Certificates**.

(a)    If an owner of a certificate representing shares claims that such certificate has been lost, destroyed or wrongfully taken, the Corporation shall issue a new certificate representing such shares or such shares in uncertificated form if the owner: (i) requests such a new certificate before the Corporation has notice that the certificate representing such shares has been acquired by a protected purchaser; (ii) if requested by the Corporation, delivers to the Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, wrongful taking or destruction of such certificate or the issuance of such new certificate or uncertificated shares; and (iii) satisfies other reasonable requirements imposed by the Corporation.

(b)    If a certificate representing shares has been lost, apparently destroyed or wrongfully taken, and the owner fails to notify the Corporation of that fact within a reasonable time after the owner has notice of such loss, apparent destruction or wrongful taking and the Corporation registers a transfer of such shares before receiving notification, the owner shall be precluded from asserting against the Corporation any claim for registering such transfer or a claim to a new certificate representing such shares or such shares in uncertificated form.

**Section 7.6.  Transfer of Stock**.

(a)    If a certificate representing shares of the Corporation is presented to the Corporation with an endorsement requesting the registration of transfer of such shares or an instruction is presented to the Corporation requesting the registration of transfer of uncertificated shares, the Corporation shall register the transfer as requested if:

(i)    in the case of certificated shares, the certificate representing such shares has been surrendered;

(ii)    (A) with respect to certificated shares, the endorsement is made by the person specified by the certificate as entitled to such shares; (B) with respect to uncertificated shares, an instruction is made by the registered owner of such uncertificated shares; or (C) with respect to certificated shares or uncertificated shares, the endorsement or instruction is made by any other appropriate person or by an agent who has actual authority to act on behalf of the appropriate person;

(iii)    the Corporation has received a guarantee of signature of the person signing such endorsement or instruction or such other reasonable assurance that the endorsement or instruction is genuine and authorized as the Corporation may request;

(iv)    the transfer does not violate any restriction on transfer imposed by the Corporation that is enforceable in accordance with Section 7.8(a); and

(v)    such other conditions for such transfer as shall be provided for under applicable law have been satisfied.

(b)    Whenever any transfer of shares shall be made for collateral security and not absolutely, the Corporation shall so record such fact in the entry of transfer if, when the certificate for such shares is presented to the Corporation for transfer or, if such shares are uncertificated, when the instruction for registration of transfer thereof is presented to the Corporation, both the transferor and transferee request the Corporation to do so.

**Section 7.7.  Registered Stockholders**. Before due presentment for registration of transfer of a certificate representing shares of the Corporation or of an instruction requesting registration of transfer of uncertificated shares, the Corporation may treat the registered owner as the person exclusively entitled to inspect for any proper purpose the stock ledger and the other

16

books and records of the Corporation, vote such shares, receive dividends or notifications with respect to such shares and otherwise exercise all the rights and powers of the owner of such shares, except that a person who is the beneficial owner of such shares (if held in a voting trust or by a nominee on behalf of such person) may, upon providing documentary evidence of beneficial ownership of such shares and satisfying such other conditions as are provided under applicable law, may also so inspect the books and records of the Corporation.

**Section 7.8. Effect of the Corporation's Restriction on Transfer**.

(a)    A written restriction on the transfer or registration of transfer of shares of the Corporation or on the amount of shares of the Corporation that may be owned by any person or group of persons, if permitted by the DGCL and noted conspicuously on the certificate representing such shares or, in the case of uncertificated shares, contained in a notice sent pursuant to Section 7.2, may be enforced against the holder of such shares or any successor or transferee of the holder including an executor, administrator, trustee, guardian or other fiduciary entrusted with like responsibility for the person or estate of the holder.

(b)    A restriction imposed by the Corporation on the transfer or the registration of shares of the Corporation or on the amount of shares of the Corporation that may be owned by any person or group of persons, even if otherwise lawful, is ineffective against a person without actual knowledge of such restriction unless: (i) the shares are certificated and such restriction is noted conspicuously on the certificate; or (ii) the shares are uncertificated and such restriction was contained in a notice sent pursuant to Section 7.2.

**Section 7.9. Regulations**. The Board shall have power and authority to make such additional rules and regulations, subject to any applicable requirement of law, as the Board may deem necessary and appropriate with respect to the issue, transfer or registration of transfer of shares of stock or certificates representing shares. The Board may appoint one or more transfer agents or registrars and may require for the validity thereof that certificates representing shares bear the signature of any transfer agent or registrar so appointed.

## ARTICLE VIII
## INDEMNIFICATION

**Section 8.1. Limitation of Director Liability**. A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the DGCL as the same exists or may hereafter be amended unless a director violated his or her duty of loyalty to the Corporation or its stockholders, acted in bad faith, knowingly or intentionally violated the law, authorized unlawful payments of dividends, unlawful stock purchases or unlawful redemptions, or derived improper personal benefit from his or her actions as a director. Any amendment, modification or repeal of the foregoing sentence shall not adversely affect any right or protection of a director of the Corporation hereunder in respect of any act or omission occurring prior to the time of such amendment, modification or repeal.

17

**Section 8.2.  Right to Indemnification and Advancement of Expenses**. (a) To the fullest extent permitted by applicable law, as the same exists or may hereafter be amended, the Corporation shall indemnify, defend and hold harmless each person who is or was made a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (a "*proceeding*") by reason of the fact that he or she is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, other enterprise or nonprofit entity, including service with respect to an employee benefit plan (an "*indemnitee*"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent, or in any other capacity while serving as a director, officer, employee or agent, against all liability and loss suffered and expenses (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes and penalties and amounts paid in settlement) reasonably incurred by such indemnitee in connection with such proceeding. The Corporation shall to the fullest extent not prohibited by applicable law pay the expenses (including attorneys' fees) incurred by an indemnitee in defending or otherwise participating in any proceeding in advance of its final disposition; provided, however, that, to the extent required by applicable law, such payment of expenses in advance of the final disposition of the proceeding shall be made only upon receipt of an undertaking, by or on behalf of the indemnitee, to repay all amounts so advanced if it shall ultimately be determined that the indemnitee is not entitled to be indemnified under this Section 8.2 or otherwise. The rights to indemnification and advancement of expenses conferred by this Section 8.2 shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of his or her heirs, executors and administrators. Notwithstanding the foregoing provisions of this Section 8.2(a), except for proceedings to enforce rights to indemnification and advancement of expenses, the Corporation shall indemnify and advance expenses to an indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Board.

(b) The rights to indemnification and advancement of expenses conferred on any indemnitee by this Section 8.2 shall not be exclusive of any other rights that any indemnitee may have or hereafter acquire under law, these By Laws, the Certificate of Incorporation, an agreement, vote of stockholders or disinterested directors, or otherwise.

**Section 8.3.  Right of Indemnitee to Bring Suit**. If a claim under Section 8.2 is not paid in full by the Corporation within 60 days after a written claim therefor has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the Indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Indemnitee shall also be entitled to be paid the expense of prosecuting or defending such suit. In (a) any suit brought by the Indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by an Indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (b) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final judicial decision from which there is no further right to appeal (hereinafter a "*final adjudication*") that, the Indemnitee has not met any

18

applicable standard for indemnification set forth in the DGCL. Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such suit that indemnification of the Indemnitee is proper in the circumstances because the Indemnitee has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including a determination by its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) that the Indemnitee has not met such applicable standard of conduct, shall create a presumption that the Indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the Indemnitee, shall be a defense to such suit. In any suit brought by the Indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this Article VIII or otherwise shall be on the Corporation.

Section 8.4.  **Non-Exclusivity of Rights**. The rights provided to any Indemnitee pursuant to this Article VIII shall not be exclusive of any other right, which such Indemnitee may have or hereafter acquire under applicable law, the Certificate of Incorporation, these By Laws, an agreement, a vote of stockholders or disinterested directors, or otherwise.

Section 8.5.  **Insurance**. The Corporation may maintain insurance, at its expense, to protect itself and/or any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the DGCL.

Section 8.6.  **Indemnification of Other Persons**. This Article VIII shall not limit the right of the Corporation to the extent and in the manner authorized or permitted by law to indemnify and to advance expenses to persons other than Indemnitees. Without limiting the foregoing, the Corporation may, to the extent authorized from time to time by the Board, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation and to any other person who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan, to the fullest extent of the provisions of this Article VIII with respect to the indemnification and advancement of expenses of Indemnitees under this Article VIII.

Section 8.7.  **Amendments**. Any repeal or amendment of this Article VIII by the Board or the stockholders of the Corporation or by changes in applicable law, or the adoption of any other provision of these By Laws inconsistent with this Article VIII, will, to the extent permitted by applicable law, be prospective only (except to the extent such amendment or change in applicable law permits the Corporation to provide broader indemnification rights to Indemnitees on a retroactive basis than permitted prior thereto), and will not in any way diminish or adversely affect any right or protection existing hereunder in respect of any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision; provided however, that amendments or repeals of this Article VIII shall require the affirmative vote of the stockholders

19

holding at least a majority of the voting power of all outstanding shares of capital stock of the Corporation.

**Section 8.8. Certain Definitions**. For purposes of this Article VIII, (a) references to "other enterprise" shall include any employee benefit plan; (b) references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; (c) references to "serving at the request of the Corporation" shall include any service that imposes duties on, or involves services by, a person with respect to any employee benefit plan, its participants, or beneficiaries; and (d) a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interest of the Corporation" for purposes of Section 145 of the DGCL.

**Section 8.9. Contract Rights**. The rights provided to Indemnitees pursuant to this Article VIII shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a director, officer, agent or employee and shall inure to the benefit of the Indemnitee's heirs, executors and administrators.

**Section 8.10. Severability**. If any provision or provisions of this Article VIII shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (a) the validity, legality and enforceability of the remaining provisions of this Article VIII shall not in any way be affected or impaired thereby; and (b) to the fullest extent possible, the provisions of this Article VIII (including, without limitation, each such portion of this Article VIII containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

**ARTICLE IX**
**MISCELLANEOUS**

**Section 9.1. Place of Meetings**. If the place of any meeting of stockholders, the Board or committee of the Board for which notice is required under these By Laws is not designated in the notice of such meeting, such meeting shall be held at the principal business office of the Corporation; provided, however, if the Board has, in its sole discretion, determined that a meeting shall not be held at any place, but instead shall be held by means of remote communication pursuant to Section 9.5 hereof, then such meeting shall not be held at any place.

**Section 9.2. Fixing Record Dates**.

(a) In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting. If the Board so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board, the record date for determining stockholders entitled to

20

notice of and to vote at a meeting of stockholders shall be at the close of business on the business day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance with the foregoing provisions of this Section 9.2(a) at the adjourned meeting.

(b)    In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

**Section 9.3.  Means of Giving Notice**.

(a)    Notice to Directors. Whenever under applicable law, the Certificate of Incorporation or these By Laws notice is required to be given to any director, such notice shall be given either (i) in writing and sent by mail, or by a nationally recognized delivery service, (ii) by means of facsimile telecommunication, electronic mail or other form of electronic transmission, or (iii) by oral notice given personally or by telephone. A notice to a director will be deemed given as follows: (i) if given by hand delivery, orally, or by telephone, when actually received by the director, (ii) if sent through the United States mail, when deposited in the United States mail, with postage and fees thereon prepaid, addressed to the director at the director's address appearing on the records of the Corporation, (iii) if sent for next day delivery by a nationally recognized overnight delivery service, when deposited with such service, with fees thereon prepaid, addressed to the director at the director's address appearing on the records of the Corporation, (iv) if sent by facsimile telecommunication, when sent to the facsimile transmission number for such director appearing on the records of the Corporation, (v) if sent by electronic mail, when sent to the electronic mail address for such director appearing on the records of the Corporation, or (vi) if sent by any other form of electronic transmission, when sent to the address, location or number (as applicable) for such director appearing on the records of the Corporation.

(b)    Electronic Transmission. "***Electronic transmission***" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

21

(c)        Notice to Stockholders Sharing Same Address. Without limiting the manner by which notice otherwise may be given effectively by the Corporation to stockholders, any notice to stockholders given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these By Laws shall be effective if given by a single written notice to stockholders who share an address if consented to by the stockholders at that address to whom such notice is given. A stockholder may revoke such stockholder's consent by delivering written notice of such revocation to the Corporation. Any stockholder who fails to object in writing to the Corporation within 60 days of having been given written notice by the Corporation of its intention to send such a single written notice shall be deemed to have consented to receiving such single written notice.

(d)        Exceptions to Notice Requirements. Whenever notice is required to be given, under the DGCL, the Certificate of Incorporation or these By Laws, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting that shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given. In the event that the action taken by the Corporation is such as to require the filing of a certificate with the Secretary of State of Delaware, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

Whenever notice is required to be given by the Corporation, under any provision of the DGCL, the Certificate of Incorporation or these By Laws, to any stockholder to whom (1) notice of two consecutive annual meetings of stockholders and all notices of stockholder meetings to such stockholder during the period between such two consecutive annual meetings, or (2) all, and at least two payments (if sent by first-class mail) of dividends or interest on securities during a 12-month period, have been mailed addressed to such stockholder at such stockholder's address as shown on the records of the Corporation and have been returned undeliverable, the giving of such notice to such stockholder shall not be required. Any action or meeting that shall be taken or held without notice to such stockholder shall have the same force and effect as if such notice had been duly given. If any such stockholder shall deliver to the Corporation a written notice setting forth such stockholder's then current address, the requirement that notice be given to such stockholder shall be reinstated. In the event that the action taken by the Corporation is such as to require the filing of a certificate with the Secretary of State of Delaware, the certificate need not state that notice was not given to persons to whom notice was not required to be given pursuant to Section 230 (b) of the DGCL. The exception in subsection (1) of the first sentence of this paragraph to the requirement that notice be given shall not be applicable to any notice returned as undeliverable if the notice was given by electronic transmission.

Section 9.4.  Waiver of Notice. Whenever any notice is required to be given under applicable law, the Certificate of Incorporation, or these By Laws, a written waiver of such notice, signed by the person or persons entitled to said notice, or a waiver by electronic transmission by the person entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to such required notice. Attendance at a meeting shall constitute a waiver of notice of

22

such meeting, except where a person attends for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

**Section 9.5.  Meeting Attendance via Remote Communication Equipment**.

(a)      Stockholder Meetings. If authorized by the Board in its sole discretion, and subject to such guidelines and procedures as the Board may adopt, stockholders and proxy holders not physically present at a meeting of stockholders may, by means of remote communication:

(i)      participate in a meeting of stockholders; and

(ii)      be deemed present in person and vote at a meeting of stockholders, whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (A) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxy holder, (B) the Corporation shall implement reasonable measures to provide such stockholders and proxy holders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (C) if any stockholder or proxy holder votes or takes other action at the meeting by means of remote communication, a record of such votes or other action shall be maintained by the Corporation.

(b)      Board Meetings. Unless otherwise restricted by applicable law, the Certificate of Incorporation or these By Laws, members of the Board or any committee thereof may participate in a meeting of the Board or any committee thereof by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other. Such participation in a meeting shall constitute presence in person at the meeting.

**Section 9.6.  Dividends**. The Board may from time to time declare, and the Corporation may pay, dividends (payable in cash, property or shares of the Corporation's capital stock) on the Corporation's outstanding shares of capital stock, subject to applicable law and the Certificate of Incorporation.

**Section 9.7.  Reserves**. The Board may set apart out of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve.

**Section 9.8.  Contracts and Negotiable Instruments**. Except as otherwise provided by applicable law, the Certificate of Incorporation or these By Laws, any contract, bond, deed, lease, mortgage or other instrument may be executed and delivered in the name and on behalf of the Corporation by such officer or officers or other employee or employees of the Corporation as the Board may from time to time authorize. Such authority may be general or confined to specific instances as the Board may determine. The Chairman of the Board, the Chief Executive

23

Officer, the President, the Chief Financial Officer, the Treasurer or any Vice President may execute and deliver any contract, bond, deed, lease, mortgage or other instrument in the name and on behalf of the Corporation. Subject to any restrictions imposed by the Board, the Chairman of the Board Chief Executive Officer, President, the Chief Financial Officer, the Treasurer or any Vice President may delegate powers to execute and deliver any contract, bond, deed, lease, mortgage or other instrument in the name and on behalf of the Corporation to other officers or employees of the Corporation under such person's supervision and authority, it being understood, however, that any such delegation of power shall not relieve such officer of responsibility with respect to the exercise of such delegated power.

Section 9.9.  **Fiscal Year**. The fiscal year of the Corporation shall be fixed by the Board.

Section 9.10.  **Seal**. The Board may adopt a corporate seal, which shall be in such form as the Board determines. The seal may be used by causing it or a facsimile thereof to be impressed, affixed or otherwise reproduced.

Section 9.11.  **Books and Records**. The books and records of the Corporation may be kept within or outside the State of Delaware at such place or places as may from time to time be designated by the Board.

Section 9.12.  **Resignation**. Any director, committee member or officer may resign by giving notice thereof in writing or by electronic transmission to the Chairman of the Board, the Chief Executive Officer, the President or the Secretary. The resignation shall take effect at the time it is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 9.13.  **Surety Bonds**. Such officers, employees and agents of the Corporation (if any) as the Chairman of the Board, Chief Executive Officer, President or the Board may direct, from time to time, shall be bonded for the faithful performance of their duties and for the restoration to the Corporation, in case of their death, resignation, retirement, disqualification or removal from office, of all books, papers, vouchers, money and other property of whatever kind in their possession or under their control belonging to the Corporation, in such amounts and by such surety companies as the Chairman of the Board, Chief Executive Officer, President or the Board may determine. The premiums on such bonds shall be paid by the Corporation and the bonds so furnished shall be in the custody of the Secretary.

Section 9.14.  **Securities of Other Corporations**. Powers of attorney, proxies, waivers of notice of meeting, consents in writing and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the Chairman of the Board, Chief Executive Officer, President, or any officers authorized by the Board. Any such officer, may, in the name of and on behalf of the Corporation, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation in which the Corporation may own securities, or to consent in writing, in the name of the Corporation as such holder, to any action by such corporation, and at any such meeting or with respect to any such consent shall possess and may exercise any and all rights and

24

power incident to the ownership of such securities and which, as the owner thereof, the Corporation might have exercised and possessed. The Board may from time to time confer like powers upon any other person or persons.

      **Section 9.15.  Amendments**. In furtherance and not in limitation of the powers conferred upon it by law, the Board shall have the power and is expressly authorized to adopt, amend, alter or repeal these By Laws by the affirmative vote of a majority of the total number of directors present at a regular or special meeting of the Board at which there is a quorum or by unanimous written consent. These By Laws also may be adopted, amended, altered or repealed by the stockholders of the Corporation; provided, however, that in addition to any vote of the holders of any class or series of capital stock of the Corporation required by law or by the Certificate of Incorporation, the affirmative vote of the holders of at least a majority of the voting power of all then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required for the stockholders of the Corporation to adopt, amend, alter or repeal these By Laws; and provided further, however, that no By Laws hereafter adopted by the stockholders of the Corporation shall invalidate any prior act of the Board that would have been valid if such By Laws had not been adopted.

25

**EXECUTION VERSION**

**REGISTRATION RIGHTS AGREEMENT**

This REGISTRATION RIGHTS AGREEMENT (this "Agreement") is made as of November 8, 2019, by and among (i) AdaptHealth Holdings LLC, a Delaware limited liability company (the "Company"), (ii) AdaptHealth Corp., a Delaware corporation ("Pubco"), (iii) each of the Persons listed on the Schedule of Investors attached hereto as of the date hereof, and (iv) each of the other Persons set forth from time to time on the Schedule of Investors who, at any time, own securities of the Company or Pubco and enter into a joinder to this Agreement agreeing to be bound by the terms hereof (each Person identified in the foregoing (iii) and (iv), an "Investor" and, collectively, the "Investors"). Unless otherwise provided in this Agreement, capitalized terms used herein shall have the meanings set forth in Section 12 hereof.

WHEREAS, Pubco and certain of the Investors (the "Original Holders") are parties to that certain Registration Rights Agreement, dated as of February 15, 2018 (the "Prior Agreement");

WHEREAS, the Original Holders currently hold an aggregate of 6,250,000 shares (the "Founder Shares") of Common Stock issued prior to Pubco's initial public offering;

WHEREAS, one of the Original Holders currently holds an aggregate of 4,333,333 warrants (the "Private Placement Warrants") to purchase, at an exercise price of $11.50 per share (subject to adjustment), shares of Common Stock;

WHEREAS, the Company and Pubco have entered into an Agreement and Plan of Merger, dated as of July 8, 2019 (the "Merger Agreement"), pursuant to which, on the date hereof, DFB Merger Sub LLC, a Delaware limited liability company, has merged with and into the Company (the "Merger"), with the Company surviving the Merger as a partially-owned subsidiary of Pubco;

WHEREAS, the Merger Agreement contemplates an "Up-C" structure such that, following the Merger, certain Investors will hold Common Units that will be exchangeable for Common Stock of Pubco;

WHEREAS, in connection with the execution and delivery of the Merger Agreement, Pubco and one of the Investors have entered into a Subscription Agreement, dated as of July 8, 2019 (the "Subscription Agreement"), pursuant to which, on the date hereof, such Investor has purchased an aggregate of 12,500,000 shares of Common Stock (the "PIPE Shares");

WHEREAS, the parties to the Prior Agreement desire to terminate the Prior Agreement and to provide for the terms and conditions included herein and to include the recipients of the other Registrable Securities identified herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

1.    Resale Shelf Registration Rights.

(a)    Registration Statement Covering Resale of Registrable Securities. Pubco shall use its reasonable best efforts to prepare and file or cause to be prepared and filed with the Commission, no later than thirty (30) days following the consummation of the Merger (the "Filing Deadline"), a Registration Statement for an offering to be made on a continuous basis pursuant to Rule 415 of the Securities Act registering the resale from time to time by the Investors of all of the Registrable Securities held by the Investors (the "Resale Shelf Registration Statement"). The Resale Shelf Registration Statement shall be on Form S-3 ("Form S-3") or, if Form S-3 is not then available to Pubco, on Form S-1 or such other appropriate form permitting Registration of such Registrable Securities for resale by such Investors. Pubco shall use reasonable best efforts to cause the Resale Shelf Registration Statement to be declared effective as soon as possible after filing, but in no event later than the earlier of (i) sixty (60) days following the Filing Deadline or (ii) ten (10) Business Days after the Commission notifies Pubco that it will not review the Resale Shelf Registration Statement, if applicable (the "Effectiveness Deadline"); provided, that the Effectiveness Deadline shall be extended to ninety (90) days after the filing deadline if the Registration Statement is reviewed by, and receives comments from, the Commission.  Once effective, Pubco shall use reasonable best efforts to keep the Resale Shelf Registration Statement continuously effective and to be supplemented and amended to the extent necessary to ensure that such Registration Statement is available or, if not available, to ensure that another Registration Statement is available, under the Securities Act at all times until such date as all Registrable Securities covered by the Shelf Resale Registration Statement have been disposed of in accordance with the intended method(s) of distribution set forth in such Registration Statement or such securities have been withdrawn (the "Effectiveness Period").  The Resale Shelf Registration Statement shall contain a Prospectus in such form as to permit any Investor to sell such Registrable Securities pursuant to Rule 415 under the Securities Act (or any successor or similar provision adopted by the Commission then in effect) at any time beginning on the effective date for such Registration Statement (subject to lock-up restrictions provided in this Agreement and in the Lock-Up Agreements), and shall provide that such Registrable Securities may be sold pursuant to any method or combination of methods legally available to, and requested by, the Investors.

(b)    Notwithstanding the registration obligations set forth in this Section 1, in the event the Commission informs Pubco that all of the Registrable Securities cannot, as a result of the application of Rule 415, be registered for resale as a secondary offering on a single registration statement, Pubco agrees to promptly (i) inform each of the holders thereof and use its reasonable best efforts to file amendments to the Resale Shelf Registration Statement as required by the Commission and/or (ii) withdraw the Resale Shelf Registration Statement and file a new registration statement (a "New Registration Statement"), on Form S-3, or if Form S-3 is not then available to Pubco for such registration statement, on such other form available to register for resale the Registrable Securities as a secondary offering; provided, however, that prior to filing such amendment or New Registration Statement, Pubco shall be obligated to use its reasonable best efforts to advocate with the Commission for the registration of all of the Registrable Securities in accordance with any publicly-available written or oral guidance, comments, requirements or requests of the Commission staff (the "SEC Guidance"), including without limitation, the Manual of Publicly Available Telephone Interpretations D.29. Notwithstanding any other provision of this Agreement, if any SEC Guidance sets forth a limitation of the number of Registrable Securities

2

permitted to be registered on a particular Registration Statement as a secondary offering (and notwithstanding that Pubco used diligent efforts to advocate with the Commission for the registration of all or a greater number of Registrable Securities), unless otherwise directed in writing by a holder as to its Registrable Securities, the number of Registrable Securities to be registered on such Registration Statement will be reduced on a pro rata basis based on the total number of Registrable Securities held by the Investors, subject to a determination by the Commission that certain Investors must be reduced first based on the number of Registrable Securities held by such Investors. In the event Pubco amends the Resale Shelf Registration Statement or files a New Registration Statement, as the case may be, under clauses (i) or (ii) above, Pubco will use its reasonable best efforts to file with the Commission, as promptly as allowed by Commission or SEC Guidance provided to Pubco or to registrants of securities in general, one or more registration statements on Form S-3 or such other form available to register for resale those Registrable Securities that were not registered for resale on the Resale Shelf Registration Statement, as amended, or the New Registration Statement.

(c)        Registrations effected pursuant to this Section 1 shall not be counted as Demand Registrations effected pursuant to Section 2.

2.        Demand Registrations.

(a)        Requests for Registration. Subject to the terms and conditions of this Agreement and of the Lock-Up Agreements, at any time or from time to time, the holders of Registrable Securities may request registration under the Securities Act of all or any portion of their Registrable Securities on Form S-1 or any similar long-form registration statement ("Long-Form Registrations") or, if available, on Form S-3 (including a shelf registration pursuant to Rule 415 under the Securities Act) or any similar short-form registration statement, including an automatic shelf registration statement (as defined in Rule 405) (an "Automatic Shelf Registration Statement"), if available to Pubco ("Short-Form Registrations") in accordance with Section 2(b) and Section 2(c) below (such holders being referred to herein as the "Initiating Investors" and all registrations requested by the Initiating Investors being referred to herein as "Demand Registrations"). Each request for a Demand Registration shall specify the approximate number of Registrable Securities requested to be registered and the intended method of distribution. Within five (5) Business Days after receipt of any such request, Pubco shall give written notice of such requested registration to all other holders of Registrable Securities and, subject to the terms and conditions set forth herein, shall include in such registration (and in all related registrations and qualifications under state blue sky laws or in compliance with other registration requirements and in any related underwriting) all such Registrable Securities with respect to which Pubco has received written requests for inclusion therein within five (5) Business Days after the receipt of Pubco's notice. Each holder of Registrable Securities agrees that such holder shall treat as confidential the receipt of the notice of Demand Registration and shall not disclose or use the information contained in such notice of Demand Registration without the prior written consent of Pubco until such time as the information contained therein is or becomes available to the public generally, other than as a result of disclosure by the holder in breach of the terms of this Agreement.

(b)        Long-Form Registrations. The Investors holding a majority of the Registrable Securities may request one (1) Long-Form Registration in which Pubco shall pay all

3

Registration Expenses whether or not any such Long-Form Registration has become effective; provided that, Pubco shall not be obligated to effect, or to take any action to effect, any Long-Form Registration unless the aggregate market price of the Registrable Securities requested to be registered in such Long-Form Registration exceeds $20,000,000 at the time of request; provided, further, that Pubco shall only be obligated to effect, or take any action to effect, one (1) Long-Form Registration. A registration shall not count as the sole permitted Long-Form Registration until it has become effective and unless the holders of Registrable Securities are able to register and sell at least 90% of the Registrable Securities requested to be included in such registration; provided that in any event Pubco shall pay all Registration Expenses in connection with any registration initiated as a Long-Form Registration whether or not it has become effective and whether or not such registration has counted as one of the permitted Long-Form Registrations hereunder.

(c)    Short-Form Registrations. In addition to the Long-Form Registration provided pursuant to Section 2(b), each of (i) the Investors holding a majority of the Common Units not held by Pubco, (ii) the Investors holding a majority of the Founder Shares and (iii) the Investors holding a majority of the PIPE Shares shall be entitled to request an unlimited number of Short-Form Registrations in which Pubco shall pay all Registration Expenses whether or not any such Short-Form Registration has become effective; provided, however, that Pubco shall not be obligated to effect any such Short-Form Registration: (i) if the holders of Registrable Securities, together with the holders of any other securities of Pubco entitled to inclusion in such Short-Form Registration, propose to sell Registrable Securities with an aggregate market price at the time of request of less than $5,000,000, or (ii) if Pubco has, within the twelve (12) month period preceding the date of such request, already effected three (3) Short-Form Registrations for the holders of Registrable Securities requesting a Short-Form Registration pursuant to this Section 2(c). Demand Registrations shall be Short-Form Registrations whenever Pubco is permitted to use any applicable short form registration and if the managing underwriters (if any) agree to the use of a Short-Form Registration. For so long as Pubco is subject to the reporting requirements of the Exchange Act, Pubco shall use its reasonable best efforts to make Short-Form Registrations available for the offer and sale of Registrable Securities. If Pubco is qualified to and, pursuant to the request of the holders of a majority of the Registrable Securities, has filed with the Commission a registration statement under the Securities Act on Form S-3 pursuant to Rule 415 (a "Shelf Registration"), then Pubco shall use its reasonable best efforts to cause the Shelf Registration to be declared effective under the Securities Act as soon as practicable after filing, and, if Pubco is a WKSI at the time of any such request, to cause such Shelf Registration to be an Automatic Shelf Registration Statement, and once effective, Pubco shall cause such Shelf Registration to remain effective (including by filing a new Shelf Registration, if necessary) for a period ending on the earlier of (i) the date on which all Registrable Securities included in such registration have been sold or distributed pursuant to the Shelf Registration or (ii) the date as of which all of the Registrable Securities included in such registration are able to be sold within a 90-day period in compliance with Rule 144 under the Securities Act. If for any reason Pubco ceases to be a WKSI or becomes ineligible to utilize Form S-3, Pubco shall prepare and file with the Commission a registration statement or registration statements on such form that is available for the sale of Registrable Securities.

(d)    Shelf Takedowns. At any time when the Resale Shelf Registration Statement or a Shelf Registration for the sale or distribution by holders of Registrable Securities

4

on a delayed or continuous basis pursuant to Rule 415, including by way of an underwritten offering, block sale or other distribution plan (each, a "Resale Shelf Registration") is effective and its use has not been otherwise suspended by Pubco in accordance with the terms of Section 2(f) below, upon a written demand (a "Takedown Demand") by any Investor that is, in either case, a Shelf Participant holding Registrable Securities at such time (the "Initiating Holder"), Pubco will facilitate in the manner described in this Agreement a "takedown" of Registrable Securities off of such Resale Shelf Registration (a "take down offering") and Pubco shall pay all Registration Expenses in connection therewith; provided that Pubco will provide (x) in connection with any non-marketed underwritten takedown offering (other than a Block Trade), at least two (2) Business Days' notice of such Takedown Demand to each holder of Registrable Securities (other than the Initiating Holder) that is a Shelf Participant, (y) in connection with any Block Trade initiated prior to the three (3) year anniversary of the consummation of the Merger, notice of such Takedown Demand to each holder of Registrable Securities (other than the Initiating Holder) that is a Shelf Participant no later than noon Eastern time on the Business Day prior to the requested Takedown Demand and (z) in connection with any marketed underwritten takedown offering, at least five (5) Business Days' notice of such Takedown Demand to each holder of Registrable Securities (other than the Initiating Holder) that is a Shelf Participant. In connection with (x) any non-marketed underwritten takedown offering initiated prior to the three (3) year anniversary of the consummation of the Merger and (y) any marketed underwritten takedown offering, if any Shelf Participants entitled to receive a notice pursuant to the preceding sentence request inclusion of their Registrable Securities (by notice to Pubco, which notice must be received by Pubco no later than (A) in the case of a non-marketed underwritten takedown offering (other than a Block Trade), the Business Day following the date notice is given to such participant, (B) in the case of a Block Trade, by 10:00 p.m. Eastern time on the date notice is given to such participant and (C) in the case of a marketed underwritten takedown offering, three (3) Business Days following the date notice is given to such participant), the Initiating Holder and the other Shelf Participants that request inclusion of their Registrable Securities shall be entitled to sell their Registrable Securities in such offering. Each holder of Registrable Securities that is a Shelf Participant agrees that such holder shall treat as confidential the receipt of the notice of a Takedown Demand and shall not disclose or use the information contained in such notice without the prior written consent of Pubco until such time as the information contained therein is or becomes available to the public generally, other than as a result of disclosure by the holder in breach of the terms of this Agreement.

(e)    Priority on Demand Registrations and Takedown Offerings. Pubco shall not include in any Demand Registration that is an underwritten offering any securities that are not Registrable Securities without the prior written consent of the managing underwriters and the holders of a majority of the Registrable Securities then outstanding. If a Demand Registration or a takedown offering is an underwritten offering and the managing underwriters advise Pubco in writing that in their opinion the number of Registrable Securities and, if permitted hereunder, other securities requested to be included in such offering exceeds the number of Registrable Securities and other securities, if any, which can be sold in an orderly manner in such offering within a price range acceptable to the holders of a majority of the Registrable Securities held by Initiating Investors, Pubco shall include in such offering prior to the inclusion of any securities which are not Registrable Securities the Registrable Securities requested to be included in such registration (pro rata among the holders of such Registrable Securities on the basis of the number of Registrable Securities owned by each such holder).

5

(f)        Restrictions on Demand Registrations and Takedown Offerings. Any demand for the filing of a registration statement or for a registered offering (including a takedown offering) hereunder will be subject to the constraints of any applicable lock-up arrangements to which any demanding Investor is party, and any such demand must be deferred until such lock-up arrangements no longer apply.

(i)        Pubco shall not be obligated to effect any Demand Registration within 30 days prior to Pubco's good faith estimate of the date of filing of an underwritten public offering of Pubco's securities and for such a period of time after such a filing as the managing underwriters request, provided that such period shall not exceed 90 days from the effective date of any such underwritten public offering. Pubco may postpone, for up to 60 days from the date of the request (the "Suspension Period"), the filing or the effectiveness of a registration statement for a Demand Registration or suspend the use of a prospectus that is part of any Resale Shelf Registration (and therefore suspend sales of the Registrable Securities included therein) by providing written notice to the holders of Registrable Securities if the board of directors of Pubco reasonably determines in good faith that the offer or sale of Registrable Securities would be expected to have a material adverse effect on any proposal or plan by Pubco or any subsidiary thereof to engage in any material acquisition or disposition of assets or stock (other than in the ordinary course of business) or any material merger, consolidation, tender offer, recapitalization, reorganization or similar transaction or would require Pubco to disclose any material nonpublic information which would reasonably be likely to be detrimental to Pubco and its subsidiaries; provided that in such event, the holders of Registrable Securities initially requesting such Demand Registration or Takedown Demand shall be entitled to withdraw such request. Pubco may delay or suspend the effectiveness of a Demand Registration or takedown offering pursuant to this Section 2(f)(i) only once in any consecutive twelve-month period; provided that, for the avoidance of doubt, Pubco may in any event delay or suspend the effectiveness of Demand Registration or takedown offering in the case of an event described under Section 5(g) to enable it to comply with its obligations set forth in Section 5(f). Pubco may extend the Suspension Period for an additional consecutive 60 days with the consent of the Applicable Approving Party.

(ii)        In the case of an event that causes Pubco to suspend the use of any Resale Shelf Registration as set forth in Section 2(f)(i) or pursuant to Section 5(g) (a "Suspension Event"), Pubco shall give a notice to the holders of Registrable Securities registered pursuant to such Shelf Registration (a "Suspension Notice") to suspend sales of the Registrable Securities and such notice shall state generally the basis for the notice and that such suspension shall continue only for so long as the Suspension Event or its effect is continuing. A holder of Registrable Securities shall not effect any sales of the Registrable Securities pursuant to such Resale Shelf Registration (or such filings) at any time after it has received a Suspension Notice from Pubco and prior to receipt of an End of Suspension Notice (as defined below). Each holder of Registrable Securities agrees that such holder shall treat as confidential the receipt of the Suspension Notice and shall not disclose or use the information contained in such Suspension Notice without the prior written consent of Pubco until such time as the information contained therein is or becomes available to the public generally, other than as a result of disclosure by such holder in breach of the terms

6

of this Agreement. The holders of Registrable Securities may recommence effecting sales of the Registrable Securities pursuant to the Resale Shelf Registration (or such filings) following further written notice to such effect (an "End of Suspension Notice") from Pubco, which End of Suspension Notice shall be given by Pubco to the holders of Registrable Securities and to such holders' counsel, if any, promptly following the conclusion of any Suspension Event.

(iii)     Notwithstanding any provision herein to the contrary, if Pubco shall give a Suspension Notice with respect to any Resale Shelf Registration pursuant to this Section 2(f), Pubco agrees that it shall extend the period of time during which such Resale Shelf Registration shall be maintained effective pursuant to this Agreement by the number of days during the period from the date of receipt by the holders of the Suspension Notice to and including the date of receipt by the holders of the End of Suspension Notice and provide copies of the supplemented or amended prospectus necessary to resume sales, with respect to each Suspension Event; provided that such period of time shall not be extended beyond the date that Common Stock covered by such Resale Shelf Registration are no longer Registrable Securities.

(g)     Selection of Underwriters. In connection with any Demand Registration, the Applicable Approving Party shall have the right to select the investment banker(s) and manager(s) to administer the offering; provided that such selection shall be subject to the written consent of Pubco, which consent will not be unreasonably withheld, conditioned or delayed. If any takedown offering is an underwritten offering, the Applicable Approving Party shall have the right to select the investment banker(s) and manager(s) to administer such takedown offering. In each case, the Applicable Approving Party shall have the right to approve the underwriting arrangements with such investment banker(s) and manager(s) on behalf of all holders of Registrable Securities participating in such offering. All Investors proposing to distribute their securities through underwriting shall (together with Pubco and the Company) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting.

(h)     Other Registration Rights. Pubco represents and warrants to each holder of Registrable Securities that the registration rights granted in this Agreement do not conflict with any other registration rights granted by Pubco.  Except as provided in this Agreement, Pubco shall not grant to any Persons the right to request Pubco to register any equity securities of Pubco, or any securities, options or rights convertible or exchangeable into or exercisable for such securities, without the prior written consent of the holders of a majority of the Registrable Securities then outstanding.

(i)     Revocation of Demand Notice or Takedown Notice. At any time prior to the effective date of the registration statement relating to a Demand Registration or the "pricing" of any offering relating to a Takedown Demand, the holders of Registrable Securities that requested such Demand Registration or takedown offering may revoke such request for a Demand Registration or takedown offering on behalf of all holders of Registrable Securities participating in such Demand Registration or takedown offering without liability to such holders of Registrable Securities, in each case by providing written notice to Pubco.

7

3.    Piggyback Registrations.

(a)    Right to Piggyback. Whenever Pubco proposes to register any of its securities under the Securities Act (other than (i) pursuant to the Resale Shelf Registration Statement, (ii) pursuant to a Demand Registration, (iii) pursuant to a Takedown Demand, (iv) in connection with registrations on Form S-4 or S-8 promulgated by the Commission or any successor forms, (v) a registration relating solely to employment benefit plans, (vi) in connection with a registration the primary purpose of which is to register debt securities, or (vii) a registration on any form that does not include substantially the same information as would be required to be included in a registration statement covering the sale of Registrable Securities) and the registration form to be used may be used for the registration of Registrable Securities (a "Piggyback Registration"), Pubco shall give prompt written notice to all holders of Registrable Securities of its intention to effect such a Piggyback Registration and, subject to the terms of Sections 3(c) and 3(d) hereof, shall include in such Piggyback Registration (and in all related registrations or qualifications under blue sky laws or in compliance with other registration requirements and in any related underwriting) all Registrable Securities with respect to which Pubco has received written requests for inclusion therein within 10 business days after the delivery of Pubco's notice; provided that any such other holder may withdraw its request for inclusion at any time prior to executing the underwriting agreement or, if none, prior to the applicable registration statement becoming effective.

(b)    Piggyback Expenses. The Registration Expenses of the holders of Registrable Securities shall be paid by Pubco in all Piggyback Registrations, whether or not any such registration became effective.

(c)    Priority on Primary Registrations. If a Piggyback Registration is an underwritten primary registration on behalf of Pubco, and the managing underwriters advise Pubco in writing that in their opinion the number of securities requested to be included in such registration exceeds the number of securities which can be sold in such offering without adversely affecting the marketability, proposed offering price, timing or method of distribution of the offering, Pubco shall include in such registration (i) first, the securities Pubco proposes to sell, (ii) second, the Registrable Securities requested to be included in such registration by the Investors which, in the opinion of such underwriters, can be sold, without any such adverse effect (pro rata among the holders of such Registrable Securities on the basis of the number of Registrable Securities owned by each such holder), and (iii) third, other securities requested to be included in such registration which, in the opinion of such underwriters, can be sold, without any such adverse effect.

(d)    Priority on Secondary Registrations. If a Piggyback Registration is an underwritten secondary registration on behalf of holders of Pubco's securities other than holders of Registrable Securities, and the managing underwriters advise Pubco in writing that in their opinion the number of securities requested to be included in such registration exceeds the number of securities which can be sold in such offering without adversely affecting the marketability, proposed offering price, timing or method of distribution of the offering, Pubco shall include in such registration (i) first, the securities requested to be included therein by the holders initially requesting such registration, (ii) second, the Registrable Securities requested to be included in such registration by the Investors which, in the opinion of such underwriters, can be sold, without any such adverse effect (pro rata among the holders of such Registrable Securities on the basis of the number of Registrable Securities owned by each such holder), and (iii) third, other securities

8

requested to be included in such registration which, in the opinion of such underwriters, can be sold, without any such adverse effect.

(e)    Other Registrations. If Pubco has previously filed a registration statement with respect to Registrable Securities pursuant to Section 2 or pursuant to this Section 3, and if such previous registration has not been withdrawn or abandoned, then Pubco shall not be required to file or cause to be effected any other registration of any of its equity securities or securities convertible or exchangeable into or exercisable for its equity securities under the Securities Act (except on Form S-8 or any successor form) at the request of any holder or holders of such securities until a period of at least 90 days has elapsed from the effective date of such previous registration.

(f)    Right to Terminate Registration. Pubco shall have the right to terminate or withdraw any registration initiated by it under this Section 3 whether or not any holder of Registrable Securities has elected to include securities in such registration. The Registration Expenses of such withdrawn registration shall be borne by Pubco in accordance with Section 7.

4.    Agreements of Holders.

(a)    If required by the managing underwriter(s), in connection with any underwritten Public Offering on or after the date hereof, each holder that beneficially owns 1% or more of the outstanding Common Stock shall enter into lock-up agreements with the managing underwriter(s) of such underwritten Public Offering in such form as agreed to by such managing underwriter(s).

(b)    The holders of Registrable Securities shall use reasonable best efforts to provide such information as may reasonably be requested by Pubco, or the managing underwriter, if any, in connection with the preparation of any Registration Statement, including amendments and supplements thereto, in order to effect the Registration Statement, including amendments and supplements thereto, in order to effect the Registration of any Registrable Securities under the Securities Act pursuant to Section 3 and in connection with Pubco's obligation to comply with federal and applicable state securities laws.

5.    Registration Procedures. In connection with the Registration to be effected pursuant to the Resale Shelf Registration Statement, and whenever the holders of Registrable Securities have requested that any Registrable Securities be registered pursuant to this Agreement or have initiated a takedown offering, Pubco shall use its reasonable best efforts to effect the registration and the sale of such Registrable Securities in accordance with the intended method of disposition thereof, and pursuant thereto Pubco shall as expeditiously as reasonably possible:

(a)    prepare in accordance with the Securities Act and all applicable rules and regulations promulgated thereunder and file with the Commission a registration statement, and all amendments and supplements thereto and related prospectuses as may be necessary to comply with applicable securities laws, with respect to such Registrable Securities and use its reasonable best efforts to cause such registration statement to become effective (provided that at least five (5) Business Days before filing a registration statement or prospectus or any amendments or supplements thereto, Pubco shall furnish to counsel selected by the Applicable Approving Party

9

copies of all such documents proposed to be filed, which documents shall be subject to the review and comment of such counsel);

(b)        notify each holder of Registrable Securities of (A) the issuance by the Commission of any stop order suspending the effectiveness of any registration statement or the initiation of any proceedings for that purpose, (B) the receipt by Pubco or its counsel of any notification with respect to the suspension of the qualification of the Registrable Securities for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose, and (C) the effectiveness of each registration statement filed hereunder;

(c)        prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective for a period ending when all of the securities covered by such registration statement have been disposed of in accordance with the intended methods of distribution by the sellers thereof set forth in such registration statement (but not in any event before the expiration of any longer period required under the Securities Act or, if such registration statement relates to an underwritten Public Offering, such longer period as in the opinion of counsel for the underwriters a prospectus is required by law to be delivered in connection with sale of Registrable Securities by an underwriter or dealer) and comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such registration statement;

(d)        furnish to each seller of Registrable Securities thereunder such number of copies of such registration statement, each amendment and supplement thereto, the prospectus included in such registration statement (including each preliminary prospectus), each Free-Writing Prospectus and such other documents as such seller may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such seller;

(e)        during any period in which a prospectus is required to be delivered under the Securities Act, promptly file all documents required to be filed with the Commission, including pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Securities Act;

(f)        use its reasonable best efforts to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as the lead underwriter or the Applicable Approving Party reasonably requests and do any and all other acts and things which may be reasonably necessary or advisable to enable such seller to consummate the disposition in such jurisdictions of the Registrable Securities owned by such seller (provided that Pubco shall not be required to (i) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 5(f), (ii) consent to general service of process in any such jurisdiction or (iii) subject itself to taxation in any such jurisdiction);

(g)        promptly notify in writing each seller of such Registrable Securities (i) after it receives notice thereof, of the date and time when such registration statement and each post-effective amendment thereto has become effective or a prospectus or supplement to any prospectus relating to a registration statement has been filed and when any registration or qualification has become effective under a state securities or blue sky law or any exemption thereunder has been

10

obtained, (ii) after receipt thereof, of any request by the Commission for the amendment or supplementing of such registration statement or prospectus or for additional information, and (iii) at any time when a prospectus relating thereto is required to be delivered under the Securities Act, of the happening of any event as a result of which the prospectus included in such registration statement contains an untrue statement of a material fact or omits any fact necessary to make the statements therein not misleading, and, at the request of any such seller, Pubco promptly shall prepare, file with the Commission and furnish to each such seller a reasonable number of copies of a supplement or amendment to such prospectus so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus shall not contain an untrue statement of a material fact or omit to state any fact necessary to make the statements therein not misleading;

(h)    cause all such Registrable Securities to be listed on each securities exchange on which similar securities issued by Pubco are then listed and, if not so listed, to be listed on a securities exchange and, without limiting the generality of the foregoing, to arrange for at least two market makers to register as such with respect to such Registrable Securities with FINRA;

(i)    provide a transfer agent and registrar for all such Registrable Securities not later than the effective date of such registration statement;

(j)    enter into and perform such customary agreements (including underwriting agreements in customary form) and take all such other actions as the Applicable Approving Party or the underwriters, if any, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities (including, without limitation, effecting a stock split or a combination of shares and preparing for and participating in such number of "road shows", investor presentations and marketing events as the underwriters managing such offering may reasonably request);

(k)    make available for inspection by any seller of Registrable Securities, any underwriter participating in any disposition pursuant to such registration statement and any attorney, accountant or other agent retained by any such seller or underwriter, all financial and other records, pertinent corporate and business documents and properties of Pubco as shall be necessary to enable them to exercise their due diligence responsibility, and cause Pubco's officers, managers, directors, employees, agents, representatives and independent accountants to supply all information reasonably requested by any such seller, underwriter, attorney, accountant or agent in connection with such registration statement;

(l)    take all reasonable actions to ensure that any Free-Writing Prospectus utilized in connection with any Demand Registration (including any Shelf Registration) or Piggyback Registration hereunder complies in all material respects with the Securities Act, is filed in accordance with the Securities Act to the extent required thereby, is retained in accordance with the Securities Act to the extent required thereby and, when taken together with the related prospectus, shall not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(m)    otherwise use its reasonable best efforts to comply with all applicable rules and regulations of the Commission;

11

(n)    permit any holder of Registrable Securities who, in its good faith judgment (based on the advice of counsel), could reasonably be expected to be deemed to be an underwriter or a controlling Person of Pubco to participate in the preparation of such registration or comparable statement and to require the insertion therein of material furnished to Pubco in writing, which in the reasonable judgment of such holder and its counsel should be included;

(o)    in the event of the issuance of any stop order suspending the effectiveness of a registration statement, or of any order suspending or preventing the use of any related prospectus or suspending the qualification of any Common Stock included in such registration statement for sale in any jurisdiction, Pubco shall use its reasonable best efforts promptly to obtain the withdrawal of such order;

(p)    use its reasonable best efforts to cause such Registrable Securities covered by such registration statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable the sellers thereof to consummate the disposition of such Registrable Securities;

(q)    cooperate with the holders of Registrable Securities covered by the registration statement and the managing underwriter or agent, if any, to facilitate the timely preparation and delivery of certificates (not bearing any restrictive legends) representing securities to be sold under the registration statement and enable such securities to be in such denominations and registered in such names as the managing underwriter, or agent, if any, or such holders may request;

(r)    cooperate with each holder of Registrable Securities covered by the registration statement and each underwriter or agent participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with FINRA;

(s)    if such registration includes an underwritten public offering, use its reasonable best efforts to obtain a cold comfort letter from Pubco's independent public accountants and addressed to the underwriters, in customary form and covering such matters of the type customarily covered by cold comfort letters as the underwriters in such registration reasonably request;

(t)    provide a legal opinion of Pubco's outside counsel, dated the effective date of such registration statement (and, if such registration includes an underwritten Public Offering, dated the date of the closing under the underwriting agreement), with respect to the registration statement, each amendment and supplement thereto, the prospectus included therein (including the preliminary prospectus) and such other documents relating thereto in customary form and covering such matters of the type customarily covered by legal opinions of such nature, which opinion shall be addressed to the underwriters;

(u)    if Pubco files an Automatic Shelf Registration Statement covering any Registrable Securities, use its reasonable best efforts to remain a WKSI (and not become an ineligible issuer (as defined in Rule 405)) during the period during which such Automatic Shelf Registration Statement is required to remain effective;

12

(v)     if Pubco does not pay the filing fee covering the Registrable Securities at the time an Automatic Shelf Registration Statement is filed, pay such fee at such time or times as the Registrable Securities are to be sold; and

(w)     subject to the terms of Section 2(c) and Section 2(d), if an Automatic Shelf Registration Statement has been outstanding for at least three (3) years, at the end of the third year, refile a new Automatic Shelf Registration Statement covering the Registrable Securities, and, if at any time when Pubco is required to re-evaluate its WKSI status Pubco determines that it is not a WKSI, use its reasonable best efforts to refile the registration statement on Form S-3 and keep such registration statement effective (including by filing a new Resale Shelf Registration or Shelf Registration, if necessary) during the period throughout which such registration statement is required to be kept effective.

6.     Termination of Rights. Notwithstanding anything contained herein to the contrary, the right of any Investor to include Registrable Securities in any Demand Registration or any Piggyback Registration shall terminate on such date that such Investor (together with its affiliates) beneficially owns less than 1% of the outstanding Common Stock and may sell all of the Registrable Securities owned by such Investor pursuant to Rule 144 of the Securities Act without any restrictions as to volume or the manner of sale or otherwise; provided, however, that with respect to any Investor whose rights have terminated pursuant to this Section 6, if following such a termination, such Investor loses the ability to sell all of its Registrable Securities pursuant to Rule 144 of the Securities Act without any restrictions as to volume or the manner of sale or otherwise due to a change in interpretive guidance by the Commission, then such Investor's right to include Registrable Securities in any Demand Registration or any Piggyback Registration shall be reinstated until such time as the Investor is once again able to sell all of its Registrable Securities pursuant to Rule 144 of the Securities Act without any restrictions as to volume or the manner of sale or otherwise.

7.     Registration Expenses.

(a)     All expenses incident to Pubco's performance of or compliance with this Agreement, including, without limitation, all registration, qualification and filing fees, listing fees, fees and expenses of compliance with securities or blue sky laws, stock exchange rules and filings, printing expenses, messenger and delivery expenses, fees and disbursements of custodians, and fees and disbursements of counsel for Pubco and all independent certified public accountants, underwriters (excluding underwriting discounts and commissions) and other Persons retained by Pubco (all such expenses being herein called "Registration Expenses"), shall be borne by Pubco as provided in this Agreement and, for the avoidance of doubt, Pubco also shall pay all of its internal expenses (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit or quarterly review, the expense of any liability insurance and the expenses and fees for listing the securities to be registered on each securities exchange on which similar securities issued by Pubco are then listed. Each Person that sells securities pursuant to a Demand Registration, a Takedown Demand or Piggyback Registration hereunder shall bear and pay all underwriting discounts and commissions and transfer taxes applicable to the securities sold for such Person's account.

13

(b)      Pubco shall reimburse the holders of Registrable Securities included in such registration for the reasonable fees and disbursements of one counsel chosen by the Applicable Approving Party and one local counsel (if necessary) for each applicable jurisdiction and chosen by the applicable holder of Registrable Securities, in each case, for the purpose of rendering a legal opinion on behalf of such holders in connection with any underwritten Demand Registration, takedown offering or Piggyback Registration.

8.      Additional Payments Under Certain Circumstances.

(a)      Payments ("Additional Payments") with respect to the shares of Common Stock included in the Registrable Securities shall be assessed as follows if any of the following events occur (each such event in clauses (i) through (ii) below being herein called a "Registration Default"):

(i)      the Resale Shelf Registration Statement has not been declared effective by the Effectiveness Deadline; or

(ii)      the Resale Shelf Registration Statement is declared effective by the Commission but thereafter ceases to be effective prior to the expiration of the Effectiveness Period (unless and except to the extent that another Registration Statement covering the applicable Registrable Securities is effective during the Effectiveness Period).

(b)      Additional Payments shall accrue on the applicable Registrable Securities for each such day from and including the date on which any such Registration Default occurs to but excluding the date on which all such Registration Defaults have been cured at a rate of $0.05 per share (subject to proportionate adjustment in the event of any stock split, reverse stock split or other recapitalization) per month or portion thereof (on a 30/360 basis); provided, however, that the Company's obligation to pay Additional Payments extends only to any shares of Common Stock included in the Registrable Securities that are affected by the Registration Default; and provided further that Additional Payments shall in no event accrue on account of any Registrable Securities during any period that such Registrable Securities may not be sold pursuant to the terms of the Lock-Up Agreements or any other applicable lock-up arrangements to which the applicable Investor is party. Other than the obligation of payment of any Additional Payments in accordance with the terms hereof, the Company will have no other liabilities for monetary damages with respect to its registration obligations. With respect to each Investor, the Company's obligations to pay Additional Payments remain in effect only so long as the applicable shares of Common Stock held by the Investor are Registrable Securities. Notwithstanding anything to the contrary contained herein, (i) in no event shall the aggregate of all Additional Payments payable by the Company hereunder on account of any share of Common Stock exceed $0.50 per share (subject to proportionate adjustment in the event of any stock split, reverse stock split or other recapitalization), (ii) no Additional Payments shall accrue during any Suspension Period, (iii) a Registration Default shall be deemed not to have occurred and be continuing, and no Additional Payments shall accrue as a result thereof, if the Registration Default relates to any information supplied or failed to be supplied by an Investor in relation to any Registration Statement or the related Prospectus. No Additional Payments shall be payable (i) if as of the relevant Registration Default, the Registrable Securities may be sold by the Investors without volume or manner of sale restrictions under Rule 144, as determined by counsel to the Company pursuant to a written opinion

14

letter to such effect, addressed and reasonably acceptable to the Company's transfer agent or (ii) with respect to any period after the expiration of the Effectiveness Period (it being understood that this clause shall not relieve the Company of any Additional Payments accruing prior to the expiration of the Effectiveness Period).

(c)    Any amounts of Additional Payments pursuant to this Section 8 will be payable in cash in arrears on the last day of each month following the date on which a Registration Default occurs. The amount of Additional Payments will be determined on the basis of a 360-day year comprised of twelve 30-day months, and the actual number of days on which Additional Payments accrued during such period.

9.    Indemnification.

(a)    Pubco agrees to (i) indemnify and hold harmless, to the fullest extent permitted by law, each Investor and their respective officers, directors, members, partners, agents, affiliates and employees and each Person who controls such Investor (within the meaning of the Securities Act or the Exchange Act) against all losses, claims, actions, damages, liabilities and expenses caused by (A) any untrue or alleged untrue statement of material fact contained in any registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, or (B) any violation or alleged violation by Pubco of the Securities Act or any other similar federal or state securities laws or any rule or regulation promulgated thereunder applicable to Pubco and relating to action or inaction required of Pubco in connection with any such registration, qualification or compliance, and (ii) pay to each Investor and their respective officers, directors, members, partners, agents, affiliates and employees and each Person who controls such Investor (within the meaning of the Securities Act or the Exchange Act), as incurred, any legal and any other expenses reasonably incurred in connection with investigating, preparing or defending any such claim, loss, damage, liability or action, except insofar as the same are caused by or contained in any information furnished in writing to Pubco or any managing underwriter by such Investor expressly for use therein; provided, however, that the indemnity agreement contained in this Section 9 shall not apply to amounts paid in settlement of any such claim, loss, damage, liability or action if such settlement is effected without the consent of Pubco (which consent shall not be unreasonably withheld, conditioned or delayed), nor shall Pubco be liable in any such case for any such claim, loss, damage, liability or action to the extent that it solely arises out of or is based upon an untrue statement of any material fact contained in the registration statement or omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case to the extent that such untrue statement or alleged untrue statement or omission or alleged omission was made in the registration statement, in reliance upon and in conformity with written information furnished by such Investor expressly for use in connection with such registration statement. In connection with an underwritten offering, Pubco shall indemnify any underwriters or deemed underwriters, their officers and directors and each Person who controls such underwriters (within the meaning of the Securities Act or the Exchange Act) to the same extent as provided above with respect to the indemnification of the holders of Registrable Securities.

(b)    In connection with any registration statement in which a holder of Registrable Securities is participating, each such holder shall furnish to Pubco in writing such

15

information relating to such holder as Pubco reasonably requests for use in connection with any such registration statement or prospectus and, to the extent permitted by law, shall indemnify Pubco, its officers, directors, employees, agents and representatives and each Person who controls Pubco (within the meaning of the Securities Act) against any losses, claims, damages, liabilities and expenses resulting from any untrue or alleged untrue statement of material fact contained in the registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement or omission is contained in any information so furnished in writing by such holder; provided that the obligation to indemnify shall be individual, not joint and several, for each holder and shall be limited to the net amount of proceeds actually received by such holder from the sale of Registrable Securities pursuant to such registration statement.

(c)        Any Person entitled to indemnification hereunder shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that the failure to give prompt notice shall not impair any Person's right to indemnification hereunder to the extent such failure has not materially prejudiced the indemnifying party) and (ii) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent shall not be unreasonably withheld, conditioned or delayed). An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel (as well as one local counsel for each applicable jurisdiction) for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim. In such instance, the conflicted indemnified parties shall have a right to retain one separate counsel, chosen by the holders of a majority of the Registrable Securities included in the registration, at the expense of the indemnifying party. No indemnifying party, in the defense of such claim or litigation, shall, except with the consent of each indemnified party, consent to the entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

(d)        Each party hereto agrees that, if for any reason the indemnification provisions contemplated by Sections 9(a) or 9(b) are unavailable to or insufficient to hold harmless an indemnified party in respect of any losses, claims, damages, liabilities or expenses (or actions in respect thereof) referred to therein, then each indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages, liabilities or expenses (or actions in respect thereof) in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party in connection with the actions which resulted in such losses, claims, damages, liabilities or expenses, as well as any other relevant equitable considerations. The relative fault of such indemnifying party and indemnified party shall be determined by reference to, among other

16

things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, relates to information supplied by such indemnifying party or indemnified party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The parties hereto agree that it would not be just or equitable if contribution pursuant to this Section 9(d) were determined by pro rata allocation (even if the holders or any underwriters or all of them were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to in this Section 9(d). The amount paid or payable by an indemnified party as a result of the losses, claims, damages, liabilities or expenses (or actions in respect thereof) referred to above shall be deemed to include any legal or other fees or expenses reasonably incurred by such indemnified party in connection with investigating or, except as provided in Section 9(c), defending any such action or claim. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. The sellers' obligations in this Section 9(d) to contribute shall be several in proportion to the amount of securities registered by them and not joint and shall be limited to an amount equal to the net proceeds actually received by such seller from the sale of Registrable Securities effected pursuant to such registration.

(e)      The indemnification and contribution provided for under this Agreement shall remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director or controlling Person of such indemnified party and shall survive the transfer of Registrable Securities and the termination or expiration of this Agreement.

10.      Participation in Underwritten Registrations. No Person may participate in any registration hereunder which is underwritten unless such Person (a) agrees to sell such Person's securities on the basis provided in any underwriting arrangements approved by the Person or Persons entitled hereunder to approve such arrangements (including, without limitation, pursuant to any over-allotment or "green shoe" option requested by the underwriters; provided that no holder of Registrable Securities shall be required to sell more than the number of Registrable Securities such holder has requested to include) and (b) completes and executes all questionnaires, powers of attorney, custody agreements, stock powers, indemnities, underwriting agreements and other documents required under the terms of such underwriting arrangements; provided that no holder of Registrable Securities included in any underwritten registration shall be required to make any representations or warranties to Pubco or the underwriters (other than representations and warranties regarding such holder, such holder's title to the securities, such Person's authority to sell such securities and such holder's intended method of distribution) or to undertake any indemnification obligations to Pubco or the underwriters with respect thereto that are materially more burdensome than those provided in Section 9. Each holder of Registrable Securities shall execute and deliver such other agreements as may be reasonably requested by Pubco and the lead managing underwriter(s) that are consistent with such holder's obligations under Section 4, Section 5 and this Section 10 or that are necessary to give further effect thereto. To the extent that any such agreement is entered into pursuant to, and consistent with, Section 4 and this Section 10, the respective rights and obligations created under such agreement shall supersede the respective rights and obligations of the holders, Pubco and the underwriters created pursuant to this Section 10.

17

11.    <u>Other Agreements</u>.  Pubco shall file all reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the Commission thereunder and shall take such further action as the Investors may reasonably request, all to the extent required to enable such Persons to sell securities pursuant to (a) Rule 144 adopted by the Commission under the Securities Act (as such rule may be amended from time to time) or any similar rule or regulation hereafter adopted by the Commission or (b) a registration statement on Form S-3 or any similar registration form hereafter adopted by the Commission. Upon request, Pubco shall deliver to the Investors a written statement as to whether it has complied with such requirements. Pubco shall at all times use its reasonable best efforts to cause the securities so registered to continue to be listed on one or more of the New York Stock Exchange, the American Stock Exchange and the Nasdaq Stock Market.  Pubco shall use its best efforts to facilitate and expedite transfers of Registrable Securities pursuant to Rule 144, which efforts shall include timely notice to its transfer agent to expedite such transfers of Registrable Securities.

12.    <u>Definitions</u>.

(a)    "<u>Applicable Approving Party</u>" means the holders of a majority of the Registrable Securities participating in the applicable offering or, in the case of a Short-Form Registration effected pursuant to <u>Section 2.3(c)</u>, the holders of a majority of the type of Registrable Securities that initiated such Short-Form Registration.

(b)    "<u>Block Trade</u>" means any non-marketed underwritten takedown offering taking the form of a bought deal or block sale to a financial institution.

(c)    "<u>Business Day</u>" means any day that is not a Saturday or Sunday or a legal holiday in the state in which Pubco's chief executive office is located or in New York, NY.

(d)    "<u>Capital Stock</u>" means (i) with respect to any Person that is a corporation, any and all shares, interests or equivalents in capital stock of such corporation (whether voting or nonvoting and whether common or preferred) and (ii) with respect to any Person that is not a corporation, individual or governmental entity, any and all partnership, membership, limited liability company or other equity interests of such Person that confer on the holder thereof the right to receive a share of the profits and losses of, or the distribution of assets of, the issuing Person, including in each case any and all warrants, rights (including conversion and exchange rights) and options to purchase any of the foregoing.

(e)    "<u>Commission</u>" means the U.S. Securities and Exchange Commission.

(f)    "<u>Common Stock</u>" means the Class A Common Stock of Pubco, par value $0.0001 per share.

(g)    "<u>Common Unit</u>" has the meaning set forth in the LLC Agreement.

(h)    "<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as amended from time to time, or any successor federal law then in force, together with all rules and regulations promulgated thereunder.

18

(i)        "FINRA" means the Financial Industry Regulatory Authority.

(j)        "Free-Writing Prospectus" means a free-writing prospectus, as defined in Rule 405 of the Securities Act.

(k)        "LLC Agreement" means the Fifth Amended and Restated Limited Liability Company Agreement of the Company, dated as of or about the date hereof, by and among the Company, Pubco and the other members of the Company (as the same may be amended, supplemented or modified from time to time in accordance with the terms thereof).

(l)        "Lock-Up Agreements" means those certain Lock-Up Agreements, dated as of July 8, 2019, by and among Pubco, the Company, and certain of the Persons listed on the Schedule of Investors attached hereto.

(m)        "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

(n)        "Prospectus" means the prospectus included in any Registration Statement, as supplemented by any and all prospectus supplements and as amended by any and all post-effective amendments and including all material incorporated by reference in such prospectus.

(o)        "Public Offering" means any sale or distribution by Pubco and/or holders of Registrable Securities to the public of Common Stock pursuant to an offering registered under the Securities Act.

(p)        "Register," "Registered" and "Registration" mean a registration effected by preparing and filing a Registration Statement or similar document in compliance with the requirements of the Securities Act, and the applicable rules and regulations promulgated thereunder, and such Registration Statement becoming effective.

(q)        "Registrable Securities" means (i) any Common Stock issued with respect to or in exchange for any Common Units held by the Investors, (ii) any Founder Shares held by the Investors, (iii) any Private Placement Warrants (or underlying securities) held by the Investors, (iv) any PIPE Shares held by the Investors (v) any Common Stock issued to an Investor pursuant to the terms of the Merger Agreement or (vi) any Common Stock issued or issuable with respect to the securities referred to in the preceding clauses (i) through (v) by way of a stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization. As to any particular Registrable Securities, such securities shall cease to be Registrable Securities when they have been sold or distributed to the public pursuant to an offering registered under the Securities Act or sold to the public through a broker, dealer or market maker in compliance with Rule 144 following the consummation of the Merger or repurchased by Pubco or any of its subsidiaries. For purposes of this Agreement, a Person shall be deemed to be a holder of Registrable Securities, and the Registrable Securities shall be deemed to be in existence, whenever such Person has the right to acquire directly or indirectly such Registrable Securities (upon conversion or exercise in connection with a transfer of securities or otherwise, but disregarding any restrictions or limitations upon the exercise of such right), whether or not such

19

acquisition has actually been effected, and such Person shall be entitled to exercise the rights of a holder of Registrable Securities hereunder; provided a holder of Registrable Securities may only request that Registrable Securities in the form of Common Stock be registered pursuant to this Agreement.

(r)    "Registration Statement" means any registration statement filed by Pubco with the Commission in compliance with the Securities Act and the rules and regulations promulgated thereunder for a public offering and sale of Common Stock or Registrable Securities, including the Prospectus included in such registration statement, amendments (including post-effective amendments) and supplements to such registration statement, and all exhibits to and all material incorporated by reference in such registration statement (other than a registration statement on Form S-4 or Form S-8, or their successors).

(s)    "Rule 144", "Rule 158", "Rule 405", "Rule 415" and "Rule 430B" mean, in each case, such rule promulgated under the Securities Act (or any successor provision) by the Commission, as the same shall be amended from time to time, or any successor rule then in force.

(t)    "Securities Act" means the Securities Act of 1933, as amended from time to time, or any successor federal law then in force, together with all rules and regulations promulgated thereunder.

(u)    "Shelf Participant" means any holder of Registrable Securities listed as a potential selling stockholder in connection with the Resale Shelf Registration Statement or the Shelf Registration or any such holder that could be added to such Resale Shelf Registration Statement or Shelf Registration without the need for a post-effective amendment thereto or added by means of an automatic post-effective amendment thereto.

(v)    "WKSI" means a "well-known seasoned issuer" as defined under Rule 405.

13.    Miscellaneous.

(a)    No Inconsistent Agreements. Neither the Company nor Pubco shall hereafter enter into any agreement with respect to its securities which is inconsistent with or violates or in any way impairs the rights granted to the Investors in this Agreement.

(b)    Entire Agreement. This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions among the parties hereto, written or oral, with respect to the subject matter hereof, including without limitation the Prior Agreement.

(c)    Remedies. Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law. The parties hereto agree and acknowledge that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that, in addition to any other rights and remedies existing in its favor, any party shall be entitled to specific performance and/or other injunctive relief from any court of law or equity of competent

20

jurisdiction (without posting any bond or other security) in order to enforce or prevent violation of the provisions of this Agreement.

(d)    Amendments and Waivers. Except as otherwise provided herein, the provisions of this Agreement may be amended or waived only with the prior written consent of Pubco and the holders of a majority of the Registrable Securities then outstanding; provided, that no amendment may materially and disproportionately adversely affect the rights of any holder of Registrable Securities compared to other holders of Registrable Securities without the consent of such adversely affected holder; and provided further, that the definition of "Effectiveness Period" and Section 8 (Additional Payments Under Certain Circumstances) may not be amended without the prior written consent of Deerfield Private Design Fund IV, L.P. Any amendment or waiver effected in accordance with this Section 13(d) shall be binding upon each Investor, Pubco and the Company. The failure of any party to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of such party thereafter to enforce each and every provision of this Agreement in accordance with its terms.

(e)    Successors and Assigns. All covenants and agreements in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and assigns of the parties hereto whether so expressed or not. In addition, whether or not any express assignment has been made, the provisions of this Agreement which are for the benefit of purchasers or holders of Registrable Securities are also for the benefit of, and enforceable by, any subsequent holder of Registrable Securities.

(f)    Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid, illegal or unenforceable in any respect under any applicable law, such provision shall be ineffective only to the extent of such prohibition, invalidity, illegality or unenforceability, without invalidating the remainder of this Agreement.

(g)    Counterparts. This Agreement may be executed simultaneously in counterparts (including by means of telecopied, facsimile or portable data format (PDF) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same Agreement.

(h)    Descriptive Headings; Interpretation. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement. The use of the word "including" herein shall mean "including without limitation."

(i)    Governing Law; Jurisdiction. All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. The parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in any Delaware Chancery Court, or if such court does not have subject matter jurisdiction, any court of

21

the United States located in the State of Delaware.  Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.

(j)    Notices. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by or email or by registered or certified mail (postage prepaid, return receipt requested) to each Investor at the address indicated on the Schedule of Investors attached hereto and to Pubco and the Company at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 13(j)):

if to Pubco:

AdaptHealth Corp.
780 Third Avenue
New York, New York 10017
Telephone: (212) 551-1600
Attention:    Chris Wolfe
Email:        chris.wolfe@dfbhealthcare.com

with a copy to:

Greenberg Traurig, LLP
200 Park Avenue
New York, New York  10166
Facsimile No.:  (212) 801-6400
Telephone No.: (212) 801-9200
Attention: Alan I. Annex, Esq.
Email:   annexa@gtlaw.com

if to the Company:

AdaptHealth Holdings, LLC
122 Mill Road, Suite A130
Phoenixville, Pennsylvania 19460
Attention: Luke McGee
Email: luke.mcgee@adapthealth.com

22

with a copy to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention: Steven J. Gartner and Michael E. Brandt
Facsimile: (212) 728-8111
Email:   sgartner@willkie.com and mbrandt@willkie.com

(k)      Mutual Waiver of Jury Trial. As a specifically bargained inducement for each of the parties to enter into this Agreement (with each party having had opportunity to consult counsel), each party hereto expressly and irrevocably waives the right to trial by jury in any lawsuit or legal proceeding relating to or arising in any way from this Agreement or the transactions contemplated herein, and any lawsuit or legal proceeding relating to or arising in any way to this Agreement or the transactions contemplated herein shall be tried in a court of competent jurisdiction by a judge sitting without a jury.

(l)      No Strict Construction. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

* * * * *

23

IN WITNESS WHEREOF, the parties hereto have executed this Registration Rights Agreement as of the date first written above.

**COMPANY:**

ADAPTHEALTH HOLDINGS LLC

By:      /s/ Luke McGee

Name:    Luke McGee

Title:     Chief Executive Officer

*[Signature Page to Registration Rights Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed this Registration Rights Agreement as of the date first written above.

**PUBCO:**

ADAPTHEALTH CORP.

By:       /s/ Luke McGee
Name:     Luke McGee
Title:    Chief Executive Officer

*[Signature Page to Registration Rights Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed this Registration Rights Agreement as of the date first written above.

**SPONSOR:**

DEERFIELD/RAB VENTURES, LLC

By:      /s/ Richard Barasch
Name:    Richard Barasch
Title:   Manager

*[Signature Page to Registration Rights Agreement]*

DEERFIELD/RAB VENTURES, LLC

By:      /s/ Richard Barasch
Name:    Richard Barasch
Title:   Manager

*[Signature Page to Registration Rights Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed this Registration Rights Agreement as of the date first written above.

**INVESTORS:**

DEERFIELD PRIVATE DESIGN FUND IV, L.P.
By: Deerfield Mgmt IV, L.P., General Partner
By: J.E. Flynn Capital IV, LLC, General Partner

By: /s/ David J. Clark
Name: David J. Clark
Title: Authorized Signatory


RAB VENTURES (DFB) LLC

By: /s/ Richard Barasch
Name: Richard Barasch
Title: Manager


2321 CAPITAL LLC

By: /s/ Luke McGee
Name: Luke McGee
Title: Manager


AMPEV LLC

By: /s/ Jason Young
Name: Jason Young
Title: Authorized Signatory

BLUEMOUNTAIN SUMMIT OPPORTUNITIES FUND II (US) L.P.
By: BlueMountain Capital Management, LLC, its investment manager

By: /s/ Richard Thorne
Name: Richard Thorne
Title: Deputy General Counsel, Tax


*[Signature Page to Registration Rights Agreement]*

BLUE RIVER NJ LLC
By: The Josh Parnes 2018 NGCG Nevada Trust

By:       /s/ Luke McGee
Name:    Luke McGee
Title:    Special Trustee


CFCP LLC

By:       /s/Nicholas Gargano
Name:    Nicholas Gargano
Title:    Chief Operating Officer


FRESH POND INVESTMENT LLC

By:       /s/ Luke McGee
Name:    Luke McGee
Title:    Authorized Signatory


JEDI ENTERPRISES, LLC

By:       /s/ John M. Gvodas, Jr.
Name:    John M. Gvodas, Jr.
Title:    Member/Manager


LBM DME HOLDINGS LLC

By:       /s/ Luke McGee
Name:    Luke McGee
Title:    Authorized Signatory


MAYAID2001 LLC

By:       /s/ Christopher Joyce
Name:    Christopher Joyce
Title:    Sole Member


*[Signature Page to Registration Rights Agreement]*

MCLARTY CAPITAL PARTNERS SBIC, L.P.

By:      /s/ Christopher D. Smith
Name:    Christopher D. Smith
Title:   Co-Founder & President


OCEAN ROCK NJ LLC

By:      /s/ Luke McGee
Name:    Luke McGee
Title:   Authorized Signatory


PLAINS CAPITAL LLC

By:      /s/ Luke McGee
Name:    Luke McGee
Title:   Authorized Signatory


QUAD CAPITAL, LLC
By: The Josh Parnes 2018 NGCG Nevada Trust

By:      /s/ Luke McGee
Name:    Luke McGee
Title:   Special Trustee


QUADRANT MANAGEMENT, INC.

By:      /s/ Marco Vega
Name:    Marco Vega
Title:   Chief Operating Officer


VERUS EQUITY HOLDING COMPANY LLC

By:      /s/ Richardson Roberts
Name:    Richardson Roberts
Title:

*[Signature Page to Registration Rights Agreement]*

VERUS NOTE HOLDING COMPANY LLC

By:       /s/ Richardson Roberts
Name:    Richardson Roberts
Title:


WHEATFIELD LLC

By:       /s/ Gregg Holst
Name:    Gregg Holst
Title:    Sole Member


CLIFTON BAY OFFSHORE INVESTMENTS L.P.

By:       /s/ Susan V. Demers
Name:    Susan V. Demers for
Title:    Vicali Services (BVI) Inc. – Sole Director For and on behalf of Clifton Bay
Management Ltd. – General Partner

BLUEMOUNTAIN FOINAVEN MASTER FUND L.P.

By: BlueMountain Capital Management, LLC, its investment manager

By:       /s/ Richard Thorne
Name:    Richard Thorne
Title:    Deputy General Counsel, Tax


BMSB L.P.

By: BlueMountain Capital Management, LLC, its investment manager

By:       /s/ Richard Thorne
Name:    Richard Thorne
Title:    Deputy General Counsel, Tax


BLUEMOUNTAIN FURSAN FUND L.P.

*[Signature Page to Registration Rights Agreement]*

By: BlueMountain Capital Management, LLC, its investment manager

By:     /s/ Richard Thorne

Name:     Richard Thorne

Title:     Deputy General Counsel, Tax

*[Signature Page to Registration Rights Agreement]*

REGISTRATION RIGHTS AGREEMENT JOINDER

The undersigned is executing and delivering this Joinder pursuant to the Registration Rights Agreement dated as of (as the same may hereafter be amended, the "Registration Rights Agreement"), among AdaptHealth Holdings Corporation, a Delaware corporation, AdaptHealth Holdings LLC, a Delaware limited liability company (the "Company"), and the other persons named as parties therein.

By executing and delivering this Joinder to Pubco, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the Registration Rights Agreement as a holder of Registrable Securities in the same manner as if the undersigned were an original signatory to the Registration Rights Agreement.

Accordingly, the undersigned has executed and delivered this Joinder as of the    day of          , 20  .

INVESTOR:

[•]

By:              _____
Its:

Address for Notices:

[•]
[•]
[•]
[•]

Agreed and Accepted as of


ADAPTHEALTH HOLDINGS LLC


By:              _____
Its:

**EXCHANGE AGREEMENT**

This EXCHANGE AGREEMENT (as it may be amended from time to time in accordance with the terms hereof, the "Agreement"), dated as of November 8, 2019 and effective as of immediately prior to the consummation of the Merger (as defined below) (the "Effective Time"), is made by and among AdaptHealth Corp., a Delaware corporation ("Pubco"), AdaptHealth Holdings LLC, a Delaware limited liability company (the "Company"), and the holders from time to time of the Company's Common Units (as defined below) listed on Exhibit A hereto (collectively, the "Members" and individually, a "Member").

WHEREAS, Pubco intends to consummate the transactions (the "Merger") described in that certain Agreement and Plan of Merger, dated as of July 8, 2019, by and among Pubco, the Company, BM AH Holdings, LLC, a Delaware limited liability company (the "BM Blocker"), Access Point Medical, Inc., a Delaware corporation (the "A Blocker" and, together with the BM Blocker, the "Blockers"), DFB Merger Sub LLC, a Delaware limited liability company ("Merger Sub"), AH Representative LLC, a Delaware limited liability company (the "Company Unitholders' Representative"), and, solely for purposes of Section 7.20 thereof, the BM Blocker Sellers (as defined therein) and, solely for purposes of Section 7.21 thereof, the A Blocker Seller (as defined therein); and

WHEREAS, the parties to this Agreement desire to provide for the exchange of Exchangeable Units together with shares of Class B Common Stock (as defined below) for shares of Class A Common Stock (as defined below), on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings contained herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**ARTICLE I.**

Section 1.1    Definitions.

As used in this Agreement, the following terms have the following meanings:

"Affiliate" has the meaning set forth in the LLC Agreement.

"Agreement" has the meaning set forth in the preamble.

"Business Day" means a day except a Saturday, a Sunday or other day on which the SEC or banks in the City of New York or the State of Delaware are authorized or required by law to be closed.

"Cash Payment" means, with respect to any Exchange, an amount in cash equal to the product of (x) the Net Exchanged Unit Amount, (y) the then-applicable Exchange Rate, and (z) the Class A Common Stock Value.

"Change of Control" has the meaning set forth in the Tax Receivable Agreement.

"Class A Common Stock" means the Class A common stock, par value $0.0001 per share, of Pubco.

"Class A Common Stock Value" means, with respect to any Exchange, the arithmetic average of the volume-weighted average prices for a share of Class A Common Stock on the principal U.S. securities exchange or automated or electronic quotation system on which the Class A Common Stock trades, as reported by Bloomberg, L.P., or its successor, for each of the three (3) consecutive full Trading Days ending on and including the last full Trading Day immediately prior to the date the related Exchange Notice is delivered, subject to appropriate and equitable adjustment for any stock splits, reverse splits, stock dividends or similar events affecting the Class A Common Stock. If the Class A Common Stock no longer trades on a securities exchange or automated or electronic quotation system, then the Class A Common Stock Value shall be determined in good faith by a majority of the directors of Pubco that do not have an interest in the Exchangeable Units and shares of Class B Common Stock being Exchanged.

"Class B Common Stock" means the Class B common stock, par value $0.0001 per share, of Pubco.

"Code" means the Internal Revenue Code of 1986, as amended.

"Common Unit" has the meaning set forth in the LLC Agreement.

"Contribution Notice" has the meaning set forth in Section 2.1(a)(iv).

"Effective Time" has the meaning set forth in the preamble.

"Exchange" has the meaning set forth in Section 2.1(a)(i).

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Exchange Date" has the meaning set forth in Section 2.1(a)(iii).

"Exchange Notice" has the meaning set forth in Section 2.1(a)(iii).

"Exchange Rate" means the number of shares of Class A Common Stock for which one Common Unit is entitled to be Exchanged. The Exchange Rate will also be used to determine the number of shares of Class B Common Stock that a Member must surrender upon an Exchange. On the date of this Agreement, the Exchange Rate shall be one, subject to adjustment pursuant to Section 2.2 of this Agreement.

"Exchangeable Unit" means a Common Unit. For the avoidance of doubt, the Common Units held by Pubco are not Exchangeable Units.

"Liens" means any and all liens, charges, security interests, options, claims, mortgages, pledges, proxies, voting trusts or agreements, obligations, understandings or arrangements, or other restrictions on title or transfer of any nature whatsoever.

2

"LLC Agreement" means the Fifth Amended and Restated Limited Liability Company Agreement of the Company dated as of the date hereof, as the same may be amended, amended and restated or replaced from time to time.

"Manager" has the meaning set forth in the LLC Agreement.

"Member" has the meaning set forth in the preamble.

"Merger" has the meaning set forth in the recitals.

"Net Exchanged Unit Amount" means, with respect to an Exchange, the number of Common Units set forth in the applicable Exchange Notice.

"Permitted Transferee" has the meaning set forth in the LLC Agreement.

"Person" means an individual, corporation, partnership, limited partnership, limited liability company, syndicate, person (including, without limitation, a "person" as defined in Section 13(d)(3) of the Exchange Act), trust, association or entity or government, political subdivision, agency or instrumentality of a government.

"Pubco" has the meaning set forth in the recitals.

"Registration Rights Agreement" means the Registration Rights Agreement by and among Pubco and the other parties thereto, dated as of the date hereof, as the same may be amended, amended and restated or replaced from time to time.

"SEC" means the Securities and Exchange Commission.

"Securities Act" means the U.S. Securities Act of 1933, as amended.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof and without limitation, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control the manager, managing member, managing director (or a board comprised of any of the foregoing) or general partner of such limited liability company, partnership, association or other business entity. For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries.

3

"Takeover Laws" means any "moratorium," "control share acquisition," "business combination," "fair price" or other form of anti-takeover laws and regulations of any jurisdiction that may purport to be applicable to this Agreement or the transactions contemplated hereby.

"Tax Receivable Agreement" means that certain Tax Receivable Agreement, dated on or about the date hereof, among Pubco, the Company and the other parties thereto, as the same may be amended, amended and restated or replaced from time to time.

"Trading Day" means a day on which the Nasdaq Capital Market or such other principal U.S. securities exchange on which the Class A Common Stock is listed or admitted to trading is open for the transaction of business (unless such trading shall have been suspended for the entire day) or if the shares of Class A Common Stock are not listed or admitted to trading on such exchange, on the automated quotation system on which the shares of Class A Common Stock are then authorized for quotation.

"Voting Securities" means any equity securities of Pubco that are entitled to vote generally in matters submitted for a vote of Pubco's stockholders or generally in the election of Pubco's Board of Directors.

## ARTICLE II.

Section 2.1        Exchange of Common Units.

(a)        Elective Exchanges.

(i)        Each Member shall be entitled, upon the terms and subject to the conditions hereof and the LLC Agreement, to surrender Exchangeable Units and a corresponding number of shares of Class B Common Stock after taking into account the Exchange Rate (in each case, free and clear of all Liens) to Pubco in exchange for the delivery to such Member (or its designee) of either, at the option of Pubco, (x) a number of shares of Class A Common Stock that is equal to the product of the applicable Net Exchanged Unit Amount multiplied by the Exchange Rate or (y) the applicable Cash Payment. Any exchange of Exchangeable Units and Class B Common Stock for Class A Common Stock or the Cash Payment, as applicable, is defined herein as an "Exchange." Subject to Section 2.1(a)(ii), a Member may Exchange Common Units at any time and from time to time, but a Member may not Exchange Common Units more than once per fiscal quarter without the prior consent of Pubco or the Manager. The minimum number of Exchangeable Units (and corresponding number of shares of Class B Common Stock after taking into account the Exchange Rate, if any) that may be exchanged by any Member shall be the lesser of (A) 10,000 and (B) all of the Exchangeable Units (and corresponding number of shares of Class B Common Stock after taking into account the Exchange Rate, if any) then held by such Member and its Affiliates, except that such minimum shall not apply if such Exchange is in connection with the exercise of any incidental registration rights pursuant to the Registration Rights Agreement.

(ii)        Notwithstanding anything to the contrary contained herein, no Member shall be entitled to effectuate an Exchange of Exchangeable Units (and a corresponding number of shares of Class B Common Stock after taking into account the Exchange Rate,

4

if any) as set forth in this Section 2.1(a), and Pubco shall have the right to refuse to honor any request for such an Exchange, if at any time Pubco determines based on the advice of counsel that such Exchange (1) would be prohibited by law or regulation (including, without limitation, the unavailability of a registration of such Exchange under the Securities Act, or an exemption from the registration requirements thereof), (2) would not be permitted under any agreement with Pubco or any of its Subsidiaries to which the applicable Member is party (including, without limitation, the LLC Agreement), (3) would result in a negative adjustment from the Exchange under Section 743(b) of the Code with respect to the Company, or (4) solely in the case of an Exchange requested by an officer, director or other personnel of Pubco, the Company or any of their Subsidiaries, would not be permitted under any written policy of Pubco, the Company or any of their Subsidiaries related to restrictions on trading by such officers, directors or other personnel. Upon such determination, Pubco shall notify the Member requesting the Exchange of such determination, which such notice shall include an explanation in reasonable detail as to the reason that the Exchange has not been honored.

(iii)    A Member shall exercise its right to effectuate an Exchange of Exchangeable Units and a corresponding number of shares of Class B Common Stock after taking into account the Exchange Rate (if any), as set forth in this Section 2.1(a) by delivering to Pubco and the Company during normal business hours, (A) a written election of exchange in respect of the Exchangeable Units to be exchanged substantially in the form of Exhibit B hereto (an "Exchange Notice"), duly executed by such Member, (B) any certificates in such Member's possession representing such Exchangeable Units, (C) any stock certificates in such Member's possession representing such shares of Class B Common Stock and (D) if Pubco or any exchanging Subsidiary requires the delivery of the certification contemplated by Section 2.4(b), such certification or written notice from such Member that it is unable to provide such certification. An Exchange pursuant to this Section 2.1(a) shall be effected on the second Business Day following the Business Day on which Pubco shall have received the items specified in clauses (A)-(D) of the first sentence of this Section 2.1(a)(iii) or such later date that is a Business Day specified in the Exchange Notice (such Business Day, the "Exchange Date"); provided, that Pubco may establish alternate exchange procedures as necessary in order to facilitate the establishment by a Member of a trading plan meeting the requirements of Rule 10b5-1 under the Exchange Act. On the Exchange Date, all rights of the exchanging Member as a holder of the Exchangeable Units and shares of Class B Common Stock that are subject to the Exchange shall cease, and unless Pubco has elected Cash Payment, such Member (or its designee) shall be treated for all purposes as having become the record holder of the shares of Class A Common Stock to be received by the exchanging Member in respect of such Exchange.

(iv)    Within two (2) Business Days following the Business Day on which Pubco has received the Exchange Notice, Pubco shall give written notice (the "Contribution Notice") to the exchanging Member of its intended settlement method; provided that if Pubco does not timely deliver a Contribution Notice, Pubco shall be deemed to have not elected the Cash Payment method.

(v)    A Member may specify, in an applicable Exchange Notice, that the Exchange is to be contingent (including as to timing) upon the occurrence of any

5

transaction or event, including the consummation of a purchase by another Person (whether in a tender or exchange offer, an underwritten offering, Change of Control transaction or otherwise) of shares of Class A Common Stock or any merger, consolidation or other business combination.

(vi)    Notwithstanding anything to the contrary herein, the settlement method with respect to an Exchange by the Company pursuant to Section 7.1 of the LLC Agreement shall be the applicable Cash Payment.

(b)    Change of Control. Pubco shall provide written notice of an expected Change of Control to all Members within the earlier of (x) five (5) Business Days following the execution of the agreement with respect to such Change of Control and (y) ten (10) Business Days before the proposed date upon which the contemplated Change of Control is to be effected, indicating in such notice such information as may reasonably describe the Change of Control transaction, subject to applicable law, including the date of execution of such agreement or such proposed effective date, as applicable, the amount and types of consideration to be paid for Exchangeable Units and shares of Class B Common Stock or shares of Class A Common Stock, as applicable, in the Change of Control (which consideration shall be equivalent whether paid for Exchangeable Units and shares of Class B Common Stock or shares of Class A Common Stock), any election with respect to types of consideration that a holder of Exchangeable Units and shares of Class B Common Stock or shares of Class A Common Stock, as applicable, shall be entitled to make in connection with the Change of Control, the percentage of total Exchangeable Units and shares of Class B Common Stock or shares of Class A Common Stock, as applicable, to be transferred to the acquirer by all shareholders in the Change of Control, and the number of Exchangeable Units and shares of Class B Common Stock held by each Member that Pubco intends to require to be Exchanged for shares of Class A Common Stock in connection with the Change of Control. Pubco shall update such notice from time to time to reflect any material changes to such notice. Pubco may satisfy any such notice and update requirements described in the preceding two sentences by providing such information on a Form 8-K, Schedule TO, Schedule 14D-9, Preliminary Merger Proxy on Schedule 14A, Definitive Merger Proxy on Schedule 14A or similar form filed with the SEC.

(c)    Exchange Consideration. As promptly as practicable on or after the Exchange Date, provided the Member has satisfied its obligations under Section 2.1(a)(iii), Pubco shall deliver or cause to be delivered to such Member (or its designee), either certificates or evidence of book-entry shares representing the number of shares of Class A Common Stock deliverable upon the applicable Exchange, registered in the name of the relevant exchanging Member (or its designee) or, if Pubco has so elected, the Cash Payment. Notwithstanding anything set forth in this Section 2.1(c) to the contrary, to the extent the Class A Common Stock issued in the exchange will be settled through the facilities of The Depository Trust Company, Pubco will, upon the written instruction of an exchanging Member, deliver the shares of Class A Common Stock deliverable to such Member through the facilities of The Depository Trust Company to the account of the participant of The Depository Trust Company designated by such Member in the Exchange Notice. Upon a Member exercising its right to Exchange in accordance with Section 2.1(a)(i), Pubco shall take such actions as may be required to ensure that such Member receives the shares of Class A Common Stock or the Cash Payment that such exchanging Member is entitled to receive in connection with such Exchange pursuant to this Section 2.1.

6

(d)    Legends.

(i)    The shares of Class A Common Stock issued upon an Exchange, other than any such shares issued in an Exchange subject to an effective registration statement under the Securities Act, shall bear a legend in substantially the following form:

THE TRANSFER OF THESE SECURITIES HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY OTHER JURISDICTION, AND MAY NOT BE SOLD OR TRANSFERRED OTHER THAN IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (OR OTHER APPLICABLE LAW), OR AN EXEMPTION THEREFROM.

(ii)    Pubco covenants and agrees that, if a registration statement under the Securities Act is effective and available for Class A Common Stock to be delivered with respect to any Exchange, Class A Common Stock that have been registered under the Securities Act shall be delivered in respect of such Exchange. If any Exchange in accordance with this Agreement is to be effected at a time when any required registration has not become effective or otherwise is unavailable, upon the request and with the reasonable cooperation of the exchanging Member requesting such Exchange, Pubco shall use commercially reasonable efforts to promptly facilitate such Exchange pursuant to any reasonably available exemption from such registration requirements. Pubco shall use commercially reasonable efforts to list the Class A Common Stock required to be delivered upon Exchange prior to such delivery upon each national securities exchange or inter-dealer quotation system upon which the outstanding Class A Common Stock may be listed or traded at the time of such delivery.

(iii)    If (A) any shares of Class A Common Stock have been sold pursuant to a registration statement that has been declared effective by the SEC, (B) all of the applicable conditions of Rule 144 are met, or (C) the legend (or a portion thereof) otherwise ceases to be applicable, Pubco, upon the written request of the holder thereof, shall promptly provide such holder or its respective transferees with new certificates (or evidence of book-entry share) for securities of like tenor not bearing the provisions of the legend with respect to which the restriction has terminated. In connection therewith, such holder shall provide Pubco with such information in its possession as Pubco may reasonably request (which may include an opinion of counsel reasonably acceptable to Pubco) in connection with the removal of any such legend.

(e)    Cancellation of Class B Common Stock. Any shares of Class B Common Stock surrendered in an Exchange shall automatically be deemed cancelled without any action on the part of any Person, including Pubco. Any such cancelled shares of Class B Common Stock shall no longer be outstanding, and all rights with respect to such shares shall automatically cease and terminate.

7

(f)      Expenses. Subject to any other arrangement or agreement among Pubco and an applicable Member, Pubco, any exchanging Subsidiary and each exchanging Member shall bear their own expenses in connection with the consummation of any Exchange, whether or not any such Exchange is ultimately consummated, except that Pubco shall bear any transfer taxes, stamp taxes or duties, or other similar taxes in connection with, or arising by reason of, any Exchange; provided, however, that if any shares of Class A Common Stock are to be delivered in a name other than that of the Member that requested the Exchange (or The Depository Trust Company or its nominee for the account of a participant of The Depository Test Company that will hold the shares for the account of such Member) or the Cash Payment is to be paid to a Person other than the Member that requested the Exchange, then such Member or the Person in whose name such shares are to be delivered or to whom the Cash Payment is to be paid shall pay to Pubco the amount of any transfer taxes, stamp taxes or duties, or other similar taxes in connection with, or arising by reason of, such Exchange or shall establish to the reasonable satisfaction of Pubco that such tax has been paid or is not payable.

(g)      Publicly Traded Partnership. Notwithstanding anything to the contrary herein, if the Manager of the Company, after consultation with its outside legal counsel and tax advisor, shall determine in good faith that interests in the Company do not meet the requirements of Treasury Regulation Section 1.7704-1(h) (or other provisions of those Regulations as determined by the Manager in its sole discretion), the Company may impose such restrictions on Exchanges as the Company may reasonably determine to be necessary or advisable so that the Company is not treated as a "publicly traded partnership" under Section 7704 of the Code.

Section 2.2      Adjustment.

The Exchange Rate shall be adjusted accordingly if there is: (a) any subdivision (by any stock or unit split, stock or unit dividend or distribution, reclassification, reorganization, recapitalization or otherwise) or combination (by reverse stock or unit split, reclassification, reorganization, recapitalization or otherwise) of the shares of Class B Common Stock or Common Units that is not accompanied by a substantively identical subdivision or combination of the Class A Common Stock; or (b) any subdivision (by any stock or unit split, stock or unit dividend or distribution, reclassification, reorganization, recapitalization or otherwise) or combination (by reverse stock or unit split, reclassification, reorganization, recapitalization or otherwise) of the shares of Class A Common Stock that is not accompanied by a substantively identical subdivision or combination of the shares of Class B Common Stock or Common Units. To the extent not reflected in an adjustment to the Exchange Rate, if there is any reclassification, reorganization, recapitalization or other similar transaction (including any Change of Control) in which the Class A Common Stock is converted or changed or exchanged into or for another security, securities or other property, then upon any subsequent Exchange, an exchanging Member shall be entitled to receive the amount of such security, securities or other property that such exchanging Member would have received if such Exchange had occurred immediately prior to the effective date of such reclassification, reorganization, recapitalization or other similar transaction, taking into account any adjustment as a result of any subdivision (by any split, distribution or dividend, reclassification, reorganization, recapitalization or otherwise) or combination (by reverse split, reclassification, recapitalization or otherwise) of such security, securities or other property that occurs after the effective time of such reclassification, reorganization, recapitalization or other similar transaction. For the avoidance of doubt, if there is any reclassification, reorganization,

8

recapitalization or other similar transaction (including any Change of Control) in which the Class A Common Stock is converted or changed or exchanged into or for another security, securities or other property, this Section 2.2 shall continue to be applicable, *mutatis mutandis*, with respect to such security or other property.

Section 2.3    Class A Common Stock to be Issued.

(a)    Pubco shall at all times reserve and keep available out of its authorized but unissued Class A Common Stock, solely for the purpose of issuance upon an Exchange, such number of shares of Class A Common Stock as shall be sufficient to effect the conversion of all outstanding Common Units; provided, however, that nothing contained herein shall be construed to preclude Pubco from satisfying its obligations in respect of any such Exchange by delivery of unencumbered purchased shares of Class A Common Stock (which may or may not be held in the treasury of Pubco or any subsidiary thereof) or cash in lieu of shares of Class A Common Stock in accordance with this Agreement.

(b)    Pubco has taken and will take all such steps as may be required to cause to qualify for exemption under Rule 16b-3(d) or (e), as applicable, under the Exchange Act, and be exempt for purposes of Section 16(b) under the Exchange Act, any acquisitions or dispositions of equity securities of Pubco (including derivative securities with respect thereto) and any securities that may be deemed to be equity securities or derivative securities of Pubco for such purposes that result from the transactions contemplated by this Agreement, by each director or officer of Pubco (including directors-by-deputization) who may reasonably be expected to be subject to the reporting requirements of Section 16(a) of the Exchange Act with respect to Pubco upon the registration of any class of equity security of Pubco pursuant to Section 12 of the Exchange Act (with the authorizing resolutions specifying the name of each such officer or director whose acquisition or disposition of securities is to be exempted and the number of securities that may be acquired and disposed of by each such Person pursuant to this Agreement).

(c)    If any Takeover Law or other similar law or regulation becomes or is deemed to become applicable to this Agreement or any of the transactions contemplated hereby, Pubco shall use its reasonable best efforts to render such law or regulation inapplicable to all of the foregoing.

(d)    Pubco covenants that all shares of Class A Common Stock issued upon an Exchange will, upon issuance, be validly issued, fully paid and non-assessable and not subject to any preemptive right of stockholders of Pubco or to any right of first refusal or other right in favor of any Person.

Section 2.4    Withholding; Certification of Non-Foreign Status.

(a)    If Pubco shall be required to withhold any amounts by reason of any federal, state, local or foreign tax rules or regulations in respect of any Exchange, Pubco shall be entitled to take such action as it deems appropriate in order to ensure compliance with such withholding requirements, including, at its option, withholding shares of Class A Common Stock with a fair market value equal to the minimum amount of any taxes that Pubco may be required to withhold with respect to such Exchange. To the extent that amounts are (or property is) so withheld and paid

9

over to the appropriate taxing authority, such withheld amounts (or property) shall be treated for all purposes of this Agreement as having been paid (or delivered) to the applicable Member.

(b)      An exchanging Member shall deliver to Pubco a certification of non-foreign status that meets the requirements of Treasury Regulation Section 1.1445-2(b) and Section 1446(f) of the Code prior to an Exchange. In the event the Member does not provide such certification, Pubco shall nevertheless deliver or cause to be delivered to the exchanging Member the Class A Common Stock or the Cash Payment in accordance with Section 2.1, but subject to withholding as provided in Section 2.4(a).

Section 2.5      Tax Treatment.

Unless otherwise required by applicable law, the parties hereto acknowledge and agree that any Exchange with Pubco or the Company shall be treated as a direct exchange between Pubco and the Member for U.S. federal and applicable state and local income tax purposes. The parties hereto intend to treat any Exchange consummated hereunder as a taxable sale of the Exchangeable Units in a transaction governed by Section 1001 of the Code by the exchanging Member to Pubco for U.S. federal and applicable state and local income tax purposes and no party hereto shall take an position inconsistent with such intended tax treatment on any tax return, amendment thereof or any other communication with a taxing authority, in each case unless otherwise required by a "determination" within the meaning of Section 1313 of the Code.

Section 2.6      Distributions.

No Exchange will impair the right of an exchanging Member to receive any distribution for periods ending on or prior to the Exchange Date for such Exchange (but for which payment had not yet been made with respect to the Exchangeable Units in question at the time the Exchange is consummated).

**ARTICLE III.**

Section 3.1      Representations and Warranties of Pubco.

Pubco represents and warrants that (i) it is a corporation duly incorporated and is existing and in good standing under the laws of the State of Delaware, (ii) it has all requisite corporate power and authority to enter into and perform this Agreement and to consummate the transactions contemplated hereby and to issue the Class A Common Stock in accordance with the terms hereof, (iii) the execution and delivery of this Agreement by Pubco and the consummation by it of the transactions contemplated hereby (including the issuance of the Class A Common Stock) have been duly authorized by all necessary corporate action on the part of Pubco, including all actions necessary to ensure that the acquisition of shares of Class A Common Stock pursuant to the transactions contemplated hereby, to the fullest extent of each of Pubco's Board of Directors' power and authority and to the extent permitted by law, shall not be subject to any Takeover Laws, (iv) this Agreement constitutes a legal, valid and binding obligation of Pubco enforceable against Pubco in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally, and (v) the execution, delivery and performance of this Agreement by Pubco and the consummation by Pubco of the transactions contemplated hereby will not (A) result

10

in a violation of the certificate of incorporation of Pubco or the bylaws of Pubco or (B) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which Pubco is a party, or (C) based on the representations to be made by each Member pursuant to the written election in the form of Exhibit A attached hereto in connection with Exchanges made pursuant to the terms of the Agreement, result in a violation of any law, rule, regulation, order, judgment or decree applicable to Pubco or by which any property or asset of Pubco is bound or affected, except with respect to clause (B) or (C) for any conflicts, defaults, accelerations, terminations, cancellations or violations that would not reasonably be expected to have a material adverse effect on Pubco or its business, financial condition or results of operations.

Section 3.2    Representations and Warranties of the Company.

The Company represents and warrants that (i) it is a limited liability company duly formed and is existing and in good standing under the laws of the State of Delaware, (ii) it has all requisite power and authority to enter into and perform this Agreement and to consummate the transactions contemplated hereby, (iii) the execution and delivery of this Agreement by the Company and the consummation by it of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Company, (iv) this Agreement constitutes a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally, (v) it is an entity treated as a partnership for U.S. federal income tax purposes and is not classified as a "publicly traded partnership" as defined under Section 7704 of the Code, and (vi) the execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the transactions contemplated hereby will not (A) result in a violation of the certificate of formation of the Company or the LLC Agreement or (B) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Company is a party, or (C) result in a violation of any law, rule, regulation, order, judgment or decree applicable to the Company or by which any property or asset of the Company is bound or affected, except with respect to clause (B) or (C) for any conflicts, defaults, accelerations, terminations, cancellations or violations that would not reasonably be expected to have a material adverse effect on the Company or its business, financial condition or results of operations.

Section 3.3    Representations and Warranties of the Members.

Each Member, severally and not jointly, represents and warrants that (i) if it is not a natural person, that it is duly incorporated or formed and, to the extent such concept exists in its jurisdiction of organization, is existing and in good standing under the laws of such jurisdiction, (ii) it has all requisite legal capacity and authority to enter into and perform this Agreement and to consummate the transactions contemplated hereby, (iii) if it is not a natural person, the execution and delivery of this Agreement by it and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate or other entity action on the part of such Member, (iv) this Agreement constitutes a legal, valid and binding obligation of such Member

11

enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally and (v) the execution, delivery and performance of this Agreement by such Member and the consummation by such Member of the transactions contemplated hereby will not (A) if it is not a natural person, result in a violation of the certificate of incorporation, bylaws or other organizational documents of such Member, (B) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which such Member is a party or by which any property or asset of such Member is bound or affected, or (C) result in a violation of any law, rule, regulation, order, judgment or decree applicable to such Member, except with respect to clause (B) or (C) for any conflicts, defaults, accelerations, terminations, cancellations or violations that would not in any material respect result in the unenforceability against such Member of this Agreement.

## ARTICLE IV.

Section 4.1        Notices.

All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made when (a) delivered personally to the recipient, (b) delivered by means of electronic mail (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if emailed before 5:00 p.m. Eastern Time on a Business Day, and otherwise on the next Business Day, or (c) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid). Such notices, demands and other communications shall be sent to the address for such recipient set forth in the Company's books and records, or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

If to the Company or Pubco to:

        AdaptHealth Holdings LLC
        122 Mill Road, Suite A130
        Phoenixville, Pennsylvania 19460
        Attention:    Luke McGee
        Email:        luke.mcgee@adapthealth.com

with a copy (which shall not constitute notice to the Company or Pubco) to:

        Willkie Farr & Gallagher LLP
        787 Seventh Avenue
        New York, New York 10019
        Attention:  Steven J. Gartner and Michael E. Brandt
        Email:        sgartner@willkie.com and mbrandt@willkie.com

12

Section 4.2    Permitted Transferees.

To the extent that a Member (or an applicable Permitted Transferee of such Member) validly transfers after the date hereof any or all of its Common Units and corresponding shares of Class B Common Stock after taking into account the Exchange Rate (to the extent that such Member holds such shares), to a Permitted Transferee of such Person or to any other Person in a transaction not in contravention of, and in accordance with, the LLC Agreement, then the transferee thereof shall have the right to execute and deliver a joinder to this Agreement, in the form attached hereto as Exhibit C. Upon execution of any such joinder, such transferee shall, with respect to such transferred Common Units and shares of Class B Common Stock (to the extent that such Member holds such shares), be entitled to all of the rights and bound by each of the obligations applicable to the relevant transferor hereunder; provided that the transferor shall remain entitled to all of the rights and bound by each of the obligations with respect to Common Units and shares of Class B Common Stock (to the extent that such Member holds such shares) that were not so transferred.

Section 4.3    Severability.

The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or entity or any circumstance, is found to be invalid or unenforceable in any jurisdiction, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 4.4    Counterparts.

This Agreement and any amendments may be executed simultaneously in two or more counterparts and delivered via facsimile or .pdf, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

Section 4.5    Entire Agreement.

This Agreement together with the LLC Agreement and the Tax Receivables Agreement (a) constitutes the entire agreement and supersedes all other prior agreements, both written and oral, among the parties with respect to the subject matter hereof and (b) is not intended to confer upon any Person, other than the parties hereto and their Permitted Transferees, any rights or remedies hereunder.

13

Section 4.6     Further Assurances.

Each party hereto shall execute, deliver, acknowledge and file such other documents and take such further actions as may be reasonably requested from time to time by any other party hereto to give effect to and carry out the transactions contemplated herein.

Section 4.7     Governing Law.

This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

Section 4.8     Consent to Jurisdiction.

Each party hereto irrevocably submits to the exclusive jurisdiction of the United States District Court for the State of Delaware and the state courts of the State of Delaware for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each party hereto further agrees that service of any process, summons, notice or document by United States certified or registered mail (in each such case, prepaid return receipt requested) to such party's respective address set forth in the Company's books and records or such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party shall be effective service of process in any action, suit or proceeding in Delaware with respect to any matters to which it has submitted to jurisdiction as set forth above in the immediately preceding sentence. Each party hereto irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in the United States District Court for the State of Delaware or the state courts of the State of Delaware and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

Section 4.9     Waiver of Jury Trial.

BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, EACH PARTY TO THIS AGREEMENT (INCLUDING THE COMPANY) HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES HERETO, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY AND/OR THE RELATIONSHIPS ESTABLISHED AMONG THE PARTIES HEREUNDER.

14

Section 4.10    Amendments.

The provisions of this Agreement may be amended only by the affirmative vote or written consent of each of (i) the Company and (ii) Members holding a majority of the then outstanding Common Units (excluding Common Units held by Pubco); provided that no amendment may disproportionately affect the rights of a Member compared to other Members without the consent of such Member. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 4.11    Assignment.

Neither this Agreement nor any of the rights or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other parties. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors, assigns and Permitted Transferees.

Section 4.12    Independent Obligations.

The obligations of each Member hereunder are several and not joint with the obligations of any other Member, and no Member shall be responsible in any way for the performance of the obligations of any other Member under hereunder. The decision of each Member to enter into to this Agreement has been made by such Member independently of any other Member. Nothing contained herein, and no action taken by any Member pursuant hereto, shall be deemed to constitute the Members as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Members are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated hereby.

Section 4.13    Specific Enforcement.

The parties hereto acknowledge that the remedies at law of the other parties for a breach or threatened breach of this Agreement would be inadequate and, in recognition of this fact, any party to this Agreement, without posting any bond, and in addition to all other remedies that may be available, shall be entitled to equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy that may then be available.

*[Signature Pages to Follow]*

15

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized representatives as of the day and year first above written.

ADAPTHEALTH CORP.

By: _____
Name: Luke McGee
Title:

ADAPTHEALTH HOLDINGS LLC

By:    /s/ Luke McGee
Name: Luke McGee
Title:

MEMBERS

**2321 CAPITAL LLC**

By:    /s/ Luke McGee
Name:    Luke McGee
Title:

**AMPEV LLC**

By:    /s/ Jason Young
Name:    Jason Young
Title:

**BLUE RIVER NJ LLC**

By:    /s/ Luke McGee
Name:    Luke McGee
Title:

16

**BLUEMOUNTAIN SUMMIT OPPORTUNITIES FUND II (US) L.P.**

By: BlueMountain Capital Management, LLC, its investment manager

By:   /s/ Richard Horne
     Name:    Richard Horne
     Title:    Deputy General Counsel, Tax

**CFCP LLC**

By:   /s/ Nicholas Gargano
     Name:    Nicholas Gargano
     Title:

**FRESHPOND INVESTMENTS LLC**

By:   /s/ Luke McGee
     Name:    Luke McGee
     Title:    Managing Member

**JEDI ENTERPRISES LLC**

By:   /s/ John M. Gvodas Jr.
     Name:    John M. Gvodas Jr.
     Title:    Member/Manager

**LBM DME HOLDINGS LLC**

By:   /s/ Luke McGee
     Name:    Luke McGee
     Title:

**MAYAID2001 LLC**

By:   /s/ Christopher Joyce
     Name:    Christopher Joyce
     Title:

**MCLARTY CAPITAL PARTNERS SBIC. LP**

By:   /s/ Christopher D. Smith
     Name:    Christopher D. Smith
     Title:    Co-Founder & President

**OCEAN ROCK NJ LLC**

By:   /s/ Luke McGee
     Name:    Luke McGee
     Title:

17

**PLAINS CAPITAL LLC**

By:  /s/ Luke McGee
      Name:   Luke McGee
      Title:

**QUAD CAPITAL LLC**

By:  /s/ Luke McGee
      Name:   Luke McGee
      Title:

**QUADRANT MANAGEMENT, INC.**

By:  /s/ Marco Vega
      Name:   Marco Vega
      Title:   COO

**VERUS EQUITY HOLDING COMPANY LLC**

By:  /s/ Richardson Roberts
      Name:   Richardson Roberts
      Title:

**VERUS NOTE HOLDING COMPANY LLC**

By:  /s/ Richardson Roberts
      Name:   Richardson Roberts
      Title:

**WHEATFIELD LLC**

By:  /s/ Gregg Holst
      Name:   Gregg Holst
      Title:

18

**Exhibit A**

2321 Capital LLC
AMPEV LLC
BlueMountain Summit Opportunities Fund II (US) L.P.
Blue River NJ LLC
CFCP LLC
Fresh Pond Investment LLC
Jedi Enterprises, LLC
LBM DME Holdings LLC
Mayaid2001 LLC
McLarty Capital Partners SBIC, L.P
Ocean Rock NJ LLC
Plains Capital LLC
Quad Capital, LLC
Quadrant Management, Inc.
Verus Equity Holding Company LLC
Verus Note Holding Company LLC
Wheatfield LLC

19

**Exhibit B**

Form of
Exchange Notice

AdaptHealth Holdings LLC
122 Mill Road, Suite A130
Phoenixville, Pennsylvania 19460
Attention: Luke McGee
Email:  luke.mcgee@adapthealth.com

Reference is hereby made to the Exchange Agreement, dated as of November 8, 2019 (as amended from time to time, the "Exchange Agreement"), by and among AdaptHealth Holding Corporation, a Delaware corporation ("Pubco"), AdaptHealth Holdings LLC, a Delaware limited liability company (the "Company"), and the holders from time to time of the Company's Common Units listed on Exhibit A to the Exchange Agreement (collectively, the "Members" and individually, a "Member"). Capitalized terms used but not defined herein shall have the meanings given to them in the Exchange Agreement.

The undersigned Member hereby transfers to Pubco effective as of the Exchange Date, the number of Exchangeable Units in Exchange for either shares of Class A Common Stock to be issued in its name as set forth below or, at the option of Pubco, the Cash Payment payable to the account set forth below, in accordance with the terms of the Exchange Agreement.

Legal Name of Member: [●]
Address: [●]
Number and Type of Exchangeable Units to be Exchanged: [●]
Number of shares of Class B Common Stock to be Exchanged (if any) : [●]

If Pubco elects a Cash Payment:

Account Number: [●]
Legal Name of Account Holder: [●]

The undersigned hereby represents and warrants that (i) the undersigned has full legal capacity to execute and deliver this Exchange Notice and to perform the undersigned's obligations hereunder; (ii) this Exchange Notice has been duly executed and delivered by the undersigned and is the legal, valid and binding obligation of the undersigned enforceable against it in accordance with the terms thereof or hereof, as the case may be, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and the availability of equitable remedies; (iii) the Exchangeable Units and shares of Class B Common Stock subject to this Exchange Notice are being transferred to the Company, free and clear of any Liens; (iv) no consent, approval, authorization, order, registration or qualification of any third party or with any court or governmental agency or body having jurisdiction over the undersigned, the Exchanged Units or shares of Class B Common Stock subject to this Exchange Notice is required to be obtained by the undersigned for the transfer of such Exchanged Units or shares of Class B Common Stock to the Company; and (v) the undersigned is either not currently in possession of material non-public

20

information concerning Pubco or will not be in possession of such material non-public information at the time the shares of Class A Common Stock are sold by the undersigned in any public sale.

The undersigned hereby irrevocably constitutes and appoints any officer of Pubco or the Company as the attorney of the undersigned, with full power of substitution and resubstitution in the premises, to do any and all things and to take any and all actions that may be necessary to transfer to the Company the Exchanged Units and shares of Class B Common Stock (if any) subject to this Exchange Notice and to deliver to the undersigned the shares of Class A Common Stock or Cash Payment to be delivered in Exchange therefor.

IN WITNESS WHEREOF, the undersigned, but authority duly given, has caused this Exchange Notice to be executed and delivered by the undersigned or by its duly authorized attorney.

[•]

Name:
Title:
Dated:

21

**Exhibit C**

Form of
Joinder

This Joinder ("Joinder") is a joinder to the Exchange Agreement, dated as of November 8, 2019 (as amended from time to time, the "Exchange Agreement"), by and among AdaptHealth Holding Corporation, a Delaware corporation ("Pubco"), AdaptHealth Holdings LLC, a Delaware limited liability company (the "Company"), and the holders from time to time of the Company's Common Units listed on Exhibit A to the Exchange Agreement (collectively, the "Members" and individually, a "Member"). Capitalized terms used but not defined herein shall have the meanings given to them in the Exchange Agreement.

The Company, Pubco and the undersigned agree that all questions concerning the construction, validity and interpretation of this Joinder shall be governed by, and construed in accordance with, the law of the State of Delaware, without giving effect to any choice or conflict of law provision or rule, notwithstanding that public policy in Delaware or any other forum jurisdiction might indicate that the laws of that or any other jurisdiction should otherwise apply based on contacts with such state or otherwise. In the event of any conflict between this Joinder and the Exchange Agreement, the terms of this Joinder shall control.

The undersigned, having acquired Common Units and, if applicable, shares of Class B Common Stock, hereby joins and enters into the Exchange Agreement. By signing and returning this Joinder to the Company and Pubco, the undersigned (i) accepts and agrees to be bound by and subject to all of the terms and conditions of and agreements of a Member contained in the Exchange Agreement, with all attendant rights, duties and obligations of a Member thereunder and (ii) makes each of the representations and warranties of a Member set forth in Section 3.3 of the Exchange Agreement as fully as if such representations and warranties were set forth herein. The parties to the Exchange Agreement shall treat the execution and delivery hereof by the undersigned as the execution and delivery of the Exchange Agreement by the undersigned and, upon receipt of this Joinder by the Company and Pubco, the signature of the undersigned set forth below shall constitute a counterpart signature to the signature page of the Agreement.

[●]

Name:
Title:
Dated:

Address for Notice: [●]

22

**TAX RECEIVABLE AGREEMENT**

**by and among**

**Adapthealth Corp.,**

**CERTAIN OTHER PERSONS NAMED HEREIN,**

**and**

**THE AGENT**

**DATED AS OF November 8, 2019**

**TAX RECEIVABLE AGREEMENT**

This **TAX RECEIVABLE AGREEMENT** (this "Agreement"), dated as of November 8, 2019, is hereby entered into by and among AdaptHealth Corp., a Delaware corporation (together with its Subsidiaries that are consolidated for U.S. federal income and applicable state and local Tax purposes, and assuming for this purpose that all available elections to file consolidated tax returns have been made, the "Corporate Taxpayer"), AdaptHealth Holdings LLC, a Delaware limited liability company (the "Company"), the TRA Holders and the Agent.

**RECITALS**

WHEREAS, the TRA Holders currently hold, directly or indirectly, limited liability company interests ("Units") in the Company, which is classified as a partnership for U.S. federal income tax purposes;

WHEREAS, the Corporate Taxpayer is the managing member of the Company;

WHEREAS, the Company and each of its direct and indirect Subsidiaries that is treated as a partnership for U.S. federal income tax purposes will have in effect an election under Section 754 of the Internal Revenue Code of 1986, as amended (the "Code"), and any corresponding provisions of state and local Tax law, for each Taxable Year in which an Exchange (as defined below) occurs, which election is expected to result, with respect to the Corporate Taxpayer, in an adjustment to the Tax basis of the assets owned by the Company and such Subsidiaries;

WHEREAS, from and after the Closing Date (as defined below), the TRA Holders may sell all or a portion of their Units (solely to the extent such Units are Exchangeable Units (as defined below)), together with shares of Class B Common Stock (as defined below), to the Corporate Taxpayer for cash and/or Class A Common Stock (as defined below) in one or more Exchanges, and as a result of such Exchanges, the Corporate Taxpayer is expected to obtain or be entitled to certain Tax benefits as further described herein; and

WHEREAS, Blocker is taxable as a corporation for U.S. federal income tax purposes;

WHEREAS, the shareholder of Blocker will enter into certain reorganization transactions with the Corporate Taxpayer in connection with the Merger (the "Reorganization Transactions"), and as a result of such transactions the Corporate Taxpayer will obtain or be entitled to certain Tax benefits as further described herein;

WHEREAS, this Agreement is intended to set forth the agreements among the parties hereto regarding the sharing of the Tax benefits realized by the Corporate Taxpayer as a result of the Exchanges and the Reorganization Transactions;

NOW, THEREFORE, in consideration of the foregoing and the respective covenants and agreements set forth herein, and intending to be legally bound hereby, the parties hereto agree as follows:

1

## ARTICLE I.

### DEFINITIONS

Section 1.1.    Definitions. As used in this Agreement, the terms set forth in this Article I shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

"**Accrued Amount**" has the meaning set forth in Section 3.1(b) of this Agreement.

"**Actual Tax Liability**" means, with respect to any Taxable Year, the actual liability for Taxes of (i) the Corporate Taxpayer and (ii) without duplication, the Company, but only with respect to Taxes imposed on the taxable income of the Company that is allocable to the Corporate Taxpayer or to the other members of the consolidated, combined, or unitary group of which the Corporate Taxpayer is a member for such Taxable Year.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such first Person.

"**Agent**" means Chief Financial Officer or such other Person designated as such pursuant to Section 7.6(c).

"**Agreed Rate**" means a per annum rate of LIBOR plus 100 basis points.

"**Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Amended Schedule**" has the meaning set forth in Section 2.4(b) of this Agreement.

"**Attributable**" has the meaning set forth in Section 3.1(b) of this Agreement.

"**Attribute Schedule**" has the meaning set forth in Section 2.2 of this Agreement.

"**Basis Adjustment**" means any adjustment to the Tax basis of a Reference Asset as a result of an Exchange and the payments made pursuant to this Agreement with respect to such Exchange (as calculated under Section 2.1 of this Agreement), including, but not limited to: (i) under Sections 734(b), 743(b), and 754 of the Code (in situations where, following an Exchange, the Company remains classified as a partnership for U.S. federal income tax purposes); and (ii) under Sections 732(b), 734(b) and 1012 of the Code (in situations where, as a result of one or more Exchanges, the Company becomes an entity that is disregarded as separate from its owner for U.S. federal income tax purposes), and in each case, comparable sections of state and local Tax laws. For the avoidance of doubt, (i) the amount of any Basis Adjustment resulting from an Exchange of Exchangeable Units shall be determined without regard to any Section 743(b) adjustment attributable to such Exchangeable Units prior to such Exchange, (ii) payments made under this Agreement shall not be treated as resulting in a Basis Adjustment to the extent such payments are treated as Imputed Interest, and (iii) for the purpose of calculating any Basis

2

Adjustment resulting from an Exchange, all consideration shall be allocated to the purchase of Exchangeable Units (and none to the Class B Common Stock, if any) in such Exchange.

"**Beneficial Owner**" means, with respect to a security, a Person who directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares:

(i)        voting power, which includes the power to vote, or to direct the voting of, such security and/or

(ii)       investment power, which includes the power to dispose of, or to direct the disposition of, such security. The terms "Beneficially Own" and "Beneficial Ownership" shall have correlative meanings.

"**Blended Rate**" means, with respect to any Taxable Year, the sum of (x) the product of (i) the highest marginal federal income tax rate applicable to the Corporate Taxpayer for such taxable year and (ii) 100% minus the rate computed under clause (y) of this definition and (y) the maximum effective rates of tax imposed on the aggregate net income of the Corporate Taxpayer in each state or local jurisdiction in which the Corporate Taxpayer files Tax Returns for such taxable year, with the maximum effective rate in any state or local jurisdiction being equal to the product of: (i) the apportionment factor on the income or franchise Tax Return filed by the Corporate Taxpayer in such jurisdiction for such taxable year, and (ii) the maximum applicable corporate tax rate in effect in such jurisdiction in such taxable year. As an illustration of the calculation of Blended Rate for a Taxable Year, if the Company solely files Tax Returns in State 1 and State 2 in a taxable year, the maximum applicable corporate tax rates in effect in such states in such Taxable Year are 6.5% and 5.5%, respectively, and the apportionment factors for such States in such taxable year are 55% and 45%, respectively, then the Blended Rate for such taxable year is 25.7795%, equal to the sum of (I) 19.7295%, which is the product of 21% (assuming 21% is the relevant federal income tax rate) and 93.95% (100% minus 6.05%) and (II) 6.05% (i.e., 6.5% times 55% plus 5.5% times 45%).

"**Blocker**" means Access Point Medical Inc., a Delaware corporation.

"**Blocker NOLs**" means the net operating losses, capital losses, disallowed interest expense carryforwards under Section 163(j) of the Code and credit carryforwards of Blocker relating to taxable periods ending on or prior to the Effective Time.

"**Board**" means the board of directors of the Corporate Taxpayer.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which the banks in New York, New York are authorized by law to be closed.

"**Cash Payment**" has the meaning set forth in the Exchange Agreement.

"**Change of Control**" means the occurrence of any of the following events:

(i)        any "person" or "group" (within the meaning of Sections 13(d) of the Exchange Act (excluding any "person" or "group" who, on the Closing Date, is the Beneficial

3

Owner of securities of the Corporate Taxpayer representing more than 50% of the combined voting power of the Corporate Taxpayer's then outstanding voting securities)) becomes the Beneficial Owner of securities of the Corporate Taxpayer representing more than 50% of the combined voting power of the Corporate Taxpayer's then outstanding voting securities;

(ii)    (A) the shareholders of the Corporate Taxpayer approve a plan of complete liquidation or dissolution of Corporate Taxpayer or

(B) there is consummated an agreement or series of related agreements for the sale or other disposition, directly or indirectly, by the Corporate Taxpayer of all or substantially all of the Corporate Taxpayer's assets, other than such sale or other disposition by the Corporate Taxpayer of all or substantially all of the Corporate Taxpayer's assets to an entity at least 50% of the combined voting power of the voting securities of which are owned by shareholders of the Corporate Taxpayer in substantially the same proportions as their ownership of the Corporate Taxpayer immediately prior to such sale or other disposition;

(iii)    there is consummated a merger or consolidation of the Corporate Taxpayer with any other corporation or other entity, and, immediately after the consummation of such merger or consolidation, either (A) the board of directors of the Corporate Taxpayer immediately prior to the merger or consolidation does not constitute at least a majority of the board of directors of the company surviving the merger or consolidation or, if the surviving company is a Subsidiary, the ultimate parent thereof, or (B) all of the Persons who were the respective Beneficial Owners of the voting securities of the Corporate Taxpayer immediately prior to such merger or consolidation do not Beneficially Own, directly or indirectly, more than 50% of the combined voting power of the then outstanding voting securities of the Person resulting from such merger or consolidation;

(iv)    the following individuals cease for any reason to constitute a majority of the number of directors of the Corporate Taxpayer then serving: individuals who were directors of the Corporate Taxpayer on the Closing Date or any new director whose appointment or election to the Board or nomination for election by the Corporate Taxpayer's shareholders was approved or recommended by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors of the Corporate Taxpayer on the Closing Date or whose appointment, election or nomination for election was previously so approved or recommended by the directors referred to in this clause (iv); or

(v)    a "change of control" or similar defined term in any agreement governing indebtedness of the Company or any of its Subsidiaries with aggregate principal amount or aggregate commitments outstanding in excess of $25,000,000.

Notwithstanding the foregoing, a "Change of Control" shall not be deemed to have occurred by virtue of the consummation of any transaction or series of integrated transactions immediately following which the record holders of the Class A Common Stock and Class B Common Stock of the Corporate Taxpayer immediately prior to such transaction or series of transactions continue to have substantially the same proportionate ownership in and voting control over, and own substantially all of the shares of, an entity which owns all or substantially all of the assets of the Corporate Taxpayer immediately following such transaction or series of transactions.

4

"**Change of Control Date**" has the meaning set forth in the Exchange Agreement.

"**Class A Common Stock**" has the meaning set forth in the LLC Agreement.

"**Class B Common Stock**" has the meaning set forth in the LLC Agreement.

"**Closing Date**" has the meaning set forth in the Agreement and Plan of Merger, dated as of July 8, 2019 by and among the Corporate Taxpayer, DFB Merger Sub LLC, a Delaware limited liability company, the Company, Access Point Medical, Inc., a Delaware corporation, Clifton Bay Offshore Investments L.P., a British Virgin Islands limited partnership, BM AH Holdings, LLC, a Delaware limited liability company, BlueMountain Foinaven Master Fund L.P., a Cayman Islands exempted limited partnership, BMSB L.P., a Delaware limited partnership, BlueMountain Fursan Fund L.P., a Cayman Islands exempted limited partnership and AH Representative LLC, a Delaware limited liability company, as the Company Unitholders' Representative.

"**Code**" has the meaning set forth in the recitals of this Agreement.

"**Common Units**" has the meaning set forth in the LLC Agreement.

"**Company**" has the meaning set forth in the recitals of this Agreement.

"**Control**" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Corporate Taxpayer**" has the meaning set forth in the preamble to this Agreement.

"**Corporate Taxpayer Return**" means the U.S. federal and/or state and local Tax Return of the Corporate Taxpayer (including any consolidated group of which the Corporate Taxpayer is a member, as further described in Section 7.13(a) of this Agreement) filed with respect to any Taxable Year.

"**Cumulative Net Realized Tax Benefit**" for a Taxable Year means the cumulative amount (but not less than zero) of Realized Tax Benefits for all Taxable Years of the Corporate Taxpayer, up to and including such Taxable Year, net of the cumulative amount of Realized Tax Detriments for the same period. The Realized Tax Benefit and Realized Tax Detriment for each Taxable Year shall be determined based on the most recent Tax Benefit Schedule or Amended Schedule, if any, in existence at the time of such determination.

"**Default Rate**" means a per annum rate of LIBOR plus 500 basis points.

"**Determination**" shall have the meaning ascribed to such term in Section 1313(a) of the Code or similar provision of any state and local Tax law or any other event (including the execution of IRS Form 870-AD) that finally and conclusively establishes the amount of any liability for Tax.

5

"**Disputing Party**" has the meaning set forth in Section 7.9 of this Agreement.

"**Early Termination**" has the meaning set forth in Section 4.1 of this Agreement.

"**Early Termination Date**" means the date of an Early Termination Notice for purposes of determining the Early Termination Payment.

"**Early Termination Effective Date**" has the meaning set forth in Section 4.4 of this Agreement.

"**Early Termination Notice**" has the meaning set forth in Section 4.4 of this Agreement.

"**Early Termination Payment**" has the meaning set forth in Section 4.5(b) of this Agreement.

"**Early Termination Rate**" means a per annum rate of LIBOR plus 100 basis points.

"**Early Termination Schedule**" has the meaning set forth in Section 4.4 of this Agreement.

"**Effective Time**" has the meaning set forth in the Exchange Agreement.

"**Exchange**" means any "Exchange" as defined in the Exchange Agreement (including, for the avoidance of doubt, any Change of Control).

"**Exchange Act**" has the meaning set forth in the LLC Agreement.

"**Exchange Agreement**" means that certain Exchange Agreement, dated as of November 8, 2019, by and among the Corporate Taxpayer, the Company and the other parties thereto.

"**Exchange Schedule**" has the meaning set forth in Section 2.1 of this Agreement.

"**Exchangeable Unit**" has the meaning set forth in the Exchange Agreement.

"**Expert**" means a "Big 4" accounting firm not disqualified by conflicts or independence analysis or such nationally recognized expert in the particular area of disagreement as is mutually acceptable to both parties.

"**Hypothetical Tax Liability**" means, with respect to any Taxable Year, (x) the U.S. federal taxable income of the Corporate Taxpayer and, without duplication, the Company, but only with respect to taxable income of the Company allocable to the Corporate Taxpayer or to the other members of the consolidated group of which the Corporate Taxpayer is a member for such Taxable Year (in each case, using the same methods, elections, conventions, and similar practices used on the relevant Corporate Taxpayer Return), but without taking into account (i) any Basis Adjustments, (ii) Blocker NOLs and (iii) any deduction attributable to Imputed Interest for

6

the Taxable Year multiplied by (y) the Blended Rate. For the avoidance of doubt, Hypothetical Tax Liability shall be determined without taking into account the carryover or carryback of any Tax item (or portions thereof) that is attributable to any Basis Adjustments, Blocker NOLs and Imputed Interest.

"**Imputed Interest**" means any interest imputed under Section 1272, 1274 or 483 or other provision of the Code and any similar provision of any state and local Tax law with respect to the Corporate Taxpayer's payment obligations under this Agreement. For the avoidance of doubt, Imputed Interest shall not include any Accrued Amount.

"**IRS**" means the U.S. Internal Revenue Service.

"**LIBOR**" means during any period, a rate per annum equal to the ICE LIBOR rate for a period of one month ("ICE LIBOR"), as published on the applicable Bloomberg screen page (or such other commercially available source providing quotations of ICE LIBOR as may be designated by the Corporate Taxpayer from time to time) at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such period, for dollar deposits (for delivery on the first day of such period) with a term equivalent to such period. If ICE LIBOR ceases to be published, "LIBOR" shall mean a rate, selected by the Corporate Taxpayer in good faith, with characteristics similar to ICE LIBOR or consistent with market practices generally.

"**LLC Agreement**" means the Fifth Amended and Restated Limited Liability Company Agreement of the Company dated as of the date hereof, as the same may be amended, amended and restated or replaced from time to time.

"**Material Objection Notice**" has the meaning set forth in Section 4.4 of this Agreement.

"**Merger**" has the meaning set forth in the Exchange Agreement.

"**Net Tax Benefit**" has the meaning set forth in Section 3.1(b) of this Agreement.

"**Objection Notice**" has the meaning set forth in Section 2.4(a) of this Agreement.

"**Payment Date**" means any date on which a payment is required to be made pursuant to this Agreement.

"**Person**" means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity.

"**Realized Tax Benefit**" means, for a Taxable Year, the excess, if any, of the Hypothetical Tax Liability over the Actual Tax Liability. If all or a portion of the Actual Tax Liability for the Taxable Year arises as a result of an audit by a Taxing Authority for any Taxable Year, such liability shall not be included in determining the Realized Tax Benefit unless and until there has been a Determination.

7

"**Realized Tax Detriment**" means, for a Taxable Year, the excess, if any, of the Actual Tax Liability over the Hypothetical Tax Liability. If all or a portion of the Actual Tax Liability for the Taxable Year arises as a result of an audit by a Taxing Authority for any Taxable Year, such liability shall not be included in determining the Realized Tax Detriment unless and until there has been a Determination.

"**Reconciliation Dispute**" has the meaning set forth in Section 7.9 of this Agreement.

"**Reconciliation Procedures**" means the procedures described in Section 7.9 of this Agreement.

"**Reference Asset**" means, with respect to any Exchange, an asset that is held by the Company, or any of its direct or indirect Subsidiaries that is treated as a partnership or disregarded entity for purposes of the applicable Tax (but only to the extent such Subsidiaries are not held through any entity treated as a corporation for purposes of the applicable Tax), at the time of such Exchange. A Reference Asset also includes any asset that is "substituted basis property" under Section 7701(a)(42) of the Code with respect to a Reference Asset.

"**Schedule**" means any of the following: (i) an Exchange Schedule, (ii) a Tax Benefit Schedule, or (iii) the Early Termination Schedule.

"**Senior Obligations**" has the meaning set forth in Section 5.1 of this Agreement.

"**Subsidiaries**" means, with respect to any Person, as of any date of determination, any other Person as to which such Person, owns, directly or indirectly, or otherwise controls more than 50% of the voting power or other similar interests or the sole general partner interest or managing member or similar interest of such Person.

"**Tax Benefit Payment**" has the meaning set forth in Section 3.1(b) of this Agreement.

"**Tax Benefit Schedule**" has the meaning set forth in Section 2.3(a) of this Agreement.

"**Tax Proceeding**" has the meaning set forth in Section 6.1 of this Agreement.

"**Tax Return**" means any return, declaration, report or similar statement filed or required to be filed with respect to Taxes (including any attached schedules), including, without limitation, any information return, claim for refund, amended return and declaration of estimated Tax.

"**Taxable Year**" means a taxable year of the Corporate Taxpayer as defined in Section 441(b) of the Code or comparable section of state or local Tax law, as applicable (which, for the avoidance of doubt, may include a period of less than twelve (12) months for which a Tax Return is made), ending on or after the date hereof.

8

"**Taxes**" means any and all U.S. federal, state and local taxes, assessments or similar charges that are based on or measured with respect to net income or profits, and any interest related to such Tax.

"**Taxing Authority**" means any federal, national, state, county or municipal or other local government, any subdivision, agency, commission or authority thereof, or any quasi- governmental body exercising any taxing authority or any other authority exercising Tax regulatory authority.

"**TRA Holder**" means each of those Persons set forth on Schedule A and their respective successors and permitted assigns pursuant to Section 7.6(a).

"**Transferor**" has the meaning set forth in Section 7.13(b) of this Agreement.

"**Treasury Regulations**" means the final, temporary and proposed regulations under the Code promulgated from time to time (including corresponding provisions and succeeding provisions) as in effect for the relevant Taxable Year.

"**Units**" has the meaning set forth in the recitals of this Agreement.

"**Valuation Assumptions**" means, as of an Early Termination Date, the assumptions that (i) in each Taxable Year ending on or after such Early Termination Date, the Corporate Taxpayer will have taxable income sufficient to fully utilize the deductions arising from all Basis Adjustments, Blocker NOLs and the Imputed Interest during such Taxable Year or future Taxable Years (including, for the avoidance of doubt, Basis Adjustments and Imputed Interest that would result from future Tax Benefit Payments that would be paid in accordance with the Valuation Assumptions, further assuming such future Tax Benefit Payments would be paid on the due date, without extensions, for filing the Corporate Taxpayer Return for the applicable Taxable Year) in which such deductions would become available, (ii) any loss or credit carryovers generated by deductions or losses arising from any Basis Adjustment, Blocker NOLs or Imputed Interest that are available in the Taxable Year that includes the Early Termination Date and any Blocker NOLs that have not been previously utilized in determining a Tax Benefit Payment as of the Early Termination Date, will be utilized by the Corporate Taxpayer in the earliest possible Taxable Year permitted by the Code and the Treasury Regulations from the Early Termination Date, (iii) the U.S. federal, state and local income and franchise tax rates that will be in effect for each Taxable Year ending on or after such Early Termination Date will be those specified for each such Taxable Year by the Code and other law as in effect on the Early Termination Date, (iv) any non-amortizable Reference Assets to which any Basis Adjustment is attributable will be disposed of for cash at their fair market value in a fully taxable transaction for Tax purposes on the earlier of (A) the fifteenth anniversary of the Exchange which gave rise to such Basis Adjustment or (B) the Early Termination Date, and (v) if, at the Early Termination Date, there are Exchangeable Units that have not been transferred in an Exchange, then all Exchangeable Units and (if applicable) shares of Class B Common Stock shall be deemed to be transferred in an Exchange effective on the Early Termination Date.

Section 1.2.    Other Definitional and Interpretative Provisions. The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this

9

Agreement as a whole and not to any particular provision of this Agreement. References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms thereof. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.

## ARTICLE II.

### DETERMINATION OF CERTAIN REALIZED TAX BENEFITS

Section 2.1.    Exchange Schedule. Within ninety (90) calendar days after the filing of the U.S. federal Corporate Taxpayer Return for each Taxable Year in which any Exchange has been effected by a TRA Holder, the Corporate Taxpayer shall deliver to the Agent a schedule (the "Exchange Schedule") that shows, in reasonable detail necessary to perform the calculations required by this Agreement, including with respect to each TRA Holder participating in any Exchange during such Taxable Year, (i) the Basis Adjustments with respect to the Reference Assets as a result of the Exchanges effected by such TRA Holder in such Taxable Year and (ii) the period (or periods) over which such Basis Adjustments are amortizable and/or depreciable.

Section 2.2.    Attribute Schedule.  Within ninety (90) calendar days after the filing of the U.S. federal Corporate Taxpayer Return for the Taxable Year including the Effective Date, the Corporate Taxpayer shall deliver to the Agent a schedule (the "Attribute Schedule") that shows, in reasonable detail necessary to perform the calculations required by this Agreement, including with respect to each TRA Holder to which such items are applicable (i) the Blocker NOLs attributable to Blocker as of the Effective Date and (ii) any applicable limitations on the use of Blocker NOLs for Tax purposes (including under Section 382 of the Code).

Section 2.3.    Tax Benefit Schedule.

(a)    Tax Benefit Schedule. Within ninety (90) calendar days after the filing of the U.S. federal Corporate Taxpayer Return for any Taxable Year in which there is a Realized Tax Benefit or Realized Tax Detriment, the Corporate Taxpayer shall provide to the Agent: (i) a schedule showing, in reasonable detail, (A) the calculation of the Realized Tax Benefit or Realized Tax Detriment for such Taxable Year, (B) the portion of the Net Tax Benefit, if any, that is Attributable to each TRA Holder, (C) the Accrued Amount with respect to any such Net Tax Benefit that is Attributable to such TRA Holder, (D) the Tax Benefit Payment determined pursuant to Section 3.1(b) of this Agreement due to each such TRA Holder, and (E) the portion of such Tax

10

Benefit Payment that the Corporate Taxpayer intends to treat as Imputed Interest (a "Tax Benefit Schedule"), (ii) a reasonably detailed calculation by the Corporate Taxpayer of the Hypothetical Tax Liability, (iii) a reasonably detailed calculation by the Corporate Taxpayer of the Actual Tax Liability, (iv) a copy of the Corporate Taxpayer Return for such Taxable Year, and (v) any other work papers reasonably requested by the Agent. In addition, the Corporate Taxpayer shall allow the Agent reasonable access at no cost to the appropriate representatives of the Corporate Taxpayer in connection with a review of such Tax Benefit Schedule. The Tax Benefit Schedule will become final as provided in Section 2.4(a) and may be amended as provided in Section 2.4(b) (subject to the procedures set forth in Section 2.4(b)).

(b)        Applicable Principles. The Realized Tax Benefit or Realized Tax Detriment for each Taxable Year is intended to measure the decrease or increase in the Corporate Taxpayer's actual liability for Taxes for such Taxable Year that is attributable to the Basis Adjustments, Blocker NOLs and Imputed Interest, determined using a "with and without" methodology. For the avoidance of doubt, such actual liability for Taxes will take into account the deduction of the portion of the Tax Benefit Payment that must be accounted for as interest under the Code based upon the characterization of Tax Benefit Payments as additional consideration payable by the Corporate Taxpayer. For purposes of calculating the Realized Tax Benefit or Realized Tax Detriment for any Taxable Year, carryforwards or carrybacks of any Tax item (such as a net operating loss) attributable to the Basis Adjustments and Imputed Interest shall be considered to be subject to the rules of the Code and the Treasury Regulations and the corresponding provisions of state and local Tax laws, as applicable, governing the use, limitation and expiration of carryforwards or carrybacks of the relevant type. If a carryforward or carryback of any Tax item includes a portion that is attributable to the Basis Adjustment, Blocker NOLs or Imputed Interest (a "TRA Portion") and another portion that is not so attributable (a "Non-TRA Portion"), such respective portions shall be considered to be used in accordance with the "with and without" methodology so that: (i) the amount of any Non-TRA Portion is deemed utilized first, followed by the amount of any TRA Portion; and (ii) in the case of a carryback of a Non-TRA Portion, such carryback shall not affect the original "with and without" calculation made in the applicable prior Taxable Year. For the avoidance of doubt, the TRA Portion of any Tax item when such item is incurred shall be determined using a marginal "with and without" methodology by calculating (i) the amount of such Tax item for all Tax purposes taking into account the Basis Adjustments, Blocker NOLs or Imputed Interest and (ii) the amount of such Tax item for all Tax purposes without taking into account the Basis Adjustments, Blocker NOLs or Imputed Interest, with the TRA Portion equal to the excess of the amount specified in clause (i) over the amount specified in clause (ii) (but only if such excess is greater than zero). The parties agree that (i) any payment under this Agreement, including the Accrued Amount (other than amounts (i) arising from Blocker NOLs or (ii) accounted for as Imputed Interest) will be treated as a subsequent upward adjustment to the purchase price of the relevant Exchangeable Units and will have the effect of creating additional Basis Adjustments to Reference Assets for the Corporate Taxpayer in the year of payment, and (ii) as a result, such additional Basis Adjustments will be incorporated into the current year calculation and into future year calculations, as appropriate.

Section 2.4.        Procedure; Amendments.

(a)        An applicable Schedule or amendment thereto shall become final and binding on all parties thirty (30) calendar days from the first date on which the Agent has received the

11

applicable Schedule or amendment thereto unless (i) the Agent, within thirty (30) calendar days after receiving an applicable Schedule or amendment thereto, provides the Corporate Taxpayer with notice of a material objection to such Schedule ("Objection Notice") made in good faith or (ii) the Agent provides a written waiver of such right of any Objection Notice within the period described in clause (i) above, in which case such Schedule or amendment thereto becomes binding on the date a waiver from the Agent has been received by the Corporate Taxpayer. If the Corporate Taxpayer and Agent, for any reason, are unable to successfully resolve the issues raised in an Objection Notice within thirty (30) calendar days after receipt by the Corporate Taxpayer of such Objection Notice, the Corporate Taxpayer and Agent shall employ the Reconciliation Procedures under Section 7.9.

(b)      The applicable Schedule for any Taxable Year may be amended from time to time by the Corporate Taxpayer (i) in connection with a Determination affecting such Schedule, (ii) to correct inaccuracies in the Schedule identified as a result of the receipt of additional factual information relating to a Taxable Year after the date the Schedule was provided to the Agent, (iii) to comply with the Expert's determination under the Reconciliation Procedures, (iv) to reflect a change in the Realized Tax Benefit or Realized Tax Detriment for such Taxable Year attributable to a carryback or carryforward of a loss or other Tax item to such Taxable Year, (v) to reflect a change in the Realized Tax Benefit or Realized Tax Detriment for such Taxable Year attributable to an amended Corporate Taxpayer Return filed for such Taxable Year or (vi) to adjust an Exchange Schedule to take into account payments made pursuant to this Agreement (any such Schedule, an "Amended Schedule").  The Corporate Taxpayer shall provide an Amended Schedule to the Agent within sixty (60) calendar days of the occurrence of an event referenced in clauses (i) through (vi) of the preceding sentence. For the avoidance of doubt, in the event a Schedule is amended after such Schedule becomes final pursuant to Section 2.4(a), the Amended Schedule shall not be taken into account in calculating any Tax Benefit Payment in the Taxable Year to which the amendment relates but instead shall be taken into account in calculating the Cumulative Net Realized Tax Benefit for the Taxable Year in which the amendment actually occurs.

## ARTICLE III.

## TAX BENEFIT PAYMENTS

Section 3.1.      Payments.

(a)      Within five (5) calendar days after a Tax Benefit Schedule delivered to the Agent becomes final in accordance with Section 2.4(a), the Corporate Taxpayer shall pay to each TRA Holder the Tax Benefit Payment in respect of such TRA Holder determined pursuant to Section 3.1(b) for such Taxable Year. Each such payment shall be made by check, by wire transfer of immediately available funds to the bank account previously designated by the TRA Holder to the Corporate Taxpayer, or as otherwise agreed by the Corporate Taxpayer and the TRA Holder. For the avoidance of doubt, no Tax Benefit Payment shall be made in respect of estimated Tax payments, including, without limitation, U.S. federal or state estimated income Tax payments.

(b)      A "Tax Benefit Payment" in respect of a TRA Holder for a Taxable Year means an amount, not less than zero, equal to the sum of the portion of the Net Tax Benefit Attributable to such TRA Holder and the Accrued Amount with respect thereto. A Net Tax Benefit is

12

"Attributable" to a TRA Holder to the extent that it is derived from any (i) Basis Adjustment or Imputed Interest that is attributable to the Exchangeable Units acquired or deemed acquired by the Corporate Taxpayer in an Exchange undertaken by or with respect to such TRA Holder or (ii) Blocker NOLs or Imputed Interest that is attributable to the Blocker. Subject to Section 3.3, the "Net Tax Benefit" for a Taxable Year shall be an amount equal to the excess, if any, of (i) 85% of the Cumulative Net Realized Tax Benefit as of the end of such Taxable Year over (ii) the total amount of payments previously made under this Section 3.1 (excluding payments attributable to Accrued Amounts); provided, for the avoidance of doubt, that no TRA Holder shall be required to return any portion of any previously made Tax Benefit Payment. The "Accrued Amount" with respect to any portion of a Net Tax Benefit shall equal an amount determined in the same manner as interest on such portion of the Net Tax Benefit for a Taxable Year calculated at the Agreed Rate from the due date (without extensions) for filing the Corporate Taxpayer Return for such Taxable Year until the Payment Date. For the avoidance of doubt, for Tax purposes, the Accrued Amount shall not be treated as interest but shall instead be treated as additional consideration for the acquisition of Exchangeable Units in an Exchange or the stock of Blocker in the Reorganization Transactions (as applicable) unless otherwise required by law.

Section 3.2.    No Duplicative Payments. It is intended that the provisions of this Agreement will not result in duplicative payment of any amount (including interest) required under this Agreement. It is also intended that the provisions of this Agreement will result in 85% of the Cumulative Net Realized Tax Benefit, and the Accrued Amount thereon, being paid to the TRA Holders. The provisions of this Agreement shall be construed in the appropriate manner to achieve these fundamental results.

(a)    Section 3.3 Pro Rata Payments; Coordination of Benefits.

(b)    Notwithstanding anything in Section 3.1 to the contrary, to the extent that the aggregate amount of the Corporate Taxpayer's Tax benefit subject to this Agreement is limited in a particular Taxable Year because the Corporate Taxpayer does not have sufficient taxable income to fully utilize available deductions and other attributes, the limitation on the Tax benefit for the Corporate Taxpayer shall be allocated among the TRA Holders in proportion to the respective amounts of Net Tax Benefit that would have been determined under this Agreement if the Corporate Taxpayer had sufficient taxable income so that there were no such limitation.

(c)    After taking into account Section 3.3(a), if for any reason the Corporate Taxpayer does not fully satisfy its payment obligations to make all Tax Benefit Payments due under this Agreement in respect of a particular Taxable Year, then (i) the Corporate Taxpayer will pay the same proportion of each Tax Benefit Payment due to each TRA Holder in respect of such Taxable Year, without favoring one obligation over the other, and (ii) no Tax Benefit Payment shall be made in respect of any Taxable Year until all Tax Benefit Payments in respect of prior Taxable Years have been made in full.

(d)    To the extent the Corporate Taxpayer makes a payment to a TRA Holder in respect of a particular Taxable Year under Section 3.1(a) of this Agreement (taking into account Section 3.3(a) and (b), but excluding payments attributable to Accrued Amounts) in an amount in excess of the amount of such payment that should have been made to such TRA Holder in respect of such Taxable Year, then (i) such TRA Holder shall not receive further payments under

13

Section 3.1(a) until such TRA Holder has foregone an amount of payments equal to such excess and (ii) the Corporate Taxpayer will pay the amount of such TRA Holder's foregone payments to the other Persons to whom a payment is due under this Agreement in a manner such that each such Person to whom a payment is due under this Agreement, to the maximum extent possible, receives aggregate payments under Section 3.1(a) (taking into account Section 3.3(a) and (b), but excluding payments attributable to Accrued Amounts) in the amount it would have received if there had been no excess payment to such TRA Holder.

**ARTICLE IV.**

**TERMINATION**

Section 4.1.    Early Termination by the Corporate Taxpayer. With the written approval of a majority of its independent directors, the Corporate Taxpayer may terminate this Agreement at any time by paying to each TRA Holder the Early Termination Payment due to such TRA Holder pursuant to Section 4.5(b), provided, however, that this Agreement shall only terminate upon the receipt of the Early Termination Payment by the TRA Holders (such termination, an "Early Termination"). Upon payment of the Early Termination Payment by the Corporate Taxpayer, the Corporate Taxpayer shall not have any further payment obligations under this Agreement, other than for any (i) Tax Benefit Payment previously due and payable but unpaid as of the Early Termination Notice and (ii) any Tax Benefit Payment due for any Taxable Year ending prior to, with or including the Early Termination Date (except to the extent that the amount described in clause (ii) is included in the Early Termination Payment).

Section 4.2.    Early Termination upon Change of Control. In the event of a Change of Control, all obligations hereunder shall be accelerated and such obligations shall be calculated as if an Early Termination Notice had been delivered on the Change of Control Date and shall include, but not be limited to the following: (a) payment of the Early Termination Payment calculated as if an Early Termination Notice had been delivered on such Change of Control Date, (b) payment of any Tax Benefit Payment in respect of a TRA Holder agreed to by the Corporate Taxpayer and such TRA Holder as due and payable but unpaid as of the Early Termination Notice, and (c) payment of any Tax Benefit Payment due for any Taxable Year ending prior to, with or including such Change of Control Date (except to the extent that the amount described in clause (c) is included in the Early Termination Payment). In the event of a Change of Control, the Early Termination Payment shall be calculated utilizing the Valuation Assumptions and by substituting in each case the term "Change of Control Date" for the term "Early Termination Date."

Section 4.3.    Breach of Agreement.

(a)    In the event that the Corporate Taxpayer breaches any of its material obligations under this Agreement, whether as a result of failure to make any payment when due, as a result of failure to honor any other material obligation required hereunder or by operation of law as a result of the rejection of this Agreement in a case commenced under the Bankruptcy Code or otherwise, then, unless otherwise waived in writing by a majority of the TRA Holders, such breach shall be treated as an Early Termination and all obligations hereunder shall be accelerated and such obligations shall be calculated as if an Early Termination Notice had been delivered on the date of such breach and shall include, but shall not be limited to, (i) the Early Termination Payment

14

calculated as if an Early Termination Notice had been delivered on the date of a breach, (ii) any Tax Benefit Payment previously due and payable but unpaid as of the date of the breach, and (iii) any Tax Benefit Payment due for any Taxable Year ending prior to, with or including the date of the breach (except to the extent that the amount described in clause (iii) is included in the Early Termination Payment). Notwithstanding the foregoing, in the event that the Corporate Taxpayer breaches any of its material obligations under this Agreement, a majority of the TRA Holders shall be entitled to elect to receive the amounts set forth in clauses (i), (ii), and (iii) above or to seek specific performance of the terms hereof.

(b)    The parties agree that the failure to make any payment due pursuant to this Agreement within three (3) months of the date such payment is due shall be deemed to be a breach of a material obligation under this Agreement for all purposes of this Agreement, and that it shall not be considered to be a breach of a material obligation under this Agreement to make a payment due pursuant to this Agreement within three (3) months of the date such payment is due. The Corporate Taxpayer shall use its commercially reasonable efforts to maintain sufficient available funds for the purpose of making required payments under this Agreement and shall use its commercially reasonable efforts to avoid entering into credit agreements that could be reasonably anticipated to materially delay the timing of any payments under this Agreement.

Section 4.4.    Early Termination Notice. If the Corporate Taxpayer chooses to exercise its right of early termination under Section 4.1 above, the Corporate Taxpayer shall deliver to the Agent notice of such intention to exercise such right (the "Early Termination Notice"). Upon delivery of the Early Termination Notice or the occurrence of an event described in Section 4.2 or Section 4.3(a), the Corporate Taxpayer shall deliver (i) a schedule showing in reasonable detail the calculation of the Early Termination Payment (the "Early Termination Schedule") and (ii) any other work papers reasonably requested by the Agent. In addition, the Corporate Taxpayer shall allow the Agent reasonable access at no cost to the appropriate representatives of the Corporate Taxpayer in connection with a review of such Early Termination Schedule. The Early Termination Schedule shall become final and binding on all parties thirty (30) calendar days from the first date on which the Agent has received such Schedule or amendment thereto unless (x) the Agent, within thirty (30) calendar days after receiving the Early Termination Schedule, provides the Corporate Taxpayer and each other Agent with notice of a material objection to such Schedule made in good faith ("Material Objection Notice") or (y) the Agent provides a written waiver of such right of a Material Objection Notice within the period described in clause (x) above, in which case such Schedule becomes binding on the date a waiver from the Agent has been received by the Corporate Taxpayer (the "Early Termination Effective Date"). If the Corporate Taxpayer and Agent, for any reason, are unable to successfully resolve the issues raised in such notice within thirty (30) calendar days after receipt by the Corporate Taxpayer of the Material Objection Notice, the Corporate Taxpayer and Agent shall employ the Reconciliation Procedures under Section 7.9.

Section 4.5.    Payment upon Early Termination.

(a)    Within three (3) calendar days after the Early Termination Effective Date, the Corporate Taxpayer shall pay to each TRA Holder its Early Termination Payment. Each such payment shall be made by check, by wire transfer of immediately available funds to a bank account or accounts designated by the TRA Holder, or as otherwise agreed by the Corporate Taxpayer and the TRA Holder.

15

(b)      The "Early Termination Payment" shall equal, with respect to each TRA Holder, the present value, discounted at the Early Termination Rate as of the Early Termination Date, of all Tax Benefit Payments that would be required to be paid by the Corporate Taxpayer to such TRA Holder beginning from the Early Termination Date and assuming that the Valuation Assumptions are applied.

## ARTICLE V.

### SUBORDINATION AND LATE PAYMENTS

Section 5.1.      Subordination. Notwithstanding any other provision of this Agreement to the contrary, any Tax Benefit Payment, Early Termination Payment or any other payment required to be made by the Corporate Taxpayer to any TRA Holder under this Agreement shall rank subordinate and junior in right of payment to any principal, interest or other amounts due and payable in respect of any obligations in respect of indebtedness for borrowed money of the Corporate Taxpayer and its Subsidiaries (such obligations, "Senior Obligations") and shall rank *pari passu* with all current or future unsecured obligations of the Corporate Taxpayer that are not Senior Obligations. For the avoidance of doubt, notwithstanding the above, the determination of whether it is a breach of this Agreement if the Corporate Taxpayer fails to make any Tax Benefit Payment when due is governed by Section 4.3(a).

Section 5.2.      Late Payments by the Corporate Taxpayer. The amount of all or any portion of any Tax Benefit Payment, Early Termination Payment or any other payment under this Agreement not made to any TRA Holder when due under the terms of this Agreement shall be payable together with any interest thereon, computed at the Default Rate (or, if so provided in Section 4.3(a), at the Agreed Rate) and commencing from the date on which such Tax Benefit Payment, Early Termination Payment or any other payment under this Agreement was due and payable.

## ARTICLE VI.

### NO DISPUTES; CONSISTENCY; COOPERATION

Section 6.1.      Participation in the Corporate Taxpayer's and Tax Matters. Except as otherwise provided herein, the Corporate Taxpayer shall have full responsibility for, and sole discretion over, all Tax matters concerning the Corporate Taxpayer, including without limitation preparing, filing or amending any Tax Return and defending, contesting or settling any issue pertaining to Taxes of the Corporate Taxpayer. Notwithstanding the foregoing, the Corporate Taxpayer (i) shall notify the Agent of, and keep the Agent reasonably informed with respect to, the portion of any audit, examination, or any other administrative or judicial proceeding (a "Tax Proceeding") of the Corporate Taxpayer by a Taxing Authority the outcome of which is reasonably expected to affect the rights and obligations of the TRA Holders under this Agreement, (ii) shall provide the Agent with reasonable opportunity to provide information and other input to the Corporate Taxpayer and its advisors concerning the conduct of any such portion of a Tax Proceeding, and (iii) shall not enter into any settlement with respect to any such portion of a Tax Proceeding that could have a material effect on the TRA Holders' rights (including the right to receive payments) under this Agreement without the written consent of the Agent, such consent

16

not to be unreasonably withheld, conditioned or delayed; provided, however, that the Corporate Taxpayer shall not be required to take any action, or refrain from taking any action, that is inconsistent with any provision of the LLC Agreement; provided, further, that, notwithstanding anything to the contrary contained herein, the Corporate Taxpayer shall prepare, file, and/or amend all Tax Returns in accordance with applicable law (including with respect to the calculation of taxable income and any calculations required to be made under this Agreement) and nothing in this Agreement shall prevent the Agent or any TRA Holder from disputing such Tax matters in accordance with Section 7.9.

Section 6.2.    Consistency. The Corporate Taxpayer and the TRA Holders agree to report and cause to be reported for all purposes, including U.S. federal, state and local Tax purposes and financial reporting purposes, all Tax-related items (including, without limitation, the Basis Adjustments, Imputed Interest, and each Tax Benefit Payment), but, for financial reporting purposes, only in respect of items that are not explicitly characterized as "deemed" or in a similar manner by the terms of this Agreement, in a manner consistent with that set forth in any Schedule required to be provided by or on behalf of the Corporate Taxpayer under this Agreement, as finally determined pursuant to Section 2.4, unless otherwise required by applicable law. If the Corporate Taxpayer and any TRA Holder, for any reason, are unable to successfully resolve any disagreement concerning such treatment within thirty (30) calendar days, the Corporate Taxpayer and such TRA Holder shall employ the Reconciliation Procedures under Section 7.9.

Section 6.3.    Cooperation. Each TRA Holder shall (i) furnish to the Corporate Taxpayer in a timely manner such information, documents and other materials as the Corporate Taxpayer may reasonably request for purposes of making any determination or computation necessary or appropriate under this Agreement, preparing any Tax Return or contesting or defending any Tax Proceeding, (ii) make itself available to the Corporate Taxpayer and its representatives to provide explanations of documents and materials and such other information as the Corporate Taxpayer or its representatives may reasonably request in connection with any of the matters described in clause (i) above, and (iii) reasonably cooperate in connection with any such matter. The Corporate Taxpayer shall reimburse the TRA Holder for any reasonable third-party costs and expenses incurred pursuant to this Section 6.3.

**ARTICLE VII.**

**MISCELLANEOUS**

Section 7.1.    Notices. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made when (a) delivered personally to the recipient, (b) delivered by means of electronic mail (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if emailed before 5:00 p.m. Phoenix, Arizona time on a Business Day, and otherwise on the next Business Day, or (c) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid). All notices hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice:

17

If to the Corporate Taxpayer or the Company, to:

> AdaptHealth Corp.
> 780 Third Avenue
> New York, New York 10017
> Telephone: (212) 551-1600
> Attention:    Chris Wolfe
> Email:        chris.wolfe@dfbhealthcare.com

with a copy (which shall not constitute notice to the Corporate Taxpayer or the Company) to:

> Greenberg Traurig, LLP
> 200 Park Avenue
> New York, New York 10166
> Facsimile:  (212) 801-6400
> Telephone: (212) 801-9200
> Attention:   Alan I. Annex, Esq.
> Email:        annexa@gtlaw.com

If to the Agent, to:

> AdaptHealth Holdings LLC
> Telephone No.: (610) 630-6357
> Attention: Gregg Holst
> Email:      gholst@adapthealth.com

If to a TRA Holder other than the Agent, to:

> The address set forth in the records of the Company.

Any party may change its address or fax number by giving the other party written notice of its new address or fax number in the manner set forth above.

Section 7.2.    Counterparts. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties, it being understood that all parties need not sign the same counterpart. Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 7.3.    Entire Agreement; No Third Party Beneficiaries. This Agreement constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof. This Agreement shall be binding upon and inure solely to the benefit of each party hereto and their respective successors and permitted assigns, and nothing in this Agreement, express or implied, is intended to or shall

confer upon any other Person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, except as expressly provided in Section 3.3.

Section 7.4.    Governing Law. This Agreement shall be governed by, and construed in accordance with, the law of the State of Delaware, without regard to the conflicts of laws principles thereof that would mandate the application of the laws of another jurisdiction.

Section 7.5.    Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 7.6.    Successors; Assignment.

(a)    No TRA Holder may assign this Agreement to any person without the prior written consent of the Corporate Taxpayer; provided, however, that

(i)    to the extent Common Units are transferred in accordance with the terms of the LLC Agreement, the transferring TRA Holder shall have the option to assign to the transferee of such Common Units the transferring TRA Holder's rights under this Agreement with respect to such transferred Common Units as long as such transferee has executed and delivered, or, in connection with such transfer, executes and delivers, a joinder to this Agreement, in form and substance reasonably satisfactory to the Corporate Taxpayer, agreeing to become a "TRA Holder" for all purposes of this Agreement, and

(ii)    any and all payments payable or that may become payable to a TRA Holder pursuant to this Agreement that, once an Exchange has occurred, arise with respect to the Exchangeable Units transferred in such Exchange, may be assigned to any Person or Persons as long as any such Person has executed and delivered, or, in connection with such assignment, executes and delivers, a joinder to this Agreement, in form and substance reasonably satisfactory to the Corporate Taxpayer, agreeing to be bound by Section 7.14 and acknowledging specifically the terms of Section 7.6(b).

For these purposes, a pledge by a TRA Holder of some or all of its rights, interests or entitlements under this Agreement to any U.S. bank in connection with a bona fide loan or other indebtedness shall not constitute an assignment of this agreement; provided that (y) if Common Units are transferred to such U.S. bank as a result of a foreclosure or other action relating to such pledge, such transfer shall be a transfer within the meaning of Section 7.6(a)(i) or (z) if such U.S. bank becomes entitled to payments payable or that may become payable to a TRA Holder as a result of

19

such pledge, such U.S. bank will be treated as a Person to whom such payments were assigned within the meaning of Section 7.6(a)(ii). For the avoidance of doubt, if a TRA Holder transfers Common Units but does not assign to the transferee of such Common Units the rights of such TRA Holder under this Agreement with respect to such transferred Common Units, such TRA Holder shall continue to be entitled to receive the Tax Benefit Payments, if any, due hereunder with respect to, including any Tax Benefit Payments arising in respect of a subsequent Exchange of, such Common Units.

(b)    Notwithstanding the foregoing provisions of this Section 7.6, no assignee described in Section 7.6(a)(ii) shall have any rights under this Agreement except for the right to enforce its right to receive payments under this Agreement.

(c)    The Person designated as the Agent may not be changed without the prior written consent of the Corporate Taxpayer and TRA Holders who would be entitled to receive more than fifty percent (50%) of the aggregate amount of the Early Termination Payments payable to all TRA Holders hereunder if the Corporate Taxpayer had exercised its right of Early Termination on the date of the most recent Exchange prior to such amendment (excluding, for purposes of this sentence, all payments made to any TRA Holder pursuant to this Agreement since the date of such most recent Exchange).

(d)    Except as otherwise specifically provided herein, all of the terms and provisions of this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the parties hereto and their respective successors, assigns, heirs, executors, administrators and legal representatives. The Corporate Taxpayer shall cause any direct or indirect successor (whether by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Corporate Taxpayer, by written agreement, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Corporate Taxpayer would be required to perform if no such succession had taken place.

Section 7.7.    Amendments; Waivers. No provision of this Agreement may be amended unless such amendment is approved in writing by each of the Corporate Taxpayer and by TRA Holders who would be entitled to receive more than fifty percent (50%) of the aggregate amount of the Early Termination Payments payable to all TRA Holders hereunder if the Corporate Taxpayer had exercised its right of Early Termination on the date of the most recent Exchange prior to such amendment (excluding, for purposes of this sentence, all payments made to any TRA Holder pursuant to this Agreement since the date of such most recent Exchange); provided, however, that no such amendment shall be effective if such amendment would have a disproportionate effect on the payments certain TRA Holders will or may receive under this Agreement unless all such disproportionately affected TRA Holders consent in writing to such amendment.

Section 7.8.    Titles and Subtitles. The titles of the sections and subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

Section 7.9.    Reconciliation. In the event that the Corporate Taxpayer and the Agent or any TRA Holder (as applicable, the "Disputing Party") are unable to resolve a disagreement with

20

respect to the calculations required to produce the schedules described in Section 2.4, Section 4.4 and Section 6.2 within the relevant period designated in this Agreement ("Reconciliation Dispute"), the Reconciliation Dispute shall be submitted for determination to the Expert. The Expert shall be a partner or principal in a nationally recognized accounting or law firm, and unless the Corporate Taxpayer and the Disputing Party agree otherwise, the Expert shall not, and the firm that employs the Expert shall not, have any material relationship with the Corporate Taxpayer or the Disputing Party or other actual or potential conflict of interest. If the parties are unable to agree on an Expert within fifteen (15) calendar days of receipt by the respondent(s) of written notice of a Reconciliation Dispute, the Expert shall be appointed by the International Chamber of Commerce Centre for Expertise. The Expert shall resolve (a) any matter relating to the Exchange Schedule or an amendment thereto or the Early Termination Schedule or an amendment thereto within thirty (30) calendar days, (b) any matter relating to a Tax Benefit Schedule or an amendment thereto within fifteen (15) calendar days , and (c) any matter related to treatment of any tax-related item as contemplated in Section 6.2 within fifteen (15) calendar days, or, in each case, as soon thereafter as is reasonably practicable after such matter has been submitted to the Expert for resolution. Notwithstanding the preceding sentence, if the matter is not resolved before any payment that is the subject of a disagreement would be due (in the absence of such disagreement) or any Tax Return reflecting the subject of a disagreement is due, any portion of such payment that is not under dispute shall be paid on the date prescribed by this Agreement and such Tax Return may be filed as prepared by the Corporate Taxpayer, subject to adjustment or amendment upon resolution. The costs and expenses relating to the engagement of such Expert or amending any Tax Return shall be borne by the Corporate Taxpayer except as provided in the next sentence. The Corporate Taxpayer and the Disputing Party shall each bear its own costs and expenses of such proceeding, unless (i) the Expert adopts such Disputing Party's position, in which case the Corporate Taxpayer shall reimburse such Disputing Party for any reasonable out-of-pocket costs and expenses in such proceeding, or (ii) the Expert adopts the Corporate Taxpayer's position, in which case such Disputing Party shall reimburse the Corporate Taxpayer for any reasonable out-of-pocket costs and expenses in such proceeding. Any dispute as to whether a dispute is a Reconciliation Dispute within the meaning of this Section 7.9 shall be decided by the Expert. The Expert shall finally determine any Reconciliation Dispute and the determinations of the Expert pursuant to this Section 7.9 shall be binding on the Corporate Taxpayer and its Subsidiaries and the Disputing Party and may be entered and enforced in any court having jurisdiction.

Section 7.10.    Consent to Jurisdiction. Each party hereto irrevocably submits to the exclusive jurisdiction of the United States District Court for the State of Delaware and the state courts of the State of Delaware for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each party hereto further agrees that service of any process, summons, notice or document by United States certified or registered mail (in each such case, prepaid return receipt requested) to such party's respective address set forth in the Company's books and records or such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party shall be effective service of process in any action, suit or proceeding in Delaware with respect to any matters to which it has submitted to jurisdiction as set forth above in the immediately preceding sentence. Each party hereto irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in the United States District Court for the State of Delaware or the state courts of the State of Delaware and hereby irrevocably and unconditionally waives and agrees not to plead or claim

21

in any such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

Section 7.11.    Waiver of Jury Trial. BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, EACH PARTY TO THIS AGREEMENT (INCLUDING THE COMPANY) HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES HERETO, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY AND/OR THE RELATIONSHIPS ESTABLISHED AMONG THE PARTIES HEREUNDER.

Section 7.12.    Withholding. The Corporate Taxpayer shall be entitled to deduct and withhold from any payment payable pursuant to this Agreement such amounts as the Corporate Taxpayer is required to deduct and withhold with respect to the making of such payment under the Code or any provision of U.S. federal, state, local or non-U.S. Tax law. To the extent that amounts are so withheld and paid over to the appropriate Taxing Authority by the Corporate Taxpayer, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the relevant TRA Holder.

Section 7.13.    Admission of the Corporate Taxpayer into a Consolidated Group; Transfers of Corporate Assets.

(a)    If the Corporate Taxpayer becomes a member of an affiliated, consolidated, combined, or unitary group of corporations that files a consolidated, combined, or unitary income Tax Return pursuant to Sections 1501 *et seq.* of the Code or any corresponding provisions of U.S. state or local Tax law, or would be eligible to become a member of such a group at the election of one or members of that group, then, subject to the application of the Valuation Assumptions upon a Change of Control: (i) the provisions of this Agreement shall be applied with respect to the group as a whole; and (ii) Tax Benefit Payments, Early Termination Payments and other applicable items hereunder shall be computed with reference to the consolidated taxable income of the group as a whole.

(b)    If any entity that is obligated to make a Tax Benefit Payment or Early Termination Payment hereunder transfers one or more assets to a corporation (or a Person classified as a corporation for Tax purposes) with which such entity does not file a consolidated Tax Return pursuant to Section 1501 of the Code or any provisions of state or local Tax law, such entity, for purposes of calculating the amount of any Tax Benefit Payment or Early Termination Payment (e.g., calculating the gross income of the entity and determining the Realized Tax Benefit or Realized Tax Detriment of such entity) due hereunder, shall be treated as having disposed of such asset in a fully taxable transaction on the date of such contribution. The consideration deemed to

22

be received by such entity shall be equal to the fair market value of the contributed asset. Thus, for example, in determining the Hypothetical Tax Liability of the entity, the taxable income of the entity shall be determined by treating the entity as having sold the asset for its fair market value, recovering any basis applicable to such asset (using the Tax basis that such asset would have had at such time if no Basis Adjustments had been made), while the Actual Tax Liability of the entity would be determined by recovering the actual Tax basis of the asset that reflects any Basis Adjustments. For purposes of this Section 7.13, a transfer of a partnership interest shall be treated as a transfer of the transferring partner's share of each of the assets and liabilities of that partnership. If any entity that is obligated to make a Tax Benefit Payment or Early Termination Payment hereunder transfers one or more assets to a partnership (or a Person classified as a partnership for Tax purposes), the principles of this Section 7.13(b) and this Agreement shall govern the treatment of such transfer and any subsequent allocations of income, gain, loss or deductions from such partnership to such entity.

Section 7.14.    Confidentiality.

(a)    The Agent, each TRA Holder and each of the TRA Holder's assignees acknowledges and agrees that the information of the Corporate Taxpayer is confidential and, except in the course of performing any duties as necessary for the Corporate Taxpayer and its Affiliates, as required by law or legal process or to enforce the terms of this Agreement, such person shall keep and retain in the strictest confidence and not disclose to any Person any confidential matters, acquired pursuant to this Agreement, of the Corporate Taxpayer and its Affiliates and successors, concerning the Company and its Affiliates and successors or the TRA Holders, learned by the Agent or any TRA Holder heretofore or hereafter. This Section 7.14 shall not apply to (i) any information that has been made publicly available by the Corporate Taxpayer or any of its Affiliates, becomes public knowledge (except as a result of an act of the Agent or a TRA Holder in violation of this Agreement) or is generally known to the business community and (ii) the disclosure of information (A) as may be proper in the course of performing such TRA Holder's obligations, or monitoring or enforcing such TRA Holder's rights, under this Agreement, (B) as part of such TRA Holder's normal reporting, rating or review procedure (including normal credit rating and pricing process), or in connection with such TRA Holder's or such TRA Holder's Affiliates' normal fund raising, marketing, informational or reporting activities, or to such TRA Holder's (or any of its Affiliates') Affiliates, auditors, accountants, attorneys or other agents, (C) to any bona fide prospective assignee of such TRA Holder's rights under this Agreement, or prospective merger or other business combination partner of such TRA Holder, provided that such assignee or merger partner agrees to be bound by the provisions of this Section 7.14, (D) as is required to be disclosed by order of a court of competent jurisdiction, administrative body or governmental body, or by subpoena, summons or legal process, or by law, rule or regulation; provided that any TRA Holder required to make any such disclosure to the extent legally permissible shall provide the Corporate Taxpayer prompt notice of such disclosure, or to regulatory authorities or similar examiners conducting regulatory reviews or examinations (without any such notice to the Corporate Taxpayer), or (E) to the extent necessary for a TRA Holder to prepare and file its Tax Returns, to respond to any inquiries regarding such Tax Returns from any Taxing Authority or to prosecute or defend any Tax Proceeding with respect to such Tax Returns. Notwithstanding anything to the contrary herein, the Agent (and each employee, representative or other agent of Agent or its assignees, as applicable) and each TRA Holder and each of its assignees (and each employee, representative or other agent of such TRA Holder or its

23

assignees, as applicable) may disclose to any and all Persons, without limitation of any kind, the Tax treatment and Tax structure of the Corporate Taxpayer, the Company, the Agent, the TRA Holders and their Affiliates, and any of their transactions, and all materials of any kind (including opinions or other Tax analyses) that are provided to the Agent or the TRA Holder relating to such Tax treatment and Tax structure.

(b)    If the Agent or an assignee or a TRA Holder or an assignee commits a breach, or threatens to commit a breach, of any of the provisions of this Section 7.14, the Corporate Taxpayer shall have the right and remedy to have the provisions of this Section 7.14 specifically enforced by injunctive relief or otherwise by any court of competent jurisdiction without the need to post any bond or other security, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to the Corporate Taxpayer or any of its Subsidiaries or the TRA Holders and the accounts and funds managed by the Corporate Taxpayer and that money damages alone shall not provide an adequate remedy to such Persons. Such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available at law or in equity.

Section 7.15.    No Similar Agreements. Neither the Corporate Taxpayer nor any of its Subsidiaries shall enter into any additional agreement providing rights similar to this Agreement to any Person (including any agreement pursuant to which the Corporate Taxpayer is obligated to pay amounts with respect to tax benefits resulting from any net operating losses or other tax attributes to which the Corporate Taxpayer becomes entitled as a result of a transaction) without the prior written consent of the TRA Holders who would be entitled to receive more than fifty percent (50%) of the aggregate amount of the Early Termination Payments payable to all TRA Holders hereunder if the Corporate Taxpayer had exercised its right of early termination on the date of the most recent Exchange (excluding, for purposes of this sentence, all payments made to any TRA Holder pursuant to this Agreement since the date of such most recent Exchange).

Section 7.16.    Change in Law. Notwithstanding anything herein to the contrary, if, in connection with an actual or proposed change in law, a TRA Holder reasonably believes that the existence of this Agreement could cause income (other than income arising from receipt of a payment under this Agreement) recognized by such TRA Holder upon any Exchange to be treated as ordinary income rather than capital gain (or otherwise taxed at ordinary income rates) for U.S. federal income and all applicable state and local Tax purposes or would have other material adverse Tax consequences to the TRA Holder and/or its direct or indirect owners, then at the election of the TRA Holder and to the extent specified by the TRA Holder, this Agreement (i) shall cease to have further effect with respect to such TRA Holder, (ii) shall not apply to an Exchange by the TRA Holder occurring after a date specified by it, or (iii) shall otherwise be amended in a manner determined by the TRA Holder to waive any benefits to which such TRA Holder would otherwise be entitled under this Agreement, provided that such amendment shall not result in an increase in or acceleration of payments under this Agreement at any time as compared to the amounts and times of payments that would have been due in the absence of such amendment.

*[Signature Pages Follow]*

24

**IN WITNESS WHEREOF**, the Corporate Taxpayer, the Company, the Agent, and the TRA Holders have duly executed this Agreement as of the date first written above.

**CORPORATE TAXPAYER:**

**AdaptHealth Corp.**

By:  /s/ Luke McGee
       Name: Luke McGee
       Title: Chief Executive Officer

**COMPANY:**

**AdaptHealth Holdings, LLC**

By:  /s/ Luke McGee
       Name: Luke McGee
       Title: Chief Executive Officer

**AGENT:**

By:  /s/ Gregg Holst
       Name: Gregg Holst
       Title: Chief Financial Officer

*[The signatures of the TRA Holders are attached in Schedule A.]*

*Signature Page to Tax Receivable Agreement*

Schedule A

Holders and Outstanding Common Units

2321 Capital LLC
AMPEV LLC
BlueMountain Summit Opportunities Fund II (US) L.P.
Blue River NJ LLC
CFCP LLC
Fresh Pond Investment LLC
Jedi Enterprises, LLC
LBM DME Holdings LLC
Mayaid2001 LLC
McLarty Capital Partners SBIC, L.P
Ocean Rock NJ LLC
Plains Capital LLC
Quad Capital, LLC
Quadrant Management, Inc.
Verus Equity Holding Company LLC
Verus Note Holding Company LLC
Wheatfield LLC

*Schedule A to Tax Receivable Agreement*

**TRA HOLDER:**

**2321 CAPITAL LLC**

By: /s/ Luke McGee
    Name: Luke McGee
    Title: Manager

**AMPEV LLC**

By: /s/ Jason Young
    Name: Jason Young
    Title:

**BLUE RIVER NJ LLC**

By: /s/ Luke McGee
    Name: Luke McGee
    Title: Special Manager

**BLUEMOUNTAIN SUMMIT OPPORTUNITIES FUND II (US) L.P.**

By: BlueMountain Capital Management, LLC, its investment manager

By: /s/ Richard Horne
    Name: Richard Horne
    Title: Deputy General Counsel, Tax

**CFCP LLC**

By: /s/ Nicholas Gargano
    Name: Nicholas Gargano
    Title: COO

**FRESHPOND INVESTMENTS LLC**

By: /s/ Luke McGee
    Name: Luke McGee
    Title: Authorized Signatory

**JEDI ENTERPRISES LLC**

By: /s/ John M. Gvodas Jr.
    Name: John M. Gvodas Jr.
    Title: Member/Manager

*Schedule A to Tax Receivable Agreement*

**LBM DME HOLDINGS LLC**

By:   /s/ Luke McGee
    Name: Luke McGee
    Title: Authorized Signatory

**MAYAID2001 LLC**

By:   /s/ Christopher Joyce
    Name: Christopher Joyce
    Title: Managing Member

**MCLARTY CAPITAL PARTNERS SBIC. LP**

By:   /s/ Christopher D. Smith
    Name: Christopher D. Smith
    Title: Co-Founder & President

**OCEAN ROCK NJ LLC**

By:   /s/ Luke McGee
    Name: Luke McGee
    Title: Authorized Signatory

**PLAINS CAPITAL LLC**

By:   /s/ Luke McGee
    Name: Luke McGee
    Title: Authorized Signatory

**QUAD CAPITAL LLC**

By:   /s/ Luke McGee
    Name: Luke McGee
    Title: Special Manager

**QUADRANT MANAGEMENT, INC.**

By:   /s/ Marco Vega
    Name: Marco Vega
    Title: COO

**VERUS EQUITY HOLDING COMPANY LLC**

By:   /s/ Richardson Roberts
    Name: Richardson Roberts
    Title:

*Schedule A to Tax Receivable Agreement*

**VERUS NOTE HOLDING COMPANY LLC**

By:    /s/ Richardson Roberts
       Name: Richardson Roberts
       Title:

**WHEATFIELD LLC**

By:    /s/ Gregg Holst
       Name: Gregg Holst
       Title: Manager

*Schedule A to Tax Receivable Agreement*

AdaptHealth Holdings LLC

A Delaware Limited Liability Company

FIFTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

THE MEMBERSHIP INTERESTS IN THE COMPANY REPRESENTED BY THIS FIFTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH MEMBERSHIP INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND OTHER LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

**TABLE OF CONTENTS**

| | | | |
|---|---|---|---|
| ARTICLE I. | DEFINITIONS | | 1 |
| SECTION 1.1. | | Definitions | 1 |
| SECTION 1.2. | | Terms Generally | 9 |
| ARTICLE II. | GENERAL PROVISIONS | | 9 |
| SECTION 2.1. | | Formation | 9 |
| SECTION 2.2. | | Name | 9 |
| SECTION 2.3. | | Term | 9 |
| SECTION 2.4. | | Purpose; Powers | 9 |
| SECTION 2.5. | | Foreign Qualification | 10 |
| SECTION 2.6. | | Registered Office; Registered Agent; Principal Office; Other Offices | 10 |
| SECTION 2.7. | | No State Law Partnership | 10 |
| SECTION 2.8. | | Rights and Privileges of Classes of Units | 10 |
| SECTION 2.9. | | Issuance of Additional Units | 10 |
| SECTION 2.10. | | Repurchase or Redemption of Class A Common Stock | 13 |
| SECTION 2.11. | | Changes in Common Stock | 13 |
| SECTION 2.12. | | Title to Company Assets | 13 |
| ARTICLE III. | MANAGEMENT | | 13 |
| SECTION 3.1. | | Management | 13 |
| SECTION 3.2. | | Officers | 15 |
| SECTION 3.3. | | Indemnification and Exculpation by the Company | 15 |
| SECTION 3.4. | | Directors & Officers Insurance | 17 |
| SECTION 3.5. | | Nature of Obligations between Members | 17 |
| SECTION 3.6. | | Business Opportunities | 17 |
| SECTION 3.7. | | Voting | 18 |
| ARTICLE IV. | CAPITAL CONTRIBUTIONS; ALLOCATIONS; DISTRIBUTIONS | | 18 |
| SECTION 4.1. | | Capital Contributions | 18 |
| SECTION 4.2. | | Capital Accounts | 19 |
| SECTION 4.3. | | Allocations of Net Income and Net Loss | 19 |
| SECTION 4.4. | | Distributions | 21 |

| | | | |
|---|---|---|---|
| ARTICLE V. | WITHDRAWAL; DISSOLUTION | | 22 |
| SECTION 5.1. | | Member Withdrawal | 22 |
| SECTION 5.2. | | Dissolution | 22 |
| ARTICLE VI. | TRANSFERS | | 23 |
| SECTION 6.1. | | Transfers | 23 |
| SECTION 6.2. | | Securities Law Compliance | 25 |
| ARTICLE VII. | RESERVED | | 25 |
| ARTICLE VIII. | RESERVED | | 25 |
| ARTICLE IX. | CONFIDENTIALITY; COVENANTS | | 25 |
| SECTION 9.1. | | Use of Confidential Information | 25 |
| SECTION 9.2. | | Related Confidentiality Covenants | 25 |
| SECTION 9.3. | | Non-Competition; Non-Solicitation | 26 |
| ARTICLE X. | REPRESENTATIONS AND WARRANTIES | | 28 |
| SECTION 10.1. | | Representations and Warranties of the Holders | 28 |
| SECTION 10.2. | | Representations and Warranties of the Company | 28 |
| ARTICLE XI. | REPORTS TO MEMBERS; TAX MATTERS | | 29 |
| SECTION 11.1. | | Books and Records; Financial Statements | 29 |
| SECTION 11.2. | | Fiscal Year | 30 |
| SECTION 11.3. | | Certain Tax Matters | 30 |
| ARTICLE XII. | MISCELLANEOUS | | 30 |
| SECTION 12.1. | | Governing Law | 30 |
| SECTION 12.2. | | Successors and Assigns | 31 |
| SECTION 12.3. | | Amendments; Waiver | 31 |
| SECTION 12.4. | | Notices | 31 |
| SECTION 12.5. | | Counterparts | 31 |
| SECTION 12.6. | | Power of Attorney | 31 |
| SECTION 12.7. | | Entire Agreement | 32 |
| SECTION 12.8. | | Jurisdiction | 32 |
| SECTION 12.9. | | WAIVER OF JURY TRIAL | 32 |
| SECTION 12.10. | | Section Titles | 32 |

**FIFTH AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT OF**
**ADAPTHEALTH HOLDINGS LLC**
**A Delaware Limited Liability Company**

**THIS FIFTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** (as amended, modified or supplemented from time to time, this "Agreement") of AdaptHealth Holdings LLC, a Delaware limited liability company (the "Company"), dated as of November 8, 2019 (the "Effective Date") by and among the Company and each of the undersigned members hereto (each individually a "Member" and collectively, the "Members").

**WHEREAS**, the Company was formed as a limited liability company under the Delaware Limited Liability Company Act (the "Act"), by filing a Certificate of Formation with respect thereto (the "Certificate") with the Delaware Secretary of State;

**WHEREAS**, the Members entered into that certain Fourth Amended and Restated Limited Liability Company Agreement of the Company (the "Previous Agreement"), dated as of March 20, 2019; and

**WHEREAS**, in connection with the transactions contemplated by the Merger Agreement (as defined below), the parties now desire to amend and restate the Previous Agreement in its entirety in order to, among other things, add Pubco (as defined below) as a Member and to set forth the respective rights and obligations of the Members and the Company as set forth herein.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained herein, the parties hereto, each intending to be legally bound, agree as follows:

**ARTICLE I.**
**DEFINITIONS**

SECTION 1.1.          **Definitions**. The following terms shall have the following meanings for purposes of this Agreement:

"Act" has the meaning ascribed to it in the Recitals to this Agreement.

"Affiliate" means, with respect to any specified Person at any time, each Person directly or indirectly controlling, controlled by or under direct or indirect common control with such specified Person at such time, and the officers, directors and managers of such specified Person. For purposes of this definition, "control", when used in reference to any specified Person, means the power to direct the management and policies of such specified Person, directly or indirectly, whether through the ownership of voting securities or other ownership interest, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agents" means a Person's officers, employees, directors, shareholders, partners, members, and legal and financial advisors.

1

"Agreement" has the meaning ascribed to it in the preamble to this Agreement.

"Amended and Restated Certificate of Incorporation" means the Amended and Restated Certificate of Incorporation of Pubco, dated on or about the date hereof, as the same may be amended, amended and restated or replaced from time to time.

"APM" means Access Point Medical LLC, a Delaware limited liability company.

"BlueMountain" means BlueMountain Summit Opportunities Fund II (US) L.P.  Such term also includes each Permitted Transferee of BlueMountain to whom Units have been Transferred or issued in accordance with the provisions of this Agreement.

"Blue River" means Blue River NJ LLC, a New Jersey limited liability company.

"Business Day" means any weekday other than a weekday on which commercial banks in the State of Delaware are authorized or required to be closed.

"Capital Account" means, with respect to any Holder, the account maintained for such Holder in accordance with the following provisions:

(a)    To each Holder's Capital Account there shall be added such Holder's Capital Contributions, such Holder's allocable share of Net Income and any items in the nature of income or gain that are specially allocated to such Holder pursuant to Section 4.3(b) hereof, and the amount of any Company liabilities assumed by such Holder or that are secured by any property distributed to such Holder.

(b)    From each Holder's Capital Account there shall be subtracted the amount of cash and the Gross Asset Value of any property distributed to such Holder pursuant to any provision of this Agreement, such Holder's allocable share of Net Losses and any items in the nature of expenses or losses that are specially allocated to such Holder pursuant to Section 4.3(b) hereof, and the amount of any liabilities of such Holder assumed by the Company or that are secured by any property contributed by such Holder to the Company.

(c)    In the event any Unit in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Unit.

(d)    In determining the amount of any liability for purposes of subparagraphs (a) and (b) hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

(e)    The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Code Section 704(b) and the Regulations promulgated thereunder, and shall be interpreted and applied by the Manager in a manner consistent with such Regulations. Additional adjustments to Capital Accounts shall be made by the Manager in accordance with such Regulations.

2

"Capital Contribution" means the amount of cash and the initial Gross Asset Value of any property other than cash (net of any liabilities to which such property is subject or assumed by the Company) contributed or deemed contributed from time to time to the Company by a Holder. If any Unit is transferred, the transferee shall succeed to the Capital Contribution of the transferor to the extent it relates to the transferred Unit.

"Cash Payment" has the meaning ascribed to it in the Exchange Agreement.

"Certificate" has the meaning ascribed to it in the Recitals to this Agreement.

"Class" means any class of Unit authorized from time to time.

"Class A Common Stock" means Pubco's common stock, par value $0.0001 per share.

"Class B Common Stock" means voting, non-economic common stock of Pubco, designated as Class B Common Stock in the Amended and Restated Certificate of Incorporation.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any successor statute.

"Common Units" means the units of ownership interest in the Company authorized in Section 2.8.

"Company" has the meaning ascribed to it in the preamble to this Agreement.

"Confidential Information" means oral and written information concerning the Company or its Subsidiaries or their respective businesses or operations furnished to any Holder or Agent thereof by or on behalf of the Company (irrespective of the form of communication and whether such information is so furnished before, on or after the date hereof), and all analyses, compilations, data, studies, notes, interpretations, memoranda or other documents prepared by any Holder or any Agent thereof containing or based in whole or in part on any such furnished information; provided that the term "Confidential Information" does not, with respect to any Holder, include any information which (i) at the time of disclosure is or thereafter becomes generally available to the public (other than as a result of a disclosure directly or indirectly by such Holder or any of its Agents in violation of Article IX) (ii) is or becomes available to such Holder on a non-confidential basis from a source other than the Company or its agents, representatives or advisors (provided that such source was not known by such Holder to be prohibited from disclosing such information to such Holder by a legal, contractual or fiduciary obligation), or (iii) is independently developed by such Holder, without use of or reliance on Confidential Information or violation of such Holder's obligations hereunder.

"Depreciation" means, for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery

3

deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the Company uses the "remedial allocation method" under Regulation §1.704-3(d) for any property, Depreciation for such property shall be determined in accordance with Regulation §1.704-3(d)(2), and provided further that if the federal income tax depreciation, amortization or other cost recovery deduction for such year is zero, Depreciation shall be calculated with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

"Distributable Assets" means, with respect to any fiscal period, all receipts by the Company of cash and other assets from any and all sources, reduced by operating expenses, contributions of capital to Subsidiaries, investments and payments required to be made in connection with any loan to the Company and any reserves as determined in the good-faith judgment of the Manager.

"Exchange" has the meaning ascribed to it in the Exchange Agreement.

"Exchange Agreement" means that certain Exchange Agreement, dated as of the date hereof, by and between the Company, Pubco and the other Members from time to time party thereto.

"Exchange Rate" has the meaning ascribed to it in the Exchange Agreement.

"Exchangeable Units" has the meaning ascribed to it in the Exchange Agreement.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States of America.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)      The initial Gross Asset Value of any asset contributed by a Holder to the Company shall be the gross fair market value of such asset on the date of the contribution, as determined by the contributing Holder and the Manager.

(b)      The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the following times:

(i)      the acquisition of an additional interest in the Company by a new or existing Holder in exchange for more than a de minimis Capital Contribution, if the Manager reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Holders in the Company;

(ii)      the distribution by the Company to a Holder of more than a de minimis amount of Company property as consideration for an entire or partial interest in the Company, if the Manager reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Holders in the Company;

4

(iii)    the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), but not a termination of the Company under Section 708(b)(1)(B) of the Code;

(iv)    the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company; and

(v)    such other times as the Manager shall reasonably determine necessary or advisable in order to comply with Regulations Sections 1.704-1(b) and 1.704-2.

(c)    The Gross Asset Value of any Company asset distributed to a Holder shall be the gross fair market value of such asset on the date of distribution, as determined by the Manager.

(d)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704- 1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (d) to the extent that the Manager determines that an adjustment pursuant to subparagraph (b) of this definition of Gross Asset Value is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d).

(e)    The Gross Asset Value of each Company asset shall be adjusted by the Depreciation with respect to such asset.

"Gvodas" means Jedi Enterprises, LLC, a Delaware limited liability company.

"Holder" means any Person who owns any Unit and is permitted to own such Unit consistent with the terms of this Agreement, without regard to whether such Holder has been admitted as a Member.

"Incentive Member" has the meaning ascribed to it in Section 2.8(b).

"Incentive Unit Agreement" means with respect to each Member holding Incentive Units, that certain agreement dated as of the date of issuance of such Member's Incentive Units between the Company and such Member.

"Incentive Units" has the meaning ascribed to it in Section 2.8(b).

"Institutional Representatives" has the meaning ascribed to it in Section 3.6.

"Joinder Agreement" has the meaning ascribed to in Section 6.1(f).

"Liquidation Value" means the amount that would be distributed with respect to a Unit if the Company sold all of its assets for their fair market value, paid all of its liabilities (limited

5

with respect to any nonrecourse liability to the fair market value of the assets that secure such liability), and distributed the balance in liquidation of the Company.

"Manager" means Pubco or any successor thereto appointed in accordance with Section 3.1(c).

"McLarty" means McLarty Capital Partners SBIC, L.P.

"Member" means (i) each Person admitted as a Member as of the date hereof and (ii) each other Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the Act. The Members shall constitute the "members" (as that term is defined in the Act) of the Company.

"Merger Agreement" means that certain Agreement and Plan of Merger, dated as of July 8, 2019, Pubco, BM AH Holdings, LLC, a Delaware limited liability company (the "BM Blocker"), Access Point Medical, Inc., a Delaware corporation (the "A Blocker" and, together with the BM Blocker, the "Blockers"), DFB Merger Sub LLC, a Delaware limited liability company, the Company, AH Representative LLC, a Delaware limited liability company (the "Company Unitholders' Representative"), and, solely for purposes of Section 7.20 thereof, the BM Blocker Sellers (as defined therein) and, solely for purposes of Section 7.21 thereof, the A Blocker Seller (as defined therein).

"Net Exchanged Unit Amount" has the meaning ascribed to it in the Exchange Agreement.

"Net Income" or "Net Loss" means for each fiscal year or other appropriate period of the Company, an amount equal to the Company's Taxable Income or Tax Loss for such fiscal year or period, determined with the following adjustments:

(a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Loss pursuant to this definition of Net Income or Net Loss shall be added to such taxable Income or Tax Loss;

(b)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Income or Net Loss pursuant to this definition of Net Income or Net Loss shall be subtracted from such Taxable Income or Tax Loss;

(c)    In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (b) or (c) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain (if the adjustment increases the Gross Asset Value of the asset) or loss (if the adjustment decreases the Gross Asset Value of the asset) from the disposition of such asset for purposes of computing Net Income or Net Loss;

(d)    Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the

6

Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(e)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, Depreciation shall be taken into account for such fiscal year or period;

(f)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Income or Net Loss; and

(g)     Notwithstanding any other provision of this definition of Net Income or Net Loss, any items that are specially allocated pursuant to Section 4.3(b) hereof shall not be taken into account in computing Net Income or Net Loss. To the extent permitted by the Regulations, the amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Section 4.3(b) hereof shall be determined by applying rules analogous to those set forth in this definition of Net Income or Net Loss.

"Ocean Rock" means Ocean Rock NJ LLC, a New Jersey limited liability company.

"Officer" means each Person designated as an officer of the Company pursuant to and in accordance with the provisions of Section 3.2, subject to any resolution of the Manager appointing such Person as an officer or relating to such appointment.

"Parnes" means Joshua Parnes.

"Permitted Transfer" has the meaning ascribed to it in Section 6.1(a).

"Person" means any natural person, corporation, limited liability company, partnership, trust, joint stock company, business trust, unincorporated association, joint venture, governmental authority or other legal entity of any nature whatsoever.

"Previous Agreement" has the meaning ascribed to it in the Recitals to this Agreement.

"Pubco" means AdaptHealth Corp., a Delaware corporation.

"Regulations" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (and including corresponding provisions of succeeding regulations).

"Regulatory Allocations" has the meaning ascribed to it in Section 4.3(b).

"Restricted Period" means, as to a Holder, the period beginning on the date on which such Person becomes a Holder and ending one (1) year following the date on which either

7

(a) neither such Person nor any Permitted Transferee of such Person owns any Units, or other equity interest in the Company, or (b) such Person offers to transfer all of such Person's Units, and other equity interests in the Company held by such Person, to the Company for a redemption price of One Dollar ($1).

"Rollover Member" means Verus Equity Holding Company LLC.

"Safe Harbor Election" has the meaning ascribed to it in Section 2.8(c).

"Sale of the Company" means the occurrence of any of the following events, in each case whether in a single transaction or a series of related transactions: (i) any Person (including, without limitation, any one or more Persons acting together as a "group" (as such term is defined in Section 13(d) of the Securities and Exchange Act of 1934, as amended, and the rules promulgated thereunder)), other than any Holder of the Company or Affiliate of such Holder as of the date of this Agreement, acquires direct or indirect beneficial ownership of fifty percent (50%) or more of the capital or profits interests or voting power of the Company; (ii) the merger or consolidation of the Company with or into any other entity in a transaction in which the Holders of the Company and the Affiliates of such Holders immediately prior to the consummation of such transaction collectively own less than 50% of the capital and profits interests or voting power of the entity surviving such transaction (or any other business combination having a similar effect); or (iii) the sale, assignment or transfer of all or substantially all of the assets, business or properties of the Company.

"Secondary Indemnitors" has the meaning ascribed to it in Section 3.3(g).

"Securities Act" means the Securities Act of 1933, or any successor federal statute, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder, as the same may be amended from time to time.

"Subsidiary" shall mean, as to any Person, (a) any corporation more than fifty percent (50%) of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the Directors of such corporation (irrespective of whether or not at the time, any class or classes of the stock of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries, (b) any partnership, limited liability company, association, joint venture or other entity in which such Person directly or indirectly through Subsidiaries has more than a fifty percent (50%) interest in the total capital, profits, or total voting interests of such entity at any time and (c) any partnership in which such Person is a general partner.

"Tax Distribution" has the meaning ascribed to it in Section 4.4(c).

"Tax Matters Member" has the meaning ascribed to it in Section 11.3(b).

"Taxable Income" or "Tax Loss" shall mean with respect to each taxable year or other period, an amount equal to the Company's taxable income or loss for such period for U.S. federal income tax purposes, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be separately stated pursuant to Code Section 703(a)(1) shall be included in such taxable income or loss).

8

"Threshold Amount" has the meaning ascribed to it in Section 2.8(a).

"Transaction" has the meaning ascribed to it in Section 9.2(c).

"Transfer" means a transfer, sale, assignment, pledge, hypothecation or other disposition, whether directly or indirectly pursuant to the creation of a derivative security, the grant of an option or other right or the imposition of a restriction on disposition or voting, and irrespective of whether any of the foregoing are effected, with or without consideration, voluntarily or involuntarily, by operation of law or otherwise, or whether inter vivos or upon death.

"Unit" means an interest in the capital, profits, losses and distributions of the Company as provided herein.

SECTION 1.2.        **Terms Generally**. The definitions in Section 1.1 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All references to "Sections" and "Articles" shall refer to Sections and Articles of this Agreement unless otherwise specified. The words "hereof" and "herein" and similar terms shall relate to this Agreement.

## ARTICLE II.
## GENERAL PROVISIONS

SECTION 2.1.        **Formation**. The Company has been organized as a Delaware limited liability company by the execution and filing of the Certificate by an authorized person under and pursuant to the Act. The rights, powers, duties, obligations and liabilities of the Holders shall be determined pursuant to the Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Holder are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

SECTION 2.2.        **Name**. The name of the Company is "AdaptHealth Holdings LLC" and all Company business shall be conducted in that name or in such other names that comply with applicable law as the Manager may select from time to time.

SECTION 2.3.        **Term**. The term of the Company commenced on the date the original Certificate was filed with the office of the Secretary of State of the State of Delaware, and shall continue in existence perpetually until termination or dissolution in accordance with the provisions of Section 5.2.

SECTION 2.4.        **Purpose; Powers**. The Company is authorized to engage in any lawful act or activity for which limited liability companies may be organized under the Act. The Company was formed for the purpose of acquiring, establishing, owning, operating, and selling durable medical equipment businesses and related businesses, and may engage in any and all activities necessary, desirable or incidental to the accomplishment of the foregoing. Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as

9

authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by law to a limited liability company organized under the laws of the State of Delaware.

SECTION 2.5.        **Foreign Qualification**. The Manager shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company in any jurisdiction in which it conducts business unless the Manager shall determine otherwise and determine that the failure so to qualify would not have a material adverse effect on the Company.

SECTION 2.6.        **Registered Office; Registered Agent; Principal Office; Other Offices**. The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Manager may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Manager may designate from time to time in the manner provided by law. The principal office of the Company shall be at such place as the Manager may designate from time to time with written notice to the Members, and the Company shall maintain records at such place.

SECTION 2.7.        **No State Law Partnership**. The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture, and that no Holder, Member, Manager or Officer shall be a partner or joint venturer of any other Holder, Member, Manager or Officer by virtue of this Agreement, for any purposes other than as set forth in the next sentence of this Section 2.7, and this Agreement shall not be construed to the contrary. The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state or local income tax purposes, and each Holder and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment. Neither the Company nor any Holder may make an election for the Company to be taxable as a corporation for federal income tax purposes or to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A or any similar provisions of applicable state law, and no provision of this Agreement shall be construed to sanction or approve such election.

SECTION 2.8.        **Rights and Privileges of Classes of Units**. A class of Units designated as "Common Units" is hereby created and the Company is authorized to issue up to 245,000,000 Common Units. The ownership of outstanding Common Units are listed on Schedule A to this Agreement, as updated from time to time as indicated on the schedule. A Holder of a Common Unit shall be entitled to the allocations and distributions with respect to such Unit as set forth in Article IV, and a Holder of a Common Unit shall have the right to one vote per Common Unit owned by such Member. Initially, Common Units shall be uncertificated but the Manager may determine in good faith to certificate some or all of the Units for business purposes of the Company at any time by resolution thereof.

SECTION 2.9.        **Issuance of Additional Units**.

(a)        From time to time, following the admission of any new Members, or following the issuance, transfer or forfeiture of any Unit, the Manager shall update Schedule A to

10

reflect such changes; provided, however, that no such update shall constitute an amendment to this Agreement.

(b)        At any time that Pubco issues one or more shares of Class A Common Stock (other than an issuance of the type covered by Section 2.9(d) or an issuance to a holder of Exchangeable Units pursuant to the Exchange Agreement, as described in Section 2.9(c)), Pubco shall contribute to the Company all of the net proceeds (if any) received by Pubco with respect to such share or shares of Class A Common Stock. Upon the contribution by Pubco to the Company of all of such net proceeds so received by Pubco, the Manager shall cause the Company to issue a number of Common Units determined based upon the Exchange Rate then in effect, registered in the name of Pubco; provided, however, that if Pubco issues any shares of Class A Common Stock in order to purchase or fund the purchase of Units from a Member (other than a Subsidiary of Pubco), then the Company shall not issue any new Common Units registered in the name of Pubco in accordance with Section 2.9(c) and Pubco shall not be required to transfer such net proceeds to the Company (it being understood that such net proceeds shall instead be subsequently transferred by Pubco to such other Member as consideration for such purchase). Notwithstanding the foregoing, this Section 2.9(b) shall not apply to the issuance and distribution to holders of shares of Class A Common Stock of rights to purchase equity securities of Pubco under a "poison pill" or similar shareholder's rights plan (it being understood that (i) upon exchange of Exchangeable Units for Class A Common Stock pursuant to the Exchange Agreement, such Class A Common Stock would be issued together with any such corresponding right and (ii) in the event such rights to purchase equity securities of Pubco are triggered, Pubco will ensure that the holders of Common Units that have not been Exchanged prior to such time will be treated equitably vis-à-vis the holders of Class A Common Stock under such plan).

(c)        At any time a holder of Exchangeable Units exchanges such Units for shares of Class A Common Stock or a Cash Payment, the Company shall cancel such Exchangeable Units. Upon the cancellation by the Company of the Exchangeable Units exchanged for shares of Class A Common Stock, the Manager shall cause the Company to issue a number of Common Units equal to the Net Exchanged Unit Amount, registered in the name of Pubco in accordance with Section 2.6 of the Exchange Agreement.

(d)        If at any time Pubco issues one or more shares of Class A Common Stock in connection with an equity incentive program, whether such share or shares are issued upon exercise (including cashless exercise) of an option, settlement of a restricted stock unit, as restricted stock or otherwise, the Manager shall cause the Company to issue a corresponding number of Common Units, registered in the name of Pubco (determined based upon the Exchange Rate then in effect); provided that Pubco shall be required to contribute all (but not less than all) of the net proceeds (if any) received by Pubco from or otherwise in connection with such issuance of one or more shares of Class A Common Stock, including the exercise price of any option exercised, to the Company. If any such shares of Class A Common Stock so issued by Pubco in connection with an equity incentive program are subject to vesting or forfeiture provisions, then the Common Units that are issued by the Company to Pubco in connection therewith in accordance with the preceding provisions of this Section 2.9(d)) shall be subject to vesting or forfeiture on the same basis; if any of such shares of Class A Common Stock vest or are forfeited, then a corresponding number of the Common Units (determined based upon the Exchange Rate then in effect) issued by the Company in accordance with the preceding provisions of this Section 2.9(d))

11

shall automatically vest or be forfeited. Any cash or property held by Pubco or the Company or on any of such Person's behalf in respect of dividends paid on restricted shares of Class A Common Stock that fail to vest shall be returned to the Company upon the forfeiture of such restricted shares of Class A Common Stock.

(e)     Pubco shall at all times reserve and keep available out of its authorized but unissued Class A Common Stock, solely for the purpose of issuance upon an Exchange, the maximum number of shares of Class A Common Stock as shall be issuable upon Exchange of all outstanding Common Units and shares of Class B Common Stock; provided that nothing contained herein shall be construed to preclude Pubco from satisfying its obligations in respect of any such Exchange by delivery of purchased shares of Class A Common Stock (which may or may not be held in the treasury of Pubco or cash in lieu of shares of Class A Common Stock in the amount provided by the Exchange Agreement). If any shares of Class A Common Stock require registration with or approval of any governmental authority under any federal or state law before such shares may be issued upon an Exchange, Pubco shall use reasonable efforts to cause the exchange of such shares of Class A Common Stock to be duly registered or approved, as the case may be. Pubco shall list and use its reasonable efforts to maintain the listing of the Class A Common Stock required to be delivered upon any such Exchange prior to such delivery upon the national securities exchange upon which the outstanding shares of Class A Common Stock are listed at the time of such Exchange (it being understood that any such shares may be subject to transfer restrictions under applicable securities laws). Pubco covenants that all shares of Class A Common Stock issued upon an Exchange will, upon issuance, be validly issued, fully paid and non-assessable.

(f)     For purposes of this Section 2.9, "net proceeds" means gross proceeds to Pubco from the issuance of Class A Common Stock or other securities less all reasonable bona fide out-of-pocket fees and expenses of Pubco, the Company and their respective Subsidiaries actually incurred in connection with such issuance.

(g)     The Company shall undertake all actions  with respect to the Common Units, to maintain at all times a one-to-one ratio between the number of Common Units owned by Pubco, directly or indirectly, and the number of outstanding shares of Class A Common Stock, disregarding, for purposes of maintaining the one-to-one ratio, (i) options, rights or securities of Pubco authorized under the Company's existing equity incentive plan that are convertible into or exercisable or exchangeable for Class A Common Stock (except to the extent the net proceeds from such other securities, including any exercise or purchase price payable upon conversion, exercise or exchange thereof, has been contributed by Pubco to the equity capital of the Company), (ii) treasury stock or (iii) preferred stock or other debt or equity securities (including without limitation warrants, options or rights) issued by Pubco that are convertible into or exercisable or exchangeable for Class A Common Stock (except to the extent the net proceeds from such other securities, including any exercise or purchase price payable upon conversion, exercise or exchange thereof, has been contributed by Pubco to the equity capital of the Company).

(h)     From and after the Effective Date to the extent required by Section 2.9(b), the Manager may authorize and create, and cause the Company to issue, additional Units or other equity securities in the Company (including creating preferred interests or other classes or series of securities having such rights, preferences and privileges as determined by the Manager) solely

12

to the extent they are in the aggregate substantially equivalent to a class of equity securities of Pubco; provided that, following the Effective Date, in each case the Company shall not issue equity securities in the Company to any Person unless such Person shall have executed a Joinder Agreement and all other documents, agreements or instruments deemed necessary or desirable in the discretion of the Manager.

SECTION 2.10.    **Repurchase or Redemption of Class A Common Stock**. If, at any time, any shares of Class A Common Stock are repurchased or redeemed (whether automatically or by means of another arrangement) by Pubco for cash, then the Manager shall cause the Company, immediately prior to such repurchase or redemption of such shares, to redeem a corresponding number of Common Units held by Pubco (determined based upon the Exchange Rate then in effect), at an aggregate redemption price equal to the aggregate purchase or redemption price of the share or shares of Class A Common Stock being repurchased or redeemed by Pubco (plus any reasonable expenses related thereto) and upon such other terms as are the same for the share or shares of Class A Common Stock being repurchased or redeemed by Pubco.

SECTION 2.11.    **Changes in Common Stock**. In addition to any other adjustments required hereby, any subdivision (by stock split, stock dividend, reclassification, recapitalization or otherwise) or combination (by reverse stock split, reclassification, recapitalization or otherwise) of Class A Common Stock, Class B Common Stock or other capital stock of Pubco shall be accompanied by an identical subdivision or combination, as applicable, of the Common Units or other equity securities of the Company, as applicable.

SECTION 2.12.    **Title to Company Assets**. All Company assets shall be deemed to be owned by the Company as an entity, and no Holder, individually, shall have any direct ownership interest in any Company assets. Each Holder, to the extent permitted by applicable law, hereby waives its rights to a partition of the assets and, to that end, agrees that it will not seek or be entitled to a partition of any assets, whether by way of physical partition, judicial sale or otherwise, except as otherwise expressly provided in Section 4.4.

**ARTICLE III.**
**MANAGEMENT**

SECTION 3.1.    **Management**.

(a)    Except as otherwise specifically provided in this Agreement or the Act, the business, property and affairs of the Company shall be managed, operated and controlled at the sole, absolute and exclusive direction of the Manager in accordance with the terms of this Agreement. No Member shall have management authority or voting or other rights over, or any other ability to take part in the conduct or control of the business of, the Company. The Manager is hereby designated as a "manager" within the meaning of Section 18-101(10) of the Act. The Manager is, to the extent of its rights and powers set forth in this Agreement, an agent of the Company for the purpose of the Company's business, and the actions of the Manager taken in accordance with such rights and powers shall bind the Company (and no Member shall have such right). The Manager shall have all necessary powers to carry out the purposes, business and objectives of the Company. The Manager may delegate in its discretion the authority to sign agreements and other documents and take other actions on behalf of the Company to any Person

13

(including any Member, officer or employee of the Company) to enter into and perform any document on behalf of the Company.

(b)        Without limiting Section 3.1(a), the Manager shall have the sole power and authority to effect any of the following by the Company or any of its Subsidiaries in one or a series of related transactions, in each case without the vote, consent or approval of any Member, unless otherwise provided in this Agreement: (i) any sale, lease, transfer, exchange or other disposition of any, all or substantially all of the assets of the Company (including the exercise or grant of any conversion, option, privilege or subscription right or any other right available in connection with any assets at any time held by the Company); (ii) any merger, consolidation, reorganization or other combination of the Company with or into another entity, (iii) any acquisition; (iv) any issuance of debt or equity securities; (v) any incurrence of indebtedness; or (vi) any dissolution. Except for any vote, consent or approval of any Member expressly required by this Agreement, if a vote, consent or approval of the Members is required by the Act or other applicable law with respect to any action to be taken by the Company or matter considered by the Manager, each Member will be deemed to have consented to or approved such action or voted on such matter in accordance with the consent or approval of the Manager on such action or matter.

(c)        Following the Effective Date, the Manager shall be elected annually by the Members in accordance with this Section 3.1(c), and the Manager so elected shall serve as the Manager until a successor has been duly elected as the Manager in accordance with this Section 3.1(c). Not more than one year after the later of (a) the Effective Date and (b) the last meeting of the Members or action by written consent of the Members at which or pursuant to which the Manager was elected in accordance with this Section 3.1(c), the Manager at such time (or the Members if the Manager shall fail to take such action) shall either (i) call and hold a meeting of the Members for purposes of electing the Manager or (ii) seek written consents from the requisite Members to elect the Manager pursuant to *Section 3.8*. A Person shall be elected as the Manager if the election of such Manager is approved by Members holding a majority of the outstanding Common Units by vote at a meeting held for such purpose or by action by written consent; provided, however, that if the Person so elected as the Manager was not the Manager immediately prior to such election, such election shall not be effective, and such Person shall not become the Manager, unless and until such Person has executed and delivered to the Company the written agreement of such Person to be bound by the terms of this Agreement applicable to the Manager, in form and substance reasonably satisfactory to the Manager serving immediately prior to such election or to the Members holding a majority of the outstanding Common Units.

(d)        The Manager may resign as the Manager at any time and may be removed at any time, with or without cause, by the Members holding a majority of the outstanding Common Units by vote at a meeting of the Members held for such purpose or by action by written consent; provided, however, that no (i) such resignation or removal shall be effective until a successor Manager has been duly elected in accordance with Section 3.1(c), and (ii) Pubco shall not resign as the Manager for so long as it is a Member. If for any reason a Manager ceases to serve as the Manager prior to the election of a successor Manager in accordance with Section 3.1(c), Pubco shall automatically, and without any action of the Company or any Member, become the Manager and serve as the Manager until another Person is duly elected as the Manager in accordance with Section 3.1(c).

14

(e)     No Member or Manager in its capacity as such shall receive any fees or other compensation (whether in the form of cash or equity or other interests in the Company) for services rendered by it, him or her in the management of the Company's business (other than pursuant to any employment agreement or arrangement with any Manager or Member who is also an employee of the Company).  The Company shall reimburse the Manager (and its employees, if any, and officers) for reasonable expenses incurred and paid by any of them in their capacity as Manager (or employees or officers thereof), including, but not limited to, telephone expenses, travel expenses incurred in connection with meeting, and any other out-of-pocket expenditures attributable to the Company.

SECTION 3.2.          **Officers**.

(a)     Designation and Appointment. The Manager may, from time to time, employ and retain Persons as may be necessary or appropriate for the conduct of the Company's business (subject to the supervision and control of the Manager), including employees, agents and other Persons who may be designated as Officers of the Company with such titles as shall be determined by the Manager. Any number of offices may be held by the same Person. In its discretion, the Manager may choose not to fill any office for any period as it may deem advisable. Any Officers so designated shall have such authority and perform such duties as the Manager may, from time to time, delegate to them. Each Officer shall hold office for such time as shall be designated by the Manager.

(b)     Resignation/Removal. Any Officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time is specified, at the time of its receipt by the Manager. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. Any Officer may be removed as such, either with or without cause at any time by the Manager, subject to the terms and conditions of any employment agreement to which such Officer is a party with the Company or any Subsidiary. Designation of an Officer shall not of itself create any contractual or employment rights.

(c)     Duties of Officers Generally. The Officers, in the performance of their duties as such, shall owe to the Company duties of loyalty and due care of the type owed by the officers of a corporation to such corporation and its stockholders under the laws of the State of Delaware.

SECTION 3.3.          **Indemnification and Exculpation by the Company**.

(a)     No Mandatory Indemnitee shall, in his or her capacity as such, be liable to the Company or any other Member for any expenses, damages, liabilities, costs or losses arising out of the performance of his, her or its duties as a Mandatory Indemnitee, other than those expenses, damages, liabilities, costs or losses arising out of or attributable to such Person's Uncovered Act.  No Member shall be personally liable for any debts, liabilities or obligations of the Company by reason of such Member's status as a Member, whether to the Company, any Member or to the creditors of the Company.

15

(b)        The Company, to the maximum extent permitted by law, shall indemnify and hold harmless the Manager and each Member and their respective Affiliates and each of its and their respective officers, directors, management committee members, trustees, partners or members, as the case may be, ("Mandatory Indemnitees") and may indemnify and hold harmless each of the Officers, employees or agents of the Company ("Permitted Indemnitees" and collectively with the Mandatory Indemnitees, the "Covered Persons"), from and against any and all judgments, interest on such judgments, fines, penalties, charges, costs, amounts paid in settlement, expenses and reasonable attorneys' fees incurred in connection with any action, claim, suit, inquiry, proceeding, investigation or appeal taken from the foregoing by or before any court or governmental, administrative or other regulatory agency, body or commission, whether pending or threatened, and whether or not a Covered Person is or may be a party thereto, which arise out of the business or affairs of the Company or their activities with respect thereto ("Indemnified Damages"), except for any such Indemnified Damages (i) that are taxes imposed on or against any Holder and any Affiliate thereof, (ii) that have resulted primarily from gross negligence, fraud, bad faith, deceit, wrongful taking or self-dealing, willful misconduct, willful breach of this Agreement, or knowing violation of law by the Covered Person, (iii) that have resulted primarily from activities in breach of this Agreement or from ultra vires acts, (iv) in connection with any proceeding by or in right of the Company in which such Covered Person was adjudged liable to the Company or (v) in connection with any proceeding charging improper personal benefit to such Covered Person (whether or not involving action in an official capacity) in which such person was adjudged liable on the basis that personal benefit was improperly received (clauses (i) through (v), the "Uncovered Acts"). Any repeal or modification of any portion of the foregoing provisions of this Section 3.3(a) or the adoption of any provision of this Agreement inconsistent with any portion of the foregoing provisions of this Section 3.3(a) shall not adversely affect any right or protection of any person indemnified under this Section 3.3(a) for any act or omission occurring, or any cause of action, suit, claim or other matter arising or accruing, prior to the effective date of such repeal, modification or adoption. This Section 3.3(a) shall not be deemed exclusive of any other provisions for indemnification, or advancement of expenses in connection with such indemnification of Members, Manager, directors, officers, employees, agents, trustees, partners and fiduciaries that may be included in any statute or is approved by the Manager or the Members.

(c)        Expenses (including reasonable attorneys' fees) incurred by a Covered Person in defending any civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such Covered Person to repay such amount if it shall ultimately be determined that such Covered Person is not entitled to be indemnified by the Company authorized in this Section 3.3. In addition, any expenses (including reasonable attorneys' fees) incurred by Covered Person in enforcing the right to indemnification pursuant to this Section 3.3 shall be paid by the Company upon a determination primarily in favor of such Covered Person.

(d)        The Company may purchase and maintain insurance on behalf of any Covered Person against any liability asserted against such Covered Person and incurred by such Covered Person in any such capacity, or arising out of such Covered Person's status as such, whether or not the Company would have the power to indemnify such Person against such liability under this Section 3.3.

16

(e)      The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 3.3 shall, unless otherwise provided when authorized or ratified, continue as to a Covered Person who has ceased to maintain the status which caused such Person to be a Covered Person and shall inure to the benefit of the heirs, executors and administrators of such Covered Person.

(f)      The rights of any Person to indemnification as provided herein shall not be deemed exclusive of any other rights to which such Person may now or at any time be entitled under applicable law, including without limitation, this Agreement, any other agreement, a resolution of the Manager or any committee thereof, any liability insurance policy of the Company or any Subsidiary thereof or otherwise.

(g)      The Company hereby acknowledges that certain of the Covered Persons may have certain rights to indemnification, advancement of expenses and/or insurance provided by other parties, employers or other Affiliates (collectively, the "Secondary Indemnitors").  Notwithstanding anything to the contrary in this Section 3.3, the Members and the Company hereby agree that if the Company has an indemnification obligation under this Agreement or pursuant to any other agreement: (i) the Company is the indemnitor of first resort (i.e., the Company's obligations to the Covered Persons are primary and any obligation of the Secondary Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Covered Persons are secondary), (ii) the Company shall be required to advance the full amount of expenses incurred by the Covered Persons and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement by or on behalf of any such Covered Person to the extent legally permitted and as required by this Agreement (or any agreement between the Company, on the one hand, and one or more of the Covered Persons, on the other hand), without regard to any rights the Covered Persons may have against the Secondary Indemnitors, and (iii) the Company irrevocably waives, relinquishes and releases the Secondary Indemnitors from any and all claims against the Secondary Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof.  The Members further agree that no advancement or payment by the Secondary Indemnitors on behalf of any Covered Person with respect to any claim for which such Covered Person has sought indemnification from the Company shall affect the foregoing, and the Secondary Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Covered Person against the Company.

SECTION 3.4.          **Directors & Officers Insurance**. The Company shall procure directors and officers liability insurance for the protection of the Manager, Officers and other applicable representatives of the Company provided that such insurance is available on commercially reasonable terms.

SECTION 3.5.          **Nature of Obligations between Members**. Except as otherwise expressly provided herein, nothing contained in this Agreement shall be deemed to constitute any Member an agent or legal representative of any other Member or to create any fiduciary relationship for any purpose whatsoever, apart from such obligations between members of a limited liability company as may be created under the Act. Except as otherwise expressly provided in this Agreement, a Member shall not have any authority to act for, or to assume any obligation or responsibility on behalf of, any other Member or the Company.

17

SECTION 3.6.    **Business Opportunities**.  Nothing in this Agreement shall be deemed to restrict in any way the rights of any Member or of any Affiliate thereof (collectively, the "Institutional Representatives"), to conduct any other business or activity whatsoever (including, without limitation, in any business that is competitive with the Company or any business that might be considered an opportunity of the Company), whether presently existing or hereafter created.  No Institutional Representative shall be accountable to the Company or to any Member with respect to that business or activity, and the organization of the Company shall be without prejudice to the Institutional Representative's rights to maintain, expand, exploit or diversify such other interests and activities of such opportunities, and to receive and enjoy profits or compensation therefrom.  Each Member waives any rights such Member might otherwise have to share or participate in such other interests, activities or opportunities of any Institutional Representative.  Subject to the foregoing, the Manager has fiduciary duties to the Company and the Members that are equivalent to the fiduciary duties owed by directors of a corporation incorporated in the State of Delaware to such corporation and its stockholders.

SECTION 3.7.    **Voting**.

(a)    Meetings of the Members may be called by the Manager and shall be called by the Manager upon the written request of Members holding at least 25% of the outstanding Common Units. Such request shall state the location of the meeting and the nature of the business to be transacted at the meeting. Written notice of any such meeting shall be given to all Members not less than two Business Days nor more than 30 days prior to the date of such meeting. Members may vote in person, by proxy or by telephone at any meeting of the Members and may waive advance notice of such meeting. Whenever the vote or consent of Members is permitted or required under this Agreement, such vote or consent may be given at a meeting of the Members or may be given in accordance with the procedure prescribed in this Section 3.7. Except as otherwise expressly provided in this Agreement, the affirmative vote of the Members holding a majority of the outstanding Common Units shall constitute the act of the Members.

(b)    Each Member may authorize any Person or Persons to act for it by proxy on all matters in which such Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by such Member or its attorney-in-fact. No proxy shall be valid after the expiration of 11 months from the date thereof unless otherwise provided in the proxy. Every proxy shall be revocable at the pleasure of the Member executing it.

(c)    Each meeting of Members shall be conducted by an Officer designated by the Manager or such other individual person as the Manager deems appropriate.

(d)    Any action required or permitted to be taken by the Members may be taken without a meeting if the requisite Members whose approval is necessary consent thereto in writing.

**ARTICLE IV.**
**CAPITAL CONTRIBUTIONS; ALLOCATIONS; DISTRIBUTIONS**

SECTION 4.1.    **Capital Contributions**. The Members have made, or shall be deemed to have made, the initial Capital Contributions to the Company as set forth in the books and records

18

of the Company. Except as set forth in Section 2.12, no Holder shall be entitled to make any additional Capital Contributions without the approval of the Manager or required to make any additional Capital Contributions without such Holder's express written agreement.

SECTION 4.2.        **Capital Accounts**.

(a)        Creation. There shall be established for each Holder on the books of the Company a Capital Account that shall be increased or decreased in the manner set forth in this Agreement.

(b)        Negative Balance. A Holder shall not have any obligation to the Company or to any other Holder to restore any negative balance in the Capital Account of such Holder.

(c)        Current Balance. The balance of each Holder's Capital Account as of the effective date of this Agreement is set forth on Schedule B attached hereto.

SECTION 4.3.        **Allocations of Net Income and Net Loss**.

(a)        Timing and Amount of Allocations of Net Income and Net Loss. Net Income and Net Loss of the Company shall be determined and allocated with respect to each fiscal year of the Company as of the end of each such year or as circumstances otherwise require or allow. After making the allocations (if any) required by Section 4.3(b), Net Income or Net Loss shall be allocated among the Holders in such a manner that, as of the end of the period to which the allocation relates, to the greatest extent possible, the Capital Account of each Holder (determined after making all other adjustments provided for in this Agreement through the close of such period) shall be equal to the respective net positive amount (if any) that would be distributed to (or reserved for) such Holder if the Company were then to sell all of its assets for their Gross Asset Value, satisfy its liabilities and distribute its remaining cash (if any) to the Holders in accordance with Section 4.4(b).

(b)        Regulatory Allocations. Provisions governing the allocation of income, gain, loss, deduction and credit (and items thereof) are hereby incorporated by reference in this Agreement as may be necessary to provide that the Company's allocation provisions contain a so-called "qualified income offset" and comply with all provisions relating to the allocation of so-called "nonrecourse deductions" and "partner nonrecourse deductions" and the chargeback thereof as set forth in the Regulations under Section 704(b) of the Code (any such allocations, "Regulatory Allocations"). It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 4.3(b). Therefore, notwithstanding any other section of this Agreement, the Manager shall make such offsetting special allocations of income, gain, loss, or deduction in whatever manner is appropriate so that, after such offsetting allocations are made, each Holder's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Holder would have had if the Regulatory Allocations were not part of the Agreement. The Manager shall elect to treat distributions of proceeds from a nonrecourse financing as not allocable to an increase in "partnership minimum gain" to the extent permitted by Regulation § 1.704-2(h)(3).

19

(c)      Allocations upon Transfer. For any fiscal year during which a Holder's interest in the Company is assigned by such Holder, the portion of the Net Income and Net Loss of the Company that is allocable in respect of such Holder's interest shall be apportioned between the assignor and the assignee of such Holder's interest using any permissible method under Code Section 706 and the Regulations thereunder, as determined by the Manager; provided, however, that upon the admission of Pubco as a Member of the Company, the books of the Company shall be closed in accordance with Section 706(d) of the Code and consistent therewith (a) Net Income and Net Loss of the Company recognized as of the date of such admission shall be allocated among the Persons who were Holders prior to such date in accordance with this Section 4.3, and (b) Net Income and Net Loss recognized after such date shall be allocated among the Persons who were Holders after such date in accordance with this Section 4.3, in each case, as determined by the Manager.

(d)      Required Tax Allocations. All items of income, gain, loss, deduction and credit for federal income tax purposes shall be allocated to each Holder in the same manner as the Net Income or Net Loss (and each item of income, gain, loss and deduction related thereto) that is allocated to such Holder pursuant to Section 4.3(a), (b) and (c) to which such tax items relate. Notwithstanding the foregoing provisions of this Section 4.3, income, gain, loss, deduction, and credits with respect to property contributed or deemed contributed to the Company by a Holder shall be allocated among the Holders for federal and state income tax purposes pursuant to Regulations promulgated under Section 704(c) of the Code, so as to take account of the variation, if any, between the adjusted basis for federal income tax purposes of the property to the Company and its initial Gross Asset Value at the time of contribution. In the event the Gross Asset Value of any Company asset is adjusted pursuant to the definition of Gross Asset Value, subsequent allocations of income, gain, loss, deduction, and credits with respect to such asset shall take account of the variation, if any, between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the applicable Regulations consistent with the requirements of Regulations Section 1.704- 1(b)(2)(iv)(g). The allocations described in the two preceding sentences shall be made using any reasonable method permitted under applicable Regulations, as determined by the Manager. Allocations pursuant to this Section 4.3(d) are solely for purposes of federal, state and local income taxes and shall not affect, or in any way be taken into account in computing, any Holder's Capital Account or share of Net Income or Net Loss. Allocations with respect to layers of Section 704(c) gain created prior to the date hereof will continue to be governed by the versions of this Agreement that were in effect on the dates those layers were created.

(e)      Holders' Tax Reporting. The Holders acknowledge and are aware of the income tax consequences of the allocations made by this Section 4.3 and, except as may otherwise be required by applicable law, hereby agree to be bound by the provisions of Section 4.3 in reporting their shares of Company income, gain, loss, deductions, and credits for federal, state and local income tax purposes.

(f)      Section 754 Elections.  The Company shall make an election under Section 754 of the Code (and any comparable state tax elections) on its tax returns for the taxable year that includes the Effective Date, and shall also cause any entities treated as partnerships for income tax purposes and in which it owns a direct or indirect interest (other than solely through a subsidiary

20

corporation) to make such elections, if such entities do not already have such elections already in effect.

SECTION 4.4.    **Distributions**.

(a)    Timing and Amounts. Subject to any other restrictions set forth in this Agreement,  Distributable Assets will be distributed to the Holders by the Company at such times and in such amounts as is determined by the Manager; provided that Tax Distributions shall be made at such times and in such amounts as specified in Section 4.4(c).

(b)    Priority of Distributions. Except as otherwise provided in this Section 4.4(b) and in Section 4.4(c), Section 4.4(d), and Section 4.4(e), distributions of Distributable Assets to the Holders of Units shall be allocated among the Holders of Common Units pro rata; provided, that the amounts otherwise distributable to a Common Unit pursuant to this Section 4.4(b) which is not vested (or not otherwise subject to vesting) shall not be distributed (and shall be reserved by the Company) unless and until such time as such Common Unit vests in accordance with its terms, at which time that amount that would have been distributed but for this proviso shall be distributed to the holder of such Common Unit; provided further, however, that in the event such Common Unit is forfeited to the Company in accordance with its terms prior to the time such Common Unit vests, all such amounts that would have been distributed but for the immediately preceding proviso shall be redistributed in accordance with this Section 4.4(b) as of the time of the original distribution.

(c)    Tax Distributions. Unless prohibited by law or by any loan document or other creditor agreements, the Manager shall cause the Company to make a cash distribution to each Holder on or before April 1 of each year in an amount equal to (A) (i) the Taxable Income allocated to the Units held by such Holder for the immediately preceding tax year, minus (ii) Tax Loss in excess of Taxable Income, in each case, allocated to such Unit for all tax years prior to such tax year, multiplied by (B) 45% (such amount determined in accordance with the foregoing, whether or not actually distributed pursuant to this Section 4.4(c), a "Tax Distribution"). The Company shall make quarterly advances against the Tax Distributions throughout the year to provide the Holders with cash to pay estimated taxes on the Taxable Income for the year, based on a reasonable estimate (as determined by the Manager) of the Company's Taxable Income for the year, and the amount of any such advances (or amounts withheld in accordance with Section 4.4(d)) shall reduce the final Tax Distribution to the applicable Holder. Tax Distributions distributed to Holders pursuant to this Section 4.4(c) shall be treated as interest-free advances on amounts otherwise distributable to a holder under this Agreement. Solely for the purposes of any Tax Distribution pursuant to this Section 4.4(c), all Common Units shall be treated as vested, whether such Common Units are actually vested or not.

(d)    Withholding. The Company is authorized to pay over to the appropriate government authority with respect to the Holder of any Unit such amounts as is required by the Code or any other provision of federal, state or local tax or other law. Any amount so paid (or any amount withheld from distributions or payments to the Company on account of the status of any Holder of any Unit (or, if such Holder is fiscally transparent for U.S. federal income tax purposes, a direct or indirect beneficial owner of such Holder)) shall be treated as a Tax Distribution to the Holder of such Unit for all purposes under this Agreement. Promptly upon learning of any

21

requirement under any provision of the Code or any other applicable law requiring the Company to withhold any sum from a distribution to a Holder or to make any payment to any taxing authority in respect of such Holder, the Company shall give written notice to such Holder of such requirement, and if practicable and if requested by such Holder, shall cooperate with such Holder in all lawful respects to minimize or to eliminate any such withholding or payment. For the avoidance of doubt, any tax or other obligation attributable to tax payable by the Company referred to in this Section 4.4(d) shall include without limitation, any "imputed underpayment" imposed on the Company under Section 6225 of the Code that is attributable to the Holder of any Unit (as determined by the Manager) and any associated interest or penalties, and any taxes, interest or penalties payable by the Company under any similar provisions of state or local tax laws. The provisions of this Section 4.4(d) shall survive the dissolution of the Company and the withdrawal of any Member or the transfer of any Member's Units.

(e)    Limitations on Distributions. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to any Holder on account of any Unit in the Company if such distribution would violate (i) the Act or other applicable law or (ii) the Credit Agreement.

# ARTICLE V.
## WITHDRAWAL; DISSOLUTION

SECTION 5.1.    **Member Withdrawal**.

(a)    No Member shall have the power or right to withdraw or otherwise resign from the Company prior to the dissolution and winding up of the Company except pursuant to a Transfer permitted under this Agreement of all of such Member's Units. Notwithstanding anything to the contrary contained in the Act, in no event shall any Member be deemed to have withdrawn from the Company or cease to be a Member upon the occurrence of any of the events specified in this Agreement (other than dissolution pursuant to Section 5.2), or any events similar thereto, unless the Member, after the occurrence of any such event, indicates in a written instrument that the Member has so withdrawn.

(b)    Pubco shall not, by any means, withdraw as a Member or otherwise cease to be a Member except in compliance with this Section 5.1(b). No withdrawal of Pubco as a Member or other cessation of Pubco to be a Member shall be effective unless (i) proper provision is made, in compliance with this Agreement, so that the obligations of Pubco and the rights of all Members under this Agreement and applicable law remain in full force and effect, and (ii) Pubco or its successor, as applicable, provides all other Members with contractual rights, directly enforceable by such other Members against Pubco or its successor, as applicable, to cause Pubco to comply with all Pubco's obligations under this Agreement (other than in its capacity as Manager, if applicable).

SECTION 5.2.    **Dissolution**.

(a)    Events. The Company shall be dissolved and its affairs shall be wound up on the first to occur of the following:

22

(i)        the entry of a decree of judicial dissolution of the Company under the Act;

(ii)        the sale or other transfer of all or substantially all of its assets; or

(iii)        upon the liquidation, dissolution or winding up of the Company as approved by the Manager; provided, however, the Manager shall not authorize or permit the liquidation or winding up of the Company absent a determination by the Manager that such liquidation or winding up is in the best interests of the Holders.

The death, retirement, resignation, expulsion, incapacity, bankruptcy or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company, shall not cause a dissolution of the Company, and the Company shall continue in existence subject to the terms and conditions of this Agreement.

(b)        Actions Upon Dissolution. When the Company is dissolved, the business and property of the Company shall be wound up and liquidated by the Manager. A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Company to minimize the normal losses attendant upon a liquidation.

(c)        Priority. Following completion of the wind up and liquidation process, the assets of the Company shall be distributed in the following manner and order:

(i)        First, all debts and obligations of the Company, if any, shall first be paid, discharged or provided for by adequate reserves in accordance with the Act; and

(ii)        Second, the balance shall be distributed to the Holders in accordance with Section 4.4(b).

(d)        Cancellation of Certificate. On completion of the distribution of Company assets as provided herein, the Company is terminated, and shall file a certificate of cancellation with the Secretary of State of the State of Delaware, cancel any other filings made and take such other actions as may be necessary to terminate the Company.

**ARTICLE VI.**
**TRANSFERS**

SECTION 6.1.        **Transfers**.

(a)        Transfers by Holders. Subject to the other restrictions contained in this Agreement, no Holder shall Transfer any Units without the written consent of the Manager, which may be granted or withheld in its sole discretion, except a Holder may, without Manager consent, make a Permitted Transfer. A "Permitted Transfer" means any Transfer by a Holder to any of the following persons (each, a "Permitted Transferee"): (i) to such Holder's spouse, children, grandchildren, parents, grandparents, and siblings or trust for the benefit of any such individuals; (ii) to an Affiliate of such Holder, to such Holder's members if such person is a limited liability

23

company, to such Holder's partners if a partnership, or to such Holder's shareholder(s) if a corporation; (iii) if Units are held by trust, to successor trusts and/or to the beneficiaries of such trust; (iv) if such Holder is a natural person, upon the death of such Holder, to his or her beneficiaries pursuant to laws of decent and distribution if the beneficiary is a Person specified in clauses (i) or (iii) above; (v) with respect to Ocean Rock, a transfer to Blue River; (vi) with respect to Blue River, a transfer to Ocean Rock; (vii) with respect to APM, any transfer to Gvodas; (viii) with respect to Gvodas, any transfer to APM; (ix) any transfer by APM to any entity that is controlled by or is under common control with APM; and (x) any transfer by BlueMountain to any fund or entity managed by BlueMountain Capital Management, LLC. Any attempted Transfer in violation of the terms of any provision of this Article VI shall be null and void *ab initio* and of no effect.

(b)    Transfer of Pubco's Units.  Pubco may not Transfer all or any portion of the Units held thereby at any time, except to (i) any wholly-owned Subsidiary of Pubco, (ii) any Person of which Pubco is a wholly-owned Subsidiary, (iii) any Person into which Pubco is merged or consolidated or (iv) any transferee of all or substantially all of the assets of Pubco, which withdrawal and replacement shall be effective upon the delivery of such notice.

(c)    No Publicly Traded Partnership - Transfer Restrictions. The Manager shall prohibit any Transfer (and shall not recognize any Transfer) if such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Section 7704 of the Code and the regulations promulgated thereunder.

(d)    Transferees Bound. Any Person who acquires in any manner whatsoever any Unit, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefits of the acquisition thereof to have agreed to be subject to and bound by all of the terms and conditions of this Agreement that any predecessor in such Unit in the Company was subject to or by which such predecessor was bound.

(e)    Admission. The Manager shall have the right to admit as a Member any Person who acquires an interest in the Company, or any part thereof, from a Member or from the Company and shall admit as a Member any Person acquiring Units pursuant to a Permitted Transfer upon the transferee's request and transferee's compliance with the provisions of Section 6.1(a) and 6.1(b). Concurrently with the admission of any additional Member, the Manager shall forthwith cause any necessary papers to be filed and recorded and notice to be given wherever and to the extent required showing the admission of such Person as a Member, all at the expense, including payment of any professional and filing fees incurred, of the new Member (unless otherwise approved by the Manager, in which case, the Company may cover said expenses). Any Holder who is permitted to own a Unit pursuant to the terms of this Agreement but has not been admitted as a Member shall have the right to distributions and allocations with respect to such Unit owned by such Holder but shall not have any further rights as a Member under this Agreement or the Act.

(f)    Conditions. The admission of any Person as a Member shall be conditioned upon such Person's written acceptance and adoption of all the terms and provisions of this Agreement, either by (i) execution and delivery of a joinder agreement, substantially in the form

24

attached hereto as Exhibit A (the "Joinder Agreement"), and shall take such other actions as the Manager shall consider appropriate for such additional Member to become bound by the terms of this Agreement to the Company or (ii), if requested by the Manager, a writing evidencing the intent of such Person to become a Member (in form and substance reasonably satisfactory to the Manager).

(g)     This Section 6.1 shall apply with respect to all Holders of Units, and the legend on the cover page of this Agreement with respect to the membership interests shall apply with respect to all of the Units.

SECTION 6.2.     Securities Law Compliance.  Each Holder further agrees that it will not make or attempt any Transfer of Units unless such Transfer is made pursuant to an effective registration statement under the Securities Act or pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and, in either case, in compliance with all applicable state securities laws. The Company agrees, and each Holder understands and consents, that the Company will not cause or permit the Transfer of any Units to be made on its books (or on any register of securities maintained on its behalf) unless the Transfer is permitted by, and has been made in accordance with the terms of this Agreement and all applicable federal and state securities laws. Each Holder agrees that in connection with any Transfer of Units that is not made pursuant to a registered public offering (other than to an Affiliate pursuant to Section 6.1(a) above), the Company may, in its sole discretion, request an opinion in form and substance reasonably satisfactory to the Company of counsel reasonably satisfactory to the Company stating that such transaction is exempt from registration under the Securities Act and in compliance with any registration or similar requirements under applicable state securities laws.

**ARTICLE VII.**
**RESERVED**

**ARTICLE VIII.**
**RESERVED**

**ARTICLE IX.**
**CONFIDENTIALITY; COVENANTS**

SECTION 9.1.     **Use of Confidential Information**. Each Holder agrees that it will not use at any time any Confidential Information of which any such Holder is or becomes aware except in connection with its investment in the Company (except that Holders who are managers, directors, officers or employees of the Company or its Subsidiaries shall also be permitted to use such Confidential Information in connection with the performance of their duties as managers, directors, officer or employees).

SECTION 9.2.     **Related Confidentiality Covenants**.

(a)     Each Holder further agrees that the Confidential Information will be kept strictly confidential and will not be disclosed by it or its Agents, except (i) as required by applicable law, regulation or legal process or in response to any inquiry from a regulatory authority having

25

jurisdiction over such Holder, and only after compliance with Section 9.2(b), and (ii) that it may disclose the Confidential Information or portions thereof to those of its and its Affiliates' respective Agents who need to know such information in connection with the investment by the Holder in the Company or any potential transferees of any Holder so long as such transferee is bound by a confidentiality agreement comparable to the provisions contained herein. Each Holder agrees to be responsible for any breach of this Article IX by its Agents or potential transferees (it being understood that such responsibility shall be in addition to and not by way of limitation of any right or remedy the Company may have against such Agents or potential transferees with respect to any such breach).

(b)        If any Holder or Agent thereof becomes legally compelled (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) to disclose any of the Confidential Information, such Holder or Agent shall provide the Company with prompt and, if possible, prior written notice of such requirement to disclose such Confidential Information. Upon receipt of such notice, the Company may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, such Holder and its Agents shall disclose only that portion of the Confidential Information which is legally required to be disclosed and shall, at the request and expense of the Company, take all reasonable steps to preserve the confidentiality of the Confidential Information. In addition, neither such Holder nor its Agent will oppose any action (and such Holder and its Agents will, if and to the extent requested by the Company and legally permissible to do so, cooperate with and assist the Company, at the Company's expense and on a reasonable basis, in any reasonable action) by the Company to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information.

(c)        Notwithstanding anything to the contrary set forth herein or in any other agreement to which the parties hereto are parties or by which they are bound, the obligations of confidentiality contained herein and therein, as they relate to an investment in the Company (the "Transaction"), shall not apply to the tax structure or tax treatment of, or tax strategies relating to, the Transaction, and each party hereto (and any employee, representative, or agent of any party hereto) may disclose to any and all Persons, without limitation of any kind, the tax structure and tax treatment of, and tax strategies relating to, the Transaction and all materials of any kind (including opinions or other tax analysis) that are provided to such party relating to such tax treatment and tax structure; provided however, that such disclosure shall not include Confidential Information not relevant to the tax structure or tax treatment of the Transaction and shall not include information for which nondisclosure is reasonably necessary in order to comply with applicable securities laws.

SECTION 9.3.        **Non-Competition; Non-Solicitation**.

(a)        Each Holder hired in an executive capacity by the Company and/or the Subsidiaries, which individuals shall sign this Agreement either currently or at the time any of the foregoing executives are hired, hereby covenants and agrees that such Holder shall not, directly or indirectly:

(i)        during the Restricted Period, engage, whether as principal, agent, investor, distributor, representative, stockholder, equity holder, consultant,

26

volunteer or otherwise, with or without pay, in any activity or business venture, anywhere within a fifty (50) mile radius of each location at which the Company, Braden Partners, L.P. (d/b/a Pacific Pulmonary Services), Sound Oxygen Service LLC, Bennett Medical Services, MedBridge Home Medical, Roberts Home Medical, TriCounty Medical Equipment and Supply, LLC, Royal Medical Supply, Inc., First Choice Home Medical Equipment, LLC, Ocean LLC, Ocean of PA, Verus Healthcare, Inc., or any other Affiliate of the Company does business, which is competitive with the business of owning and/or operating a durable medical equipment business;

        (ii)      during the Restricted Period, (A) solicit or endeavor to solicit any client, customer, director, officer, employee, agent or consultant of the Company or any of its Affiliates, either on such Holder's own account or for any other Person, or (B) employ any person who was a manager, director, officer or employee of the Company or any of its Affiliates or any person who is or is likely to be in possession of confidential information or trade secrets of the Company or any of its Affiliates; or (C) induce or attempt to influence any Person that has a referring relationship with the Company or any of its Affiliates, or any health care payor or insurer that has a contractual arrangement with the Company or any of its Affiliates, to terminate or not renew such relationship; or

        (iii)      take any action or make any statement the effect of which would be, directly or indirectly, to disparage the Company or any of its Affiliates or the business reputation or good name of the Company or any of its Affiliates.

        (b)      Each Holder hereby acknowledges and agrees that the provisions set forth in this Section 9.3 are fair, reasonable and necessary to protect the legitimate interests of the Company and its Holders, and that this Section 9.3 was negotiated and bargained for by the parties hereto.

        (c)      Each such Holder acknowledges and agrees that (i) a breach of the provisions of this Section 9.3 would result in immediate, substantial and irreparable damage to the Company and its Holders and (ii) such damage would be extremely difficult to measure in terms of monetary damages and no other remedy for such breach would be adequate. Therefore, upon such a breach, the Company shall be entitled to specific performance of these provisions and injunctive or other appropriate equitable relief and the breaching Person shall be responsible for the payment of court costs and other fees and expenses incurred by the Company (including reasonable attorneys' fees) in connection with the enforcement of this Section 9.3.

        (d)      Each such Holder hereby agrees that if the scope of any restriction or covenant contained in this Section 9.3 should be or become too broad or extensive to permit enforcement thereof to its fullest extent, then such restriction or covenant shall be enforced to the maximum extent permitted by law, and each Holder hereby consents and agrees that (i) it is the parties' intention that the covenants and restrictions contained herein be enforced as written and (ii) in the event a court of competent jurisdiction determines that any restriction or covenant contained herein is too broad or extensive to permit enforcement thereof to its fullest extent, the scope of any such restriction or covenant may be modified accordingly in any judicial proceeding

27

brought to enforce such restriction or covenant, but should be modified to permit enforcement of the restrictions and covenants contained herein to the maximum extent the court, in its judgment, will permit.

(e)    Notwithstanding the foregoing, the obligations and restrictions set forth in this Section 9.3 shall not apply to McLarty or any of its transferees.

(f)    For the purposes of clarity, notwithstanding the foregoing, the obligations and restrictions set forth in this Section 9.3 shall not apply to BlueMountain or any of its transferees.

(g)    Notwithstanding the foregoing, with respect to the obligations and restrictions of the Rollover Member and Mr. Roberts set forth in this Section 9.3, (i) SnapWorx, LLC and its business shall not be subject to this Section 9.3, provided that the business of SnapWorx, LLC shall comply with the restrictions outlined in that certain Subscription Agreement, dated May 17, 2018, between SnapWorx LLC and the Company and there shall be no breach of the restrictions outlined in the Subscription Agreement, and (ii) the business of providing an ozone cleaning product shall not be subject to this Section 9.3.

**ARTICLE X.**
**REPRESENTATIONS AND WARRANTIES**

SECTION 10.1.    **Representations and Warranties of the Holders**. Each Holder, severally and not jointly, represents and warrants to the Company and the other Holders as follows:

(a)    The execution, delivery and performance of this Agreement by such Holder will not violate (i) any provision of the certificate or articles of incorporation, bylaws, operating agreement, partnership agreement or other organizational documents of such Holder (if applicable), (ii) any provision of applicable law or regulation, any order of any court or other agency of government, or (iii) any provision of any indenture, agreement or other instrument to which such Holder or any of such Holder's properties or assets is bound, or conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument.

(b)    This Agreement has been duly executed and delivered by such Holder, and, when executed by the other parties hereto, will constitute the legal, valid and binding obligation of such Holder, enforceable against such Holder in accordance with its terms, subject to applicable bankruptcy, insolvency and other laws affecting the enforceability of creditors' rights generally and the discretion of courts in granting or denying equitable remedies.

SECTION 10.2.    **Representations and Warranties of the Company**. The Company represents and warrants to each Holder as follows:

(a)    The execution, delivery and performance of this Agreement by the Company will not violate (i) any provision of this Agreement, (ii) any provision of applicable law or regulation, any order of any court or other agency of government, or (iii) any provision of any indenture, agreement or other instrument to which the Company or any of its properties or assets

28

is bound, or conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument.

(b)     This Agreement has been duly executed and delivered by the Company, and, when executed by the other parties hereto, will constitute the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

**ARTICLE XI.**
**REPORTS TO MEMBERS; TAX MATTERS**

SECTION 11.1.          **Books and Records; Financial Statements**.

(a)     At all times during the continuance of the Company, the Company shall maintain, at its principal place of business, separate books of account for the Company that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Company business on an accrual method in accordance with GAAP consistently applied, and, to the extent inconsistent therewith, in accordance with this Agreement. Notwithstanding any provision to the contrary of the Act, such books of account, together with an executed copy of this Agreement and of the Certificate, shall at all times be maintained at the principal place of business of the Company and shall be open to inspection and examination at reasonable times by each Member and its duly authorized representatives for any purpose reasonably related to such Member's interest in the Company. In addition to the other rights specifically set forth in this Agreement, each Member shall have access to all information to which a Member is entitled to have access pursuant to the Act and such other information regarding the Company and its business and affairs as such Person may reasonably request from time to time. The books of account and the records of the Company shall be examined by and reported upon as of the end of each fiscal year by a firm of independent certified public accountants that shall be selected by the Manager.

(b)     The Company shall prepare and maintain, or cause to be prepared and maintained, the books of account of the Company and the following financial information, prepared, in the case of clauses (i) and (ii) below, on an accrual basis in accordance with GAAP, together with an operating report in a form to be determined by the Manager analyzing such information, shall be transmitted by the Company to each Member. Within ninety (90) days after the close of each fiscal year and within forty-five (45) days after the close of each fiscal quarter, such operating report and the following financial statements shall be transmitted by the Company to each Member:

(i)     the balance sheet of the Company as of the close of such fiscal period;

(ii)     a statement of Company profits and losses for such fiscal period; and

(iii)     a statement of the Company's cash flows for such fiscal period.

(c)     Each Holder shall provide the Company upon request tax basis information about contributed assets and other tax information reasonably requested by the Company.

29

(d)    Determinations. All determinations, valuations and other matters of judgment required to be made for accounting purposes under this Agreement shall be made by the Manager and shall be conclusive and binding on all Holders and any other Person, and to the fullest extent permitted by law, no such Person shall have the right to an accounting or an appraisal of the assets of the Company or any successor thereto.

SECTION 11.2.    **Fiscal Year**. The fiscal year of the Company shall be the calendar year unless otherwise determined by the Manager or required in accordance with Section 706 of the Code.

SECTION 11.3.    **Certain Tax Matters**.

(a)    Preparation of Returns. The Manager shall cause to be prepared and filed all federal, state and local tax returns of the Company for each year for which such returns are required to be filed. The Manager shall determine the appropriate treatment of each item of Company income, gain, loss, deduction and credit and the accounting methods and conventions to be used by the Company under the tax laws of the United States, the several states and other relevant jurisdictions. Prior to March 15 of each year, the Manager shall cause the Company to distribute to each Holder all Company information reasonably necessary to enable each Holder to prepare its federal, state, and local income tax returns, including a Schedule K-1. Each Holder agrees that it shall not, except as otherwise required by applicable law or regulatory requirements, (i) treat, on its individual income tax returns, any item of income, gain, loss, deduction or credit allocated to the Holder by the Company in a manner inconsistent with the treatment of such item by the Company as reflected on the Schedule K-1 or other information statement furnished by the Company to such Holder for use in preparing its income tax returns in the absence of an administrative determination or judicial ruling to the contrary or (ii) file any claim for refund relating to any such item based on, or which would result in, such inconsistent treatment.

(b)    Tax Matters Member. The Company and each Member hereby designate the Manager as the "tax matters partner" for purposes of Section 6231(a)(7)of the Code; the "partnership representative" of the Company within the meaning of Section 6223 of the Code (as amended by the Bipartisan Budget Act of 2015) for any tax period subject to the provisions of such Section 6223 of the Code, and in each case any analogous provisions of state law (in either capacity, the "Tax Matters Member"). The Tax Matters Member, on behalf of the Company and the Holders, shall be permitted to make any filing or election under the Code, the Regulations, or any other law or regulations that it believes to be in the best interests of the Company or the Holders. The Company shall indemnify and reimburse the Tax Matters Member for all expenses (including legal and accounting fees) incurred as Tax Matters Member pursuant to this clause (b).

## ARTICLE XII.
## MISCELLANEOUS

SECTION 12.1.    **Governing Law**. THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT OF LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. In the event of a direct conflict between the

provisions of this Agreement and any provision of the Certificate or any mandatory provision of the Act, the applicable provision of the Certificate or the Act shall control. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall not be not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

SECTION 12.2.    **Successors and Assigns**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; provided that no Person claiming by, through or under a Holder (whether as such Holder's successor in interest or assign or otherwise), as distinct from a Holder itself, shall have any rights as, or in respect to, a Holder (including the right to approve or vote on any matter or to notice thereof).

SECTION 12.3.    **Amendments; Waiver**. The Manager may, to the fullest extent allowable under Delaware law, amend this Agreement; provided, however, the holders of a majority of the outstanding Common Units other than the Common Units held by the Manager shall be required to amend in any material respect Section 2.8, Section 2.9, Section 3.1, Article IV, Article V, and Section 7.1; and provided further that if an amendment or modification of this Agreement or the Certificate (whether by merger, consolidation or otherwise) would adversely and disproportionately (relative to any other Class of Units) affect a Class of Units, the Members holding a majority of all Units owned by Members of such disproportionately and adversely affected Class must approve such amendment or modification; and (b) if an amendment or modification of this Agreement or the Certificate (whether by merger, consolidation or otherwise) would adversely and disproportionately affect a Member holding Units of a particular Class (relative to the other Members holding Units of the same Class), such disproportionately and adversely affected Member must approve such amendment or modification. No provision of this Agreement shall be deemed to have been waived unless such waiver is contained in writing signed by the party charged with the waiver, and provided that no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.

SECTION 12.4.    **Notices**. Whenever notice is required or permitted by this Agreement to be given, such notice shall be in writing and shall be given to any Holder at its address shown in the Company's books and records, or, if given to the Company, at the designated business address of the Company. Each proper notice shall be effective upon any of the following: (i) personal delivery to the recipient, (ii) on the day scheduled for delivery to the recipient by a nationally recognized overnight courier service (charges prepaid) or (iv) five (5) Business Days after being deposited in the United States mail (first class, postage prepaid).

SECTION 12.5.    **Counterparts**. This Agreement may be executed in any number of counterparts (including by means of signature pages sent by facsimile or other electronic means), all of which together shall constitute a single instrument.

SECTION 12.6.    **Power of Attorney**. Each Member hereby irrevocably appoints the Manager as such Member's true and lawful representative and attorney-in-fact, acting in such Member's name, place and stead, (i) to make, execute, sign and file all instruments, documents and certificates which, from time to time, may be required to set forth any amendment (provided

31

such amendment has been adopted in accordance with the terms of this Agreement) to this Agreement or which may be required by this Agreement or by the laws of the United States of America, the State of Delaware or any other state in which the Company shall determine to do business, or any political subdivision or agency thereof and (ii) to execute, implement and continue the valid and subsisting existence of the Company or to qualify and continue the Company as a foreign limited liability company in all jurisdictions in which the Company may conduct business. Such power of attorney is coupled with an interest and shall survive and continue in full force and effect notwithstanding the subsequent withdrawal from the Company of any Member for any reason and shall survive and shall not be affected by the disability or incapacity of such Member.

SECTION 12.7.    **Entire Agreement**. This Agreement and the other documents and agreements referred to herein or entered into concurrently herewith embody the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein and therein. This Agreement and such other documents and agreements supersede all prior agreements and understandings between the parties with respect to such subject matter.

SECTION 12.8.    **Jurisdiction**. Any suit, action or proceeding under or with respect to this Agreement, shall be brought in any court of competent jurisdiction in the State of Delaware, New Castle County, and each of the Company and the Holders hereby submits to the exclusive jurisdiction of such courts for the purpose of any such suit, action, proceeding or judgment. Each of the Company and the Holders hereby irrevocably waives any objections which it may now or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any court of competent jurisdiction in the State of Delaware, New Castle County, and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in any inconvenient forum.

SECTION 12.9.    **WAIVER OF JURY TRIAL**. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE OR ACTION, CLAIM, CAUSE OF ACTION OR SUIT (IN CONTRACT, TORT OR OTHERWISE), INQUIRY, PROCEEDING OR INVESTIGATION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED HEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING. EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTIES HERETO THAT THIS SECTION 12.9 CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH THEY ARE RELYING AND WILL RELY IN ENTERING INTO THIS AGREEMENT. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 12.9 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

SECTION 12.10.    **Section Titles**. Section titles and headings are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text hereof.

32

[*Signature Page Follows*]

33

IN WITNESS WHEREOF, the parties have executed this Limited Liability Company Agreement as of the day and year first above written.

MEMBERS

**2321 CAPITAL LLC**

By:   /s/ Luke McGee
_____
Name: Luke McGee
Title: Manager

**AMPEV LLC**

By:   /s/ Jason Young
_____
Name: Jason Young
Title:

**BLUE RIVER NJ LLC**

By:   /s/ Luke McGee
_____
Name: Luke McGee
Title: Special Manager

**BLUEMOUNTAIN SUMMIT OPPORTUNITIES FUND II (US) L.P.**

By: BlueMountain Capital Management, LLC, its investment manager

By:   /s/ Richard Horne
_____
Name: Richard Horne
Title: Deputy General Counsel, Tax

**CFCP LLC**

By:   /s/ Nicholas Gargano
_____
Name: Nicholas Gargano
Title: COO

**FRESHPOND INVESTMENTS LLC**

By:   /s/ Luke McGee
_____
Name: Luke McGee
Title: Authorized Signatory

**JEDI ENTERPRISES LLC**

By:   /s/ John M. Gvodas Jr.
_____
Name: John M. Gvodas Jr.
Title: Member/Manager

**LBM DME HOLDINGS LLC**

By:    /s/ Luke McGee
     Name: Luke McGee
     Title: Managing Member

**MAYAID2001 LLC**

By:    /s/ Christopher Joyce
     Name: Christopher Joyce
     Title: Managing Member

**MCLARTY CAPITAL PARTNERS SBIC. LP**

By:    /s/ Christopher D. Smith
     Name: Christopher D. Smith
     Title: Co-Founder & President

**OCEAN ROCK NJ LLC**

By:    /s/ Luke McGee
     Name: Luke McGee
     Title: Authorized Signatory

**PLAINS CAPITAL LLC**

By:    /s/ Luke McGee
     Name: Luke McGee
     Title: Authorized Signatory

**QUAD CAPITAL LLC**

By:    /s/ Luke McGee
     Name: Luke McGee
     Title: Special Manager

**QUADRANT MANAGEMENT, INC.**

By:    /s/ Marco Vega
     Name: Marco Vega
     Title: COO

**VERUS EQUITY HOLDING COMPANY LLC**

By:    /s/ Richardson Roberts
     Name: Richardson Roberts
     Title:

**VERUS NOTE HOLDING COMPANY LLC**

By:   /s/ Richardson Roberts
          Name: Richardson Roberts
          Title:

**WHEATFIELD LLC**

By:   /s/ Gregg Holst
          Name: Gregg Holst
          Title: Manager

IN WITNESS WHEREOF, the parties hereto have executed this Limited Liability Company Agreement as of the date first above written.

COMPANY:

ADAPTHEALTH HOLDINGS LLC

By:     /s/ Luke McGee

Name: Luke McGee

SPECIFICALLY WITH RESPECT TO SECTION 9.3
HEREOF:

/s/ Joshua Parnes
Joshua Parnes

/s/ Alan Quasha
Alan Quasha

/s/ Luke McGee
Luke McGee

/s/ John M. Gvodas, Jr.
John M. Gvodas, Jr.

/s/ Jason Young
Jason Young

**Exhibit A**

**FORM OF JOINDER AGREEMENT**

**TO**

**FIFTH AMENDED AND RESTATED LLC AGREEMENT**

This Joinder Agreement (this "Agreement") to the Fifth Amended and Restated Limited Liability Company Agreement of AdaptHealth Holdings LLC, a Delaware limited liability company (the "Company"), dated as of [•], 2019 (the "Operating Agreement"), is executed and delivered as of the date set forth opposite the signature of the undersigned (the "Additional Member") and is effective as of such date. Capitalized terms used but not defined herein have the respective meanings ascribed to them in the Operating Agreement.

WHEREAS, the Additional Member desires to receive Common Units of the Company;

WHEREAS, in connection with the receipt of the Common Units, the Additional Member must, among other things, become a party to the Operating Agreement;

NOW, THEREFORE, in consideration of the premises, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. The Additional Member hereby certifies that it has received a copy of the Operating Agreement

2. The Additional Member hereby acknowledges and agrees with the Company that the Additional Member is a signatory and party to the Operating Agreement as of the date written below and thus subject to all terms and conditions of the Operating Agreement applicable to each Member of the Company.

IN WITNESS WHEREOF, the undersigned has executed this Agreement on the date set forth below.

Date:                                                         MEMBER:

                                                              [Add Sig Block]


ACCEPTED:

ADAPTHEALTH HOLDINGS LLC

By:
Name:
Title:

**ADAPTHEALTH CORP**
**INDEMNIFICATION AGREEMENT**

This Indemnification Agreement (this "Agreement") is made as of November 8, 2019, by and between AdaptHealth Corp., a Delaware corporation (the "Company"), and [•] ("Indemnitee").  This Agreement supersedes and replaces any and all previous Agreements between the Company and Indemnitee covering the subject matter of this Agreement.  Certain capitalized terms used herein are defined in Section 2 hereof.

**RECITALS**

WHEREAS, individuals are reluctant to serve publicly-held corporations as directors, officers or in other capacities unless they are provided with adequate protection through insurance or adequate indemnification against inordinate risks of claims and actions against them arising out of their service to and activities on behalf of the corporation;

WHEREAS, the Board of Directors of the Company (the "Board") has determined that, in order to attract and retain qualified individuals, the Company will attempt to maintain on an ongoing basis, at its sole expense, liability insurance to protect persons serving the Company and its subsidiaries from certain liabilities. Although the furnishing of such insurance has been a customary and widespread practice among United States-based corporations and other business enterprises, the Company believes that, given current market conditions and trends, such insurance may be available to it in the future only at higher premiums and with more exclusions. At the same time, directors, officers and other persons in service to corporations or business enterprises are being increasingly subjected to expensive and time-consuming litigation relating to, among other things, matters that traditionally would have been brought only against the corporation or business enterprise itself;

WHEREAS, the Amended and Restated Bylaws (the "Bylaws") and Second Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation") of the Company require indemnification of the officers and directors of the Company and Indemnitee may also be entitled to indemnification pursuant to the General Corporation Law of the State of Delaware (the "DGCL"). The Bylaws, Certificate of Incorporation and the DGCL expressly provide that the indemnification provisions set forth therein are not exclusive, and thereby contemplate that contracts may be entered into between the Company and members of the Board, officers and other persons with respect to indemnification;

WHEREAS, the uncertainties relating to such insurance and to indemnification have increased the difficulty of attracting and retaining such persons;

WHEREAS, the Board has determined that the increased difficulty in attracting and retaining such persons is detrimental to the best interests of the Company and its stockholders and that the Company should act to assure such persons that there will be increased certainty of such protection in the future;

WHEREAS, it is reasonable, prudent and necessary for the Company to contractually obligate itself to indemnify, and to advance expenses on behalf of, such persons to the fullest extent permitted by applicable law so that they will serve or continue to serve the Company free from undue concern that they will not be so indemnified;

WHEREAS, this Agreement is a supplement to and in furtherance of the indemnification provided in the Company's Bylaws, the Certificate of Incorporation and any resolutions adopted pursuant thereto, as well as any rights of Indemnitee under any directors' and officers' liability insurance policy, and this Agreement shall not be deemed a substitute therefor, nor to limit, diminish or abrogate any rights of Indemnitee thereunder; and

WHEREAS, Indemnitee does not regard the protection available under the Bylaws, Certificate of Incorporation and insurance as adequate in the present circumstances, and may not be willing to serve as an officer or director without adequate protection, and the Company desires Indemnitee to serve in such capacity. Indemnitee is willing to serve, continue to serve and to take on additional service for or on behalf of the Company on the condition that he be so indemnified.

NOW, THEREFORE, in consideration of the premises and the covenants contained herein, the Company and Indemnitee do hereby covenant and agree as follows:

Section 1.        Services to the Company.  Indemnitee agrees to serve as a director, officer, employee or agent of the Company, as applicable, or at the request of the Company, as a director, officer, employee, agent or fiduciary of another corporation, partnership, joint venture, trust or other enterprise, as applicable.  Indemnitee may at any time and for any reason resign from such position (subject to any other contractual obligation or any obligation imposed by operation of law), in which event the Company shall have no obligation under this Agreement to continue Indemnitee in such position.  This Agreement shall not be deemed an employment contract between the Company (or any of its subsidiaries or any Enterprise (as defined below)) and Indemnitee.  Indemnitee specifically acknowledges that Indemnitee's employment with the Company (or any of its subsidiaries or any Enterprise), if any, is at will, and Indemnitee may be discharged at any time for any reason, with or without cause, except as may be otherwise provided in any written employment contract between Indemnitee and the Company (or any of its subsidiaries or any Enterprise), other applicable formal severance policies duly adopted by the Board or, with respect to service as a director, officer or agent of the Company, by the Certificate of Incorporation, the Bylaws and the DGCL.  The foregoing notwithstanding, this Agreement shall continue in force after Indemnitee has ceased to serve as a director or, officer, employee or agent of the Company, as applicable, or, at the request of the Company, as a director, officer, employee, agent or fiduciary of another corporation, partnership, joint venture, trust or other enterprise, as applicable, as provided in Section 16 hereof.

Section 2.        Definitions.  As used in this Agreement:

(a)        References to "agent" shall mean any person who is or was a director, officer or employee of the Company or a subsidiary of the Company or other person authorized by the Company to act for the Company or serve as a director, officer, employee, fiduciary or other official of another corporation, partnership, limited liability company, joint venture, trust or other enterprise at the request of, for the convenience of or to represent the interests of the Company or a subsidiary of the Company.

(b)        A "Change in Control" shall be deemed to occur upon the earliest to occur after the date of this Agreement of any of the following events:

2

i.      *Acquisition of Stock by Third Party*.  Any Person (as defined below) is or becomes the Beneficial Owner (as defined below), directly or indirectly, of securities of the Company representing fifteen percent (15%) or more of the combined voting power of the Company's then outstanding securities unless the change in relative Beneficial Ownership of the Company's securities by any Person results solely from a reduction in the aggregate number of outstanding shares of securities entitled to vote generally in the election of directors;

ii.      *Change in Board of Directors*.  During any period of two (2) consecutive years (not including any period prior to the execution of this Agreement), individuals who at the beginning of such period constitute the Board, and any new director whose election by the Board or nomination for election by the Company's stockholders was approved by a vote of at least a majority of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority of the members of the Board;

iii.      *Corporate Transactions*.  The effective date of a merger or consolidation of the Company with any other entity, other than a merger or consolidation that would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than a majority of the combined voting power of the voting securities of the surviving entity outstanding immediately after such merger or consolidation and with the power to elect at least a majority of the board of directors or other governing body of such surviving entity;

iv.      *Liquidation*.  The approval by the stockholders of the Company of a complete liquidation of the Company or an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets; and

v.      *Other Events*.  There occurs any other event of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A (or a response to any similar item on any similar schedule or form) promulgated under the Exchange Act, whether or not the Company is then subject to such reporting requirement.

For purposes of this Section 2(b), the following terms shall have the following meanings:

(A)      "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time.

(B)      "Person" shall have the meaning as set forth in Sections 13(d) and 14(d) of the Exchange Act; provided, however, that Person shall exclude (i) the Company, (ii) any trustee or other fiduciary holding securities under an employee benefit plan of the Company and (iii) any corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

3

(C)        "Beneficial Owner" shall have the meaning given to such term in Rule 13d-3 under the Exchange Act; provided, however, that Beneficial Owner shall exclude any Person otherwise becoming a Beneficial Owner by reason of the stockholders of the Company approving a merger of the Company with another entity.

(c)        "Corporate Status" describes the status of a person who is or was a director, trustee, partner, managing member, officer, employee, agent or fiduciary of the Company or of any other corporation, limited liability company, partnership or joint venture, trust or other enterprise which such person is or was serving at the request of the Company.

(d)        "Disinterested Director" shall mean a director of the Company who is not and was not a party to the Proceeding (as defined below) in respect of which indemnification is sought by Indemnitee.

(e)        "Enterprise" shall mean the Company and any other corporation, limited liability company, partnership, joint venture, trust or other enterprise of which Indemnitee is or was serving at the request of the Company as a director, officer, trustee, partner, managing member, employee, agent or fiduciary.

(f)        "Expenses" shall include all reasonable attorneys' fees, retainers, court costs, transcript costs, fees and costs of experts and other professionals, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, fax transmission charges, secretarial services, any federal, state, local or foreign taxes imposed on Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement, ERISA excise taxes and penalties, and all other disbursements, obligations or expenses of the types customarily incurred in connection with, or as a result of, prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a deponent or witness in or otherwise participating in a Proceeding. Expenses also shall include (i) Expenses incurred in connection with any appeal resulting from any Proceeding, including, without limitation, the premium, security for and other costs relating to any cost bond, supersedes bond or other appeal bond or its equivalent, (ii) expenses incurred in connection with recovery under any directors' and officers' liability insurance policies maintained by the Company, regardless of whether Indemnitee is ultimately determined to be entitled to such indemnification, advancement or Expenses or insurance recovery, as the case may be, and (iii) for purposes of Section 14(d) only, Expenses incurred by or on behalf of Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, the Certificate of Incorporation, the Bylaws or under any officers' liability insurance policies maintained by the Company, by litigation or otherwise. The parties agree that for the purposes of any advancement of Expenses for which Indemnitee has made written demand to the Company in accordance with this Agreement, all Expenses included in such demand that are certified by affidavit of Indemnitee's counsel as being reasonable shall be presumed conclusively to be reasonable. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(g)        "Indemnity Obligations" shall mean all obligations of the Company to Indemnitee under this Agreement, including the Company's obligations to provide indemnification to Indemnitee and advance Expenses to Indemnitee under this Agreement.

4

(h)     "Independent Counsel" shall mean a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently is, nor in the past five years has been, retained to represent:  (i) the Company or Indemnitee in any matter material to either such party (other than with respect to matters concerning Indemnitee under this Agreement, or of other indemnitees under similar indemnification agreements), or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder.  Notwithstanding the foregoing, the term "Independent Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement. The Company agrees to pay the reasonable fees and expenses of the Independent Counsel referred to above and to fully indemnify such counsel against any and all Expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

(i)     The term "Proceeding" shall include any threatened, pending or completed action, suit, claim, counterclaim, cross claim, arbitration, mediation, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether brought in the right of the Company or otherwise and whether of a civil, criminal, administrative, regulatory, legislative or investigative (formal or informal) nature, including any appeal therefrom and including without limitation any such Proceeding pending as of the date of this Agreement, in which Indemnitee was, is or will be involved as a party, potential party, non-party witness or otherwise by reason of the fact that Indemnitee is or was a director or officer of the Company, by reason of any action taken by him (or a failure to take action by him) or of any action (or failure to act) on his part while acting pursuant to his Corporate Status, in each case whether or not serving in such capacity at the time any liability or Expense is incurred for which indemnification, reimbursement or advancement of Expenses can be provided under this Agreement.  If Indemnitee believes in good faith that a given situation may lead to or culminate in the institution of a Proceeding, this shall be considered a Proceeding under this paragraph.

(j)     Reference to "other enterprise" shall include employee benefit plans; references to "fines" shall include any excise tax assessed with respect to any employee benefit plan; references to "serving at the request of the Company" shall include any service as a director, officer, employee or agent of the Company that imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner he reasonably believed to be in the best interests of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Company" as referred to in this Agreement.

Section 3.     Indemnity in Third-Party Proceedings.  The Company shall indemnify Indemnitee in accordance with the provisions of this Section 3 if Indemnitee is, or is threatened to be made, a party to or a participant in any Proceeding, other than a Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 3, Indemnitee shall be indemnified to the fullest extent permitted by applicable law against all Expenses, judgments, liabilities, fines, penalties and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses, judgments, liabilities, fines, penalties and amounts paid in settlement) actually and reasonably incurred by Indemnitee or on his behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a

5

manner he reasonably believed to be in or not opposed to the best interests of the Company and, in the case of a criminal Proceeding, had no reasonable cause to believe that his conduct was unlawful.  The parties hereto intend that this Agreement, to the fullest extent permitted by applicable law, shall provide for indemnification in excess of that expressly permitted by statute, including, without limitation, any indemnification provided by the Certificate of Incorporation, the Bylaws, vote of its stockholders or disinterested directors or applicable law.

Section 4.        Indemnity in Proceedings by or in the Right of the Company. The Company shall indemnify Indemnitee in accordance with the provisions of this Section 4 if Indemnitee is, or is threatened to be made, a party to or a participant in any Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 4, Indemnitee shall be indemnified to the fullest extent permitted by applicable law against all Expenses actually and reasonably incurred by him or on his behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company.  If applicable law so provides, no indemnification for Expenses shall be made under this Section 4 in respect of any claim, issue or matter in such Proceeding as to which Indemnitee shall have been finally adjudged by a court of competent jurisdiction to be liable to the Company, unless and only to the extent that the Chancery Court of the State of Delaware (the "Delaware Court") or any court in which the Proceeding was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, Indemnitee is fairly and reasonably entitled to indemnification for such Expenses as the Delaware Court or such other court shall deem proper.

Section 5.        Indemnification for Expenses of a Party who is wholly or partly successful. Notwithstanding any other provisions of this Agreement, to the fullest extent permitted by applicable law and to the extent that Indemnitee is a party to (or a participant in) and is successful, on the merits or otherwise, in any Proceeding or in defense of any claim, issue or matter therein, in whole or in part, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by him or on his behalf in connection therewith.  If Indemnitee is not wholly successful in such Proceeding but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by him or on his behalf in connection with or related to each successfully resolved claim, issue or matter to the fullest extent permitted by applicable law.  For purposes of this Section and without limitation, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

Section 6.        Indemnification for Expenses of a Witness.  Notwithstanding any other provision of this Agreement, to the fullest extent permitted by applicable law and to the extent that Indemnitee is, by reason of his Corporate Status, a witness, is or was made (or asked) to respond to discovery requests in any Proceeding or otherwise asked to participate in any aspect of a Proceeding to which Indemnitee is not a party, he shall be indemnified against all Expenses actually and reasonably incurred by him or on his behalf in connection therewith.

Section 7.        Partial Indemnification. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for some or a portion of Expenses, but not, however, for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

Section 8.        Additional Indemnification.

(a)        Notwithstanding any limitation in Sections 3, 4 or 5, the Company shall indemnify Indemnitee to the fullest extent permitted by applicable law if Indemnitee, by reason of his or her Corporate Status is, or is a party to or threatened to be made a party to or a participant in any Proceeding (including a Proceeding by or in the right of the Company to procure a judgment in its favor) against all Expenses, judgments, fines and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses, judgments, fines and amounts paid in settlement) actually and reasonably incurred by Indemnitee or on his behalf in connection with the Proceeding or any claim, issue or matter therein.

(b)        For purposes of Section 8(a), the meaning of the phrase "to the fullest extent permitted by applicable law" shall include, but not be limited to:

i.        to the fullest extent permitted by the provision of the DGCL that authorizes or contemplates additional indemnification by agreement, or the corresponding provision of any amendment to or replacement of the DGCL, and

ii.        to the fullest extent authorized or permitted by any amendments to or replacements of the DGCL adopted after the date of this Agreement that increase the extent to which a corporation may indemnify its officers and directors.

Section 9.        Exclusions. Notwithstanding any provision in this Agreement, the Company shall not be obligated under this Agreement to make any indemnification payment in connection with any claim made against Indemnitee:

(a)        for which payment has actually been made to or on behalf of Indemnitee under any insurance policy or other indemnity provision, except with respect to any excess beyond the amount paid under any insurance policy or other indemnity provision; or

(b)        for (i) an accounting or disgorgement of profits made from the purchase and sale (or sale and purchase) by Indemnitee of securities of the Company within the meaning of Section 16(b) of the Exchange Act or similar provisions of federal, state or local statutory law or common law; provided that the Company shall advance Expenses in connection with Indemnitee's defense of a claim under Section 16(b), which advances shall be repaid to the Company if it is ultimately determined that Indemnitee is not entitled to indemnification of such Expenses; or (ii) any reimbursement of the Company by Indemnitee of any bonus or other incentive-based or equity-based compensation or of any profits realized by Indemnitee from the sale of securities of the Company, as required in each case under the Exchange Act (including any such reimbursements that arise from an accounting restatement of the Company pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), or the payment to the Company of profits arising from the purchase and sale by Indemnitee of securities in violation of Section 306 of the Sarbanes-Oxley Act), if Indemnitee is held liable therefor (including pursuant to any settlement arrangements);

(c)        except as provided in Section 14(d) of this Agreement, in connection with any Proceeding (or any part of any Proceeding) initiated by Indemnitee, including any Proceeding (or any part

7

of any Proceeding) initiated by Indemnitee against the Company or its directors, officers, employees or other indemnitees, unless (i) the Board authorized the Proceeding (or any part of any Proceeding) prior to its initiation, (ii) such payment arises in connection with any mandatory counterclaim or cross-claim or affirmative defense brought or raised by Indemnitee in any Proceeding (or any part of any Proceeding), or (iii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under applicable law; or

(d)     if a court having jurisdiction in the matter shall determine by final non-appealable judgment or other final non-appealable adjudication that such indemnification is not lawful.

Section 10.     Advances of Expenses. Notwithstanding any provision of this Agreement to the contrary (other than Section 14(d)), the Company shall advance, to the extent not prohibited by applicable law, the Expenses incurred by or on behalf of Indemnitee in connection with any Proceeding (or any part of any Proceeding) not initiated by Indemnitee, and such advancement shall be made as soon as reasonably practicable, but in any event no later than within thirty (30) days after the receipt by the Company of a written statement or statements requesting such advances from time to time (which shall include invoices received by Indemnitee in connection with such Expenses or otherwise reasonably evidence the Expenses incurred by Indemnitee, but, in the case of invoices in connection with legal services, any references to legal work performed or to expenditures made that would cause Indemnitee to waive any privilege accorded by applicable law shall not be so included), whether prior to or after final disposition of any Proceeding. Advances shall be unsecured and interest-free. Advances shall be made without regard to Indemnitee's ability to repay the Expenses and without regard to Indemnitee's ultimate entitlement to indemnification under the other provisions of this Agreement. In accordance with Section 14(d), advances shall include any and all reasonable Expenses incurred pursuing an action to enforce this right of advancement, including Expenses incurred preparing and forwarding statements to the Company to support the advances claimed. Indemnitee shall qualify for advances upon the execution and delivery to the Company of this Agreement which shall constitute an undertaking providing that Indemnitee shall reimburse the Company for all Expenses advanced (without interest) by the Company pursuant to this Section 10, in the event and only to the extent that it shall be determined by final non-appealable judgment or other final non-appealable adjudication under the provisions of any applicable law (as to which all rights of appeal therefrom have been exhausted or lapsed) that Indemnitee is not entitled to be indemnified by the Company for such Expenses. This Section 10 shall not apply to any claim made by Indemnitee for which indemnity is excluded pursuant to Section 9.

Section 11.     Procedure for Notification and Defense of Claim.

(a)     Indemnitee shall notify the Company in writing of any matter with respect to which Indemnitee intends to seek indemnification or advancement of Expenses hereunder as soon as reasonably practicable following the receipt by Indemnitee of written notice thereof or Indemnitee's becoming aware thereof. The written notification to the Company shall include, in reasonable detail, a description of the nature of the Proceeding and the facts underlying the Proceeding, in each case, to the extent known to Indemnitee. To obtain indemnification under this Agreement, Indemnitee shall submit to the Company a written request, including therein or therewith such documentation and information as is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of such Proceeding. The failure

8

by Indemnitee to notify the Company hereunder will not relieve the Company from any liability that it may have to Indemnitee hereunder or otherwise than under this Agreement, and any delay in so notifying the Company shall not constitute a waiver by Indemnitee of any rights under this Agreement, except to the extent (solely with respect to the indemnity hereunder) that such failure or delay materially prejudices the Company. The Secretary of the Company shall, promptly upon receipt of such a request for indemnification, advise the Board in writing that Indemnitee has requested indemnification. Any delay in providing the request will not relieve the Company from its obligations under this Agreement, except to the extent such delay is prejudicial.

(b)    The Company will be entitled to participate in the Proceeding at its own expense.

(c)    The Company shall not settle any Proceeding (in whole or in part) if such settlement would impose any Expense, judgment, liability, fine, penalty or limitation on Indemnitee which Indemnitee is not entitled to be indemnified hereunder without Indemnitee's prior written consent, which shall not be unreasonably withheld.

Section 12.    Procedure Upon Application for Indemnification.

(a)    Upon written request by Indemnitee for indemnification pursuant to Section 11(a), a determination, if required by applicable law, with respect to Indemnitee's entitlement thereto shall be made in the specific case: (i) if a Change in Control shall have occurred, by Independent Counsel in a written opinion to the Board, a copy of which shall be delivered to Indemnitee; or (ii) if a Change in Control shall not have occurred, (A) by a majority vote of the Disinterested Directors, even though less than a quorum of the Board, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum of the Board, (C) if there are no such Disinterested Directors or, if such Disinterested Directors so direct, by Independent Counsel in a written opinion to the Board, a copy of which shall be delivered to Indemnitee or (D) if so directed by the Board, by the stockholders of the Company; and, if it is so determined that Indemnitee is entitled to indemnification, payment to Indemnitee shall be made within ten (10) days after such determination. Indemnitee shall cooperate with the person, persons or entity making such determination with respect to Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information that is not privileged or otherwise protected from disclosure and that is reasonably available to Indemnitee and reasonably necessary to such determination. Any costs or Expenses (including attorneys' fees and disbursements) reasonably incurred by or on behalf of Indemnitee in so cooperating with the person, persons or entity making such determination shall be borne by the Company (irrespective of the determination as to Indemnitee's entitlement to indemnification) and the Company hereby indemnifies and agrees to hold Indemnitee harmless therefrom. The Company promptly will advise Indemnitee in writing with respect to any determination that Indemnitee is or is not entitled to indemnification, including a description of any reason or basis for which indemnification has been denied.

(b)    In the event the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to Section 12(a) hereof, the Independent Counsel shall be selected as provided in this Section 12(b). If a Change in Control shall not have occurred, the Independent Counsel shall be selected by the Board, and the Company shall give written notice to Indemnitee advising him of the identity of the Independent Counsel so selected. If a Change in Control shall have occurred, the

9

Independent Counsel shall be selected by Indemnitee (unless Indemnitee shall request that such selection be made by the Board, in which event the preceding sentence shall apply), and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected.  In either event, Indemnitee or the Company, as the case may be, may, within ten (10) days after such written notice of selection shall have been given, deliver to the Company or to Indemnitee, as the case may be, a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of "Independent Counsel" as defined in Section 2 of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the person so selected shall act as Independent Counsel.  If such written objection is so made and substantiated, the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or the Delaware Court has determined that such objection is without merit.  If, within twenty (20) days after the later of submission by Indemnitee of a written request for indemnification pursuant to Section 11(a) hereof and the final disposition of the Proceeding, no Independent Counsel shall have been selected and not objected to, either the Company or Indemnitee may petition the Delaware Court for resolution of any objection that shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and/or for the appointment as Independent Counsel of a person selected by such court or by such other person as such court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under Section 12(a) hereof.  Upon the due commencement of any judicial proceeding or arbitration pursuant to Section 14(a) of this Agreement, Independent Counsel shall be discharged and relieved of any further responsibility in such capacity (subject to the applicable standards of professional conduct then prevailing).

(c)     If the Company disputes a portion of the amounts for which indemnification is requested, the undisputed portion shall be paid and only the disputed portion withheld pending resolution of any such dispute.

Section 13.     Presumptions and Effect of Certain Proceedings.

(a)     In making a determination with respect to entitlement to indemnification hereunder, the person or persons or entity making such determination shall, to the fullest extent not prohibited by applicable law, presume that Indemnitee is entitled to indemnification under this Agreement if Indemnitee has submitted a request for indemnification in accordance with Section 11(a) of this Agreement, and the Company shall, to the fullest extent not prohibited by applicable law, have the burden of proof to overcome that presumption in connection with the making by any person, persons or entity of any determination contrary to that presumption. Neither the failure of the Company (including by its directors or Independent Counsel) to have made a determination prior to the commencement of any action pursuant to this Agreement that indemnification is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor an actual determination by the Company (including by its directors or Independent Counsel) that Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that Indemnitee has not met the applicable standard of conduct.

(b)     Subject to Section 14(e), if the person, persons or entity empowered or selected under Section 12 of this Agreement to determine whether Indemnitee is entitled to indemnification shall not have made a determination within sixty (60) days after receipt by the Company of the request

10

therefor, the requisite determination of entitlement to indemnification shall, to the fullest extent not prohibited by law, be deemed to have been made and Indemnitee shall be entitled to such indemnification, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statement not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law; provided, however, that such 60-day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the person, persons or entity making the determination with respect to entitlement to indemnification in good faith requires such additional time for the obtaining or evaluating of documentation and/or information relating thereto; and provided, further, that the foregoing provisions of this Section 13(b) shall not apply (i) if the determination of entitlement to indemnification is to be made by the stockholders pursuant to Section 12(a) of this Agreement and if (A) within fifteen (15) days after receipt by the Company of the request for such determination the Board has resolved to submit such determination to the stockholders for their consideration at an annual meeting thereof to be held within seventy five (75) days after such receipt and such determination is made threat, or (B) a special meeting of stockholders is called within fifteen (15) days after such receipt for the purpose of making such determination, such meeting is held for such purpose within sixty (60) days after having been so called and such determination is made threat, or (ii) if the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to Section 12(a) of this Agreement.

(c)     The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of nolo contendere or its equivalent, shall not (except as otherwise expressly provided in this Agreement) of itself adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that his conduct was unlawful.

(a)     For purposes of any determination of good faith, Indemnitee shall be deemed to have acted in good faith if Indemnitee's action is based on the records or books of account of the Enterprise, including financial statements, or on information supplied to Indemnitee by the directors or officers of the Enterprise in the course of their duties, or on the advice of legal counsel for the Enterprise or on information or records given or reports made to the Enterprise by an independent certified public accountant or by an appraiser, investment banker, or other expert selected with reasonable care by the Enterprise. The provisions of this Section 13(d) shall not be deemed to be exclusive or to limit in any way the other circumstances in which Indemnitee may be deemed to have met the applicable standard of conduct set forth in this Agreement. Whether or not the foregoing provisions of this Section 13(d) are satisfied, it shall in any event be presumed that Indemnitee has at all times acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company. The Company acknowledges that a settlement or other disposition short of final judgment may be successful if it permits a party to avoid expense, delay, distraction, disruption and uncertainty. In the event that any Proceeding to which Indemnitee is a party is resolved in any manner other than by adverse judgment against Indemnitee (including, without limitation, settlement of such Proceeding with or without payment of money or other consideration) it shall be presumed that Indemnitee has been successful on the merits or otherwise in such Proceeding. Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.

11

(b)      The knowledge and/or actions, or failure to act, of any director, officer, trustee, partner, managing member, fiduciary, agent or employee of the Enterprise shall not be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement.

Section 14.      Remedies of Indemnitee.

(a)      Subject to Section 14(e), in the event that (i) a determination is made pursuant to Section 12 of this Agreement that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses is not timely made pursuant to Section 10 of this Agreement, (iii) no determination of entitlement to indemnification shall have been made pursuant to Section 12(a) of this Agreement within ninety (90) days after receipt by the Company of the request for indemnification, (iv) payment of indemnification is not made pursuant to Section 5, 6 or 7 or the last sentence of Section 12(a) of this Agreement within ten (10) days after receipt by the Company of a written request therefor, (v) payment of indemnification pursuant to Section 3, 4 or 8 of this Agreement is not made within ten (10) days after a determination has been made that Indemnitee is entitled to indemnification, or (vi) the Company or any other person takes or threatens to take any action to declare this Agreement void or unenforceable, or institutes any litigation or other action or Proceeding designed to deny, or to recover from, Indemnitee the benefits provided or intended to be provided to Indemnitee hereunder, Indemnitee shall be entitled to an adjudication by a court of his entitlement to such indemnification or advancement of Expenses. Alternatively, Indemnitee, at his option, may seek an award in arbitration to be conducted by a single arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association.  Indemnitee shall commence such proceeding seeking an adjudication or an award in arbitration within one-hundred eighty (180) days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 14(a); provided, however, that the foregoing clause shall not apply in respect of a proceeding brought by Indemnitee to enforce his rights under Section 5 of this Agreement. The Company shall not oppose Indemnitee's right to seek any such adjudication or award in arbitration.

(b)      In the event that a determination shall have been made pursuant to Section 12(a) of this Agreement that Indemnitee is not entitled to indemnification, any judicial proceeding or arbitration commenced pursuant to this Section 14 shall be conducted in all respects as a de novo trial, or arbitration, on the merits and Indemnitee shall not be prejudiced by reason of that adverse determination. In any judicial proceeding or arbitration commenced pursuant to this Section 14 the Company shall have the burden of proving Indemnitee is not entitled to indemnification or advancement of Expenses, as the case may be.

(c)      If a determination shall have been made pursuant to Section 12(a) of this Agreement that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding or arbitration commenced pursuant to this Section 14, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statement not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law.

(d)      The Company shall, to the fullest extent not prohibited by law, be precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this Section 14 that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate

12

in any such court or before any such arbitrator that the Company is bound by all the provisions of this Agreement.  It is the intent of the Company that, to the fullest extent permitted by applicable law, Indemnitee not be required to incur legal fees or other Expenses associated with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement by litigation or otherwise because the cost and expense thereof would substantially detract from the benefits intended to be extended to Indemnitee hereunder.  The Company shall, to the fullest extent permitted by applicable law, indemnify Indemnitee against any and all Expenses and, if requested by Indemnitee, shall (within ten (10) days after receipt by the Company of a written request therefor) advance, to the extent not prohibited by law, such Expenses to Indemnitee, which are incurred by or on behalf of Indemnitee in connection with any action brought by Indemnitee for indemnification or advancement of Expenses from the Company under this Agreement or under any directors' and officers' liability insurance policies maintained by the Company regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advancement of Expenses or insurance recovery, as the case may be.

(e)        Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement of Indemnitee to indemnification under this Agreement shall be required to be made prior to the final disposition of the Proceeding.

Section 15.        <u>Non-exclusivity; Survival of Rights; Insurance; Subrogation.</u>

(a)        The rights of indemnification and to receive advancement of Expenses as provided by this Agreement (i) shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Certificate of Incorporation, the Bylaws, any agreement, a vote of stockholders or a resolution of directors, or otherwise and (ii) shall be interpreted independently of, and without reference to, any other such rights to which Indemnitee may at any time be entitled.  No amendment, alteration or repeal of this Agreement or of any provision hereof shall limit or restrict any right of Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee in his Corporate Status prior to such amendment, alteration or repeal.  The Company shall not adopt any amendment or alteration to, or repeal of, the Certificate of Incorporation or the Bylaws, the effect of which would be to deny, diminish or encumber the Indemnitee's rights to indemnification pursuant to this Agreement, the Certificate of Incorporation, the Bylaws or applicable law relative to such rights prior to such amendment, alteration or repeal.  To the extent that a change in Delaware law, whether by statute or judicial decision, permits greater indemnification or advancement of Expenses than would be afforded currently under the Bylaws, Certificate of Incorporation and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change.  No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

(b)        To the extent that the Company maintains an insurance policy or policies providing liability insurance for directors, officers, employees, or agents of the Enterprise, Indemnitee shall be covered by such policy or policies in accordance with its or their terms to the maximum extent of the coverage available for any such director, officer, employee or agent under such policy or policies.  If, at the time of the receipt of a notice of a claim pursuant to the terms hereof, the Company has director and

13

officer liability insurance in effect, the Company shall give prompt notice of such claim or of the commencement of a Proceeding, as the case may be, to the insurers in accordance with the procedures set forth in the respective policies.  The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of Indemnitee, all amounts payable as a result of such Proceeding in accordance with the terms of such policies.

(c)    In the event of any payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to effectively bring suit to enforce such rights.

(d)    The Company shall not be liable under this Agreement to make any payment of amounts otherwise indemnifiable hereunder (or for which advancement is provided hereunder) if and to the extent that Indemnitee has otherwise actually received such payment under any insurance policy, contract, agreement or otherwise.

(e)    The Company's obligation to indemnify or advance Expenses hereunder to Indemnitee who is or was serving at the request of the Company as a director, officer, trustee, partner, managing member, fiduciary, employee or agent of any other corporation, limited liability company, partnership, joint venture, trust, employee benefit plan or other enterprise shall be reduced by any amount Indemnitee has actually received as indemnification or advancement of Expenses from such other corporation, limited liability company, partnership, joint venture, trust or other enterprise.

(f)    The Company hereby acknowledges that Indemnitee may have certain rights to indemnification, advancement and insurance provided by one or more Persons with whom or which Indemnitee may be associated. The Company hereby acknowledges and agrees that (i) the Company shall be the indemnitor of first resort with respect to any Proceeding, Expense, liability or matter that is the subject of the Indemnity Obligations, (ii) the Company shall be primarily liable for all Indemnity Obligations and any indemnification afforded to Indemnitee in respect of any Proceeding, Expense, liability or matter that is the subject of Indemnity Obligations, whether created by applicable law, organizational or constituent documents, contract (including this Agreement) or otherwise, (iii) any obligation of any other Persons with whom or which Indemnitee may be associated to indemnify Indemnitee or advance Expenses or liabilities to Indemnitee in respect of any Proceeding shall be secondary to the obligations of the Company hereunder, (iv) the Company shall be required to indemnify Indemnitee and advance Expenses or liabilities to Indemnitee hereunder to the fullest extent provided herein without regard to any rights Indemnitee may have against any other Person with whom or which Indemnitee may be associated or insurer of any such Person and (v) the Company irrevocably waives, relinquishes and releases any other Person with whom or which Indemnitee may be associated from any claim of contribution, subrogation or any other recovery of any kind in respect of amounts paid by the Company hereunder. In the event any other Person with whom or which Indemnitee may be associated or their insurers advances or extinguishes any liability or loss which is the subject of any Indemnity Obligation owed by the Company or payable under any Company insurance policy, the payor shall have a right of subrogation against the Company or its insurer or insurers for all amounts so paid which would otherwise be payable by the Company or its insurer or insurers under this Agreement. In no event will payment of an Indemnity Obligation by any other Person with whom or which Indemnitee may be associated or their insurers affect the obligations of the Company hereunder or shift primary liability for

14

any Indemnity Obligation to any other Person with whom or which Indemnitee may be associated. Any indemnification, insurance or advancement provided by any other Person with whom or which Indemnitee may be associated with respect to any liability arising as a result of Indemnitee's status as director, officer, employee or agent of the Company or capacity as an officer or director of any Person is specifically in excess over any Indemnity Obligation of the Company or valid and any collectible insurance (including but not limited to any malpractice insurance or professional errors and omissions insurance) provided by the Company under this Agreement.

Section 16.    Duration of Agreement.  This Agreement shall continue until and terminate upon the later of (a) ten (10) years after the date that Indemnitee shall have ceased to serve as a director, officer, employee or agent of the Company or (b) one year after the final termination of any Proceeding then pending in respect of which Indemnitee is granted rights of indemnification or advancement of Expenses hereunder and of any proceeding (including any appeal thereof) commenced by Indemnitee pursuant to Section 14 of this Agreement relating thereto.  The indemnification and advancement of expenses rights provided by or granted pursuant to this Agreement shall be binding upon and be enforceable by the parties hereto and their respective successors and assigns (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company), shall continue as to an Indemnitee who has ceased to be a director, officer, employee or agent of the Company or of any other Enterprise, and shall inure to the benefit of Indemnitee and his spouse, assigns, heirs, devisees, executors and administrators and other legal representatives.  The Company shall require and shall cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company to, by written agreement, expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

Section 17.    Severability. Nothing in this Agreement is intended to require or shall be construed as requiring the Company to do or fail to do any act in violation of applicable law. The Company's inability, pursuant to court order or other applicable law, to perform its obligations hereunder shall not constitute a breach of this Agreement.  If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever, then (a) the validity, legality and enforceability of the remaining provisions of this Agreement (including, without limitation, each portion of any Section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and shall remain enforceable to the fullest extent permitted by applicable law; (b) such provision or provisions shall be deemed reformed to the extent necessary to conform to applicable law and to give the maximum effect to the intent of the parties hereto; and (c) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any Section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested thereby.

Section 18.    Enforcement. The Company expressly confirms and agrees that it has entered into this Agreement and assumed the obligations imposed on it hereby in order to induce Indemnitee to serve or continue to serve as a director or officer of the Company, and the Company acknowledges that Indemnitee is relying upon this Agreement in serving as a director or officer of the Company.

15

Section 19.	Entire Agreement.  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof; provided, however, that this Agreement is a supplement to and in furtherance of the Certificate of Incorporation, the Bylaws, any directors' and officers' insurance maintained by the Company and applicable law, and shall not be deemed a substitute therefor, nor to diminish or abrogate any rights of Indemnitee thereunder.

Section 20.	Modification and Waiver. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by the parties hereto.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions of this Agreement nor shall any waiver constitute a continuing waiver.

Section 21.	Notice by Indemnitee. Indemnitee agrees promptly to notify the Company in writing upon being served with any summons, citation, subpoena, complaint, indictment, information or other document relating to any Proceeding or matter which may be subject to indemnification or advancement of Expenses covered hereunder.  The failure of Indemnitee to so notify the Company shall not relieve the Company of any obligation which it may have to Indemnitee under this Agreement or otherwise.

Section 22.	Notices.  All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if (a) delivered by hand and receipted for by the party to whom said notice or other communication shall have been directed, (b) mailed by certified or registered mail with postage prepaid, on the third business day after the date on which it is so mailed, (c) mailed by reputable overnight courier and receipted for by the party to whom said notice or other communication shall have been directed or (d) sent by electronic mail, on the date of such delivery:

(a)	If to Indemnitee, at the address indicated on the signature page of this Agreement, or such other address as Indemnitee shall provide to the Company.

(b)	If to the Company to:

c/o AdaptHealth Corp.
220 West Germantown Pike, Suite 250
Plymouth Meeting, Pennsylvania 19462
Attention:  General Counsel

with a copy to (which shall not constitute notice):

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attention: Steven Gartner and Michael Brandt
E-mail: sgartner@willkie.com and mbrandt@willkie.com

16

or to any other address as may have been furnished to Indemnitee by the Company.

Section 23. <u>Contribution</u>. To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by or on behalf of Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or payable in settlement and/or for Expenses, in connection with any claim relating to an indemnifiable event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Proceeding; and/or (ii) the relative fault of the Company (and its directors, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

Section 24. <u>Applicable Law and Consent to Jurisdiction</u>. This Agreement and the legal relations among the parties shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules. Except with respect to any arbitration commenced by Indemnitee pursuant to Section 14(a) of this Agreement, the Company and Indemnitee hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the Delaware Court, and not in any other state or federal court in the United States of America or any court in any other country, (ii) consent to submit to the exclusive jurisdiction of the Delaware Court for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) waive any objection to the laying of venue of any such action or proceeding in the Delaware Court and (iv) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the Delaware Court has been brought in an improper or inconvenient forum.

Section 25. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement. Only one such counterpart signed by the party against whom enforceability is sought needs to be produced to evidence the existence of this Agreement.

Section 26. <u>Miscellaneous</u>. Use of the masculine pronoun shall be deemed to include usage of the feminine pronoun where appropriate. The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

[*Signature Page Follows*]

17

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed as of the day and year first above written.

ADAPTHEALTH CORP.                                          INDEMNITEE

By: _____

    Name:                                                  Name:        [•]
    Title:                                                 Address:

[Signature Page to D&O Indemnification Agreement]

November 8, 2019

BM AH Holdings, LLC
BlueMountain Foinaven Master Fund L.P.
BMSB L.P.
BlueMountain Fursan Fund L.P.
BlueMountain Summit Opportunities Fund II (US) L.P.

c/o BlueMountain Capital Management, LLC
280 Park Avenue — 12th Floor
New York, NY
Attn: General Counsel
Email: legalnotices@bmcm.com

Ladies and Gentlemen:

Reference is hereby made to (i) that certain Agreement and Plan of Merger, dated as of July 8, 2019 (the "*Merger Agreement*"), by and among AdaptHealth Holdings LLC, a Delaware limited liability company (the "*Company*"), DFB Healthcare Acquisitions Corp., a Delaware corporation ("*Pubco*"), Access Point Medical, Inc., a Delaware corporation (the "*A Blocker*"), Clifton Bay Offshore Investments L.P., a British Virgin Islands limited partnership (the "*A Blocker Seller*"), BlueMountain Foinaven Master Fund L.P., a Cayman Islands exempted limited partnership, BMSB L.P., a Delaware limited partnership, BlueMountain Fursan Fund L.P., a Cayman Islands exempted limited partnership (collectively, the "*BM Blocker Sellers*" and, together with the A Blocker Seller, the "*Blocker Sellers*"), BM AH Holdings, LLC, a Delaware limited liability company (the "*BM Blocker*" and together with the A Blocker, the "*Blockers*"), DFB Merger Sub LLC, a Delaware limited liability company ("*Merger Sub*"), and AH Representative LLC, as the Company Unitholders' Representative (the "*Company Unitholders' Representative*") and (ii) the BM Redemption Notes (as such term is defined in the Merger Agreement) and the BM Replacement Notes (as such term is defined in the Merger Agreement), collectively, the "*BM Notes*"). Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the BM Notes.

1. **Pubco Board Seat**

i. During the period commencing upon the date hereof and ending on the Board Right Termination Date, the Purchasers (or their permitted transferees) holding a majority of the outstanding principal amount under the BM Notes (the "*Noteholder Majority*") shall have the option and right, exercisable by delivering a written notice of such designation to the Company, to designate and nominate for election one (1) person (the "*Board Designee*") to serve on the board of directors of Pubco (the "*Board*"), and the Company and Pubco, whether acting through the Board, any applicable committee of the Board or otherwise,

shall take all actions within its control that are necessary or advisable to effect the foregoing, including, without limitation, by taking any or all of the following actions as necessary: (i) causing one or more incumbent directors serving on the Board to resign; (ii) expanding the size of the Board; (iii) appointing such Board Designee to any vacant or newly-created director position; (iv) including the Board Designee in the slate of director nominees recommended to Pubco's stockholders for election to the Board or (v) including the Board Designee in the proxy statement prepared by Pubco in connection with the solicitation of proxies for any meeting of Pubco stockholders called with respect to the election of members of the Board at which the election of the Board Designee is to be considered, and at every adjournment or postponement thereof, and on every action or approval by written consent of the Board with respect to the election of members of the Board; provided, however; that such Board Designee shall (x) not be prohibited from serving as a director pursuant to any rule or regulation of the Securities and Exchange Commission or any national securities exchange on which Pubco's equity interests are listed or admitted to trading, and (y) not be an employee or director of any competitor to the Company or Pubco. The Purchasers agree upon the Company's or Pubco's request, to timely provide Pubco with accurate and complete information relating to the Board Designee as may be required to be disclosed by Pubco under the Exchange Act and the rules and regulations promulgated thereunder. The initial Board Designee is Dale Wolf. Prior to the Board Right Termination Date, the Board Designee may be removed or replaced by the Noteholder Majority at any time, and any vacancy occurring by reason the death, disability, resignation, removal for cause or other cessation of a person serving as Board Designee, shall be filled solely by the Noteholder Majority. Any action by the Noteholder Majority to designate, remove or replace a Board Designee shall be evidenced in writing furnished to the Board, shall include a statement that the action has been approved by the Noteholder Majority and shall be executed by or on behalf of the Noteholder Majority. While serving as a Board Designee, a Board Designee shall be entitled to vote on any matter on which independent members of the Board are entitled to vote on (unless prohibited by the rules and regulations of the Securities and Exchange Commission or applicable national securities exchange). Notwithstanding any rights to be granted or provided to the Board Designee hereunder, the Board may exclude the Board Designee from access to any Board or committee materials or information or meeting or portion thereof or written consent if the Board determines, in good faith, including the Board Designee in discussions relating to such determination (but not requiring the affirmative vote of such Board Designee), that such access would reasonably be expected to result in a conflict of interest with the Pubco or the Company (other than a conflict of interest with respect to the Noteholder's ownership interest in Pubco or the Company); provided, that such exclusion shall be limited to the portion of the Board or committee material or information and/or meeting or written consent that is the basis for such exclusion and shall not extend to any portion of the Board or committee material and/or meeting that does not involve or pertain to such exclusion. Subject to the immediately preceding sentence, the Board Designee will receive the same information provided to other similarly situated (i.e., independent, non-affiliate) members of the Board, at the same time as such information is provided to other similarly situated members of the Board, including without limitation monthly information packages, and will receive copies of all written materials and other information given to members of any committee of the Board.

2

The option and right to appoint a Board Designee granted to the Purchasers hereunder may not be transferred or assigned directly or indirectly whether by contract, merger, operation of law or otherwise, without the prior written consent of the Company.

ii. Pubco will reimburse the Board Designee for all reasonable and documented expenses incurred in connection with the Board Designee's participation in meetings of the Board or any committee of the Board, including, without limitation, all reasonable and documented travel, lodging and meal expenses, in each case to the same extent as Pubco reimburses any other non-executive member of the Board for such expenses.

iii. Pubco shall maintain in effect at all times directors' and officers' indemnity insurance covering the Board Designee to the same extent and on the same terms as any directors' and officers' indemnity insurance maintained by the Pubco with respect to the other non-executive members of the Board.  Any directors' and officers' indemnity insurance shall be primary to any insurance coverage for the Board Designee maintained by any other person.  Prior to the Board Right Termination Date, Pubco shall not amend or alter any right to indemnification, exculpation or the advancement of expenses covering or benefiting any Board Designee contained in Pubco's Amended and Restated Certificate of Incorporation or Amended and Restated Bylaws as in effect on the date of the BM Notes without the prior written consent of the Noteholder Majority, except if such amendment or alteration (A) provides a broader right to indemnification, exculpation or advancement of expenses than those previously contained in the Amended and Restated Certificate of Incorporation or Amended and Restated Bylaws, as applicable, or (B) is required to comply with applicable law.

iv. Unless otherwise agreed in writing by BlueMountain, subject to applicable law and applicable stock exchange rules, Pubco shall take all necessary or advisable action, whether acting through the Board, any applicable committee of the Board or otherwise, to cause the Board Designee to be appointed to the Compensation Committee of the Board; provided, that the Board Designee satisfies all applicable independence requirements, as determined in good faith by the Board.

v. For the purposes of the BM Notes, the "***Board Right Termination Date***" means the date upon which the BM Notes have been paid in full.  For the avoidance of doubt, upon the Board Right Termination Date (A) the Noteholder Majority's rights pursuant to this Section 1 shall expire and terminate immediately and (B) the Noteholder Majority shall cause any Board Designees to resign from the Board.

vi. Notwithstanding the foregoing in this Section 1, if the BM Notes are not paid in full on or prior to the date that is fifteen (15) days following the Maturity Date, then, until the BM Notes have been paid in full, the number of Board Designees that the Noteholder Majority shall have the right to designate hereunder shall be increased to the greater of (x) two (2) and (y) twenty-five percent (25%) of the number of seats on the Board, rounded down to the nearest whole number, and the provisions of this Section 1 shall apply with respect to any such additional Board Designee, *mutatis mutandis.*

3

2. **Activities of Pubco**. Prior to the Board Right Termination Date, Pubco may, in its sole and absolute discretion, from time to time hold or acquire assets in its own name or otherwise other than through the Company and its Subsidiaries; provided, that in such event Pubco shall take commercially reasonable measures to ensure that the economic benefits and burdens of such assets are otherwise vested in the Company or its Subsidiaries, through assignment, mortgage, loan or otherwise or, if it is not commercially reasonable to vest such economic interests in the Company or any of its Subsidiaries, Pubco shall negotiate in good faith to amend the Surviving Company LLC Agreement (as such term is defined in the Merger Agreement) to reflect such activities and the direct ownership of assets by Pubco. Nothing contained herein shall be deemed to prohibit Pubco from executing any guarantee of indebtedness of the Company or its Subsidiaries.

3. **Miscellaneous.**

i.   This agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts executed in and to be performed in that State.  All actions and proceedings arising out of or relating to this agreement shall be heard and determined exclusively in any Delaware Chancery Court, or if such court does not have subject matter jurisdiction, any court of the United States located in the State of Delaware.  The parties hereto hereby (a) submit to the exclusive jurisdiction of the Delaware Chancery Court for the purpose of any Action arising out of or relating to this agreement brought by any party hereto, and (b) irrevocably waive, and agree not to assert by way of motion, defense, or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this agreement may not be enforced in or by any of the above-named courts.

ii.  Each of the parties hereto hereby waives to the fullest extent permitted by applicable law any right it may have to a trial by jury with respect to any litigation directly or indirectly arising out of, under or in connection with this agreement.  Each of the parties hereto (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce that foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this agreement, by, among other things, the mutual waivers and certifications herein.

iii. This agreement may be executed and delivered (including by facsimile or portable document format (.pdf) transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

[Remainder of this page intentionally left blank]

4

Please evidence your agreement with the foregoing by executing in the space indicated below.

Very truly yours,

ADAPTHEALTH CORP.

By:    /s/ Luke McGee
      Name: Luke McGee
      Title: Chief Executive Officer

ADAPTHEALTH HOLDINGS, LLC

By:    /s/ Luke McGee
      Name: Luke McGee
      Title: Chief Executive Officer

Agreed and accepted:

BM AH HOLDINGS, LLC

By: BlueMountain Capital Management, LLC,
its manager

By:    /s/ Richard Thorne
Name:    Richard Thorne
Title:    Deputy General Counsel, Tax

BLUEMOUNTAIN SUMMIT OPPORTUNITIES
FUND II (US) L.P.

By: BlueMountain Capital Management, LLC,
its manager

By:    /s/ Richard Thorne
Name:    Richard Thorne
Title:    Deputy General Counsel, Tax

BLUEMOUNTAIN FOINAVEN
MASTER FUND L.P.

By: BlueMountain Capital Management, LLC,
its investment manager

By:     /s/ Richard Thorne
Name:   Richard Thorne
Title:    Deputy General Counsel, Tax

BMSB L.P.

By: BlueMountain Capital Management, LLC,
its manager

By:     /s/ Richard Thorne
Name:   Richard Thorne
Title:    Deputy General Counsel, Tax

BLUEMOUNTAIN FURSAN FUND L.P.

By: BlueMountain Capital Management, LLC,
its manager

By:     /s/ Richard Thorne
Name:   Richard Thorne
Title:    Deputy General Counsel, Tax

**Exhibit 10.6**

**Execution Copy**

**THIRD AMENDED AND RESTATED CREDIT AND GUARANTY AGREEMENT**

**Dated as of March 20, 2019**

**by and among**

**ADAPTHEALTH LLC,**

**as the Borrower,**

**CIT FINANCE LLC,**
**as Administrative Agent,**

**and**

**THE OTHER LENDERS PARTY HERETO**

**REGIONS BANK**
**SUNTRUST BANK**
**as Documentation Agents**

**CITIZENS BANK, N.A.**
**JPMORGAN CHASE BANK, N.A.**
**as Co-Syndication Agents**

**Arranged By:**

**CIT FINANCE LLC**
**REGIONS BANK**
**SUNTRUST ROBINSON HUMPHREY, INC.**
**as Joint Lead Arrangers and Joint Book Runners**

**TABLE OF CONTENTS**

ARTICLE 1 DEFINITIONS AND ACCOUNTING TERMS                                          1
    **1.01**    Defined Terms                                              1
    **1.02**    Other Interpretive Provisions                             48
    **1.03**    Accounting Terms                                          48
    **1.04**    Rounding                                                  49
    **1.05**    Times of Day                                              49
    **1.06**    Letter of Credit Amounts                                  49
    **1.07**    Financial Covenant Defaults                               49
    **1.08**    Divisions                                                 49

ARTICLE 2 THE COMMITMENTS AND CREDIT EXTENSIONS                                      50
    **2.01**    Loans                                                     50
    **2.02**    Borrowings, Conversions and Continuations of Loans        51
    **2.03**    Letters of Credit and Letter of Credit Fees               52
    **2.04**    Swingline Loans                                           58
    **2.05**    Prepayments                                               60
    **2.06**    Termination or Reduction of Total Revolving Commitments    63
    **2.07**    Repayment of Loans                                        64
    **2.08**    Interest                                                  65
    **2.09**    Fees                                                      65
    **2.10**    Computation of Interest and Fees                          66
    **2.11**    Evidence of Debt                                          66
    **2.12**    Payments Generally                                        67
    **2.13**    Sharing of Payments                                       68
    **2.14**    Handling of Proceeds of Collateral; Cash Dominion; Revolving Loan Account    68
    **2.15**    Uncommitted Facilities Increase                           70
    **2.16**    Defaulting Lenders                                        73
    **2.17**    Refinancing Facilities                                    75
    **2.18**    Amend and Extend Transactions                             77

ARTICLE 3 TAXES, YIELD PROTECTION AND ILLEGALITY                                     78
    **3.01**    Taxes                                                     78
    **3.02**    Illegality                                                82
    **3.03**    Inability to Determine Rate; Alternate Rate of Interest   82
    **3.04**    Increased Cost and Reduced Return; Capital Adequacy       83
    **3.05**    Funding Losses                                            84
    **3.06**    Matters Applicable to all Requests for Compensation       85
    **3.07**    Survival                                                  85

i

Case 2:21-cv-03382-HB     Document 114-3     Filed 03/30/23     Page 216 of 571

| | | | |
|---|---|---|---|
| ARTICLE 4 | CONDITIONS PRECEDENT TO CREDIT EXTENSIONS | | 85 |
| | 4.01 | Conditions of Initial Credit Extension | 85 |
| | 4.02 | Conditions to all Credit Extensions | 89 |
| | 4.03 | Satisfaction of Conditions | 90 |
| | | | |
| ARTICLE 5 | REPRESENTATIONS AND WARRANTIES | | 90 |
| | 5.01 | Existence, Qualification and Power | 90 |
| | 5.02 | Authorization; No Contravention | 90 |
| | 5.03 | Governmental Authorization; Other Consents | 91 |
| | 5.04 | Binding Effect | 91 |
| | 5.05 | Financial Statements; No Material Adverse Effect | 91 |
| | 5.06 | Litigation | 92 |
| | 5.07 | No Default | 92 |
| | 5.08 | Ownership of Property; Liens | 92 |
| | 5.09 | Environmental Compliance | 92 |
| | 5.10 | Insurance | 93 |
| | 5.11 | Taxes | 93 |
| | 5.12 | ERISA Compliance | 93 |
| | 5.13 | Subsidiaries | 94 |
| | 5.14 | Margin Regulations; Investment Company Act, Use of Proceeds | 94 |
| | 5.15 | Disclosure | 94 |
| | 5.16 | Compliance with Laws | 95 |
| | 5.17 | Intellectual Property; Licenses, Etc. | 95 |
| | 5.18 | Broker's Fees | 95 |
| | 5.19 | Labor Matters | 95 |
| | 5.20 | Business Locations | 95 |
| | 5.21 | Perfection of Security Interests in the Collateral | 96 |
| | 5.22 | Solvency | 96 |
| | 5.23 | [Reserved] | 96 |
| | 5.24 | Material Contracts | 96 |
| | 5.25 | Accounts | 96 |
| | 5.26 | Holding Company Status | 96 |
| | 5.27 | Inventory Suppliers | 96 |
| | 5.28 | Patriot Act | 96 |
| | 5.29 | Regulatory Matters | 96 |
| | 5.30 | Compliance of Products | 100 |
| | 5.31 | OFAC | 103 |
| | | | |
| ARTICLE 6 | AFFIRMATIVE COVENANTS | | 103 |
| | 6.01 | Financial Statements | 103 |
| | 6.02 | Certificates; Other Information | 104 |

| | | |
|---|---|---|
| **6.03** | Notices | 105 |
| **6.04** | Payment of Obligations; Tax Returns | 107 |
| **6.05** | Preservation of Existence, Material Contracts, Etc. | 107 |
| **6.06** | Maintenance of Properties | 108 |
| **6.07** | Maintenance of Insurance | 108 |
| **6.08** | Compliance with Laws | 109 |
| **6.09** | Books and Records | 109 |
| **6.10** | Inspection Rights | 109 |
| **6.11** | Use of Proceeds | 110 |
| **6.12** | Additional Subsidiaries | 110 |
| **6.13** | ERISA Compliance | 111 |
| **6.14** | Further Assurances | 111 |
| **6.15** | Covenant with Respect to Environmental Matters | 112 |
| **6.16** | Covenants with Respect to Real Property | 113 |
| **6.17** | Lenders Meetings | 113 |
| **6.18** | Post-Closing Covenants | 113 |
| **6.19** | Qualified ECP Guarantors | 114 |
| **6.20** | Interest Rate Protection | 114 |
| **6.21** | Covenants Regarding Products and Compliance with Required Permits | 114 |
| **6.22** | Healthcare Operations | 114 |
| **6.23** | Patriot Act; OFAC | 115 |
| | | |
| **ARTICLE 7 NEGATIVE COVENANTS** | | 115 |
| **7.01** | Indebtedness | 115 |
| **7.02** | Liens | 117 |
| **7.03** | Investments | 118 |
| **7.04** | Fundamental Changes | 120 |
| **7.05** | Dispositions | 120 |
| **7.06** | Restricted Payments | 121 |
| **7.07** | Change in Nature of Business; Cloud-Based Billing | 122 |
| **7.08** | Transactions with Affiliates and Insiders | 123 |
| **7.09** | Burdensome Agreements | 123 |
| **7.10** | Use of Proceeds | 123 |
| **7.11** | Amendments to Certain Agreements | 123 |
| **7.12** | Organization Documents; Fiscal Year; Legal Name, State of Formation and Form of Entity | 124 |
| **7.13** | Ownership of Subsidiaries | 124 |
| **7.14** | Sale and Leaseback Transactions | 124 |
| **7.15** | Limitations on Holdings | 124 |
| **7.16** | Account Control Agreements; Bank Accounts | 124 |
| **7.17** | Permits | 124 |

| | | |
|---|---|---:|
| **7.18** | Covenants Relating to Excluded Subsidiaries | 125 |
| | | |
| **ARTICLE 8 FINANCIAL COVENANTS** | | 125 |
| **8.01** | Financial Covenants | 125 |
| | | |
| **ARTICLE 9 EVENTS OF DEFAULT AND REMEDIES** | | 126 |
| **9.01** | Events of Default | 126 |
| **9.02** | Remedies upon Event of Default | 128 |
| **9.03** | [Reserved] | 129 |
| **9.04** | Application of Funds | 129 |
| **9.05** | Loan Parties Right to Cure | 130 |
| | | |
| **ARTICLE 10 GUARANTY** | | 131 |
| **10.01** | The Guaranty | 131 |
| **10.02** | Obligations Unconditional | 132 |
| **10.03** | Reinstatement | 133 |
| **10.04** | Waivers | 133 |
| **10.05** | Remedies | 134 |
| **10.06** | Contribution by Guarantors | 134 |
| **10.07** | Guarantee of Payment; Continuing Guarantee | 135 |
| **10.08** | Subordination of Other Obligations | 135 |
| | | |
| **ARTICLE 11 THE ADMINISTRATIVE AGENT** | | 135 |
| **11.01** | Appointment and Authorization of Administrative Agent | 135 |
| **11.02** | Delegation of Duties | 136 |
| **11.03** | Liability of Administrative Agent | 136 |
| **11.04** | Reliance by Administrative Agent | 137 |
| **11.05** | Notice of Default | 137 |
| **11.06** | Credit Decision; Disclosure of Information by Administrative Agent | 137 |
| **11.07** | Indemnification of Administrative Agent | 138 |
| **11.08** | Administrative Agent in its Individual Capacity | 138 |
| **11.09** | Successor Administrative Agent | 139 |
| **11.10** | Administrative Agent May File Proofs of Claim | 139 |
| **11.11** | Collateral and Guaranty Matters | 140 |
| **11.12** | Other Agents; Arrangers and Managers | 141 |
| **11.13** | Additional Secured Parties | 141 |
| **11.14** | Exclusive Right to Enforce Rights and Remedies | 141 |
| **11.15** | Flood Laws | 142 |
| **11.16** | Banking Services Obligations/Hedging | 142 |
| **11.17** | Certain ERISA Matters | 143 |

ARTICLE 12 MISCELLANEOUS                                                                       144
    **12.01**    Amendments, Etc.                                          144
    **12.02**    Notices and Other Communications; Facsimile Copies        146
    **12.03**    No Waiver; Cumulative Remedies                            148
    **12.04**    Attorney Costs, Expenses                                  148
    **12.05**    Indemnification by the Loan Parties                       149
    **12.06**    Payments Set Aside                                        150
    **12.07**    Successors and Assigns                                    150
    **12.08**    Confidentiality                                           157
    **12.09**    Set-off                                                   158
    **12.10**    Interest Rate Limitation                                  159
    **12.11**    Counterparts                                              159
    **12.12**    Integration                                               159
    **12.13**    Survival of Representations and Warranties                159
    **12.14**    Severability                                              159
    **12.15**    Replacement of Lenders                                    160
    **12.16**    Governing Law                                             160
    **12.17**    Waiver of Right to Trial by Jury                          161
    **12.18**    USA Patriot Act Notice                                    161
    **12.19**    Nonliability of Lenders                                   161
    **12.20**    Acknowledgment and Consent to Bail-In of EEA Financial Institutions    163
    **12.21**    Effect of Amendment and Restatement                       163

ARTICLE 13 APPOINTMENT OF THE BORROWER REPRESENTATIVE; JOINT AND SEVERAL LIABILITY OF THE BORROWERS    164
    **13.01**    Borrower Representative                                   164
    **13.02**    Joint and Several Liability of Borrowers                  164

**SCHEDULES**

| | |
|---|---|
| 1.01(a) | Existing Letters of Credit |
| 1.01(b) | Excluded Accounts |
| 1.01(c) | Inventory Suppliers |
| 2.01 | Commitments and Pro Rata Shares |
| 5.10 | Insurance |
| 5.13 | Capitalization |
| 5.17 | IP Rights |
| 5.20(a) | Locations of Real Property |
| 5.20(b) | Locations of Tangible Personal Property |
| 5.20(c) | Locations of Chief Executive Office |
| 5.24 | Material Contracts |
| 5.25 | Accounts |
| 5.29(a) | Regulatory Matters |
| 5.29(b) | Specific Licensing |
| 5.29(c) | Physician Ownership |
| 5.29(f)(iii) | Healthcare Proceedings |
| 5.30(a) | Compliance of Products |
| 5.30(b) | Required Permits |
| 6.18 | Post-Closing Covenants |
| 7.01 | Indebtedness Existing on the Closing Date |
| 7.02 | Liens Existing on the Closing Date |
| 7.03 | Investments Existing on the Closing Date |
| 12.02 | Certain Addresses for Notices |

**EXHIBITS**

| | |
|---|---|
| A-1 | Form of Loan Notice |
| A-2 | Form of Swingline Loan Notice |
| B-1 | Form of Revolving Note |
| B-2 | Form of Term Note |
| B-3 | Form of Swingline Note |
| C | Form of Compliance Certificate |
| D | Form of Assignment and Assumption Agreement |
| E | Form of Solvency Certificate |
| F-1 | Form of U.S. Tax Compliance Certificate |
| F-2 | Form of U.S. Tax Compliance Certificate |
| F-3 | Form of U.S. Tax Compliance Certificate |
| F-4 | Form of U.S. Tax Compliance Certificate |
| G | Form of Dutch Auction Procedure for Borrower Buy-Backs |
| Z | Form of Affiliated Lender Assignment and Assumption |

**THIRD AMENDED AND RESTATED CREDIT AND GUARANTY AGREEMENT**

This THIRD AMENDED AND RESTATED CREDIT AND GUARANTY AGREEMENT is entered into as of March 20, 2019, among ADAPTHEALTH LLC (formerly known as QMES LLC), a Delaware limited liability company, and such other Persons joined hereto as a Borrower from time to time (each a "Borrower" and together, the "Borrowers"), the Guarantors (as hereinafter defined) from time to time party hereto, the Lenders (as hereinafter defined) from time to time party hereto, and CIT FINANCE LLC ("CIT"), as Administrative Agent.

The Administrative Agent and certain lenders have previously established credit facilities in favor of Borrowers pursuant to that certain Second Amended and Restated Loan and Security Agreement (as amended by that certain Amendment No. 1 to Second Amended and Restated Credit and Guaranty Agreement, Joinder and Limited Consent dated as of May 17, 2018, Amendment No. 2 to Second Amended and Restated Credit and Guaranty Agreement and Limited Consent dated as of June 28, 2018, Amendment No. 3 to Second Amended and Restated Credit and Guaranty Agreement, and Limited Consent dated as of December 20, 2018, and as further amended, restated, supplemented or otherwise modified form time to time, the "Original Loan Agreement"), dated as of February 16, 2018, by and among Borrowers, the Administrative Agent, and certain lenders party thereto.

The Borrowers have requested that the Administrative Agent and Lenders agree to certain modifications and to provide $425,000,000 in credit facilities for the purposes set forth herein and the Lenders are willing to do so on the terms and conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

**ARTICLE 1**

**DEFINITIONS AND ACCOUNTING TERMS**

1.01    **Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Accounts" means all of the Loan Parties' present and future:  (a) accounts (as defined in the UCC); (b) instruments, documents, chattel paper (including electronic chattel paper) (all as defined in the UCC); (c) reserves and credit balances arising in connection with or pursuant to this Agreement; (d) guaranties; (e) other supporting obligations, payment intangibles and letter of credit rights (all as defined in the UCC); (f) property, including notes and deposits, of the Loan Parties' account debtors securing the obligations owed by such account debtors to the Loan Parties; and (g) all proceeds of any of the foregoing.

"Acquisition", by any Person, means the acquisition by such Person, in a single transaction or in a series of related transactions, of (a) all or substantially all of the Property of another Person, (b) all or substantially all of a division or operating group of another Person, or (c) all of the Capital Stock of another Person, in each case whether or not involving a merger or consolidation with such other Person and whether for cash, property, services, assumption of Indebtedness, securities or otherwise.

"Additional Credit Extension Amendment" means an amendment to this Agreement (which may, at the option of the Administrative Agent, be in the form of an amendment and restatement of this Agreement) providing for any Extended Term Loans and/or Extended Revolving Commitments pursuant to Section 2.18, which shall be consistent with the applicable provisions of this Agreement and otherwise

1

satisfactory to the parties thereto.  Each Additional Credit Extension Amendment shall be executed by the Administrative Agent, the L/C Issuer, and/or the Swingline Lender (to the extent Section 2.18 would require the consent of the L/C Issuer and/or the Swingline Lender, respectively, for the amendments effected in such Additional Credit Extension Amendment), the applicable Loan Parties and the other parties specified in Section 2.18 (but not any other Lender).  Any Additional Credit Extension Amendment may include conditions for delivery of opinions of counsel and other documentation consistent with the conditions in Section 4.01, all to the extent reasonably requested by the Administrative Agent or the other parties to such Additional Credit Extension Amendment.

"Additional Lender" has the meaning specified in Section 2.15(d).

"Administrative Agent" means CIT in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Administrative Agent's Bank Account" means the Administrative Agent's bank account number 432233505, ABA No. 021000021, account name CIT Finance LLC-Healthcare, at JPMorgan Chase Bank NA in New York, New York, Reference:  AdaptHealth LLC.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 12.02 or such other address or account as the Administrative Agent may from time to time notify the Borrowers and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Affiliated Lender" means, collectively, the Sponsor or BlueMountain or any of their respective Affiliates (other than Holdings and its Subsidiaries).

"Affiliated Lender Assignment and Assumption" has the meaning specified in Section 12.07(i)(ii).

"Agent-Related Persons" means the Administrative Agent, together with its Affiliates, and its Approved Funds, and the officers, directors, employees, agents, advisors, auditors and Controlling Persons and attorneys-in-fact of such Persons, Affiliates and Approved Funds, provided, however, that for the purposes of this Agreement, no Agent-Related Person shall be deemed an Affiliate of the Sponsor, the Borrowers or the Guarantors.

"Aggregate Payments"  has the meaning set forth in Section 10.06.

"AHYDO Catch-Up Payments" means any minimum prepayment or redemption necessary at the end of each accrual period (as determined for purposes of Section 163(i) of the Internal Revenue Code) ending after the fifth anniversary of March 20, 2019, pursuant to the terms of the Preferred Note that is intended or designed to cause the loan under the Preferred Note not to be treated as an "applicable high yield discount obligation" within the meaning of Section 163(i) of the Internal Revenue Code.

"Agreement" means this Third Amended and Restated Credit and Guaranty Agreement, as amended, modified, restated, supplemented or extended from time to time.

2

"Applicable Margin" means with respect to the Loans and the Letters of Credit, the following percentages per annum, based upon the Consolidated Total Leverage Ratio as set forth in the most recent Compliance Certificate received by the Administrative Agent pursuant to Section 6.02(b):

| Pricing Level | Consolidated Total Leverage Ratio | Letters of Credit | Initial Term Loan | | Revolving Loans | | | Delayed – Draw Term Loan | |
|---|---|---|---|---|---|---|---|---|---|
| | | | LIBOR Loans | Base Rate Loans | LIBOR Loans | Base Rate Loans | Swingline Loans | LIBOR Loans | Base Rate Loans |
| 1 | > 3.00 to 1.00 | 3.50% | 3.50% | 2.50% | 3.50% | 2.50% | 2.50% | 3.50% | 2.50% |
| 2 | > 2.50 to 1.00 but ≤ 3.00 to 1.00 | 3.00% | 3.00% | 2.00% | 3.00% | 2.00% | 2.00% | 3.00% | 2.00% |
| 3 | > 2.00 to 1.00 but ≤ 2.50 to 1.00 | 2.75% | 2.75% | 1.75% | 2.75% | 1.75% | 1.75% | 2.75% | 1.75% |
| 4 | ≤ to 2.00 to 1.00 | 2.50% | 2.50% | 1.50% | 2.50% | 1.50% | 1.50% | 2.50% | 1.50% |

Any increase or decrease in the Applicable Margin resulting from a change in the Consolidated Total Leverage Ratio shall become effective as of the first (1st) Business Day immediately following the date a Compliance Certificate is required to be delivered to the Administrative Agent pursuant to Section 6.02(b), provided, that if a Compliance Certificate is not delivered to the Administrative Agent when due in accordance with such Section, then Pricing Level 1 shall apply as of the first (1st) Business Day after the date on which such a Compliance Certificate was required to have been delivered and shall continue to apply until the first (1st) Business Day immediately following the date a Compliance Certificate is delivered to the Administrative Agent in accordance with Section 6.02(b), whereupon the Applicable Margin shall be adjusted based upon the calculation of the Consolidated Total Leverage Ratio contained in such Compliance Certificate.  Notwithstanding the foregoing, the Applicable Margin in effect from the Closing Date through the first (1st) Business Day immediately following the date a Compliance Certificate is required to be delivered to the Administrative Agent pursuant to Section 6.02(b) for the Fiscal Quarter ending June 30, 2019 shall be set at Pricing Level 2.  In the event that (a) any financial statement delivered pursuant to Section 6.01(a) or Section 6.01(b) or Compliance Certificate delivered pursuant to Section 6.02(b) is shown to be inaccurate and (b) such inaccuracy if corrected, would have led to the application of a higher Applicable Margin for any period (an "Applicable Period") than the Applicable Margin applied for such Applicable Period, then (i) the Borrowers shall immediately deliver to the Administrative Agent a corrected Compliance Certificate for such Applicable Period, (ii) the Applicable Margin for such Applicable Period shall be the Applicable Margin corresponding to the information disclosed on the corrected Compliance Certificate, and (iii) the Borrowers shall immediately pay to the Administrative Agent the accrued additional interest owing as a result of the application of such increased Applicable Margin for such Applicable Period, which payment shall be promptly applied by the Administrative Agent.  The rights of the Administrative Agent set forth above shall survive the Termination Date and are in addition to rights of the Administrative Agent and Lenders with respect to Sections 2.08 and 9.02 and other of their respective rights under this Agreement.

3

"Appropriate Lender" means, at any time, (a) with respect to the Revolving Commitments and the Term Loans, a Lender that has a Commitment with respect thereto or holds a Loan thereunder at such time, as applicable (b) with respect to the Letter of Credit Sublimit, the L/C Issuer and (c) with respect to the Swingline Loan Sublimit, the Swingline Lender.

"Approved Fund" means (a) any Person (other than a natural person) engaged in making, purchasing, holding, or investing in commercial loans and similar extensions of credit and that is advised, administered, or managed by a Lender, an Affiliate of a Lender (or an entity or an Affiliate of an entity that administers, advises or manages a Lender); (b) with respect to any Lender that is an investment fund, any other investment fund that invests in loans and that is advised, administered or managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor; and (c) any third party which provides "warehouse financing" to a Person described in the preceding clause (a) or (b) (and any Person described in said clause (a) or (b) shall also be deemed an Approved Fund with respect to such third party providing such warehouse financing).

"Arranger" means CIT Finance LLC, in its capacity as sole lead arranger and book runner.

"Assignment and Assumption" means an Assignment and Assumption Agreement substantially in the form of Exhibit D.

"Attorney Costs" means and includes all documented and out-of-pocket fees, expenses and disbursements of any law firm or other external counsel.

"Attributable Indebtedness" means, on any date, in respect of any Capital Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"Audited Pre-Closing Financial Statements" means the audited consolidated balance sheet of the Loan Parties and their Subsidiaries for the Fiscal Years ended December 31, 2015, December 31, 2016, and December 31, 2017, and the related consolidated statements of income or operations, shareholders' equity and cash flows of the Loan Parties and their Subsidiaries for such Fiscal Year, including the notes thereto.

"Availability Period" means, with respect to the Revolving Commitments, the period from and including the first (1st) Business Day immediately following the Closing Date to the earliest of (a) the date that is five (5) Business Days before the Revolving Loan Maturity Date, (b) the date of termination of the Revolving Commitments pursuant to Section 2.06, and (c) the date of termination of the commitment of each Lender to make Loans pursuant to Section 9.02 and of the obligation of the L/C Issuer (or the Support Provider, as the case may be) to make (or cause to make) L/C Credit Extensions pursuant to Section 9.02.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Banking Services" mean each and any of the following banking services provided to any Loan Party as follows: (a) commercial credit cards, purchasing cards or other similar charge cards provided by

4

any Person that is a Lender or an Affiliate of a Lender at the time provided (or otherwise introduced by, provided by, and/or such obligations guaranteed by, the Administrative Agent or any Lender), (b) stored value cards provided by any Person that is a Lender or an Affiliate of a Lender at the time provided and (c) treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services) provided by the Administrative Agent or any of the Administrative Agent's Affiliates.

"Banking Services Obligations" mean any and all obligations of the Loan Parties, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with Banking Services.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Base Rate" means for any day a fluctuating rate per annum equal to the highest of: (a) the Federal Funds Rate plus 1/2 of 1%; (b) the rate of interest in effect for such day as publicly announced from time to time by JPMorgan Chase Bank as its "prime rate" in effect for such day; or (c) the most recently available LIBO Base Rate (as adjusted by any minimum LIBO Rate floor) plus one percent (1%); provided that for the purpose of this definition, the LIBO Base Rate for any day shall be based on the LIBO Screen Rate. Any change in the "prime rate" announced by JPMorgan Chase Bank shall take effect without notice to the Borrowers at the opening of business on the day specified as the effective date of change in the public announcement or publication of such change. The Base Rate is not necessarily the lowest rate of interest charged by Lenders in connection with extensions of credit. If JPMorgan Chase Bank ceases to announce its "prime rate", the Administrative Agent may select a reasonably comparable index or source to use as the basis for the Base Rate. For the avoidance of doubt, if the Base Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Base Rate Loan" means a Loan that accrues interest by reference to the Base Rate in accordance with the terms of this Agreement.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employment benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Internal Revenue Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Internal Revenue Code) the assets of any such "employee benefit plan" or "plan".

"BlueMountain" means investment funds managed by BlueMountain Capital Management LLC.

"Borrower Representative" means AdaptHealth LLC, in its capacity as the borrowing agent on behalf of itself and the Borrowers.

"Borrowers" has the meaning specified in the introductory paragraph hereto, together with all permitted successors and assigns of such Person and any other Person joining this Agreement as a "Borrower" pursuant to Section 6.12 hereof or otherwise.

5

"Borrowing" means (a) a borrowing consisting of simultaneous Loans (other than Swingline Loans) of the same Type and, in the case of LIBOR Loans, having the same Interest Period made by the Lenders pursuant to Sections 2.01 and 2.02 or (b) a borrowing of a Swingline Loan made by Swingline Lender pursuant to Section 2.04.

"Brightree Collateral Assignment Agreement" shall have the meaning set forth in Section 4.01(j) hereof.

"Brightree Services Agreement" shall mean collectively each of (a) that certain Business Solutions Provider Agreement dated as of October 29, 2009, by and between Royal Homestar LLC and Brightree LLC, (b) that certain Brightree LLC QMES Pricing Agreement dated as of December 1, 2014, between Brightree LLC and Borrower Representative, (c) that certain Brightree LLC Business Solutions Provider Agreement dated as of May 4, 2014, between Brightree LLC and Borrower Representative, and (d) that certain Business Solutions Provider Agreement dated as of September 21, 2005, by and between Brightree LLC and Ocean Home Health Supply LLC.

"Business" or "Businesses" means, at any time, a collective reference to the businesses operated by the Borrowers and their Subsidiaries at such time, including the provision of home health equipment and supplies.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, either New York or in the state where the Administrative Agent's Office is located or, with respect to a Letter of Credit, the state where the L/C Issuer's (or the Support Provider's, as the case may be) office is located and, if such day relates to any LIBOR Loan or any Base Rate Loan bearing interest at a rate based on the LIBO Rate, means any such day meeting the above requirements on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"Capital Expenditures" means, with respect to any Person, all expenditures which, in accordance with GAAP, would be required to be capitalized and shown on the balance sheet of such Person, including expenditures in respect of Capital Leases.

"Capital Lease" means, with respect to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such person.

"Capital Stock" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interest in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"Cash Collateralize" means to pledge and deposit with or deliver to the Administrative Agent (or with and to a bank designated by the Administrative Agent to be held in a deposit account subject to a control agreement), for the benefit of the Administrative Agent (on behalf of itself, the Support Providers, L/C Issuers and the other Secured Parties), as collateral for the total Letter of Credit Liabilities or other contingent Obligations, cash or deposit account balances pursuant to documentation in form and

6

substance satisfactory to the Administrative Agent, the Support Provider and the L/C Issuer, if the L/C Issuer is a Lender (which documents are hereby consented to by the Lenders). Derivatives of the term Cash Collateralize have corresponding meanings. "Cash Collateral" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral.

"Cash Control Period" means the period of time commencing upon the occurrence of an Event of Default and the delivery by the Administrative Agent of a notice of control to the applicable financial institution and ending on the earlier of (a) the written waiver of such Event of Default by the Required Lenders, or (b) the Termination Date.

"Cash Equivalents" means, as of any date of determination, (a) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than twelve (12) months from the date of acquisition, (b) Dollar denominated time deposits and certificates of deposit of (i) any Lender, (ii) any domestic commercial bank of recognized standing having capital and surplus in excess of $500,000,000 or (iii) any bank whose short term commercial paper rating from S&P is at least A1 or the equivalent thereof or from Moody's is at least P1 or the equivalent thereof (any such bank being an "Approved Bank"), in each case with maturities of not more than 270 days from the date of acquisition, (c) commercial paper and variable or fixed rate notes issued by any Approved Bank (or by the parent company thereof) or any variable rate notes issued by, or guaranteed by, any domestic corporation rated A1 (or the equivalent thereof) or better by S&P or P1 (or the equivalent thereof) or better by Moody's and maturing within six (6) months of the date of acquisition, (d) repurchase agreements entered into by any Person with a bank or trust company (including any of the Lenders) or recognized securities dealer having capital and surplus in excess of $500,000,000 for direct obligations issued by or fully guaranteed by the United States in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a fair market value of at least one hundred percent (100%) of the amount of the repurchase obligations and (e) Investments, classified in accordance with GAAP as current assets, in money market mutual funds (as defined in Rule 2(a).7 of the Investment Company Act) registered under the Investment Company Act of 1940, as amended, which are administered by reputable financial institutions having capital of at least $500,000,000 and the portfolios of which are limited to Investments of the character described in the foregoing clauses (a) through (d).

"CFC" means a "controlled foreign corporation" as such term is defined in Section 957 of the Internal Revenue Code.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority. For purposes of this Agreement, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, guidelines and directives in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to have been adopted and gone into effect after the date of this Agreement.

"Change of Control" means, at any time, (i) the Sponsor and its Affiliates shall cease to beneficially own directly or indirectly, at least eighteen percent (18%) of the Capital Stock of Holdings on a fully diluted basis, (ii) Management Entity shall cease to beneficially own directly or indirectly, at least 41,252 of the Common Units (as defined in the Fourth Amended and Restated Limited Liability

7

Company Agreement of Holdings) of Holdings, (iii) the Sponsor and its Affiliates (excluding Affiliates that are portfolio companies) and Management Entity shall cease to beneficially own directly or indirectly, at least thirty-three percent (33%) of the Capital Stock of Holdings on a fully diluted basis; (iv) any Person or "group" (within the meanings of Rules 13d-3 and 13d-5 under the Exchange Act), other than Sponsor, its Affiliates (excluding Affiliates that are portfolio companies), Management Entity, or BlueMountain shall have acquired beneficial ownership of twenty percent (20%) or more on a fully diluted basis of the voting and/or economic interest in the Capital Stock of Holdings; (v) the Sponsor and its Affiliates (excluding Affiliates that are portfolio companies) and Management Entity shall cease to have the power to appoint, remove or replace at least three (3) of the seats on the board of directors (or similar governing body) of Holdings; provided, the number of seats on the board of directors (or similar governing body) of Holdings shall not exceed nine (9); (vi) any Person or "group" (within the meanings of Rules 13d-3 and 13d-5 under the Exchange Act), other than Sponsor, its Affiliates (excluding Affiliates that are portfolio companies) or Management Entity shall have acquired beneficial ownership of more than fifty percent (50%) on a fully diluted basis of the voting and/or economic interest in the Capital Stock of Holdings; (vii) Holdings shall cease to own and control one hundred percent (100%), on a fully diluted basis, of the economic and voting interests in the Capital Stock of Intermediate Holdings; or (viii) Intermediate Holdings shall cease to own and control one hundred percent (100%), on a fully diluted basis, of the economic and voting interests in the Capital Stock of AdaptHealth LLC.  For the avoidance of doubt, any transfer of Capital Stock of Holdings to a "Permitted Transferee" as defined in the Amended and Restated Limited Liability Company Agreement of Holdings as in effect on the date hereof, shall be ignored for purposes of determining if any Change of Control has occurred.

"CIT" has the meaning specified in the introductory paragraph hereto.

"Closing Date" means March 20, 2019.

"Closing Date Distributions" has the meaning specified in Section 6.11(a)(i)(z).

"Closing Date Facilities" has the meaning specified in Section 2.15(c).

"Collateral" means, collectively, all real and personal Property (other than Excluded Property) with respect to which Liens in favor of the Administrative Agent are granted (or were intended to be granted) pursuant to and in accordance with the terms of the Collateral Documents.

"Collateral Assignment of Agreement" means any agreement executed by each of the applicable Loan Parties in favor of the Administrative Agent under and pursuant to which such Loan Parties collaterally assign to the Administrative Agent all of their respective rights and remedies to certain agreements, in each case as amended, supplemented, modified, replaced, substituted for or restated from time to time and all exhibits and schedules attached thereto.

"Collateral Documents" means, collectively, the Security Agreement, the Mortgage Instruments, the Landlord Agreements, the Collateral Assignment(s) of Agreement, the Securities Account Control Agreement(s), the Deposit Account Control Agreement(s), the Uncertificated Securities Control Agreement(s) and such other security documents as may be executed and delivered by the Loan Parties pursuant to the terms of Section 6.14.

"Commitment" means, as to each Lender, the Revolving Commitment and/or Term Loan Commitment, as applicable, set forth opposite such Lender's name on Schedule 2.01 or in the Register, as applicable, as the same may be reduced or modified at any time and from time to time pursuant to the terms hereof.

8

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.) and any successor statute, and any rule, regulation, or order promulgated thereunder, in each case as amended from time to time.

"Competitor" means (i) any Person specifically identified in writing to the Administrative Agent as of the Closing Date and (ii) any other bona fide competitor of Borrower (other than banks, fixed income investors, investment funds or other non-bank lending entities) identified in writing by Borrower Representative after the Closing Date to the Administrative Agent and agreed to by the Lenders at their sole option.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Capital Expenditures" means, for any period, for the Consolidated Group on a consolidated basis, all Capital Expenditures, as determined in accordance with GAAP, provided, that Consolidated Capital Expenditures shall not include (a) expenditures made with proceeds of any Involuntary Disposition to the extent such expenditures are used to purchase Property that is the same as or similar to the Property subject to such Involuntary Disposition or (b) Permitted Acquisitions.

"Consolidated Current Assets" means, as of any date of determination, for the Consolidated Group on a consolidated basis, the total assets that may properly be classified as current assets in conformity with GAAP, excluding cash and Cash Equivalents.

"Consolidated Current Liabilities" means, as of any date of determination, for the Consolidated Group on a consolidated basis, all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a balance sheet of the Consolidated Group (or any member thereof), but excluding (i) the current portion of any Funded Indebtedness and (ii) without duplication of clause (i) above, all Loans then outstanding hereunder.

"Consolidated EBITDA" means, for any period for the Consolidated Group on a consolidated basis (without duplication), an amount equal to Consolidated Net Income for such period plus the following, without duplication, to the extent deducted and not already added back in calculating such Consolidated Net Income: (a) Consolidated Interest Charges for such period, (b) the provision for federal, state, local and foreign income taxes payable by the Consolidated Group for such period, (c) the amount of depreciation and amortization expense for such period, (d) other non-cash charges, expenses or losses (provided, in each case, that if any non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent), and including amortization of any prepaid cash item that was paid in a prior period, (e) fees, costs and expenses related to or incurred in connection with (i) the Transactions in an amount equal to $11,566,970.18 and (ii) following the Closing Date, any consummated Permitted Acquisition (provided, the amount added back with respect to any individual Permitted Acquisition shall not exceed $1,500,000, and the aggregate amount added back pursuant to this clause (d)(ii) for any four (4) Fiscal Quarter period shall not exceed $7,500,000), (f) extraordinary, unusual, and/or non-recurring losses or charges (provided, the aggregate amount added back pursuant to this clause (f) for any four (4) Fiscal Quarter period, when taken together with the aggregate amount added back pursuant to clauses (g) and (h) immediately following, shall not exceed twenty percent (20%) of Consolidated EBITDA (calculated without giving effect to the add backs permitted pursuant to this clause (f) and clauses (g) and (h) immediately following)), (g) non-recurring cash expenses during such period resulting from restructuring charges, accruals, reserves and business optimization expenses

9

(provided, the aggregate amount added back pursuant to this clause (g) for any four (4) Fiscal Quarter period, when taken together with the aggregate amount added back pursuant to clauses (f) and (h) of this definition, shall not exceed twenty percent (20%) of Consolidated EBITDA (calculated without giving effect to the add backs permitted pursuant to this clause (g) and clauses (f) and (h) immediately following)), and (h) the amount of "run rate" net cost savings and operating expense reductions, other operating improvements and synergies (calculated on a Pro Forma Basis as though such items had been realized on the first day of such period) as a result of (i) actions taken in connection with any Permitted Acquisition, Investment, Disposition, restructuring or cost savings initiative or (i) actions which will be taken within twelve (12) months after the date of such Permitted Acquisition, Investment, Disposition, restructuring or cost savings initiative, in each case (A) that are projected by the Borrowers in good faith to be realized as a result of such actions taken or to be taken and (B) net of the amount of actual benefits realized during such period that are otherwise included in the calculation of Consolidated EBITDA from such actions (provided, the aggregate amount added back pursuant to this clause (h) for any four (4) Fiscal Quarter period, when taken together with the aggregate amount added back pursuant to clauses (f) and (g) immediately preceding, shall not exceed 20% of Consolidated EBITDA (calculated without giving effect to the add backs permitted pursuant to this clause (h) and clauses (f) and (g) immediately preceding)) and minus the following to the extent included in calculating such Consolidated Net Income: (w) Consolidated Interest Income, (x) income tax credits (to the extent not netted from income taxes payable), (y) any extraordinary, unusual or non-recurring income receipts or gains (including gains on the sale of assets outside the ordinary course of business) and related tax effects thereon, and (z) other non-cash income, receipts of gains (excluding any such non-cash item of income to the extent it represents a receipt of cash in any future period), all as determined in accordance with GAAP. Notwithstanding anything herein to the contrary, for purposes of determining Consolidated EBITDA under this Agreement for any period that includes any of the Fiscal Quarters ended March 31, 2018, June 30 2018, September 30, 2018 and December 31, 2018, Consolidated EBITDA for such Fiscal Quarters shall be $29,408,000 $28,879,000, $30,939,000, and $31,203,000, respectively, in each case, subject to any adjustment set forth above with respect to the Transactions.

"Consolidated Fixed Charges" means, for any period for the Consolidated Group on a consolidated basis, an amount equal to the sum of, without duplication, (a) the cash portion of Consolidated Interest Charges for such period, plus (b) Consolidated Scheduled Funded Debt Payments (excluding any payments in respect of Capital Leases for such period) for such period, plus (c) Restricted Payments paid in cash during such period (including Restricted Payments paid to (i) any holders (other than Loan Parties) of Capital Stock of any non-Wholly Owned Subsidiary and (ii) to BlueMountain (including any of BMSB L.P., BlueMountain Summit Opportunities Fund II (US) L.P., BlueMountain Fursan Fund L.P., and/or BlueMountain Foinaven Master Fund L.P.) to be applied to cash interest payments due and owing under the Preferred Note), all as determined in accordance with GAAP.

"Consolidated Fixed Charges Coverage Ratio" means, as of any date of determination, the ratio of (a) Consolidated EBITDA for the period of the four (4) Fiscal Quarters most recently ended less the sum of (i) eighty-five percent (85%) of Capital Expenditures made in such period and (ii) taxes, along with any Tax Distributions, paid in cash for such period, to (b) Consolidated Fixed Charges for such period.

"Consolidated Funded Indebtedness" means Funded Indebtedness of the Consolidated Group on a consolidated basis determined in accordance with GAAP.

"Consolidated Group" means Intermediate Holdings and its Subsidiaries (other than any Excluded Foreign Subsidiary or Excluded Subsidiary).

10

"<u>Consolidated Interest Charges</u>" means, for any period, the interest expense (including any rent expense for such period under Capital Leases that is treated as interest in accordance with GAAP) of the Consolidated Group for such period with respect to all outstanding Indebtedness of the Consolidated Group (including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Hedge Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP), determined on a consolidated basis in accordance with GAAP.

"<u>Consolidated Interest Income</u>" means, for any period, the interest income of the Consolidated Group for such period, determined on a consolidated basis in accordance with GAAP.

"<u>Consolidated Net Income</u>" means, for any period for the Consolidated Group on a consolidated basis, the net income of the Consolidated Group for such period as determined in accordance with GAAP, <u>provided</u> that there shall be excluded from Consolidated Net Income (a) the income (or deficit) of any Person (other than a Subsidiary of a Borrower) in which a Borrower or any of its Subsidiaries has an ownership interest, except to the extent that any such income is actually received by such Borrower or such Subsidiary in the form of cash dividends or similar cash distributions, (b) the undistributed earnings of any Subsidiary of the Borrower to the extent that the declaration of payment or dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any Contractual Obligation, governing document or Law applicable to such Subsidiary and (c) the income (or deficit) of any Subsidiary of Intermediate Holdings that is not a Loan Party.

"<u>Consolidated Scheduled Funded Debt Payments</u>" means, for any period for the Consolidated Group on a consolidated basis, the sum of all scheduled payments of principal on Consolidated Funded Indebtedness scheduled to be paid during such period, as determined in accordance with GAAP. For purposes of this definition, payments of principal scheduled to be paid (a) shall be determined without giving effect to any reduction of such scheduled payments resulting from the application of any voluntary or mandatory prepayments made during the applicable period, (b) shall be deemed to include the Attributable Indebtedness in respect of Capital Leases, Synthetic Leases and Sale and Leaseback Transactions, (c) shall not include any voluntary or mandatory prepayments made pursuant to <u>Section 2.05</u>, and (d) shall be determined without giving effect to the Following Business Day Convention.

"<u>Consolidated Total Leverage Ratio</u>" means, as of any date of determination, the ratio of (a) Consolidated Funded Indebtedness as of such date less the amount of unrestricted cash and Cash Equivalents on such date (the aggregate amount of which shall not exceed $25,000,000) to (b) Consolidated EBITDA for the period of the four (4) Fiscal Quarters most recently ended.

"<u>Consolidated Unfinanced Capital Expenditure</u>" means any Consolidated Capital Expenditure to the extent not financed with Funded Indebtedness within ninety (90) days of the incurrence of the Capital Expenditure (excluding any Funded Indebtedness included as part of the determination of Revolving Exposure).

"<u>Consolidated Working Capital</u>" means, as at the date of determination, the excess or deficiency of Consolidated Current Assets over Consolidated Current Liabilities.

"<u>Contractual Obligation</u>" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"<u>Contributing Guarantors</u>" has the meaning set forth in <u>Section 10.06</u>.

11

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto. Without limiting the generality of the foregoing, a Person shall be deemed to be Controlled by another Person if such other Person possesses, directly or indirectly, power to vote 15% or more of the securities having ordinary voting power for the election of directors, managing general partners or the equivalent.

"Controlled Account" means each bank account that is established by the Borrowers pursuant to Section 2.14(c) of this Agreement.

"Correction" means repair, modification, adjustment, relabeling, destruction or inspection (including patient monitoring) of a product without its physical removal to some other location; or any plan in response to a state or federal notice of violation or deficiency, such as, without limitation, FDA 483 inspection reports, FDA warning letters, and any plans to implement, monitor and audit ongoing compliance with plans of correction.

"Credit Extension" means each of the following: (a) a Borrowing and (b) an L/C Credit Extension.

"Cure Amount" has the meaning set forth in Section 9.05.

"Cure Date" has the meaning set forth in Section 9.05.

"Cure Right" has the meaning set forth in Section 9.05.

"Debt Issuance" means the issuance of any Indebtedness for borrowed money by any Loan Party other than Indebtedness permitted under Section 7.03.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Excess" means, with respect to any Defaulting Lender, the excess, if any, of such Defaulting Lender's Pro Rata Share of the aggregate outstanding principal amount of all Revolving Loans (calculated as if all Defaulting Lenders (other than such Defaulting Lender) had funded their respective Pro Rata Shares of all Revolving Loans) over the aggregate outstanding principal amount of all Revolving Loans of such Defaulting Lender.

"Default Rate" means (a) when used with respect to Obligations other than Letter of Credit Fees and LIBOR Loans, an interest rate equal to (i) the Base Rate plus (ii) the Applicable Margin applicable to Base Rate Loans plus (iii) two percent (2%) per annum; (b) when used with respect to a LIBOR Loan, an interest rate equal to (i) the LIBO Rate applicable to such LIBOR Loan plus (ii) the Applicable Margin applicable to LIBOR Loans plus (iii) two percent (2%) per annum; and (c) when used with respect to Letter of Credit Fees, a rate equal to (i) the Applicable Margin then applicable to Letters of Credit plus (ii) two percent (2%) per annum, in all cases to the fullest extent permitted by applicable Laws. Interest accruing at the Default Rate shall be immediately payable upon demand.

12

"Defaulting Lender" means any Lender that has at any time after the Closing Date (a) defaulted in its obligation under this Agreement to make a Revolving Loan, a Delayed — Draw Term Loan or to fund its participation in any Letter of Credit, Support Agreement or Swingline Loan required to be made or funded by it hereunder within three (3) Business Days of the date when due (unless such failure is the subject of a good faith dispute), (b) failed to pay over to the Administrative Agent or any Lender any other amount required to be paid by it hereunder within three (3) Business Days of the date when due (unless such failure is the subject of a good faith dispute), (c) notified the Administrative Agent or a Loan Party in writing that it does not intend to satisfy any such obligation or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under agreements in which it commits to extend credit generally, (d) failed within three (3) Business Days after the request of the Administrative Agent to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Revolving Loans, Delayed — Draw Term Loans and participations in then outstanding Letters of Credit, Support Agreements and Swingline Loans, (e) (i) been (or has a parent company that has been) determined by any Governmental Authority having regulatory authority over such Person or its assets to be insolvent, or the assets or management of which has been taken over by any Governmental Authority, or (ii) become (or has a parent company that has become) the subject of a bankruptcy or insolvency proceeding under any Debtor Relief Laws, unless in the case of any Lender subject to this clause (e), the Borrowers, Administrative Agent, L/C Issuer, Support Provider and Swingline Lender shall each have determined that such Lender intends, and has all approvals required to enable it, to continue to perform its obligations as a Lender hereunder, or (f) become the subject of a Bail-In Action.

"Delayed — Draw Term Loan" has the meaning specified in Section 2.01(c).

"Delayed — Draw Term Loan Availability Period" means, with respect to the Delayed — Draw Term Loan Commitments, the period from and including the first (1st) Business Day immediately following the Closing Date to the earliest of (a) the Term Loan Maturity Date, (b) twenty-four (24) months following the Closing Date, and (c) the date of termination of the commitment of each Lender to make Loans pursuant to Section 9.02.

"Delayed — Draw Term Loan Commitment" means, as to each Lender, its obligation to make its portion of the Delayed — Draw Term Loan to the Borrowers pursuant to Section 2.01(c) and the other terms and conditions of this Agreement, in the principal amount set forth opposite such Lender's name on Schedule 2.01, as such amounts may be adjusted from time to time in accordance with this Agreement. The initial aggregate amount of the Delayed — Draw Term Loan Commitments is $50,000,000.

"Deposit Account Control Agreement" means an agreement among a Loan Party, a depository institution, and the Administrative Agent, which agreement is in a form reasonably acceptable to the Administrative Agent and which provides the Administrative Agent with "control" (as such term is used in Article 9 of the UCC) over the deposit account(s) described therein, as the same may be amended, modified, extended, restated, replaced, or supplemented from time to time, and contains such other terms and conditions as Administrative Agent may reasonably require, including a requirement that such depository institution shall wire, or otherwise transfer, in immediately available funds, on a daily basis during a Cash Control Period, to Administrative Agent's Bank Account all immediately available funds received or deposited into such deposit account.

"Device Application" means a 510(k) premarket notification or premarket approval (PMA) application, as appropriate, as those terms are defined in the FDCA.

"Disposition" means the sale, transfer, license, lease or other disposition (including any Sale and Leaseback Transaction) of any Property by any Loan Party or any Subsidiary (including the Capital Stock

13

of any Subsidiary), including any Sale and Leaseback Transaction and including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, provided that the term Disposition shall not include Equity Issuances of Capital Stock by Intermediate Holdings.

"Disqualified Capital Stock" means any Capital Stock which, by its terms (or by the terms of any security or any other Capital Stock into which it is convertible or for which it is exchangeable) or upon the happening of any event or condition, (i) matures or becomes mandatorily redeemable (other than solely for Capital Stock that is not Disqualified Capital Stock) pursuant to a sinking fund obligation or otherwise, except as a result of a customarily defined change of control or asset sale and only so long as any rights of the holders thereof after such change of control or asset sale shall be subject to the prior repayment in full of the Obligations (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted) and the termination of all Commitments and Letters of Credit, (ii) becomes redeemable at the option of the holder thereof (other than solely for Capital Stock that is not Disqualified Capital Stock), in whole or in part, (iii) provides for scheduled payments of dividends in cash or (iv) becomes convertible into or exchangeable for indebtedness for borrowed money or any other Disqualified Capital Stock, in whole or in part, in each case on or prior to the date that is ninety-one (91) calendar days after the later of the Revolving Loan Maturity Date and the Term Loan Maturity Date at the time of issuance.

"Disqualified Institution" means, on any date, (a) any Person designated by the Borrower Representative as a "Disqualified Institution" by written notice delivered to the Administrative Agent on or prior to the date hereof and (b) any other Person that is a Competitor of the Borrowers or any of its Subsidiaries, which Person has been designated by the Borrowers as a "Disqualified Institution" by written notice to the Administrative Agent and the Lenders (including by posting such notice on or through the E-System) not less than ten (10) Business Days prior to such date; provided that "Disqualified Institutions" shall (i) exclude any Person that the Borrowers (or any of them) have (or has) designated as no longer being a "Disqualified Institution" by written notice delivered to the Administrative Agent from time to time and shall exclude any Lender party hereto prior to such tenth (10th) Business Day (and such Lender's Approved Funds and Affiliates shall also be so excluded) and (ii) not apply at any time upon the occurrence and during the continuance of an Event of Default.

"Dollar" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any political subdivision of the United States or any state or commonwealth thereof or under the laws of the District of Columbia.

"E-System" has the meaning specified in Section 12.04.

"Earn-Out Obligations" means, with respect to any Person, "earn-outs" and similar payment obligations of such Person, excluding, for the avoidance of doubt, purchase price holdbacks (whether or not in escrow) to secure seller indemnities.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in any EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

14

"EEA Member Country" means any member state of the European Union, Iceland, Liechtenstein and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 12.08(b)(iii) and (v) (subject to such consents, if any, as may be required under Section 12.08(b)(iii)).

"Environmental Laws" means the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 5101, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, et seq.), the Federal Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Safe Drinking Water Act (42 U.S.C. § 300f to 300j-26 et seq.), the Oil Pollution Act of 1990 (33 U.S.C. § 2701 et seq.) and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), as such laws may be amended or otherwise modified from time to time, and any other federal, state, local, foreign and other applicable statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions and common law relating to pollution, the protection of the environment, natural resources, human health or the release of any materials into the environment, including those related to Hazardous Materials, hazardous substances or wastes, indoor and outdoor air emissions, soil, groundwater, wastewater, surface water, stormwater, wetlands, sediment and discharges of wastewater to public treatment systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, losses, punitive damages, consequential damages, costs of environmental investigation and remediation, fines, penalties, indemnities or expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants)), of the Borrowers or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Issuance" has the meaning set forth in Section 2.05(b)(iii).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder, and any successor thereto.

"ERISA Affiliate" means any corporation, trade or business (whether or not incorporated) under common control with a Borrower within the meaning of Section 414(b) or (c) of the Internal Revenue Code (and Sections 414(m) and (o) of the Internal Revenue Code for purposes of provisions relating to Section 412 of the Internal Revenue Code). Any former ERISA Affiliate of a Borrower or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of a Borrower or any of its Subsidiaries within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of a Borrower or any of its Subsidiaries and with respect to liabilities arising after such period for which a Borrower or any of its Subsidiaries could be liable under the Internal Revenue Code or ERISA.

15

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to a Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make a required installment under Section 412(m) of the Internal Revenue Code with respect to a Pension Plan; (c) a withdrawal by a Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (d) a complete or partial withdrawal by a Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA; (e) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon a Borrower or any ERISA Affiliate; (h) the occurrence of an act or omission which could give rise to the imposition on a Borrower or any ERISA Affiliate of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Plan; (i) the assertion of a material claim (other than routine claims for benefits) against any Plan other than a Multiemployer Plan or the assets thereof, or against the Borrowers or any ERISA Affiliate in connection with any Plan; (j) receipt from the IRS of notice of the failure of any Pension Plan (or any other Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; (k) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan; (l) the commencement of any administrative investigation, audit or other administrative proceeding by the Department of Labor, IRS or other Governmental Authority, including any voluntary compliance submission through the IRS's Employee Plans Compliance Resolution System or the Department of Labor's Voluntary Fiduciary Correction Program; (m) the occurrence of a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Internal Revenue Code; or (n) the receipt by a Borrower or any of its ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency or that it intends to terminate or has terminated.

"ERISA Plan" means (i) any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed by the Borrowers, any of their Subsidiaries or any of their respective ERISA Affiliates; and (ii) all other employee benefit plans, programs, policies, agreements or arrangements, including any deferred compensation plan, incentive plan, bonus plan or arrangement, stock option plan, stock purchase plan, stock award plan or other equity-based plan, change in control agreement, retention, severance pay plan, dependent care plan, sick leave, disability, death benefit, group insurance, hospitalization, dental, life, any fund, trust or arrangement providing health benefits including multiemployer welfare arrangements, a multiple employer welfare fund or arrangement, cafeteria plan, employee assistance program, scholarship program, employment contract, retention incentive agreement, termination agreement, severance agreement, non-competition agreement, consulting agreement, confidentiality agreement, vacation policy, employee loan, or other similar plan, agreement or arrangement, whether written or oral, funded or unfunded, or actual or contingent which is or was sponsored, maintained or contributed to by, or required to be contributed by, the Borrowers, any of their Subsidiaries or any of their respective ERISA Affiliates.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

16

"Eurodollar Reserve Percentage" means, for any day during any Interest Period, the reserve percentage (expressed as a decimal, carried out to five decimal places) in effect on such day, whether or not applicable to any Lender, under regulations issued from time to time by the FRB for determining the maximum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to eurocurrency funding (currently referred to as "Eurocurrency Liabilities").  The LIBO Rate for each outstanding LIBOR Loan shall be adjusted automatically as of the effective date of any change in the Eurodollar Reserve Percentage.

"Event of Default" has the meaning specified in Section 9.01.

"Excess Cash Flow" means, with respect to the Loan Parties and their Subsidiaries on a consolidated basis, for any period: (a) without duplication, the sum of (i) Consolidated Net Income, (ii) decreases or minus increases (as the case may be) in Consolidated Working Capital, (iii) extraordinary or non-recurring gains or minus extraordinary or non-recurring losses (as the case may be) which are cash items, (iv) non-cash depreciation, non-cash amortization and other non-cash charges; minus (b) without duplication, the sum of: (i) Consolidated Unfinanced Capital Expenditures, (ii) expenses paid in respect of Permitted Acquisitions during such period, (iii) to the extent not taken into account in the calculation of Consolidated Net Income, (x) the principal amortization paid in cash during such period with respect to Capital Leases and (y) the amount of any Restricted Payments actually made to Holdings pursuant to Section 7.06(e), (iv) Restricted Payments paid in cash to Holdings pursuant to Section 7.06(g) during such period, (v) Earn-Out Obligations paid in cash and (vi) unfinanced consideration paid in cash for Permitted Acquisitions during such period.

"Excess Liquidity" means the sum (a) Revolving Availability plus (b) the average daily balance (based on preceding thirty (30) days) of unrestricted cash (free of Liens or encumbrances except in favor of the Administrative Agent) on deposit in the Loan Parties' Controlled Accounts located within the United States.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Account" means any deposit account (i) that is used solely for payment of payroll, bonuses, other compensation and related expenses; (ii) deposit accounts that are zero balance accounts so long as such deposit accounts are swept on a daily basis to a deposit account that otherwise constitutes Excluded Property, an Excluded Account or that is subject to a Deposit Account Control Agreement or similar agreement; or (iii) that maintains a balance on deposit at any time of not more than $100,000, provided that, (A) the aggregate balance on deposit at any time in all Excluded Accounts described in clause (i) shall not exceed 105% of the amount to be applied for the pay period next ending, (B) the aggregate balance on deposit at any time in all Excluded Accounts described in clause (iii) shall not exceed $1,000,000 at any time and (C) the Excluded Accounts are listed on Schedule 1.01(b) and maintained with banks reasonably satisfactory to the Administrative Agent.

"Excluded Foreign Subsidiary" means any Subsidiary of Intermediate Holdings (other than any Loan Party) that is, and continues to be, (a) a Foreign Subsidiary that is a CFC, or (b) a Domestic Subsidiary that is (i) a direct or indirect Subsidiary of a Foreign Subsidiary that is a CFC or (ii) a Subsidiary that is treated as a disregarded entity or as a partnership for United States Federal income tax purposes and all or substantially all of whose assets consist of Capital Stock of one or more Foreign Subsidiaries that are CFCs and conducts no material business other than the ownership of such Capital Stock (a "Foreign Subsidiary Holdco").

17

"Excluded Hedge Obligation" means, with respect to any Loan Party, any Hedge Obligation if, and to the extent that, all or a portion of the Loan Documents to which such Loan Party is party with respect to, or the grant by such Loan Party of a security interest to secure, such Hedge Obligation (or any Guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule or regulation promulgated thereunder (or the application or official interpretation of any provision thereof) by virtue of such Loan Party's failure for any reason not to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time any such Loan Document would otherwise have become effective with respect to such related Hedge Obligation.

"Excluded Property" means, with respect to any Loan Party (a) any owned or leased real or personal Property (other than Capital Stock) which is located outside of the United States unless requested by the Administrative Agent or the Required Lenders, (b) any leasehold interests in Real Property, (c) any personal Property (other than motor vehicles, which are addressed in clause (i) below) in respect of which perfection of a Lien is not either (i) governed by the UCC or (ii) effected by appropriate evidence of the Lien being filed in either the United States Copyright Office or the United States Patent and Trademark Office, unless requested by the Administrative Agent or the Required Lenders, (d) any Property which, subject to the terms of Section 7.01(c), is subject to a Lien of the type described in Section 7.02(h) pursuant to documents which prohibit such Loan Party from granting any other Liens in such Property, (e) other than Accounts, any contract, permit, agreement, lease, license or license agreement covering real or personal property if the grant of a security interest in such contract, permit, agreement, lease, license or license agreement or the asset subject to such contract, permit, agreement, lease, license or license agreement is prohibited by the terms of such contract, permit, agreement, lease, license or license agreement or by Law and would result in the termination of or give rise to a right to materially modify such contract, permit, agreement, lease, license or license agreement, but only to the extent that (x) any such prohibition would not be rendered ineffective pursuant to the UCC or any other applicable law (including, if and when applicable, Debtor Relief Laws) or principles of equity and would require the consent a Person other than a Loan Party or its Affiliates to waive such prohibition and (y) such contract, agreement, lease, license or license agreement was not entered into in contemplation of circumventing any Loan Party's obligation to pledge such contract or agreement as collateral security, (f) any United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal law, provided that upon submission and acceptance by the United States Patent and Trademark Office of an amendment to allege use pursuant to 15 U.S.C. Section 1060(a) (or any successor provision), such intent-to-use trademark application shall not be considered Excluded Property, (g) any Excluded Account, provided that for the avoidance of doubt, any proceeds of Collateral held from time to time in any such Excluded Account shall not cease to be Collateral solely because such proceeds are held in an Excluded Account, (h) any particular asset, if the pledge thereof or the security interest therein is prohibited by applicable Law (but only for so long as such prohibition remains in effect), other than to the extent such prohibition is rendered ineffective under the UCC or other applicable Laws, (i) any motor vehicle or other equipment subject to a certificate of title, but only to the extent that (x) the fair market value thereof is less than $50,000 individually or $250,000 in the aggregate, (y) as of the Closing Date, the name of CIT or any of its Affiliates is not notated on the certificate of title and (z) a security interest therein cannot be perfected by the filing of a UCC financing statement, (j) any Capital Stock in joint ventures or any non-Wholly Owned Subsidiary to the extent (i) consent of the minority investor is required pursuant to the Organizational Documents of such Excluded Subsidiary (and such consent was not required in connection with or in contemplation or anticipation of such pledge) and not obtained after using commercially reasonable efforts and (ii) such non-Wholly Owned Subsidiary is an Excluded Subsidiary, (k) any Capital Stock in any Excluded Foreign Subsidiary held by the Loan Parties in excess of sixty-five percent (65%) of the total outstanding voting Capital Stock of such Excluded Foreign Subsidiary, and (l) particular assets if and for so long as, in the reasonable judgment of the Administrative Agent, the Required Lenders and the Borrower Representative

18

(as set forth in a written agreement among the Administrative Agent, the Required Lenders and the Borrower Representative), the cost of obtaining a security interest in such assets exceeds the practical benefits to the Secured Parties afforded thereby; provided, "Excluded Property" shall not include any proceeds, products, substitutions, or replacements of Excluded Property (unless such proceeds, products, substitutions, or replacements would otherwise constitute Excluded Property).

"Excluded Subsidiary" means, as of any date, any Subsidiary of Intermediate Holdings (other than any Loan Party) designated as such by the Borrowers in writing to the Administrative Agent that is, and continues to be, a non-Wholly Owned Subsidiary of Intermediate Holdings, that satisfies the following requirements: (a) the aggregate Consolidated EBITDA attributable to such Person individually does not exceed 5.0% of Consolidated EBITDA of the Loan Parties and their Subsidiaries for the last twelve (12) months ending on the last day of the last month that is also the end of a Fiscal Quarter for which financial statements of the type set forth in Sections 6.01(a) or (b) have been delivered to Administrative Agent and (b) the aggregate Consolidated EBITDA attributable to such Person together with all other Excluded Subsidiaries does not exceed 7.50% of Consolidated EBITDA of the Loan Parties and their Subsidiaries for the last twelve (12) months ending on the last day of the last month that is also the end of a Fiscal Quarter for which financial statements of the type set forth in Section 6.01(a) or (b) have been delivered to the Administrative Agent; provided, to the extent any Excluded Subsidiary ceases to be a joint venture and becomes a Wholly Owned Subsidiary of a Loan Party, then such Subsidiary will be required to become a Loan Party at such time.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower Representative under Section 12.15) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.01, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(f) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Extended Revolving Commitment" means any Revolving Commitments the maturity of which shall have been extended pursuant to Section 2.18.

"Extended Revolving Loans" means any Loans made pursuant to the Extended Revolving Commitments.

"Extended Term Loans" means any Term Loans the maturity of which shall have been extended pursuant to Section 2.18.

"Extension" has the meaning set forth in Section 2.18(a).

"Extension Offer" has the meaning set forth in Section 2.18(a).

19

"Extraordinary Receipts" means any cash received by or paid to or for the account of any Loan Party not in the ordinary course of business (and not consisting of proceeds described in any of Section 2.05(b)(ii), (iii) and (iv)) including without limitation amounts received in respect of indemnity obligations of a seller under any agreement governing a Permitted Acquisition, foreign, United States, state or local tax refunds to the extent not included in the calculation of Consolidated EBITDA and pension plan reversions.

"Facilities" means, at any time, the facilities and real properties owned, leased, managed or operated by any Loan Party or any Subsidiary, from which any Loan Party or any Subsidiary provides or furnishes goods or services.

"Fair Share" has the meaning set forth in Section 10.06.

"Fair Share Contribution Amount" has the meaning set forth in Section 10.06.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such sections of the Internal Revenue Code.

"FDA" means the Food and Drug Administration of the United States of America or any successor entity thereto.

"FDCA" means the Federal Food, Drug, and Cosmetic Act, as amended, 21 U.S.C. Section 301 et seq. and all regulations promulgated thereunder.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank on the Business Day next succeeding such day, provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent, in its sole discretion.

"Fee Letter" means the letter agreement dated as of February 27, 2019, among the Loan Parties, the Administrative Agent, and the Arranger.

"FIRREA" means the Financial Institutions Reform Recovery and Enforcement Act.

"Fiscal Quarter" means a fiscal quarter of any Fiscal Year.

"Fiscal Year" means the fiscal year of the Loan Parties and their Subsidiaries ending on December 31st of each calendar year.

"Flood Hazard Property" means Mortgaged Property in an area designated by the Federal Emergency Management Agency as having special flood and mud slide hazards.

"Flood Laws" has the meaning set forth in Section 11.15.

"Following Business Day Convention" means a contractual provision or provision of applicable Laws pursuant to which a scheduled date for payment or performance of an obligation, which date is not a Business Day, is extended to the first following day that is a Business Day.

"Foreign Lender" means a Lender that is not a U.S. Person.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"Foreign Subsidiary Holdco" has the meaning specified in the definition of Excluded Foreign Subsidiary.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fronting Exposure" means, at any time there is a Defaulting Lender, with respect to the L/C Issuer (or the Support Provider, as the case may be), such Defaulting Lender's Pro Rata Share of the outstanding Letter of Credit Liabilities other than Letter of Credit Liabilities as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof.

"Fronting Fee" has the meaning specified in Section 2.03(c).

"Funded Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)        all obligations for borrowed money, whether current or long-term (including the Obligations) and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)        all purchase money indebtedness;

(c)        the principal portion of all obligations under conditional sale or other title retention agreements relating to Property purchased by such Person (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business);

(d)        the maximum amount available to be drawn under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(e)        all obligations in respect of the deferred purchase price of Property or services (other than trade accounts payable in the ordinary course of business);

(f)        Attributable Indebtedness in respect of Capital Leases;

(g)        all preferred stock or other Disqualified Capital Stock providing for mandatory redemptions, sinking fund or like payments prior to the Termination Date;

(h)        Earn-Out Obligations if, and only to the extent, such obligation has not been paid in full in cash when initially due and payable;

(i)        all indebtedness of the types specified in clauses (a) through (h) above secured by (or for which the holder of such Funded Indebtedness has an existing right, contingent or otherwise, to be

21

secured by) any Lien on, or payable out of the proceeds of production from, Property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed; and

(j)        all Guarantees with respect to indebtedness of the types specified in clauses (a) through (i) above of another Person.

"Funding Guarantor" has the meaning set forth in Section 10.06.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, consistently applied and as in effect from time to time.

"Gould's Acquisition" means the acquisition by Borrower of one hundred percent (100%) of the Capital Stock of Gould's Discount Medical, LLC a Kentucky limited liability company, as set forth in the Gould's Purchase Agreement.

"Gould's Purchase Agreement" means the Equity Purchase Agreement dated January 1, 2019, by and among Borrower, as buyer, Edmond L. Gould, Sharon S. Gould, Kenneth C. Gould Irrevocable Trust, and David R. Gould Irrevocable Trust, as selling shareholders, Gould's Discount Medical, LLC, a Kentucky limited liability company, as company, and GDM HoldCo, Inc., a Kentucky corporation, as holdco.

"Gould's Subordinated Note" means that certain Seller Note as described in Section 2.3(a)(ii) of the Gould's Purchase Agreement.

"Government Reimbursement Program" shall mean (i) the Medicare program established under the Title XVIII of the Federal Social Security Act, the Federal Employees Health Benefit Program under 5 U.S.C. §§ 8902 et seq., the TRICARE program established by the Department of Defense under 10 U.S.C. §§ 1071 et seq. or the Civilian Health and Medical Program of the Uniformed Services under 10 U.S.C. §§ 1079 and 1086, (ii) the Medicaid program of any state or the District of Columbia acting pursuant to a health plan adopted pursuant to Title XIX of the Federal Social Security Act or (iii) any agent, administrator, intermediary or carrier for any of the foregoing.

"Governmental Approvals" means any and all governmental licenses, authorizations, registrations, permits, certificates, franchises, qualifications, accreditations, consents and approvals required under any applicable Law and required in order for any Person to carry on its business as now conducted, of each Governmental Authority issued or required under Laws applicable to the business of any Borrower or any of its Subsidiaries or to the transactions described herein (including any Acquisitions and the Loans made hereunder) or necessary in the sale, furnishing, or delivery of goods or services under Laws applicable to the business of any Borrower or any of its Subsidiaries.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or

22

supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person.  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"Guaranteed Obligations" has the meaning set forth in Section 10.01.

"Guarantor" means each of Intermediate Holdings, and all future direct or indirect Subsidiaries of Intermediate Holdings (other than the Borrowers, any Excluded Subsidiary and any Excluded Foreign Subsidiary), and any other Person joining this Agreement as a "Guarantor" hereunder from time to time.

"Guaranty" means the guaranty made by each Guarantor in favor of the Administrative Agent, the Lenders and the other Secured Parties pursuant to Article 10.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, lead-based paint, toxic mold or fungus, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Healthcare Law(s)" shall mean:  (a) any and all federal, state and local fraud and abuse laws, including (i) the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7(b)), (ii) the Stark Law (42 U.S.C. § 1395nn and §1395(q)), (iii) the civil False Claims Act (31 U.S.C. § 3729 et seq.), (iv) Sections 1320a-7 and 1320a-7a of Title 42 of the United States Code, and (v) the regulations promulgated pursuant to such statutes; (b) the FDCA; (c) the Health Insurance Portability and Accountability Act of 1996 (Pub. L. No. 104-191) and the regulations promulgated pursuant thereto; (d) laws, rules and regulations governing Medicare and Medicaid; (e) the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Pub. L. No. 108-173) and the regulations promulgated pursuant thereto; (f) quality, safety, life safety, and accreditation standards and requirements of all applicable state laws or regulatory bodies; (g) any applicable Law relating to the Loan Parties' ownership, management, or operation of a healthcare facility or business, or assets used in connection therewith; (h) any applicable Law relating to the billing or submission of claims, collection of accounts receivable, underwriting the cost of, or provision of management or administrative services in connection with, any and all of the foregoing, by any Loan Party; (i) the Patient Protection and Affordable Care Act (Pub. L. 111-148) and (j) any and all other applicable healthcare laws, regulations, manual provisions, policies and administrative guidance, each of (a) through (j) as may be amended from time to time.

"Hedge Agreement" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward

23

foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Hedge Obligations" of a Person means any and all obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any and all Hedge Agreements, and (b) any and all cancellations, buy backs, reversals, terminations or assignments of any Hedge Agreement transaction.

"Hedge Party" means any Person that is a counterparty to a Hedge Agreement with a Loan Party.

"HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

"HIPAA Compliant" shall mean that such Loan Party is in compliance in all material respects with HIPAA and has adopted and implemented policies and procedures to strive to ensure compliance with and has trained its personnel in the transaction standards, privacy standards and security standards promulgated pursuant to HIPAA.

"Holdings" means AdaptHealth Holdings LLC, a Delaware limited liability company.

"Holdings Operating Agreement" means that certain Fourth Amended and Restated Limited Liability Company Agreement of AdaptHealth Holdings LLC, dated as of March 20, 2019.

"Incremental Facilities" has the meaning specified in Section 2.15(a).

"Incremental Facility Amendment" has the meaning specified in Section 2.15(d).

"Incremental Facility Closing Date" has the meaning specified in Section 2.15(d).

"Incremental Revolving Commitments" has the meaning specified in Section 2.15(a).

"Incremental Revolving Lender" has the meaning specified in Section 2.15(d).

"Incremental Term Loans" has the meaning specified in Section 2.15(a).

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)        all Funded Indebtedness;

(b)        the Termination Value of any Secured Hedge Agreement;

24

(c)	Synthetic Leases, Sale and Leaseback Transactions and Securitization Transactions;

(d)	all obligations in respect of Disqualified Capital Stock; and

(e)	all Guarantees with respect to outstanding indebtedness of the types specified in clauses (b), (c) and (d) above of any other Person.

"Indemnified Liabilities" has the meaning set forth in Section 12.05.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning set forth in Section 12.05.

"Information" has the meaning set forth in Section 12.08.

"Initial Term Loan" has the meaning specified in Section 2.01(b).

"Initial Term Loan Commitment" means, as to each Lender, its obligations to make its portion of the Initial Term Loan to the Borrower pursuant to Section 2.01(b) and the other terms and conditions of this Agreement, in the principal amount set forth opposite such Lenders name on Schedule 2.01, as such amounts may be adjusted from time to time, in accordance with this Agreement.  The initial aggregate amount of the Initial Term Loan Commitments is $300,000,000.

"Interest Payment Date" means (a) as to any LIBOR Loan, the last day of each Interest Period applicable to such LIBOR Loan and the Term Loan Maturity Date or Revolving Loan Maturity Date (as applicable), provided, that if any Interest Period for a LIBOR Loan exceeds three (3) months, the respective dates that fall every three (3) months after the beginning of such Interest Period shall also be Interest Payment Dates; (b) as to any Base Rate Loan (other than a Swingline Loan), the last Business Day of each calendar quarter and the Revolving Loan Maturity Date or Term Loan Maturity Date (as applicable); and (c) with respect to any Swingline Loan, the day that such Loan is required to be repaid.

"Interest Period" means, as to each LIBOR Loan, the period commencing on the date such LIBOR Loan is disbursed or converted to or continued as a LIBOR Loan and ending on the date one (1), two (2), three (3) or six (6) months thereafter or, if approved by all affected Lenders, the Administrative Agent and the Borrowers, twelve (12) months thereafter, as selected by the Borrower Representative in its Loan Notice, provided, that:

(a)	any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)	any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)	no Interest Period shall extend beyond the Term Loan Maturity Date or Revolving Loan Maturity Date, as applicable.

25

"Interim Pre-Closing Financial Statements" means, collectively, (i) the unaudited consolidated financial statements of the Loan Parties and their Subsidiaries for the Fiscal Quarters ended March 31, 2018, June 30, 2018, September 30, 2018 and December 31, 2018, and the related consolidated statements of income or operations, shareholders' equity and cash flows, for the Fiscal Quarter ended on that date.

"Intermediate Holdings" means AdaptHealth Intermediate Holdco LLC, a Delaware limited liability company.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended, and any successor thereto.

"Internally Generated Cash" means, with respect to any Fiscal Year, cash of the Consolidated Group received in such Fiscal Year and not constituting (a) proceeds of an Equity Issuance, (b) proceeds of the incurrence of Indebtedness, (c) proceeds of Dispositions and Involuntary Dispositions, and (d) insurance proceeds in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"Inventory Suppliers" means the financing companies, lenders and/or leasing companies set forth on Schedule 1.01(c) that provide equipment or inventory financing or leasing services to any Loan Party with an aggregate value of $250,000 or more.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of any of the Capital Stock of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, or (c) an Acquisition. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment or any returns of capital.

"Involuntary Disposition" means any loss of, damage to or destruction of, or any condemnation or other taking for public use of, any Property of any Loan Party.

"IP Rights" has the meaning set forth in Section 5.17.

"IRS" means the United States Internal Revenue Service.

"ISP" means, with respect to any standby Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"Issuer Documents" means with respect to any Letter of Credit, any application for such Letter of Credit and any other document, agreement and instrument entered into by the applicable L/C Issuer and the Borrower Representative on behalf of Borrowers or in favor of such L/C Issuer and relating to any such Letter of Credit.

"Landlord Agreement" means any agreement between the Administrative Agent and the landlord of Real Property occupied by a Loan Party, as tenant, which agreement shall be in form and substance as is satisfactory to the Administrative Agent, as amended, supplemented, modified, replaced, substituted for or restated from time to time and all exhibits and schedules attached thereto.

26

"Law(s)" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, compacts, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"L/C Credit Extension" means (a) the issuance, extension or increase of a Letter of Credit, and (b) with respect to any Supported Letter of Credit, the entry into any Support Agreement by the Administrative Agent or its Affiliate.

"L/C Issuer" means (a) Bank of America, N.A. or (b) a Revolving Lender willing and able to issue Letters of Credit and acceptable to the Administrative Agent.

"Lender" means each Person identified as a "Lender" on the signature pages hereto and its successors and assigns and, as the context requires, includes the L/C Issuer to the extent it is a party to this Agreement.  Unless the context otherwise requires, the term "Lenders" includes the Swingline Lender.

"Lender Letter of Credit" means a Letter of Credit issued by an L/C Issuer that is also, at the time of issuance of such Letter of Credit, a Lender.

"Lender Parties" has the meaning specified in Section 12.07(g).

"Lender Securitization" has the meaning specified in Section 12.07(g).

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower Representative and the Administrative Agent.

"Letter of Credit" means a standby or documentary (trade) letter of credit issued for the account of any Borrower by an L/C Issuer pursuant to the terms of this Agreement.

"Letter of Credit Fee" has the meaning specified in Section 2.03(c).

"Letter of Credit Liabilities" means, at any time of calculation, the sum of the following (without duplication): (a) the amount then available for drawing under all outstanding Letters of Credit, in each case without regard to whether any conditions to drawing thereunder can then be met, and (without duplication) the amount of any outstanding Support Agreement related to a Letter of Credit, and (b) the aggregate of all Unreimbursed Amounts.  For all purposes of this Agreement, if as of any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount that remains available to be drawn.  The Letter of Credit Liability of any Revolving Lender at any time shall be equal to its Pro Rata Share of the total Letter of Credit Liabilities at such time.

"Letter of Credit Sublimit" means an amount equal to the lesser of (a) the total Revolving Commitments and (b) $6,000,000.  The Letter of Credit Sublimit is part of, and not in addition to, the total Revolving Commitments.

"LIBO Base Rate" means,

(1)     for any Interest Period with respect to any LIBOR Loan:

(a)     the rate per annum equal to the rate determined by the Administrative Agent to be the London Interbank Offered Rate benchmark rate which is calculated and distributed by the ICE Benchmark Administration Data Service ("ICE") (or any successor thereto) for deposits in Dollars (for delivery on the first (1st) day of such Interest Period) with a term equivalent to such Interest Period, determined as of approximately 11:45 a.m. (London time) (or such other time as confirmed by ICE (or any successor thereto)) two (2) Business Days prior to the first (1st) day of such Interest Period as displayed on such day and time on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion) (the "LIBO Screen Rate"), or

(b)     if the rate referenced in the preceding clause (a) does not appear through such service or such service shall not be available, the rate per annum equal to the rate determined by the Administrative Agent to be the offered rate which is calculated and distributed daily by ICE (or any successor thereto) as an average ICE Benchmark Administration Limited Interest Settlement Rate for deposits in Dollars (for delivery on the first (1st) day of such Interest Period) with a term equivalent to such Interest Period, determined as of approximately 11:45 a.m. (London time) two (2) Business Days prior to the first (1st) day of such Interest Period, or

(c)     if the rates referenced in the preceding clauses (a) and (b) are not available, the rate per annum (rounded upward to the next 1/100th of 1%) determined by the Administrative Agent as the rate of interest at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the LIBOR Loan being made, continued or converted by JPMorgan Chase Bank and with a term equivalent to such Interest Period would be offered by JPMorgan Chase Bank's London Branch (or such other major bank as is acceptable to the Administrative Agent if JPMorgan Chase Bank is no longer offering to acquire or allow deposits in the London interbank eurodollar market) to major banks in the London interbank eurodollar market at their request at approximately 11:45 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period.

(2)     for any day with respect to an interest rate calculation for a Base Rate Loan:

(a)     the rate per annum equal to the rate determined by the Administrative Agent to be the offered rate which is calculated and distributed daily by ICE (or any successor thereto) as an average ICE Benchmark Administration Limited Interest Settlement Rate for deposits in Dollars (for delivery on such day) with a term equivalent to three (3) months, determined as of approximately 11:45 a.m. (London time) two (2) Business Days prior to such day, or

(b)     if the rate referenced in the preceding clause (a) does not appear through such service or such service shall not be available, the rate per annum equal to the rate determined by the Administrative Agent to be the offered rate through such other service that displays an average ICE Benchmark Administration Limited Interest Settlement Rate for deposits in Dollars (for delivery on such day) with a term equivalent to three (3) months, determined as of approximately 11:45 a.m. (London time) two (2) Business Days prior to such day, or

28

(c)        if the rates referenced in the preceding clauses (a) and (b) are not available, the rate per annum (rounded upward to the next 1/100th of 1%) determined by the Administrative Agent as the rate of interest at which deposits in Dollars (for delivery on such day in same day funds) with a term equivalent to three months, determined as of approximately 11:00 a.m. (London time) two (2) Business Days prior to such day in the approximate amount of such Base Rate Loan by JPMorgan Chase Bank and with a term equivalent to three (3) months would be offered by JPMorgan Chase Bank's London Branch (or such other major bank as is acceptable to the Administrative Agent if JPMorgan Chase Bank is no longer offering to acquire or allow deposits in the London interbank eurodollar market) to major banks in the London interbank eurodollar market at their request at approximately 11:45 a.m. (London time) two (2) Business Days prior to such day.

"LIBO Rate" means the greater of: (a) one percent (1.0%); and (b) (1) for any Interest Period with respect to any LIBOR Loan, a rate per annum determined by the Administrative Agent to be equal to the quotient obtained by dividing (i) the LIBO Base Rate for such LIBOR Loan for such Interest Period by (ii) one minus the Eurodollar Reserve Percentage for such LIBOR Loan for such Interest Period and (2) for any day with respect to any Base Rate Loan bearing interest at a rate based on the LIBO Rate, a rate per annum determined by the Administrative Agent to be equal to the quotient obtained by dividing (i) the LIBO Base Rate for such Base Rate Loan for such day by (ii) one minus the Eurodollar Reserve Percentage for such Base Rate Loan for such day.

"LIBO Screen Rate" has the meaning set forth in clause (1)(a) of the definition of LIBO Base Rate.

"LIBOR Loan" means any Loan (other than Swingline Loans and Base Rate Loans bearing interest at a rate based on the LIBO Rate) which accrues interest solely by reference to the LIBO Rate plus the Applicable Margin, in accordance with the terms of this Agreement.

"Lien" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, and any financing lease having substantially the same economic effect as any of the foregoing).

"Loan" means an extension of credit by a Lender to any Borrower under Article 2 in the form of an Initial Term Loan, a Delayed — Draw Term Loan, a Revolving Loan and/or a Swingline Loan.

"Loan Documents" means this Agreement, each Note, each Letter of Credit, each Collateral Document, each Request for Credit Extension, each Issuer Document, each Compliance Certificate, the Fee Letter, each Subordination Agreement, each Secured Hedge Agreement and each other document, instrument or agreement from time to time executed by any Loan Party or any Subsidiary or any Responsible Officer thereof and delivered in connection with the transactions contemplated by this Agreement; provided, however, that all Secured Hedge Agreements, agreements hereafter executed solely in respect of the Banking Services Obligations and all Issuer Documents executed by or on behalf of any Loan Party and delivered concurrently herewith or at any time hereafter shall not constitute "Loan Documents" solely for the purposes of Sections 9.01(a), (b), (c), (d) and (j) hereof or Section 11.14.

"Loan Notice" means a notice of (a) (i) a Borrowing of Revolving Loans or (ii) a Borrowing of a Delayed — Draw Term Loan, (b) a conversion of Loans from one Type to the other pursuant to Section 2.02(a), or (c) a continuation of LIBOR Loans pursuant to Section 2.02(a), which, if in writing, shall be substantially in the form of Exhibit A-1.

"Loan Parties" means, collectively, each Borrower and each Guarantor party hereto.

"Management Entity" means, collectively, each of Josh Parnes, Luke McGee and any entities wholly owned or otherwise controlled by such individuals, including, without limitation, for so long as such entities are so owned or controlled, Jedi Enterprises LLC, a New York limited liability company and 2321 Capital LLC, a Delaware limited liability company.

"Master Agreement" has the meaning set forth in the definition of "Hedge Agreement."

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, assets, liabilities (actual or contingent) or financial condition of the Loan Parties and their Subsidiaries taken as a whole; (b) (i) a material impairment of the ability of any Borrower to perform its obligations under any Loan Document to which it is a party or (ii) a material impairment of the ability of the Guarantors taken as a whole to perform their obligations under any Loan Document to which they are party; (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party; (d) a material adverse effect on the validity, perfection or priority of a Lien in favor of the Administrative Agent for the benefit of the Secured Parties on any material portion of the Collateral or a material adverse effect on the aggregate value of the Collateral; or (e) a material adverse effect on the use or scope of any material healthcare Permit or the continued participation or the ability to accept or bill for goods or services in the Medicaid, Medicare or other Government Reimbursement Program by any Loan Party; provided, however, that this section (e) shall not apply to the voluntary cancellation or termination of the items referenced in this clause (e) by a Loan Party in good faith (a "Voluntary Termination").

"Material Contract" means any lease of real or personal property, contract or other arrangement to which any Loan Party or any of its Subsidiaries is a party (other than the Loan Documents), for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"Medicaid" shall mean, collectively, the healthcare assistance program established by Title XIX of the Social Security Act (42 U.S.C. §§ 1396 et. seq.) and any statutes succeeding thereto, and all laws, rules, regulations, manuals, orders, guidelines or requirements (whether or not having the force of law) pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"Medicare" shall mean, collectively, the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. §§ 1395 et. seq.) and any statutes succeeding thereto, and all laws, rules, regulations, manuals, orders or guidelines (whether or not having the force of law) pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"Med Way Acquisition" means the acquisition by Med Star Surgical & Breath Inc., a Loan Party, of one hundred percent (100%) of the Capital Stock of Med Way Medical, Inc., a Utah corporation, as set forth in the Med Way Purchase Agreement.

"Med Way Purchase Agreement" means the Stock Purchase Agreement to be entered into by and among Med Star Surgical & Breathing Inc., as buyer, Med Way Medical, Inc., a Utah corporation, as company, and Benjamin Dickman, Matthew Larsen, and David Larsen, as selling shareholders.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

30

"Mortgage Instrument" means a fully executed and notarized mortgage, deed of trust or deed to secure debt, delivered by any Loan Party to the Administrative Agent with respect to Real Property owned or leased by such Loan Party, in each case to secure the payment and performance of the Obligations of such Loan Party. Unless otherwise consented to by the Administrative Agent, each Mortgage Instrument shall grant to the Administrative Agent for the benefit of the Secured Parties a first priority perfected Lien on the Real Property interests described therein.

"Mortgage Supporting Documents" means, with respect to a Mortgage Instrument for a parcel of Mortgaged Property, to the extent requested by Administrative Agent, each of the following:

(a)    (i) evidence in form and substance reasonably satisfactory to the Administrative Agent that the recording of counterparts of such Mortgage Instrument in the recording offices specified in such Mortgage Instrument will create a valid and enforceable first priority Lien on the Property described therein in favor of the Administrative Agent (or in favor of such other trustee as may be required or desired under local Law) for the benefit of the Secured Parties, subject only to (A) Permitted Liens and (B) such other Liens as the Administrative Agent may reasonably approve and (ii) an opinion of counsel in each state in which any such Mortgage Instrument is to be recorded in form and substance and from counsel reasonably satisfactory to the Administrative Agent;

(b)    (i) mortgagee's title policy (or policies) or marked-up unconditional binder (or binders) for such insurance (or other evidence reasonably acceptable to the Administrative Agent proving ownership thereof) ("Mortgagee's Title Insurance Policy"), dated a date reasonably satisfactory to the Administrative Agent, which shall (A) be in an amount not less than the then recently appraised fair market value (determined by reference to an appraisal) of such parcel of Real Property in form and substance satisfactory to the Administrative Agent, provided, that the amount of such title insurance required pursuant to such Mortgagee's Title Insurance Policy shall not materially exceed such appraised fair market value, (B) be issued at ordinary rates, (C) insure that the Lien granted pursuant to the Mortgage Instrument insured thereby creates a valid first Lien on such parcel of Real Property free and clear of all defects and encumbrances, except for Permitted Liens and for such other defects and encumbrances as may be approved by the Administrative Agent, (D) name the Administrative Agent as the insured thereunder, (E) be in the form of ALTA Loan Policy - 2006 (or such local equivalent thereof as is reasonably satisfactory to the Administrative Agent), (F) contain a comprehensive lender's endorsement (including, but not limited to, a revolving credit endorsement and a floating rate endorsement), (G) be issued by Chicago Title Insurance Company, First American Title Insurance Company, Lawyers Title Insurance Corporation or any other title company reasonably satisfactory to the Administrative Agent (including any such title companies acting as co-insurers or reinsurers) and (H) be otherwise in form and substance reasonably satisfactory to the Administrative Agent and (ii) a copy of all documents referred to, or listed as exceptions to title, in such title policy (or policies) in each case in form and substance reasonably satisfactory to the Administrative Agent;

(c)    in the case of each Mortgaged Property that is leased by any Loan Party, such estoppel letters, consents, Landlord Agreements and waivers from the landlords on such Mortgaged Property (and any mortgagee of such landlord) as may be reasonably required by the Administrative Agent;

(d)    a current Survey of such parcel of Mortgaged Property certified to and received by (in a manner reasonably satisfactory to each of them) the Administrative Agent and the title insurance company issuing the Mortgagee's Title Insurance Policy for such Mortgage Instrument, dated a date reasonably satisfactory to the Administrative Agent and such title insurance company, by an independent professional licensed land surveyor reasonably satisfactory to the Administrative Agent and such title insurance company;

31

(e)        evidence in form and substance reasonably satisfactory to the Administrative Agent that all premiums in respect of each Mortgagee's Title Insurance Policy, all recording fees and stamp, documentary, intangible or mortgage taxes, if any, in connection with the Mortgage Instrument have been paid;

(f)        a Phase I Environmental Site Assessment with respect to such parcel of Mortgaged Property, dated a date reasonably satisfactory to the Administrative Agent showing no material condition of environmental concern or recognized environmental conditions and otherwise in form and substance reasonably satisfactory to the Administrative Agent;

(g)        evidence as to (A) whether such Mortgaged Property is a Flood Hazard Property, and (B) if such Mortgaged Property is a Flood Hazard Property, (1) whether the community in which such Mortgaged Property is located is participating in the National Flood Insurance Program, (2) the applicable Loan Party's written acknowledgment of receipt of written notification (a) as to the fact that such Mortgaged Property is a Flood Hazard Property and (b) as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program and (3) copies of insurance policies or certificates of insurance of the Loan Parties and their Subsidiaries which shall evidence flood insurance which satisfies all regulatory requirements for flood insurance and is otherwise satisfactory to the Administrative Agent and naming the Administrative Agent as sole loss payee on behalf of the Secured Parties.

(h)        evidence reasonably satisfactory to the Administrative Agent that such Mortgaged Property, and the uses of such Mortgaged Property, are in compliance in all material respects with all applicable zoning laws, regulations, ordinances and requirements (the evidence submitted as to which should include the zoning designation made for such Mortgaged Property, the permitted uses of such Mortgaged Property under such zoning designation and, if available, zoning requirements as to parking, lot size, ingress, egress and building setbacks);

(i)        an appraisal of such Mortgaged Property satisfying the requirements of FIRREA; and

(j)        such other agreements, documents and instruments in form and substance reasonably satisfactory to the Administrative Agent as the Administrative Agent reasonably deems necessary or appropriate to create, register or otherwise perfect, maintain, evidence the existence, substance, form or validity of, or enforce a valid and enforceable first priority Lien on such parcel of Mortgaged Property in favor of the Administrative Agent for the benefit of the Secured Parties (or in favor of such other trustee as may be required or desired under local Law) subject only to (i) Permitted Liens and (ii) such other Liens as the Administrative Agent may reasonably approve; provided, notwithstanding anything contained in this Agreement to the contrary, no Mortgage Instrument shall be executed and delivered with respect to any real property unless and until each Lender has received, at least twenty (20) Business Days prior to such execution and delivery, a life loan flood zone determination and such other documents as it may reasonably request to complete its flood insurance due diligence (including those described in the preceding clause (g)) and has confirmed to the Administrative Agent that flood insurance due diligence and flood insurance compliance has been completed to its satisfaction.

"Mortgaged Property" means all Real Property owned by any Loan Party other than Excluded Property.

"Multiemployer Plan" means any employee benefit plan of the type described in Sections 4001(a)(3) or 3(37) of ERISA that is sponsored or maintained by any Borrower or any ERISA

32

Affiliate or to which any Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding six (6) plan years, has made or been obligated to make contributions.

"Net Cash Proceeds" means the aggregate cash and Cash Equivalents proceeds (including insurance proceeds and condemnation awards) received by any Loan Party or any Subsidiary in respect of any Disposition, Involuntary Disposition, Equity Issuance, or Debt Issuance net of (a) direct third-party costs incurred in connection therewith (including legal, accounting and investment banking fees, and sales commissions payable to third parties unrelated to Loan Parties), (b) taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), and (c) the amount necessary to retire any Indebtedness secured by a Permitted Lien on the related Property that is senior in priority to the Lien of Administrative Agent and is also required to be discharged in connection with such disposition or issuance; it being understood that "Net Cash Proceeds" shall include any cash or Cash Equivalents received upon the sale or other disposition of any non-cash consideration received by any Borrower or any Subsidiary in any Disposition, Involuntary Disposition, Equity Issuance or Debt Issuance.

"Note" or "Notes" means each Term Note, each Revolving Note and/or the Swingline Note, individually or collectively, as appropriate.

"Note and Unit Purchase Agreement" means that certain Note and Unit Purchase Agreement dated as of February 27, 2019, by and between Holdings and BM AH Holdings, LLC.

"Notice of L/C Credit Event" means a notice from a Responsible Officer of Borrower Representative to Administrative Agent with respect to any issuance or amendment (including any increase or extension) of a Letter of Credit specifying: (i) the date of issuance or amendment of a Letter of Credit; (ii) the identity of the L/C Issuer with respect to such Letter of Credit; (iii) the expiry date of such Letter of Credit; (iv) the proposed terms of such Letter of Credit (or amendment thereof), including the face amount; and (v) the transactions that are to be supported or financed with such Letter of Credit or increase thereof.

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party now or hereinafter arising from time to time under this Agreement and any other Loan Document or otherwise with respect to any Loan (including the obligation to pay principal and interest thereon and all fees and other costs and liabilities with respect thereto), Letter of Credit, Support Agreement, Reimbursement Obligation or Unreimbursed Amount, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding. The foregoing shall also include any Banking Services Obligations and any obligations or liabilities of any Loan Party under any Secured Hedge Agreement. Notwithstanding anything to the contrary, the term "Obligations" shall not include, with respect to any Loan Party, any Excluded Hedge Obligation of such Loan Party. On the Closing Date, all existing "Obligations" under, and as defined in, the Original Loan Agreement shall be deemed to be Obligations hereunder.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Organization Documents" means, (a) with respect to any corporation, the charter, certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint

33

venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Original Loan Agreement" has the meaning specified in the recitals.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 12.15).

"Parent" means Access Point Medical LLC, a Delaware limited liability company, Blue River NJ, LLC, a New Jersey limited liability company, Ocean Rock NJ LLC, a New Jersey limited liability company, Jedi Enterprises LLC, a New York limited liability company, 2321 Capital LLC, a Delaware limited liability company, and MCP QMES Corp. a Delaware corporation, BM AH Holdings, LLC, a Delaware limited liability company, and the other holders of approximately 2.0% of the Capital Stock of Holdings as of the date hereof (each a "Parent" and collectively the "Parents").

"Participant" has the meaning set forth in Section 12.07(d).

"Participant Register" has the meaning specified in Section 12.07(d).

"Participation Agreement" has the meaning set forth in Section 6.08.

"Patriot Act" has the meaning specified in Section 5.28.

"Payor" means the party primarily obligated to pay an Account.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" means any ERISA Plan, other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Borrower or any ERISA Affiliate or to which any Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or with respect to which any Borrower or any ERISA Affiliate may have any liability or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding six (6) plan years.

"Permits" shall mean all accreditations, certifications, provider or supplier numbers, registrations, certificates of authority, certificates of need, certificates of reimbursement, variances, qualifications, filings, consents, governmental licenses, authorizations, supplier numbers, registrations, permits, device authorizations and approvals, certificates, franchises, qualifications, accreditations, consents, approvals,

34

listings, certificates, product clearances or approvals, marketing authorizations and all other licenses, authorizations, registrations, permits, consents and approvals or exemptions thereto required in connection with the conduct of any Loan Party's or any Subsidiary's business or to comply with any applicable Laws, including, without limitation, (a) any "Permits" (as defined prior to this clause (a))  issued or required under Healthcare Laws applicable to the business of any Loan Party or any of its Subsidiaries or necessary in the possession, ownership, warehousing, marketing, promoting, sale, leasing, labeling, furnishing, distribution or delivery of goods or services under Healthcare Laws applicable to the business of any Loan Party or any of its Subsidiaries, (b) any "Permits" (as defined prior to clause (a)) issued by any Person from which any Loan Party has, as of the Closing Date, received an accreditation, any of the above issued or required under Healthcare Laws applicable to the ownership or operation of any business location of a Loan Party, and (c) establishment registrations, device listings, Investigational Device Exemptions (IDEs), 510(k) exemptions, 510(k) clearances, and PMA approvals, as those terms are defined in the FDCA and implementing regulations, and those issued by state governments, environmental protection agency permits, and any and all licenses, patents, trademarks and other intellectual property rights necessary for the conduct of any Loan Party's or Subsidiary's business.

"Permitted Acquisitions" means Investments consisting of an Acquisition by any Loan Party or any Subsidiary, provided that (i) the line of business of any acquired Person shall be substantially similar to, or reasonably ancillary, complementary or related to, or a reasonable extension, development or expansion of, the businesses conducted by Borrowers and their respective Subsidiaries on the Closing Date (as determined by the Borrowers in their reasonable discretion), (ii) the Property acquired (or the Property of the Person acquired) in such Acquisition is used or useful in substantially the same line of business as the Borrowers and their respective Subsidiaries were engaged in on the Closing Date, or in a business reasonably ancillary, complementary or related to, or a reasonable extension, development or expansion of, such business, and the Property is located (or if an Acquisition of Capital Stock, the Acquisition target is formed or otherwise organized) in the United States, (iii) the Administrative Agent shall have received not less than ten (10) days (or such shorter period as agreed to by the Administrative Agent in its sole discretion) prior notice of such Acquisition, which notice shall contain a summary, in reasonable detail, of the acquisition terms and conditions, including price, and Borrowers' projections prepared in connection with such Acquisition, (iv) at or prior to the closing of such Permitted Acquisition, the Administrative Agent shall be granted a first priority perfected Lien (subject to Permitted Liens) in the assets and Capital Stock (other than Excluded Property) of such Acquisition target or Subsidiary and such Acquisition target or Subsidiary shall join this Agreement and the other Loan Documents as a Loan Party pursuant to the terms of Section 6.12, provided that nothing in this definition shall permit in any event the Acquisition of, or any Investment in respect of, an Excluded Subsidiary or an Excluded Foreign Subsidiary other than within the limits set forth in clause (x) below, (v) in the case of an Acquisition of the Capital Stock of another Person, the board of directors (or other comparable governing body) of such other Person shall have duly approved such Acquisition and such Acquisition shall not be hostile, (vi) the Borrower Representative shall have delivered to the Administrative Agent a Pro Forma Compliance Certificate demonstrating that, upon giving effect to such Acquisition and the incurrence of any Indebtedness related to such Acquisition on a Pro Forma Basis, (A) the Loan Parties would be in compliance with the financial covenants set forth in Article 8 as of the most recent Fiscal Quarter for which the Borrowers have delivered financial statements pursuant to Section 6.01(a) or Section 6.01(b), as applicable, (B) the Borrowers' Consolidated Total Leverage Ratio does not exceed 2.70:1.00 as of the most recent Fiscal Quarter for which the Borrowers have delivered financial statements pursuant to Section 6.01(a) or Section 6.01(b), as applicable, and (C) no Default or Event of Default exists or would be caused by such Acquisition or the incurrence of any related Indebtedness, (vii) the representations and warranties made by the Loan Parties in each Loan Document shall be true and correct in all material respects (or, in all respects, if already qualified by materiality) at and as if made as of the date of such Acquisition (after giving effect thereto) except to the extent such representations and warranties expressly relate to an earlier date, (viii) immediately after giving effect to such Acquisition, Excess Liquidity shall

35

be at least $10,000,000, (ix) the Borrower Representative shall have delivered to the Administrative Agent a Collateral Assignment of Agreement with respect to the purchase agreement governing the Acquisition unless the same is freely assignable to Administrative Agent for the benefit of the Secured Parties, (x) the Total Consideration paid by the Loan Parties and any Subsidiary in the aggregate prior to the Termination Date shall not exceed $100,000,000, provided that the Total Consideration reasonably allocable to all Acquisitions of, or any other Investments in respect of, all Excluded Foreign Subsidiaries shall not exceed $5,000,000 in the aggregate prior to the Termination Date, (xi) with respect to the maximum, potential Earn-Out Obligations (if any) payable under any circumstance in connection with such Acquisition, such Earn-Out Obligations shall not exceed thirty-five percent (35.0%) of the Total Consideration paid in cash at closing for such Acquisitions and shall, at the request of the Administrative Agent, be subject to a Subordination Agreement acceptable to the Administrative Agent in its sole discretion, (xii) the business and assets acquired by a Loan Party in such Acquisition shall be free and clear of all Liens (other than Permitted Liens), (xiii) except in the case of a Permitted PAP Acquisition, the acquisition target, division or line of business shall have Consolidated EBITDA (calculated for the twelve (12) consecutive calendar months most recently ended) equal to or greater than -$1,000,000 (or less than -$1,000,000 with prior written consent of the Administrative Agent), (xiv) except in the case of a Permitted PAP Acquisition, the Borrower Representative shall have delivered to the Administrative Agent historical financial information (including income statements, balance sheets and cash flows) covering at least the three (3) most recently ended Fiscal Years ended at least ninety (90) days prior to the proposed acquisition for which financial statements have been prepared for such acquisition target, division or line of business to be so acquired prior to the effective date of the acquisition or the entire financial history for such acquisition target, division or line of business to be so acquired, whichever period is shorter, (xv) except in the case of a Permitted PAP Acquisition, the Borrower Representative shall have delivered such financial and other information (including, with respect to any acquisition target with Consolidated EBITDA less than $0, information to be provided by Borrowers demonstrating steps Borrowers intend to take (and a timeline with respect thereto) in order for such entity to have Consolidated EBITDA greater than $0), together with, to the extent Total Consideration for such Acquisition exceeds $7,500,000, a quality of earnings report and other third-party reports obtained by a Loan Party or its Affiliates in connection with such Acquisition, in each case in form and results acceptable to Administrative Agent, with respect to each Person or any division or line of business, (xvi) each Loan Party shall have provided the Administrative Agent copies of all material notifications, reports, submissions, certifications, correspondence and other documents with respect to such acquired Person's initial or continued enrollment in any Government Reimbursement Program, (xvii) to the extent such Acquisition is with respect to a non-Wholly Owned Subsidiary (other than an Excluded Subsidiary), after giving effect to such Acquisition the aggregate Consolidated EBITDA attributable to all non-Wholly Owned Subsidiaries (other than those designated as Excluded Subsidiaries) does not exceed 7.50% of Consolidated EBITDA of the Loan Parties and their Subsidiaries for the last twelve (12) months ending on the last day of the last month that is also the end of a Fiscal Quarter for which financial statements of the type set forth in Section 6.01(a) or (b) have been delivered to the Administrative Agent, and (xviii) the Borrower Representative shall have delivered to the Administrative Agent (A) as soon as available, executed counterparts of the respective agreements, documents or instruments pursuant to which such Acquisition is to be consummated (including any related management, non-compete, employment, option or other material agreements), any schedules to such agreements, documents or instruments and all other material ancillary agreements, instruments and documents to be executed or delivered in connection therewith, and (B) to the extent required under the related acquisition agreement, all consents and approvals from applicable Governmental Authorities and Persons.

"Permitted Liens" means, at any time, Liens in respect of Property of the Loan Parties and their Subsidiaries permitted to exist at such time pursuant to the terms of Section 7.02.

"Permitted PAP Acquisition" means the Acquisition of the positive airway supplies business assets of any Person, consisting of inventory, patient files and referral source contact information, provided that (i) the purchase price thereof is less than or equal to $1,200,000 and at least 100 active accounts are acquired thereby for each $12,000 of consideration paid.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" has the meaning set forth in Section 12.07(i)(iv)(B).

"Preferred Note" means collectively, each of the following: (a) that certain Promissory Note dated as of the date hereof in the amount of $55,713,800 issued by Holdings to BMSB L.P. as purchaser, (b) that certain Promissory Note dated as of the date hereof in the amount of $3,964,700 issued by Holdings to BlueMountain Summit Opportunities Fund II (US) L.P. as purchaser, (c) that certain Promissory Note dated as of the date hereof in the amount of $22,190,200 issued by Holdings to BlueMountain Fursan Fund L.P. as purchaser, (d) that certain Promissory Note dated as of the date hereof in the amount of $22,190,200 issued by Holdings to BlueMountain Fursan Fund L.P. as purchaser, and (e) that certain Promissory Note dated as of the date hereof in the amount of $22,190,200 issued by Holdings to BlueMountain Foinaven Master Fund L.P. as purchaser.

"Preferred Note Cash Interest Payments" means payments of interest pursuant to Section 2(b)(i) of the Preferred Note.

"Preferred Note PIK Interest Payments" means payments of interest pursuant to Section 2(b)(ii) of the Preferred Note that Holdings has elected to pay in cash rather than pay in kind and increase the principal amount of the Preferred Note; provided, to the extent that any interest is elected by Holdings to be paid in kind pursuant to Section 2(b)(ii) of the Preferred Note, such shall be principal under the Preferred Note and any payment thereof shall not constitute a Preferred Note PIK Interest Payment.

"Proceedings" means any actual or threatened civil, equitable or criminal proceeding litigation, action, suit, claim, investigation (governmental or judicial or otherwise), dispute indictment or prosecution, pleading, demand or the imposition of any fine or penalty or similar matter.

"Products" means any devices or products manufactured, sold, leased, rented, developed, tested or marketed by any Loan Party or any of its Subsidiaries.

"Pro Forma Basis" means, for purposes of calculating any financial covenant (including for purposes of determining the Applicable Margin), that any Disposition (other than any voluntary Disposition described in clause (a), (b), (c) or (d) of Section 7.05), Involuntary Disposition (other than an Involuntary Disposition, the proceeds of which are intended to be and are reinvested with the time periods provided in Section 2.05(b)(ii)), any Restricted Payment, any Investment, any Disposition that results in a Loan Party or a Subsidiary ceasing to be a Subsidiary of Intermediate Holdings or any incurrence or assumption of Indebtedness shall be deemed to have occurred as of the first (1st) day of the four (4) Fiscal Quarter period most recently ended prior to the date of such transaction for which the Borrowers have delivered financial statements pursuant to Sections 6.01(a), 6.01 (b) or 6.01(d). In connection with the foregoing, (a) with respect to any such Disposition or Involuntary Disposition (i) income statement and cash flow statement items (whether positive or negative) attributable to the Property or Person disposed of or so designated shall be excluded to the extent relating to any period occurring prior to the date of such transaction and (ii) Indebtedness which is retired shall be excluded and deemed to have been retired as of the first (1st) day of the applicable period and (b) with respect to any Investment (i) income statement

37

items attributable to the Person or Property acquired or so designated shall be included to the extent relating to any period applicable in such calculations to the extent (A) such items are supported by financial statements or other information reasonably satisfactory to the Administrative Agent and Required Lenders and (B) such items are not otherwise included in such income statement items for the Loan Parties and their respective Subsidiaries in accordance with GAAP or in accordance with any defined terms set forth in Section 1.01; and (ii) any Indebtedness incurred or assumed by any Loan Party or any Subsidiary (including the Person or Property acquired) in connection with such transaction and any Indebtedness of the Person or Property acquired which is not retired in connection with such transaction (A) shall be deemed to have been incurred as of the first (1st) day of the applicable period and (B) if such Indebtedness has a floating or formula rate, shall have an implied rate of interest for the applicable period for purposes of this definition determined by utilizing the rate which is or would be in effect with respect to such Indebtedness as at the relevant date of determination.

"Pro Forma Compliance Certificate" means a certificate of a Responsible Officer of the Borrower Representative containing reasonably detailed calculations of the financial covenants set forth in Article 8 as of the most recent Fiscal Quarter end for which the Loan Parties have delivered financial statements pursuant to Section 6.01(a) or Section 6.01(b) after giving effect to the applicable transaction on a Pro Forma Basis.

"Properly Contested" means, with respect to any obligation of a Loan Party, (a) the obligation is subject to a bona fide dispute regarding amount or the Loan Party's liability to pay; (b) the obligation is being contested in good faith by appropriate proceedings promptly instituted and diligently pursued; (c) appropriate reserves have been established in accordance with GAAP; (d) non-payment could not reasonably be expected to result in a Material Adverse Effect, nor result in forfeiture or sale of any assets of such Loan Party pending resolution of such contest proceedings and the payment of any liabilities resulting therefrom; (e) no Lien (other than a Permitted Lien) is imposed on assets of such Loan Party; and (f) if the obligation results from entry of a judgment or other order, such judgment or order is stayed pending appeal or other judicial review.

"Property" means any interest of any kind in any property or asset, whether real, personal or mixed, or tangible or intangible, including Capital Stock.

"Proposal Letter" means the Proposal Letter dated as of February 27, 2019, issued by CIT Bank, N.A. and accepted by the Borrower.

"Pro Rata Share" means, with respect to any Lender at any time, (a) with respect to such Lender's Revolving Commitment, Letter of Credit Liabilities and Swingline Exposures at any time, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Revolving Commitment of such Lender at such time and the denominator of which is the amount of the total Revolving Commitments at such time, provided that if commitments of each Lender to make Revolving Loans have been terminated pursuant to Section 9.02, then the Pro Rata Share of each Lender shall be determined based on the Pro Rata Share of such Lender's Revolving Exposure, and (b) with respect to the outstanding Term Loan(s) at any time, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the principal amount of the outstanding Term Loan held by such Lender at such time and the denominator of which is the aggregate outstanding principal amount of the Term Loan(s) held by all Term Loan Lenders at such time. The initial Pro Rata Share of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Qualified ECP Guarantor" means in respect of any Hedge Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant guarantee or grant of the relevant security interest becomes effective with respect to such Hedge Obligation or such other Person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Rating Agencies" has the meaning set forth in Section 12.08(b).

"Real Property" means the real estate listed on Schedule 5.20(a), and any other real estate owned or leased after the Closing Date.

"Recall" means a Person's Removal or Correction of a marketed product that the FDA considers to be in violation of the laws it administers and against which the FDA would initiate legal action, e.g., seizure.

"Recipient" means (a) the Administrative Agent, (b) any Lender, (c) any L/C Issuer and (d) any Support Provider, as applicable.

"Refinancing Facility" has the meaning set forth in Section 2.17.

"Refinancing Revolving Facility" has the meaning set forth in Section 2.17.

"Refinancing Revolving Loans" has the meaning set forth in Section 2.17.

"Refinancing Term Facility" has the meaning set forth in Section 2.17.

"Refinancing Term Loans" has the meaning set forth in Section 2.17.

"Register" has the meaning set forth in Section 12.07(c).

"Registrar" has the meaning set forth in Section 12.07(c).

"Regulation U" and "Regulation X" mean, respectively, Regulations U and X of the Board of Governors of the Federal Reserve System or any successor, as the same may be amended or supplemented from time to time.

"Reimbursement Loan" has the meaning given to such term in Section 2.03(d)(ii).

"Reimbursement Obligation" means the Borrowers' obligation to immediately reimburse or pay all Unreimbursed Amounts with respect to all Letters of Credit and Support Agreements, as more fully described in Section 2.03(d).

"Removal" means the physical removal of a device from its point of use to some other location for repair, modification, adjustment, relabeling, destruction, or inspection.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty-day notice period has been waived.

"Representatives" has the meaning set forth in Section 12.08(b).

39

"<u>Request for Credit Extension</u>" means (a) with respect to a Borrowing, a Loan Notice or Swingline Loan Notice, as the case may be, and (b) with respect to an L/C Credit Extension, a Notice of L/C Credit Event.

"<u>Required Lenders</u>" means (a) at any time there are two or fewer non-Defaulting Lenders, Lenders holding in the aggregate one hundred percent (100%) of (i) the Revolving Commitments and the outstanding Term Loan(s) or (ii) if the Revolving Commitments have been terminated, the Revolving Exposures and the outstanding Term Loan(s) or (b) at any other time, Lenders holding in the aggregate more than fifty percent (50%) of (i) the Revolving Commitments and the outstanding Term Loan(s) or (ii) if the Revolving Commitments have been terminated, the Revolving Exposures and outstanding Term Loan(s); <u>provided</u>, <u>however</u>, as to the threshold requirements disclosed above in <u>clause (b)</u>, the relevant Required Lenders threshold requirements may not be satisfied solely by a Lender and other Lenders which are Affiliates of such Lender, if at such time there is another Lender which is not an Affiliate of such Lender. The Revolving Commitments (or, if the Revolving Commitments have terminated, the Revolving Exposure) and the outstanding Term Loan(s) held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders, including any minimum head-count.

"<u>Required Permit</u>" means a Permit (a) required under applicable Laws applicable to the business of any Loan Party or any of its Subsidiaries or necessary in the manufacturing, importing, exporting, possession, ownership, warehousing, marketing, promoting, sale, leasing, labeling, furnishing, distribution or delivery of goods or services under applicable Laws applicable to the business of any Loan Party or any of its Subsidiaries or any Device Application (including without limitation, at any point in time, all licenses, approvals and permits issued by the FDA or any other applicable Governmental Authority necessary for the testing, manufacture, marketing or sale of any Product by any Loan Party or any of its Subsidiaries as such activities are being conducted by such Person with respect to such Product at such time), and (b) issued by any Person from which any Loan Party or any of its Subsidiaries has received an accreditation. This shall include all state government registrations and certifications applicable to the operation of the business of any Loan Party or any of its Subsidiaries which are necessary for the manufacture or repair of respiratory therapy healthcare products and related Products.

"<u>Required Revolving Lenders</u>" means, (a) at any time there are two or fewer Revolving Lenders who are non-Defaulting Lenders, Revolving Lenders holding in the aggregate one hundred percent (100%) of (i) the Revolving Commitments or (ii) if the Revolving Commitments have been terminated, the Revolving Exposures, or (b) at any other time, Revolving Lenders holding in the aggregate more than fifty percent (50%) of (i) the Revolving Commitments, or (ii) if the Revolving Commitments have been terminated, the Revolving Exposures; <u>provided</u>, <u>however</u>, as to the threshold requirements described above in <u>clause (b)</u>, the relevant Required Revolving Lenders threshold may not be satisfied solely by a Revolving Lender and other Revolving Lenders which are Affiliates of such Revolving Lender if at such time there is another Revolving Lender which is not an Affiliate of such Revolving Lender. The Revolving Commitments (or, if the Revolving Commitments have terminated, the Revolving Exposure) held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Revolving Lenders, including any minimum head-count.

"<u>Required Term Loan Lenders</u>" means, (a) at any other time there are two or fewer Term Loan Lenders who are non-Defaulting Lenders, Term Loan Lenders holding in the aggregate one hundred percent (100%) of the outstanding Term Loan(s), or (b) at any other time, Term Loan Lenders holding in the aggregate more than fifty percent (50%) of outstanding Term Loan(s); <u>provided</u>, <u>however</u>, as to the threshold requirements described above in <u>clause (b)</u>, the relevant Required Term Loan Lenders threshold requirement may not be satisfied solely by a Term Loan Lender and other Term Loan Lenders which are Affiliates of such Term Loan Lender, if at such time there is another Term Loan Lender which is not an

40

Affiliate of such Term Loan Lender. The outstanding Term Loan(s) held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Term Loan Lenders, including any minimum head-count.

"Responsible Officer" means the chief executive officer, president, chief financial officer or treasurer of a Loan Party. Any document delivered hereunder that is executed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means (a) any dividend or other distribution, direct or indirect, on account of any shares (or equivalent) of any class of Capital Stock of any Loan Party or any of its Subsidiaries, now or hereafter outstanding, (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares (or equivalent) of any class of Capital Stock of any Loan Party or any of its Subsidiaries, now or hereafter outstanding, (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of Capital Stock of any Loan Party or any of its Subsidiaries, now or hereafter outstanding, (d) any payment from any Loan Party to Holdings not expressly permitted by Section 7.06, and (e) the payment by any Loan Party or any of its Subsidiaries of any management, advisory or consulting fee to the Sponsor or an Affiliate of the Sponsor or the payment of any extraordinary salary, bonus or other form of compensation to any Person who is directly or indirectly a significant partner, shareholder, owner or executive officer of the Sponsor or Affiliate of the Sponsor, or any such Person, including, without limitation, pursuant to any management fee agreements.

"Revolving Availability" means, at any time beginning on the first (1st) Business Day following the Closing Date and ending five (5) Business Days prior to the Revolving Loan Maturity Date, an amount equal to (a) the total Revolving Commitments less (b) the total Revolving Exposures at such time, provided, that Revolving Availability shall equal zero Dollars ($0) while any Default or Event of Default exists and remains outstanding.

"Revolving Commitment" means, as to each Lender, its obligation to (a) make Revolving Loans to the Borrowers pursuant to Sections 2.01 and 2.03 (for Reimbursement Loans) and (b) and to acquire participations in Letter of Credit Liabilities and Swingline Loans pursuant to Section 2.03 and Section 2.04, respectively, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement. The initial aggregate amount of the Revolving Commitments of all Revolving Lenders is $75,000,000.

"Revolving Commitment Increase" has the meaning specified in Section 2.15(a).

"Revolving Exposure" means, with respect to any Lender at any time, the sum of (a) the outstanding principal amount of such Lender's Revolving Loans, (b) its Pro Rata Share of outstanding Letter of Credit Liabilities and (c) its Swingline Exposure at such time.

"Revolving Lenders" means, as of any date of determination, Lenders having a Revolving Commitment, or after the Revolving Commitments have terminated, Lenders holding any portion of the outstanding Revolving Loan.

"Revolving Loan" has the meaning specified in Section 2.01(a).

41

"Revolving Loan Account" means the loan account on the Administrative Agent's books, in the name of the Borrower Representative on behalf of the Borrowers, in which the Borrowers will be charged with all Obligations when due or incurred by the Administrative Agent or any Lender.

"Revolving Loan Maturity Date" means March 20, 2024.

"Revolving Note" has the meaning specified in Section 2.11(a).

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc. and any successor thereto.

"Sale and Leaseback Transaction" means, with respect to any Loan Party or any Subsidiary, any arrangement, directly or indirectly, with any Person whereby such Loan Party or such Subsidiary shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, or (d) a Person resident in or determined to be resident in a country, in each case, that is subject to a country sanctions program administered and enforced by the U.S. Department of State, OFAC, or other relevant United States sanctions authority.

"Sanctioned Person" means a Person named on the OFAC-maintained list of "Specially Designated Nationals" (as defined by OFAC) or a Person otherwise subject to or the target of any Sanctions.

"Sanctions" means the country or list based economic and trade sanctions administered and enforced by OFAC, the U.S. Department of State or other relevant United States sanctions authority.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Hedge Agreement" means any Hedge Agreement required or permitted by this Agreement that is entered into by and between a Loan Party and a Secured Hedge Provider (whether entered into before or after the Closing Date).

"Secured Hedge Provider" means (a) the Administrative Agent or any of its Affiliates (or any Person who was an Affiliate of the Administrative Agent at the time such Person entered into a Secured Hedge Agreement), and (b) any other Lender or Affiliate of a Lender (or any Person who was a Lender or an Affiliate of a Lender at the time such Person entered into a Secured Hedge Agreement), in each case which is approved in writing by the Administrative Agent as a Secured Hedge Provider, each in their capacity as a counterparty to a Secured Hedge Agreement; provided, in the case of a Secured Hedge Agreement with a Person who is no longer a Lender (or Affiliate of a Lender), such Person shall be considered a Secured Hedge Provider only through the stated termination date (without extension or renewal) of such Secured Hedge Agreement and provided further that for any of the foregoing to be included as a "Secured Hedge Agreement" on any date of determination by the Administrative Agent, the applicable Hedge Party (other than the Administrative Agent or an Affiliate of the Administrative Agent) must have delivered a written designation notice, on the form proscribed by Administrative Agent, to the Administrative Agent prior to such date of determination.

"Secured Parties" means, collectively, the Administrative Agent, an Affiliate of the Administrative Agent who provides Banking Services, the Arranger, the Book Runner, the Lenders, an Affiliate of a Lender who provides Banking Services, the Support Provider, the L/C Issuer (solely to the extent such L/C Issuer also is the Administrative Agent or a Lender), and the Secured Hedge Providers.

"Securities Account Control Agreement" means an agreement, among a Loan Party, a securities intermediary, and the Administrative Agent, which agreement is in a form reasonably acceptable to the Administrative Agent and which provides the Administrative Agent with "control" (as such term is used in Articles 8 and 9 of the UCC) over the securities account(s) described therein, as the same may be as amended, modified, extended, restated, replaced, or supplemented from time to time.

"Securitization Transaction" means any financing transaction or series of financing transactions (including factoring arrangements) pursuant to which any Borrower or any Subsidiary may sell, convey or otherwise transfer, or grant a security interest in, accounts, payments, receivables, rights to future lease payments or residuals or similar rights to payment to a special purpose subsidiary or affiliate of any Person.

"Security Agreement" means the Third Amended and Restated Security and Pledge Agreement dated as of the Closing Date executed in favor of the Administrative Agent by each of the Loan Parties which is a party thereto, as the same may be as amended, modified, extended, restated, replaced or supplemented from time to time.

"Solvent" means, with respect to any Person on a particular date, that on such date (a) the fair value of the assets of such Person exceed its liabilities, including contingent liabilities, (b) the present fair saleable value of the assets of such Person is not less than the amount that will be required to pay the probable liabilities of such Person or its debts as they become absolute and matured, (c) the remaining capital of such Person is not unreasonably small to conduct its business, and (d) such Person will not have incurred debts and does not have the present intent to incur debts, beyond its ability to pay such debts as they mature. In computing the amount of contingent liabilities of any Person on any date, such liabilities shall be computed at the amount that, in the judgment of the Administrative Agent, in light of all facts and circumstances existing at such time, represents the amount of such liabilities that reasonably can be expected to become actual or matured liabilities.

"Specified Equity Contribution" has the meaning set forth in Section 9.05.

"Specified Laws" means all applicable Laws relating to the operation of private label and other medical device product distributions, and the possession, control, warehousing, marketing, sale, lease, rental, and distribution of medical devices, including without limitation, the FDCA, Current Good Manufacturing Practices (CGMP) requirements of the Quality System regulation for medical devices, as specified in Title 21, Code of Federal Regulations, Part 820 (21 C.F.R. 820), the Occupational Health and Safety Act (29 U.S.C. § 651 et seq.), any laws pertaining to the storage and disposal of biomedical and other hazardous waste, and any implementing regulations to any of the foregoing or other applicable state or federal laws. This shall include all guidelines and standards established by state government agencies for the manufacture or repair of respiratory therapy healthcare products and related Products.

"Sponsor" means Quadrant Management, Inc.

"Subordination Agreement(s)" means (a) an agreement (in form and substance satisfactory to the Administrative Agent) among any Loan Party, a subordinating creditor of such Loan Party and the Administrative Agent, on behalf of the Secured Parties, pursuant to which, among other things, (i) Indebtedness is subordinated to the prior payment and satisfaction of the Obligations and (ii) the

43

subordinating creditor agrees not to require, accept or maintain any Lien(s) on any assets of the Loan Parties and their Subsidiaries, except as the Administrative Agent may expressly permit hereunder, and (b) any note, indenture, note purchase agreement or similar instrument or agreement, pursuant to which the indebtedness evidenced thereby or issued thereunder is subordinated to the Obligations by the express terms of such note, indenture, note purchase agreement or similar instrument or agreement, in each case in form and substance satisfactory to the Administrative Agent.

"Subpoena" has the meaning specified in Section 6.03(l).

"Subsidiary" of a Person means a corporation, partnership, limited liability company or other business entity of which a majority of the shares of Capital Stock having ordinary voting power for the election of directors or other governing body (other than Capital Stock having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Loan Parties.

"Support Agreement" means a guaranty, reimbursement agreement or other arrangement or agreement whereby a Support Provider agrees to guaranty or otherwise provide for the reimbursement of drawings under a Letter of Credit on behalf of the Borrower or another party obligated to make such reimbursement.

"Support Provider" means the Administrative Agent or one of its Affiliates who agrees (in its sole discretion) to provide a Support Agreement.

"Supported Letter of Credit" means a Letter of Credit issued by an L/C Issuer in reliance on one or more Support Agreements.

"Survey" means a survey certified to the Administrative Agent and the Title Insurance Company in a manner reasonably satisfactory to each of the Administrative Agent and the Title Insurance Company, dated a date reasonably satisfactory to each of the Administrative Agent and the Title Insurance Company by an independent professional licensed land surveyor, which surveys shall be sufficient to delete any standard printed survey exception contained in the applicable title policy and be made in accordance with the Minimum Standard Detail Requirements for Land Title Surveys jointly established and adopted by the American Land Title Association and the American Congress on Surveying and Mapping in 2005 with all items from Table A thereof completed, except for Nos. 5 and 12.

"Swingline Exposure" means, at any time, the aggregate principal amount of all Swingline Loans outstanding at such time. The Swingline Exposure of any Lender at any time shall be its Pro Rata Share of the total Swingline Exposure at such time.

"Swingline Lender" means CIT, in its capacity as lender of Swingline Loans hereunder.

"Swingline Loan" means a Loan made pursuant to Section 2.04.

"Swingline Loan Notice" means a notice of a Borrowing of Swingline Loans which, if in writing, shall be substantially in the form of Exhibit A-2.

"Swingline Loan Sublimit" means an amount equal to the lesser of (a) the total Revolving Commitments and (b) $5,000,000. The Swingline Loan Sublimit is part of, and not in addition to, the total Revolving Commitments.

"Swingline Note" has the meaning specified in Section 2.11.

"Synthetic Lease" means any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing arrangement whereby the arrangement is considered borrowed money indebtedness for tax purposes but is classified as an operating lease or does not otherwise appear on a balance sheet under GAAP.

"Tax Distributions" means, for any taxable year for which Holdings is treated under the Internal Revenue Code as a partnership for income tax purposes or otherwise similarly disregarded under the Internal Revenue Code for income tax purposes, dividends and/or distributions paid by Holdings to its owners in an amount not to exceed the product of (i) taxable income related to such owners' ownership interest in Holdings multiplied by (ii) the sum of the highest marginal individual federal and state income tax rates in any state in which any owner resides which were applicable in such taxable year.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan Commitment" means the Initial Term Loan Commitment and the Delayed - Draw Term Loan Commitment.

"Term Loan Increase" has the meaning specified in Section 2.15(a).

"Term Loan Lender" means, as of any date of determination, (a) any Lender holding an Initial Term Loan Commitment or any portion of the then-outstanding Initial Term Loan and (b) any Lender holding a Delayed — Draw Term Loan Commitment or any portion of the then outstanding Delayed — Draw Term Loan.

"Term Loan Maturity Date" means March 20, 2024.

"Term Loans" has the meaning specified in Section 2.01(c).

"Term Note" has the meaning set forth in Section 2.11.

"Termination Date" means the date that (a) all Obligations (other than contingent obligations in respect of Letters of Credit, Secured Hedge Agreements and Banking Services Obligations) have been paid in full in cash, (b) no commitments or other obligations of any Lender to provide funds to the Borrowers remain outstanding, (c) no Lender Letter of Credit or Supported Letter of Credit remains outstanding (or, to the extent outstanding, such Letters of Credit have been Cash Collateralized as provided in Section 2.03(g)), (d) to the extent requested by the Administrative Agent, receipt by the Secured Parties of customary liability releases from the Loan Parties in form and substance reasonably acceptable to the Administrative Agent and (e) all contingent obligations have been cash collateralized with Administrative Agent in a manner and amounts reasonably acceptable to Administrative Agent.

"Termination Value" means, in respect of any one or more Hedge Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedge Agreements, (a) for any date on or after the date such Hedge Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedge Agreements, as determined based upon one or more mid-market or other readily available quotations

45

provided by any recognized dealer in such Hedge Agreements (which may include a Lender or any Affiliate of a Lender).

"Test Period" means, as of any date of determination, the most recently completed four (4) consecutive Fiscal Quarters of Intermediate Holdings ending on or prior to such date for which financial statements have been or are required to be delivered pursuant to Section 6.01(a) or Section 6.01(b).

"Third Party Payor" means a Government Reimbursement Program including Medicare, Medicaid, TRICARE, and other state or federal health care program, Blue Cross and/or Blue Shield, private insurers, managed care plans and any other person or entity which presently or in the future maintains Third Party Payor Programs.

"Third Party Payor Programs" means all payment and reimbursement programs sponsored by a Third Party Payor, in which a Loan Party participates.

"Title Insurance Company" means a title insurance company satisfactory to the Administrative Agent.

"Total Consideration" means, with respect to any Acquisition, all cash and non-cash consideration, including the amount of Indebtedness assumed by the buyer and the amount of Indebtedness evidenced by notes issued by the buyer to the seller, the maximum amount payable in connection with any deferred purchase price obligation (including any Earn-Out Obligation) and the value of any Capital Stock of any Loan Party issued to the seller in connection with such Acquisition.

"Transaction Documents" means the Note and Unit Purchase Agreement, the Preferred Note, Holdings Operating Agreement and any documents entered into in connection therewith.

"Transactions" means the transactions contemplated under the Transaction Documents.

"Transport and Disposal Agreement" means an agreement for the transport and disposal of hazardous wastes in accordance with all applicable Laws, as the same may be amended, supplemented, restated, modified or replaced from time to time.

"TRICARE" means the program administered pursuant to 10 U.S.C. Section 1071 et. seq., Sections 1320a-7 and 1320a-7a of Title 42 of the United States Code and the regulations promulgated pursuant to such statutes.

"Type" means, with respect to any Loan, its character as a Base Rate Loan or a LIBOR Loan.

"UCC" means the Uniform Commercial Code as in effect in any applicable jurisdiction.

"UCP" means, with respect to any commercial Letter of Credit, the "Uniform Customs and Practice for Documentary Credits", as most recently published by the International Chamber of Commerce.

"Uncertificated Securities Control Agreement" means an agreement in form and substance satisfactory to the Administrative Agent among the Administrative Agent, a Loan Party and a pledgor of uncertificated securities which provides the Administrative Agent with "control" (as such term is used in Articles 8 and 9 of the UCC) of such uncertificated securities (as defined in the UCC).

46

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Sections 412 and 430 of the Internal Revenue Code for the applicable plan year.

"United States" and "U.S." mean the United States of America.

"Unreimbursed Amount" means the amount of any drawing under a Letter of Credit or payment under a Support Agreement which has not yet been reimbursed by the Borrowers (through direct payment or by the making of a Revolving Loan).

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Internal Revenue Code.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 3.01(f).

"Verus Merger" has the meaning set forth in the definition of "Verus Merger Agreement".

"Verus Merger Agreement" means that certain Agreement and Plan of Merger, dated as of May 17, 2018 (the "Verus Merger Agreement"), by and among Holdings, as purchaser, Medstar Surgical & Breathing Equipment, Inc., a New York corporation and indirect wholly owned subsidiary of Holdings ("Merger Sub Parent"), Medstar Acquisition Co, Inc., a Delaware corporation and wholly owned subsidiary of Merger Sub Parent (the "Verus Merger Sub"), Verus Healthcare, Inc., a Delaware corporation ("Verus Company"), the shareholders of Verus Company signatory thereto and Verus Note Holding Company, LLC, a Tennessee limited liability company, in its capacity as the Shareholder Representative, pursuant to which Verus Merger Sub will merge (the "Verus Merger") with and into Verus Company with (a) the purchase price being paid by Holdings as set forth therein and (b) Verus Company surviving as a Wholly Owned Subsidiary of Merger Sub Parent.

"Voluntary Termination" shall have the meaning set forth in the definition of "Material Adverse Effect".

"Weighted Average Life to Maturity" means, when applied to any Indebtedness as of any date of determination, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (b) the then outstanding principal amount of such Indebtedness.

"Wholly Owned Subsidiary" means any Person one hundred percent (100%) of whose Capital Stock is at the time owned by a Loan Party directly or indirectly through other Persons one hundred percent (100%) of whose Capital Stock is at the time owned, directly or indirectly, by such a Loan Party.

"Withholding Agent" means any Loan Party and the Administrative Agent.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which Write-Down and Conversion Powers are described in the EU Bail-In Legislation Schedule.

47

**1.02**    **Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all real and personal property and tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

**1.03**    **Accounting Terms.**

(a)    Except as otherwise specifically prescribed herein, all accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Pre-Closing Financial Statements.  Notwithstanding any other provision contained herein, any obligations relating to a lease that was accounted for by such Person as an operating lease as of the Closing Date and any similar lease entered into after the Closing Date by such Person shall be accounted for as obligations relating to an operating lease and not as obligations relating to a Capital Lease; provided, however, that the Borrower Representative may elect, with notice to the Administrative Agent to treat operating leases as Capital Leases in accordance with GAAP as in effect from time to time and, upon such election, and upon any subsequent change to GAAP therefor, the parties will enter into negotiations in good faith in an effort to preserve the original intent of the financial covenants set forth herein (it being understood and agreed that the treatment of operating leases be interpreted on the basis of GAAP as in effect on the Closing Date until such election shall have been withdrawn or such provision amended in accordance herewith).

48

(b)      Together with each Compliance Certificate, the Borrower Representative will provide a written summary of any changes in GAAP that materially impact the calculation of the financial covenants in Article 8 contained in such Compliance Certificate.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and any of the Borrowers, the Administrative Agent or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower Representative on behalf of the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP, provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower Representative shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

(c)      Notwithstanding the above, all calculations of the financial covenants in Article 8 (including for purposes of determining compliance with such financial covenants) shall be made on a Pro Forma Basis; however, no Specified Equity Contribution shall be included in any calculation made hereunder on a Pro Forma Basis. Further, no Specified Equity Contribution shall be included in the calculation of Excess Cash Flow.

(d)      All financial statements delivered hereunder shall be prepared without giving effect to any election under Statement of Financial Accounting Standards Accounting Standards Codification No. 825 — Financial Instruments, or any successor thereto (including pursuant to the Accounting Standards Codification) (or any similar accounting principle) permitting a Person to value its financial liabilities at the fair value thereof.

1.04    Rounding.  Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.05    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

1.06    Letter of Credit Amounts.  Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to mean the maximum face amount of such Letter of Credit after giving effect to all increases thereof contemplated by such Letter of Credit or the Issuer Document related thereto, whether or not such maximum face amount is in effect at such time.

1.07    Financial Covenant Defaults.  For the purposes of Sections 9.01 and 4.02, a breach of a covenant contained in Section 8.01 shall be deemed to have occurred as of any date of determination by the Administrative Agent and as of the last day of any specified period of measurement regardless of whether or when the financial statements reflecting such breach are delivered to the Administrative Agent.

1.08    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes

49

into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Capital Stock at such time.

## ARTICLE 2

## THE COMMITMENTS AND CREDIT EXTENSIONS

2.01    **Loans**.

(a)    <u>Revolving Loans</u>.  Subject to the terms and conditions set forth herein, each Revolving Lender severally (and neither jointly nor jointly and severally) agrees to make loans to the Borrower Representative on behalf of the Borrowers (each such loan a "<u>Revolving Loan</u>") in Dollars from time to time on any Business Day during the Availability Period in an aggregate amount not to exceed at any time outstanding the amount of such Revolving Lender's Revolving Commitment, <u>provided</u>, that after giving effect to any Borrowing of Revolving Loans, (i) the total Revolving Exposure of all Revolving Lenders shall not exceed the total Revolving Commitments of all Revolving Lenders, (ii) the Revolving Exposure of each Revolving Lender shall not exceed such Revolving Lender's Revolving Commitment, and (iii) the total Revolving Exposure of all Revolving Lenders to be used for working capital, to make Capital Expenditures, and for other general corporate purposes (other than Permitted Acquisitions and fees and transaction costs associated with Permitted Acquisitions) shall not exceed $25,000,000.  Within the limits of each Revolving Lender's Revolving Commitment, and subject to the other terms and conditions hereof, the Borrower Representative on behalf of the Borrowers may borrow under this <u>Section 2.01(a)</u>, prepay under <u>Section 2.05</u>, and re-borrow under this <u>Section 2.01(a)</u>.  The Revolving Loans may be Base Rate Loans or LIBOR Loans, as further provided herein.  No Borrowing of Revolving Loans shall be made on the Closing Date.

(b)    <u>Initial Term Loan</u>.  Subject to the terms and conditions set forth herein, each Term Loan Lender severally agrees to fund its Pro Rata Share of a term loan to the Borrower Representative on behalf of the Borrowers (the "<u>Initial Term Loan</u>") on the Closing Date in an aggregate amount not to exceed such Term Loan Lender's Initial Term Loan Commitment, <u>provided</u>, that after giving effect to any Borrowing under the Initial Term Loan, the outstanding amount of the Initial Term Loan shall not exceed the total Initial Term Loan Commitments.  Amounts repaid or prepaid on the Initial Term Loan may not be re-borrowed.  The Initial Term Loan may consist of Base Rate Loans or LIBOR Loans, as further provided herein; <u>provided</u>, <u>however</u>, all Borrowings of the Initial Term Loan on the Closing Date shall be Base Rate Loans.  Any portion of the Initial Term Loan that is repaid or prepaid may not be re-borrowed.  Upon making the Initial Term Loan, each Term Loan Lender's Initial Term Loan Commitment shall be reduced to zero.

(c)    <u>Delayed — Draw Term Loan</u>.  Subject to the terms and conditions set forth herein, each Term Loan Lender severally agrees to fund its Pro Rata Share of a term loan to the Borrower Representative on behalf of the Borrowers (the "<u>Delayed — Draw Term Loan</u>," and together with the Initial Term Loan, the "<u>Term Loans</u>") during the Delayed — Draw Term Loan Availability Period in an aggregate amount not to exceed such Term Loan Lender's Delayed — Draw Term Loan Commitment; <u>provided</u>, that after giving effect to any Borrowing under the Delayed — Draw Term Loan, the outstanding amount of the Delayed — Draw Term Loan shall not exceed the total Delayed — Draw Term Loan Commitments.  Amounts repaid or prepaid on the Delayed — Draw Term Loan may not be re-borrowed.  The Delayed — Draw Term Loan may consist of Base Rate Loans or LIBOR Loans, as further provided herein.  No more than eight (8) Delayed - Draw Term Loan Borrowings may be made during the Delayed - Draw Term Loan Availability Period.  Each Borrowing of Delayed - Draw Term Loans shall be in a principal amount of $2,000,000 or a whole multiple of $100,000 in excess thereof and may include funding for one or more Permitted Acquisitions occurring on or prior to the date thereof.

50

**2.02**    <u>Borrowings, Conversions and Continuations of Loans.</u>

(a)    Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of LIBOR Loans shall be made upon the Borrower Representative's irrevocable notice (and if in writing, in the form of the Loan Notice) to the Administrative Agent, which may be delivered by telephone or e-mail request (or such other means as may be agreed upon by the Administrative Agent in its sole discretion).  Each such notice must be received by the Administrative Agent not later than 10:00 a.m. (i) three (3) Business Days prior to the requested date of any Borrowing of, conversion to or continuation of LIBOR Loans or of any conversion of LIBOR Loans to Base Rate Loans, and (ii) one (1) Business Day prior to the requested date of any Borrowing of Base Rate Loans (or any conversion to Base Rate Loans).  Each telephonic notice by the Borrower Representative pursuant to this <u>Section 2.02(a)</u> must be confirmed promptly by delivery to the Administrative Agent of a written Loan Notice, appropriately completed and executed by a Responsible Officer of the Borrower Representative.  Subject to <u>Section 2.03(d)</u> with respect to Reimbursement Loans, each Borrowing (subject to <u>Section 2.01(c)</u> for Delayed - Draw Term Loans) of, conversion to or continuation of LIBOR Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof.  Each Borrowing (subject to <u>Section 2.01(c)</u> for Delayed - Draw Term Loans) of or conversion to Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof.  Each Loan Notice pursuant to this <u>Section 2.02(a)</u> (whether telephonic or written) shall specify (i) whether the Borrower Representative is requesting a Borrowing, a conversion of Loans from one Type to the other, or a continuation of LIBOR Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto.  If the Borrower Representative fails to specify a Type of Loan in a Loan Notice or if the Borrower Representative fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Base Rate Loans.  Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable LIBOR Loans.  If the Borrower Representative requests a Borrowing of, conversion to, or continuation of LIBOR Loans in any such Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month.

(b)    Following receipt of a Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the applicable Loans, and if no timely notice of a conversion or continuation is provided by the Borrower Representative as required by <u>Section 2.02(a)</u> with respect to any continuation of a LIBOR Loan, the Administrative Agent shall notify each Lender of the details of any automatic conversion of such LIBOR Loans to Base Rate Loans as described in the preceding subsection.  In the case of a Borrowing, each Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Loan Notice without setoff, defense, counterclaim or claims in recoupment.  Upon satisfaction of the conditions set forth in <u>Section 4.02</u> (and, if such Borrowing is the initial Credit Extension, <u>Section 4.01</u> and if such Borrowing is a Delayed — Draw Term Loan, <u>Section 4.02(e)</u>), the Administrative Agent shall make all funds so received available to the Borrower Representative in like funds as received by the Administrative Agent by wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower Representative, <u>provided</u>, that if, on the date of a Borrowing of Revolving Loans, there are Unreimbursed Amounts outstanding, then the proceeds of such Borrowing shall be applied, <u>first</u>, to the payment in full of any such Unreimbursed Amounts, and <u>second</u>, to the Borrower Representative as provided above.

(c)    Except as otherwise provided herein, a LIBOR Loan may be continued or converted only on the last day of the Interest Period for such LIBOR Loan. During the existence of an Event of Default, no Loans may be requested as, converted to or continued as LIBOR Loans without the consent of the Administrative Agent or Required Lenders, and the Administrative Agent or Required Lenders may demand that any or all of the then outstanding LIBOR Loans be converted immediately to Base Rate Loans.

(d)    The Administrative Agent shall promptly notify the Borrower Representative and the Lenders of the interest rate applicable to any Interest Period for LIBOR Loans upon determination of such interest rate.  The determination of the LIBO Rate by the Administrative Agent shall be conclusive in the absence of manifest error.

(e)    After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than seven (7) Interest Periods in effect with respect to outstanding Loans.

(f)    Notwithstanding the foregoing, this Section 2.02 shall not apply to Swingline Loans except as otherwise required by Section 2.04.

**2.03    Letters of Credit and Letter of Credit Fees.**

(a)    Letter of Credit.

(i)    On any Business Day that is at least thirty-one (31) days prior to the Revolving Loan Maturity Date the Revolving Commitment may be used by Borrowers, in addition to the making of Revolving Loans hereunder, for the issuance or arrangement of Letters of Credit and of Support Agreements related thereto pursuant to the terms, and subject to the conditions, set forth herein.

(ii)    No Letter of Credit or Support Agreement shall be issued, arranged, increased, amended or extended hereunder if:

(A)    such issuance, increase, amendment or extension would violate or be prohibited or enjoined by applicable Law or any decree request or directive of any Governmental Authority or would subject the L/C Issuer, Support Provider or the Lenders to any restriction, reserve or capital requirement not in effect on the Closing Date, or would impose any unreimbursed loss, cost or expense which was not applicable on the Closing Date and which the L/C Issuer, Support Provider or Lenders in good faith deems material to it;

(B)    any Lender is at such time a Defaulting Lender, unless the L/C Issuer (or Support Provider) has entered into arrangements, including the delivery of Cash Collateral, satisfactory to the L/C Issuer (or such Support Provider) (in its sole discretion) with the Borrowers or such Lender to eliminate the L/C Issuer's (or such Support Provider's) actual or potential Fronting Exposure (after giving effect to Section 2.16(d)) with respect to the Defaulting Lender arising from either the Letter of Credit then proposed to be issued or that Letter of Credit and all other Letter of Credit Liabilities as to which the L/C Issuer (or such Support Provider) has actual or potential Fronting Exposure, as it may elect in its sole discretion;

52

(C)    the Administrative Agent determines that one or more applicable conditions contained in Article 4 has not been satisfied; or

(D)    after giving effect to such issuance, increase or extension, (x) the aggregate Letter of Credit Liabilities under all Letters of Credit exceed the Letter of Credit Sublimit, (y) the total Revolving Exposure of all Lenders exceeds the aggregate Revolving Commitments of all Lenders, or (z) the Revolving Exposure of any Lender exceeds such Lender's Revolving Commitment.

Additionally, no Letter of Credit shall be amended (including any increase in its amount or extension of its term) if such Letter of Credit in its amended form would not be permitted under the terms hereof or if the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(iii)    Each Letter of Credit shall expire by its terms within one (1) year after the date of issuance and in any event at least thirty (30) days prior to the Revolving Loan Maturity Date.  Notwithstanding the foregoing, a Letter of Credit may provide for automatic extensions of its expiry date for one or more successive one (1) year periods, provided that (A) no renewal term may extend the term of the Letter of Credit to a date that is later than the thirtieth (30th) day prior to the Revolving Loan Maturity Date, (B)  the L/C Issuer that issued such Letter of Credit has the right (either on its own initiative or at the direction of the Administrative Agent or Support Provider issuing a Support Agreement with respect thereto) not to extend such expiry date and to terminate such Letter of Credit on each such annual expiration date with the giving of notice and (C) no such extension shall be permitted (and the Administrative Agent may notify the L/C Issuer not to so extend such Letter of Credit) if the L/C Issuer, the Support Provider, or the Administrative Agent has determined that such Letter of Credit would not be permitted in its revised (as extended) form under the terms hereof, or the Administrative Agent has determined that one or more of the applicable conditions specified in Article 4 or in this Section 2.03 for Letter of Credit issuance is not then satisfied.  Each letter of credit issued or renewed by the L/C Issuer on account of this Agreement or any Support Agreement, and each Support Agreement delivered by a Support Provider on account of this Agreement, in each case shall be conclusively deemed to constitute a Letter of Credit or a Support Agreement, as applicable, issued, renewed or delivered in full compliance with this Agreement for all purposes hereunder.

(iv)    Nothing in this Agreement (other than as provided in Section 2.03(a) as to the L/C Issuer or the Support Provider) shall be construed to obligate any Lender, the Administrative Agent or its Affiliates to arrange, issue, increase the amount of or extend the expiry date of any Letter of Credit or Support Agreement, which act or acts, if any, shall be subject to agreements to be entered into from time to time between the applicable Borrower and such Person.

(b)    Letter of Credit Procedure.

(i)    Should a Borrower wish to have a Letter of Credit issued or an existing Letter of Credit amended (including any increase in the amount thereof or extension of the expiry date thereof), Borrower Representative shall deliver to the Administrative Agent a Notice of L/C Credit Event at least five (5) Business Days before the proposed date of issuance or amendment.

(ii)    Each L/C Issuer that is a party to this Agreement shall give the Administrative Agent prompt written notice (and Borrowers shall cause each L/C Issuer not a party to this Agreement to give the Administrative Agent prompt written notice) of each issuance

53

or amendment of a Letter of Credit, each payment made by such L/C Issuer in respect of such Letter of Credit issued by it, and any other information requested by the Administrative Agent with respect to such Letter of Credit or amendment.

(c)        Letter of Credit Fee. Borrowers shall also pay directly to each L/C Issuer (or if applicable, the Support Provider) for its own account a fronting fee with respect to each Letter of Credit issued (or guaranteed) by it equal to 0.125% per annum of the daily maximum amount then available to be drawn under such Letter of Credit (determined without regard to whether any conditions to drawing could then be met) (the "Fronting Fee"). Borrowers shall pay to Administrative Agent, for the benefit of the Revolving Lenders, a letter of credit fee with respect to the Letter of Credit Liabilities for each Letter of Credit, computed for each day from the date of issuance of such Letter of Credit to the date that is the last day a drawing is available under such Letter of Credit, at a rate per annum equal to the Applicable Margin then applicable to Letters of Credit (the "Letter of Credit Fee") times the daily maximum amount available to be drawn under such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit); provided, however, any Letter of Credit Fees otherwise payable for the account of a Defaulting Lender with respect to any Letter of Credit as to which such Defaulting Lender has not provided Cash Collateral satisfactory to the L/C Issuer (or the Support Provider, as the case may be) pursuant to this Section 2.03 shall be payable, to the maximum extent permitted by applicable Law, to the other Revolving Lenders in accordance with the upward adjustments in their respective Pro Rata Share allocable to such Letter of Credit pursuant to Section 2.16(d), with the balance of such fee, if any, payable to the L/C Issuer (or the Support Provider, as the case may be) for its own account. Fronting Fees and Letter of Credit Fees shall be (i) computed on a quarterly basis in arrears and (ii) due and payable on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Revolving Loan Maturity Date and thereafter on demand. If there is any change in the Applicable Margin during any quarter, the daily maximum amount of each Letter of Credit shall be computed and multiplied by the Applicable Margin separately for each period during such quarter that such Applicable Margin was in effect. Notwithstanding anything to the contrary contained herein, while an Event of Default exists, all Letter of Credit Fees shall accrue at the Default Rate to the extent applicable pursuant to Section 2.08(b). In addition, Borrowers shall pay promptly to the L/C Issuer (or reimburse the Support Provider for) any fronting or other fees, costs or expenses that it may charge in connection with any Letter of Credit.

(d)        Reimbursement Obligations of Borrowers, Reimbursement Loans and Lender Participations.

(i)        If an L/C Issuer shall make a payment under a Letter of Credit or a Support Provider shall make a payment under a related Support Agreement, L/C Issuer or the Support Provider, as applicable, shall notify the Borrower Representative thereof. Not later than 11:00 a.m. on the date of any payment by the L/C Issuer under a Letter of Credit or by the Support Provider under a Support Agreement, so long as the Borrower Representative has received telephonic notice of such payment prior to 10:00 a.m. on such date, and otherwise on the following Business Day, the applicable Borrowers shall promptly (but in any event on the same day) satisfy its Reimbursement Obligation by paying to the L/C Issuer or Support Provider (or to the Administrative Agent for the account of the L/C Issuer or Support Provider), as applicable, the full outstanding amount of such Unreimbursed Amount. Such Borrower shall also pay interest, on demand, on all Unreimbursed Amounts for each day until such Unreimbursed Amount is satisfied at a rate per annum equal to the sum of two percent (2%) plus the interest rate applicable to Revolving Loans (which are Base Rate Loans) for such day.

(ii)        If any Borrower fails to pay its Reimbursement Obligation when due, the Borrower Representative shall be deemed to have immediately requested that Revolving Lenders

54

make a Revolving Loan (a "Reimbursement Loan"), which shall be a Base Rate Loan, in a principal amount equal to the amount of such Unreimbursed Amount, the proceeds of which shall be applied to satisfy such Reimbursement Obligation. Administrative Agent shall promptly notify Revolving Lenders of any such deemed request and each Revolving Lender shall make available to Administrative Agent not later than 12:00 p.m. on the Business Day following such notification from Administrative Agent such Revolving Lender's Pro Rata Share of such Revolving Loan. Each Revolving Lender hereby absolutely and unconditionally agrees to fund such Revolving Lender's Pro Rata Share of the Reimbursement Loan, unaffected by any circumstance whatsoever, including without limitation (A) the occurrence and continuance of a Default or an Event of Default (but the funding of such a Revolving Loan shall not act as a cure or waiver of any Default or Event of Default other than the non-payment of such Unreimbursed Amount), (B) the fact that, whether before or after giving effect to the making of any such Revolving Loan, the Revolving Exposure exceeds or will exceed the Revolving Commitment, (C) the surrender or impairment of any security for the performance or observance of any of the terms of this Agreement, or (D) the failure of any condition in Article 4 to have been satisfied. Administrative Agent shall apply the gross proceeds of each such Revolving Loan in satisfaction of such Borrowers' Reimbursement Obligation.

(iii)    Concurrently with the issuance of each Support Agreement and Letter of Credit, each such Revolving Lender shall be deemed to have purchased and received, without recourse or warranty, an undivided interest and participation, to the extent of such Lender's Pro Rata Share of the Revolving Commitment, in and to the liabilities and obligations in respect of such Letters of Credit and Support Agreements and the corresponding Reimbursement Obligations and Unreimbursed Amounts which may arise therefrom. Such Lenders' participation obligation shall be absolute and unconditional and shall not be affected by any circumstances whatsoever. If, notwithstanding the provision of Section 2.03(d)(i) or (ii) above, any portion of an Unreimbursed Amount remains outstanding (whether due to Borrowers failing to honor their Reimbursement Obligation, or if a Reimbursement Loan cannot for any reason be made, or otherwise) or if any reimbursement received by Support Provider or any L/C Issuer from any Borrower is or must be returned or rescinded upon or during any bankruptcy or reorganization of any Loan Party or otherwise (including any Revolving Loan made pursuant to Section 2.03(d)(ii)), each Revolving Lender shall be irrevocably and unconditionally obligated to fund its participation in such Unreimbursed Amount by paying to Administrative Agent for the account of the Support Provider or L/C Issuer, as applicable, its Pro Rata Share of such Unreimbursed Amount. To the extent any such Revolving Lender shall not have made such amount available to Administrative Agent, as applicable, by 12:00 p.m. on the Business Day on which such Lender receives such notice from Administrative Agent, (A) such Lender shall pay interest on such amount to Administrative Agent on demand accruing daily at the Federal Funds Rate, for the first three (3) days following such Lender's receipt of such notice, and thereafter at the Base Rate plus the Applicable Margin in respect of Revolving Loans that are Base Rate Loans and (B) the Administrative Agent may apply any subsequent payment that such Lender otherwise is entitled to receive under this Agreement to the satisfaction of such Lender's obligation. Any Revolving Lender's failure to fund its participation amount shall not relieve any other Lender of its obligation hereunder to fund such participation, but no Revolving Lender shall be responsible for the failure of any other Lender to fund its participation.

(iv)    Notwithstanding the foregoing, payment of any such Lender's participation described in Section 2.03(d)(iii) above, and further disbursement of such payment to the L/C Issuer or Support Provider, shall in no way extinguish the Borrowers' related Reimbursement Obligation and any such Reimbursement Obligation not paid by Borrower or

55

refinanced by Reimbursement Loans shall be due and payable on demand together with interest as described in Section 2.03(d)(i).

    (e)    <u>Repayment to Lenders</u>.

    (i)    Until a Lender funds its Reimbursement Loan or participation pursuant to Section 2.03(d), interest with respect to any Unreimbursed Amount shall be for the account of the L/C Issuer or Support Provider, as the case may be.  Once the Administrative Agent has received from any Lender such Lender's portion of the Reimbursement Loan or participation, the Administrative Agent shall distribute to such Lender (in the same funds as those received by the Administrative Agent, and whether such funds are directly from the Borrowers or otherwise, including proceeds of cash collateral applied thereto by the Administrative Agent), such Lender's Pro Rata Share of any principal payments received by the Administrative Agent in respect of such Unreimbursed Amount or Reimbursement Loan, plus any interest received by the Administrative Agent which have accrued on such Unreimbursed Amount or Reimbursement Loan for the period after such Lender funded such participation or Reimbursement Loan.

    (ii)    If any payment received by the Administrative Agent pursuant to Section 2.03(d) is required to be returned under any circumstances (including pursuant to any settlement entered into by the L/C Issuer or the Support Provider, as the case may be, in its discretion), each Revolving Lender shall pay to the Administrative Agent for its own account or for the account of the L/C Issuer or Support Provider, as the case may be, its Pro Rata Share thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned by such Lender, at a rate per annum equal to the Federal Funds Rate from time to time in effect.

    (f)    <u>Absolute Obligations</u>.  The obligations of each Borrower to pay its Reimbursement Obligations and its obligation to repay the Reimbursement Loans and the obligations of the Lenders to fund their portion of Reimbursement Loans or participations under Section 2.03(d) shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement, under all circumstances whatsoever, including the following:

    (i)    any lack of validity or enforceability of, or any amendment or waiver of or any consent to departure from, any Letter of Credit, Support Agreement or any related document;

    (ii)    the existence of any claim, set-off, defense or other right which any Person may have at any time against the beneficiary of any Letter of Credit, the L/C Issuer (including any claim for improper payment), Support Provider, Administrative Agent, any Lender or any other Person, whether in connection with any Loan Document or any unrelated transaction, <u>provided</u> that nothing herein shall prevent the assertion of any such claim by separate suit or compulsory counterclaim;

    (iii)    any statement or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect whatsoever other than in respect of the gross negligence or willful misconduct of the L/C Issuer as determined by a non appealable decision of a court of competent jurisdiction;

    (iv)    any affiliation between the L/C Issuer, the Administrative Agent and/or the Support Providers; or

56

(v)      to the extent permitted under applicable law, any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrowers' Obligations hereunder.

(g)      Deposit Obligations of Borrowers.  Upon the request of the Administrative Agent or the L/C Issuer (or the Support Provider, as the case may be), (x) if the L/C Issuer (or the Support Provider, as the case may be) has honored any full or partial drawing request under any Letter of Credit (as if any Support Provider has made a payment under a Support Agreement) and such drawing (or payment) has resulted in any Unreimbursed Amounts or (y) in the event any Letters of Credit, Support Agreements or Unreimbursed Amounts are outstanding at the time that Borrowers prepay or are required to repay the Obligations or the Revolving Commitment is terminated, Borrowers shall (i) Cash Collateralize one hundred and five percent (105%) of the aggregate outstanding Letter of Credit Liabilities and such Cash Collateral shall be available to Administrative Agent, for its benefit and the benefit of issuers of Lender Letters of Credit and Support Providers, to reimburse payments of drafts drawn under such Letters of Credit and pay any fees and expenses related thereto and (ii) prepay the fee payable under Section 2.03(e) with respect to such Letters of Credit for the full remaining terms of such Letters of Credit.  At any time that there shall exist a Defaulting Lender, promptly upon the request of the Administrative Agent, the L/C Issuer (or the Support Provider, as the case may be) or the Swingline Lender, the Borrowers shall deliver to the Administrative Agent Cash Collateral in an amount sufficient to cover all Fronting Exposure (after giving effect to Section 2.16(d) and any Cash Collateral provided by the Defaulting Lender).  Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under this Section 2.03 in respect of Letters of Credit shall be held and applied in satisfaction of the specific Letter of Credit Liabilities, obligations to fund participations therein (including, as to Cash Collateral provided by a Defaulting Lender, any interest accrued on such obligation) and other obligations for which the Cash Collateral was so provided, prior to any other application of such property as may be provided herein.  Cash Collateral (or the appropriate portion thereof) provided to reduce Fronting Exposure or other obligations shall be released promptly following (i) the elimination of the applicable Fronting Exposure or other obligations giving rise thereto (including by the termination of Defaulting Lender status of the applicable Lender) or (ii) the Administrative Agent's good faith determination that there exists excess Cash Collateral; provided, however, (x) that Cash Collateral furnished by or on behalf of a Loan Party shall not be released during the continuance of a Default or an Event of Default and (y) the Person providing Cash Collateral and the L/C Issuer (or the Support Provider, as the case may be) may agree that Cash Collateral shall not be released but instead held to support future anticipated Fronting Exposure or other obligations.  Each Borrower hereby grants to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, a security interest in all such cash, deposit accounts and all balances therein pledged, deposited with or delivered to the Administrative Agent and all proceeds of the foregoing.  Cash Collateral shall be maintained in blocked, non-interest bearing deposit accounts at a bank designated by the Administrative Agent.

(h)      Applicability of ISP and UCP.  Unless otherwise expressly set forth in the applicable Letter of Credit, (i) the rules of ISP shall apply to each standby Letter of Credit and (ii) the rules of the UCP shall apply to each commercial Letter of Credit.

(i)      Letters of Credit Issued for Subsidiaries.  Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, a Subsidiary of the Borrowers, the Borrowers shall be obligated to pay any Unreimbursed Amount.  The Borrowers hereby acknowledge that the issuance of Letters of Credit or any Support Agreement for the account of any such Subsidiary inures to the benefit of the Borrowers and that the Borrowers' business derives substantial benefits from the businesses of such Subsidiaries.

57

(j)      Role of L/C Issuer and Others, Conflicts.  (i) The L/C Issuer, its correspondents, participants or assignees, the Administrative Agent, the Support Providers and the Agent-Related Persons (collectively, the "Released Persons") shall have no responsibility to obtain any document (other than the L/C Issuer's obligation to obtain any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  No Released Person shall be liable to any Loan Party or any Lender for (A) any action taken or omitted in connection herewith at the request or with the approval of the Lenders or the Required Lenders, as applicable; (B) any action taken or omitted in the absence of gross negligence or willful misconduct of such Released Person as determined by a final non appealable decision of a court of competent jurisdiction; or (C) the due execution, effectiveness, validity or enforceability of any Issuer Document or any other document or instrument related to any Letter of Credit or Support Agreement.  Each Loan Party and their Subsidiaries hereby assume all risks of the acts or omissions of any beneficiary or transferee with respect to the use of any Letter of Credit.  No Released Person shall be liable or responsible for any of the matters described in Section 2.03(f), provided, that anything in such clauses to the contrary notwithstanding, the Borrowers may have a claim against the L/C Issuer, and the L/C Issuer may be liable to the Borrowers, to the extent, but only to the extent, of any direct, as opposed to consequential, punitive or exemplary, damages suffered by the Borrowers which the Borrowers prove were caused by the L/C Issuer's willful misconduct or gross negligence or the L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit, each as determined by a final non appealable decision of a court of competent jurisdiction.  In furtherance and not in limitation of the foregoing, the L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and the L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

(ii)      In the event of any conflict between the terms hereof and the terms of any Issuer Documents, the terms hereof shall control.

(iii)      The failure of the L/C Issuer to agree to or to conform with the terms of this Agreement (particularly if the L/C Issuer is not a party to this Agreement) shall in no way limit the obligations of the Loan Parties hereunder or subject the Administrative Agent, Support Providers or any Agent-Related Person to any liability.

2.04      **Swingline Loans.**

(a)      Swingline Facility.  Subject to all of the terms and conditions of this Agreement (including the applicable conditions set forth in Article 4), the Swingline Lender may, in its sole discretion and in reliance upon the representations and warranties of the Borrowers set forth herein and the agreements of the other Lenders set forth in Sections 2.04(c) and 2.04(d), make Swingline Loans to the Borrower Representative on behalf of the Borrowers, from time to time during the Availability Period, for the purposes identified in Section 6.11, notwithstanding the fact that the aggregate amount of the outstanding Swingline Loans, when added to the Swingline Lender's Pro Rata Share of the outstanding Revolving Loans and Letter of Credit Liabilities, from time to time may exceed the amount of such Lender's Revolving Commitment; provided, that, after giving effect to any Borrowing of a Swingline Loan, (i) the total Revolving Exposures shall not exceed the total Revolving Commitments, (ii) the Revolving Exposure of any Lender shall not exceed such Lender's Revolving Commitment (except that in the case of the Swingline Lender, the Swingline Lender's Revolving Exposure (excluding all Swingline Exposure) plus the principal balance of all outstanding and the proposed Swingline Loans shall not

58

exceed the sum of such Revolving Exposure (other than Swingline Exposure) plus the Swingline Loan Sublimit), and (iii) the total Swingline Exposure shall not exceed the Swingline Loan Sublimit.  Each Swingline Loan shall be a Base Rate Loan.  No Swingline Loan shall be used for the purpose of funding the payment of the principal of any other Swingline Loan.  Immediately upon the making of a Swingline Loan, each Revolving Lender shall be deemed to have purchased, and hereby irrevocably and unconditionally agrees to purchase, from the Swingline Lender, a risk participation in such Swingline Loan in an amount equal to the product obtained by multiplying such Lender's Pro Rata Share by the amount of such Swingline Loan.  Swingline Loans may be prepaid and re-borrowed from time to time during the Availability Period.  All Swingline Loans shall be paid in full no later than the earlier of the tenth (10th) Business Day following the Borrowing of such Swingline Loan and the Revolving Loan Maturity Date.

(b)    Funding Procedures for Swingline Loans.  In order to request a Swingline Loan, the Borrower Representative shall give to the Administrative Agent and Swingline Lender a Swingline Loan Notice (or telephonic notice to be confirmed promptly with a Swingline Loan Notice) of a proposed Borrowing consisting of a Swingline Loan, specifying the amount of the requested Swingline Loan, not later than 10:00 a.m. on the Business Day of the proposed Borrowing.  Subject to the foregoing, on the Business Day of the proposed Borrowing, the Swingline Lender may make the proceeds of the requested Swingline Loan available to the Borrower Representative by crediting an account of the Borrower Representative that has been designated for such purpose in writing by the Borrower Representative to the Swingline Lender.  Each Swingline Loan shall be in a minimum amount of $500,000 and in integral multiples of $100,000 in excess of that amount.

(c)    Repayment of Swingline Loans with Revolving Loans.  Regardless of whether the conditions set forth in Sections 4.01 and 4.02 have been or are capable of being satisfied and without limiting the requirement of the Borrowers to repay the Swingline Loans as set forth in the last sentence of Section 2.04(a), on any Business Day the Swingline Lender may, in its sole discretion, give notice to the Lenders that some part or all of the outstanding Swingline Loans are to be repaid on the next succeeding Business Day with a Borrowing of Revolving Loans constituting Base Rate Loans made pursuant to Section 2.01 (but not subject to the minimum borrowing requirements of Section 2.02) in the same manner and with the same force and effect as if the Borrower Representative had submitted a Loan Notice therefor pursuant to Section 2.02.  Swingline Lender hereby agrees that it shall request such a settlement of all of the outstanding Swingline Loans from Revolving Lenders at least once every ten (10) Business Days.  Each Lender holding a Revolving Commitment shall make the amount of its Revolving Loan available to the Administrative Agent, in immediately available funds, at Administrative Agent's Office, not later than 11:00 a.m. on the applicable funding date.  The Administrative Agent shall make the proceeds of such Revolving Loans available to the Swingline Lender on such funding date by causing an amount of immediately available funds equal to the proceeds of all such Revolving Loans received by the Administrative Agent to be credited to an account of the Swingline Lender at such office of the Administrative Agent or shall make such proceeds available to the Swingline Lender in such other manner as shall be satisfactory to the Administrative Agent and the Swingline Lender.

(d)    Participations in Swingline Loans.  If for any reason a requested Borrowing of Revolving Loans pursuant to Section 2.04(c) is not or cannot be effected, the Revolving Lenders will, as of the date such proposed Borrowing otherwise would have occurred but adjusted for any payments received in respect of such Swingline Loan(s) by or for the account of the Borrowers on or after such date and prior to such purchase, immediately fund their respective participations in the outstanding Swingline Loans as necessary to cause such Lenders to share in such Swingline Loan(s) proportionately in accordance with their respective Pro Rata Shares.  Whenever, at any time after any Revolving Lender has funded its purchase of a participating interest in a Swingline Loan, the Swingline Lender receives any payment on account thereof, the Swingline Lender will distribute to such Lender its proportionate share of

59

such amount (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's participating interest was outstanding and funded), provided, that in the event any such payment received by the Swingline Lender is subsequently set aside or is required to be refunded, returned or repaid, such Lender will repay to the Swingline Lender its proportionate share thereof.

(e)    Failure to Pay by Lenders.  If any Lender shall fail to perform its obligation to make a Revolving Loan pursuant to Section 2.04(c) or to fund its purchase of a participation in Swingline Loans pursuant to Section 2.04(d), the amount in default shall bear interest for each day from the day such amount is payable until fully paid at a rate per annum equal to (i) for the first three (3) days, the Federal Funds Rate and (ii) thereafter, the Base Rate plus the Applicable Margin in respect of Revolving Loans which are Base Rate Loans, and such obligation may be satisfied by application by the Administrative Agent (for the account of the Swingline Lender) of any payment that such Lender otherwise is entitled to receive under this Agreement.  Pending repayment, each such advance shall be secured by such Lender's participation interest, if any, in the Swingline Loans and any security therefor, and the Swingline Lender shall be subrogated to such Lender's rights hereunder in respect thereof.

(f)    Lenders' Obligations Absolute.  The obligation of each Lender to make Revolving Loans pursuant to Section 2.04(c) and to purchase participations in Swingline Loans pursuant to Section 2.04(d) shall be unconditional and irrevocable, shall not be subject to any qualification or exception whatsoever, shall be made in accordance with the terms and conditions of this Agreement under all circumstances and shall be binding in accordance with the terms and conditions of this Agreement under all circumstances, including the following circumstances: (i) any lack of validity or enforceability of this Agreement, any of the other Loan Documents or any other instrument, document or agreement relating to the transactions that are the subject thereof; (ii) the existence of any claim, defense, set-off or other right that any Borrower, any Guarantor or any Lender may have at any time against any Agent-Related Person, the Swingline Lender, any other Lender, or any other Person, whether in connection with this Agreement, the transactions contemplated herein or any related transactions; (iii) the surrender or impairment of any security for the performance or observance of any of the terms of this Agreement; (iv) the occurrence or continuance of any Default or failure of any condition in Article 4 to have been satisfied upon funding the Swingline Loan or thereafter; (v) any adverse change in the condition (financial or other) of any Borrower or any Guarantor; or (vi) any other reason.

2.05    **Prepayments.**

(a)    Voluntary Prepayments of Loans.

(i)    Revolving Loans and Term Loans.  Subject to the limitations set forth in this Section 2.05(a), the Borrowers may, upon notice from the Borrower Representative to the Administrative Agent, at any time or from time to time voluntarily prepay Revolving Loans and the Term Loans in whole or in part without premium or penalty, provided that (i) such notice must be received by the Administrative Agent not later than 10:00 a.m. (A) three (3) Business Days prior to any date of prepayment of LIBOR Loans, and (B) one (1) Business Day prior to the date of prepayment of Base Rate Loans; (ii) any such prepayment of LIBOR Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof (or, if less, the entire principal amount thereof then outstanding) and (iii) any such prepayment of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof (or, if less, the entire principal amount thereof then outstanding).  Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid.  The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment.  If such notice is delivered by the Borrowers, the Borrowers shall make such prepayment and the payment amount specified in

60

such notice shall be due and payable on the date specified therein, <u>unless</u> such notice is made in connection with the prepayment in full of all Loans and the termination of all commitments under this Agreement, in which case no prepayment shall be required hereunder if the condition to such commitment termination is not satisfied as contemplated by <u>Section 2.06</u>. Any prepayment of a LIBOR Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to <u>Section 3.05</u>. Notwithstanding the foregoing, the Borrowers may not voluntarily prepay any Loans that are LIBOR Loans unless such Loans are prepaid at the end of the applicable Interest Period or unless the Borrowers pay all breakage costs associated with such prepayment as provided in <u>Section 3.05</u> hereof.

(ii)    <u>Application of Voluntary Prepayments of Revolving Loans and Term Loans</u>. Any voluntary prepayment of the Term Loans shall be applied at the direction of Borrower (or in the absence of direction from Borrower, in the direct order of maturity). Prepayments of Revolving Loans pursuant to this <u>Section 2.05(a)</u> shall not reduce the total Revolving Commitments. Each such prepayment shall be applied to the Loans of the applicable Lenders in accordance with their respective Pro Rata Shares.

(iii)    <u>Prepayment of Swingline Loans</u>. The Borrowers may prepay Swingline Loans, in whole or in part, at any time and from time to time. The Borrowers shall, prior to or contemporaneously with making any such prepayment, give the Swingline Lender such notice of prepayment (written notice or telephonic notice confirmed in writing to the Swingline Lender) as is sufficient to enable the Swingline Lender to apply such prepayment properly to the repayment of Swingline Loans.

(b)    <u>Mandatory Prepayments of Loans</u>.

(i)    <u>Total Revolving Exposure</u>. If, for any reason (a) the total Revolving Exposures at any time exceed the total Revolving Commitments then in effect, (b) the aggregate Letter of Credit Liabilities exceed the Letter of Credit Sublimit, or (c) the total Swingline Exposure exceeds the Swingline Loan Sublimit, the Borrowers shall immediately prepay the Swingline Loans, prepay the Revolving Loans and/or Cash Collateralize the Letter of Credit Liabilities, as applicable, in an aggregate amount equal to any such excess (each such prepayment to be applied as set forth in clause (vii) below).

(ii)    <u>Dispositions and Involuntary Dispositions</u>. The Borrowers shall prepay the Term Loan and thereafter, all other Obligations in an aggregate amount equal to one hundred percent (100%) of the Net Cash Proceeds of any Disposition or Involuntary Disposition (each such prepayment to be applied as set forth in <u>clause (vii)</u> below) excluding the proceeds of any Dispositions less than $2,000,000 in the aggregate in any Fiscal Year and any voluntary Disposition described in <u>clauses (a)</u>, <u>(b)</u> or <u>(c)</u> of <u>Section 7.05</u>. Notwithstanding the foregoing, if at the time of the receipt of such Net Cash Proceeds no Default or Event of Default has occurred and is continuing and the Borrower Representative delivers to the Administrative Agent a certificate, executed by the Borrower Representative's chief financial officer, that it intends within 365 days after receipt thereof to use all of such Net Cash Proceeds either to purchase assets used in the ordinary course of business of the Borrowers and their respective Subsidiaries (other than current assets, as defined in accordance with GAAP) or to make Capital Expenditures, the Borrower may use such Net Cash Proceeds in the manner set forth in such certificate, <u>provided</u>, that, (A) such Net Cash Proceeds shall be held in a Controlled Account until such time as such Net Cash Proceeds are used to purchase such assets or to make such Capital Expenditures or applied to the Obligations upon the occurrence of any Event of Default, as the case may be, (B) the aggregate amount of such Net Cash Proceeds so used and not subject to prepayment under

61

this clause (ii) of this Section 2.05(b) shall not exceed $2,000,000 in any Fiscal Year plus any insurance proceeds received in respect of any Disposition, (C) any assets so acquired shall be subject to the security interests under the Collateral Documents with not less than the same priority as the assets subject to such Disposition or Involuntary Disposition, and (D) any such Net Cash Proceeds not so used or committed to such use pursuant to a binding agreement on or before the earliest of the following dates shall promptly (but in any event within two (2) Business Days after such date) be applied as a prepayment in accordance with clause (vii) below: (1) the date that is 365 days (or 540 days, if committed to such use pursuant to a binding agreement that was entered into on or before the 365th day after receipt of such proceeds and notice of such agreement has been delivered to the Administrative Agent) after receipt thereof, (2) the date that is five (5) Business Days after the date on which the Borrower Representative shall have notified the Administrative Agent of the Borrowers' determination not to purchase such replacement assets with such Net Cash Proceeds, (3) the date on which an Event of Default set forth in Section 9.01(a) occurs, and (4) the date that is five (5) Business Days after the delivery of a notice by the Administrative Agent or the Required Lenders to the Borrower Representative during the continuance of any other Event of Default.

(iii)    Equity Issuances.  Immediately upon receipt by Intermediate Holdings of Net Cash Proceeds from a capital contribution to, or the issuance of any Capital Stock of, Intermediate Holdings or any of its Subsidiaries (other than any issuance of Capital Stock (A) pursuant to the exercise of options or warrants, (B) pursuant to the conversion of any debt securities to equity or the conversion of any class equity securities to any other class of equity securities (other than Disqualified Capital Stock), (C) as consideration for or to finance a Permitted Acquisition or permitted Capital Expenditures, (D) to officers and employees pursuant to employee benefit or incentive plans or other similar arrangements, (E) Capital Stock of Intermediate Holdings issued to Holdings or any other Person holding Capital Stock of Intermediate Holdings as of the Closing Date, and (F) Capital Stock issued to another Loan Party) (unless, in each case, made in connection with a Specified Equity Contribution, which shall in all events be subject to the prepayment requirements of this paragraph) (an "Equity Issuance"), the Borrowers shall prepay the Term Loans and thereafter, all other Obligations in an aggregate amount equal to one hundred percent (100%) of such Net Cash Proceeds (or in the case of a Specified Equity Contribution, one hundred percent (100%) of the gross proceeds of such Specified Equity Contribution) (such prepayment to be applied as set forth in clause (vii) below).

(iv)    Debt Issuances.  Immediately upon receipt by any Loan Party or any Subsidiary of the Net Cash Proceeds of any Debt Issuance, the Borrowers shall prepay the Term Loans and thereafter, all other Obligations in an aggregate amount equal to one hundred percent (100%) of all such Net Cash Proceeds (such prepayment to be applied as set forth in clause (vii) below).

(v)    Excess Cash Flow.  On the date that is fifteen (15) days after the date on which the annual financial statements are required to be delivered pursuant to Section 6.01(a) for each Fiscal Year (commencing with the Fiscal Year ending December 31, 2019), the Borrowers shall prepay the Term Loans and thereafter, all other Obligations in an aggregate amount equal to fifty percent (50%) (provided, (A) if the Consolidated Total Leverage Ratio was less than 2.00:1.00 but greater than or equal to 1.50:1.00 as of the end of such Fiscal Year as reflected in and properly calculated by the Compliance Certificate for such Fiscal Year, reducing to twenty five percent (25%) for such Fiscal Year and (B) if the Consolidated Total Leverage Ratio was less than 1.50:1.00 as of the end of such Fiscal Year as reflected in and properly calculated by the Compliance Certificate for such Fiscal Year, reducing to zero percent (0%) for such Fiscal Year) of Excess Cash Flow for such Fiscal Year less voluntary principal prepayments under the Loans

62

(other than in respect of the Revolving Loans to the extent not accompanied by an equivalent permanent reduction of the Revolving Commitment) made with Internally Generated Cash. Simultaneously with the delivery by the Loan Parties of the financial statements required to be delivered pursuant to Section 6.01(a) for each Fiscal Year, the Loan Parties shall deliver to the Administrative Agent a calculation (in such detail as the Administrative Agent may reasonably require) of the Excess Cash Flow for such Fiscal Year. Each prepayment with respect to Excess Cash Flow shall be accompanied by a certificate executed by the Borrower Representative's chief financial officer certifying the manner in which Excess Cash Flow and the resulting prepayment were calculated, which certificate shall be in form, substance and detail reasonably satisfactory to the Administrative Agent and shall be applied as set forth in clause (vii) below.

(vi)    Extraordinary Receipts. Upon receipt by any Loan Party of any Extraordinary Receipts, the Borrower shall prepay the Term Loans and thereafter, all other Obligations in an aggregate amount equal to one hundred percent (100%) of such Extraordinary Receipts and shall be applied as set forth in clause (vii) below.

(vii)    Application of Mandatory Prepayments. All amounts required to be paid pursuant to this Section 2.05(b) shall be applied as follows:

(A)    with respect to all amounts prepaid pursuant to Section 2.05(b)(i), (x) to the Swingline Loans, to the full extent thereof, (y) after all Swingline Loans have been repaid, to the Revolving Loans to the full extent thereof and, (z) after all Swingline Loans and Revolving Loans have been repaid, to Cash Collateralize any Letter of Credit Liabilities; and

(B)    with respect to all amounts prepaid pursuant to Sections 2.05(b)(ii) through (vi), first to the Term Loans (applied in direct order of maturity for the four (4) scheduled principal amortization payments immediately following such prepayment and thereafter pro rata to the remaining principal amortization payments of the Term Loan, including the payment due on the Term Loan Maturity Date), second to the Swingline Loans, third to the Revolving Loans and fourth to Cash Collateralize the Letter of Credit Liabilities.

(C)    Within the parameters of the applications set forth above, prepayments shall be applied first to Base Rate Loans and then to LIBOR Loans in direct order of Interest Period maturities. Prepayments of the Revolving Loans pursuant to Sections 2.05(b)(ii) through (vi) shall reduce the total Revolving Commitments. All prepayments under this Section 2.05(b) shall be subject to Section 3.05, and shall be without premium or penalty, and shall be accompanied by a payment of all interest accrued on the principal amount prepaid through the date of prepayment.

**2.06    Termination or Reduction of Total Revolving Commitments**. The Borrowers may, upon prior written notice from the Borrower Representative to the Administrative Agent, terminate the total Revolving Commitments or from time to time permanently reduce the total Revolving Commitments; provided, however, that (a) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. (i) ten (10) Business Days prior to the date of termination or (ii) three (3) Business Days prior to the date of reduction, (b) any such partial reduction shall be in an aggregate amount of $500,000 or any whole multiple of $100,000 in excess thereof, (c) after giving effect to any reduction of the total Revolving Commitments, the total Revolving Commitments shall not be less than (i) the total Revolving Exposures or (ii) the sum of the Letter of Credit Sublimit and the Swingline Loan Sublimit, (d) any termination of the total Revolving Commitments shall be accompanied by a prepayment

63

in full of all Revolving Loans and all Letter of Credit Liabilities shall be Cash Collateralized in accordance with the terms of Section 2.03(g), and (e) the Administrative Agent shall not be required to release its Lien on any Collateral in connection with any termination or reduction.  The Administrative Agent will promptly notify the Revolving Lenders of any such notice of termination or reduction of the Revolving Commitments.  Any reduction of the total Revolving Commitments shall be applied to the Revolving Commitment of each Lender according to its Pro Rata Share.  All fees accrued with respect thereto until the effective date of any termination or reduction of the total Revolving Commitments shall be paid on the effective date of such termination or reduction.  Any notice of termination of the total Revolving Commitments delivered by the Borrower Representative pursuant to this Section 2.06 shall be irrevocable.

**2.07**    **Repayment of Loans.**

(a)    Revolving Loans.  On the Revolving Loan Maturity Date, the Borrowers shall repay to the Administrative Agent, for the ratable benefit of the Lenders, the aggregate principal amount of all Revolving Loans outstanding on such date.

(b)    Term Loans.  (i) The Borrowers shall pay the principal amount of the Initial Term Loan in consecutive quarterly installments in the aggregate amounts set forth below commencing with June 30, 2019:

| Date | Term Loan Installment |
|------|----------------------|
| June 30, 2019 | $ 1,875,000 |
| September 30, 2019 | $ 1,875,000 |
| December 31, 2019 | $ 1,875,000 |
| March 31, 2020 | $ 1,875,000 |
| June 30, 2020 | $ 1,875,000 |
| September 30, 2020 | $ 1,875,000 |
| December 31, 2020 | $ 1,875,000 |
| March 31, 2021 | $ 1,875,000 |
| June 30, 2021 | $ 3,750,000 |
| September 30, 2021 | $ 3,750,000 |
| December 31, 2021 | $ 3,750,000 |
| March 31, 2022 | $ 3,750,000 |
| June 30, 2022 | $ 3,750,000 |
| September 30, 2022 | $ 3,750,000 |
| December 31, 2022 | $ 3,750,000 |
| March 31, 2023 | $ 3,750,000 |
| June 30, 2023 | $ 3,750,000 |
| September 30, 2023 | $ 3,750,000 |
| December 31, 2023 | $ 3,750,000 |
| Term Loan Maturity Date | The unpaid principal amount of the Initial Term Loan then outstanding |

 (ii) After the initial incurrence of the Delayed — Draw Term Loan, the principal amount of the Delayed — Draw Term Loan will amortize (and be payable by the Borrowers) in equal quarterly installments of two and one-half percent (2.50%) per annum of the sum of the initial principal amounts of each Delayed — Draw Term Loan theretofore incurred until the second anniversary of the Closing Date when such amortization rate will increase to five percent (5.0%) per annum of the sum of the initial principal

64

amounts of each Delayed — Draw Term Loan theretofore incurred with the principal balance payable in full by Borrowers on the Term Loan Maturity Date.

(c)    Swingline Loans. The Borrowers shall repay each Swingline Loan as provided in Section 2.04(a).

**2.08    Interest.**

(a)    Subject to the provisions of subsection (b) below, (i) each LIBOR Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the sum of (A) the LIBO Rate for such Interest Period plus (B) the Applicable Margin; and (ii) each Base Rate Loan bear interest on the outstanding principal amount thereof from the applicable borrowing or conversion date at a rate per annum equal to the (A) Base Rate plus (B) the Applicable Margin.

(b)    After the occurrence and during the continuation of an Event of Default, at the election of the Required Lenders (unless an Event of Default exists pursuant to Section 9.01(a), Section 9.01(f) or Section 9.01(g), in which event such an election shall be deemed to have automatically occurred without any further action of the Required Lenders), the Borrowers shall pay interest on the principal amount of all outstanding Loans and any interest payments thereon not paid when due and any fees and other amounts then due and payable hereunder or under any other Loan Document at a rate per annum equal to the Default Rate to the fullest extent permitted by applicable Laws, commencing upon the occurrence of such Event of Default, notwithstanding when such election is made.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law whether or not allowed in such proceeding to the fullest extent permitted by Law.

**2.09    Fees.**

(a)    Unused Revolving Commitments Fee. The Borrowers shall pay, or cause to be paid, to the Administrative Agent for the account of each Revolving Lender in accordance with its Pro Rata Share, an unused fee equal to the product of (i) one-half of one percent (0.50%) per annum (provided, such percentage shall be reduced to one-quarter of one percent (0.25%) per annum so long as the Consolidated Total Leverage Ratio as of the end of the most recent Test Period is less than or equal to 2.50:1.00 as of the most recent Fiscal Quarter for which the Loan Parties have delivered financial statements pursuant to Section 6.01(a) or Section 6.01(b), as applicable) times (ii) the average daily amount by which the total Revolving Commitments exceed the sum of (y) the total outstanding amount of Revolving Loans (excluding Swingline Loans) and (z) the total Letter of Credit Liabilities. This unused fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in Article 4 is not met, and shall be due and payable quarterly in arrears on the last day of March, June, September and December, commencing with the first such date to occur after the Closing Date, and on the Revolving Loan Maturity Date; provided that no such unused fee shall accrue on the Revolving Commitment of a Defaulting Lender so long as such Lender shall be a Defaulting Lender (not including any portion thereof reallocated to non-Defaulting Lenders pursuant to Section 2.16(d) hereof).

65

(b)      _Unused Delayed — Draw Term Loan Commitments Fee_.  The Borrowers shall pay, or cause to be paid, to the Administrative Agent, for the account of each Term Loan Lender with a Delayed — Draw Term Loan Commitment, in accordance with its Pro Rata Share, an unused fee equal to the product of (i) one-half of one percent (0.50%) per annum (provided, such percentage shall be reduced to one-quarter of one percent (0.25%) per annum so long as the Consolidated Total Leverage Ratio as of the end of the most recent Test Period is less than or equal to 2.50:1.00 as of the most recent Fiscal Quarter for which the Loan Parties have delivered financial statements pursuant to Section 6.01(a) or Section 6.01(b), as applicable) times (ii) the average daily amount by which the total Delayed — Draw Term Loan Commitments exceed the total outstanding amount of Delayed — Draw Term Loans.  This unused fee shall accrue at all times during the Delayed — Draw Term Loan Availability Period, including at any time during which one or more of the conditions in the Article 4 is not met, and shall be due and payable quarterly in arrears on the last day of March, June, September and December, commencing with the first such date to occur after the Closing Date, and on the Term Loan Maturity Date; provided that no such unused fee shall accrue on the Delayed — Draw Term Loan Commitment of a Defaulting Lender so long as such Lender shall be a Defaulting Lender.

(c)      _Other Fees_.  The Borrowers shall pay the fees in the amounts and at the times specified in the Fee Letter, and in furtherance of the foregoing, the Borrowers hereby assume the obligations of each Person (other than a Secured Party) arising under the Fee Letter.  Such fees shall be fully earned when paid and shall be non-refundable for any reason whatsoever.

**2.10**      **Computation of Interest and Fees**.  All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed, except that interest computed by reference to clause (b) of the definition of Base Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid.

**2.11**      **Evidence of Debt.**

(a)      The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender with respect to this Agreement shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon with respect to this Agreement and the other Loan Documents.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrowers shall execute and deliver to such Lender (through the Administrative Agent) a promissory note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each such promissory note shall (i) in the case of Revolving Loans, be substantially in the form of Exhibit B-1 (a "Revolving Note"), and (ii) in the case of a Term Loan, be substantially in the form of Exhibit B-2 (a "Term Note"), and (iii) in the case of Swingline Loans, be substantially in the form of Exhibit B-3 (the "Swingline Note").  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto, but any failure to do so shall not limit or otherwise affect the Borrowers' Obligations hereunder.

(b)      In addition to the accounts and records referred to in subsection (a), each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records

66

evidencing the purchases and sales by such Lender of participations in Letters of Credit and Swingline Loans. In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

**2.12    Payments Generally.**

(a)    All payments to be made by the Borrowers of principal, interest, fees and other Obligations shall be absolute and unconditional and shall be made without condition or deduction for any counterclaim, defense, recoupment, setoff or rescission. Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office (or, in the case of Swingline Loans and if so directed in writing by Swingline Lender, delivered directly to the Swingline Lender) in Dollars and in immediately available funds not later than 12:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 12:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)    Subject to the definition of "Interest Period", if any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(c)    Unless any Borrower or any Lender has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder, that any Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrowers or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto. If and to the extent that such payment was not in fact made to the Administrative Agent in immediately available funds, then:

(i)    if any Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in immediately available funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in immediately available funds at the Federal Funds Rate from time to time in effect; and

(ii)    if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof, in immediately available funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrowers to the date such amount is recovered by the Administrative Agent (the "Compensation Period") at a rate per annum equal to (i) for the first three (3) days, the Federal Funds Rate and (ii) thereafter, the Base Rate plus the Applicable Margin in respect of Revolving Loans which are Base Rate Loans. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in the applicable Borrowing. If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrowers, and the Borrowers shall pay such amount to the Administrative

67

Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing. Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Revolving Commitment or to prejudice any rights which the Administrative Agent or the Borrowers may have against any Lender as a result of any default by such Lender hereunder.

A notice of the Administrative Agent to any Lender or the Borrower Representative with respect to any amount owing under this subsection (c) shall be conclusive, absent manifest error.

(d)     The obligations of the Lenders hereunder to make Loans are several and not joint. The failure of any Lender to make any Loan or to fund any participation on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or purchase its participation.

2.13    **Sharing of Payments**. If, other than as provided elsewhere in this Agreement, in the Fee Letter, in any Assignment and Assumption permitted hereunder or in any participation agreement with a Participant permitted hereunder, any Lender shall obtain on account of the Loans made by it, or Letter of Credit Liabilities or Swingline Exposures held by it, any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) in excess of its Pro Rata Share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them, and/or such subparticipations in Letter of Credit Liabilities and Swingline Exposures held by them, as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, pro rata with each of them, provided, that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 12.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon. The Borrowers agree that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off, but subject to Section 12.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrowers in the amount of such participation. The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.13 and will in each case notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this Section shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

2.14    **Handling of Proceeds of Collateral; Cash Dominion; Revolving Loan Account.**

(a)     **Collection of Accounts and Other Proceeds**. The Borrowers, at their expense, will enforce and collect payments and other amounts owing on all Accounts in the ordinary course of the Borrowers' business subject to the terms hereof. The Borrowers shall deposit payments on all Accounts directly to one or more Controlled Accounts. Notwithstanding the foregoing, should any Borrower ever receive any payment on an Account or other proceeds of the sale of Collateral, including checks, cash, receipts from credit card sales and receipts, notes or other instruments or property with respect to any

68

Collateral, such Borrower agrees to hold such proceeds separate from such Borrower's other property and funds, and to deposit such proceeds directly into the bank account(s) maintained pursuant to this subsection within three (3) Business Days.

(b)      Transfer of Funds.  During a Cash Control Period, the Administrative Agent shall have the right, at the Administrative Agent's election in its sole discretion, to require that funds remaining on deposit in any Controlled Account be transferred to the Administrative Agent's Bank Account on each Business Day, and the Borrowers shall take all actions required by the Administrative Agent or by any bank at which any Controlled Account is maintained in order to effectuate the transfer of funds in this manner.  All amounts so received will, for purposes of calculating Revolving Availability and interest, be credited to the Revolving Loan Account on the date of deposit in the Administrative Agent's Bank Account.  No checks, drafts or other instruments received by the Administrative Agent shall constitute final payment to the Administrative Agent unless and until such instruments have actually been collected.

(c)      New Bank Accounts.  Each Borrower agrees not to open any new bank account into which proceeds of Collateral are to be delivered or deposited unless concurrently with the opening of such bank account (unless such account constitutes an Excluded Account), the Borrowers enter into a Deposit Account Control Agreement with respect to such bank account; provided, that if any new bank account is acquired in connection with a Permitted Acquisition, such Borrower shall not be required to enter into such Deposit Account Control Agreement until such time as is required pursuant to Sections 6.12 or 6.14 hereof (or such longer period as may be approved in writing by the Administrative Agent at its sole option).  Upon compliance with the terms set forth above, such bank account shall constitute a Controlled Account for purposes of this Agreement.  Notwithstanding anything to the contrary in this Section 2.14, the Borrowers may maintain one or more accounts constituting Excluded Accounts, provided that if such account ceases to be an Excluded Account, (i) Borrowers shall cause such account to be a Controlled Account within thirty (30) days of such event and (ii) pending such account becoming a Controlled Account, Borrowers shall cause the daily transfer of funds in such account into another Controlled Account.

(d)      Collective Borrowing Arrangement.  The Borrowers have informed the Administrative Agent that: (i) in order to increase the efficiency, profitability and productivity of each Borrower, the Borrower Representative has established a centralized cash management system for the Borrowers that entails, in part, central disbursement and operating accounts for each of the Borrowers in which the Borrower Representative provides the working capital needs of each of the other Borrowers and manages and timely pays the accounts payable of each of the other Borrowers; (ii) the Borrower Representative further enhances the operating efficiencies of the other Borrowers by purchasing, or causing to be purchased, in the Borrower Representative's name for its account, all or substantially all materials, supplies, inventory and services required by the other Borrowers, resulting in a reduction in operating costs of the other Borrowers; and (iii) all of the Borrowers presently engage in an integrated operation that requires financing on an integrated basis, and each Borrower expects to benefit from the continued successful performance of such integrated operations.  Therefore, in order to best utilize the borrowing powers of the Borrowers in the most effective and cost efficient manner and to avoid adverse effects on the operating efficiencies of each Borrower and the existing back office practices of the Borrowers, each Borrower has requested that all Revolving Loans, the Term Loans, the Swingline Loans be disbursed, and Letters of Credit be issued, solely upon the request of the Borrower Representative and to bank accounts managed solely by the Borrower Representative, it being the intent and desire of the Borrowers that the Borrower Representative manage for the benefit of each Borrower the expenditure and usage of such funds.

(e)      Revolving Loan Account.  The Administrative Agent may charge the Revolving Loan Account for all loans and advances made by the Administrative Agent and the Lenders to the

69

Borrower Representative, or otherwise for the Revolving Loan Account, and for any other Obligations, including out-of-pocket expenses of the Administrative Agent, when due and payable hereunder.  Interest on the Revolving Loans shall be paid as set forth in Section 2.08 hereto.  In no event shall prior recourse to any Account or other security granted to or by the Borrowers be a prerequisite to the Administrative Agent's or the Lenders' rights to demand payment of any of the Obligations.  In addition, neither the Administrative Agent nor any Lender shall have any obligation whatsoever to perform in any respect any Borrower's contracts or obligations relating to the Accounts.

        **2.15**    **Uncommitted Facilities Increase.**

        (a)    At any time and from time to time prior to twelve (12) months before the Term Loan Maturity Date, subject to the terms and conditions set forth herein and subject to the consent of each Lender, the Borrower Representative may, by notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders), request to add (x) one or more increases of the existing Term Loans and/or one or more new tranches of term loans to made available under this Agreement (a "Term Loan Increase" or the "Incremental Term Loans") or (y) one or more increases in the Revolving Commitments (a "Revolving Commitment Increase" or the "Incremental Revolving Commitments"); together with the Incremental Term Loans, individually an "Incremental Facility" and collectively the "Incremental Facilities"), or both; provided that (i) at the time of each such request and upon the effectiveness of each Incremental Facility Amendment (as defined below), no Default or Event of Default has occurred and is continuing or shall result therefrom; (ii) the final maturity date of any Incremental Revolving Commitments shall be no earlier than the Revolving Loan Maturity Date, and the final maturity date of any Incremental Term Loans shall be no earlier than the latest Term Loan Maturity Date; (iii) the Weighted Average Life to Maturity of any Incremental Term Loans shall be no shorter than the remaining Weighted Average Life to Maturity of the outstanding Term Loan(s) funded on the Closing Date, and in the case of Incremental Revolving Commitments, such Incremental Facility shall require no scheduled amortization or mandatory commitment reduction prior to the Revolving Loan Maturity Date; (iv) in no event shall the Incremental Term Loans be permitted to be voluntarily or mandatorily prepaid prior to repayment of all Term Loans, unless accompanied by ratable prepayment of Term Loans and any Incremental Revolving Commitments will be subject to the same pro rata borrowing, Letter of Credit participations and prepayment and commitment reduction provisions as the existing Revolving Commitments; (v) Administrative Agent shall have received from Borrower Representative a Pro Forma Compliance Certificate demonstrating the Loan Parties will be in compliance on a Pro Forma Basis with the financial covenants set forth in Article 8 for the most recently completed four (4) Fiscal Quarter period, after giving effect to the Indebtedness incurred under such Incremental Facility, assuming in the case of any Incremental Revolving Commitments such Incremental Revolving Commitments were fully drawn as of the date of measurement; (vi) Administrative Agent shall have received from Borrower Representative a Pro Forma Compliance Certificate demonstrating that after giving effect on a Pro Forma Basis to the Indebtedness incurred under such Incremental Facility (and giving effect on a Pro Forma Basis to any Acquisition consummated concurrently therewith and with all other appropriate adjustments on a Pro Forma Basis as if, if applicable, such Incremental Revolving Commitments were fully drawn as of the date of measurement), (x) the Consolidated Total Leverage Ratio (calculated on a Pro Forma Basis) as of the end of the most recent Test Period would not be greater than 3.00:1.00 and (y) the Consolidated Total Leverage Ratio (calculated on a Pro Forma Basis) as of the end of the most recent Test Period would not be greater than 0.25:1.00 less than the maximum Consolidated Total Leverage Ratio permitted under Section 8.01 at the end of the next measurement date, (vii) after giving effect to the incurrence of such Incremental Facility (but disregarding any proceeds thereof), the Excess Liquidity shall not be less than $10,000,000; (viii) any such Incremental Facility shall have the same Loan Parties obligated in respect of all other Obligations, shall be *pari passu* with all other Loans and secured on a *pari passu* basis by the same Collateral securing the existing Obligations; (ix) the proceeds of any Incremental Facility shall be used only to finance a Permitted Acquisition hereunder; (x) Administrative Agent shall have

70

received (x) a satisfactory legal opinion from counsel covering matters reasonably acceptable to Administrative Agent and (y) all Organization Documents reasonably requested by Administrative Agent; (xi) all of the representations and warranties contained in the Loan Documents are true and correct in all material respects (or, in all respects, if already qualified by materiality); and (y) the other terms and conditions in respect thereof shall be not more restrictive taken as a whole (as determined by all of the Lenders), than those applicable to the Revolving Exposure or the Term Loans, or both, as applicable, except (A) if the applicable Lenders holding such Revolving Exposure or Term Loans, or both, as applicable, also receive the benefit of any more restrictive terms, (B) the more restrictive terms are not effective until after the Revolving Loan Maturity Date or the Term Loan Maturity Date, as the case may be, then in effect or (C) otherwise as reasonably satisfactory to all of the Lenders. Borrower Representative may seek commitments for the Incremental Facilities from the existing Lenders, or if the Administrative Agent consents, Additional Lenders who will become Lenders in connection therewith (and meet the requirements of an Eligible Assignee), and for the avoidance of doubt, no Secured Party shall have any obligation to provide or arrange any Incremental Facility or commitment related thereto.

(b)    Notwithstanding anything to contrary herein, the aggregate principal amount of all Incremental Facilities (including commitments therefor) shall not exceed $100,000,000, of which Revolving Commitment Increases shall not exceed $15,000,000, and not more than three (3) Incremental Facilities may be requested hereunder. Each Incremental Facility shall be in an integral multiple of $500,000 and be in an aggregate principal amount that is not less than $10,000,000; provided that such amount may be less than the applicable minimum amount if such amount represents all the remaining availability hereunder as set forth above.

(c)    The terms, provisions and documentation of the Incremental Term Loans and Incremental Revolving Commitments shall be on the same terms and conditions of this Agreement, except as agreed (unless otherwise set forth in this Section 2.15) among the Borrowers, each Lender and the applicable Additional Lender(s) providing such Incremental Term Loans and Incremental Revolving Commitments and except that:

(i)    if the Applicable Margin (which, for such purposes only, shall be deemed to include all upfront or similar fees or original issue discount (with original issue discount being equated to interest based on an assumed four-year life to maturity or, if shorter, the actual Weighted Average Life to Maturity) payable to all Additional Lenders providing such Incremental Facility (but excluding the portion of structuring, arrangement, commitment or similar fees not shared with all such Additional Lenders in connection therewith)) relating to any Incremental Facility exceeds the then Applicable Margin (which, for such purposes only, shall be deemed to include all upfront or similar fees or original issue discount (with original issue discount being equated to interest based on an assumed four-year life to maturity or, if shorter, the actual Weighted Average Life to Maturity) payable to all Lenders providing the Term Loans and Revolving Commitments extended on the Closing Date (the "Closing Date Facilities") (but excluding structuring, arrangement, commitment or similar fees not shared with such Term Loan Lenders in connection therewith)) immediately prior to the effectiveness of the applicable Incremental Facility Amendment by more than one-half of one percent (0.50%), the Applicable Margin relating to the Closing Date Facilities shall be adjusted to be equal to the Applicable Margin (which, for such purposes only, shall be deemed to include all upfront or similar fees or original issue discount (with original issue discount being equated to interest based on an assumed four-year life to maturity or, if shorter, the actual Weighted Average Life to Maturity) payable to all Additional Lenders providing such Incremental Facilities (but excluding structuring, arrangement, commitment or similar fees not shared with all such Additional Lenders in connection therewith)) relating to such Incremental Facilities minus one-half of one percent (0.50%); provided that, (x) in the case of this clause (i), if an Incremental Facility includes an

71

interest rate floor greater than the applicable interest rate floor for the Closing Date Facilities, such differential between interest rate floors shall be equated to the Applicable Margin for purposes of determining whether an increase to the Applicable Margin under the Closing Date Facilities shall be required, but only to the extent an increase in the interest rate floor in the Closing Date Facilities would cause an increase in the interest rate then in effect thereunder, and in such case the interest rate floor (but not the Applicable Margin) applicable to the Initial Term Loans shall be increased to the extent of such differential between interest rate floors and (y) any amendments to the Applicable Margin relating to the Closing Date Facilities that became effective subsequent to the Closing Date but prior to the time of such Incremental Facility shall also be included in the foregoing calculations,

(ii)    the amortization requirements for such Incremental Term Loans may differ, so long as any Incremental Term Loans shall not have a Weighted Average Life to Maturity that is shorter than the Weighted Average Life to Maturity of the then-remaining Term Loans part of the Closing Date Facilities (without giving effect to any prepayments), and in no event shall such Incremental Term Loans be permitted to be voluntarily or mandatorily prepaid prior to the repayment in full of all Term Loans borrowed on the Closing Date, unless accompanied by a ratable prepayment of the Term Loans borrowed on the Closing Date,

(iii)    any Incremental Revolving Commitments will be subject to the same pro rata borrowing, Letter of Credit participations and prepayment and commitment reduction provisions as the existing Revolving Commitments, and

(iv)    such Incremental Facilities (a) shall not be secured by any Lien on any asset of any Person that does not also secure the then outstanding Closing Date Facilities or (b) shall not be guaranteed by any Person other than a Loan Party under the then outstanding Closing Date Facilities.

(d)    Each notice from the Borrowers pursuant to this Section 2.15 shall set forth the requested amount and proposed terms of the relevant Incremental Term Loans and/or Incremental Revolving Commitments, as applicable. If the Administrative Agent does not receive within a time period proscribed by the Administrative Agent sufficient commitments from existing Lenders to effectuate the Incremental Term Loans and/or the Incremental Revolving Commitments, as applicable, any additional bank, financial institution, existing Lender or other Person that constitutes an entity of the type that would be an Eligible Assignee electing to extend Incremental Term Loans or Incremental Revolving Commitments shall be determined by the Borrower (subject to the consent of (y) the Administrative Agent and (z) the L/C Issuer (or if applicable, the Support Provider) and the Swingline Lender solely with respect to Incremental Revolving Commitments) (any such bank, financial institution, existing Lender or other Person being called an "Additional Lender") and, if not already a Lender, shall become a Lender under this Agreement pursuant to an amendment (an "Incremental Facility Amendment") to this Agreement and, as appropriate, the other Loan Documents, executed by (in form and substance mutually acceptable to each of) the Loan Parties, each Lender, such Additional Lender, the Administrative Agent, and in the case of any Incremental Revolving Commitments, each L/C Issuer (or if applicable, the Support Provider) and Swingline Lender. For the avoidance of doubt, no L/C Issuer (or if applicable, Support Provider) and Swingline Lender is required to act as such for any additional Revolving Commitments unless they so consent. No Incremental Facility Amendment shall require the consent of any Lenders other than the Additional Lenders with respect to such Incremental Facility Amendment.

Upon each increase in the Revolving Commitments pursuant to this Section 2.15, each Revolving Lender immediately prior to such increase will automatically and without further action be deemed to

72

have assigned to each Lender providing a portion of the Incremental Revolving Commitment (each an "Incremental Revolving Lender") in respect of such increase, and each such Incremental Revolving Lender will automatically and without further act be deemed to have assumed, a portion of such Revolving Lender's participations hereunder in outstanding Letters of Credit and Swingline Loans such that, after giving effect to each such deemed assignment and assumption of participations, the percentage of the aggregate outstanding (i) participations hereunder in Letters of Credit and (ii) participations hereunder in Swingline Loans held by each Revolving Lender (including each such Incremental Revolving Lender) will equal the percentage of the aggregate Revolving Commitments of all Revolving Lenders represented by such Revolving Lender's Revolving Commitment. The Administrative Agent and the Lenders hereby agree that the minimum borrowings, pro rata borrowing and pro rata payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence. Commitments in respect of any Incremental Term Loans or Incremental Revolving Commitments shall become Commitments under this Agreement. The effectiveness of any Incremental Facility Amendment shall, unless otherwise agreed to by the Administrative Agent, each Lender and the Additional Lenders, be subject to the satisfaction on the date thereof (each, an "Incremental Facility Closing Date") of each of the conditions set forth in Section 4.01 (it being understood that (x) all references to "the date of such Credit Extension" in Section 4.01 shall be deemed to refer to the Incremental Facility Closing Date and (y) the Incremental Facility Closing Date shall be deemed to be the initial Credit Extension).

(e)    No Incremental Term Loans or Incremental Revolving Commitments may be made by Sponsor, any Loan Party or any of their respective Affiliates or Subsidiaries.

2.16    **Defaulting Lenders**. If any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)    (i) such Defaulting Lender's Revolving Commitment and outstanding Revolving Loans shall be excluded for purposes of calculating the fee payable to Revolving Lenders in respect of Section 2.09(a), and such Defaulting Lender shall not be entitled to receive any fee pursuant to Section 2.09(a) with respect to such Defaulting Lender's Revolving Commitment or Revolving Loans (in each case not including any fee in connection with any portion of such Defaulting Lender's Revolving Commitment that has been reallocated to non-Defaulting Lenders pursuant to Section 2.16(d) hereof) and (ii) such Defaulting Lender's Delayed — Draw Term Loan Commitment and outstanding Delayed - Draw Term Loans shall be excluded for purposes of calculating the fee payable to the Term Loan Lenders in respect of Section 2.09(b) and such Defaulting Lender shall not be entitled to receive any fee pursuant to Section 2.09(b) with respect to such Defaulting Lender Delayed — Draw Term Loan Commitment or Delayed — Draw Term Loans.

(b)    the Revolving Commitments and Loans of such Defaulting Lender shall not be included in determining whether all Lenders or the Required Lenders, Required Revolving Lenders or Required Term Loan Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 12.01).

(c)    in the event a Defaulting Lender has defaulted on its obligation to fund any Revolving Loan, or purchase any participation pursuant to Section 2.03(d) or Section 2.04(d) hereof, until such time as the Default Excess with respect to such Defaulting Lender has been reduced to zero, any prepayments or repayments on account of the Revolving Loans or participations purchased pursuant to Section 2.03(d) or Section 2.04(d), in each case to the extent they would be otherwise be payable to such Defaulting Lender, shall be applied first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the L/C Issuer, Support Provider or Swingline Lender hereunder; third, to

73

Cash Collateralize the L/C Issuer's (or the Support Provider's, as the case may be) Fronting Exposure with respect to such Defaulting Lender; <u>fourth,</u> as the Borrowers may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; <u>fifth,</u> if so determined by the Administrative Agent and the Borrowers, to be held in a deposit account and released pro rata in order to (x) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (y) Cash Collateralize the L/C Issuer's (or the Support Provider's, as the case may be) future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement; <u>sixth,</u> to the payment of any amounts owing to the Lenders, the L/C Issuer, the Support Provider or Swingline Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender, the L/C Issuer, the Support Provider or Swingline Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; <u>seventh,</u> so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and <u>eighth,</u> to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided, <u>that,</u> if (x) such payment is a payment of the principal amount of any Loans or Letter of Credit Liabilities in respect of which such Defaulting Lender has not fully funded its appropriate share and (y) such Loans or Letter of Credit Liabilities were made at a time when the conditions set forth in <u>Section 4.02</u> and, if applicable, <u>Section 4.02(e)</u> were satisfied or waived, such payment shall be applied solely to pay the Loans of, and Letter of Credit Liabilities owed to, all non-Defaulting Lenders on a <u>pro rata</u> basis prior to being applied to the payment of any Loans of, or Letter of Credit Liabilities owed to, such Defaulting Lender.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this <u>Section 2.16(c)</u> shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(d)    If any Swingline Loans or Letter of Credit Liabilities are outstanding at the time a Lender becomes a Defaulting Lender then:

(i)    so long as no Default or Event of Default then exists, all or any part of such Swingline Loans and Letter of Credit Liabilities shall be reallocated among the non-Defaulting Lenders of Revolving Loans in accordance with their respective Pro Rata Shares of the total Revolving Commitments (calculated without regard to such Defaulting Lender's Revolving Commitments), <u>provided</u> that no Revolving Lender's Revolving Exposure shall exceed its Revolving Commitment;

(ii)    if the reallocation described in <u>paragraph (i)</u> above cannot, or can only partially, be effected, the Borrowers shall within one (1) Business Day following notice by the Administrative Agent (A) first, prepay the amount of the Swingline Loans equal to Defaulting Lender's Pro Rata Share thereof after giving effect to any partial reallocation pursuant to <u>paragraph (i)</u> above and (B) second, Cash Collateralize such Defaulting Lender's Pro Rata Share of Letter of Credit Liabilities (after giving effect to any partial reallocation pursuant to <u>paragraph (i)</u> above) in accordance with the procedures set forth in <u>Section 2.03(g)</u> and for so long as any such Obligations related to Letters of Credit are outstanding;

(iii)    if the Borrowers Cash Collateralize any portion of such Defaulting Lender's Pro Rata Share of Letter of Credit Obligations pursuant to this <u>Section 2.16(d)</u>, the Borrowers shall not be required to pay any fees to such Defaulting Lender pursuant to <u>Section 2.03(c)</u> with respect to the portion of such Defaulting Lender's Pro Rata Share of Letter of Credit

74

Obligations which have been Cash Collateralized (and the Defaulting Lender shall not be entitled to receive any such fees);

(iv)    if the Defaulting Lender's Pro Rata Share of Letter of Credit Obligations are reallocated pursuant to this Section 2.16(d), then the letter of credit fees payable to the non-Defaulting Lenders pursuant to Section 2.03(c) shall be adjusted accordingly; and

(v)    if any Defaulting Lender's Pro Rata Share of Letter of Credit Liabilities is not Cash Collateralized or reallocated pursuant to this Section 2.16(d), then without prejudice to any rights or remedies of the applicable Support Provider or L/C Issuer hereunder, all letter of credit fees payable under Section 2.03(c) with respect to such Defaulting Lender's Pro Rata Share of Letter of Credit Liabilities shall be payable to the L/C Issuer or if applicable, the Support Provider.

(e)    So long as any Lender is a Defaulting Lender, the Swingline Lender shall not be required to fund any Swingline Loan, and no L/C Issuer or Support Provider shall be required to issue, extend or increase any Letter of Credit or Support Agreement, in each case unless it is reasonably satisfied that the related exposure will be one hundred percent (100%) covered by the Revolving Commitments of the non-Defaulting Lenders and/or Cash Collateral will be provided by the Borrowers in accordance with Section 2.03(g), and participating interests in any such newly issued, extended or increased Letter of Credit or Support Agreement or newly made Swingline Loan shall be allocated among non-Defaulting Lenders in a manner consistent with Section 2.16(d)(i) (and Defaulting Lenders shall not participate therein).

(f)    No reallocation permitted pursuant to Section 2.16(d) shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a non-Defaulting Lender as a result of such non-Defaulting Lender's increased exposure following such reallocation.

(g)    In the event that the Administrative Agent, the L/C Issuer, the Support Provider and the Swingline Lender each agrees in writing that a Defaulting Lender has adequately remedied all matters which caused such Lender to become a Defaulting Lender, then the Pro Rata Shares of Swingline Loans and Letter of Credit Obligations of the Revolving Lenders shall be readjusted to reflect the inclusion of such Lender's Revolving Commitment and on such date such Lender shall purchase at par such of the Revolving Loans of the other Lenders (other than Swingline Loans) or participations in the Revolving Loans as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Revolving Loans or participations in accordance with its Pro Rata Share; provided, that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender having been a Defaulting Lender.

(h)    The rights and remedies with respect to a Defaulting Lender under this Section 2.16 are in addition to any other rights and remedies which the Borrower, the Administrative Agent, the L/C Issuer, the Support Provider or the Swingline Lender, as applicable, may have against such Defaulting Lender.

2.17    **Refinancing Facilities**.  After the Closing Date, the Borrowers may obtain from any Lender (but with the consent of the Administrative Agent (not to be unreasonably withheld or delayed)) to refinance all or any portion of the applicable Loans or Commitments then outstanding under this

75

Agreement (which for purposes of this Section 2.17 will be deemed to include any then outstanding Refinancing Facilities), one or more new senior secured first lien term facilities (each, a "Refinancing Term Facility" and the term loans made pursuant to a Refinancing Term Facility, "Refinancing Term Loans") or, in the case of a refinancing and/or replacement of the Revolving Commitments or Revolving Loans, new revolving credit facilities (each, a "Refinancing Revolving Facility" and, together with any Refinancing Term Facility, a "Refinancing Facility" or the "Refinancing Facilities", and the revolving loans made pursuant to a Refinancing Revolving Facility, "Refinancing Revolving Loans"); provided, that:

(a)        the Refinancing Term Loans or Refinancing Revolving Loans, as applicable, will be *pari passu* in right of payment and be secured by the Collateral on a *pari passu* basis with the remaining portion of the Term Loans, Revolving Loans and Revolving Commitments;

(b)        with respect to any Refinancing Term Facility, such Refinancing Term Facility shall not (i) have a maturity date that is earlier than ninety-one (91) days after the maturity date of the Term Loans being refinanced by such Refinancing Term Facility or (ii) have a shorter Weighted Average Life to Maturity than the Term Loans being refinanced by such Refinancing Term Facility, and in no event shall the Refinancing Term Facility be permitted to be voluntarily or mandatorily prepaid prior to repayment of all existing Term Loans that survive the initial funding of such Refinancing Term Facility, unless accompanied by ratable prepayment of all Term Loans;

(c)        with respect to any Refinancing Revolving Facility, (i) such Refinancing Revolving Facility shall not have a maturity date that is earlier than the maturity date of the Revolving Loans or Revolving Commitments being refinanced by such Refinancing Revolving Facility, (ii) such Refinancing Revolving Facility shall require no scheduled amortization or mandatory commitment reduction prior to the maturity date of any existing Revolving Commitments that survive the initial funding of the Refinancing Revolving Facility and (iii) any Refinancing Revolving Facility will be subject to the same pro rata (or in the case of prepayment, pro rata or less than pro rata, but not greater than pro rata) borrowing, Letter of Credit participations, Swingline Loan participations and prepayment and Commitment reduction provisions as the existing Revolving Commitments that survive the initial funding of the Refinancing Revolving Facility (except to the extent applicable only to periods after the latest final maturity date of the relevant Loans or Commitments existing at the time of such refinancing or replacement);

(d)        such Refinancing Facility shall have pricing (including interest, fees and premiums), optional prepayment and redemption terms as may be agreed to by the Borrowers and the Lenders party thereto, except as provided herein;

(e)        such Refinancing Facility shall not be secured by any assets other than the Collateral;

(f)        if any such Refinancing Facility is guaranteed, it shall not be guaranteed by any Person other than the Guarantors;

(g)        if any such Refinancing Facility will provide for the issuance or extension of Letters of Credit or the making of Swingline Loans, then the L/C Issuer (or if applicable, Support Provider) and the Swingline Lender, respectively, shall have consented to such Refinancing Facility;

(h)        the other terms (excluding those referenced in clauses (a) through (g) above and excluding pricing, fee and prepayment or redemption provisions) of such Refinancing Facility shall be substantially identical to, or (taken as a whole) no more favorable to the Lenders providing such

76

Refinancing Facility than those applicable to the Loans or Commitments being refinanced or replaced (except for covenants or other provisions applicable only to periods after the latest final maturity date of the relevant Loans or Commitments existing at the time of such refinancing or replacement);

(i)      the aggregate principal amount of any Refinancing Facility shall not exceed the aggregate principal amount of the Loans and Commitments being refinanced or replaced therewith, plus reasonable and customary interest, premiums, fees and expenses; and

(j)      any Refinancing Facility held by any Affiliated Lender shall be subject to the same restrictions applicable to assignments to such Persons as are set forth in Section 12.07 (including voting restrictions, the prohibition on holding Revolving Commitments and an aggregate cap on the amount of Term Loans held by such Person).

Notwithstanding anything to the contrary contained in this Agreement, any Lender may exchange, continue or rollover all or a portion of its Loans in connection with any Refinancing Facility permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Borrowers, the Administrative Agent and such Lender.

2.18      **Amend and Extend Transactions**.

(a)      The Borrowers may, by written notice to the Administrative Agent from time to time, request an extension (each, an "Extension") of the Revolving Loan Maturity Date and/or the Term Loan Maturity Date to the extended maturity date specified in such request.  Such notice shall set forth (i) the amount of the Revolving Commitments and/or Term Loans to be extended (which shall be in minimum increments of $100,000 and a minimum amount of $1,000,000), and (ii) the date on which such Extension is requested to become effective (which shall be not less than ten (10) Business Days nor more than sixty (60) days after the date of such requested Extension (or such longer or shorter periods as the Administrative Agent shall agree)).  Each Appropriate Lender shall be offered (an "Extension Offer") an opportunity to participate in such Extension on a pro rata basis and on the same terms and conditions as each other Appropriate Lender pursuant to procedures established by, or reasonably acceptable to, the Administrative Agent.  Any Lender approached to participate in such Extension may elect or decline, in its sole discretion, to participate in such Extension.  If the aggregate principal amount of Revolving Commitments or Term Loans (calculated on the face amount thereof) in respect of which Appropriate Lenders shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Revolving Commitments or Term Loans, as applicable, requested to be extended by the Borrowers pursuant to such Extension Offer, then the Revolving Commitments or Term Loans, as applicable, of Appropriate Lenders shall be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Appropriate Lenders have accepted such Extension Offer.

(b)      It shall be a condition precedent to the effectiveness of any Extension that (i) no Default or Event of Default shall have occurred and be continuing immediately prior to and immediately after giving effect to such Extension, (ii) the representations and warranties of the Borrowers and each other Loan Party contained in Article 2 and Article 5 or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (provided, if any representation or warranty is by its terms qualified by concepts of materiality, such representation and warranty shall be true and correct in all respects) on and as of the date of such Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (provided, if any representation or warranty is by its terms qualified by concepts of materiality, such representation and warranty shall be true and correct in all respects) as of such earlier date, (iii) the

77

L/C Issuer and the Swingline Lender shall have consented to any Extension of the Revolving Commitments to the extent that such Extension provides for the issuance of Letters of Credit or making of Swingline Loans at any time during the extended period and (iv) the terms of such Extended Revolving Commitments and Extended Term Loans shall comply with Section 2.18(c).

(c)    The terms of each Extension shall be determined by the Borrowers and the applicable extending Lenders and be set forth in an Additional Credit Extension Amendment; provided, that, (i) the final maturity date of any Extended Revolving Commitment or Extended Term Loan shall be no earlier than the Revolving Loan Maturity Date or the Term Loan Maturity Date, respectively, (ii)(A) there shall be no scheduled amortization of the Extended Revolving Commitments and (B) the Weighted Average Life to Maturity of the Extended Term Loans shall be no shorter than the remaining Weighted Average Life to Maturity of the Term Loans, (iii) the Extended Revolving Loans and the Extended Term Loans will rank pari passu in right of payment and with respect to security with the Revolving Loans and the Term Loans being extended and the borrower and guarantors of the Extended Revolving Commitments or Extended Term Loans, as applicable, shall be the same as the borrower and guarantors with respect to the Revolving Loans or applicable Term Loans being extended, (iv) the interest rate margin, rate floors, fees, original issue discounts and premiums applicable to any Extended Revolving Commitments (and the Extended Revolving Loans thereunder) and Extended Term Loans shall be determined by the Borrower and the applicable extending Lenders and (v) to the extent the terms of the Extended Revolving Commitments or Extended Term Loans are inconsistent with the terms set forth herein (except as set forth in clause (i) through (iv) above), such terms shall be reasonably satisfactory to the Administrative Agent.

(d)    In connection with any Extension, the Borrowers, the Administrative Agent and each applicable extending Lender shall execute and deliver to the Administrative Agent an Additional Credit Extension Amendment and such other documentation as the Administrative Agent shall reasonably specify to evidence such Extension. The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Extension. Notwithstanding anything herein to the contrary, any Additional Credit Extension Amendment may, without the consent of any other Lender, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate (but only to such extent), in the reasonable opinion of the Administrative Agent and the Borrowers, to implement the terms of any such Extension Offer, including any amendments necessary to establish Extended Revolving Commitments or Extended Term Loans as a new tranche of revolving commitments or term loans, as applicable, and such other technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrowers in connection with the establishment of such new tranche (including to preserve the pro rata treatment of the extended and non-extended tranches and to provide for the reallocation of any obligations under Swingline Loans or Letters of Credit (including Letter of Credit Liabilities) upon the expiration or termination of the commitments under any tranche), in each case on terms consistent with this Section 2.18).

ARTICLE 3

TAXES, YIELD PROTECTION AND ILLEGALITY

3.01    Taxes.

(a)    Payments Free of Taxes. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Law. If any applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the

78

relevant Governmental Authority in accordance with applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by the Loan Parties.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    Indemnification by the Loan Parties.  The Loan Parties shall jointly and severally indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower Representative by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.07(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)    Evidence of Payments.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 3.01, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)    Status of Lenders.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower Representative and the Administrative Agent, at the time or times reasonably requested by the Borrower Representative or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower Representative or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower Representative or the Administrative Agent, shall deliver such other documentation prescribed by

79

applicable Law or reasonably requested by the Borrower Representative or the Administrative Agent as will enable the Borrower Representative or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing,

(A)    any Lender that is a U.S. Person shall deliver to the Borrower Representative and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower Representative and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed originals of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) a certificate substantially in the form of Exhibit F-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, a "10 percent shareholder" of a Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable; or

80

(4) to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-2 or Exhibit F-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-4 on behalf of each such direct and indirect partner;

(C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower Representative and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), executed originals of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower Representative or the Administrative Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to the Borrower Representative and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower Representative or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrower Representative or the Administrative Agent as may be necessary for the Borrower Representative and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower Representative and the Administrative Agent in writing of its legal inability to do so.

(g) Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.01 (including by the payment of additional amounts pursuant to this Section 3.01), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the

81

amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    Survival. Each party's obligations under this Section 3.01 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

**3.02    Illegality**. If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund LIBOR Loans, or to determine or charge interest rates based upon the LIBO Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or take deposits of Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrowers through the Administrative Agent, any obligation of such Lender to make or continue LIBOR Loans or to convert Base Rate Loans to LIBOR Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrowers that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrowers shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all LIBOR Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBOR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBOR Loans. Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted. Each Lender agrees to use reasonable efforts consistent with legal and regulatory requirements to designate a different Lending Office if such designation will avoid the need for such notice and will not, in the good faith judgment of such Lender, otherwise be disadvantageous to such Lender or cost any additional amount.

**3.03    Inability to Determine Rate; Alternate Rate of Interest**. If prior to the commencement of any Interest Period for a Borrowing of LIBOR Loans:

(i)    the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the LIBO Base Rate or the LIBO Rate, as applicable (including, without limitation, because the LIBO Screen Rate is not available or published on a current basis), for such Interest Period; or

(ii)    the Administrative Agent is advised by the Required Lenders that the LIBO Base Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) at the LIBO Base Rate or the LIBO Rate, as appliable for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower Representative and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower Representative and the Lenders that the

82

circumstances giving rise to such notice no longer exist, (A) any request pursuant to Section 2.02 to convert any Loan to LIBOR Loans, or continue any LIBOR Loans as LIBOR Loans shall be ineffective and (B) if any request pursuant to Section 2.02 requests a borrowing of a LIBOR Loan, such borrowing shall be made as a Base Rate Loan.

(b)     If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in clause (a)(i) have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in clause (a)(i) have not arisen but the supervisor for the administrator of the LIBO Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the LIBO Screen Rate shall no longer be used for determining interest rates for loans, then the Administrative Agent and the Borrower Representative shall endeavor to establish an alternate rate of interest to the LIBO Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable (but for the avoidance of doubt, such related changes shall not include a reduction of the Applicable Margin). Notwithstanding anything to the contrary in Section 12.01, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as Administrative Agent shall not have received, within five (5) Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from the Required Lenders stating that such Required Lenders object to such amendment. Until an alternate rate of interest shall be determined in accordance with this clause (b) (but, in the case of circumstances described in clause (ii) of the first sentence of this clause (b), only to the extent the LIBO Screen Rate for such Interest Period is not available or published at such time on a current basis), (x) any request pursuant to Section 2.02 to convert any Loan to LIBOR Loans, or continue any LIBOR Loans as LIBOR Loans shall be ineffective and (y) if any request pursuant to Section 2.02 requests a borrowing of a LIBOR Loan, such borrowing shall be made as a Base Rate Loan; provided that, if such alternate rate of interest shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

3.04     **Increased Cost and Reduced Return; Capital Adequacy**.

(a)     If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge, liquidity requirement or other similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the LIBO Rate) or the L/C Issuer or Support Provider;

(ii)     subject any Lender or the L/C Issuer or Support Provider to any Tax of any kind whatsoever with respect to this Agreement, any Letter of Credit or Support Agreement, any participation in a Letter of Credit or any LIBOR Loan made by it, or change the basis of taxation of payments to such Lender or the L/C Issuer or Support Provider in respect thereof (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes); or

(iii)     impose on any Lender, the Support Provider or the L/C Issuer or the London interbank market any other condition, cost or expense affecting this Agreement or LIBOR Loans made by such Lender or any Letter of Credit or Support Agreement, or participation therein;

83

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBOR Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or the Support Provider or L/C Issuer of participating in, issuing or maintaining any Lender Letter of Credit or continuing its obligation under any Support Agreement (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the L/C Issuer hereunder (whether of principal, interest or any other amount), in each case by an amount deemed by such Lender to be material, then, upon request of such Lender, Support Provider, or the L/C Issuer (with a copy to the Administrative Agent), the Borrowers will pay to such Lender, Support Provider, or L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender, Support Provider or the L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

(b)        Without duplication of amounts payable in paragraph (a) above, if any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of its obligations hereunder or under or in respect of any Letter of Credit or Support Agreement, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital or liquidity adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

3.05    **Funding Losses**.  Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)        any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)        any failure by the Borrowers (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrowers; or

(c)        any assignment of a LIBOR Loan on a day other than the last day of the Interest Period therefor as a result of (i) a request by the Borrowers pursuant to Section 12.15 or (ii) an assignment by any Lender that is a Lender on the Closing Date pursuant to Section 12.07(b) as part of the primary syndication of the Commitments and Loans following the Closing Date;

including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.  Lenders shall provide Borrower Representative with a notice (with a copy to the Administrative Agent) setting forth in reasonable detail the basis for Lenders demand, which shall be conclusive absent manifest error.  Borrowers shall pay such amount within ten (10) days after receipt of such notice.

For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each LIBOR Loan made by it at the LIBO Base Rate used in determining the LIBO Rate for such Loan by a matching deposit or other borrowing in the London

84

interbank market for a comparable amount and for a comparable period, whether or not such LIBOR Loan was in fact so funded.

**3.06    Matters Applicable to all Requests for Compensation.**

(a)    A certificate of the Administrative Agent or any Lender, Support Provider, or L/C Issuer claiming compensation under this Article 3 and setting forth the additional amount or amounts to be paid to it hereunder and the calculation thereof in reasonable detail shall be conclusive in the absence of manifest error.  In determining such amount, the Administrative Agent or such Lender, Support Provider or L/C Issuer may use any reasonable averaging and attribution methods.  The Borrowers shall pay the Administrative agent, Lender, Support Provider or L/C Issuer the amount shown as due on any such certificate within ten (10) days of receipt thereof.

(b)    Upon any Lender's making a claim for compensation under Section 3.01 or 3.04, the Borrowers may replace such Lender in accordance with Section 12.15.

**3.07    Survival**.  All of the Borrowers' obligations under this Article 3 shall survive the Termination Date.

## ARTICLE 4

## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

**4.01    Conditions of Initial Credit Extension**.  The obligation of each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent, except as provided under Section 6.18:

(a)    Loan Documents.  Receipt by the Administrative Agent of executed counterparts of this Agreement, the Security Agreement, the Fee Letter, the other Loan Documents to be executed as of the Closing Date and the agreements and the other documents executed in connection herewith and therewith and the Notes (if requested), each properly executed by a Responsible Officer of the signing Loan Party and each other Person a party thereto.

(b)    Organization Documents, Resolutions, Etc.  Receipt by the Administrative Agent of the following, each of which shall be originals or facsimiles (followed promptly by originals), dated as of a recent date before the Closing Date and in form and substance satisfactory to the Administrative Agent and its legal counsel:

(i)    copies of the Organization Documents of each Loan Party certified to be true and complete as of a recent date by the appropriate Governmental Authority of the state or other jurisdiction of its incorporation or organization, where applicable, and certified by a secretary or assistant secretary of such Loan Party to be true and correct as of the Closing Date;

(ii)    such resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may require evidencing the identity, authority and capacity of each Responsible Officer thereof (A) executing any agreement, certificate or other document required to be delivered hereby or (B) authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party; and

85

(iii)    such documents and certifications as the Administrative Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and is validly existing, in good standing and qualified to engage in business in its state of organization or formation, in the state in which its principal place of business is located, and in each other state in which a failure to be so qualified would have a Material Adverse Effect.

(c)    <u>Filings, Registrations and Recordings</u>.  Receipt by the Administrative Agent of each document (including any UCC financing statements) required by the Collateral Documents or under Law or reasonably requested by the Administrative Agent and an intellectual property security agreement as to all intellectual property rights of a Loan Party registered with the United States Patent and Trademark Office or the United States Copyright Office to be filed, registered or recorded in order to create in favor of the Administrative Agent, for its benefit and the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than Permitted Liens), which shall be in proper form for filing, registration or recordation.

(d)    <u>Pledged Stock; Stock Powers; Pledged Notes</u>.  Receipt by the Administrative Agent of (i) any certificates representing the shares of Capital Stock pledged pursuant to the Security Agreement, together with an undated stock (or analogous) power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof or, with respect to any uncertificated security, an Uncertificated Security Control Agreement executed by a pledgor and acknowledged by the applicable Loan Parties, and (ii) each promissory note (if any) pledged to the Administrative Agent pursuant to the Security Agreement endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(e)    <u>Real Estate Documents</u>.  Receipt by the Administrative Agent, with respect to each Mortgaged Property owned, if any, by a Loan Party as of the Closing Date, of all Mortgage Instruments and Mortgage Supporting Documents relating thereto.

(f)    <u>Opinions of Counsel</u>.  Receipt by the Administrative Agent of favorable opinions of K&L Gates LLP, counsel to the Loan Parties, addressed to the Administrative Agent and each Secured Party, dated as of the Closing Date, and in form and substance satisfactory to the Administrative Agent.

(g)    <u>Evidence of Insurance</u>.  Receipt by the Administrative Agent of ACORD insurance evidencing insurance coverages and amounts satisfactory to the Administrative Agent and appropriate endorsements in favor of the Administrative Agent with respect thereto.

(h)    <u>Liens Searches</u>.  Receipt by the Administrative Agent of UCC and other Lien searches considered necessary by the Administrative Agent and other evidence as requested by Administrative Agent that no Liens exist other than Permitted Liens.

(i)    <u>Transaction Documents</u>.  The Transaction Documents shall be in form and substance reasonably satisfactory to the Administrative Agent and shall be in full force and effect.  Concurrently with the initial funding of the Loans on the Closing Date, the Transactions shall have been consummated in accordance with the terms of the Transaction Documents.

(j)    <u>[Reserved]</u>.

(k)    <u>Third Party Consents; Change of Ownership</u>.  Receipt by the Administrative Agent of evidence reasonably satisfactory to the Administrative Agent that the Loan Parties have obtained all required consents and approvals of all Persons including all requisite Governmental Authorities and counterparties to Material Contracts, to the execution, delivery and performance of the Loan Documents.

86

(l)      Fees.  Receipt by the Administrative Agent and the Lenders of any fees required to be paid on or before the Closing Date under this Agreement and the Fee Letter.

(m)      Attorney Costs.  The Loan Parties shall have paid all reasonable Attorney Costs of the Administrative Agent, plus such additional amounts of Attorney Costs as shall constitute its reasonable estimate of Attorney Costs incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Loan Parties and the Administrative Agent).

(n)      Compliance with Laws.  Each Loan Party shall be in compliance in all material respects with all applicable Law, and shall have provided the Administrative Agent with true and correct copies of each of the accreditations, license and, certifications required by Section 5.01 below.

(o)      Compliance with Agreements.  Each Loan Party shall be in compliance in all material respects with all material agreements, and shall have provided the Administrative Agent with true and correct copies of each Material Contract.

(p)      No Litigation.  There exists no pending or threatened Proceeding against the Loan Parties or any of their respective Affiliates or respective assets in any court or administrative forum, (i) which could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect or (ii) that involves this Agreement or any other Loan Document.

(q)      Financial Statements; Projections.  Receipt by the Administrative Agent of

(i)      the Audited Pre-Closing Financial Statements;

(ii)      the Interim Pre-Closing Financial Statements;

(iii)      satisfactory projections through December 31, 2023;

(iv)      pro forma financial statements for the twelve-month period ending no more than thirty (30) days prior to the Closing Date for the Consolidated Group on a consolidated basis; and

(v)      such other information as the Administrative Agent may reasonably request.

(r)      [Reserved].

(s)      No Material Adverse Change.  There shall not have occurred since December 31, 2017 any developments or events which individually or in the aggregate with other such circumstances has had or could reasonably be expected to have a Material Adverse Effect with respect to the Loan Parties and their respective Subsidiaries, taken as a whole, or any of their respective assets.

(t)      Closing Certificate.  Receipt by the Administrative Agent of a certificate executed by a Responsible Officer of the Borrower Representative certifying that the conditions specified in Sections 4.01(s) and (v)-(dd) and Sections 4.02(a), (b), (c) and (d) have been satisfied and that the representations and warranties contained in Article 5 are true and correct in all material respects (provided, that if any representation or warranty is by its terms qualified by concepts of materiality, such representation and warranty shall be true and correct in all respects) as of the Closing Date.

87

(u)    [Reserved].

(v)    Investment Documents.  The Administrative Agent shall have received confirmation of ownership and capital structure of the Loan Parties and be reasonably satisfied with the constituent documents of the Loan Parties and related investment agreements.  All preferred equity securities shall have a maturity or redemption date at least six (6) months after the Term Loan Maturity Date and shall otherwise not constitute Disqualified Capital Stock.

(w)    Patriot Act.

(i)    Receipt by the Administrative Agent and Lenders, at least ten (10) days prior to the Closing Date, of all documentation and other information about the Loan Parties required under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act, that has been requested by the Administrative Agent and the Lenders at least ten (10) Business Days prior to the Closing Date.

(ii)    Receipt by the Administrative Agent and Lenders, at least five (5) days prior to the Closing Date, a Beneficial Ownership Certification in relation to any Borrower that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation.

(x)    [Reserved].

(y)    Solvency.  Receipt by the Administrative Agent of a Solvency Certificate from the Chief Financial Officer of Intermediate Holdings, substantially in the form of Exhibit E hereto.

(z)    [Reserved].

(aa)    Minimum EBITDA.  Receipt by the Administrative Agent of a certificate of the Borrower Representative's chief financial officer, in form, substance and detail satisfactory to the Administrative Agent demonstrating that the Consolidated EBITDA of the Consolidated Group (as adjusted in a manner satisfactory to the Administrative Agent) for the twelve (12) month period ended February 28, 2019 is equal to or greater than $119,794,000.00.

(bb)    Maximum Closing Date Indebtedness.  The Consolidated Group shall have maximum Indebtedness outstanding after giving effect to initial funding of the Loans on the Closing Date in an amount not in excess of fifty percent (50.0%) of the total capitalization of Borrower.

(cc)    Maximum Closing Date Leverage.  Receipt by the Administrative Agent of a certificate of the Borrower Representative's chief financial officer, in form, substance and detail satisfactory to the Administrative Agent, demonstrating that the Consolidated Total Leverage Ratio for the twelve (12) month period ended February 28, 2019, does not exceed 2.70:1.00 calculated on a Pro Forma Basis after giving effect to the initial funding of the Loans (and the application of the proceeds thereof) and based on Consolidated EBITDA determined pursuant to clause (aa) above.

(dd)    Other.  Receipt by the Administrative Agent and the Lenders of such other documents, instruments, agreements and information as reasonably requested by the Administrative Agent or any Lender, including, but not limited to, information regarding litigation, tax, accounting, labor, insurance, pension liabilities (actual or contingent), real estate leases, environmental matters, material contracts, debt agreements, property ownership, contingent liabilities, employment agreements, non-compete agreements and management of the Loan Parties and their respective Subsidiaries.

88

**4.02**   **Conditions to all Credit Extensions**.  The obligation of each Lender and the L/C Issuer and Support Provider to honor any Request for Credit Extension (or provide a Support Agreement), whether on the Closing Date or at any time thereafter, is subject to the following conditions precedent:

(a)      The representations and warranties of each Loan Party contained in Article 5 or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct (i) if such date is the Closing Date, on and as of such date and (ii) otherwise, in all material respects (provided, that if any representation or warranty is by its terms qualified by concepts of materiality, such representation and warranty shall be true and correct in all respects) on and as of such date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, and except that for purposes of this Section 4.02, the representations and warranties contained in subsections (a) and (b) of Section 5.05 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01.

(b)      No Default or Event of Default shall exist, or would result from such proposed Credit Extension.

(c)      After giving effect to such Credit Extension, (i) the total Revolving Exposures shall not exceed the total Revolving Commitments and (ii) the Loan Parties shall be in compliance on a Pro Forma Basis with the financial covenants set forth in Article 8 computed using the covenant levels and financial information for the most recently ended quarter for which information is available.

(d)      The Administrative Agent and, if applicable, the applicable L/C Issuer (or the Support Provider, as the case may be) shall have received a Request for Credit Extension in accordance with the requirements hereof.

(e)      The obligation of each Revolving Lender holding a Revolving Commitment to honor a Loan Notice for a Borrowing of a Revolving Loan to finance a Permitted Acquisition or fees and transaction costs associated with such Permitted Acquisitions is further subject to receipt by the Administrative Agent of a certificate of the Borrower Representative's chief financial officer, in form, substance and detail satisfactory to Administrative Agent, demonstrating that the Consolidated Total Leverage Ratio on the date of such Borrowing does not exceed 2.70 to 1.00 calculated on a Pro Forma Basis after giving effect to such Borrowing and related Permitted Acquisition and using the financial information for the most recently ended quarter for which information is available.

(f)      The obligation of each Term Loan Lender holding a Delayed — Draw Term Loan Commitment to honor a Loan Notice for a Borrowing of a Delayed — Draw Term Loan is further subject to:

(i)      No Loan Notice for a Borrowing of a Delayed — Draw Term Loan may be requested at any time after the second anniversary of the Closing Date, and no Lender shall have any obligation to honor a request for such Borrowing after such date.

(ii)      Evidence satisfactory to Administrative Agent that the requirements for a "Permitted Acquisition" have been satisfied.

(iii)      Receipt by the Administrative Agent of a certificate of the Borrower Representative's chief financial officer, in form, substance and detail satisfactory to Administrative Agent, demonstrating that the Consolidated Total Leverage Ratio on the date of such Borrowing does not exceed 2.70 to 1.00 calculated on a Pro Forma Basis after giving effect

89

to such Borrowing and related Permitted Acquisition and using the financial information for the most recently ended quarter for which information is available.

Each Request for Credit Extension submitted by the Borrower Representative shall be deemed to be a representation and warranty by the Loan Parties that the conditions specified in Section 4.02 have been satisfied on and as of the date of the applicable Credit Extension.

4.03    **Satisfaction of Conditions**.  In determining the satisfaction of the conditions specified in this Article 4, to the extent any item is required to be satisfactory to (a) any individual Lender, such item shall be deemed satisfactory to each Lender which has not notified the Administrative Agent in writing (with reasonable detail relating to why such Lender views a condition as not having been satisfied) prior to the Closing Date or the date on which a Credit Extension has been requested to be made, as applicable, that the respective item or matter does not meet its satisfaction or (b) the Required Lenders, such item shall be deemed satisfactory to the Required Lenders unless the Required Lenders have notified the Administrative Agent in writing (with reasonable detail relating to why the Required Lenders view a condition as not having been satisfied) prior to the Closing Date or the date on which a Credit Extension has been requested to be made, as applicable, that the respective item or matter does not meet their satisfaction, in each case, regardless of whether Administrative Agent has knowledge that such condition is satisfied, underlined provided, that the occurrence of the Closing Date or the making of a Credit Extension, the execution and delivery to the Administrative Agent by a Lender of a counterpart of this Agreement (or if applicable, an Assignment and Assumption) shall be deemed confirmation by such Lender that (a) the decision of such Lender to execute and deliver to the Administrative Agent an executed counterpart of this Agreement (or become a Lender hereunder) was made by such Lender independently and without reliance on Administrative Agent or any other Lender and (b) all documents made available to such Lender were acceptable to such Lender.  No Credit Extension shall release any Loan Party from any liability for failure to satisfy one or more of the applicable conditions contained in this Article 4.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES

The Loan Parties hereby represent and warrant to the Administrative Agent and the Lenders that, both immediately before and after giving effect to any Permitted Acquisition, any Restricted Payment and any Credit Extension:

5.01    **Existence, Qualification and Power**.  Each Loan Party (a) is a corporation, partnership or limited liability company duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all requisite Permits to (i) own its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, except where the failure to have such Permits, either singularly or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, and (c) is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, except to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

5.02    **Authorization; No Contravention**.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is party, have been duly authorized by all necessary corporate or other organizational action, and do not (a) contravene the terms of any Loan Party's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, (i) any Contractual Obligation under any Material Contract to which any Loan

90

Party is a party or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which any Loan Party or the Property of any Loan Party is subject; (c) violate any Law (including Regulation U or Regulation X issued by the FRB); or (d) result in a limitation on any material licenses, permits or other Governmental Approvals applicable to the business, operations or properties of any Loan Party.

**5.03** **Governmental Authorization; Other Consents**. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, other than (i) those that have already been obtained and are in full force and effect and (ii) filings to perfect the Liens created by the Collateral Documents.

**5.04** **Binding Effect**. Each Loan Document has been duly executed and delivered by each Loan Party that is party thereto. Each Loan Document constitutes a legal, valid and binding obligation of each Loan Party that is party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by applicable Debtor Relief Laws or by equitable principles relating to enforceability.

**5.05** **Financial Statements; No Material Adverse Effect.**

(a)    The Audited Pre-Closing Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present in all material respects the financial condition of the Loan Parties and their Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all material Indebtedness and other liabilities, direct or contingent, of the Loan Parties and their Subsidiaries as of the date thereof, including liabilities for taxes, commitments and Indebtedness.

(b)    The Interim Pre-Closing Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present in all material respects the financial condition of the Loan Parties and their Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments; and (iii) show all material Indebtedness and other liabilities, direct or contingent (to the extent required by GAAP), of the Loan Parties and their Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness.

(c)    From the date of the Audited Pre-Closing Financial Statements and the Interim Pre-Closing Financial Statements to and including the Closing Date, there has been no Disposition by the Loan Parties and their Subsidiaries, or any Involuntary Disposition, of any material part of the business or Property of the Loan Parties and their Subsidiaries, taken as a whole, and no purchase or other acquisition by any of them of any business or property (including any Capital Stock of any other Person) material in relation to the consolidated financial condition of the Loan Parties and their Subsidiaries, taken as a whole, in each case, which is not reflected in the foregoing financial statements or in the notes thereto and has not otherwise been disclosed in writing to the Lenders on or prior to the Closing Date.

(d)    The financial statements delivered pursuant to Sections 6.01(a) and 6.01(b) have been prepared in accordance with GAAP (except as may otherwise be permitted under Sections 6.01(a) and 6.01(b)) and present fairly (on the basis disclosed in the footnotes to such financial statements) in all

91

material respects the consolidated financial condition, results of operations and cash flows of the Loan Parties and their respective Subsidiaries as of the dates thereof and for the periods covered thereby.

       (e)      Since December 31, 2017, there has been no event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect.

      **5.06**    **Litigation**. There are no Proceedings pending or, to the knowledge of the Loan Parties after due investigation, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or (b) could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

      **5.07**    **No Default**.

       (a)      No Loan Party is (i) in breach of or in default under any Material Contract, or (ii) in breach of or in default under any Contractual Obligation that could reasonably be expected to have a Material Adverse Effect.

       (b)      No Default or Event of Default has occurred and is continuing.

      **5.08**    **Ownership of Property; Liens**. Each of the Loan Parties and its Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, all Real Property necessary or used in the ordinary conduct of its business. No Property of the Loan Parties and their Subsidiaries is subject to any Liens, other than Permitted Liens.

      **5.09**    **Environmental Compliance**. Except as could not reasonably be expected to have a Material Adverse Effect:

       (a)      Each of the Facilities and all operations at the Facilities are in compliance with all applicable Environmental Laws, and there is no violation of any Environmental Law with respect to the Facilities or the Businesses, and there are no conditions relating to the Facilities or the Businesses that could give rise to liability under any applicable Environmental Laws.

       (b)      None of the Facilities contains, or has previously contained, any Hazardous Materials at, on or under the Facilities in amounts or concentrations that constitute or constituted a violation of, or could give rise to liability under, Environmental Laws.

       (c)      Neither any Loan Party nor any Subsidiary has received any written or verbal notice of, or inquiry from any Governmental Authority regarding, any violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Facilities or the Businesses, nor does any Responsible Officer of any Loan Party have knowledge or reason to believe that any such notice will be received or is being threatened.

       (d)      Hazardous Materials have not been transported or disposed of from the Facilities, or generated, treated, stored or disposed of at, on or under any of the Facilities or any other location, in each case by or on behalf of any Loan Party or any Subsidiary in violation of, or in a manner that would be reasonably likely to give rise to liability under, any applicable Environmental Law.

(e)        No judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Responsible Officers of the Loan Parties, threatened, under any Environmental Law to which any Loan Party or any Subsidiary is or will be named as a party, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to any Loan Party, any Subsidiary, the Facilities or the Businesses.

(f)        There has been no release or, threat of release of Hazardous Materials at or from the Facilities, or arising from or related to the operations (including disposal) of any Loan Party or any Subsidiary in connection with the Facilities or otherwise in connection with the Businesses, in violation of or in amounts or in a manner that could give rise to liability under Environmental Laws.

5.10    **Insurance**.  The properties of the Loan Parties and their Subsidiaries are insured with financially sound and reputable insurance companies (none of which are Affiliates of the Loan Parties), in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the applicable Loan Party or the applicable Subsidiary operates.  The insurance coverage of the Loan Parties complies with the requirements of Section 6.07 and the insurance coverage in effect on the Closing Date is outlined as to carrier, policy number, expiration date, type, amount and deductibles on Schedule 5.10.

5.11    **Taxes**.  The Loan Parties and their respective Subsidiaries have filed all federal, state and other material tax returns and reports required to be filed, and have paid all federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being Properly Contested.  There is no material proposed tax assessment against any Loan Party or Subsidiary.  No Loan Party nor any Subsidiary thereof is party to any tax sharing agreement.

5.12    **ERISA Compliance**.

(a)        Each ERISA Plan and each Loan Party is in compliance in all material respects with the applicable provisions of ERISA, the Internal Revenue Code, the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and the regulations and published interpretations thereunder, and other federal or state Laws.  Each ERISA Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code has a currently effective favorable determination letter (or in the case of a volume submitter or prototype plan is the subject of a currently effective favorable opinion letter) from the IRS or an application for such letter is currently being processed by the IRS with respect thereto (and each ERISA Plan has been timely amended to reflect changes in the applicable qualification requirements under Section 401(a) of the Internal Revenue Code and any applicable IRS guidance issued thereunder) and, to the best knowledge of the Loan Parties, nothing has occurred which would prevent, or cause the loss of, such qualification. Each Loan Party and each ERISA Affiliate has made all required contributions to each ERISA Plan subject to Sections 412 and 430 of the Internal Revenue Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 or 430 of the Internal Revenue Code has been made with respect to any ERISA Plan. Each Loan Party and each ERISA Affiliate has performed all their obligations under each ERISA Plan according to their terms, including filing or furnishing to the IRS, Department of Labor or other Governmental Authority, or to participants or beneficiaries of each ERISA Plan, any reports, returns, notices and other documentation required to be filed or furnished.

(b)        There are no pending or, to the knowledge of the Loan Parties, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan.

(c)        (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability and no other ERISA Plan providing retiree welfare benefits has any unfunded liability for benefits; (iii) no Loan Party or any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) no Loan Party or any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) no Loan Party or any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

**5.13    Subsidiaries**.  Set forth on Schedule 5.13 is a complete and accurate list of the name and jurisdiction of organization of each Loan Party and each Subsidiary (including each Excluded Subsidiary which is identified as such therein) as of the Closing Date, (or following the delivery of the first Compliance Certificate hereunder, as of the date of the most recently delivered Compliance Certificate), together with (a) the number of shares of each class of Capital Stock of any Loan Party outstanding as of the Closing Date and (b) the number and percentage of outstanding shares of each class owned (directly or indirectly) by any Loan Party or any Subsidiary as of the Closing Date.  None of the shares of Capital Stock of any Subsidiary is subject to any outstanding options, warrants, rights of conversion or purchase and all other similar rights with respect thereto.  The outstanding Capital Stock of each Loan Party and each Subsidiary is validly issued, and, in the case of any Loan Party that is a corporation, fully paid and non-assessable.  No Subsidiary of Intermediate Holdings has outstanding any shares of Disqualified Capital Stock.

**5.14    Margin Regulations; Investment Company Act, Use of Proceeds**.

(a)        The Loan Parties are not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.  No proceeds of any Borrowing shall be used for the purpose of purchasing or carrying margin stock or to extend credit to others for the purpose of purchasing or carrying margin stock.

(b)        None of the Loan Parties, any Person Controlling any Loan Party or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

(c)        No proceeds of any Borrowing will be used in violation of Section 6.11.

**5.15    Disclosure**.  No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, provided that, with respect to any projected financial information, the Loan Parties represent that such information was prepared in good faith based upon assumptions believed to be reasonable at the time and at the time made available to Administrative Agent and the Lenders.  Notwithstanding the foregoing, Administrative Agent and Lenders acknowledge that the pro forma financial statements and other economic forecasts and information of a general industry nature delivered by Borrowers hereunder are not factual representations and that the actual financial results of the Borrowers may differ from the pro forma financial statements and other economic forecasts submitted from time to time.  As of the Closing Date, the information included in the Beneficial Ownership Certificate is true and correct in all respects.

94

**5.16**    **Compliance with Laws**.  Each of the Loan Parties and each Subsidiary has operated at all times in compliance in all material respects with the requirements of all Laws and all orders, writs, conditions of participation, contracts, standards, policies, injunctions, decrees, and Governmental Approvals applicable to it, its properties or the Facilities.  Without limiting the generality of the foregoing:

(i)    neither any Loan Party nor any Subsidiary thereof is in receipt of any written notice of any material violation of any Law, statute, rule, regulation, ordinance, code, judgment, order writ, decree, permit, concession, franchise or other governmental approval applicable to it or any of its property, which notice, individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect; and

(ii)    neither any Loan party nor any Subsidiary or any Affiliate thereof is in violation of and shall not violate any of the country or list based economic and trade sanctions administered and enforced by OFAC that are described or referenced at http://ustreas.gov/offices/enforcement/ofac/ or as otherwise published from time to time.

**5.17**    **Intellectual Property; Licenses, Etc.**  The Loan Parties and their Subsidiaries own, or possess the legal right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights (collectively, "IP Rights") that are necessary for the operation of their respective businesses without conflict with the rights of any other Person.  Set forth on Schedule 5.17 is a list of all IP Rights registered or pending registration with the United States Copyright Office or the United States Patent and Trademark Office and owned by any Loan Party, or that any Loan Party has the right to use, as of the Closing Date (or following the delivery of the first Compliance Certificate hereunder, as of the date of the most recently delivered Compliance Certificate).  No claim has been asserted and is pending by any Person challenging or questioning the use of any IP Rights or the validity or effectiveness of any IP Rights, nor does any Loan Party know of any such claim, and, to the knowledge of the Responsible Officers of the Loan Parties, the use of any IP Rights by any Loan Party or any Subsidiary or the granting of a right or a license in respect of any IP Rights from any Loan Party or any Subsidiary does not infringe on the rights of any Person.  As of the Closing Date, (or following the delivery of the first Compliance Certificate hereunder, as of the date of the most recently delivered Compliance Certificate), none of the IP Rights owned by any of the Loan Parties is subject to any licensing agreement or similar arrangement except as set forth on Schedule 5.17.

**5.18**    **Broker's Fees**.  Neither any Loan Party nor any Subsidiary has any obligation to any Person in respect of any finder's, broker's, investment banking or other similar fee in connection with any of the transactions contemplated under the Loan.

**5.19**    **Labor Matters**.  There are no collective bargaining agreements or Multiemployer Plans covering the employees of any Loan Party or any Subsidiary as of the Closing Date, and neither any Loan Party nor any Subsidiary has suffered any strikes, walkouts, work stoppages or other material labor difficulty within the last five (5) years.

**5.20**    **Business Locations**.  Set forth on Schedule 5.20(a) is a list of all Real Property located in the United States that is owned or leased by any Loan Party as of the Closing Date (or following the delivery of the first Compliance Certificate hereunder as of the date of the most recently delivered Compliance Certificate).  Set forth on Schedule 5.20(b) is a list of all locations where any tangible personal property of any Loan Party (excluding the location of moveable assets, which are moved from location to location in the ordinary course of business) with a value in excess of $100,000 is located as of the Closing Date (or following the delivery of the first Compliance Certificate hereunder, as of the date of the most recently delivered Compliance Certificate).  Set forth on Schedule 5.20(c) is the state of

95

organization, chief executive office and taxpayer identification number of each Loan Party as of the Closing Date.

**5.21**    **Perfection of Security Interests in the Collateral**.  The Collateral Documents create valid security interests in, and Liens on, the Collateral purported to be covered thereby, which security interests and Liens are currently perfected security interests and Liens (except to the extent perfection is deferred pursuant to Schedule 6.18), prior to all other Liens other than Permitted Liens as of the Closing Date.  The exact legal name of each Loan Party is as set forth on the signature pages hereto as of the Closing Date.

**5.22**    **Solvency**.  Both before and after giving effect to (a) the Loans to be made or extended on the Closing Date or such other date as Loans requested hereunder are made or extended, the issuance of the guaranties of the Obligations and the pledge of assets as security therefor by all of the Loan Parties, (b) the disbursement of the proceeds of such Loans pursuant to the instructions of the Loan Parties, (c) the consummation of the transactions contemplated in the Loan Documents, (d) the payment of any Restricted Payment and (e) the payment and accrual of all transaction costs in connection with the foregoing, the Loan Parties taken as a whole are Solvent.

**5.23**    **[Reserved]**.

**5.24**    **Material Contracts**.  Schedule 5.24 contains a true, correct and complete list of all Material Contracts in effect as of the Closing Date, and except as described thereon, all such Material Contracts are in full force and effect and no material breaches, defaults or events of default currently exist thereunder.

**5.25**    **Accounts**.  Schedule 5.25 sets forth a complete and accurate list as of the Closing Date of all deposit accounts and all securities accounts maintained by each Loan Party, together with a description thereof and such Schedule correctly identifies the name and address of each depository or broker dealer where the account is maintained, the name in which the account is held, the purpose of the account, and the complete account number thereof.

**5.26**    **Holding Company Status**.  Neither Holdings nor Intermediate Holdings is engaged in any trade or business in violation of Section 7.15.

**5.27**    **Inventory Suppliers**.  Schedule 1.01(c) sets forth a complete and accurate list of all Inventory Suppliers.

**5.28**    **Patriot Act**.  Each Loan Party and its Subsidiaries are in compliance with the (i) Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V) and any other enabling legislation or executive order relating thereto, and (ii) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001) (the "Patriot Act").  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any Person, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**5.29**    **Regulatory Matters**.  Without limiting the generality of any other representation or warranty made in this Agreement, each Loan Party hereby represents and warrants that, except as disclosed in Schedule 5.29(a), the following statements are true, complete and correct, and the Loan Parties hereby covenant and agree to notify the Administrative Agent within three (3) Business Days (but in any event prior to the Loan Parties submitting any requests for advances of reserves or escrows) following the occurrence of any facts, events or circumstances, whether threatened, existing or pending,

96

that would make any of the following representations and warranties untrue, incomplete or incorrect (together with such supporting data and information as shall be necessary to fully explain to the Administrative Agent the scope and nature of the fact, event or circumstance), and shall provide to the Administrative Agent within two (2) Business Days of the Administrative Agent's request, such additional information as the Administrative Agent shall reasonably request regarding such disclosure:

(a)    **Permits**. Each Loan Party has (i) each Permit and other rights from, and have made all declarations and filings with, all applicable Governmental Authorities, all self-regulatory authorities and all courts and other tribunals necessary to engage in the Business conducted by the Loan Parties and the ownership, if any, and operation of the Facilities, and (ii) no knowledge that any Governmental Authority is considering limiting, suspending or revoking any such Permit. All such Permits are valid and in full force and effect and each Loan Party is in material compliance with the terms and conditions of all such Permits except where failure to be in such compliance or for a Permit to be valid and in full force and effect could not reasonably be expected to have a Material Adverse Effect.

(b)    **Specific Licensing**. Each Loan Party is duly licensed under the applicable Laws of each state where such Loan Party conducts business and is required to be licensed to conduct business. Each Loan Party owns, leases or operates a health care business and/or provides health care goods and services and (i) if it maintains Medicare and Medicaid provider status, is the holder of the provider identification numbers as identified on Schedule 5.29(b) hereto, all of which are current and valid and such Loan Party has not allowed, permitted, authorized or caused any other Person to use any such provider identification number, and (ii) has obtained all material Permits necessary for any Borrower to own its assets, to carry on its business, to execute, deliver and perform the Loan Documents, and to receive payments from the Payors and, if organized as a not-for-profit entity, has and maintains its status, if any, as an organization exempt from federal taxation under Section 501(c)(3) of the Internal Revenue Code. No Loan Party has been notified by any such Governmental Authority or other Person during the immediately preceding twenty-four (24) month period that such party has rescinded, limited or not renewed, or intends to rescind, limit or not renew, any such license or approval.

(c)    **Physician Ownership**. Except as set forth on Schedule 5.29(c), no physician has any direct or indirect "financial relationship" that constitutes an "ownership or investment interest" (each as defined in 42 CFR 411.354(b)) in any Loan Party or any Affiliate of any Loan Party.

(d)    **Participation Agreements/Provider Status/Cost Reports**.

(i)    Each Loan Party has the requisite participation agreement or provider number or other Permit to bill Medicare and/or Medicaid program in the state or states in which such Loan Party operates (to the extent such Loan Party participates in Medicare or Medicaid in such state or states) and all other Third Party Payor Programs which have historically accounted for any portion of the revenues of the Business or such Loan Party the loss of which could not reasonably be expected to have a Material Adverse Effect.

(ii)    There is no investigation, audit, claim review, or other action pending or, to the knowledge of any Loan Party, threatened which could reasonably be expected to result in a revocation, suspension, termination, probation, restriction, limitation, or non-renewal of any Participation Agreement or provider number or result in a Loan Party's exclusion from any Third Party Payor Program, nor has any Third Party Payor Program made any decision not to renew any Participation Agreement or provider agreement

97

related to the Business that could reasonably be expected to have a Material Adverse Effect, nor has any Loan Party made any decision not to renew any Participation Agreement or provider agreement that could reasonably be expected to have a Material Adverse Effect, nor is there any action pending or threatened to impose material sanctions with respect to the Business or penalty, sanction, fine or imposition upon any Loan Party.

(iii)     To the knowledge of each Loan Party, each Loan Party and its contractors, have properly and legally billed all Third Party Payors (or intermediaries of Third Party Payors, as applicable) for goods and services rendered with respect to the Business and have maintained their records to reflect such billing practices. No funds relating to any Borrower are now, or, to the knowledge of any Loan Party will be, withheld by any Third Party Payor.

(iv)     All Medicare, Medicaid, and private insurance cost reports and financial reports submitted by each Loan Party are and will be materially accurate and complete and have not been and will not be misleading in any material respects. No cost reports for any goods and services rendered with respect to the Business remain "open" or unsettled. There are no current, pending or outstanding Medicare, Medicaid or Third Party Payor Program reimbursement audits or appeals pending with respect to the Business or any Loan Party that could reasonably be expected to have a Material Adverse Effect and no Loan Party has any knowledge that any cost reports or financial reports previously given or declared are inaccurate.

(v)     No Loan Party has any obligation (whether or not currently due) under or pursuant to any agreement, instrument or applicable Law to reimburse, repay or make payment to any Governmental Authority for any loans, advances, grants or monies given or paid to any Loan Party or any Affiliate of any Loan Party and no Person asserts a claim that any such Loan Party has any such obligation to reimburse, repay or make payment to any Governmental Authority for any loans, advances, grants or monies given or paid to any Loan Party or any Affiliate of any Loan Party.

(e)     **No Violation of Healthcare Laws**.

(i)     No Loan Party is in violation of any Healthcare Laws, except where any such violation could not reasonably be expected to have a Material Adverse Effect. With respect to any existing Healthcare Laws not currently effective (any "Future Effective Healthcare Law"), no Loan Party is aware of any fact, circumstance or condition that exists that if not cured or corrected would constitute a violation of any Future Effective Healthcare Law when the obligation of compliance under such Future Effective Healthcare Law becomes effective, except where any such violation would not have a Material Adverse Effect.

(ii)     Each Loan Party is HIPAA Compliant.

(f)     **Proceedings**. No Loan Party is subject to any proceeding, suit or, to any Loan Party's knowledge, investigation by any federal, state or local government or quasi-governmental body, agency, board or authority or any other administrative or investigative body (including the Office of the Inspector General of the United States Department of Health and Human Services): (i) which could reasonably be expected to result in the imposition of a fine, sanction, or lower reimbursement rate for products or services rendered to eligible patients which has not been

98

provided for on their respective financial statements, or which could reasonably be expected to have a Material Adverse Effect on any Loan Party or the operation of the Business or any material aspect thereof; (ii) which could reasonably be expected to result in the revocation, transfer, surrender, suspension or other impairment of the Permits of the Business; (iii) which pertains to any state or federal Medicare or Medicaid cost reports or claims filed by any Loan Party (including, but not limited to, any reimbursement audits), or any disallowance by any commission, board or agency in connection with any audit of such cost reports, other than as set forth on Schedule 5.29(f)(iii); or (iv) which pertains to or requests any voluntary disclosure pertaining to a potential overpayment matter involving the submission of claims to such payor by any Loan Party.

(g)     **Fraud & Abuse**.

(i)     No Loan Party has, or to its knowledge has been threatened to have, and no owner, officer, manager, employee or person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §420.201) in any Loan Party has, engaged in any of the following: (A) knowingly and willfully making or causing to be made any false statement or representation of a material fact in any application for any benefit or payment under any Healthcare Laws; (B) knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment under any Healthcare Laws; (C) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment under any Healthcare Laws on its own behalf or on behalf of another, with intent to secure such benefit or payment fraudulently; (D) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offering to pay such remuneration (1) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by any Healthcare Laws, or (2) in return for purchasing, leasing or ordering or arranging for or recommending the purchasing, leasing or ordering of any good, facility, service, or item for which payment may be made in whole or in part by Medicare, Medicaid, or any other governmental payor; (E) presenting or causing to be presented a claim for reimbursement for services that is for an item or services that was known or should have been known to be (1) not provided as claimed, or (2) false or fraudulent; or (F) knowingly and willfully making or causing to be made or inducing or seeking to induce the making of any false statement or representation (or omitting to state a fact required to be stated therein or necessary to make the statements contained therein not misleading) of a material fact with respect to (1) a facility in order that the facility may qualify for Governmental Authority certification, or (2) information required to be provided under 42 U.S.C. § 1320a-3.

(ii)     No Loan Party has been, or to its knowledge has been threatened to be, and no owner, officer, manager, employee or person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §420.201) in any Loan Party: (A) has had a civil monetary penalty assessed against him or her pursuant to 42 U.S.C. §1320a-7a or is the subject of a proceeding seeking to assess such penalty; (B) has been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. §1320a-7b) or is the subject of a proceeding seeking to assess such penalty, or has been "suspended" or "debarred" from selling products to the U.S. government or its agencies pursuant to the Federal Acquisition Regulation, relating to debarment and suspension applicable to federal government agencies generally (48 C.F.R. Subpart 8.4), or other

99

applicable Laws or regulations; (C) has been convicted (as that term is defined in 42 C.F.R. §1001.2) of any of those offenses described in 42 U.S.C. §1320a-7b or 18 U.S.C. §§669, 1035, 1347, 1518 or is the subject of a proceeding seeking to assess such penalty; (D) has been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§3729-3731 or qui tam action brought pursuant to 31 U.S.C. §3729 et seq.; (E) has been made a party to any other action by any Governmental Authority that may prohibit it from selling products to any governmental or other purchaser pursuant to any law; or (F) was or has become subject to any federal, state, local governmental or private payor civil or criminal investigations or inquiries, proceedings, validation review, program integrity review or statement of charges involving and/or related to its compliance with Healthcare Laws or involving or threatening its participation in Medicare, Medicaid or other Third Party Payor Programs or its billing practices with respect thereto.

**5.30**    **Compliance of Products**.

(a)    Each Loan Party:

(i)    has obtained all Required Permits, or has contracted with third parties holding Required Permits, necessary for compliance with all applicable Laws including the Specified Laws, and all such Required Permits are current and each holder of such Required Permits is in material compliance with the terms and conditions of all such Required Permits;

(ii)    except as set forth on Schedule 5.30(a), has been operating in compliance in all material respects with all reporting and regulatory requirements imposed upon it as well as the Specified Laws, including reporting to FDA and other agencies, to include state government agencies of product deviations, contamination or of device malfunctions and/or device-related serious injuries or deaths and reporting to FDA of Corrections or Removals, when and as required under the FDCA;

(iii)    has not, and none of its officers, directors, employees, shareholders, their agents or affiliates have, made an untrue statement of material fact or fraudulent statement to the FDA or failed to disclose a material fact required to be disclosed to the FDA, committed an act, made a statement, or failed to make a statement that could reasonably be expected to provide a basis for the FDA to invoke its policy respecting "Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities," set forth in 56 Fed. Regulation 46191 (September 10, 1991);

(iv)    has not received any notice that any Governmental Authority, including the FDA, the Office of the Inspector General of HHS, the United States Department of Justice or any equivalent foreign agency, has commenced or threatened to initiate any action to enjoin a Loan Party, or any of its officers, directors, employees, shareholders, agents or Affiliates, from conducting their respective businesses at any facility owned or used by any of them, or for any material civil penalty, injunction, seizure or criminal action, or which would result in the revocation, transfer, surrender, suspension or other material impairment of any Required Permit;

(v)    is not a participant in any federal program whereby any federal, state or local government or quasi-governmental body, agency, board or other authority may have the right to recover funds by reason of the advance of federal funds, including those authorized under the Hill-Burton Act (42 U.S.C. 291, et seq.);

100

(vi)       has not been threatened to be (A) excluded from United States health care programs pursuant to 42 U.S.C. §1320a7 and related regulations, (B) "suspended" or "debarred" from selling products to the United States government or its agencies pursuant to the Federal Acquisition Regulation, relating to debarment and suspension applicable to federal government agencies generally (48 C.F.R. Subpart 9.4), or other applicable Laws or regulations, or (C) made a party to any other action by any Governmental Authority that may prohibit it from selling products to any governmental or other purchaser pursuant to any Law;

(vii)      is in compliance with all Environmental Laws;

(viii)     maintains or causes to be maintained a standard of care in the storage, use, transportation and disposal of all Products, medical equipment, medical supplies, medical products and medical waste, of any kind and in any form, that is at least comparable to that which exists on the date of this Agreement and that is in conformity in all material respects with all applicable regulations and Laws;

(ix)       maintains or causes to be maintained corporate regulatory compliance program ("CCP") in accordance with Specified Laws, applicable regulatory guidance, and customary business practices for each Loan Party which includes at least the following components:  (A) specific officer within high-level personnel identified as having overall responsibility for regulatory compliance (B) training and education programs which effectively communicate the compliance standards and procedures to employees and agents;(C) policies and procedures to allow employees and other agents to anonymously report criminal or suspect conduct and potential compliance problems; (D) consistent enforcement of compliance policies including discipline of individuals responsible for the failure to detect violations of the CCP; and (E) mechanisms to immediately respond to detected violations of the CCP;

(x)        except as set forth on Schedule 5.30(a), has not received from the FDA at any time warning letters, Form FDA-483 inspection reports, "Untitled Letter", other correspondence or notice setting forth allegedly objectionable observations or alleged violations of laws and regulations enforced by the FDA, including the FDCA, or any comparable correspondence from any state or local authority responsible for regulating medical device products and establishments, or any comparable correspondence from any foreign counterpart of the FDA, or any comparable correspondence from any foreign counterpart of any state or local authority with regard to any Product or the manufacture, processing, packing, or holding thereof;

(xi)       [reserved];

(xii)      has entered into a Transport and Disposal Agreement with a reputable and qualified Person for the transport and disposal of hazardous wastes pursuant to which such Person has agreed to provide such transport and disposal services at all facilities at which such biomedical wastes and hazardous wastes are generated in conformity in all material respects with all applicable regulations and Laws and such Transport and Disposal Agreement remains in full force and effect; and

(xiii)     except as set forth on Schedule 5.30(a), maintains or causes to be maintained a policy that prevents the exposure of employees or contractors to bloodborne pathogens by prohibiting staff from handling returned or used Product if such Product is not received in a decontaminated manner.

(b)        With respect to Products:

101

(i)        No Loan Party has acquired, received, or otherwise transferred any human tissue or organs for valuable consideration for use in human transplantation, in violation of any Law.

(ii)        Schedule 5.30(b), hereto lists all Required Permits issued by a Governmental Authority relating to a Product and/or the applicable Loan Party's manufacture, sale, development, testing or marketing thereof maintained by Loan Parties as of the Closing Date, together with the applicable Product category corresponding to the Required Permits.  Loan Parties have delivered to the Administrative Agent on or prior to the Closing Date copies of all such Required Permits. If, after the Closing Date, any Loan Party acquires or renews any Required Permit issued by a Governmental Authority relating to a Product and/or the applicable Loan Party's manufacture, sale, development, testing or marketing thereof issued, Loan Parties shall promptly deliver a copy of such new or renewed Required Permit along with a copy of an update to Schedule 5.30(b);

(iii)        Except as set forth on Schedule 5.30(b), each Product has been and/or shall be manufactured, imported, possessed, owned, warehoused, marketed, promoted, sold, labeled, furnished, distributed and marketed in accordance with all applicable Permits and Laws, including but not limited to the FDCA;

(iv)        Without limiting the generality of Section 5.30(a)(i) above, with respect to any Product being tested or manufactured by any Loan Party or any Subsidiary of any Loan Party, such Person has received, and such Product shall be the subject of, all Required Permits needed in connection with the testing or manufacture of such Product as such testing is currently being conducted by or on behalf of such Person, and such Person has not received any notice from any applicable Governmental Authority, including the FDA, that such Governmental Authority is conducting an investigation or review of (A) such Person's manufacturing facilities and processes for such Product which have disclosed any material deficiencies or violations of applicable Laws (including Healthcare Laws) and/or the Required Permits related to the manufacture of such Product, or (B) any such Required Permit or that any such Required Permit has been revoked or withdrawn, nor has any such Governmental Authority issued any order or recommendation stating that the development, testing and/or manufacturing of such Product by such Person should cease;

(v)        Without limiting the generality of Section 5.30(a)(i) above, with respect to any Product marketed, leased, rented, or sold by any Loan Party or any Subsidiary of any Loan Party, such Person shall have received, and such Product shall be the subject of, all Required Permits needed in connection with the marketing and sales of such Product as currently being marketed, leased, rented, or sold by such Person, and such Person has not received any notice from any applicable Governmental Authority, including the FDA, that such Governmental Authority is conducting an investigation or review of any such Required Permit or approval or that any such Required Permit has been revoked or withdrawn, nor has any such Governmental Authority issued any order or recommendation stating that such marketing or sales of such Product cease or that such Product be withdrawn from the marketplace; and

(vi)        the Loan Parties and their Subsidiaries have not experienced any significant failures in their manufacturing of any Product such that the amount of such Product successfully manufactured by them in accordance with all specifications thereof and any required payments related thereto in any month shall decrease significantly with respect to the quantities of such Product produced in the prior month.

102

(c)        Neither the execution nor performance by any Loan Party of any Loan Documents, nor the exercise of any remedies by any party thereunder, will adversely affect any of the Required Permits.

**5.31**    **OFAC**.  Neither any Loan Party nor any Subsidiary or any Affiliate thereof is in violation of any of the Sanctions.  Neither any Loan Party nor any Subsidiary thereof, nor to the knowledge of such Loan Party or any of its Subsidiaries, any director, officer, employee, agent, Affiliate or representative thereof (a) is a Sanctioned Person or a Sanctioned Entity, (b) has its assets located in a Sanctioned Entity, (c) derives revenues from investments in, or transactions with a Sanctioned Person or a Sanctioned Entity or (d) is owned or controlled by a Sanctioned Entity or a Sanctioned Person.  No part of the proceeds of the Loans will be used, directly or indirectly, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as underwriter, advisor, investor, or otherwise).

## ARTICLE 6

## AFFIRMATIVE COVENANTS

On the Closing Date and at all times thereafter until and including the Termination Date, the Loan Parties shall and shall cause each Subsidiary to:

**6.01**    **Financial Statements**.  Deliver to the Administrative Agent for the benefit of each Lender:

(a)        Annual Financial Statements.  As soon as available, but in any event within one hundred and twenty (120) days after the end of each Fiscal Year (commencing with the Fiscal Year ending December 31, 2018) of the Loan Parties and their Subsidiaries, consolidated balance sheets of the Loan Parties and their Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of income or operations, retained earnings, shareholders' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures as of the end of and for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, and in the case of the consolidated financial statements audited and accompanied by a report and opinion of KPMG LLP or other independent certified public accountants of nationally recognized standing reasonably acceptable to the Administrative Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification, explanation or exception or any qualification, explanation or exception as to the scope of such audit;

(b)        Quarterly Financial Statements.  As soon as available, but in any event within forty-five (45) days after the end of each of the first three (3) Fiscal Quarters (commencing with the Fiscal Quarter ending March 31, 2019) of each Fiscal Year of the Loan Parties and their Subsidiaries, consolidated balance sheets of the Loan Parties and their Subsidiaries as at the end of such Fiscal Quarter, and the related consolidated statements of income or operations, retained earnings, shareholders' equity and cash flows for such Fiscal Quarter and for the portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures as of the end of and for the corresponding Fiscal Quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year, all in reasonable detail and certified by a Responsible Officer of the Borrower Representative as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of Loan Parties and their Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

103

(c)      Management Discussion and Analysis.  Concurrently with any delivery under clause (a) or (d) of this Section 6.01 (with respect to clause (d), solely in the case of financial statements with respect to a month that coincides with the end of any Fiscal Quarter), a management discussion and analysis describing any differences in the reported financial results as between the periods covered and that in the same periods during the immediately preceding Fiscal Year, and as between such periods and the same periods included in the budget delivered pursuant to Section 6.02(c) below, which shall include, among any other information or explanation reasonably requested by the Administrative Agent, an explanation of any revenues, Consolidated EBITDA, Consolidated Capital Expenditures and new or lost customers that would assist the Lenders to better understand the results being reported; and

(d)      Monthly Reports.  As soon as available, but in any event within thirty (30) days after the end of each calendar month of the Loan Parties and their Subsidiaries, consolidated balance sheets of the Loan Parties and their Subsidiaries as at the end of such month, and the related consolidated statements of income or operations, retained earnings, shareholders' equity and cash flows for such month, setting forth in each case in comparative form the figures as of the end of and for the corresponding month of the previous Fiscal Year and to any budget provided pursuant to Section 6.02(c), all in reasonable detail and certified by a Responsible Officer of the Borrower Representative as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of the Loan Parties and their Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes.

**6.02**      **Certificates; Other Information**.  Deliver to the Administrative Agent for the benefit of each Lender, in form and detail satisfactory to the Administrative Agent:

(a)      Accountant Certification.  Concurrently with the delivery of the financial statements referred to in Section 6.01(a), a certificate of its independent certified public accountants certifying such financial statements;

(b)      Compliance Certificate.  Concurrently with the delivery of the financial statements referred to in Sections 6.01(a) and 6.01(b), a duly completed Pro Forma Compliance Certificate executed by a Responsible Officer of the Borrower Representative, and such Pro Forma Compliance Certificate shall: (i) include such supplements to Schedules 5.13, 5.17, 5.20(a), 5.20(b), and 5.20(c) as are necessary such that, as supplemented, such Schedules would be accurate and complete as of the date of such Pro Forma Compliance Certificate, provided, however, that in the event that any item included in such supplement shall constitute, result in or disclose a Default or an Event of Default hereunder, in no event shall the delivery of such supplement constitute a waiver of such Default or Event of Default by the Administrative Agent or any Lender, (ii) specify any information required to be delivered pursuant to the Security Agreement that has not already been identified in a written notice delivered to the Administrative Agent in accordance with the Security Agreement, and (iii) either confirm that there has been no material change in the Loan Parties' insurance coverage since delivery of the immediately prior Pro Forma Compliance Certificate or identify any such change thereto;

(c)      Annual Budget.  Within sixty (60) days after the end of each Fiscal Year, the annual business plan and budget of the Loan Parties and their respective Subsidiaries containing, among other things, projected financial statements (including, without limitation, consolidated balance sheets of the Loan Parties and their Subsidiaries as at the end of each such Fiscal Quarter, and the related consolidated statements of income or operations, retained earnings, shareholders' equity and cash flows for each such Fiscal Quarter) for each Fiscal Quarter through the Term Loan Maturity Date;

(d)      Audit Letters.  Copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of

104

the Loan Parties and their Subsidiaries by independent accountants in connection with the accounts or books of the Loan Parties and their Subsidiaries, or any audit of any of them;

(e)    <u>Public Company Reporting</u>.  (i) to the extent that any Loan Party is a public company, promptly after the same are available (and in any event within ten (10) days thereof), copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of any Loan Party, and copies of all annual, regular, periodic and special reports and registration statements which any Loan Party may file or be required to file with the SEC under Section 13 or 15(d) of the Exchange Act or to a holder of any Indebtedness owed by any Loan Party or any Subsidiary in its capacity as such a holder and not otherwise required to be delivered to the Administrative Agent pursuant hereto, (ii) all reports and written information to and from the United States Environmental Protection Agency, or any state or local agency responsible for environmental matters, the United States Occupational Health and Safety Administration or any successor agencies or authorities concerning environmental, health or safety matters, and (iii) all material reports and written information to and from any state or local agency responsible for health and safety matters, or any successor agencies or authorities concerning environmental, health or safety matters;

(f)    <u>Insurance Report</u>.  By the last day of each Fiscal Year, a report in form and substance reasonably satisfactory to Administrative Agent outlining all material insurance coverage maintained as of the date of such report by the Loan Parties and their Subsidiaries and all material insurance coverage planned to be maintained by the Loan Parties and their Subsidiaries in the immediately succeeding Fiscal Year;

(g)    <u>Annual Collateral Verification</u>.  Concurrently with the delivery of the financial statements referred to in <u>Section 6.01(a)</u>, an officer's certificate (i) either confirming that there has been no change in the information set forth in the then existing schedules to the Security Agreement or identifying any such changes thereto and (ii) certifying that all UCC financing statements (including fixtures filings, as applicable) or other appropriate filings, recordings or registrations, have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction identified pursuant to clause (i) above to the extent necessary to protect and perfect the security interests under the Loan Documents for a period of not less than eighteen (18) months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period);

(h)    <u>Real Property Leases</u>.  Within forty-five (45) days after the end of each Fiscal Quarter, a report in form and substance satisfactory to the Administrative Agent identifying: (i) all Real Property lease agreements to which any Loan Party is a party, (ii) the property governed by such Real Property lease agreements, (iii) the expiration dates of such lease agreements, and (iv) the amount of rental payments due under each lease agreement and such other information as the Administrative Agent may reasonably request; and

(i)    <u>Additional Information</u>.  Promptly (and in any event within two (2) days after a request therefor), such additional information (including Medicare and Medicaid cost reports and audits) regarding the business, financial or corporate affairs of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request (including as required under the Patriot Act and the Beneficial Ownership Regulation).

6.03    <u>Notices</u>.

(a)    Promptly (and in any event within two (2) Business Days) notify the Administrative Agent and each Lender in writing of the occurrence of any Default or Event of Default.

(b)        Promptly (and in any event within two (2) Business Days) notify the Administrative Agent and each Lender in writing of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)        Promptly (and in any event within two (2) Business Days) notify the Administrative Agent and each Lender in writing of the occurrence of any ERISA Event.

(d)        Promptly (and in any event within two (2) Business Days) notify the Administrative Agent and each Lender in writing of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary.

(e)        Promptly (and in any event within two (2) Business Days), notify the Administrative Agent and each Lender, in writing, of the threat or institution of, or any material development in, any Proceeding against or affecting any Loan Party (i) in which the amount involved or relief sought is in excess of $1,000,000, (ii) which could reasonably be expected to have a Material Adverse Effect, (iii) which seeks injunctive relief, (iv) which alleges criminal misconduct by any Loan Party, (v) which alleges material violations of any Laws or Governmental Approvals, or (vi) which alleges the violation of any law regarding, or seeks remedies in connection with, any Environmental Liability.

(f)        Promptly (and in any event within two (2) Business Days of such event), notify the Administrative Agent and each Lender, in writing, of (i) any loss, damage or destruction to the Collateral in the amount of $1,000,000 or more individually, whether or not covered by insurance and (ii) any change in the information which would require a material correction or material addition to Schedule 1 to the Security Agreement.

(g)        Immediately notify the Administrative Agent and each Lender, in writing, upon the occurrence of, upon becoming aware of, or upon receipt of notice from a third party of, (i) any Loan Party's default pursuant to the terms of any Material Contract or lease to which such Loan Party is a party or (ii) the termination of, or the intent or threat to terminate, any such Material Contract or lease.

(h)        Upon the written request of the Administrative Agent following the occurrence of any event or the discovery of any condition which the Administrative Agent or the Required Lenders reasonably believe has caused (or could be reasonably expected to cause) the representations and warranties set forth in Section 5.09 to be untrue in any material respect, furnish or cause to be furnished to the Administrative Agent, at the Loan Parties' expense, a report of an environmental assessment of reasonable scope, form and depth, (including, where appropriate, invasive soil or groundwater sampling) by a consultant reasonably acceptable to the Administrative Agent as to the nature and extent of the presence of any Hazardous Materials on any Facilities and as to the compliance by any Loan Party or any of its Subsidiaries with Environmental Laws at such Facilities.  If the Loan Parties fail to deliver such an environmental report within forty-five (45) days after receipt of such written request then the Administrative Agent may arrange for same, and the Loan Parties hereby grant to the Administrative Agent and its representatives access to the Facilities to reasonably undertake such an assessment (including, where appropriate, invasive soil or groundwater sampling).  The reasonable cost of any assessment arranged for by the Administrative Agent pursuant to this provision will be payable by the Loan Parties on demand and added to the obligations secured by the Collateral Documents.

(i)        Promptly notify the Administrative Agent and each Lender of any Loan Party's receipt of notice of any citation, any investigation or audit, or pending or threatened proceedings relating to, any material violation by any Loan Party of any Healthcare Law, including, without regard to

106

materiality, (x) any investigation or audit or proceeding involving violation of any of the Medicare and/or Medicaid fraud and abuse provisions and (y) any criminal or civil investigation initiated, claim filed or disclosure required by the Office of Inspector General, the Department of Justice, CMS (formerly HCFA), or any other Governmental Authority.

(j)      Promptly notify the Administrative Agent and each Lender of any Loan Party's receipt of a written recommendation from any Governmental Authority or other regulatory body that such Loan Party should have its licensure, provider or supplier number or accreditation suspended, revoked, or limited in any material way, or have its eligibility to participate in Medicare, Medicaid or any other government program to accept assignments or rights to reimbursement under Medicaid, Medicare, or any other government program regulations suspended, revoked, or limited in any material way.

(k)      Any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in such certification.

(l)      In addition to and not in limitation of any other provision of this Agreement, it is understood and agreed that Borrower Representative shall (a) within two (2) Business Days notify the Administrative Agent and each Lender of any material adverse developments related to that certain subpoena dated July 11, 2017 and issued to Borrower Representative or any other Loan Party by the United States Attorneys' Office for the Eastern District of Pennsylvania pursuant to 18 U.S.C. § 3486 (the "Subpoena"), (b) shall participate in a phone call with the Administrative Agent and the Lenders quarterly, at the request of the Administrative Agent, in order to provide an update on the status of the Subpoena, relevant related details and what action the Loan Parties have taken over the course of the previous quarter and propose to take with respect thereto, and (c) shall provide such other documents, instruments, agreements and information related to the Subpoena as reasonably requested by the Administrative Agent and each Lender.

Each notice pursuant to this Section 6.03 shall be accompanied by a statement of a Responsible Officer of the Borrower Representative setting forth details of the occurrence referred to therein and stating what action the Borrowers have taken and propose to take with respect thereto.  Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

6.04     **Payment of Obligations; Tax Returns.**

(a)      Pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all federal, state and other material tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being Properly Contested; and (b) all lawful claims which, if unpaid, would by law become a Lien upon its Property unless the same are being Properly Contested.

(b)      Timely file or cause to be timely filed all federal, state and other material tax returns required to be filed.

6.05     **Preservation of Existence, Material Contracts, Etc.**

(a)      Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or Section 7.05.

(b)        Preserve, renew and maintain in full force and effect its good standing and qualification to do business under the Laws of the jurisdiction of its organization and in any other jurisdiction where failure to so maintain good standing or qualification would have or would constitute a Material Adverse Effect.

(c)        Preserve, renew and maintain all Governmental Approvals as are necessary for the conduct of its business as currently conducted and herein contemplated.

(d)        Preserve, register and renew whenever applicable all of its material registered patents, copyrights, trademarks, trade names and service marks as are necessary for the conduct of its business as currently conducted and herein contemplated.

(e)        Maintain all Material Contracts to which it is a party without default or right of any counterparty thereto to terminate or accelerate thereunder unless replaced with one or more alternative contracts of substantially equivalent value.

**6.06**    **Maintenance of Properties**.

(a)        Maintain, preserve and protect all of its property owned or used in the operation of its business in good working order and condition, ordinary wear and tear excepted.

(b)        Make all necessary repairs thereto and renewals and replacements thereof.

(c)        Use the standard of care typical in the industry in the operation and maintenance of its Facilities.

**6.07**    **Maintenance of Insurance**.  Maintain or cause to be maintained, with financially sound and reputable insurers rated not less than A-, Class VII by Best's, commercial general liability insurance, professional liability insurance, product liability insurance, business interruption insurance, pollution liability insurance and all risk property insurance, in each case with respect to liabilities, losses or damage in respect of the assets, properties and businesses of each Loan Party as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks, and in amounts and otherwise on such terms and conditions as shall be customary for such Persons (including perils of flood, quake and/or windstorm, as applicable) and reasonably acceptable to the Administrative Agent.  Without limiting the generality of the foregoing, if the Property or any part thereof is identified by the Secretary of Housing and Urban Development as being situated in an area now or subsequently designated as having special flood hazards (including, without limitation, those areas designated as Zone A or Zone V), flood insurance in compliance with applicable flood insurance Laws and in an amount equal to the lesser of: (x) the minimum amount required, under the terms of coverage, to compensate for any damage or loss on a replacement basis (or the unpaid balance of the Obligations if replacement cost coverage is not available for the type of building insured); or (y) such lesser amount as may be required by Administrative Agent; provided, such amount not to be less than the amount required under any applicable flood insurance Laws.  Each such policy of insurance shall (i) name Administrative Agent, on behalf of each Lender as an additional insured by endorsement thereunder as its interests may appear, (ii) in the case of each property insurance policy, contain a lender's loss payable clause or endorsement, satisfactory in form and substance to Administrative Agent, that names Administrative Agent, on behalf of Lenders, as the lender's loss payee thereunder and (iii) provide for at least thirty (30) days' prior written notice to Administrative Agent of any modification or cancellation of such policy.  The Administrative Agent and Secured Parties have no responsibility for premiums, warranties or

representations to underwriters. The Loan Parties or their insurance broker shall provide a certificate of insurance upon each policy renewal or replacement. In the event Borrowers fail within ten (10) Business Days after Administrative Agent's request to provide Administrative Agent with evidence of the insurance coverage required by this Agreement, Administrative Agent may purchase insurance at Borrowers' expense to protect the Administrative Agent's interests in the Collateral. This insurance may, but need not, protect Borrowers' interests. The coverage purchased by Administrative Agent may, but need not, pay any claim made by any Loan Party or any claim that is made against any Loan Party in connection with the Collateral. Loan Parties may later cancel any insurance purchased by Administrative Agent, but only after providing Administrative Agent with evidence that Loan Parties have obtained insurance as required by this Agreement. If Administrative Agent purchases insurance for the Collateral, to the fullest extent provided by law, Loan Parties will be responsible for the costs of that insurance, including interest and other charges imposed by Administrative Agent in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the Obligations. The costs of the insurance may be more than the cost of insurance Loan Parties are able to obtain on their own.

**6.08**    **Compliance with Laws**. Comply in all material respects with the requirements of all Laws and Governmental Approvals applicable to it (including Environmental Laws) and all orders, writs, injunctions and decrees applicable to it or to its business or Property, except in such instances in which such requirement of Law or order, writ, injunction or decree is being Properly Contested or where failure to comply could not reasonably be expected to have a Material Adverse Effect. The Loan Parties will (i) other than with respect to a Voluntary Termination, maintain in full force and effect, and free from restrictions, probations, conditions or known conflicts which would materially impair the use or operation of any healthcare or other business conducted or hereafter conducted or of the Business as it is currently conducted, all Permits necessary under Healthcare Laws to continue to bill or receive payment or reimbursement under all Third Party Payor Programs in which any Loan Party or the Business participates as of the date of this Agreement or any time hereafter, and (ii) provide to the Administrative Agent upon request, an accurate, complete and current list of all participation agreements with Third Party Payors with respect to the Business and the business of each Loan Party (collectively, "Participation Agreements"). Other than with respect to a Voluntary Termination, the Loan Parties will at all times comply in all material respects with all requirements, contracts, conditions and stipulations applicable to such Loan Party necessary in order to maintain in good standing and without default or limitation under all such Participation Agreements.

**6.09**    **Books and Records**.

(a)    Maintain proper books of record and account, in which full, true and correct entries shall be made of all financial transactions and matters involving the assets and business of such Loan Party or such Subsidiary, as the case may be, in each case in accordance with GAAP.

(b)    Maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over such Loan Party or such Subsidiary, as the case may be.

**6.10**    **Inspection Rights**. Permit (a) representatives and independent contractors of the Administrative Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and conduct audits and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Loan Parties; provided, however, that absent the existence of a Default or Event of Default, the Loan Parties shall be liable for no more than one

109

(1) such inspection in any Fiscal Year, and (b) representatives and independent contractors of the Administrative Agent to conduct an annual audit of the Collateral at the expense of the Loan Parties and upon reasonable advance notice to the Loan Parties, provided, that when a Default or an Event of Default exists the Administrative Agent (or any of its respective representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and without advance notice and, in the case of Collateral audits, as frequently as deemed necessary by the Administrative Agent.  A representative of each Lender shall have the right to accompany the Administrative Agent in connection with all such inspections, audits and examinations (at such Lender's sole cost and expense if a Default or an Event of Default has not occurred and is continuing).

**6.11**    **Use of Proceeds**.

(a)    (i) Use the proceeds of the Initial Term Loan to (x) refinance Indebtedness of the Loan Parties and their Subsidiaries under the Original Loan Agreement, (y) pay transaction costs, fees and expenses related to the consummation of the transactions contemplated under this Agreement, and (z) make distributions in an aggregate amount equal to $142,736,452 to holders of Capital Stock of Holdings as set forth in Section 2.5(ii) of the Note and Unit Purchase Agreement (the "Closing Date Distributions").

(ii) Use the proceeds of the Delayed — Draw Term Loans solely to finance Permitted Acquisitions and to pay fees and transaction costs associated with such Permitted Acquisitions.

(iii) Use the proceeds of each Incremental Facility consisting of Term Loans solely to finance Permitted Acquisitions and to pay fees and transaction costs associated with such Permitted Acquisitions.

(b)    Use proceeds of the Revolving Loans and Swingline Loans (i) in an amount not to exceed $25,000,000 to finance working capital, make Capital Expenditures, and for other general corporate purposes; and (ii) in an amount not to exceed $50,000,000 solely to finance Permitted Acquisitions and to pay fees and transaction costs associated with such Permitted Acquisitions.

(c)    Notwithstanding the foregoing, in no event shall the proceeds of the Credit Extensions be used in contravention of any Law or of any Loan Document.

**6.12**    **Additional Subsidiaries**.  Simultaneously with (or such longer period as the Administrative Agent may provide at its sole option) any Acquisition or the formation of any Subsidiary:

(a)    notify the Administrative Agent thereof in writing, together with (i) jurisdiction of formation, (ii) number of shares of each class of Capital Stock outstanding, (iii) number and percentage of outstanding shares of each class owned (directly or indirectly) by any Loan Party or any Subsidiary and (iv) number and effect, if exercised, of all outstanding options, warrants, rights of conversion or purchase and all other similar rights with respect thereto; and

(b)    simultaneously with a Permitted Acquisition, or within thirty (30) days (in each case, or such later date as may be approved in writing by the Administrative Agent at its sole option) of any Subsidiary being formed, cause each Subsidiary formed or acquired in connection with such Permitted Acquisition, other than an Excluded Subsidiary or an Excluded Foreign Subsidiary, to (A) become a Borrower or Guarantor (to be determined by the Administrative Agent absent the prior direction of the Required Lenders in their sole discretion) by executing and delivering to the Administrative Agent a joinder agreement or such other document as the Administrative Agent may reasonably request for such purpose (including as required under the Security Agreement), and (B) deliver to the Administrative

110

Agent documents of the types referred to in Sections 4.01(b), (c), and (d) and take any actions required under Section 6.14, and, if requested by the Administrative Agent, favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (A)), all in form, content and scope reasonably satisfactory to the Administrative Agent.

**6.13**   **ERISA Compliance**.  Do, and cause each of its ERISA Affiliates to do, each of the following: (a) maintain each ERISA Plan in compliance in all material respects with the applicable provisions of ERISA, the Internal Revenue Code and other federal or state Law; (b) cause each ERISA Plan that is qualified under Section 401(a) of the Internal Revenue Code to maintain such qualification; and (c) make all required contributions to any ERISA Plan subject to Section 412, Section 430 or Section 431 of the Internal Revenue Code.

**6.14**   **Further Assurances**.

(a)   To the extent not delivered to the Administrative Agent on or before the Closing Date (including in respect of after-acquired property and Persons that become Subsidiaries of any Loan Party after the Closing Date), the Loan Parties will promptly (and in any event within thirty (30) days) deliver to the Administrative Agent such modifications to the terms of the Loan Documents (or, to the extent applicable as determined by the Administrative Agent, such other documents, including, within thirty (30) days of such acquisition, Deposit Account Control Agreements), in each case in form and substance reasonably satisfactory to the Administrative Agent and as the Administrative Agent reasonably deems necessary or advisable in order to ensure that each Loan Party (including any Person required to become a Guarantor or Borrower pursuant to Section 6.12 hereof) shall effectively grant to the Administrative Agent, for the benefit of the Secured Parties, a valid and enforceable security interest in all of its property, including all of its Capital Stock (other than Excluded Property), as security for the Obligations of such Loan Party.

(b)   Without limiting the generality of the above, the Loan Parties will cause (a) 100% of the issued and outstanding Capital Stock owned by the Loan Parties of each Domestic Subsidiary and (b) 65% (or such greater percentage that could not reasonably be expected to cause any material adverse tax consequences) of the issued and outstanding Capital Stock owned by the Loan Parties entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and 100% of the issued and outstanding Capital Stock not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) in each Foreign Subsidiary directly owned by a Loan Party or any Foreign Subsidiary Holdco owned by a Loan Party to be subject at all times to a first priority, perfected Lien in favor of the Administrative Agent pursuant to the terms and conditions of the Collateral Documents or such other security documents as the Administrative Agent shall request; provided, however, that the Loan Parties shall not be required to pledge the Capital Stock of any non-Wholly Owned Subsidiary to the extent (a) consent of the minority investor is required pursuant to the Organizational Documents of such Excluded Subsidiary (and such consent was not required in connection with or in contemplation or anticipation of such pledge) and not obtained after using commercially reasonable efforts and (b) such non-Wholly Owned Subsidiary is an Excluded Subsidiary.

(c)   With respect to each Account for which either the perfection, enforceability, or validity of the Administrative Agent's Liens in such Account, or the Administrative Agent's right or ability to obtain direct payment to the Administrative Agent of the proceeds of such Account, is governed by any federal, state, or local statutory requirements other than those of the UCC, the Loan Parties will take such steps as the Administrative Agent may from time to time reasonably request to ensure such perfection, enforceability, validity of the Lien or right to obtain direct payment, including compliance with the Federal Assignment of Claims Act of 1940.

111

(d)        If an Event of Default exists, each Loan Party shall grant (and in any event, shall be deemed to grant) a first priority, perfected Lien (except for Permitted Liens) on any additional Property of the Loan Parties (including Excluded Property other than as described in clauses (e), (h) and (j) of the Excluded Property definition) in favor of Administrative Agent for the benefit of itself, the other Lenders and the other Secured Parties to secure the Obligations pursuant to the terms and conditions of the Collateral Documents as requested by Administrative Agent in its sole discretion.

(e)        Each Loan Party will, and will cause each Subsidiary to, at its own cost and expense, cause to be promptly and duly taken, executed, acknowledged and delivered all such further acts, documents and assurances as may from time to time be necessary or as the Administrative Agent or the Required Lenders may from time to time reasonably request in order to carry out the intent and purposes of the Loan Documents and the transactions contemplated thereby, including all such actions to establish, create, preserve, protect and perfect a first priority Lien (subject only to Permitted Liens) in favor of the Administrative Agent for the benefit of the Lenders on the Collateral (including Collateral acquired after the Closing Date), including on any and all assets of each Loan Party (other than Excluded Property), whether now owned or hereafter acquired.

(f)        The Loan Parties shall deliver to the Administrative Agent fully-executed agreements, in form and substance satisfactory to the Administrative Agent, between the Loan Parties, the Administrative Agent and the Loan Parties' vendors (including the Brightree Collateral Assignment Agreement to be delivered in accordance with Section 4.01(j)) that provide off-site data storage, network hosting or management, shared application services or other "cloud-based" services to any Loan Party, which shall provide the Administrative Agent with such access to the Loan Parties' billing and Accounts records as the Administrative Agent deems necessary or helpful in connection with the Administrative Agent's and Lenders' audit and inspection rights under the Loan Documents and the collection or realization of or on the Collateral

6.15    **Covenant with Respect to Environmental Matters**.  In respect of all environmental matters:

(a)        comply in all material respects with the requirements of all federal, state, and local Environmental Laws applicable to the Loan Parties or their Property; notify the Administrative Agent promptly in the event of any spill, release or disposal of Hazardous Material on, or hazardous waste pollution or contamination affecting, the Facilities in material violation of applicable Environmental Laws of which a Loan Party has actual knowledge; forward to the Administrative Agent promptly any written notices relating to such matters received from any Governmental Authority; and pay when due any fine or assessment against the Facilities, provided, that the Loan Parties shall not be required to pay any such fine or assessment so long as the validity thereof shall be Properly Contested; and provided further that, in any event, payment of any such fine or assessment shall be made before any of their Property shall be subjected to a Lien or be seized or sold in satisfaction thereof;

(b)        promptly notify the Administrative Agent upon becoming aware of any fact or change in circumstances that would be expected to cause any of the representations and warranties contained in Section 5.09 to cease to be true in all material respects (without duplication of any materiality qualifier therein) for any time before the Termination Date;

(c)        not become involved, and will not knowingly permit any tenant of the Facilities to become involved, in any operations at the Facilities generating, storing, disposing, or handling Hazardous Materials in material violation of applicable Environmental Laws or any other activity that could lead to the imposition on any Lender or the Administrative Agent of any liability, or the imposition on the Loan Parties or the Facilities of any material liability or any lien under any Environmental Laws;

112

(d)        promptly contain or remove any Hazardous Materials found on the Facilities in violation of any applicable Environmental Law, which containment or removal must be done in compliance with applicable Environmental Laws and at the Loan Parties' expense; and the Loan Parties agree that the Administrative Agent has the right, at its sole option but at the Loan Parties' expense, to have an environmental engineer or other representative review the work being done; and

(e)        indemnify, protect, defend and hold harmless each Indemnitee from and against and all liabilities, obligations, losses, damages (including, consequential damages), penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, the reasonable fees and disbursements of counsel for and consultants of such Indemnitees in connection with any investigative, administrative or judicial proceeding, whether or not such Indemnitees shall be designated a party thereto), which may be imposed on, incurred by, or asserted against such Indemnitees (whether direct, indirect, or consequential) now or hereafter arising as a result of any claim for environmental cleanup costs, any resulting damage to the environment and any other environmental claims against any Loan Party, any Lender, the Administrative Agent, any other Indemnitee or the Facilities.  The provisions of this Section 6.15(e) shall continue in effect and shall survive the Termination Date.

6.16    **Covenants with Respect to Real Property**.  With respect to Mortgaged Property acquired by any Loan Party after the Closing Date, deliver to the Administrative Agent within sixty (60) days of the date such Mortgaged Property was acquired, as the case may be, each in form and substance reasonably satisfactory to the Administrative Agent:

(a)        a Mortgage Instrument encumbering the fee interest of any Loan Party in such Mortgaged Property;

(b)        all other Mortgage Supporting Documents required by Administrative Agent with respect to such Mortgaged Property;

(c)        a customary legal opinion of special local counsel for the Loan Parties for the state in which such Mortgaged Property is located in form and substance reasonably acceptable to the Administrative Agent;

(d)        evidence reasonably satisfactory to the Administrative Agent of comprehensive "all risk" insurance with respect to such Mortgaged Property in form and substance satisfactory to the Administrative Agent; and

(e)        an environmental site assessment of such Mortgaged Property from an environmental consulting firm acceptable to the Administrative Agent.

6.17    **Lenders Meetings**.  The Loan Parties will, upon the request of the Administrative Agent, participate in a meeting of the Administrative Agent and Lenders once during each Fiscal Year to be held at the Borrowers' corporate offices (or at such other location as may be agreed to by the Borrowers and the Administrative Agent) at such time as may be agreed to by the Borrowers and the Administrative Agent, provided that during the existence of an Event of Default, meetings may be held more frequently than once per Fiscal Year.

6.18    **Post-Closing Covenants**.  The Loan Parties shall satisfy the requirements and/or provide to the Administrative Agent each of the documents, instruments, agreements and information set forth on Schedule 6.18, in form and substance acceptable to the Administrative Agent, on or before the date

113

specified for such requirement in such Schedule or such later date to be determined by the Administrative Agent, at its sole option, each of which shall be completed or provided in form and substance satisfactory to the Administrative Agent.

**6.19**    **Qualified ECP Guarantors.**  Each Qualified ECP Guarantor hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Agreement in respect of Hedge Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 6.19 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 6.19 or otherwise under this Agreement, as it relates to such other Loan Party, voidable under applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Guarantor under this Section shall remain in full force and effect until each Loan and all other Obligations (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted) have been paid in full and all Commitments and Letters of Credit have been terminated.  Each Qualified ECP Guarantor intends that this Section constitute, and this Section shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**6.20**    **Interest Rate Protection**.  Within ninety (90) days after the Closing Date, the Borrowers shall enter into, and thereafter maintain in full force and effect, Secured Hedge Agreements with coverage in a notional amount of not less than 50% of the outstanding principal amount of the Term Loans and having a term of at least three (3) years commencing after the Closing Date, and otherwise on other terms and conditions reasonably satisfactory to the Administrative Agent.  If the Borrowers are required to maintain such Secured Hedge Agreements and an Incremental Term Loan or a Delayed — Draw Term Loan is subsequently funded, the Borrowers shall have a period of thirty (30) days following such funding to comply with the requirements of this Section 6.20 as to entering into Secured Hedge Agreements with coverage in a notional amount of not less than 50% of the outstanding principal amount of the Term Loan (after taking into account the additional Term Loans funded).

**6.21**    **Covenants Regarding Products and Compliance with Required Permits**.

(a)    Without limiting the generality of Section 6.08, each Loan Party and its Subsidiaries shall comply fully and completely in all material respects with all Required Permits at all times issued by any Governmental Authority, including the FDA, with respect to such development, testing, manufacture, marketing, sales, or leasing of such Product by such Person as such activities are at any such time being conducted by such Person, including the timely filing (after giving effect to any extension duly obtained) of all notifications, reports, submissions, Required Permit renewals, cost reports and other reports of every kind whatsoever required by applicable Laws (which reports shall be materially accurate and complete in all material respects and not misleading in any material respect and shall not remain open or unsettled) and shall operate in a manner such that the Required Permits remain in full force and effect.

(b)    Loan Parties and their Subsidiaries shall maintain in full force and effect the Transport and Disposal Agreement or such other agreement in form and substance for the transport and disposal of hazardous wastes with respect to all facilities at which such waste is generated.

**6.22**    **Healthcare Operations**.  Without limiting the generality of the foregoing covenants and to induce the Administrative Agent and the Lenders to enter into this Agreement and to make the Loans and other credit accommodations contemplated hereby, the Loan Parties hereby covenant that the Loan Parties will:

114

(a)    timely file or caused to be timely filed (after giving effect to any extension duly obtained), all notifications, reports, submissions, Permit renewals, cost reports and other reports or documents of every kind whatsoever required by Healthcare Laws (which reports will be materially accurate and complete in all material respects and not misleading in any material respect and shall not remain open or unsettled);

(b)    maintain in full force and effect, and free from restrictions, probations, conditions or known conflicts that would materially impair the use or operation of any healthcare or other business conducted or hereafter conducted by any Loan Party, all Permits necessary under Healthcare Laws to carry on the Business of the Loan Parties as it is conducted on the Closing Date or substantially similar thereto; and

(c)    at all times be HIPAA Compliant.

**6.23    Patriot Act; OFAC.**  (a) Comply with the Patriot Act, (b) use no part of the proceeds of the Loans, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, and (c) comply with the Sanctions.

## ARTICLE 7

## NEGATIVE COVENANTS

On the Closing Date and at all times thereafter until and including the Termination Date, no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01    Indebtedness**.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness under the Loan Documents (including Banking Services Obligations);

(b)    Indebtedness of the Loan Parties and their Subsidiaries existing on the Closing Date and set forth in Schedule 7.01 and refinancings and extensions of any such Indebtedness if the representations, warranties, covenants, events of default and other material terms and conditions thereof are not materially less favorable to the obligor thereon or to the Lenders than the Indebtedness being refinanced or extended, and the average life to maturity thereof is greater than or equal to that of the Indebtedness being refinanced or extended, provided, such Indebtedness permitted under the immediately preceding clause shall not (i) include Indebtedness of an obligor that was not an obligor with respect to the Indebtedness being extended, renewed or refinanced or (ii) exceed in a principal amount the Indebtedness being renewed, extended or refinanced;

(c)    purchase money Indebtedness (including obligations in respect of Capital Leases but excluding Synthetic Leases) hereafter incurred by the Loan Parties or any of their Subsidiaries to finance the purchase of fixed assets, provided that (i) such Indebtedness when incurred shall not exceed the purchase price of the asset(s) financed, (ii) no such Indebtedness shall be refinanced for a principal amount in excess of the principal balance outstanding thereon at the time of such refinancing and (iii) the total amount of all such Indebtedness at any time outstanding shall not exceed $40,000,000;

(d)    obligations (contingent or otherwise) of any Loan Party or any Subsidiary existing or arising under any Hedge Agreement to the extent required by Section 6.20;

115

(e)       intercompany Indebtedness permitted under Section 7.03(h), provided that such intercompany Indebtedness is evidenced by a demand note (which may cover all such intercompany Indebtedness) in form and substance satisfactory to the Administrative Agent and pledged and delivered to the Administrative Agent pursuant to the Security Agreement as additional collateral security for the Obligations, and the obligations under such demand note shall be subordinated to the Obligations in a manner satisfactory to the Administrative Agent;

(f)       Indebtedness assumed in connection with (or attaching to assets of a Person that becomes a Subsidiary in connection with) a Permitted Acquisition, provided that (i) the aggregate amount of such Indebtedness shall not exceed $6,000,000 in the aggregate at any time and (ii) such Indebtedness exists at the time such Person becomes a Subsidiary or such Permitted Acquisition occurs and is not created in contemplation of or in connection therewith;

(g)       Guarantees with respect to Indebtedness permitted under this Section 7.01;

(h)       current Indebtedness maturing in less than one (1) year and incurred in the ordinary course of business for raw materials, supplies, equipment, services Taxes or labor;

(i)       so long as in the aggregate such Indebtedness does not exceed $4,000,000, Indebtedness consisting of the financing of insurance premiums in the ordinary course of business or consistent with past practice;

(j)       Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations (including, in each case, letters of credit issued to provide such bonds, guaranties and similar obligations), in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(k)       Indebtedness arising from overdraft facilities and/or the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(l)       Indebtedness due to sellers in connection with Permitted Acquisitions, including any Earn-Out Obligations incurred in connection thereto, so long as (a) with respect to the Verus Merger and subject to clause (d) hereof, the aggregate principal amount of such Indebtedness shall not exceed $12,000,000 at any time outstanding, (b) with respect to the Gould's Acquisition and subject to clause (d) hereof, the aggregate principal amount of such Indebtedness shall not exceed $1,500,000 at any time outstanding, (c) with respect to the Med Way Acquisition and subject to clause (d) hereof, the aggregate principal amount of such Indebtedness shall not exceed $5,000,000 at any time outstanding, (d) each of the Earn-Out Obligations with respect to the Verus Merger, Gould's Acquisition and Med Way Acquisition shall be subordinated to the Obligations to the Administrative Agent and prior to any payments (other than payments solely in Capital Stock (which may not be Disqualified Capital Stock) of Holdings) of Earn-Out Obligations with respect to each of the Verus Merger, Gould's Acquisition and Med Way Acquisition, Administrative Agent shall have received a Pro Forma Compliance Certificate demonstrating that, upon giving effect to such payment on a Pro Forma Basis, (i) the Loan Parties would be in compliance with the financial covenants set forth in Article 8 as of the most recent Fiscal Quarter for which the Loan Parties have delivered financial statements pursuant to Section 6.01(a) or Section 6.01(b), as applicable, (ii) the Consolidated Total Leverage Ratio does not exceed 3.00:1.00 as of the most recent Fiscal Quarter for which the Loan Parties have delivered financial statements pursuant to Section 6.01(a) or Section 6.01(b), as applicable, and (iii) Excess Liquidity as of

116

the date of the payment shall be at least $10,000,000, and (e) for all other Permitted Acquisitions, the aggregate principal amount of such Indebtedness shall not exceed $8,500,000 at any time outstanding;

(m)      [reserved];

(n)      the Gould's Subordinated Note in an aggregate principal amount not to exceed $2,000,000 so long as the obligations thereunder are subject to a Subordination Agreement in form and substance satisfactory to the Administrative Agent (provided, prior to any payments (other than payments solely in Capital Stock (which may not be Disqualified Capital Stock) of Holdings) of principal under the Gould's Subordinated Note, Administrative Agent shall have received a Pro Forma Compliance Certificate demonstrating that, upon giving effect to such payment on a Pro Forma Basis, (i) the Loan Parties would be in compliance with the financial covenants set forth in Article 8 as of the most recent Fiscal Quarter for which the Loan Parties have delivered financial statements pursuant to Section 6.01(a) or Section 6.01(b), as applicable, (ii) the Consolidated Total Leverage Ratio does not exceed 3.00:1.00 as of the most recent Fiscal Quarter for which the Loan Parties have delivered financial statements pursuant to Section 6.01(a) or Section 6.01(b), as applicable, and (iii) Excess Liquidity as of the date of the payment shall be at least $10,000,000); and

(o)      other unsecured Indebtedness in an aggregate principal amount not exceeding $5,000,000 at any time outstanding.

7.02      **Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, other than the following:

(a)      Liens pursuant to any Loan Document;

(b)      Liens existing on the Closing Date and listed on Schedule 7.02;

(c)      Liens (other than Liens imposed under ERISA) for taxes, assessments or governmental charges or levies not yet due or which are being Properly Contested;

(d)      statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen and suppliers and other Liens imposed by law or pursuant to customary reservations or retentions of title arising in the ordinary course of business, provided that such Liens secure only amounts not yet due and payable or, if due and payable, (i) are unfiled and no other action has been taken to enforce the same or (ii) are being Properly Contested;

(e)      segregated cash pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(f)      segregated cash deposits to secure the performance of bids, trade contracts, licenses and leases, statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature (other than Indebtedness) incurred in the ordinary course of business;

(g)      easements, rights-of-way, restrictions and other similar encumbrances affecting Real Property which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value or marketability of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

117

(h)      Liens securing Indebtedness permitted under Section 7.01(c), provided that (i) such Liens do not at any time encumber any Property other than the Property financed by such Indebtedness, (ii) the Indebtedness secured thereby does not exceed the cost or fair market value, whichever is lower, of the Property being acquired on the date of acquisition and (iii) such Liens (unless such Lien is a refinancing a pre-existing Lien) attached to such Property concurrently with or within thirty (30) days after the acquisition thereof;

(i)      leases, non-exclusive licenses or subleases granted to others not interfering in any material respect with the business of any Loan Party or any Subsidiary and not adverse to the interests of the Administrative Agent or the Lenders in any material respect;

(j)      any interest of title of a lessor under, and Liens arising from precautionary UCC financing statements (or equivalent filings, registrations or agreements in foreign jurisdictions) solely evidencing such lessor's interest under, leases permitted by this Agreement;

(k)      normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions holding such deposits;

(l)      Liens of a collection bank arising under Section 4-210 of the UCC on items in the course of collection;

(m)      Liens solely on any cash earnest money deposits made by any Loan Party or any Subsidiary in connection with any letter of intent or purchase agreement in respect of any Investment permitted hereunder;

(n)      all bonds, deposits and security instruments or other Liens required or imposed by any Governmental Authority or Third Party Payor in connection with the Business of the Loan Parties in the ordinary course of business;

(o)      Liens in favor of the Administrative Agent, L/C Issuer, Support Provider or Swingline Lender on cash collateral securing the obligations of a Defaulting Lender to fund risk participations hereunder;

(p)      Liens consisting of judgment, appeal bonds, judicial attachment liens or other similar Liens arising in connection with court proceedings, provided that the enforcement of such Liens is effectively stayed and all such Liens secure judgments the existence of which do not constitute an Event of Default under Section 9.01(h);

(q)      Liens (junior in priority and subordinated in all respects to the Liens securing the Obligations in a manner satisfactory to the Administrative Agent through at least one hundred and eighty (180) days following the Term Loan Maturity Date (as such date may be extended through any amendment, restatement, supplement or other modification to this Agreement)) securing Indebtedness permitted under Section 7.01(l); and

(r)      Liens (junior in priority to the Liens securing the Obligations) not otherwise permitted hereunder so long as neither (i) the aggregate outstanding principal amount of the obligations secured thereby nor (ii) the aggregate fair market value (determined as the date such Lien is incurred) of the assets subject thereto exceeds (as to the Borrowers and all Subsidiaries) $4,000,000 at any one time.

118

7.03    **Investments**.  Make any Investments, except:

(a)    cash or Cash Equivalents;

(b)    accounts receivable created, acquired or made and trade credit extended in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(c)    Investments consisting of stock, obligations, securities or other property received in settlement of accounts receivable (created in the ordinary course of business) from bankrupt obligors;

(d)    Investments existing as of the Closing Date and set forth in Schedule 7.03; provided that the amount of such Investment is not increased after the Closing Date except in accordance with this Section 7.03;

(e)    Guarantees permitted by Section 7.01;

(f)    Permitted Acquisitions and Capital Expenditures otherwise permitted hereunder;

(g)    loans or advances to officers, directors, managers, consultants and employees of any Loan Party for travel, entertainment, relocation and analogous ordinary business purposes in the ordinary course of business or constituting advances in payroll payments and expenses or relating to indemnification or reimbursement in respect of liability relating to their serving in any capacity in the ordinary course of business; provided, such loans and advances at any time outstanding shall not in the aggregate exceed $1,000,000;

(h)    intercompany Investments by any Loan Party in any other wholly owned Loan Party (excluding Intermediate Holdings);

(i)    non-cash purchase money loans and advances to employees, directors and officers to finance the purchase by such Persons of Capital Stock issued by Intermediate Holdings; provided, such loans and advances at any time outstanding shall not in the aggregate exceed $4,000,000;

(j)    to the extent constituting an Investment, any Secured Hedge Agreement entered into for risk management purposes and not speculative purposes;

(k)    Investments constituting deposits made in connection with the purchase of goods or services in the ordinary course of business or otherwise constituting deposits permitted pursuant to Section 7.02(f), (k) or (n);

(l)    Investments in the ordinary course of business and consistent with past practice, consisting of (i) endorsements for collection or deposit, (ii) customary trade arrangements with customers, (iii) loans or advances made to distributors not to exceed in the aggregate at any time $250,000 so long as no Default or Event of Default exists at the time such loan or advance is made or would result from the making of such loan or advance, (iv) advances of payroll payments to employees or other advances of salaries or compensation (including advances against commissions) to employees and sales representatives not to exceed in the aggregate at any time $500,000 so long as no Default or Event of Default exists at the time such loan or advance is made or would result from the making of such loan or advance and (v) Investments maintained in connection with any Loan Party's deferred compensation plan approved by such Loan Party's board of directors or managers, as applicable;

119

(m)    Investments in Excluded Subsidiaries and non-Wholly Owned Subsidiaries in an aggregate amount (as of the date such Investment is made) not to exceed $3,000,000 prior to the Termination Date; and

(n)    so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom, other Investments by the Loan Parties and their Subsidiaries (other than Investments in Persons who are not Loan Parties) not exceeding in the aggregate the sum of (i) $3,000,000 plus (ii) any returns (including dividends, interest, distributions and returns of principal) actually received by the Loan Parties in cash in respect of Investments made under Section 7.03(k).

7.04    **Fundamental Changes**.  Merge, dissolve, liquidate, consolidate with or into another Person; provided, however, that, subject to the terms of Sections 6.12 and 6.14 (a) any Loan Party other than Intermediate Holdings may merge or consolidate with any other Loan Party other than Intermediate Holdings, provided that, if such transaction involves a Borrower, such Borrower is the surviving entity, (b) any Subsidiary may merge with any Person that is not a Loan Party in connection with a Disposition permitted under Section 7.05, and (c) any Wholly Owned Subsidiary may dissolve, liquidate or wind up its affairs at any time provided that such dissolution, liquidation or winding up, as applicable, could not reasonably be expected to have a Material Adverse Effect and substantially all of its assets and business is transferred to a Loan Party in any manner satisfactory to the Administrative Agent.  Notwithstanding anything in the foregoing to the contrary, no merger or consolidation otherwise permitted under any of the foregoing provisos shall be permitted if any Loan Party would not be Solvent after giving effect to such merger or consolidation.

7.05    **Dispositions**.  Make any Disposition other than:

(a)    sales of inventory in the ordinary course of business of the Loan Parties and their Subsidiaries;

(b)    any sale, transfer or other disposition of Property by any Loan Party to any other Loan Party so long as no Loan Party would fail to be Solvent after giving effect to such sale, transfer or other disposition;

(c)    so long as no Default or Event of Default exists or would result therefrom, (i) sell, transfer or otherwise dispose of equipment for fair market value not in excess of $100,000 per transaction (or series of related transactions) and $500,000 in any Fiscal Year of the Loan Parties, and (ii) sell or trade-in equipment in connection with the acquisition of replacement equipment;

(d)    the sale, transfer or other disposition of obsolete or worn out tangible Property which is no longer used or useful in the conduct of business of the Loan Parties and their Subsidiaries;

(e)    any Involuntary Disposition by any Loan Party or any Subsidiary;

(f)    any non-exclusive license of any IP Rights by any Loan Party or any Subsidiary in the ordinary course of business, provided that such license does not materially impair the value of any such IP Right as Collateral or the security interest of the Administrative Agent granted under the Loan Documents;

(g)    the sale, transfer or other disposition of accounts receivable constituting bad debts in connection with the compromise, settlement or collection thereof in the ordinary course of business (and not as part of a bulk sale or receivables financing); and

120

(h)      other Dispositions by the Borrowers and their Subsidiaries the proceeds (valued at the principal amount in the case of non-cash proceeds consisting of notes or other evidences of Indebtedness and valued at fair market value in the case of all other non-cash proceeds) of which do not exceed $2,000,000 in the aggregate in any Fiscal Year, provided that (i) no such Disposition involves the sale or other disposition of a minority equity interest in the Borrower or any Loan Party (other than Intermediate Holdings to the extent permitted hereunder), (ii) no less than ninety percent (90%) of the proceeds of such Disposition consist of cash or Cash Equivalents received contemporaneously with the consummation of such Disposition, (iii) the proceeds received in consideration for such Disposition shall not be less than the fair market value of the Property disposed of, (iv) the Net Cash Proceeds of any such Disposition are applied in the manner specified in Section 2.05(b)(ii) hereof and (v) both immediately before and after giving effect to any such Disposition, no Default or Event of Default exists or would result therefrom.

Notwithstanding the foregoing, nothing in this Section 7.05 shall directly or indirectly permit any Disposition that would result in a Change of Control.

7.06      **Restricted Payments**.  Directly or indirectly declare or make any Restricted Payment or incur any obligation to do so, except that:

(a)      each Subsidiary of the Loan Parties may make Restricted Payments (directly or indirectly) to any Loan Party (other than Intermediate Holdings);

(b)      each Loan Party and each Subsidiary may declare and make non-cash dividend payments or other distributions payable solely in the Capital Stock (other than Disqualified Capital Stock) of the Person making such dividend or distribution;

(c)      the Borrowers may pay expense reimbursement obligations in respect of reasonable and documented third-party out-of-pocket costs incurred by the Sponsor that are reimbursable to the Sponsor by the Borrowers pursuant to management agreements entered into following the Closing Date, so long as (i) such reimbursed costs do not exceed $500,000 in the aggregate in any Fiscal Year, (ii) immediately before and after giving effect to such payment no Default or Event of Default then exists or would result therefrom and (iii) the Loan Parties will be in compliance on a Pro Forma Basis with the financial covenants set forth in Article 8 for the most recently completed four (4) Fiscal Quarter period, after giving effect to such payment;

(d)      the Loan Parties may make Restricted Payments to Holdings to pay for the repurchase, retirement or other acquisition or retirement for value of Capital Stock of Holdings held by any present or former employee or director of Holdings or any of its Subsidiaries pursuant to any employee or director equity plan, employee or director stock option plan or any other employee or director benefit plan or any agreement (including any stock subscription or shareholder agreement) upon such Person's death, disability, retirement or termination of employment or under the terms of any such benefit plan or agreement, provided that (i) the aggregate amount of any such purchases or redemptions shall not exceed $1,750,000 in any Fiscal Year, (ii) no Default or Event of Default then exists or would result therefrom, and (iii) the Loan Parties shall have Excess Liquidity in an amount equal to or greater than $10,000,000;

(e)      the Loan Parties may make Restricted Payments to Holdings, and Holdings may in turn distribute Tax Distributions (which may only be paid annually based on Holdings' audited financial statements or, so long as no Event of Default is then outstanding, in multiple installments, based on Borrower's good-faith and reasonable estimate of income to be generated by Holdings' and its

121

Subsidiaries' business in such year) to allow Parents to meet their tax obligations on such income in a timely manner;

(f)      the Loan Parties may make dividend payments and distributions as required pursuant to (i) Section 14 of that certain operating agreement for Royal Homestar LLC, dated as of March 1, 2013, in the form provided to the Administrative Agent on the Closing Date, (ii) Section 4.02 of that certain operating agreement for Southeast Sleep Holdings, LLC, in the form provided to the Administrative Agent on May 17, 2018, (iii) Section 4.02 of that certain operating agreement for Sleep Therapy, LLC, in the form provided to the Administrative Agent on December 20, 2018, subject to Section 7.10 hereof, and (iv) Section 4.02 of that certain operating agreement for Olean General Healthcare Systems, LLC, in the form provided to the Administrative Agent on May 17, 2018, provided, in each case, that (1) no Default or Event of Default then exists or would result therefrom and (2) the Loan Parties will be in compliance on a Pro Forma Basis with the financial covenants set forth in Article 8 for the most recently completed four (4) Fiscal Quarter period, after giving effect to such dividend payment or distribution;

(g)      the Loan Parties may make Restricted Payments to Holdings (i) to make Preferred Note Cash Interest Payments due and owing at such time under the Preferred Note (without giving effect to any amendment, restatements, supplement or any other modification to such Preferred Note not approved in writing by the Administrative Agent) and (ii) AHYDO Catch-Up Payments, in each case so long as (A) immediately before and after giving effect to such payment no Default or Event of Default then exists or would result therefrom and (B) the Loan Parties will be in compliance on a Pro Forma Basis with the financial covenants set forth in Article 8 for the most recently completed four (4) Fiscal Quarter period, after giving effect to such payment;

(h)      the Loan Parties may make Restricted Payments to Holdings to make Preferred Note PIK Interest Payments due and owing at such time under the Preferred Note (without giving effect to any amendment, restatements, supplement or any other modification to such Preferred Note not approved in writing by the Administrative Agent) so long as (i) immediately before and after giving effect to such payment no Default or Event of Default then exists or would result therefrom, (ii) the Loan Parties will be in compliance on a Pro Forma Basis with the financial covenants set forth in Article 8 (other than with respect to the Consolidated Total Leverage Ratio which is subject to the immediately following clause (iii)) for the most recently completed four (4) Fiscal Quarter period, after giving effect to such payment, and (iii) the Loan Parties will be in compliance on a Pro Forma Basis with a Consolidated Total Leverage Ratio of less than 3.00 to 1.00 for the most recently completed four (4) Fiscal Quarter period, after giving effect to such payment;

(i)      the Loan Parties may make Restricted Payments not otherwise permitted by this Section 7.06 so long as (i) immediately before and after giving effect to such payment no Default or Event of Default then exists or would result therefrom and (ii) the Loan Parties will be in compliance on a Pro Forma Basis with a Consolidated Total Leverage Ratio of less than 1.75 to 1.00 for the most recently completed four (4) Fiscal Quarter period, after giving effect to such payment; and

(j)      the Loan Parties may make Restricted Payments constituting Closing Date Distributions.

7.07    **Change in Nature of Business; Cloud-Based Billing**. Engage to any material extent in any business different from the business conducted by the Loan Parties and their Subsidiaries on the Closing Date and businesses reasonably related thereto or reasonably ancillary, complementary or a reasonable extension, development or expansion of such business.  No Loan Party will utilize or enter into any agreement with any remote access or internet-based/cloud-based billing services or records repository

122

provider without first entering into such agreements with the Administrative Agent and such service provider, in form and substance satisfactory to the Administrative Agent, as the Administrative Agent shall deem necessary or helpful in the collection or realization of or on its Collateral.

7.08     **Transactions with Affiliates and Insiders**.  Enter into or permit to exist any transaction or series of transactions with (a) any Excluded Subsidiary or (b) any officer, director or Affiliate of such Person other than (i) transactions between the Loan Parties, (ii) intercompany transactions expressly permitted by Sections 7.01, 7.03, 7.04, 7.05 or 7.06, (iii) customary and reasonable compensation and reimbursement of expenses of officers and directors, (iv) to the extent permitted by Section 7.06, payment of the Sponsor expense reimbursements, and (v) except as otherwise specifically limited in this Agreement, other transactions which are entered into in the ordinary course of such Person's business on terms and conditions substantially as favorable to such Person as would be obtainable by it in a comparable arm's length transaction with a Person other than an Excluded Subsidiary, officer, director or Affiliate.

7.09     **Burdensome Agreements**.  Enter into or permit to exist any Contractual Obligation that encumbers or restricts the ability of any Loan Party or any Subsidiary to (i) pay dividends or make any other distributions to any Loan Party on its Capital Stock or with respect to any other interest or participation in, or measured by, its profits, (ii) pay any Indebtedness or other obligation owed to any Loan Party, (iii) make loans or advances to any Loan Party, (iv) sell, lease or transfer any of its Property to any Loan Party, (v) grant any Lien on any of its Property to secure the Obligations pursuant to the Loan Documents or any renewals, refinancings, exchanges, refundings or extension thereof or (vi) act as a Loan Party pursuant to the Loan Documents or any renewals, refinancings, exchanges, refundings or extension thereof, except (in respect of any of the matters referred to in clauses (i)-(vi) above) for (A) this Agreement and the other Loan Documents, (B) any document or instrument governing Indebtedness incurred pursuant to Section 7.01(c), provided that any such restriction contained therein relates only to the asset or assets constructed or acquired in connection therewith, (C) any Permitted Lien or any document or instrument governing any Permitted Lien, provided that any such restriction contained therein relates only to the asset or assets subject to such Permitted Lien, (D) customary restrictions and conditions contained in any agreement relating to the sale of any Property permitted under Section 7.05 pending the consummation of such sale, and (E) customary restrictions on assignment contained in leases, licenses and other contracts entered into in the ordinary course of business with third parties and not for the purpose of circumventing any provision of this Agreement.

7.10     **Use of Proceeds**.  Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose; provided, however, that no proceeds of any Credit Extension shall be received in any manner by any Excluded Subsidiary, including by way of any Investment or distribution of any Loan Party other than as expressly permitted herein.

7.11     **Amendments to Certain Agreements**.

(a)      Pay any Earn-Out Obligations or obligations under the Gould's Subordinated Note, in each case, prior to the due date for such obligations or when a Default or an Event of Default is continuing.

(b)      Amend or modify, or waive any rights under any Material Contract if, in any case, such amendment, modification or waiver could reasonably be expected to be materially adverse to the interests of the Administrative Agent or the Lenders.

**7.12**   **Organization Documents; Fiscal Year; Legal Name, State of Formation and Form of Entity**.

(a)   Amend, modify or change its Organization Documents in a manner which is materially adverse to the interests of the Administrative Agent or the Lenders.

(b)   Change its Fiscal Year.

(c)   Change its name or its state of formation or form of organization without providing thirty (30) days prior written notice to the Administrative Agent, provided that nothing herein shall permit any Loan Party to change its state of formation in a state or jurisdiction outside the United States.

(d)   Make any significant change in accounting treatment or reporting practices, except as required by GAAP.

**7.13**   **Ownership of Subsidiaries**.  Notwithstanding any other provisions of this Agreement to the contrary, (i) permit any Person (other than any Borrower or any Wholly Owned Subsidiary) to own any Capital Stock of any Subsidiary other than owned by any holders (other than Loan Parties) of Capital Stock of any non-Wholly Owned Subsidiary permitted under clauses (d), (f), and/or (m) of Section 7.03, (ii) permit any Subsidiary to issue or have outstanding any shares of Disqualified Capital Stock, (iii) create, incur, assume or suffer to exist any Lien on any Capital Stock of any Subsidiary other than pursuant to the Loan Documents.

**7.14**   **Sale and Leaseback Transactions**.  Enter into any Sale and Leaseback Transaction.

**7.15**   **Limitations on Holdings**.  Permit Intermediate Holdings or Holdings, directly or indirectly, to (a) incur, directly or indirectly, any Indebtedness or any other obligation or liability whatsoever other than (i) Holdings' Obligations under the Preferred Note and (ii) Intermediate Holdings' Obligations hereunder, (b) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by Holdings or Intermediate Holdings other than, with respect to Intermediate Holdings only, the Liens created under the Loan Documents to which it is a party, (c) engage in any business or activity or own any assets (including, without limitation, cash and Cash Equivalents) other than (i) holding one hundred percent (100%) of the Capital Stock of Intermediate Holdings and the Borrowers, as applicable and (ii) performing its obligations and activities incidental thereto and (iii) with respect to Intermediate Holdings, performing its obligations under the Loan Documents, (d) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any Person, or (e) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

**7.16**   **Account Control Agreements; Bank Accounts**.  Open, maintain or otherwise have any bank account, other than (a) deposit accounts with CIT Bank, N.A., (b) deposit accounts consented to by the Administrative Agent that are subject to a Deposit Account Control Agreement, and (c) Excluded Accounts.

**7.17**   **Permits**.

(a)   (i) Suffer or permit to occur (A) any transfer of a Required Permit or rights thereunder to any Person (other than a Loan Party or the Administrative Agent) other than with respect to a Voluntary Termination; or (B) any rescission, withdrawal, revocation, termination, amendment or modification of or other alteration to the nature, tenor or scope of any Required Permit except for any

124

such amendment, modification or other alteration which does not have a Material Adverse Effect and does not materially adversely affect the Administrative Agent's rights and remedies with respect to the Collateral; or (ii) rescind, withdraw, revoke, amend, modify, supplement, or otherwise alter the nature, tenor or scope of the Required Permits in any material respect, other than with respect to a Voluntary Termination.

(b)    Terminate, surrender, modify, limit, withdraw or rescind any Participation Agreement or participation in any other Third Party Payor Program.

**7.18    Covenants Relating to Excluded Subsidiaries**.  Notwithstanding anything in this Agreement to the contrary:

(a)    no Loan Party shall provide any guarantee of, or any credit support for, any Indebtedness or other obligation (contingent or otherwise) of an Excluded Subsidiary or Excluded Foreign Subsidiary, or otherwise be directly or indirectly liable for any Indebtedness or other obligation (contingent or otherwise) of such Excluded Subsidiary or Excluded Foreign Subsidiary, (i) have any direct or indirect obligation to maintain or preserve the financial condition of such Excluded Subsidiary or Excluded Foreign Subsidiary or to cause any such Excluded Subsidiary or Excluded Foreign Subsidiary to achieve any specified level of operating results, and (ii) permit a Lien on any of its property to secure, or permit any of its property to be otherwise subject (directly or indirectly) to the satisfaction of, any Indebtedness or other obligation (contingent or otherwise), of any Excluded Subsidiary or Excluded Foreign Subsidiary; and

(b)    no Loan Party shall permit an Excluded Subsidiary to (i) own any Capital Stock issued by a Loan Party, (ii) hold any Indebtedness of any Loan Party, or (iii) hold any Lien on property of any Loan Party.

## ARTICLE 8

## FINANCIAL COVENANTS

**8.01    Financial Covenants**.  So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding, the Loan Parties agree that:

(a)    <u>Consolidated Total Leverage Ratio</u>.  The Consolidated Total Leverage Ratio as of the end of any Fiscal Quarter set forth below shall not be greater than the ratio set forth opposite such Fiscal Quarter:

| Each Fiscal Quarter Ending | Consolidated Total Leverage Ratio |
|---|---|
| June 30, 2019 through and including September 30, 2020 | 3.75 to 1.00 |
| December 31, 2020 through the Termination Date | 3.25 to 1.00 |

125

(b)      Consolidated Fixed Charges Coverage Ratio.  Beginning with the Fiscal Quarter ending June 30, 2019, the Consolidated Fixed Charges Coverage Ratio as of the end of each Fiscal Quarter shall not be less than 1.25 to 1.00.

# ARTICLE 9

## EVENTS OF DEFAULT AND REMEDIES

9.01      Events of Default.  Any of the following shall constitute an Event of Default:

(a)      Non-Payment.  Any Borrower or any other Loan Party fails to pay when and as required to be paid pursuant to this Agreement or any other Loan Document, (i) any amount of principal of any Loan or any Letter of Credit Liabilities, or (ii) within one (1) Business Day after the same becomes due, any interest on any Loan or any Letter of Credit Liabilities, or any commitment fee, utilization fee or other fee due hereunder, or (iii) within five (5) Business Day after the same becomes due, any other amount payable hereunder or under any other Loan Document; or

(b)      Specific Covenants.  Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Sections 6.01, 6.02, 6.03, 6.05 (with respect to each Borrower's existence), 6.07, 6.10, 6.11, 6.12, 6.14, 6.18, 6.19, Article 7, Article 8 or Article 10; or

(c)      Other Defaults.  (i) An event of default has occurred under any other Loan Document, or (ii) any Loan Party fails to perform, observe or comply with any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document and such failure continues for thirty (30) days after the earlier of (x) a Responsible Officer of any Loan Party becoming aware of such failure or (y) notice thereof to any Loan Party by the Administrative Agent or any Lender; or

(d)      Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made (except to the extent already qualified by knowledge, materiality or Material Adverse Effect, in which case it shall be true and correct in all respects and shall not be incorrect or misleading in any respect); or

(e)      Cross-Default.  (i) Any Loan Party or any Subsidiary fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of one or more items of Indebtedness (other than Indebtedness hereunder or under any Hedge Agreement) having an aggregate principal amount (including undrawn committed or available amounts) of more than $2,500,000; (ii) any Loan Party or any Subsidiary fails to observe or perform any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; or (iii) there occurs under any Hedge Agreement an Early Termination Date (as defined in such Hedge Agreement) resulting from (A) any event of default under such Hedge Agreement as to which any Loan Party or any Subsidiary is the Defaulting Party (as defined in such Hedge Agreement) or (B) any Termination Event (as so defined) under such Hedge Agreement as to which any Loan Party or any Subsidiary is an Affected Party (as so defined); or

126

(f)     <u>Insolvency Proceedings, Etc</u>. Any Loan Party or any of its Subsidiaries institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors, or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its Property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its Property is instituted without the consent of such Person and such Person fails to challenge such Proceeding or such Proceeding is challenged but continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(g)     <u>Inability to Pay Debts; Attachment</u>. (i) Any Loan Party or any of its Subsidiaries becomes unable to or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the Property of any such Loan Party or any Loan Party otherwise becomes insolvent; or

(h)     <u>Judgments</u>. There is entered against any Loan Party or any of its Subsidiaries (i) one or more final judgments or orders for the payment of money (including a disgorgement order issued by a Governmental Authority) in an aggregate amount exceeding $2,500,000 (to the extent not covered by independent third-party insurance as to which the insurer has not disclaimed its obligation to cover), or (ii) one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i)     <u>ERISA</u>. (i) An ERISA Event occurs which has resulted or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $2,500,000, or (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $2,500,000; or

(j)     <u>Invalidity of Loan Documents</u>. Any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect or ceases to give the Administrative Agent, for the benefit of the Lenders, a valid and perfected Lien in any material portion of the Collateral purported to be covered by the Loan Documents with the priority required by the relevant Loan Document (except to the extent perfection is deferred pursuant to the terms of <u>Schedule 6.18</u>); or any Loan Party or any other Affiliate of a Loan Party contests in any manner the validity or enforceability of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; or

(k)     <u>Change of Control</u>.  There occurs any Change of Control; or

(l)     <u>[Reserved]</u>; or

(m)     <u>[Reserved]</u>; or

127

(n)      Healthcare Proceedings.  The institution of any proceeding by FDA or similar Governmental Authority to order the withdrawal of any Product or Product category that is material to any Loan Parties' business, taken as a whole, from the market or to enjoin any such Person or any representative of any such Person from manufacturing, marketing, selling or distributing any Product or Product category that is material to such Persons' business, taken as a whole where such proceeding could reasonably be expected to have a Material Adverse Effect; or

(o)      Required Permits.  The institution of any action or proceeding by the FDA or any other Governmental Authority to revoke, suspend, reject, withdraw, limit, or restrict any Required Permit held by any Loan Party or any representative of such Person if the same could reasonably be expected to result in a Material Adverse Effect or a material adverse change in, or a material adverse effect upon, the prospects of the Loan Parties taken as a whole; or

(p)      Enforcement Actions.  The commencement of any enforcement action against any Loan Party by the FDA or any other Governmental Authority if such enforcement action could reasonably be expected to result in a Material Adverse Effect; or

(q)      Product Recall.  The Recall of any Product from the market, the voluntary withdrawal of any Product from the market, or actions to discontinue the sale of any Product, if the same could reasonably be expected to result in a Material Adverse Effect; or

(r)      Change in Law.  A Change in Law, including a change in FDA policies or procedures or state government agency policies or procedures, occurs which could reasonably be expected to have a Material Adverse Effect; or

(s)      Inventory Supplier Agreements.  The termination of any agreements with manufacturers that supply any Product or any components of any Product or any changes to any agreements with manufacturers that supply any Product or any components of any Product that could reasonably be expected to have a Material Adverse Effect; or

(t)      Earn-Out Obligations in connection with Verus Merger, Gould's Acquisition, and Med Way Acquisition.  Holdings, Intermediate Holdings or any Loan Party makes a payment (other than a payment solely in Capital Stock of Holdings) with respect to the Earn-Out Obligations in connection with the Verus Merger, Gould's Acquisition or Med Way Acquisition without the Administrative Agent having received a Pro Forma Compliance Certificate demonstrating that, upon giving effect to such payment on a Pro Forma Basis, (i) the Loan Parties would be in compliance with the financial covenants set forth in Article 8 as of the most recent Fiscal Quarter for which the Loan Parties have delivered financial statements pursuant to Section 6.01(a) or Section 6.01(b), as applicable, (ii) the Consolidated Total Leverage Ratio does not exceed 3.00:1.00 as of the most recent Fiscal Quarter for which the Loan Parties have delivered financial statements pursuant to Section 6.01(a) or Section 6.01(b), as applicable, and (iii) Excess Liquidity as of the date of the payment shall be at least $10,000,000.

**9.02**      **Remedies upon Event of Default**.  Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent may, and upon the direction of the Required Lenders shall, take any or all of the following actions:

(a)      declare the commitment of each Lender to make Loans and any obligation of the L/C Issuers or Support Providers to make L/C Credit Extensions to be terminated, whereupon such commitments and obligation shall be terminated;

(b)        declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document other than a Secured Hedge Agreement which shall be governed by its own provisions to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(c)        require that the Borrowers Cash Collateralize the total Letter of Credit Liabilities (in an amount equal to 105% of the total Letter of Credit Liabilities as of such date) and prepay Letter of Credit Fees; and

(d)        exercise on behalf of itself and the other Secured Parties any and all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

provided, however, that upon the occurrence of any Event of Default described in Section 9.01(f) or 9.01(g), the obligation of each Lender to make Loans and any obligation of the L/C Issuers to make L/C Credit Extensions and Support Providers to issue Support Agreements shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, and the obligation of the Loan Parties to Cash Collateralize the total Letter of Credit Liabilities as aforesaid shall automatically become effective, in each case without further act of the Administrative Agent or any Lender. Except as expressly provided for herein, presentment, demand, protest and all other notices (including notice of acceleration and notice of intent to accelerate) of any kind are hereby waived by the Borrowers.

9.03    [**Reserved**].

9.04    **Application of Funds**.  Upon the occurrence and during the continuance of an Event of Default (or after the Loans have otherwise become due and payable and the Letter of Credit Liabilities have been required to be Cash Collateralized as set forth in the proviso to Section 9.02), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order upon the Administrative Agent's election or the direction of the Required Lenders:

(a)        First, to payment of that portion of the Obligations constituting fees, indemnities, expenses, protective advances and other amounts (including reasonable Attorney Costs and amounts payable under Article 3) payable or reimbursable to the Administrative Agent in its capacity as such;

(b)        Second, to payment of that portion of the Obligations constituting fees payable to the Lenders, ratably among them in proportion to the fees payable to them;

(c)        Third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and Unreimbursed Amounts and fees, premiums and scheduled periodic payments, and any interest accrued thereon, due under any Secured Hedge Agreement, ratably among the Secured Parties in proportion to the respective amounts described in this clause (c) held by them;

(d)        Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans and Unreimbursed Amounts, payments of amounts due in respect of any Banking Services Obligations, breakage, termination or other payments, and any interest accrued thereon, due under any Secured Hedge Agreement, to Cash Collateralize that portion of Letter of Credit Liabilities comprised of the aggregate undrawn amount of Letters of Credit and Support Agreements (together with aggregate facing and similar fees and expenses of the issuers of the Letters of Credit that will accrue on such Letters of Credit through the stated expiry of such Letters of Credit (assuming no drawings thereon

129

before stated expiry date)), ratably among the Secured Parties in proportion to the respective amounts described in this clause (d) held by them;

(e)        Fifth, to the payment of any other unpaid Obligations and to Cash Collateralize any other contingent Obligations which are not yet due and payable but with respect to which a claim has been or may reasonably be expected to be asserted by the applicable Secured Party in an amount estimated by Administrative Agent to be the amount of related costs, expenses and indemnification Obligations that may become due and payable; and

(f)        Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrowers or as otherwise required by Law.

All amounts owing under this Agreement in respect of such Obligations, including fees, interest, default interest, interest on interests, expense reimbursement and indemnities, shall be payable in accordance with the foregoing waterfall provisions irrespective of whether a claim in respect of such amounts is allowed or allowable in any insolvency Proceeding under any Debtor Relief Law to the fullest extent permitted by Law.

Subject to Section 2.03(c), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit and Support Agreements pursuant to clause (d) above shall be applied to satisfy drawings under such Letters of Credit and Support Agreements if and as they occur.  If any amount remains on deposit as cash collateral after all Letters of Credit and Support Agreements have either been fully drawn or expired, and all Unreimbursed Amounts have been paid, such remaining amount shall be applied to other Obligations, if any, in the order set forth above.

In connection with any distribution of payments and collections pursuant to this Section 9.04, the Administrative Agent may in its discretion assume that no amounts are due to any Secured Hedge Provider or any provider of Banking Services or are due on account of clause (e) unless such Secured Hedge Provider or other applicable Secured Party has notified the Administrative Agent of the amount of any such liability owed to it prior to such distribution.

Notwithstanding anything to the contrary set forth above, Excluded Hedge Obligations with respect to any Guarantor shall not be paid with amounts received from such Guarantor or its assets, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to Obligations otherwise set forth above in this Section.

9.05    **Loan Parties Right to Cure**.

(a)        Notwithstanding anything to the contrary contained in this Article 9, for purposes of determining whether the Loan Parties have failed to comply with any covenant contained in Section 8.01 that is calculated by using Consolidated EBITDA, the Borrowers shall have the right (the "Cure Right") to increase Consolidated EBITDA for any Fiscal Quarter by the amount of Net Cash Proceeds actually received by Intermediate Holdings from the Sponsor (by way of common equity contributions or in return for the issuance of Capital Stock, in each case, other than Disqualified Capital Stock) (any such equity contribution so included in the calculation of Consolidated EBITDA, a "Specified Equity Contribution" and the amount of any such Specified Equity Contribution, the "Cure Amount") after the end of such Fiscal Quarter and on or prior to the date that is ten (10) days after the date on which financial statements with respect to such Fiscal Quarter are required to be delivered pursuant to Section 6.01(b) (the "Cure Date"), in each case so long as, and to the extent that, such amounts are then contributed by Intermediate Holdings in cash to the common equity of the Borrowers, and that, on or prior to the Cure Date, the Borrowers shall inform the Administrative Agent of the Specified Equity Contribution,

130

whereupon the covenants contained in Section 8.01 shall be recalculated giving effect to the following pro forma adjustments:

(i)        Consolidated EBITDA shall be increased, solely for the purpose of determining the existence of a Default or an Event of Default under the covenants contained in Section 8.01 with respect to any period of four (4) consecutive Fiscal Quarters that includes the Fiscal Quarter for which the Cure Right was exercised and not for any other purpose under this Agreement, by an amount equal to the Net Cash Proceeds of the Specified Equity Contribution; it being understood that for purposes of calculating the Consolidated Total Leverage Ratio as of the end of the Fiscal Quarter for which the Cure Right was exercised and the immediately following three (3) Fiscal Quarters, Consolidated Funded Indebtedness shall not be reduced by the amount of any prepayment or repayment of Indebtedness made with the proceeds of the Specified Equity Contribution; and

(ii)        if, after giving effect to the foregoing recalculations, the Borrowers shall then be in compliance with the requirements of all covenants contained in Section 8.01, the Borrowers shall be deemed to have satisfied the requirements of the financial performance covenants contained in Section 8.01 as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or default of the financial performance covenants contained in Section 8.01 that had occurred shall be deemed cured for the purposes of this Agreement, provided, that in any event, neither Administrative Agent nor any Lender shall be required to provide any Credit Extension following any Default or Event of Default under the covenants contained in Section 8.01 for which a Cure Right has been exercised but for which the Specified Equity Contribution has not yet been made to the Borrowers and applied in accordance with this Section 9.05(a).

Notwithstanding anything herein to the contrary, (a) there shall be no more than two (2) Fiscal Quarters in each four (4) Fiscal Quarter period in which a Cure Right is exercised; (b) during the term of this Agreement, there shall be no more than five (5) Fiscal Quarters in which a Cure Right is exercised; (c) there shall not be two (2) consecutive Fiscal Quarters in which a Cure Right is exercised; (d) the Cure Amount for any Fiscal Quarter shall be no greater than and not less than the amount required to cause the Borrowers to be in compliance with the financial covenants contained in Section 8.01 calculated by using Consolidated EBITDA for such Fiscal Quarter; (e) any and all proceeds of a Specified Equity Contribution shall be immediately due and payable as a mandatory prepayment of the Obligations in accordance with Section 2.05(b)(iii) and applied in accordance with Section 2.05(b)(vii)(B); (f) all Cure Amounts will be disregarded in calculating Consolidated EBITDA for all purposes (other than those set forth in this Section 9.05) or for any other purpose under this Agreement or the other Loan Documents (including in respect of the making of any Restricted Payment or the determination of the Applicable Margin); and (g) any Obligations prepaid with Cure Amounts shall be deemed outstanding for purposes of determining compliance with the financial covenants contained in Section 8.01 for the current Fiscal Quarter and the next three (3) Fiscal Quarters thereafter.

## ARTICLE 10

### GUARANTY

**10.01**    **The Guaranty**.  Each Guarantor hereby guarantees to each Secured Party and the Administrative Agent as hereinafter provided, as primary obligor and not as surety, the prompt payment and performance of the Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise) strictly in accordance with the terms thereof.  Each Guarantor hereby further agrees that if any of the Obligations are not paid in full when due (whether at stated

131

maturity, as a mandatory prepayment, by acceleration or otherwise), each Guarantor will promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration or otherwise) in accordance with the terms of such extension or renewal (collectively, the "Guaranteed Obligations").

Subject to Section 10.06 and the last sentence of this Section 10.01 below, the Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which the Administrative Agent or any Secured Party may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of any Guaranteed Obligations to be paid when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code), the Guarantors will, upon demand pay, or cause to be paid, in cash, to the Administrative Agent for the ratable benefit of Secured Parties, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for any Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against any Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to the Secured Parties as aforesaid.

Notwithstanding any provision to the contrary contained herein or in any other of the Loan Documents, the Guaranteed Obligations of each Guarantor under this Agreement and the other Loan Documents shall be limited to an aggregate amount equal to the largest amount that would not render such obligations subject to avoidance under the Debtor Relief Laws.

      **10.02**    **Obligations Unconditional**. The Guaranteed Obligations of each Guarantor under Section 10.01 are joint and several and absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Loan Documents or any other agreement or instrument referred to therein, or any substitution, release, impairment or exchange of any other guarantee of or security for any of the Obligations, and, to the fullest extent permitted by applicable Law, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 10.02 that the obligations of each Guarantor hereunder shall be absolute and unconditional under any and all circumstances. Each Guarantor agrees that such Guarantor shall have no right of subrogation, indemnity, reimbursement or contribution against the Borrowers or any other Guarantor for amounts paid under this Article 10 until the Termination Date. Without limiting the generality of the foregoing, it is agreed that, to the fullest extent permitted by law, the occurrence of any one or more of the following shall not alter or impair the liability of any Guarantor hereunder, which shall remain joint and several and absolute and unconditional as described above:

      (a)     at any time or from time to time, without notice to any Guarantor, the time for any performance of or compliance with any of the Obligations shall be extended, or such performance or compliance shall be waived;

      (b)     any of the acts mentioned in any of the provisions of any of the Loan Documents or any other agreement or instrument referred to in the Loan Documents shall be done or omitted;

      (c)     the maturity of any of the Obligations shall be accelerated, or any of the Obligations shall be modified, supplemented or amended in any respect, or any right under any of the Loan Documents or any other agreement or instrument referred to in the Loan Documents shall be waived

132

or any other guarantee of any of the Obligations or any security therefor shall be released, impaired or exchanged in whole or in part or otherwise dealt with;

(d)    any Lien granted to, or in favor of, the Administrative Agent or any Secured Party or Secured Parties as security for any of the Obligations shall fail to attach or be perfected;

(e)    any of the Obligations shall be determined to be void or voidable (including for the benefit of any creditor of any Guarantor) or shall be subordinated to the claims of any Person (including any creditor of any Guarantor); or

(f)    any other action or inaction shall occur that might constitute a surety defense.

10.03    **Reinstatement**.  The Guaranteed Obligations of any Guarantor under this Article 10 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Person in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and each Guarantor agrees that it will indemnify the Administrative Agent and each Secured Party on demand for all reasonable costs and expenses (including fees and expenses of counsel) incurred by the Administrative Agent or such Secured Party in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.  This paragraph shall survive any termination of this Agreement.

10.04    **Waivers**.

(a)    Each Guarantor hereby waives, to the fullest extent permitted by Law, for the benefit of the Administrative Agent and each Secured Party:  (a) any right to require the Administrative Agent or any Secured Party, as a condition of payment or performance by such Guarantor, to (i) proceed against any Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from any Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of the Administrative Agent and Secured Parties in favor of any Borrower or any other Person, or (iv) pursue any other remedy in the power of the Administrative Agent and the Secured Parties whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of any Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of any Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal or any law, rule, regulation, or order of any jurisdiction affecting any term of the Guaranteed Obligations; (d) any defense based upon the Administrative Agent's or any Secured Party's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that the Administrative Agent and the Secured Parties protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default under any Loan Document, any Secured Hedge Agreement or any agreement or instrument related

133

thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to any Borrower and notices of any of the matters referred to in Section 10.02 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof. Each Guarantor agrees that such Guarantor shall have no right of recourse to security for the Obligations, except through the exercise of rights of subrogation to the extent permitted by Section 10.02; provided, however, Guarantor agrees that such rights shall be automatically (and without any further action) irrevocably waived and released if such security is acquired by a Person as a result of the exercise of the remedies under the Loan Documents.

10.05    **Remedies**. Each Guarantor agrees that, to the fullest extent permitted by Law, as between such Guarantor, on the one hand, and the Administrative Agent and the Secured Parties, on the other hand, the Obligations may be declared to be forthwith due and payable as provided in Section 9.02 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 9.02) for purposes of Section 10.01 notwithstanding any stay, injunction or other prohibition preventing such declaration (or preventing the Obligations from becoming automatically due and payable) as against any other Person and that, in the event of such declaration (or the Obligations being deemed to have become automatically due and payable), the Obligations (whether or not due and payable by any other Person) shall forthwith become due and payable by each Guarantor for purposes of Section 10.01. Each Guarantor acknowledges and agrees that its Guaranteed Obligations hereunder are secured in accordance with the terms of the Collateral Documents and that the Secured Parties may exercise their remedies thereunder in accordance with the terms thereof.

10.06    **Contribution by Guarantors**. All Guarantors desire to allocate among themselves (collectively, the "Contributing Guarantors"), in a fair and equitable manner, their respective obligations arising under the Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "Funding Guarantor") under the Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date. "Fair Share" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under the Guaranty in respect of the Guaranteed Obligations. "Fair Share Contribution Amount" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under the Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of the Bankruptcy Code or any comparable applicable provisions of state law, provided, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Guarantor for purposes of this Section 10.06, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor. "Aggregate Payments" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of the Guaranty (including in respect of this Section 10.06), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 10.06. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor. The allocation among Contributing Guarantors of their obligations as set forth in this Section 10.06 shall not be construed in any way to limit the liability of any

134

Contributing Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 10.06 and a right to receive any Fair Share Contribution Amount shall be deemed an asset of the Guarantor entitled to such amount.

**10.07**    **Guarantee of Payment; Continuing Guarantee**. The guarantee in this Article 10 is an absolute and unconditional guaranty of payment and not of collection, is a continuing and irrevocable guarantee, and shall apply to all Obligations whenever arising.

**10.08**    **Subordination of Other Obligations**. Any Indebtedness of any Borrower or any Guarantor or any Subsidiary now or hereafter owing to any Loan Party (the "Obligee") shall be subordinated in right of payment to the Obligations (provided, such payments shall be permitted so long as no Event of Default has occurred and is continuing) and any Lien now or hereafter securing such Indebtedness is hereby subordinated in priority to the Liens of Administrative Agent now or hereafter securing any of the Obligations, and any such Indebtedness collected or received by the Obligee after an Event of Default has occurred and is continuing shall be held in trust for the Administrative Agent for its benefit and the benefit of the Secured Parties and shall forthwith be paid over to Administrative Agent for its benefit and the benefit of the Secured Parties to be credited and applied against the Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee under any other provision hereof. No Obligee shall exercise any remedy with respect to such Indebtedness prior to the Termination Date.

**ARTICLE 11**

**THE ADMINISTRATIVE AGENT**

**11.01**    **Appointment and Authorization of Administrative Agent**.

(a)    Each Secured Party hereby irrevocably appoints, designates and authorizes the Administrative Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere herein or in any other Loan Document, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall the Administrative Agent have or be deemed to have any fiduciary relationship with any Secured Party or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)    Each L/C Issuer shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and each Support Provider shall act on behalf of the Lenders with respect to any Support Agreements entered into by it and the documents associated therewith and each L/C Issuer and Support Provider, respectively, shall have all of the benefits and immunities (i) provided to the Administrative Agent in this Article 11 with respect to any acts taken or omissions suffered by such L/C Issuer or Support Provider in connection with Letters of Credit and Support Agreements issued by it or proposed to be issued by it and the applications and agreements for letters of credit pertaining to such Letters of Credit and Support Agreements as fully as if the term

135

"Administrative Agent" as used in this Article 11 and in the definition of "Agent-Related Person" included such L/C Issuer or Support Provider with respect to such acts or omissions, and (ii) as additionally provided herein with respect to the L/C Issuers or Support Providers.

(c)    Swingline Lender shall act on behalf of the Lenders with respect to any Swingline Loan made by it and the documents associated therewith, and the Swingline Lender shall have all of the benefits and immunities (i) provided to the Administrative Agent in this Article 11 with respect to any acts taken or omissions suffered by the Swingline Lender in connection with the Swingline Loans made by it or proposed to be made by it as fully as if the term "Administrative Agent" as used in this Article 11 and in the definition of "Agent-Related Person" included the Swingline Lender with respect to such acts or omissions, and (ii) as additionally provided herein with respect to the Swingline Lender.

11.02    **Delegation of Duties**.  The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document by or through its, or its Affiliates', agents, employees or attorneys-in-fact and shall be entitled to obtain and rely upon the advice of counsel and other consultants or experts concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects in the absence of the Administrative Agent's gross negligence or willful misconduct (as finally determined in a non-appealable decision of a court of competent jurisdiction).

11.03    **Liability of Administrative Agent**.  No Agent-Related Person shall be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby, and each Loan Party and Secured Party hereby waives and agrees not to assert any right, claim or cause of action based thereon, except to the extent of liabilities resulting primarily from its own gross negligence or willful misconduct in connection with its duties expressly set forth herein, as finally determined in a non-appealable decision of a court of competent jurisdiction.  Without limiting the foregoing, no Agent-Related Person shall be: (i) responsible or have any obligation to any other Secured Party for the due execution, validity, genuineness, effectiveness, sufficiency, or enforceability of, or for any recital, statement, warranty or representation in, this Agreement, any other Loan Document or any related agreement, document or order; (ii) required or have any obligation to ascertain, monitor or enforce or to make any inquiry concerning the performance or observance by any Loan Party and any Lender of any of the terms, conditions, covenants, or agreements of this Agreement or any of the other Loan Documents (including, without limitation, any restrictions, limitations or qualifications related to any Disqualified Institution); (iii) responsible for or have any duty to ascertain or monitor or to inquire into whether a condition set forth in any Loan Document is satisfied, or waived, including any condition set forth in Article 4 hereof; (iv) responsible or have any obligation to any other Secured Party for the state or condition of any properties of the Loan Parties constituting Collateral for the Obligations or any information contained in the books or records of the Loan Parties; (v) responsible or have any obligation to any other Secured Party for the validity, enforceability, collectability, effectiveness or genuineness of this Agreement or any other Loan Document or any other certificate, document or instrument furnished in connection therewith; (vi) liable with respect to or arising out of any assignment or participation of the Obligations, or disclosure of any information, to any Secured Party or such Secured Party's representatives, Approved Funds or Affiliates; or (vii) responsible or have any obligation to any other Secured Party to assure that the Collateral exists or is owned by the Loan Parties or is cared for, protected, or insured or has been encumbered, or that the Liens granted to the Administrative Agent therein have been properly or sufficiently or lawfully created, perfected (or continue to be perfected), protected, or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure, or fidelity, or to continue exercising, any of the rights, authorities, and powers granted or available to the Administrative Agent pursuant to any of the Loan Documents.  In addition to and not in limitation of the foregoing, it is understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, the

136

Administrative Agent may act in any manner it may deem appropriate, in its sole discretion, given the Administrative Agent's own interest in the Collateral in its capacity as one of the Secured Parties and that the Administrative Agent shall have no other duty or liability whatsoever to any Secured Party as to any of the foregoing, including, without limitation, the preparation, form or filing of any Uniform Commercial Code financing statement, amendment or continuation or of any other type of document related to the creation, perfection, continuation or priority of any Lien as to any property of the Loan Parties.

**11.04    Reliance by Administrative Agent**.

(a)    The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by the Administrative Agent. The Administrative Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Secured Parties against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Secured Parties. Notwithstanding the foregoing, the Administrative Agent shall not be required to take, or to omit to take, any action that is, in the opinion of the Administrative Agent or its counsel, contrary to any Loan Document or applicable Law.

(b)    For purposes of determining compliance with the conditions specified in Article 4, each Lender that has signed this Agreement (or an addendum or joinder to this Agreement) shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**11.05    Notice of Default**. The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default and/or Event of Default, unless the Administrative Agent shall have received written notice from a Lender or any Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." The Administrative Agent will notify the Lenders of its receipt of any such notice. The Administrative Agent shall take such action with respect to such Default and/or Event of Default as may be directed by the Required Lenders in accordance with Article 9, provided, that unless and until the Administrative Agent has received any such direction in accordance with Section 11.04, the Administrative Agent may (but shall not be obligated to) take any action, or refrain from taking any action, with respect to such Default and/or Event of Default as it shall deem advisable or in the best interest of the Lenders.

**11.06    Credit Decision; Disclosure of Information by Administrative Agent**. Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent-Related Person hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including

137

whether Agent-Related Persons have disclosed material information in their possession. Each Lender represents to the Administrative Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrowers and the other Loan Parties hereunder. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrowers and the other Loan Parties. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent herein, no Agent-Related Person shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

**11.07** **Indemnification of Administrative Agent**. The Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), severally in proportion to its Pro Rata Share, and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities incurred by it; provided, however, that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities to the extent determined in a final, non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Agent-Related Person's own gross negligence or willful misconduct; provided, however, that no action taken in furtherance of the directions of the Required Lenders shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 11.07. Without limitation of the foregoing, each Lender shall reimburse each Agent-Related Person upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by any Agent-Related Person in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein. The obligations of the Lenders hereunder shall not diminish the obligations of the Borrowers to indemnify and reimburse the Agent-Related Persons for such amounts. The Administrative Agent may in its discretion first seek payment from the Lenders hereunder before seeking payment from the Borrowers for such amounts or may seek payments first from the Borrowers. In any event, any amounts received from Borrowers as reimbursement for amounts already reimbursed by Lenders shall be paid to Lenders in accordance with the terms hereof. The undertaking in this Section 11.07 shall survive the Termination Date and the resignation of the Administrative Agent.

**11.08** **Administrative Agent in its Individual Capacity**. Administrative Agent and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though Administrative Agent were not the Administrative Agent, Support Provider or an L/C Issuer hereunder and without notice to or consent of any Secured Party. The Secured Parties acknowledge that, pursuant to such activities, Administrative Agent or its Affiliates may receive information regarding any Loan Party or its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Administrative Agent shall be under no obligation to

138

provide such information to them. With respect to its Loans, Administrative Agent and/or its Affiliates (as applicable) shall have the same rights and powers under this Agreement as any other Secured Party and may exercise such rights and powers as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" include the Administrative Agent and/or its Affiliates (as applicable) in its individual capacity.

11.09    **Successor Administrative Agent**. The Administrative Agent may resign as the Administrative Agent upon ten (10) days' notice to the Lenders and the Borrower Representative, <u>provided</u> that any such resignation by the Administrative Agent may also constitute its resignation as the L/C Issuer, Support Provider and Swingline Lender (if applicable). If the Administrative Agent resigns under this Agreement, the Required Lenders shall appoint from among the Lenders (or the Affiliates thereof) a successor administrative agent for the Lenders, which successor administrative agent shall (unless an Event of Default has occurred and is continuing) be subject to the approval of the Borrower Representative (which approval shall not be unreasonably withheld or delayed). If no successor administrative agent is appointed prior to the effective date of the resignation of the Administrative Agent, the Administrative Agent may appoint, after consulting with the Lenders, a successor administrative agent from among the Lenders (or the Affiliates thereof). Upon the acceptance of its appointment as successor administrative agent hereunder, the Person acting as such successor administrative agent shall succeed to all the rights, powers and duties of the retiring Administrative Agent (and Support Provider, L/C Issuer and Swingline Lender (if the retiring Administrative Agent desires to resign therefrom)) and the respective terms "Administrative Agent", "Support Provider", "L/C Issuer" and "Swingline Lender" shall mean such successor administrative agent, Letter of Credit issuer, support provider, and swingline lender, and the retiring Administrative Agent's appointment, powers and duties in such capacities shall be terminated without any other further act or deed on its behalf. After any retiring Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Article 11 and Sections 12.04 and 12.05 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under this Agreement or while it was actively engaged in transferring its rights and obligations as Administrative Agent to the successor administrative agent. If no successor administrative agent has accepted appointment as the Administrative Agent by the date ten (10) days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Required Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor administrative agent as provided for above. No Person may be removed from its capacity as Administrative Agent.

11.10    **Administrative Agent May File Proofs of Claim**. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan, Letter of Credit Liabilities or Swingline Exposure shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Loan Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, Letter of Credit Liabilities, Swingline Exposures and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Secured Parties and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Secured Parties and the Administrative Agent and their respective agents and counsel and all other amounts due the Secured Parties and the Administrative Agent under Sections 2.09 and 12.04) allowed in such judicial proceeding; and

139

(b)        to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Secured Parties, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09 and 12.04.

        **11.11    Collateral and Guaranty Matters**.  The Secured Parties irrevocably authorize the Administrative Agent, at its option and in its discretion, to release any Guarantor and any Lien on any Collateral granted to or held by the Administrative Agent under any Loan Document (i) upon the Termination Date, (ii) that is transferred or to be transferred as part of or in connection with any Disposition permitted hereunder or under any other Loan Document, or (iii) as approved in accordance with Section 12.01, and to execute in connection with such events such payoff letters and related documentation in form and substance satisfactory to Administrative Agent, in its sole discretion, as shall in Administrative Agent's sole discretion be deemed advisable.  In connection with any such release, each Lender, the L/C Issuer and the Support Providers hereby direct the Administrative Agent, and the Administrative Agent agrees that it shall, upon the reasonable request of the Borrower Representative (and except in the case where the Termination Date has actually occurred, so long as no Default or Event of Default then exists), to (i) promptly execute and deliver or file such documents and perform other actions reasonably requested to release the guaranties and the Liens and (ii) deliver to the Loan Parties any portion of such Collateral so released in the possession of the Administrative Agent or as otherwise required under any Loan Documents, Subordination Agreement or applicable Law, in each case without recourse, representation or warranty.  Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of Property, pursuant to this Section 11.11.

The Secured Parties hereby irrevocably authorize Administrative Agent (absent, with respect to any particular transaction, Administrative Agent receiving contrary written bidding instructions from the Required Lenders before such transaction), to credit bid all or any portion of the Obligations (including, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise)) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Section 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which a Loan Party is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Capital Stock or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase).  In connection with any such bid Administrative Agent shall be authorized (i) to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Capital Stock thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the

140

termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in clauses (a) through (h) of Section 12.01 of this Agreement (provided that, in any event, the consent of each Lender shall be required for any amendment that would treat or attempts to treat a Lender or a class of Lenders in a manner different than all other Lenders)), and (iii) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Capital Stock and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

11.12    **Other Agents; Arrangers and Managers**.  None of the Lenders or other Persons identified on the facing page or signature pages of this Agreement as a "syndication agent," "documentation agent," "co-agent," "book manager," "lead manager," "arranger," "lead arranger" or "co-arranger" (each, an "Additional Titled Agent") shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than, in the case of such Lenders, those applicable to all Lenders as such. Without limiting the foregoing, no Additional Titled Agent shall have or be deemed to have any fiduciary relationship with any Lender.  Each Lender acknowledges that it has not relied, and will not rely, on any Additional Titled Agent in deciding to enter into this Agreement or in taking or not taking action hereunder.  At any time that any Lender serving as an Additional Titled Agent shall have transferred to any other Person (other than any Affiliates) all of its interests in the Loans, such Lender shall be deemed to have concurrently resigned as such Additional Titled Agent.

11.13    **Additional Secured Parties**.  The benefit of the provisions of the Loan Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not a Lender, L/C Issuer or Support Provider as long as, by accepting such benefits, such Secured Party agrees, as among the Administrative Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by the Administrative Agent, shall confirm such agreement in a writing in form and substance acceptable to the Administrative Agent) this Article 11, Section 2.13 (Sharing of Payments), Section 12.08 (Confidentiality) and Section 12.09 (Setoff) as each may be in effect from time to time, and the decisions and actions of the Administrative Agent and the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders) to the same extent a Lender is bound, provided, however, that, notwithstanding the foregoing, (a) such Secured Party shall be bound by Section 11.07 (Indemnification of Administrative Agent) only to the extent of liabilities, costs and expenses with respect to or otherwise relating to the Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of ratability or similar concept, (b) except as set forth specifically herein as to such Secured Party (rather than the Secured Parties generally), each of the Administrative Agent, the Lenders, the L/C Issuers and the Support Providers shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (c) except as set forth specifically herein as to such Secured Party (rather than the Secured Parties generally), such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

11.14    **Exclusive Right to Enforce Rights and Remedies**.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them or in respect of

141

the Collateral are hereby granted to, and shall be vested exclusively in, and all actions and Proceedings in connection with any such enforcement shall be instituted and maintained exclusively by, Administrative Agent (or its agents or designees) in accordance with the Loan Documents for the benefit of the applicable Secured Parties; provided that the foregoing shall not prohibit (i) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (ii) each of the L/C Issuer, any Support Provider and the Swingline Lender from exercising the rights and remedies that inure to its benefit (solely in its capacity as L/C Issuer, Support Provider or Swingline Lender, as the case may be) hereunder and under the other Loan Documents, (iii) any Lender or Participant from exercising setoff rights in accordance with Section 12.09, (iv) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a Proceeding relative to any Loan Party under any Bankruptcy Code or other Debtor Relief Law or (v) any Lender or other Secured Party from exercising any express right or remedy of such Lender under the Loan Documents where the Administrative Agent does not have the power and authority under the Loan Documents to act on behalf of such Lender or other Secured Party; and provided, further, that if at any time there is no Person acting as the Administrative Agent hereunder and under the other Loan Documents, then (A) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 9.02 and (B) in addition to the matters set forth in Section 11.04 and Section 12.09, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**11.15    Flood Laws**.  Administrative Agent has adopted internal policies and procedures that address requirements placed on federally regulated lenders under the National Flood Insurance Reform Act of 1994 and related legislation (the "Flood Law").  Administrative Agent may post an E-System (or otherwise distribute to each Lender in the syndicate) documents that it receives in connection with the Flood Laws.  However, Administrative Agent reminds each Lender and Participant in the facility that, pursuant to the Flood Laws, each federally regulated Lender (whether acting as a Lender or Participant in the credit facility) is responsible for assuring its own compliance with the flood insurance requirements, and Administrative Agent disclaims any liability in connection with the failure of any such Lender or Participant to comply with flood insurance requirements.

**11.16    Banking Services Obligations/Hedging**.  Except as otherwise expressly set forth herein, no Hedge Party or any party that provides Banking Services that obtains the benefit of the provisions of Section 9.04, the Guaranty or any Collateral by virtue of the provisions hereof or any Loan Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) (or to notice of or to consent to any amendment, waiver or modification of the provisions hereof or of the Guaranty or any Loan Document) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents.  Notwithstanding any other provision of this Article 11 to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising in connection with the Banking Services Obligations and Secured Hedge Agreements except to the extent expressly provided herein and unless the Administrative Agent has received a written designation notice, in form proscribed by the Administrative Agent, of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Hedge Party or the party providing Banking Services, as the case may be (in each case, other than in the case where Administrative Agent or its Affiliates is the Hedge Party or such provider).  Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising in connection with Banking Services Obligations or Secured Hedge Agreements in the case of a Termination Date.

**11.17**  **Certain ERISA Matters**.

(a)  Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and the Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrowers or any other Loan Party, that at least one of the following is and will be true:

(i)  Such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans, the Letters of Credit or the Commitments,

(ii)  The transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)  (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)  Such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)  In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and the Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrowers or any other Loan Party, that:

(i)  none of the Administrative Agent or the Arranger, or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto),

(ii)  the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the

143

Letters of Credit, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50,000,000, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E).

(iii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is a fiduciary under ERISA or the Internal Revenue Code, or both, with respect to the Loans, the Letters of Credit, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)    no fee or other compensation is being paid directly to the Administrative Agent or the Arranger or any of their respective Affiliates for investment advice (as opposed to other services) in connection with the Loans, the Letters of Credit, the Commitments or this Agreement.

(c)    The Administrative Agent and the Arranger hereby informs the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Letters of Credit, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans, the Letters of Credit or the Commitments for an amount less than the amount being paid for an interest in the Loans, the Letters of Credit or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

**ARTICLE 12**

**MISCELLANEOUS**

**12.01    Amendments, Etc.** Except as provided in Sections 2.15, 2.17, 2.18, and 3.03(b) as in effect on the date hereof, no amendment or waiver of any provision of any Loan Document (other than the Fee Letter, the Landlord Agreements, the Deposit Account Control Agreements, the Issuer Documents, any Secured Hedge Agreement, agreements hereafter executed solely in respect of the Banking Services Obligations and Schedule 6.18), and no consent to any departure by any Borrower or any other Loan Party therefrom, shall be effective unless in writing executed by (1) in the case of any amendment, consent or waiver to cure any ambiguity, omission, defect or inconsistency or granting a new Lien for the benefit of the Secured Parties or extending any existing Lien over additional property or

144

adding additional Subsidiaries of Intermediate Holdings or other pledgors as parties thereto, the Administrative Agent and the applicable Borrower or Loan Party, (2) in the case of any amendment necessary to implement the terms of a Term Loan Increase or a Revolving Commitment Increase in accordance with the terms hereof, the Administrative Agent, the Borrowers and the participating Lenders, and (3) in the case of any other amendment, consent or waiver, the Required Lenders (or the Administrative Agent with the consent of the Required Lenders) and the applicable Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, provided, that no such amendment, waiver or consent shall:

(a)        extend the expiry or increase the amount of the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 9.02) without the written consent of such Lender (it being understood and agreed that a waiver or amendment of any condition precedent set forth in Section 4.02 or of any Default or Event of Default shall not be considered an extension or increase in Commitments of any Lender);

(b)        postpone any date fixed by this Agreement or any other Loan Document for any payment of principal (excluding mandatory prepayments), Unreimbursed Amounts, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby;

(c)        reduce or forgive the principal of, or the rate of interest specified herein on, any Loan or Unreimbursed Amounts, or any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby, provided, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate, and no change to the definition of "Consolidated Total Leverage Ratio" or in the component definitions thereto shall be considered to be a reduction or forgiveness of interest;

(d)        change Section 2.13 or Section 9.04 or the definition of "Pro Rata Share" in a manner that would alter the sharing or application or priority of payments required thereby without the written consent of each Lender;

(e)        change any provision of this Section 12.01 or the definition of "Required Lenders", "Required Revolving Lenders" or "Required Term Loan Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights thereunder or make any determination or grant any consent thereunder without the written consent of each Lender;

(f)        release all or substantially all of the Collateral, consensually subordinate the Liens of Administrative Agent on the Collateral or consensually subordinate the Obligations to other indebtedness or liabilities (in accordance with this Agreement (as in effect on the date hereof) or in accordance with financing to one or more Loan Parties, pursuant to Section 364 of the Bankruptcy Code or any similar proceeding under any Debtor Relief Law) without the written consent of each Lender;

(g)        change any provision that restricts the Sponsor or its Affiliates from holding an interest (whether through an assignment, a participation or otherwise) in the Obligations without the written consent of each Lender; or

(h)        release any Borrower; or release all or substantially all of the Guarantors from their obligations under the Loan Documents (or otherwise limit such Guarantors' liability) without the written consent of each Lender directly affected thereby;

145

and, provided further, that (i) no amendment, waiver or consent shall, unless in writing and executed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document; (ii) to the extent that an L/C Issuer or Support Provider (as the case may be) is a party to this Agreement, no amendment, waiver or consent shall, unless in writing and executed by the L/C Issuers or Support Providers in addition to the Lenders required above, affect the rights or duties of any L/C Issuers or Support Providers under this Agreement; (iii) no amendment, waiver or consent shall, unless in writing and executed by the Swingline Lender in addition to the Lenders required above, affect the rights or duties of the Swingline Lender under this Agreement; (iv) a Secured Hedge Agreement, agreements hereafter executed solely in respect of the Banking Services Obligations, the Fee Letter, the Landlord Agreements, the Deposit Account Control Agreements and the Issuer Documents may be amended, or rights or privileges thereunder waived, in a writing executed only by the required parties thereto; (v) no amendment, waiver or consent shall, unless in writing signed by Required Term Loan Lenders and Required Revolving Lenders, amend or modify the terms of Section 2.05(b)(vii) in a manner that would alter the application of mandatory prepayments; (vi) no amendment, waiver or consent shall unless in writing and signed by all Revolving Lenders, amend the percentage specified in the definition of Required Revolving Lenders; and (vii) no amendment, waiver or consent shall, unless in writing and signed by all Term Loan Lenders, amend the percentage specified in the definition of Required Term Loan Lenders.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that (i) the Revolving Commitment of such Lender may not be increased without the consent of such Defaulting Lender and (ii) any waiver, amendment or modification requiring the consent of each affected Lender which affects such Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

Each waiver or consent under any Loan Document shall be effective only in the specific instance and for the specific purpose for which it was given.

**12.02    Notices and Other Communications; Facsimile Copies**.

(a)    General.  Unless otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (which includes messages sent by electronic mail or other electronic transmission).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or (subject to subsection (c) below) electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Borrower Representative or the Loan Parties, to the Borrower Representative, at the address, facsimile number, electronic mail address or telephone number specified for the Borrower Representative on Schedule 12.02 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Administrative Agent;

(ii)    if to the Administrative Agent, the L/C Issuer, the Support Provider, or Swingline Lender, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 12.02 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Borrower Representative and Administrative Agent; and

(iii)    if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other

146

address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Borrower Representative and the Administrative Agent.

All such notices and other communications shall be deemed to be delivered or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when received by the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of subsection (c) below), when delivered, provided, however, that notices and other communications to the Administrative Agent pursuant to Article 2 shall not be effective until actually received by such Person.  In no event shall a voicemail message be effective as a notice, communication or confirmation hereunder.

(b)  Effectiveness of Facsimile Documents and Signatures.  Loan Documents may be transmitted and/or executed by facsimile, or by electronic mail.  The effectiveness of any such documents and signatures shall, subject to applicable Law, have the same force and effect as manually signed originals and shall be binding on all Loan Parties, the Administrative Agent and the Lenders.  The Administrative Agent may also require that any such documents and signatures be confirmed by a manually signed original thereof, provided, that the failure to request or deliver the same shall not limit the effectiveness of any facsimile or other electronic document or signature.

(c)  Limited Use of Electronic Mail.  Electronic mail and internet and intranet websites may be used only to distribute routine communications, such as financial statements and other information as provided in Section 6.01 and Section 6.02, and to deliver any other notices and other communications and to distribute Loan Documents for execution by the parties thereto, and may not be used for any other purpose without the consent of the Administrative Agent.

(d)  Reliance by Administrative Agent and Lenders.  The Administrative Agent and the Lenders shall be entitled to rely and act upon, and shall not incur any liability for relying upon, any notices (including telephonic Loan Notices) purportedly delivered by or on behalf of any Loan Party or the Borrower Representative even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrowers shall indemnify each Agent-Related Person and each Lender from all losses, costs, expenses and liabilities resulting from the reliance, in good faith, by such Person on each notice purportedly delivered by or on behalf of any Loan Party or Borrower Representative.  All telephonic notices to and other communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

(e)  Public Materials.  Borrowers hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of Loan Parties hereunder (collectively, "**Borrower Materials**") by posting the Borrower Materials on any E-System and (b) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive material non-public information with respect to Holdings or its Subsidiaries, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  Borrowers hereby agree that so long as a Loan Party is the issuer of any outstanding debt or equity securities that are registered or issued pursuant to a Rule 144A private offering or is actively contemplating issuing any such securities it will, if requested by the Administrative Agent, use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC"

147

shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to any Loan Party or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 12.08); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of any E-System designated "Public Side Information"; and (z) the Administrative Agent shall treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of any E-System not designated "Public Side Information." Notwithstanding the foregoing, Borrowers shall be under no obligation to mark the Borrower Materials "PUBLIC."

**12.03    No Waiver; Cumulative Remedies**. No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

**12.04    Attorney Costs, Expenses**. Any action taken by any Loan Party under or with respect to any Loan Document, even if required under any Loan Document or at the request of any Secured Party, shall be at the expense of such Loan Party, and no Secured Party shall be required under any Loan Document to reimburse any Loan Party therefor except as expressly provided therein. The Borrowers agree (a) to pay or reimburse the Administrative Agent for all reasonable, documented out-of-pocket costs and expenses incurred in connection with the development, preparation, negotiation and execution of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated hereby or thereby are consummated), and the consummation, syndication and administration of the transactions contemplated hereby and thereby, including all reasonable Attorney Costs and costs and expenses in connection with the use of IntraLinks, SyndTrak, StuckyNet, or other similar information transmission systems in connection with this Agreement (each being an "E-System"), and (b) to pay or reimburse the Administrative Agent, the L/C Issuer and each Support Provider and each Lender for all documented out-of-pocket costs and expenses incurred in connection with the enforcement, attempted enforcement, or preservation of any rights following the occurrence and during the continuance of a Default or an Event of Default or the exercise of remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any "workout" or restructuring in respect of the Obligations and during any legal proceeding, including any proceeding under any Debtor Relief Law), including all Attorney Costs. In the case of Attorney Costs otherwise payable or reimbursable under this paragraph (other than pursuant to clause (b) in the immediately preceding sentence, which Attorney Costs will not be so limited), Attorney Costs shall be limited to the reasonable fees, disbursements and other charges of one counsel to the Secured Parties and one separate counsel for the Administrative Agent and, if reasonably necessary, of one special counsel and one local counsel to the Secured Parties and another to the Administrative Agent in each and any relevant jurisdiction, and, solely in the case of any actual or perceived conflict of interest, one additional counsel in each relevant jurisdiction for each Secured Party similarly situated. The foregoing costs and expenses shall include all due diligence, search, filing, recording, title insurance and appraisal charges and fees and taxes related thereto, and other out-of-pocket expenses (including travel, courier, reproduction, printing and delivery expenses) incurred by the applicable Persons and the cost of independent public accountants, consultants and other outside experts retained by the Administrative Agent or any Lender. All amounts due under this Section 12.04 shall be deemed part of the Obligations when incurred and shall be payable within ten (10) Business Days after demand therefor. The agreements in this Section 12.04 shall survive the Termination Date.

148

**12.05**    **Indemnification by the Loan Parties**.  The Loan Parties agree jointly and severally to indemnify and hold harmless each Agent-Related Person, each Lender, the L/C Issuer, Support Providers, each Secured Party and the respective Affiliates of all such Persons, and the directors, officers, employees, counsel, trustees, advisors, agents, financing sources, managed funds, controlling persons, attorneys-in-fact, and members of all of the foregoing Persons (collectively, the "Indemnitees") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including Attorney Costs incurred by each Indemnitee and other costs of investigation or defense, including those incurred upon any appeal), but in the case of Attorney Costs, limited to the reasonable fees, disbursements and other charges of one primary counsel to the Indemnitees and, if necessary, of special counsel and one local counsel to the Indemnitees in each and any relevant jurisdiction and in the case of any actual or perceived conflict of interest, one additional counsel to each relevant jurisdiction for the group of Indemnitees similarly situated, of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance, syndication or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Commitment, Loan or Letter of Credit or Support Agreement or the use or proposed use of the proceeds therefrom (including any refusal by any L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (c) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by any Borrower, any Subsidiary or any other Loan Party, or any Environmental Liability related in any way to any Borrower, any Subsidiary or any other Loan Party, or (d) any actual or prospective claim, litigation, investigation or Proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding), whether brought by a third party or by any Loan Party, and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "Indemnified Liabilities"), provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee (or such Indemnitee's officers, directors, employees or agents).  No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through the internet or any E-System in connection with this Agreement, **nor shall any Indemnitee have any liability for any punitive, special, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether arising or occurring before or after the Closing Date).** All amounts due under this Section 12.05 shall be payable within ten (10) Business Days after demand therefor.  The agreements in this Section 12.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender and the Termination Date.  To the extent that the indemnification set forth in this Section 12.05 may be unenforceable, each Loan Party shall contribute the maximum portion which it is permitted to pay and satisfy under applicable Law to the payment and satisfaction of all such Indemnified Liabilities incurred by the Indemnitees or any of them.  Without limiting the generality of any provision of this Section 12.05, to the fullest extent permitted by law, each Loan Party hereby waives all rights for contribution or any other rights of recovery with respect to liabilities, losses, damages, costs and expenses arising under or relating to Environmental Laws that it might have by statute or otherwise against any Indemnitee, except to the extent that such items are determined by a final and non-appealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee.  No Loan Party shall, without the prior written consent of each applicable Indemnitee, effect any settlement of any pending or threatened proceedings in respect of which indemnity could have been sought hereunder by such Indemnitee unless such settlement (i) includes an

149

unconditional release of such Indemnitee in form and substance reasonably satisfactory to such Indemnitee from all liability or claims that are the subject matter of such proceedings and (ii) does not include any statement as to or any admission of fault, culpability, wrong doing or a failure to act by or on behalf of any Indemnitee. This Section 12.05 shall not apply with respect to Taxes other than any Taxes that represent liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements arising from any non-Tax related Indemnified Liability.

12.06    **Payments Set Aside**. To the extent that any payment by or on behalf of any Loan Party is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of set-off, and such payment or the proceeds of such set-off or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid or turned-over to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied (along with any Lien previously terminated with respect to such obligation) shall be revived and continued in full force and effect as if such payment had not been made or such set-off had not occurred, the Termination Date had not occurred and such termination had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The provisions of this paragraph shall survive any termination of this Agreement.

12.07    **Successors and Assigns**.

(a)    Successors and Assigns Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, the Indemnitees and to the extent provided in Section 11.13 each other Secured Party, provided that (x) neither any Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and (y) no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section 12.07, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section 12.07 or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section 12.07 (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section 12.07, the Indemnitees and to the extent provided in Section 11.13 each other Secured Party) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders. Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it), provided that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund of a Lender, no minimum amount need be assigned; and

150

(B)    in any case not described in subsection (b)(i)(A) of this Section 12.07, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of such Trade Date) shall not be less than $1,000,000, in the case of any assignment of a Revolving Commitment, or $1,000,000, in the case of any assignment of a Term Loan Commitment or Term Loan, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower Representative, otherwise consents (each such consent not to be unreasonably withheld, conditioned or delayed).

(ii)    Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate tranches or facilities on a non-pro rata basis.

(iii)    Required Consents.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section 12.07 and, in addition:

(A)    the consent of the Borrower Representative (such consent not to be unreasonably withheld, conditioned or delayed) shall be required unless (x) an Event of Default under clauses (a), (b) (with respect to Article 8 only), (f), (g) or (k) of Section 9.01 has occurred and is continuing at the time of such assignment, or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund of a Lender, provided that the Borrower Representative shall be deemed to have consented to any such assignment if the Administrative Agent has not received an objection thereto in writing within ten (10) Business Days after the Borrower Representative's receipt of notice of such assignment; and

(B)    the consent of the Administrative Agent (and also the L/C Issuer or, if applicable, the Support Provider and the Swingline Lender, in the case of any assignment of Revolving Exposure), such consent not to be unreasonably withheld, conditioned or delayed, shall be required for assignments in respect of (i) any Revolving Exposure if such assignment is to a Person that is not a Lender with a Revolving Commitment or an Approved Fund with respect to such assigning Lender, provided that Administrative Agent's (and L/C Issuer's or, if applicable, Support Provider's and the Swingline Lender's) consent, shall be required if the proposed assignee Lender is a Defaulting Lender or (ii) a Term Loan to a Person who is not a Lender, an Affiliate of a Lender or an Approved Fund of a Lender.

(iv)    Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (unless waived by the Administrative Agent at its sole option), and the assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)    No Assignment to certain Persons.  No such assignment may be made to the Sponsor, any Loan Party or any Defaulting Lender or any of their respective Affiliates or

151

Subsidiaries reasonably identifiable on basis of such Person's name. No such assignment shall be made to a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person).

(vi)     No Assignment to Prohibited Assignee. No such assignment shall be made to any Disqualified Institution (so long as the list of Disqualified Institutions is available to the Lenders) unless an Event of Default described in Section 9.01(a), Section 9.01(f) or Section 9.01(g) has occurred and is continuing at the time of such assignment.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section 12.07, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 12.04 and 12.05 with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request of the assignee Lender made itself or through the Administrative Agent, the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section 12.07.

For purposes of determining compliance with Section 12.07(b)(v) above, the Administrative Agent and assigning Lender may rely upon the representations and warranties of the proposed assignee Lender; it being agreed that neither the Administrative Agent nor any assigning Lender shall have any duty of inquiry to determine such compliance.

(c)     Register. The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers (the "Registrar"), shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, the principal amounts of the Loans owing to, and the Letter of Credit Liabilities and Swingline Exposure held by, each Lender pursuant to the terms hereof from time to time (the "Register"). No assignment or transfer of a Loan or a Commitment (other than a pledgee described in subsection (f) below) shall be effective unless and until registered in the Register. The entries in the Register shall be conclusive, and the Borrowers, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary, provided that, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or any Borrower's or other Loan Party's Obligations in respect of any Loan or Letter of Credit. The Register shall be available for inspection by any Borrower and any Lender (but, with respect to any Lender, solely as to the Loans and Commitments thereof), at any reasonable time and from time to time upon reasonable prior notice. Each Borrower hereby designates the entity serving as the Administrative Agent to serve as such Borrower's non-fiduciary agent solely for purposes of maintaining the Register as provided in this Section, and each Borrower hereby agrees that the entity serving as Registrar and its Affiliates, and their respective officers, directors, employees and agents shall constitute Indemnitees under Section 12.05. At the written request of the registered Lender, the Registrar shall note a collateral assignment of a Loan on the Register as described in subsection (f) below and, provided that

152

the Registrar has received the name and address of such collateral assignee, the Registrar (i) shall not permit any further transfers of the Loan on the Register absent receipt of written consent to such transfers from such collateral assignee and (ii) shall record the transfer of the Loan on the Register to such collateral assignee (or such collateral assignee's designee, nominee or assignee) upon written request by such collateral assignee and compliance with the other provisions of this Agreement governing collateral assignments.

(d)      Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrower Representative, any Loan Party, the Administrative Agent, the L/C Issuer, the Support Provider or the Swingline Lender, sell participations to any Person (other than a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person), a Defaulting Lender or its Affilaites, or any Loan Party, the Sponsor or any of their respective Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it (including such Lender's Letter of Credit Liabilities and Swingline Exposure)), provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) each Borrower, each other Loan Party, the Administrative Agent and the Lenders, the L/C Issuer and Swingline Lender shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement, provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso of Section 12.01 (clauses (a) through (g)) that affects such Participant.  Subject to subsection (e) of this Section, each Borrower and each other Loan Party agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.09 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a Lender.

Each Lender that sells a participation shall acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a Participant's interest in any Commitments, Loans, Letters of Credit or other Obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan, Letter of Credit or other Obligation is in registered form under Section 5f 103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)      Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to

153

such Participant is made with the Borrower Representative's prior written consent and such Participant shall in any event be subject to replacement pursuant to Section 12.15 in the event it exercises such rights.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.01 unless the Borrower Representative is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrowers, to comply with Section 3.01 as though it were a Lender.

(f)  Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank and any pledge to a trustee as security for the benefit of the noteholders and other securityholders or creditors of a Lender, provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto until the provisions of this Section regarding assignment are satisfied with respect to such pledge or assignment.

(g)  Lender Securitization.  In addition to any other assignment permitted pursuant to this Section, the Loan Parties hereby agree that (i) the Lenders, their Affiliates and Approved Funds (the "Lender Parties") may sell or securitize the Loans (a "Lender Securitization") through the pledge of the Loans as collateral security for loans to a Lender Party or the assignment or issuance of direct or indirect interests in the Loans (such as, for instance, collateralized loan obligations), and (ii) such Lender Securitization may be rated by a Rating Agency, provided that the consent of the Borrower Representative (such consent not to be unreasonably withheld, conditioned or delayed) to the assignment or issuance of direct or indirect interests in the Loans shall be required unless an Event of Default has occurred and is continuing at the time of such assignment or issuance, or such assignment or issuance is to a Lender Party or a Person Controlled by a Lender Party (provided, further, that such consent shall be deemed given if Administrative Agent has not received an objection to any such consent or issuance in writing within five (5) Business Days after the Borrower Representative's receipt of notice of such proposed assignment or issuance).  The Loan Parties shall reasonably cooperate with the Lender Parties to effect the Lender Securitization, including providing such information as may be reasonably requested by the Lenders or Rating Agencies in connection with the rating of the Loans or the Lender Securitization, provided that (i) no costs incurred by the Lender Parties in connection with such Lender Securitization shall be reimbursable by the Loan Parties and (ii) the Loan Parties shall not be required to enter into any amendment or additional documentation that adversely affects the rights or the obligations, of Borrowers under the Loan Documents or changes or affects in a manner adverse to the Borrowers the financial terms of the Loans, in each case, as determined by the Borrower Representative in its sole discretion.

(h)  Consent to Disclosure; Cooperation of Loan Parties.  Subject to the provisions of Section 12.08, each Loan Party authorizes each Lender to disclose to any prospective participant or assignee of a Commitment or Loan, any and all information in such Lender's possession concerning the Loan Parties and their financial affairs which has been delivered to such Lender by or on behalf of the Loan Parties pursuant to this Agreement, or which has been delivered to such Lender by or on behalf of the Loan Parties in connection with such Lender's credit evaluation of the Loan Parties prior to entering into this Agreement.  If necessary, each Loan Party agrees to (i) execute any documents (including new Revolving Notes and/or Term Notes) reasonably required to effectuate and acknowledge each assignment of a Commitment or Loan to an assignee in accordance with Section 12.07, (ii) make the Loan Parties' management available to meet with the Administrative Agent and prospective participants and assignees of Commitments or Loans and (iii) assist the Administrative Agent or the Lenders in the preparation of information relating to the financial affairs of the Loan Parties as any prospective participant or assignee of a Commitment or Loan reasonably may request.

154

(i)        Assignments to Affiliated Lenders.  Notwithstanding anything in this Agreement to the contrary, any Term Loan Lender may, at any time, assign all or a portion of its Term Loans on a non-pro rata basis to an Affiliated Lender through open-market purchases, subject to the following limitations:

(i)        in connection with an assignment to an Affiliated Lender, (A) the Affiliated Lender shall have identified itself in writing as an Affiliated Lender to the assigning Term Loan Lender and the Administrative Agent prior to the execution of such assignment and (B) the Affiliated Lender shall be deemed to have represented and warranted to the assigning Term Loan Lender and the Administrative Agent that (x) the requirements set forth in this Section 12.07(i), shall have been satisfied upon consummation of the applicable assignment; and (y) either (1) such Affiliated Lender is not in possession of material non-public information that has not been disclosed to the assigning Term Loan Lender or (2) such Affiliated Lender cannot make the representation set forth in Section 12.07(i)(i)(y) hereof;

(ii)       the assigning Lender and the Affiliated Lender purchasing such Lender's portion of the Term Loan shall execute and deliver to the Administrative Agent an assignment agreement substantially in the form of Exhibit Z hereto (an "Affiliated Lender Assignment and Assumption");

(iii)      Affiliated Lenders will not (A) have the right to receive information, reports or other materials provided solely to Lenders by the Administrative Agent or any other Lender, except to the extent made available to the Borrowers, (B) attend or participate in meetings attended solely by the Lenders and the Administrative Agent, or (C) access any electronic site established for the Lenders or confidential communications from counsel to or financial advisors of the Administrative Agent or the Lenders;

(iv)      (A) for purposes of any consent to any amendment, waiver or modification of, or any action under, and for the purpose of any direction to the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) under, this Agreement or any other Loan Document, each Affiliated Lender will be deemed to have consented in the same proportion as the Term Loan Lenders that are not Affiliated Lenders that have consented to such matter, unless such matter requires the consent of all or all affected Lenders and adversely affects such Affiliated Lender more than other Term Loan Lenders in any material respect, provided, that in no event shall an amendment, waiver or modification cause the Commitments of any Affiliated Lender to increase, extend the due date for the payments of interest and scheduled amortization (including on the Term Loan Maturity Date) owing to any Affiliated Lender or reduce the amounts owing to any Affiliated Lender, in each case, without the consent of such Affiliated Lender, (B) for purposes of voting on any plan of reorganization or plan of liquidation pursuant to any Debtor Relief Laws (a "Plan"), each Affiliated Lender hereby agrees (x) not to vote on such Plan, (y) if such Affiliated Lender does vote on such Plan notwithstanding the restriction in the foregoing clause (x), such vote will be deemed not to be in good faith and shall be "designated" pursuant to Section 1126(e) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws), and such vote shall not be counted in determining whether the applicable class has accepted or rejected such Plan in accordance with Section 1126(c) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws) and (z) not to contest any request by any party for a determination by the Bankruptcy Court (or other applicable court of competent jurisdiction) effectuating the foregoing clause (y), in each case under this clause (iv)(B) unless such Plan adversely affects such Affiliated Lender more than other Term Loan Lenders in any material respect, and (C) each Affiliated Lender hereby irrevocably appoints the Administrative Agent (such appointment being coupled with an

155

interest) as such Affiliated Lender's attorney-in-fact, with full authority in the place and stead of such Affiliated Lender and in the name of such Affiliated Lender (solely in respect of Term Loans therein and not in respect of any other claim or status such Affiliated Lender may otherwise have), from time to time in the Administrative Agent's discretion to take any action and to execute any instrument that the Administrative Agent may deem reasonably necessary or appropriate to carry out the provisions of this clause (iv), including to ensure that any vote of such Affiliated Lender on any Plan is (at the Administrative Agent's sole option) withdrawn, otherwise not counted or made in accordance with the votes of the non-Affiliated Lenders in the same proportion as the non-Affiliated Lenders have voted;

(v)    the aggregate principal amount of the Term Loans held at any one time by Affiliated Lenders may not exceed fifteen percent (15%) of the aggregate outstanding principal amount of the Term Loans;

(vi)    Affiliated Lenders shall not constitute more than forty-nine percent (49%) of the total number of all Term Loan Lenders;

(vii)    the Affiliated Lender will not be entitled to bring actions against the Administrative Agent, in its role as such (all of which claims each Affiliated Lender hereby releases and agrees to indemnify, defend and hold the Secured Parties harmless from) or receive advice of counsel or other advisors to the Administrative Agent or any other Lenders or challenge the attorney client privilege of their respective counsel;

(viii)    the portion of any Loans held by Affiliated Lenders required to be held by Lenders in order for such Lenders to constitute "Required Lenders" or Required Term Loan Lenders shall be disregarded in determining Required Lenders or Required Term Loan Lender at any time or to meet any minimum head-count; and

(ix)    to the extent that any Affiliated Lender receives an offer from the Borrowers to repurchase Term Loans on a pro rata basis, such Affiliated Lender shall be required to accept such offer.

Each Affiliated Lender that is a Term Loan Lender hereunder agrees to comply with the terms of this Section 12.07(i) (notwithstanding that it may be granted access to an electronic site established for the Lenders by the Administrative Agent), and agrees that in any subsequent assignment of all or any portion of its Term Loans it shall identify itself in writing to the assignee as an Affiliated Lender prior to the execution of such assignment.

For the avoidance of doubt, Lenders shall not be permitted to assign any other Term Loan (except in accordance with the foregoing provisions) or any Revolving Commitments or Revolving Loans (or grant any participation therein) to an Affiliated Lender and any purported assignment of or participation in each other Term Loan any Revolving Commitments or Revolving Loans to an Affiliated Lender shall be null and void (or at the Administrative Agent's election, any Commitments or Loans purported to be acquired by such Affiliated Lender shall be deemed permanently canceled and discharged).

(j)    Borrower Buybacks.  Notwithstanding anything in this Agreement to the contrary, any Term Loan Lender may, at any time, assign all or a portion of its Term Loans on a non-pro rata basis to the Borrowers in accordance with the procedures set forth on Exhibit G, pursuant to an offer made available to all Term Loan Lenders on a pro rata basis (a "Dutch Auction"), subject to the following limitations:

156

(i)      the Borrowers shall represent and warrant, as of the date of the launch of the Dutch Auction and on the date of any such assignment, that neither the Borrower, their respective Affiliates nor any of their respective directors or officers has any material non-public information that has not been disclosed to the Term Loan Lenders generally (other than to the extent any such Term Loan Lender does not wish to receive material non-public information with respect to the Borrowers or its Subsidiaries or any of their respective securities) prior to such date or that the Borrowers cannot make such representation and warranty;

(ii)      immediately and automatically, without any further action on the part of the Borrowers, any Lender, the Administrative Agent or any other Person, upon the effectiveness of such assignment of Term Loans from a Term Loan Lender to the Borrowers (or any of them), such Term Loans and any related Commitments and all rights and obligations as a Term Loan Lender related thereto shall, for all purposes under this Agreement, the other Loan Documents and otherwise, be deemed to be irrevocably prepaid, terminated, extinguished, cancelled and of no further force and effect, and the Borrowers shall neither obtain nor have any rights as a Term Loan Lender hereunder or under the other Loan Documents by virtue of such assignment

(iii)      the Borrowers shall not use the proceeds of any Revolving Loans, Delayed-Draw Term Loans or other Loans for any such assignment; and

(iv)      no Default or Event of Default shall have occurred and be continuing before or immediately after giving effect to such assignment.

**12.08    Confidentiality**.

(a)      Each Loan Party acknowledges that (i) from time to time financial advisory, investment banking and other services may be offered or provided to it (in connection with this Agreement or otherwise) by each Lender or by one or more affiliates of such Lender and (ii) information delivered to each Lender by the Loan Parties may be provided to each such affiliate, it being understood that any such affiliate receiving such information shall be bound by the provisions of Section 12.08(b) as if it were a Lender under this Agreement.

(b)      Each of the Administrative Agent and each Lender severally (and not jointly) agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its Affiliates and Approved Funds and to its and its Affiliates' and Approved Funds' respective partners, directors, officers, employees, agents, consultants, counsel, accountants, advisors, controlling persons, managed funds, financing sources, actual and prospective investors, and other representatives (collectively, the "Representatives") (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), or to Rating Agencies, (ii) to the extent requested or required by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), including, without limitation, any regulatory filings, (iii) to the extent required by applicable Laws or by any subpoena or similar judicial or legal process, (iv) to any other party to the Loan Documents, (v) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or Proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (vi) to (A) any actual or prospective assignee of a Lender, assignee or successor of Administrative Agent, or pledgee of or Participant in any of its rights or obligations under this Agreement, or (B) any actual or prospective counterparty to any swap or derivative transaction or Banking Services transactions relating to any Borrower or any other Loan Party and its obligations, or (C) any counterparty to any Subordination Agreement to the extent required by the provisions of such Subordination Agreement, provided that such

157

parties agree to be bound by confidentiality provisions substantially similar to those hereunder, and to the Representatives of the foregoing parties in clauses (A) and (B) and (C), (vii) with the consent of the Borrower Representative, (viii) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Section or (B) becomes available to the Administrative Agent, any Lender, or any of their respective Representatives on a non-confidential basis from a source other than the Loan Parties or (ix) for purposes of establishing a due diligence defense. The terms of this provision shall supersede and replace any previous agreement regarding the confidentiality of the Information and shall terminate upon the termination of the Commitments and the payment of the Obligations.

For purposes of this Section, (i) "Information" means, all information received from any Loan Party or any of its Subsidiaries relating to any Loan Party or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to or in the possession of the Administrative Agent, any other Secured Party or their Representatives on a non-confidential basis prior to disclosure by any Loan Party or any of its Subsidiaries and (ii) "Rating Agencies" means Moody's, S&P, Fitch Ratings Ltd., or any other nationally recognized rating agency or service. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. Notwithstanding anything herein to the contrary, "Information" shall not include, and the Administrative Agent and each other Secured Party may disclose without limitation of any kind, any information with respect to the "tax treatment" and "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Administrative Agent or such other Secured Party relating to such tax treatment and tax structure, provided that with respect to any document or similar item that in either case contains information concerning the tax treatment or tax structure of the transaction as well as other information, this sentence shall only apply to such portions of the document or similar item that relate to the tax treatment or tax structure of the Loans and transactions contemplated hereby.

(c)    No Borrower or Affiliate thereof will issue any press releases or other public disclosure using the name of the Administrative Agent or its Affiliates or any other Lender or its Affiliates or referring to this Agreement or the other Loan Documents without at least three (3) Business Days' prior notice to the Administrative Agent or such Lender and without the prior written consent of the Administrative Agent or such Lender unless (and only to the extent that) such Borrower or Affiliate is required to do so under law and then, in any event, such Borrower or Affiliate will consult with such Lender before issuing such press release or other public disclosure. The Borrowers hereby consent to the publication by any Secured Party of a tombstone or similar advertising material relating to the financing transactions contemplated by this Agreement (such material may, without limitation, include a description of the Loan Parties and the use of any identifying trademark or other marks of a Loan Party). Each Secured Party reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

12.09    Set-off. In addition to any rights and remedies of the Lenders provided by law, upon the occurrence and during the continuance of any Event of Default, each Lender and any Affiliate of a Lender is authorized at any time and from time to time, with the prior written consent of the Administrative Agent, but without prior notice to the Borrowers or any other Loan Party (any such notice being waived by the Borrowers on their own behalf and on behalf of each Loan Party), to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other indebtedness at any time owing by, such Lender or such Affiliate to or for the credit or the account of the respective Loan Parties against any and all Obligations owing to such Lender hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not the Administrative Agent or such Lender shall have made demand under this Agreement or any other

158

Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or indebtedness. Each Lender agrees promptly to notify the Borrowers and the Administrative Agent after any such set-off and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such set-off and application. Any Lender exercising a right to set-off shall purchase for cash (and the other Lenders shall sell) interests in each of such other Lender's Pro Rata Share of the Obligations as would be necessary to cause all Lenders to share the amount so set-off with each other Lender in accordance with their respective Pro Rata Share of the Obligations.

12.10    **Interest Rate Limitation**. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers. In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

12.11    **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.12    **Integration**. This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter, including the Proposal Letter (other than in respect of any terms that expressly survive the termination or expiration thereof following the delivery of this Agreement), provided that the Fee Letter shall survive the effectiveness of this Agreement and the initial Credit Extensions hereunder and shall continue to be in full force and effect after the Closing Date in accordance with their terms. In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control, provided that the inclusion of supplemental rights or remedies in favor of the Administrative Agent or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

12.13    **Survival of Representations and Warranties**. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

12.14    **Severability**. If any provision of this Agreement or any other Loan Document is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the

159

illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**12.15    Replacement of Lenders**.  If (i) any Lender requests compensation under Section 3.04, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, unless such Lender has waived its right to such additional amount, (iii) a Lender (a "Non-Consenting Lender") does not consent to a proposed change, waiver, discharge or termination with respect to any Loan Document that has been approved by the Required Lenders as provided in Section 12.01 but requires unanimous consent of all Lenders or all Lenders directly affected thereby (as applicable), (iv) it is, and continues to be, unlawful for any Lender to fund or maintain LIBOR Loans, as provided in Section 3.02, or (v) any Lender is a Defaulting Lender, then Administrative Agent or the Borrower Representative may, at its sole option, expense and effort, and upon notice to such Lender and, in the case of an election made by the Borrower Representative, the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 12.07), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)    the Borrowers shall have paid to the Administrative Agent the assignment fee specified in Section 12.07(b), if any;

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and Unreimbursed Amounts, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(d)    such assignment does not conflict with applicable Laws; and

(e)    in the case of any such assignment resulting from a Non-Consenting Lender's failure to consent to a proposed change, waiver, discharge or termination with respect to any Loan Document, the applicable replacement Lender consents to the proposed change, waiver, discharge or termination, provided that the failure by such Non-Consenting Lender to execute and deliver an Assignment and Assumption shall not impair the validity of the removal of such Non-Consenting Lender and the mandatory assignment of such Non-Consenting Lender's Commitments and outstanding Loans and participations in outstanding Letters of Credit pursuant to this Section 12.15 shall nevertheless be effective without the execution by such Non-Consenting Lender of an Assignment and Assumption.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers or Administrative Agent to require such assignment and delegation cease to apply.

**12.16    Governing Law**.

(a)    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO AND THERETO SHALL BE

160

CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ANY CONFLICTS OF LAWS PRINCIPLES THEREOF THAT WOULD CALL FOR THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.

(b)      Each Loan Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against any Secured Party of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable Law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or in any other Loan Document shall affect any right that any Secured Party may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction. Each Loan Party hereby irrevocably waives, to the fullest extent not prohibited by applicable Law, any objection that it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.

**12.17    Waiver of Right to Trial by Jury**. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

**12.18    USA Patriot Act Notice**. Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of the Loan Parties and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Loan Parties in accordance with the Patriot Act.

**12.19    Nonliability of Lenders**. The relationship between the Loan Parties on the one hand and the Lenders and the Administrative Agent on the other hand shall be solely that of borrower or guarantor, as applicable, and lender. Neither the Administrative Agent nor any Lender or other Secured Party has any fiduciary relationship with or duty to any Loan Party arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Loan Parties, on the one hand, and the Administrative Agent and the Lenders and other Secured Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor. Neither the Administrative Agent

161

nor any Lender or any other Secured Party undertakes any responsibility to any Loan Party to review or inform any Loan Party of any matter in connection with any phase of any Loan Party's business or operations. The Loan Parties agree that neither the Administrative Agent nor any Lender or other Secured Party shall have liability to any Loan Party (whether sounding in tort, contract or otherwise) for losses suffered by any Loan Party in connection with, arising out of, or in any way related to the transactions contemplated and the relationship established by the Loan Documents, or any act, omission or event occurring in connection therewith, unless it is determined in a final non-appealable judgment by a court of competent jurisdiction that such losses resulted from the gross negligence or willful misconduct of the party from which recovery is sought. **NO SECURED PARTY SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE USE BY OTHERS OF ANY INFORMATION OR OTHER MATERIALS OBTAINED THROUGH INTRALINKS OR OTHER SIMILAR INFORMATION TRANSMISSION SYSTEMS IN CONNECTION WITH THIS AGREEMENT, NOR SHALL ANY SECURED PARTY HAVE ANY LIABILITY WITH RESPECT TO, AND THE BORROWER REPRESENTATIVE ON BEHALF OF ITSELF AND EACH OTHER LOAN PARTY, HEREBY WAIVES, RELEASES AND AGREES NOT TO SUE FOR ANY SPECIAL, PUNITIVE, INDIRECT OR CONSEQUENTIAL DAMAGES RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ARISING OUT OF ITS ACTIVITIES IN CONNECTION HEREWITH OR THEREWITH (WHETHER BEFORE OR AFTER THE CLOSING DATE).** The Loan Parties acknowledge that they have been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party. No joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Administrative Agent, Lenders or among the Loan Parties and the Lenders and the Administrative Agent. The Loan Parties further acknowledge that each Lender or one or more of its affiliates may be a financial and securities firm and that such Lender or such affiliates may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of a Loan Party and its affiliates and of other companies that may be the subject of the transactions contemplated by this Agreement. The Loan Parties further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between a Loan Party and the Secured Parties (or any of them) is intended to be or has been created in respect of any of the transactions contemplated by this Agreement, irrespective of whether any Secured Party or its affiliates has advised or is advising any Loan Party on other matters, (b) the Secured Parties, on the one hand, and the Loan Parties, on the other hand, have an arms-length business relationship that does not directly or indirectly give rise to, nor does any Loan Party rely on, any fiduciary duty on any Secured Party's part, (c) each Loan Party is capable of evaluating and understanding, and each Loan Party understands and accepts, the terms, risks and conditions of the transactions contemplated by this Agreement and the other Loan Documents, (d) the Secured Parties have not provided any legal, accounting, regulatory or tax advice with respect to the transactions and each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate and it is not relying on CIT for such advice, (e) the Loan Parties have been advised that the Secured Parties and their respective affiliates are or may be engaged in a broad range of transactions that may involve interests that differ from any Loan Party's interests and that the Secured Parties and their respective affiliates have no obligation to disclose such interests and transactions to any Loan Party by virtue of any fiduciary, advisory or agency relationship, (f) the Loan Parties will not assert and waive, to the fullest extent not prohibited by law, any claims any Loan Party may have against any Secured Party or its affiliates for breach of fiduciary duty or alleged breach of fiduciary duty, and agree that the Secured Parties and their respective affiliates shall have no liability (whether direct or indirect) to any Loan Party in respect of such a fiduciary duty claim or to any Person asserting a fiduciary duty claim on behalf of or in right of any Loan Party, including a Loan Party's stockholders, employees or creditors, and (g) should the Secured Parties or their respective affiliates have any other business with any Loan Party or any Loan Party's affiliates, nothing herein shall limit or otherwise diminish such Loan Party's or such Loan Party's affiliates' obligations thereunder or with respect thereto.

162

**12.20**    <u>Acknowledgment and Consent to Bail-In of EEA Financial Institutions</u>.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among the parties hereto, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

**12.21**    <u>Effect of Amendment and Restatement</u>.  Upon the effectiveness of this Agreement, the debt, obligations and other liabilities (including, without limitation, interest and fees accrued on or prior to the Closing Date) governed by the Original Loan Agreement shall continue to be in full force and effect, but shall be governed by the terms and conditions set forth in this Agreement.  All Obligations evidenced by the Original Loan Agreement, together with any and all additional Obligations incurred by any Loan Party hereunder or under any of the other Loan Documents (whether executed and/or delivered in connection with the Original Loan Agreement, this Agreement or otherwise), shall continue to be secured by all of the pledges and grants of security interests and Liens provided in connection with the Original Loan Agreement (and, from and after the Closing Date, shall be secured by all of the pledges and grants of security interests and Liens provided in connection with this Agreement).  Each Loan Party hereby reaffirms its Obligations under each Loan Document to which it is party (whether executed and/or delivered in connection with the Original Loan Agreement, this Agreement or otherwise), in each case, as amended, restated, supplemented or otherwise modified from time to time.  Each Loan Party further agrees that all of the Loan Documents (whether executed and/or delivered in connection with the Original Loan Agreement, this Agreement or otherwise) remain in full force and effect, as amended, restated, supplemented or otherwise modified, following the execution and delivery of this Agreement and that all references to the "Loan Agreement" in all such Loan Documents shall be deemed to refer to this Agreement.  The execution and delivery of this Agreement shall constitute an amendment and restatement, but not a novation, substitution or repayment, of any of the Obligations incurred prior to the Closing Date, whether pursuant to the Original Loan Agreement or otherwise.  None of the amendments or other modifications to the Original Loan Agreement shall be construed to require any disgorgement or other return of any principal, interest, fee or other payments made prior to the Closing Date pursuant to the Original Loan Agreement by any Loan Party to or for the benefit of the Administrative Agent or any Lender.  Each Loan Party, jointly and severally, represents and warrants that, as of the Closing Date, there are no claims or offsets against, or defenses or counterclaims to, their Obligations (or the Obligations of any Loan Party) under the Original Loan Agreement or any of the Loan Documents (and hereby expressly waives any and all such claims, offsets, defenses and counterclaims).

163

**ARTICLE 13**

**APPOINTMENT OF THE BORROWER REPRESENTATIVE; JOINT AND SEVERAL LIABILITY OF THE BORROWERS**

13.01    **Borrower Representative**.  Each Borrower hereby irrevocably appoints the Borrower Representative, as the agent for such Borrower on its behalf, to (i) request Loans from the Lenders, (ii) request L/C Issuer to issue Letters of Credit and Support Providers to issue Support Agreements, (iii) to give and receive notices under the Loan Documents and (iv) take all other action which the Borrower Representative or the Borrowers are permitted or required to take under this Agreement.

13.02    **Joint and Several Liability of Borrowers**.

(a)    <u>Joint and Several Liability</u>.  Each Borrower hereby agrees that such Borrower is jointly and severally liable for, and hereby absolutely and unconditionally guarantees to the Administrative Agent and other Secured Parties and their respective successors and assigns, the full and prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of, all Obligations owed or hereafter owing to the Administrative Agent and other Secured Parties by each other Borrower.  Each Borrower agrees that its guaranty obligation hereunder is a continuing guaranty of payment and performance and not of collection, that its obligations under this <u>Section 13.02</u> shall not be discharged until payment and performance, in full, of the Obligations has occurred, and that its obligations under this <u>Section 13.02</u> shall be absolute, unconditional and irrevocable, irrespective of, and unaffected by, (i) the genuineness, validity, regularity, enforceability or any future amendment of, or change in, any Obligation or any agreement, document or instrument to which any Borrower is or may become a party; (ii) the absence of any action to enforce any Obligation or the waiver or consent by the Administrative Agent or any other Secured Party with respect to any of the provisions governing any Obligation; (iii) the insolvency of any Borrower or Subsidiary; and (iv) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor.  Each Borrower shall be regarded, and shall be in the same position, as principal debtor with respect to the Obligations guaranteed hereunder.

(b)    <u>Waivers by Borrowers</u>.  Each Borrower expressly waives all rights it may have now or in the future under any statute, or at common law, or at law or in equity, or otherwise, to compel the Administrative Agent or other Secured Parties to marshal assets or to proceed in respect of the Obligations guaranteed hereunder against any other Borrower or Subsidiary, any other party or against any security for the payment and performance of the Obligations before proceeding against, or as a condition to proceeding against, such Borrower.  Each Borrower consents and agrees that the Administrative Agent or the other Secured Parties may, at any time and from time to time, without notice or demand, whether before or after an actual or purported termination, repudiation or revocation of this Agreement by any Borrower, and without affecting the enforceability or continuing effectiveness hereof as to such Borrower: (i) with the consent of the other Borrowers, supplement, restate, modify, amend, increase, decrease, extent, renew or otherwise change the time for payment or the terms of this Agreement or any part thereof, including any increase or decrease of the rate(s) of interest thereon; (ii) with the consent of the other Borrowers, supplement, restate, modify, amend, increase, decrease, or enter into or give any agreement with respect to, this Agreement or any part thereof, or any of the Security Documents; (iii) waive, approve or consent to any action, condition, covenant, default, remedy, right, representation or term of this Agreement or any other Loan Document; (iv) accept partial payments; (v) release, reconvey, terminate, waive, abandon, fail to perfect, subordinate, exchange, substitute, transfer or enforce any security or guarantees, and apply any security and direct the order or manner of sale thereof as the

164

Administrative Agent or Lenders in their sole and absolute discretion may determine; (vi) release any person from any personal liability with respect to this Agreement or any part thereof; (vii) settle, release on terms satisfactory to the Required Lenders or by operation of applicable Laws or otherwise liquidate or enforce any security or guaranty in any manner, consent to the transfer of any security and bid and purchase at any sale; or (viii) consent to the merger, change or any other restructuring or termination of the corporate or partnership existence of any Borrower or any other person, and correspondingly restructure the obligations evidenced hereby, and any such merger, change, restructuring or termination shall not affect the liability of any Borrower or the continuing effectiveness hereof, or the enforceability hereof with respect to all or any part of the obligations evidenced hereby. It is agreed among each Borrower, the Administrative Agent and Lenders that the foregoing consents and waivers are of the essence of the transaction contemplated by this Agreement and the other Loan Documents and that, but for the provisions of this Section 13.02 and such waivers, the Administrative Agent and Lenders would decline to enter into this Agreement.

(c)    Benefit of Guaranty. Each Borrower agrees that the provisions of this Section 13.02 are for the benefit of the Administrative Agent and the other Secured Parties and their respective successors, transferees, endorsees and assigns, and nothing herein contained shall impair, as between any other Borrower and the Administrative Agent or the other Secured Parties, the obligations of such other Borrower under the Loan Documents.

(d)    Waiver of Subrogation, Etc. Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, and except as set forth in Section 13.02(g), each Borrower hereby expressly and irrevocably waives until after the Termination Date any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off and any and all defenses available to a surety, guarantor or accommodation co-obligor, including, without limitation, any defense based upon any statute or rule of law that provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal, and any defense of the statute of limitations in any action hereunder or in any action for the collection or performance of any obligations hereby guaranteed. Each Borrower acknowledges and agrees that this waiver is intended to benefit the Administrative Agent and Lenders and other Secured Parties and shall not limit or otherwise affect such Borrower's liability hereunder or the enforceability of this Section 13.02, and that the Administrative Agent, the Lenders and the other Secured Parties and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this Section 13.02(d).

(e)    Election of Remedies. If the Administrative Agent or any other Secured Party may, under applicable Law, proceed to realize its benefits under any of the Loan Documents, the Administrative Agent or any other Secured Party may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this Section 13.02. If, in the exercise of any of its rights and remedies, the Administrative Agent or any other Secured Party shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Borrower or any other Person, whether because of any applicable Laws pertaining to "election of remedies" or the like, each Borrower hereby consents to such action by the Administrative Agent or such other Secured Party and waives any claim based upon such action, even if such action by the Administrative Agent or such other Secured Party shall result in a full or partial loss of any rights of subrogation that each Borrower might otherwise have had but for such action by the Administrative Agent or such other Secured Party. Any election of remedies that results in the denial or impairment of the right of the Administrative Agent or any other Secured Party to seek a deficiency judgment against any Borrower shall not impair any other Borrower's obligation to pay the full amount of the Obligations.

165

(f)    Limitation.  Notwithstanding any provision herein contained to the contrary, each Borrower's liability under this Section 13.02 (which liability is in any event in addition to amounts for which such Borrower is primarily liable under Article 2) shall be limited to an amount not to exceed as of any date of determination the greater of:

(i)    the net amount of all Loans advanced to any other Borrower under this Agreement and then re-loaned or otherwise transferred to, or for the benefit of, such Borrower; and

(ii)    the amount that could be claimed by the Administrative Agent and the other Secured Parties from such Borrower under this Section 13.02 without rendering such claim voidable or avoidable under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law after taking into account, among other things, such Borrower's right of contribution and indemnification from each other Borrower under Section 13.02(h).

(g)    Contribution with Respect to Guaranty Obligations.

(i)    To the extent that any Borrower shall make a payment under this Section 13.02 of all or any of the Obligations (other than Obligations related to Loans and other extensions of credit made directly or indirectly to that Borrower, or on such Borrower's behalf, in which case such Borrower shall be primarily liable) (a "Guarantor Payment") that, taking into account all other Guarantor Payments then previously or concurrently made by any other Borrower, exceeds the amount that such Borrower would otherwise have paid if each Borrower had paid the aggregate Obligations satisfied by such Guarantor Payment in the same proportion that such Borrower's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Borrowers as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Obligations and termination of the Commitments, such Borrower shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Borrower for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(ii)    As of any date of determination, the "Allocable Amount" of any Borrower shall be equal to the maximum amount of the claim that could then be recovered from such Borrower under this Section 13.02 without rendering such claim voidable or avoidable under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.

(iii)    This Section 13.02(g) is intended only to define the relative rights of Borrowers and nothing set forth in this Section 13.02(h) is intended to or shall impair the obligations of Borrowers, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement, including Section 13.02(a).  Nothing contained in this Section 13.02(h) shall limit the liability of any Borrower to pay the Loans made directly or indirectly to that Borrower, or on such Borrower's behalf, and accrued interest, fees and expenses with respect thereto for which such Borrower shall be primarily liable.

(iv)    The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Borrower to which such contribution and indemnification is owing.

166

(v)    The rights of the indemnifying Borrowers against other Borrowers under this Section 13.02(h) shall be exercisable on or after the Termination Date, but shall in all respects be subordinate to any Obligations owing to any Secured Party.

(h)    Liability Cumulative.  The liability of Borrowers under this Section 13.02 is in addition to and shall be cumulative with all liabilities of each Borrower to the Administrative Agent and Lenders under this Agreement and the other Loan Documents to which such Borrower is a party or in respect of any Obligations or obligation of the other Borrower, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

(i)    Stay of Acceleration.  If acceleration of the time for payment of any amount payable by the Borrowers under this Agreement is stayed upon the insolvency, bankruptcy or reorganization of any of the Borrowers, all such amounts otherwise subject to acceleration under the terms of this Agreement shall nonetheless be payable jointly and severally by the Borrower hereunder forthwith on demand by the Administrative Agent made at the request of the Required Lenders.

(j)    Benefit to Borrowers.  All of the Borrowers and their Subsidiaries are engaged in related businesses and integrated to such an extent that the financial strength and flexibility of each such Person has a direct impact on the success of each other Person.  Each Borrower and each Subsidiary will derive substantial direct and indirect benefit from the extension of credit hereunder.

*Signature Pages Follow*

167

In witness whereof, this Amendment has been duly executed as of the day and year first above written.

ADMINISTRATIVE AGENT:

CIT FINANCE LLC, as Administrative Agent

By:    /s/ Andrew C. Sepe
      Name: Andrew C. Sepe
      Title: Director

LENDERS

CIT FINANCE LLC, as a lender

By:    /s/ Andrew C. Sepe
      Name: Andrew C. Sepe
      Title: Director

REGIONS BANK, as a lender

By:    /s/ Kip Hurd
      Name: Kip Hurd
      Title: Managing Director

SUNTRUST BANK, as a lender

By:    /s/ David Sharp
      Name: David Sharp
      Title: Managing Director

CITIZENS BANK, N.A, as a lender

By: /s/ Mark Guyeski
    Name: Mark Guyeski
    Title: Vice President

PEOPLE'S UNITED BANK, as a lender

By: /s/ Henry L. Petrillo
    Name: Henry L. Petrillo
    Title: Senior Vice President

FIFTH THIRD BANK as a lender

By: /s/ John McChesney
    Name: John McChesney
    Title: AVP

JP MORGAN CHASE BANK, N.A, as a lender

By: /s/ Kristina Harbison
    Name: Kristina Harbison
    Title: Authorized Signer

BANKUNITED, N.A, as a lender

By: /s/ Craig Kinade
    Name: Craig Kinade
    Title: Senior Vice President

FIST MIDWEST BANK, as a lender

By: /s/ James A. Goody
    Name: James A. Good
    Title: Senior Vice President

[Signature Page to Third Amended and Restated Credit and Guaranty Agreement]

U.S. BANK NATIONAL ASSOCIATION, as a lender

By: /s/ Cynthia L. Rogers
_____
Name: Cynthia L. Rogers
Title: Managing Director

HANCOCK WITNEY BANK, as a lender

By: /s/ Megan Brearey
_____
Name: Megan Brearey
Title: Senior Vice President

WEBSTER BANK, NATIONAL ASSOCIATION as a lender

By: /s/ Theresa Baker
_____
Name: Theresa Baker
Title: Director

BANCALLIANCE INC, as a lender
By: Alliance Partners LLC, its Attorney-in Fact

By: /s/ John Gray
_____
Name: John Gray
Title: Executive Vice President

WILLMINGTON SAVINGS FUND SOCIETY, as a lender

By: /s/ Gena N. Spratt
_____
Name: Gena N. Spratt
Title: Vice President

[Signature Page to Third Amended and Restated Credit and Guaranty Agreement]

CAPSTAR BANK, as a lender

By:    /s/ Mark D. Mattson
        Name: Mark D. Mattson
        Title: Executive Vice President

PROVIDENT BANK, as a lender

By:    /s/ Andrew DeTullio
        Name: Andrew DeTullio
        Title: Senior Vice President

BORROWERs:

ADAPTHEALTH LLC,

By:    /s/ Luke McGee
        Name: Luke McGee
        Title: Chief Executive Officer

GUARANTORS:

ADAPTHEALTH INTERMEDIATE HOLDCO LLC
ADAPTHEALTH - MISSOURI LLC
AIR CARE HOME RESPIRATORY, LLC
AMERICAN ANCILLARIES, INC.
AMERICOAST MARYLAND LLC
ASSOCIATED HEALTHCARE SYSTEMS, INC.
BENNETT MEDICAL SERVICES LLC
BRADEN PARTNERS, L.P.
CHOICE MEDICAL HEALTH CARE, LLC
CLEARVIEW MEDICAL INCORPORATED
CP AP SOLUTIONS, LLC
CP AP2ME, INC.
FAMILY HOME MEDICAL SUPPLY LLC
FIRST CHOICE DME LLC
FIRST CHOICE HOME MEDICAL EQUIPMENT,
LLC
GOULD'S DISCOUNT MEDICAL, LLC
HALPRIN, INCORPORATED
HEALTH SOLUTIONS LLC
HOME MEDICAL EXPRESS, INC.

[Signature Page to Third Amended and Restated Credit and Guaranty Agreement]

HOME MEDISERVICE, LLC
HOMETOWN HOME HEALTH
MED STAR SURGICAL & BREATHING
EQUIPMENT INC.
MED WAY MEDICAL, INC.
MEDBRIDGE HOME MEDICAL LLC
MED-EQUIP, INC.
MEDSTAR HOLDINGS LLC
OCEAN HOME HEALTH OF PA LLC
OCEAN HOME HEALTH SUPPLY LLC
OGLES OXYGEN, LLC
ORBIT MEDICAL OF PORTLAND, INC.
PALMETTO OXYGEN, LLC
PPS HME HOLDINGS LLC
PPS HME LLC
ROBERTS HOME MEDICAL, LLC
ROYAL DME LLC
ROYAL MEDICAL SUPPLY INC.
SLEEPEASY THERAPEUTICS, INC.
SOUND OXYGEN SERVICE LLC
TOTAL RESPIRATORY, LLC
TRICOUNTY MEDICAL EQUIPMENT AND
SUPPLY,LLC
VERUS HEALTHCARE, INC.
VERUS HEALTHCARE,LLC

By:    /s/ Luke McGee
Name: Luke McGee
Title: Chief Executive Officer

[Signature Page to Third Amended and Restated Credit and Guaranty Agreement]

**Execution Version**

**AMENDMENT NO. 1 TO THIRD AMENDED AND RESTATED**
**CREDIT AND GUARANTY AGREEMENT**

THIS AMENDMENT NO. 1 TO THIRD AMENDED AND RESTATED CREDIT AND GUARANTY AGREEMENT (this "Amendment"), effective as of August 22, 2019 (the "Effective Date"), is made by and among **CIT FINANCE LLC** ("Administrative Agent"), each of the financial entities set forth on the signature pages hereto constituting all the Lenders under the Credit Agreement, **ADAPTHEALTH LLC**, a Delaware limited liability company ("Borrower"), and each of the entities set forth on the signature pages hereto as "Guarantors" (the "Guarantors").

**BACKGROUND STATEMENT**

A.    Borrower, Guarantors, Administrative Agent and Lenders are parties to that certain Third Amended and Restated Credit and Guaranty Agreement, dated as of March 20, 2019 (as amended, restated, modified or supplemented, the "Credit Agreement"), pursuant to which the Borrower and Guarantors established certain financing arrangements with Lenders upon the terms and conditions set forth therein. Capitalized terms used herein without definition shall have the meanings given to them in the Credit Agreement.

B.    Administrative Agent, Lenders and the Loan Parties wish to amend the Credit Agreement to adjust the LIBO Rate floor, which shall become effective in accordance with the terms and conditions set forth below.

**STATEMENT OF AGREEMENT**

The parties hereto, in consideration of the mutual covenants and agreements set forth herein (the receipt and sufficiency of which is hereby acknowledged), agree as follows:

1.    **Recitals**.  This Amendment shall constitute a Loan Document and the Recitals set forth above shall be construed as part of this Amendment as if set forth fully in the body of this Amendment.

2.    **Amendment to Credit Agreement**.

(a)    Amendment to LIBO Rate Definition.  The LIBO Rate definition of Section 1.01 of the Credit Agreement is hereby deleted in its entirety and replaced with the following::

"LIBO Rate" means the greater of: (a) zero percent (0.0%); and (b) (1) for any Interest Period with respect to any LIBOR Loan, a rate per annum determined by the Administrative Agent to be equal to the quotient obtained by dividing (i) the LIBO Base Rate for such LIBOR Loan for such Interest Period by (ii) one minus the Eurodollar Reserve Percentage for such LIBOR Loan for such Interest Period and (2) for any day with respect to any Base Rate Loan bearing interest at a rate based on the LIBO Rate, a rate per annum determined by the Administrative Agent to be equal to the quotient obtained by dividing (i) the LIBO Base Rate for such Base Rate Loan for such day by (ii) one minus the Eurodollar Reserve Percentage for such Base Rate Loan for such day.

3.    **Representations and Warranties; Covenants**.  Each Loan Party hereby represents and warrants as follows:

(a)     <u>Bringdown</u>.   After giving effect to this Amendment, each of the representations and warranties of the Loan Parties contained in the Credit Agreement and in the other Loan Documents is true and correct in all material respects (<u>provided,</u> that if any representation or warranty is by it terms qualified by concepts of materiality, such representation or warranty shall be true and correct in all respects) on and as of the date hereof with the same effect as if made on and as of the date hereof (except to the extent any such representation or warranty is expressly stated to have been made as of a specific date, in which case such representation or warranty is true and correct as of such date).

(b)     <u>No Default</u>.  No Default or Event of Default has occurred and is continuing under the Credit Agreement or any of the other Loan Documents, each Loan Party is in compliance with all terms and provisions set forth in the Credit Agreement and the other Loan Documents, and each of the conditions set forth in Section 4 of this Amendment has been satisfied.

(c)     <u>Enforceability; Non-Contravention</u>.  The execution and delivery by each Loan Party of this Amendment and the performance by it of the transactions herein contemplated (i) are and will be within its powers; (ii) have been authorized by all necessary action; (iii) are not and will not be in contravention of any Loan Party's Organization Documents; (iv) are not and will not conflict with or result in any breach or contravention of, or the creation of any Lien under, (A) any Contractual Obligation under any Material Contract to which any Loan Party is a party or (B) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which any Loan Party or the Property of any Loan Party is subject; (v) will not violate any Law; or (vi) will not result in a limitation on any material licenses, permits or other Governmental Approvals applicable to the business, operations or properties of any Loan Party. This Amendment and all allonges, assignments, instruments, documents, and agreements executed and delivered in connection herewith, are and will be valid, binding, and enforceable against Borrower and each other Loan Party in accordance with their respective terms, except as such enforceability may be limited (x) by general principles of equity and conflicts of laws or (y) by bankruptcy, reorganization, insolvency, moratorium or other laws of general application relating to or affecting the enforcement, of Administrative Agent's rights.

(d)     <u>No Conflicts</u>.  No consent, approval, authorization or order of, or filing, registration or qualification with, any court or Governmental Authority or third party is required in connection with the execution, delivery or performance by the Loan Parties of this Amendment.

(e)     <u>No Material Adverse Effect</u>.  No Material Adverse Effect has occurred and is continuing, and the Loan Parties know of no event, condition or state of facts since the date of the Credit Agreement that could reasonably be expected to have a Material Adverse Effect.

(f)     <u>Obligations</u>.  The execution and delivery of this Amendment does not diminish or reduce the Loan Parties' obligations under the Loan Documents, except as expressly modified by this Amendment.

(g)     <u>No Claims</u>.  The Loan Parties have no claims, counterclaims, offsets or defenses to the Loan Documents and the performance of their obligations thereunder, or if a Loan Party has any such claims, counterclaims, offsets, or defenses arising from events occurring on or before the date hereof, whether known or unknown, to the Loan Documents or any transaction related to the Loan Documents, the same are hereby waived, relinquished and released in consideration of Administrative Agent's execution and delivery of this Amendment.

2

4.       **Effectiveness Conditions**.  This Amendment shall be effective upon completion of the following conditions precedent (all documents to be in form and substance satisfactory to Administrative Agent and Administrative Agent's counsel):

(a)       Executed counterparts of this Amendment each properly executed by a Responsible Officer of the signing Loan Party and each other Person party thereto; and

(b)       all representations and warranties of the Loan Parties contained herein shall be true, correct and complete in all material respects (provided, that if any representation or warranty is by its terms qualified by concepts of materiality, such representation shall be true and correct in all respects) as of the Effective Date, except to the extent that any such representation or warranty relates to a specific date in which case such representation or warranty shall be true and correct as of such earlier date (and each Loan Party's delivery of its respective signature hereto shall be deemed to be its certification thereof).

5.       **Effect of Amendment**.  From and after the Effective Date, all references to the Credit Agreement set forth in any other Loan Document or other agreement or instrument shall, unless otherwise specifically provided, be references to the Credit Agreement as amended by this Amendment and as may be further amended, modified, restated or supplemented from time to time. This Amendment is limited as specified and shall not constitute or be deemed to constitute an amendment, modification or waiver of any provision of the Credit Agreement or of any other Loan Document except as expressly set forth herein. Except as expressly amended hereby, the Credit Agreement shall remain in full force and effect in accordance with its terms.

(a)       Ratification of Loan Documents.  Except as expressly set forth herein, all of the terms and conditions of the Credit Agreement and Loan Documents are hereby ratified and confirmed and continue unchanged and in full force and effect.

(b)       Governing Law.  This Amendment shall be governed by and construed and enforced in accordance with the laws of the State of New York (without regard to the conflicts of law provisions thereof).

(c)       Waiver of Trial by Jury.  **EACH OF THE LOAN PARTIES AND ADMINISTRATIVE AGENT, BY ITS EXECUTION OR ACCEPTANCE OF THIS AMENDMENT, REAFFIRMS ITS WAIVER OF THE RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATED TO ANY OF THE LOAN DOCUMENTS, THE OBLIGATIONS OR THE COLLATERAL.**

(d)       Expenses.  The Loan Parties agree to pay upon demand all reasonable, documented out-of-pocket costs and expenses of the Administrative Agent (including, without limitation, all reasonable Attorney Costs) in connection with the preparation, negotiation, execution and delivery of this Amendment.

(e)       Third Parties.  No rights are intended to be created hereunder for the benefit of any third party donee, creditor, or incidental beneficiary.

(f)       Severability.  To the extent any provision of this Amendment is prohibited by or invalid

3

under the applicable law of any jurisdiction, such provision shall be ineffective only to the extent of such prohibition or invalidity and only in any such jurisdiction, without prohibiting or invalidating such provision in any other jurisdiction or the remaining provisions of this Amendment in any jurisdiction.

(g)    Successors and Assigns.  This Amendment shall be binding upon, inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto.

(h)    Construction.  The headings of the various sections and subsections of this Amendment have been inserted for convenience only and shall not in any way affect the meaning or construction of any of the provisions hereof.

(i)    Counterparts; Effectiveness.  This Amendment may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. This Amendment shall become effective as of the Effective Date upon the execution and delivery of a counterpart hereof by the Loan Parties, Administrative Agent and Lenders, and the satisfaction of the conditions set forth in Section 4 hereof. Signatures of the parties to this Amendment transmitted by facsimile or via other electronic format shall be deemed to be their original signatures for all purposes.

**[Signatures on following page.]**

4

In witness whereof, this Amendment has been duly executed as of the day and year first above written.

ADMINISTRATIVE AGENT:

CIT FINANCE LLC, as Administrative Agent

By:    /s/ William Backus
         Name: William Backus
         Title: Director

LENDERS

CIT FINANCE LLC, as a lender

By:    /s/ William Backus
         Name: William Backus
         Title: Director

REGIONS BANK, as a lender

By:    /s/ Brian Walsh
         Name: Brian Walsh
         Title: Director

SUNTRUST BANK, as a lender

By:    /s/ Anton Brykalin
         Name: Anton Brykalin
         Title: Vice President

CITIZENS BANK, N.A, as a lender

By:   /s/ Mark Guyeski
     Name: Mark Guyeski
     Title: Vice President

PEOPLE'S UNITED BANK, as a lender

By:   /s/ Henry L. Petrillo
     Name: Henry L. Petrillo
     Title: Senior Vice President

FIFTH THIRD BANK as a lender

By:   /s/ John McChesney
     Name: John McChesney
     Title: AVP

JP MORGAN CHASE BANK, N.A, as a lender

By:   /s/ Kristina Harbison
     Name: Kristina Harbison
     Title: Authorized Signer

BANKUNITED, N.A, as a lender

By:   /s/ Craig Kinade
     Name: Craig Kinade
     Title: Senior Vice President

FIST MIDWEST BANK, as a lender

By:   /s/ James Goody
     Name: James Goody
     Title: Senior Vice President

[Signature Page to Amendment No. 1 to Third Amended and Restated Credit and Guaranty Agreement]

U.S. BANK NATIONAL ASSOCIATION, as a lender

By:    /s/ Roger Yee
       Name: Roger Yee
       Title: Senior Vice President

HANCOCK WITNEY BANK, as a lender

By:    /s/ Megan Brearey
       Name: Megan Brearey
       Title: Senior Vice President

WEBSTER BANK, NATIONAL ASSOCIATION as a lender

By:    /s/ John Tracey
       Name: John Tracey
       Title: Managing Director

BANCALLIANCE INC, as a lender
By: Alliance Partners LLC, its Attorney-in Fact

By:    /s/ John Gray
       Name: John Gray
       Title: Executive Vice President

WILLMINGTON SAVINGS FUND SOCIETY, as a lender

By:    /s/ James A. Gise
       Name: James A. Gise
       Title: Senior Vice President

[Signature Page to Amendment No. 1 to Third Amended and Restated Credit and Guaranty Agreement]

CAPSTAR BANK, as a lender

By:    /s/ Mark D. Mattson

Name: Mark D. Mattson
Title: Executive Vice President

PROVIDENT BANK, as a lender

By:    /s/ Ron Ilan

Name: Ron Ilan
Title: Vice President

BORROWER:

ADAPTHEALTH LLC,

By:    /s/ Luke McGee

Name: Luke McGee
Title: Chief Executive Officer

GUARANTORS:

ADAPTHEALTH INTERMEDIATE HOLDCO LLC
ADAPTHEALTH - MISSOURI LLC
AIR CARE HOME RESPIRATORY, LLC
AMERICAN ANCILLARIES, INC.
AMERICOAST MARYLAND LLC
ASSOCIATED HEALTHCARE SYSTEMS, INC.
BENNETT MEDICAL SERVICES LLC
BRADEN PARTNERS, L.P.
CHOICE MEDICAL HEALTH CARE, LLC
CLEARVIEW MEDICAL INCORPORATED
CP AP SOLUTIONS, LLC
CP AP2ME, INC.
FAMILY HOME MEDICAL SUPPLY LLC
FIRST CHOICE DME LLC
FIRST CHOICE HOME MEDICAL EQUIPMENT, LLC
GOULD'S DISCOUNT MEDICAL, LLC
HALPRIN, INCORPORATED
HEALTH SOLUTIONS LLC
HOME MEDICAL EXPRESS, INC.

[Signature Page to Amendment No. 1 to Third Amended and Restated Credit and Guaranty Agreement]

HOME MEDISERVICE, LLC
HOMETOWN HOME HEALTH
MED STAR SURGICAL & BREATHING EQUIPMENT INC.
MED WAY MEDICAL, INC.
MEDBRIDGE HOME MEDICAL LLC
MED-EQUIP, INC.
MEDSTAR HOLDINGS LLC
OCEAN HOME HEALTH OF PA LLC
OCEAN HOME HEALTH SUPPLY LLC
OGLES OXYGEN, LLC
ORBIT MEDICAL OF PORTLAND, INC.
PALMETTO OXYGEN, LLC
PPS HME HOLDINGS LLC
PPS HME LLC
ROBERTS HOME MEDICAL, LLC
ROYAL DME LLC
ROYAL MEDICAL SUPPLY INC.
SLEEPEASY THERAPEUTICS, INC.
SOUND OXYGEN SERVICE LLC
TOTAL RESPIRATORY, LLC
TRICOUNTY MEDICAL EQUIPMENT AND SUPPLY,LLC
VERUS HEALTHCARE, INC.
VERUS HEALTHCARE,LLC

By:    /s/ Luke McGee
       Name: Luke McGee
       Title: Chief Executive Officer

[Signature Page to Amendment No. 1 to Third Amended and Restated Credit and Guaranty Agreement]

**Execution Copy**

**AMENDMENT NO. 2 TO THIRD AMENDED AND RESTATED CREDIT AND GUARANTY AGREEMENT**

THIS AMENDMENT NO. 2 TO THIRD AMENDED AND RESTATED CREDIT AND GUARANTY AGREEMENT (this "Amendment"), effective as of November 8, 2019 (the "Effective Date"), is made by and among **CIT FINANCE LLC** ("Administrative Agent"), each of the financial entities set forth on the signature pages hereto constituting all the Lenders under the Credit Agreement, **ADAPTHEALTH LLC**, a Delaware limited liability company ("Borrower"), and each of the entities set forth on the signature pages hereto as "Guarantors" (the "Guarantors").

**BACKGROUND STATEMENT**

A.     Borrower, Guarantors, Administrative Agent and Lenders are parties to that certain Third Amended and Restated Credit and Guaranty Agreement, dated as of March 20, 2019 (as amended by that certain Amendment No. 1 to Third Amended and Restated Credit and Guaranty Agreement dated as of August 22, 2019, as amended hereby, and as the same may be further amended, restated, modified or supplemented, the "Credit Agreement"), pursuant to which the Borrower and Guarantors established certain financing arrangements with Lenders upon the terms and conditions set forth therein. Capitalized terms used herein without definition shall have the meanings given to them in the Credit Agreement.

B.     Pursuant to that certain Agreement and Plan of Merger, dated as of July 8, 2019 (as amended by that certain Amendment No. 1 to Agreement and Plan of Merger dated as of October 15, 2019, and as the same may be further amended, restated, supplemented or otherwise modified, the "Merger Agreement"), by and among DFB Healthcare Acquisitions Corp., a Delaware corporation ("DFB Healthcare"), DFB Merger Sub LLC, a Delaware limited liability company ("Merger Sub"), AdaptHealth Holdings LLC, a Delaware limited liability company ("AdaptHealth Holdings"), such other parties thereto, and the other transactions contemplated thereby, Merger Sub will merge into AdaptHealth Holdings, with AdaptHealth Holdings surviving as a partially owned subsidiary of DFB Healthcare (collectively, the "SPAC Merger");

C.     The closing of the SPAC Merger is conditioned upon, among other things, the approval by the stockholders of DFB Healthcare of a number of proposals including the Business Combination Proposal, the Charter Proposal, the Nasdaq Proposal, the 2019 Plan Proposal and the 2019 ESPP Proposal (each as defined in the Proxy Statement for Special Meeting in Lieu of the 2019 Annual Meeting of Stockholders of DFB Healthcare, and collectively the "Proposals"); and

D.     In connection with the SPAC Merger, Administrative Agent, Lenders and the Loan Parties wish to amend certain provisions of the Credit Agreement as set forth herein, which shall become effective in accordance with the terms and conditions set forth below.

**STATEMENT OF AGREEMENT**

The parties hereto, in consideration of the mutual covenants and agreements set forth herein (the receipt and sufficiency of which is hereby acknowledged), agree as follows:

1.     **Recitals**.  This Amendment shall constitute a Loan Document and the Recitals set forth above shall be construed as part of this Amendment as if set forth fully in the body of this Amendment.

2.     **Amendment to Credit Agreement**.  Upon satisfaction of the conditions set forth in

Section 4 hereof, the Credit Agreement is hereby amended pursuant to the attached Annex A as follows:

(a)        Annex A.  In Annex A hereto, deletions of text in the Credit Agreement (including, to the extent included in such Annex A, each Schedule or Exhibit to the Credit Agreement) are indicated by ~~struck through text~~, and insertions of text as amended by this Amendment are indicated by **bold, double-underlined text**.

3.        **Representations and Warranties; Covenants**.  Each Loan Party hereby represents and warrants as follows:

(a)        Bringdown.  After giving effect to this Amendment, each of the representations and warranties of the Loan Parties contained in the Credit Agreement and in the other Loan Documents is true and correct in all material respects (provided, that if any representation or warranty is by it terms qualified by concepts of materiality, such representation or warranty shall be true and correct in all respects) on and as of the date hereof with the same effect as if made on and as of the date hereof (except to the extent any such representation or warranty is expressly stated to have been made as of a specific date, in which case such representation or warranty is true and correct as of such date).

(b)        No Default.  No Default or Event of Default has occurred and is continuing under the Credit Agreement or any of the other Loan Documents, each Loan Party is in compliance with all terms and provisions set forth in the Credit Agreement and the other Loan Documents, and each of the conditions set forth in Section 4 of this Amendment has been satisfied.

(c)        Enforceability; Non-Contravention.  The execution and delivery by each Loan Party of this Amendment and the performance by it of the transactions herein contemplated (i) are and will be within its powers; (ii) have been authorized by all necessary action; (iii) are not and will not be in contravention of any Loan Party's Organization Documents; (iv) are not and will not conflict with or result in any breach or contravention of, or the creation of any Lien under, (A) any Contractual Obligation under any Material Contract to which any Loan Party is a party or (B) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which any Loan Party or the Property of any Loan Party is subject; (v) will not violate any Law; or (vi) will not result in a limitation on any material licenses, permits or other Governmental Approvals applicable to the business, operations or properties of any Loan Party. This Amendment and all alonges, assignments, instruments, documents, and agreements executed and delivered in connection herewith, are and will be valid, binding, and enforceable against Borrower and each other Loan Party in accordance with their respective terms, except as such enforceability may be limited (x) by general principles of equity and conflicts of laws or (y) by bankruptcy, reorganization, insolvency, moratorium or other laws of general application relating to or affecting the enforcement, of Administrative Agent's rights.

(d)        No Conflicts.  No consent, approval, authorization or order of, or filing, registration or qualification with, any court or Governmental Authority or third party is required in connection with the execution, delivery or performance by the Loan Parties of this Amendment.

(e)        No Material Adverse Effect.  No Material Adverse Effect has occurred and is continuing, and the Loan Parties know of no event, condition or state of facts since the date of the Credit Agreement that could reasonably be expected to have a Material Adverse Effect.

(f)        Obligations.  The execution and delivery of this Amendment does not diminish or reduce

2

the Loan Parties' obligations under the Loan Documents, except as expressly modified by this Amendment.

(g)    No Claims. The Loan Parties have no claims, counterclaims, offsets or defenses to the Loan Documents and the performance of their obligations thereunder, or if a Loan Party has any such claims, counterclaims, offsets, or defenses arising from events occurring on or before the date hereof, whether known or unknown, to the Loan Documents or any transaction related to the Loan Documents, the same are hereby waived, relinquished and released in consideration of Administrative Agent's execution and delivery of this Amendment.

4.    **Effectiveness Conditions**. This Amendment shall be effective upon completion of the following conditions precedent (all documents to be in form and substance satisfactory to Administrative Agent and Administrative Agent's counsel):

(a)    Executed Amendment and Related Deliverables. Prior to the Effective Date, Administrative Agent shall have received each of the following to the satisfaction of Administrative Agent in its sole discretion:

(i)    Executed counterparts of this Amendment and other Loan Documents to be executed as of the Effective Date, each properly executed by a Responsible Officer of the signing Loan Party and each other Person party thereto;

(ii)    each agreement, document and instrument set forth on the closing checklist prepared by Administrative Agent's counsel and provided to the Loan Parties, each in form and substance satisfactory to Administrative Agent and such further documents, information, certificates, records and filings as Administrative Agent may reasonably request;

(iii)    all representations and warranties of the Loan Parties contained herein shall be true, correct and complete in all material respects (provided, that if any representation or warranty is by its terms qualified by concepts of materiality, such representation shall be true and correct in all respects) as of the Effective Date, except to the extent that any such representation or warranty relates to a specific date in which case such representation or warranty shall be true and correct as of such earlier date (and each Loan Party's delivery of its respective signature hereto shall be deemed to be its certification thereof);

(iv)    all costs and expenses referenced in Section 5(d) to this Amendment, and all other fees, expenses and other amounts due and payable under any Loan Document on or prior to the date hereof;

(v)    delivery to Administrative Agent of a certificate executed by a Responsible Officer of the Borrower Representative certifying that the conditions herein have been satisfied and that the representations and warranties contained herein are true and correct in all material respects (provided, that if any representation or warranty is by its terms qualified by concepts of materiality, such representation and warranty shall be true and correct in all respects) as of the Effective Date, except to the extent that any such representation or warranty relates to a specific date in which case such representation or warranty shall be true and correct as of such earlier date;

3

(vi)    delivery to Administrative Agent and Lenders all documentation and other information about the Loan Parties required under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act, that has been requested by Administrative Agent and the Lenders;

(vii)    delivery to Administrative Agent and Lenders of any requested Beneficial Ownership Certification in relation to any Borrower that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation; and

(viii)    delivery of a legal opinion in form and substance satisfactory to Administrative Agent.

(b)    SPAC Merger Related Deliverables. Administrative Agent shall have received each of the following to the satisfaction of Administrative Agent in its sole discretion:

(i)    fully executed and delivered copies of the Merger Agreement and related agreements, in each case acceptable to Administrative Agent in its sole discretion;

(ii)    such documents and certifications as Administrative Agent may reasonably require to evidence the approval of the Proposals by the stockholders of DFB Healthcare;

(iii)    such documents and certifications as Administrative Agent may reasonably require to evidence the closing of the SPAC Merger; and

(iv)    such further documents, information, certificates, records and filings (including those related to the SPAC Merger) as Administrative Agent may reasonably request, including with respect to confirmation of ownership and capital structure of the Loan Parties.

5.    **Effect of Amendment**. From and after the Effective Date, all references to the Credit Agreement set forth in any other Loan Document or other agreement or instrument shall, unless otherwise specifically provided, be references to the Credit Agreement as amended by this Amendment and as may be further amended, modified, restated or supplemented from time to time. This Amendment is limited as specified and shall not constitute or be deemed to constitute an amendment, modification or waiver of any provision of the Credit Agreement or of any other Loan Document except as expressly set forth herein. Except as expressly amended hereby, the Credit Agreement shall remain in full force and effect in accordance with its terms.

(a)    Ratification of Loan Documents.  Except as expressly set forth herein, all of the terms and conditions of the Credit Agreement and Loan Documents are hereby ratified and confirmed and continue unchanged and in full force and effect.

(b)    Governing Law.  This Amendment shall be governed by and construed and enforced in accordance with the laws of the State of New York (without regard to the conflicts of law provisions thereof).

(c)    Waiver of Trial by Jury.  **EACH OF THE LOAN PARTIES AND ADMINISTRATIVE AGENT, BY ITS EXECUTION OR ACCEPTANCE OF THIS AMENDMENT, REAFFIRMS ITS WAIVER OF THE RIGHT TO TRIAL BY JURY IN ANY**

4

ACTION, SUIT OR PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATED TO ANY OF THE LOAN DOCUMENTS, THE OBLIGATIONS OR THE COLLATERAL.

(d)      Expenses.  The Loan Parties agree to pay upon demand all reasonable, documented out-of-pocket costs and expenses of Administrative Agent (including, without limitation, all reasonable Attorney Costs) in connection with the preparation, negotiation, execution and delivery of this Amendment.

(e)      Third Parties.  No rights are intended to be created hereunder for the benefit of any third party donee, creditor, or incidental beneficiary.

(f)      Severability.  To the extent any provision of this Amendment is prohibited by or invalid under the applicable law of any jurisdiction, such provision shall be ineffective only to the extent of such prohibition or invalidity and only in any such jurisdiction, without prohibiting or invalidating such provision in any other jurisdiction or the remaining provisions of this Amendment in any jurisdiction.

(g)      Successors and Assigns.  This Amendment shall be binding upon, inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto.

(h)      Construction.  The headings of the various sections and subsections of this Amendment have been inserted for convenience only and shall not in any way affect the meaning or construction of any of the provisions hereof.

(i)      Counterparts; Effectiveness.  This Amendment may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. This Amendment shall become effective as of the Effective Date upon the execution and delivery of a counterpart hereof by the Loan Parties, Administrative Agent and Lenders, and the satisfaction of the conditions set forth in Section 4 hereof. Signatures of the parties to this Amendment transmitted by facsimile or via other electronic format shall be deemed to be their original signatures for all purposes.

**[Signatures on following page.]**

5

In witness whereof, this Amendment has been duly executed as of the day and year first above written.

ADMINISTRATIVE AGENT:

CIT FINANCE LLC, as Administrative Agent

By:    /s/ Andres Alev
_____
Name: Andres Alev
Title: Director

LENDERS

CIT FINANCE LLC, as a lender

By:    /s/ Andres Alev
_____
Name: Andres Alev
Title: Director

REGIONS BANK, as a lender

By:    /s/ Brian Walsh
_____
Name: Brian Walsh
Title: Director

SUNTRUST BANK, as a lender

By:    /s/ Ben Cumming
_____
Name: Ben Cumming
Title: Managing Director

CITIZENS BANK, N.A, as a lender

By:   /s/ Christopher DeLauro
      Name: Christopher DeLauro
      Title: Senior Vice President

PEOPLE'S UNITED BANK, as a lender

By:   /s/ Henry L. Petrillo
      Name: Henry L. Petrillo
      Title: Senior Vice President

FIFTH THIRD BANK as a lender

By:   /s/ John McChesney
      Name: John McChesney
      Title: AVP

JP MORGAN CHASE BANK, N.A, as a lender

By:   /s/ Kristina Harbison
      Name: Kristina Harbison
      Title: Authorized Signer

BANKUNITED, N.A, as a lender

By:   /s/ Craig Kinade
      Name: Craig Kinade
      Title: Senior Vice President

FIST MIDWEST BANK, as a lender

By:   /s/ James A. Good
      Name: James A. Good
      Title: Senior Vice President

[Signature Page to Amendment No. 2 to Third Amended and Restated Credit and Guaranty Agreement]

U.S. BANK NATIONAL ASSOCIATION, as a lender

By: /s/ Cynthia L. Rogers
Name: Cynthia L. Rogers
Title: Managing Director

HANCOCK WITNEY BANK, as a lender

By: /s/ Megan Brearey
Name: Megan Brearey
Title: Senior Vice President

WEBSTER BANK, NATIONAL ASSOCIATION as a lender

By: /s/ Melissa Souri
Name: Melissa Souri
Title: Director PM Sponsor and Specialty Finance

BANCALLIANCE INC, as a lender
By: Alliance Partners LLC, its Attorney-in Fact

By: /s/ John Gray
Name: John Gray
Title: Executive Vice President

WILLMINGTON SAVINGS FUND SOCIETY, as a lender

By: /s/ James A. Gise
Name: James A. Gise
Title: Senior Vice President

[Signature Page to Amendment No. 2 to Third Amended and Restated Credit and Guaranty Agreement]

CAPSTAR BANK, as a lender

By:    /s/ Mark D. Mattson
       Name: Mark D. Mattson
       Title: Executive Vice President

BORROWER:

ADAPTHEALTH LLC,

By:    /s/ Luke McGee
       Name: Luke McGee
       Title: Chief Executive Officer

GUARANTORS:

ADAPTHEALTH INTERMEDIATE HOLDCO LLC
ADAPTHEALTH - MISSOURI LLC
AIR CARE HOME RESPIRATORY, LLC
AMERICAN ANCILLARIES, INC.
AMERICOAST MARYLAND LLC
ASSOCIATED HEALTHCARE SYSTEMS, INC.
BENNETT MEDICAL SERVICES LLC
BRADEN PARTNERS, L.P.
CHOICE MEDICAL HEALTH CARE, LLC
CLEARVIEW MEDICAL INCORPORATED
CP AP SOLUTIONS, LLC
CP AP2ME, INC.
FAMILY HOME MEDICAL SUPPLY LLC
FIRST CHOICE DME LLC
FIRST CHOICE HOME MEDICAL EQUIPMENT, LLC
GOULD'S DISCOUNT MEDICAL, LLC
HALPRIN, INCORPORATED
HEALTH SOLUTIONS LLC
HOME MEDICAL EXPRESS, INC.
HOME MEDISERVICE, LLC
HOMETOWN HOME HEALTH
MED STAR SURGICAL & BREATHING EQUIPMENT INC.
MED WAY MEDICAL, INC.
MEDBRIDGE HOME MEDICAL LLC
MED-EQUIP, INC.
MEDSTAR HOLDINGS LLC
OCEAN HOME HEALTH OF PA LLC
OCEAN HOME HEALTH SUPPLY LLC
OGLES OXYGEN, LLC
ORBIT MEDICAL OF PORTLAND, INC.
PALMETTO OXYGEN, LLC

[Signature Page to Amendment No. 2 to Third Amended and Restated Credit and Guaranty Agreement]

PPS HME HOLDINGS LLC
PPS HME LLC
ROBERTS HOME MEDICAL, LLC
ROYAL DME LLC
ROYAL MEDICAL SUPPLY INC.
SLEEPEASY THERAPEUTICS, INC.
SOUND OXYGEN SERVICE LLC
TOTAL RESPIRATORY, LLC
TRICOUNTY MEDICAL EQUIPMENT AND SUPPLY,LLC
VERUS HEALTHCARE, INC.
VERUS HEALTHCARE,LLC

By:      /s/ Luke McGee
         Name: Luke McGee
         Title: Chief Executive Officer

[Signature Page to Amendment No. 2 to Third Amended and Restated Credit and Guaranty Agreement]

Execution Copy

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (this "*Agreement*") is made and entered into as of this 20th day of March, 2019, by and between AdaptHealth Holdings LLC, a Delaware limited liability company (the "*Company*"), and Luke McGee ("*Executive*").

W I T N E S S E T H :

WHEREAS, Executive is currently employed by the Company as its Chief Executive Officer; and

WHEREAS, Executive is a party to an employment agreement with the Company, dated May 17, 2018 (the "*Prior Agreement*"); and

WHEREAS, the Company desires to employ Executive and to enter into this Agreement embodying the terms of such employment, and Executive desires to enter into this Agreement and to accept such employment, subject to the terms and provisions of this Agreement.

NOW, THEREFORE, in consideration of the promises and mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are mutually acknowledged, the Company and Executive hereby agree as follows:

**Section 1.        Definitions.**

(a)        "*Accrued Obligations*" shall mean (i) all accrued but unpaid Base Salary through the date of termination of Executive's employment, (ii) any unpaid or unreimbursed expenses incurred in accordance with Section 7 hereof, and (iii) any benefits provided under the Company's employee benefit plans upon a termination of employment (excluding any employee benefit plan providing for severance or similar benefits), in accordance with the terms contained therein.

(b)        "*Agreement*" shall have the meaning set forth in the preamble hereto.

(c)        "*Annual Bonus*" shall have the meaning set forth in Section 4(b) hereof.

(d)        "*Base Salary*" shall mean the salary provided for in Section 4(a) hereof or any increased salary granted to Executive pursuant to Section 4(a) hereof.

(e)        "*Board*" shall mean the Board of Managers of the Company.

(f)        "*Cause*" shall mean (i) Executive's act(s) of gross negligence or willful misconduct in the course of Executive's employment hereunder, (ii) willful failure or refusal by Executive to perform in any material respect Executive's duties or responsibilities under this Agreement, (iii) misappropriation (or attempted misappropriation) by Executive of any assets or business opportunities of the Company or any other member of the Company Group, (iv) theft, embezzlement or fraud committed (or attempted) by Executive, at Executive's direction, or with Executive's prior actual knowledge, (v) Executive's conviction of or pleading "guilty" or "no contest" to, (x) a felony or (y) any other criminal charge that has, or could be reasonably expected to have, an adverse impact on the performance of Executive's duties to the Company or any other

member of the Company Group or otherwise result in material injury to the reputation or business of the Company or any other member of the Company Group, (vi) any material violation by Executive of the policies of the Company including but not limited to those relating to sexual harassment or business conduct, and those otherwise set forth in the manuals or statements of policy of the Company, (vii) Executive's material breach of this Agreement or breach of the Restrictive Covenant Agreement, (viii) any willful act or omission to act of Executive that is intended to result in material injury to the business, property, operations, financial condition or reputation of the Company or any other member of the Company Group, or (ix) Executive's willful failure to reasonably cooperate, if requested by the Board, with any investigation or inquiry into Executive's or the Company's business practices (in each case, to the extent related to the Company or any other member of the Company Group), whether internal or external, including, but not limited to, Executive's refusal to be deposed or to provide truthful testimony or evidence at any trial, proceeding or inquiry. If, within ninety (90) days subsequent to Executive's termination for any reason other than by the Company for Cause, the Company determines that Executive's employment could have been terminated for Cause pursuant to clauses (iii), (iv), or (v) of the definition thereof, Executive's employment will be deemed to have been terminated for Cause for all purposes, and Executive will be required to disgorge to the Company all amounts received pursuant to this Agreement or otherwise on account of such termination that would not have been payable to Executive had such termination been by the Company for Cause.

(g)      "***Closing Date***" shall have the meaning set forth in the Purchase Agreement.

(h)      "***Code***" shall mean the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

(i)      "***Company***" shall have the meaning set forth in the preamble hereto.

(j)      "***Company Group***" shall mean the Company together with any direct or indirect subsidiaries of the Company.

(k)      "***Compensation Committee***" shall mean the Board or the committee of the Board designated to make compensation decisions relating to senior executive officers of the Company Group.

(l)      "***Delay Period***" shall have the meaning set forth in Section 13(a) hereof.

(m)      "***Disability***" shall mean any physical or mental disability or infirmity of Executive that prevents the performance of Executive's duties for a period of (i) ninety (90) consecutive days or (ii) one hundred twenty (120) non-consecutive days during any consecutive twelve (12) month period. Any question as to the existence, extent, or potentiality of Executive's Disability upon which Executive and the Company cannot agree shall be determined by a qualified, independent physician selected by the Company and approved by Executive (which approval shall not be unreasonably withheld). The determination of any such physician shall be final and conclusive for all purposes of this Agreement.

(n)      "***Executive***" shall have the meaning set forth in the preamble hereto.

2

(o)    "*Good Reason*" shall mean, without Executive's consent, (i) a material diminution in Executive's title, duties, or responsibilities as set forth in Section 3 hereof, (ii) a material reduction in Base Salary set forth in Section 4(a) hereof or Annual Bonus opportunity set forth in Section 4(b) hereof, (iii) the relocation of Executive's principal place of employment (as provided in Section 3(c) hereof) more than fifty (50) miles from its current location, or (iv) any other material breach of a provision of this Agreement by the Company (other than a provision that is covered by clause (i), (ii), or (iii) above). Executive acknowledges and agrees that Executive's exclusive remedy in the event of any breach of this Agreement shall be to assert Good Reason pursuant to the terms and conditions of Section 8(e) hereof. Notwithstanding the foregoing, during the Term, in the event that the Company reasonably believes that Executive may have engaged in conduct that could constitute Cause hereunder, the Company may, in its sole and absolute discretion, suspend Executive from performing Executive's duties hereunder for up to sixty (60) days, and in no event shall any such suspension constitute an event pursuant to which Executive may terminate employment with Good Reason or otherwise constitute a breach hereunder; *provided*, that no such suspension shall alter the Company's obligations under this Agreement during such period of suspension.

(p)    "*Person*" shall mean any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust (charitable or non-charitable), unincorporated organization, or other form of business entity.

(q)    "*Prior Agreement*" shall have the meaning set forth in the recitals hereto.

(r)    "*Profits Interest*" has the meaning specified in Section 4(c) hereof.

(s)    "*Purchase Agreement*" shall mean that certain Note and Unit Purchase Agreement between BM AH Holdings, LLC and the Company, dated as of February 27, 2019.

(t)    "*Release of Claims*" shall mean the Release of Claims in substantially the same form attached hereto as Exhibit B (as the same may be revised from time to time by the Company upon the advice of counsel).

(u)    "*Restrictive Covenant Agreement*" shall mean the Restrictive Covenant Agreement attached hereto as Exhibit A.

(v)    "*Severance Benefits*" shall have the meaning set forth in Section 8(g) hereof.

(w)    "*Severance Term*" shall mean the twenty four (24) month period following Executive's termination by the Company without Cause (other than by reason of death or Disability) or by Executive for Good Reason.

(x)    "*Term*" shall mean the period specified in Section 2 hereof.

Section 2.        Acceptance and Term.

The Company agrees to employ Executive, and Executive agrees to serve the Company, on the terms and conditions set forth herein. The Term shall commence on the date hereof and shall continue until terminated as provided in Section 8 hereof.

3

**Section 3.        Position, Duties, and Responsibilities; Place of Performance.**

(a)    <u>Position, Duties, and Responsibilities</u>. During the Term, Executive shall be employed and serve as the Chief Executive Officer of the Company (together with such other position or positions consistent with Executive's title as the Board shall specify from time to time) and shall have such duties and responsibilities commensurate with such title. Executive also agrees to serve as an officer and/or director of any other member of the Company Group, in each case without additional compensation.

(b)    <u>Performance</u>. Executive shall devote Executive's full business time, attention, skill, and best efforts to the performance of Executive's duties under this Agreement and shall not engage in any other business or occupation during the Term, including, without limitation, any activity that (x) conflicts with the interests of the Company or any other member of the Company Group, (y) interferes with the proper and efficient performance of Executive's duties for the Company, or (z) interferes with Executive's exercise of judgment in the Company's best interests. Notwithstanding the foregoing, nothing herein shall preclude Executive from (i) serving, with the prior written consent of the Board, as a member of the boards of directors or advisory boards (or their equivalents in the case of a non-corporate entity) of non-competing businesses and charitable organizations, (ii) engaging in charitable activities and community affairs, and (iii) managing Executive's personal investments and affairs; *provided*, *however*, that the activities set out in clauses (i), (ii), and (iii) shall be limited by Executive so as not to materially interfere, individually or in the aggregate, with the performance of Executive's duties and responsibilities hereunder.

(c)    <u>Principal Place of Employment</u>. Executive's principal place of employment shall be in the Company's office in Philadelphia, Pennsylvania, although Executive understands and agrees that Executive may be required to travel from time to time for business reasons.

**Section 4.        Compensation.**

During the Term, Executive shall be entitled to the following compensation:

(a)    <u>Base Salary</u>. Executive shall be paid an annualized Base Salary, payable in accordance with the regular payroll practices of the Company, of not less than $500,000, with increases, if any, as may be approved in writing by the Compensation Committee.

(b)    <u>Annual Bonus</u>. Executive shall be eligible for an annual incentive bonus award determined by the Compensation Committee in respect of each fiscal year during the Term (the "***Annual Bonus***"). The target Annual Bonus for each fiscal year (commencing with the 2019 fiscal year) shall be 100% of Base Salary, with the actual Annual Bonus payable being based upon the level of achievement of annual Company and individual performance objectives for such fiscal year, as determined by the Compensation Committee and communicated to Executive. The Annual Bonus shall be paid to Executive at the same time as annual bonuses are generally payable to other senior executives of the Company subject to Executive's continuous employment through the payment date except as otherwise provided for in this Agreement.

4

(c)     Equity Awards.

(i)     <u>Accelerated Vesting of Existing Incentive Units</u>. Notwithstanding anything to the contrary, all unvested Incentive Units (as defined in the Company's operating agreement) held by Executive as of the date hereof shall, without any further action by Executive or the Company, fully vest effective as of the closing of the transactions contemplated by the Purchase Agreement, subject to Executive's continuous employment with the Company through the closing.

(ii)     <u>New Profits Interests</u>. On or promptly following the Closing Date and subject to the approval of the Board, the Company shall grant to Executive "profits interests" (the "***Profits Interests***") that will entitle Executive to not less than 2% of the appreciation in the value of the Company's equity value above the equity value on the Closing Date. The Profits Interests shall be subject to an award agreement which will contain such terms and conditions as the Board determines appropriate in its sole discretion and the terms and conditions of the Company's operating agreement, as in effect from time to time.

**Section 5.     Employee Benefits.**

During the Term, Executive shall be entitled to participate in health, insurance, retirement, and other benefits provided generally to similarly situated employees of the Company. Executive shall also be entitled to the same number of holidays, vacation days, and sick days, as well as any other benefits, in each case as are generally allowed to similarly situated employees of the Company in accordance with the Company policy as in effect from time to time. Nothing contained herein shall be construed to limit the Company's ability to amend, suspend, or terminate any employee benefit plan or policy at any time without providing Executive notice, and the right to do so is expressly reserved.

**Section 6.     Key-Man Insurance.**

At any time during the Term, the Company shall have the right to insure the life of Executive for the sole benefit of the Company, in such amounts, and with such terms, as it may determine. All premiums payable thereon shall be the obligation of the Company. Executive shall have no interest in any such policy, but agrees to cooperate with the Company in procuring such insurance by submitting to physical examinations, supplying all information required by the insurance company, and executing all necessary documents, provided that no financial obligation is imposed on Executive by any such documents.

**Section 7.     Reimbursement of Business Expenses.**

During the Term, the Company shall pay (or promptly reimburse Executive) for documented, out-of-pocket expenses reasonably incurred by Executive in the course of performing Executive's duties and responsibilities hereunder, which are consistent with the Company's policies in effect from time to time with respect to business expenses, subject to the Company's requirements with respect to reporting of such expenses.

**Section 8.     Termination of Employment.**

(a)     <u>General</u>. The Term shall terminate earlier than as provided in Section 2 hereof upon the earliest to occur of (i) Executive's death, (ii) a termination by reason of a Disability, (iii) a termination by the Company with or without Cause, and (iv) a termination by Executive with or

5

without Good Reason. Upon any termination of Executive's employment for any reason, except as may otherwise be requested by the Company in writing and agreed upon in writing by Executive, Executive shall be deemed to have resigned from any and all directorships, committee memberships, and any other positions Executive holds with the Company or any other member of the Company Group and hereby agrees to execute any documents that the Company (or any member of the Company Group) determines necessary to effectuate such resignations. Notwithstanding anything herein to the contrary, the payment (or commencement of a series of payments) hereunder of any "nonqualified deferred compensation" (within the meaning of Section 409A of the Code) upon a termination of employment shall be delayed until such time as Executive has also undergone a "separation from service" as defined in Treas. Reg. 1.409A-1(h), at which time such nonqualified deferred compensation (calculated as of the date of Executive's termination of employment hereunder) shall be paid (or commence to be paid) to Executive on the schedule set forth in this Section 8 as if Executive had undergone such termination of employment (under the same circumstances) on the date of Executive's ultimate "separation from service."

(b)      Termination Due to Death or Disability. Executive's employment shall terminate automatically upon Executive's death. The Company may terminate Executive's employment immediately upon the occurrence of a Disability, such termination to be effective upon Executive's receipt of written notice of such termination. Upon Executive's death or in the event that Executive's employment is terminated due to Executive's Disability, Executive or Executive's estate or Executive's beneficiaries, as the case may be, shall be entitled to:

(i)      The Accrued Obligations; and

(ii)      Any unpaid Annual Bonus in respect of any completed fiscal year that has ended prior to the date of such termination, which amount shall be paid at such time annual bonuses are paid to other senior executives of the Company, but in no event later than the date that is two and one-half (2½) months following the last day of the fiscal year in which such termination occurred.

Following Executive's death or a termination of Executive's employment by reason of a Disability, except as set forth in this Section 8(b), Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(c)      Termination by the Company with Cause.

(i)      The Company may terminate Executive's employment at any time with Cause, effective upon Executive's receipt of written notice of such termination; *provided*, *however*, that with respect to any Cause termination relying on clause (ii) or (vi) of the definition of Cause set forth in Section 1(f) hereof, to the extent that such act or acts or failure or failures to act are curable, Executive shall be given not less than ten (10) days' written notice by the Board of the Company's intention to terminate him with Cause, such notice to state in detail the particular act or acts or failure or failures to act that constitute the grounds on which the proposed termination with Cause is based, and such termination shall be effective at the expiration of such ten (10) day notice period unless Executive has fully cured such act or acts or failure or failures to act that give rise to Cause during such period.

6

(ii)    In the event that the Company terminates Executive's employment with Cause, Executive shall be entitled only to the Accrued Obligations. Following such termination of Executive's employment with Cause, except as set forth in this Section 8(c)(ii), Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(d)    <u>Termination by the Company without Cause</u>. The Company may terminate Executive's employment at any time without Cause, effective upon Executive's receipt of written notice of such termination. In the event that Executive's employment is terminated by the Company without Cause (other than due to death or Disability), Executive shall be entitled to:

(i)    The Accrued Obligations;

(ii)    Any unpaid Annual Bonus in respect of any completed fiscal year that has ended prior to the date of such termination, which amount shall be paid at such time annual bonuses are paid to other senior executives of the Company, but in no event later than the date that is two and one-half (2½) months following the last day of the fiscal year in which such termination occurred;

(iii)    Continued payment of Base Salary during the Severance Term, payable in accordance with the Company's regular payroll practices; and

(iv)    An amount equal to two (2) times Executive's then-current target Annual Bonus, payable in substantially equal installments during the Severance Term in accordance with the Company's regular payroll practices. Notwithstanding the foregoing, the payments and benefits described in clauses (ii), (iii) and (iv) above shall immediately terminate, and the Company shall have no further obligations to Executive with respect thereto, in the event that Executive breaches any provision of the Restrictive Covenant Agreement. Following such termination of Executive's employment by the Company without Cause, except as set forth in this Section 8(d), Executive shall have no further rights to any compensation or any other benefits under this Agreement. For the avoidance of doubt, Executive's sole and exclusive remedy upon a termination of employment by the Company without Cause shall be receipt of the Severance Benefits.

(e)    <u>Termination by Executive with Good Reason</u>. Executive may terminate Executive's employment with Good Reason by providing the Company ten (10) days' written notice setting forth in reasonable specificity the event that constitutes Good Reason, which written notice, to be effective, must be provided to the Company within sixty (60) days of the first occurrence of such event. During such ten (10) day notice period, the Company shall have a cure right (if curable), and if not cured within such period, Executive's termination will be effective upon the expiration of such cure period, and Executive shall be entitled to the same payments and benefits as provided in Section 8(d) hereof for a termination by the Company without Cause, subject to the same conditions on payment and benefits as described in Section 8(d) hereof. Following such termination of Executive's employment by Executive with Good Reason, except as set forth in this Section 8(e), Executive shall have no further rights to any compensation or any other benefits under this Agreement. For the avoidance of doubt, Executive's sole and exclusive remedy upon a termination of employment with Good Reason shall be receipt of the Severance Benefits.

7

(f)    Termination by Executive without Good Reason. Executive may terminate Executive's employment without Good Reason by providing the Company sixty (60) days' written notice of such termination. In the event of a termination of employment by Executive under this Section 8(f), Executive shall be entitled only to the Accrued Obligations. In the event of termination of Executive's employment under this Section 8(f), the Company may, in its sole and absolute discretion, by written notice accelerate such date of termination without changing the characterization of such termination as a termination by Executive without Good Reason. Following such termination of Executive's employment by Executive without Good Reason, except as set forth in this Section 8(f), Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(g)    Release. Notwithstanding any provision herein to the contrary, the payment of any amount or provision of any benefit pursuant to subsection (b), (d), or (e) of this Section 8 (other than the Accrued Obligations) (collectively, the "*Severance Benefits*") shall be conditioned upon Executive's execution, delivery to the Company, and non-revocation of the Release of Claims (and the expiration of any revocation period contained in such Release of Claims) within sixty (60) days following the date of Executive's termination of employment hereunder. If Executive fails to execute the Release of Claims in such a timely manner so as to permit any revocation period to expire prior to the end of such sixty (60) day period, or timely revokes Executive's acceptance of such release following its execution, Executive shall not be entitled to any of the Severance Benefits. Further, (i) to the extent that any of the Severance Benefits constitutes "nonqualified deferred compensation" for purposes of Section 409A of the Code, any payment of any amount or provision of any benefit otherwise scheduled to occur prior to the sixtieth (60th) day following the date of Executive's termination of employment hereunder, but for the condition on executing the Release of Claims as set forth herein, shall not be made until the first regularly scheduled payroll date following such sixtieth (60th) day and (ii) to the extent that any of the Severance Benefits do not constitute "nonqualified deferred compensation" for purposes of Section 409A of the Code, any payment of any amount or provision of any benefit otherwise scheduled to occur following the date of Executive's termination of employment hereunder, but for the condition on executing the Release of Claims as set forth herein, shall not be made until the first regularly scheduled payroll date following the date the Release of Claims is timely executed and the applicable revocation period has ended, after which, in each case, any remaining Severance Benefits shall thereafter be provided to Executive according to the applicable schedule set forth herein. For the avoidance of doubt, in the event of a termination due to Executive's death or Disability, Executive's obligations herein to execute and not revoke the Release of Claims may be satisfied on Executive's behalf by Executive's estate or a person having legal power of attorney over Executive's affairs.

**Section 9.        Restrictive Covenant Agreement.**

As a condition of, and prior to commencement of, Executive's employment with the Company, Executive shall have executed and delivered to the Company the Restrictive Covenant Agreement. The parties hereto acknowledge and agree that this Agreement and the Restrictive Covenant Agreement shall be considered separate contracts, and the Restrictive Covenant Agreement will survive the termination of this Agreement for any reason.

8

**Section 10.        Representations and Warranties of Executive.**

Executive represents and warrants to the Company that—

(a)        Executive is entering into this Agreement voluntarily and that Executive's employment hereunder and compliance with the terms and conditions hereof will not conflict with or result in the breach by Executive of any agreement to which Executive is a party or by which Executive may be bound;

(b)        Executive has not violated, and in connection with Executive's employment with the Company will not violate, any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer by which Executive is or may be bound; and

(c)        in connection with Executive's employment with the Company, Executive will not use any confidential or proprietary information Executive may have obtained in connection with employment with any prior employer.

**Section 11.        Taxes.**

The Company may withhold from any payments made under this Agreement all applicable taxes, including but not limited to income, employment, and social insurance taxes, as shall be required by law. Executive acknowledges and represents that the Company has not provided any tax advice to Executive in connection with this Agreement and that Executive has been advised by the Company to seek tax advice from Executive's own tax advisors regarding this Agreement and payments that may be made to Executive pursuant to this Agreement, including specifically, the application of the provisions of Section 409A of the Code to such payments.

**Section 12.        Set Off; Mitigation.**

The Company's obligation to pay Executive the amounts provided and to make the arrangements provided hereunder shall be subject to set-off, counterclaim, or recoupment of amounts owed by Executive to the Company or its affiliates; *provided*, *however*, that to the extent any amount so subject to set-off, counterclaim, or recoupment is payable in installments hereunder, such set-off, counterclaim, or recoupment shall not modify the applicable payment date of any installment, and to the extent an obligation cannot be satisfied by reduction of a single installment payment, any portion not satisfied shall remain an outstanding obligation of Executive and shall be applied to the next installment only at such time the installment is otherwise payable pursuant to the specified payment schedule. Executive shall not be required to mitigate the amount of any payment or benefit provided pursuant to this Agreement by seeking other employment or otherwise, and the amount of any payment or benefit provided for pursuant to this Agreement shall not be reduced by any compensation earned as a result of Executive's other employment or otherwise.

9

**Section 13.**        **Additional Section 409A Provisions.**

Notwithstanding any provision in this Agreement to the contrary—

(a)        Any payment otherwise required to be made hereunder to Executive at any date as a result of the termination of Executive's employment shall be delayed for such period of time as may be necessary to meet the requirements of Section 409A(a)(2)(B)(i) of the Code (the "**Delay Period**"). On the first business day following the expiration of the Delay Period, Executive shall be paid, in a single cash lump sum, an amount equal to the aggregate amount of all payments delayed pursuant to the preceding sentence, and any remaining payments not so delayed shall continue to be paid pursuant to the payment schedule set forth herein.

(b)        Each payment in a series of payments hereunder shall be deemed to be a separate payment for purposes of Section 409A of the Code.

(c)        To the extent that any right to reimbursement of expenses or payment of any benefit in-kind under this Agreement constitutes nonqualified deferred compensation (within the meaning of Section 409A of the Code), (i) any such expense reimbursement shall be made by the Company no later than the last day of the taxable year following the taxable year in which such expense was incurred by Executive, (ii) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, and (iii) the amount of expenses eligible for reimbursement or in-kind benefits provided during any taxable year shall not affect the expenses eligible for reimbursement or in-kind benefits to be provided in any other taxable year; *provided*, that the foregoing clause shall not be violated with regard to expenses reimbursed under any arrangement covered by Section 105(b) of the Code solely because such expenses are subject to a limit related to the period the arrangement is in effect.

(d)        While the payments and benefits provided hereunder are intended to be structured in a manner to avoid the implication of any penalty taxes under Section 409A of the Code, in no event whatsoever shall the Company or any of its affiliates be liable for any additional tax, interest, or penalties that may be imposed on Executive as a result of Section 409A of the Code or any damages for failing to comply with Section 409A of the Code (other than for withholding obligations or other obligations applicable to employers, if any, under Section 409A of the Code).

**Section 14.**        **Successors and Assigns; No Third-Party Beneficiaries.**

(a)        The Company. This Agreement shall inure to the benefit of the Company and its respective successors and assigns. Neither this Agreement nor any of the rights, obligations, or interests arising hereunder may be assigned by the Company to a Person (other than another member of the Company Group, or its or their respective successors) without Executive's prior written consent (which shall not be unreasonably withheld, delayed, or conditioned); *provided*, *however*, that in the event of a sale of all or substantially all of the assets of the Company or any direct or indirect division or subsidiary thereof to which Executive's employment primarily relates, the Company may provide that this Agreement will be assigned to, and assumed by, the acquiror of such assets, it being agreed that in such circumstances, Executive's consent will not be required in connection therewith.

(b)        Executive. Executive's rights and obligations under this Agreement shall not be transferable by Executive by assignment or otherwise, without the prior written consent of the Company; *provided*, *however*, that if Executive shall die, all amounts then payable to Executive

10

hereunder shall be paid in accordance with the terms of this Agreement to Executive's devisee, legatee, or other designee, or if there be no such designee, to Executive's estate.

(c)    No Third-Party Beneficiaries. Except as otherwise set forth in Section 8(b) or Section 14(b) hereof, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Company, the other members of the Company Group, and Executive any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

**Section 15.    Waiver and Amendments.**

Any waiver, alteration, amendment, or modification of any of the terms of this Agreement shall be valid only if made in writing and signed by each of the parties hereto; *provided*, *however*, that any such waiver, alteration, amendment, or modification must be consented to on the Company's behalf by the Board. No waiver by either of the parties hereto of their rights hereunder shall be deemed to constitute a waiver with respect to any subsequent occurrences or transactions hereunder unless such waiver specifically states that it is to be construed as a continuing waiver.

**Section 16.    Severability.**

If any covenants or such other provisions of this Agreement are found to be invalid or unenforceable by a final determination of a court of competent jurisdiction, (a) the remaining terms and provisions hereof shall be unimpaired, and (b) the invalid or unenforceable term or provision hereof shall be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision hereof.

**Section 17.    Governing Law and Jurisdiction.**

EXCEPT WHERE PREEMPTED BY FEDERAL LAW, THE VALIDITY, INTERPRETATION, CONSTRUCTION, AND PERFORMANCE OF THIS AGREEMENT IS GOVERNED BY AND IS TO BE CONSTRUED UNDER THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THAT STATE, WITHOUT REGARD TO CONFLICT OF LAWS RULES. ALL DISPUTES AND CONTROVERSIES ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE FINALLY SETTLED AND BINDING UNDER THE RULES OF INTERNATIONAL COMMERCIAL DISPUTE RESOLUTION OF THE AMERICAN ARBITRATION ASSOCIATION. THE PLACE OF ARBITRATION SHALL BE NEW YORK, NEW YORK. ANY SUCH ARBITRATION SHALL BE CONDUCTED BY A SINGLE ARBITRATOR APPOINTED IN ACCORDANCE WITH ICDR RULES. ANY AWARD, VERDICT OR SETTLEMENT ISSUED UNDER SUCH ARBITRATION MAY BE ENTERED BY ANY PARTY FOR ORDER OF ENFORCEMENT BY ANY COURT OF COMPETENT JURISDICTION. THE ARBITRATOR SHALL HAVE THE POWER TO TAKE INTERIM MEASURES HE OR SHE DEEMS NECESSARY, INCLUDING INJUNCTIVE RELIEF AND MEASURES FOR THE PROTECTION OR CONSERVATION OR PROPERTY.

11

**Section 18.**        **Notices.**

(a)        Place of Delivery. Every notice or other communication relating to this Agreement shall be in writing, and shall be mailed to or delivered to the party for whom or which it is intended at such address as may from time to time be designated by it in a notice mailed or delivered to the other party as herein provided; *provided*, that unless and until some other address be so designated, all notices and communications by Executive to the Company shall be mailed or delivered to the Company at its principal executive office, and all notices and communications by the Company to Executive may be given to Executive personally or may be mailed to Executive at Executive's last known address, as reflected in the Company's records.

(b)        Date of Delivery. Any notice so addressed shall be deemed to be given or received (i) if delivered by hand, on the date of such delivery, (ii) if mailed by courier or by overnight mail, on the first business day following the date of such mailing, and (iii) if mailed by registered or certified mail, on the third business day after the date of such mailing.

**Section 19.**        **Section Headings.**

The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part thereof or affect the meaning or interpretation of this Agreement or of any term or provision hereof.

**Section 20.**        **Entire Agreement.**

This Agreement, together with any exhibits attached hereto, constitutes the entire understanding and agreement of the parties hereto regarding the employment of Executive. This Agreement supersedes all prior negotiations, discussions, correspondence, communications, understandings, and agreements between the parties relating to the subject matter of this Agreement, including, without limitation, the Prior Agreement.

**Section 21.**        **Survival of Operative Sections.**

Upon any termination of Executive's employment, the provisions of Section 8 through Section 22 of this Agreement (together with any related definitions set forth in Section 1 hereof) shall survive to the extent necessary to give effect to the provisions thereof.

**Section 22.**        **Counterparts.**

This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument. The execution of this Agreement may be by actual signature or by signature delivered by facsimile or by e-mail as a portable document format (.pdf) file or image file attachment.

*        *        *

[*Signatures to appear on the following page(s).*]

12

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

**ADAPTHEALTH HOLDINGS LLC**

By:      /s/ Joshua Parnes
        Name:
        Title:


**EXECUTIVE**


/s/ Luke McGee
Luke McGee

[*Signature Page to Employment Agreement*]

**Exhibit A**

## RESTRICTIVE COVENANT AGREEMENT

As a condition of my becoming employed by, or continuing employment with, AdaptHealth Holdings LLC, a Delaware limited liability company (the "***Company***"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following:

**Section 1.**        **Confidential Information.**

(a)        <u>Company Group Information</u>. I acknowledge that, during the period of my employment with the Company (the "***Employment Period***"), I will have access to information about the Company and its direct and indirect parents, subsidiaries and affiliates (collectively, the "***Company Group***") and that my employment with the Company shall bring me into close contact with confidential and proprietary information of the Company Group. In recognition of the foregoing, I agree, at all times during the Employment Period and thereafter, to hold in confidence, and not to use, except for the benefit of the Company Group, or to disclose to any person, firm, corporation, or other entity without prior written authorization of the Company, any Confidential Information that I obtain or create. I further agree not to make copies of such Confidential Information except as authorized by the Company. I understand that "***Confidential Information***" means information that the Company Group has developed, acquired, created, compiled, discovered, or owned or will develop, acquire, create, compile, discover, or own, that has value in or to the business of the Company Group. I understand that Confidential Information includes, but is not limited to, any and all non-public information that relates to the actual or anticipated business and/or products, research, or development of the Company Group, or to the Company Group's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company Group's products or services and markets, customer lists, and customers (including, but not limited to, customers of the Company Group on whom I called or with whom I may become acquainted during the Employment Period), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company Group either directly or indirectly in writing, orally, or by drawings or inspection of premises, parts, equipment, or other Company Group property. Notwithstanding the foregoing, Confidential Information shall not include (i) any of the foregoing items that have become publicly and widely known through no unauthorized disclosure by me or others who were under confidentiality obligations as to the item or items involved or (ii) any information that I am required to disclose to, or by, any governmental or judicial authority; *provided*, *however*, that in such event I will give the Company prompt written notice thereof so that the Company Group may seek an appropriate protective order and/or waive in writing compliance with the confidentiality provisions of this Restrictive Covenant Agreement (this "***Agreement***").

(b)        <u>Former Employer Information</u>. I represent that my performance of all of the terms of this Agreement as an employee of the Company has not breached and will not breach any agreement to keep in confidence proprietary information, knowledge, or data acquired by me in confidence or trust prior or subsequent to the commencement of my employment with the Company, and I will not disclose to any member of the Company Group, or induce any member of the Company Group to use, any developments, or confidential or proprietary information or material I may have obtained in connection with employment with any prior employer in violation

A-1

of a confidentiality agreement, nondisclosure agreement, or similar agreement with such prior employer. During the Employment Period, I will not improperly make use of, or disclose, any developments, or confidential or proprietary information or material of any prior employer or other third party, nor will I bring onto the premises of the Company or use any unpublished documents or any property belonging to any prior employer or other third party, in violation of any lawful agreements with that prior employer or third party. I will use in the performance of my duties only information that is generally known and used by persons with training and experience comparable to my own, is common knowledge in the industry or otherwise legally in the public domain, or is otherwise provided or developed by the Company.

(c)    Third Party Information. I understand that the Company Group has received and in the future may receive from third parties confidential or proprietary information ("*Third Party Information*") subject to a duty on the Company Group's part to maintain the confidentiality of such information and to use it only for certain limited purposes. In recognition of the foregoing, I agree, at all times during the Employment Period and thereafter, to hold in confidence and will not disclose to anyone (other than Company Group personnel who need to know such information in connection with their work for the Company Group), and not to use, except for the benefit of the Company Group, Third Party Information without the express prior written consent of an officer of the Company and otherwise treat Third Party Information as Confidential Information.

(d)    Whistleblower; Defend Trade Secrets Act Disclosure.

(i)    In addition, I understand that nothing in this Agreement shall be construed to prohibit me from (A) filing a charge or complaint with, participating in an investigation or proceeding conducted by, or reporting possible violations of law or regulation to any federal, state or local government agency, (B) truthfully responding to or complying with a subpoena, court order, or other legal process, or (C) exercising any rights I may have under applicable labor laws to engage in concerted activity with other employees; *provided however*, that I agree to forgo any monetary benefit from the filing of a charge or complaint with a government agency except pursuant to a whistleblower program or where my right to receive such a monetary benefit is otherwise not waivable by law.

(ii)    I understand that the Defend Trade Secrets Act provides that I may not be held criminally or civilly liable under any Federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a Federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In the event that I file a lawsuit for retaliation by any member of the Company Group for reporting a suspected violation of law, I may disclose the trade secret to my attorney and use the trade secret information in the court proceeding, if I file any document containing the trade secret under seal and do not disclose the trade secret, except pursuant to court order.

**Section 2.        Inventions.**

(a)    No Prior Developments. By signing below, I represent that there are no developments, inventions, concepts, know-how, original works of authorship, improvements,

A-2

trade secrets, methodology, algorithms, software, processes, formulas, designs, drawings and other technological advancements and implementations that I can demonstrate were created or owned by me prior to the commencement of the Employment Period, which belong solely to me or belong to me jointly with another, that relate in any way to any of the actual or proposed businesses, products, or research and development of any member of the Company Group and which are not assigned to the Company hereunder.

(b)    Assignment of Inventions. Without additional compensation, I agree to assign, and hereby do assign, to the Company all rights, title and interest throughout the world in and to all Inventions (as defined below) which I may solely or jointly conceive, create, invent, develop, modify, compile or reduce to practice, at any time during any period during which I perform or performed services for the Company Group both before or after the date hereof (the "***Assignment Period***"), whether as an officer, employee, director, independent contractor, consultant, or agent, or in any other capacity, whether or not during regular working hours, provided they either (i) relate at the time of conception, development or reduction to practice to the business of any member of the Company Group, or the actual or anticipated research or development of any member of the Company Group; (ii) result from or relate to any work performed for any member of the Company Group; or (iii) are developed through the use of equipment, supplies, or facilities of any member of the Company Group, or any Confidential Information, or in consultation with personnel of any member of the Company Group (collectively referred to as "***Company IP Rights***"). I understand that "Inventions" means inventions, concepts, know-how, developments, original works of authorship, improvements, trade secrets, methodology, algorithms, software, processes, formulas, designs, drawings and other technological advancements and implementations. I agree that I will promptly make full written disclosure to the Company of any Company IP Rights I participate in conceiving, creating, inventing, developing, modifying, compiling or reducing to practice during the Assignment Period. I further acknowledge that, to the greatest extent permitted by applicable law, all Company IP Rights made by me (solely or jointly with others) within the scope of and during the Assignment Period are "works made for hire" for which I am, in part, compensated by my salary, unless regulated otherwise by law. If any Company IP Rights cannot be assigned, I hereby grant to the Company Group an exclusive, assignable, irrevocable, perpetual, worldwide, sublicenseable (through one or multiple tiers), royalty-free, unlimited license to use, make, modify, sell, offer for sale, reproduce, distribute, create derivative works of, publicly perform, publicly display and digitally perform and display such work in any media now known or hereafter known. Outside the scope of my service, whether during or after the Employment Period, I agree not to (i) modify, adapt, alter, translate, or create derivative works from any such work of authorship or (ii) merge any such work of authorship with other Company IP Rights. To the extent rights related to paternity, integrity, disclosure and withdrawal (collectively, "***Moral Rights***") may not be assignable under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, I hereby irrevocably waive such Moral Rights and consent to any action of the Company Group that would violate such Moral Rights in the absence of such consent.

(c)    Maintenance of Records. I agree to keep and maintain adequate and current written records of all Company IP Rights made by me (solely or jointly with others) during the Assignment Period. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, and any other format. The records will be available to and remain the sole property of the Company Group at all times. I agree not to remove such records from the Company's place

A-3

of business except as expressly permitted by Company Group policy, which may, from time to time, be revised at the sole election of the Company Group for the purpose of furthering the business of the Company Group.

(d)    Intellectual Property Rights. I hereby agree to assist the Company, or its designee, at the Company's expense, in every way to secure the rights of the Company Group in the Company IP Rights and any copyrights, patents, trademarks, service marks, database rights, domain names, mask work rights, moral rights, and other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments that the Company shall deem necessary in order to apply for, obtain, maintain, and transfer such rights and in order to assign and convey to the Company Group the sole and exclusive right, title, and interest in and to such Company IP Rights, and any intellectual property and other proprietary rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the Assignment Period until the expiration of the last such intellectual property right to expire in any country of the world; *provided*, *however*, that the Company shall reimburse me for my reasonable expenses incurred in connection with carrying out the foregoing obligation. If the Company is unable because of my mental or physical incapacity or unavailability for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Company IP Rights or original works of authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact to act for and in my behalf and stead to execute and file any such applications or records and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance, and transfer of letters patent or registrations thereon with the same legal force and effect as if originally executed by me. I hereby waive and irrevocably quitclaim to the Company any and all claims, of any nature whatsoever, that I now or hereafter have for past, present, or future infringement of any and all proprietary rights assigned to the Company.

(e)    State Non-assignable Invention Exemptions. Solely to the extent that I (i) was or am an employee of the Company and (ii) was or am based in California, Illinois, Washington, Kansas or Minnesota or otherwise entitled to the benefits of the state statutes of California, Illinois, Washington, Kansas or Minnesota during the Employment Period, then, to the extent the assignment of Company IP Rights to the Company in this Section 2 can be construed to cover inventions excluded under the appropriate state statutes (including California Labor Code Sec. 2870, Illinois Employee Patent Act, 765 ILCS 1060, Sec. 2, Revised Code of Washington Section 49.44.140(1), Kansas Statute K.S.A. §44-130, and Minn. Stat. §181.78, each incorporated herein by reference), this Section 2 shall not apply to such inventions.

**Section 3.        Returning Company Group Documents.**

I agree that, at the time of termination of my employment with the Company for any reason, I will deliver to the Company (and will not keep in my possession, recreate, or deliver to anyone else) any and all Confidential Information, Third Party Information and all other documents, materials, information, and property developed by me pursuant to my employment or otherwise belonging to the Company and, if so requested, will certify in writing that I have fully complied

A-4

with the foregoing obligation. I agree further that I will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to the Company. In addition, if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, I agree to provide the Company with a computer-useable copy of all such Company information and then permanently delete and expunge such Company information from those systems; and I agree to provide the Company access to my system as reasonably requested to verify that the necessary copying and/or deletion is completed. I agree further that any property situated on the Company's premises and owned by the Company (or any other member of the Company Group), including disks and other storage media, filing cabinets, and other work areas, is subject to inspection by personnel of any member of the Company Group at any time with or without notice.

**Section 4.**      **Disclosure of Agreement.**

As long as it remains in effect, I will disclose the existence of this Agreement to any prospective employer, partner, co-venturer, investor, or lender prior to entering into an employment, partnership, or other business relationship with such person or entity. I also consent to the notification of my prospective employer, partner, co-venturer, investor, or lender of my rights and obligations under this Agreement, by the Company providing a copy of this Agreement or otherwise.

**Section 5.**      **Publicity.**

I hereby consent to any and all uses and displays by the Company Group of my name, voice, likeness, image, appearance and biographical information in or in connection with any printed, electronic or digital materials, including, without limitation, any pictures, audio or video recordings, digital images, websites, television programs, advertising, sales or marketing brochures, printed materials and computer media, throughout the world and at any time during or after the Employment Period for all legitimate business purposes of the Company Group (the "***Permitted Use***"). I hereby forever release the Company Group and each of their respective current or former directors, officers, employees, shareholders, representatives and agents from any and all claims, actions, damages, losses, costs, expenses and liability of any kind arising under any legal or equitable theory whatsoever at any time during or after the Employment Period in connection with any Permitted Use.

**Section 6.**      **Restrictions on Interfering.**

(a)      <u>Non-Competition</u>. During the Restricted Period, I shall not, directly or indirectly, individually or on behalf of any person, company, enterprise, or entity, or as a sole proprietor, partner, shareholder, director, officer, principal, agent, or executive, or in any other capacity or relationship, engage in any Competitive Activities, within the United States or any other jurisdiction in which the Company Group is actively engaged in business.

(b)      <u>Non-Interference</u>. During the Restricted Period, I shall not, directly or indirectly for my own account or for the account of any other individual or entity, engage in Interfering Activities.

A-5

(c)        Definitions. For purposes of this Agreement:

(i)        "**Business Relation**" shall mean any current or prospective client, customer, licensee, or other business relation of the Company Group, or any such relation that was a client, customer, licensee, supplier, or other business relation within the twelve (12) month period prior to the termination of the Employment Period, in each case, to whom I provided services, or with whom I transacted business, or whose identity became known to me in connection with my relationship with or employment by the Company.

(ii)        "**Competitive Activities**" shall mean the business of owning and operating a durable medical equipment business or any other business activity that is competitive with the then-current or demonstrably planned business activities of the Company Group.

(iii)        "**Interfering Activities**" shall mean (A) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Person employed by, or providing consulting services to, any member of the Company Group and who is or is likely to be in possession of Confidential Information to terminate such Person's employment or services (or in the case of a consultant, materially reducing such services) with the Company Group; (B) hiring any individual who was employed by the Company Group within the six (6) month period prior to the date of such hiring; or (C) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Business Relation to cease doing business with or reduce the amount of business conducted with any member of the Company Group, or in any way interfering with the relationship between any such Business Relation and any member of the Company Group.

(iv)        "**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust (charitable or non- charitable), unincorporated organization, or other form of business entity.

(v)        "**Restricted Period**" shall mean the period commencing on the date hereof and ending on the twenty-four (24) month anniversary of such date of termination.

(d)        Non-Disparagement. I agree that during the Employment Period, and at all times thereafter, I will not make any disparaging or defamatory comments regarding any member of the Company Group or its respective current or former directors, officers, employees or shareholders in any respect or make any comments concerning any aspect of my relationship with any member of the Company Group or any conduct or events which precipitated any termination of my employment from the Company. However, my obligations under this subsection (d) shall not apply to disclosures required by applicable law, regulation, or order of a court or governmental agency.

**Section 7.        Reasonableness of Restrictions.**

I acknowledge and recognize the highly competitive nature of the Company's business, that access to Confidential Information renders me special and unique within the Company's industry, and that I will have the opportunity to develop substantial relationships with existing and prospective clients, accounts, customers, consultants, contractors, investors, and strategic partners of the Company Group during the course of and as a result of my employment with the Company. In light of the foregoing, I recognize and acknowledge that the restrictions and limitations set forth in this Agreement are reasonable and valid in geographical and temporal scope and in all other

A-6

respects and are essential to protect the value of the business and assets of the Company Group. I acknowledge further that the restrictions and limitations set forth in this Agreement will not materially interfere with my ability to earn a living following the termination of the Employment Period and that my ability to earn a livelihood without violating such restrictions is a material condition to my employment with the Company.

Section 8.          Independence; Severability; Blue Pencil.

Each of the rights enumerated in this Agreement shall be independent of the others and shall be in addition to and not in lieu of any other rights and remedies available to the Company Group at law or in equity. If any of the provisions of this Agreement or any part of any of them is hereafter construed or adjudicated to be invalid or unenforceable, the same shall not affect the remainder of this Agreement, which shall be given full effect without regard to the invalid portions. If any of the covenants contained herein are held to be invalid or unenforceable because of the duration of such provisions or the area or scope covered thereby, I agree that the court making such determination shall have the power to reduce the duration, scope, and/or area of such provision to the maximum and/or broadest duration, scope, and/or area permissible by law, and in its reduced form said provision shall then be enforceable.

Section 9.          Injunctive Relief.

I expressly acknowledge that, because my services are personal and unique and because I will have access to Confidential Information, any breach or threatened breach of any of the terms and/or conditions set forth in this Agreement may result in substantial, continuing, and irreparable injury to the members of the Company Group for which monetary damages would not be an adequate remedy. Therefore, I hereby agree that, in addition to any other right or remedy that may be available to the Company in law or in equity, any member of the Company Group shall be entitled to injunctive relief, specific performance, or other equitable relief by a court of appropriate jurisdiction in the event of any breach or threatened breach of the terms of this Agreement without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach or posting a bond and without liability should relief be denied, modified or vacated. Notwithstanding any other provision to the contrary, I acknowledge and agree that the Restricted Period shall be tolled during any period of violation of any of the covenants in Section 6 hereof and during any other period required for litigation during which the Company or any other member of the Company Group seeks to enforce such covenants against me if it is ultimately determined that I was in breach of such covenants.

Section 10.          Cooperation.

I agree that, following any termination of my employment, I will continue to provide reasonable cooperation to the Company and/or any other member of the Company Group and its or their respective counsel in connection with any investigation, administrative proceeding, or litigation relating to any matter that occurred during the Employment Period in which I was involved or of which I have knowledge. As a condition of such cooperation, the Company shall reimburse me for reasonable out-of-pocket expenses incurred at the request of the Company with respect to my compliance with this Section. I also agree that, in the event that I am subpoenaed by any person or entity (including, but not limited to, any government agency) to give testimony or

A-7

provide documents (in a deposition, court proceeding, or otherwise) that in any way relates to my employment by the Company and/or any other member of the Company Group, I will give prompt notice of such request to the Company and will make no disclosure until the Company and/or the other member of the Company Group has had a reasonable opportunity to contest the right of the requesting person or entity to such disclosure.

**Section 11.      General Provisions.**

(a)      Governing Law and Jurisdiction. EXCEPT WHERE PREEMPTED BY FEDERAL LAW, THE VALIDITY, INTERPRETATION, CONSTRUCTION, AND PERFORMANCE OF THIS AGREEMENT IS GOVERNED BY AND IS TO BE CONSTRUED UNDER THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THAT STATE, WITHOUT REGARD TO CONFLICT OF LAWS RULES. FURTHER, I HEREBY CONSENT TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF NEW YORK, AND WAIVE ANY RIGHT TO TRIAL BY JURY, IN CONNECTION WITH ANY DISPUTE ARISING UNDER OR CONCERNING THIS AGREEMENT.

(b)      Entire Agreement. This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us. No modification or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in my duties, obligations, rights, or compensation will not affect the validity or scope of this Agreement.

(c)      No Right of Continued Employment. I acknowledge and agree that nothing contained herein shall be construed as granting me any right to continued employment by the Company, and the right of the Company to terminate my employment at any time and for any reason, with or without cause, is specifically reserved.

(d)      Successors and Assigns. This Agreement will be binding upon my heirs, executors, administrators, and other legal representatives and will be for the benefit of the Company, its successors, and its assigns. I expressly acknowledge and agree that this Agreement may be assigned by the Company without my consent to any other member of the Company Group as well as any purchaser of all or substantially all of the assets or stock of the Company or of any business or division of the Company for which I provide services, whether by purchase, merger, or other similar corporate transaction.

(e)      Survival. The provisions of this Agreement shall survive the termination of my employment with the Company and/or the assignment of this Agreement by the Company to any successor in interest or other assignee.

*      *      *

[*Signature to appear on the following page.*]

A-8

I, Luke McGee, have executed this Restrictive Covenant Agreement on the date set forth below:

Date: March 20, 2019

/s/ Luke McGee
(Signature)

Luke McGee
(Type/Print Name)

[*Signature Page to Luke McGee Restrictive Covenant Agreement*]

**RELEASE OF CLAIMS**

As used in this Release of Claims (this "***Release***"), the term "claims" will include all claims, covenants, warranties, promises, undertakings, actions, suits, causes of action, obligations, debts, accounts, attorneys' fees, judgments, losses, and liabilities, of whatsoever kind or nature, in law, in equity, or otherwise.

For and in consideration of the Severance Benefits (as defined in my Employment Agreement, dated March 20, 2019, with AdaptHealth Holdings LLC, a Delaware limited liability company (such entity, the "***Company***" and such agreement, my "***Employment Agreement***")), and other good and valuable consideration, I, Luke McGee, for and on behalf of myself and my heirs, administrators, executors, and assigns, effective as of the date on which this release becomes effective pursuant to its terms, do fully and forever release, remise, and discharge the Company and each of its direct and indirect subsidiaries and affiliates, and their respective successors and assigns, together with their respective current and former officers, directors, partners, shareholders, employees, and agents (collectively, the "***Group***"), from any and all claims whatsoever up to the date hereof that I had, may have had, or now have against the Group, whether known or unknown, for or by reason of any matter, cause, or thing whatsoever, including any claim arising out of or attributable to my employment or the termination of my employment with the Company, whether for tort, breach of express or implied employment contract, intentional infliction of emotional distress, wrongful termination, unjust dismissal, defamation, libel, or slander, or under any federal, state, or local law dealing with discrimination based on age, race, sex, national origin, handicap, religion, disability, or sexual orientation. The release of claims in this Release includes, but is not limited to, all claims arising under the Age Discrimination in Employment Act of 1967 ("***ADEA***"), Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, the Civil Rights Act of 1991, the Family and Medical Leave Act of 1993, the Worker Adjustment and Retraining Notification Act of 1988 and the Equal Pay Act of 1963, each as may be amended from time to time, and all other federal, state, and local laws, the common law, and any other purported restriction on an employer's right to terminate the employment of employees. The release contained herein is intended to be a general release of any and all claims to the fullest extent permissible by law.

By executing this Release, I specifically release all claims relating to my employment and its termination under ADEA, a United States federal statute that, among other things, prohibits discrimination on the basis of age in employment and employee benefit plans.

Notwithstanding any provision of this Release to the contrary, by executing this Release, I am not releasing (i) any claims relating to my rights under Section 8 of my Employment Agreement, (ii) any claims that cannot be waived by law, (iii) my rights with respect to any equity securities that I own in the Company, or (iv) my right of indemnification as provided by, and in accordance with the terms of, the Company's by-laws or a Company insurance policy providing such coverage, as any of such may be amended from time to time.

I expressly acknowledge and agree that I—

- Am able to read the language, and understand the meaning and effect, of this Release;

B-1

- Have no physical or mental impairment of any kind that has interfered with my ability to read and understand the meaning of this Release or its terms, and that I am not acting under the influence of any medication, drug, or chemical of any type in entering into this Release;

- Am specifically agreeing to the terms of the release contained in this Release because the Company has agreed to pay me the Severance Benefits in consideration for my agreement to accept it in full settlement of all possible claims I might have or ever have had, and because of my execution of this Release;

- Acknowledge that, but for my execution of this Release, I would not be entitled to the Severance Benefits;

- Understand that, by entering into this Release, I do not waive rights or claims under ADEA that may arise after the date I execute this Release;

- Had or could have had [twenty-one (21)][forty-five (45)](1) calendar days from the date of my termination of employment (the "***Release Expiration Date***") in which to review and consider this Release, and that if I execute this Release prior to the Release Expiration Date, I have voluntarily and knowingly waived the remainder of the review period;

- Have not relied upon any representation or statement not set forth in this Release or my Employment Agreement made by the Company or any of its representatives;

- Was advised to consult with my attorney regarding the terms and effect of this Release; and

- Have signed this Release knowingly and voluntarily.

I represent and warrant that I have not previously filed, and to the maximum extent permitted by law agree that I will not file, a complaint, charge, or lawsuit against any member of the Group regarding any of the claims released herein. If, notwithstanding this representation and warranty, I have filed or file such a complaint, charge, or lawsuit, I agree that I shall cause such complaint, charge, or lawsuit to be dismissed with prejudice and shall pay any and all costs required in obtaining dismissal of such complaint, charge, or lawsuit, including without limitation the attorneys' fees of any member of the Group against whom I have filed such a complaint, charge, or lawsuit. Notwithstanding anything to the contrary, nothing herein shall prevent or restrict me from (i) filing a charge or complaint with, participating in an investigation or proceeding conducted by, or reporting possible violations of law or regulation to any federal, state or local government agency; (ii) truthfully responding to or complying with a subpoena, court order, or other legal process; or (iii) exercising any rights I may have under applicable labor laws to engage in concerted activity with other employees; *provided however*, that I hereby forgo any monetary benefit from the filing of a charge or complaint with a government agency except

---

(1) To be selected based on whether applicable termination was "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967).

B-2

pursuant to a whistleblower program or where my right to receive such a monetary benefit is otherwise not waivable by law.

I hereby agree to waive any and all claims to re-employment with the Company or any other member of the Group and affirmatively agree not to seek further employment with the Company or any other member of the Group.

Notwithstanding anything contained herein to the contrary, this Release will not become effective or enforceable prior to the expiration of the period of seven (7) calendar days immediately following the date of its execution by me (the "***Revocation Period***"), during which time I may revoke my acceptance of this Release by notifying the Company and the Board of Directors of the Company, in writing, delivered to the Company at its principal executive office, marked for the attention of its General Counsel. To be effective, such revocation must be received by the Company no later than 11:59 p.m. on the seventh (7th) calendar day following the execution of this Release. Provided that the Release is executed and I do not revoke it during the Revocation Period, the eighth (8th) calendar day following the date on which this Release is executed shall be its effective date. I acknowledge and agree that if I revoke this Release during the Revocation Period, this Release will be null and void and of no effect, and neither the Company nor any other member of the Group will have any obligations to pay me the Severance Benefits.

The provisions of this Release shall be binding upon my heirs, executors, administrators, legal personal representatives, and assigns. If any provision of this Release shall be held by any court of competent jurisdiction to be illegal, void, or unenforceable, such provision shall be of no force or effect. The illegality or unenforceability of such provision, however, shall have no effect upon and shall not impair the enforceability of any other provision of this Release.

EXCEPT WHERE PREEMPTED BY FEDERAL LAW, THE VALIDITY, INTERPRETATION, CONSTRUCTION, AND PERFORMANCE OF THIS RELEASE IS GOVERNED BY AND IS TO BE CONSTRUED UNDER THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THAT STATE, WITHOUT REGARD TO CONFLICT OF LAWS RULES. ANY DISPUTE OR CLAIM ARISING OUT OF OR RELATING TO THIS RELEASE OR CLAIM OF BREACH HEREOF SHALL BE BROUGHT EXCLUSIVELY IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, TO THE EXTENT FEDERAL JURISDICTION EXISTS, AND IN ANY COURT SITTING IN MANHATTAN, NEW YORK, BUT ONLY IN THE EVENT FEDERAL JURISDICTION DOES NOT EXIST, AND ANY APPLICABLE APPELLATE COURTS. BY EXECUTION OF THIS RELEASE, I CONSENT TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS, AND WAIVE ANY RIGHT TO CHALLENGE JURISDICTION OR VENUE IN SUCH COURT WITH REGARD TO ANY SUIT, ACTION, OR PROCEEDING UNDER OR IN CONNECTION WITH THIS RELEASE. FURTHER, I HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN CONNECTION WITH ANY SUIT, ACTION, OR PROCEEDING UNDER OR IN CONNECTION WITH THIS RELEASE.

B-3

Capitalized terms used, but not defined herein, shall have the meanings ascribed to such terms in my Employment Agreement.

*   *   *

I, Luke McGee, have executed this Release of Claims on the respective date set forth below:

_____
Luke McGee


Date:        [To Be Executed Following
             Termination of Employment]

B-4

**Execution Copy**

**EMPLOYMENT AGREEMENT**

This EMPLOYMENT AGREEMENT (this "*Agreement*") is made and entered into as of this 20th day of March, 2019, by and between AdaptHealth Holdings LLC, a Delaware limited liability company (the "*Company*"), and Josh Parnes ("*Executive*").

W I T N E S S E T H :

WHEREAS, Executive is currently employed by the Company as its President; and

WHEREAS, Executive is a party to an employment agreement with the Company, dated May 17, 2018 (the "*Prior Agreement*"); and

WHEREAS, the Company desires to employ Executive and to enter into this Agreement embodying the terms of such employment, and Executive desires to enter into this Agreement and to accept such employment, subject to the terms and provisions of this Agreement.

NOW, THEREFORE, in consideration of the promises and mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are mutually acknowledged, the Company and Executive hereby agree as follows:

**Section 1.        Definitions.**

(a)        "*Accrued Obligations*" shall mean (i) all accrued but unpaid Base Salary through the date of termination of Executive's employment, (ii) any unpaid or unreimbursed expenses incurred in accordance with Section 7 hereof, and (iii) any benefits provided under the Company's employee benefit plans upon a termination of employment (excluding any employee benefit plan providing for severance or similar benefits), in accordance with the terms contained therein.

(b)        "*Agreement*" shall have the meaning set forth in the preamble hereto.

(c)        "*Annual Bonus*" shall have the meaning set forth in Section 4(b) hereof.

(d)        "*Base Salary*" shall mean the salary provided for in Section 4(a) hereof or any increased salary granted to Executive pursuant to Section 4(a) hereof.

(e)        "*Board*" shall mean the Board of Managers of the Company.

(f)        "*Cause*" shall mean (i) Executive's act(s) of gross negligence or willful misconduct in the course of Executive's employment hereunder, (ii) willful failure or refusal by Executive to perform in any material respect Executive's duties or responsibilities under this Agreement, (iii) misappropriation (or attempted misappropriation) by Executive of any assets or business opportunities of the Company or any other member of the Company Group, (iv) theft, embezzlement or fraud committed (or attempted) by Executive, at Executive's direction, or with Executive's prior actual knowledge, (v) Executive's conviction of or pleading "guilty" or "no contest" to, (x) a felony or (y) any other criminal charge that has, or could be reasonably expected to have, an adverse impact on the performance of Executive's duties to the Company or any other member of the Company Group or otherwise result in material injury to the reputation or business

of the Company or any other member of the Company Group, (vi) any material violation by Executive of the policies of the Company including but not limited to those relating to sexual harassment or business conduct, and those otherwise set forth in the manuals or statements of policy of the Company, (vii) Executive's material breach of this Agreement or breach of the Restrictive Covenant Agreement, (viii) any willful act or omission to act of Executive that is intended to result in material injury to the business, property, operations, financial condition or reputation of the Company or any other member of the Company Group, or (ix) Executive's willful failure to reasonably cooperate, if requested by the Board, with any investigation or inquiry into Executive's or the Company's business practices (in each case, to the extent related to the Company or any other member of the Company Group), whether internal or external, including, but not limited to, Executive's refusal to be deposed or to provide truthful testimony or evidence at any trial, proceeding or inquiry. If, within ninety (90) days subsequent to Executive's termination for any reason other than by the Company for Cause, the Company determines that Executive's employment could have been terminated for Cause pursuant to clauses (iii), (iv), or (v) of the definition thereof, Executive's employment will be deemed to have been terminated for Cause for all purposes, and Executive will be required to disgorge to the Company all amounts received pursuant to this Agreement or otherwise on account of such termination that would not have been payable to Executive had such termination been by the Company for Cause.

(g)  "***Closing Date***" shall have the meaning set forth in the Purchase Agreement.

(h)  "***Code***" shall mean the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

(i)  "***Company***" shall have the meaning set forth in the preamble hereto.

(j)  "***Company Group***" shall mean the Company together with any direct or indirect subsidiaries of the Company.

(k)  "***Compensation Committee***" shall mean the Board or the committee of the Board designated to make compensation decisions relating to senior executive officers of the Company Group.

(l)  "***Delay Period***" shall have the meaning set forth in Section 13(a) hereof.

(m)  "***Disability***" shall mean any physical or mental disability or infirmity of Executive that prevents the performance of Executive's duties for a period of (i) ninety (90) consecutive days or (ii) one hundred twenty (120) non-consecutive days during any consecutive twelve (12) month period. Any question as to the existence, extent, or potentiality of Executive's Disability upon which Executive and the Company cannot agree shall be determined by a qualified, independent physician selected by the Company and approved by Executive (which approval shall not be unreasonably withheld). The determination of any such physician shall be final and conclusive for all purposes of this Agreement.

(n)  "***Executive***" shall have the meaning set forth in the preamble hereto.

(o)  "***Good Reason***" shall mean, without Executive's consent, (i) a material diminution in Executive's title, duties, or responsibilities as set forth in Section 3 hereof, (ii) a material

2

reduction in Base Salary set forth in Section 4(a) hereof or Annual Bonus opportunity set forth in Section 4(b) hereof, (iii) the relocation of Executive's principal place of employment (as provided in Section 3(c) hereof) more than fifty (50) miles from its current location, or (iv) any other material breach of a provision of this Agreement by the Company (other than a provision that is covered by clause (i), (ii), or (iii) above). Executive acknowledges and agrees that Executive's exclusive remedy in the event of any breach of this Agreement shall be to assert Good Reason pursuant to the terms and conditions of Section 8(e) hereof. Notwithstanding the foregoing, during the Term, in the event that the Company reasonably believes that Executive may have engaged in conduct that could constitute Cause hereunder, the Company may, in its sole and absolute discretion, suspend Executive from performing Executive's duties hereunder for up to sixty (60) days, and in no event shall any such suspension constitute an event pursuant to which Executive may terminate employment with Good Reason or otherwise constitute a breach hereunder; *provided*, that no such suspension shall alter the Company's obligations under this Agreement during such period of suspension.

(p)        "***Person***" shall mean any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust (charitable or non-charitable), unincorporated organization, or other form of business entity.

(q)        "***Prior Agreement***" shall have the meaning set forth in the recitals hereto.

(r)        "***Profits Interest***" has the meaning specified in Section 4(c) hereof.

(s)        "***Purchase Agreement***" shall mean that certain Note and Unit Purchase Agreement between BM AH Holdings, LLC and the Company, dated as of February 27, 2019.

(t)        "***Release of Claims***" shall mean the Release of Claims in substantially the same form attached hereto as Exhibit B (as the same may be revised from time to time by the Company upon the advice of counsel).

(u)        "***Restrictive Covenant Agreement***" shall mean the Restrictive Covenant Agreement attached hereto as Exhibit A.

(v)        "***Severance Benefits***" shall have the meaning set forth in Section 8(g) hereof.

(w)        "***Severance Term***" shall mean the twenty four (24) month period following Executive's termination by the Company without Cause (other than by reason of death or Disability) or by Executive for Good Reason.

(x)        "***Term***" shall mean the period specified in Section 2 hereof.

**Section 2.        Acceptance and Term.**

The Company agrees to employ Executive, and Executive agrees to serve the Company, on the terms and conditions set forth herein. The Term shall commence on the date hereof and shall continue until terminated as provided in Section 8 hereof.

3

**Section 3.**        **Position, Duties, and Responsibilities; Place of Performance.**

(a)        Position, Duties, and Responsibilities. During the Term, Executive shall be employed and serve as the President of the Company (together with such other position or positions consistent with Executive's title as the Board shall specify from time to time) and shall have such duties and responsibilities commensurate with such title. Executive also agrees to serve as an officer and/or director of any other member of the Company Group, in each case without additional compensation.

(b)        Performance. Executive shall devote Executive's full business time, attention, skill, and best efforts to the performance of Executive's duties under this Agreement and shall not engage in any other business or occupation during the Term, including, without limitation, any activity that (x) conflicts with the interests of the Company or any other member of the Company Group, (y) interferes with the proper and efficient performance of Executive's duties for the Company, or (z) interferes with Executive's exercise of judgment in the Company's best interests. Notwithstanding the foregoing, nothing herein shall preclude Executive from (i) serving, with the prior written consent of the Board, as a member of the boards of directors or advisory boards (or their equivalents in the case of a non-corporate entity) of non-competing businesses and charitable organizations, (ii) engaging in charitable activities and community affairs, and (iii) managing Executive's personal investments and affairs; *provided*, *however*, that the activities set out in clauses (i), (ii), and (iii) shall be limited by Executive so as not to materially interfere, individually or in the aggregate, with the performance of Executive's duties and responsibilities hereunder.

(c)        Principal Place of Employment. Executive's principal place of employment shall be in the Company's office in Lakewood, New Jersey, although Executive understands and agrees that Executive may be required to travel from time to time for business reasons.

**Section 4.**        **Compensation.**

During the Term, Executive shall be entitled to the following compensation:

(a)        Base Salary. Executive shall be paid an annualized Base Salary, payable in accordance with the regular payroll practices of the Company, of not less than $500,000, with increases, if any, as may be approved in writing by the Compensation Committee.

(b)        Annual Bonus. Executive shall be eligible for an annual incentive bonus award determined by the Compensation Committee in respect of each fiscal year during the Term (the "*Annual Bonus*"). The target Annual Bonus for each fiscal year (commencing with the 2019 fiscal year) shall be 100% of Base Salary, with the actual Annual Bonus payable being based upon the level of achievement of annual Company and individual performance objectives for such fiscal year, as determined by the Compensation Committee and communicated to Executive. The Annual Bonus shall be paid to Executive at the same time as annual bonuses are generally payable to other senior executives of the Company subject to Executive's continuous employment through the payment date except as otherwise provided for in this Agreement.

4

(c)  Equity Awards.

(i)  <u>Accelerated Vesting of Existing Incentive Units</u>. Notwithstanding anything to the contrary, all unvested Incentive Units (as defined in the Company's operating agreement) held by Executive as of the date hereof shall, without any further action by Executive or the Company, fully vest effective as of the closing of the transactions contemplated by the Purchase Agreement, subject to Executive's continuous employment with the Company through the closing.

(ii)  <u>New Profits Interests</u>. On or promptly following the Closing Date and subject to the approval of the Board, the Company shall grant to Executive "profits interests" (the "***Profits Interests***") that will entitle Executive to not less than 2% of the appreciation in the value of the Company's equity value above the equity value on the Closing Date. The Profits Interests shall be subject to an award agreement which will contain such terms and conditions as the Board determines appropriate in its sole discretion and the terms and conditions of the Company's operating agreement, as in effect from time to time.

**Section 5.  Employee Benefits.**

During the Term, Executive shall be entitled to participate in health, insurance, retirement, and other benefits provided generally to similarly situated employees of the Company. Executive shall also be entitled to the same number of holidays, vacation days, and sick days, as well as any other benefits, in each case as are generally allowed to similarly situated employees of the Company in accordance with the Company policy as in effect from time to time. Nothing contained herein shall be construed to limit the Company's ability to amend, suspend, or terminate any employee benefit plan or policy at any time without providing Executive notice, and the right to do so is expressly reserved.

**Section 6.  Key-Man Insurance.**

At any time during the Term, the Company shall have the right to insure the life of Executive for the sole benefit of the Company, in such amounts, and with such terms, as it may determine. All premiums payable thereon shall be the obligation of the Company. Executive shall have no interest in any such policy, but agrees to cooperate with the Company in procuring such insurance by submitting to physical examinations, supplying all information required by the insurance company, and executing all necessary documents, provided that no financial obligation is imposed on Executive by any such documents.

**Section 7.  Reimbursement of Business Expenses.**

During the Term, the Company shall pay (or promptly reimburse Executive) for documented, out-of-pocket expenses reasonably incurred by Executive in the course of performing Executive's duties and responsibilities hereunder, which are consistent with the Company's policies in effect from time to time with respect to business expenses, subject to the Company's requirements with respect to reporting of such expenses.

**Section 8.  Termination of Employment.**

(a)  <u>General</u>. The Term shall terminate earlier than as provided in Section 2 hereof upon the earliest to occur of (i) Executive's death, (ii) a termination by reason of a Disability, (iii) a termination by the Company with or without Cause, and (iv) a termination by Executive with or

5

without Good Reason. Upon any termination of Executive's employment for any reason, except as may otherwise be requested by the Company in writing and agreed upon in writing by Executive, Executive shall be deemed to have resigned from any and all directorships, committee memberships, and any other positions Executive holds with the Company or any other member of the Company Group and hereby agrees to execute any documents that the Company (or any member of the Company Group) determines necessary to effectuate such resignations. Notwithstanding anything herein to the contrary, the payment (or commencement of a series of payments) hereunder of any "nonqualified deferred compensation" (within the meaning of Section 409A of the Code) upon a termination of employment shall be delayed until such time as Executive has also undergone a "separation from service" as defined in Treas. Reg. 1.409A-1(h), at which time such nonqualified deferred compensation (calculated as of the date of Executive's termination of employment hereunder) shall be paid (or commence to be paid) to Executive on the schedule set forth in this Section 8 as if Executive had undergone such termination of employment (under the same circumstances) on the date of Executive's ultimate "separation from service."

(b)    _Termination Due to Death or Disability_. Executive's employment shall terminate automatically upon Executive's death. The Company may terminate Executive's employment immediately upon the occurrence of a Disability, such termination to be effective upon Executive's receipt of written notice of such termination. Upon Executive's death or in the event that Executive's employment is terminated due to Executive's Disability, Executive or Executive's estate or Executive's beneficiaries, as the case may be, shall be entitled to:

(i)    The Accrued Obligations; and

(ii)    Any unpaid Annual Bonus in respect of any completed fiscal year that has ended prior to the date of such termination, which amount shall be paid at such time annual bonuses are paid to other senior executives of the Company, but in no event later than the date that is two and one-half (2½) months following the last day of the fiscal year in which such termination occurred.

Following Executive's death or a termination of Executive's employment by reason of a Disability, except as set forth in this Section 8(b), Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(c)    Termination by the Company with Cause.

(i)    The Company may terminate Executive's employment at any time with Cause, effective upon Executive's receipt of written notice of such termination; _provided_, _however_, that with respect to any Cause termination relying on clause (ii) or (vi) of the definition of Cause set forth in Section 1(f) hereof, to the extent that such act or acts or failure or failures to act are curable, Executive shall be given not less than ten (10) days' written notice by the Board of the Company's intention to terminate him with Cause, such notice to state in detail the particular act or acts or failure or failures to act that constitute the grounds on which the proposed termination with Cause is based, and such termination shall be effective at the expiration of such ten (10) day notice period unless Executive has fully cured such act or acts or failure or failures to act that give rise to Cause during such period.

6

(ii) In the event that the Company terminates Executive's employment with Cause, Executive shall be entitled only to the Accrued Obligations. Following such termination of Executive's employment with Cause, except as set forth in this Section 8(c)(ii), Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(d) <u>Termination by the Company without Cause</u>. The Company may terminate Executive's employment at any time without Cause, effective upon Executive's receipt of written notice of such termination. In the event that Executive's employment is terminated by the Company without Cause (other than due to death or Disability), Executive shall be entitled to:

(i) The Accrued Obligations;

(ii) Any unpaid Annual Bonus in respect of any completed fiscal year that has ended prior to the date of such termination, which amount shall be paid at such time annual bonuses are paid to other senior executives of the Company, but in no event later than the date that is two and one-half (2½) months following the last day of the fiscal year in which such termination occurred;

(iii) Continued payment of Base Salary during the Severance Term, payable in accordance with the Company's regular payroll practices; and

(iv) An amount equal to two (2) times Executive's then-current target Annual Bonus, payable in substantially equal installments during the Severance Term in accordance with the Company's regular payroll practices. Notwithstanding the foregoing, the payments and benefits described in clauses (ii), (iii) and (iv) above shall immediately terminate, and the Company shall have no further obligations to Executive with respect thereto, in the event that Executive breaches any provision of the Restrictive Covenant Agreement. Following such termination of Executive's employment by the Company without Cause, except as set forth in this Section 8(d), Executive shall have no further rights to any compensation or any other benefits under this Agreement. For the avoidance of doubt, Executive's sole and exclusive remedy upon a termination of employment by the Company without Cause shall be receipt of the Severance Benefits.

(e) <u>Termination by Executive with Good Reason</u>. Executive may terminate Executive's employment with Good Reason by providing the Company ten (10) days' written notice setting forth in reasonable specificity the event that constitutes Good Reason, which written notice, to be effective, must be provided to the Company within sixty (60) days of the first occurrence of such event. During such ten (10) day notice period, the Company shall have a cure right (if curable), and if not cured within such period, Executive's termination will be effective upon the expiration of such cure period, and Executive shall be entitled to the same payments and benefits as provided in Section 8(d) hereof for a termination by the Company without Cause, subject to the same conditions on payment and benefits as described in Section 8(d) hereof. Following such termination of Executive's employment by Executive with Good Reason, except as set forth in this Section 8(e), Executive shall have no further rights to any compensation or any other benefits under this Agreement. For the avoidance of doubt, Executive's sole and exclusive remedy upon a termination of employment with Good Reason shall be receipt of the Severance Benefits.

(f)     Termination by Executive without Good Reason. Executive may terminate Executive's employment without Good Reason by providing the Company sixty (60) days' written notice of such termination. In the event of a termination of employment by Executive under this Section 8(f), Executive shall be entitled only to the Accrued Obligations. In the event of termination of Executive's employment under this Section 8(f), the Company may, in its sole and absolute discretion, by written notice accelerate such date of termination without changing the characterization of such termination as a termination by Executive without Good Reason. Following such termination of Executive's employment by Executive without Good Reason, except as set forth in this Section 8(f), Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(g)     Release. Notwithstanding any provision herein to the contrary, the payment of any amount or provision of any benefit pursuant to subsection (b), (d), or (e) of this Section 8 (other than the Accrued Obligations) (collectively, the "*Severance Benefits*") shall be conditioned upon Executive's execution, delivery to the Company, and non-revocation of the Release of Claims (and the expiration of any revocation period contained in such Release of Claims) within sixty (60) days following the date of Executive's termination of employment hereunder. If Executive fails to execute the Release of Claims in such a timely manner so as to permit any revocation period to expire prior to the end of such sixty (60) day period, or timely revokes Executive's acceptance of such release following its execution, Executive shall not be entitled to any of the Severance Benefits. Further, (i) to the extent that any of the Severance Benefits constitutes "nonqualified deferred compensation" for purposes of Section 409A of the Code, any payment of any amount or provision of any benefit otherwise scheduled to occur prior to the sixtieth (60th) day following the date of Executive's termination of employment hereunder, but for the condition on executing the Release of Claims as set forth herein, shall not be made until the first regularly scheduled payroll date following such sixtieth (60th) day and (ii) to the extent that any of the Severance Benefits do not constitute "nonqualified deferred compensation" for purposes of Section 409A of the Code, any payment of any amount or provision of any benefit otherwise scheduled to occur following the date of Executive's termination of employment hereunder, but for the condition on executing the Release of Claims as set forth herein, shall not be made until the first regularly scheduled payroll date following the date the Release of Claims is timely executed and the applicable revocation period has ended, after which, in each case, any remaining Severance Benefits shall thereafter be provided to Executive according to the applicable schedule set forth herein. For the avoidance of doubt, in the event of a termination due to Executive's death or Disability, Executive's obligations herein to execute and not revoke the Release of Claims may be satisfied on Executive's behalf by Executive's estate or a person having legal power of attorney over Executive's affairs.

Section 9.      Restrictive Covenant Agreement.

As a condition of, and prior to commencement of, Executive's employment with the Company, Executive shall have executed and delivered to the Company the Restrictive Covenant Agreement. The parties hereto acknowledge and agree that this Agreement and the Restrictive Covenant Agreement shall be considered separate contracts, and the Restrictive Covenant Agreement will survive the termination of this Agreement for any reason.

**Section 10.        Representations and Warranties of Executive.**

Executive represents and warrants to the Company that—

(a)        Executive is entering into this Agreement voluntarily and that Executive's employment hereunder and compliance with the terms and conditions hereof will not conflict with or result in the breach by Executive of any agreement to which Executive is a party or by which Executive may be bound;

(b)        Executive has not violated, and in connection with Executive's employment with the Company will not violate, any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer by which Executive is or may be bound; and

(c)        in connection with Executive's employment with the Company, Executive will not use any confidential or proprietary information Executive may have obtained in connection with employment with any prior employer.

**Section 11.        Taxes.**

The Company may withhold from any payments made under this Agreement all applicable taxes, including but not limited to income, employment, and social insurance taxes, as shall be required by law. Executive acknowledges and represents that the Company has not provided any tax advice to Executive in connection with this Agreement and that Executive has been advised by the Company to seek tax advice from Executive's own tax advisors regarding this Agreement and payments that may be made to Executive pursuant to this Agreement, including specifically, the application of the provisions of Section 409A of the Code to such payments.

**Section 12.        Set Off; Mitigation.**

The Company's obligation to pay Executive the amounts provided and to make the arrangements provided hereunder shall be subject to set-off, counterclaim, or recoupment of amounts owed by Executive to the Company or its affiliates; *provided*, *however*, that to the extent any amount so subject to set-off, counterclaim, or recoupment is payable in installments hereunder, such set-off, counterclaim, or recoupment shall not modify the applicable payment date of any installment, and to the extent an obligation cannot be satisfied by reduction of a single installment payment, any portion not satisfied shall remain an outstanding obligation of Executive and shall be applied to the next installment only at such time the installment is otherwise payable pursuant to the specified payment schedule. Executive shall not be required to mitigate the amount of any payment or benefit provided pursuant to this Agreement by seeking other employment or otherwise, and the amount of any payment or benefit provided for pursuant to this Agreement shall not be reduced by any compensation earned as a result of Executive's other employment or otherwise.

9

**Section 13.      Additional Section 409A Provisions.**

Notwithstanding any provision in this Agreement to the contrary—

(a)      Any payment otherwise required to be made hereunder to Executive at any date as a result of the termination of Executive's employment shall be delayed for such period of time as may be necessary to meet the requirements of Section 409A(a)(2)(B)(i) of the Code (the "**Delay Period**"). On the first business day following the expiration of the Delay Period, Executive shall be paid, in a single cash lump sum, an amount equal to the aggregate amount of all payments delayed pursuant to the preceding sentence, and any remaining payments not so delayed shall continue to be paid pursuant to the payment schedule set forth herein.

(b)      Each payment in a series of payments hereunder shall be deemed to be a separate payment for purposes of Section 409A of the Code.

(c)      To the extent that any right to reimbursement of expenses or payment of any benefit in-kind under this Agreement constitutes nonqualified deferred compensation (within the meaning of Section 409A of the Code), (i) any such expense reimbursement shall be made by the Company no later than the last day of the taxable year following the taxable year in which such expense was incurred by Executive, (ii) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, and (iii) the amount of expenses eligible for reimbursement or in-kind benefits provided during any taxable year shall not affect the expenses eligible for reimbursement or in-kind benefits to be provided in any other taxable year; *provided*, that the foregoing clause shall not be violated with regard to expenses reimbursed under any arrangement covered by Section 105(b) of the Code solely because such expenses are subject to a limit related to the period the arrangement is in effect.

(d)      While the payments and benefits provided hereunder are intended to be structured in a manner to avoid the implication of any penalty taxes under Section 409A of the Code, in no event whatsoever shall the Company or any of its affiliates be liable for any additional tax, interest, or penalties that may be imposed on Executive as a result of Section 409A of the Code or any damages for failing to comply with Section 409A of the Code (other than for withholding obligations or other obligations applicable to employers, if any, under Section 409A of the Code).

**Section 14.      Successors and Assigns; No Third-Party Beneficiaries.**

(a)      <u>The Company</u>. This Agreement shall inure to the benefit of the Company and its respective successors and assigns. Neither this Agreement nor any of the rights, obligations, or interests arising hereunder may be assigned by the Company to a Person (other than another member of the Company Group, or its or their respective successors) without Executive's prior written consent (which shall not be unreasonably withheld, delayed, or conditioned); *provided*, *however*, that in the event of a sale of all or substantially all of the assets of the Company or any direct or indirect division or subsidiary thereof to which Executive's employment primarily relates, the Company may provide that this Agreement will be assigned to, and assumed by, the acquiror of such assets, it being agreed that in such circumstances, Executive's consent will not be required in connection therewith.

(b)      <u>Executive</u>. Executive's rights and obligations under this Agreement shall not be transferable by Executive by assignment or otherwise, without the prior written consent of the Company; *provided*, *however*, that if Executive shall die, all amounts then payable to Executive

10

hereunder shall be paid in accordance with the terms of this Agreement to Executive's devisee, legatee, or other designee, or if there be no such designee, to Executive's estate.

(c)      No Third-Party Beneficiaries. Except as otherwise set forth in Section 8(b) or Section 14(b) hereof, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Company, the other members of the Company Group, and Executive any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

**Section 15.      Waiver and Amendments.**

Any waiver, alteration, amendment, or modification of any of the terms of this Agreement shall be valid only if made in writing and signed by each of the parties hereto; *provided*, *however*, that any such waiver, alteration, amendment, or modification must be consented to on the Company's behalf by the Board. No waiver by either of the parties hereto of their rights hereunder shall be deemed to constitute a waiver with respect to any subsequent occurrences or transactions hereunder unless such waiver specifically states that it is to be construed as a continuing waiver.

**Section 16.      Severability.**

If any covenants or such other provisions of this Agreement are found to be invalid or unenforceable by a final determination of a court of competent jurisdiction, (a) the remaining terms and provisions hereof shall be unimpaired, and (b) the invalid or unenforceable term or provision hereof shall be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision hereof.

**Section 17.      Governing Law and Jurisdiction.**

EXCEPT WHERE PREEMPTED BY FEDERAL LAW, THE VALIDITY, INTERPRETATION, CONSTRUCTION, AND PERFORMANCE OF THIS AGREEMENT IS GOVERNED BY AND IS TO BE CONSTRUED UNDER THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THAT STATE, WITHOUT REGARD TO CONFLICT OF LAWS RULES. ALL DISPUTES AND CONTROVERSIES ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE FINALLY SETTLED AND BINDING UNDER THE RULES OF INTERNATIONAL COMMERCIAL DISPUTE RESOLUTION OF THE AMERICAN ARBITRATION ASSOCIATION. THE PLACE OF ARBITRATION SHALL BE NEW YORK, NEW YORK. ANY SUCH ARBITRATION SHALL BE CONDUCTED BY A SINGLE ARBITRATOR APPOINTED IN ACCORDANCE WITH ICDR RULES. ANY AWARD, VERDICT OR SETTLEMENT ISSUED UNDER SUCH ARBITRATION MAY BE ENTERED BY ANY PARTY FOR ORDER OF ENFORCEMENT BY ANY COURT OF COMPETENT JURISDICTION. THE ARBITRATOR SHALL HAVE THE POWER TO TAKE INTERIM MEASURES HE OR SHE DEEMS NECESSARY, INCLUDING INJUNCTIVE RELIEF AND MEASURES FOR THE PROTECTION OR CONSERVATION OR PROPERTY.

**Section 18.**        **Notices.**

(a)        <u>Place of Delivery</u>. Every notice or other communication relating to this Agreement shall be in writing, and shall be mailed to or delivered to the party for whom or which it is intended at such address as may from time to time be designated by it in a notice mailed or delivered to the other party as herein provided; *provided*, that unless and until some other address be so designated, all notices and communications by Executive to the Company shall be mailed or delivered to the Company at its principal executive office, and all notices and communications by the Company to Executive may be given to Executive personally or may be mailed to Executive at Executive's last known address, as reflected in the Company's records.

(b)        <u>Date of Delivery</u>. Any notice so addressed shall be deemed to be given or received (i) if delivered by hand, on the date of such delivery, (ii) if mailed by courier or by overnight mail, on the first business day following the date of such mailing, and (iii) if mailed by registered or certified mail, on the third business day after the date of such mailing.

**Section 19.**        **Section Headings.**

The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part thereof or affect the meaning or interpretation of this Agreement or of any term or provision hereof.

**Section 20.**        **Entire Agreement.**

This Agreement, together with any exhibits attached hereto, constitutes the entire understanding and agreement of the parties hereto regarding the employment of Executive. This Agreement supersedes all prior negotiations, discussions, correspondence, communications, understandings, and agreements between the parties relating to the subject matter of this Agreement, including, without limitation, the Prior Agreement.

**Section 21.**        **Survival of Operative Sections.**

Upon any termination of Executive's employment, the provisions of Section 8 through Section 22 of this Agreement (together with any related definitions set forth in Section 1 hereof) shall survive to the extent necessary to give effect to the provisions thereof.

**Section 22.**        **Counterparts.**

This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument. The execution of this Agreement may be by actual signature or by signature delivered by facsimile or by e-mail as a portable document format (.pdf) file or image file attachment.

*        *        *

[*Signatures to appear on the following page(s).*]

12

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

**ADAPTHEALTH HOLDINGS LLC**

By:   /s/ Luke McGee
Name:      Luke McGee
Title:      Chief Executive Officer

**EXECUTIVE**

/s/ Joshua Parnes
Joshua Parnes

[*Signature Page to Employment Agreement*]

**Exhibit A**

# RESTRICTIVE COVENANT AGREEMENT

As a condition of my becoming employed by, or continuing employment with, AdaptHealth Holdings LLC, a Delaware limited liability company (the "***Company***"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following:

**Section 1.      Confidential Information.**

(a)      <u>Company Group Information</u>. I acknowledge that, during the period of my employment with the Company (the "***Employment Period***"), I will have access to information about the Company and its direct and indirect parents, subsidiaries and affiliates (collectively, the "***Company Group***") and that my employment with the Company shall bring me into close contact with confidential and proprietary information of the Company Group. In recognition of the foregoing, I agree, at all times during the Employment Period and thereafter, to hold in confidence, and not to use, except for the benefit of the Company Group, or to disclose to any person, firm, corporation, or other entity without prior written authorization of the Company, any Confidential Information that I obtain or create. I further agree not to make copies of such Confidential Information except as authorized by the Company. I understand that "***Confidential Information***" means information that the Company Group has developed, acquired, created, compiled, discovered, or owned or will develop, acquire, create, compile, discover, or own, that has value in or to the business of the Company Group. I understand that Confidential Information includes, but is not limited to, any and all non-public information that relates to the actual or anticipated business and/or products, research, or development of the Company Group, or to the Company Group's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company Group's products or services and markets, customer lists, and customers (including, but not limited to, customers of the Company Group on whom I called or with whom I may become acquainted during the Employment Period), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company Group either directly or indirectly in writing, orally, or by drawings or inspection of premises, parts, equipment, or other Company Group property. Notwithstanding the foregoing, Confidential Information shall not include (i) any of the foregoing items that have become publicly and widely known through no unauthorized disclosure by me or others who were under confidentiality obligations as to the item or items involved or (ii) any information that I am required to disclose to, or by, any governmental or judicial authority; *provided*, *however*, that in such event I will give the Company prompt written notice thereof so that the Company Group may seek an appropriate protective order and/or waive in writing compliance with the confidentiality provisions of this Restrictive Covenant Agreement (this "***Agreement***").

(b)      <u>Former Employer Information</u>. I represent that my performance of all of the terms of this Agreement as an employee of the Company has not breached and will not breach any agreement to keep in confidence proprietary information, knowledge, or data acquired by me in confidence or trust prior or subsequent to the commencement of my employment with the Company, and I will not disclose to any member of the Company Group, or induce any member of the Company Group to use, any developments, or confidential or proprietary information or material I may have obtained in connection with employment with any prior employer in violation

A-1

of a confidentiality agreement, nondisclosure agreement, or similar agreement with such prior employer. During the Employment Period, I will not improperly make use of, or disclose, any developments, or confidential or proprietary information or material of any prior employer or other third party, nor will I bring onto the premises of the Company or use any unpublished documents or any property belonging to any prior employer or other third party, in violation of any lawful agreements with that prior employer or third party. I will use in the performance of my duties only information that is generally known and used by persons with training and experience comparable to my own, is common knowledge in the industry or otherwise legally in the public domain, or is otherwise provided or developed by the Company.

(c)    Third Party Information. I understand that the Company Group has received and in the future may receive from third parties confidential or proprietary information ("*Third Party Information*") subject to a duty on the Company Group's part to maintain the confidentiality of such information and to use it only for certain limited purposes. In recognition of the foregoing, I agree, at all times during the Employment Period and thereafter, to hold in confidence and will not disclose to anyone (other than Company Group personnel who need to know such information in connection with their work for the Company Group), and not to use, except for the benefit of the Company Group, Third Party Information without the express prior written consent of an officer of the Company and otherwise treat Third Party Information as Confidential Information.

(d)    Whistleblower; Defend Trade Secrets Act Disclosure.

(i)    In addition, I understand that nothing in this Agreement shall be construed to prohibit me from (A) filing a charge or complaint with, participating in an investigation or proceeding conducted by, or reporting possible violations of law or regulation to any federal, state or local government agency, (B) truthfully responding to or complying with a subpoena, court order, or other legal process, or (C) exercising any rights I may have under applicable labor laws to engage in concerted activity with other employees; *provided however*, that I agree to forgo any monetary benefit from the filing of a charge or complaint with a government agency except pursuant to a whistleblower program or where my right to receive such a monetary benefit is otherwise not waivable by law.

(ii)    I understand that the Defend Trade Secrets Act provides that I may not be held criminally or civilly liable under any Federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a Federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In the event that I file a lawsuit for retaliation by any member of the Company Group for reporting a suspected violation of law, I may disclose the trade secret to my attorney and use the trade secret information in the court proceeding, if I file any document containing the trade secret under seal and do not disclose the trade secret, except pursuant to court order.

**Section 2.    Inventions.**

(a)    No Prior Developments. By signing below, I represent that there are no developments, inventions, concepts, know-how, original works of authorship, improvements,

A-2

trade secrets, methodology, algorithms, software, processes, formulas, designs, drawings and other technological advancements and implementations that I can demonstrate were created or owned by me prior to the commencement of the Employment Period, which belong solely to me or belong to me jointly with another, that relate in any way to any of the actual or proposed businesses, products, or research and development of any member of the Company Group and which are not assigned to the Company hereunder.

(b)    Assignment of Inventions. Without additional compensation, I agree to assign, and hereby do assign, to the Company all rights, title and interest throughout the world in and to all Inventions (as defined below) which I may solely or jointly conceive, create, invent, develop, modify, compile or reduce to practice, at any time during any period during which I perform or performed services for the Company Group both before or after the date hereof (the "***Assignment Period***"), whether as an officer, employee, director, independent contractor, consultant, or agent, or in any other capacity, whether or not during regular working hours, provided they either (i) relate at the time of conception, development or reduction to practice to the business of any member of the Company Group, or the actual or anticipated research or development of any member of the Company Group; (ii) result from or relate to any work performed for any member of the Company Group; or (iii) are developed through the use of equipment, supplies, or facilities of any member of the Company Group, or any Confidential Information, or in consultation with personnel of any member of the Company Group (collectively referred to as "***Company IP Rights***"). I understand that "Inventions" means inventions, concepts, know-how, developments, original works of authorship, improvements, trade secrets, methodology, algorithms, software, processes, formulas, designs, drawings and other technological advancements and implementations. I agree that I will promptly make full written disclosure to the Company of any Company IP Rights I participate in conceiving, creating, inventing, developing, modifying, compiling or reducing to practice during the Assignment Period. I further acknowledge that, to the greatest extent permitted by applicable law, all Company IP Rights made by me (solely or jointly with others) within the scope of and during the Assignment Period are "works made for hire" for which I am, in part, compensated by my salary, unless regulated otherwise by law. If any Company IP Rights cannot be assigned, I hereby grant to the Company Group an exclusive, assignable, irrevocable, perpetual, worldwide, sublicenseable (through one or multiple tiers), royalty-free, unlimited license to use, make, modify, sell, offer for sale, reproduce, distribute, create derivative works of, publicly perform, publicly display and digitally perform and display such work in any media now known or hereafter known. Outside the scope of my service, whether during or after the Employment Period, I agree not to (i) modify, adapt, alter, translate, or create derivative works from any such work of authorship or (ii) merge any such work of authorship with other Company IP Rights. To the extent rights related to paternity, integrity, disclosure and withdrawal (collectively, "***Moral Rights***") may not be assignable under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, I hereby irrevocably waive such Moral Rights and consent to any action of the Company Group that would violate such Moral Rights in the absence of such consent.

(c)    Maintenance of Records. I agree to keep and maintain adequate and current written records of all Company IP Rights made by me (solely or jointly with others) during the Assignment Period. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, and any other format. The records will be available to and remain the sole property of the Company Group at all times. I agree not to remove such records from the Company's place

A-3

of business except as expressly permitted by Company Group policy, which may, from time to time, be revised at the sole election of the Company Group for the purpose of furthering the business of the Company Group.

(d)    Intellectual Property Rights. I hereby agree to assist the Company, or its designee, at the Company's expense, in every way to secure the rights of the Company Group in the Company IP Rights and any copyrights, patents, trademarks, service marks, database rights, domain names, mask work rights, moral rights, and other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments that the Company shall deem necessary in order to apply for, obtain, maintain, and transfer such rights and in order to assign and convey to the Company Group the sole and exclusive right, title, and interest in and to such Company IP Rights, and any intellectual property and other proprietary rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the Assignment Period until the expiration of the last such intellectual property right to expire in any country of the world; provided, however, that the Company shall reimburse me for my reasonable expenses incurred in connection with carrying out the foregoing obligation. If the Company is unable because of my mental or physical incapacity or unavailability for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Company IP Rights or original works of authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact to act for and in my behalf and stead to execute and file any such applications or records and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance, and transfer of letters patent or registrations thereon with the same legal force and effect as if originally executed by me. I hereby waive and irrevocably quitclaim to the Company any and all claims, of any nature whatsoever, that I now or hereafter have for past, present, or future infringement of any and all proprietary rights assigned to the Company.

(e)    State Non-assignable Invention Exemptions. Solely to the extent that I (i) was or am an employee of the Company and (ii) was or am based in California, Illinois, Washington, Kansas or Minnesota or otherwise entitled to the benefits of the state statutes of California, Illinois, Washington, Kansas or Minnesota during the Employment Period, then, to the extent the assignment of Company IP Rights to the Company in this Section 2 can be construed to cover inventions excluded under the appropriate state statutes (including California Labor Code Sec. 2870, Illinois Employee Patent Act, 765 ILCS 1060, Sec. 2, Revised Code of Washington Section 49.44.140(1), Kansas Statute K.S.A. §44-130, and Minn. Stat. §181.78, each incorporated herein by reference), this Section 2 shall not apply to such inventions.

**Section 3.        Returning Company Group Documents.**

I agree that, at the time of termination of my employment with the Company for any reason, I will deliver to the Company (and will not keep in my possession, recreate, or deliver to anyone else) any and all Confidential Information, Third Party Information and all other documents, materials, information, and property developed by me pursuant to my employment or otherwise belonging to the Company and, if so requested, will certify in writing that I have fully complied

A-4

with the foregoing obligation. I agree further that I will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to the Company. In addition, if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, I agree to provide the Company with a computer-useable copy of all such Company information and then permanently delete and expunge such Company information from those systems; and I agree to provide the Company access to my system as reasonably requested to verify that the necessary copying and/or deletion is completed. I agree further that any property situated on the Company's premises and owned by the Company (or any other member of the Company Group), including disks and other storage media, filing cabinets, and other work areas, is subject to inspection by personnel of any member of the Company Group at any time with or without notice.

Section 4.        **Disclosure of Agreement.**

As long as it remains in effect, I will disclose the existence of this Agreement to any prospective employer, partner, co-venturer, investor, or lender prior to entering into an employment, partnership, or other business relationship with such person or entity. I also consent to the notification of my prospective employer, partner, co-venturer, investor, or lender of my rights and obligations under this Agreement, by the Company providing a copy of this Agreement or otherwise.

Section 5.        **Publicity.**

I hereby consent to any and all uses and displays by the Company Group of my name, voice, likeness, image, appearance and biographical information in or in connection with any printed, electronic or digital materials, including, without limitation, any pictures, audio or video recordings, digital images, websites, television programs, advertising, sales or marketing brochures, printed materials and computer media, throughout the world and at any time during or after the Employment Period for all legitimate business purposes of the Company Group (the "***Permitted Use***"). I hereby forever release the Company Group and each of their respective current or former directors, officers, employees, shareholders, representatives and agents from any and all claims, actions, damages, losses, costs, expenses and liability of any kind arising under any legal or equitable theory whatsoever at any time during or after the Employment Period in connection with any Permitted Use.

Section 6.        **Restrictions on Interfering.**

(a)        <u>Non-Competition</u>. During the Restricted Period, I shall not, directly or indirectly, individually or on behalf of any person, company, enterprise, or entity, or as a sole proprietor, partner, shareholder, director, officer, principal, agent, or executive, or in any other capacity or relationship, engage in any Competitive Activities, within the United States or any other jurisdiction in which the Company Group is actively engaged in business.

(b)        <u>Non-Interference</u>. During the Restricted Period, I shall not, directly or indirectly for my own account or for the account of any other individual or entity, engage in Interfering Activities.

(c)  Definitions. For purposes of this Agreement:

(i)  "**Business Relation**" shall mean any current or prospective client, customer, licensee, or other business relation of the Company Group, or any such relation that was a client, customer, licensee, supplier, or other business relation within the twelve (12) month period prior to the termination of the Employment Period, in each case, to whom I provided services, or with whom I transacted business, or whose identity became known to me in connection with my relationship with or employment by the Company.

(ii)  "**Competitive Activities**" shall mean the business of owning and operating a durable medical equipment business or any other business activity that is competitive with the then-current or demonstrably planned business activities of the Company Group.

(iii)  "**Interfering Activities**" shall mean (A) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Person employed by, or providing consulting services to, any member of the Company Group and who is or is likely to be in possession of Confidential Information to terminate such Person's employment or services (or in the case of a consultant, materially reducing such services) with the Company Group; (B) hiring any individual who was employed by the Company Group within the six (6) month period prior to the date of such hiring; or (C) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Business Relation to cease doing business with or reduce the amount of business conducted with any member of the Company Group, or in any way interfering with the relationship between any such Business Relation and any member of the Company Group.

(iv)  "**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust (charitable or non-charitable), unincorporated organization, or other form of business entity.

(v)  "**Restricted Period**" shall mean the period commencing on the date hereof and ending on the twenty-four (24) month anniversary of such date of termination.

(d)  Non-Disparagement. I agree that during the Employment Period, and at all times thereafter, I will not make any disparaging or defamatory comments regarding any member of the Company Group or its respective current or former directors, officers, employees or shareholders in any respect or make any comments concerning any aspect of my relationship with any member of the Company Group or any conduct or events which precipitated any termination of my employment from the Company. However, my obligations under this subsection (d) shall not apply to disclosures required by applicable law, regulation, or order of a court or governmental agency.

**Section 7.  Reasonableness of Restrictions.**

I acknowledge and recognize the highly competitive nature of the Company's business, that access to Confidential Information renders me special and unique within the Company's industry, and that I will have the opportunity to develop substantial relationships with existing and prospective clients, accounts, customers, consultants, contractors, investors, and strategic partners of the Company Group during the course of and as a result of my employment with the Company. In light of the foregoing, I recognize and acknowledge that the restrictions and limitations set forth in this Agreement are reasonable and valid in geographical and temporal scope and in all other

A-6

respects and are essential to protect the value of the business and assets of the Company Group. I acknowledge further that the restrictions and limitations set forth in this Agreement will not materially interfere with my ability to earn a living following the termination of the Employment Period and that my ability to earn a livelihood without violating such restrictions is a material condition to my employment with the Company.

**Section 8.**        **Independence; Severability; Blue Pencil.**

Each of the rights enumerated in this Agreement shall be independent of the others and shall be in addition to and not in lieu of any other rights and remedies available to the Company Group at law or in equity. If any of the provisions of this Agreement or any part of any of them is hereafter construed or adjudicated to be invalid or unenforceable, the same shall not affect the remainder of this Agreement, which shall be given full effect without regard to the invalid portions. If any of the covenants contained herein are held to be invalid or unenforceable because of the duration of such provisions or the area or scope covered thereby, I agree that the court making such determination shall have the power to reduce the duration, scope, and/or area of such provision to the maximum and/or broadest duration, scope, and/or area permissible by law, and in its reduced form said provision shall then be enforceable.

**Section 9.**        **Injunctive Relief.**

I expressly acknowledge that, because my services are personal and unique and because I will have access to Confidential Information, any breach or threatened breach of any of the terms and/or conditions set forth in this Agreement may result in substantial, continuing, and irreparable injury to the members of the Company Group for which monetary damages would not be an adequate remedy. Therefore, I hereby agree that, in addition to any other right or remedy that may be available to the Company in law or in equity, any member of the Company Group shall be entitled to injunctive relief, specific performance, or other equitable relief by a court of appropriate jurisdiction in the event of any breach or threatened breach of the terms of this Agreement without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach or posting a bond and without liability should relief be denied, modified or vacated. Notwithstanding any other provision to the contrary, I acknowledge and agree that the Restricted Period shall be tolled during any period of violation of any of the covenants in Section 6 hereof and during any other period required for litigation during which the Company or any other member of the Company Group seeks to enforce such covenants against me if it is ultimately determined that I was in breach of such covenants.

**Section 10.**        **Cooperation.**

I agree that, following any termination of my employment, I will continue to provide reasonable cooperation to the Company and/or any other member of the Company Group and its or their respective counsel in connection with any investigation, administrative proceeding, or litigation relating to any matter that occurred during the Employment Period in which I was involved or of which I have knowledge. As a condition of such cooperation, the Company shall reimburse me for reasonable out-of-pocket expenses incurred at the request of the Company with respect to my compliance with this Section. I also agree that, in the event that I am subpoenaed by any person or entity (including, but not limited to, any government agency) to give testimony or

A-7

provide documents (in a deposition, court proceeding, or otherwise) that in any way relates to my employment by the Company and/or any other member of the Company Group, I will give prompt notice of such request to the Company and will make no disclosure until the Company and/or the other member of the Company Group has had a reasonable opportunity to contest the right of the requesting person or entity to such disclosure.

**Section 11.**        **General Provisions.**

(a)        <u>Governing Law and Jurisdiction</u>. EXCEPT WHERE PREEMPTED BY FEDERAL LAW, THE VALIDITY, INTERPRETATION, CONSTRUCTION, AND PERFORMANCE OF THIS AGREEMENT IS GOVERNED BY AND IS TO BE CONSTRUED UNDER THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THAT STATE, WITHOUT REGARD TO CONFLICT OF LAWS RULES. FURTHER, I HEREBY CONSENT TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF NEW YORK, AND WAIVE ANY RIGHT TO TRIAL BY JURY, IN CONNECTION WITH ANY DISPUTE ARISING UNDER OR CONCERNING THIS AGREEMENT.

(b)        <u>Entire Agreement</u>. This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us. No modification or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in my duties, obligations, rights, or compensation will not affect the validity or scope of this Agreement.

(c)        <u>No Right of Continued Employment</u>. I acknowledge and agree that nothing contained herein shall be construed as granting me any right to continued employment by the Company, and the right of the Company to terminate my employment at any time and for any reason, with or without cause, is specifically reserved.

(d)        <u>Successors and Assigns</u>. This Agreement will be binding upon my heirs, executors, administrators, and other legal representatives and will be for the benefit of the Company, its successors, and its assigns. I expressly acknowledge and agree that this Agreement may be assigned by the Company without my consent to any other member of the Company Group as well as any purchaser of all or substantially all of the assets or stock of the Company or of any business or division of the Company for which I provide services, whether by purchase, merger, or other similar corporate transaction.

(e)        <u>Survival</u>. The provisions of this Agreement shall survive the termination of my employment with the Company and/or the assignment of this Agreement by the Company to any successor in interest or other assignee.

*        *        *

[*Signature to appear on the following page.*]

A-8

I, <u>Josh Parnes,</u> have executed this Restrictive Covenant Agreement on the date set forth below:

Date: March 20, 2019

/s/ Josh Parnes
_____
(Signature)

Josh Parnes
_____
(Type/Print Name)

[*Signature Page to Josh Parnes Restrictive Covenant Agreement*]

**Exhibit B**

**RELEASE OF CLAIMS**

As used in this Release of Claims (this "***Release***"), the term "claims" will include all claims, covenants, warranties, promises, undertakings, actions, suits, causes of action, obligations, debts, accounts, attorneys' fees, judgments, losses, and liabilities, of whatsoever kind or nature, in law, in equity, or otherwise.

For and in consideration of the Severance Benefits (as defined in my Employment Agreement, dated March 20, 2019, with AdaptHealth Holdings LLC, a Delaware limited liability company (such entity, the "***Company***" and such agreement, my "***Employment Agreement***")), and other good and valuable consideration, I, Josh Parnes, for and on behalf of myself and my heirs, administrators, executors, and assigns, effective as of the date on which this release becomes effective pursuant to its terms, do fully and forever release, remise, and discharge the Company and each of its direct and indirect subsidiaries and affiliates, and their respective successors and assigns, together with their respective current and former officers, directors, partners, shareholders, employees, and agents (collectively, the "***Group***"), from any and all claims whatsoever up to the date hereof that I had, may have had, or now have against the Group, whether known or unknown, for or by reason of any matter, cause, or thing whatsoever, including any claim arising out of or attributable to my employment or the termination of my employment with the Company, whether for tort, breach of express or implied employment contract, intentional infliction of emotional distress, wrongful termination, unjust dismissal, defamation, libel, or slander, or under any federal, state, or local law dealing with discrimination based on age, race, sex, national origin, handicap, religion, disability, or sexual orientation. The release of claims in this Release includes, but is not limited to, all claims arising under the Age Discrimination in Employment Act of 1967 ("***ADEA***"), Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, the Civil Rights Act of 1991, the Family and Medical Leave Act of 1993, the Worker Adjustment and Retraining Notification Act of 1988 and the Equal Pay Act of 1963, each as may be amended from time to time, and all other federal, state, and local laws, the common law, and any other purported restriction on an employer's right to terminate the employment of employees. The release contained herein is intended to be a general release of any and all claims to the fullest extent permissible by law.

By executing this Release, I specifically release all claims relating to my employment and its termination under ADEA, a United States federal statute that, among other things, prohibits discrimination on the basis of age in employment and employee benefit plans.

Notwithstanding any provision of this Release to the contrary, by executing this Release, I am not releasing (i) any claims relating to my rights under Section 8 of my Employment Agreement, (ii) any claims that cannot be waived by law, (iii) my rights with respect to any equity securities that I own in the Company, or (iv) my right of indemnification as provided by, and in accordance with the terms of, the Company's by-laws or a Company insurance policy providing such coverage, as any of such may be amended from time to time.

I expressly acknowledge and agree that I—

- Am able to read the language, and understand the meaning and effect, of this Release;

B-1

- Have no physical or mental impairment of any kind that has interfered with my ability to read and understand the meaning of this Release or its terms, and that I am not acting under the influence of any medication, drug, or chemical of any type in entering into this Release;

- Am specifically agreeing to the terms of the release contained in this Release because the Company has agreed to pay me the Severance Benefits in consideration for my agreement to accept it in full settlement of all possible claims I might have or ever have had, and because of my execution of this Release;

- Acknowledge that, but for my execution of this Release, I would not be entitled to the Severance Benefits;

- Understand that, by entering into this Release, I do not waive rights or claims under ADEA that may arise after the date I execute this Release;

- Had or could have had [twenty-one (21)][forty-five (45)](1) calendar days from the date of my termination of employment (the "***Release Expiration Date***") in which to review and consider this Release, and that if I execute this Release prior to the Release Expiration Date, I have voluntarily and knowingly waived the remainder of the review period;

- Have not relied upon any representation or statement not set forth in this Release or my Employment Agreement made by the Company or any of its representatives;

- Was advised to consult with my attorney regarding the terms and effect of this Release; and

- Have signed this Release knowingly and voluntarily.

I represent and warrant that I have not previously filed, and to the maximum extent permitted by law agree that I will not file, a complaint, charge, or lawsuit against any member of the Group regarding any of the claims released herein. If, notwithstanding this representation and warranty, I have filed or file such a complaint, charge, or lawsuit, I agree that I shall cause such complaint, charge, or lawsuit to be dismissed with prejudice and shall pay any and all costs required in obtaining dismissal of such complaint, charge, or lawsuit, including without limitation the attorneys' fees of any member of the Group against whom I have filed such a complaint, charge, or lawsuit. Notwithstanding anything to the contrary, nothing herein shall prevent or restrict me from (i) filing a charge or complaint with, participating in an investigation or proceeding conducted by, or reporting possible violations of law or regulation to any federal, state or local government agency; (ii) truthfully responding to or complying with a subpoena, court order, or other legal process; or (iii) exercising any rights I may have under applicable labor laws to engage in concerted activity with other employees; *provided however*, that I hereby forgo any monetary benefit from the filing of a charge or complaint with a government agency except

---

(1) To be selected based on whether applicable termination was "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment Act of 1967).

B-2

pursuant to a whistleblower program or where my right to receive such a monetary benefit is otherwise not waivable by law.

I hereby agree to waive any and all claims to re-employment with the Company or any other member of the Group and affirmatively agree not to seek further employment with the Company or any other member of the Group.

Notwithstanding anything contained herein to the contrary, this Release will not become effective or enforceable prior to the expiration of the period of seven (7) calendar days immediately following the date of its execution by me (the "***Revocation Period***"), during which time I may revoke my acceptance of this Release by notifying the Company and the Board of Directors of the Company, in writing, delivered to the Company at its principal executive office, marked for the attention of its General Counsel. To be effective, such revocation must be received by the Company no later than 11:59 p.m. on the seventh (7th) calendar day following the execution of this Release. Provided that the Release is executed and I do not revoke it during the Revocation Period, the eighth (8th) calendar day following the date on which this Release is executed shall be its effective date. I acknowledge and agree that if I revoke this Release during the Revocation Period, this Release will be null and void and of no effect, and neither the Company nor any other member of the Group will have any obligations to pay me the Severance Benefits.

The provisions of this Release shall be binding upon my heirs, executors, administrators, legal personal representatives, and assigns. If any provision of this Release shall be held by any court of competent jurisdiction to be illegal, void, or unenforceable, such provision shall be of no force or effect. The illegality or unenforceability of such provision, however, shall have no effect upon and shall not impair the enforceability of any other provision of this Release.

EXCEPT WHERE PREEMPTED BY FEDERAL LAW, THE VALIDITY, INTERPRETATION, CONSTRUCTION, AND PERFORMANCE OF THIS RELEASE IS GOVERNED BY AND IS TO BE CONSTRUED UNDER THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THAT STATE, WITHOUT REGARD TO CONFLICT OF LAWS RULES. ANY DISPUTE OR CLAIM ARISING OUT OF OR RELATING TO THIS RELEASE OR CLAIM OF BREACH HEREOF SHALL BE BROUGHT EXCLUSIVELY IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, TO THE EXTENT FEDERAL JURISDICTION EXISTS, AND IN ANY COURT SITTING IN MANHATTAN, NEW YORK, BUT ONLY IN THE EVENT FEDERAL JURISDICTION DOES NOT EXIST, AND ANY APPLICABLE APPELLATE COURTS. BY EXECUTION OF THIS RELEASE, I CONSENT TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS, AND WAIVE ANY RIGHT TO CHALLENGE JURISDICTION OR VENUE IN SUCH COURT WITH REGARD TO ANY SUIT, ACTION, OR PROCEEDING UNDER OR IN CONNECTION WITH THIS RELEASE. FURTHER, I HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN CONNECTION WITH ANY SUIT, ACTION, OR PROCEEDING UNDER OR IN CONNECTION WITH THIS RELEASE.

B-3

Capitalized terms used, but not defined herein, shall have the meanings ascribed to such terms in my Employment Agreement.

\* \* \*

I, Josh Parnes, have executed this Release of Claims on the respective date set forth below:

_____

Josh Parnes


Date:        [To Be Executed Following
             Termination of Employment]

B-4

**EMPLOYMENT AGREEMENT**

THIS AGREEMENT (this "Agreement") dated as of November 10, 2014, by and between QMES, LLC ("QMES" or the "Company") and Gregg Holst (the "Key Executive").

The Company desires to retain Key Executive and Key Executive desires to be employed by the Company, upon the terms and conditions provided herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein and other good and valuable consideration, intending to be legally bound, the parties to this Agreement hereby agree as follows:

1.      **Assignment and Duties**. The Company shall employ Key Executive and Key Executive hereby accepts such employment as Chief Financial Officer during the term of this Agreement set forth in Section 2. Key Executive shall assume full responsibilities as provided in the position job description, and assume such other responsibilities and duties, consistent with his position and expertise, as may from time to time be reasonably prescribed by the Chairman and Chief Executive Officer or the Board of Directors (the "Board") of QMES and the Company. Key Executive shall report to the Chief Executive Officer of the Company. Key Executive shall devote substantially all of his business time, energy, skill and best efforts to the business and affairs of the Company and its subsidiaries. Key Executive acknowledges and agrees that he shall observe and comply with all of the Company's policies.

2.      **Term**. The term of this Agreement (the "Term") shall commence on the date hereof and shall continue for a period of one year, and shall renew automatically for subsequent periods of one year, until terminated prior to the end of the initial term or any subsequent term by either the Company or Key Executive pursuant to the provisions of Section 4.

3.      **Compensation and Benefits**.

3.1.      **Salary**. The Company shall pay to Key Executive as his compensation for services rendered hereunder a base salary (the "Salary") of two hundred and fifty thousand dollars ($250,000) per year for the first year of service under this Agreement. Payments shall be payable to Key Executive in accordance with the Company's normal payroll practices for executive officers. The Company shall deduct or cause to be deducted from the Salary and all other compensation payable hereunder all taxes and amounts required by law to be withheld. The Salary shall be reviewed on each anniversary of Key Executive's date of hire in accordance with the Company's normal compensation practices for executive officers.

3.2.      **Benefits**. During the Term, and subject to the other provisions of the Agreement, Key Executive shall be entitled to participate in any benefit plan of the Company generally available to executive officers to the extent Key Executive is eligible under the general provisions therein (the "Benefits"). Key Executive shall be entitled to four (4) weeks paid time off each year during the first 5 years of the Term and five (5) weeks thereafter. Paid time off not utilized in the respective year may be utilized in the following year, however, such carryover is limited by the Company's paid time off policy.

**3.3.**    **Bonus**. The Company has established a bonus program for the Company's executive officers, with the criteria and procedures relating to the bonus program to be determined by the Board from time to time. The Key Executive shall have the right to earn and be paid an annual cash bonus (the "Bonus") of up to thirty percent (30%) of his Salary as in effect at the beginning of each fiscal year. The payment of the Bonus will be conditioned upon (a) Key Executive's successful attainment of agreed upon non-financial goals (the "Executive Goal Bonus Portion") and (b) the Company's attainment of its annual consolidated financial targets (the "Company Target Bonus Portion"). The Executive Goal Bonus Portion will be earned and paid quarterly while the Company Target Bonus Portion will be paid annually within four (4) months of the end of the respective fiscal year. The initial year under this Agreement will be prorated from the start date. The Company intends to review the bonus program and its criteria and procedures on at least an annual basis.

**3.4.**    **Out of Pocket Expenses**. Key Executive shall be reimbursed by the Company for all reasonable and necessary expenses incurred by Key Executive on behalf of the Company. Key Executive shall submit such expenses and appropriate documentation to the Company for payment in accordance with the Company's policies and procedures.

**3.5.**    **Equity Ownership**. As additional compensation, the Company will provide Key Executive with such number of Common Units of the Company, granted effective as of the date of this Agreement, pending approval of the Company's Board of Directors, representing one (1.00%) percent of the total fully diluted Common Units of the Company as of the date of the grant. Such grant shall vest in four (4) equal annual increments of 25% each of the grant of the Common Units on the first four (4) anniversary dates immediately following the date of this Agreement; provided, however, (a) all Common Units shall vest immediately upon a Capital Event or the sale of a controlling interest of the equity of the Company, a merger in which the Company does not maintain a controlling interest, an IPO (Initial Public Offering), a sale of a majority equity interest to a SPAC (a special purpose acquisition entity) or the conversion to a different business entity in anticipation of any of the foregoing and (b) in the event Key Executive is terminated by the Company without Cause, as provided in Section 4.2.5 below, within the first twelve (12) months from the effective date of this Agreement, 25% of the grant of Common Units shall immediately vest. Common Units granted hereunder may not be sold, assigned, pledged or transferred other than upon the death of the Key Executive by will or by the laws of descent and distribution or as otherwise set forth in the Company's Limited Liability Company Operating Agreement as amended from time to time; except that Key Executive may transfer or assign all or any portion of the Common Units granted to him hereunder to an entity in which he has and retains a controlling interest; provided that all terms and conditions of this Agreement that apply to the Key Executive shall continue to be effective and apply to the entity which becomes owner of the Common Units as if Key Executive retained ownership in his own name of the Common Units. For the purposes of this Section 3.5. Capitalized terms not otherwise defined in this Agreement shall have the meanings ascribed to them in the QMES Limited Liability Operating Agreement dated July 1, 2013.

All vested portions of these Common Units are owned by the Key Executive upon termination, except for Termination for Cause as defined in 4.2.3 herein. In addition, if at any time within one year after the termination of the Key Executive's employment, the Key Executive engages in any activity in competition with any activity of the Company, or inimical,

2

contrary or harmful to the interests of the Company, including, but not limited to: (1) conduct related to the Key Executive's employment for which either criminal or civil penalties against the Key Executive may be sought, (2) violation of Company policies, including, without limitation, insider trading rules, (3) accepting employment with or serving as a consultant, advisor or in any capacity to an employer that is in competition with or acting against the interest of the Company, including employing or recruiting any present, former or future employee of the Company, (4) disclosing or misusing any confidential information or material concerning the Company, (5) participating in a hostile takeover attempt with respect to the Company, then all Common Units hereunder held by the Key Executive shall terminate effective as of the date on which Key Executive enters into such activity.

**3.6.**    **Entire Compensation**. The Salary, Benefits, Bonus, out of pocket reimbursed expenses and the Executive Ownership shall be the total consideration for the services to be rendered by Key Executive to the Company hereunder.

**4.**    **Termination**.

**4.1.**    **Notice of Termination**. Any termination by the Company or by Key Executive other than due to Key Executive's death shall be communicated by written Notice of Termination to the other party. As used in this Agreement, (a) "Notice of Termination" means a written notice specifying the termination provision in this Agreement relied upon and (b) "Date of Termination" means the date of death or the date specified in the Notice of Termination, as the case may be.

**4.2.**    **Grounds for Termination**.

**4.2.1**    Termination upon Death. Key Executive's relationship with the Company and all of his rights to Salary and Benefits hereunder shall automatically terminate upon his death, except that his heirs, personal representatives or estate (as the case may be) shall be entitled to (i) any unpaid portion of his Salary and Benefits up to the Date of Termination and (ii) a prorated portion of his Bonus determined pursuant to Section 4.4.

**4.2.2**    Termination upon Disability. If Key Executive becomes disabled, Key Executive shall continue to receive his Salary and Benefits in accordance with Sections 3.1 and 3.2 for a period of six (6) months following the Onset of Disability (as defined in this Section 4.2.2). Any amounts due to Key Executive will be reduced, dollar-for-dollar, for any amounts received by Key Executive under any disability insurance policy or plan provided to Key Executive by the Company. "Onset of Disability" means the first day on which Key Executive shall be unable to attend to the regular affairs of the Company on a full time basis by reason of physical or mental incapacity, sickness or infirmity. If Key Executive's disability continues for more than six (6) months after Onset of Disability or for periods aggregating more than six (6) months during any twelve (12) month period, then the Company shall have the right to terminate this Employment Agreement immediately upon delivery by the Company to Key Executive of a Notice of Termination and all of Key Executive's rights to Salary and Benefits hereunder shall simultaneously terminate. In the event of a termination pursuant to this Section 4.2.2, Key Executive shall also be entitled to a prorated portion of his Bonus determined pursuant to Section 4.4.

3

**4.2.3**    Termination for Cause. At any time during the Term, the Company may terminate Key Executive's employment for Cause (as defined in this Section 4.2.3), effective immediately upon delivery of a Notice of Termination. For purposes of this Agreement, "Cause" shall mean: (a) Key Executive's willful misfeasance, willful misconduct, willful waste of material corporate assets, gross negligence or willful failure to substantially perform reasonably assigned duties; (b) breach of any of the Covenants (as defined in Section 5.3) or any other material breach of this Agreement; (c) commission of Key Executive of a felony or any crime involving fraud, larceny, embezzlement or moral turpitude; or (d) abuse of alcohol or drugs by Key Executive which materially interferes with the performance of his duties under this Agreement. On termination of this Agreement pursuant to this Section 4.2.3., all of Key Executive's rights to Compensation and Benefits shall automatically terminate as of the Date of Termination except with respect to any earned but unpaid portion of his Salary to the Date of Termination.

**4.2.4**    Elective Termination by Key Executive Without Good Reason. Key Executive's employment with the Company and all of his rights to Compensation and Benefits hereunder (except as provided in Section 4.5) shall automatically terminate on the day Notice of Termination without Good Reason is given by Key Executive to the Company. Except for the payment of any earned but unpaid portion of Key Executive's Salary and Benefits up to the Date of Termination, the Company shall have no further obligation or liability to Key Executive under this Agreement upon a termination of employment by Key Executive without Good Reason.

**4.2.5**    Termination by the Company Without Cause. At any time during the Term, the Company may terminate Key Executive's employment hereunder without Cause, effective immediately upon delivery by the Company to Key Executive of a Notice of Termination. Upon such termination, Key Executive shall continue to receive all of his Salary and Benefits for six (6) months following the effective date of the Notice of Termination and any unreimbursed out of pocket expenses, paid in accordance with Company's normal payroll policies. The effective date shall not be earlier than the date of delivery of said notice. Compensation under this Section 4.2.5 and Section 4.4 will be the sole and exclusive compensation in the event Key Executive is terminated without Cause. Receipt by Executive of any compensation under this Section 4.2.5 shall be conditioned upon (i) Executive's delivery to the Company of a general release for the benefit of the Company and its officers, directors and agents reasonable and customary for situations involving the termination of employment and (ii) Executive's fulfillment and non-contravention of his obligations and covenants set forth in Section 5 hereto. Termination at the end of the employment contract year entitles Key Executive to all of his Salary and Benefits for six months.

**4.2.6**    Termination by Key Executive for Good Reason. Key Executive may terminate Key Executive's employment hereunder for Good Reason (as defined in this Section 4.2.6) upon delivery of a Notice of Termination to the Company in accordance with this Section 4.2.6. For purposes of this Agreement, "Good Reason" shall mean the occurrence at any time during the Term, without Key Executive's consent, of any of the following events: (a) a material breach of the Company's obligations hereunder; (b) a material diminution in the nature or scope of the authority, powers, functions, duties or responsibilities of Key Executive with the Company; (c) a reduction in or failure to pay Key Executive his Salary or any amounts otherwise vested and/or due under the Company's employee benefit plans or employee benefit programs; (d) a reduction in the Bonus percentage for which Key Executive is eligible hereunder; or (e) the

4

Company requires Key Executive to be based at any office or location that is more than fifty (50) miles from the Company's offices located in Oaks, Pennsylvania. A Notice of Termination for Good Reason must be given no later than on the thirtieth (30th day following the effective date of the event giving rise to the Good Reason, provided that such termination shall not be effective unless the Company has not cured the cause for such Good Reason on or before the thirtieth (30th day following its receipt of such Notice. Upon such termination, Key Executive shall continue to receive all of his Salary and Benefits for six (6) months following the effective date of the Notice of Termination and any unreimbursed out of pocket expenses, paid in accordance with Company's normal payroll policies. Compensation under this Section 4.2.6 and Section 4.4 will be the sole and exclusive compensation in the event Key Executive is terminated without Cause. Receipt by Executive of any compensation under this Section 4.2.5 shall be conditioned upon (i) Executive's delivery to the Company of a general release for the benefit of the Company and its officers, directors and agents reasonable and customary for situations involving the termination of employment and (ii) Executive's fulfillment and non-contravention of his obligations and covenants set forth in Section 5 hereto.

**4.3.    Procedure Upon Termination**. On termination of Agreement regardless of the reason, Key Executive (or his heirs, representatives or estate as the case may be) shall promptly return to the Company all documents (including copies) and other property of the Company, including without limitation customer lists, manuals, letters, materials, reports and records in Key Executive's possession or control no matter from whom or in what manner acquired.

**4.4.    Bonus Payable Upon Certain Terminations**. If Key Executive's employment is terminated pursuant to Section 4.2.1, 4.2.2, 4.2.5 or 4.2.6 with a minimum of six months service in a given calendar year, Key Executive (or his heirs, representatives or estate, as the case may be) shall be eligible to receive a prorated portion of the Company Target Bonus Portion which would otherwise be payable to Key Executive based on the Company's attainment of its annual financial targets for the fiscal year in which the employment of Key Executive terminates which shall be payable within four (4) months following the end of the fiscal year in which the employment of Key Executive terminates. Key Executive shall not be entitled to receive (a) any Employee Goal Bonus Portion for any quarter which is not completed prior to the termination of Key Executive's employment or (b) any Bonus for any fiscal year of the Company following the fiscal year in which the employment of Key Executive terminates.

**4.5.    Certain Rights**. Nothing in this Section 4 is intended to preclude Key Executive from receiving: (i) any vested or accrued benefits under any Benefits which are to be continued or paid after the Date of Termination in accordance with the terms of the corresponding plans for such Benefits; and (ii) any indemnification provided to Key Executive by law or by the Company's organizational documents in Key Executive's capacity as an officer of the Company to the extent Key Executive is or was otherwise entitled to receive such indemnification under law or the Company's organizational documents.

5.    **Covenants**

**5.1.    Nondisclosure**. At all times during and after the Term, Key Executive shall keep confidential and shall not, except with the Board's express prior written consent, or except in

5

the proper course of Key Executive's employment with the Company, directly or indirectly, communicate, disclose, divulge, publish or otherwise express to any Person (as hereinafter defined), or use for Key Executive's own benefit or the benefit of any Person, any trade secrets, confidential or proprietary knowledge or information, no matter when or how acquired, concerning the conduct and details of the Company Group's businesses, including without limitation names of customers, service providers, suppliers, marketing methods, trade secrets, policies, written memoranda or Company Group operation manuals or other similar documents, as well as prospects and financial condition of the Company Group. For purposes of this section, Confidential Information shall not include any information which is now known by or readily available to the general public or which becomes known or readily available to the general public other than as a result of any improper act or omission by Key Executive. For purposes of this Agreement, the term "Person" means a natural person, corporation, partnership, limited liability company, trust, estate, joint venture, sole proprietorship, government (and any branch or subdivision thereof), governmental agency, association, cooperative or other entity, and the term "Company Group" shall be defined as the Company and all other entities controlling, controlled by or under common control with the Company.

     **5.2.**   **Proprietary Information/Work Product**. All work product produced by Key Executive during the term of this Agreement shall be the sole property of the Company and shall be deemed to be Confidential Information as defined in Section 5.1 hereof. Key Executive acknowledges that all inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports and all similar or related information (whether able to receive intellectual property protection or not), which relate to the Company Group's actual or anticipated business, research and development or existing or future products or services and which are conceived, developed or made by Key Executive while employed by the Company Group's ("Work Product") belong to the Company or other relevant Company Group entity. Key Executive shall promptly disclose such Work Product to the Board and perform all actions reasonably requested by the Board (whether during or after the Term) to establish and confirm such ownership (including, without limitation, assignments, consents, powers of attorney and other instruments).

     **5.3.**   **Noncompetition and Nonsolicitation**. Key Executive acknowledges that: (a) the Company businesses (collectively, the "Company Group's Businesses") involve providing durable medical equipment to patient homes and health care institutions and related services (b) the Company Group's Businesses are highly competitive and face competition from other similar durable medical equipment companies, and (c) the Company Group makes substantial and continuous expenditures of time and money to develop, market and maintain the Company Group's Businesses. Accordingly, during the period of Key Executive's employment with the Company and for the Covenant Period (as defined in Section 5.3.4 hereof) Key Executive shall not, except with the Company's express prior written consent (which consent must be authorized by the Board), directly or indirectly, in any capacity, for Key Executive's benefit or the benefit of any Person:

     **5.3.1**   Solicit any Person who is on the Date of Termination or during the Covenant Period an employee of or consultant to the Company Group in any manner which interferes or might interfere with such Person's relationship with the Company Group or in an effort to obtain such Person as an employee, consultant, agent or similar relationship of any Person

or hire any Person who is on the Date of Termination or during the Covenant Period an employee of the Company Group.

5.3.2    Solicit, divert, or accept business from any person who during the Term or the Covenant Period is a customer, supplier, consultant, salesman, agent or representative of the Company Group (a) in any manner which interferes or might interfere with such Person's relationship with the Company Group (including, without limitation, making any negative statements about the Company Group or its subsidiaries), or (b) in an effort to obtain such Person as a customer, supplier, consultant, salesman, agent, or representative of any Person which conducts a business in competition with, or similar to, all or any material part of the Company Group's Businesses; or

5.3.3    Anywhere in the United States, establish, engage, own, manage, operate, join or control, or participate in the establishment, ownership, management, operation or control of, or be a director, officer, employee, salesman, agent or representative of, or be a consultant to, any Person which conducts a business in competition with, or similar to, all or any material part of the Company Group's Businesses as such businesses exist now or during such period; provided, however, that nothing in this Section 5.3.3 shall prevent Key Executive from owning not more than five percent of the outstanding securities of any Person whose securities are listed on the New York Stock Exchange or the American Stock Exchange or are quoted on NASDAQ.

5.3.4    The "Covenant Period" means a period of twelve (12) months after the termination of Key Executive's employment with the Company regardless of the reason for such termination.

5.4.    **Non-Disparagement**. Following the date hereof and regardless of any dispute that may arise in the future, the Employee will not, and will use his best efforts to cause his business associates to not, disparage, criticize or make statements to the detriment of the Company or any of its affiliates; and the Company will not, and will use its best efforts to cause its affiliates to not, disparage, criticize or make statements to the detriment of the Employee.

5.5.    **Equitable Relief**. Key Executive acknowledges that any breach by his of any of the covenants and agreements set forth in this Section 5 (collectively, the "Covenants") will result in irreparable injury to the Company for which monetary damages could not adequately compensate the Company. Therefore, in the event of any such breach, the Company shall be entitled, in addition to all other rights and remedies which the Company may have at law or in equity, to have an injunction issued by any competent court enjoining and restraining Key Executive and/or all other Persons involved therein from continuing such breach. The existence of any claim or cause of action which Key Executive or any such other Person may have against the Company shall not constitute a defense or bar to the enforcement of any of the Covenants. If the Company is obliged to resort to litigation to enforce any of the Covenants which has a fixed term, then such term shall be extended for a period of time equal to the period during which a material breach of such covenant was occurring, beginning on the date of a final court order (without further right of appeal) holding that such a material breach occurred or, if later, the last day of the original fixed term of such Covenant.

7

**5.6.**     **Consideration**. Key Executive expressly acknowledges and agrees that the Covenants are (a) the result of arm's length negotiations between the parties, and without Key Executive's agreement to be bound by the Covenants, the Company would not have entered into this Agreement, (b) are reasonable in scope and duration and (c) are necessary to protect the legitimate business interests of the Company and that the level of Salary and Benefits provided to Key Executive hereunder includes good and adequate consideration for the Covenants. Key Executive further acknowledges and agrees that the Company's business is intended to be national in scope. Key Executive hereby represents and warrants that Key Executive has a broad range of skills and abilities, and that enforcement by the Company of its rights under this Section 5 shall not prevent Key Executive from obtaining suitable employment subsequent to the termination of his employment with the Company.

**5.7.**     **Scope**. If any portion of any Covenant or its application is construed to be invalid, illegal or unenforceable, then the other portions and their application shall not be affected thereby and shall be enforceable with regard thereto. If any of the Covenants is determined to be unenforceable because of its scope, duration, geographical area or similar factor, then the court making such determination shall have the power to reduce or limit such scope, duration, area or other factor, and such Covenant shall then be enforceable in its reduced or limited form.

**6.**     **Miscellaneous**.

**6.1.**     **Notice** . All notices, requests, demands. consents or other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given (l) if and when delivered personally, (2) three days after mailing by first class certified mail, return receipt requested, postage prepaid, or (3) one day after being sent by a nationally recognized overnight courier service, postage or delivery charges prepaid, to the parties at their respective addresses set forth on the last page of this Agreement or to such other addresses of which the parties may give notice in accordance with this Section 7.1.

**6.2.**     **Entire Understanding; Modification**. This Agreement and sets forth the entire understanding between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous, ·written, oral, expressed or implied, communications, agreements and understandings with respect to the subject matter hereof. This Agreement shall not be amended, modified, supplemented or terminated except in writing signed by both parties. No action taken by the Company hereunder, including without limitation, any waiver, consent or approval, shall be effective unless authorized by the Company's Board.

**6.3.**     **Parties in Interest**. This Agreement shall inure to the benefit of, bind and be enforceable by Key Executive and his heirs, personal representatives, estate and beneficiaries, and the Company and its successors and assigns. This Agreement is a personal employment contract between Key Executive and the Company, for Key Executive's personal services, and Key Executive's rights and duties hereunder shall not be assignable or delegable by Key Executive. The Company may assign its rights and duties hereunder provided that the assignee is the successor, by operation of law or otherwise, to any or all of the Company's businesses, and the nature of Key Executive's duties do not change in any material respect.

8

**6.4.**     <u>Severability</u>. If any provision of this Agreement is construed to be invalid, illegal or unenforceable, then the remaining provision hereof shall not be affected thereby and shall be enforceable without regard thereto.

**6.5.**     <u>Counterparts</u>. This Agreement may be fully executed in any number of counterparts, each of which when so executed and delivered shall be an original hereof, and it shall not be necessary in making proof of this Agreement to produce or account for more than one counterpart hereof.

**6.6.**     <u>Section Headings; References</u>. Section and subsection headings in this Agreement are inserted for convenience and reference only, and shat! neither constitute a part of this Agreement nor affect its construction, interpretation, meaning or effect. All words used in this Agreement shall be construed to be of such number and gender as the context requires or permits.

**6.7.**     <u>Waivers</u>. Neither the failure nor delay on the part of either party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall the single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or any other right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

**6.8.**     <u>Controlling Law</u>. This Agreement is made under, and shall be governed by, construed and enforced in accordance with, the substantive laws of the Commonwealth of Pennsylvania applicable to agreements to be performed entirely therein without giving effect to principles of conflicts of laws.

**6.9.**     <u>EXCLUSIVE JURISDICTION</u>. IN ANY ACTION OR PROCEEDING BETWEEN THE PARTIES HERETO, KEY EXECUTIVE AND THE COMPANY IRREVOCABLY CONSENT AND AGREE TO THE EXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS LOCATED IN THE COMMONWEALTH OF PENNSYLVANJA; AND SERVICE OF PROCESS BY HAND DELIVERY OR BY CERTIFIED MAIL, TO THE ADDRESSES SET FORTH ABOVE FOR EACH PARTY.

**6.10.**     <u>Survival</u>. Sections 4, 5, 6 and 7 shall survive and continue in full force in accordance with their terms notwithstanding any termination of the Term.

9

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date above written.

QMES, LLC
122 Mill Road
Phoenixville, PA 19460                                          Attest:


By:  /s/ Luke McGee                                            /s/ Steven Himmel
     Luke McGee, Chairman and Chief Executive Officer


Gregg Holst


By:  /s/ Gregg Holst                                           /s/ Steven Himmel
                                                               Witness

Employment Agreement Signature Page

**ADAPTHEALTH CORP.**
**2019 STOCK INCENTIVE PLAN**

1.      **Purpose.**

The purpose of the Plan is to assist the Company in attracting, retaining, motivating, and rewarding certain employees, officers, directors, and consultants of the Company and its Affiliates and promoting the creation of long-term value for stockholders of the Company by closely aligning the interests of such individuals with those of such stockholders.  The Plan authorizes the award of Stock-based and cash-based incentives to Eligible Persons to encourage such Eligible Persons to expend maximum effort in the creation of stockholder value.

2.      **Definitions.**

For purposes of the Plan, the following terms shall be defined as set forth below:

(a)      "Affiliate" means, with respect to a Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.

(b)      "Award" means any Option, award of Restricted Stock, Restricted Stock Unit, Stock Appreciation Right, or other Stock-based award granted under the Plan.

(c)      "Award Agreement" means an Option Agreement, a Restricted Stock Agreement, an RSU Agreement, a SAR Agreement, or an agreement governing the grant of any other Stock-based Award granted under the Plan.

(d)      "Board" means the Board of Directors of the Company.

(e)      "Cause" means, with respect to a Participant and in the absence of an Award Agreement or Participant Agreement otherwise defining Cause, (1) the Participant's plea of *nolo contendere* to, conviction of or indictment for, any crime (whether or not involving the Company or its Affiliates) (i) constituting a felony or (ii) that has, or could reasonably be expected to result in, an adverse impact on the performance of the Participant's duties to the Service Recipient, or otherwise has, or could reasonably be expected to result in, an adverse impact on the business or reputation of the Company or its Affiliates, (2) conduct of the Participant, in connection with his or her employment or service, that has resulted, or could reasonably be expected to result, in injury to the business or reputation of the Company or its Affiliates, (3) any material violation of the policies of the Service Recipient, including, but not limited to, those relating to sexual harassment or the disclosure or misuse of confidential information, or those set forth in the manuals or statements of policy of the Service Recipient; (4) the Participant's act(s) of negligence or willful misconduct in the course of his or her employment or service with the Service Recipient; (5) misappropriation by the Participant of any assets or business opportunities of the Company or its Affiliates; (6) embezzlement or fraud committed by the Participant, at the Participant's direction, or with the Participant's prior actual knowledge; or (7) willful neglect in the performance of the Participant's duties for the Service Recipient or willful or repeated failure or refusal to perform such duties.  If, subsequent to the Termination of a Participant for any reason other than by the Service Recipient for Cause, it is

discovered that the Participant's employment or service could have been terminated for Cause, such Participant's employment or service shall, at the discretion of the Committee, be deemed to have been terminated by the Service Recipient for Cause for all purposes under the Plan, and the Participant shall be required to repay to the Company all amounts received by him or her in respect of any Award following such Termination that would have been forfeited under the Plan had such Termination been by the Service Recipient for Cause. In the event that there is an Award Agreement or Participant Agreement defining Cause, "Cause" shall have the meaning provided in such agreement, and a Termination by the Service Recipient for Cause hereunder shall not be deemed to have occurred unless all applicable notice and cure periods in such Award Agreement or Participant Agreement are complied with.

(f)        "Change in Control" means:

(1)        a change in ownership or control of the Company effected through a transaction or series of transactions (other than an offering of Stock to the general public through a registration statement filed with the U.S. Securities and Exchange Commission or similar non-U.S. regulatory agency or pursuant to a Non-Control Transaction) whereby any "person" (as defined in Section 3(a)(9) of the Exchange Act) or any two or more persons deemed to be one "person" (as used in Sections 13(d)(3) and 14(d)(2) of the Exchange Act), other than the Company or any of its Affiliates, an employee benefit plan sponsored or maintained by the Company or any of its Affiliates (or its related trust), or any underwriter temporarily holding securities pursuant to an offering of such securities, directly or indirectly acquire "beneficial ownership" (within the meaning of Rule 13d-3 under the Exchange Act) of securities of the Company possessing more than fifty percent (50%) of the total combined voting power of the Company's securities eligible to vote in the election of the Board (the "Company Voting Securities");

(2)        the date, within any consecutive twenty-four (24) month period commencing on or after the Effective Date, upon which individuals who constitute the Board as of the Effective Date (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board; *provided, however*, that any individual who becomes a director subsequent to the Effective Date whose election or nomination for election by the Company's stockholders was approved by a vote of at least a majority of the directors then constituting the Incumbent Board (either by a specific vote or by approval of the proxy statement of the Company in which such individual is named as a nominee for director, without objection to such nomination) shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest (including, but not limited to, a consent solicitation) with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a person other than the Board; or

(3)        the consummation of a merger, consolidation, share exchange, or similar form of corporate transaction involving the Company or any of its Affiliates that requires the approval of the Company's stockholders (whether for such transaction, the issuance of securities in the transaction or otherwise) (a "Reorganization"), unless

2

immediately following such Reorganization (i) more than fifty percent (50%) of the total voting power of (A) the corporation resulting from such Reorganization (the "Surviving Company") or (B) if applicable, the ultimate parent corporation that has, directly or indirectly, beneficial ownership of one hundred percent (100%) of the voting securities of the Surviving Company (the "Parent Company"), is represented by Company Voting Securities that were outstanding immediately prior to such Reorganization (or, if applicable, is represented by shares into which such Company Voting Securities were converted pursuant to such Reorganization), and such voting power among the holders thereof is in substantially the same proportion as the voting power of such Company Voting Securities among holders thereof immediately prior to such Reorganization, (ii) no person, other than an employee benefit plan sponsored or maintained by the Surviving Company or the Parent Company (or its related trust), is or becomes the beneficial owner, directly or indirectly, of fifty percent (50%) or more of the total voting power of the outstanding voting securities eligible to elect directors of the Parent Company, or if there is no Parent Company, the Surviving Company, and (iii) at least a majority of the members of the board of directors of the Parent Company, or if there is no Parent Company, the Surviving Company, following the consummation of such Reorganization are members of the Incumbent Board at the time of the Board's approval of the execution of the initial agreement providing for such Reorganization (any Reorganization which satisfies all of the criteria specified in clauses (i), (ii), and (iii) above shall be a "Non-Control Transaction"); or

(4)     the sale or disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company to any "person" (as defined in Section 3(a)(9) of the Exchange Act) or to any two or more persons deemed to be one "person" (as used in Sections 13(d)(3) and 14(d)(2) of the Exchange Act) other than the Company's Affiliates.

Notwithstanding the foregoing, (x) a Change in Control shall not be deemed to occur solely because any person acquires beneficial ownership of fifty percent (50%) or more of the Company Voting Securities as a result of an acquisition of Company Voting Securities by the Company that reduces the number of Company Voting Securities outstanding; *provided* that if after such acquisition by the Company such person becomes the beneficial owner of additional Company Voting Securities that increases the percentage of outstanding Company Voting Securities beneficially owned by such person, a Change in Control shall then be deemed to occur, and (y) with respect to the payment of any amount that constitutes a deferral of compensation subject to Section 409A of the Code payable upon a Change in Control, a Change in Control shall not be deemed to have occurred, unless the Change in Control constitutes a change in the ownership or effective control of the Company or in the ownership of a substantial portion of the assets of the Company under Section 409A(a)(2)(A)(v) of the Code.

(g)     "Code" means the U.S. Internal Revenue Code of 1986, as amended from time to time, including the rules and regulations thereunder and any successor provisions, rules and regulations thereto.

(h)     "Committee" means the Board, the Compensation Committee of the Board or such other committee consisting of two or more individuals appointed by the Board to

3

administer the Plan and each other individual or committee of individuals designated to exercise authority under the Plan.

(i)    "Company" means AdaptHealth Corp., a Delaware corporation.

(j)    "Corporate Event" has the meaning set forth in Section 10(b) hereof.

(k)    "Data" has the meaning set forth in Section 20(f) hereof.

(l)    "Disability" means, in the absence of an Award Agreement or Participant Agreement otherwise defining Disability, the permanent and total disability of such Participant within the meaning of Section 22(e)(3) of the Code.  In the event that there is an Award Agreement or Participant Agreement defining Disability, "Disability" shall have the meaning provided in such Award Agreement or Participant Agreement.

(m)    "Disqualifying Disposition" means any disposition (including any sale) of Stock acquired upon the exercise of an Incentive Stock Option made within the period that ends either (1) two years after the date on which the Participant was granted the Incentive Stock Option or (2) one year after the date upon which the Participant acquired the Stock.

(n)    "Effective Date" means October 14, 2019, which is the date on which the Plan was approved by the Board.

(o)    "Eligible Person" means (1) each employee and officer of the Company or any of its Affiliates, (2) each non-employee director of the Company or any of its Affiliates; (3) each other natural Person who provides substantial services to the Company or any of its Affiliates as a consultant or advisor (or a wholly owned alter ego entity of the natural Person providing such services of which such Person is an employee, stockholder or partner) and who is designated as eligible by the Committee, and (4) each natural Person who has been offered employment by the Company or any of its Affiliates; *provided* that such prospective employee may not receive any payment or exercise any right relating to an Award until such Person has commenced employment or service with the Company or its Affiliates; *provided further, however*, that (i) with respect to any Award that is intended to qualify as a "stock right" that does not provide for a "deferral of compensation" within the meaning of Section 409A of the Code, the term "Affiliate" as used in this Section 2(o) shall include only those corporations or other entities in the unbroken chain of corporations or other entities beginning with the Company where each of the corporations or other entities in the unbroken chain other than the last corporation or other entity owns stock possessing at least fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations or other entities in the chain, and (ii) with respect to any Award that is intended to be an Incentive Stock Option, the term "Affiliate" as used in this Section 2(o) shall include only those entities that qualify as a "subsidiary corporation" with respect to the Company within the meaning of Section 424(f) of the Code.  An employee on an approved leave of absence may be considered as still in the employ of the Company or any of its Affiliates for purposes of eligibility for participation in the Plan.

4

(p)     "Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended from time to time, including the rules and regulations thereunder and any successor provisions, rules and regulations thereto.

(q)     "Expiration Date" means, with respect to an Option or Stock Appreciation Right, the date on which the term of such Option or Stock Appreciation Right expires, as determined under Sections 5(b) or 8(b) hereof, as applicable.

(r)     "Fair Market Value" means, as of any date when the Stock is listed on one or more national securities exchanges, the closing price reported on the principal national securities exchange on which such Stock is listed and traded on the date of determination or, if the closing price is not reported on such date of determination, the closing price reported on the most recent date prior to the date of determination.  If the Stock is not listed on a national securities exchange, "Fair Market Value" shall mean the amount determined by the Board in good faith, and in a manner consistent with Section 409A of the Code, to be the fair market value per share of Stock.

(s)     "GAAP" means the U.S. Generally Accepted Accounting Principles, as in effect from time to time.

(t)     "Incentive Stock Option" means an Option intended to qualify as an "incentive stock option" within the meaning of Section 422 of the Code.

(u)     "Nonqualified Stock Option" means an Option not intended to be an Incentive Stock Option.

(v)     "Option" means a conditional right, granted to a Participant under Section 5 hereof, to purchase Stock at a specified price during a specified time period.

(w)     "Option Agreement" means a written agreement between the Company and a Participant evidencing the terms and conditions of an individual Option Award.

(x)     "Participant" means an Eligible Person who has been granted an Award under the Plan or, if applicable, such other Person who holds an Award.

(y)     "Participant Agreement" means an employment or other services agreement between a Participant and the Service Recipient that describes the terms and conditions of such Participant's employment or service with the Service Recipient and is effective as of the date of determination.

(z)     "Person" means any individual, corporation, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, or other entity.

(aa)    "Plan" means this AdaptHealth Corp. 2019 Stock Incentive Plan, as amended from time to time.

(bb)    "Qualified Member" means a member of the Committee who is a "Non-Employee Director" within the meaning of Rule 16b-3 under the Exchange Act and an

5

"independent director" as defined under, as applicable, the NASDAQ Listing Rules, the NYSE Listed Company Manual or other applicable stock exchange rules.

(cc)    "Qualifying Committee" has the meaning set forth in Section 3(b) hereof.

(dd)    "Restricted Stock" means Stock granted to a Participant under Section 6 hereof that is subject to certain restrictions and to a risk of forfeiture.

(ee)    "Restricted Stock Agreement" means a written agreement between the Company and a Participant evidencing the terms and conditions of an individual Restricted Stock Award.

(ff)    "Restricted Stock Unit" means a notional unit representing the right to receive one share of Stock (or the cash value of one share of Stock, if so determined by the Committee) on a specified settlement date.

(gg)    "RSU Agreement" means a written agreement between the Company and a Participant evidencing the terms and conditions of an individual Award of Restricted Stock Units.

(hh)    "SAR Agreement" means a written agreement between the Company and a Participant evidencing the terms and conditions of an individual Award of Stock Appreciation Rights.

(ii)    "Securities Act" means the U.S. Securities Act of 1933, as amended from time to time, including the rules and regulations thereunder and any successor provisions, rules and regulations thereto.

(jj)    "Service Recipient" means, with respect to a Participant holding an Award, either the Company or an Affiliate of the Company by which the original recipient of such Award is, or following a Termination was most recently, principally employed or to which such original recipient provides, or following a Termination was most recently providing, services, as applicable.

(kk)    "Stock" means Class A Common Stock, par value $0.0001 per share, of the Company, and such other securities as may be substituted for such stock pursuant to Section 10 hereof.

(ll)    "Stock Appreciation Right" means a conditional right to receive an amount equal to the value of the appreciation in the Stock over a specified period.  Except in the event of extraordinary circumstances, as determined in the sole discretion of the Committee, or pursuant to Section 10(b) hereof, Stock Appreciation Rights shall be settled in Stock.

(mm)    "Substitute Award" has the meaning set forth in Section 4(a) hereof.

(nn)    "Termination" means the termination of a Participant's employment or service, as applicable, with the Service Recipient; *provided, however*, that, if so determined by the Committee at the time of any change in status in relation to the Service Recipient (*e.g.*, a

6

Participant ceases to be an employee and begins providing services as a consultant, or vice versa), such change in status will not be deemed a Termination hereunder. Unless otherwise determined by the Committee, in the event that the Service Recipient ceases to be an Affiliate of the Company (by reason of sale, divestiture, spin-off, or other similar transaction), unless a Participant's employment or service is transferred to another entity that would constitute the Service Recipient immediately following such transaction, such Participant shall be deemed to have suffered a Termination hereunder as of the date of the consummation of such transaction. Notwithstanding anything herein to the contrary, a Participant's change in status in relation to the Service Recipient (for example, a change from employee to consultant) shall not be deemed a Termination hereunder with respect to any Awards constituting "nonqualified deferred compensation" subject to Section 409A of the Code that are payable upon a Termination unless such change in status constitutes a "separation from service" within the meaning of Section 409A of the Code. Any payments in respect of an Award constituting nonqualified deferred compensation subject to Section 409A of the Code that are payable upon a Termination shall be delayed for such period as may be necessary to meet the requirements of Section 409A(a)(2)(B)(i) of the Code. On the first business day following the expiration of such period, the Participant shall be paid, in a single lump sum without interest, an amount equal to the aggregate amount of all payments delayed pursuant to the preceding sentence, and any remaining payments not so delayed shall continue to be paid pursuant to the payment schedule applicable to such Award.

3.    **Administration.**

(a)    <u>Authority of the Committee</u>. Except as otherwise provided below, the Plan shall be administered by the Committee. The Committee shall have full and final authority, in each case subject to and consistent with the provisions of the Plan, to (1) select Eligible Persons to become Participants, (2) grant Awards, (3) determine the type, number and type of shares of Stock subject to, other terms and conditions of, and all other matters relating to, Awards, (4) prescribe Award Agreements (which need not be identical for each Participant) and rules and regulations for the administration of the Plan, (5) construe and interpret the Plan and Award Agreements and correct defects, supply omissions, and reconcile inconsistencies therein, (6) suspend the right to exercise Awards during any period that the Committee deems appropriate to comply with applicable securities laws, and thereafter extend the exercise period of an Award by an equivalent period of time or such shorter period required by, or necessary to comply with, applicable law, and (7) make all other decisions and determinations as the Committee may deem necessary or advisable for the administration of the Plan. Any action of the Committee shall be final, conclusive, and binding on all Persons, including, without limitation, the Company, its stockholders and Affiliates, Eligible Persons, Participants, and beneficiaries of Participants. Notwithstanding anything in the Plan to the contrary, the Committee shall have the ability to accelerate the vesting of any outstanding Award at any time and for any reason, including upon a Corporate Event, subject to Section 10(d), or in the event of a Participant's Termination by the Service Recipient other than for Cause, or due to the Participant's death, Disability or retirement (as such term may be defined in an applicable Award Agreement or Participant Agreement, or, if no such definition exists, in accordance with the Company's then-current employment policies and guidelines). For the avoidance of doubt, the Board shall have the authority to take all actions under the Plan that the Committee is permitted to take.

7

(b)        Manner of Exercise of Committee Authority.  At any time that a member of the Committee is not a Qualified Member, any action of the Committee relating to an Award granted or to be granted to a Participant who is then subject to Section 16 of the Exchange Act in respect of the Company, must be taken by the remaining members of the Committee or a subcommittee, designated by the Committee or the Board, composed solely of two or more Qualified Members (a "Qualifying Committee").  Any action authorized by such a Qualifying Committee shall be deemed the action of the Committee for purposes of the Plan.  The express grant of any specific power to a Qualifying Committee, and the taking of any action by such a Qualifying Committee, shall not be construed as limiting any power or authority of the Committee.

(c)        Delegation.  To the extent permitted by applicable law, the Committee may delegate to officers or employees of the Company or any of its Affiliates, or committees thereof, the authority, subject to such terms as the Committee shall determine, to perform such functions under the Plan, including, but not limited to, administrative functions, as the Committee may determine appropriate.  The Committee may appoint agents to assist it in administering the Plan.  Any actions taken by an officer or employee delegated authority pursuant to this Section 3(c) within the scope of such delegation shall, for all purposes under the Plan, be deemed to be an action taken by the Committee.  Notwithstanding the foregoing or any other provision of the Plan to the contrary, any Award granted under the Plan to any Eligible Person who is not an employee of the Company or any of its Affiliates (including any non-employee director of the Company or any Affiliate) or to any Eligible Person who is subject to Section 16 of the Exchange Act must be expressly approved by the Committee or Qualifying Committee in accordance with Section 3(b) above.

(d)        Sections 409A and 457A.  The Committee shall take into account compliance with Sections 409A and 457A of the Code in connection with any grant of an Award under the Plan, to the extent applicable.  While the Awards granted hereunder are intended to be structured in a manner to avoid the imposition of any penalty taxes under Sections 409A and 457A of the Code, in no event whatsoever shall the Company or any of its Affiliates be liable for any additional tax, interest, or penalties that may be imposed on a Participant as a result of Section 409A or Section 457A of the Code or any damages for failing to comply with Section 409A or Section 457A of the Code or any similar state or local laws (other than for withholding obligations or other obligations applicable to employers, if any, under Section 409A or Section 457A of the Code).

4.        **Shares Available Under the Plan; Other Limitations.**

(a)        Number of Shares Available for Delivery.  Subject to adjustment as provided in Section 10 hereof, the total number of shares of Stock reserved and available for delivery in connection with Awards under the Plan shall equal 8,000,000.  Shares of Stock delivered under the Plan shall consist of authorized and unissued shares or previously issued shares of Stock reacquired by the Company on the open market or by private purchase.  Notwithstanding the foregoing, (i) except as may be required by reason of Section 422 of the Code, the number of shares of Stock available for issuance hereunder shall not be reduced by shares issued pursuant to Awards issued or assumed in connection with a merger or acquisition as contemplated by, as applicable, NYSE Listed Company Manual Section 303A.08, NASDAQ

8

Listing Rule 5635(c) and IM-5635-1, AMEX Company Guide Section 711, or other applicable stock exchange rules, and their respective successor rules and listing exchange promulgations (each such Award, a "Substitute Award"); and (ii) shares of Stock shall not be deemed to have been issued pursuant to the Plan with respect to any portion of an Award that is settled in cash.

(b)     Share Counting Rules.  The Committee may adopt reasonable counting procedures to ensure appropriate counting, avoid double-counting (as, for example, in the case of tandem awards or Substitute Awards) and make adjustments if the number of shares of Stock actually delivered differs from the number of shares previously counted in connection with an Award.  Other than with respect to a Substitute Award, to the extent that an Award expires or is canceled, forfeited, settled in cash, or otherwise terminated without delivery to the Participant of the full number of shares of Stock to which the Award related, the undelivered shares of Stock will again be available for grant.  Shares of Stock withheld in payment of the exercise price or taxes relating to an Award and shares of Stock equal to the number surrendered in payment of any exercise price or taxes relating to an Award shall not be deemed to constitute shares delivered to the Participant and shall be deemed to again be available for delivery under the Plan.

(c)     Incentive Stock Options.  No more than 8,000,000 shares of Stock (subject to adjustment as provided in Section 10 hereof) reserved for issuance hereunder may be issued or transferred upon exercise or settlement of Incentive Stock Options.

(d)     Shares Available Under Acquired Plans.  To the extent permitted by NYSE Listed Company Manual Section 303A.08, NASDAQ Listing Rule 5635(c) or other applicable stock exchange rules, subject to applicable law, in the event that a company acquired by the Company or with which the Company combines has shares available under a pre-existing plan approved by stockholders and not adopted in contemplation of such acquisition or combination, the shares available for grant pursuant to the terms of such pre-existing plan (as adjusted, to the extent appropriate, using the exchange ratio or other adjustment or valuation ratio of formula used in such acquisition or combination to determine the consideration payable to the holders of common stock of the entities party to such acquisition or combination) may be used for Awards under the Plan and shall not reduce the number of shares of Stock reserved and available for delivery in connection with Awards under the Plan; *provided* that Awards using such available shares shall not be made after the date awards could have been made under the terms of such pre-existing plan, absent the acquisition or combination, and shall only be made to individuals who were not employed by the Company or any subsidiary of the Company immediately prior to such acquisition or combination.

5.     **Options.**

(a)     General.  Certain Options granted under the Plan may be intended to be Incentive Stock Options; however, no Incentive Stock Options may be granted hereunder following the tenth (10th) anniversary of the earlier of (i) the date the Plan is adopted by the Board and (ii) the date the stockholders of the Company approve the Plan.  Options may be granted to Eligible Persons in such form and having such terms and conditions as the Committee shall deem appropriate; *provided, however*, that Incentive Stock Options may be granted only to Eligible Persons who are employees of the Company or an Affiliate (as such definition is limited pursuant to Section 2(o) hereof) of the Company.  The provisions of separate Options shall be set

9

forth in separate Option Agreements, which agreements need not be identical.  No dividends or dividend equivalents shall be paid on Options.

(b)    Term.  The term of each Option shall be set by the Committee at the time of grant; *provided, however*, that no Option granted hereunder shall be exercisable after, and each Option shall expire, ten (10) years from the date it was granted.

(c)    Exercise Price.  The exercise price per share of Stock for each Option shall be set by the Committee at the time of grant and shall not be less than the Fair Market Value on the date of grant, subject to Section 5(g) hereof in the case of any Incentive Stock Option.  Notwithstanding the foregoing, in the case of an Option that is a Substitute Award, the exercise price per share of Stock for such Option may be less than the Fair Market Value on the date of grant; *provided*, that such exercise price is determined in a manner consistent with the provisions of Section 409A of the Code and, if applicable, Section 424(a) of the Code.

(d)    Payment for Stock.  Payment for shares of Stock acquired pursuant to an Option granted hereunder shall be made in full upon exercise of the Option in a manner approved by the Committee, which may include any of the following payment methods: (1) in immediately available funds in U.S. dollars, or by certified or bank cashier's check, (2)  by delivery of shares of Stock having a value equal to the exercise price, (3) by a broker-assisted cashless exercise in accordance with procedures approved by the Committee, whereby payment of the Option exercise price or tax withholding obligations may be satisfied, in whole or in part, with shares of Stock subject to the Option by delivery of an irrevocable direction to a securities broker (on a form prescribed by the Committee) to sell shares of Stock and to deliver all or part of the sale proceeds to the Company in payment of the aggregate exercise price and, if applicable, the amount necessary to satisfy the Company's withholding obligations, or (4) by any other means approved by the Committee (including, by delivery of a notice of "net exercise" to the Company, pursuant to which the Participant shall receive the number of shares of Stock underlying the Option so exercised reduced by the number of shares of Stock equal to the aggregate exercise price of the Option divided by the Fair Market Value on the date of exercise).  Notwithstanding anything herein to the contrary, if the Committee determines that any form of payment available hereunder would be in violation of Section 402 of the Sarbanes-Oxley Act of 2002, such form of payment shall not be available.

(e)    Vesting.  Options shall vest and become exercisable in such manner, on such date or dates, or upon the achievement of performance or other conditions, in each case as may be determined by the Committee and set forth in an Option Agreement; *provided*, *however*, that notwithstanding any such vesting dates, the Committee may in its sole discretion accelerate the vesting of any Option at any time and for any reason.  Unless otherwise specifically determined by the Committee, the vesting of an Option shall occur only while the Participant is employed by or rendering services to the Service Recipient, and all vesting shall cease upon a Participant's Termination for any reason.  To the extent permitted by applicable law and unless otherwise determined by the Committee, vesting shall be suspended during the period of any approved unpaid leave of absence by a Participant following which the Participant has a right to reinstatement and shall resume upon such Participant's return to active employment.  If an Option is exercisable in installments, such installments or portions thereof that become exercisable shall remain exercisable until the Option expires, is canceled or otherwise terminates.

10

(f)    Termination of Employment or Service. Except as provided by the Committee in an Option Agreement, Participant Agreement or otherwise:

(1)    In the event of a Participant's Termination prior to the applicable Expiration Date for any reason other than (i) by the Service Recipient for Cause, or (ii) by reason of the Participant's death or Disability, (A) all vesting with respect to such Participant's Options outstanding shall cease, (B) all of such Participant's unvested Options outstanding shall terminate and be forfeited for no consideration as of the date of such Termination, and (C) all of such Participant's vested Options outstanding shall terminate and be forfeited for no consideration on the earlier of (x) the applicable Expiration Date and (y) the date that is ninety (90) days after the date of such Termination.

(2)    In the event of a Participant's Termination prior to the applicable Expiration Date by reason of such Participant's death or Disability, (i) all vesting with respect to such Participant's Options outstanding shall cease, (ii) all of such Participant's unvested Options outstanding shall terminate and be forfeited for no consideration as of the date of such Termination, and (iii) all of such Participant's vested Options outstanding shall terminate and be forfeited for no consideration on the earlier of (x) the applicable Expiration Date and (y) the date that is twelve (12) months after the date of such Termination.

(3)    In the event of a Participant's Termination prior to the applicable Expiration Date by the Service Recipient for Cause, all of such Participant's Options outstanding (whether or not vested) shall immediately terminate and be forfeited for no consideration as of the date of such Termination.

(g)    Special Provisions Applicable to Incentive Stock Options.

(1)    No Incentive Stock Option may be granted to any Eligible Person who, at the time the Option is granted, owns directly, or indirectly within the meaning of Section 424(d) of the Code, stock possessing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company or of any parent or subsidiary thereof, unless such Incentive Stock Option (i) has an exercise price of at least one hundred ten percent (110%) of the Fair Market Value on the date of the grant of such Option and (ii) cannot be exercised more than five (5) years after the date it is granted.

(2)    To the extent that the aggregate Fair Market Value (determined as of the date of grant) of Stock for which Incentive Stock Options are exercisable for the first time by any Participant during any calendar year (under all plans of the Company and its Affiliates) exceeds $100,000, such excess Incentive Stock Options shall be treated as Nonqualified Stock Options.

(3)    Each Participant who receives an Incentive Stock Option must agree to notify the Company in writing immediately after the Participant makes a Disqualifying Disposition of any Stock acquired pursuant to the exercise of an Incentive Stock Option.

11

6.      **Restricted Stock.**

(a)      <u>General</u>.  Restricted Stock may be granted to Eligible Persons in such form and having such terms and conditions as the Committee shall deem appropriate.  The provisions of separate Awards of Restricted Stock shall be set forth in separate Restricted Stock Agreements, which agreements need not be identical.  Subject to the restrictions set forth in Section 6(b) hereof, and except as otherwise set forth in the applicable Restricted Stock Agreement, the Participant shall generally have the rights and privileges of a stockholder as to such Restricted Stock, including the right to vote such Restricted Stock.  Unless otherwise set forth in a Participant's Restricted Stock Agreement, cash dividends and stock dividends, if any, with respect to the Restricted Stock shall be withheld by the Company for the Participant's account, and shall be subject to forfeiture to the same degree as the shares of Restricted Stock to which such dividends relate.  Except as otherwise determined by the Committee, no interest will accrue or be paid on the amount of any cash dividends withheld.

(b)      <u>Vesting and Restrictions on Transfer</u>.  Restricted Stock shall vest in such manner, on such date or dates, or upon the achievement of performance or other conditions, in each case as may be determined by the Committee and set forth in a Restricted Stock Agreement; *provided, however*, that notwithstanding any such vesting dates, the Committee may in its sole discretion accelerate the vesting of any Award of Restricted Stock at any time and for any reason.  Unless otherwise specifically determined by the Committee, the vesting of an Award of Restricted Stock shall occur only while the Participant is employed by or rendering services to the Service Recipient, and all vesting shall cease upon a Participant's Termination for any reason.  To the extent permitted by applicable law and unless otherwise determined by the Committee, vesting shall be suspended during the period of any approved unpaid leave of absence by a Participant following which the Participant has a right to reinstatement and shall resume upon such Participant's return to active employment.  In addition to any other restrictions set forth in a Participant's Restricted Stock Agreement, the Participant shall not be permitted to sell, transfer, pledge, or otherwise encumber the Restricted Stock prior to the time the Restricted Stock has vested pursuant to the terms of the Restricted Stock Agreement.

(c)      <u>Termination of Employment or Service</u>.  Except as provided by the Committee in a Restricted Stock Agreement, Participant Agreement or otherwise, in the event of a Participant's Termination for any reason prior to the time that such Participant's Restricted Stock has vested, (1) all vesting with respect to such Participant's Restricted Stock outstanding shall cease, and (2) as soon as practicable following such Termination, the Company shall repurchase from the Participant, and the Participant shall sell, all of such Participant's unvested shares of Restricted Stock at a purchase price equal to the original purchase price paid for the Restricted Stock; *provided* that, if the original purchase price paid for the Restricted Stock is equal to zero dollars ($0), such unvested shares of Restricted Stock shall be forfeited to the Company by the Participant for no consideration as of the date of such Termination.

7.      **Restricted Stock Units.**

(a)      <u>General</u>.  Restricted Stock Units may be granted to Eligible Persons in such form and having such terms and conditions as the Committee shall deem appropriate.  The

12

provisions of separate Restricted Stock Units shall be set forth in separate RSU Agreements, which agreements need not be identical.

(b)      Vesting.  Restricted Stock Units shall vest in such manner, on such date or dates, or upon the achievement of performance or other conditions, in each case as may be determined by the Committee and set forth in an RSU Agreement; *provided*, *however*, that notwithstanding any such vesting dates, the Committee may in its sole discretion accelerate the vesting of any Restricted Stock Unit at any time and for any reason.  Unless otherwise specifically determined by the Committee, the vesting of a Restricted Stock Unit shall occur only while the Participant is employed by or rendering services to the Service Recipient, and all vesting shall cease upon a Participant's Termination for any reason.  To the extent permitted by applicable law and unless otherwise determined by the Committee, vesting shall be suspended during the period of any approved unpaid leave of absence by a Participant following which the Participant has a right to reinstatement and shall resume upon such Participant's return to active employment.

(c)      Settlement.  Restricted Stock Units shall be settled in Stock, cash, or property, as determined by the Committee, in its sole discretion, on the date or dates determined by the Committee and set forth in an RSU Agreement.  Unless otherwise set forth in a Participant's RSU Agreement, a Participant shall not be entitled to dividends, if any, or dividend equivalents with respect to Restricted Stock Units prior to settlement.

(d)      Termination of Employment or Service.  Except as provided by the Committee in an RSU Agreement, Participant Agreement or otherwise, in the event of a Participant's Termination for any reason prior to the time that such Participant's Restricted Stock Units have been settled, (1) all vesting with respect to such Participant's Restricted Stock Units outstanding shall cease, (2) all of such Participant's unvested Restricted Stock Units outstanding shall be forfeited for no consideration as of the date of such Termination, and (3) any shares remaining undelivered with respect to vested Restricted Stock Units then held by such Participant shall be delivered on the delivery date or dates specified in the RSU Agreement.

8.      **Stock Appreciation Rights.**

(a)      General.  Stock Appreciation Rights may be granted to Eligible Persons in such form and having such terms and conditions as the Committee shall deem appropriate.  The provisions of separate Stock Appreciation Rights shall be set forth in separate SAR Agreements, which agreements need not be identical.  No dividends or dividend equivalents shall be paid on Stock Appreciation Rights.

(b)      Term.  The term of each Stock Appreciation Right shall be set by the Committee at the time of grant; *provided, however*, that no Stock Appreciation Right granted hereunder shall be exercisable after, and each Stock Appreciation Right shall expire, ten (10) years from the date it was granted.

(c)      Base Price.  The base price per share of Stock for each Stock Appreciation Right shall be set by the Committee at the time of grant and shall not be less than the Fair Market Value on the date of grant.  Notwithstanding the foregoing, in the case of a Stock Appreciation

13

Right that is a Substitute Award, the base price per share of Stock for such Stock Appreciation Right may be less than the Fair Market Value on the date of grant; *provided*, that such base price is determined in a manner consistent with the provisions of Section 409A of the Code.

        (d)      <u>Vesting</u>. Stock Appreciation Rights shall vest and become exercisable in such manner, on such date or dates, or upon the achievement of performance or other conditions, in each case as may be determined by the Committee and set forth in a SAR Agreement; *provided*, *however*, that notwithstanding any such vesting dates, the Committee may in its sole discretion accelerate the vesting of any Stock Appreciation Right at any time and for any reason. Unless otherwise specifically determined by the Committee, the vesting of a Stock Appreciation Right shall occur only while the Participant is employed by or rendering services to the Service Recipient, and all vesting shall cease upon a Participant's Termination for any reason. To the extent permitted by applicable law and unless otherwise determined by the Committee, vesting shall be suspended during the period of any approved unpaid leave of absence by a Participant following which the Participant has a right to reinstatement and shall resume upon such Participant's return to active employment. If a Stock Appreciation Right is exercisable in installments, such installments or portions thereof that become exercisable shall remain exercisable until the Stock Appreciation Right expires, is canceled or otherwise terminates.

        (e)      <u>Payment upon Exercise</u>. Payment upon exercise of a Stock Appreciation Right may be made in cash, Stock, or property as specified in the SAR Agreement or determined by the Committee, in each case having a value in respect of each share of Stock underlying the portion of the Stock Appreciation Right so exercised, equal to the difference between the base price of such Stock Appreciation Right and the Fair Market Value of one (1) share of Stock on the exercise date. For purposes of clarity, each share of Stock to be issued in settlement of a Stock Appreciation Right is deemed to have a value equal to the Fair Market Value of one (1) share of Stock on the exercise date. In no event shall fractional shares be issuable upon the exercise of a Stock Appreciation Right, and in the event that fractional shares would otherwise be issuable, the number of shares issuable will be rounded down to the next lower whole number of shares, and the Participant will be entitled to receive a cash payment equal to the value of such fractional share.

        (f)      <u>Termination of Employment or Service</u>. Except as provided by the Committee in a SAR Agreement, Participant Agreement or otherwise:

        (1)      In the event of a Participant's Termination prior to the applicable Expiration Date for any reason other than (i) by the Service Recipient for Cause, or (ii) by reason of the Participant's death or Disability, (A) all vesting with respect to such Participant's Stock Appreciation Rights outstanding shall cease, (B) all of such Participant's unvested Stock Appreciation Rights outstanding shall terminate and be forfeited for no consideration as of the date of such Termination, and (C) all of such Participant's vested Stock Appreciation Rights outstanding shall terminate and be forfeited for no consideration on the earlier of (x) the applicable Expiration Date and (y) the date that is ninety (90) days after the date of such Termination.

        (2)      In the event of a Participant's Termination prior to the applicable Expiration Date by reason of such Participant's death or Disability, (i) all vesting with

14

respect to such Participant's Stock Appreciation Rights outstanding shall cease, (ii) all of such Participant's unvested Stock Appreciation Rights outstanding shall terminate and be forfeited for no consideration as of the date of such Termination, and (iii) all of such Participant's vested Stock Appreciation Rights outstanding shall terminate and be forfeited for no consideration on the earlier of (x) the applicable Expiration Date and (y) the date that is twelve (12) months after the date of such Termination. In the event of a Participant's death, such Participant's Stock Appreciation Rights shall remain exercisable by the Person or Persons to whom such Participant's rights under the Stock Appreciation Rights pass by will or by the applicable laws of descent and distribution until the applicable Expiration Date, but only to the extent that the Stock Appreciation Rights were vested at the time of such Termination.

(3)    In the event of a Participant's Termination prior to the applicable Expiration Date by the Service Recipient for Cause, all of such Participant's Stock Appreciation Rights outstanding (whether or not vested) shall immediately terminate and be forfeited for no consideration as of the date of such Termination.

9.    **Other Stock-Based Awards.**

The Committee is authorized, subject to limitations under applicable law, to grant to Participants such other Awards that may be denominated or payable in, valued in whole or in part by reference to, or otherwise based upon or related to Stock, as deemed by the Committee to be consistent with the purposes of the Plan. The Committee may also grant Stock as a bonus (whether or not subject to any vesting requirements or other restrictions on transfer), and may grant other Awards in lieu of obligations of the Company or an Affiliate to pay cash or deliver other property under the Plan or under other plans or compensatory arrangements, subject to such terms as shall be determined by the Committee. The terms and conditions applicable to such Awards shall be determined by the Committee and evidenced by Award Agreements, which agreements need not be identical.

10.    **Adjustment for Recapitalization, Merger, etc.**

(a)    Capitalization Adjustments. The aggregate number of shares of Stock that may be delivered in connection with Awards (as set forth in Section 4 hereof), the numerical share limits in Section 4(a) hereof, the number of shares of Stock covered by each outstanding Award, and the price per share of Stock underlying each such Award shall be equitably and proportionally adjusted or substituted, as determined by the Committee, in its sole discretion, as to the number, price, or kind of a share of Stock or other consideration subject to such Awards (1) in the event of changes in the outstanding Stock or in the capital structure of the Company by reason of stock dividends, extraordinary cash dividends, stock splits, reverse stock splits, recapitalizations, reorganizations, mergers, amalgamations, consolidations, combinations, exchanges, or other relevant changes in capitalization occurring after the date of grant of any such Award (including any Corporate Event); (2) in connection with any extraordinary dividend declared and paid in respect of shares of Stock, whether payable in the form of cash, stock, or any other form of consideration; or (3) in the event of any change in applicable laws or circumstances that results in or could result in, in either case, as determined by the Committee in

15

its sole discretion, any substantial dilution or enlargement of the rights intended to be granted to, or available for, Participants in the Plan.

(b)    Corporate Events. Notwithstanding the foregoing, except as provided by the Committee in an Award Agreement, Participant Agreement or otherwise, in connection with (i) a merger, amalgamation, or consolidation involving the Company in which the Company is not the surviving corporation, (ii) a merger, amalgamation, or consolidation involving the Company in which the Company is the surviving corporation but the holders of shares of Stock receive securities of another corporation or other property or cash, (iii) a Change in Control, or (iv) the reorganization, dissolution or liquidation of the Company (each, a "Corporate Event"), the Committee may provide for any one or more of the following:

(1)    The assumption or substitution of any or all Awards in connection with such Corporate Event, in which case the Awards shall be subject to the adjustment set forth in Section 10(a) above;

(2)    The acceleration of vesting of any or all Awards not assumed or substituted in connection with such Corporate Event, subject to the consummation of such Corporate Event;

(3)    The cancellation of any or all Awards not assumed or substituted in connection with such Corporate Event (whether vested or unvested) as of the consummation of such Corporate Event, together with the payment to the Participants holding vested Awards (including any Awards that would vest upon the Corporate Event but for such cancellation) so canceled of an amount in respect of cancellation equal to the amount payable pursuant to any Cash Award or, with respect to other Awards, an amount based upon the per-share consideration being paid for the Stock in connection with such Corporate Event, less, in the case of Options, Stock Appreciation Rights, and other Awards subject to exercise, the applicable exercise or base price; *provided, however*, that holders of Options, Stock Appreciation Rights, and other Awards subject to exercise shall be entitled to consideration in respect of cancellation of such Awards only if the per-share consideration less the applicable exercise or base price is greater than zero dollars ($0), and to the extent that the per-share consideration is less than or equal to the applicable exercise or base price, such Awards shall be canceled for no consideration;

(4)    The cancellation of any or all Options, Stock Appreciation Rights and other Awards subject to exercise not assumed or substituted in connection with such Corporate Event (whether vested or unvested) as of the consummation of such Corporate Event; *provided* that all Options, Stock Appreciation Rights and other Awards to be so canceled pursuant to this paragraph (4) shall first become exercisable for a period of at least ten (10) days prior to such Corporate Event, with any exercise during such period of any unvested Options, Stock Appreciation Rights or other Awards to be (A) contingent upon and subject to the occurrence of the Corporate Event, and (B) effectuated by such means as are approved by the Committee; and

(5)    The replacement of any or all Awards (other than Awards that are intended to qualify as "stock rights" that do not provide for a "deferral of compensation"

16

within the meaning of Section 409A of the Code) with a cash incentive program that preserves the value of the Awards so replaced (determined as of the consummation of the Corporate Event), with subsequent payment of cash incentives subject to the same vesting conditions as applicable to the Awards so replaced and payment to be made within thirty (30) days of the applicable vesting date.

Payments to holders pursuant to paragraph (3) above shall be made in cash or, in the sole discretion of the Committee, and to the extent applicable, in the form of such other consideration necessary for a Participant to receive property, cash, or securities (or a combination thereof) as such Participant would have been entitled to receive upon the occurrence of the transaction if the Participant had been, immediately prior to such transaction, the holder of the number of shares of Stock covered by the Award at such time (less any applicable exercise or base price). In addition, in connection with any Corporate Event, prior to any payment or adjustment contemplated under this Section 10(b), the Committee may require a Participant to (A) represent and warrant as to the unencumbered title to his or her Awards, (B) bear such Participant's pro-rata share of any post-closing indemnity obligations, and be subject to the same post-closing purchase price adjustments, escrow terms, offset rights, holdback terms, and similar conditions as the other holders of Stock, and (C) deliver customary transfer documentation as reasonably determined by the Committee. The Committee need not take the same action or actions with respect to all Awards or portions thereof or with respect to all Participants. The Committee may take different actions with respect to the vested and unvested portions of an Award.

(c)    Fractional Shares. Any adjustment provided under this Section 10 may, in the Committee's discretion, provide for the elimination of any fractional share that might otherwise become subject to an Award. No cash settlements shall be made with respect to fractional shares so eliminated.

(d)    Double-Trigger Vesting. Notwithstanding any other provisions of the Plan, an Award Agreement or Participant Agreement to the contrary, with respect to any Award that is assumed or substituted in connection with a Change in Control, the vesting, payment, purchase or distribution of such Award may not be accelerated by reason of the Change in Control for any Participant unless the Participant experiences an involuntary Termination as a result of the Change in Control. Unless otherwise provided for in an Award Agreement or Participant Agreement, any Award held by a Participant who experiences an involuntary Termination as a result of a Change in Control shall immediately vest as of the date of such Termination. For purposes of this Section 10(d), a Participant will be deemed to experience an involuntary Termination as a result of a Change in Control if the Participant experiences a Termination by the Service Recipient other than for Cause, or otherwise experiences a Termination under circumstances which entitle the Participant to mandatory severance payment(s) pursuant to applicable law or, in the case of a non-employee director of the Company, if the non-employee director's service on the Board terminates in connection with or as a result of a Change in Control, in each case, at any time beginning on the date of the Change in Control up to and including the second (2nd) anniversary of the Change in Control.

17

11.     **Use of Proceeds.**

The proceeds received from the sale of Stock pursuant to the Plan shall be used for general corporate purposes.

12.     **Rights and Privileges as a Stockholder.**

Except as otherwise specifically provided in the Plan, no Person shall be entitled to the rights and privileges of Stock ownership in respect of shares of Stock that are subject to Awards hereunder until such shares have been issued to that Person.

13.     **Transferability of Awards.**

Awards may not be sold, transferred, pledged, assigned, or otherwise alienated or hypothecated, other than by will or by the applicable laws of descent and distribution, and to the extent subject to exercise, Awards may not be exercised during the lifetime of the grantee other than by the grantee. Notwithstanding the foregoing, except with respect to Incentive Stock Options, Awards and a Participant's rights under the Plan shall be transferable for no value to the extent provided in an Award Agreement or otherwise determined at any time by the Committee.

14.     **Employment or Service Rights.**

No individual shall have any claim or right to be granted an Award under the Plan or, having been selected for the grant of an Award, to be selected for the grant of any other Award. Neither the Plan nor any action taken hereunder shall be construed as giving any individual any right to be retained in the employ or service of the Company or an Affiliate of the Company.

15.     **Compliance with Laws.**

The obligation of the Company to deliver Stock upon issuance, vesting, exercise, or settlement of any Award shall be subject to all applicable laws, rules, and regulations, and to such approvals by governmental agencies as may be required. Notwithstanding any terms or conditions of any Award to the contrary, the Company shall be under no obligation to offer to sell or to sell, and shall be prohibited from offering to sell or selling, any shares of Stock pursuant to an Award unless such shares have been properly registered for sale with the U.S. Securities and Exchange Commission pursuant to the Securities Act (or with a similar non-U.S. regulatory agency pursuant to a similar law or regulation) or unless the Company has received an opinion of counsel, satisfactory to the Company, that such shares may be offered or sold without such registration pursuant to an available exemption therefrom and the terms and conditions of such exemption have been fully complied with. The Company shall be under no obligation to register for sale or resale under the Securities Act any of the shares of Stock to be offered or sold under the Plan or any shares of Stock to be issued upon exercise or settlement of Awards. If the shares of Stock offered for sale or sold under the Plan are offered or sold pursuant to an exemption from registration under the Securities Act, the Company may restrict the transfer of such shares and may legend the Stock certificates representing such shares in such manner as it deems advisable to ensure the availability of any such exemption.

18

16.     **Withholding Obligations.**

As a condition to the issuance, vesting, exercise, or settlement of any Award (or upon the making of an election under Section 83(b) of the Code), the Committee may require that a Participant satisfy, through deduction or withholding from any payment of any kind otherwise due to the Participant, or through such other arrangements as are satisfactory to the Committee, the amount of all federal, state, and local income and other taxes of any kind required or permitted to be withheld in connection with such issuance, vesting, exercise, or settlement (or election). The Committee, in its discretion, may permit shares of Stock to be used to satisfy tax withholding requirements, and such shares shall be valued at their Fair Market Value as of the issuance, vesting, exercise, or settlement date of the Award, as applicable.

17.     **Amendment of the Plan or Awards.**

(a)     <u>Amendment of Plan</u>.  The Board or the Committee may amend the Plan at any time and from time to time.

(b)     <u>Amendment of Awards</u>.  The Board or the Committee may amend the terms of any one or more Awards at any time and from time to time.

(c)     <u>Stockholder Approval; No Material Impairment</u>.  Notwithstanding anything herein to the contrary, no amendment to the Plan or any Award shall be effective without stockholder approval to the extent that such approval is required pursuant to applicable law or the applicable rules of each national securities exchange on which the Stock is listed.  Additionally, no amendment to the Plan or any Award shall materially impair a Participant's rights under any Award unless the Participant consents in writing (it being understood that no action taken by the Board or the Committee that is expressly permitted under the Plan, including, without limitation, any actions described in Section 10 hereof, shall constitute an amendment to the Plan or an Award for such purpose).  Notwithstanding the foregoing, subject to the limitations of applicable law, if any, and without an affected Participant's consent, the Board or the Committee may amend the terms of the Plan or any one or more Awards from time to time as necessary to bring such Awards into compliance with applicable law, including, without limitation, Section 409A of the Code.

(d)     <u>No Repricing of Awards Without Stockholder Approval</u>.  Notwithstanding Sections 17(a) or 17(b) above, or any other provision of the Plan, the repricing of Awards shall not be permitted without stockholder approval.  For this purpose, a "<u>repricing</u>" means any of the following (or any other action that has the same effect as any of the following): (1) changing the terms of an Award to lower its exercise or base price (other than on account of capital adjustments resulting from share splits, etc., as described in Section 10(a) hereof), (2) any other action that is treated as a repricing under GAAP, and (3) repurchasing for cash or canceling an Award in exchange for another Award at a time when its exercise or base price is greater than the Fair Market Value of the underlying Stock, unless the cancellation and exchange occurs in connection with an event set forth in Section 10(b) hereof.

19

18.     **Termination or Suspension of the Plan.**

The Board or the Committee may suspend or terminate the Plan at any time. Unless sooner terminated, the Plan shall terminate on the day before the tenth (10th) anniversary of the date the stockholders of the Company approve the Plan. No Awards may be granted under the Plan while the Plan is suspended or after it is terminated; *provided, however*, that following any suspension or termination of the Plan, the Plan shall remain in effect for the purpose of governing all Awards then outstanding hereunder until such time as all Awards under the Plan have been terminated, forfeited, or otherwise canceled, or earned, exercised, settled, or otherwise paid out, in accordance with their terms.

19.     **Effective Date of the Plan.**

The Plan is effective as of the Effective Date, subject to stockholder approval.

20.     **Miscellaneous.**

(a)     <u>Certificates</u>. Stock acquired pursuant to Awards granted under the Plan may be evidenced in such a manner as the Committee shall determine. If certificates representing Stock are registered in the name of the Participant, the Committee may require that (1) such certificates bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Stock, (2) the Company retain physical possession of the certificates, and (3) the Participant deliver a stock power to the Company, endorsed in blank, relating to the Stock. Notwithstanding the foregoing, the Committee may determine, in its sole discretion, that the Stock shall be held in book-entry form rather than delivered to the Participant pending the release of any applicable restrictions.

(b)     <u>Other Benefits</u>. No Award granted or paid out under the Plan shall be deemed compensation for purposes of computing benefits under any retirement plan of the Company or its Affiliates nor affect any benefits under any other benefit plan now or subsequently in effect under which the availability or amount of benefits is related to the level of compensation.

(c)     <u>Corporate Action Constituting Grant of Awards</u>. Corporate action constituting a grant by the Company of an Award to any Participant will be deemed completed as of the date of such corporate action, unless otherwise determined by the Committee, regardless of when the instrument, certificate, or letter evidencing the Award is communicated to, or actually received or accepted by, the Participant. In the event that the corporate records (*e.g.*, Committee consents, resolutions or minutes) documenting the corporate action constituting the grant contain terms (*e.g.*, exercise price, vesting schedule or number of shares of Stock) that are inconsistent with those in the Award Agreement as a result of a clerical error in connection with the preparation of the Award Agreement, the corporate records will control and the Participant will have no legally binding right to the incorrect term in the Award Agreement.

(d)     <u>Clawback/Recoupment Policy</u>. Notwithstanding anything contained herein to the contrary, all Awards granted under the Plan shall be and remain subject to any incentive compensation clawback or recoupment policy currently in effect or as may be adopted by the Board (or a committee or subcommittee of the Board) and, in each case, as may be

20

amended from time to time. No such policy adoption or amendment shall in any event require the prior consent of any Participant. No recovery of compensation under such a clawback policy will be an event giving rise to a right to resign for "good reason" or "constructive termination" (or similar term) under any agreement with the Company or any of its Affiliates. In the event that an Award is subject to more than one such policy, the policy with the most restrictive clawback or recoupment provisions shall govern such Award, subject to applicable law.

(e) <u>Non-Exempt Employees</u>. If an Option is granted to an employee of the Company or any of its Affiliates in the United States who is a non-exempt employee for purposes of the Fair Labor Standards Act of 1938, as amended, the Option will not be first exercisable for any shares of Stock until at least six (6) months following the date of grant of the Option (although the Option may vest prior to such date). Consistent with the provisions of the Worker Economic Opportunity Act, (1) if such employee dies or suffers a Disability, (2) upon a Corporate Event in which such Option is not assumed, continued, or substituted, (3) upon a Change in Control, or (4) upon the Participant's retirement (as such term may be defined in the applicable Award Agreement or a Participant Agreement, or, if no such definition exists, in accordance with the Company's then current employment policies and guidelines), the vested portion of any Options held by such employee may be exercised earlier than six (6) months following the date of grant. The foregoing provision is intended to operate so that any income derived by a non-exempt employee in connection with the exercise or vesting of an Option will be exempt from his or her regular rate of pay. To the extent permitted and/or required for compliance with the Worker Economic Opportunity Act to ensure that any income derived by a non-exempt employee in connection with the exercise, vesting or issuance of any shares under any other Award will be exempt from such employee's regular rate of pay, the provisions of this Section 20(e) will apply to all Awards.

(f) <u>Data Privacy</u>. As a condition of receipt of any Award, each Participant explicitly and unambiguously consents to the collection, use, and transfer, in electronic or other form, of personal data as described in this Section 20(e) by and among, as applicable, the Company and its Affiliates for the exclusive purpose of implementing, administering, and managing the Plan and Awards and the Participant's participation in the Plan. In furtherance of such implementation, administration, and management, the Company and its Affiliates may hold certain personal information about a Participant, including, but not limited to, the Participant's name, home address, telephone number, date of birth, social security or insurance number or other identification number, salary, nationality, job title(s), information regarding any securities of the Company or any of its Affiliates, and details of all Awards (the "<u>Data</u>"). In addition to transferring the Data amongst themselves as necessary for the purpose of implementation, administration, and management of the Plan and Awards and the Participant's participation in the Plan, the Company and its Affiliates may each transfer the Data to any third parties assisting the Company in the implementation, administration, and management of the Plan and Awards and the Participant's participation in the Plan. Recipients of the Data may be located in the Participant's country or elsewhere, and the Participant's country and any given recipient's country may have different data privacy laws and protections. By accepting an Award, each Participant authorizes such recipients to receive, possess, use, retain, and transfer the Data, in electronic or other form, for the purposes of assisting the Company in the implementation, administration, and management of the Plan and Awards and the Participant's participation in the Plan, including any requisite transfer of such Data as may be required to a broker or other third

21

party with whom the Company or the Participant may elect to deposit any shares of Stock. The Data related to a Participant will be held only as long as is necessary to implement, administer, and manage the Plan and Awards and the Participant's participation in the Plan. A Participant may, at any time, view the Data held by the Company with respect to such Participant, request additional information about the storage and processing of the Data with respect to such Participant, recommend any necessary corrections to the Data with respect to the Participant, or refuse or withdraw the consents herein in writing, in any case without cost, by contacting his or her local human resources representative. The Company may cancel the Participant's eligibility to participate in the Plan, and in the Committee's discretion, the Participant may forfeit any outstanding Awards if the Participant refuses or withdraws the consents described herein. For more information on the consequences of refusal to consent or withdrawal of consent, Participants may contact their local human resources representative.

(g)    Participants Outside of the United States.  The Committee may modify the terms of any Award under the Plan made to or held by a Participant who is then a resident, or is primarily employed or providing services, outside of the United States in any manner deemed by the Committee to be necessary or appropriate in order that such Award shall conform to laws, regulations, and customs of the country in which the Participant is then a resident or primarily employed or providing services, or so that the value and other benefits of the Award to the Participant, as affected by non—U.S. tax laws and other restrictions applicable as a result of the Participant's residence, employment, or providing services abroad, shall be comparable to the value of such Award to a Participant who is a resident, or is primarily employed or providing services, in the United States. An Award may be modified under this Section 20(g) in a manner that is inconsistent with the express terms of the Plan, so long as such modifications will not contravene any applicable law or regulation or result in actual liability under Section 16(b) of the Exchange Act for the Participant whose Award is modified. Additionally, the Committee may adopt such procedures and sub-plans as are necessary or appropriate to permit participation in the Plan by Eligible Persons who are non—U.S. nationals or are primarily employed or providing services outside the United States.

(h)    Change in Time Commitment.  In the event a Participant's regular level of time commitment in the performance of his or her services for the Company or any of its Affiliates is reduced (for example, and without limitation, if the Participant is an employee of the Company and the employee has a change in status from a full-time employee to a part-time employee) after the date of grant of any Award to the Participant, the Committee has the right in its sole discretion to (i) make a corresponding reduction in the number of shares of Stock subject to any portion of such Award that is scheduled to vest or become payable after the date of such change in time commitment, and (ii) in lieu of or in combination with such a reduction, extend the vesting or payment schedule applicable to such Award. In the event of any such reduction, the Participant will have no right with respect to any portion of the Award that is so reduced or extended.

(i)    No Liability of Committee Members.  Neither any member of the Committee nor any of the Committee's permitted delegates shall be liable personally by reason of any contract or other instrument executed by such member or on his or her behalf in his or her capacity as a member of the Committee or for any mistake of judgment made in good faith, and the Company shall indemnify and hold harmless each member of the Committee and each other

22

employee, officer, or director of the Company to whom any duty or power relating to the administration or interpretation of the Plan may be allocated or delegated, against all costs and expenses (including counsel fees) and liabilities (including sums paid in settlement of a claim) arising out of any act or omission to act in connection with the Plan, unless arising out of such Person's own fraud or willful misconduct; *provided, however*, that approval of the Board shall be required for the payment of any amount in settlement of a claim against any such Person. The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such Persons may be entitled under the Company's certificate or articles of incorporation or by-laws, each as may be amended from time to time, as a matter of law, or otherwise, or any power that the Company may have to indemnify them or hold them harmless.

(j)     <u>Payments Following Accidents or Illness</u>.  If the Committee shall find that any Person to whom any amount is payable under the Plan is unable to care for his or her affairs because of illness or accident, or is a minor, or has died, then any payment due to such Person or his or her estate (unless a prior claim therefor has been made by a duly appointed legal representative) may, if the Committee so directs the Company, be paid to his or her spouse, child, relative, an institution maintaining or having custody of such Person, or any other Person deemed by the Committee to be a proper recipient on behalf of such Person otherwise entitled to payment.  Any such payment shall be a complete discharge of the liability of the Committee and the Company therefor.

(k)     <u>Governing Law</u>.  The Plan shall be governed by and construed in accordance with the laws of State of Delaware without reference to the principles of conflicts of laws thereof.

(l)     <u>Electronic Delivery</u>.  Any reference herein to a "written" agreement or document or "writing" will include any agreement or document delivered electronically or posted on the Company's intranet (or other shared electronic medium controlled or authorized by the Company to which the Participant has access) to the extent permitted by applicable law.

(m)     <u>Arbitration</u>.  All disputes and claims of any nature that a Participant (or such Participant's transferee or estate) may have against the Company arising out of or in any way related to the Plan or any Award Agreement shall be submitted to and resolved exclusively by binding arbitration conducted in New York City, New York (or such other location as the parties thereto may agree) in accordance with the applicable rules of the American Arbitration Association then in effect, and the arbitration shall be heard and determined by a panel of three arbitrators in accordance with such rules (except that in the event of any inconsistency between such rules and this Section 20(m), the provisions of this Section 20(m) shall control).  The arbitration panel may not modify the arbitration rules specified above without the prior written approval of all parties to the arbitration.  Within ten business days after the receipt of a written demand, each party shall designate one arbitrator, each of whom shall have experience involving complex business or legal matters, but shall not have any prior, existing or potential material business relationship with any party to the arbitration.  The two arbitrators so designated shall select a third arbitrator, who shall preside over the arbitration, shall be similarly qualified as the two arbitrators and shall have no prior, existing or potential material business relationship with any party to the arbitration; *provided* that if the two arbitrators are unable to agree upon the selection of such third arbitrator, such third arbitrator shall be designated in accordance with the

23

arbitration rules referred to above. The arbitrators will decide the dispute by majority decision, and the decision shall be rendered in writing and shall bear the signatures of the arbitrators and the party or parties who shall be charged therewith, or the allocation of the expenses among the parties in the discretion of the panel. The arbitration decision shall be rendered as soon as possible, but in any event not later than 120 days after the constitution of the arbitration panel. The arbitration decision shall be final and binding upon all parties to the arbitration. The parties hereto agree that judgment upon any award rendered by the arbitration panel may be entered in the United States District Court for the Southern District of New York or any New York State court sitting in New York City. To the maximum extent permitted by law, the parties hereby irrevocably waive any right of appeal from any judgment rendered upon any such arbitration award in any such court. Notwithstanding the foregoing, any party may seek injunctive relief in any such court.

        (n)    <u>Statute of Limitations</u>. A Participant or any other person filing a claim for benefits under the Plan must file the claim within one (1) year of the date the Participant or other person knew or should have known of the facts giving rise to the claim. This one-year statute of limitations will apply in any forum where a Participant or any other person may file a claim and, unless the Company waives the time limits set forth above in its sole discretion, any claim not brought within the time periods specified shall be waived and forever barred.

        (o)    <u>Funding</u>. No provision of the Plan shall require the Company, for the purpose of satisfying any obligations under the Plan, to purchase assets or place any assets in a trust or other entity to which contributions are made or otherwise to segregate any assets, nor shall the Company be required to maintain separate bank accounts, books, records, or other evidence of the existence of a segregated or separately maintained or administered fund for such purposes. Participants shall have no rights under the Plan other than as unsecured general creditors of the Company, except that insofar as they may have become entitled to payment of additional compensation by performance of services, they shall have the same rights as other employees and service providers under general law.

        (p)    <u>Reliance on Reports</u>. Each member of the Committee and each member of the Board shall be fully justified in relying, acting, or failing to act, and shall not be liable for having so relied, acted, or failed to act in good faith, upon any report made by the independent public accountant of the Company and its Affiliates and upon any other information furnished in connection with the Plan by any Person or Persons other than such member.

        (q)    <u>Titles and Headings</u>. The titles and headings of the sections in the Plan are for convenience of reference only, and in the event of any conflict, the text of the Plan, rather than such titles or headings, shall control.

\*     \*     \*

ADOPTED BY THE BOARD OF DIRECTORS: OCTOBER 14, 2019
APPROVED BY THE STOCKHOLDERS: NOVEMBER 7, 2019
TERMINATION DATE: NOVEMBER 7, 2029

24

**RESTRICTED STOCK GRANT NOTICE AND AGREEMENT**

AdaptHealth Corp. (the "***Company***"), pursuant to its 2019 Stock Incentive Plan (as may be amended, restated or otherwise modified from time to time, the "***Plan***"), hereby grants to Holder the number of shares of Restricted Stock set forth below.  The Restricted Stock is subject to all of the terms and conditions of this Restricted Stock Grant Notice and Agreement (this "***Award Agreement***"), as well as the terms and conditions of the Plan, all of which are incorporated herein in their entirety. To the extent that any provisions herein (or portion thereof) conflicts with any provision of the Plan, the Plan shall prevail and control.  Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Plan.  [The Restricted Stock granted hereby are in satisfaction of the obligation to grant the Restricted Stock to Holder under his, her or its employment letter with [●], dated [●], as may be amended, restated or otherwise modified from time to time.]

**Holder**: [●]

**Date of Grant**: [●], 20[●]

**Number of Shares of Restricted Stock**: [●]

**Vesting Schedule**: [Insert Vesting Schedule]

**Termination**: Section 6(c) of the Plan regarding Termination is incorporated herein by reference and made a part hereof.  Following any such Termination, the provisions of Section 10 of the Plan shall apply to all shares of Restricted Stock that have vested on or prior to such Termination.

**Additional Terms**: The Restricted Stock shall be subject to the following additional terms:

- Any certificates representing the vested Restricted Stock delivered to Holder shall be subject to such stop transfer orders and other restrictions as the Committee may deem advisable under the rules, regulations, and other requirements of the Securities and Exchange Commission, any stock exchange upon which such shares are listed, and any applicable federal or state laws, and the Committee may cause a legend or legends to be put on any such certificates to make appropriate reference to such restrictions as the Committee deems appropriate.

- Holder shall be the record owner of the shares of Restricted Stock until or unless such Restricted Stock is forfeited or repurchased, or otherwise sold or transferred in accordance with the terms of the Plan, and as record owner shall generally be entitled to all rights of a stockholder with respect to the Restricted Stock; *provided*, *however*, that the Company will retain custody of all dividends and distributions, if any ("***Retained Distributions***"), made or declared on the Restricted Stock (and such Retained Distributions shall be subject to forfeiture and the same restrictions, terms and vesting and

other conditions as are applicable to the Restricted Stock) until such time, if ever, as the Restricted Stock with respect to which such Retained Distributions shall have been made, paid or declared shall have become vested, and such Retained Distributions shall not bear interest or be segregated in a separate account. As soon as practicable following each applicable vesting date any applicable Retained Distributions shall be delivered to Holder.

- Upon vesting of the Restricted Stock (or such other time that the Restricted Stock is taken into income), Holder will be required to satisfy applicable withholding tax obligations, if any, as provided in Section 16 of the Plan.

- This Award Agreement does not confer upon Holder any right to continue as an employee or service provider of the Service Recipient or any other member of the Company Group.

- This Award Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware, without regard to the principles of conflicts of law thereof.

- Holder agrees that the Company may deliver by email all documents relating to the Plan or the Restricted Stock (including, without limitation, a copy of the Plan) and all other documents that the Company is required to deliver to its security holders (including, without limitation, disclosures that may be required by the Securities and Exchange Commission). Holder also agrees that the Company may deliver these documents by posting them on a website maintained by the Company or by a third party under contract with the Company. If the Company posts these documents on a website, it shall notify Holder by email or such other reasonable manner as then determined by the Company.

- This Award Agreement and the Plan constitute the entire understanding and agreement of the parties hereto and supersede all prior negotiations, discussions, correspondence, communications, understandings, and agreements (whether oral or written and whether express or implied) between the Company and Holder relating to the subject matter of this Award Agreement. Without limiting the foregoing, to the extent Holder has entered into an employment or similar agreement with the Company or any of its affiliates, and the terms noted in such employment or similar agreement are inconsistent with or conflict with this Award Agreement, then the terms of this Award Agreement will supersede and be deemed to amend and modify the inconsistent or conflicting terms set forth in such employment or similar agreement.

2

\* \* \*

3

**THE UNDERSIGNED HOLDER ACKNOWLEDGES RECEIPT OF THIS AWARD AGREEMENT AND THE PLAN, AND, AS AN EXPRESS CONDITION TO THE GRANT OF RESTRICTED STOCK HEREUNDER, AGREES TO BE BOUND BY THE TERMS OF BOTH THIS AWARD AGREEMENT AND THE PLAN.**

**ADAPTHEALTH CORP.**                                             **HOLDER**

By: _____                    _____

                Signature                                             Signature

Title: _____                 Print Name: _____

Date: _____                  Date: _____

[*Signature Page to Restricted Stock Grant Notice and Agreement*]

**OPTION GRANT NOTICE AND AGREEMENT**

AdaptHealth Corp. (the "***Company***"), pursuant to its 2019 Stock Incentive Plan (as may be amended, restated or otherwise modified from time to time, the "***Plan***"), hereby grants to Holder the number of Options (the "***Options***") set forth below, each Option representing the right to purchase one share of Stock at the applicable Exercise Price (set forth below).  The Options are subject to all of the terms and conditions set forth in this Option Grant Notice and Agreement (this "***Award Agreement***"), as well as all of the terms and conditions of the Plan, all of which are incorporated herein in their entirety.  To the extent that any provisions herein (or portion thereof) conflicts with any provision of the Plan, the Plan shall prevail and control.  Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Plan.  [The Options granted hereby are in satisfaction of the obligation to grant the Options to Holder under his, her or its employment letter with [•], dated [•], as may be amended, restated or otherwise modified from time to time.]

**Holder**: [•]

**Date of Grant**: [•], 20[•]

**Number of Options**: [•]

**Exercise Price**: $[•]

**Expiration Date**: The tenth (10th) anniversary of the Date of Grant

**Type of Option**: [Nonqualified][Incentive] Stock Option

**Vesting Schedule**: [Insert Vesting Schedule]

**Exercise of Options**: To exercise vested Options, Holder (or his, her or its authorized representative) must give written notice to the Company, using the form of Option Exercise Notice as proscribed by the Committee, stating the number of Options which he, she or it intends to exercise. The Company will issue the shares of Stock with respect to which the Options are exercised upon payment of the shares of Stock acquired in accordance with Section 5(d) of the Plan, which Section 5(d) is incorporated herein by reference and made a part hereof.

Upon exercise of Options, Holder will be required to satisfy applicable withholding tax obligations as provided in Section 16 of the Plan.

**Termination**: Section 5(f) of the Plan regarding treatment of Options upon Termination is incorporated herein by reference and made a part hereof.

**Additional Terms**: Options shall be subject to the following additional terms:

- Options shall be exercisable in whole shares of Stock only.

- Each Option shall cease to be exercisable as to any share of Stock

when Holder purchases the share of Stock or when the Option otherwise expires or is forfeited.

- Any certificates representing the shares of Stock delivered to Holder shall be subject to such stop transfer orders and other restrictions as the Committee may deem advisable under the rules, regulations, and other requirements of the Securities and Exchange Commission, any stock exchange upon which such shares are listed, and any applicable federal or state laws, and the Committee may cause a legend or legends to be put on any such certificates to make appropriate reference to such restrictions as the Committee deems appropriate.

- Holder shall be the record owner of the shares of Stock issued in respect of the Options, and as record owner shall generally be entitled to all rights of a stockholder with respect to the shares of Stock issued in respect of the Options.

- This Award Agreement does not confer upon Holder any right to continue as an employee or service provider of the Service Recipient or any other member of the Company Group.

- This Award Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware, without regard to the principles of conflicts of law thereof.

- Holder and the Company acknowledge that the Options are intended to be exempt from Section 409A of the Code, with the Exercise Price intended to be at least equal to the Fair Market Value per share of Stock on the Date of Grant. Holder acknowledges that there is no guarantee that the Internal Revenue Service will agree with this valuation, and agrees not to make any claim against the Company, the Committee, the Company's officers or employees in the event that the Internal Revenue Service or any other person, entity or agency asserts that the valuation was too low or that the Options are not otherwise exempt from Section 409A of the Code.

- Holder agrees that the Company may deliver by email all documents relating to the Plan or the Options (including, without limitation, a copy of the Plan) and all other documents that the Company is required to deliver to its security holders (including, without limitation, disclosures that may be required by the Securities and Exchange Commission). Holder also agrees that the Company may deliver these documents by posting them on a website maintained by the Company or by a third party under contract with the Company. If the Company posts these documents on a website, it shall notify Holder by email or such other reasonable manner as then

2

determined by the Company.

- This Award Agreement and the Plan constitute the entire understanding and agreement of the parties hereto and supersede all prior negotiations, discussions, correspondence, communications, understandings, and agreements (whether oral or written and whether express or implied) between the Company and Holder relating to the subject matter of this Award Agreement.  Without limiting the foregoing, to the extent Holder has entered into an employment or similar agreement with the Company or any of its affiliates, and the terms noted in such employment or similar agreement are inconsistent with or conflict with this Award Agreement, then the terms of this Award Agreement will supersede and be deemed to amend and modify the inconsistent or conflicting terms set forth in such employment or similar agreement.

\*      \*      \*

3

THE UNDERSIGNED HOLDER ACKNOWLEDGES RECEIPT OF THIS AWARD AGREEMENT AND THE PLAN, AND, AS AN EXPRESS CONDITION TO THE GRANT OF OPTIONS HEREUNDER, AGREES TO BE BOUND BY THE TERMS OF BOTH THIS AWARD AGREEMENT AND THE PLAN.

**ADAPTHEALTH CORP.**                                    **HOLDER**

By: _____                    _____
                Signature                                                    Signature

Title: _____          Print Name: _____
Date: _____           Date: _____

[*Signature Page to Option Grant Notice and Agreement*]



November 13, 2019

Office of the Chief Accountant
Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549

Ladies and Gentlemen:

We have read the statements of AdaptHealth Corp. (formally known as DFB Healthcare Acquisitions Corp.) included under Item 4.01 of its Form 8-K dated November 7, 2019. We agree with the statements concerning our Firm under Item 4.01, in which we were informed of our dismissal on November 8, 2019. We are not in a position to agree or disagree with other statements contained therein.

Very truly yours,

*WithumSmith+Brown, PC*

**WithumSmith+Brown, PC**

WithumSmith+Brown, PC    1411 Broadway, 9th Floor, New York, New York 10018-3496    T (212) 751 9100    F (212) 750 3262    withum.com

AN INDEPENDENT MEMBER OF HLB - THE GLOBAL ADVISORY AND ACCOUNTING NETWORK

| Subsidiaries (Alphabetically) | State of Inc. |
|---|---|
| AdaptHealth Holdings LLC | DELAWARE |
| AdaptHealth Intermediate Holdco | DELAWARE |
| AdaptHealth LLC | DELAWARE |
| Americoast LLC DBA Americoast of Maryland LLC | DELAWARE |
| Associated Healthcare Systems, Inc. | NEW YORK |
| Braden Partners, L.P. | CALIFORNIA |
| First Choice Home Medical Equipment, LLC | DELAWARE |
| Gould's Discount Medical, LLC | KENTUCKY |
| Home MediService, LLC | MARYLAND |
| Med Star Surgical & Breathing Equipment Inc. | NEW YORK |
| Med-Equip, Inc. | PENNSYLVANIA |
| Medstar Holdings LLC | DELAWARE |
| Ocean Home Health Supply LLC | NEW JERSEY |
| PPS HME Holdings LLC | DELAWARE |
| Roberts Home Medical, LLC | MARYLAND |
| Royal DME LLC | DELAWARE |
| Royal Homestar LLC | DELAWARE |
| Royal Medical Supply, Inc. | PENNSYLVANIA |
| TriCounty Medical Equipment and Supply, LLC | PENNSYLVANIA |
| Verus Healthcare, Inc. | DELAWARE |
| Verus Healthcare, LLC | DELAWARE |

2

**SELECTED HISTORICAL FINANCIAL INFORMATION OF ADAPTHEALTH**

The following table shows selected historical financial information of AdaptHealth Holdings for the periods and as of the dates indicated. The selected historical consolidated financial information of AdaptHealth Holdings as of December 31, 2018 and 2017 and for the years ended December 31, 2018, 2017 and 2016 was derived from the audited historical consolidated financial statements of AdaptHealth Holdings included or incorporated by reference elsewhere in this Current Report on Form 8-K. The selected historical interim condensed consolidated financial information of AdaptHealth Holdings as of September 30, 2019 and for the nine months ended September 30, 2019 and 2018 was derived from the unaudited interim condensed consolidated financial statements of AdaptHealth Holdings included or incorporated by reference elsewhere in this Current Report on Form 8-K.

AdaptHealth Holdings' historical results are not necessarily indicative of future operating results. The selected consolidated financial information should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations of AdaptHealth," as well as the historical consolidated financial statements of AdaptHealth Holdings and accompanying notes included or incorporated by reference elsewhere in this Current Report on Form 8-K.

| (in thousands) Statements of Operations Data: | Nine Months Ended September 30, | | | | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2019 | | 2018 | | 2018 | | 2017 | | 2016 | |
| | (unaudited) | | | | | | | | | |
| Total net revenue | $ | 380,103 | $ | 236,625 | $ | 345,278 | $ | 192,559 | $ | 174,316 |
| Net (loss) income attributable to AdaptHealth Holdings | $ | (11,570) | $ | 19,756 | $ | 23,260 | $ | 9,687 | $ | (4,183) |

| (in thousands) Balance Sheet Data: | As of September 30, | | As of December 31, | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2019 | | 2018 | | 2017 | |
| | (unaudited) | | | | | |
| Total assets | $ | 427,987 | $ | 368,957 | $ | 111,984 |
| Total long-term obligations, including current portion | $ | 456,523 | $ | 158,415 | $ | 66,935 |

The following table sets forth selected elements of AdaptHealth Holdings' Consolidated Statements of Cash Flows:

| (in thousands) | Nine Months Ended September 30, | | | | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2019 | | 2018 | | 2018 | | 2017 | | 2016 | |
| | (unaudited) | | | | | | | | | |
| Net Cash provided by Operating Activities | $ | 43,174 | $ | 43,147 | $ | 68,427 | $ | 45,930 | $ | 29,936 |
| Net Cash used in Investing Activities | $ | (62,399) | $ | (86,048) | $ | (96,284) | $ | (15,077) | $ | (2,676) |
| Net Cash provided by (used in) Financing Activities | $ | 2,862 | $ | 59,528 | $ | 48,769 | $ | (30,263) | $ | (27,580) |

The following table sets forth EBITDA, Adjusted EBITDA and Adjusted EBITDA less Patient Equipment Capex:

| (in thousands) | Nine Months Ended September 30, | | Year Ended December 31, | | |
| --- | --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2018 | 2017 | 2016 |
| | | | (unaudited) | | |
| EBITDA | $71,938 | $54,130 | $77,569 | $43,580 | $28,886 |
| Adjusted EBITDA | $89,352 | $58,734 | $84,447 | $45,035 | $33,104 |
| Adjusted EBITDA less Patient Equipment Capex | $53,763 | $30,828 | $45,083 | $19,186 | $7,625 |

The following table reconciles net income (loss) attributable to AdaptHealth Holdings, the most directly comparable GAAP measure, to EBITDA, Adjusted EBITDA and Adjusted EBITDA less Patient Equipment Capex:

| (in thousands) | Nine Months Ended September 30, | | Year Ended December 31, | | |
| --- | --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2018 | 2017 | 2016 |
| | | | (unaudited) | | |
| Net (loss) income attributable to AdaptHealth Holdings LLC | $ (11,570) | $ 19,756 | $ 23,260 | $ 9,687 | $ (4,183) |
| Income attributable to noncontrolling interest | 1,336 | 681 | 1,077 | 580 | 563 |
| Interest expense (income) - Excluding change in FV of interest rate swaps | 19,292 | 5,481 | 8,000 | 5,041 | 5,761 |
| Interest expense (income) - Change in FV of interest rate swaps | 12,359 | (281) | (547) | — | — |
| Income tax expense (benefit) | 5,444 | (4,519) | (2,098) | 249 | (208) |
| Depreciation | 45,077 | 33,012 | 47,877 | 27,816 | 26,563 |
| Loss from discontinued operations, net of tax | — | — | — | 207 | 390 |
| **EBITDA** | **71,938** | **54,130** | **77,569** | **43,580** | **28,886** |
| Loss on extinguishment of debt, net (a) | 2,121 | 1,399 | 1,399 | 324 | — |
| Equity-based compensation expense (b) | 5,806 | 571 | 884 | 49 | 49 |
| Transaction costs (c) | 8,232 | 1,342 | 2,514 | — | — |
| Severance (d) | 721 | 1,198 | 1,920 | 826 | 430 |
| Non-recurring expenses (e) | 534 | 94 | 161 | 256 | 3,739 |
| **Adjusted EBITDA** | **89,352** | **58,734** | **84,447** | **45,035** | **33,104** |
| Less: Patient equipment capex (f) | (35,589) | (27,906) | (39,364) | (25,849) | (25,479) |
| **Adjusted EBITDA less Patient Equipment Capex** | **$ 53,763** | **$ 30,828** | **$ 45,083** | **$ 19,186** | **$ 7,625** |

| | |
| --- | --- |
| (a) | Represents write off of deferred financing costs and prepayment penalty expense related to refinancing of debt offset by gain on debt extinguishment. |
| (b) | Represents amortization of equity-based compensation to employees and expense resulting from accelerated vesting of certain profit interests. |
| (c) | Represents transaction costs primarily related to acquisition growth, the 2019 Recapitalization, and costs related to the Business Combination. |
| (d) | Represents severance costs related to acquisition integration and internal AdaptHealth Holdings restructuring and workforce reduction activities. |
| (e) | Represents one-time legal and consulting expenses, in addition to certain non-recurring expenses. |
| (f) | Represents patient equipment acquired during the respective period without regard to the manner in which the equipment was financed. |

**UNAUDITED PRO FORMA CONDENSED**
**COMBINED FINANCIAL INFORMATION OF DFB**

The following unaudited pro forma condensed combined information presents the unaudited pro forma condensed combined balance sheet as of September 30, 2019 and the unaudited pro forma condensed combined statements of operations for nine months ended September 30, 2019 and the year ended December 31, 2018 based upon the combined historical financial statements of DFB Acquisitions Corp., a Delaware corporation ("DFB") and AdaptHealth Holdings LLC, a Delaware limited liability company ("AdaptHealth Holdings"), after giving effect to the series of transactions in connection with the approval and adoption of the Merger Agreement, dated as of July 8, 2019 (as amended on October 15, 2019) by and among DFB, AdaptHealth Holdings, BM AH Holdings, LLC, a Delaware limited liability company (the "BM Blocker"), Access Point Medical, Inc., a Delaware corporation (the "A Blocker" and, together with the BM Blocker, the "Blockers"), DFB Merger Sub LLC, a Delaware limited liability company ("Merger Sub"), AH Representative LLC, a Delaware limited liability company (the "Company Unitholders' Representative"), solely for purposes of Section 7.20 thereof, the BlueMountain Foinaven Master Fund L.P., a Cayman Islands exempted limited partnership, BMSP L.P., a Delaware limited partnership, and BlueMountain Fursan Fund L.P., a Cayman Islands exempted limited partnership (collectively, "BM Blocker Sellers") and, solely for purposes of Section 7.21 thereof, Clifton Bay Offshore Investments L.P., a British Virgin Islands limited partnership (the "A Blocker Seller" and together with the BM Blocker Sellers, the "Blocker Sellers"), pursuant to which DFB acquired 56% of the economic and voting interests of AdaptHealth Holdings (collectively, the "Business Combination") and related adjustments described in the accompanying notes. Under applicable accounting standards, AdaptHealth Holdings will be the accounting acquirer in the Business Combination, which will be treated as a reverse recapitalization. The accounting guidance for business combinations, FASB Accounting Standards Codification (ASC) 805, provides that in identifying the acquiring entity in a transaction effected through an exchange of equity interests, all pertinent facts and circumstances must be considered, including: the relative voting rights of the stockholders of the constituent companies in the combined company, the existence of a large minority voting interest in the combined entity if no other owner or organized group of owners has a significant voting interest, the composition of the board of directors and senior management of the combined company, the relative size of each company and the terms of the exchange of equity securities in the transaction, including payment of any premium.

The unaudited pro forma condensed combined statements of operations for the nine months ended September 30, 2019 and for the fiscal year ended December 31, 2018 give pro forma effect to the Business Combination as if it had occurred on January 1, 2018. The unaudited pro forma condensed combined balance sheet as of September 30, 2019 gives pro forma effect to the Business Combination as if it was completed on September 30, 2019. Additionally, the unaudited pro forma condensed combined statement of operations for the fiscal year ended December 31, 2018 gives pro forma effect to the acquisitions by AdaptHealth Holdings of PPS HME Holdings LLC ("PPS") on May 17, 2018, Verus Healthcare, Inc. ("Verus") on May 17, 2018, Home Medical Express Inc. ("HMEI") on July 31, 2018 and Gould's Discount Medical ("Gould's") on January 2, 2019, as if they had occurred on January 1, 2018.

The unaudited pro forma condensed combined financial information should be read in conjunction with the audited and unaudited historical financial statements of each of DFB, AdaptHealth Holdings, PPS and Verus and the notes thereto, as well as the disclosures contained in the sections titled "Management's Discussion and Analysis of Financial Condition and Results of Operations of DFB" and "Management's Discussion and Analysis of Financial Condition and Results of Operations of AdaptHealth," included or incorporated by reference elsewhere in this Current Report on Form 8-K.

The unaudited pro forma condensed combined statements of operations for the year ended December 31, 2018 do not give effect to the impact on total costs and expenses of cost savings and synergies resulting from the favorable vendor pricing in the pre-acquisition period of entities acquired by AdaptHealth Holdings. These pre-acquisition cost savings and synergies are estimated at $2.3 million on a pro forma basis for the year ended December 31, 2018. These synergies are effective starting the date of each acquisition and therefore are captured in the results for the period ended September 30, 2019.

The unaudited pro forma condensed combined financial information is provided for informational purposes only and is not necessarily indicative of the operating results or financial position that would have occurred if the

Business Combination had been completed as of the dates set forth above, nor is it indicative of the future results or financial position of the combined company. The unaudited pro forma condensed combined financial information also does not give effect to the potential impact, of any anticipated synergies, operating efficiencies or cost savings that may result from the Business Combination, any integration costs or tax deductibility of transaction costs. Furthermore, the unaudited pro forma condensed combined statements of operations do not include certain nonrecurring charges and the related tax effects which result directly from the Business Combination as described in the notes to the unaudited pro forma condensed combined financial information.

2

**DFB HEALTHCARE ACQUISITIONS CORP.**
**UNAUDITED PRO FORMA CONDENSED COMBINED BALANCE SHEET**
**September 30, 2019**

| (in thousands) | DFB Reclassified(1) | | AdaptHealth Historical | | Pro Forma Adjustments | | Note 4 | Pro Forma Combined | |
|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | |
| **Current assets:** | | | | | | | | | |
| Cash and cash equivalents | $ | 622 | $ | 8,823 | $ | 50,783 | (a) | $ | 60,228 |
| Accounts receivable, net | | — | | 73,670 | | — | | | 73,670 |
| Inventory | | — | | 14,234 | | — | | | 14,234 |
| Prepaid and other current assets | | 125 | | 6,350 | | — | | | 6,475 |
| Total current assets | | 747 | | 103,077 | | 50,783 | | | 154,607 |
| Equipment and other fixed assets, net | | — | | 66,706 | | — | | | 66,706 |
| Goodwill | | — | | 245,346 | | — | | | 245,346 |
| Cash and marketable securities held in Trust Account | | 255,880 | | — | | (255,880) | (b) | | — |
| Other assets | | — | | 5,893 | | — | | | 5,893 |
| Deferred tax asset | | — | | 6,965 | | 26,422 | (c) | | 33,387 |
| **Total assets** | $ | 256,627 | $ | 427,987 | $ | (178,675) | | $ | 505,939 |
| **Liabilities and Stockholders'/Members' Equity (Deficit)** | | | | | | | | | |
| **Current liabilities:** | | | | | | | | | |
| Accounts payable and accrued expenses | $ | 3,154 | $ | 90,456 | $ | (5,436) | (d) | $ | 88,174 |
| Current portion of capital lease obligations | | — | | 21,656 | | — | | | 21,656 |
| Current portion of long-term debt | | — | | 8,894 | | — | | | 8,894 |
| Deferred revenue | | — | | 9,097 | | — | | | 9,097 |
| Other liabilities | | 44 | | 8,609 | | — | | | 8,653 |
| Total current liabilities | | 3,198 | | 138,712 | | (5,436) | | | 136,474 |
| Long-term debt, less current portion | | — | | 410,538 | | (35,000) | (f) | | 375,538 |
| Capital lease obligations, less current portion | | — | | 236 | | — | | | 236 |
| Other long-term liabilities | | 7,875 | | 15,199 | | (7,875) | (d) | | 20,292 |
| | | | | | | 5,093 | (e) | | |
| Total liabilities | | 11,073 | | 564,685 | | (43,218) | | | 532,540 |
| **Commitments and contingencies** | | | | | | | | | |
| Total stockholders'/members' equity (deficit) | | 245,554 | | (139,561) | | (113,108) | (g) | | (7,115) |
| Total stockholders'/members' equity (deficit) attributable to AdaptHealth Holdings LLC | | 245,554 | | (139,561) | | (113,108) | | | (7,115) |
| Noncontrolling interest in subsidiaries | | — | | 2,863 | | (22,349) | (g) | | (19,486) |
| Total stockholders'/members' equity (deficit) | | 245,554 | | (136,698) | | (135,457) | | | (26,601) |
| **Total Liabilities and Stockholders'/Members' Equity (Deficit)** | $ | 256,627 | $ | 427,987 | $ | (178,675) | | $ | 505,939 |

---

(1)    Refer to Note 2 for reclassification of DFB historical information.

3

**DFB HEALTHCARE ACQUISITIONS CORP.**
**UNAUDITED PRO FORMA CONDENSED COMBINED STATEMENT OF OPERATIONS**
**FOR THE NINE MONTHS ENDED SEPTEMBER 30, 2019**

| (in thousands except share and per share amounts) | DFB Reclassified(1) | AdaptHealth Pro Forma(2) | Pro Forma Adjustments | Note 4 | Pro Forma Combined |
|---|---|---|---|---|---|
| **Revenue:** | | | | | |
| Revenue, net of contractual allowances and discounts | $　　— | $　400,958 | $　　— | | $　400,958 |
| Provision for doubtful accounts | — | (20,855) | — | | (20,855) |
| **Net revenue less provision for doubtful accounts** | — | 380,103 | — | | 380,103 |
| Costs and expenses: | | | | | |
| Cost of net revenue | — | 316,790 | — | | 316,790 |
| General and administrative expenses | 3,436 | 23,590 | (7,627) | (h) | 19,399 |
| Depreciation, excluding patient equipment depreciation | — | 2,439 | — | | 2,439 |
| **Total costs and expenses** | 3,436 | 342,819 | (7,627) | | 338,628 |
| **Operating (loss) income** | (3,436) | 37,284 | 7,627 | | 41,475 |
| Interest (income) expense | (4,314) | 31,651 | (1,151) | (i) | 26,186 |
| Loss on extinguishment of debt, net | — | 2,121 | (2,121) | (j) | — |
| **Income before income taxes** | 878 | 3,512 | 10,899 | | 15,289 |
| Income tax expense | 874 | 5,444 | (4,191) | (k) | 2,127 |
| **Net income** | 4 | (1,932) | 15,090 | | 13,162 |
| Income attributable to noncontrolling interest | — | 1,336 | 6,139 | (l) | 7,475 |
| **Net income attributable to AdaptHealth Corp.** | $　　4 | $　(3,268) | $　8,951 | | $　5,687 |
| Weighted average common shares outstanding—basic and diluted | 25,000,000 | | 15,296,166 | (m) | 40,296,166 |
| Net income attributable to AdaptHealth Corp. per share—basic and diluted | 0.13 | | | | 0.14 |
| Weighted average founder shares outstanding—basic and diluted | 6,250,000 | | (6,250,000) | (n) | — |
| Net income attributable to founder share holders per share—basic and diluted | (0.53) | | | | — |

---

(1)     Refer to Note 2 for reclassification of DFB historical information.

(2)     Refer to Note 3 for reclassification of AdaptHealth historical information.

4

**DFB HEALTHCARE ACQUISITIONS CORP.**
**UNAUDITED PRO FORMA CONDENSED COMBINED STATEMENT OF OPERATIONS**
**FOR THE YEAR ENDED DECEMBER 31, 2018**

| (in thousands except share and per share amounts) | DFB Reclassified(1) | AdaptHealth Pro Forma(2) | Pro Forma Adjustments | Note 4 | Pro Forma Combined |
|---|---|---|---|---|---|
| **Revenue:** | | | | | |
| Revenue, net of contractual allowances and discounts | $ — | $ 469,233 | $ — | | $ 469,233 |
| Provision for doubtful accounts | — | (26,053) | — | | (26,053) |
| **Net revenue less provision for doubtful accounts** | **—** | **443,180** | **—** | | **443,180** |
| **Costs and expenses:** | | | | | |
| Cost of net revenue | — | 389,421 | | | 389,421 |
| General and administrative expenses | 1,234 | 15,633 | (500) | (h) | 16,367 |
| Depreciation, excluding patient equipment depreciation | — | 5,253 | — | | 5,253 |
| **Total costs and expenses** | **1,234** | **410,307** | **(500)** | | **411,041** |
| **Operating (loss) income** | **(1,234)** | **32,873** | **500** | | **32,139** |
| Interest expense | (4,150) | 7,827 | (1,534) | (i) | 2,143 |
| Loss on extinguishment of debt, net | — | 1,399 | (1,399) | (j) | — |
| **Income before income taxes** | **2,916** | **23,647** | **3,433** | | **29,996** |
| Income tax expense (benefit) | 830 | (3,100) | 6,443 | (k) | 4,173 |
| **Net income** | **2,086** | **26,747** | **(3,010)** | | **25,823** |
| Income attributable to noncontrolling interest | — | 1,077 | 12,724 | (l) | 13,801 |
| **Net income attributable to AdaptHealth Corp.** | **$ 2,086** | **$ 25,670** | **$ (15,734)** | | **$ 12,022** |
| Weighted average common shares outstanding—basic and diluted | 25,000,000 | | 15,296,166 | (m) | 40,296,166 |
| Net income attributable to AdaptHealth Corp. per share—basic and diluted | 0.11 | | | | 0.30 |
| Weighted average founder shares outstanding—basic and diluted | 6,250,000 | | (6,250,000) | (n) | — |
| Net income attributable to founder share holders per share—basic and diluted | (0.13) | | | | — |

---

(1)   Refer to Note 2 for reclassification of DFB historical information.

(2)   Refer to Note 3 for reclassification of AdaptHealth historical information.

5

**NOTES TO UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS**

**Note 1—Description of the Business Combination**

*Basis of presentation*

The historical financial information has been adjusted in the unaudited pro forma condensed combined financial information to give effect to events that are (1) directly attributable to the Business Combination, (2) factually supportable, and (3) with respect to the statement of operations, expected to have a continuing impact on the combined results. The pro forma adjustments are prepared to illustrate the estimated effect of the Business Combination and certain other adjustments.

DFB's historical results reflect the audited consolidated statement of income for the year ended December 31, 2018, unaudited condensed consolidated balance sheet as of September 30, 2019 and unaudited condensed consolidated statement of income for the nine months ended September 30, 2019 under GAAP. AdaptHealth Holdings' historical results reflect AdaptHealth Holdings' audited consolidated statement of operations for the year ended December 31, 2018, unaudited condensed consolidated balance sheet as of September 30, 2019 and unaudited condensed consolidated statement of operations for the nine months ended September 30, 2019 under GAAP.

*Description of the Business Combination*

On July 8, 2019, DFB, Merger Sub, AdaptHealth Holdings, the Blocker Companies, AdaptHealth Holdings Unitholders' Representative named therein and, solely for the purposes specified therein, the Blocker Sellers entered into the Merger Agreement, pursuant to which the parties undertook a series of transactions at the Closing that resulted in AdaptHealth Holdings becoming a partially owned subsidiary of DFB. On October 15, 2019, the parties entered into the Merger Agreement Amendment to, among other things, remove the minimum cash closing condition, adding a new condition to the Closing with respect to the absence, since the date of the Merger Agreement Amendment, of the commencement of a material investigation or action against AdaptHealth Holdings by certain healthcare regulatory authorities, and amend and restate the forms of certain of the Related Agreements. The completion of the Business Combination (the "Closing") occurred on November 8, 2019. After completion of the Business Combination, the combined company now operates under the name AdaptHealth Corp.

To effect the Business Combination, the parties executed the following steps:

- the merger of each of the Blocker Companies with and into DFB, with DFB surviving;

- the merger of Merger Sub with and into AdaptHealth Holdings, with AdaptHealth Holdings surviving; and

- the contribution by DFB to AdaptHealth Holdings of all of its available funds in exchange for equity interests in AdaptHealth Holdings.

The following table represents the structure of the combined company upon the Closing of the Business Combination:

6



Upon the Closing of the Business Combination, the former owners of AdaptHealth Holdings hold approximately 49% of the economic interest in AdaptHealth Corp. and the former stockholders of DFB hold the remaining approximately 51% of the economic interests in AdaptHealth Corp., both in the form of shares of the AdaptHealth Corp.'s Class A Common Stock, par value $0.0001 per share ("Class A Common Stock"). AdaptHealth Corp owns approximately 56% of the combined company with the remaining 44% owned by the former owners of AdaptHealth Holdings in the form of common units representing limited liability company interests in AdaptHealth Holdings from and after the Closing ("New AdaptHealth Units"). Under applicable accounting standards, AdaptHealth Holdings is the accounting acquirer in the Business Combination, which was treated as a reverse recapitalization. Accordingly, for accounting purposes, the Business Combination is treated as the equivalent of AdaptHealth Holdings issuing stock for the net assets of DFB, accompanied by a recapitalization. Net assets of DFB will be stated at historical costs, with no goodwill or intangible assets recorded.

Following the Closing of the Business Combination, the combined results of DFB and AdaptHealth Holdings will be consolidated with the holders of Class A Common Stock owning an approximately 56% direct controlling interest and the holders of New AdaptHealth Units owning an approximately 44% direct noncontrolling economic interest shown as noncontrolling interest in the financial statements of the combined entity. The approximately 44% direct noncontrolling economic interest in AdaptHealth Holdings held by the current owners of AdaptHealth Holdings noted above is in the form of New AdaptHealth Units and are exchangeable on a one-to-one basis for Class A Common Stock. The approximately 44% direct noncontrolling economic interest will continue to decrease as New AdaptHealth Units are exchanged for shares of Class A Common Stock.

The following table sets forth the net assets of DFB:

| (in thousands) | | |
|---|---|---|
| Current assets | $ | 747 |
| Cash held in trust | | 255,880 |
| Current liabilities | | (3,198) |
| Other long-term liabilities | | (7,875) |
| Net assets acquired | $ | 245,554 |

7

*Sources and Uses (in thousands)*

| Sources | | | Uses | | |
|---|---|---:|---|---|---:|
| DFB Cash | $ | 255,880 | Cash to balance sheet(2) | $ | 50,783 |
| PIPE(1) | | 125,000 | SPAC redemptions | | 213,665 |
| | | | Legacy AdaptHealth redemptions(3) | | 20,000 |
| | | | Debt repayment(4) | | 78,500 |
| | | | Deal expenses(5) | | 17,932 |
| Total Sources | $ | 380,880 | Total Uses | $ | 380,880 |

(1)     Represents the issuance, in a private placement consummated concurrently with the Closing, of 12,500,000 shares of Class A Common Stock.

(2)     Represents remaining cash that will be used to fund operations and working capital needs of the Company after the closing of the Business Combination.

(3)     Represents cash that was used to fund redemptions made by legacy AdaptHealth Holdings investors.

(4)     Represents the amount of debt that the combined company paid down upon closing of the Business Combination.

(5)     Represents the amount of deal expenses incurred in connection with the Closing of the Business Combination.

### Basis of the Pro Forma Presentation

Upon consummation of the Business Combination, DFB adopted AdaptHealth Holdings' accounting policies. AdaptHealth Holdings may identify differences between the accounting policies among the companies, that when conformed, could have a material impact on the consolidated financial statements of the combined entity.

### Note 2—Reclassifications to Historical Financial Information of DFB

Certain balances and transactions presented in the historical financial statements of DFB included within the unaudited pro forma condensed combined financial information have been reclassified to conform to the presentation of financial statements of AdaptHealth Holdings as indicated in the tables below.

### DFB Balance Sheet Reclassifications at September 30, 2019

| (in thousands) | | As per Financial Statements | | Reclassifications | | As Reclassified |
|---|---|---:|---|---:|---|---:|
| **Assets** | | | | | | |
| Accounts payable | $ | 29 | $ | (29) | $ | — |
| Accrued expenses | | 3,125 | | (3,125) | | — |
| Accounts payable and accrued expenses | | — | | 3,154 | | 3,154 |
| Other liabilities | | — | | 44 | | 44 |
| Franchise tax payable | | 44 | | (44) | | — |
| Deferred underwriting commissions | | 7,875 | | (7,875) | | — |
| Other long-term liabilities | | — | | 7,875 | | 7,875 |

8

*DFB Statement of Operations Reclassifications for the Nine Months Ended September 30, 2019*

| (in thousands) | As per Financial Statements | | Reclassifications | | As Reclassified |
|---|---|---|---|---|---|
| General and administrative expenses | $ | 3,286 | $ | 150 | $ | 3,436 |
| State franchise taxes | | 150 | | (150) | | — |

*DFB Statement of Operations Reclassification for the Year Ended December 31, 2018*

| (in thousands) | As per Financial Statements | | Reclassifications | | As Reclassified |
|---|---|---|---|---|---|
| General and administrative expenses | $ | 1,036 | $ | 198 | $ | 1,234 |
| State franchise taxes | | 198 | | (198) | | — |

**Note 3—Reclassifications and Adjustments to Historical Information of AdaptHealth**

**(a) Pro forma financial statement of operations of AdaptHealth**

The following table provides the pro forma statement of operations of AdaptHealth Holdings for the nine months ended September 30, 2019.

9

**ADAPTHEALTH PRO FORMA FINANCIAL STATEMENT OF OPERATIONS**
**FOR THE NINE MONTHS ENDED SEPTEMBER 30, 2019**

| (in thousands) | AdaptHealth Historical | | Pro Forma Adjustments | | AdaptHealth Pro Forma | |
|---|---|---|---|---|---|---|
| Revenue: | | | | | | |
| Revenue, net of contractual allowances and discounts | $ | 400,958 | $ | — | $ | 400,958 |
| Provision for doubtful accounts | | (20,855) | | — | | (20,855) |
| Net revenue less provision for doubtful accounts | | 380,103 | | — | | 380,103 |
| Costs and expenses: | | | | | | |
| Cost of net revenue | | 317,174 | | (384)(1) | | 316,790 |
| General and administrative expenses | | 31,508 | | (7,918)(1) | | 23,590 |
| Depreciation, excluding patient equipment depreciation | | 2,439 | | — | | 2,439 |
| Total costs and expenses | | 351,121 | | (8,302) | | 342,819 |
| Operating income | | 28,982 | | 8,302 | | 37,284 |
| Interest expense (2) | | 31,651 | | — | | 31,651 |
| Loss on extinguishment of debt, net | | 2,121 | | — | | 2,121 |
| (Loss) income before income taxes | | (4,790) | | 8,302 | | 3,512 |
| Income tax expense | | 5,444 | | | | 5,444 |
| Net (loss) income | | (10,234) | | 8,302 | | (1,932) |
| Income attributable to noncontrolling interest | | 1,336 | | — | | 1,336 |
| Net (loss) income attributable to AdaptHealth Corp. | $ | (11,570) | $ | 8,302 | $ | (3,268) |

(1)     Represents the elimination of non-recurring transaction costs specifically incurred by AdaptHealth for various acquisitions in the period.

(2)     Interest expense includes a non-cash expense of $12.4 million representing the change in fair value of AdaptHealth Holdings' interest rate swaps.

10

The following table provides the pro forma statement of operations of AdaptHealth Holdings for year the ended December 31, 2018 as if PPS, Verus, HMEI and Gould's had been acquired on January 1, 2018. PPS and Verus were acquired by AdaptHealth Holdings on May 18, 2018. HMEI and Gould's were acquired by AdaptHealth Holdings on July 31, 2018 and January 2, 2019, respectively. The pro forma results do not include any anticipated cost synergies or other effects of the planned integration of PPS, Verus, HMEI and Gould's, which are estimated to be $2.3 million on a pro forma basis for the year ended December 31, 2018.

11

**ADAPTHEALTH PRO FORMA FINANCIAL STATEMENT OF OPERATIONS**
**FOR THE YEAR ENDED DECEMBER 31, 2018**

| (in thousands) | AdaptHealth Historical | PPS Reclassified(1) | Verus Reclassified(2) | HMEI Historical | Gould's Historical | Pro Forma Adjustments | AdaptHealth Pro Forma |
|---|---|---|---|---|---|---|---|
| Revenue: | | | | | | | |
| Revenue, net of contractual allowances and discounts | $ 361,054 | $ 32,841 | $ 31,211 | $ 10,770 | $ 33,357 | $ — | $ 469,233 |
| Provision for doubtful accounts | (15,776) | (3,716) | (4,866) | (1,652) | (43) | — | (26,053) |
| Net revenue less provision for doubtful accounts | 345,278 | 29,125 | 26,345 | 9,118 | 33,314 | — | 443,180 |
| Costs and expenses: | | | | | | | |
| Cost of net revenue | 293,384 | 34,283 | 31,192 | 8,562 | 28,124 | (6,124)(3) | 389,421 |
| General and administrative expenses | 18,069 | — | — | — | — | (2,436)(3) | 15,633 |
| Depreciation, excluding patient equipment depreciation | 2,734 | 816 | 1,332 | 7 | 364 | — | 5,253 |
| Total costs and expenses | 314,187 | 35,099 | 32,524 | 8,569 | 28,488 | (8,560) | 410,307 |
| Operating income (loss) | 31,091 | (5,974) | (6,179) | 549 | 4,826 | 8,560 | 32,873 |
| Interest expense (income) | 7,453 | — | 272 | 115 | (13) | — | 7,827 |
| Loss on extinguishment of debt, net | 1,399 | — | — | — | — | — | 1,399 |
| Income (loss) before income taxes | 22,239 | (5,974) | (6,451) | 434 | 4,839 | 8,560 | 23,647 |
| Income tax (benefit) expense | (2,098) | — | (1,593) | — | $ 591 | — | (3,100) |
| Net income (loss) | 24,337 | (5,974) | (4,858) | 434 | 4,248 | 8,560 | 26,747 |
| Income attributable to noncontrolling interest | 1,077 | — | — | — | — | — | 1,077 |
| Net income (loss) attributable to AdaptHealth Corp. | $ 23,260 | $ (5,974) | $ (4,858) | $ 434 | $ 4,248 | $ 8,560 | $ 25,670 |

(1)    Refer to Note 3(b) for reclassification of PPS historical information.

(2)    Refer to Note 3(c) for reclassification of Verus historical information.

(3)    Represents the elimination of non-recurring transaction costs specifically incurred by AdaptHealth, PPS and Verus in connection with the business combinations.

12

**(b) Reclassifications and adjustments to historical information of PPS**

Certain balances and transactions presented in the historical financial statements of PPS included within the unaudited pro forma condensed combined financial information have been reclassified to conform to the presentation of financial statements of AdaptHealth Holdings as indicated in the table below.

**PPS Statement of Operations Reclassifications for the Period January 1, 2018 through May 17, 2018**

| (in thousands) | As per Financial Statements | | Reclassifications | | As Reclassified |
|---|---|---|---|---|---|
| Costs and expenses: | | | | | |
| Cost of net revenue | $ | — | $ 34,283 | $ | 34,283 |
| Depreciation, excluding patient equipment depreciation | | — | 816 | | 816 |
| Cost of goods sold | | 7,736 | (7,736) | | — |
| Salaries, labor and benefits | | 14,426 | (14,426) | | — |
| Depreciation | | 4,761 | (4,761) | | — |
| Amortization | | 567 | (567) | | — |
| Rent and occupancy expenses | | 1,484 | (1,484) | | — |
| Other operating expenses | | 6,169 | (6,169) | | — |
| Other expense (income) | | (44) | 44 | | — |

**(c) Reclassifications and adjustments to historical information of Verus**

Certain balances and transactions presented in the historical financial statements of Verus included within the unaudited pro forma condensed combined financial information have been reclassified to conform to the presentation of financial statements of AdaptHealth Holdings as indicated in the table below.

**Verus Statement of Operations Reclassifications for the Period January 1, 2018 through May 17, 2018**

| (in thousands) | As per Financial Statements | | Reclassifications | | As Reclassified |
|---|---|---|---|---|---|
| Costs and expenses: | | | | | |
| Cost of net revenue | $ | 15,483 | $ 15,709 | $ | 31,192 |
| Operating expenses | | 17,012 | (17,012) | | — |
| Depreciation, excluding patient equipment depreciation | | — | 1,332 | | 1,332 |
| Loss on disposal of equipment | | 29 | (29) | | — |

**Note 4—Pro Forma Adjustments**

**Adjustments to the Unaudited Pro Forma Condensed Combined Balance Sheet (in thousands)**

The pro forma adjustments included in the unaudited pro forma condensed combined balance sheet as of September 30, 2019 are as follows:

a)   See Note 1—*Sources and Uses* for impact of the Business Combination on the cash balance, which resulted in net cash of $50,783 to the balance sheet of the combined entity.

b)   See Note 1—*Sources and Uses* for the release of the restricted investments and cash held in the Trust Account upon consummation of the Business Combination to fund the Closing.

c)   Represents adjustments to reflect applicable deferred tax. The deferred taxes are primarily related to the difference between the financial statement and tax basis in the investment in AdaptHealth Holdings. This basis difference primarily results from the Business Combination where DFB

13

recorded a carryover basis on all assets for financial accounting purposes and a fair value step-up on a portion of the assets for income tax purposes. The $26,422 adjustment related to the deferred tax asset is assuming: (1) the GAAP balance sheet as of September 30, 2019 adjusted for the pro forma entries described herein, (2) estimated tax basis as of September 30, 2019 adjusted for the pro forma entries described herein, (3) a valuation allowance of $32,891, (4) a constant federal income tax rate of 21.0% and a state tax rate of 4.0%, and (5) no material changes in tax law. The recorded valuation allowance relates to a portion of DFB's tax basis in excess of GAAP basis in its investment in AdaptHealth Holdings for which DFB believes it is not more likely than not that it will realize a tax benefit in the future.

d)      Represents the payment of $5,436 of accrued transaction expenses and $7,875 of deferred underwriting costs incurred as part of DFB's initial public offering and committed to be paid in connection with the Closing of the Business Combination.

e)      Upon the completion of the Business Combination, DFB will be a party to a tax receivable agreement. Under the terms of that agreement, DFB generally will be required to pay to the Non-Blocker AdaptHealth Members 85% of the applicable cash savings, if any, in U.S. federal and state income tax that DFB is deemed to realize in certain circumstances as a result of certain tax attributes that are created as a result of (i) the sales of their AdaptHealth Holdings Common Units for shares of Class A common stock or the cash equivalent thereof and (ii) tax benefits attributable to payments made under this tax receivable agreement. Additionally, DFB generally will be required to pay to the owners of each of the Blocker Companies 85% of the amount of cash savings, if any, that DFB is deemed to realize as a result of any tax attributes of the Blocker Companies which are inherited by DFB in the Blocker Mergers. In both instances, DFB generally will retain the benefit of the remaining 15% of the applicable tax savings.

The $5,093 adjustment related to the tax receivable agreement and the exchange agreement liability assume: (1) $20 million of cash redemptions by legacy AdaptHealth Holdings investors, (2) a share price equal to $10.00 per share, (3) a constant federal income tax rate of 21.0% and a state tax rate of 4.0%, (4) no material changes in tax law, (5) the ability to utilize tax attributes and (6) future tax receivable agreement and exchange agreement payments.

The adjustments to the tax receivable agreement have been recorded as an adjustment to stockholder equity as these adjustments arise from an equity transaction of the combined company.

DFB anticipates that it will account for the income tax effects resulting from future taxable exchanges of AdaptHealth Holdings Common Units by Non-Blocker AdaptHealth Members for shares of Class A Common Stock or the cash equivalent thereof by recognizing an increase in deferred tax assets, based on enacted tax rates at the date of each exchange. Further, DFB will evaluate the likelihood that DFB will realize the benefit represented by the deferred tax asset, and, to the extent that DFB estimates that it is more likely than not that DFB will not realize the benefit, DFB will reduce the carrying amount of the deferred tax asset with a valuation allowance.

f)      In connection with the Closing of the Business Combination, the following debt-related transactions took place:

| (in thousands) | Long-term Debt |
|---|---|
| Retirement of pre-combination promissory note(1) | $ (100,000) |
| Reinstatement of pre-combination promissory note(1) | 100,000 |
| Repayment on historical AdaptHealth Holdings long-term debt(2) | (78,500) |
| Exchange of AdaptHealth Holdings equity for debt(3) | 43,500 |
| **Total** | **$ (35,000)** |

(1)    At the date of the Business Combination, the $100,000 promissory note was cancelled and immediately reinstated under substantially the same terms as the pre-combination promissory note.

(2)    Proceeds from the Business Combination will be used to fund future acquisitions, repay debt or for other corporate purposes. Given there are no probable acquisitions at this time, the pro formas show that a portion of proceeds were used to repay debt in a manner where it can be redrawn when a future acquisition becomes available.

(3)    Represents promissory notes issued by AdaptHealth Holdings in favor of BlueMountain in exchange for AdaptHealth Holdings Common Units.

g)    The following table represents the impact of the Business Combination on the number of shares of Class A Common Stock and Class B Common Stock and represents the total equity section based on actual redemptions by DFB stockholders:

| (in thousands except share data) | Total Equity (100%) | Noncontrolling Interest (44%) | Controlling Interest (56%) |
|---|---|---|---|
| Historical AdaptHealth Holdings members' equity | $ (139,561) | $ (61,407) | $ (78,154) |
| Historical DFB stockholders' equity | 245,554 | 108,044 | 137,510 |
| Exchange of AdaptHealth Holdings equity for debt | (43,500) | (19,140) | (24,360) |
| PIPE | 125,000 | 55,000 | 70,000 |
| SPAC redemptions | (213,665) | (94,013) | (119,652) |
| Legacy AdaptHealth redemptions | (20,000) | (8,800) | (11,200) |
| Payment of transaction costs | (4,621) | (2,033) | (2,588) |
| Total stockholders' equity/members' equity | (50,793) | (22,349) | (28,444) |
| Noncontrolling interest in subsidiaries | 2,863 | 2,863 | — |
| Subtotal | (47,930) | (19,486) | (28,444) |
| Deferred taxes, net of tax receivable agreement | 21,329 | — | 21,329 |
| **Total equity** | $ (26,601) | $ (19,486) | $ (7,115) |

| | Total Shares | Shares of Class B | | Shares of Class A | |
|---|---|---|---|---|---|
| Legacy AdaptHealth Holdings shareholders | 51,937,500 | 32,113,799 | | 19,823,701 | |
| Legacy DFB stockholders | 20,472,465 | — | | 20,472,465 | |
| | 72,409,965 | 32,113,799 | 44% | 40,296,166 | 56% |

*Adjustments to the Unaudited Pro Forma Condensed Combined Statements of Operations*

The pro forma adjustments included in the unaudited pro forma condensed combined statement of operations for the nine month period ended September 30, 2019 and for the fiscal year ended December 31, 2018 are as follows:

h)    Represents the elimination of non-recurring transaction costs specifically incurred by DFB and AdaptHealth Holdings as part of the Business Combination.

i)    Represents adjustments to interest expense for debt-related transactions that took place in connection with the Closing of the Business Combination. The pro forma adjustments reflect a reduction in interest expense of $5,066 and $6,754 for the nine months ended September 30, 2019 and the twelve months ended December 31, 2018, respectively, due to a $50,000 paydown on the historical AdaptHealth Holdings term loan and a $28,500 paydown on the historical AdaptHealth holdings revolver with an interest rate of 4.41% for both periods and incremental interest expense

15

of $3,915 and $5,220 for the nine months ended September 30, 2019 and the twelve months ended December 31, 2018, respectively, on the $43,500 of promissory notes from the exchange of AdaptHealth Holdings equity for debt at a fixed interest rate of 12% for both periods.

j)    Represents the elimination of non-recurring losses on extinguishments of debt as part of the Business Combination.

k)    Adjustment to eliminate the historical tax expense (benefit) of DFB and AdaptHealth Holdings and to record the tax provisions of the combined entities on a pro forma basis using a pro forma effective tax rate of 25% for both periods, which was applied to the income attributable to the controlling interest as the income attributable to the non-controlling interest is pass-through income. However, the effective tax rate of the combined company could be different depending on post-Business Combination activities.

l)    Represents the pro forma adjustment to the noncontrolling interest in the Business Combination.

| (in thousands) | For The Nine Months Ended September 30, 2019 | | For The Year Ended December 31, 2018 | |
|---|---|---|---|---|
| Pro forma income before taxes | $ | 15,289 | $ | 29,996 |
| Less: income attributable to legacy AdaptHealth noncontrolling interest | | (1,336) | | (1,077) |
| Net pro forma income before taxes | | 13,953 | | 28,919 |
| Noncontrolling interest pro forma adjustment (at 44%) | | 6,139 | | 12,724 |
| Add: income attributable to legacy AdaptHealth noncontrolling interest | | 1,336 | | 1,077 |
| Pro forma income attributable to noncontrolling interest | $ | 7,475 | $ | 13,801 |

m)    As a result of the Business Combination, the pro forma basic and diluted number of shares are reflective of 40,296,166 shares of Class A Common Stock outstanding. Given that conversion of the Class B Common Stock would result in no change to EPS on a pro forma diluted basis, the 32,113,799 shares of Class B Common Stock are not included in the diluted number of shares. Additionally, on a pro forma basis, there are 12,666,666 warrants outstanding with a strike price of $11.50, which have been excluded as these instruments would be anti-dilutive to pro forma EPS.

n)    Adjustment is to reflect the number of founder shares that will be entitled to share in earnings on an equivalent basis after the closing of the Business Combination as such a separate founder share EPS calculation is not needed on pro forma basis.

16

**ADAPTHEALTH HOLDINGS LLC**

**INDEX**

**Item 1.**    **Consolidated Interim Financial Statements (Unaudited)**

Consolidated Balance Sheets                                                                1

Consolidated Statements of Income (Loss)                                                  2

Consolidated Statements of Comprehensive Income (Loss)                                     3

Consolidated Statements of Changes in Members' Equity (Deficit)                           4

Consolidated Statements of Cash Flows                                                     5

Notes to Consolidated Interim Financial Statements                                        6

**Item 2.**    **Management's Discussion and Analysis of Financial Condition and Results of Operations**    27

**Item 1. Consolidated Financial Statements (Unaudited)**

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**
**Consolidated Balance Sheets (Unaudited)**
**September 30, 2019 and December 31, 2018**

| | September 30, 2019 | | December 31, 2018 |
|---|---|---|---|
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 8,822,532 | $ | 25,185,681 |
| Accounts receivable, net | 73,670,396 | | 53,016,649 |
| Inventory | 14,233,639 | | 7,672,646 |
| Prepaid and other current assets | 6,350,953 | | 4,915,277 |
| Total current assets | 103,077,520 | | 90,790,253 |
| Equipment and other fixed assets, net | 66,706,469 | | 61,601,350 |
| Goodwill | 245,346,006 | | 202,436,212 |
| Other assets | 5,892,781 | | 5,049,628 |
| Deferred tax asset | 6,964,502 | | 9,079,190 |
| Total assets | $ 427,987,278 | $ | 368,956,633 |
| **Liabilities and Members' Equity (Deficit)** | | | |
| Current liabilities: | | | |
| Accounts payable and accrued expenses | $ 90,456,428 | $ | 85,558,419 |
| Current portion of capital lease obligations | 21,656,103 | | 20,814,404 |
| Current portion of long-term debt | 8,893,701 | | 7,089,976 |
| Deferred revenue | 9,097,423 | | 7,508,428 |
| Other liabilities | 8,608,991 | | 14,705,719 |
| Total current liabilities | 138,712,646 | | 135,676,946 |
| Long-term debt, less current portion | 410,538,425 | | 127,094,723 |
| Capital lease obligations, less current portion | 236,436 | | 172,467 |
| Other long-term liabilities | 15,197,774 | | 3,243,839 |
| Total liabilities | 564,685,281 | | 266,187,975 |
| Commitments and contingencies | | | |
| Members' equity (deficit) | | | |
| Membership units | 136,130,966 | | 113,274,181 |
| Controlling interest members' deficit | (276,541,697) | | (13,370,648) |
| Accumulated other comprehensive income | 850,119 | | — |
| Total equity (deficit) attributable to AdaptHealth Holdings LLC | (139,560,612) | | 99,903,533 |
| Noncontrolling interest in subsidiaries | 2,862,609 | | 2,865,125 |
| Total members' equity (deficit) | (136,698,003) | | 102,768,658 |
| Total liabilities and members' equity (deficit) | $ 427,987,278 | $ | 368,956,633 |

See accompanying notes to unaudited interim consolidated financial statements.

1

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**
**Consolidated Statements of Income (Loss) (Unaudited)**
**Nine Months Ended September 30, 2019 and 2018**

|  | Nine Months Ended September 30, | |
|  | 2019 | 2018 |
|---|---|---|
| Revenue: | | |
| Revenue, net of contractual allowances and discounts | $ 400,958,624 | $ 246,092,513 |
| Provision for doubtful accounts | (20,854,931) | (9,466,570) |
| Net revenue less provision for doubtful accounts | 380,103,693 | 236,625,943 |
| Costs and expenses: | | |
| Cost of net revenue | 317,174,530 | 199,586,119 |
| General and administrative expenses | 31,508,619 | 12,229,504 |
| Depreciation, excluding patient equipment depreciation | 2,439,207 | 2,292,992 |
| Total costs and expenses | 351,122,356 | 214,108,615 |
| Operating income | 28,981,337 | 22,517,328 |
| Interest expense (includes loss of $12,358,728 and gain of $280,861 representing change in fair value of interest rate swaps, respectively) | 31,650,578 | 5,199,799 |
| Loss on extinguishment of debt, net | 2,121,451 | 1,398,929 |
| (Loss) income before income taxes | (4,790,692) | 15,918,600 |
| Income tax expense (benefit) | 5,443,535 | (4,518,772) |
| Net (loss) income | (10,234,227) | 20,437,372 |
| Net income attributable to noncontrolling interests | 1,335,867 | 680,894 |
| Net (loss) income attributable to AdaptHealth Holdings LLC | $ (11,570,094) | $ 19,756,478 |

See accompanying notes to unaudited interim consolidated financial statements.

2

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**
**Consolidated Statements of Comprehensive Income (Loss) (Unaudited)**
**Nine Months Ended September 30, 2019 and 2018**

| | Nine Months Ended September 30, | |
| | 2019 | 2018 |
| --- | ---: | ---: |
| Net (loss) income | $ (10,234,227) | $ 20,437,372 |
| Other comprehensive income: | | |
| Interest rate swap agreements | 850,119 | — |
| Comprehensive (loss) income | (9,384,108) | 20,437,372 |
| | | |
| Net income attributable to noncontrolling interests | 1,335,867 | 680,894 |
| Comprehensive (loss) income attributable to AdaptHealth Holdings LLC | $ (10,719,975) | $ 19,756,478 |

See accompanying notes to unaudited interim consolidated financial statements.

3

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**
**Consolidated Statements of Changes in Members' Equity (Deficit) (Unaudited)**
**Nine months ended September 30, 2019 and 2018**

| | Membership units | | | | | | | Controlling interest members' deficit | Accumulated other comprehensive income | Noncontrolling interest in subsidiaries | Total |
| | Common units | Amount | Preferred units | Amount | Investor units | Amount | Total amount | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance, December 31, 2018 | 182,420 | $108,406,906 | 2,112,500 | $2,112,500 | 2,885,858 | $2,754,775 | $113,274,181 | $ (13,370,648) | $ — | $ 2,865,125 | $ 102,768,658 |
| Issuance of Common Units, net of offering costs of $837,156 | 37,050 | 19,162,844 | — | — | — | — | 19,162,844 | — | — | — | 19,162,844 |
| Conversion of Investor Units to Common Units | 14,719 | 2,754,775 | — | — | (2,885,858) | (2,754,775) | — | — | — | — | — |
| Redemption of Preferred Units | — | — | (2,112,500) | (2,112,500) | — | — | (2,112,500) | (1,600,955) | — | — | (3,713,455) |
| Equity-based compensation | 9,852 | 5,806,441 | — | — | — | — | 5,806,441 | — | — | — | 5,806,441 |
| Distributions to members | — | — | — | — | — | — | — | (250,000,000) | — | — | (250,000,000) |
| Distributions to noncontrolling interest | — | — | — | — | — | — | — | — | — | (1,338,383) | (1,338,383) |
| Change in fair value of interest rate swaps, net of reclassification adjustment | — | — | — | — | — | — | — | — | 850,119 | — | 850,119 |
| Net (loss) income | — | — | — | — | — | — | — | (11,570,094) | — | 1,335,867 | (10,234,227) |
| Balance, September 30, 2019 | 244,041 | $136,130,966 | — | $ — | — | $ — | $136,130,966 | $(276,541,697) | $ 850,119 | $ 2,862,609 | $(136,698,003) |

| | Membership units | | | | | | | Controlling interest members' deficit | Accumulated other comprehensive income | Noncontrolling interest in subsidiaries | Total |
| | Common units | Amount | Preferred units | Amount | Investor units | Amount | Total amount | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance, December 31, 2017 | 128,192 | $ 28,904,351 | 2,112,500 | $2,112,500 | 2,569,455 | $2,438,372 | $ 33,455,223 | $(36,180,242) | $ — | $ 2,088,359 | $ (636,660) |
| Issuance of Common Units for acquisitions | 39,526 | 61,638,895 | — | — | — | — | 61,638,895 | — | — | — | 61,638,895 |
| Cashless exercise of warrants | 3,900 | 134,350 | — | — | — | — | 134,350 | (134,350) | — | — | — |
| Accrued return on Investor Units | — | — | — | — | 232,172 | 232,172 | 232,172 | (232,172) | — | — | — |
| Equity-based compensation | — | 570,389 | — | — | — | — | 570,389 | — | — | — | 570,389 |
| Distributions to noncontrolling interest | — | — | — | — | — | — | — | — | — | (300,000) | (300,000) |
| Net income | — | — | — | — | — | — | — | 19,756,478 | — | 680,894 | 20,437,372 |
| Balance, September 30, 2018 | 171,618 | $ 91,247,985 | 2,112,500 | $2,112,500 | 2,801,627 | $2,670,544 | $ 96,031,029 | $(16,790,286) | $ — | $ 2,469,253 | $ 81,709,996 |

See accompanying notes to unaudited interim consolidated financial statements.

4

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**
**Consolidated Statements of Cash Flows (Unaudited)**
**Nine Months Ended September 30, 2019 and 2018**

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2019 | 2018 |
| Cash flows from operating activities: | | |
| Net (loss) income | $ (10,234,227) | $ 20,437,372 |
| Adjustments to reconcile net (loss) income to net cash provided by operating activities: | | |
| Depreciation | 45,076,331 | 33,011,415 |
| Equity-based compensation | 5,806,441 | 570,389 |
| Deferred income tax | 2,114,688 | (5,045,261) |
| Change in fair value of interest rate swaps, net of reclassification adjustment | 12,141,076 | (280,861) |
| Provision for doubtful accounts | 20,854,931 | 9,466,570 |
| Amortization of deferred financing costs | 830,287 | 340,978 |
| Write-off of deferred financing costs | 2,121,451 | 1,219,205 |
| Gain on debt extinguishment | — | (800,000) |
| Changes in operating assets and liabilities, net of effects from acquisitions: | | |
| Accounts receivable | (38,104,970) | (11,289,810) |
| Due from affiliates and related parties | — | 700,791 |
| Inventory | (2,388,003) | 1,640,685 |
| Prepaid and other assets | (2,381,307) | (4,866,675) |
| Accounts payable and accrued expenses | 7,337,040 | (1,957,408) |
| Net cash provided by operating activities | 43,173,738 | 43,147,390 |
| Cash flows from investing activities: | | |
| Purchases of equipment and other fixed assets | (14,452,473) | (7,885,440) |
| Payments for business acquisitions, net of cash acquired | (47,946,259) | (78,162,954) |
| Net cash used in investing activities | (62,398,732) | (86,048,394) |
| Cash flows from financing activities: | | |
| Proceeds from borrowings on long-term debt | 317,000,000 | 140,000,000 |
| Payments on long-term debt | (156,062,245) | (23,113,743) |
| Proceeds from issuance of promissory note payable | 100,000,000 | — |
| Proceeds from issuance of Common Units | 20,000,000 | — |
| Payments for equity issuance costs | (837,156) | — |
| Payments of deferred financing costs | (9,027,753) | (2,715,849) |
| Payments on capital leases | (28,659,163) | (18,894,233) |
| Borrowings on lines of credit | 28,500,000 | 24,750,000 |
| Payments on lines of credit | — | (59,218,647) |
| Distributions to members | (250,000,000) | — |
| Payments for redemption of Preferred Units | (3,713,455) | — |
| Payment of contingent consideration | (13,000,000) | — |
| Payments for debt prepayment penalties | — | (979,724) |
| Distributions to noncontrolling interest | (1,338,383) | (300,000) |
| Net cash provided by financing activities | 2,861,845 | 59,527,804 |
| Net (decrease) increase in cash and cash equivalents | (16,363,149) | 16,626,800 |
| Cash and cash equivalents at beginning of period | 25,185,681 | 4,274,334 |
| Cash and cash equivalents at end of period | $ 8,822,532 | $ 20,901,134 |
| Supplemental disclosures: | | |
| Cash paid for interest | $ 15,769,026 | $ 4,368,900 |
| Cash paid for income taxes | $ 492,010 | $ 405,205 |
| Noncash investing and financing activities: | | |
| Equipment acquired under capital lease obligations | $ 29,564,831 | $ 19,001,154 |
| Unpaid equipment and other fixed asset purchases at end of period | $ 8,483,482 | $ 10,106,508 |
| Seller note issued in connection with acquisition of Gould's Discount Medical, LLC | $ 2,000,000 | $ — |
| Contingent purchase price in connection with acquisitions | $ 6,425,000 | $ 15,250,000 |
| Deferred purchase price in connection with acquisition of American Ancillaries, Inc. | $ 1,500,000 | $ — |
| Convertible debt issued in connection with acquisition of Verus Healthcare, Inc. | $ — | $ 16,845,937 |

See accompanying notes to unaudited interim consolidated financial statements.

5

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

**(1)      General Information**

*Nature of Business*

AdaptHealth Holdings LLC and Subsidiaries (the Company) is a provider of home healthcare equipment and related services, including home oxygen, respiratory medications and sleep therapy equipment and services, to both commercial organizations and directly to end users. The Company's primary operations are throughout the United States of America and the District of Columbia.

*Basis of Presentation*

The accompanying interim consolidated financial statements are unaudited and have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures included in financial statements prepared in conformity with accounting principles generally accepted in the United States of America have been condensed or omitted pursuant to such rules and regulations relating to interim financial statements. They should be read in conjunction with the consolidated financial statements and related notes of AdaptHealth Holdings LLC and Subsidiaries for the year ended December 31, 2018. In the opinion of management, all adjustments, consisting of normal recurring accruals, necessary for a fair presentation of the results of operations for the interim periods presented have been reflected herein. The results of operations for interim periods are not necessarily indicative of the results to be expected for the entire year.

The accompanying consolidated interim financial statements include the accounts of the Company. All intercompany balances and transactions have been eliminated in consolidation.

*Concentration of Credit Risk*

Financial instruments which potentially subject the Company to concentrations of credit risk consist principally of cash and trade accounts receivable. The Company maintains its cash in bank deposit accounts, which, at times, may exceed federally insured limits. The Company has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk on cash and cash equivalents. As of September 30, 2019 and December 31, 2018, approximately 97% of the Company's net accounts receivable are from Medicare, Medicaid and insurance companies pursuant to primary and co-insurance contracts and 3% from patients under co-pay or private plan arrangements. Credit evaluations, account monitoring procedures and a third party collection agent are utilized to minimize the risk of loss. Collateral is not required.

Cost-containment efforts of governmental organizations, primarily Medicare, could have a material adverse effect on the Company's sales and profitability. Medicare typically awards contracts on a category-by-category basis through a competitive bidding process. Bids are generally solicited from multiple distributors with intention of driving down pricing. The Company was previously in a protected three year window which expired in 2016. The Company was able to maintain protection for the round two recompete contracts that became effective on July 1, 2016 and expired on December 31, 2018. Subsequent to December 31, 2018, any registered suppliers can provide equipment and services in all areas.

*Concentration of customers*

The Company provides and distributes medical equipment and health care services, including home oxygen, respiratory medications and sleep therapy equipment and services, to both commercial organizations and directly to end users. This results in a customer concentration relating to Medicare's service reimbursement programs. During the nine months ended September 30, 2019 and 2018, the Company derived approximately 32% and 37% of its net revenue from government healthcare programs, including Medicare and

6

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

Medicaid, respectively. Concentration of credit risk with respect to other payors is limited due to the large number of such payors and varied geographical locations.

*Recent Accounting Pronouncements*

In May 2014, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) No. 2014-09, *Revenue from Contracts with Customers (ASU 2014-09) (Accounting Standards Codification (ASC) Topic 606)*, which supersedes all existing revenue recognition requirements, including guidance specific to the healthcare industry. The new standard requires a company to recognize revenue when it transfers goods or services to customers in an amount that reflects the consideration that the company expects to receive for those goods or services, and requires enhanced disclosures to enable users of financial statements to understand the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. This guidance allows for adoption using a full retrospective method, or a modified retrospective method. Subsequent to the issuance of ASU 2014-09, the FASB also issued several updates related to ASU 2014-09 including deferring its adoption date. The new guidance is required for the Company for the annual reporting period beginning January 1, 2019, and for interim reporting periods beginning January 1, 2020. The new standard will impact amounts presented in certain categories on the Company's consolidated statements of income (loss), as upon adoption, the majority of amounts currently classified as provision for doubtful accounts will be reflected as implicit price concessions, and therefore a direct reduction to revenue, net of contractual allowances and discounts. Other than as described above, the standard is not expected to have a material impact on the Company's consolidated financial position, results of operations and cash flows. However, there will be expanded disclosures required.

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)* (ASU 2016-02), which amended authoritative guidance on accounting for leases. The new provisions require that a lessee of operating leases recognize a liability to make lease payments (the lease liability) and a right-of-use asset representing its right to use the underlying asset for the lease term. The lease liability will be equal to the present value of lease payments, with the right-of-use asset equal to the lease liability. The classification criteria for distinguishing between finance (or capital) leases and operating leases are substantially similar to the previous lease guidance, but with no explicit bright lines. As such, operating leases will result in straight-line rent expense similar to current practice. For short term leases (term of 12 months or less), a lessee is permitted to make an accounting election not to recognize lease assets and lease liabilities, which would generally result in lease expense being recognized on a straight-line basis over the lease term. The new guidance is required for the Company for the annual reporting period beginning January 1, 2020, and interim reporting periods beginning January 1, 2021. In October 2019, the FASB approved a proposal that would extend the adoption date of the new standard for the Company. The FASB expects to issue an ASU containing this decision by December 31, 2019, which would require the Company to adopt the new standard for the annual reporting period beginning January 1, 2021, and interim reporting periods beginning January 1, 2022. The standard requires a transition adoption election using either 1) a modified retrospective approach with periods prior to the adoption date being recast or 2) a prospective adoption approach with a cumulative-effect adjustment recognized to the opening balance of retained earnings on the adoption date with prior periods not recast. The Company anticipates adopting this standard using the prospective adoption approach and electing the practical expedients allowed under the standard. The adoption of this standard is expected to have a material impact on the Company's financial position. The Company is still evaluating the impact on its results of operations and does not expect the adoption of this standard to have an impact on liquidity.

In January 2017, the FASB issued ASU 2017-04, *Intangibles — Goodwill and Other (ASC Topic 350): Simplifying the Test for Goodwill Impairment*, which will eliminate the requirement to calculate the implied fair value of goodwill, commonly referred to as "Step 2" in the current goodwill impairment test. An entity will still have the option to perform the qualitative assessment for a reporting unit to determine if the quantitative impairment test is necessary. This guidance will be effective for annual and interim impairment tests performed in annual reporting periods beginning after December 15, 2020, and early adoption is permitted for annual or

7

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

interim impairment tests performed after January 1, 2017. The Company is still evaluating the impact that this standard will have on the Company's results of operations.

**(2)    Significant Transactions**

*Acquisitions*

During the nine months ended September 30, 2019 and 2018, the Company made the following acquisitions to strengthen its current market share in existing markets or to expand into new markets. Each of the following acquisitions was accounted for using the acquisition method pursuant to the requirements of FASB ASC Topic 805, *Business Combinations*, and are included in the accompanying interim consolidated financial statements since the respective acquisition date. The goodwill generated from these acquisitions is attributable to expected growth and cost synergies and the expected contribution of each acquisition to the overall Company strategy. The goodwill from these acquisitions is expected to be deductible for tax purposes. Also, see subsection, "Pro-forma information" of this Note 2 for further pro-forma information on net revenue less provision for doubtful accounts and operating income.

Certain estimated fair values of the net assets of acquired businesses as determined below are subject to change resulting from such items as working capital adjustments post acquisition. As a result, the acquisition accounting for acquired businesses could change in subsequent periods resulting in adjustments to goodwill once finalized.

*Nine months ended September 30, 2019*

On January 2, 2019, the Company purchased 100% of the stock of Gould's Discount Medical, LLC (Goulds). Goulds is headquartered in Louisville, Kentucky and provides home medical equipment, supplies, and respiratory products such as home oxygen and sleep apnea equipment. The total consideration was $24,264,344, inclusive of an initial cash payment of $20,764,344, the issuance of a promissory note in the amount of $2,000,000 (payable in six equal quarterly installments commencing on September 30, 2019 and accruing 5.0% interest annually), and potential contingent earn-out payments in an aggregate amount up to $1,500,000.

On July 5, 2019, the Company purchased certain assets relating to the durable medical equipment business of SleepMed Therapies, Inc. (SleepMed). SleepMed is a durable medical equipment company headquartered in Atlanta, GA and provides positive airway pressure devices and related supplies to customers in their homes or other alternative site care facilities. The total consideration was $15,405,000, inclusive of an initial cash payment of $11,405,000 and potential contingent earn-out payments in an aggregate amount up to $4,000,000.

On July 31, 2019, the Company purchased 100% of the stock of American Ancillaries, Inc. (AA Medical). AA Medical is headquartered in Nevada and provides respiratory and durable medical equipment and services. The total consideration was $4,473,000, inclusive of an initial cash payment of $2,973,000 and potential deferred payments in an aggregate amount up to $1,500,000 to be paid subsequent to closing based on certain conditions.

On August 16, 2019, the Company purchased certain assets relating to the durable medical equipment business of Classic SleepCare LLC (Classic). Classic is a durable medical equipment company headquartered in Agoura Hills, CA and provides positive airway pressure devices and related supplies to customers in their homes or other alternative site care facilities. The total consideration was $6,050,000, inclusive of an initial cash payment of $5,525,000 and potential contingent earn-out payments in an aggregate amount up to $525,000.

8

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

During the nine months ended September 30, 2019, the Company also completed acquisitions of multiple individually immaterial businesses. The total consideration was $7,496,040, inclusive of initial cash payments of $7,096,040 and potential earn-out payments in an aggregate amount up to $400,000. The results of these acquired companies were immaterial to the Company's results for the nine months ended September 30, 2019.

The following table summarizes the allocation of the purchase price to the estimated fair values of the net assets acquired at the date of the transactions:

|  | Goulds | SleepMed | AA Medical | Classic | Other | Total |
|---|---|---|---|---|---|---|
| Cash | $ 117,000 | — | — | — | — | 117,000 |
| Accounts receivables | 2,968,010 | — | 435,698 | — | — | 3,403,708 |
| Inventory | 2,452,777 | 266,759 | 143,513 | — | 1,309,941 | 4,172,990 |
| Prepaid and other current assets | 11,835 | — | — | — | — | 11,835 |
| Equipment and other fixed assets | 3,352,330 | 1,274,083 | 1,188,650 | 717,815 | 3,705,549 | 10,238,427 |
| Goodwill | 18,113,420 | 14,129,158 | 3,155,566 | 5,380,795 | 3,104,550 | 43,883,489 |
| Deferred revenue | (485,000) | (265,000) | (89,385) | (48,610) | (624,000) | (1,511,995) |
| Accounts payable and accrued expenses | (2,266,028) | — | (361,042) | — | — | (2,627,070) |
| Net assets acquired | $ 24,264,344 | 15,405,000 | 4,473,000 | 6,050,000 | 7,496,040 | 57,688,384 |

*Nine months ended September 30, 2018*

On May 17, 2018, as set forth in a Contribution and Exchange Agreement, the members of PPS HME Holdings LLC (PPS) contributed all their membership units in PPS to AdaptHealth LLC (AdaptHealth), a subsidiary of the Company, in exchange for cash consideration of $7,000,000 and 31,091 Common Units with a value of $48,484,848. PPS provides home oxygen, respiratory medications and sleep therapy equipment and services. Prior to the May 17, 2018 transaction, in May 2017, MedStar Surgical & Breathing Equipment, Inc (MedStar), a subsidiary of AdaptHealth, entered into an Administrative Services Agreement with Braden Partners L.P. (BP), a subsidiary of PPS. Under the agreement, MedStar provides management, consulting and administrative support to all BP's business operations. During the six months ended June 30, 2018, prior to the May 17, 2018 transaction, AdaptHealth recorded management fee income of $576,458 related to this agreement, which is included in net revenue less provision for doubtful accounts in the accompanying consolidated statements of income (loss). At May 17, 2018, AdaptHealth had accounts receivable of $1,715,430 with BP, which primarily related to unpaid management fees, which was settled as part of the May 17, 2018 transaction. The settlement of this receivable was included in the total consideration for purposes of the acquisition accounting for the transaction.

On May 17, 2018, the Company entered into an Agreement and Plan of Merger with Verus Healthcare, Inc. (Verus) in which the Company purchased 100% of the stock of Verus for total consideration of $100,399,268, inclusive of cash payments of $58,399,284, issuance of 8,435 Common Units with a value of $13,154,047, issuance of convertible notes of $16,845,937, and contingent consideration of $12,000,000. Verus is headquartered in Tennessee and provides and distributes various types of medical equipment and health care services, including respiratory medications, sleep therapy equipment and services and nutrition products, to both commercial organizations and directly to end users. The contingent consideration was based on the achievement of certain financial targets after the transaction. Verus achieved these targets and amounts were paid in February 2019; accordingly, the contingent consideration was included within other current liabilities in the accompanying consolidated balance sheets at December 31, 2018. The parties intended that the convertible notes would convert to equity which occurred on December 31, 2018; such convertible notes

9

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

converted to 10,802 Common Units. During the nine months ended September 30, 2018, the Company recorded $175,011 of interest expense relating to the convertible notes.

On July 31, 2018, the Company purchased 100% of the stock of Home Medical Express, Inc. (HME) for total consideration of $13,250,000, inclusive of an initial cash payment of $9,000,000, an escrow payment of $1,000,000, and estimated contingent consideration of $3,250,000 (which represented the maximum payout under the agreement and was recorded as a contingent payment liability at the acquisition date). HME is headquartered in Illinois and provides respiratory and durable medical equipment and services. The escrow payment was made at closing and was due to the sellers on the first anniversary of the closing date, subject to certain conditions after the closing date, with any amounts not paid to the sellers to be paid back to the Company. Refer to Note 4, *Goodwill*, for additional information. The estimated contingent consideration consisted of potential payments upon the achievement of certain financial targets for the first and second years after the transaction ($1,625,000 each year). Based on HME's actual results during the first year after closing, $1,000,000 of the first year payout was earned and paid to the sellers during the three months ended September 30, 2019 which reduced the initial contingent payment liability. As part of a separate arrangement executed in September 2019, the Company provided the sellers with the potential to receive the unearned portion of the first year payout based on revised financial targets through the end of 2019. Based on management's assessment of the probability of achievement of such revised targets, $625,000 was recorded in other current liabilities at September 30, 2019 in the accompanying consolidated balance sheets. The accounting for the payment of the first year payout and the arrangement to potentially earn the unearned portion of the first year payout had no impact to goodwill recorded during the nine months ended September 30, 2019.

The following table summarizes the allocation of the purchase price to the estimated fair values of the net assets acquired at the date of the transactions:

| | PPS | Verus | HME |
|---|---:|---:|---:|
| Cash | $ 407,456 | 1,449,817 | 100,000 |
| Accounts receivables | 12,126,481 | 7,795,765 | 2,200,774 |
| Inventory | 1,344,535 | 2,923,211 | 75,493 |
| Prepaid and other current assets | 995,048 | 466,114 | 35,960 |
| Equipment and other fixed assets | 20,357,062 | 5,895,113 | 2,165,448 |
| Deferred tax asset | — | 6,525,269 | — |
| Other assets | 1,927,355 | 838,008 | 37,956 |
| Goodwill | 49,660,338 | 91,829,157 | 13,230,987 |
| Accounts payable and accrued expenses | (20,484,673) | (11,963,664) | (3,180,531) |
| Deferred revenue | (1,677,813) | (306,194) | (341,667) |
| Capital lease obligations | (6,395,438) | (3,793,103) | (1,074,420) |
| Deferred tax liability | (321,974) | — | — |
| Other long-term liabilities | (738,099) | (1,260,225) | — |
| Net assets acquired | $ 57,200,278 | 100,399,268 | 13,250,000 |

*Pro-Forma Information (unaudited)*

The unaudited supplemental pro-forma financial information has been provided for illustrative purposes only. The unaudited pro-forma financial information does not purport to be indicative of the actual results that would have been achieved by the combined companies for the periods presented, or of the results that may be achieved by the combined companies in the future. Future results may vary significantly from the results

10

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

reflected in the following unaudited pro-forma financial information because of future events and transactions, as well as other factors, many of which are beyond the Company's control.

The unaudited pro-forma combined financial information presented below has been prepared by adjusting the historical results of the Company to include the historical results of the significant acquisitions described above. The unaudited pro-forma financial information does not include any adjustments to reflect the impact of cost savings or other synergies that may result from these acquisitions. As noted above, the unaudited pro-forma financial information does not purport to be indicative of the actual results that would have been achieved by the combined companies for the periods presented or that may be achieved by the combined company in the future.

The information in the following table represents net revenue and operating income for the nine months ended September 30, 2019 and 2018 had the Company consolidated its 2019 and 2018 significant acquisitions in those periods.

|  | Nine months ended September 30, | | | |
|  | 2019 | | 2018 | |
| --- | --- | --- | --- | --- |
| Net revenue less provision for doubtful accounts | $ | 404,411,160 | $ | 360,589,263 |
| Operating income | $ | 30,867,518 | $ | 15,947,351 |

The above results do not include interest expense associated with debt incurred to fund the cash consideration paid for the acquisitions.

*Results of Businesses Acquired*

The amount of net revenue and operating income of the significant acquisitions in 2019 since the respective acquisition dates included in the Company's interim consolidated statements of net income (loss) for the nine months ended September 30, 2019 are as follows:

|  | Nine months ended September 30, 2019 | |
| --- | --- | --- |
| Net revenue less provision for doubtful accounts | $ | 35,734,327 |
| Operating income | $ | 5,917,780 |

*March 2019 Recapitalization Transactions*

During the nine months ended September 30, 2019, the Company entered into a number of agreements, amendments and new financing facilities (herein after referred to as the March 2019 Recapitalization Transactions). For further information on these debt refinancings, see Note 9, *Debt*.

11

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

**(3)    Equipment and Other Fixed Assets**

Equipment and other fixed assets as of September 30, 2019 and December 31, 2018 are as follows:

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Patient medical equipment | $ 115,770,057 | $ 123,881,314 |
| Vehicles | 4,324,941 | 3,903,819 |
| Other | 14,107,285 | 12,704,131 |
| | 134,202,283 | 140,489,264 |
| Less accumulated depreciation | (67,495,814) | (78,887,914) |
| | $ 66,706,469 | $ 61,601,350 |

Depreciation expense was $45,076,331 and $33,011,415 for the nine months ended September 30, 2019 and 2018, respectively. During the nine months ended September 30, 2019, the Company wrote off $56,286,209 of fully depreciated patient medical equipment. Write-offs for the nine months ended September 30, 2018 were not material.

**(4)    Goodwill**

The change in the carrying amount of goodwill for the nine months ended September 30, 2019 was as follows:

| | Gross carrying amount | Accumulated impairment losses | Net carrying amount |
|---|---|---|---|
| Balance at December 31, 2018 | $ 202,436,212 | $ — | $ 202,436,212 |
| Acquired goodwill during the period | 43,883,489 | — | 43,883,489 |
| Receipt of prior escrow payment | (504,000) | — | (504,000) |
| Other | (469,695) | — | (469,695) |
| Balance at September 30, 2019 | $ 245,346,006 | $ — | $ 245,346,006 |

As discussed in Note 2, *Acquisitions*, in connection with the acquisition of HME in 2018, the Company made an escrow payment of $1,000,000 that would either be due to the sellers or paid back to the Company within one year subject to certain conditions after closing. Based on the outcome of such conditions, the Company received $504,000 of the escrow funds during the nine months ended September 30, 2019 and recorded that amount as a reduction of goodwill. The other in the table above primarily relates to working capital and other measurement period adjustments relating to businesses that were acquired by the Company during 2018.

**(5)    Fair Value of Assets and Liabilities**

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e. "the exit price") in an orderly transaction between market participants at the measurement date. In determining fair value, the Company uses various valuation approaches, including quoted market prices and discounted cash flows. A hierarchy for inputs is used in measuring fair value that maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available. Observable inputs are inputs that market participants would use in pricing the asset or

12

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

liability developed based on market data obtained from independent sources. Unobservable inputs are inputs that reflect a company's judgment concerning the assumptions that market participants would use in pricing the asset or liability developed based on the best information available under the circumstances. The fair value hierarchy is broken down into three levels based on the reliability of inputs.

To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Accordingly, the Company's degree of judgment exercised in determining fair value is greatest for instruments categorized in Level 3. In certain cases, the inputs used to measure fair value may fall into different levels of the fair value hierarchy. In such cases an asset or liability is classified in its entirety based on the lowest level of input that is significant to the measurement of fair value.

Fair value is a market-based measure considered from the perspective of a market participant who holds the asset or owes the liability rather than an entity-specific measure. Therefore, even when market assumptions are not readily available, the Company's own assumptions are set to reflect those that market participants would use in pricing the asset or liability at the measurement date. The Company uses prices and inputs that are current as of the measurement date, including periods of market dislocation. In periods of market dislocation, the observability of prices and inputs may be reduced for many instruments. This condition in the future may cause the Company's financial instruments to be reclassified from Level 1 to Level 2 or from Level 2 to Level 3. During the nine months ended September 30, 2019 and 2018, the Company did not have any reclassifications in levels.

Each period, the Company evaluates the fair value of acquisition-related contingent consideration obligations. The Company estimates the fair value of acquisition-related contingent consideration obligations by applying the income approach using a probability-weighted discounted cash flow model. This fair value measurement is based on significant inputs not observed in the market and thus represents a Level 3 measurement. Level 3 instruments are valued based on unobservable inputs that are supported by little or no market activity and reflect the Company's own assumptions in measuring fair value. The Company records any increases in the fair value as contingent consideration expense and decreases in the fair value as a reduction of contingent consideration expense. Contingent consideration obligations of $8,050,000 were outstanding at September 30, 2019 which related to business acquisitions that occurred during the nine months ended September 30, 2019 and in July 2018. Contingent consideration obligations of $15,250,000 were outstanding at December 31, 2018 which related to business acquisitions in May 2018 and July 2018, of which $13,000,000 was paid during the nine months ended September 30, 2019.  At September 30, 2019 and December 31, 2018, the amounts recognized for these contingent consideration arrangements, the range of outcomes, and the assumptions used to develop the estimates had not materially changed from the respective acquisition dates.

Currently, the Company uses interest rate swap agreements to manage interest rate risk by converting a portion of its variable rate borrowings to a fixed rate and recognizes these derivative instruments as either assets or liabilities in the accompanying consolidated balance sheets at fair value. The valuation of these derivative instruments is determined using widely accepted valuation techniques, including discounted cash flow analysis on the expected cash flows of each derivative. This analysis reflects the contractual terms of the derivatives, including the period to maturity, and uses observable market-based inputs, including interest rate curves and implied volatilities. The fair values of the Company's interest rate swaps are determined using the market standard methodology of netting the discounted future fixed cash payments and the discounted expected variable cash payments receipts. The variable cash receipts are based on an expectation of future interest rates (forward curves) derived from observable market interest rate curves. To comply with the provisions of FASB ASC Topic 820, *Fair Value Measurement*, the Company incorporates credit valuation adjustments to appropriately reflect both its own nonperformance risk and the respective counterparty's nonperformance risk in the fair value measurements. In adjusting the fair value of its derivative contracts for the

13

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

effect of nonperformance risk, the Company has considered the impact of netting and any applicable credit enhancements, such as collateral postings, thresholds, mutual puts and guarantees.

Although the Company has determined that the majority of the inputs used to value its derivatives fall within Level 2 of the fair value hierarchy, the credit valuation adjustments associated with the Company's derivatives utilize Level 3 inputs, such as estimates of current credit spreads to evaluate the likelihood of default by the Company and the respective counterparties. The Company has determined that the significance of the impact of the credit valuation adjustments made to its derivative contracts, which determination was based on the fair value of each individual contract, was not significant to the overall valuation. As a result, all of the Company's derivatives held as of September 30, 2019 and December 31, 2018 were classified as Level 2 of the fair value hierarchy. Refer to Note 6, *Derivative Instruments and Hedging Activities*, for additional information regarding the Company's derivative instruments.

The following table presents the valuation of the Company's financial assets and liabilities as of September 30, 2019 and December 31, 2018 measured at fair value on a recurring basis. The fair value estimates presented herein are based on information available to management as of September 30, 2019 and December 31, 2018. These estimates are not necessarily indicative of the amounts the Company could ultimately realize.

| | Level 1 | Level 2 | Level 3 | Fair Value |
|---|---|---|---|---|
| **September 30, 2019** | | | | |
| **Assets** | | | | |
| Money market accounts | $ 4,947 | $ — | $ — | $ 4,947 |
| Total assets measured at fair value | $ 4,947 | $ — | $ — | $ 4,947 |
| | | | | |
| **Liabilities** | | | | |
| Acquisition-related contingent consideration obligations-short term | $ — | $ — | $ 3,725,000 | $ 3,725,000 |
| Acquisition-related contingent consideration obligations-long term | — | — | 4,325,000 | 4,325,000 |
| Interest rate swap agreements | — | 10,741,159 | — | 10,741,159 |
| Total liabilities measured at fair value | $ — | $ 10,741,159 | $ 8,050,000 | $ 18,791,159 |

| | Level 1 | Level 2 | Level 3 | Fair Value |
|---|---|---|---|---|
| **December 31, 2018** | | | | |
| **Assets** | | | | |
| Money market accounts | $ 16,126,899 | $ — | $ — | $ 16,126,899 |
| Interest rate swap agreements | — | 943,134 | — | 943,134 |
| Total assets measured at fair value | $ 16,126,899 | $ 943,134 | $ — | $ 17,070,033 |
| | | | | |
| **Liabilities** | | | | |
| Acquisition-related contingent consideration obligations-short term | $ — | $ — | $ 13,625,000 | $ 13,625,000 |
| Acquisition-related contingent consideration obligations-long term | — | — | 1,625,000 | 1,625,000 |
| Interest rate swap agreements | — | 396,302 | — | 396,302 |
| Total liabilities measured at fair value | $ — | $ 396,302 | $ 15,250,000 | $ 15,646,302 |

14

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

There were no changes in the estimated the fair values of the Company's financial assets and liabilities that are measured using significant unobservable inputs (Level 3) for the nine months ended September 30, 2019 and 2018.

The carrying amounts of cash and cash equivalents, accounts receivable, prepaid and other current assets, accounts payable and accrued expenses approximate their fair value because of the short-term maturity of these financial instruments.

The carrying amount of long-term debt and obligations under capital leases approximates fair value because these financial instruments bear interest at rates that approximate current market rates for debt with similar maturity and credit quality, and because the borrowings under the Company's long-term debt arrangements bear interest at the variable rates described in Note 9, *Debt*.

The Company's non-financial assets measured on a non-recurring basis were as follows:

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Significant unobservable inputs (Level 3): | | |
| Goodwill (annual impairment assessment) | $ 245,346,006 | $ 202,436,212 |

## (6) Derivative Instruments and Hedging Activities

FASB ASC Topic 815, *Derivatives and Hedging* (ASC 815), provides the disclosure requirements for derivatives and hedging activities with the intent to provide users of financial statements with an enhanced understanding of: (a) how and why an entity uses derivative instruments, (b) how the entity accounts for derivative instruments and related hedged items, and (c) how derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows. Further, qualitative disclosures are required that explain the Company's objectives and strategies for using derivatives, as well as quantitative disclosures about the fair value of and gains and losses on derivative instruments, and disclosures about credit-risk-related contingent features in derivative instruments.

As discussed in Note 5, *Fair Value of Assets and Liabilities*, and as required by ASC 815, the Company records all derivatives on its consolidated balance sheet at fair value. The accounting for changes in the fair value of derivatives depends on the intended use of the derivative, whether the Company has elected to designate a derivative in a hedging relationship and apply hedge accounting and whether the hedging relationship has satisfied the criteria necessary to apply hedge accounting. Derivatives designated and qualifying as a hedge of the exposure to variability in expected future cash flows, or other types of forecasted transactions, are considered cash flow hedges. Hedge accounting generally provides for the matching of the timing of gain or loss recognition on the hedging instrument with the recognition of the earnings effect of the hedged forecasted transactions in a cash flow hedge.

The Company is exposed to certain risk arising from economic conditions. The Company principally manages its exposures to interest rate risk through the use of derivative financial instruments. Specifically, the Company enters into derivative financial instruments to manage differences in the amount, timing and duration of the Company's known or expected cash payments principally related to the Company's variable rate borrowings.

The Company's objectives in using interest rate derivatives are to add stability to interest expense and to manage its exposure to interest rate movements. To accomplish this objective, the Company primarily uses interest rate swaps as part of its interest rate risk management strategy. Interest rate swaps designated as cash flow hedges involve the receipt of variable amounts from a counterparty in exchange for the Company

15

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

making fixed-rate payments over the life of the agreements without exchange of the underlying notional amount.

For derivatives designated and that qualify as cash flow hedges of interest rate risk, the gain or loss on the derivative is recorded in accumulated other comprehensive income and subsequently reclassified into interest expense in the same period during which the hedged transaction affects earnings. Amounts reported in accumulated other comprehensive income related to derivatives will be reclassified to interest expense as interest payments are made on the Company's variable-rate debt. In the twelve months subsequent to September 30, 2019, the Company estimates that an additional $767,000 will be reclassified as a reduction to interest expense.

As of September 30, 2019 and December 31, 2018, the Company had outstanding interest rate derivatives with third parties in which the Company pays a fixed interest rate and receives a rate equal to the one-month LIBOR. The notional associated with the swap agreements was $250,000,000 and $85,000,000 as of September 30, 2019 and December 31, 2018, respectively, and have a maturity date at certain dates through March 2024. Prior to August 22, 2019, the interest rate swap agreements were not designated as cash flow hedging instruments for accounting purposes and accordingly changes in fair value of the interest rate swap agreements were recorded in earnings. On August 22, 2019, in accordance with the provisions of ASC 815 and FASB ASU No. 2017-12, *Targeted Improvements to Accounting for Hedging Activities*, the Company designated its swaps as effective cash flow hedges of interest rate risk. Accordingly, subsequent to August 22, 2019, changes in the fair value of the interest rate swaps are recorded as a component of accumulated other comprehensive income within members' equity and subsequently reclassified into interest expense in the same period during which the hedged transaction affects earnings.

The table below presents the fair value of the Company's derivative financial instruments as well as their classification on the consolidated balance sheets at September 30, 2019 and December 31, 2018.

| | As of September 30, 2019 | |
| --- | --- | --- |
| | Balance Sheet Location | Fair Value Asset (Liability) |
| Derivatives designated as hedging instruments: | | |
| Interest rate swap agreements | Other current liabilities | $ (2,070,621) |
| Interest rate swap agreements | Other long-term liabilities | (8,670,538) |
| Total derivatives designated as hedging instruments | | $ (10,741,159) |

| | As of December 31, 2018 | |
| --- | --- | --- |
| | Balance Sheet Location | Fair Value Asset (Liability) |
| Derivatives not designated as hedging instruments: | | |
| Interest rate swap agreements | Prepaid and other current assets | $ 943,134 |
| Interest rate swap agreements | Other current liabilities | (396,302) |
| Total derivatives not designated as hedging instruments | | $ 546,832 |

The table below presents the effect of cash flow hedge accounting on accumulated other comprehensive income during the nine months ended September 30, 2019. There was no effect on accumulated other comprehensive income during the nine months ended September 30, 2018.

16

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

| | Nine Months Ended September 30, 2019 | | |
| --- | --- | --- | --- |
| | Amount of Gain or (Loss) Recognized in OCI on Derivative | Location of Gain or (Loss) Reclassified from Accumulated OCI into Income | Amount of Gain or (Loss) Reclassified from Accumulated OCI into Income |
| Derivatives in cash flow hedging relationships: | | | |
| Interest rate swap agreements | $ 1,067,771 | Interest expense | $ 217,652 |
| Total | $ 1,067,771 | | $ 217,652 |

The table below presents the effect of the Company's derivative financial instruments that were not designated as hedging instruments on the consolidated statements of income (loss) during the nine months ended September 30, 2019 and 2018 and represents the change in fair value of the Company's interest rate swap agreements during such periods.

| | Nine Months Ended September 30, 2019 | |
| --- | --- | --- |
| | Location of Gain or (Loss) Recognized in Income on Derivative | Amount of Gain or (Loss) Recognized in Income on Derivative |
| Derivatives Not Designated as Hedging Instruments: | | |
| Interest rate swap agreements | Interest Expense | $ (12,358,728) |
| Total | | $ (12,358,728) |

| | Nine Months Ended September 30, 2018 | |
| --- | --- | --- |
| | Location of Gain or (Loss) Recognized in Income on Derivative | Amount of Gain or (Loss) Recognized in Income on Derivative |
| Derivatives Not Designated as Hedging Instruments: | | |
| Interest rate swap agreements | Interest Expense | $ 280,861 |
| Total | | $ 280,861 |

**(7)  Deferred Financing Costs**

The change in the carrying amount of deferred financing costs for the nine months ended September 30, 2019 was as follows:

| | |
| --- | --- |
| Balance at December 31, 2018 | $ 2,258,253 |
| Capitalized fees | 9,027,753 |
| Amortization | (830,287) |
| Write-off due to debt refinancing | (2,121,451) |
| Balance at September 30, 2019 | $ 8,334,268 |

Amortization expense relating to deferred financing costs was $830,287 and $340,978 during the nine months ended September 30, 2019 and 2018, respectively, and is included in interest expense in the accompanying consolidated statements of income (loss). The write-off of deferred financing costs is included in loss on extinguishment of debt, net in the accompanying consolidated statements of income (loss) for the nine months ended September 30, 2019.

17

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

**(8) Accounts Payable and Accrued Expenses**

Accounts payable and accrued expenses as of September 30, 2019 and December 31, 2018 consisted of the following:

|  | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Accounts payable | $ 70,807,292 | $ 70,603,562 |
| Employee related accruals | 5,863,299 | 9,142,347 |
| Self insurance reserves | 1,010,205 | 1,304,335 |
| Accrued interest | 3,326,743 | 404,015 |
| Other | 9,448,889 | 4,104,160 |
| Accounts payable and accrued expenses | $ 90,456,428 | $ 85,558,419 |

**(9) Debt**

The following is a summary of long-term debt as of September 30, 2019 and December 31, 2018:

|  | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Secured term loans | $ 296,250,000 | $ 134,875,000 |
| Revolving credit facility | 28,500,000 | — |
| Note payable | 100,000,000 | — |
| Seller note (see Note 2) | 1,666,667 | — |
| Auto loans | 68,030 | 171,942 |
| Unamortized deferred financing fees | (7,052,571) | (862,243) |
|  | 419,432,126 | 134,184,699 |
| Current portion | (8,893,701) | (7,089,976) |
|  | $ 410,538,425 | $ 127,094,723 |

Interest expense related to long-term debt agreements, including amortization of deferred financing costs and payments made under the Company's interest rate swap agreements, for the nine months ended September 30, 2019 and 2018 was $19,447,319 and $5,248,241, respectively.

18

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

In March 2019, the Company signed the Third Amended and Restated Credit and Guaranty Agreement and restructured its debt borrowings with its bank group. The maturity of total debt, excluding unamortized deferred financing fees, at September 30, 2019 is as follows:

| Twelve months ended September 30, | | |
|---|---|---:|
| 2020 | $ | 8,893,701 |
| 2021 | | 11,590,996 |
| 2022 | | 15,000,000 |
| 2023 | | 15,000,000 |
| 2024 | | 276,000,000 |
| Thereafter | | 100,000,000 |
| Total debt maturity | $ | 426,484,697 |

### Long-Term Debt

The March 2019 debt restructuring consisted of $425,000,000 in credit facilities, which includes a $300,000,000 Initial Term Loan (Credit Facility Term Loan), $50,000,000 Delayed Draw Term Loan (Delayed Draw), and $75,000,000 Revolving Credit Facility (New Revolver), all with maturities in March 2024. The Credit Facility Term Loan and Delayed Draw loan may consist of Base Rate Loans or LIBOR Rate Loans (as defined in the agreement). Each LIBOR Rate Loan bears interest quarterly at variable rates based upon the sum of (a) the LIBOR Rate for such interest period, plus (b) an applicable margin based upon the Company's Consolidated Total Leverage Ratio. Each Base Rate Loan bears interest quarterly at variable rates based upon the sum of (a) the Base Rate (as defined in the agreement), plus (b) an applicable margin based upon the Company's Consolidated Total Leverage Ratio. The applicable margin was set at 3.50% and 2.50% for LIBOR Rate Loans and Base Rate Loans, respectively, following the closing of the transaction and are reset each quarter. Per the agreement, the Delayed Draw loan carries 0.5% of unused fee per annum, and the New Revolver carries 0.5% of unused line fee per annum. Under the debt restructuring, the Company is subject to various agreements that contain a number of restrictive covenants that, among other things, impose operating and financial restrictions on the Company. Financial covenants include a Total Leverage Ratio and a Fixed Charges Coverage Ratio, as defined in the agreement. Additionally, under the terms of the debt restructuring, the Company may be required to repay principal based on excess cash flow, as defined.

The proceeds from the Credit Facility Term Loan were used to (1) repay secured term loans with December 31, 2018 balances of $134,875,000, (2) pay transaction costs, fees and expenses related to the consummation of the transactions contemplated under the agreement (see Note and Unit Purchase Agreement discussed below), (3) pay a distribution to the Company's members, and (4) redeem all of the Company's issued and outstanding Preferred Units, including the cumulative preferred dividends. The proceeds of any borrowings under the Delayed Draw loan will be to finance Permitted Acquisitions (as defined in the agreement) and to pay fees and transaction costs associated with such acquisitions. The proceeds of any borrowings under the New Revolver will be for (1) an amount not to exceed $25,000,000 to finance working capital, make capital expenditures and for other general corporate purposes, and (2) an amount not to exceed $50,000,000 to finance Permitted Acquisitions and to pay fees and transaction costs associated with such acquisitions.

### Secured Term Loans

In connection with the debt restructuring the Company borrowed $300,000,000 under the Credit Faciity Term Loan. The Credit Facility Term Loan requires quarterly principal repayments of $1,875,000 beginning June 30, 2019 through March 31, 2021, quarterly principal repayments of $3,750,000 beginning June 30, 2021 through December 31, 2023, and the unpaid principal amount of the Credit Facility Term Loan is due at

19

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

maturity in March 2024. At September 30, 2019 there was $296,250,000 outstanding under the Credit Facility Term Loan. The interest rate under the Credit Facility Term Loan was 5.11% at September 30, 2019.

The Delayed Draw loan has an availability period from the first business day immediately following the Closing Date (March 2019) to the earliest of (a) the Credit Facility Term Loan maturity date, (b) twenty-four months following the closing date, or (c) the date of the termination of the commitment. During the nine months ended September 30, 2019 no amounts were borrowed under the Delayed Draw loan.

In February 2018, the Company signed the Second Amended and Restated Credit and Guaranty Agreement and refinanced its debt structure at that time. The refinancing consisted of $175,000,000, which included a $70,000,000 Initial Term Loan (Initial Term Loan), $80,000,000 Delayed Draw Term Loan (Delayed Draw Loan), and $25,000,000 Revolving Credit Facility (Revolver). The credit facilities bore interest quarterly at variable rates (6.02% at December 31, 2018). At December 31, 2018 there was $67,375,000 and $67,500,000 outstanding under the Initial Term Loan and Delayed Draw Loan, respectively, and there were no amounts outstanding under the Revolver.

### Revolving Credit Facility

During the nine months ended September 30, 2019 the Company borrowed $28,500,000 under the New Revolver, which remained outstanding at September 30, 2019. The interest rate under the New Revolver was 5.11% at September 30, 2019. After consideration of stand-by letters of credit outstanding of $2,496,518, the remaining maximum borrowings available pursuant to the New Revolver were $44,003,482 at September 30, 2019.

### Note Payable

On March 20, 2019, the Company signed a Note and Unit Purchase Agreement with an investor. In connection with the agreement, the Company signed a promissory note agreement with the investor with a principal amount of $100,000,000. The outstanding principal amount under the note agreement is due on the tenth anniversary of the agreement and bears interest at the following rates (a) for the period starting on the closing date and ending on the seventh anniversary, a rate of 12% per annum, with 6% payable in cash and 6% Payment in Kind (PIK), and (b) for the period starting on the day after the seventh anniversary of the closing date and ending on the maturity date, a rate equal to the greater of (i) 15% per annum or (ii) the twelve-month LIBOR plus 12% per annum. The Company has the option to pay the PIK interest in cash, which it did during the nine months ended September 30, 2019, and thus no amounts were added to the principal balance during that period.

### Auto Loans

The Company has auto loans with various banks for its vehicles. These loans are payable in monthly installments ranging from $332 to $661 with interest rates ranging from 0.0% to 3.24%. These loans mature through January 2021 and each loan is secured by the respective vehicle.

### (10)   Membership Units

#### Common Units

As of September 30, 2019 and December 31, 2018, a total of 244,041 and 182,420 of Common Units have been authorized and were issued and outstanding, respectively. A holder of a Common Unit shall be entitled to the allocations and distributions with respect to such unit, and a holder of a Common Unit who is also a Member shall have the right to one vote for each Common Unit owned by such Member.

20

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

On March 20, 2019, the Company signed a Note and Unit Purchase Agreement with an investor. In connection with the agreement, the investor purchased 37,050 Common Units for $20,000,000.

In May 2018, the Company issued 39,526 Common Units as part of the consideration paid for the acquisition of two businesses.  Also in May 2018, the Company issued 3,900 Common Units in connection with the cashless exercise of warrants by a related party.

### Investor Units

On November 18, 2015, the Company issued 2,000,000 Investor Units in a private placement offering. Each Investor Unit carried a value of $1 per $1 contributed and allows for purchase of Common Units, at an exercise price of $182.38 per unit, as defined by the Second Amended and Restated Limited Liability Company agreement.

The Investor Units carried an interest rate of 12% per annum, with interest compounding quarterly, and had no voting or other rights with respect to the Company until the holder of Investor Units converted its units into Common Units. All of the Investor Units were converted to Common Units in conjunction with the March 2019 Recapitalization Transactions.

### Preferred Units

In 2014, the Company issued 2,112,500 of Preferred Units with a fair value of $2,112,500 as repayment to lenders for accrued interest. The Preferred Units had an interest rate of 15% per annum, which is cumulative but not compounding, and have no voting or other rights with respect to the Company. As of December 31, 2018, cumulative preferred dividends to the holders of the Preferred Units was $1,531,563. All of the Company's issued and outstanding Preferred Units were redeemed in conjunction with the March 2019 Recapitalization Transactions.

### Incentive Units and Equity-based Compensation

On June 11, 2019, 14,553 Incentive Units (the 2019 Incentive Units) and April 18, 2018, 15,270 Incentive Units (the 2018 Incentive Units) were granted to certain members of the Company's management. The Incentive Units are intended to constitute profits interests and were granted for purposes of enabling such individuals to participate in the long-term growth and financial success of the Company, and were issued in exchange for services to be performed.

With respect to the 2019 Incentive Units, 50% of the awards vest in equal annual installments on each of the first, second, third and fourth anniversaries of the Vesting Commencement Date as defined in the agreements (which was determined to be May 20, 2019). The remaining 50% vest upon the first to occur of a sale of the Company and the fourth anniversary of the Vesting Commencement Date, in either case, provided that the equity value of the Company at the time of such sale or fourth anniversary equals or exceeds a certain threshold as defined in the agreements, subject to the employee's continuous employment with the Company through each applicable vesting date. The grant date fair value of the 2019 Incentive Units, as calculated under an Option Pricing Method, was $4,511,120, and will be recognized as expense over the employees' requisite service period.

The 2018 Incentive Units vest 50% on the second anniversary of the Vesting Commencement Date as defined in the agreements (which was determined to be May 17, 2018), and 25% on the third and fourth anniversaries of the Vesting Commencement Date, subject to the employee's continuous employment with the Company through each applicable vesting date. The grant date fair value of the 2018 Incentive Units, as calculated under an Option Pricing Method, was $5,344,500, and will be recognized as expense over the employees' requisite service period.

21

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

In conjunction with the March 2019 Recapitalization Transactions, the vesting of 9,852 of the 2018 Incentive Units was accelerated. In addition, although the remaining 2018 Investor Units had not vested under the original vesting terms as the transactions completed in connection with the March 2019 Recapitalization Transactions did not meet the acceleration provisions, the Company approved a cash distribution to the remaining holders of the 2018 Incentive Units as if the awards had fully vested. The distributions are non-refundable upon termination of employment for any cause prior to the remaining vesting period of the 2018 Incentive Units. In addition to the payment of the distribution in March 2019, all holders of the 2018 Incentive Units received an advance for future distribution, which is not refundable upon termination of employment for any cause prior to the remaining vesting period of the 2018 Incentive Units. These cash distributions were treated as a modification of the awards for accounting purposes.

The Company recorded equity-based compensation expense of $5,806,441 and $570,389 during the nine months ended September 30, 2019 and 2018, respectively, which is included in general and administrative expenses in the accompanying consolidated statements of income (loss). The expense recorded during the nine months ended September 30, 2019 included $2,694,201 in connection with the acceleration of vesting of the 2018 Investor Units and $2,200,519 for the modification of the awards relating to the cash distributions discussed above. At September 30, 2019, there was $5,415,075 of unrecognized compensation expense related to the awards.

The assumptions used to determine the grant-date fair value of the 2019 Investor Units and 2018 Investor Units were as follows:

|  | 2019 Investor Units | 2018 Investor Units |
|---|---|---|
| Expected volatility (1) | 40.0% | 35.0% |
| Risk-free interest rate (2) | 2.0% | 2.3% |
| Expected term (3) | 1.5 years | 1.5 years |

(1)    The expected volatility is derived from the asset volatilities of comparable public companies.

(2)    The risk-free interest rate is obtained from Standard and Poor's Capital IQ, and represents the yield on a treasury note as of the valuation date with the maturity matching the expected term.

(3)    The expected term is based on management's estimate.

**(11)    Income Taxes**

AdaptHealth Holdings LLC is treated as a partnership for income tax purposes. A partnership is not a tax-paying entity for federal and state income tax purposes. Income and loss from AdaptHealth Holdings LLC flows through to the members' tax returns. In addition, there are regular C corporations included in the AdaptHealth group where taxes are paid at the entity level.

As of September 30, 2019, Royal Medical Supply, Inc., and MedStar Surgical & Breathing Equipment, Inc. (MedStar), were subject to fiing both Federal and state income tax returns. Included within the MedStar Federal filing group were LI Respiratory Services, Inc., Med Equipment, Inc., Inspire Medical Equipment and Services Inc, Med Star Surgical & Breathing Equipment, Inc., Verus Healthcare Inc., Orbit Medical of Portland, Inc, Clearview Medical Inc., also wholly owned subsidiaries of the Company. In July of 2018, the Company acquired Home Medical Express, Inc., which is included in the Federal tax filing of MedStar. For the nine months ended September 30, 2019 and 2018, the Company recorded income tax expense of $5,443,535 and income tax benefit of $4,518,772, respectively.

Deferred income taxes are determined based on the temporary differences between the financial statement book basis and the tax basis of assets and liabilities using enacted tax rates in effect in the years in

22

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

which the differences are expected to reverse. In assessing the realizability of deferred income tax assets, management considers whether it is more likely than not that all, or some portion, of the deferred income tax assets will not be realized. The ultimate realization of deferred income tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. Management considers the scheduled reversal of deferred income tax liabilities and projected future taxable income in making this assessment. Management evaluates the need for valuation allowances on the deferred income tax assets according to the provisions of ASC 740, *Income Taxes.* In making this determination, management assesses all available evidence, both positive and negative, available at the balance sheet date. This includes, but is not limited to, recent earnings, internally-prepared income projections, and historical financial performance. A history of cumulative losses is a significant piece of negative evidence used in the assessment. Due to the history of losses a valuation allowance was established as of December 31, 2017. The Company reached the point of cumulative income during the three months ended September 30, 2018. Accordingly, the accompanying financial statements reflect the reversal of the valuation allowance at September 30, 2018, resulting in an income tax benefit of $5,019,000 recorded during the three months ended September 30, 2018.

**(12)    Leases**

*Capital leases*

The Company has acquired patient medical equipment and supplies, and office equipment through multiple capital leases. The capital lease obligations represent the present value of minimum lease payments under the respective agreement, payable monthly and bearing interest rates ranging from 0.0% to 10.2%. Interest expense related to capital leases was $80,257 and $232,419 for the nine months ended Septmber 30, 2019 and 2018, respectively. As of September 30, 2019, future annual minimum payments required under lease obligations are as follows:

| Twelve months ended September 30, | | |
|---|---|---:|
| 2020 | $ | 21,788,316 |
| 2021 | | 278,626 |
| Total | | 22,066,942 |
| Less amount representing interest | | (174,403) |
| | | 21,892,539 |
| Current portion | | (21,656,103) |
| Long-term portion | $ | 236,436 |

At September 30, 2019 and December 31, 2018, equipment under capital leases consisted of patient equipment with a cost basis of approximately $40,800,000 and $29,300,000, respectively, and the accumulated depreciation of equipment under capital leases totaled approximately $12,200,000 and $8,800,000, respectively. Depreciation expense for equipment purchased under capital leases is primarily included in cost of net revenue in the accompanying consolidated statements of income (loss).

*Operating leases*

The Company leases its office facilities and office equipment under noncancelable lease agreements which expire at various dates through November 2028. Some of these lease agreements include an option to

23

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

renew at the end of the term. The Company also leases certain patient medical equipment with such leases set to expire at various dates through August 2021. The Company also leases certain office facilities on a month to month basis. In some instances, the Company is also required to pay its pro rata share of real estate taxes and utility costs in connection with the premises. Some of the leases contain fixed annual increases of minimum rent. Accordingly, the Company recognizes rent expense on a straight-line basis and records the difference between the recognized rent expense and the amount payable under the lease as deferred rent. The deferred rent recorded in accounts payable and accrued expenses on the accompanying consolidated balance sheets at September 30, 2019 and December 31, 2018 was $1,072,693 and $741,167, respectively. The Company recorded $7,570,923 and $4,409,860 of rent expense for the nine months ended September 30, 2019 and 2018, respectively, which is primarily included in cost of net revenue in the accompanying consolidated statements of income (loss).

The minimum annual lease commitments under noncancelable leases with initial or remaining terms in excess of one year as of September 30, 2019 are as follows:

| Twelve months ended September 30, | | |
|---|---|---|
| 2020 | $ | 12,634,338 |
| 2021 | | 7,852,167 |
| 2022 | | 5,185,841 |
| 2023 | | 4,110,599 |
| 2024 | | 3,351,053 |
| Thereafter | | 4,189,801 |
| | $ | 37,323,799 |

**(13)    Commitments and Contingencies**

In the normal course of business, the Company is subject to loss contingencies, such as legal proceedings and claims arising out of its business that cover a wide range of matters. In accordance with FASB ASC Topic 450, *Accounting for Contingencies*, the Company records accruals for such loss contingencies when it is probable that a liability has been incurred and the amount of loss can be reasonably estimated. Significant judgement is required to determine both probability and the estimated amount. The Company reviews at least quarterly and adjusts accordingly to reflect the impact of negotiations, settlements, rulings, advice of legal counsel, and updated information. At this time, the Company has no accrual related to lawsuits, claims, investigations and proceedings.

**(14)    Related Parties**

As discussed in Note 9, *Debt*, on March 20, 2019, the Company signed a Note and Unit Purchase Agreement with an investor which included a promissory note agreement with a principal amount of $100,000,000.  This investor also has equity ownership in the Company.

At December 31, 2017, the Company had an outstanding balance of $1,123,181 payable to certain members of AdaptHealth. The payable was noninterest bearing and had no specific repayment terms. The Company repaid the amount in full during 2018.

In 2014, Ocean Home Health Supply LLC, a subsidiary of AdaptHealth, executed an agreement with a related party for software and billing services. The agreement was for one year and automatically renewed from year to year. This agreement was terminated effective December 31, 2018, therefore there was no expense related to the agreement during the nine months ended September 30, 2019. The expense for the nine months ended September 30, 2018 related to the agreement was $1,941,948.

24

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

On December 31, 2014, an executive of the Company borrowed $965,550 to acquire membership units in the Company, which have been included as a reduction to the Common Unit equity balance. Monthly payments are due of interest only at a rate of 1.9% per annum starting February 2015. Principal is due in full at maturity on December 31, 2021. The executive entered into a personal guarantee for the loan.

On November 19, 2015, McLarty Capital Partners SBIC, L.P. (McLarty) contributed $1,000,000 in exchange for 1,000,000 of Investor Units. In May 2017, McLarty converted its convertible notes into 16,900 of Common Units. As of December 31, 2017, $8,642,144 was outstanding to McLarty. This amount was repaid in February 2018.

The Company and certain officers have equity investments in two vendors that provide workflow technology services and automated order intake software, respectively. The expense related to these vendors was $4,624,517 and $1,539,202 for the nine months ended September 30, 2019 and 2018, respectively.

## (15) Subsequent Events

Management has evaluated subsequent events through November 13, 2019, the date which the interim consolidated financial statements were available to be issued.

On October 1, 2019, the Company purchased certain assets of a hospice medical equipment company for total consideration of $725,000, inclusive of an initial cash payment of $652,500 and a potential deferred payment of $72,500 to be paid on the six-month anniversary of the closing date subject to certain conditions. The company is headquartered in Idaho and provides hospice medical equipment and services.

On October 1, 2019, the Company purchased 100% of the stock of a durable medical equipment company. The total consideration consisted of an initial cash payment of $1,977,000 and the sellers have the potential to receive variable earn-out payments each quarter during the first two years following the closing date based on the terms included in the agreement. The company is headquartered in New York and provides respiratory and durable medical equipment and services.

On October 31, 2019, the Company purchased 100% of the membership interests of a durable medical equipment company. The total consideration consisted of an initial cash payment of $12,483,832 and the sellers have the potential to receive earn-out payments in an aggregate amount up to $12,500,000 based on certain financial targets after the transaction. The company is headquartered in Utah and provides continuous positive airway pressure devices and related supplies to its customers.

As of the date the interim consolidated financial statements were available to be issued, the Company was in the process of determining the allocation of the purchase price to the fair value of the net assets acquired for these acquisitions.

On July 8, 2019, the Company entered into an Agreement and Plan of Merger, as amended on October 15, 2019, with DFB Healthcare Acquisitions Corp. (DFB), pursuant to which the Company agreed to combine with DFB (the Transaction). DFB mailed proxy statements and related materials to shareholders of record as of October 15, 2019 and scheduled its special meeting in lieu of an annual meeting of shareholders on November 7, 2019. One of the agenda items for the special meeting was a vote to approve and adopt the proposed merger. The merger was approved, and the Transaction closed on November 8, 2019. The Company will be the accounting acquirer in the merger, which will be treated as a reverse recapitalization. Accordingly, for accounting purposes, the merger will be treated as the equivalent of the Company issuing stock for the net assets of DFB, accompanied by a recapitalization. Net assets of DFB will be stated at historical costs, with no goodwill or intangible assets recorded. The sources of cash were DFB cash on the balance sheet and proceeds

25

**ADAPTHEALTH HOLDINGS LLC AND SUBSIDIARIES**

Notes to Interim Consolidated Financial Statements (Unaudited)

from a private placement offering, and the uses of cash were redemptions of legacy Company and DFB shareholders, debt repayment and payment of transaction expenses. As a result of the merger, the Company's cash balance increased by approximately $54,000,000, which will be used to fund the operations and working capital needs of the combined company.

In connection with the Transaction, the Company amended its credit facility with its lender primarily to (i) increase the amount available under the Delayed Draw Term Loan from $50,000,000 to $100,000,000, and (ii) revise the Consolidated Total Leverage Ratio thresholds and lower the applicable margin to determine the variable quarterly interest rate under the credit facility. In addition, in connection with the Transaction, the $100,000,000 promissory note executed as part of the Note and Unit Purchase Agreement discussed in Note 9, *Debt*, was cancelled and the investor was issued a new amended and restated promissory note with a principal amount of $100,000,000. In addition, the investor converted 19,747 of Common Units to a $43,500,000 promissory note. The new $100,000,000 promissory note, together with the $43,500,000 promissory note, are collectively referred to herein as the New Promissory Note. The outstanding principal amount under the New Promissory Note is due on the tenth anniversary of the closing date of the Transaction and bears interest at the following rates (a) for the period starting on the closing date and ending on the seventh anniversary, a rate of 12% per annum, with 6% payable in cash and 6% Payment in Kind (PIK), and (b) for the period starting on the day after the seventh anniversary of the closing date and ending on the maturity date, a rate equal to the greater of (i) 15% per annum or (ii) the twelve-month LIBOR plus 12% per annum. The Company has the option to pay the PIK interest in cash.

In connection with the Transaction, the principal and interest outstanding relating to the $965,550 loan to an executive of the Company discussed in Note 14, *Related Parties*, was forgiven by the Company.

In connection with the Transaction, the vesting of 3,448 of the 2018 Incentive Units discussed in Note 10, *Membership Units*, was accelerated. In addition, with respect to the 2019 Incentive Units which vest upon the first to occur of a sale of the Company and the fourth anniversary of the Vesting Commencement Date, the vesting terms of these 2019 Incentive Units was changed to be subject to time based vesting, with 25% of such units vesting on each of the first four quarterly anniversaries of the closing date of the Transaction.

26

**Item 2.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF ADAPTHEALTH HOLDINGS LLC**

The following discussion should be read in conjunction with AdaptHealth Holdings LLC's ("AdaptHealth Holdings" or the "Company") consolidated interim financial statements and the accompanying notes contained in this report, as well as the financial information and MD&A contained in our annual report. All amounts presented are in accordance with U.S. generally accepted accounting principles (GAAP), except as noted. In addition to historical information, this discussion contains forward-looking statements that involve risks, uncertainties and assumptions that could cause actual results to differ materially from management's expectations. Factors that could cause such differences are discussed below and elsewhere in this Current Report on Form 8-K and in the Proxy Statement, particularly "Cautionary Note Regarding Forward-Looking Statements" and "Risk Factors."

**AdaptHealth Holdings LLC Overview**

AdaptHealth Holdings is a leading provider of home healthcare equipment and related services in the United States. AdaptHealth Holdings focuses primarily on providing (i) sleep therapy equipment, supplies and related services (including CPAP and bi-PAP services) to individuals suffering from obstructive sleep apnea (OSA), (ii) home medical equipment to patients discharged from acute care and other facilities and (iii) oxygen and related chronic therapy services in the home. AdaptHealth Holdings also provides hospice-focused Home Medical Equipment ("HME") services, wound therapy and nutritional HME services. AdaptHealth Holdings services beneficiaries of Medicare, Medicaid and commercial payors. As of September 30, 2019, AdaptHealth Holdings serviced over one million patients annually in 49 states through its network of 186 locations in 35 states. AdaptHealth's principal executive offices are located at 220 West Germantown Pike, Suite 250, Plymouth Meeting, Pennsylvania 19462.

On July 8, 2019, AdaptHealth Holdings entered into an Agreement and Plan of Merger, as amended on October 15, 2019, with DFB Healthcare Acquisitions Corp. (DFB), pursuant to which AdaptHealth Holdings agreed to combine with DFB. DFB mailed proxy statements and related materials to shareholders of record as of October 15, 2019 and scheduled its special meeting in lieu of an annual meeting of shareholders on November 7, 2019. One of the agenda items for the special meeting was a vote to approve and adopt the proposed merger. The merger was approved and closed on November 8, 2019.

**Trends and Factors Affecting AdaptHealth Holdings' Future Performance**

Significant trends and factors that AdaptHealth Holdings believes may affect its future performance include:

- **Home Medical Equipment Growth.** According to CMS, the HME industry has grown from $40 billion in 2010 to $56 billion in 2018 (representing a 4.3% CAGR), of which AdaptHealth's total addressable market for its sleep therapy, oxygen services, mobility products and hospice HME business lines comprised approximately $12 billion to $15 billion in 2018. During that time Medicaid data shows a continued shift of long-term services and supports (LTSS) spending into the home, with 57% of that spending going to home and community-based services in 2016. According to CMS, the HME market is projected to continue to grow at a 6.1% CAGR over the next nine years.

- **Aging U.S. Population.** The population of adults aged 65 and older in the U.S., a significant group of end users of AdaptHealth's products and services, is expected to continue to grow and thus grow AdaptHealth's market opportunity. According to CMS, in the U.S., the population of adults between the ages of 65 and 84 is expected to grow at a 2.5% CAGR through 2030, while the population of adults over 85 is projected to grow at a 2.9% CAGR during that same time period. Not only is the elderly population expected to grow, but they are also expected to make up a larger percentage of the total U.S. population. According to the U.S. Census Bureau, the U.S. geriatric population was approximately 15% of the total population in 2014 and is expected to grow to approximately 24% of the total population by 2060.

- **Increasing Prevalence of Chronic Conditions.** HME is necessary to help treat significant health issues affecting millions of Americans, such as chronic obstructive pulmonary disease, congestive heart failure and obstructive sleep apnea.

- **Increasing Prevalence of and Preference for In-Home Treatments.** The number of conditions that can be treated in the home continues to grow, with recent additions including chronic wound care, sleep testing,

27

dialysis and chemotherapy. In-home care is also increasingly becoming the preferred method of treatment, particularly for the elderly population. According to the AARP Public Policy Institute, 90% of patients over age 55 have indicated a preference to receive care in the home rather than in an institutional setting.

- ***Home Care is the Lowest Cost Setting.***  Not only is in-home care typically just as effective as care delivered in an inpatient setting, but it has also proven to be more cost effective. This is especially important within the context of government pressures to lower the cost of care, pushing clinicians to seek care settings that are less costly than hospitals and inpatient facilities. On a daily basis, home health has been estimated by Cain Brothers & Company, LLC to be approximately seven times less expensive than care provided in skilled nursing facilities, the closest acuity site of care. Home care offers a significant cost reduction opportunity relative to facility-based care without sacrificing quality.

Certain additional items may impact the comparability of the historical results presented below with AdaptHealth Holdings' future performance, such as the cost of being a public company. To operate as a public company, AdaptHealth Holdings will be required to continue to implement changes in certain aspects of its business and develop, manage, and train management-level and other employees to comply with ongoing public company requirements. AdaptHealth Holdings will also incur new expenses as a public company, including expenses associated with public reporting obligations, proxy statements and stockholder meetings, stock exchange fees, transfer agent fees, SEC and Financial Industry Regulatory Authority filing fees and offering expenses.

### Key Components of Operating Results

*Net Revenues.*  Net revenues are recorded for services that AdaptHealth Holdings provides to patients for home healthcare equipment and related services. AdaptHealth Holdings' primary service lines are (i) sleep therapy equipment, supplies and related services (including CPAP and bi-PAP services) to individuals suffering from OSA, (ii) home medical equipment to patients discharged from acute care and other facilities and (iii) respiratory, including oxygen and related chronic therapy services in the home. Net revenues also include other services and supplies, primarily related to orthotics, enteral and hospice. Revenues are recorded either (x) at a point in time for the sale of supplies and disposables, or (y) over the service period for equipment rental (including, but not limited to, CPAP machines, hospital beds, wheelchairs and other equipment), at amounts estimated to be received from patients or under reimbursement arrangements with Medicare, Medicaid and other third-party payors, including private insurers. For the nine months ended September 30, 2019, approximately 59% and 41% of revenues were recognized at a point in time and over the service period, respectively. For the nine months ended September 30, 2018, approximately 54% and 46% of revenues were recognized at a point in time and over the service period, respectively. Net revenues are net of related provision for doubtful accounts. Provision for doubtful accounts consists of billed charges that are ultimately deemed uncollectible due a patient's or a third-party payor's unwillingness to pay. The amount is based on management's best estimate of the net realizable value of accounts receivable.

*Cost of Net Revenues.*  Cost of net revenues includes the cost of non-capitalized medical equipment and supplies, distribution expenses, labor costs, facilities rental costs, third-party revenue cycle management costs and depreciation for capitalized patient equipment. Distribution expenses represents the cost incurred to coordinate and deliver products and services to the patients. Included in distribution expenses are leasing, maintenance, licensing and fuel costs for the vehicle fleet; salaries, benefits and other costs related to drivers and dispatch personnel; and amounts paid to couriers.

*General and Administrative Expenses.*  General and administrative expenses consist of corporate support costs including information technology, human resources, finance, contracting, legal, compliance and other administrative costs.

*Depreciation, Excluding Patient Equipment Depreciation.*  Depreciation expense includes depreciation charges for capital assets other than patient equipment (which is included as part of the cost of net revenues).

*Interest Expense.*  Interest expense includes the cost of borrowing on AdaptHealth Holdings' credit facility, amortization expense related to capitalized loan costs, obligations under capital leases and the change in fair value of its interest rate swap contracts prior to such contracts being designated as effective cash flow hedges.  On August 22, 2019, in accordance with the provisions of FASB ASC 815, *Derivatives and Hedging*, and FASB ASU No. 2017-12, *Targeted Improvements to Accounting for Hedging Activities*, AdaptHealth Holdings designated its swaps as effective cash flow hedges. Accordingly, subsequent to August 22, 2019, changes in the fair value of its interest rate swaps will be recorded as a component of other comprehensive income rather than interest expense.

28

*Income Tax (Benefit) Expense.* AdaptHealth Holdings is treated as a partnership for income tax purposes. A partnership is not a tax-paying entity for federal and state income tax purposes; therefore, income and loss from AdaptHealth Holdings flows through to its members' tax returns. In addition, there are regular C corporations included in the AdaptHealth Holdings group where taxes are paid at the entity level. AdaptHealth Holdings makes no provision for federal income taxes because its members are responsible for the tax on their share of the taxable income and loss and are entitled to any available tax credits on their income tax returns. However, a provision is made for entity level taxes attributable to the C corporations.

At the closing of the merger, DFB and AdaptHealth Holdings entered into the Tax Receivable Agreement with the Blocker Sellers and Non-Blocker AdaptHealth Members. The Tax Receivable Agreement will generally provide for the payment by DFB to the Blocker Sellers and Non-Blocker AdaptHealth Members of 85% of the net cash savings, if any, in U.S. federal, state and local income tax that DFB actually realizes (or is deemed to realize in certain circumstances) in periods after the closing of the merger as a result of: (i) certain tax attributes of Access Point Medical, Inc. existing prior to the merger; (ii) certain increases in tax basis resulting from exchanges of New AdaptHealth Units and shares of Class B Common Stock; (iii) imputed interest deemed to be paid by DFB as a result of payments it makes under the Tax Receivable Agreement; and (iv) certain increases in tax basis resulting from payments DFB makes under the Tax Receivable Agreement.

**Factors Affecting AdaptHealth Holdings' Operating Results**

AdaptHealth Holdings' operating results and financial performance are influenced by certain unique events during the periods discussed herein, including the following:

**Significant Acquisitions**

AdaptHealth Holdings accounts for its acquisitions in accordance with FASB ASC Topic 805, *Business Combinations*, and the operations of the acquired entities are included in the historical results of AdaptHealth Holdings for the periods following the closing of the acquisition. The most significant of these acquisitions impacting the comparability of AdaptHealth Holdings' operating results were:

- *Gould's.* On January 2, 2019, AdaptHealth Holdings acquired Gould's Discount Medical, LLC ("Gould's") for total consideration $24.3 million, consisting of $20.8 million in cash, a $2.0 million promissory note (payable in six equal quarterly installments commencing on September 30, 2019 and accruing 5.0% interest annually), and $1.5 million in potential earn-out payments (the "Gould's Acquisition"). Gould's is headquartered in Louisville, Kentucky and provides home medical equipment supplies and respiratory products such as home oxygen and sleep apnea equipment. At the time of the acquisition, Gould's had annual revenues of approximately $33 million based on the results for the 12 months ended December 31, 2018.

- *SleepMed.* On July 5, 2019, AdaptHealth Holdings purchased certain assets relating to the durable medical equipment business of SleepMed Therapies, Inc. ("SleepMed") for total consideration of $15.4 million, consisting of $11.4 million in cash and $4.0 million in potential earn-out payments. SleepMed is headquartered in Atlanta, GA and provides positive airway pressure devices and related supplies to customers in their homes or other alternative site care facilities. At the time of the acquisition, SleepMed had annual revenues of approximately $26 million based on the results for the 12 months ended June 30, 2019.

- *CCLI.* On October 15, 2018, AdaptHealth Holdings acquired Continued Care of Long Island, Inc. ("CCLI") for total cash consideration of $4.8 million. CCLI is headquartered in New York and provides home medical equipment and services. At the time of the acquisition, CCLI had annual net revenues of approximately $19 million based on results for the 12 months ended June 30, 2018.

- *Med Way.* On December 31, 2018, AdaptHealth Holdings acquired Med Way Medical, Inc. ("Med Way") for total consideration of $5.4 million consisting of $4.9 million in cash and $0.5 million in deferred payments (the "Med Way Acquisition"). In addition, the sellers have the potential to receive earn-out payments up to a maximum of $5.0 million which are based on the achievement of certain financial targets during the three year period after the transaction. Based on the available information at the date of the acquisition, the targets were not determined to be probable of achievement, and therefore these potential payments were not reflected in the acquisition accounting for the acquisition and are not included in the total consideration noted above. Med Way is headquartered in Utah and provides respiratory durable medical equipment and hospice services. At the time of the acquisition, Med Way had annual revenues of approximately $6 million based on the results for the 12 months ended September 30, 2018.

29

- **HMEI.** On July 31, 2018, AdaptHealth Holdings acquired Home Medical Express Inc. ("HMEI") for total initial consideration of $13.3 million, consisting of $9.0 million in cash, $1.0 million in escrow payments and estimated contingent consideration of up to $3.3 million (the "HMEI Acquisition"). HMEI is headquartered in Illinois and provides respiratory and durable medical equipment and services. At the time of the acquisition, HMEI had annual revenues of approximately $16 million based on annualized year-to-date results through July 31, 2018.

- **Verus.** On May 17, 2018, AdaptHealth Holdings acquired Verus Healthcare, Inc. ("Verus") for $100.4 million of total consideration, consisting of $58.4 million in cash, $13.2 million of AdaptHealth Holdings Common Units, the issuance of $16.8 million of convertible notes and $12.0 of contingent consideration (the "Verus Acquisition"). Verus is headquartered in Nashville, Tennessee and operates a national CPAP resupply business. The contingent consideration was paid in February 2019 following the achievement of certain financial targets after the transaction. The convertible notes converted to 10,802 AdaptHealth Holdings Common Units on December 31, 2018. At the time of the acquisition, Verus had annual net revenues of approximately $70 million based on annualized year-to-date results through May 17, 2018.

- **PPS.** On May 17, 2018, AdaptHealth Holdings acquired PPS HME Holdings LLC ("PPS") for $7 million in cash and $48.5 million of AdaptHealth Holdings Common Units (the "PPS Acquisition"). PPS is headquartered in California, and provides home oxygen, respiratory medications, and sleep therapy equipment and services. At the time of the acquisition, PPS had annual net revenues of approximately $78 million based on annualized year-to-date results through May 17, 2018.

**Debt and Recapitalization**

On March 20, 2019, AdaptHealth Holdings entered into the Third Amended and Restated Credit and Guaranty Agreement and restructured its debt borrowings with its bank group. The debt restructuring consisted of $425 million in credit facilities, which includes a $300 million Initial Term Loan (the "Credit Facility Term Loan"), $50 million Delayed Draw Term Loan (the "Delayed Draw Loan"), and $75 million Revolving Credit Facility (the "New Revolver"), all with maturities in March 2024. The Credit Facility Term Loan may consist of Base Rate Loans or LIBOR Rate Loans (as defined in the agreement). See "—Liquidity and Capital Resources—2019 Recapitalization."

On March 20, 2019, AdaptHealth Holdings signed a Note and Unit Purchase Agreement with BM AH Holdings, LLC, an affiliate of Blue Mountain Capital (Blue Mountain). In connection with the agreement, Blue Mountain purchased 37,050 AdaptHealth Holdings Common Units for $20 million, and AdaptHealth Holdings also signed a promissory note agreement with Blue Mountain with a principal amount of $100 million. The outstanding principal amount under the note agreement is due on the tenth anniversary of the agreement and bears interest at the following rates (a) for the period starting on the closing date and ending on the seventh anniversary, a rate of 12% per annum, with 6% payable in cash and 6% payment in kind, and (b) for the period starting on the day after the seventh anniversary of the closing date and ending on the maturity date, a rate equal to the greater of (i) 15% per annum or (ii) the twelve-month LIBOR plus 12% per annum.

The transactions consummated with respect to the Third Amended and Restated Credit and Guaranty Agreement and the Note and Unit Purchase Agreement are hereinafter referred to as the "2019 Recapitalization."

In connection with the closing of the merger with DFB, the Company amended its credit facility primarily to (i) increase the amount available under the Delayed Draw Loan from $50 million to $100 million, and (ii) revise the Consolidated Total Leverage Ratio thresholds and lower the applicable margin to determine the variable quarterly interest rate under the credit facility. In addition, in connection with the closing of the merger, the $100 million promissory note issued to Blue Mountain discuesed above was cancelled and Blue Mountain was issued a new amended and restated promissory note with a principal amount of $100 million. In addition, Blue Mountain converted 19,747 of Common Units to a $43.5 million promissory note. The new $100 million promissory note, together with the $43.5 million promissory note, are collectively referred to herein as the New Promissory Note. The outstanding principal amount under the New Promissory Note is due on the tenth anniversary of the closing date of the merger and bears interest at the following rates (a) for the period starting on the closing date and ending on the seventh anniversary, a rate of 12% per annum, with 6% payable in cash and 6% Payment in Kind (PIK), and (b) for the period starting on the day after the seventh anniversary of the closing date and ending on the maturity date, a rate equal to the greater of (i) 15% per annum or (ii) the twelve-month LIBOR plus 12% per annum. The Company has the option to pay the PIK interest in cash.

**Seasonality**

AdaptHealth Holdings' business is somewhat sensitive to seasonal fluctuations. Its patients are generally responsible for a greater percentage of the cost of their treatment or therapy during the early months of the year due to co-insurance, co-payments and deductibles, and therefore may defer treatment and services of certain therapies until meeting their annual deductibles. In addition, changes to employer insurance coverage often go into effect at the beginning of each calendar year which may impact eligibility requirements and delay or defer treatment. These factors may lead to lower net revenues and cash flow in the early part of the year relative to the latter half of the year. Additionally, the increased incidence of respiratory infections during the winter season may result in initiation of additional respiratory services such as oxygen therapy for certain patient populations. AdaptHealth Holdings' quarterly operating results may fluctuate significantly in the future depending on these and other factors.

**Key Business Metrics**

AdaptHealth Holdings focuses on net revenues, EBITDA, Adjusted EBITDA and Adjusted EBITDA less Patient Equipment Capex as it reviews its performance. Total net revenue is comprised of net sales revenue and net revenue from fixed monthly equipment reimbursements. Net sales revenue consists of revenue recognized at a point in time for the sale of supplies and disposables less a provision for doubtful accounts. Net revenue from fixed monthly equipment reimbursements consists of revenue recognized over the service period for equipment (including, but not limited to, CPAP machines, hospital beds, wheelchairs and other equipment) less a provision for doubtful accounts.

| Net Revenues (in thousands) | Nine Months Ended September 30, 2019 | | Nine Months Ended September 30, 2018 | |
|---|---|---|---|---|
| | Dollars | Revenue Percentage | Dollars | Revenue Percentage |
| | (Unaudited) | | | |
| Net sales revenue | | | | |
| Sleep | $ 156,677 | 41.2% | $ 79,191 | 33.4% |
| Respiratory | $ 4,121 | 1.1% | $ 3,529 | 1.5% |
| HME | $ 33,971 | 8.9% | $ 27,296 | 11.5% |
| Other | $ 30,247 | 8.0% | $ 17,577 | 7.4% |
| Total Net sales revenue | $ 225,016 | 59.2% | $ 127,593 | 53.8% |
| | | | | |
| Net revenue from fixed monthly equipment reimbursments | | | | |
| Sleep | $ 57,762 | 15.2% | $ 35,345 | 15.0% |
| Respiratory | $ 60,085 | 15.8% | $ 47,040 | 19.9% |
| HME | $ 31,767 | 8.4% | $ 26,304 | 11.1% |
| Other | $ 5,473 | 1.4% | $ 343 | 0.2% |
| Total Net revenue from fixed monthly equipment reimbursments | $ 155,087 | 40.8% | $ 109,032 | 46.2% |
| | | | | |
| Total net revenue | | | | |
| Sleep | $ 214,439 | 56.4% | $ 114,536 | 48.4% |
| Respiratory | $ 64,206 | 16.9% | $ 50,569 | 21.4% |
| HME | $ 65,738 | 17.3% | $ 53,600 | 22.6% |
| Other | $ 35,720 | 9.4% | $ 17,920 | 7.6% |
| Total net revenue | $ 380,103 | 100% | $ 236,625 | 100% |

**Results of Operations**

*Comparison of Nine Months Ended September 30, 2019 and Nine Months Ended September 30, 2018.*

The following table summarizes AdaptHealth Holdings' unaudited consolidated results of operations for the nine months ended September 30, 2019 and September 30, 2018:

31

| (in thousands, except percentages) | Nine Months Ended September 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | Increase/(Decrease) | |
| | Dollars | Revenue Percentage | Dollars | Revenue Percentage | Dollars | Percentage |
| | | | (unaudited) | | | |
| Revenue: | | | | | | |
| Revenue, net of contractual allowances and discounts | $ 400,958 | 105.5% | $ 246,092 | 104.0% | $ 154,866 | 62.9% |
| Provision for doubtful accounts | (20,855) | (5.5)% | (9,467) | (4.0)% | (11,388) | 120.3% |
| **Net revenue less provision for doubtful accounts** | **380,103** | **100.0%** | **236,625** | **100.0%** | **143,478** | **60.6%** |
| Costs and expenses: | | | | | | |
| Cost of net revenue | 317,174 | 83.4% | 199,586 | 84.3% | 117,588 | 58.9% |
| General and administrative expenses | 31,508 | 8.3% | 12,229 | 5.2% | 19,279 | 157.6% |
| Depreciation, excluding patient equipment depreciation | 2,439 | 0.6% | 2,293 | 1.0% | 146 | 6.4% |
| **Total costs and expenses** | **351,121** | **92.3%** | **214,108** | **90.5%** | **137,013** | **64.0%** |
| **Operating income** | **28,982** | **7.7%** | **22,517** | **9.5%** | **6,465** | **28.7%** |
| Interest expense | 31,651 | 8.3% | 5,200 | 2.2% | 26,451 | 508.7% |
| Loss on extinguishment of debt, net | 2,121 | 0.6% | 1,399 | 0.6% | 722 | 51.6% |
| **(Loss) income before income taxes** | **(4,790)** | **(1.2)%** | **15,918** | **6.7%** | **(20,708)** | **(130.1)%** |
| Income tax expense | 5,444 | 1.4% | (4,519) | (1.9)% | 9,963 | NM |
| **Net (loss) income** | **(10,234)** | **(2.6)%** | **20,437** | **8.6%** | **(30,671)** | **(150.1)%** |
| Income attributable to noncontrolling interest | 1,336 | 0.4% | 681 | 0.3% | 655 | 96.2% |
| **Net (loss) income attributable to AdaptHealth Holdings LLC** | **$ (11,570)** | **(3.0)%** | **$ 19,756** | **8.3%** | **$ (31,326)** | **(158.6)%** |

*Net Revenue.* Net revenue for the nine months ended September 30, 2019 were $380.1 million compared to $236.6 million for the nine months ended September 30, 2018, an increase of $143.5 million or 60.6%. The increase of net revenue was driven primarily by acquisitions, which increased revenue by approximately $128.5 million. Approximately 54.3% of the increase in net revenue was attributable to acquisitions and approximately 6.3% was attributable to internal growth. Internal growth in net revenue is attributable to demographic growth in core markets and CPAP resupply sales and marketing initiatives. For the nine months ended September 30, 2019, sales revenue comprised 59.2% of total net revenue, compared to 53.8% of total net revenue for the nine months ended September 30, 2018. The increase in sales revenue was driven primarily by the Verus Acquisition, which is predominantly a CPAP resupply business and therefore has a high sales revenue mix. For the nine months ended September 30, 2019, revenue from fixed monthly equipment reimbursements comprised 40.8% of total net revenue, compared to 46.2% of total net revenue for the nine months ended September 30, 2018.

*Cost of Net Revenue.* Cost of net revenue for the nine months ended September 30, 2019 was $317.2 million compared to $199.6 million for the nine months ended September 30, 2018, an increase of $117.6 million or 58.9%. Cost of net revenue as a percentage of net revenue was 83.4% of net revenues for the nine months ended September 30, 2019, compared to 84.3% of net revenues for the nine months ended September 30, 2018. The 0.9% decrease in cost of net revenue as a percentage of net revenue is due in part to lower product cost and lower labor expense due to an increased usage of a global workforce. The $117.6 million increase in cost of net revenue is primarily attributable to acquisition growth.

*General and Administrative Expenses.* General and administrative expenses for the nine months ended September 30, 2019 were $31.5 million compared to $12.2 million for the nine months ended September 30, 2018, an increase of $19.3 million or 157.6%. General and administrative expenses as a percentage of net revenues was 8.3% for the nine months ended September 30, 2019, and 5.2% for the nine months ended September 30, 2018. General and administrative expenses for the nine months ended September 30, 2019 included $5.8 million in equity-based compensation expense, $7.8 million in transaction costs, $0.1 million in severance expenses and $0.3 million in other non-recurring expenses. General and administrative expenses for the nine months ended September 30, 2018 included $0.6 million in equity-based compensation expense and $1.3 million in transaction costs. Excluding the impact of equity-based compensation expense, transaction costs, severance and other non-recurring expenses, general and administrative expenses as a percentage of net revenues was 4.6% and 4.4% for the nine months ended September 30, 2019 and 2018, respectively. The $19.3 million increase was primarily comprised of an increase in labor costs of $10.7 million which included a $5.2 million increase in equity-based compensation expense, and an increase in other general and administrative expenses of $8.6 million of which $6.5 million was transaction related. Excluding the impact attributable to

32

equity-based compensation and transaction expenses, the increase was primarily a result of increased support costs related to acquisition growth.

*Interest Expense.* Interest expense for the nine months ended September 30, 2019 was $31.7 million compared to $5.2 million for the nine months ended September 30, 2018. The increase in interest expense was driven by higher long-term debt obligations to fund acquisitions as well as the 2019 Recapitalization. Additionally, during the nine months ended September 30, 2019, AdaptHealth Holdings recorded non-cash interest expense representing the change in fair value of its interest rate swap agreements of $12.4 million, as compared to non-cash interest income of $0.3 million recorded in the nine months ended September 30, 2018; such amounts would only be paid out if the interest rate swap agreements were terminated. On August 22, 2019, in accordance with the provisions of FASB ASC 815, *Derivatives and Hedging*, and FASB ASU No. 2017-12, *Targeted Improvements to Accounting for Hedging Activities*, AdaptHealth Holdings designated its swaps as effective cash flow hedges. Accordingly, subsequent to August 22, 2019, changes in the fair value of its interest rate swaps will be recorded as a component of other comprehensive income rather than interest expense.

*Loss on Extinguishment of Debt.* Loss on extinguishment of debt for the nine months ended September 30, 2019 was $2.1 million which was a result of the write-off of deferred financing costs related to the 2019 Recapitalization. Loss on extinguishment of debt for the nine months ended September 30, 2018 was $1.4 million which was the result of the write-off of deferred financing costs and prepayment penalties incurred related to a debt restructuring that occurred in February 2018 offset by gain on debt extinguishment.

*Income Tax Expense.* Income tax expense for the nine months ended September 30, 2019 was $5.4 million compared to income tax benefit of $4.5 million for the nine months ended September 30, 2018. The increase in income tax expense was primarily related to increased pre-tax income associated with the tax paying entities. In the quarter ended September 30, 2018, AdaptHealth Holdings reversed a previously established valuation allowance on deferred tax assets as a result of its profitability over the previous two years, resulting in an income tax benefit of $5.0 million recorded during that period. The recorded income tax benefit was shown as recorded in the three months ended December 31, 2018 in the "Quarterly Results of Operations and Other Financial and Operations Data" in the Proxy Statement. The change has no impact on net income for the year ended December 31, 2018.

**EBITDA, Adjusted EBITDA and Adjusted EBITDA less Patient Equipment Capex**

AdaptHealth Holdings uses EBITDA, Adjusted EBITDA and Adjusted EBITDA less Patient Equipment Capex, which are financial measures that are not prepared in accordance with generally accepted accounting principles in the United States, or U.S. GAAP, to analyze its financial results and believes that it is useful to investors, as a supplement to U.S. GAAP measures. Under AdaptHealth Holdings' existing credit agreement, its ability to engage in activities such as incurring additional indebtedness and making investments is governed, in part, by its ability to satisfy tests based on EBITDA, Adjusted EBITDA and Adjusted EBITDA less Patient Equipment Capex.

AdaptHealth Holdings defines EBITDA as net income (loss) attributable to AdaptHealth Holdings LLC, plus net income (loss) attributable to noncontrolling interest, plus interest expense, income tax expense (benefit), depreciation and amortization and loss from discontinued operations, net of tax.

AdaptHealth Holdings defines Adjusted EBITDA as EBITDA, plus loss on extinguishment from debt, equity-based compensation, transaction costs, severance, and certain other non-recurring expenses.

AdaptHealth Holdings defines Adjusted EBITDA less Patient Equipment Capex as Adjusted EBITDA (as defined above) less patient equipment acquired during the period without regard to whether the equipment was purchased or financed through lease transactions.

AdaptHealth Holdings presents Adjusted EBITDA less Patient Equipment Capex because it believes this measure is useful to investors in evaluating AdaptHealth Holdings' financial performance. AdaptHealth Holdings' business requires significant investment in equipment purchases to maintain its patient equipment inventory. Some equipment title transfers to patients' ownership after a prescribed number of fixed monthly payments. Equipment that does not transfer wears out or oftentimes is not recovered after a patient's use of the equipment terminates.

AdaptHealth Holdings uses the Adjusted EBITDA less Patient Equipment Capex metric internally in the following ways:

- All incentive compensation plans that have a profitability component use Adjusted EBITDA less Patient Equipment Capex as the relevant profitability measure;

33

- AdaptHealth Holdings evaluates acquisition opportunities using Adjusted EBITDA less Patient Equipment Capex as the metric and most contingent consideration arrangements are based on this metric; and

- AdaptHealth Holdings' debt agreements contain covenants that use a variation of Adjusted EBITDA less Patient Equipment Capex for purposes of determining debt covenant compliance.

For purposes of this metric, patient equipment capital expenditure is measured as the value of the patient equipment received during the accounting period without regard to whether the equipment is purchased or financed through lease transactions.

EBITDA, Adjusted EBITDA and Adjusted EBITDA less Patient Equipment Capex should not be considered as measures of financial performance under U.S. GAAP, and the items excluded from EBITDA, Adjusted EBITDA and Adjusted EBITDA less Patient Equipment Capex are significant components in understanding and assessing financial performance. Both key business metrics have limitations as an analytical tool. Some of these limitations are:

- they do not reflect AdaptHealth Holdings' cash expenditures, future requirements for capital expenditures or contractual commitments;

- they do not reflect changes in, or cash requirements for, AdaptHealth Holdings' working capital needs;

- they do not reflect significant interest expense, or the cash requirements necessary to service interest or principal payments on AdaptHealth Holdings' debts; although depreciation and amortization are non-cash charges, the assets being depreciated and amortized will often have to be replaced in the future, and Adjusted EBITDA does not reflect any cash requirements for such replacements;

- Stock-based compensation is and will remain a key element of AdaptHealth Holdings' overall long-term incentive compensation package, although AdaptHealth Holdings excludes it as an expense when evaluating its ongoing operating performance for a particular period; and

- they do not reflect the impact of certain cash charges resulting from matters AdaptHealth Holdings considers not to be indicative of its ongoing operations; and other companies in AdaptHealth Holdings' industry may calculate Adjusted EBITDA differently than AdaptHealth Holdings does, limiting its usefulness as a comparative measure.

Because of these limitations, EBITDA, Adjusted EBITDA and Adjusted EBITDA less Patient Equipment Capex should not be considered in isolation from, or as a substitute for, financial information prepared in accordance with U.S. GAAP, and should not be considered as an alternative to net income or any other performance measures derived in accordance with U.S. GAAP or as an alternative to cash flows from operating activities as a measure of AdaptHealth Holdings' liquidity.

The following unaudited table presents the reconciliation of net income (loss) attributable to AdaptHealth Holdings LLC, to EBITDA, Adjusted EBITDA and Adjusted EBITDA less Patient Equipment Capex for the nine months ended September 30, 2019 and 2018:

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| (in thousands) | 2019 | 2018 |
| | (Unaudited) | |
| Net (loss) income attributable to AdaptHealth Holdings LLC | $ (11,570) | $ 19,756 |
| Income attributable to noncontrolling interest | 1,336 | 681 |
| Interest expense excluding change in fair value of interest rate swaps | 19,292 | 5,481 |
| Interest expense (income) representing change in fair value of interest rate swaps | 12,359 | (281) |
| Income tax expense | 5,444 | (4,519) |
| Depreciation | 45,077 | 33,012 |
| **EBITDA** | **71,938** | **54,130** |
| Loss on extinguishment of debt, net(a) | 2,121 | 1,399 |
| Equity-based compensation expense(b) | 5,806 | 571 |
| Transaction costs(c) | 8,232 | 1,342 |
| Severance(d) | 721 | 1,198 |
| Non-recurring expenses(e) | 534 | 94 |
| **Adjusted EBITDA** | **89,352** | **58,734** |
| Less: Patient equipment capex(f) | (35,589) | (27,906) |
| **Adjusted EBITDA less Patient Equipment Capex** | **$ 53,763** | **$ 30,828** |

34

(a)    Represents write off of deferred financing costs and prepayment penalty expense related to refinancing of debt offset by gain on debt extinguishment.

(b)    Represents amortization of equity-based compensation to employees and expense resulting from accelerated vesting and modification of certain profit interests.

(c)    Represents transaction costs primarily related to acquisition growth, the 2019 Recapitalization, and costs related to the DFB merger.

(d)    Represents severance costs related to acquisition integration and internal AdaptHealth Holdings restructuring and workforce reduction activities.

(e)    Represents one-time legal and consulting expenses, in addition to certain other non-recurring expenses.

(f)    Represents patient equipment acquired during the respective period without regard to the manner in which the equipment was financed.

**Liquidity and Capital Resources**

AdaptHealth Holdings' principal sources of liquidity are its operating cash flow, borrowings under its credit agreements and proceeds from equity issuances. AdaptHealth Holdings has used these funds to meet its capital requirements, which consist of salaries, labor, benefits and other employee-related costs, product and supply costs, third-party customer service, billing and collections and logistics costs, capital expenditures including patient equipment, acquisitions and debt service. Their future capital expenditure requirements will depend on many factors, including its patient volume and revenue growth rates. AdaptHealth Holdings' capital expenditures are made in advance of patients beginning service. Certain operating costs are incurred at the beginning of the equipment service period and during initial patient set up. AdaptHealth Holdings may be required to seek additional equity or debt financing in connection with the business. In the event that additional financing is required from outside sources, AdaptHealth Holdings may not be able to raise it on acceptable terms or at all. If additional capital is unavailable when desired, AdaptHealth Holdings' business, results of operations, and financial condition would be materially and adversely affected. AdaptHealth Holdings believes that its operating cash flow, together with its existing cash, cash equivalents, and credit facility, will continue to be sufficient to fund its operations and growth strategies for at least the next 12 months.

As of September 30, 2019, AdaptHealth Holdings had $8.8 million of cash and cash equivalents and $94.0 million available under the Third Amended and Restated Credit and Guaranty Agreement (including $50.0 million available under the Delayed Draw Loan and $44.0 million available under its Revolving Credit Facility after consideration of stand-by letters of credit outstanding of $2.5 million).

*2019 Recapitalization*

On March 20, 2019, AdaptHealth Holdings entered into a credit agreement with its bank group. The credit agreement consists of $425 million in credit facilities, which includes a $300 million Credit Facility Term Loan, a $50 million Delayed Draw Term Loan and a $75 million New Revolver, all with maturities in March 2024.

The Credit Facility Term Loan may consist of Base Rate Loans or LIBOR Rate Loans (as defined in the agreement). Each LIBOR Rate Loan bears interest quarterly at variable rates based upon the sum of (a) the LIBOR Rate for such interest period, plus (b) an applicable margin based upon the AdaptHealth Holdings' Consolidated Total Leverage Ratio. Each Base Rate Loan bears interest quarterly at variable rates based upon the sum of (a) the Base Rate (as defined in the agreement), plus (b) an applicable margin based upon the AdaptHealth Holdings' Consolidated Total Leverage Ratio. The applicable

35

margin was set at 3.50% and 2.50% for LIBOR Rate Loans and Base Rate Loans, respectively, following the closing of the transaction and are reset each quarter. As of September 30, 2019, AdaptHealth Holdings had $296.3 outstanding under the Credit Facility Term Loan (5.11% interest rate at September 30, 2019). The Credit Facility Term Loan requires quarterly principal repayments of $1.875 million beginning June 30, 2019 through March 31, 2021, quarterly principal repayments of $3.75 million beginning June 30, 2021 through December 31, 2023, and the unpaid principal amount of the Credit Facility Term Loan is due at maturity in March 2024.

The Delayed Draw Loan allows up to $50 million to be drawn in order to fund permitted acquisitions and to pay fees and transaction costs associated with such acquisitions, and has an availability period from the first business day immediately following the closing date of the credit agreement (March 20, 2019) to the earliest of (a) the Credit Facility Term Loan maturity date (March 2024), (b) 24 months following the closing date, or (c) the date of the termination of the commitment. The Delayed Draw Loan may consist of Base Rate Loans or LIBOR Rate Loans. As of September 30, 2019, AdaptHealth Holdings did not have any borrowings outstanding under the Delayed Draw Loan.

The New Revolver allows up to $75 million to be drawn in order to (1) finance working capital, make capital expenditures and for other general corporate purposes in an amount not to exceed $25 million, and (2) finance permitted acquisitions and to pay fees and transaction costs associated with such acquisitions in an amount not to exceed $50 million. As of September 30, 2019, AdaptHealth Holdings had $28.5 million outstanding under the New Revolver. Amounts outstanding under the New Revolver are due at maturity in March 2024. The interest rate under the New Revolver was 5.11% at September 30, 2019.

Under the credit agreement, AdaptHealth Holdings is subject to various agreements that contain a number of restrictive covenants that, among other things, impose operating and financial restrictions on AdaptHealth Holdings. Financial covenants include a total leverage ratio and a fixed charges coverage ratio, as defined in the agreement. Additionally, under the terms of the credit agreement, AdaptHealth Holdings may be required to repay principal based on excess cash flow, as defined. AdaptHealth Holdings was in compliance with all debt covenants as of September 30, 2019.

On March 20, 2019, AdaptHealth Holdings signed a Note and Unit Purchase Agreement with BM AH Holdings, LLC, an affiliate of Blue Mountain Capital (Blue Mountain). In connection with the agreement, Blue Mountain purchased 37,050 AdaptHealth Holdings Common Units for $20 million, and AdaptHealth Holdings also signed a promissory note agreement with Blue Mountain with a principal amount of $100 million. The outstanding principal amount under the note agreement is due on the tenth anniversary of the agreement and bears interest at the following rates (a) for the period starting on the closing date and ending on the seventh anniversary, a rate of 12% per annum, with 6% payable in cash and 6% payment in kind, and (b) for the period starting on the day after the seventh anniversary of the closing date and ending on the maturity date, a rate equal to the greater of (i) 15% per annum or (ii) the twelve-month LIBOR plus 12% per annum.

At September 30, 2019, AdaptHealth Holdings' working capital deficit was $35.6 million, as compared to a working capital deficit of $44.9 million at December 31, 2018. A significant portion of AdaptHealth Holdings' assets consists of accounts receivable from third-party payors that are responsible for payment for the equipment and the services that AdaptHealth Holdings provides.

*Cash Flow.* The following table presents selected data from AdaptHealth Holdings' unaudited consolidated statement of cash flows:

| (in thousands) | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2019 | 2018 |
| | (unaudited) | |
| Net cash provided by operating activities | $ 43,174 | $ 43,147 |
| Net cash used in investing activities | (62,399) | (86,048) |
| Net cash provided by financing activities | 2,862 | 59,528 |
| Net (decrease) increase in cash and cash equivalents | (16,363) | 16,627 |
| Cash at beginning of period | 25,186 | 4,274 |
| Cash at end of period | $ 8,823 | $ 20,901 |

Net cash provided by operating activities for the nine months ended September 30, 2019 was $43.2 million compared to $43.1 million for the nine months ended September 30, 2018, an increase of less than $0.1 million. The increase in net cash provided by operating activities was primarily the result of a $30.7 million decrease in net income, a net increase

36

of $43.1 million in non-cash charges primarily from depreciation, provision for doubtful accounts, interest expense relating to the Company's interest rate swaps, equity-based compensation expense and write-off of deferred financing costs, an increase in deferred income taxes expense of $7.2 million, and a $19.5 million increase in cash used resulting from the change in operating assets and liabilities, primarily due to an increase in accounts receivable for the period.

Net cash used in investing activities for the nine months ended September 30, 2019 was $62.4 million compared to $86.0 million for the nine months ended September 30, 2018. The use of funds in the nine months ended September 30, 2019 consisted of $14.5 million for equipment and other fixed asset purchases and $47.9 million for acquisitions, including the Gould's Acquisition and the SleepMed Acquisition. The use of funds in the nine months ended September 30, 2018 consisted of $7.9 million for equipment and other fixed asset purchases and $78.1 million for acquisitions, including the Verus Acquisition and the PPS Acquisition.

Net cash provided by financing activities for the nine months ended September 30, 2019 was $2.9 million compared to $59.5 million of cash provided by financing activities for the nine months ended September 30, 2018. Net cash provided by financing activities for the nine months ended September 30, 2019 was primarily related to the 2019 Recapitalization, and consisted of $345.5 million of borrowings from long-term debt and lines of credit, $20.0 million of proceeds from an equity offering, and proceeds of $100.0 million from a preferred debt issuance, offset by total repayments of $184.7 million on long-term debt and capital lease obligations, payments of $9.0 million for deferred financing costs, payments of $0.8 million for equity issuance costs, payment of $3.7 million for the redemption of preferred units, payment of $13.0 million in contingent consideration in connection with the Verus Acquisition and the HMEI Acquisition, distributions to members of $250.0 million and $1.4 million of distributions to noncontrolling interests. For the nine months ended September 30, 2018, net cash provided by financing activities consisted of $164.7 million of borrowings from long-term debt and lines of credit, offset by total repayments of $101.2 million on long-term debt, lines of credit and capital lease obligations, and payments of $2.7 million for deferred financing costs, $1.0 million for debt prepayment penalties and $0.3 million of distributions to noncontrolling interest.

**Off-Balance Sheet Arrangements**

As of September 30, 2019, AdaptHealth Holdings did not have any off-balance sheet arrangements, as defined in Item 303(a)(4)(ii) of Regulation S-K.

**Commitments and Contingencies**

In the normal course of business, AdaptHealth Holdings is subject to loss contingencies, such as legal proceedings and claims arising out of its business that cover a wide range of matters. In accordance with the Financial Accounting Standards Board Accounting Standards Codification Topic 450, *Accounting for Contingencies*, AdaptHealth Holdings records accruals for such loss contingencies when it is probable that a liability has been incurred and the amount of loss can be reasonably estimated. AdaptHealth Holdings management believes that any liability that may ultimately result from its resolution will not have a material adverse effect on AdaptHealth Holdings' financial conditions or results of operations.

Other contingencies arising in the normal course of business relate to acquisitions and the related contingent purchase prices and deferred payments.

*Contractual Obligations*

The following table summarizes the long-term cash payment obligations to which AdaptHealth Holdings is contractually bound. The years presented below represent twelve month periods beginning September 30, 2019.

| (in thousands) | Less than 1 Year | | 1 - 3 Years | | 3 - 5 Years | | More than 5 Years | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|
| Credit Facility Repayments(1)(2) | $ | 23,855 | $ | 86,699 | $ | 279,478 | $ | — | $ | 390,032 |
| Fees on Credit Facility(2) | | 483 | | 840 | | 424 | | — | | 1,747 |
| Promissory Note Repayments(3) | | 12,000 | | 36,000 | | 37,500 | | 137,500 | | 223,000 |
| Seller Note(4) | | 1,392 | | 338 | | — | | — | | 1,730 |
| Capital Leases | | 21,656 | | 236 | | — | | — | | 21,892 |
| Operating Leases | | 12,634 | | 13,038 | | 7,462 | | 4,190 | | 37,324 |
| Other | | 60 | | 8 | | — | | — | | 68 |
| Total Contractual Obligations | $ | 72,080 | $ | 137,159 | $ | 324,864 | $ | 141,690 | $ | 675,793 |

(1)    Credit facility repayments include the principal amount of long-term debt, including the current portion, and the related estimated contractual interest obligations. Borrowings under the credit facility bear interest quarterly at variable rates based upon the sum of the LIBOR Rate for such interest period, plus an applicable margin based upon AdaptHealth Holdings' consolidated total leverage ratio. The rate assumed for the variable interest component of the contractual interest obligation was the rate in effect at September 30, 2019. Contractual interest is the interest that AdaptHealth Holdings is contracted to pay on its credit facility without taking into account the interest impact of interest rate swaps related to any of its debt.

(2)    The actual amounts of interest and fee payments under the credit facility will ultimately depend on the amount of debt outstanding and the interest rates in effect during each period. The fees payable on the credit facility include estimated fees for unused borrowings and an annual administrative fee.

(3)    The promissory note is due on the tenth anniversary of the agreement and bears interest at 12% per annum (with the option to pay 6% in cash and 6% as Payment in Kind) through the seventh anniversary of the agreement closing date, and the greater of 15% per annum or LIBOR plus 12% per annum thereafter until maturity. The amounts included in the table above reflect all interest as being paid in cash.

(4)    The seller note was issued in connection with the Gould's Acquisition and is due in six equal quarterly installments commencing on September 30, 2019 and accrues 5.0% interest annually.

At September 30, 2019, AdaptHealth Holdings recorded liabilities of $8.1 million related to possible future earnout payments due to sellers in connection with acquisitions in 2018 and 2019. These payments are due at various dates through March 31, 2022, if earned. In addition, in connection with an acquisition in December 2018, the sellers have the potential to receive earn-out payments up to a maximum of $5.0 million which are based on the achievement of certain financial targets during the three year period after the transaction. Based on the available information at the date of the acquisition, the targets were not determined to be probable of achievement, and therefore these potential payments were not recorded as a liability at such date. There continued to be no liability recorded for such potential earn-out payments through September 30, 2019.

**Quantitative and Qualitative Disclosures about Market Risk**

AdaptHealth Holdings' exposure to market risk relates to fluctuations in interest rates from borrowings under its credit facility. Interest on AdaptHealth Holdings' debt borrowings carries a floating interest rate which is tied to LIBOR, and therefore AdaptHealth Holdings is exposed to changes in interest rates.

AdaptHealth Holdings' secured term loans and revolving credit facility expose it to variability in interest payments due to changes in interest rates. As of September 30, 2019, and December 31, 2018, the total amount of outstanding debt subject to interest rate fluctuations was $324.8 million and $134.9 million, which approximates fair value. A hypothetical 1% increase in the applicable interest rate on our variable-rate debt would result in an approximately $3.2 million and $1.3 million increase in our annual interest expense in 2019 and 2018, respectively.

AdaptHealth Holdings maintained interest rate swap agreements with notional amounts totaling $250 million and $85 million as of September 30, 2019 and December 31, 2018, respectively, with maturity dates through March 2024. These swap agreements convert a portion of AdaptHealth Holdings' variable rate borrowings to a fixed rate. As of September 30, 2019 and December 31, 2018, the total fair value of these swap agreements was a liability of $10.7 million and $0.4 million, respectively, and an asset of $0 and $0.9 million, respectively.

38

**DFB HEALTHCARE ACQUISITIONS CORP. ANNOUNCES STOCKHOLDER APPROVAL OF BUSINESS COMBINATION WITH ADAPTHEALTH HOLDINGS, LLC**

**New York, NY — November 7, 2019 —** DFB Healthcare Acquisitions Corp. ("DFB") (NASDAQ: DFBH, DFBHU, DFBHW), a special purpose acquisition company sponsored by Deerfield Management and Richard Barasch, announced today that DFB's stockholders have voted to approve all of the proposals related to the proposed business combination with AdaptHealth Holdings LLC ("Adapt"), the third largest distributor of home medical equipment in the United States, which will result in Adapt becoming a partially owned subsidiary of DFB (the "Business Combination"). DFB's Board of Directors had previously approved the Business Combination and recommended that its stockholders vote in favor of all of the proposals relating to the Business Combination.

In addition to approving the Agreement and Plan of Merger, DFB's stockholders approved proposals to (i) amend the amended and restated certificate of incorporation of DFB to, among other things, change DFB's name to AdaptHealth Corp. and remove certain provisions related to DFB's status as a blank check company; (ii) issue certain securities for purposes of complying with applicable listing rules of The Nasdaq Capital Market; (iii) approve the AdaptHealth Corp. 2019 Stock Incentive Plan; (iv) approve the AdaptHealth Corp. 2019 Employee Stock Purchase Plan; and (v) elect seven directors to the board of DFB (Richard Barasch, Alan Quasha, Terence Connors, Dr. Susan Weaver, Dale Wolf, Luke McGee and Joshua Parnes).

The Business Combination is expected to close on Friday, November 8, 2019. Upon closing, Adapt will become a partially owned subsidiary of DFB and DFB will be renamed AdaptHealth Corp. as of the same date. Following the closing of the Business Combination, it is expected that the combined company's Class A common stock and warrants will continue to be listed on The Nasdaq Capital Market under the ticker symbols "AHCO" and "AHCOW", respectively. The combined company's units, which had been traded under the ticker symbol "DFBHU," are expected to separate into their components of one share of common stock and one-third of one warrant to purchase a share of common stock on November 11, 2019.

**Forward-Looking Statements**

This press release includes certain statements that are not historical facts but are forward-looking statements for purposes of the safe harbor provisions under the United States Private Securities Litigation Reform Act of 1995. Forward-looking statements generally are accompanied by words such as "believe," "may," "will," "estimate," "continue," "anticipate," "intend," "expect," "should," "would," "plan," "predict," "potential," "seem," "seek," "future," "outlook," and similar expressions that predict or indicate future events or trends or that are not statements of historical matters. These forward-looking statements include, but are not limited to, statements regarding projections, estimates and forecasts of revenue and other financial and performance metrics and projections of market opportunity and expectations, and the closing of the proposed transaction. These statements are based on various assumptions and on the current expectations of DFB and Adapt management and are not predictions of actual performance. These forward-looking statements are provided for illustrative purposes only and are not intended to serve as, and must not be relied on by any investor as, a guarantee, an assurance, a prediction or a definitive statement of fact or probability. Actual events and circumstances are difficult or impossible to predict and will differ from assumptions. Many actual events and circumstances are beyond the control of DFB and Adapt. These forward-looking statements are subject to a number of risks and uncertainties, including the outcome of judicial and administrative proceedings to which Adapt may become a party or governmental investigations to which Adapt may become subject that could interrupt or limit Adapt's operations, result in adverse judgments, settlements or fines and create negative publicity; changes in Adapt's clients' preferences, prospects and the competitive conditions prevailing in the healthcare sector; the inability of the parties to successfully or timely consummate the proposed transaction; failure to realize the anticipated benefits of

the proposed transaction, including as a result of a delay in consummating the proposed transaction or a delay or difficulty in integrating the businesses of DFB and Adapt; those factors discussed in the definitive proxy statement filed by DFB with respect to the proposed transaction under the heading "Risk Factors," and other documents of DFB filed, or to be filed, with the SEC. If the risks materialize or assumptions prove incorrect, actual results could differ materially from the results implied by these forward-looking statements. There may be additional risks that neither DFB nor Adapt presently know or that DFB and Adapt currently believe are immaterial that could also cause actual results to differ from those contained in the forward-looking statements. In addition, forward-looking statements reflect DFB's and Adapt's expectations, plans or forecasts of future events and views as of the date of this press release. DFB and Adapt anticipate that subsequent events and developments will cause DFB's and Adapt's assessments to change. However, while DFB and Adapt may elect to update these forward-looking statements at some point in the future, DFB and Adapt specifically disclaim any obligation to do so. These forward-looking statements should not be relied upon as representing DFB's and Adapt's assessments as of any date subsequent to the date of this press release. Accordingly, undue reliance should not be placed upon the forward-looking statements.

**CONTACTS:**

**DFB Healthcare**
Chris Wolfe
(212) 769-4546
chris.wolfe@dfbhealthcare.com

**DFB Investor Relations**
The Equity Group Inc.
Devin Sullivan
Senior Vice President
dsullivan@equityny.com
(212) 836-9608

**FOR IMMEDIATE RELEASE**

### DFB HEALTHCARE ACQUISITIONS CORP. ANNOUNCES CLOSING OF BUSINESS COMBINATION WITH ADAPTHEALTH HOLDINGS LLC

#### AdaptHealth Corp. Set to Trade on NASDAQ Under Ticker Symbol "AHCO"

**New York, NY and Plymouth Meeting, PA – November 8, 2019** -- DFB Healthcare Acquisitions Corp. ("DFB") (NASDAQ: DFBH, DFBHU, DFBHW), a special purpose acquisition company sponsored by Deerfield Management ("Deerfield") and Richard Barasch, today announced that it has closed its business combination with AdaptHealth Holdings LLC, the third largest provider of home medical equipment ("HME") in the United States.  As previously announced, the transaction was approved at a special meeting of DFB's shareholders held on November 7, 2019.

The combined company, which has been renamed AdaptHealth Corp. ("AdaptHealth"), expects that its Class A Common Stock and public warrants will continue to list on the Nasdaq Capital Market under the new trading symbols "AHCO" and "AHCOW", respectively, starting on or about Monday, November 11, 2019.

AdaptHealth will continue to be led by its seasoned team of industry and financial professionals, including Chief Executive Officer, Luke McGee; President, Josh Parnes; and Chief Financial Officer, Gregg Holst.

"On behalf of the team at DFB and Deerfield, I am thrilled to announce the closing of this transaction," said Richard Barasch, who will serve as Chairman of the Board of AdaptHealth. "Luke and his team have built one of the industry's leading HME providers through a combination of accretive capital deployment, high-touch customer engagement, and a scalable, purpose-built, technology-enabled operating model. We believe AdaptHealth will continue to occupy an increasingly distinct position in the home-based healthcare value chain as the most efficient provider in the space."

"We look forward to this next, exciting phase of our growth as a public company," said Mr. McGee. "We expect to remain an active participant in the consolidation of our industry while providing the highest level of patient care and service, with an over-arching commitment to creating value for all stakeholders."



Headquartered in Plymouth Meeting, Pennsylvania, AdaptHealth has grown to become the third largest provider of HME in the U.S., completing more than 7,000 deliveries per day to more than 1 million patients across 49 states.

AdaptHealth offers a full suite of medical products for both rental and sale, with a focus on CPAP sleep equipment and supplies, oxygen equipment, wheelchairs, walkers, and hospital beds. These lines of business comprise a total addressable market for AdaptHealth of $12-$15 billion that is growing due to multiple industry tailwinds, including an aging population, increasing prevalence of chronic conditions, and the continuing migration of healthcare from the institutional setting to the home.

AdaptHealth's industry-leading technology platform provides a distinct competitive advantage and is in stark contrast to the outmoded and inefficient processes currently used by many companies in the HME industry. Purpose-built for the evolving HME landscape, the system is easy-to-use for physicians, provides automated and integrated proprietary workflow technology for patients' care plans, enhances compliance, promotes efficiencies, and elevates customer service.

AdaptHealth has completed 59 acquisitions since 2012 and intends to continue to focus on increasing net revenue and profitability, both organically and via accretive acquisitions. AdaptHealth has identified a significant volume of potential acquisition opportunities and based on the current pipeline of acquisitions, believes it can add approximately $100 million of acquired revenue each year.

### About AdaptHealth Corp.

AdaptHealth is a leading provider of home healthcare equipment and related services in the United States. AdaptHealth Holdings focuses primarily on providing sleep therapy equipment, supplies and related services (including CPAP and bi-PAP services) to individuals suffering from OSA; home medical equipment to patients discharged from acute care and other facilities; and oxygen and related chronic therapy services in the home. AdaptHealth also provides hospice-focused HME services, wound therapy and nutritional HME services. AdaptHealth services beneficiaries of Medicare, Medicaid and commercial payors. As of September 30, 2019, AdaptHealth serviced over one million patients annually in 49 states through its network of 189 locations in 35 states. Learn more at www.adapthealth.com.

- 2 -



**Forward-Looking Statements**

This press release includes certain statements that are not historical facts but are forward-looking statements for purposes of the safe harbor provisions under the United States Private Securities Litigation Reform Act of 1995. Forward-looking statements generally are accompanied by words such as "believe," "may," "will," "estimate," "continue," "anticipate," "intend," "expect," "should," "would," "plan," "predict," "potential," "seem," "seek," "future," "outlook," and similar expressions that predict or indicate future events or trends or that are not statements of historical matters. These forward-looking statements include, but are not limited to, statements regarding projections, estimates and forecasts of revenue and other financial and performance metrics and projections of market opportunity and expectations, and the closing of the proposed transaction. These statements are based on various assumptions and on the current expectations of DFB and AdaptHealth management and are not predictions of actual performance. These forward-looking statements are provided for illustrative purposes only and are not intended to serve as, and must not be relied on by any investor as, a guarantee, an assurance, a prediction or a definitive statement of fact or probability. Actual events and circumstances are difficult or impossible to predict and will differ from assumptions. Many actual events and circumstances are beyond the control of DFB and AdaptHealth. These forward-looking statements are subject to a number of risks and uncertainties, including the outcome of judicial and administrative proceedings to which AdaptHealth may become a party or governmental investigations to which AdaptHealth may become subject that could interrupt or limit AdaptHealth's operations, result in adverse judgments, settlements or fines and create negative publicity; changes in AdaptHealth's clients' preferences, prospects and the competitive conditions prevailing in the healthcare sector; those factors discussed in the definitive proxy statement filed by DFB under the heading "Risk Factors," and other documents of DFB filed, or to be filed, with the SEC. If the risks materialize or assumptions prove incorrect, actual results could differ materially from the results implied by these forward-looking statements. There may be additional risks that neither DFB nor AdaptHealth presently know or that DFB and AdaptHealth currently believe are immaterial that could also cause actual results to differ from those contained in the forward-looking statements. In addition, forward-looking statements reflect DFB's and AdaptHealth's expectations, plans or forecasts of future events and views as of the date of this press release. DFB and AdaptHealth anticipate that subsequent events and developments will cause DFB's and AdaptHealth's assessments to change. However, while DFB and AdaptHealth may elect to update these forward-looking statements at some point in the future, DFB and AdaptHealth specifically disclaim any obligation to do so. These forward-looking statements should not be relied upon as representing DFB's and AdaptHealth's assessments as of any date subsequent to the date of this press release. Accordingly, undue reliance should not be placed upon the forward-looking statements.

**CONTACTS:**

| DFB Healthcare | AdaptHealth Holdings |
| --- | --- |
| Chris Wolfe | Brittany Lett |
| (212) 769-4546 | (909) 915-4983 |
| chris.wolfe@dfbhealthcare.com | blett@adapthealth.com |

**Investor Relations**
The Equity Group Inc.
Devin Sullivan
Senior Vice President
dsullivan@equityny.com
(212) 836-9608

Kalle Ahl, CFA
Vice President
kahl@equityny.com
(212) 836-9614

- 4 -