# Exhibit 13

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DELAWARE COUNTY EMPLOYEES' RETIREMENT SYSTEM and BUCKS COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>v.<br><br>ADAPTHEALTH CORP. f/k/a DFB HEALTHCARE ACQUISITIONS CORP., LUKE MCGEE, STEPHEN P. GRIGGS, JASON CLEMENS, FRANK J. MULLEN, RICHARD BARASCH, JOSHUA PARNES, ALAN QUASHA, TERENCE CONNORS, DR. SUSAN WEAVER, DALE WOLF, BRADLEY COPPENS, and DAVID S. WILLIAMS III,<br><br>        Defendants. | Civ. Action No. 2:21-cv-03382-HB |

**EXPERT REPORT OF SUSAN G. MARKEL**

**March 29, 2023**

## I.    SCOPE OF WORK

1.    I have been retained by counsel for AdaptHealth Corp. ("AdaptHealth"), Stephen P. Griggs, Jason Clemens, Frank J. Mullen, Richard Barasch, Joshua Parnes, Alan Quasha, Terence Connors, Dr. Susan Weaver, Dale Wolf, Bradley Coppens, and David S. Williams III to review and analyze whether the calculations in the "Short Report of AdaptHealth (AHCO)" issued by Jehoshaphat Research (the "Jehoshaphat Report") were based on information other than what was publicly available.

2.    I submit this report reflecting my opinion related to the above.  I have overall responsibility for the supervision and conduct of the services rendered by AlixPartners LLP ("AlixPartners") on this engagement.  I, or AlixPartners staff under my direct supervision, have reviewed the relevant documents and performed the work necessary, in order to form my opinions.

3.    I reserve the right to amend, update and/or supplement this report based upon (i) any new and/or additional information or documents that come to my attention, or (ii) any forthcoming expert reports, deposition testimony, and related document exhibits.

4.    AlixPartners is compensated at the rate of $1,150 per hour for my time, including for any testimony I may provide in this matter.  The compensation paid to AlixPartners is not dependent on the outcome of this matter.

5.    If I am called upon to testify, I may prepare demonstrative aids, such as graphs, charts, or other visual materials.

## II.    MY BACKGROUND

6.    I am a Managing Director of AlixPartners, a position I have held since January 2009. AlixPartners is a professional services firm, offering a broad range of consulting services, including corporate investigations, as well as valuation services, litigation consulting, and advisory services.

7.    I have more than 30 years of experience in a broad range of areas related to accounting, auditing, and corporate financial reporting, including nearly 15 years in the Division of Enforcement at the Securities and Exchange Commission ("SEC").  Since joining AlixPartners' Washington, D.C. office in January 2009, I have focused on corporate investigations and litigation support, including providing advice on the application of generally accepted accounting principles ("GAAP"), and the reporting and disclosure requirements of the federal securities laws; providing expert opinions concerning accounting issues, auditor responsibilities, and generally accepted auditing standards ("GAAS") including matters related to materiality; assessing compliance with internal

1

controls; and conducting internal investigations. My findings and expert opinions have been communicated in expert witness reports and presentations to various regulatory agencies, including the SEC, the Public Company Accounting Oversight Board, and the Department of Justice.

8.    Prior to joining AlixPartners, I was the Chief Accountant in the Division of Enforcement of the SEC. I joined the SEC in 1994 as a Staff Accountant in the Division of Enforcement, became Associate Chief Accountant in 2000, and became the Chief Accountant in 2003 and held that position until 2009. At the SEC, I focused on financial fraud and financial reporting investigations of public companies of various sizes and in various industries, as well as the associated conduct of auditors and accountants. As Chief Accountant, I oversaw and directed hundreds of financial reporting and fraud investigations involving complex GAAP and GAAS issues. I participated in bringing many notable enforcement actions, including the Cendant, WorldCom, and Cardinal Health matters. I worked closely with the SEC's Office of the Chief Accountant on policy issues as well as specific enforcement cases. I was awarded the Andrew Barr Award and the Commission's Distinguished Service Award, which recognized "success in overseeing the accounting staff central to investigations involving accounting and financial fraud—among the most challenging and important matters investigated by the Commission." I also was recognized by the FBI for my expert advice and assistance in the Cendant securities fraud case. I have also been recognized by Global Investigations Reporter (GIR) as one of the top Women in Investigations and Top FCPA practitioners.

9.    Prior to my employment with the SEC, I was an auditor with a major international public accounting firm and audited the financial statements of both public and non-public entities. I also provided forensic accounting and litigation support services related to financial accounting and reporting issues.

10.   I hold a Bachelor of Science degree in Accounting from The University of Akron and a certified public accountant license in Ohio and the District of Columbia.

