# Exhibit 15

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM and BUCKS COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>ADAPTHEALTH CORP. f/k/a DFB HEALTHCARE ACQUISITIONS CORP., LUKE MCGEE, STEPHEN P. GRIGGS, JASON CLEMENS, FRANK J. MULLEN, RICHARD BARASCH, JOSHUA PARNES, ALAN QUASHA, TERENCE CONNORS, DR. SUSAN WEAVER, DALE WOLF, BRADLEY COPPENS, and DAVID S. WILLIAMS III,<br><br>                    Defendants. | Civ. Action No. 2:21-cv-03382-HB |

# EXPERT REPORT OF L. ADEL TURKI

## March 29, 2023

**TABLE OF CONTENTS**

I.    Qualifications ..................................................................................................1

II.   Case Background ..............................................................................................1

    A.    AdaptHealth .............................................................................................1

    B.    Lead Plaintiffs' Allegations ......................................................................2

        1.    The Organic Growth Issue ................................................................ 3

        2.    The McGee Tax Issue ...................................................................... 4

        3.    Class Certification............................................................................ 5

III.  Assignment .....................................................................................................6

IV.   Summary of Opinions ......................................................................................6

V.    Economic and Statistical Background ..............................................................7

    A.    Market Efficiency .....................................................................................7

    B.    Event Studies ...........................................................................................9

VI.   The Cain Report Failed to Analyze Market Efficiency for AdaptHealth's Stock Following the deSPAC Merger.  Certain of the Market Efficiency Indicators for the Three, Six, and Nine Months Following the deSPAC Merger Are Substantially Different from the Thresholds and/or Measures That Were the Basis for Dr. Cain's Market Efficiency Conclusion for the Entire Putative Class Period.................................13

VII.  With Respect to the Organic Growth Issue, There Is No Economic Evidence That the Alleged Misrepresentations Elicited a Statistically Significant Price Increase in AdaptHealth Stock, and the Movement in AdaptHealth's Stock Price on the Date of the Alleged Corrective Disclosure, July 19, 2021, Was Neither Statistically Significant Nor Due to the Factual Underpinnings of the Jehoshaphat Report ..................................18

    A.    Alleged Misrepresentations ......................................................................18

    B.    Alleged Corrective Disclosure..................................................................19

VIII. With Respect to the McGee Tax Issue, There is No Economic Evidence That the Alleged Misrepresentations Elicited a Statistically Significant Price Increase in AdaptHealth Stock, and the Movement in AdaptHealth's Stock Price on the Date of the Alleged Corrective Disclosure, April 13, 2021, Was Not Due to the Disclosure of Mr. McGee's Alleged Involvement in an Alleged Tax Fraud in the April 13 Press Release ...........................................................................................................24

    A.    Alleged Misrepresentations ......................................................................24

    B.    Alleged Corrective Disclosure..................................................................25

        1.    The McGee Tax Issue ...................................................................... 26

        2.    Criminal Indictment Information...................................................... 30

3.    Executive Departure Information ............................................................ 31

IX.    Lead Plaintiffs Did Not Purchase Any AdaptHealth Securities from March 4, 2021, to the End of the Putative Class Period on July 16, 2021.  One of the Lead Plaintiffs, Bucks County, Benefitted from the Alleged Fraud Related to the Organic Growth Issue, and the Other Lead Plaintiff, Delaware County, Did Not Experience a Loss From the Alleged Fraud Related to the Organic Growth Issue .........................................................31

## I.    Qualifications

1.    I am a Senior Managing Director at Compass Lexecon, an international economic consulting firm. Compass Lexecon specializes in providing expert economic work related to economics and finance to law firms, corporations, and government clients in various legal and regulatory proceedings.  Prior to joining Compass Lexecon, I was a Senior Vice President at Cornerstone Research, where I was also the head of the firm's domestic and international finance practice.

2.    During my 31-year consulting career, I have been retained to analyze class certification, merits, and damage issues in hundreds of securities fraud suits.  In particular, I have performed event study analyses and have reviewed and evaluated the event study analyses of other experts.

3.    I have also performed economic studies on major financial issues to assist defendants under investigation by the Securities and Exchange Commission ("SEC"), the Consumer Financial Protection Bureau, and the Department of Justice, and presented my findings to these and other regulatory bodies.  I have been retained to assist with internal investigations in high-profile matters involving insider trading, front running, and Ponzi scheme allegations.

4.    I have testified in federal and state courts as well as in arbitrations.

5.    I was previously on the faculty of Purdue University and Stanford University, where I earned my Ph.D. degree.  My curriculum vitae is attached as **Appendix A** to this report.

6.    A list of cases in which I have provided testimony over the last four years is attached as **Appendix B**.

## II.    Case Background

### A.    AdaptHealth

7.    AdaptHealth Corp. ("AdaptHealth" or the "Company") is "a leading provider of home healthcare equipment, supplies and related services in the United States."[1]

---

[1] AdaptHealth Corp., Form 10-K, December 31, 2019, filed on March 6, 2020 at 4:40 pm ET, at 3.

8.      Prior to November 2019, AdaptHealth Holdings LLC was a private company.[2]

9.      After market close on November 8, 2019, AdaptHealth Holdings LLC completed its business combination with DFB Healthcare Acquisitions Corp., a special purpose acquisition company ("SPAC"), pursuant to an Agreement and Plan of Merger.[3]  A SPAC is a shell company that goes public using an IPO "for the purpose of merging with or acquiring a yet-to-be-identified private operating company."[4]  The transaction by which the SPAC company is merged with the private operating company is called a "deSPAC" merger.  A deSPAC merger usually takes place within two years from the SPAC IPO.[5]

10.     On November 11, 2019, AdaptHealth Corp. began publicly trading on NASDAQ under the symbol "AHCO."[6]

B.      **Lead Plaintiffs' Allegations**

11.     On November 22, 2021, Delaware County Employees Retirement System ("Delaware County") and Bucks County Employees' Retirement System ("Bucks County") (collectively, "Lead Plaintiffs") filed a consolidated complaint against AdaptHealth and certain AdaptHealth officers and directors (collectively, "Defendants")[7] on behalf of a putative class of

---

[2] DFB Healthcare Acquisitions Corp., Form 8-K, July 8, 2019, at Exhibit 99.1 ("DFB Healthcare Acquisitions Corp. ('DFB') (NASDAQ: DFBH, DFBHU, DFBHW), a special purpose acquisition company sponsored by Deerfield Management ('Deerfield') and Richard Barasch, announced today that it has entered into a definitive agreement for a business combination with AdaptHealth Holdings, LLC ('Adapt' or the 'Company'), the third largest distributor of home medical equipment ('HME') in the United States.  Upon the closing of the transaction, it is expected that DFB will be renamed AdaptHealth Holding Corporation ('AdaptHealth') and remain NASDAQ-listed under a new ticker symbol.").

[3] "DFB Healthcare Acquisitions Corp. Announces Closing of Business Combination With AdaptHealth Holdings LLC," *Business Wire*, November 8, 2019 at 4:30 pm ET; AdaptHealth Corp., Form 8-K, November 13, 2019 at 9:38 pm ET, at 1 & Exhibit 4.1.

[4] "What are the differences in an IPO, a SPAC, and a direct listing?," SEC.gov, https://www.sec.gov/education/capitalraising/building-blocks/registered-offerings.

[5] *See id.*

[6] "DFB Healthcare Acquisitions Corp. Announces Closing of Business Combination With AdaptHealth Holdings LLC," *Business Wire*, November 8, 2019 at 4:30 pm ET.

[7] Consolidated Complaint for Violations of the Federal Securities Laws, *Delaware County Employees Retirement System and Bucks County Employees' Retirement System v. AdaptHealth Corp.*, No. 2:21-cv-03382-HB, United States District Court Eastern District of Pennsylvania, filed November 22, 2021 ("Complaint"), at 46–58.  The individual defendants are Luke McGee, Stephen P. Griggs, Jason Clemens, Frank J. Mullen, Richard Barasch, Joshua Parnes, Alan Quasha, Terence Connors, Dr. Susan Weaver, Dale Wolf, Bradley Coppens, and David S. Williams III.

2

purchasers of AdaptHealth securities (*i.e.*, common stock and options) during the period from November 8, 2019, through July 16, 2021 (the "Putative Class Period").[8]

12.    The start of the Putative Class Period (*i.e.*, November 8, 2019) is three days before AdaptHealth began publicly trading its common stock (*i.e.*, November 11, 2019).[9]

13.    There are two primary allegations relevant for purposes of my report.

### 1.    The Organic Growth Issue

14.    *First*, Lead Plaintiffs allege that AdaptHealth misrepresented its organic growth by implementing a new methodology for calculating organic growth that incorporated revenue growth from recent acquisitions and concealed that AdaptHealth's "actual" organic growth "had stalled and even declined" (the "Organic Growth Issue").[10]

15.    Lead Plaintiffs point to March 4, 2021, as the first date on which alleged misrepresentations about the Organic Growth Issue were made.[11]  On that date, AdaptHealth disclosed its new methodology and the resulting organic growth results in connection with its Q4 2020 earnings call.  Specifically, AdaptHealth defined the new methodology as follows: "[C]urrent period net revenue plus current period acquisition revenue divided by prior period net revenue plus prior period revenue for acquisition revenue.  Acquisition revenue is confirmed through third-party Quality of Earnings ('QoE') reports where available and management estimates where QoE revenue is not available."[12]

16.    Lead Plaintiffs also allege that on three subsequent dates—March 16, 2021, May 6, 2021, and May 10, 2021—the Company made materially misleading statements regarding its organic growth by using its new methodology.[13]

---

[8] Complaint ¶ 1.

[9] "DFB Healthcare Acquisitions Corp. Announces Closing of Business Combination With AdaptHealth Holdings LLC," *Business Wire*, November 8, 2019 at 4:30 pm ET.

[10] Complaint ¶¶ 6, 115, 127.

[11] *Id*. ¶¶ 116–19.

[12] AdaptHealth Corp., Financial Supplement – Q4 2020, March 4, 2021, at 7.

[13] Complaint ¶¶ 120, 122, 126.

17.     Lead Plaintiffs allege that, on July 19, 2021, an anonymous short-seller, Jehoshaphat Research, published a report (the "Jehoshaphat Report") that disclosed the "truth" about the Organic Growth Issue to the market, and AdaptHealth's stock fell "precipitously and materially, as the prior artificial inflation came out of the price." [14]  Lead Plaintiffs allege AdaptHealth's stock price decline on July 19, 2021, reflected the purported correction of the alleged misrepresentations. [15]

18.     The Jehoshaphat Report claimed that AdaptHealth had intentionally inflated and concealed its organic growth figures in Q4 2020 and Q1 2021 by changing the organic growth calculation to include revenue growth attributable to recent acquisitions and that AdaptHealth's organic growth "was actually negative for the first six months of 2021." [16]  The Jehoshaphat Report also stated that "[t]his entire report consists of opinions as outsiders of the company. We are obviously short [AdaptHealth]." [17]

### 2.      The McGee Tax Issue

19.     *Second*, Lead Plaintiffs allege that Defendants made materially false and misleading statements related to (i) the experience, qualifications, and success of AdaptHealth's management team, (ii) AdaptHealth's ongoing legal proceedings, and (iii) AdaptHealth's business performance and strategy on 15 dates between November 8, 2019, and March 16, 2021, by failing to disclose that Mr. McGee, the Company's then Co-Chief Executive Officer ("Co-CEO"), had allegedly been involved in an alleged tax fraud between March 2014 and August 2015 (the "McGee Tax Issue"). [18]

20.     On April 13, 2021, AdaptHealth issued a press release announcing that it had placed Mr. McGee on "unpaid leave" from his role as Co-CEO after it "learned that authorities in Denmark [had] formally charged Co-Chief Executive Officer Luke McGee with alleged tax fraud

---

[14] *Id*. ¶¶ 7, 36, 134, 150.

[15] *Id*. ¶¶ 154.

[16] *Id*. ¶ 7 (emphasis omitted).

[17] Jehoshaphat Research, "Not Just a Roll-Up, But a CoverUp: Is AHCO the Next MDCA?," July 19, 2021, at 1 n.1.

[18] Complaint ¶¶ 76–114, 128.

arising from certain past private activity" (the "April 13 Press Release").[19]  The April 13 Press Release also stated that Mr. McGee's "alleged personal conduct . . . had no connection to AdaptHealth's business."[20]

21.    Lead Plaintiffs allege that the April 13 Press Release revealed the "truth" to the market, and AdaptHealth's stock price fell "precipitously and materially, as the prior artificial inflation came out of the price."[21]  Lead Plaintiffs allege AdaptHealth's stock price decline on April 13, 2021, reflected the purported correction of the alleged misrepresentations.[22]

### 3.    Class Certification

22.    On July 28, 2022, Lead Plaintiffs filed their Motion to Certify Class in this lawsuit (the "Motion for Class Certification").  Attached to the Motion for Class Certification was the Expert Report of Matthew D. Cain, Ph.D., dated July 26, 2022 (the "Cain Report").

23.    In the Cain Report, Dr. Cain concludes:  "Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the opinion that the market for AdaptHealth's Common Stock was efficient during the [Putative] Class Period."[23]

24.    To support his conclusion, Dr. Cain analyzed for the entire Putative Class Period AdaptHealth's (i) Average Weekly Trading Volume, (ii) Analyst Coverage, (iii) the Presence of Market Makers, (iv) SEC Form S-3 Filing Eligibility, (v) Cause and Effect Relationship Between

---

[19] "AdaptHealth Corp.'s Board of Directors' Statement on Co-Chief Executive Officer Luke McGee," *Business Wire*, April 13, 2021 at 9:48 am ET ("AdaptHealth Corp. has learned that authorities in Denmark have formally charged Co-Chief Executive Officer Luke McGee with alleged tax fraud arising from certain past private activity.  The alleged personal conduct occurred between March 2014 and August 2015 and had no connection to AdaptHealth's business. AdaptHealth has placed Mr. McGee on unpaid leave from his roles as Co-CEO and a Director of the Company while this matter is pending.  The Board of Directors of AdaptHealth takes this matter very seriously and is monitoring the situation closely in consultation with its legal advisors.  The Board has full confidence in the Company's management team, led by current Co-CEO Steve Griggs and President Josh Parnes, and in its ability to ensure that AdaptHealth's business remains strong and to maintain the Company's growth trajectory."); Complaint ¶ 7.

[20] "AdaptHealth Corp.'s Board of Directors' Statement on Co-Chief Executive Officer Luke McGee," *Business Wire*, April 13, 2021 at 9:48 am ET.

[21] Complaint ¶¶ 7, 34–35, 150.

[22] *Id*. ¶¶ 151–53.

[23] Cain Report ¶ 10.

Company Information and Stock Prices, (vi) Market Capitalization, (vii) Bid-Ask Spread, (viii) Public Float, (ix) Institutional Ownership, (x) Autocorrelation, and (xi) Options Trading.[24]

## III.    Assignment

25.    I have been retained by counsel for the AdaptHealth Defendants[25] to (i) review and analyze the Cain Report's market efficiency conclusion, (ii) analyze AdaptHealth's stock price on the dates of the alleged misrepresentations and alleged corrective disclosures, and (iii) review and analyze Lead Plaintiffs' trading records in this matter.

26.    In performing these tasks, I have been assisted by Compass Lexecon staff.  The materials I have considered are listed in **Appendix C**.  This report is subject to change or modification should additional relevant information become available that bears on the analysis, opinions, or conclusions contained herein.  I may also seek to respond to opinions or analyses proffered by other experts.

27.    My analyses, opinions, and conclusions are based solely on the work performed by me and those under my supervision through the date of this report.  Compass Lexecon is being compensated for my work on this matter at an hourly rate of $1,075, including for any testimony I may provide in this matter.  My compensation and that of Compass Lexecon is not contingent upon my opinions and conclusions or the outcome of this matter.

## IV.    Summary of Opinions

28.    Based on my review, analysis, experience, and training, I have formed the following principal conclusions:

   a.   The Cain Report failed to analyze market efficiency for AdaptHealth's stock following the deSPAC merger.  Certain of the market efficiency indicators for the three, six, and nine months following the deSPAC merger are substantially different from the thresholds and/or measures that were the basis for Dr. Cain's market efficiency conclusion for the entire Putative Class Period;

   b.   With respect to the Organic Growth Issue, there is no economic evidence that the alleged misrepresentations elicited a statistically significant price increase in AdaptHealth stock, and the movement in AdaptHealth's stock price on the date of the

---

[24] *Id*. ¶¶ 27–79.

[25] The AdaptHealth Defendants include AdaptHealth Corp., Stephen P. Griggs, Jason Clemens, Frank J. Mullen, Richard Barasch, Joshua Parnes, Alan Quasha, Terence Connors, Dr. Susan Weaver, Dale Wolf, Bradley Coppens, and David S. Williams III.

alleged corrective disclosure, July 19, 2021, was neither statistically significant nor due to the factual underpinnings of the Jehoshaphat Report;

c.  With respect to the McGee Tax Issue, there is no economic evidence that the alleged misrepresentations elicited a statistically significant price increase in AdaptHealth stock, and the movement in AdaptHealth's stock price on the date of the alleged corrective disclosure, April 13, 2021, was not due to the disclosure of Mr. McGee's alleged involvement in an alleged tax fraud in the April 13 Press Release; and

d.  Lead Plaintiffs did not purchase any AdaptHealth securities from March 4, 2021, to the end of the Putative Class Period on July 16, 2021. One of the Lead Plaintiffs, Bucks County, benefitted from the alleged fraud related to the Organic Growth Issue, and the other Lead Plaintiff, Delaware County, did not experience a loss from the alleged fraud related to the Organic Growth Issue.

