# Exhibit 16

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM and BUCKS COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>v.<br><br>ADAPTHEALTH CORP. f/k/a DFB HEALTHCARE ACQUISITIONS CORP., LUKE MCGEE, STEPHEN P. GRIGGS, JASON CLEMENS, FRANK J. MULLEN, RICHARD BARASCH, JOSHUA PARNES, ALAN QUASHA, TERENCE CONNORS, DR. SUSAN WEAVER, DALE WOLF, BRADLEY COPPENS, and DAVID S. WILLIAMS III,<br><br>     Defendants. | Civ. Action No. 2:21-cv-03382-HB<br><br>Hon. Harvey Bartle III |

**EXPERT REPORT OF JACK R. WIENER**

**March 29, 2023**

**TABLE OF CONTENTS**

**Page**

I.   Background & Assignment................................................................................................1

II.   Qualifications..................................................................................................................3

III.   Executive Summary .......................................................................................................5

IV.   History and Background of DTC.....................................................................................6

    A.   Development of the DTC System ........................................................................6

    B.   DTC's Intermediated System of Securities Holding ...........................................10

V.   The Nature of the Fungible Bulk of Securities ...............................................................16

VI.   Tracing Shares in the DTC System................................................................................20

VII.   AdaptHealth Secondary Offering ...............................................................................22

    A.   The Secondary Offering and the Traceability of AdaptHealth Stock....................22

    B.   Flow of Shares During the AdaptHealth Secondary Offering..............................24

    C.   Applicability of Methods to Trace in the DTC System ........................................26

VIII.   Conclusions.................................................................................................................28

## I.    Background & Assignment

1.    I have been retained in the above-captioned action (the "Action") by counsel for both AdaptHealth Corp. ("AdaptHealth") and certain current and former members of AdaptHealth's board of directors and/or executive management[1] (collectively with AdaptHealth, the "AdaptHealth Defendants").  They have asked me to assess whether it is factually possible to trace shares of a security held at The Depository Trust Company ("DTC") or DTC's sub-custodian in the street name of DTC to a particular registration statement, prospectus, and/or offering when multiple issuances of the security—issued pursuant to different registration statements, but represented by the same CUSIP number—have been deposited at DTC.

2.    Throughout this report when I refer to the "traceability" of shares, I am referring to whether specific shares of a security that a person acquired are the same shares that were issued in connection with a particular registration statement, prospectus, and/or offering.[2]

3.    I understand that, with respect to the claims brought under the Securities Act, Lead Plaintiffs in this Action seek to certify a class that includes persons who "purchased or acquired" shares of AdaptHealth Class A common stock ("AdaptHealth Stock") "traceable to" the registration statement and/or associated prospectus for AdaptHealth's January 8, 2021, secondary stock offering (the "Secondary Offering").[3]  I also understand that Lead Plaintiffs claimed to have

---

[1] The individual defendants are Stephen P. Griggs, Jason Clemens, Frank J. Mullen, Richard Barasch, Joshua Parnes, Alan Quasha, Terence Connors, Dr. Susan Weaver, Dale Wolf, Bradley Coppens, and David S. Williams III.

[2] I understand from counsel that the lead plaintiffs in the Action (Delaware County Employees Retirement System and Bucks County Employees' Retirement System; collectively "Lead Plaintiffs") have asserted claims under Section 11, Section 12(a)(2), and Section 15 of the Securities Act of 1933 (the "Securities Act").  I also understand from counsel that those claims require Lead Plaintiffs to prove that the specific securities they acquired were issued pursuant to an allegedly false or misleading registration statement and/or prospectus.  I do not express an opinion one way or another regarding the requirements of Lead Plaintiffs' claims.

[3] I understand that the Secondary Offering closed on January 8, 2021, and will refer to that as the closing date throughout this report.  *See* Affidavit of Michael Mullings of Continental ¶ 3 ("Cont. Aff.").  However, I understand that in the Consolidated Complaint, Lead Plaintiffs refer to the Secondary Offering as occurring on either January 4, 2021, or January 5, 2021.  Complaint at  ¶¶ 105, 193.  As a matter of clarification, at the time of the Secondary Offering, such securities transactions "settled" in the United States two business dates after they were initiated,

"purchased or acquired AdaptHealth securities traceable to the Offering Documents issued in connection with AdaptHealth's January 4, 2021 Secondary Offering."[4]

4.    I have prepared this report to state my opinions; to describe the bases for those opinions and the reasons underlying them; to disclose the facts and data on which I relied in reaching my opinions; and to make all other appropriate disclosures. I express no legal opinions in this report. The work that I conducted in this matter has been informed by my education, knowledge, and experience in securities clearance and settlement, custody, and servicing. The information in this report is based upon discovery to date and the information that is currently available to me. In forming my opinions and preparing this report, I have considered the sources of information set forth in **Appendix A**.

5.    I will review, evaluate, and analyze additional information as it becomes available. I reserve the right to amend or supplement my opinions based upon further information learned or relied upon, and in response to opinions raised in any reports, declarations, or depositions of any other expert put forward in this matter or during expert discovery. Therefore, the analyses and opinions described herein are subject to change based upon future discovery and developments.

6.    I am being compensated at a rate of $1,250 per hour for my work in this matter. My compensation in this matter is not contingent on any opinion that I reach or the outcome of this action.

---

meaning that a purchase of securities on January 6, 2021, would not "settle" until January 8, 2021. *See* SEC, *Updated Investor Bulletin: New "T+2" Settlement Cycle – What Investors Need to Know* (Aug. 22, 2017), https://www.sec.gov/oiea/investor-alerts-and-bulletins/ibsettlementcycle.

[4] Complaint at ¶ 193. I understand from Counsel that Lead Plaintiffs refer to the Form S-3 filed with the SEC on December 18, 2020, as the "Registration Statement," and the Prospectus on Form 424B4 filed with the SEC on January 4, 2021 as the "Prospectus." Complaint at ¶ 105. I also understand that Lead Plaintiffs refer to the Registration Statement and Prospectus together as the "Offering Documents," and will refer to those documents as such here. *Id.*

**REPORT OF JACK R. WIENER**                                                                                      **PAGE 2**

## II.    Qualifications

7.    I graduated from Brooklyn College *summa cum laude* (B.A., Phi Beta Kappa) in 1979.  I subsequently graduated from the University of Pennsylvania Law School, where I was an Editor of the *University of Pennsylvania Law Review*, with a J.D. in 1982.  From 1982-89, I practiced as a corporate and securities lawyer.

8.    From 1989 to 2005, I was an officer of and attorney for The Depository Trust & Clearing Corporation ("DTCC") and DTC, which is DTCC's wholly owned subsidiary and the world's largest custodian of securities.  I held a number of positions at these companies until I became Managing Director and Deputy General Counsel of both companies in 2001.

9.    Those 17 years at DTC and DTCC constitute a significant portion of my 40 years of professional experience, which has largely focused on securities clearance and settlement, custody, and servicing, primarily as they relate to the DTC system.  While my time at DTC does not cover the period under review in this action, the fundamentals of how DTC operates have not changed in any material way with respect to the matters on which I am opining.  I remain current on how DTC operates through my ongoing conversations with DTC staff; my review of DTC rule filings and notices, SEC orders related to DTC, and coverage of DTC in the press; and my participation in litigation matters in which DTC appears either in person through an employee or through written affidavits.

10.    From 2007 to 2008, I was a Managing Director of the Securities Industry and Financial Markets Association, the largest securities industry lobbying organization in the U.S.  In that role, I represented the 650 largest brokers, banks, and asset managers before the SEC, the Financial Industry Regulatory Authority ("FINRA"), and the Federal Reserve Bank.  One of my duties was representing broker-dealer and bank members on matters relating to custody, clearance

and settlement, and the servicing of securities, especially with regard to the DTC clearance and settlement system.

11.     Since 2000, I have been a U.S. State Department-appointed Delegate negotiating securities law treaties for the United States.  I have negotiated two multilateral, 40-nation treaties on the law of the custody, transfer, and pledging of securities.

12.     Since 2009, I have been the Chief Executive Officer of Financial Services Consulting.  In that capacity, I have advised clients with regard to clearance and settlement, custody, transactions, regulation, compliance, and litigation in the areas of securities, derivatives, banking, and broker-dealer law and operations, and white collar defense.  I have advised individuals, banks, investment banks, broker-dealers, hedge funds, clearing firms, investment advisors, issuers, and regulators from the United States, Canada, France, Germany, the United Kingdom, Ireland, Sweden, China, and the Cayman Islands, and others in both securities structuring and litigation matters relating to DTC's clearance and settlement system.  I have also advised the Israel Ministry of Finance on restructuring its bond offerings in the United States in a manner that would most efficiently leverage the clearance and settlement system of DTC.  I have represented both plaintiffs and defendants in litigation matters.

13.     I have in addition served as an expert witness on DTC and on the clearance, settlement, and custody of securities through DTC:  (a) for the United States Attorney's Office, Southern District of New York; (b) for a Swedish hedge fund; (c) for two European banks, in litigation regarding the loss through fraud of $1.8 billion; (d) for a British bank, with regard to multi-billion dollar litigation in Ireland and in the Cayman Islands related to the Madoff Ponzi scheme; (e) for a U.S. clearing firm, regarding attempted manipulation of DTC's processes; (f) for a French custodian bank, regarding the theft by means of fraud of $400 million in securities which

were subsequently transferred through DTC's settlement system; and (g) for various issuers, underwriters, and individuals regarding the ability to trace shares of a security held at DTC—in the street name of DTC—to a particular registration statement when multiple issuances of the security—issued pursuant to different registration statements, but represented by the same CUSIP number—have been deposited at DTC.

14.     I have taught as an adjunct Professor of Law at Brooklyn Law School since 2011, focusing, among other things, on the law of the sale, clearance and settlement, servicing, and custody of securities, especially through DTC.

15.     My qualifications and prior expert engagements are described in further detail in my curriculum vitae, which is attached to this report as **Appendix B**.  The list of all cases in which, during the past four years, I have testified as an expert at trial or arbitration or by deposition is attached to this report as **Appendix C**.