11.   My curriculum vitae and a list of my prior expert testimony engagements are included as **Appendix A**.

2

### III. OVERVIEW AND BACKGROUND OF JEHOSHAPHAT RESEARCH'S METHODOLOGY[1]

12.   The Jehoshaphat Report[2] purports to calculate AdaptHealth's year-over-year organic growth for each quarter by dividing (i) the difference in net revenue (excluding revenue attributable to acquisitions) between the three months ended of the current quarter and the three months ended of the same quarter of the prior year; by (ii) the net revenue for the three months ended of the same quarter of the prior year.[3]

13.   To quantify (and exclude from the calculation of year-over-year organic growth) the change in net revenue attributable to acquisitions, the Jehoshaphat Report generally "rel[ies] on the 'Significant Acquisitions' disclosures available in the 10-Qs, which tell [] the revenue contribution from deals that AHCO management deems 'significant[]' [and] use[s] other available disclosures, when it's possible to do that, to plug in what 'insignificant' contributions must have been."[4]  Using these disclosures and inferences regarding the "insignificant" contributions, the Jehoshaphat Report calculates an assumed revenue run rate for the acquisitions made in each quarter, which it extrapolates over one year.

    a.   For example, using the acquisition of Choice Medical Healthcare, Inc. ("Choice") on October 31, 2019, the Jehoshaphat Report assumes Choice generated $3.5 million of net revenue in the fourth quarter of 2019.  The Jehoshaphat Report then "multipl[ies] those [two months of] revenues by 3/2 to get the quarterly run rate of $5.2m, and run[s] that forward until [a full year] lap[s] in Q420."[5]  The Jehoshaphat Report assumes this $5.2 million is earned in the first, second and third quarters of 2020 (for a total of nine months), and $1.8 million (half of $3.5 million) in the fourth quarter of 2020 for the remaining months.

---

[1]   While this analysis required me to replicate Jehoshaphat Research's methodology to determine whether the calculations in the Jehoshaphat Report were based on information other than what was publicly available, I have not attempted to verify the veracity of the Jehoshaphat Report and take no position as to whether such methodology was appropriate.

[2]   *Not Just a Roll-Up, But a Coverup: Is AHCO The Next MDCA?*, Jehoshaphat Research (July 19, 2021), https://jehoshaphatresearch.com/wp-content/uploads/AHCO-Short-Report-by-Jehoshaphat-Research.pdf.

[3]   That is, for example: ((net revenue (excluding revenue attributable to acquisitions) for three months ended December 31, 2020) – (net revenue (excluding revenue attributable to acquisitions) for three months ended December 31, 2019)) / (net revenue for three months ended December 31, 2019).

[4]   Jehoshaphat Report, page 21.

[5]   Jehoshaphat Report, page 22.

b.    These amounts are combined with the impacts of the other acquisitions made during that year and removed from the year-over-year change in net revenue to arrive at the year-over-year change in organic net revenue.  As explained above, this amount is then divided by the net revenue for the three months ended of the same quarter of the prior year to calculate the organic growth rate as of a given quarter.

## IV.    SUMMARY OF OPINIONS

14.    Based on my review, as illustrated in Section V, and in my professional opinion, I did not identify any evidence that suggests the Organic Growth Calculations (defined in paragraph 16) in the Jehoshaphat Report were derived from information other than that which was publicly available.  All of the Organic Growth Calculations can be reproduced using publicly available information.

15.    Additionally, in connection with my analysis, I identified at least one calculation that, in my opinion, suggests that Jehoshaphat Research likely made an error in applying its methodology for the Organic Growth Calculations.

## V.    BASIS OF OPINIONS

16.    **Opinion 1:  I have not identified any evidence that suggests the Organic Growth Calculations in the Jehoshaphat Report were derived from information other than that which was publicly available.**

a.    In forming my opinion above, I have performed the following evaluation of the Jehoshaphat Report:

i.    Reviewed each sentence and graphic and bifurcated each into one of two categories: those that related, directly or indirectly, to organic growth and those that did not.

ii.    Grouped each sentence and graphic that related to organic growth into one of five categories: (1) facts, (2) calculations (collectively, "Organic Growth Calculations"), (3) assumptions, (4) opinions, and (5) estimates.

iii.    Reviewed all Organic Growth Calculations, totaling 138, to either (1) verify the source when cited or (2) identify the source when not cited, and determine whether the source was based on information other than that which was publicly available.

b.    By way of example, the following summary demonstrates my process for determining that the sources of the Organic Growth Calculations related to Q4

4

2020 were not based on information other than that which was publicly available.[6]

### i.    The Jehoshaphat Report Calculated a Negative 15% Year-Over-Year Organic Growth Rate for Q4 2020

(1)    The negative 15% year-over-year organic growth rate (excluding business-to-business revenue) is based on the following three figures, each of which is consistent with publicly available information:  (i) net revenue for the three months ended December 31, 2019 of $150.0 million ("Q4 2019 Revenue");[7] (ii) net revenue for the three months ended December 31, 2020 (excluding business-to-business revenue) of $345.0 million ("Q4 2020 Revenue");[8] and (iii) change in net revenue attributable to acquisitions for the three months ended December 31, 2020 as compared to the three months ended December 31, 2019 of $217.0 million ("Q4 2020 Inorganic YOY Contribution").