I elaborate and provide the bases for my opinions in the remainder of this report.

## V.    Economic and Statistical Background

### A.    Market Efficiency

29.    The value of a company's stock is equal to the present value of its expected future cash flows.[26] Only information that changes the total mix of information regarding the present value of the company's expected future cash flows is value-relevant information.[27]

30.    In an efficient market, the disclosure of any new and unexpected value-relevant information—whether in SEC filings, earnings releases, presentations, news articles, court filings, etc.—is quickly and fully incorporated into the company's stock price at the time the disclosure is made.[28]

31.    In an efficient market, only new and unexpected value-relevant information can move stock prices because prices already reflect all information that has been previously disclosed. Previously disclosed information that cannot move stock prices is frequently referred to as "stale." Stale information does not move stock prices because the value of the information, if any, would

---

[26] See J.E. Pinto, E. Henry, T.R. Robinson & J.D., Stowe, 2010, *Equity Asset Valuation*, 2nd edition, John Wiley & Sons, Inc., Chapter 2, 37–82, at 43 ("[I]ntrinsic value of a common equity share [i]s the present value of [its] expected future cash flows.").

[27] See A. Ferrell & A. Roper, 2015, "Price Impact, Materiality, and Halliburton II," *Washington University Law Review*, Vol. 93, 553–82, at 565; *see also* Securities and Exchange Commission, 2000, "Final Rule: Selective Disclosure and Insider Trading," Federal Register, Vol. 65(165), 51716–51740, 51721 (to be codified at pts. 240, 243 & 249) ("To fulfill the materiality requirement, there must be a substantial likelihood that a fact 'would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'").

[28] See C.P. Jones, 2013, *Investments: Analysis and Management*, 12th edition, John Wiley & Sons, Inc., Chapter 12, 319–46, at 320.

have already been reflected in a given company's stock price when the information was originally disclosed. For example, if a company announces that its earnings beat analyst expectations and its stock price increased on the day of the announcement, repeating the same information one day, one week, or one month later would not elicit a stock price reaction because the value of that information, if any, would already have been reflected in the company's stock price on the day of the initial earnings announcement.

32.    In addition, information that is expected cannot move stock prices, even if this information is new, because this information is already incorporated into stock prices. For example, an earnings announcement can only move stock prices if the earnings announced were not already expected by the market.

33.    Similarly, in an efficient market, information that is not value-relevant cannot move stock prices because it does not change the total mix of information regarding the present value of the company's expected future cash flows.

34.    The academic literature finds that, even for a company whose stock generally trades in an efficient market, there could be periods of time when the stock may not be trading in an efficient market. For example, academic literature provides evidence of market inefficiency in the months following a company's initial public offering, as well as in the months following a deSPAC merger.[29] For example:

    a.  Rose (2021): "SPAC investors around the time of a deSPAC merger are unlikely to enjoy the protections of an efficient market. As in early aftermarket IPO trading, the supply of shares available to trade is artificially restricted in and around a deSPAC merger due to lock-up agreements. In a recent paper, Rodrigues and Stegemoller report empirical findings on SPAC liquidity, concluding that 'SPACs have relatively thin trading volume and number of trades and are plagued by a considerable number of days in which the stock does not trade at all.' Moreover, arbitrage opportunities are limited. While short interest in deSPAC shares is on the rise, this is a risky strategy given the low inventory available. Indeed, some SPAC short sellers have recently been squeezed. All of this means that stock price movements in the wake of a deSPAC merger may largely be driven by retail investors, many of whom may be unreasonable investors vulnerable to placing undue reliance on management forecasts."[30]

---

[29] *See*, *e.g.*, T. Loughran & J.R. Ritter, 1995, "The New Issues Puzzle," *The Journal of Finance*, Vol. 50(1), 23–51.

[30] A.M. Rose, 2021, "SPAC Mergers, IPOs, and the PSLRA's Safe Harbor: Unpacking Claims of Regulatory Arbitrage," Working Paper, 1–49, at 41.

b. Rodrigues and Stegemoller (2021): "[We have] f[ou]nd considerabl[e] evidence of liquidity challenges in SPACs, both before and after the announcement of a merger. . . . SPAC trading can be light to the point of nonexistence. There are days, even around the announcement of a deal—the most important piece of information a SPAC can announce to the market, that it has in fact found a target—when not a single SPAC share trades."[31]

c. Klausner et al. (2022): "[M]arket-adjusted SPAC shares consistently and significantly drop in value after a merger. If prices really were perfectly efficient the day mergers close, then this consistent post-merger price drop could only be explained by an extraordinary and prolonged string of bad luck. Under our interpretation, by contrast, target companies may have been willing to accept the terms of SPAC mergers because they viewed those terms as reflecting the true value of their businesses—even if it took the market time to come to that realization."[32]

35.     This literature makes clear that for companies like AdaptHealth, which underwent a deSPAC merger on November 8, 2019, and began publicly trading on November 11, 2019, the stock price may not be trading in an efficient market in the months immediately following the deSPAC merger. As such, further scrutiny of market efficiency during this period is necessary.

## B.     Event Studies

36.     To analyze the effect of a particular event on a publicly traded stock, I used a standard and widely accepted statistical framework known as an "event study." An event study evaluates whether, assuming an efficient market, a particular event may be associated with a statistically significant change in the stock price.

37.     Specifically, an event study is typically done by: (i) using a regression analysis (*i.e.*, a statistical tool that estimates the relationship between two or more variables of interest) to estimate the historical relationship between changes in a company's stock price and changes in the performance of relevant market and industry indices; (ii) using the historical relationship and the actual performance of these indices on the day in question to calculate an expected return; and (iii) subtracting the expected return from the actual return to derive the residual return. This analysis determines whether the firm-specific price change is of a sufficient magnitude to be

---

[31] U. Rodrigues & M. Stegemoller, 2021, "Redeeming SPACs," Working Paper, 1–57, at 32–33.

[32] M. Klausner, M. Ohlrogge & E. Ruan, 2022, "A Sober Look at SPACs," *Yale Journal on Regulation*, Vol. 39, 228–303, at 302; *see generally* M. Gahng, J.R. Ritter & D. Zhang, 2022, "SPACs," Working Paper, 1–47; M. Klausner & M. Ohlrogge, 2022, "Is SPAC Sponsor Compensation Evolving? A Sober Look at Earnouts," Working Paper, 1–43; J. Kolb & T. Tykova, 2016, "Going public via special purpose acquisition companies: Frogs do not turn into princes," *Journal of Corporate Finance*, Vol. 40, 80–96.

considered "statistically significant," *i.e.*, significantly different from zero at conventional levels of significance,[33] after taking into account the effect of contemporaneous market and industry factors on a stock price change (or "return") by estimating a firm-specific price change ("abnormal return" or "residual return") net of these factors. The statistical significance of the residual returns is typically assessed by calculating a standardized measure of the size of the residual return known as a "*t*-statistic."[34] A *t*-statistic with an absolute value of 1.96 or greater denotes statistical significance at the 5% level of significance (a conventional level at which assessments of statistical significance are made, also commonly referred to as the 95% confidence interval).[35]

38.    The lack of a statistically significant price movement indicates that the change in the stock price is due to the typical random price movements one would expect in a risky security, and not due to the particular event at issue. In other words, the particular event is not new and unexpected value-relevant information and, thus, could not have moved the stock price. If there is a statistically significant price movement, there is economic evidence of a non-random price movement but further analysis is required to determine the cause of that movement—namely, whether the particular event reflects new and unexpected value-relevant information and, if so, whether the particular event caused the price movement.[36]

39.    In the context of securities litigation, it is typical to perform an event study on both the days of alleged misrepresentations and days of alleged corrective disclosures. Only statistically significant price increases related to the alleged misrepresentations would provide reliable economic evidence that the alleged misrepresentations may have contained new and unexpected value-relevant information. Furthermore, if the alleged misrepresentations contained new and unexpected value-relevant information, the stock price will exhibit statistically significant price

---

[33] *See* J.Y. Campbell, A.W. Lo & A.C. MacKinlay, 1997, *The Econometrics of Financial Markets*, Princeton University Press, Chapter 4, 149–80, at 160–61; D.R. Fischel, 1982, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer*, Vol. 38, 1–20, at 18–19; G.W. Schwert, 1981, "Using Financial Data to Measure Effects of Regulation," *Journal Law and Economics*, Vol. 24(1), 121–58, at 131.

[34] *See* Campbell et al., *supra* note 33, at 160–61; Fischel, *supra* note 33, at 18–19; Schwert, *supra* note 33, at 131.

[35] *See, e.g.*, W. Mendenhall, J.E. Reinmuth & R.J. Beaver, 1993, *Statistics for Management and Economics*, 7th edition, Duxbury Press, Chapter 9, 325–63, at 329–31; *see also* Cain Report ¶ 58.

[36] Similarly, if there is a statistically significant price decrease, one would have to analyze whether the cause of the price decrease was the alleged corrective disclosure or information that is unrelated to the alleged corrective disclosure.

increases on the days of the alleged misrepresentations *and* statistically significant price decreases on the days of the alleged corrective disclosures.

40.     For purposes of my event studies in Sections VII and VIII, I use the NASDAQ Composite for the market index (excluding AdaptHealth), and I use NASDAQ Health Care for the industry index (excluding AdaptHealth).  AdaptHealth is an emerging growth company and so it does not provide a stock price chart in its 10-K showing the indices against which it compares its performance.[37]  I choose NASDAQ Composite and NASDAQ Health Care as the market and industry indices because AdaptHealth is listed on NASDAQ and it is a "provider of home healthcare equipment, supplies and related services in the United States."[38]

41.     Because Dr. Cain's analysis of market efficiency is conducted over the entire Putative Class Period,[39] for all of my event studies, I estimate the historical relationship between the returns of AdaptHealth's stock price and the returns of the market and industry indices over the period from November 11, 2019—the first day AdaptHealth stock began trading publicly—to July 19, 2021, and I include indicator variables for the alleged misrepresentation and alleged corrective disclosure dates in my regression model.[40]  Nevertheless, I also test the robustness of

---

[37] AdaptHealth Corp., Form 10-K, December 31, 2019, filed on March 6, 2020 at 4:40 pm ET, at cover page.

Results are qualitatively similar if I use the market and industry indices used in the Cain Report, that is, S&P 500 Total Return Index and S&P 600 Health Care Equipment and Services Industry Group.  Cain Report ¶ 55.  None of the four alleged misrepresentations related to the Organic Growth Issue elicited a statistically significant and positive stock price reaction.  *See* **Appendix D**.  In addition, none of the 15 alleged misrepresentations related to the McGee Tax Issue elicited a statistically significant and positive stock price reaction.  *See* **Appendix E**.  AdaptHealth's residual return on April 13, 2021, was equal to -20.28% with a *t*-statistic equal to -5.28 (*i.e.*, statistically significant), and AdaptHealth's residual return on July 19, 2021, was equal to -5.99% with a *t*-statistic equal to -1.55 (*i.e.*, not statistically significant).  Finally, there is no statistically significant stock price reaction on the five dates prior to April 13, 2021, when news about Mr. McGee's alleged involvement in the alleged tax fraud was disclosed to the market through court filings and news articles.  *See* **Appendix F**.

[38] AdaptHealth Corp., Form 10-K, December 31, 2019, filed on March 6, 2020 at 4:40 pm ET, at cover page & 3.

[39] *See*, *e.g.*, Cain Report ¶ 29.

[40] Although the Complaint defines the Putative Class Period as the period between November 8, 2019, and July 16, 2021 (Complaint ¶ 1), Dr. Cain begins his event study on November 11, 2019, the first day that AdaptHealth began trading publicly.  Cain Report ¶ 55 & n.54.  Thus, the start date for my event study is also November 11, 2019.

To control for the potential effect of the alleged misrepresentation and alleged corrective disclosure dates on my regression model, I add indicator variables to my regression model for the following dates:  November 11, 2019; November 14, 2019; November 20, 2019; February 25, 2020; March 9, 2020; April 30, 2020; May 5, 2020; May 11, 2020; August 4, 2020; August 7, 2020; November 4, 2020; November 9, 2020; January 5, 2021; March 4, 2021; March 17, 2021; April 13, 2021; May 6, 2021; May 11, 2021; and July 19, 2021.  An indicator variable is a variable that takes the value of one on the day of the alleged misrepresentation or alleged corrective disclosure and zero otherwise.

the results of my event study by using 120 days and 250 trading days as the estimation period.[41] The residual return on each of the 17 alleged misrepresentation dates and the two alleged corrective disclosure dates is equal to the regression coefficients on the indicator variables.[42]

---

[41] Results are qualitatively similar if I use 250 trading days instead of the whole Putative Class Period as the estimation period. For events that fall within the first 250 trading days, I use a single, fixed, 250-day estimation period starting on November 11, 2019. For all other events, I use a rolling, 250-day estimation period that ends on the day prior to each event. None of the four alleged misrepresentations related to the Organic Growth Issue elicited a statistically significant and positive stock price reaction. *See* **Appendix G**. In addition, none of the 15 alleged misrepresentations related to the McGee Tax Issue elicited a statistically significant and positive stock price reaction. *See* **Appendix H**. AdaptHealth's residual return on April 13, 2021, was equal to -20.86% with a *t*-statistic equal to -5.30 (*i.e.*, statistically significant), and AdaptHealth's residual return on July 19, 2021, was equal to -6.05% with a *t*-statistic equal to -1.90 (*i.e.*, statistically nonsignificant). Finally, there is no statistically significant stock price reaction on the five dates prior to April 13, 2021, when news about Mr. McGee's alleged involvement in the alleged tax fraud was disclosed to the market through court filings and news articles. *See* **Appendix I**.

Results are qualitatively similar if I use 120 trading days instead of the whole Putative Class Period as the estimation period, with the exception of the event study results on July 19, 2021. For events that fall within the first 120 trading days, I use a single, fixed, 120-day estimation period starting on November 11, 2019. For all other events, I use a rolling, 120-day estimation period that ends on the day prior to each event. None of the four alleged misrepresentations related to the Organic Growth Issue elicited a statistically significant and positive stock price reaction. *See* **Appendix J**. In addition, none of the 15 alleged misrepresentations related to the McGee Tax Issue elicited a statistically significant and positive stock price reaction. *See* **Appendix K**. AdaptHealth's residual return on April 13, 2021, was equal to -21.61% with a *t*-statistic equal to -6.10 (*i.e.*, statistically significant), and AdaptHealth's residual return on July 19, 2021, was equal to -5.69% with a *t*-statistic equal to -2.21 (*i.e.*, statistically significant). Finally, there is no statistically significant stock price reaction on the five dates prior to April 13, 2021, when news about Mr. McGee's alleged involvement in the alleged tax fraud was disclosed to the market through court filings and news articles. *See* **Appendix L**.

[42] There is an overlap of two days between the 15 alleged misrepresentation dates related to the McGee Tax Issue and the four alleged misrepresentation dates related to the Organic Growth Issue, resulting in a total of 17 alleged misrepresentation dates.

**VI.**   **The Cain Report Failed to Analyze Market Efficiency for AdaptHealth's Stock Following the deSPAC Merger.  Certain of the Market Efficiency Indicators for the Three, Six, and Nine Months Following the deSPAC Merger Are Substantially Different from the Thresholds and/or Measures That Were the Basis for Dr. Cain's Market Efficiency Conclusion for the Entire Putative Class Period**

42.   As noted in Paragraph 24 above, Dr. Cain analyzes for the entire Putative Class Period AdaptHealth's (i) Average Weekly Trading Volume, (ii) Analyst Coverage, (iii) the Presence of Market Makers, (iv) SEC Form S-3 Filing Eligibility, (v) Cause and Effect Relationship Between Company Information and Stock Prices, (vi) Market Capitalization, (vii) Bid-Ask Spread, (viii) Public Float, (ix) Institutional Ownership, (x) Autocorrelation, and (xi) Options Trading.[43]   Based on his analysis of the above, Dr. Cain concludes that "the market for AdaptHealth's Common Stock was efficient during the [Putative] Class Period."[44]

43.   The factors Dr. Cain analyzes are necessary but not sufficient indicators of market efficiency because they do not speak to whether the price of AdaptHealth stock moved fully, quickly, and in the predicted direction in response to new and unexpected value-relevant information.[45]   In fact, academic literature typically does not use the factors used in Dr. Cain's market efficiency analysis to examine whether the stock of a company is trading in an efficient market.[46]

44.   Also, as discussed in Paragraph 34 above, academic literature indicates that there may be periods of inefficiency in the market for a company's shares in the months following a deSPAC merger.  One of the possible explanations for or contributors to this inefficiency is the presence of lockup agreements following a deSPAC merger.[47]

45.   In AdaptHealth's case, there were lockup agreements that expired three, six, and nine months following its deSPAC merger.[48]   However, nowhere in the Cain Report does Dr. Cain

---

[43] Cain Report ¶¶ 27–79.

[44] *Id.* ¶ 10.

[45] *See* E.F. Fama, 1970, "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance*, Vol. 25(2), 383–417, at 383.

[46] *See, e.g.*, A. Brav & J.B. Heaton, 2015, "Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias," *Washington University Law Review*, Vol. 93(2), 583–614.

[47] *See* Rose, *supra* note 30, at 41.

[48] DFB Healthcare Acquisitions Corp., Schedule 14A, October 23, 2019, at 6.

consider the possible impact of the deSPAC merger and the lockup agreements on the market for AdaptHealth stock in the periods immediately following the deSPAC merger. Rather, Dr. Cain ignores the deSPAC merger in his market efficiency analysis.