## III.     Executive Summary

16.     My principal conclusions are as follows.

    a.  All shares of AdaptHealth Stock issued in connection with the Secondary Offering:  (i) bore the same CUSIP number as the shares of AdaptHealth Stock already outstanding and held at DTC; (ii) were issued in book-entry-only form—without any physical certificates for beneficial owners—and were registered in DTC's street name; and (iii) were held in a single undifferentiated fungible aggregate bulk at DTC, blended with over 46 million other identical, indistinguishable shares of AdaptHealth Stock.

    b.  In light of shares of AdaptHealth Stock from multiple offerings having been blended into a single undifferentiated fungible aggregate bulk at DTC, I do not

believe that any method exists by which Lead Plaintiffs or any other alleged beneficial owners would be able to show that they acquired AdaptHealth Stock traceable to the Secondary Offering or traceable to the Offering Documents that were filed in connection with the Secondary Offering.

## IV. History and Background of DTC

### A. Development of the DTC System

17.     DTC was established in 1973 to provide securities clearance and settlement and custody services to buyers and sellers in an efficient, cost-effective, and streamlined manner.[5] Headquartered in New York City, DTC is the world's largest custodian and securities depository.[6] In 2021, DTC was the custodian of and provided asset servicing for approximately $87.1 trillion in securities, and DTCC handled nearly $2.4 quadrillion in securities transactions.[7]  The securities[8] held in custody by DTC consist of over 1.3 million securities issues.[9]  The AdaptHealth securities

---

[5] *See* DTCC, *The Depository Trust Company (DTC)*, https://www.dtcc.com/about/businesses-and-subsidiaries/dtc (last visited Mar. 22, 2023).

[6] *See* Virginia B. Morris & Stuart Z. Goldstein, *Life Cycle of a Security* 4 (2010) (referring to DTC as "the largest central securities depository in the world"); NASDAQ Glossary of Stock Market Terms, *Depository Trust Company*, https://www.nasdaq.com/glossary/d/depository-trust-company (last visited Mar. 22, 2023) (defining DTC as "the world's largest central securities depository.").

[7] DTCC, *DTCC'S Alternative Investment Product Reaches New Milestone, Processing Over 500 Million Transactions Since Inception* (Dec. 13, 2022), https://www.dtcc.com/news/2022/december/13/alternative-investment-product-reaches-new-milestone.

[8] The terms "security" and "securities" encompass various forms of investment interests, one of which is common stock of a company, such as AdaptHealth.  *See* SEC, *What Different Types Of Securities Are Issued To Startup Investors?* (Jan. 12, 2023), https://www.sec.gov/education/capitalraising/building-blocks/startup-securities.  In this report, I generally refer to "securities" when discussing the functions of the DTC Intermediated System of Securities Holding and I refer more specifically to shares of AdaptHealth Stock when discussing the AdaptHealth Secondary Offering.

[9] DTCC, *Asset Services Learning Center, "Asset Services"* (Nov. 10, 2022), https://dtcclearning.com/products-and-services/asset-services.html; DTCC, *DTCC 2021 Annual Report* https://www.dtcc.com/annuals/2021/performance/dashboard/ (last visited Mar. 22, 2023) (in 2021, the "Number of Active Security Issues Held at DTCC" was 1.39 million).  When a company issues shares of a security in multiple offerings, each offering of shares of that security constitutes an "issuance," and the multiple issuances collectively constitute an "issue" of a security.  This is what I am referring to in this report when I use the term "issue."

**REPORT OF JACK R. WIENER**                                                                              **PAGE 6**

issue that is the subject of this litigation is just one of those 1.3 million issues.[10]  DTC has approximately 236 Participants, which in turn act both for themselves and for their customers.[11]

18.    Some Participants themselves have as many as 80 million customers.[12]  As discussed below, AdaptHealth Stock was held by DTC, on behalf of DTC Participants, who in turn held shares ultimately on behalf of Lead Plaintiffs and others.[13]  For a sense of scale in the industry, while only about 236 institutions are DTC Participants, there are approximately 3,400 broker-dealer firms registered with FINRA[14] and nearly 32,000 independent investment advisor firms registered with the SEC.[15]  Many broker-dealers in turn act on behalf of independent investment advisors to clear trades.  For example, Fidelity Institutional (a division of Fidelity Investments) provides such services to approximately 13,500 institutional clients, that in turn service more than 8.1 million end investor (beneficial owner) accounts.[16]  Most large U.S. broker-dealers and banks

---

[10] *See infra* Section VII.

[11] A DTC "Participant" is an entity that DTC has admitted to be a member of the depository and to maintain a securities account at DTC.  DTC Participants deposit and hold securities at DTC.  *See* DTCC, *FAQS: How Issuers Work with DTC*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc (last visited Mar. 22, 2023) (stating that "DTC holds eligible securities on behalf of Participants").  DTC sometimes refers to Participants as DTC's "Direct Participants," "customers," "clients," and "members."  To avoid confusion, I refer to them in this report simply as Participants in order to draw a clear distinction between a DTC account holder (*i.e.*, a Participant) and any person who holds interests in securities indirectly through a Participant, such as the Participant's customers.  A list of DTC Participants can be found here: http://www.dtcc.com/client-center/dtc-directories.  As of December 30, 2022, there were 840 DTC Participant accounts listed in DTC's member directory, but some entities have multiple DTC Participant accounts.  Jefferies LLC, for example, has four DTC Participant accounts (accounts 0019, 0536, 7441, and 7565).  My above tally of 236 Participants counts Jefferies LLC as only one Participant, even though it has four Participant accounts, and does the same for other entities with multiple Participant accounts.  *See* DTCC, *DTC Member Directories* (database updated Mar. 1, 2023), http://www.dtcc.com/client-center/dtc-directories.  Lead Plaintiffs and Emerald are not DTC Participants.

[12] One Participant, JP Morgan Chase, had over 80 million customers in 2014.  *See* James O'Toole, *JPMorgan: 76 Million Customers Hacked*, CNN.com (Oct. 3, 2014, 8:00 AM), https://money.cnn.com/2014/10/02/technology/security/jpmorgan-hack/index.html.

[13] *See infra* Section VII.A-B.

[14] *See* FINRA, *2022 FINRA Industry Snapshot*, at p. 15 (2022), https://www.finra.org/sites/default/files/2022-03/2022-industry-snapshot.pdf.

[15] *Id.*

[16] *See* Fidelity Investments, *Fidelity Fixed Income Investment Capabilities* (Sept. 30, 2022), https://institutional.fidelity.com/app/proxy/content?literatureURL=/9895996.PDF; *see also* Fidelity Institutional, *Q3 2022 Business Update*, https://www.fidelity.com/about-fidelity/our-company/quarterly-updates/quarterlyupdates-q3-2022 (last visited Mar. 22, 2023).  Throughout this report, I use the term "beneficial owner" to refer to an individual

---

**REPORT OF JACK R. WIENER**                                    **PAGE 7**

are DTC Participants.[17]  That system was created to provide an efficient means of clearing and settling securities transactions.

19.    Since the 1700s, the most common way in which an interest in securities, such as shares of common stock of a company, was transferred in the United States was by transferring a paper securities certificate that represented a beneficial interest in the stock.  The certificate included the date of issuance of the certificate to the owner, and was evidence that the person whose name was reflected on the certificate as the owner was listed on the company's records (or the records of the company's registrar) as a security holder, holding rights represented by the certificate.[18]

20.    A sharp increase in the volume of securities traded in the late 1960s and early 1970s prompted the creation of DTC.[19]  Daily trade volumes on the New York Stock Exchange ("NYSE") increased from an average of 3 million shares in 1960 to daily average volumes of over 19 million shares in some months in 1971, including a high of over 28 million shares traded on one day in 1971.[20]  Each purchase and sale required the cancellation, creation, signing, and

---

or entity that has the ultimate ownership interest in shares of a company's stock.  Beneficial owners may be shareholders and/or investors.

[17] *See, e.g.*, SEC, *DTC Chills and Freezes* (May 1, 2012), https://www.sec.gov/oiea/investor-alerts-bulletins/ib_dtcfreezes.html.

[18] SEC, *Transfer Agent Regulations*, 17 C.F.R. Part 240, Release No. 34-76743, File No. S7-27-15, at pp. 11–13, 67 (Dec. 22, 2015), https://www.sec.gov/rules/concept/2015/34-76743.pdf.

[19] *See* DTC, 1997 Annual Report, at p. 9 (1997), https://www.sechistorical.org/collection/papers/1990/1997_0101_DTCAR.pdf; *see also* Edward C. Kelleher, *DTCC Celebrates 40 Years of Service*, DTCC (June 3, 2013), https://web.archive.org/web/20210507040651/https://www.dtcc.com/news/2013/june/03/dtcc-celebrates-40-years-of-service.

[20] *See* New York Stock Exchange, Inc., *Crisis in the Securities Industry, A Chronology: 1967–1970* (Aug. 2, 1971), at 31, 50, http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45.r81.cf1.rackcdn.com/collection/papers/1970/1971_0730_NYSECrisis.pdf ("A new record for a single day's trading was set on February 2, [1971] when more than 22 million shares changed hands. That record fell on February 8, when volume soared to 25.6 million shares which, in turn, was eclipsed the next day by volume of more than 28 million shares."); Larry E. Bergmann, *The U.S. View of the Role of Regulation in Market Efficiency,* Speech by SEC Staff: International Securities Settlement Conference (Feb. 10, 2004), https://www.sec.gov/news/speech/spch021004leb.htm; Terry Robards, *Stocks: Dam Is Holding*, N.Y. TIMES (Feb. 14, 1971), https://www.nytimes.com/1971/02/14/archives/stocks-dam-is-holding-this-time-so-far-trading-flood-is-controlled.html ("For several weeks now, volume has been averaging over 20 million shares a day.").