### ii.    Calculation of the Q4 2020 Inorganic YOY Contribution

(1)    The Q4 2020 Inorganic YOY Contribution is comprised of six component figures, as captioned in the Jehoshaphat Report:[9]  I determined that each component figure was not based on information other than that which was publicly available and recalculated each, as described below.

(a)    Q4 2019 "Significant" M&A of $1.8 million:  This refers to acquisition-related net revenue ("Acquisition Revenue") earned during the three

---

[6]  While this report only summarizes my process with respect to certain Q4 2020 Organic Growth Calculations for illustrative purposes, I applied a similar process to each of the 138 Organic Growth Calculations in the Jehoshaphat Report.

[7]  I confirmed that this amount was consistent with AdaptHealth's disclosure in its Q4 2019 Earnings Release that "[n]et revenue was $149.5 million . . ." (AdaptHealth February 25, 2020, Earnings Release, page 1.)

[8]  I confirmed that this amount was consistent with AdaptHealth's Financial Supplement for the fourth quarter of 2020 in which it publicly disclosed that total net revenue (excluding business-to-business revenue) for the three months ended December 31, 2020 was $345.8 million. (AdaptHealth March 4, 2021, Financial Supplement, page 6.)  For reasons unknown to me, the Jehoshaphat Report rounds $345.8 million to $345.0 million.

[9]  Jehoshaphat Report, page 18 (graphic).  The sum of $1.8 million, $53.0 million, $62.0 million, $103.3 million, and negative $2.7 million is $217.4 million, which rounds to $217.0 million.

months ended December 31, 2020 attributable to "significant acquisitions" completed during the three months ended December 31, 2019.

(i) To quantify the Q4 2019 "Significant" M&A of $1.8 million, I first calculated the Acquisition Revenue for the three months ended December 31, 2019 by subtracting the Acquisition Revenue for the nine months ended September 30, 2019 from the corresponding amount for the twelve months ended December 31, 2019. AdaptHealth's 2019 10-K disclosed that "[t]he amount of net revenue . . . of the significant acquisitions in 2019 . . . for the year[] ended December 31, 2019" was $53.3 million.[10]   The same disclosure for the nine months ended September 30, 2019 states that "the amount of net revenue . . . for the significant acquisitions"   was   $33.7   million.[11] Accordingly, the amount of Acquisition Revenue for the three months ended December 31, 2019 was $19.6 million.[12]

(ii) To arrive at the portion attributable to "significant acquisitions" completed during the three months ended December 31, 2019, and using the Jehoshaphat Report's run rate assumption, I then subtracted from the $19.6 million the Acquisition Revenue attributable to "significant acquisitions" completed during the three months ended March 31, 2019, June 30, 2019, and September 30, 2019. AdaptHealth disclosed the "amount of net revenue . . . since the respective acquisition" for the three months ended March 31, 2019

---

[10]  AdaptHealth December 31, 2019, Form 10-K, page 78.
[11]  AdaptHealth September 30, 2020, Form 10-Q, page 19.
[12]  Net revenue of $53.3 million for the twelve months ended less $33.7 million of net revenue for the nine months ended equals $19.6 million for the three months ended.

was $8.6 million.[13]    AdaptHealth also disclosed the "amount of net revenue . . . for the significant acquisitions" for the three months ended June 30, 2019 was $9.0 million.[14]    Because AdaptHealth only disclosed one significant transaction for the six months ended June 30, 2019, which was the purchase of Gould's Discount Medical, LLC ("Gould's") on January 2, 2019 (i.e., Q1 2019),[15] the Jehoshaphat Report assumed that the Acquisition Revenue earned during the three months ended June 30, 2019 was attributable entirely to Gould's[16]—meaning the Acquisition Revenue attributable to "significant acquisitions" completed during the three months ended June 30, 2019 was $0. Finally, for the three months ended September 30, 2019, AdaptHealth disclosed that "the amount of net revenue . . . for the significant acquisitions" was $16.1 million.[17] Accordingly, the amount of net revenue attributable to "significant acquisitions" completed during the three months ended September 30, 2019 was $7.1 million.[18] I then subtracted the $9.0 million for the first quarter of 2019[19] and $7.1 million for the third quarter

---

[13]  AdaptHealth March 31, 2020, Form 10-Q, page 14.

[14]  AdaptHealth June 30, 2020, Form 10-Q, page 16.

[15]  AdaptHealth June 30, 2020, Form 10-Q, page 15.

[16]  The Jehoshaphat Report states on page 21 that "[n]o new 'significant' acquisitions took place [in the second quarter of 2019], but the retroactive information about contributions from 2019's significant acquisitions [Gould's] shows that $9m of revenue showed up from these in Q219."