46. Accordingly, I analyzed the same market efficiency indicators in the Cain Report but I analyzed those indicators for the three-, six-, and nine-month periods following AdaptHealth's deSPAC merger. I then compared the results of my analyses (*i.e.*, for the three-, six-, and nine-month periods following AdaptHealth's deSPAC merger) to the results of Dr. Cain's market efficiency analysis (*i.e.*, for the entire Putative Class Period).

47. **Appendix M** reflects the results of my analysis. Columns 1–3 show my calculations during the three, six, and nine months following the deSPAC merger. Column 4 shows Dr. Cain's calculations of the same market efficiency indicators for the entire Putative Class Period, as presented in the Cain Report.

48. As **Appendix M** shows, when certain market efficiency indicators analyzed in the Cain Report are measured during the three-, six-, and nine-month periods following AdaptHealth's deSPAC merger, my results are significantly different from the results in the Cain Report for the entire Putative Class Period. More importantly, for certain market efficiency indicators that Dr. Cain relies on, my results are substantially below the thresholds that Dr. Cain concluded were indicative of market efficiency. For example:

a. <u>Average Weekly Trading Volume</u>: Row 1 shows that the average weekly trading volume during the three, six, and nine months following the deSPAC merger is equal to 0.88%, 1.01%, and 1.54%, respectively.[49] Looking at the entire Putative Class Period, Dr. Cain found that it was equal to 3.56%. Hence, the average weekly trading volume during the three, six, and nine months following the deSPAC merger is less than half of the average weekly trading volume during the entire Putative Class Period. In addition, the average weekly trading volume during the

---

[49] Similar to the Cain Report, I estimate the average weekly trading volume during each relevant period (*i.e.*, three, six, nine months, or the Putative Class Period) as follows. *First*, I estimate the weekly trading volume as the sum of the daily number of shares traded on five consecutive trading days divided by the number of shares outstanding. *Second*, I estimate the average weekly trading volume as the average of the weekly trading volume during each relevant period (*i.e.*, three, six, nine months, or the Putative Class Period). Cain Report ¶ 29. According to Dr. Cain, the greater the trading volume, "the more likely it is that new information will be quickly incorporated into the price of that security." *Id.* ¶ 27. Dr. Cain also cites a court opinion stating that "[t]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." *Id.* ¶ 28.

three months following the deSPAC merger is below the 1% threshold cited by Dr. Cain as the level that would justify a substantial presumption of market efficiency, and the average weekly trading volume during the six and nine months following the deSPAC merger is below the 2% threshold cited by Dr. Cain as the level that would justify a strong presumption of market efficiency.[50]

b.    Number of Analysts:  Row 2 shows the number of analysts during the three, six, and nine months following the deSPAC merger is equal to two, three, and five, respectively.[51] Looking at the entire Putative Class Period, Dr. Cain found that the number of analysts was equal to eight.  Hence, the number of analysts during the three, six, and nine months following the deSPAC merger is less than half of the number of analysts during the entire Putative Class Period. According to Dr. Cain, "[a]nalyst coverage can be indicative of market efficiency since research analysts ensure that new important company-specific information is disseminated to investors and thus impounded into stock prices quickly and efficiently."[52]  Hence, lower analyst coverage during the three, six, and nine months following the deSPAC merger compared to the Putative Class Period may suggest that "new important company-specific information" may be disseminated less quickly and efficiently into AdaptHealth's stock price.

c.    Number of Event Dates with Statistically Significant Returns:  Row 5 shows that there are no event dates with statistically significant returns during the three, six, and nine months following the deSPAC merger.[53]  In contrast, looking at the entire Putative Class Period, Dr. Cain found that four out of the 14 event dates were associated with a statistically significant stock price

---

[50] Cain Report ¶ 29 ("The average weekly trading volume was 3.56% of AdaptHealth's common shares outstanding over the Class Period.  This level of trading volume significantly exceeds both the 1% and 2% thresholds established by the Cammer court.  As a result, AdaptHealth's level of stock trading volume throughout the Class Period supports the conclusion that AdaptHealth's Common Stock traded in an efficient market throughout the Class Period.").

[51] The "number of analysts" is the unique number of "firms that conducted thorough and detailed research on AdaptHealth and its industry, such as Jefferies, RBC Capital Markets, Deutsche Bank, UBS, and Bank of America." Id. ¶ 33.

[52] Id. ¶ 31.

[53] The "number of event dates with statistically significant returns" is the number of dates on which AdaptHealth's stock experienced a statistically significant residual stock price reaction.  The event dates considered in this analysis are (i) AdaptHealth's quarterly earnings announcement dates during the Putative Class Period, (ii) AdaptHealth's M&A announcement dates during the Putative Class Period, and (iii) the alleged corrective disclosure dates in this matter (i.e., April 13, 2021, and July 19, 2021).  Cain Report ¶¶ 48–51.

return.[54]  According to Dr. Cain, "[i]f the company's stock price moves more on days in which new information is released, relative to prior trading days, this would support a finding of market efficiency."[55]  The fact that there are no event dates with statistically significant returns during the three, six, and nine months following the deSPAC merger is inconsistent with AdaptHealth's stock trading in an efficient market during this period.

      d.      <u>Number of Event Dates with Statistically Significant Trading Volume</u>:  Row 6 shows that there are no event dates with statistically significant trading volume during the three and six months following the deSPAC merger, and there is only one out of the eight days with statistically significant trading volume during the nine months following the deSPAC merger.[56] In contrast, looking at the entire Putative Class Period, Dr. Cain found four out of the 14 event dates were associated with a statistically significant trading volume.[57]  According to Dr. Cain, "[i]f the company's stock price moves more on days in which new information is released, relative to prior trading days, this would support a finding of market efficiency."[58]  The fact that there are no event dates with statistically significant trading volume during the three and six months following the deSPAC merger, and there is only one out of eight event dates with statistically significant trading volume during the nine months following the deSPAC merger, is inconsistent with AdaptHealth's stock trading in an efficient market during this period.

      e.      <u>Average Bid-Ask Spread</u>:  Row 8 shows the average bid-ask spread during the three, six, and nine months following the deSPAC merger is equal to 1.84%, 1.60%, and 1.21%,

---

[54] Cain Report, Exhibit 7.  The 14 event dates Dr. Cain evaluated are (i) seven earnings announcement dates during the Putative Class Period, (ii) five M&A announcement dates during the Putative Class Period, and (iii) the two alleged corrective disclosure dates (*i.e.*, April 13, 2021, and July 19, 2021).  *Id.* ¶¶ 48–51.  Three out of the 14 event dates fall within the first three months following the deSPAC merger, six out of the 14 event dates fall within the first six months following the deSPAC merger, and eight out of the 14 event dates fall within the first nine months following the deSPAC merger.

[55] *Id.* ¶ 46.

[56] The "number of event dates with statistically significant trading volume" is the number of dates on which AdaptHealth's stock experienced a statistically significant residual trading volume.  The event dates considered in this analysis are (i) AdaptHealth's quarterly earnings announcement dates during the Putative Class Period, (ii) AdaptHealth's M&A announcement dates during the Putative Class Period, and (iii) the alleged corrective disclosure dates in this matter (*i.e.*, April 13, 2021, and July 16, 2021). *Id.*  ¶¶ 48–51.  *See also supra* n.54.

[57] Cain Report, Exhibit 7.

[58] *Id.* ¶ 46.

respectively,[59] and during the entire Putative Class Period is equal to 0.66%.  Hence, the average bid-ask spread during the three, six, and nine months following the deSPAC merger is more than double the average bid-ask spread during the entire Putative Class Period.  According to Dr. Cain, "a narrow bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally-efficient market."[60]  The fact that the average bid-ask spread during the three months following the deSPAC merger is above the 1.69% average bid-ask spread of the "MRK Covered" firms suggests that AdaptHealth's bid-ask spread during the three months following the deSPAC merger did not reflect the "common indicia of firms operating in efficient markets."[61]

 f. Options Trading: Row 12 shows that AdaptHealth's options did not trade during the three, six, and nine months following the deSPAC merger.  According to Dr. Cain, "options trading on a company's stock can improve price discovery and support a finding of market efficiency, relative to a company without any options trading."[62]  The fact that AdaptHealth's options did not trade throughout the entire Putative Class Period[63] suggests that AdaptHealth's options trading does not "support a finding of market efficiency" throughout the whole Putative Class Period.[64]

49. In sum, the Cain Report concludes that the market for AdaptHealth's stock was efficient for the entire Putative Class Period while ignoring the three, six, and nine months following the deSPAC merger and the markedly different findings with respect to market efficiency indicators during these periods.

---

[59] The "average bid-ask spread" is the average of the daily ask price minus the daily bid price divided by the bid-ask midpoint.  Cain Report ¶ 70.

[60] Id. ¶ 69.

[61] Id. ¶¶ 25, 71.

[62] Cain Report ¶ 79.

[63] AdaptHealth options began publicly trading on the Chicago Board Options Exchange on November 25, 2020, over a year after AdaptHealth common stock began publicly trading on NASDAQ on November 11, 2019. See "Historical Options Data Download – AHCO," Cboe.com, https://www.cboe.com/us/options/market_statistics/historical_data/.

[64] Id.

**VII.    With Respect to the Organic Growth Issue, There Is No Economic Evidence That the Alleged Misrepresentations Elicited a Statistically Significant Price Increase in AdaptHealth Stock, and the Movement in AdaptHealth's Stock Price on the Date of the Alleged Corrective Disclosure, July 19, 2021, Was Neither Statistically Significant Nor Due to the Factual Underpinnings of the Jehoshaphat Report**

**A.    Alleged Misrepresentations**

50.    Lead Plaintiffs allege that Defendants made alleged misrepresentations related to the Organic Growth Issue on four dates, starting on March 4, 2021.[65]

51.    I performed an event study of AdaptHealth's stock price reaction on the four alleged misrepresentation dates related to the Organic Growth Issue.  My event study analysis, which I describe in Section V.B. above, finds that none of the four alleged misrepresentations related to the Organic Growth Issue elicited a statistically significant and positive stock price reaction.[66]  On three of the days, March 4, 2021, March 16, 2021, and May 10, 2021, the returns are not statistically significant, which means that the returns on these dates cannot be distinguished from zero.  On May 6, 2021, the return is statistically significant and *negative*, which is inconsistent with the alleged misrepresentations containing new and unexpected value-relevant information that *increased* AdaptHealth's stock price.  Hence, there is no reliable economic basis to conclude that the alleged misrepresentations related to the Organic Growth Issue contained new and unexpected value-relevant information for AdaptHealth investors.

52.    **Appendix N** shows the results of my event study analysis on those four dates.

---

[65] Complaint ¶¶ 115–27.  Lead Plaintiffs allege misrepresentations related to the Organic Growth Issue on the following dates:  March 4, 2021; March 16, 2021; May 6, 2021; and May 10, 2021.  The Form 10-K issued on March 16, 2021, and the Form 10-Q issued on May 10, 2021, do not provide organic growth estimates or information about the methodology used to estimate organic growth.

[66] I reviewed (i) AdaptHealth's public filings, and (ii) news articles that have "AdaptHealth" in the headline or the lead paragraph and were published in *The Wall Street Journal* or *Dow Jones* on the three trading days surrounding each alleged misrepresentation date (*i.e.*, days -1 to +1).  My analysis did not show any potential company-specific value-relevant news on the four alleged misrepresentation dates other than the public filings that contained the alleged misrepresentations.

AdaptHealth's public filings that included the alleged misrepresentations, however, contained information other than the alleged misrepresentations.  In particular, AdaptHealth:  (i) announced its 4Q 2020 financial results on March 4, 2021; (ii) filed its 2020 Form 10-K on March 16, 2021; (iii) announced its 1Q 2021 financial results on May 6, 2021; and (iv) filed its 1Q 2021 Form 10-Q on May 10, 2021.  *See* AdaptHealth Corp., FQ4 2020 Earnings Call Transcripts, March 4, 2021 at 8:30 am ET; AdaptHealth Corp., Financial Supplement – Q4 2020, March 4, 2021; AdaptHealth Corp., Form 10-K, December 31, 2020, filed on March 16, 2021 at 5:08 pm ET; AdaptHealth Corp., FQ1 2021 Earnings Call Transcripts, May 6, 2021 at 8:30 am ET; AdaptHealth Corp., Financial Supplement – Q1 2021, May 6, 2021; AdaptHealth Corp., Form 10-Q, March 31, 2021, filed on May 10, 2021 at 4:23 pm ET.

B.      **Alleged Corrective Disclosure**

53.      I performed an event study of AdaptHealth's stock price reaction on the alleged corrective disclosure date related to the Organic Growth Issue. My event study analysis, which I describe in Section V.B. above, finds that on July 19, 2021, the date of the alleged Organic Growth corrective disclosure, AdaptHealth's stock price decreased by -6.15%, and the price decline had a *t*-statistic of -1.60 and is, therefore, *not* statistically significant (*i.e.*, the absolute value of the *t*-statistic is below the threshold for statistical significance of 1.96).[67] Accordingly, there is no reliable economic basis to conclude the Jehoshaphat Report contained new and unexpected value-relevant information about AdaptHealth's organic growth methodology and organic growth calculations that allegedly revealed the "truth" to the market.

54.      *First*, value-relevant information, to the extent that it is new and unexpected, should elicit a statistically significant price reaction, but there was no statistically significant price reaction on July 19, 2021. In other words, AdaptHealth's stock price change on July 19, 2021, cannot be distinguished from zero. This result indicates that the publication of the Jehoshaphat Report did not provide new and unexpected value-relevant information to AdaptHealth investors.

55.      *Second*, the factual underpinnings of the Jehoshaphat Report's content were stale (*i.e.*, previously disclosed) information. AdaptHealth publicly announced its new organic growth methodology in its Q4 2020 Financial Supplement, released on March 4, 2021, disclosing how it calculated organic growth and the organic growth results for FY 2020 and all prior quarters using the new methodology. It explained:

> Organic growth as shown is defined as current period net revenue plus current period acquisition revenue divided by prior period net revenue plus prior period revenue for acquisition revenue. Acquisition revenue is confirmed through third-party Quality of Earnings ('QoE') reports where available and management estimates where QoE revenue is not available.[68]

56.      In addition, the Jehoshaphat Report's organic growth calculations were based on publicly available information disclosed in AdaptHealth's SEC filings prior to July 19, 2021 (*i.e.*,

---

[67] *See, e.g.*, Mendenhall et al., *supra* note 35, at 329–31.

[68] AdaptHealth Corp., Financial Supplement – Q4 2020, March 4, 2021, at 7; *see also* AdaptHealth Corp., Financial Supplement – Q1 2021, May 6, 2021, at 7.

AdaptHealth's Forms 10-K, Forms 10-Q, and merger proxy filings), and thus were publicly available at the time the Jehoshaphat Report was published.[69]

57.    Further, AdaptHealth explained during the Company's Q4 2020 earnings call that AdaptHealth's 2021 organic growth guidance included revenue from recent acquisitions.[70]  In particular:

> **Philip Chickering**
>
> *Deutsche Bank AG, Research Division*
>
> Nice quarter.  A couple of quick ones here.  On the 2021 guidance raise, you talked about the 8% to 10% organic growth rate.  So just to double check, is the guidance raise solely coming from M&A done since your last guidance?
>
> **Luke McGee**
>
> *Co-CEO & Director*
>
> So on the revenue side, we didn't change any revenue.  So that would be -- the revenue raise is related to the acquisitions. . . .
>
> **Mathew Justin Blackman**
>
> *Stifel, Nicolaus & Company, Incorporated, Research Division*
>
> . . . So the entirety of the revenue guidance range lift is driven by the new M&A. . . .
>
> **Jason A. Clemens**
>
> *Chief Financial Officer*
>
> Yes. Sure. Sure, Matt.  So on the revenue side, I mean you've got that right.  I mean we increased the organic growth in the revenue guide when we came out with the Aero announcement in late 2020.  So no real change there, just

---

[69] Jehoshaphat Report, at 19–23;  *see also id*. at 25 ("If you can do this math and find your way through the filings to source everything, your numbers might come out slightly differently but you're going to find the same main thing: Organic growth, which averaged 0-2% over time to begin with, imploded right around the time management started obscuring it." (emphasis omitted)).

[70] AdaptHealth Corp., FQ4 2020 Earnings Call Transcripts, March 4, 2021 at 8:30 am ET, at 11–12, 15.

> kind of confirming evidence that we feel rock-solid about our organic growth.
>
> To your point, the increased revenue is from the acquisitions mentioned by Luke that we're very excited about. I think when you run the math, take out the $5 million of increase in your synergy, I think what you're getting at is really just a ramp in some of these businesses. I mean these are very recently acquired businesses.

58.     In addition, analyst reports published following AdaptHealth's Q4 2020 earnings call reiterated that AdaptHealth's 2021 organic growth guidance included revenue from recent acquisitions, which shows that market participants understood that AdaptHealth's organic growth metric as disclosed starting from March 4, 2021, included revenue from recent acquisitions. For example:

a. Baird Equity Research, March 4, 2021: "**2021 guidance increased**: . . . **Drivers**: *Press release notes incremental 4Q and 1Q-to-date tuck-in acquisitions, so guidance increase likely benefits in part from these new deals*. However, comments also note guidance up due to organic growth prospects and a callout for high ordering patterns and substantial growth in diabetes franchise."[71]

b. Canaccord Genuity, March 4, 2021: "**Bullish takeaway**: *AHCO raised 2021 guidance with revenue moving higher on recent M&A transactions and adj-EBITDA from acquisitions* and better-than-expected AeroCare integration cost synergies ($30M annualized versus $25M targeted previously) in 2020."[72]

c. Deutsche Bank, March 4, 2021: "There was a lot of concern headed into AHCO's 4Q print due to concerns around COVID's impact on AHCO's revenue trajectory and earnings potential in 2021. We believe that AHCO's 4Q print and 2021 guide should alleviate those concerns, and because there are only 27 days until the end of 1Q, that AHCO has good visibility on intra quarter trends. *While the increased revenue guidance is exclusively due to incremental M&A revenues*, the fact that core revenue guidance was maintained should give investors confidence that the sky isn't falling. The increased EBITDA guidance includes $30m in realized synergies in 2021, which is up from previous guidance of $25m and indicates the Aerocare integration is tracking ahead of schedule."[73]

---

[71] Baird Equity Research, "Meaningful 2021 Guidance Boost, Calling Out Diabetes and Sleep," March 4, 2021, at 1 (emphasis added).