**REPORT OF JACK R. WIENER**                                                                 **PAGE 8**

handling of engraved stock certificates and, typically, over 30 associated paper forms (including a transmittal letter, receipt, transfer instructions, power of attorney or stock power, guarantee, and transfer journal).[21] Those documents were generally carried by messengers from the seller to the seller's broker, to the company's transfer agent, to the company's registrar, from the transfer agent to the buyer's broker, and eventually to the buyer. It was a cumbersome and time-consuming process.

21. What became known as the "paperwork crisis" developed. Banks, broker-dealers, and transfer agents and their messengers were unable to, in a timely manner, move and manually process the stock certificates and paper forms necessary to effect changes in ownership from seller to buyer. Stock certificates and associated documents "were piled 'halfway to the ceiling' in some offices."[22] Between 1968 and 1970, approximately 100 financial firms went out of business because they were not able to keep up with their paperwork, and thus failed to settle many of their trades. The crisis compelled the NYSE to shorten its trading hours, and even close completely on some days, so that the paper could be processed and the clearance and settlement of securities could catch up with the trading volume.[23]

---

To put this in historical perspective and to explain how the old 1970s method of securities clearance and settlement could not have handled the dramatic increases in trading that were to come, on October 11, 2008, The *Wall Street Journal* reported that the total trading volume of stocks listed on the NYSE hit a record of 11.16 billion shares—390 times 1971's then-record high daily trading volume of 28 million shares. *See* E.S. Browning, et al., *Wild Day Caps Worst Week Ever for Stocks*, WALL STREET J. (Oct. 11, 2008), https://www.wsj.com/articles/SB122368071064524779.

[21] *See* SEC, *Transfer Agent Regulations*, 17 C.F.R. Part 240, Release No. 34-76743, File No. S7-27-15, 13–17 (Dec. 22, 2015), https://www.sec.gov/rules/concept/2015/34-76743.pdf.

[22] Suellen M. Wolfe, *Escheat and the Challenge of Apportionment: A Bright Line Test to Slice a Shadow*, 27 ARIZ. ST. L.J. 173, 181 n.49 (1995) (citation omitted).

[23] In 1971, the SEC described the crisis as "the most prolonged and severe crisis in the securities industry" since the Great Depression. *See* SEC, *Study of Unsafe and Unsound Practices of Brokers and Dealers*, H.R. Doc. No. 92-231 (Dec. 1971), http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45.r81.cf1.rackcdn.com/collection/papers/1970/1971_1201_SECUnsafe_01.pdf.

---

22.    In response to this crisis, the U.S. government and the banking and securities industries launched an initiative to reduce reliance on paper certificates that were being delivered to settle securities transactions, and to thereby increase the speed, safety, and accuracy of the clearance and settlement of securities.  They created a new system of clearance and settlement.[24]

### B.  DTC's Intermediated System of Securities Holding

23.    DTC was created to address this paperwork crisis.  Rather than physically move paper securities certificates upon a sale from seller to buyer, as had historically been done, certificates were immobilized at DTC through an intermediated system of securities holding (also known as the "indirect holding system").  Today, DTC holds the vast majority of stock and corporate bonds issued in the United States, and nearly all U.S. municipal securities.[25]

24.    The following chart illustrates the structure of DTC's intermediated system of securities holding:

---

[24] New York Stock Exchange, Inc., *Crisis in the Securities Industry, A Chronology: 1967–1970* (Aug. 2, 1971), http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45.r81.cf1.rackcdn.com/collection/papers/1970/1971_0730_NYSECrisis.pdf; *see also* DTC, *1989 Annual Report*, at pp. 6–10 (1989), http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45.r81.cf1.rackcdn.com/collection/papers/1980/1989_0101_DTCAR.pdf.
[25] *See supra*, note 17.

**REPORT OF JACK R. WIENER**                                      **PAGE 10**



25.     In DTC's intermediated system of securities holding, one or more securities certificates (sometimes referred to as global certificates) are typically issued by a company in DTC's "street name"—that is, in the name of DTC's partnership nominee, Cede & Co.[26]

26.     The practice of companies issuing securities in "street name" has been a common one for over a century, going back to at least World War I, long preceding the 1933 enactment of the Securities Act.[27]

---

[26] A security held in "street name" is a security that is registered not in the name of the beneficial owner, but rather in the name of DTC, a brokerage firm, or another nominee. *See, e.g.*, John C. Wilcox et al., *"Street Name" Registration & The Proxy Solicitation Process*, in Amy Goodman et al., *A Practical Guide to SEC Proxy and Compensation Rules*, 10-3 (4th ed. 2007 & 2008 Supp.) ("The vast majority of publicly traded shares in the United States are registered on the companies' books not in the name of beneficial owners . . . but rather in the name of 'Cede & Co.' the name used by [DTC]. Shares registered in this manner are commonly referred to as being held in 'street name.'"). *See also, e.g.*, SEC, *Fast Answers: Street Name*, https://www.sec.gov/answers/street.htm (modified Oct. 5, 2005) ("When you buy securities through a brokerage firm, most firms will automatically put your securities into 'street name.' This means your brokerage firm will hold your securities in its name or another nominee and not in your name, but your firm will keep records showing you as the real or 'beneficial owner.'").

[27] *See, e.g.*, Legislative History of the Revenue Act of 1932: P.L. 72-154: 47 Stat. 169: June 6, 1932 (1932) (discussing scenarios in which "it is necessary for the broker to transfer the certificate into a street name before he delivers it on a contract of sale"); Milton N. Nelson, Readings in Corporation Finance 338 (1st ed. 1926) (noting that "no

27.     Thus, Cede & Co. becomes the registered owner of these securities on the books of the company (and those books are maintained by the company's registrar/transfer agent).[28]  For example, when a company issues new shares of a security of a book-entry-only issue[29] and delivers them to DTC (or DTC's sub-custodian), the books and records of the company (or its registrar/transfer agent) reflect that the sole owner of all such shares is Cede & Co.

28.     Those shares of the security are then typically held by and reflected on the books of DTC (as well as at time those of a sub-custodian of DTC, such as what DTC refers to as a FAST Agent).[30]  As a result, DTC holds the position for those DTC Participants who are holding positions in the security through DTC.[31]

29.     The company and its transfer agent have no visibility via DTC into the identities of the beneficial owners whose securities are held by DTC.  Interests in those securities are held by DTC Participants.  Those Participants are in turn holding interests in the securities either for themselves or for beneficial owners or intermediaries, with the interests in the securities potentially being held through a series of intermediaries before they reach the beneficial owner.  Similarly, DTC has no visibility into the identity of its Participants' customers on whose behalf interests in

---

inconvenience results from leaving [an investor's] stock in 'street name.'"); Trading with the Enemy: Hearings before the Subcommittee of the Committee on Commerce, United States Senate, Sixty-Fifth Congress, First Session on H.R. 4960, at 67 (1917) (Statement of J.G. Boston).

[28] DTCC, *FAQs: How Issuers Work With DTC*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc (last visited Mar. 22, 2023) ("When an investor holds shares [in street name] . . . . DTC's nominee name (Cede & Co.) is listed as the registered owner on the records of the issuer maintained by its transfer agent.").

[29] In a "book-entry-only" issue, beneficial owners do not receive certificates.  Instead, they receive only statements of "book entries" reflecting their position.

[30] The DTC Fast Automated Securities Transfer Program ("FAST") is a contract between DTC and transfer agents that eliminates the movement of physical securities certificates by allowing agents to act as custodians for DTC. DTCC, *The Fast Program*, https://www.dtcc.com/settlement-and-asset-services/agent-services/fast (last visited Mar. 22, 2023).

[31] A DTC Participant's position in a securities issue is sometimes referred to as a "book-entry" position, reflecting the fact that the Participant's position is reflected only on the books and records of DTC, rather than in the form of a paper certificate made available to the Participant.

the securities may be held.  Nor can DTC tell how many of the shares owned by a Participant are held for that Participant's own account, as opposed to being held by the Participant on behalf of the Participant's customers.

30.    Each issue of a company's securities held by DTC bears a CUSIP number.[32]  A CUSIP number is a 9-character alphanumeric code that uniquely identifies a security issue offered in the United States or Canada.  A company can also determine whether different offerings (or "issuances") of a security, such as an IPO and a subsequent public offering, bear different CUSIP numbers; however the common practice—as is the case with AdaptHealth—is for securities to bear the same CUSIP number across multiple offerings.

31.    DTC holds all securities that it custodies that bear the same CUSIP number in one fungible, aggregate bulk.[33]  All securities of an issue in such a fungible bulk in general share the

---

[32] CUSIP's database contains issue identifiers and related data for millions of issues of securities, including corporate securities.  In 1964, the New York Clearing House Association asked the American Bankers Association ("ABA") to develop a standard method of identifying securities in order to improve securities clearance and settlement operating efficiencies.  The Committee on Uniform Security Identification Procedures ("CUSIP") was created, the CUSIP system developed, the CUSIP Service Bureau was formed to administer the system, and now CUSIP Global Services ("CGS") is the overarching entity for CUSIP.  CGS is managed on behalf of the ABA by FactSet Research Systems Inc.  *See* CGS, *About Us*, https://www.cusip.com/about/index.html (last visited Mar 22, 2023).  CGS is endorsed by the Securities and Exchange Commission.  *See* CGS, *Inside the CGS Identification System* (Aug. 2010), https://web.archive.org/web/20211102145159/https://www.cusip.com/pdf/CUSIP_Intro_03.14.11.pdf.  Per its terms, CGS's determination of whether a security is eligible for a CUSIP identifier is made at CGS's discretion, and its determination is final.  *See* CGS, *Applying For A New Identifier Is Quick And Easy*, https://www.cusip.com/apply/index.html (last visited Mar. 22, 2023).  Furthermore, when DTC holds shares as described above, it identifies them by their CUSIP number.  *See* DTC, *Operational Arrangements* (Feb. 2023), https://www.dtcc.com/~/media/Files/Downloads/legal/issue-eligibility/eligibility/operational-arrangements.pdf ("CUSIP Number Assignment").