[17]  AdaptHealth September 30, 2020, Form 10-Q, page 19.

[18]  $16.1 million of net revenue attributable to "significant acquisitions" for the three months ended September 30, 2019 less $9.0 million of net revenue which the Jehoshaphat Report assumes is attributable to "significant acquisitions" completed during the three months ended March 31, 2019 equals $7.1 million of net revenue attributable to "significant acquisitions" *completed* during the three months ended September 30, 2019.

[19]  Per page 14 of the AdaptHealth Q1 2020 Form 10-Q, this amount is $8.6 million.  The Jehoshaphat Report assumes on page 22 that $9.0 million represents the full quarterly net revenue attributable to this acquisition: "9.0m [is] the assumed run rate of Gould's, still contributing inorganically."

7

of 2019 from the $19.6 million Acquisition Revenue for the fourth quarter of 2019[20] to arrive at the Acquisition Revenue attributable to "significant acquisitions" completed during the three months ended December 31, 2019 of $3.5 million.[21]

(iii) Finally, I reperformed the calculation in the Jehoshaphat Report to quantify the Q4 2019 "Significant" M&A. The Jehoshaphat Report states that AdaptHealth "only did one deal [in Q4 2019], buying Choice [Medical Healthcare, Inc.] on [October 31, 2019][22] . . . [which] implies $3.5m for the Q4 purchase of Choice."[23] Based on the assumptions in the Jehoshaphat Report, I calculated the portion of Acquisition Revenue attributable to Choice for the three months ended December 31, 2020 to be $1.8 million.[24]

(b)    Q1 2020 "Significant" M&A of $53.0 million: This refers to Acquisition Revenue earned during the three months ended December 31, 2020 attributable to "significant acquisitions" completed during the three months ended March 31, 2020.

(i) AdaptHealth disclosed "the amount of net revenue . . . since the respective acquisition" for the three months ended March 31, 2020

---

[20] *See* Section V.15.b.ii.(1).(a).(i).

[21] As stated in Section V.15.b.ii.(1).(a).(ii), the Jehoshaphat Report assumed that there was no Acquisition Revenue earned during the three months ended June 30, 2019 attributable to "significant acquisitions" completed during the three months ended June 30, 2019.

[22] I confirmed that AdaptHealth publicly disclosed that the acquisition date for Choice was October 31, 2019. (AdaptHealth December 31, 2019, Form 10-K, page 75.)

[23] Jehoshaphat Report, page 22.

[24] The Jehoshaphat Report states on page 22 that it "multipl[ied] those revenues [of $3.5 million for Choice] by 3/2 to get the quarterly run rate of $5.2m . . ." To quantify the twelfth month of 'inorganic' revenue (October 2020) related to Choice, I divided $5.25 million (the unrounded amount) by three which, when rounded, equals $1.8 million.

was $40.7 million.[25]   However, the Jehoshaphat Report adjusted this number based on AdaptHealth's subsequent disclosure that "the amount of net revenue . . . for the significant acquisitions" for the three months ended June 30, 2020 was $53.0 million.[26]   The Jehoshaphat Report determined that there "were no 'significant' acquisitions made" during the second quarter of 2020[27] and, accordingly, assumes that "the $53.0 million in this 10-Q is driven by the full run rates of the Q120 'significant' deals"[28]— *i.e.*, that the $53.0 million of Acquisition Revenue earned during the three months ended June 30, 2020 was attributable to the acquisitions completed during the first quarter of 2020.  Furthermore, the $53.0 million is "assumed to be the ongoing run rate of the Q120 deals" and therefore these acquisitions generated the same amount of net revenue during the three months ended December 31, 2020.[29]

(c)   Q2 2020 "Significant" M&A of $0:  This refers to Acquisition Revenue earned during the three months ended December 31, 2020 attributable to "significant acquisitions" completed during the three months ended June 30, 2020.[30]

(d)   Q3 2020 "Significant" M&A of $62.0 million:  This refers to Acquisition Revenue earned during the three months ended December 31, 2020 attributable to

---

[25] AdaptHealth March 31, 2020, Form 10-Q, page 14.

[26] AdaptHealth June 30, 2020, Form 10-Q, page 16.

[27] Jehoshaphat Report, page 22.  I confirmed that the only acquisitions disclosed by AdaptHealth in its Q2 2020 Form 10-Q were made in the first quarter of 2020, so this statement was consistent with public disclosures.  (AdaptHealth June 30, 2020, Form 10-Q, page 14.)

[28] Jehoshaphat Report, page 22.

[29] Jehoshaphat Report, page 23.

[30] As discussed in further detail above, the Jehoshaphat Report assumes that there was no "significant acquisition" activity during the three months ended June 30, 2020.