[72] Canaccord Genuity, "Beat-and-raise scenario likely to continue through 2021," March 4, 2021, at 1 (emphasis added).

[73] Deutsche Bank, "Not Your Great Grandma's DME Provider," March 4, 2021, at 1 (emphasis added).

d.  Jefferies, March 4, 2021: "AHCO's guidance raise is driven by continued organic growth strength, as well as *contributions from recently-completed acquisitions*."[74]

e.  RBC Capital Markets, March 4, 2021: "Organic rev. growth – Current/Previous: 8-10%. *Guidance includes only contribution from completed or announced acquisitions*. Excludes any contribution from CARES Act grant income."[75]

59.     If the market for AdaptHealth stock was efficient during the Putative Class Period, as Dr. Cain contends, only new and unexpected value-relevant information would elicit a stock price reaction.[76] Because AdaptHealth disclosed its organic growth methodology and the market understood that methodology prior to the publication of the Jehoshaphat Report, the "truth" allegedly revealed by the Jehoshaphat Report was stale information, and thus AdaptHealth's stock price would not react to the information in the Jehoshaphat Report. Hence, any stock price decline on July 19, 2021, is not due to the factual underpinnings of the Jehoshaphat Report.

60.     *Third*, assuming that the market for AdaptHealth stock was efficient, as Dr. Cain contends, and the Jehoshaphat Report elicited a statistically significant price reaction (which as explained above is not the case), that impact could only be attributable to the publication of the Jehoshaphat Report, not its factual underpinnings. Academic literature shows that anonymous short-seller reports elicit negative stock price reactions that subsequently reverse. The reversals of the initially negative stock price reactions are consistent with the idea that anonymous short-seller reports do not necessarily convey new and unexpected value-relevant information but instead aim to manipulate stock prices.

61.     In particular, Mitts (2020) studies "pseudonymous attacks on public companies" and finds that these attacks "are followed by stock price declines and sharp reversals."[77] Pseudonymous reports are defined as articles published on *Seeking Alpha* under the category "Short Ideas," for which there is no personally identifiable biographical information in the *Seeking*

---

[74] Jefferies, "Strong Q4, FY21 Guidance Raise Should Address Recent Investor Concerns," March 4, 2021, at 1 (emphasis added).

[75] RBC Capital Markets, "FY21 organic and M&A tailwinds blowing stronger than expected," March 4, 2021, at 4 (emphasis added); *see also* Stifel, "Long-Tailed Secular Growth Story with Accretive M&A Opportunities Remains Very Much on Track," March 4, 2021, at 2–3; UBS, "Strong Momentum Sets Up Meaningful Upside Risks to 2022 Estimates; Reiterate Buy," March 8, 2021, at 5.

[76] Cain Report ¶ 10.

[77] J. Mitts, 2020, "Short and Distort," *Journal of Legal Studies*, Vol. 49(2), 287–334, at 287.

*Alpha* website for the author of the report.[78]  Mitts interprets the findings of his study as suggesting that "short attacks carried out by pseudonymous authors may indeed be manipulative."[79]

62.     Relatedly, Zhao (2020) studies "activist short-sellers' interest in opaque firms" and finds that opaque targets experience larger price declines but also larger price reversals following the short-seller attacks relative to non-opaque firms.[80]  Zhao also defines activist short-seller attacks as the publication of "Short Ideas" articles in the *Seeking Alpha* website.[81]  The author constructs "five corporate opacity indicators:  low accruals quality, high bid-ask spread, high analyst disagreement, non-Big4 auditors, and a summary indicator coded as one if any of these four individual measures is coded as one."[82]  Zhao interprets the findings as suggesting that "activist short-sellers generally exploit corporate opacity for informative shorts, but there is evidence of manipulation indicated by price reversals."[83]

63.     Here, analysts described the Jehoshaphat Report as an "anonymous short report."[84] Thus, in line with the findings of the academic literature discussed in Paragraphs 60 to 62 above, the mere publication of the anonymous Jehoshaphat Report may have caused AdaptHealth's (nonsignificant) stock price decline on July 19, 2021, and not the factual underpinnings of the Jehoshaphat Report.

64.     This conclusion is further supported by analysts' review of the Jehoshaphat Report. Following the publication of the Jehoshaphat Report, analysts pointed out the "inconsistencies" in the Jehoshaphat Report and stated that the Jehoshaphat Report "inappropriately state[d] opinions as facts":

  a. Deutsche Bank, July 19, 2021:  "AHCO shares fell 6% on Monday on a lengthy, anonymous short report published before the market open.  While we are still reviewing various aspects of the report, the crux of the call is that AHCO is significantly overstating its organic revenue growth on both a trailing and forward looking basis,

---

[78] *Id*. at 297.

[79] *Id*. at 291.

[80] W. Zhao, 2020, "Activist Short-Selling and Corporate Opacity," Working Paper, at 2, 28.

[81] *Id*. at 13.

[82] *Id*. at 3.

[83] *Id*. at abstract page.

[84] Deutsche Bank, "AHCO anonymous short report fuels uncertainty; reiterate Buy," July 19, 2021, at 1; *see also* Baird Equity Research, "Model Update," July 27, 2021, at 1.

with the author reaching the conclusion that organic growth has actually been running in the -DD% range since 4Q20.  While there is a lot to unpack here and we are still reviewing the numbers, below we highlight what we see as the key inconsistencies in the author's conclusion."[85]

   b.  Baird Equity Research, July 27, 2021:  "No change in opinion on AHCO.  We received a flurry of inbound requests for AHCO discussion and model requests in recent days, following a lengthy short report anonymously issued by a firm called Jehoshaphat.  Our mindset is not to get in a lengthy battle of wits with authors who hide under anonymity, inappropriately state opinions as facts, bias interpretations with limited data sets when broad data sets are readily available, distort reality and make many claims based on off-base assumptions and guesses.  That said, never waste a crisis."[86]

65.    As explained above, as my event study analysis finds that none of the four alleged misrepresentations related to the Organic Growth Issue elicited a statistically significant stock price increase, there is no reliable economic basis to conclude that the alleged misrepresentations related to the Organic Growth Issue contained new and unexpected value-relevant information for AdaptHealth investors.  It is my opinion that any price decline on July 19, 2021, is not due to the information contained in the Jehoshaphat Report but to the publication of the Jehoshaphat Report itself.

**VIII.  With Respect to the McGee Tax Issue, There is No Economic Evidence That the Alleged Misrepresentations Elicited a Statistically Significant Price Increase in AdaptHealth Stock, and the Movement in AdaptHealth's Stock Price on the Date of the Alleged Corrective Disclosure, April 13, 2021, Was Not Due to the Disclosure of Mr. McGee's Alleged Involvement in an Alleged Tax Fraud in the April 13 Press Release**

   **A.    Alleged Misrepresentations**

66.    Lead Plaintiffs allege that Defendants made alleged misrepresentations related to the McGee Tax Issue on 15 dates between November 8, 2019, and March 16, 2021.[87]

67.    I performed an event study of AdaptHealth's stock price reaction on the alleged misrepresentation dates related to the McGee Tax Issue.[88]   My event study analysis, which I

---

[85] Deutsche Bank, *supra* note 84, at 1.

[86] Baird Equity Research, *supra* note 84, at 1 (emphasis omitted).

[87] Complaint ¶¶ 76–114.

[88] For disclosures made after market hours, I use AdaptHealth's return on the first trading day following the disclosure in my event study analysis.  For example, the first alleged misrepresentation related to the McGee Tax Issue was publicly released after market hours on Friday, November 8, 2019; thus, I use AdaptHealth's return on Monday,

describe in Section V.B. above, finds that none of the 15 alleged misrepresentations related to the McGee Tax Issue elicited a statistically significant stock price reaction (*i.e.*, the information disclosed was not new and unexpected value-relevant information).[89]  Hence, there is no reliable economic basis to conclude that the alleged misrepresentations related to the McGee Tax Issue contained new and unexpected value-relevant information for AdaptHealth investors.

68.     **Appendix O** shows the results of my event study analysis.

## B.     Alleged Corrective Disclosure

69.     I performed an event study of AdaptHealth's stock price reaction on the alleged corrective disclosure date related to the McGee Tax Issue.  My event study analysis, as described in Section V.B. above, finds that on April 13, 2021, the date of the alleged McGee Tax Issue corrective disclosure, AdaptHealth's stock price decreased by -20.90%, and the price decline had a *t*-statistic of -5.42, and is, therefore, statistically significant (*i.e.*,  the absolute value of the

---

November 11, 2019, in my event study analysis. *See* "DFB Healthcare Acquisitions Corp. Announces Closing of Business Combination With AdaptHealth Holdings LLC," *Business Wire*, November 8, 2019 at 4:30 pm ET.

[89] I reviewed (i) AdaptHealth's public filings, and (ii) news articles that have "AdaptHealth" in the headline or the lead paragraph and were published in *The Wall Street Journal* or *Dow Jones* on the three trading days surrounding each alleged corrective disclosure date (*i.e.*, days -1 to +1).  My analysis did not show any potential company-specific value-relevant news on the 15 alleged misrepresentation dates other than the public filings that contained the alleged misrepresentations.

AdaptHealth's public filings that included the alleged misrepresentations, however, contained information other than the alleged misrepresentations.  In particular, AdaptHealth:  (i) announced the deSPAC merger on November 8, 2019; (ii) announced its Q3 2019 financial results on November 13, 2019; (iii) filed a Form 8-K on November 20, 2019, announcing that it "made available on its website at www.adapthealth.com a presentation relating to the Company's business and operations"; (iv) announced its Q4 2019 financial results on February 25, 2020; (v) filed its 2019 Form 10-K on March 6, 2020; (vi) filed a Schedule 14A on April 29, 2020, related to an annual shareholder meeting; (vii) announced its Q1 2020 financial results on May 5, 2020; (viii) filed its Q1 2020 Form 10-Q on May 8, 2020; (ix) announced its Q2 2020 financial results on August 4, 2020; (x) filed its Q2 2020 Form 10-Q on August 6, 2020; (xi) announced its Q3 2020 financial results on November 4, 2020; (xii) filed its Q3 2020 Form 10-Q on November 6, 2020; (xiii) filed a Form 424B5 related to a secondary offering on January 4, 2021; (xiv) announced its 4Q 2020 financial results on March 4, 2021; and (xv) filed its 2020 Form 10-K on March 16, 2021. *See* "DFB Healthcare Acquisitions Corp. Announces Closing of Business Combination With AdaptHealth Holdings LLC," *Business Wire*, November 8, 2019 at 4:30 pm ET; AdaptHealth Corp., Form 8-K, November 13, 2019 at 9:38 pm ET; AdaptHealth Corp., Form 8-K, November 20, 2019 at 3:06 pm ET, at 2; AdaptHealth Corp., FQ4 2019 Earnings Call Transcripts, February 25, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-K, December 31, 2019, filed on March 6, 2020 at 4:40 pm ET; AdaptHealth Corp., Schedule 14A, April 29, 2020 at 4:26 pm ET; AdaptHealth Corp., FQ1 2020 Earnings Call Transcripts, May 5, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-Q, March 31, 2020, filed on May 8, 2020 at 5:01 PM ET; AdaptHealth Corp., FQ2 2020 Earnings Call Transcripts, August 4, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-Q, June 30, 2020, filed on August 6, 2020 at 5:25 PM ET; AdaptHealth Corp., FQ3 2020 Earnings Call Transcripts, November 4, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-Q, September 30, 2020, filed on November 6, 2020 at 4:32 pm ET; AdaptHealth Corp., Prospectus Supplement (to Prospectus dated December 30, 2020), January 4, 2021 at 5:32 pm ET; AdaptHealth Corp., FQ4 2020 Earnings Call Transcripts, March 4, 2021 at 8:30 am ET; AdaptHealth Corp., Form 10-K, December 31, 2020, filed on March 16, 2021 at 5:08 pm ET.

*t*-statistic is above the threshold of 1.96).[90]  As is necessary with this result, I analyzed the information disclosed on April 13, 2021, to assess the reasons for the stock price decline on that day.  Based on my analysis, which is summarized below, there is no reliable economic basis to conclude the decline in AdaptHealth's stock price was due to the disclosure of the McGee Tax Issue.

70.     On April 13, 2021, during market hours, the Company issued the April 13 Press Release stating that:

> AdaptHealth Corp. has learned that authorities in Denmark have formally charged Co-Chief Executive Officer Luke McGee with alleged tax fraud arising from certain past private activity. The alleged personal conduct occurred between March 2014 and August 2015 and had no connection to AdaptHealth's business. AdaptHealth has placed Mr. McGee on unpaid leave from his roles as Co-CEO and a Director of the Company while this matter is pending. The Board of Directors of AdaptHealth takes this matter very seriously and is monitoring the situation closely in consultation with its legal advisors. The Board has full confidence in the Company's management team, led by current Co-CEO Steve Griggs and President Josh Parnes, and in its ability to ensure that AdaptHealth's business remains strong and to maintain the Company's growth trajectory.[91]

71.     In the April 13 Press Release, there were three pieces of information disclosed: (i) the McGee Tax Issue; (ii) Mr. McGee was criminally charged in Denmark in connection with this alleged tax fraud ("Criminal Indictment Information"); and (iii) Mr. McGee was being put on unpaid leave ("Executive Departure Information").

### 1.      The McGee Tax Issue

72.     My analysis shows that the McGee Tax Issue could not have elicited a negative stock price reaction on April 13, 2021, and thus does not explain the price decline on that day.

---

[90] *See* W. Mendenhall et al., *supra* note 35, at 329–31.

[91] "AdaptHealth Corp.'s Board of Directors' Statement on Co-Chief Executive Officer Luke McGee," *Business Wire*, April 13, 2021 at 9:48 am ET.

73.    Mr. McGee's alleged involvement in the alleged tax fraud was publicly disclosed on at least five dates prior to April 13, 2021:

a.    *First*, on November 19, 2019, after market hours, Denmark filed a complaint (the "Danish Complaint") related to "a fraudulent tax refund scheme" that involved two pension funds, 2321 Capital Pension Plan and Lion Advisory Inc. Pension Plan, that Mr. McGee owned and controlled.[92]  Even though the Danish Complaint did not name Mr. McGee, a November 13, 2019 AdaptHealth Form 8-K stated that 2321 Capital LLC was "controlled" by Mr. McGee.[93]

b.    *Second*, on November 21, 2019, three Danish news articles linked Mr. McGee to the alleged tax fraud:

i.    A *Berlingske* article stated that:

The newspapers' reports show that the two financiers have played key roles in the alleged fraud as close business partners of the alleged ringleader of the dividend scam, Sanjay Shah, who has been charged in the case.  According to the newspapers, Richard Markowitz and John van Merkensteijn also co-founded an asset management company. The company also included Jerome Lhote and Matthew Stein, who were named by TV2 and Politiken earlier this year as accomplices in the case, and who have settled with the Danish Tax Agency along with a third partner, Luke McGee. The newspapers have unsuccessfully sought comment from Richard Markowitz, John van Merkensteijn, Jerome Lhote, Matthew Stein and Luke McGee through their lawyers regarding their role in the fraud.[94]

ii.    A *Børsen* article stated that:

Earlier this year[], Matthew Stein, Jerome Lhote and the previously unknown business partner Luke McGee, entered into a settlement with the Danish Tax Agency to repay the money that they had received through Shah, the former Shah people and North Channel Bank.  Together the three men and their 61 associated pension plans received approx. 1.6 billion kroner.  The rest of the 2.9 billion kroner that the 61

---

[92] Complaint, *Skatteforvaltningen v. van Merkensteijn*, No. 1:19-cv-10713-UA, United States District Court Southern District of New York, filed November 19, 2019 at 4:46 pm ET, at preamble, ¶ 2.

[93] AdaptHealth Corp., Form 8-K, November 13, 2019 at 9:38 pm ET, at 9.

[94] "Media: American duo played key role in dividend affair," *Berlingske*, November 21, 2019 at 2:39 pm ET (certified translation from Danish to English).

pension plans had demanded to be paid out by Skat have, according to the Danish Tax Agency, ended up with other actors who were involved in the assumed fraud against Denmark.  We have not succeeded in obtaining a comment from Matthew Stein, Jerome Lhote and Luke McGee's lawyers.  The new management in North Channel Bank has admitted that the bank participated in fraud against both Belgium and Denmark.[95]

    iii.   A *DR* article stated that:

A number of John van Merkensteijn's and Richard Markowitz's pension funds were among the very first—in collaboration with Sanjay Shah—to start embezzling money from the tax authorities in late summer 2012, when the alleged billion-dollar fraud against Denmark began. Merkensteijn and Markowitz co-founded the asset management company Argre Management, based near Central Park in New York.  The same company also included Jerome Lhote and Matthew Stein—two other New York wealth managers named by TV2 . . . earlier this year as accomplices in the case, and who earlier this year settled with the IRS along with a third partner, Luke McGee. According to the mapping of the complex case, around DKK 5.7 billion of the total amount in the fraud case of DKK 12.7 billion can be attributed to refund requests from US pension plans linked to the five men—Shah's American 'gang' of Markowitz, Merkensteijn, Lhote, Stein and McGee, around Argre Management in New York.[96]

    c.   *Third*, a *DR* article published in Danish on January 24, 2020, stated that:

The three, Matt Stein, Jherome Lhote and Luke McGee, are via a large number of front men, behind a total of 61 American pension funds, which in the period between August 2012 to August 2015, received a total of 2.9 billion kroner paid out via the total 12.7 billion kroner that the Danish Tax Agency (then called Skat) collectively was

---

[95] "New fraudster revealed: Unknown American duo withdrew a billion kroner sum from Skat," *Børsen*, November 21, 2019 at 2:01 pm ET (certified translation from Danish to English).