[33] *See* SEC, *Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries*, 17 C.F.R. Part 240, Release No. 34-50758A; File No. S7-24-04, RIN 3235-AJ26 (Mar. 7, 2005), https://www.sec.gov/rules/final/34-50758a.htm ("Securities registered in the name of the securities intermediary or its nominee allows the securities to be immobilized and held in fungible bulk thereby significantly reducing the number of certificates that need to be delivered and transferred. This in turn reduces the risk and cost associated with transferring the securities. . . .  The securities deposited with DTC are registered in DTC's nominee name and are held in fungible bulk for the benefit of its participants and their customers.  Each participant having an interest in securities of a given issue credited to its account has a pro rata interest in the securities of that issue held by DTC.") (footnotes omitted).  There are certain discrete exceptions to this general rule.  For example, some securities may be restricted, and not available for open-market trading.  *See* SEC, *Rule 144: Selling Restricted and Control Securities* (Jan. 16, 2013), https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144.  In these instances, DTC may decide not

---

**REPORT OF JACK R. WIENER**                                                          **PAGE 13**

same readily identifiable characteristics, although the securities that were deposited into what thereafter constitutes the blended fungible bulk may have been issued on different dates, pursuant to different registration statements. Once deposited into the fungible bulk, they are wholly commingled and are not capable of being distinguished from one another, not even by date of issuance pursuant to a particular registration statement.[34]

32.    When a company uses the same CUSIP number for multiple offerings of the same security, and shares of that security bearing that CUSIP (from multiple offerings) are held at DTC in a fungible aggregate bulk, it is impossible to identify the date that any specific share of that security held at DTC was issued, because the nature of any interest in the blended fungible bulk is that of a *pro rata* interest in that bulk, rather than an interest in any pre-commingling share of that security.  It is likewise, for the same reason, impossible to determine under which particular registration statement any specific share of that security held at DTC was issued, as the originally deposited shares no longer exist in their prior form, but have been wholly blended with the other shares in that CUSIP that are held by DTC, and beneficial owners receive a *pro rata* interest in that fungible bulk, rather than an interest in any particular shares.

33.    Under the DTC system of intermediated holding of securities, the registrar of a book-entry-only issue may list only DTC's partnership nominee Cede & Co. as the owner of a position in the issue of the security on the registrar's register.[35]  DTC acts as a securities

---

to commingle the securities in a fungible bulk.  None of these exceptions apply to the AdaptHealth Stock that was sold in the Secondary Offering.

[34] *See id.* at n.23 ("Fungible bulk means that no participant or customer of a participant has any claim or ownership rights to any particular certificate held by DTC.  Rather, participants have a securities entitlement to obtain a certificate representing securities held in their DTC accounts.").

[35] DTCC, *FAQs: How Issuers Work With DTC*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc (last visited Mar. 22, 2023) ("When an investor holds shares this way, the investor's name is listed on its brokerage firm's books as the beneficial owner of the shares. The brokerage firm's name is listed in DTC's ownership records. DTC's nominee name (Cede & Co.) is listed as the registered owner on the records of the issuer maintained by its transfer agent.").

intermediary and, in turn, maintains securities accounts for its Participants.[36] DTC knows only the identities of the DTC Participants that hold positions in the issue at DTC; DTC does not know the identities of those persons or entities who in turn may hold positions through those Participants.[37] As a matter of operational clearance and settlement practice, DTC, pursuant to Article 8 of the Uniform Commercial Code ("UCC"),[38] "holds the deposited securities in 'fungible bulk,' meaning that there are no specifically identifiable shares directly owned by the DTC participants."[39]

34.    As the SEC has explained, in the DTC indirect holding system, a shareholder beneficial owner does not own any given particular shares of stock:

> In the United States, most investors' holdings of stock are not matched with particular shares of stock. Instead, investors hold their shares through brokers, and thus have an interest in a pool of shares. Approximately 85% of exchange-traded securities are held by securities intermediaries, such as broker-dealers and banks, on behalf of themselves or their customers. The vast majority of these securities are deposited with The Depository Trust Company (DTC) . . . and held in fungible bulk for the benefit of DTC participants. As a result, broker-dealer participants of DTC own a pro rata interest in the aggregate number of shares of an issue held by DTC, and their beneficial owners (*i.e.*, the broker-dealers' customers) own an interest in the shares in which their broker-dealers have an interest. Consequently

---

[36] *Id.* ("The Depository Trust Company (DTC), DTCC's central securities depository subsidiary, provides depository and book-entry services and operates a securities settlement system. In this regard, DTC holds eligible securities on behalf of Participants and its activities include transfers and pledges of securities, and the settlement of transactions for Participants by book-entry, free of payment or delivery versus payment."). For ease of discussion, I refer herein to Participants owning (whether as a nominee or as a beneficial owner) securities in their DTC accounts, but this as a precise technical matter refers to Participants having security entitlements. A "security entitlement" in the intermediated holding system is a bundle of property and contract rights in the contents of a security account that an entitlement holder—a customer of a securities intermediary, such as a Participant of DTC or a beneficial owner holding through such Participant—has with a securities intermediary.

[37] *Id.* ("DTC is able to provide position information on a security at the DTC participant level."); *id.* ("DTC does NOT have beneficial owner information.").

[38] *See, e.g., Self-Regulatory Organizations; The Depository Trust Company; Notice of Filing and Immediate Effectiveness of a Proposed Rule Change to Amend the DTC Deposits Service Guide Relating to Procedures for the Deposit of Nontransferable Securities*, Release No. 34-86897, U.S. SECURITIES AND EXCHANGE COMMISSION (Sept. 6, 2019), https://www.sec.gov/rules/sro/dtc/2019/34-86897.pdf. ("Security certificates are eligible for Deposit at DTC when they are delivered to DTC in accordance with the Rules and Procedures and pursuant to Article 8 ('Article 8') of the NYUCC.").

[39] SEC, *Staff Legal Bulletin No. 14f (CF)* (Oct. 18, 2011), https://www.sec.gov/corpfin/staff-legal-bulletin-14f-shareholder-proposals.

---

**REPORT OF JACK R. WIENER**                                                    **PAGE 15**

there are no specific shares directly owned by either the broker-dealer participants or the underlying beneficial owner.[40]

Rather than direct ownership in particular shares of a security, beneficial owners hold a "pro rata interest" in the "fungible bulk" of securities bearing the same CUSIP and held by DTC on behalf of various Participants.[41]

35.     The benefit of the United States' system of intermediated securities holding is that it allows for the efficient and accurate clearance and settlement of over two quadrillion dollars' worth of securities transactions a year.  Securities trading had ground to a halt and the NYSE was actually closed for periods of time years ago, because the then-existing system of direct certificated holding of securities could not handle the volume of securities transactions—even when transaction volumes were just a small fraction of those in today's market.  The recasting of securities settlement into the intermediated system of holdings that I discuss above has allowed the United States not only to solve the paperwork crisis of the late 1960s and early 1970s, but also to handle massively larger volumes of transactions today.  It has also enabled the United States to shorten the securities clearance and settlement time cycle, thereby reducing risk in the financial markets.

## V.     The Nature of the Fungible Bulk of Securities

36.     To understand the nature of the blended, fungible, aggregate bulk of securities that DTC holds for each CUSIP, it may prove helpful to consider the following analogy.  Let's imagine a deposit of wine, rather than the deposit of securities.  It is as though a company, on behalf of

---

[40]    SEC, *Roundtable on Proxy Voting Mechanics* (May 23, 2007), https://www.sec.gov/spotlight/proxyprocess/proxyvotingbrief.htm; *see also supra*, note 39.
[41]    *Id.*; *see also* SEC, *Staff Legal Bulletin No. 14f (CF)* (Oct. 18, 2011), https://www.sec.gov/corpfin/staff-legal-bulletin-14f-shareholder-proposals ("[E]ach DTC participant holds a pro rata interest or position in the aggregate number of shares of a particular issuer held at DTC. Correspondingly, each customer of a DTC participant – such as an individual investor – owns a pro rata interest in the shares in which the DTC participant has a pro rata interest.").

three Participants, were to deposit with DTC 10 gallons of red wine from the same vineyard—but of *different vintages*—as follows:

> On behalf of Participant A – one gallon of Chadsford Winery Merlot 2019;
>
> On behalf of Participant B – two gallons of Chadsford Winery Merlot 2021; and
>
> On behalf of Participant C – seven gallons of Chadsford Winery Merlot 2022.

37.     DTC, in turn, pours the aggregate 10 gallons of Chadsford Winery Merlot red wine, of three different vintages, into a single vat.

38.     The 10 gallons of red wine in the vat is the fungible, aggregate bulk that DTC holds. The gallons of wine from the three vintages are all commingled in the vat.  Each Participant has a right to its respective *pro rata* share of the contents of the vat (Participant A, for example, owns a 10% interest in the wine in the vat, and Participant C owns a 70% interest in the wine in the vat). But no Participant directly owns any specifically identifiable wine—indeed, due to the wine having all been commingled in the vat, none of the wine is specifically identifiable to any one vintage or to any one gallon that had been poured into the vat.  If Participant C were to transfer one gallon of wine to Participant A, DTC would simply note on its records that Participant C now owned 60% of the wine in the vat, and Participant A now owned 20% of the wine in the vat.  If, alternatively, Participant B seeks to withdraw from DTC its *pro rata* share of wine, DTC in effect simply dips a ladle into the vat and scoops out 20% of the wine that is in the vat—two gallons—and moves it to Participant B, updating its records accordingly.  Because the gallons of wine were all commingled in the vat, no Participant (or any other person) is able to determine that any particular drop or cup of wine in the vat came from a particular gallon or vintage.

39.     Holding securities in a fungible, aggregate bulk has allowed DTC to hold and (by electronic book-entry) transfer securities on behalf of its Participants in a manner that solved the

paperwork crisis discussed above, and that provides the same benefits today.  Using DTC's system, transfers of security entitlements from one Participant to another Participant are effected on DTC's computers through "book-entry" changes reflected on the "books" of DTC.