9

"significant acquisitions" completed during the three months ended September 30, 2020.

(i)   To quantify the Q3 2020 "Significant" M&A of $62.0 million, I subtracted the amount the Jehoshaphat Report assumed related to prior quarter acquisitions from the amount disclosed in the 10-Q for the third quarter of 2020. AdaptHealth disclosed "the amount of net revenue . . . for the significant acquisitions" for the three months ended September 30, 2020 was $115.1 million.[31] The Jehoshaphat Report "subtract[s] the $53m which is *assumed* to be the ongoing run rate of the Q120 deals which are still contributing,"[32] which I replicated and arrived at $62.0 million.[33]

(e)   Q4 2020 "Significant" M&A of $103.3 million: This refers to Acquisition Revenue earned during the three months ended December 31, 2020 attributable to "significant acquisitions" completed during the three months ended December 31, 2020.

(i)   To quantify the Q4 2020 "Significant" M&A of $103.3 million, I first calculated the Acquisition Revenue for the three months ended December 31, 2020 by subtracting the Acquisition Revenue for the nine months ended September 30, 2020 from the corresponding amount for the twelve months ended December 31, 2020. AdaptHealth disclosed that "the amount of net revenue . . . for the significant acquisitions" for the twelve

---

[31]   AdaptHealth September 30, 2020, Form 10-Q, page 19.

[32]   Jehoshaphat Report, page 23 (emphasis added). *See* Section V.15.b.ii.(1).(b).(i).

[33]   $115.1 million of net revenue attributable to "significant acquisitions" for the three months ended September 30, 2020 less $53.0 million of net revenue which the Jehoshaphat Report assumes is attributable to "significant acquisitions" completed during the three months ended March 31, 2020 equals $62.1 million of net revenue attributable to "significant acquisitions" *completed* during the three months ended September 30, 2020, which rounds to $62.0 million.

months ended December 31, 2020 was $427.4 million.[34] The same disclosure for the nine months ended September 30, 2020 states that "the amount of net revenue . . . since the respective acquisition dates for the significant acquisitions" was $208.8 million.[35] Accordingly, I calculated the amount of Acquisition Revenue for the three months ended December 31, 2020 to be $218.6 million.[36]

(ii)    Consistent with the Jehoshaphat Report, I then "subtract[ed] the inorganic contributions from the 'significant' deals of Q120 and Q320 . . ."[37] Accordingly, I subtracted from the $218.6 million the Acquisition Revenue from the "significant acquisitions" of $53.0 million[38] and $62.0 million[39] attributable to "significant acquisitions" completed during the three months ended March 31, 2020 and September 30, 2020, respectively, to arrive at $103.6 million.[40]

(f)    Negative Q4 Plug to Match 10-K Total 2020 Contribution of negative $2.7 million. This is the difference between the disclosed amount of Acquisition Revenue attributable to acquisitions

---

[34] AdaptHealth December 31, 2020, Form 10-K, page 92.

[35] AdaptHealth September 30, 2020, Form 10-Q, page 19.

[36] Acquisition Revenue of $427.4 million for the twelve months ended less $208.8 million of Acquisition Revenue for the nine months ended. Per page 23 of the Jehoshaphat Report: "$218m is the number for 'significant' deals' contributions in Q420 . . ." For reasons unknown to me, the Jehoshaphat Report rounds $218.6 million to $218.0 million.

[37] Jehoshaphat Report, page 23. As stated in Section V.15.b.ii.(1).(b).(i)., the Jehoshaphat Report assumes that there was no Acquisition Revenue earned during the three months ended June 30, 2020 attributable to "significant acquisitions" completed during the three months ended June 30, 2020.

[38] *See* Section V.15.b.ii.(1).(b). Q1 2020 "Significant" M&A.

[39] *See* Section V.15.b.ii.(1).(d). Q3 2020 "Significant" M&A.

[40] For reasons unknown to me, the Jehoshaphat Report arrived at $103.3 million. This difference is likely due to rounding and does not change my opinion.

completed in 2020 and the corresponding amount calculated in the Jehoshaphat Report.

(i)   The Jehoshaphat Report states, "[i]f we assume that our $25.9m contribution in Q320 from 'insignificant' deals is from 2020 deals only, then that actually gets us pretty close. Just take $450.2m (total 2020 deals' contribution in 2020) minus $427.0m (the aggregate 'significant' acquisitions contribution in 2020) minus $25.9m (the 'insignificant' contribution in Q320) and you get negative $2.7m."[41]

(ii)  I replicated the calculations under the assumptions of the Jehoshaphat Report to arrive at the Negative Q4 Plug to Match 10-K Total 2020 Contribution of negative $2.7 million. First, I confirmed that AdaptHealth disclosed in its 2020 10-K that "acquisitions completed during 2020 . . . contributed net revenue of $450.2 million during the year . . ."[42] and that AdaptHealth disclosed "the amount of net revenue . . . for the significant acquisitions" for the twelve months ended December 31, 2020 was $427.4 million.[43] Then, I arrived at the $25.9 million (which the Jehoshaphat Report calls the "contribution in Q320 from 'insignificant' deals") by subtracting the $5.3 million attributable to the acquisition of Choice in the fourth quarter of 2019,[44] the Q1 2020 "Significant" M&A of $53.0 million,[45] and the Q3 2020

---

[41]  Jehoshaphat Report, page 24.