[96] "Two hitherto unknown accomplices embezzled billions from the Danish Treasury," *DR*, November 21, 2019 at 2:00 pm ET (certified translation from Danish to English).

meant to have been cheated out of through fictitious equity trading scams, so-called cum ex-transactions.[97]

d.  *Fourth*, a *Politiken* article published in Danish on February 7, 2020, stated that:

> While the bank's former management are now behind bars in Germany, the bank's main shareholders, Americans Matthew Stein, Jerome Lhote and Luke McGee, are free. . . . However, TV2 and Politiken revealed in September 2019 that both Larosa and Donaldson were simply middlemen. The actual people behind it were hiding behind them: Matthew Stein, Jerome Lhote and Luke McGee, who are also the hidden main shareholders in North Channel Bank.[98]

e.  *Fifth*, a *Reporter* article published in German on February 21, 2020, stated that:

> 'What's breaking into a bank compared with founding a bank?' Berthold Brecht's 'Threepenny Opera' apparently provided inspiration for investors Jérôme Lhote, Matthew Stein and Luke McGee.
>
> In 2009, they took over a small private bank based in Mainz. Between 2012 and 2015, North Channel Bank is alleged to have been part of a network that defrauded Denmark and Belgium of millions in taxes. The plan was organized, among other things, by the three bank owners.
>
> According to the 'Süddeutsche Zeitung' (SZ), the group caused damage of 550 million euros in Denmark and another 70 million euros in Belgium. The case involves more than just a suspicion. According to the Danish television station TV2, Jérôme Lhote, Matthew Stein and Luke McGee admitted to the transactions and have reached an agreement with the Danish tax authorities to pay back the equivalent of 210 million euros.[99]

74.  Thus, the McGee Tax Issue was stale information at the time of the April 13 Press Release. If the market in which AdaptHealth's stock was trading during the Putative Class Period

---

[97] "The National Audit Office: Yield tax settlement with American bankers is illegal," *DR*, January 24, 2020 at 1:29 pm ET (certified translation from Danish to English).

[98] "Feared that they would fly out of the country: Two German bank managers detained in a case of Danish dividend fraud," *Politiken*, February 7, 2020 at 4:31 am ET (certified translation from Danish to English).

[99] "Bought a bank to commit fraud," *Reporter*, February 21, 2020 at 11:05 am ET (certified translation from German to English).

29

was efficient, as Dr. Cain concludes, then the disclosure on April 13, 2021, of the McGee Tax Issue could not have elicited a negative stock price reaction.

75.    In addition, there is no reliable economic evidence that such information was new and unexpected value-relevant information to AdaptHealth's investors, as AdaptHealth's stock price did not react in a statistically significant way on any of the five dates prior to April 13, 2021, that Mr. McGee's alleged involvement in the alleged tax fraud was publicly disclosed.[100]  *See* **Appendix P**.

### 2.    Criminal Indictment Information

76.    Assuming the market for AdaptHealth's stock was efficient, as Dr. Cain contends, and the April 13 Press Release was new and unexpected value-relevant information, there is economic evidence to support a conclusion that the other two pieces of new information disclosed in the April 13 Press Release, the Criminal Indictment Information and Executive Departure Information, would explain the decline on April 13, 2021.

77.    The Criminal Indictment Information was new to the market as of April 13, 2021, because the charges against Mr. McGee were only announced by the Danish State Prosecutor for Serious Economic and International Crime that day.[101]  While this information is not necessarily value-relevant to AdaptHealth investors because it does not necessarily affect the present value of the Company's expected future cash flows, academic literature shows that criminal indictments of key personnel are likely to have a negative impact on the stock price of the company associated with those individuals.  For example, Alexander (1999) examines "the equity-price consequences

---

[100] I reviewed (i) AdaptHealth's public filings, and (ii) news articles that have "AdaptHealth" in the headline or the lead paragraph and were published in *The Wall Street Journal* or *Dow Jones* on the three trading days surrounding each of the five dates (*i.e.*, days -1 to +1).  My analysis did not show any potential company-specific value-relevant news on those five dates other than the Form 8-K AdaptHealth filed on November 20, 2019, at 3:06 pm ET.

[101] I searched for *Bloomberg* articles containing the words "Denmark" or "Danish" and "McGee" or "North Channel Bank" between January 1, 2021, and April 13, 2021.  *See*, *e.g.*, "Denmark Charges 6 More People in $2.1 Billion Tax Scandal," *Bloomberg*, April 13, 2021 at 3:01 am ET (stating that "Denmark has charged six more people with fraud as prosecutors move closer to completing a years-long hunt to track down a total of $2.1 billion allegedly stolen through a dividend-tax scam"); *see also* "Dividend Reclaim Case: Six persons formally charged with defrauding the Danish Treasury of more than DKK 1 billion," *Anklagemyndigheden*, April 13, 2021 (stating that "[t]oday, the State Prosecutor for Serious Economic and International Crime (SEIC) has raised formal charges against three US nationals and three UK nationals for having defrauded the Danish Treasury of more than DKK 1.1 billion through a German bank.  This brings the total number of persons who have been formally charged in various parts of the dividend reclaim case to eight").

of . . . corporate crimes" by examining the stock price reaction on "the first date on which news of each firm's criminal investigation, indictment, or conviction was reported."[102]  The author finds a negative and statistically significant stock price reaction around the initial public announcement of the criminal conduct when the CEO is involved in the criminal conduct.

78.    To the extent this new and unexpected information was value-relevant to AdaptHealth investors, its disclosure would explain some or all of the price decline on April 13, 2021.

### 3.    Executive Departure Information

79.    The Executive Departure Information was also new to the market as of April 13, 2021, because AdaptHealth only announced it was putting Mr. McGee on leave that day. Academic literature demonstrates that the unexpected departure of a company's key personnel, like a company's CEO, may elicit a statistically significant change in the company's stock price. For example, Ertugrul & Krishnan (2011) examine the market reaction to "early" and "late" CEO dismissals and find a negative and statistically significant stock price reaction to "early" dismissals and a nonsignificant reaction to late dismissals.[103]  Early (late) dismissals are the dismissals in the absence of (following) significant poor prior stock performance.

80.    To the extent the Executive Departure Information was value-relevant to AdaptHealth investors, its disclosure would explain some or all of the price decline on April 13, 2021.

**IX.    Lead Plaintiffs Did Not Purchase Any AdaptHealth Securities from March 4, 2021, to the End of the Putative Class Period on July 16, 2021.  One of the Lead Plaintiffs, Bucks County, Benefitted from the Alleged Fraud Related to the Organic Growth Issue, and the Other Lead Plaintiff, Delaware County, Did Not Experience a Loss From the Alleged Fraud Related to the Organic Growth Issue**

81.    I reviewed Lead Plaintiffs' trading records during the Putative Class Period.

---

[102] C.R. Alexander, 1999, "On the Nature of the Reputational Penalty for Corporate Crime: Evidence," *The Journal of Law and Economics*, Vol. 42, 489–526, at 500.  The sample in this study includes both criminal conduct that affects related parties (*e.g.*, suppliers, customers, etc.) and criminal conduct that affects third parties (*e.g.*, violations of environmental law, etc.).

[103] *See* M. Ertugrul & K. Krishnan, 2011, "Can CEO dismissals be proactive?," *Journal of Corporate Finance*, Vol. 17(1), 134–51, at 145.

82.    Lead Plaintiffs did not purchase any AdaptHealth options during the Putative Class Period.[104]

83.    One of the Lead Plaintiffs, Bucks County, last purchased AdaptHealth stock on CONFIDENTIAL (*i.e.*, before the first alleged misrepresentation concerning the Organic Growth Issue) and sold CONFIDENTIAL AdaptHealth shares on CONFIDENTIAL , respectively (*i.e.*, between the first alleged misrepresentation and alleged corrective disclosure concerning the Organic Growth Issue).[105]  Thus, to the extent that there was any artificial inflation related to the Organic Growth Issue, Bucks County would have benefitted from the alleged artificial inflation from the above two sales.  As shown in **Appendix Q**, assuming that the artificial inflation is equal to the residual price change based on Dr. Cain's event study analysis, Bucks County benefitted by $2,724.15 (= $1.27 alleged artificial inflation × CONFIDENTIAL ) from the alleged fraud associated with the Organic Growth Issue.

84.    The other Lead Plaintiff, Delaware County, last purchased AdaptHealth stock on CONFIDENTIAL (*i.e.*, before the first alleged misrepresentation concerning the Organic Growth Issue) and CONFIDENTIAL (*i.e.*, after the alleged corrective disclosure concerning the Organic Growth Issue).[106]  Thus, even if there was any artificial inflation related to the Organic Growth Issue, Delaware County did not experience any loss or gain from the alleged fraud associated with the Organic Growth Issue.  *See* **Appendix Q**.

_____

L. Adel Turki

March 29, 2023

_____

[104] EMERALDADV-00000792.xlsx; EMERALDADV-00000787.xlsx.

[105] EMERALDADV-00000792.xlsx.

[106] EMERALDADV-00000787.xlsx.

32



APPENDIX A

## CURRICULUM VITAE

# L. Adel Turki

### OFFICE

Washington, DC
555 12th Street NW
Suite 501
Washington, DC 20004
Direct: 202.753.5275
Fax: 202.753.5280
Email: aturki@compasslexecon.com

New York
156 West 56th Street
19th Floor
New York, NY 10019
Direct: 212.782.3501
Fax: 212.782.3513

### EDUCATION

**Stanford University**                                    Stanford, California
*Ph.D., March 1994*
Industrial Engineering, major area:  Finance
Thesis topic:  A Contingent Claims Approach to Valuing New Ventures

*M.S., December 1986*
Petroleum Engineering

**The University of Tulsa**                                    Tulsa, Oklahoma
*B.S., December 1984*
Petroleum Engineering, *magna cum laude*

### PROFESSIONAL EXPERIENCE

2017 – Present  **Compass Lexecon**                          Washington, DC; New York, NY
*Senior Managing Director*

1995 – 2017
1991 – 1993  **Cornerstone Research, Inc.**                  Washington, DC; New York, NY
*Senior Vice President*

Former head of the firm's finance practice. Served as an expert witness. Provided analytical support to experts and consult to attorneys on finding experts, clarified the economic and financial issues in complex cases, and prepared summary reports and demonstrative exhibits. Specialize in cases involving derivatives, complex securities and valuation issues. Analyzed damages issues in antitrust, breach of contract and wrongful termination cases.

| | | |
|---|---|---|
| 2005 – 2006 | **University of Maryland** | College Park, Maryland |

*Lecturer, Robert H. Smith School of Business*
Taught the MBA Futures and Options Contracts course.

| | | |
|---|---|---|
| 2004 – Present | **South Mediterranean University** | Tunis, Tunisia |

*Faculty, Mediterranean School of Business*
Teach the finance module in the Executive MBA Program.

1995 – 2003

| | | |
|---|---|---|
| 1991 – 1993 | **Stanford University** | Stanford, California |

*Consulting Associate Professor, Management Science and Engineering Department*
Taught financial analysis and accounting courses.
*Lecturer, School of Law, 2001*
Taught quantitative methods in Finance.

| | | |
|---|---|---|
| 1993 – 1995 | **Purdue University School of Management** | West Lafayette, Indiana |

*Assistant Professor*
Taught Investments Seminar (Ph.D.), Options and Convertible Securities course (M.B.A.), Financial Management (undergraduate) and Investment Management (undergraduate).

## PUBLICATIONS

"A Venture Capital Price Index," *International Perspectives on Entrepreneurship Research*, S. Birley and I. C. MacMillan, ed., North-Holland, 1992 (with Robert H. Keeley)

"Risk-Return Profiles of New Ventures: An Empirical Study," *Journal of Small Business Finance*, Vol. 2, No. 2, 1993 (with Robert H. Keeley)

"New Ventures:  How Risky Are They?" *Frontiers of Entrepreneurship Research 1992* (with Robert H. Keeley)

"A New Approach to the Valuation of New Ventures," *Frontiers of Entrepreneurship Research 1993* (with Robert H. Keeley)

"Valuation of Early-Stage Ventures: Option Valuation Models vs, Traditional Approaches," *Journal of Entrepreneurial and Small Business Finance*, Vol. 5, No. 1, 1996 (with Robert H. Keeley and Sanjeev Punjabi)

"Initial Public Offerings by Development Stage Companies," *The Journal of Small and Emerging Business Law*, Vol. 1, No. 1, Summer 1998 (with Christopher B. Barry)

## WORKING PAPERS

"Compound Option Valuation:  A Simplified Approach" (with Robert H. Keeley)

"Executive Compensation in New Public Firms: Characteristics and Incentives" (with Robert H. Keeley and Gordon M. Phillips)

## PRESENTATIONS

"A Venture Capital Price Index," presented at the *Inaugural International Conference on Entrepreneurial Research*, February 18–20, 1991, London.

"Risk-Return Profiles of New Ventures: An Empirical Study," presented at the *Fourth Annual International Research Symposium On Small Firm Finance*, April 23–24, 1992, Baylor University (Waco, Texas).

"New Ventures: How Risky Are They?" presented at the *12th Annual Babson Entrepreneurship Research Conference*, June 28–July 2, 1992, INSEAD, Fontainebleau, France.

"A New Approach to Valuing New Ventures," presented at the *ORSA/TIMS Joint National Meeting*, November 1–4, 1992, San Francisco; at the 13th Annual Babson Entrepreneurship Research Conference, March 25–27, 1993, University of Houston; and at the *Fifth Annual International Research Symposium On Small Firm Financ*e, April 29–30, 1993, California State University at Long Beach

"Executive Compensation in New Public Firms: Characteristics and Incentives," presented at the *14th Annual Babson Entrepreneurship Research Conference*, June 9–12, 1994, Babson College (Babson, Massachusetts)

"Compound Option Valuation: A Simplified Approach," presented at the *International Conference on Mathematical Economics and Mathematical Finance*, June 21–24, 1994, Tunis, Tunisia

## AWARDS

Distinguished Paper Award — "Risk-Return Profiles of New Ventures: An Empirical Study," presented at the *Fourth Annual International Research Symposium On Small Firm Finance*, April 23–24, 1992, Baylor University (Waco, Texas)

Coleman Foundation Award for Best Paper — "New Ventures: How Risky Are They?" presented at the *12th Annual Babson Entrepreneurship Research Conference*, June 28–July 2, 1992, INSEAD, Fontainebleau, France

# Appendix B

# Last 4 Year Prior Testimony

1. *Jacobs v. Verizon Communications, Inc. et al.* (Deposition Testimony, 2019)

2. *Ramos, et al. v. Banner Health, et al.* (Trial Testimony, 2020)

3. *U.S. Securities and Exchange Commission v. Osiris, et al.* (Deposition Testimony, 2020)

4. *Baleja v. Northrup Grumman* (Deposition Testimony, 2020)

5. *Construction Laborers Pension Trust v. CBS Corporation, et al.* (Deposition Testimony, 2020)

6. *Karp v. First Connecticut Bancorp, Inc., et al.* (Deposition Testimony, 2021)

7. *KVC Waffles Ltd v. New Carbon Company, LLC* (Deposition Testimony, 2021)

8. *Linda Lao v. Dalian Wanda Group Co., et al.* (Deposition Testimony, 2021)

9. *SEC Holdings Group v. EMJ Corporation, et al.* (Deposition Testimony, 2022)

10. *SEC Holdings Group v. EMJ Corporation, et al.* (Arbitration Testimony, 2022)

11. *Turner v. Schneider Electric Holdings, et al.* (Deposition Testimony, 2022)

**Appendix C**

**Materials Relied Upon**

**I.     Legal Pleadings & Case Related Documents**

1.      Complaint, *Skatteforvaltningen v. van Merkensteijn*, No. 1:19-cv-10713-UA, United States District Court Southern District of New York, filed November 19, 2019

2.      EMERALDADV-00000792.xlsx

3.      EMERALDADV-00000787.xlsx

4.      Consolidated Complaint for Violations of the Federal Securities Laws, *Delaware County Employees Retirement System and Bucks County Employees' Retirement System v. AdaptHealth Corp.*, No. 2:21-cv-03382-HB, United States District Court Eastern District of Pennsylvania, filed November 22, 2021