40.     Similarly, Participants acting (whether directly or indirectly) for a seller or buyer make book-entry changes on their own records, reflecting (directly or indirectly) the positions of the seller or the buyer.  In the event that there are tiers of ownership, which is common today—as where a Participant holds for a bank, which holds for a prime broker, which holds for a corporation, which holds for an individual (the ultimate beneficial owner)—corresponding book-entry changes are reflected by the relevant entity on that entity's books at each tier, down to the ultimate beneficial owner.

41.     This system—in contrast to the certificated method of holding securities—removes the need to: (a) obtain, cancel, and then destroy the seller's physical securities certificate; (b) create, sign, and transfer another physical securities certificate for the buyer; and (c) generate, process, and deliver all the otherwise-required associated paper forms.

42.     When securities, such common stock, are held via DTC's intermediated system, Participants, customers of Participants, and beneficial owners holding through such customers do not have their names reflected as the owners on any security certificates.  Indeed, no Participant, customer of a Participant, or beneficial owner owns any particular, individual shares of a given issue of a security.  The system of intermediated securities holding described above necessarily prevents identification of any particular share of a security as being owned by any individual Participant, its customer, or any underlying beneficial owner holding through such a Participant or customer.

43.     At the end of each day, DTC debits from or credits to each Participant's account the net amount of securities, and net dollar amount of payments, for all of that Participant's activities that day in each securities issue. DTC does not know the identities of, nor does it track the activity of, any customer of any Participant, or any lower-tier holders including beneficial owners. Rather, DTC records only net positions of each Participant, which represent the net activities of the Participant.

44.     For example, if a Participant begins a trading day with 10 shares of Company X in its DTC account, and one customer of the Participant buys five shares of Company X that day while another customer of the same Participant sells five shares of Company X, the Participant would still have 10 shares of Company X in its DTC account at the end of the trading day. This netting occurs at each level of DTC's intermediated system of securities holding.

45.     In addition, many large brokerage firms hold inventory of securities of multiple companies on their own balance sheets. They often do this in order to help make a market in the securities and support liquidity.[42]  When the customers of those brokers seek to buy or sell a security that the broker is already holding through DTC and reflecting on its own balance sheet, the brokerage firm may engage in a "principal transaction" in which it transacts with its own client, buying or selling the security for its own account,[43] and the resulting change in security ownership is reflected only on the broker's own books (and not on DTC's books) between its principal account (shares of a security that it owns for itself) and its custodial account (shares of a security

---

[42] *See* Craig A. Chikis and Jonathan Goldberg, *Dealer Inventory Constraints in the Corporate Bond Market during the COVID Crisis*, FEDS Notes (July 15, 2021), https://www.federalreserve.gov/econres/notes/feds-notes/dealer-inventory-constraints-in-the-corporate-bond-market-during-the-covid-crisis-20210715.htm ("Dealers have a central role in the corporate bond market and use their balance sheets to provide liquidity to corporate bond investors.").

[43] Merrill Lynch, for example, explained in client materials in 2012 that "[i]n a principal transaction, [it] will buy securities from [a client] for its own account or sell securities it owns to [a client] from its own account." *See* Merrill Lynch Wealth Management, *Review and Consider* (Feb. 29, 2012), https://www.mymerrill.com/Publish/Content/application/pdf/GWMOL/229123_Mer_6pgs_R1.pdf.

**REPORT OF JACK R. WIENER**                                                          **PAGE 19**

that it owns on behalf of its clients).  In a principal transaction, the total number of shares of a security held by the broker at DTC does not change; only the allocation on the broker's own books between its principal and custodial accounts changes.  In that event, no net change in security ownership resulting from that transaction is even reported to DTC, nor of course reflected on DTC's records.

## VI.    Tracing Shares in the DTC System

46.    In today's securities system, in which the vast majority of publicly traded securities in the United States are held in DTC's street name[44]—that is, in the name of Cede & Co.—there are nonetheless a number of situations in which beneficial owners might well be able to trace their shares of a security to a particular registration statement, prospectus, and/or offering.  However, as discussed below in Section VII.C, none of them are applicable to the shares of AdaptHealth Stock acquired by Lead Plaintiffs here.

47.    First, tracing is straightforward when all shares of a security in the market were issued under the same registration statement, such as when there is only an initial public offering, and there is no other issuance of the security.  In such a situation, all shares—even those held in DTC's street name—are traceable to the one registration statement, because all shares in the market necessarily came from that single registration statement.

48.    Second, some companies still offer physical paper security certificates to beneficial owners.  In a situation in which a company issues a physical certificate directly to a beneficial owner, and the company's registrar registers the beneficial owner's name on the company's books,

---

[44] *See* John C. Wilcox et al., *supra* note 26, at 10-3 ("The vast majority of publicly traded shares in the United States are registered on the companies' books not in the name of beneficial owners . . . but rather in the name of 'Cede & Co.' the name used by [DTC].").

**REPORT OF JACK R. WIENER**                                                                              **PAGE 20**

that certificate represents the beneficial owner's ownership of the security,[45] and it is possible that a beneficial owner can trace its shares of a security to a particular registration statement.

49.     Third, some companies allow for the possibility of "direct registration."  Direct registration provides beneficial owners with an alternative to holding their securities in street name.  Under this method of registration, beneficial owners can elect—indirectly, through DTC's Direct Registration System—to have their securities registered in their name or in the name of a third-party custodian, such as a broker or bank, on the company's (or transfer agent/registrar's) books and records.[46]  It is theoretically possible that beneficial owners who have directly registered their shares of a security might be able to trace them to a particular registration statement, if their shares were never part of a fungible bulk containing shares from multiple offerings held by DTC or another intermediary.  But whether someone who has directly registered their shares can in fact trace those shares to a particular registration statement depends on whether his shares were ever commingled with shares issued pursuant or traceable to a different registration statement.

50.     Finally, a company may apply for a different unique CUSIP number identifier for each offering of an issue.  If such a request were granted by CGS, and each offering were given a unique CUSIP number, a beneficial owner receiving shares in an offering would be able to trace its shares to that offering by virtue of the unique CUSIP.

---

[45]  *See* SEC, *Investor Publications: Holding Your Securities - Get the Fact*s (Mar. 4, 2003), https://www.sec.gov/reportspubs/investor-publications/investorpubsholdsechtm.html.

[46]  *See id.*; *see also* DTCC, *Direct Registration System Overview*, http://www.dtcc.com/settlement-and-asset-services/securities-processing/direct-registration-system (last visited Mar. 22, 2023).

**REPORT OF JACK R. WIENER**                                                                                          **PAGE 21**

**VII.    AdaptHealth Secondary Offering**

**A.  The Secondary Offering and the Traceability of AdaptHealth Stock**

51.      I have reviewed the materials set forth in **Appendix A**.  Based on my review, and my knowledge of the DTC intermediated system of securities holding, I do not believe that any method exists by which Lead Plaintiffs or any other potential class member would be able to show that they acquired AdaptHealth Stock traceable to the Offering Documents filed in connection with the Secondary Offering.

52.      I understand that AdaptHealth Stock began publicly trading on November 11, 2019.[47]  Since that date, there have been two separate public offerings of AdaptHealth Stock during the putative class period.  The first public offering during that period occurred in July of 2020 (the "2020 Offering") and closed on July 6, 2020, resulting in an additional 9,200,000 shares of AdaptHealth Stock being issued and becoming outstanding.[48]  The second, the Secondary Offering, closed on January 8, 2021, and resulted in an additional 8,450,000 shares of AdaptHealth Stock being issued and becoming outstanding.[49]

53.      All shares of AdaptHealth Stock, whether sold in the 2020 Offering, the Secondary Offering, or otherwise issued, bore the exact same CUSIP number: 00653Q102.[50]

---

[47] DFB Healthcare Acquisitions Corp., *DFB Healthcare Acquisitions Corp. Announces Closing of Business Combination With AdaptHealth Holdings LLC* (Nov. 8, 2019), https://www.businesswire.com/news/home/20191108005600/en/DFB-Healthcare-Acquisitions-Corp.-Announces-Closing-of-Business-Combination-With-AdaptHealth-Holdings-LLC.

[48] AdaptHealth, *AdaptHealth Corp. Announces Pricing of Upsized Public Offering of Class A Common Stock* (July 1, 2020), https://adapthealth.com/wp-content/uploads/2020/07/AdaptHealth-Corp.-Announces-Pricing-of-Upsized-Public-Offering-of-Class-A-Common-Stock_07012020.pdf.

[49] Cont. Aff. ¶¶ 3, 7, 9.  In total, 9,200,000 shares of AdaptHealth Stock were sold in the Secondary Offering.  This was comprised of 8,450,000 newly issued shares of AdaptHealth Stock as well as 750,000 shares of previously issued and restricted AdaptHealth Stock previously held by a shareholder, Quadrant Management LLC ("Quadrant").  Cont. Aff. ¶¶ 7-9.

[50] Cont. Aff. ¶¶ 4, 10, 16; Affidavit of Ann Marie Bria of DTCC ¶¶ 3-6 ("DTCC Aff.").

**REPORT OF JACK R. WIENER**                                                              **PAGE 22**

54.     Prior to the Secondary Offering, at close of business on January 7, 2021, there were 46,601,963 shares of AdaptHealth Stock held by DTC.[51]  After the Secondary Offering, at close of business on January 8, 2021, there were 55,810,344 shares of AdaptHealth Stock held by DTC.[52] The increase of 9,208,381 shares of AdaptHealth Stock held by DTC after the Secondary Offering is due to the delivery to DTC of 8,450,000 shares newly issued in the Secondary Offering, the delivery to DTC of 750,000 previously restricted shares formerly held by Quadrant that were re-registered and sold in the Secondary Offering, and the delivery to DTC of 8,381 shares issued on the same date which were not part of the Secondary Offering.[53]

55.     All shares of AdaptHealth Stock held by DTC bore the same CUSIP number (00653Q102) and were registered in Cede & Co.'s name, including those issued in the Secondary Offering, and were held by DTC in a single undifferentiated fungible aggregate bulk, as described above in Section V.[54]  The CUSIP number in this case does not provide any way for one to distinguish between shares of AdaptHealth Stock issued pursuant to the Secondary Offering and shares of AdaptHealth Stock from prior (or subsequent) issuances, as all of the AdaptHealth Stock was blended into a single undifferentiated fungible aggregate bulk at DTC.  The CUSIP number thus fails to provide any way to trace shares of AdaptHealth Stock acquired or purchased by persons (including Lead Plaintiffs) to the Secondary Offering or to the associated Offering Documents.