[42]  AdaptHealth December 31, 2020, Form 10-K, page 52.

[43]  AdaptHealth December 31, 2020, Form 10-K, page 92. For reasons unknown to me, the Jehoshaphat report rounded this number to $427.0 million.

[44]  Jehoshaphat Report, page 24. The Jehoshaphat Report states on page 22 that it "multipl[ied] those revenues [of $3.5 million for Choice] by 3/2 to get the quarterly run rate of $5.2m…" This calculation, when rounded, results in $5.3 million.

[45]  *See* Section V.15.b.ii.(1).(b).

12

"Significant" M&A of $62.0 million[46] from the $146.2 million increase in net revenue attributable to acquisitions for the three months ended September 30, 2020.[47] Finally, I replicated the calculation in the Jehoshaphat Report to arrive at the Negative Q4 Plug to Match 10-K Total 2020 Contribution of negative $2.7 million.[48]

(2)     Using the Q4 2019 Revenue, the Q4 2020 Revenue and the Q4 2020 Inorganic YOY Contribution, which are not based on information other than that which was publicly available, I was able to recalculate the negative 15% year-over-year organic growth rate for the three months ended December 31, 2020 by dividing the net of Q4 2020 Revenue less Q4 2020 Inorganic YOY Contribution less Q4 2019 Revenue by Q4 2019 Revenue.[49]

c.   Based on this process, I have not identified any evidence that suggests the Organic Growth Calculations in the Jehoshaphat Report were derived from information other than that which was publicly available.

17.   **Opinion 2: Jehoshaphat Research likely made an error in applying its methodology for the Organic Growth Calculations.**

a.     In its 10-Q for the second quarter of 2020, AdaptHealth disclosed that its "increase in net revenue [for the three months ended June 30, 2020] was driven primarily by (i) acquisitions, which increased net revenue by $77.0 million . . ."[50] When reconciling its calculations, Jehoshaphat stated that "we are **still $8.7 million short** in order to get to the total acquisition contribution of $77m [as disclosed on page 41 of the Q2 2020 10-Q], so **we plug in that exact amount for 'insignificant' M&A**."[51] By virtue of how Jehoshaphat understood AdaptHealth calculated organic growth, Jehoshaphat assumed that AdaptHealth earned $8.7 million of net revenue between the third quarter of 2019 and the second quarter of 2020.

---

[46]  *See* Section V.15.b.ii.(1).(d).

[47]  AdaptHealth September 30, 2020, Form 10-Q, page 41.

[48]  $450.2 million less $427.0 million less $25.9 million equals negative $2.7 million. *See* Footnote 41.

[49]   The net of $345.0 million less $217.0 million less $150.0 million divided by $150.0 million equals negative 14.7%, which rounds to negative 15.0%.

[50]  AdaptHealth June 30, 2020, Form 10-Q, page 37.

[51]  Jehoshaphat Report, page 23 (emphasis added).

13

revenue by approximately $156.3 million."[54]    Jehoshaphat therefore excluded the "plug" of $8.7 million when reconciling fiscal years 2019 *and* 2020, which calls into question the accuracy of both calculations.


_____

Susan G. Markel, CPA
March 29, 2023

_____
[54] AdaptHealth December 31, 2019, Form 10-K, page 45.

14

**Susan G. Markel**
**Appendix A**

# **Alix**Partners

---

**Susan G. Markel**
Managing Director

**AlixPartners LLP**
2099 Pennsylvania Ave., N.W.
Suite 300
Washington, DC 20006
Tel:  202-756-9016

smarkel@alixpartners.com

## Professional Experience

2009 to Present
Managing Director, AlixPartners LLP, Washington, DC.  Providing consulting, investigation and expert services related to accounting, auditing, internal controls and financial reporting.

2003 to 2009
Chief Accountant, Division of Enforcement,
U.S. Securities and Exchange Commission, Washington, DC.

1994 to 2003
Staff Accountant to Associate Chief Accountant, Division of Enforcement,
U.S. Securities and Exchange Commission, Washington, DC.

1990 to 1994
Economic Consultant on International Trade Matters, Stewart and Stewart, LLP, Washington, DC.

1984 to 1990
Staff to Manager – Audit and Litigation Support Practice, Arthur Andersen & Co., Washington, DC and Cleveland, Ohio.