5.      Expert Report of Matthew D. Cain, Ph.D., July 26, 2022, and Backup Materials

**II.    SEC Filings & Financial Supplements**

6.      AdaptHealth Corp., Form 8-K, November 13, 2019

7.      AdaptHealth Corp., Form 8-K, November 20, 2019

8.      AdaptHealth Corp., Form 10-K, December 31, 2019

9.      AdaptHealth Corp., Form 10-Q, March 31, 2020

10.     AdaptHealth Corp., Schedule 14A, April 29, 2020

11.     AdaptHealth Corp., Form 10-Q, June 30, 2020

12.     AdaptHealth Corp., Form 10-Q, September 30, 2020

13.     AdaptHealth Corp., Form 10-K, December 31, 2020

14.     AdaptHealth Corp., Prospectus Supplement (to Prospectus dated December 30, 2020), January 4, 2021

15.     AdaptHealth Corp., Financial Supplement – Q4 2020, March 4, 2021

16.     AdaptHealth Corp., Form 10-Q, March 31, 2021

17.     AdaptHealth Corp., Financial Supplement – Q1 2021, May 6, 2021

18.     DFB Healthcare Acquisitions Corp., Form 8-K, July 8, 2019

19.     DFB Healthcare Acquisitions Corp., Schedule 14A, October 23, 2019

### III.    Earnings Call Transcripts

20.    AdaptHealth Corp., FQ4 2019 Earnings Call Transcripts, February 25, 2020

21.    AdaptHealth Corp., FQ1 2020 Earnings Call Transcripts, May 5, 2020

22.    AdaptHealth Corp., FQ2 2020 Earnings Call Transcripts, August 4, 2020

23.    AdaptHealth Corp., FQ3 2020 Earnings Call Transcripts, November 4, 2020

24.    AdaptHealth Corp., FQ4 2020 Earnings Call Transcripts, March 4, 2021

25.    AdaptHealth Corp., FQ1 2021 Earnings Call Transcripts, May 6, 2021


### IV.    News Articles & Press Releases

26.    "DFB Healthcare Acquisitions Corp. Announces Closing of Business Combination With AdaptHealth Holdings LLC," *Business Wire*, November 8, 2019

27.    "Media: American duo played key role in dividend affair," *Berlingske*, November 21, 2019 (certified translation from Danish into English)

28.    "New fraudster revealed: Unknown American duo withdrew a billion kroner sum from Skat," *Børsen*, November 21, 2019 (certified translation from Danish to English)

29.    "Two hitherto unknown accomplices embezzled billions from the Danish Treasury," *DR*, November 21, 2019 (certified translation from Danish into English)

30.    "The National Audit Office: Yield tax settlement with American bankers is illegal," *DR*, January 24, 2020 (certified translation from Danish into English)

31.    "Feared that they would fly out of the country: Two German bank managers detained in a case of Danish dividend fraud," *Politiken*, February 7, 2020 (certified translation from Danish into English)

32.    "Bought a bank to commit fraud," *Reporter*, February 21, 2020 (certified translation from German into English)

33.    "AdaptHealth Corp.'s Board of Directors' Statement on Co-Chief Executive Officer Luke McGee," *Business Wire*, April 13, 2021

34.    "Denmark Charges 6 More People in $2.1 Billion Tax Scandal," *Bloomberg*, April 13, 2021

35.    "Dividend Reclaim Case: Six persons formally charged with defrauding the Danish Treasury of more than DKK 1 billion," *Anklagemyndigheden*, April 13, 2021


### V.    News Articles Cited in Footnotes 66, 89, & 100

36.    "DFB Healthcare Acquisitions Corp. Announces Closing of Business Combination With AdaptHealth Holdings LLC," *Dow Jones Institutional News*, November 8, 2019

37.    "AdaptHealth 3Q Loss $3.06M > AHCO," *Dow Jones Newswires Chinese (English)*, November 13, 2019

38.    "AdaptHealth Corp. Announces Third Quarter 2019 Financial Results for its AdaptHealth Holdings LLC Subsidiary," *Dow Jones Institutional News*, November 13, 2019

39.    "AdaptHealth Files 8K - Asset Acquisition Or Disposition > AHCO," *Dow Jones Institutional News*, November 14, 2019

40.    "AdaptHealth Files 8K - Changes In Control > AHCO," *Dow Jones Institutional News*, November 14, 2019

41.    "AdaptHealth to Buy Patient Care Solutions Business From McKesson," *Dow Jones Institutional News*, November 22, 2019

42.    "AdaptHealth Signs Definitive Agreement to Acquire Patient Care Solutions Business From McKesson Corporation," *Dow Jones Institutional News*, November 22, 2019

43.    "AdaptHealth Corp. Schedules 2019 Fourth Quarter and Full Year Financial Results and Conference Call," *Dow Jones Institutional News*, February 21, 2020

44.    "AdaptHealth Corp. Announces Fourth Quarter and Full Year 2019 Financial Results," *Dow Jones Institutional News*, February 25, 2020

45.    "AdaptHealth 4Q Loss/Shr 10c > AHCO," *Dow Jones Newswires Chinese (English)*, February 25, 2020

46.    "AdaptHealth Is Maintained at Buy by Stifel," *Dow Jones Institutional News*, February 26, 2020

47.    "AdaptHealth Corp. Schedules First Quarter 2020 Financial Results and Conference Call," *Dow Jones Institutional News*, April 29, 2020

48.    "AdaptHealth Corp. Announces First Quarter 2020 Financial Results," *Dow Jones Institutional News*, May 5, 2020

49.    "AdaptHealth 1Q EPS 0c > AHCO," *Dow Jones Newswires Chinese (English)*, May 5, 2020

50.    "AdaptHealth Corp. Announces Second Quarter 2020 Financial Results," *Dow Jones Institutional News*, August 4, 2020

51.    "AdaptHealth 2Q EPS 8c > AHCO," *Dow Jones Newswires Chinese (English)*, August 4, 2020

52.    "AdaptHealth Corp. CEO Luke McGee on Q2 2020 Results -- Earnings Call Transcript > AHCO," *Dow Jones Institutional News*, August 9, 2020

53.    "AdaptHealth Initiated at Buy by Canaccord Genuity," *Dow Jones Institutional News*, August 10, 2020

54.    "AdaptHealth Corp. to Participate in Fireside Chat at Canaccord Genuity 40th Annual Growth Conference," *Dow Jones Institutional News*, August 10, 2020

C-3

55.    "AdaptHealth Initiated at Buy by Canaccord Genuity," *Dow Jones Newswires Chinese (English)*, August 10, 2020

56.    "AdaptHealth Price Target Announced at $31.00/Share by Canaccord Genuity," *Dow Jones Newswires Chinese (English)*, August 10, 2020

57.    "AdaptHealth Corp. CEO Luke McGee on Q3 2020 Results -- Earnings Call Transcript > AHCO," *Dow Jones Institutional News*, November 4, 2020

58.    "AdaptHealth Posts Narrower 3Q Guidance, Raises FY Revenue Outlook," *Dow Jones Institutional News*, November 4, 2020

59.    "AdaptHealth Corp. Announces Third Quarter 2020 Financial Results," *Dow Jones Institutional News*, November 4, 2020

60.    "AdaptHealth 3Q Loss/Shr 4c > AHCO," *Dow Jones Newswires Chinese (English)*, November 4, 2020

61.    "AdaptHealth Is Maintained at Buy by Canaccord Genuity," *Dow Jones Institutional News*, November 5, 2020

62.    "AdaptHealth Is Maintained at Outperform by SVB Leerink," *Dow Jones Institutional News*, November 5, 2020

63.    "AdaptHealth Is Maintained at Buy by Canaccord Genuity," *Dow Jones Newswires Chinese* (English), November 5, 2020

64.    "AdaptHealth Is Maintained at Outperform by SVB Leerink," *Dow Jones Newswires Chinese (English)*, November 5, 2020

65.    "AdaptHealth Price Target Raised to $32.50/Share From $23.50 by SVB Leerink," *Dow Jones Newswires Chinese (English)*, November 5, 2020

66.    "AdaptHealth Price Target Raised to $34.00/Share From $31.00 by Canaccord Genuity," *Dow Jones Newswires Chinese (English)*, November 5, 2020

67.    "AdaptHealth Corp. Announces Proposed Public Offering of Class A Common Stock," *Dow Jones Institutional News*, January 4, 2021

68.    "AdaptHealth Corp. Announces Pricing of Public Offering of Class A Common Stock," *Dow Jones Institutional News*, January 5, 2021

69.    "AdaptHealth's CEO Luke McGee on Q4 2020 Results -- Earnings Call Transcript > AHCO," *Dow Jones Institutional News*, March 4, 2021

70.    "AdaptHealth Corp. Announces Fourth Quarter and Full Year 2020 Financial Results," *Dow Jones Institutional News*, March 4, 2021

71.    "AdaptHealth 4Q Rev $348.4M >AHCO," *Dow Jones Newswires Chinese (English)*, March 4, 2021

72.    "AdaptHealth Initiated at Buy by Truist Securities," *Dow Jones Institutional News*, March 18, 2021

C-4

73.    "AdaptHealth Initiated at Buy by Truist Securities," *Dow Jones Newswires Chinese (English)*, March 18, 2021

74.    "AdaptHealth Price Target Announced at $48.00/Share by Truist Securities," *Dow Jones Newswires Chinese (English)*, March 18, 2021

75.    "AdaptHealth Co-CEO McGee on Leave After Denmark Tax Charges > AHCO," *Dow Jones Institutional News*, April 13, 2021

76.    "AdaptHealth Corp. Down Nearly 18%, on Pace for Largest Percent Decrease in Over a Year -- Data Talk," *Dow Jones Institutional News*, April 13, 2021

77.    "AdaptHealth Says Authorities in Denmark Have Formally Charged Co-CEO Luke McGee With Alleged Tax Fraud > AHCO," *Dow Jones Institutional News*, April 13, 2021

78.    "AdaptHealth Shares Tumble as Co-CEO McGee Charged With Tax Fraud > AHCO," *Dow Jones Institutional News*, April 13, 2021

79.    "AdaptHealth Stock Plunges After CEO Charged With Tax Fraud In Denmark – MarketWatch," *Dow Jones Institutional News*, April 13, 2021

80.    "Ademi LLP Investigates Claims of Securities Fraud against AdaptHealth Corporation," *Dow Jones Institutional News*, April 14, 2021

81.    "AdaptHealth Cut to Neutral From Outperform by Baird," *Dow Jones Newswires Chinese (English)*, April 14, 2021

82.    "AdaptHealth Cut to Neutral From Outperform by Baird," *Dow Jones Institutional News*, April 14, 2021

83.    "AdaptHealth Price Target Announced at $35.00/Share by Baird," *Dow Jones Newswires Chinese (English)*, April 14, 2021

84.    "AdaptHealth Corp. Schedules First Quarter 2020 Financial Results and Conference Call," *Dow Jones Institutional News*, April 29, 2021

85.    "AdaptHealth Corp. Announces First Quarter 2021 Financial Results," *Dow Jones Institutional News*, May 6, 2021

86.    "AdaptHealth 1Q Loss/Shr 8c > AHCO," *Dow Jones Newswires Chinese (English)*, May 6, 2021

87.    "AdaptHealth Corp. Announces Participation at Upcoming Investor Conferences," *Dow Jones Institutional News*, May 10, 2021

88.    "ADAPTHEALTH CORP CL A, Inst Holders, 2Q 2021 (AHCO)," *Dow Jones Institutional News*, July 20, 2021

## VI.    Analyst Reports & Short Seller Reports

89.    Baird Equity Research, "Meaningful 2021 Guidance Boost, Calling Out Diabetes and Sleep," March 4, 2021

90.    Baird Equity Research, "Model Update," July 27, 2021

91.    Canaccord Genuity, "Beat-and-raise scenario likely to continue through 2021," March 4, 2021

92.    Deutsche Bank, "Not Your Great Grandma's DME Provider," March 4, 2021

93.    Deutsche Bank, "AHCO anonymous short report fuels uncertainty; reiterate Buy," July 19, 2021

94.    Jefferies, "Strong Q4, FY21 Guidance Raise Should Address Recent Investor Concerns," March 4, 2021

95.    Jehoshaphat Research, "Not Just a Roll-Up, But a CoverUp: Is AHCO the Next MDCA?," July 19, 2021

96.    RBC Capital Markets, "FY21 organic and M&A tailwinds blowing stronger than expected," March 4, 2021

97.    Stifel, "Long-Tailed Secular Growth Story with Accretive M&A Opportunities Remains Very Much on Track," March 4, 2021

98.    UBS, "Strong Momentum Sets Up Meaningful Upside Risks to 2022 Estimates; Reiterate Buy," March 8, 2021

## VII.    Academic Literature

99.    C.R. Alexander, 1999, "On the Nature of the Reputational Penalty for Corporate Crime: Evidence," *The Journal of Law and Economics*, Vol. 42(1), 489-526

100.    A. Brav & J.B. Heaton, 2015, "Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias," *Washington University Law Review*, Vol. 93(2), 583-614

101.    J.Y. Campbell, A.W. Lo, & A.C. MacKinlay, 1997, *The Econometrics of Financial Markets*, Princeton University Press, Chapter 4, 149-180

102.    M. Ertugrul, & K. Krishnan, 2011, "Can CEO dismissals be proactive?," *Journal of Corporate Finance,* Vol. 17(1), 134-151

103.    E.F. Fama, 1970, "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance,* Vol. 25(2), 383-417

104.    A. Ferrell & A. Roper, 2015, "Price Impact, Materiality, and Halliburton II," *Washington University Law Review*, Vol. 93, 553-582

105.    D.R. Fischel, 1982, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer*, Vol. 38(1), 1-20

106.    M. Gahng, J.R. Ritter, & D. Zhang, 2022, "SPACs," Working Paper, 1-47

107.    C.P. Jones, 2013, *Investments: Analysis and Management*, 12th edition, John Wiley & Sons, Inc., Chapter 12, 319-346

108.    M. Klausner & M. Ohlrogge, 2022, "Is SPAC Sponsor Compensation Evolving? A Sober Look at Earnouts," Working Paper, 1-43

109.    M. Klausner, M. Ohlrogge, & E. Ruan, 2022, "A Sober Look at SPACs," *Yale Journal on Regulation*, Vol. 39, 228-303

110.    J. Kolb & T. Tykova, 2016, "Going public via special purpose acquisition companies: Frogs do not turn into princes," *Journal of Corporate Finance*, Vol. 40, 80-96

111.    T. Loughran & J.R. Ritter, 1995, "The New Issues Puzzle," *The Journal of Finance*, Vol. 50(1), 23-51

112.    W. Mendenhall, J.E. Reinmuth, & R.J. Beaver, 1993, *Statistics for Management and Economic*, 7th edition, Duxbury Press, Chapter 9, 325-363

113.    J. Mitts, 2020, "Short and Distort," *Journal of Legal Studies*, Vol. 49(2), 287-334

114.    J.E. Pinto, E. Henry, T.R. Robinson, & J.D. Stowe, 2010, Equity Asset Valuation, 2nd edition, John Wiley & Sons Inc., Chapter 2, 37-82

115.    U. Rodrigues & M. Stegemoller, 2021, "Redeeming SPACs," Working Paper, 1-57

116.    A.M. Rose, 2021, "SPAC Mergers, IPOs, and the PSLRA's Safe Harbor: Unpacking Claims of Regulatory Arbitrage," Working Paper, 1-49

117.    G.W. Schwert, 1981, "Using Financial Data to Measure Effects of Regulation," *Journal of Law and Economics,* Vol. 24(1), 121-158

118.    Securities and Exchange Commission, 2000, "Final Rule: Selective Disclosure and Insider Trading," Federal Register, Vol. 65(165), 51716-51740

119.    W. Zhao, 2020, "Activist Short-Selling and Corporate Opacity," Working Paper, 1-50

## VIII.    Websites

120.    "Historical Options Data Download – AHCO," Cboe.com, https://www.cboe.com/us/options/market_statistics/historical_data/

121.    "What are the differences in an IPO, a SPAC, and a direct listing?," SEC.gov, https://www.sec.gov/education/capitalraising/building-blocks/registered-offerings

## IX.    Data Sources

122.    Bloomberg L.P.

123.    EIKON

124.    FactSet

125.    Refinitiv

126.    S&P Capital IQ

All other materials cited in the report.

**Appendix D**
**AdaptHealth Corp.**
**Event Study on the Alleged Misrepresentation Dates**
**Related to the Organic Growth Issue**
**Using Dr. Cain's Market and Industry Indices**

| | Event Date | Reaction Date | Residual Return | t-stat | Positive & Significant? |
|---|---|---|---|---|---|
| 1 | 03/04/21 | 03/04/21 | 2.66% | 0.69 | No |
| 2 | 03/16/21 | 03/17/21 | -3.13% | -0.81 | No |
| 3 | 05/06/21 | 05/06/21 | -12.49% | -3.25 | No |
| 4 | 05/10/21 | 05/11/21 | -2.11% | -0.55 | No |

Notes: Residual returns are based on a regression of the returns of AdaptHealth stock on the returns of the S&P 500 Total Return Index and S&P 600 Healthcare Equipment and Services Industry Group over the period November 11, 2019, to July 19, 2021. I include indicator variables for the alleged misrepresentation and alleged corrective disclosure dates in my regression model. "Positive & Significant" residual returns are the residual returns with a t-statistic that is greater than or equal to 1.96.

Sources: Bloomberg L.P.; Complaint ¶¶ 115–27; AdaptHealth Corp., FQ4 2020 Earnings Call Transcripts, March 4, 2021 at 8:30 am ET; AdaptHealth Corp., Financial Supplement – Q4 2020, March 4, 2021; AdaptHealth Corp., Form 10-K, December 31, 2020, filed on March 16, 2021 at 5:08 pm ET; AdaptHealth Corp., FQ1 2021 Earnings Call Transcripts, May 6, 2021 at 8:30 am ET; AdaptHealth Corp., Financial Supplement – Q1 2021, May 6, 2021; AdaptHealth Corp., Form 10-Q, March 31, 2021, filed on May 10, 2021 at 4:23 pm ET.