56.     As previously discussed, there is no way to trace any such share of AdaptHealth Stock held in DTC's single undifferentiated fungible aggregate bulk to any particular offering or

---

[51] Cont. Aff. ¶¶ 4, 10.
[52] Cont. Aff. ¶ 16.
[53] Cont. Aff. ¶¶ 7-9, 15.
[54] Cont. Aff. ¶¶ 11, 16; DTCC Aff. ¶¶ 3-6.

**REPORT OF JACK R. WIENER**                                      **PAGE 23**

other issuance.  Just as there is no way to trace even a single drop of wine—from the blend that

has resulted from different vintages of Merlot wine being poured into a vat—to a particular vintage

of Merlot wine.  In these cases, what is done cannot be undone.

**B.  Flow of Shares During the AdaptHealth Secondary Offering**

57.     I analyzed the flow of interests in shares during and after AdaptHealth's Secondary

Offering, which further supports my opinion.

58.      The below chart shows the flow of interests in shares from AdaptHealth to Lead

Plaintiffs during the Secondary Offering, which closed on January 8, 2021:



59.     On January 8, 2021, AdaptHealth issued 8,450,000 shares of AdaptHealth Stock by

authorizing Continental Stock Transfer & Trust Co. ("Continental"), its transfer agent and

registrar, to issue, register, and deliver 8,450,000 newly issued shares of AdaptHealth Stock.[55] AdaptHealth also authorized Continental to re-register and deliver 750,000 previously issued restricted shares of AdaptHealth Stock held by beneficial owner Quadrant.[56] Continental, in turn, as instructed by Deutsche Bank Securities Inc. ("Deutsche Bank"), the lead underwriter for the Secondary Offering, delivered such 9,200,000 shares to DTC.[57]

60.    On the same date, DTC received said shares of AdaptHealth Stock, and the shares of AdaptHealth Stock were commingled into the single undifferentiated fungible aggregate bulk of earlier-issued shares of AdaptHealth Stock that DTC already held. DTC thus held at this point a larger single undifferentiated fungible aggregate bulk, with Participants' interests consisting of *pro rata* interests in that blended fungible bulk of AdaptHealth Stock.[58]

61.    On the same date, DTC, in turn, credited its participant Deutsche Bank with a *pro rata* interest in the single undifferentiated fungible aggregate bulk held at DTC, which addition DTC reflected as 9,200,000 shares of AdaptHealth Stock credited to Deutsche Bank.[59] On the same date, Deutsche Bank, in turn, transferred a *pro rata* interest in that single undifferentiated fungible aggregate bulk of AdaptHealth Stock that had been credited to Deutsche Bank, to Jefferies LLC ("Jefferies"), which transferred interest was reflected as 972,600 shares of AdaptHealth Stock credited to Jefferies.[60]

62.    On the same date, Jefferies then, in turn, transferred a *pro rata* interest in the single undifferentiated fungible aggregate bulk of AdaptHealth Stock that had been credited to Jefferies,

---

[55] Cont. Aff. ¶¶ 3, 7.
[56] Cont. Aff. ¶ 8.
[57] Cont. Aff. ¶¶ 6, 13.
[58] Cont. Aff. ¶ 13; DTCC Aff. ¶¶ 3-6.
[59] Cont. Aff. ¶ 14.
[60] Affidavit of James Persico of Jefferies LLC ¶ 5 ("Jefferies Aff.").

**REPORT OF JACK R. WIENER**                                    **PAGE 25**

to Emerald Asset Management ("Emerald"), which transferred amount was reflected as ▮CONFID.▮ shares of AdaptHealth Stock credited to Emerald.[61]  Emerald, in turn, held on behalf of Lead Plaintiffs a *pro rata* interest of ▮CONFIDENTIAL▮ of AdaptHealth Stock in the single undifferentiated fungible aggregate bulk of AdaptHealth Stock in which Jefferies had a *pro rata* interest.[62]

63.    It is worth noting, though not necessary for the conclusions that I otherwise reach in this report, that at the time of the Secondary Offering Jefferies already held an interest in shares of AdaptHealth Stock for its customers or on a proprietary basis for its own account.[63]  As such, the position in AdaptHealth Stock that Jefferies received on the date of the Secondary Offering—a position which would have already been blended into the single undifferentiated fungible aggregate bulk at the DTC level as described above—was blended yet again at the Jefferies level, with the position that Jefferies already held in previously issued shares of AdaptHealth Stock.[64]

## C.  Applicability of Methods to Trace in the DTC System

64.    As discussed in Section VI, in the intermediated system of securities holding at DTC, I am aware of only four situations in which a beneficial owner can trace its shares to a particular registration statement.  They are: (i) where all shares in the market were issued under the same registration statement; (ii) where the beneficial owner received a physical stock certificate directly from the company issuing the shares; (iii) where the beneficial owner availed itself of DTC's Direct Registration System; or (iv) where the company received a unique CUSIP identifier in connection with the offering.  *See supra* ¶¶ 46-50.  However, none of these situations apply with respect to the Secondary Offering.

---

[61] EMERALDADV-00001412.
[62] *Id.*
[63] Jefferies Aff. ¶¶ 4, 6.
[64] Jefferies Aff. ¶¶ 4-6.

65.    *First*, as reviewed, not all AdaptHealth Stock in the market was issued under the Secondary Offering registration statement.  Indeed, the 8,450,000 shares issued and the 750,000 shares sold in the Secondary Offering represented only ~16% of all outstanding shares held by DTC in a blended undifferentiated fungible aggregate bulk, all of which were in Cede & Co.'s name and represented by the same CUSIP number.  *See supra* ¶¶ 52-56.

66.    *Second*, no physical stock certificates were issued to beneficial owners in connection with the Secondary Offering; rather, it was a book-entry-only issuance.[65]

67.    *Third*, no beneficial owners availed themselves of DTC's Direct Registration System in connection with the Secondary Offering; instead, all 9,200,000 shares of AdaptHealth Stock offered in the Secondary Offering were issued and registered in DTC's Cede & Co street name, and delivered to DTC.[66]

68.    *Fourth*, no unique CUSIP number was used for the Secondary Offering that differed from the CUSIP number that was used for the shares of AdaptHealth Stock publicly traded on and after November 11, 2019 and for the shares issued in the 2020 Offering.[67]  As noted above in Paragraph 53, the shares of AdaptHealth Stock issued in connection with the Secondary Offering bore the same CUSIP number as all the then-outstanding shares of AdaptHealth Stock held by DTC.

69.    In sum, based on my above summarized review, analysis, and knowledge of the DTC system, I can conclude that all shares of AdaptHealth Stock issued and sold in connection with the Secondary Offering were held by DTC as part of a single blended undifferentiated

---

[65] Cont. Aff. ¶¶ 6, 11.

[66] Cont. Aff. ¶¶ 11-13.  No AdaptHealth Stock sold in the Secondary Offering was issued via the Direct Registration System, inasmuch as the records of the registrar show that all 8,450,000 newly issued shares and the 750,000 previously issued restricted shares sold by Quadrant were registered to Cede & Co.  *See* Cont. Aff. ¶¶ 9-12.

[67] Cont. Aff. ¶¶ 4, 10, 16; DTCC Aff. ¶¶ 3-6.

**REPORT OF JACK R. WIENER**                                                                 **PAGE 27**

fungible aggregate bulk that included shares not issued in connection with the Secondary Offering.[68]

70.     Accordingly, I do not know of any way that a beneficial owner holding a position indirectly through DTC, such as Lead Plaintiffs, would be able to trace any particular share of AdaptHealth Stock they acquired to the Secondary Offering or to the Offering Documents associated with the Secondary Offering.

## VIII.   Conclusions

71.     My principal conclusions based on the above, as well as my expertise, experience, and in-depth understanding of DTC and its processes, are as follows.

72.     *First*, as described above, all shares of AdaptHealth Stock issued and sold in connection with the Secondary Offering:  (i) bore the same CUSIP number as the shares of AdaptHealth Stock already outstanding; (ii) were issued in book-entry-only form—without any physical certificates being made available for beneficial owners—and registered in DTC's street name; and (iii) were held in a single undifferentiated fungible aggregate bulk at DTC, blended with over 46 million other identical, indistinguishable shares of AdaptHealth Stock.

73.     *Second*, in light of shares of AdaptHealth Stock from multiple offerings having been blended into a single undifferentiated fungible aggregate bulk at DTC, I do not believe that any method exists by which Lead Plaintiffs or any other alleged beneficial owners would be able to show that they acquired AdaptHealth Stock traceable to the Secondary Offering or traceable to the Offering Documents that were filed in connection with the Secondary Offering.

Jack Wiener
March 29, 2023

---

[68] DTCC Aff. ¶¶ 3-6.