## Education
The University of Akron, 1985

## SEC Enforcement Division

Ms. Markel worked in the Division of Enforcement at the Securities and Exchange Commission for nearly 15 years, focusing on financial fraud and financial reporting and internal controls investigations.  During the last five years of her tenure with the SEC, she served as the Chief Accountant in the Division of Enforcement where she was involved in many significant enforcement actions, as well as significant policy decisions working closely with other Commission staff.  These investigations spanned across all industries and dealt with a wide range of complex accounting, auditing, and internal controls issues.

As Chief Accountant, Ms. Markel oversaw and directed financial fraud investigations and participated in decisions regarding the appropriate resolution of the matter as it pertained to corporations, corporate officers and employees, and independent auditors. This involved close and frequent communication with various offices within the SEC and also external parties including opposing counsel and other regulators or law enforcement agencies.

## Forensic Accounting and Fraud Investigations

**Susan G. Markel**
**Appendix A**

**AlixPartners**

Ms. Markel has extensive investigative and forensic accounting analysis experience. Ms. Markel has represented Boards of Directors, investors, corporate officers, auditors, and corporations in investigations and in conjunction with AML and FCPA monitorships.

Among other matters, Ms. Markel's investigations have involved financial reporting errors and fraud, potential violations of the Foreign Corrupt Practices Act, post-acquisition reviews and accounting analysis and adequacy of MD&A and other disclosures. She has performed such services in connection with internal investigations, legal proceedings, regulatory investigations and M&A transactions.

Ms. Markel has reviewed accounting practices and internal controls in support of monitors in the FCPA and AML areas, including an FCPA monitorship of an oil and gas services company, and also as part of investigations.

Ms. Markel has consulted with clients on matters such as SEC reporting implications, restatements of previously issued financial information and adequacy of internal controls and has prepared and delivered related reports and presentations to third parties. Since joining AlixPartners in 2009, she has been engaged in more than 100 matters involving a wide range of accounting, financial reporting and disclosure issues. Assessing materiality was a consideration in many of these matters.

## Auditing Experience

Ms. Markel's auditing and accounting experience includes managing and directing financial statement audits for numerous public and private companies operating in a variety of industries including manufacturing, real estate, construction, telecommunications, technology, retail, and product distribution.

Ms. Markel has conducted investigations related to financial reporting issues, in a wide range of industries, including assessing the conduct of the independent auditors. She has also been engaged as a consulting or testifying expert witness on numerous matters.

## FCPA Related

Ms. Markel has conducted forensic accounting investigations of a Fortune 500 company's compliance with the FCPA related to its operations in Asia. Required preparation of reports, in conjunction with counsel that were presented to the U.S. Securities and Exchange Commission and the U.S. Department of Justice.

Ms. Markel has served as the consulting expert to a monitor related to a Deferred Prosecution Agreement on FCPA matters of an international oil and gas company. Term of monitorship was 2½ years and resulted in submissions of results and recommendations to the US Department of Justice.

**Susan G. Markel**
**Appendix A**

**Alix**Partners

Ms. Markel has been a consulting expert to the monitor related to a Deferred Prosecution Agreement on FCPA matters for an international transportation company and a consulting expert retained by U.S. Department of Justice to assist the Fraud Section in the investigation of compliance with the FCPA of a major US corporation.

## Auditing Matters

Ms. Markel has been a consulting expert in a non-public PCAOB investigation regarding the conduct of an auditor for a financial services company and a consulting expert engaged by international accounting firms under investigation by the SEC related to potential errors and irregularities at an audit client.

Ms. Markel has been engaged as a testifying expert in a non-public PCAOB investigation and hearing regarding the conduct of auditors for a public company and engaged as a testifying expert on auditor independence issues on behalf of an international accounting firm's audit of a financial services company.

## Internal Investigations and Consulting Expert Roles

Ms. Markel's experience also includes:

Internal investigation on behalf of Audit Committee for a technology company which involved issues related to revenue recognition and other potential accounting irregularities in operations in the US and Europe.

Valuation dispute of assets which were valued as Level 3 under FAS 157. Provided assistance during class action suits against company and SEC investigation. Provided accounting expertise in valuation and assistance with the restatement and litigation/regulatory matters.

Engagements for Audit Committees during review of revenue recognition and other accounting and disclosure matters in investigations by the SEC.

SEC investigation related to the valuation of intangible assets. Presentation made with counsel to SEC.

Forensic accounting investigation on behalf of an Audit Committee of whistleblower tips related to percentage of completion accounting and internal control issues. Presentations made with counsel to the SEC and Audit Committee.

**Susan G. Markel**
**Appendix A**

**AlixPartners**

Consulting expert engagement related to an SEC inquiry into percentage of completion accounting practices in the defense industry.  Presentation made on behalf of company.

Review of revenue recognition practices in response to a whistleblower complaint of an international technology company.

Consulting expert engagement in response to SEC Wells notice and supporting counsel in its defense of a financial services company. Authored white paper and made presentations to the SEC regarding same.