**Appendix E**
**AdaptHealth Corp.**
**Event Study on the Alleged Misrepresentation Dates**
**Related to the McGee Tax Issue**
**Using Dr. Cain's Market and Industry Indices**

|   | Event Date | Reaction Date | Residual Return | *t*-stat | Positive & Significant? |
|---|---|---|---|---|---|
| 1 | 11/08/19 | 11/11/19 | -1.15% | -0.30 | No |
| 2 | 11/13/19 | 11/14/19 | -6.93% | -1.80 | No |
| 3 | 11/20/19 | 11/20/19 | -6.04% | -1.57 | No |
| 4 | 02/25/20 | 02/25/20 | 0.88% | 0.23 | No |
| 5 | 03/06/20 | 03/09/20 | -4.83% | -1.23 | No |
| 6 | 04/29/20 | 04/30/20 | -1.83% | -0.47 | No |
| 7 | 05/05/20 | 05/05/20 | -0.59% | -0.15 | No |
| 8 | 05/08/20 | 05/11/20 | -2.56% | -0.67 | No |
| 9 | 08/04/20 | 08/04/20 | 3.34% | 0.87 | No |
| 10 | 08/06/20 | 08/07/20 | 0.84% | 0.22 | No |
| 11 | 11/04/20 | 11/04/20 | -0.22% | -0.06 | No |
| 12 | 11/06/20 | 11/09/20 | -3.64% | -0.94 | No |
| 13 | 01/04/21 | 01/05/21 | -6.55% | -1.70 | No |
| 14 | 03/04/21 | 03/04/21 | 2.66% | 0.69 | No |
| 15 | 03/16/21 | 03/17/21 | -3.13% | -0.81 | No |

Notes: Residual returns are based on a regression of the returns of AdaptHealth stock on the returns of the S&P 500 Total Return Index and S&P 600 Healthcare Equipment and Services Industry Group over the period November 11, 2019, to July 19, 2021. I include indicator variables for the alleged misrepresentation and alleged corrective disclosure dates in my regression model. "Positive & Significant" residual returns are the residual returns with a *t*-statistic that is greater than or equal to 1.96.

Sources: Bloomberg L.P.; Complaint ¶¶ 76–78, 80, 82, 86, 88, 90, 93, 95, 99, 101, 105-06, 108, 110; "DFB Healthcare Acquisitions Corp. Announces Closing of Business Combination With AdaptHealth Holdings LLC," *Business Wire*, November 8, 2019 at 4:30 pm ET; AdaptHealth Corp., Form 8-K, November 13, 2019 at 9:38 pm ET; AdaptHealth Corp., Form 8-K, November 20, 2019 at 3:06 pm ET; AdaptHealth Corp., FQ4 2019 Earnings Call Transcripts, February 25, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-K, December 31, 2019, filed on March 6, 2020 at 4:40 pm ET; AdaptHealth Corp., Schedule 14A, April 29, 2020 at 4:26 pm ET; AdaptHealth Corp., FQ1 2020 Earnings Call Transcripts, May 5, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-Q, March 31, 2020, filed on May 8, 2020 at 5:01 PM ET; AdaptHealth Corp., FQ2 2020 Earnings Call Transcripts, August 4, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-Q, June 30, 2020, filed on August 6, 2020 at 5:25 PM ET; AdaptHealth Corp., FQ3 2020 Earnings Call Transcripts, November 4, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-Q, September 30, 2020, filed on November 6, 2020 at 4:32 pm ET; AdaptHealth Corp., Prospectus Supplement (to

Prospectus dated December 30, 2020), January 4, 2021 at 5:32 pm ET; AdaptHealth Corp., FQ4 2020 Earnings Call Transcripts, March 4, 2021 at 8:30 am ET; AdaptHealth Corp., Form 10-K, December 31, 2020, filed on March 16, 2021 at 5:08 pm ET.

**Appendix F**
**AdaptHealth Corp.**
**Event Study on Dates of Prior Disclosures**
**Related to the McGee Tax Issue**
**Using Dr. Cain's Market and Industry Indices**

| | Event Date | Reaction Date | Residual Return | *t*-stat | Negative & Significant? |
|---|---|---|---|---|---|
| 1 | 11/19/19 | 11/20/19 | -6.04% | -1.57 | No |
| 2 | 11/21/19 | 11/21/19 | -0.63% | -0.16 | No |
| 3 | 01/24/20 | 01/24/20 | 2.46% | 0.64 | No |
| 4 | 02/07/20 | 02/07/20 | -1.54% | -0.40 | No |
| 5 | 02/21/20 | 02/21/20 | -0.88% | -0.23 | No |

Notes: Residual returns are based on a regression of the returns of AdaptHealth stock on the returns of the S&P 500 Total Return Index and S&P 600 Healthcare Equipment and Services Industry Group over the period November 11, 2019, to July 19, 2021. I include indicator variables for the alleged misrepresentation and alleged corrective disclosure dates in my regression model. "Negative & Significant" residual returns are the residual returns with a *t*-statistic that is less than or equal to -1.96.

Sources: Bloomberg L.P.; Danish Complaint, at 1 and 2, ¶ 2; "Media: American duo played key role in dividend affair," *Berlingske*, November 21, 2019 at 2:39 pm ET (certified translation from Danish into English); "New fraudster revealed: Unknown American duo withdrew a billion kroner sum from Skat," *Børsen*, November 21, 2019 at 2:01 pm ET (certified translation from Danish into English); "Two hitherto unknown accomplices embezzled billions from the Danish Treasury," *DR*, November 21, 2019 at 2:00 pm ET (certified translation from Danish into English); "The National Audit Office: Yield tax settlement with American bankers is illegal," *DR*, January 24, 2020 at 1:29 pm ET (certified translation from Danish into English); "Feared that they would fly out of the country: Two German bank managers detained in a case of Danish dividend fraud," *Politiken*, February 7, 2020 at 4:31 am ET (certified translation from Danish into English); "Bought a bank to commit fraud," *Reporter*, February 21, 2020, 11:05 am ET (certified translation from German into English).

**Appendix G**
**AdaptHealth Corp.**
**Event Study on the Alleged Misrepresentation Dates**
**Related to the Organic Growth Issue**
**Using 250 Trading Days as Estimation Period**

|   | Event Date | Reaction Date | Residual Return | *t*-stat | Positive & Significant? |
|---|---|---|---|---|---|
| 1 | 03/04/21 | 03/04/21 | 3.02% | 0.67 | No |
| 2 | 03/16/21 | 03/17/21 | -3.05% | -0.72 | No |
| 3 | 05/06/21 | 05/06/21 | -11.72% | -3.08 | No |
| 4 | 05/10/21 | 05/11/21 | -2.11% | -0.56 | No |

Notes: Residual returns are based on a regression of the returns of AdaptHealth stock on the returns of the NASDAQ Composite and NASDAQ Health Care indices (after excluding AdaptHealth from both indices) using a 250-trading-days estimation period (after excluding the following dates from the estimation period whenever applicable: November 11, 2019; November 14, 2019; November 20, 2019; February 25, 2020; March 9, 2020; April 30, 2020; May 5, 2020; May 11, 2020; August 4, 2020; August 7, 2020; November 4, 2020; November 9, 2020; January 5, 2021; March 4, 2021; March 17, 2021; April 13, 2021; May 6, 2021; and May 11, 2021). For events that fall within the first 250 trading days, I use a single, fixed, 250-days estimation period starting on November 11, 2019. For all other events, I use a rolling, 250-days estimation period that ends on the day prior to each event. "Positive & Significant" residual returns are the residual returns with a *t*-statistic that is greater than or equal to 1.96.

Sources: Bloomberg L.P.; Complaint ¶¶ 115–27; AdaptHealth Corp., FQ4 2020 Earnings Call Transcripts, March 4, 2021 at 8:30 am ET; AdaptHealth Corp., Financial Supplement – Q4 2020, March 4, 2021; AdaptHealth Corp., Form 10-K, December 31, 2020, filed on March 16, 2021 at 5:08 pm ET; AdaptHealth Corp., FQ1 2021 Earnings Call Transcripts, May 6, 2021 at 8:30 am ET; AdaptHealth Corp., Financial Supplement – Q1 2021, May 6, 2021; AdaptHealth Corp., Form 10-Q, March 31, 2021, filed on May 10, 2021 at 4:23 pm ET.

**Appendix H**
**AdaptHealth Corp.**
**Event Study on the Alleged Misrepresentation Dates**
**Related to the McGee Tax Issue**
**Using 250 Trading Days as Estimation Period**

| | Event Date | Reaction Date | Residual Return | t-stat | Positive & Significant? |
|---|---|---|---|---|---|
| 1 | 11/08/19 | 11/11/19 | -1.65% | -0.38 | No |
| 2 | 11/13/19 | 11/14/19 | -6.89% | -1.59 | No |
| 3 | 11/20/19 | 11/20/19 | -6.14% | -1.42 | No |
| 4 | 02/25/20 | 02/25/20 | 0.50% | 0.11 | No |
| 5 | 03/06/20 | 03/09/20 | -5.66% | -1.28 | No |
| 6 | 04/29/20 | 04/30/20 | -3.02% | -0.70 | No |
| 7 | 05/05/20 | 05/05/20 | -0.30% | -0.07 | No |
| 8 | 05/08/20 | 05/11/20 | -3.09% | -0.70 | No |
| 9 | 08/04/20 | 08/04/20 | 2.78% | 0.64 | No |
| 10 | 08/06/20 | 08/07/20 | 1.28% | 0.29 | No |
| 11 | 11/04/20 | 11/04/20 | -1.96% | -0.45 | No |
| 12 | 11/06/20 | 11/09/20 | -1.94% | -0.45 | No |
| 13 | 01/04/21 | 01/05/21 | -6.24% | -1.42 | No |
| 14 | 03/04/21 | 03/04/21 | 3.02% | 0.67 | No |
| 15 | 03/16/21 | 03/17/21 | -3.05% | -0.72 | No |

Notes: Residual returns are based on a regression of the returns of AdaptHealth stock on the returns of the NASDAQ Composite and NASDAQ Health Care indices (after excluding AdaptHealth from both indices) using a 250-trading-days estimation period (after excluding the following dates from the estimation period whenever applicable: November 11, 2019; November 14, 2019; November 20, 2019; February 25, 2020; March 9, 2020; April 30, 2020; May 5, 2020; May 11, 2020; August 4, 2020; August 7, 2020; November 4, 2020; November 9, 2020; January 5, 2021; March 4, 2021; March 17, 2021; April 13, 2021; May 6, 2021; and May 11, 2021). For events that fall within the first 250 trading days, I use a single, fixed, 250-days estimation period starting on November 11, 2019. For all other events, I use a rolling, 250-days estimation period that ends on the day prior to each event. "Positive & Significant" residual returns are the residual returns with a $t$-statistic that is greater than or equal to 1.96.

Sources: Bloomberg L.P.; Complaint ¶¶ 76–78, 80, 82, 86, 88, 90, 93, 95, 99, 101, 105–06, 108, 110; "DFB Healthcare Acquisitions Corp. Announces Closing of Business Combination With AdaptHealth Holdings LLC," *Business Wire*, November 8, 2019 at 4:30 pm ET; AdaptHealth Corp., Form 8-K, November 13, 2019 at 9:38 pm ET; AdaptHealth Corp., Form 8-K, November 20, 2019 at 3:06 pm ET; AdaptHealth Corp., FQ4 2019 Earnings Call Transcripts, February 25, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-K, December 31, 2019, filed on March 6, 2020 at 4:40 pm ET; AdaptHealth Corp., Schedule 14A, April 29, 2020 at 4:26 pm ET; AdaptHealth Corp., FQ1 2020 Earnings Call Transcripts, May 5, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-Q, March 31, 2020,

filed on May 8, 2020 at 5:01 PM ET; AdaptHealth Corp., FQ2 2020 Earnings Call Transcripts, August 4, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-Q, June 30, 2020, filed on August 6, 2020 at 5:25 PM ET; AdaptHealth Corp., FQ3 2020 Earnings Call Transcripts, November 4, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-Q, September 30, 2020, filed on November 6, 2020 at 4:32 pm ET; AdaptHealth Corp., Prospectus Supplement (to Prospectus dated December 30, 2020), January 4, 2021 at 5:32 pm ET; AdaptHealth Corp., FQ4 2020 Earnings Call Transcripts, March 4, 2021 at 8:30 am ET; AdaptHealth Corp., Form 10-K, December 31, 2020, filed on March 16, 2021 at 5:08 pm ET.

**Appendix I**
**AdaptHealth Corp.**
**Event Study on Dates of Prior Disclosures**
**Related to the McGee Tax Issue**
**Using 250 Trading Days as Estimation Period**

|   | Event Date | Reaction Date | Residual Return | *t*-stat | Negative & Significant? |
|---|------------|---------------|-----------------|----------|-------------------------|
| 1 | 11/19/19 | 11/20/19 | -6.14% | -1.42 | No |
| 2 | 11/21/19 | 11/21/19 | -0.51% | -0.12 | No |
| 3 | 01/24/20 | 01/24/20 | 1.83% | 0.43 | No |
| 4 | 02/07/20 | 02/07/20 | -2.25% | -0.52 | No |
| 5 | 02/21/20 | 02/21/20 | -0.87% | -0.20 | No |

Notes: Residual returns are based on a regression of the returns of AdaptHealth stock on the returns of the NASDAQ Composite and NASDAQ Health Care indices (after excluding AdaptHealth from both indices) using a 250-trading-days estimation period (after excluding the following dates from the estimation period whenever applicable: November 11, 2019; November 14, 2019; November 20, 2019; February 25, 2020; March 9, 2020; April 30, 2020; May 5, 2020; May 11, 2020; August 4, 2020; August 7, 2020; November 4, 2020; November 9, 2020; January 5, 2021; March 4, 2021; March 17, 2021; April 13, 2021; May 6, 2021; and May 11, 2021). For events that fall within the first 250 trading days, I use a single, fixed, 250-days estimation period starting on November 11, 2019.  For all other events, I use a rolling, 250-days estimation period that ends on the day prior to each event. "Negative & Significant" residual returns are the residual returns with a *t*-statistic that is less than or equal to -1.96.

Sources: Bloomberg L.P.; Danish Complaint, at preamble, ¶ 2; "Media: American duo played key role in dividend affair," *Berlingske*, November 21, 2019 at 2:39 pm ET (certified translation from Danish into English); "New fraudster revealed: Unknown American duo withdrew a billion kroner sum from Skat," *Børsen*, November 21, 2019 at 2:01 pm ET (certified translation from Danish into English); "Two hitherto unknown accomplices embezzled billions from the Danish Treasury," *DR*, November 21, 2019 at 2:00 pm ET (certified translation from Danish into English); "The National Audit Office: Yield tax settlement with American bankers is illegal," *DR*, January 24, 2020 at 1:29 pm ET (certified translation from Danish into English); "Feared that they would fly out of the country: Two German bank managers detained in a case of Danish dividend fraud," *Politiken*, February 7, 2020 at 4:31 am ET (certified translation from Danish into English); "Bought a bank to commit fraud," *Reporter*, February 21, 2020, 11:05 am ET (certified translation from German into English).

**Appendix J**
**AdaptHealth Corp.**
**Event Study on the Alleged Misrepresentation Dates**
**Related to the Organic Growth Issue**
**Using 120 Trading Days as Estimation Period**

|   | Event Date | Reaction Date | Residual Return | t-stat | Positive & Significant? |
|---|---|---|---|---|---|
| 1 | 03/04/21 | 03/04/21 | 4.17% | 1.11 | No |
| 2 | 03/16/21 | 03/17/21 | -3.21% | -0.89 | No |
| 3 | 05/06/21 | 05/06/21 | -11.16% | -3.42 | No |
| 4 | 05/10/21 | 05/11/21 | -2.09% | -0.64 | No |

Notes: Residual returns are based on a regression of the returns of AdaptHealth stock on the returns of the NASDAQ Composite and NASDAQ Health Care indices (after excluding AdaptHealth from both indices) using a 120-trading-days estimation period (after excluding the following dates from the estimation period whenever applicable: November 11, 2019; November 14, 2019; November 20, 2019; February 25, 2020; March 9, 2020; April 30, 2020; May 5, 2020; May 11, 2020; August 4, 2020; August 7, 2020; November 4, 2020; November 9, 2020; January 5, 2021; March 4, 2021; March 17, 2021; April 13, 2021; May 6, 2021; and May 11, 2021). For events that fall within the first 120 trading days, I use a single, fixed, 120-days estimation period starting on November 11, 2019. For all other events, I use a rolling, 120-days estimation period that ends on the day prior to each event. "Positive & Significant" residual returns are the residual returns with a t-statistic that is greater than or equal to 1.96.

Sources: Bloomberg L.P.; Complaint ¶¶ 115–27; AdaptHealth Corp., FQ4 2020 Earnings Call Transcripts, March 4, 2021 at 8:30 am ET; AdaptHealth Corp., Financial Supplement – Q4 2020, March 4, 2021; AdaptHealth Corp., Form 10-K, December 31, 2020, filed on March 16, 2021 at 5:08 pm ET; AdaptHealth Corp., FQ1 2021 Earnings Call Transcripts, May 6, 2021 at 8:30 am ET; AdaptHealth Corp., Financial Supplement – Q1 2021, May 6, 2021; AdaptHealth Corp., Form 10-Q, March 31, 2021, filed on May 10, 2021 at 4:23 pm ET.