**REPORT OF JACK R. WIENER**                                                                 **PAGE 28**

# APPENDIX A

**<u>Sources of Information Considered by Jack R. Wiener in Forming Expert Report</u>**

1.  Lead Plaintiffs' Consolidated Class Action Complaint [ECF No. 19]

2.  Lead Plaintiffs' Motion to Certify Class and Memorandum of Law in Support Thereof [ECF No. 65]

3.  Certification of Delaware County Employees Retirement System Pursuant to Federal Securities Law [ECF 5-4]

4.  Certification of Bucks County Employees' Retirement System Pursuant to Federal Securities Law [ECF 5-4]

5.  AdaptHealth Securities Registration Statement (Form S-3) (Dec. 18, 2020)

6.  AdaptHealth Prospectus (Form 424B5) (Jan. 4, 2021)

7.  AdaptHealth Prospectus (Form 424B5) (Jan. 7, 2021)

8.  Documents received from AdaptHealth's Transfer Agent and Registrar, Continental, relating to the AdaptHealth Secondary Offering:

    a.  AdaptHealth Authorization Letter (Jan. 8, 2021)

    b.  DTC Deposit/Withdrawal at Custodian 750,000 (Jan. 8, 2021)

    c.  DTC Deposit/Withdrawal at Custodian 8,450,000 (Jan. 8, 2021)

    d.  Underwriters Instructions – Deutsche Bank (Jan. 7, 2021)

    e.  AdaptHealth Authorized Shares Report (Jan. 8, 2021)

9.  Affidavits relating to AdaptHealth's Secondary Offering:

    a.  Affidavit of Michael Mullings of Continental Stock Transfer & Trust Co.

    b.  Affidavit of Ann Marie Bria of the Depository Trust & Clearing Corporation

    c.  Affidavit of James Persico of Jefferies LLC

10. EMERALDADV-00001412

11. SEC, *What Different Types Of Securities Are Issued To Startup Investors?* (Jan. 12, 2023), https://www.sec.gov/education/capitalraising/building-blocks/startup-securities

12. SEC, *Updated Investor Bulletin: New "T+2" Settlement Cycle – What Investors Need to Know* (Aug. 22, 2017), https://www.sec.gov/oiea/investor-alerts-and-bulletins/ibsettlementcycle

13. DTCC, *The Depository Trust Company (DTC)*, https://www.dtcc.com/about/businesses-and-subsidiaries/dtc (last visited Mar. 22, 2023)

14. Virginia B. Morris & Stuart Z. Goldstein, *Life Cycle of a Security* 4 (2010)

15. NASDAQ Glossary of Stock Market Terms, *Depository Trust Company*, https://www.nasdaq.com/glossary/d/depository-trust-company (last visited Mar. 22, 2023)

16. DTCC, *DTCC'S Alternative Investment Product Reaches New Milestone, Processing Over 500 Million Transactions Since Inception* (Dec. 13, 2022), https://www.dtcc.com/news/2022/december/13/alternative-investment-product-reaches-new-milestone

17. DTCC, *Asset Services Learning Center, "Asset Services"* (Nov. 10, 2022), https://dtcclearning.com/products-and-services/asset-services.html

18. DTCC, *DTCC 2021 Annual Report* https://www.dtcc.com/annuals/2021/performance/dashboard/ (last visited Mar. 22, 2023)

19. DTCC, *FAQS: How Issuers Work with DTC*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc (last visited Mar. 22, 2023)

20. DTCC, *DTC Member Directories* (database updated Mar. 1, 2023), http://www.dtcc.com/client-center/dtc-directories

21. James O'Toole, *JPMorgan: 76 Million Customers Hacked*, CNN.com (Oct. 3, 2014, 8:00 AM), https://money.cnn.com/2014/10/02/technology/security/jpmorgan-hack/index.html

22. FINRA, *2022 FINRA Industry Snapshot*, at p. 15 (2022), https://www.finra.org/sites/default/files/2022-03/2022-industry-snapshot.pdf

23. Fidelity Investments, *Fidelity Fixed Income Investment Capabilities* (Sept. 30, 2022), https://institutional.fidelity.com/app/proxy/content?literatureURL=/9895996.PDF

24. Fidelity Institutional, *Q3 2022 Business Update*, https://www.fidelity.com/about-fidelity/our-company/quarterly-updates/quarterlyupdates-q3-2022 (last visited Mar. 22, 2023)

25. SEC, *DTC Chills and Freezes* (May 1, 2012), https://www.sec.gov/oiea/investor-alerts-bulletins/ib_dtcfreezes.html

26. SEC, *Transfer Agent Regulations*, 17 C.F.R. Part 240, Release No. 34-76743, File No. S7-27-15, at pp. 11–13, 67 (Dec. 22, 2015), https://www.sec.gov/rules/concept/2015/34-76743.pdf

27. DTC, 1997 Annual Report, at p. 9 (1997), https://www.sechistorical.org/collection/papers/1990/1997_0101_DTCAR.pdf

28. Edward C. Kelleher, *DTCC Celebrates 40 Years of Service*, DTCC (June 3, 2013), https://web.archive.org/web/20210507040651/https://www.dtcc.com/news/2013/june/03/dtcc-celebrates-40-years-of-service

29. New York Stock Exchange, Inc., *Crisis in the Securities Industry, A Chronology: 1967–1970* (Aug. 2, 1971), at 31, 50, http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45.r81.cf1.rackcdn.com/collection/papers/1970/1971_0730_NYSECrisis.pdf

30. Larry E. Bergmann, *The U.S. View of the Role of Regulation in Market Efficiency,* Speech by SEC Staff: International Securities Settlement Conference (Feb. 10, 2004), https://www.sec.gov/news/speech/spch021004leb.htm

31. Terry Robards, *Stocks: Dam Is Holding*, N.Y. TIMES (Feb. 14, 1971), https://www.nytimes.com/1971/02/14/archives/stocks-dam-is-holding-this-time-so-far-trading-flood-is-controlled.html

32. E.S. Browning, et al., *Wild Day Caps Worst Week Ever for Stocks*, WALL STREET J. (Oct. 11, 2008), https://www.wsj.com/articles/SB122368071064524779

33. SEC, *Study of Unsafe and Unsound Practices of Brokers and Dealers*, H.R. Doc. No. 92-231 (Dec. 1971), http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45.r81.cf1.rackcdn.com/collection/papers/1970/1971_1201_SECUnsafe_01.pdf

34. DTC, *1989 Annual Report*, at pp. 6–10 (1989), http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45.r81.cf1.rackcdn.com/collection/papers/1980/1989_0101_DTCAR.pdf

35. John C. Wilcox et al., *"Street Name" Registration & The Proxy Solicitation Process*, in Amy Goodman et al., *A Practical Guide to SEC Proxy and Compensation Rules*, 10-3 (4th ed. 2007 & 2008 Supp.)

36. SEC, *Fast Answers: Street Name*, https://www.sec.gov/answers/street.htm (modified Oct. 5, 2005)

37. Legislative History of the Revenue Act of 1932: P.L. 72-154: 47 Stat. 169: June 6, 1932 (1932)

3

38.  Milton N. Nelson, Readings in Corporation Finance 338 (1st ed. 1926)

39.  Trading with the Enemy: Hearings before the Subcommittee of the Committee on Commerce, United States Senate, Sixty-Fifth Congress, First Session on H.R. 4960, at 67 (1917) (Statement of J.G. Boston)

40.  DTCC, *The Fast Program*, https://www.dtcc.com/settlement-and-asset-services/agent-services/fast (last visited Mar. 22, 2023)

41.  CGS, *About Us*, https://www.cusip.com/about/index.html (last visited Mar. 22, 2023)

42.  CGS, *Inside the CGS Identification System* (Aug. 2010), https://web.archive.org/web/20211102145159/https://www.cusip.com/pdf/CUSIP_Intro_03.14.11.pdf

43.  CGS, *Applying For A New Identifier Is Quick And Easy*, https://www.cusip.com/apply/index.html (last visited Mar. 22, 2023)

44.  DTC, *Operational Arrangements* (Feb. 2023), https://www.dtcc.com/~/media/Files/Downloads/legal/issue-eligibility/eligibility/operational-arrangements.pdf

45.  SEC, *Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries*, 17 C.F.R. Part 240, Release No. 34-50758A; File No. S7-24-04, RIN 3235-AJ26 (Mar. 7, 2005), https://www.sec.gov/rules/final/34-50758a.htm

46.  SEC, *Rule 144: Selling Restricted and Control Securities* (Jan. 16, 2013), https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144

47.  *Self-Regulatory Organizations; The Depository Trust Company; Notice of Filing and Immediate Effectiveness of a Proposed Rule Change to Amend the DTC Deposits Service Guide Relating to Procedures for the Deposit of Nontransferable Securities*, Release No. 34-86897, U.S. SECURITIES AND EXCHANGE COMMISSION (Sept. 6, 2019), https://www.sec.gov/rules/sro/dtc/2019/34-86897.pdf

48.  SEC, *Staff Legal Bulletin No. 14f (CF)* (Oct. 18, 2011), https://www.sec.gov/corpfin/staff-legal-bulletin-14f-shareholder-proposals

49.  SEC, *Roundtable on Proxy Voting Mechanics* (May 23, 2007), https://www.sec.gov/spotlight/proxyprocess/proxyvotingbrief.htm

50.  Craig A. Chikis and Jonathan Goldberg, *Dealer Inventory Constraints in the Corporate Bond Market during the COVID Crisis*, FEDS Notes (July 15, 2021), https://www.federalreserve.gov/econres/notes/feds-notes/dealer-inventory-constraints-in-the-corporate-bond-market-during-the-covid-crisis-20210715.htm

51. Merrill Lynch Wealth Management, *Review and Consider* (Feb. 29, 2012), https://www.mymerrill.com/Publish/Content/application/pdf/GWMOL/229123_Mer_6 pgs_R1.pdf

52. SEC, *Investor Publications: Holding Your Securities - Get the Fact*s (Mar. 4, 2003), https://www.sec.gov/reportspubs/investor-publications/investorpubsholdsechtm.html

53. DTCC, *Direct Registration System Overview*, http://www.dtcc.com/settlement-and-asset-services/securities-processing/direct-registration-system (last visited Mar. 22, 2023)

54. DFB Healthcare Acquisitions Corp., *DFB Healthcare Acquisitions Corp. Announces Closing of Business Combination With AdaptHealth Holdings LLC* (Nov. 8, 2019), https://www.businesswire.com/news/home/20191108005600/en/DFB-Healthcare-Acquisitions-Corp.-Announces-Closing-of-Business-Combination-With-AdaptHealth-Holdings-LLC