SEC enforcement division inquiry of a company in the healthcare industry regarding FAS 5 reserve calculations and disclosure issues. Presentations made to the SEC with company personnel.

Internal investigation on behalf of the Audit Committee of a healthcare company related to potential errors and irregularities and internal control issues. Presentations made to the Audit Committee and the SEC.

## Awards

Ms. Markel has received the SEC's prestigious Andrew Barr Award and the Distinguished Service Award.. In addition to being recognized by the Commission, the Federal Bureau of Investigation also honored her for tireless assistance, expert advice, and keen insights during the Cendant securities fraud case.  She has also been recognized by Global Investigations Reporter (GIR) as one of the top Women in Investigations and Top FCPA practitioners.

## Expert Testimony

Ms. Markel's testifying experience includes the following:

Non-public PCAOB investigation and hearing regarding the conduct of auditors for a public company – expert report and testimony at hearing.

Taylor, Dean & Whitaker Plan Trust by and through Neil Luria as Plan Trustee vs. PricewaterhouseCoopers, LLP. – deposition testimony (matter settled prior to testifying at trial).

Fuji Holdings Corp., Plaintiff, v. Xerox Corp. – expert report (matter settled prior to testifying at trial).

## Certifications/Affiliations

Certified Public Accountant
Certified in Financial Forensics
Member, American Institute of Certified Public Accountants

**Susan G. Markel**
**Appendix A**

**AlixPartners**

Member, International Association of Independent Corporate Monitors
Trustee and President, SEC Historical Society
Advisory Board Member – University of Akron Accounting Department

## Publications

Ms. Markel's publications include the following:

Author, "Interview with Deborah P. Majoras, General Counsel, Procter & Gamble," Inside Counsel, July 2015

Author, "Interview with Lucy Lee Helm, General Counsel, Starbucks Coffee Company," Inside Counsel, February 2015

Author, "Clawbacks in Focus – How Companies Can Link Executive Compensation to Compliance," AlixPartnersLLP, March 2014

Author, "Strategies for Keeping a Whistleblower In-House," ACC Docket Magazine, November 2013

Author, "Compliance and the Road Ahead – Insights for Executives and In-House Counsel," AlixPartners LLP, January 2012

Co-Author, "The GATT Uruguay Round: Antidumping: A Negotiating History (1986-1992)," 1993

## Speaking Engagements

Ms. Markel's public speaking engagements and panels include the following:

"Is that a Whistleblower I Hear?," Association of Corporate Counsel Annual Conference, Washington, DC

"Legal & Compliance as Gatekeepers: How Regulatory Agencies are Changing the Game," Women, Influence & Power in Law Conference, Washington, DC

"On the Hunt for Fraud: Real Life Case Studies to Detect and Prevent Fraud," Financial Executives International Summit Leadership Conference, Boca Raton, FL

"SEC Enforcement," RR Donnelly – SEC Hot Topics Institute, Cleveland, OH

"Staying a Step Ahead: Strategies for Responding to Evolving Enterprise Risks," Women, Influence & Power in Law Conference, Washington, DC

**Susan G. Markel**
**Appendix A**

**AlixPartners**

"Whistleblower Update: New Risks & Regulation in Europe and the United States," European American Chamber of Commerce, New York, NY

"Current Issues at the SEC & PCAOB Through an Enforcement Lens," University of Washington Financial Reporting Conference, Seattle, WA

"Latest News in International Prosecution and Investigation Practices of US Authorities," Frankfurt, Germany

"SEC 2014 Financial Reporting Initiatives – The Task Force, Big Data, and Admissions: What's on the Horizon?" SEC Enforcement Seminar, Weil Gotshal and AIG, New York, NY

"SEC Enforcement in China," CPE Inc., SEC Accounting and Reporting Conference, Beijing, China

"SOX 404 Conference – Compliance & Regulatory Landscape Hot Topics," October 2013

Moderator, "SEC Enforcement 2014: A Preview," National Law Journal 2013 Regulatory Summit, Washington, DC

"SEC Enforcement – The Current Landscape," RR Donnelly SEC Hot Topics Institute, Cleveland, OH

"SEC Enforcement – The Current Landscape," SEC Year-End Enforcement Conference 2013: An Accounting & Reporting Update for Public Companies, CPE Inc., Phoenix, AZ

"Whistleblower Laws and Investigations: Strategies and Practical Considerations" C4CM Training and Professional Development Webinar, Online

"Strategies for Keeping a Whistleblower Claim In-house," Association of Corporate Counsel Annual Conference

"In Pursuit of Clean Earnings: Dodging an SEC Investigation or Litigation," SCCE's 15th Annual Compliance & Ethics Institute, September 2016

"The SEC's Focus on Private Equity Firms: How to Be Prepared," Hedge Fund Webinar, Covington & Burling, LLP