**Appendix K**
**AdaptHealth Corp.**
**Event Study on the Alleged Misrepresentation Dates**
**Related to the McGee Tax Issue**
**Using 120 Trading Days as Estimation Period**

|   | Event Date | Reaction Date | Residual Return | *t*-stat | Positive & Significant? |
|---|---|---|---|---|---|
| 1 | 11/08/19 | 11/11/19 | -1.84% | -0.41 | No |
| 2 | 11/13/19 | 11/14/19 | -7.04% | -1.59 | No |
| 3 | 11/20/19 | 11/20/19 | -6.09% | -1.37 | No |
| 4 | 02/25/20 | 02/25/20 | 0.08% | 0.02 | No |
| 5 | 03/06/20 | 03/09/20 | -6.35% | -1.39 | No |
| 6 | 04/29/20 | 04/30/20 | -3.37% | -0.76 | No |
| 7 | 05/05/20 | 05/05/20 | -0.06% | -0.01 | No |
| 8 | 05/08/20 | 05/11/20 | -2.33% | -0.50 | No |
| 9 | 08/04/20 | 08/04/20 | 3.04% | 0.60 | No |
| 10 | 08/06/20 | 08/07/20 | 1.47% | 0.28 | No |
| 11 | 11/04/20 | 11/04/20 | -3.02% | -0.66 | No |
| 12 | 11/06/20 | 11/09/20 | -1.61% | -0.36 | No |
| 13 | 01/04/21 | 01/05/21 | -6.25% | -1.70 | No |
| 14 | 03/04/21 | 03/04/21 | 4.17% | 1.11 | No |
| 15 | 03/16/21 | 03/17/21 | -3.21% | -0.89 | No |

Notes: Residual returns are based on a regression of the returns of AdaptHealth stock on the returns of the NASDAQ Composite and NASDAQ Health Care indices (after excluding AdaptHealth from both indices) using a 120-trading-days estimation period (after excluding the following dates from the estimation period whenever applicable: November 11, 2019; November 14, 2019; November 20, 2019; February 25, 2020; March 9, 2020; April 30, 2020; May 5, 2020; May 11, 2020; August 4, 2020; August 7, 2020; November 4, 2020; November 9, 2020; January 5, 2021; March 4, 2021; March 17, 2021; April 13, 2021; May 6, 2021; and May 11, 2021). For events that fall within the first 120 trading days, I use a single, fixed, 120-days estimation period starting on November 11, 2019. For all other events, I use a rolling, 120-days estimation period that ends on the day prior to each event. "Positive & Significant" residual returns are the residual returns with a *t*-statistic that is greater than or equal to 1.96.

Sources: Bloomberg L.P.; Complaint ¶¶ 76–78, 80, 82, 86, 88, 90, 93, 95, 99, 101, 105, 106, 108, 110; "DFB Healthcare Acquisitions Corp. Announces Closing of Business Combination With AdaptHealth Holdings LLC," *Business Wire*, November 8, 2019 at 4:30 pm ET; AdaptHealth Corp., Form 8-K, November 13, 2019 at 9:38 pm ET; AdaptHealth Corp., Form 8-K, November 20, 2019 at 3:06 pm ET; AdaptHealth Corp., FQ4 2019 Earnings Call Transcripts, February 25, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-K, December 31, 2019, filed on March 6, 2020 at 4:40 pm ET; AdaptHealth Corp., Schedule 14A, April 29, 2020 at 4:26 pm ET; AdaptHealth Corp., FQ1 2020 Earnings Call Transcripts, May 5, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-Q, March 31, 2020, filed on May 8, 2020

at 5:01 PM ET; AdaptHealth Corp., FQ2 2020 Earnings Call Transcripts, August 4, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-Q, June 30, 2020, filed on August 6, 2020 at 5:25 PM ET; AdaptHealth Corp., FQ3 2020 Earnings Call Transcripts, November 4, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-Q, September 30, 2020, filed on November 6, 2020 at 4:32 pm ET; AdaptHealth Corp., Prospectus Supplement (to Prospectus dated December 30, 2020), January 4, 2021 at 5:32 pm ET; AdaptHealth Corp., FQ4 2020 Earnings Call Transcripts, March 4, 2021 at 8:30 am ET; AdaptHealth Corp., Form 10-K, December 31, 2020, filed on March 16, 2021 at 5:08 pm ET.

**Appendix L**
**AdaptHealth Corp.**
**Event Study on Dates of Prior Disclosures**
**Related to the McGee Tax Issue**
**Using 120 Trading Days as Estimation Period**

|  | Event Date | Reaction Date | Residual Return | $t$-stat | Negative & Significant? |
|---|---|---|---|---|---|
| 1 | 11/19/19 | 11/20/19 | -6.09% | -1.37 | No |
| 2 | 11/21/19 | 11/21/19 | -0.54% | -0.12 | No |
| 3 | 01/24/20 | 01/24/20 | 1.31% | 0.30 | No |
| 4 | 02/07/20 | 02/07/20 | -2.48% | -0.57 | No |
| 5 | 02/21/20 | 02/21/20 | -0.81% | -0.19 | No |

Notes: Residual returns are based on a regression of the returns of AdaptHealth stock on the returns of the NASDAQ Composite and NASDAQ Health Care indices (after excluding AdaptHealth from both indices) using a 120-trading-days estimation period (after excluding the following dates from the estimation period whenever applicable: November 11, 2019; November 14, 2019; November 20, 2019; February 25, 2020; March 9, 2020; April 30, 2020; May 5, 2020; May 11, 2020; August 4, 2020; August 7, 2020; November 4, 2020; November 9, 2020; January 5, 2021; March 4, 2021; March 17, 2021; April 13, 2021; May 6, 2021; and May 11, 2021). For events that fall within the first 120 trading days, I use a single, fixed, 120-days estimation period starting on November 11, 2019.  For all other events, I use a rolling, 120-days estimation period that ends on the day prior to each event. "Negative & Significant" residual returns are the residual returns with a $t$-statistic that is less than or equal to -1.96.

Sources: Bloomberg L.P.; Danish Complaint, at preamble, ¶ 2; "Media: American duo played key role in dividend affair," *Berlingske*, November 21, 2019 at 2:39 pm ET (certified translation from Danish into English); "New fraudster revealed: Unknown American duo withdrew a billion kroner sum from Skat," *Børsen*, November 21, 2019 at 2:01 pm ET (certified translation from Danish into English); "Two hitherto unknown accomplices embezzled billions from the Danish Treasury," *DR*, November 21, 2019 at 2:00 pm ET (certified translation from Danish into English); "The National Audit Office: Yield tax settlement with American bankers is illegal," *DR*, January 24, 2020 at 1:29 pm ET (certified translation from Danish into English); "Feared that they would fly out of the country: Two German bank managers detained in a case of Danish dividend fraud," *Politiken*, February 7, 2020 at 4:31 am ET (certified translation from Danish into English); "Bought a bank to commit fraud," *Reporter*, February 21, 2020, 11:05 am ET (certified translation from German into English).

**Appendix M**
**AdaptHealth Corp.**
**Market Efficiency Indicators in the Three, Six, and Nine Months Following the deSPAC Merger and for the Entire Putative Class Period**

| | | Three Months 11/11/19 - 2/11/20 (1) | Six Months 11/11/19 - 5/11/20 (2) | Nine Months 11/11/19 - 8/11/20 (3) | As Reported in Cain Report for Class Period 11/11/19 - 7/16/21 (4) |
|---|---|---|---|---|---|
| 1 | Average Weekly Trading Volume | 0.88% | 1.01% | 1.54% | 3.56% |
| 2 | Number of Analysts | 2 | 3 | 5 | 8 |
| 3 | Number of Market Makers | 35 | 41 | 56 | 90 |
| 4 | SEC Form S-3 Filing Eligibility | Yes | Yes | Yes | Yes |
| 5 | Number of Event Dates with Statistically Significant Returns | 0 out of 3 event dates with statistically significant returns. | 0 out of 6 event dates with statistically significant returns. | 0 out of 8 event dates with statistically significant returns. | 4 out of 14 event dates with statistically significant returns. |
| 6 | Number of Event Dates with Statistically Significant Trading Volume | 0 out of 3 event dates with statistically significant volume. | 0 out of 6 event dates with statistically significant volume. | 1 out of 8 event dates with statistically significant volume. | 4 out of 14 event dates with statistically significant volume. |
| 7 | Market Capitalization | $403 Million | $538 Million | $645 Million | $1,728 Million |
| 8 | Bid-Ask Spread | 1.84% | 1.60% | 1.21% | 0.66% |
| 9 | Public Float as % of Shares Outstanding | 94.0% | 94.1% | 94.4% | 93.0% |
| 10 | Institutional Holdings as % of Shares Outstanding | 92.7% | 80.8% | 85.0% | 85.9% |

| 11 | Statistically Significant Autocorrelation | No | No | No | No |
|----|----|----|----|----|----|
| 12 | Options Trading | No | No | No | Yes |

Sources: Cain Report and Backup Materials; Chicago Board Options Exchange ("CBOE").

**Appendix N**
**AdaptHealth Corp.**
**Event Study on the Alleged Misrepresentation Dates**
**Related to the Organic Growth Issue**

|   | Event Date | Reaction Date | Residual Return | *t*-stat | Positive & Significant? |
|---|---|---|---|---|---|
| 1 | 03/04/21 | 03/04/21 | 3.05% | 0.79 | No |
| 2 | 03/16/21 | 03/17/21 | -2.93% | -0.76 | No |
| 3 | 05/06/21 | 05/06/21 | -11.94% | -3.09 | No |
| 4 | 05/10/21 | 05/11/21 | -2.14% | -0.55 | No |

Notes: Residual returns are based on a regression of the returns of AdaptHealth stock on the returns of the NASDAQ Composite and NASDAQ Health Care indices (after excluding AdaptHealth from both indices) over the period November 11, 2019, to July 19, 2021. I include indicator variables for the alleged misrepresentation and alleged corrective disclosure dates in my regression model. "Positive & Significant" residual returns are the residual returns with a *t*-statistic that is greater than or equal to 1.96.

Sources: Bloomberg L.P.; Complaint ¶¶ 115–27; AdaptHealth Corp., FQ4 2020 Earnings Call Transcripts, March 4, 2021 at 8:30 am ET; AdaptHealth Corp., Financial Supplement – Q4 2020, March 4, 2021; AdaptHealth Corp., Form 10-K, December 31, 2020, filed on March 16, 2021 at 5:08 pm ET; AdaptHealth Corp., FQ1 2021 Earnings Call Transcripts, May 6, 2021 at 8:30 am ET; AdaptHealth Corp., Financial Supplement – Q1 2021, May 6, 2021; AdaptHealth Corp., Form 10-Q, March 31, 2021, filed on May 10, 2021 at 4:23 pm ET.

**Appendix O**
**AdaptHealth Corp.**
**Event Study on the Alleged Misrepresentation Dates**
**Related to the McGee Tax Issue**

|  | Event Date | Reaction Date | Residual Return | *t*-stat | Positive & Significant? |
|---|---|---|---|---|---|
| 1 | 11/08/19 | 11/11/19 | -1.38% | -0.36 | No |
| 2 | 11/13/19 | 11/14/19 | -6.65% | -1.73 | No |
| 3 | 11/20/19 | 11/20/19 | -6.13% | -1.59 | No |
| 4 | 02/25/20 | 02/25/20 | 1.07% | 0.28 | No |
| 5 | 03/06/20 | 03/09/20 | -4.70% | -1.20 | No |
| 6 | 04/29/20 | 04/30/20 | -2.57% | -0.67 | No |
| 7 | 05/05/20 | 05/05/20 | -0.52% | -0.14 | No |
| 8 | 05/08/20 | 05/11/20 | -3.83% | -0.98 | No |
| 9 | 08/04/20 | 08/04/20 | 3.14% | 0.81 | No |
| 10 | 08/06/20 | 08/07/20 | 1.36% | 0.35 | No |
| 11 | 11/04/20 | 11/04/20 | -2.55% | -0.66 | No |
| 12 | 11/06/20 | 11/09/20 | -1.80% | -0.47 | No |
| 13 | 01/04/21 | 01/05/21 | -6.09% | -1.58 | No |
| 14 | 03/04/21 | 03/04/21 | 3.05% | 0.79 | No |
| 15 | 03/16/21 | 03/17/21 | -2.93% | -0.76 | No |

Notes: Residual returns are based on a regression of the returns of AdaptHealth stock on the returns of the NASDAQ Composite and NASDAQ Health Care indices (after excluding AdaptHealth from both indices) over the period November 11, 2019, to July 19, 2021. I include indicator variables for the alleged misrepresentation and alleged corrective disclosure dates in my regression model. "Positive & Significant" residual returns are the residual returns with a *t*-statistic that is greater than or equal to 1.96.

Sources: Bloomberg L.P.; Complaint ¶¶ 76–78, 80, 82, 86, 88, 90, 93, 95, 99, 101, 105, 106, 108, 110; "DFB Healthcare Acquisitions Corp. Announces Closing of Business Combination With AdaptHealth Holdings LLC," *Business Wire*, November 8, 2019 at 4:30 pm ET; AdaptHealth Corp., Form 8-K, November 13, 2019 at 9:38 pm ET; AdaptHealth Corp., Form 8-K, November 20, 2019 at 3:06 pm ET; AdaptHealth Corp., FQ4 2019 Earnings Call Transcripts, February 25, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-K, December 31, 2019, filed on March 6, 2020 at 4:40 pm ET; AdaptHealth Corp., Schedule 14A, April 29, 2020 at 4:26 pm ET; AdaptHealth Corp., FQ1 2020 Earnings Call Transcripts, May 5, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-Q, March 31, 2020, filed on May 8, 2020 at 5:01 PM ET; AdaptHealth Corp., FQ2 2020 Earnings Call Transcripts, August 4, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-Q, June 30, 2020, filed on August 6, 2020 at 5:25 PM ET; AdaptHealth Corp., FQ3 2020 Earnings Call Transcripts, November 4, 2020 at 8:30 am ET; AdaptHealth Corp., Form 10-Q, September 30, 2020, filed on November 6, 2020 at 4:32 pm ET; AdaptHealth Corp., Prospectus Supplement (to Prospectus dated December 30, 2020), January 4, 2021 at 5:32 pm ET; AdaptHealth Corp., FQ4 2020 Earnings Call Transcripts,

March 4, 2021 at 8:30 am ET; AdaptHealth Corp., Form 10-K, December 31, 2020, filed on March 16, 2021 at 5:08 pm ET.

**Appendix P**
**AdaptHealth Corp.**
**Event Study on Dates of Prior Disclosures Related to the McGee Tax Issue**

| | Event Date | Reaction Date | Residual Return | *t*-stat | Negative & Significant? |
|---|---|---|---|---|---|
| 1 | 11/19/19 | 11/20/19 | -6.13% | -1.60 | No |
| 2 | 11/21/19 | 11/21/19 | -0.41% | -0.11 | No |
| 3 | 01/24/20 | 01/24/20 | 2.48% | 0.64 | No |
| 4 | 02/07/20 | 02/07/20 | -1.92% | -0.50 | No |
| 5 | 02/21/20 | 02/21/20 | -0.8% | -0.22 | No |

Notes: Residual returns are based on a regression of the returns of AdaptHealth stock on the returns of the Nasdaq Composite and Nasdaq Health Care indices (after excluding AdaptHealth from both indices) over the period November 11, 2019, to July 19, 2021. I include indicator variables for the alleged misrepresentation and alleged corrective disclosure dates in my regression model. "Negative & Significant" residual returns are the residual returns with a *t*-statistic that is less than or equal to -1.96.

Sources: Bloomberg L.P.; Danish Complaint, at preamble, ¶ 2; "Media: American duo played key role in dividend affair," *Berlingske*, November 21, 2019 at 2:39 pm ET (certified translation from Danish into English); "New fraudster revealed: Unknown American duo withdrew a billion kroner sum from Skat," *Børsen*, November 21, 2019 at 2:01 pm ET; "Two hitherto unknown accomplices embezzled billions from the Danish Treasury," *DR*, November 21, 2019 at 2:00 pm ET; "The National Audit Office: Yield tax settlement with American bankers is illegal," *DR*, January 24, 2020 at 1:29 pm ET (certified translation from Danish into English); "Feared that they would fly out of the country: Two German bank managers detained in a case of Danish dividend fraud," *Politiken*, February 7, 2020 at 4:31 am ET (certified translation from Danish into English); "Bought a bank to commit fraud," *Reporter*, February 21, 2020, 11:05 am ET (certified translation from German into English).

**Appendix Q**
**AdaptHealth Corp.**
**Lead Plaintiffs' Alleged Losses Related to the Organic Growth Issue**

| | |
|---|---:|
| Alleged Artificial Inflation Related to the Organic Growth Issue at Purchase [A] | $0.00 |
| | |
| AdaptHealth Closing Stock Price on July 16, 2021 [B] | $25.47 |
| Residual Return on July 19, 2021 Per Cain Report [C] | -4.97% |
| Alleged Artificial Inflation Related to the Organic Growth Issue [D] | $1.27 |

*Panel A: Bucks County*

| | |
|---|---:|
| Number of Shares Purchased During the Period March 4, 2021 to July 16, 2021 [E] | ▮ |
| Number of Shares Sold During the Period March 4, 2021 to July 16, 2021 [F] | CONFI |
| | |
| Alleged Losses Related to the Organic Growth Issue [G] | -$2,724.15 |

*Panel B: Delaware County*

| | |
|---|---:|
| Number of Shares Purchased During the Period March 4, 2021 to July 16, 2021 [E] | ▮ |
| Number of Shares Sold During the Period March 4, 2021 to July 16, 2021 [F] | ▮ |
| | |
| Alleged Losses Related to the Organic Growth Issue [G] | $0 |

Notes:
[D] = - [B] x [C]
[G] = [D] x ( [E] – [F] )
Sources: CAIN0000042, tab "Abnormal Returns;" EMERALDADV-00000792; EMERALDADV-00000787.