55. AdaptHealth, *AdaptHealth Corp. Announces Pricing of Upsized Public Offering of Class A Common Stock* (July 1, 2020), https://adapthealth.com/wp-content/uploads/2020/07/AdaptHealth-Corp.-Announces-Pricing-of-Upsized-Public-Offering-of-Class-A-Common-Stock_07012020.pdf

# APPENDIX B

# JACK R. WIENER

300 E. 74th St.; 19G                                                                C:  (917) 626-0154
NY, NY 10021-3715                                                          Jackrwiener@gmail.com

## EXPERIENCE:

**FINANCIAL SERVICES CONSULTING,** New York, NY                            2009-present
    **Chief Executive Officer**

Founded consulting firm that provides advice and expert witness support with regard to transactions, clearance & settlement, custody, regulation, compliance, and litigation in the areas of securities, derivatives, banking, and white collar defense.  Advise banks, investment banks, broker-dealers, hedge funds, investment advisors, clearing firms, regulators, governments, individuals, and issuers from the US, Canada, France, Germany, the United Kingdom, Sweden, Israel, China, and the Cayman Islands in structuring and litigation matters.  Serve as expert witness for US Attorney's Office (SDNY) on clearance & settlement and international securities law, for law firms and global custodian banks at trials in Ireland and the Cayman Islands in multi-billion dollar Madoff-related litigation, for European banks in litigation regarding loss of $1.8 billion in asset-backed commercial paper, for clearing firm in dividend litigation, and for various parties in Section 11 securities class action litigation.  Advise Israel Ministry of Finance on restructuring bond offerings. In addition, represent athletes in sports law and SafeSport matters.

- **US Delegate**.  Represent the US in two multi-lateral, 40-nation treaty negotiations on the law of custody and transfer of securities.  Negotiating the Hague Securities Convention (cross-border pledging of securities) and the Unidroit Securities Convention (harmonizing substantive international securities law/regulation).  Appointed by US State Department.

- **Adjunct Professor of Law** at Brooklyn Law School, 2012-present. Teach International Securities Regulation & Compliance, International Sales of Securities and Goods, and the Law of War.

**SECURITIES INDUSTRY & FINANCIAL MARKETS ASSN,** New York, NY          2007-08
    **Managing Director & Associate General Counsel**

**Legal, Regulatory, Compliance, Advocacy, and Market Practice Activities:**  Headed securities, fixed income, and derivatives market practice, legal, regulatory, and compliance initiatives of corporate credit market, primary market, and money market divisions for the largest securities industry lobby organization in the US. Advised the general counsels and investment advisors committees on securities and custody law, practice, regulation, and compliance.  Represented interests of 650 largest global underwriters and asset managers

1

with the Federal Reserve Bank, CFTC, SEC, FINRA, and European Commission.  Liaised with ISDA on derivatives matters.  Led various international initiatives.

**Credit Rating Agencies, Rule 144A, and MAAU:**  Led global industry task force that developed credit rating agency recommendations agreed upon by underwriters, buy-side firms, banks, and issuers.  Recommendations have driven global advocacy in the US and Europe, and are Presidents Working Group-endorsed.  Liaised with senior members of the PWG, Treasury Department, and US and European regulators.  Led task force of 16 largest global underwriters that developed an industry Guidance for Rule 144A issues, and an industry-wide Master Agreement Among Underwriters.

**THE DEPOSITORY TRUST & CLEARING CORPORATION,** New York, NY

| | |
|---|---|
| **Deputy General Counsel & Managing Director** | 2001-05 |
| **General Counsel, Global Asset Solutions LLC** | 2003-05 |
| **Senior Counsel & Vice President** | 1999-2001 |
| **Associate Counsel & Vice President** | 1995-99 |
| **Associate Counsel** | 1989-95 |

*DTCC is the parent company of DTC, GSCC, NSCC, and GAS.  Custodies $87 trillion in securities, handles $2.4 quadrillion in transactions annually, and operates Deriv/SERV for derivative.*
*Regulated by the Fed, SEC, and NYS Banking Dept.*

**Corporate Support:**  Responsible for the company's activities in the areas of securities custody and transfer. Provided strategic legal counsel to senior management, the Board of Directors, and the Underwriting, Operations, Derivatives, Compliance, Risk, Internal Audit, International, Strategy, Dividends, Reorganization, Membership, Human Resources, and Systems Departments, and to subsidiaries (DTC, Deriv/SERV, GSCC, NSCC, and GAS).  Structured broad range of transactions.  Negotiated and drafted various agreements, including custodian and sub-custodian agreements with some of the world's largest custodians of securities, and MOUs and membership, joint venture, acquisition, and technology agreements.  Represented DTC on the Securities Clearing Group and the Unified Clearing Group, comprised of the US clearance and settlement self-regulatory organizations, which focus on identifying and minimizing risk. Participated in the design and implementation of several systems critical to the custody and processing of securities. Managed 12 staff members.

**Regulatory:**  Liaised with regulators on application of existing and proposed banking and securities laws and regulations, risk, compliance, audits, reviews, company practices, clearance-and-settlement offerings, changes in services, regulatory filings, derivatives, and anti-money-laundering. Responsible for regulatory examinations and investigations. Interfaced with the SEC, Federal Reserve Bank of NY, and NY State Banking Dept., as well as the Treasury Department, OFAC, NASD, NYSE, GAO, and the UK's Financial Services Authority ("FSA").  Submitted comment letters to and worked closely with regulators on revisions, relating to the custody of securities, to the '40 Act (Rule 17f) and the '34 Act (Section 17A).  Advised management on existing and proposed SEC, Fed, and CFTC rules and regulations.

2

**Compliance/Risk:**  Developed and oversaw the enforcement of compliance and risk management rules, controls, policies, and procedures for securities custody and transactions, haircuts, underwritings, counter-party exposure, capital requirements, credit risk, stress-testing, Basel II, and membership. Performed investigations of fraud and breaches of compliance policies. Liaised with regulators as to appropriate risk control measures, including standards for Participant admissions.

**International:**  Headed international clearance-and-settlement law practice.  Structured and negotiated cross-border links and transactions with U.S. and non-US regulators, and with non-US custodian banks, broker-dealers, and depositories, supporting global trading for issues such as ordinary shares of UBS and DaimlerChrysler. Established, obtained regulatory approval of, and handled legal issues for UK and China offices.  Negotiated new international securities processing standards to standardize global practices, as a member of the G-30 Legal Working Group.

**Underwriting:**  Headed staff providing counsel on securities law aspects of debt and equity global offerings.  Advised with regard to clearance & settlement, including IPOs, exchanges, book-entry-only and uncertificated issues, and private placements.

**General Counsel of Global Asset Solutions LLC:**  General Counsel to major operating subsidiary handling all start-up business of parent, including a corporate actions validation service.

**Treaty Negotiations:**  Serve on US Delegations negotiating the Hague Securities Convention and the Unidroit Securities Convention with 40 nations. Appointed by the US State Department.

**WEBSTER & SHEFFIELD,** New York, NY                                              1987-89

**WILLKIE FARR & GALLAGHER,** New York, NY                                  1985-87

**PEPPER, HAMILTON & SCHEETZ,** Philadelphia, PA                          1982-85

As a securities associate, negotiated and drafted agreements for a wide range of securities, banking, and corporate transactions.  Worked primarily on mergers & acquisitions, leveraged buy-outs, and divestitures.  Represented bidders, purchasers, and sellers.  Drafted and filed a variety of SEC filings, including '33 & '34 Act filings.

**EDUCATION:**

 **J.D., UNIVERSITY OF PENNSYLVANIA LAW SCHOOL,** Philadelphia, PA            1982

Honors:     Editor, **University of Pennsylvania Law Review**
Activities:  Morris Fellow; Phi Delta Phi

3

**B.A., BROOKLYN COLLEGE,** Brooklyn, NY                                    1979

| | |
|---|---|
| Class Standing: | 3.98 G.P.A.; *summa cum laude* |
| Double Major: | Political Science & Psychology (with honors) |
| Honors: | <u>Phi Beta Kappa</u>; Dean's List; Scholars Program |
| Awards: | Sive Award; Regents Scholarship; Social Science Scholarship |
| Activities: | Fencing – NCAA épée semi-finalist 1977, 1979; Team MVP Captain, 1978-79 |

<u>**ADMITTED:**</u> New York, DC, and Pennsylvania

<u>**PRESENTATIONS**</u>**:**

Presented speeches in the US, United Kingdom, Germany, Switzerland, Israel, China, Peru, and Argentina on various topics, including on the custody and transfer of securities, derivatives, Rule 144A/Reg. S offerings, Rule 17f of the '40 Act, credit ratings, bitcoins, and international legal harmonization.

4

# APPENDIX C

**Deposition, Trial, and Arbitration Testimony**

I have not provided trial or arbitration testimony in the last four years.  I have provided deposition testimony in the last four years as follows:

1.     Deposition testimony in *In re Cloudera, Inc. Sec. Litig*., Case No. 19-CV-03221-LHK (N.D. Cal.) (August 1 & August 3, 2022).

2.     Deposition testimony in *Hound Partners Offshore Fund LP et al v. Valeant Pharmaceuticals International, Inc.*, Case No. 18-8705 (D. NJ.) (June 24 & June 27, 2022).

3.     Deposition testimony in *Hayden v. Portola Pharm.*, Case No. 20-cv-00367-VC (N.D. Cal) (May 18, 2022) .

4.     Deposition testimony in *In re Evoqua Water Technologies Corp. Securities Litigation*, Case No. 1:18-cv-10320-JPC (S.D.N.Y.) (March 25, 2021).

5.     Deposition testimony in *In re American Realty Capital Properties, Inc. Litigation*, Case No. 1:15-mc-00040-AKH (S.D.N.Y.) (June 28, 2019).

6.     Deposition testimony in *Oklahoma Law Enforcement Retirement System v. Adeptus Health Inc., et al.*, Case No. 4:17-cv-0449 (E.D. Tx.) (March 7, 2019).

1