# Exhibit 17

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRIC OF PENNSYLVANIA
- - -

DELAWARE COUNTY EMPLOYEES :
RETIREMENT SYSTEM and      :
BUCKS COUNTY EMPLOYEES'    : Civ. Action No.
RETIREMENT SYSTEM,         : 2:21-cv-03382-HB
Individually and on        :
Behalf of All Others       :
Similarly Situated,        :
                           :
             Plaintiffs,   :
                           :
      v.                   :
                           :
ADAPTHEALTH CORP. f/k/a    :
DFB HEALTHCARE             :
ACQUISITIONS CORP.,        :
LUKE MCGEE, STEPHEN P.     :
GRIGGS, JASON CLEMENS,     :
FRANK J. MULLEN,           :
RICHARD BARASCH, JOSHUA    :
PARNES, ALAN QUASHA,       :
TERENCE CONNORS,           :
DR. SUSAN WEAVER, DALE     :
WOLF, BRADLEY COPPENS,     :
and DAVID S. WILLIAMS III,:
                           :
             Defendants.   :

- - -

February 10, 2023

- - -

30(b)(6) videotaped deposition of
the Bucks County Employees' Retirement System
taken through Kimberly S. Doran, via Zoom,
beginning at 9:53 a.m., before LINDA
ROSSI-RIOS, a Federally Approved Registered
Professional Reporter, Certified Court
Reporter and Notary Public.

Page 2

APPEARANCES:

Representing the Plaintiffs
ROBBINS GELLER RUDMAN & DOWD LLP
BY: DOUGLAS BRITTON, ESQUIRE
    KEVIN LAVELLE, ESQUIRE
    JOSEPH TULL, ESQUIRE
655 West Broadway, Suite 1900
San Diego, CA 92101
dougb@rgrdlaw.com
klavelle@rgrdlaw.com
jtull@rgrdlaw.com

Representing the AdaptHealth Defendants
WILLKIE FARR & GALLAGHER LLP
BY: MARGOT MOONEY, ESQUIRE
    BENJAMIN WOLTERS, ESQUIRE
    ZEH EKONO, ESQUIRE
    VINCENT IANNECE, ESQUIRE
787 Seventh Avenue
New York, NY 10019
mmooney@willkie.com
bwolters@willkie.com
zekono@willkie.com
iannece@willkie.com

Representing the Defendant Luke McGee
KRAMER LEVIN NAFTALIS & FRANKEL LLP
BY: RYAN GANDER, ESQUIRE
1177 Avenue of The Americas
New York, NY 10036
rgander@kramerlevin.com

ALSO PRESENT:

Jessica Reid, Concierge

Michael Barankovich, Videographer

- - -

Page 3

I N D E X

WITNESS                    PAGE

KIMBERLY S. DORAN

By Ms. Mooney               7


E X H I B I T S

MARKED       DESCRIPTION        PAGE

Bucks 0001   Notice of Deposition    21

Bucks 0002   BCERS0000901 to        84
             BCERS0000903
Bucks 0003   BCERS0000912 to        102
             BCERS0000914

Bucks 0004   BCERS0000908 to        126
             BCERS00009011
Bucks 0005   BCERS0000898 to        137
             BCERS0000900

Bucks 0006   Memorandum            149

Bucks 0007   Motion to Certify      151
             Class
Bucks 0008   Exhibit B to Motion    152
Bucks 0009   Order                  156
Bucks 0010   EMERALDADV-00000311 to    174
             EMERALDADV-00000317

Bucks 0011   EMERALDADV-00000302 to    186
             EMERALDADV-00000309
Bucks 0012   EMERALDADV-00000289 to    187
             EMERALDADV-00000301

Page 4

Bucks 0013   BCERS0000915 to        193
             BCERS0000926

Bucks 0014   BCERS0001030 to        194
             BCERS0001079
Bucks 0015   Consolidated Complaint    203
Bucks 0016   Exhibit 51             217
Bucks 0017   Jehoshaphat Research    218
             Report

Bucks 0018   Defendants' First Set    233
             of Requests For
             Production of
             Documents

Page 5

- - -

COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room, and that I will be reporting this deposition remotely.

They further acknowledge that in lieu of an oath administered in person, I will administer the oath remotely.

If any party does have an objection to this manner of reporting, please state so now.

(No objections.)

- - -

VIDEOGRAPHER: Good morning. We're going on the record at 9:53 on February 10, 2023.

Please note that this deposition is being conducted virtually. Quality of recording depends on quality of camera and internet connection of participants. What is seen from the witness and heard on screen is what

2 (Pages 2 - 5)

Page 6

will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit 1 of the deposition of Kimberly Doran in the matter of Delaware County Employees' Retirement System, et al. versus AdaptHealth Corp., et al. filed in the US District Court, Eastern District of Pennsylvania, Case Number 2:21-cv-03382-HB.

My name is Michael Barankovich representing Veritext, and I'm the videographer. The court reporter is Linda Rossi-Rios from the firm Veritext.

I am not authorized to administer an oath, I'm not related to any party in this action, nor am I financially interested in the outcome.

Would counsel please announce their appearance for the record.

MS. MOONEY: This is Margot

Page 7

Mooney from Willkie Farr on behalf of the AdaptHealth defendants. And my colleague Ben Wolters is here with me as well.

MR. GANDER: This is Ryan Gander from Kramer Levin Naftalis & Frankel, here on behalf of defendant Luke McKee.

MR. BRITTON: Is that all the defendants that are going to appear? All right.

Doug Britton with Robbins Geller on behalf of plaintiff and the witness. And with me today is Kevin Lavelle and Joseph Tull also on behalf of plaintiffs and the witness.

VIDEOGRAPHER: Will the court reporter please swear in the witness.

- - -

KIMBERLY S. DORAN, after having been duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

Page 8

BY MS. MOONEY:

Q.    Good morning, Ms. Doran. My name is Margot Mooney, and I'm from Willkie Farr representing the AdaptHealth defendants today.

Could you please state your full name and address for the record?

A.    Sure. My name is Kimberly S. Doran. My address is, here at work, 55 East Court Street, Doylestown, PA 18901.

Do you need my home address, too?

Q.    No, that's all right. Thank you.

Are you being represented by Robbins Geller today?

A.    Yes.

Q.    Have you ever been deposed before?

A.    Yes.

Q.    How many times have you been deposed?

A.    Probably three times.

Q.    Of the three times that you were previously deposed, were you ever deposed as a

Page 9

corporate representative?

A.    One time. One time involved with the Bucks County Employees' Retirement System. Another time with the Bucks County Controller's Office.

Q.    Of the three times that you were previously deposed, were any of those depositions in securities actions?

A.    Yes. One.

Q.    And was that the same one that you represented Bucks County as a corporate representative in?

A.    Yes.

Q.    Do you recall the name of that action?

A.    It was the Endo litigation.

Q.    What was Bucks County Retirement System's role in that action?

MR. BRITTON: Objection. Vague. Kim, give me a chance to object. Objection. Vague and ambiguous. You can answer.

THE WITNESS: We were a lead plaintiff in a case against Endo.

3 (Pages 6 - 9)

Page 10

BY MS. MOONEY:

Q. And that deposition was a 30(b)(6) deposition. Is that correct?

MR. BRITTON: Objection. Calls for a legal conclusion.

BY MS. MOONEY:

Q. Were you a witness in that deposition in the same capacity that you are appearing as a witness today?

A. Yes.

Q. What was the subject matter of your testimony?

A. The Bucks County Employees' Retirement System transaction with Endo as a class representative or as a lead plaintiff.

Q. When you say the transaction with Endo, can you provide a little more detail?

A. We were involved in a securities litigation suit with Endo Pharmaceutical.

Q. All right. So I want to go over a few ground rules. Sounds like you'll likely already be familiar with some of these.

First, I want to remind you you

Page 11

are under oath today. Do you understand that?

A. Yes.

Q. Second, it's important that there be a clear record of today's deposition. I'm going to be asking you a series of questions. And to ensure that there is a clear transcript of your answers, if you could please respond verbally to all of my questions, no head nods or shakes.

Do you understand?

A. Yes.

Q. Third, so that the court reporter can accurately transcribe today's deposition, let's try not to talk at the same time. Please let me finish my question before you answer, and I'll let you finish your answer before I ask my next question.

Do you understand?

A. Yes.

Q. Fourth, if you don't understand a question, just let me know and I'll do my best to rephrase it. If you don't say anything, I will assume that you understand the question.

Page 12

Do you understand that?

A. Yes.

Q. At times your counsel may object to my question. Unless he instructs you not to answer, you can answer the question when he finishes stating his objection.

Do you understand that?

A. Yes.

Q. Finally, if at any point you would like to take a break, let your counsel know and we will accommodate it. The only exception is if there is a question pending. In that instance, I'll ask you to answer the question before we take a break.

Do you understand that?

A. Yes.

Q. Do you have any questions about the procedures we will follow today?

A. No.

Q. Is there any reason that you cannot testify truthfully and accurately today?

A. No.

Q. Because we're doing this

Page 13

deposition from remote locations and by video, I need to ask you a few questions about your environment there. Is there anyone else in the room with you?

A. No.

Q. Do you understand that when we are on the record, you're not allowed to communicate with anyone during the deposition; that includes no messages, texting, emailing or chatting in Zoom?

A. Yes.

Q. Finally, do you have any written, printed or electronic information with you at the deposition right now?

A. No.

Q. Please describe your formal education after high school.

A. I attended college at Ryder University. Graduated with a degree in accounting. Worked for a public accounting firm for a couple of years, and I came to the County of Bucks in 1990. I've been here as the deputy controller for 32 years.

Q. What educational degrees do you

4 (Pages 10 - 13)

Page 14

hold?

A. I hold a BS in accounting and I have a CPA license.

Q. And the BS in accounting, that's from Ryder University?

A. Correct.

Q. What year did you graduate from Ryder?

A. 1983.

Q. I know you already gave me part of your employment history, but can you just start with from when you graduated and describe your employment history from then?

A. Sure. I graduated from Ryder, I got a job with the Bucks County Controller's Office as an auditor for two years. I then left there and went into public accounting for a couple of years. I was with the firm called Laventhol & Horwath, and then I came back to the county in 1990.

Q. And in your first two years at Bucks County as the controller, what were your job duties and responsibilities?

A. I was an internal auditor. In

Page 15

my -- right out of college I was an internal auditor.

Q. And then the accounting firm that you were with, what was your title there?

A. Auditor.

Q. What were your job duties and responsibilities in that role?

A. To audit clients. Prepare financial statements as a member of a team.

Q. And how many years were you at that firm?

A. I'm going to say three.

Q. Who are you currently employed by?

A. The Bucks County Controller's Office.

Q. What is the relationship between the Bucks County Controller's Office and the Bucks County Employees' Retirement System?

A. So as part of the Bucks County Employees' Retirement System, it's set up by a state statute, Act 96, and as a member of the board -- it's a five-person board, the three commissioners, the controller, who is my boss,

Page 16

and the treasurer. So the controller is automatically the secretary of the retirement board. So all of the agendas, minutes, documentation falls upon the controller's office for the retirement system.

Q. I want to break that down a little bit. So the Bucks County Employees' Retirement System, did you say that is managed by a five person board?

A. Correct.

Q. And that board is comprised of did you say three commissioners?

A. The three elected commissioners, elected treasurer and elected controller, yes.

Q. And are you also a member of that board?

A. In the absence of the controller, I can vote on that board. And that is set up by state statute, Pennsylvania state statute.

Q. Who are the other two members of the board?

A. So it's the three commissioners, the treasurer who is elected and the controller. So it's a five member board.

Page 17

Q. Understood. Understood.

Is the Bucks County Employees' Retirement System part of the Bucks County government?

A. So it's within the Bucks County government's financial statement. It's established in order to provide the pension plan for the Bucks County employees who work over a thousand hours a year. Our pension plan is set up by state statute, Act 96 of 1971, for all Pennsylvania county governments. So there's not a choice to be in the system. By being a county government, we would have a county employees retirement system.

Q. Throughout this deposition I'll refer to the Bucks County Retirement System as Bucks County or the county. Is that okay?

A. Perfect.

Q. And you said before that you've worked at the county for the last 30 years. Is that correct?

A. Correct. Actually over 30 years, yes.

Q. And can you tell me one more

5 (Pages 14 - 17)

Page 18

time what your official title is?

A.    Sure.  I'm the deputy controller.

Q.    What are your job duties and responsibilities in that role?

A.    For the deputy controller I'm responsible for the controller's office daily functions.  The controller is responsible for payroll, accounting, accounts payable, audit and retirement.

Q.    And when you say for the controller's office daily functions, what do some of those daily functions include?

A.    So on a biweekly basis we prepare the county payroll for 2500 county employees.  On a monthly basis we provide the annuity checks for the retirement system.  We do internal audits of county departments which would include the 54 tax collectors and the parole offices and MDJs.

Accounting, we prepare the county's finance report and we're audited by an outside accounting firm.  And for accounts payable, we have a weekly disbursement run to pay all of our vendors in the county.

Page 19

Q.    You said before that you report to the controller.  Is that correct?

A.    Correct.

Q.    And what is his or her name?

A.    Her name is Pamela Van Blunk.

Q.    Does anybody report to you?

A.    The staff of the controller's office reports to me.

Q.    Who are the members of the staff?

A.    So we have 25 members.  Did you want me to list them or --

Q.    Perhaps you could tell me what their roles are.

A.    Sure.  So in the accounts payable section we have the accounts payable specialists who take a look at the invoices that come in on a daily basis.  In the payroll section we have the payroll specialists who take the county's time and process it through our ERP system.  In the internal audit section we have internal auditors who go out and actually audit or review information within departments or tax collectors or MDJ's

Page 20

offices.  In the accounting section we have accountants that pull together all of the various funds in departments within the county to help prepare the financial statements that get audited.  I think I covered it.

Q.    We talked about this a bit a minute ago, but the Bucks County Retirement System has a board of directors.  Is that right?

A.    Yes.

Q.    Is it called a board of directors or is it called a board of commissioners or does it go by another name?

A.    It's called the Bucks County Employees' Retirement System board.  They don't call themselves directors.  Just board, board members.

Q.    You explained that you do not ordinarily serve on the board but that you can vote in lieu of the controller.  Is that correct?

A.    That's correct.  However, I provide the information for the board on a daily or monthly basis when they have

Page 21

questions.  So kind of handles the day-to-day operations of the fund.

Q.    And what type of questions would you be responding to from the board?

A.    A number of retirements in the month.  Cost of the retirements.  Value of the assets.  Purchases and buybacks from employees if they want to buy back time or if they want to purchase prior service time.  Anything that is set up in Act 96 is what the Bucks County Employees' Retirement System is responsible for.  We handle the daily transactions of running the retirement system.

MS. MOONEY:  I'd like to mark now what we have as tab 1.  If you could mark that as Exhibit 1, Ben.  It will just take a minute for it to load to the Exhibit Share and become available for all of the participants.

- - -

(Bucks 0001, Notice of Deposition, marked for identification.)

- - -

MS. MOONEY:  Exhibit 1 should

6 (Pages 18 - 21)

Page 22

now be published on Exhibit Share. Jessica, can you let us know if you see that and are able to pull it up.

MS. REID: I do see it and I'm able to bring it up now.

MR. BRITTON: I have it, so it came through.

MS. REID: I have it.

MR. BRITTON: Kim, is it up on your end?

THE WITNESS: Exhibit 1, yes. Can I open it?

MS. MOONEY: We're also going to share them on the screen which may be an easier way to view it because the -- Jessica will be able to go to the portion that we're discussing.

THE WITNESS: Okay.

BY MS. MOONEY:

Q. Just looking at the title here, do you recognize this document?

A. Yes.

Q. What is it?

A. So it was one of the documents

Page 23

presented to the Bucks County Employees' Retirement System. And it was the notice that we had to provide information to the defendants.

MS. MOONEY: If we could go to pages 10 -- to page 10 of the document, and if we could just scroll through to 13 to show the witness the questions there.

BY MS. MOONEY:

Q. Do you see here it says "Topics For Examination"?

A. Yes.

MR. BRITTON: So, Kim, if you need time to review the document to become familiar with it, take the time that you need.

THE WITNESS: I remember the document.

BY MS. MOONEY:

Q. Prior to today's deposition, did you review the topics of examination that are listed here?

A. Yes, I did.

Page 24

Q. Are you appearing today as Bucks County's representative as to all of the topics of examination on pages 10 to 13 of the deposition notice?

A. Yes, I am.

Q. Is there anything on this list that you're not prepared to testify about?

A. I have researched and looked at all the topics for examination, so I'm prepared.

Q. Are you prepared to testify in your -- what I'll refer to as your 30(b)(6) capacity or your capacity as a corporate representative as to all of the topics in the deposition notice?

MR. BRITTON: Objection. Vague. You can answer, Kim.

THE WITNESS: Yes, I'm prepared to testify.

BY MS. MOONEY:

Q. Do you understand that as the designated representative for this deposition my questions are asking about the county's knowledge, not only your personal knowledge?

Page 25

A. Yes.

Q. When I'm asking questions about your personal knowledge, I will use you to refer to you. Okay?

A. Okay.

Q. Did you prepare to testify on topics in the deposition notice?

A. Yes, I did.

Q. How did you prepare?

A. I spoke with various people within the Bucks County Employees' Retirement System. I worked with our law department as well as Robbins Geller to familiarize myself with the case and the topics for examination. I, as part of the request for information, talked to our IT -- well, our deputy IT director as well as our IT director for the information regarding our retention policies for IT. I reviewed different documents and read a lot of information about items that were asked in the case.

Q. You mentioned that you talked with various people at the Bucks County Employees' Retirement System. Who did you

Veritext Legal Solutions

212-279-9424                    www.veritext.com                    212-490-3430

Page 26

talk with?

A. So --

MR. BRITTON: Let me jump in real quick, Margot, give one caution to the witness. When you're talking about the solicitor's office, Ms. Doran, you can talk about the existence of a communication, but please don't talk about what the solicitor talked to you about.

THE WITNESS: Understood.

MR. BRITTON: Apologize for interrupting.

THE WITNESS: What was the question again? I'm sorry.

BY MS. MOONEY:

Q. No problem. You talked to various people at the Bucks County Employees' Retirement System. With whom did you talk?

A. So I talked with Mike Gallagher, who is the deputy CIO, and I also talked with John Regula, who is the chief information officer here at the County of Bucks, surrounding policies for our email and H drive

Page 27

retention. And access.

Q. Did you speak with them about anything else?

A. No. That was all I talked to them about.

Q. Did you speak with anybody else from the Bucks County Employees' Retirement System?

A. I did talk to Commissioner Marseglia. She would be the one person that would have been involved back in the class period. That has been consistent. We switched over -- being they're elected officials, we've switched over treasurers, controller and part of the commissioners.

Q. When you say involved back in the class period, you mean that she was a member of the board at that time?

A. Correct.

Q. And there is no other members of the board from that time who are still current members of the board?

A. From 2019, correct.

Q. Your counsel mentioned the

Page 28

solicitor's office. What is the solicitor's office?

A. The solicitor's office is our law department. The board relies on our solicitor's office or law department for anything to do with legal topics within the retirement fund.

Q. Who did you speak with from the law department?

A. Amy Fitzpatrick.

Q. When did you speak with her?

A. All throughout the process with the county becoming involved in the case.

Q. When did the county become involved in the case?

A. The first time that I became involved in the case was in September of '21. The retirement board was asked to put an item on the agenda, and our office prepares the agenda, for the retirement board meeting in September, and it had to do with AdaptHealth.

Q. Did you speak with Amy Fitzpatrick specifically in preparation for your deposition today?

Page 29

A. I spoke with Amy about -- yes.

Q. When did you speak with her specifically about this deposition?

A. Throughout the -- throughout the time period I kept her informed of the deposition and different documents that had been sent to our law department. She would share them with me, we would go over any questions or concerns I had, as well as with Robbins Geller.

Q. In the process of preparing for your deposition, how many times would you say you spoke with Ms. Fitzpatrick?

A. I'm going to say probably ten times.

Q. Were these in-person meetings or phone calls or some other form of communication?

A. Either in person or phone calls.

Q. About how long were each of the meetings?

A. Not long. She works right down the hall from me. So sometimes they may have been just in the hallway, a two-minute

8 (Pages 26 - 29)

Page 30

conversation.

Q.    Did you have any conversations that were longer than two minutes?

A.    Yes.

Q.    When -- when did you have those conversations?

A.    From the period when we first put this item on our agenda for the retirement board meeting in September of '21, all the way up until today.

Q.    So were the ten times that you referred to in times that you spoke with Ms. Fitzpatrick in preparation for this deposition or just times that you have spoken with her about the AdaptHealth matter in any capacity?

MR. BRITTON:  Objection.  Vague.

MS. MOONEY:  I can rephrase if it would be helpful.

BY MS. MOONEY:

Q.    I understood you to be saying you had spoken with her ten times in preparation for this deposition.  But then it wasn't clear to me if you actually were saying

Page 31

you had spoken with her ten times since this was first added to the Bucks County Employees' Retirement System agenda?  Which is the case?

MR. BRITTON:  Same objection.  You can answer.

THE WITNESS:  Okay.  So I spoke to her on both topics.  Sometimes about something as simple as putting the item on the agenda and presenting it at the retirement board meeting, and other times about the case.

BY MS. MOONEY:

Q.    So I'm just trying to get a sense of your preparation for this deposition today.  And if you could tell me how many times you spoke with Ms. Fitzpatrick specifically about this deposition, that would be helpful.

MR. BRITTON:  Again, I'll caution the witness not to disclose anything that was actually said during those conversations, but you can testify about the number of times.

THE WITNESS:  Sure.  So I've

Page 32

talked to Robbins Geller and Ms. Fitzpatrick in order to prepare for this examination, for this deposition.  Just questions about the case and gathering information about the case, and just general questions about depositions.

BY MS. MOONEY:

Q.    And so just focusing first for now on your communications with Ms. Fitzpatrick, can you estimate how many times you spoke with her about your preparation or in preparation for this deposition?

MR. BRITTON:  Objection.  Vague.

THE WITNESS:  Do I answer?

MR. BRITTON:  Yes, you can answer.

THE WITNESS:  Sure.  I would say probably the majority of the ten times was in preparation for this examination.  I have read a number of documents related to this examination which were anything from the Complaint

Page 33

to the motions, and I just wanted to be sure that I understood exactly what some of the wording meant within the documents.

BY MS. MOONEY:

Q.    When was the first time that you spoke with Ms. Fitzpatrick about your preparation for this deposition specifically?

A.    I'm going to say -- I don't recall the first time I spoke with her about it.

Q.    Would it have been after the county received the deposition notice that we just looked at in Exhibit 1?

A.    It definitely would have been around that time period.  But I don't know if it was after we received it or not.

Q.    Did you speak with anybody else from the law department in preparation for your deposition?

A.    No.

Q.    Now, let's switch to the conversations you mentioned with Robbins Geller.  Who did you speak with from Robbins

9 (Pages 30 - 33)

Page 34

Geller?

A. I spoke with Doug.

Q. Did you speak with anybody else?

A. He was my main contact. And also Kevin.

Q. So Doug and Kevin were the only two people from Robbins Geller you spoke about the deposition?

A. I may have -- yes, I think they were the main two, yes, that actually we had conversations.

Q. How many times did you speak with attorneys from Robbins Geller?

A. A number of times. I don't know an exact number.

Q. Can you give a ballpark? I'm asking specifically about in preparation for your deposition today.

A. I'm going to say a half a dozen times.

Q. So let's talk about each of those times. When did you first meet with them to prepare for your deposition?

A. Well, we first met over the --

Page 35

MR. BRITTON: Objection. Vague. Go ahead and answer, Kim.

THE WITNESS: We had first talked over the phone when there was the request for information documents from the county. So we talked about how we would go about searching for the documents within our IT system, how we would go about searching for the documents within our offices as far as what search terms that we would use in order to find the requested information. That was our first major meeting that I remember.

BY MS. MOONEY:

Q. And when did you first speak with them about testifying today at this deposition?

A. I'm going to say it was probably around the same time period. Since I was the person that was most involved during the whole time period and with a lot of the daily transactions of the fund, the decision was that I would be the best person to testify on

Page 36

behalf of the Bucks County Employees' Retirement System. I've been here probably the longest of any of the officials that are involved with the Bucks County Employees' Retirement System, and I have an understanding of the retirement benefits and the way the retirement system works for the county.

Q. When did you determine that you would be the best person to testify on behalf of the county?

A. I'm going to say it was sometime last year, but I don't know the date.

Q. So would you say you've been preparing to testify today since that time?

MR. BRITTON: Objection. Vague.

THE WITNESS: Okay. So I've been learning different information about the topics, but probably not since that time.

BY MS. MOONEY:

Q. When was the -- you mentioned having discussions about search terms and the requests for information that you received. When was the first major meeting about that

Page 37

topic?

MR. BRITTON: Objection. Vague as to major meeting.

BY MS. MOONEY:

Q. You can answer the question.

MR. BRITTON: You can answer. Hold on one second. Ms. Doran, just so you know, I'm going to be objecting throughout the day. You can answer the question even though I've objected unless I say don't answer the question.

THE WITNESS: Understood. So I believe it was in the fall that we first sat down in a conference call with Robbins Geller, Mike Gallagher, myself, the law department, to talk about looking for the documents that were requested and the search terms.

BY MS. MOONEY:

Q. And that was in the fall of 2022. Is that right?

A. I believe so, yes.

Q. In preparation for your deposition

10 (Pages 34 - 37)

Page 38

today, did you review any documents?

A.    Yes.

Q.    Did your counsel provide any of the documents that you reviewed?

A.    Yes.

Q.    Did your counsel provide all of the documents that you reviewed?

A.    No.

Q.    Can you describe the documents your counsel provided?

MR. BRITTON:  I'll caution the witness that you can identify the documents we provided but don't talk about our communications.

You can answer.

THE WITNESS:  So they provided documents to me such as articles to inform me about the fraud case in Denmark.  They provided me with the Jehosaphat report that was the research analyst report.

They provided me with different -- through our law department, all of the documents that

Page 39

have been involved with the motion to dismiss, the denied motion to dismiss.  All of the documents came from our law department, but from them originally to our law department.

BY MS. MOONEY:

Q.    And when you say the fraud case in Denmark, what are you referring to?

A.    So I've done the research and read some of the documents about there was a fraud case in Denmark against Luke, where Luke McGee was named as one of the people that perpetrated a fraud against Denmark and got some refunds based on dividends for securities that weren't really his.  And I read the newspaper article and the report on that.

Q.    Were any of the documents that your counsel provided email communications?

MR. BRITTON:  Objection.  Vague as to email communications.

THE WITNESS:  So yes, some were, I believe, over email.

BY MS. MOONEY:

Q.    Who were the emails between?

Page 40

A.    Well, they would provide our law department with the different Complaints, motions to dismiss, and then our law department would email them to me.  So it was the different documents within the whole case from the first point of the first Complaint to the point we're at now with discovery.

Q.    Understood.  So you're saying they provided you documents by email.  I actually was asking you a little bit of a different question about whether any of the documents that you reviewed were previously sent or received emails?

MR. BRITTON:  Objection.  Vague.  You can answer.

THE WITNESS:  The majority of the information that I received was, just as I said, the Complaints.  I'm trying to think of anything that was email to me from them.  Most of what I received was pretty much through Amy in our law department.

BY MS. MOONEY:

Q.    Just to be clear, did they give

Page 41

you anything to review that was an email communication?  Not whether they attached a document and sent it to you by email, but whether one of those things that they asked you to look at was itself an email communication?

MR. BRITTON:  Objection.  Vague as to email communication.

THE WITNESS:  I don't believe that they were like review this email, read this email.  Most of what I received and read is documents, actual documents that were documents.  There may have been one chart or whatever that I looked at that was a graph.  That would be it.

BY MS. MOONEY:

Q.    Do you recall what it was a graph of?

A.    I believe it was a graph of like a timeline.

Q.    A timeline of what?

A.    A timeline of when we had originally purchased the AdaptHealth stock and

11 (Pages 38 - 41)

Page 42

when we sold the AdaptHealth stock. I was also asked to verify the same information as part of one of the items that Commissioner Marseglia signed off on also.

Q. Who is the author of the timeline that you reviewed?

MR. BRITTON: Objection. Foundation.

THE WITNESS: I don't know.

BY MS. MOONEY:

Q. You mentioned that you were also asked to verify the same information as part of one of the items that Commissioner Marseglia signed off on?

A. Yes.

Q. What item are you referring to there?

A. So it was an exhibit attached to one of the Complaints that showed the Bucks County Employees' Retirement System transactions within the AdaptHealth stock. It had the purchases and the date of the purchase and the cost of the purchase. And it had the sales, the date of the sales, the amount of

Page 43

shares sold and the cost of the sales. And I was asked to go and verify that information before she signed.

Q. Have all of the documents that you reviewed been produced or otherwise provided to the defendants?

MR. BRITTON: Objection. Foundation.

THE WITNESS: Yes.

BY MS. MOONEY:

Q. For the documents that your counsel did not provide, that you reviewed in preparation for your deposition today, what type of documents were they?

A. I went back and reviewed the county's retention policy. So it would be the Bucks County IT systems and their retention policies as well as the county follows the Pennsylvania Historic Museum Commission's guidelines for retention for county governments which includes the retirement fund.

I took a look at our investment guidelines with PFM, our investment management

Page 44

agreement with PFM, our agreement with Emerald.

Q. Did you select all of these documents that you reviewed?

A. So any of the documents that I reviewed were policies or guidelines or directives that were established by the board with the help of our advisor, of course, but then submitted, yes.

Q. Were all of those documents produced to the defendants?

A. Yes.

MR. BRITTON: Objection. Foundation.

THE WITNESS: Yes.

BY MS. MOONEY:

Q. Did you do anything else to prepare for your deposition that we have not discussed?

A. I familiarized myself with the case. I read the documents that were part of the securities, topics for examination. I read through to make sure that I understood or tried to understand, to the best of my

Page 45

knowledge, what information was being asked for. I talked to our law department. I talked to Robbins Geller about any questions that I had. So I feel that I prepared.

Q. And that was -- there was nothing else that we're missing?

A. Not that I can think of.

Q. Are you being compensated for testifying today?

A. No.

Q. Are there any employees, other than the five board members who we discussed before, who oversee the retirement fund?

A. So within the controller's office here we have an employee who works on the retirement of the people. I wouldn't say she oversees the retirement fund, but she helps calculate the employees' retirements. So there is a formula and a calculation involved with everyone that retires from our fund who are employees that decide to get a refund or a rollover of their money that they put into the fund. She is involved with the retirement fund but not in that capacity other

12 (Pages 42 - 45)

Page 46

than working with the employees.

Q.    Are there any other employees who oversee the retirement fund?

MR. BRITTON:  Objection. Misstates testimony.

THE WITNESS:  No other employees that oversee the retirement fund. Again, we're all -- Amy, Amy Fitzpatrick from the law department is the solicitor for the retirement fund but not -- does not oversee.  The board was set up as a fiduciary by Act 96, the Pennsylvania statute.  So the board is actually responsible for being the fiduciary of the fund.

BY MS. MOONEY:

Q.    I just want to go back for a minute to the documents that you mentioned you reviewed in preparation for your deposition. You mentioned looking at a PFM investment agreement, and I don't believe that defendants have received that.  So I would just like to make a request for that to be produced.

A.    You may have it called

Page 47

Spagnola-Cosack.  That was the original PFM back in I believe it was 1999.  The board decided that they should have an expert because our fund was growing and they should hire an expert advisor for the fund.  They didn't know anything about stock selection or diversification of investments.  So they hired a group called Spagnola-Cosack, which was Mike Cosack and John Spagnola.  John Spagnola then became a member of PFM, and Spagnola-Cosack folded into the PFM Investment Advisors.

John Spagnola is still our investment advisor.  And it's just the amount of money we pay him has changed to be our advisor over the years since 1999.

MR. BRITTON:  Margot, I'll represent to you that you guys have that document.  We got it from correspondence that you guys cited to.

BY MS. MOONEY:

Q.    We'll come back and talk about the relationship with Spagnola-Cosack and/or PFM in a little bit, but just going back to -- just going back to the discussion about who

Page 48

oversees the retirement fund, would it actually be correct, then, to say that Spagnola-Cosack is another party that oversees the retirement fund?

A.    Third party.  Not an employee but, yes, they our vendor or our advisor who we pay to be our experts to help us review all of the information in the retirement fund. They're our experts.

Q.    Is the fund a separate entity from the county?

A.    Yes.  It has a separate tax ID number.

Q.    What is the relationship between the fund and the county?

MR. BRITTON:  Objection.  Asked and answered.

THE WITNESS:  So the fund is established in order to be the pension fund for the Bucks County employees. Since the county has employees who are full-time employees that work over a thousand hours, they're required by Act 96 to have a deduction from their gross

Page 49

pay in order to put into the fund.

The fund also is used for any -- available for any employees that are part time but work over a thousand hours a year.  So they're also members of the Bucks County Employees' Retirement Fund.  Their biweekly paycheck has a deduction for the retirement fund, and it goes into a separate entity, if you want to call it that, called the Bucks County Employees' Retirement System.

BY MS. MOONEY:

Q.    Does the county exert control over the retirement fund?

MR. BRITTON:  Objection.  Vague and ambiguous.  You can answer.

THE WITNESS:  The county does not.  It's the five member board.

BY MS. MOONEY:

Q.    Do the members of the five member board work for the county or do they only work for the fund?

A.    They're elected officials of the

13 (Pages 46 - 49)

Page 50

county who are responsible for the fund as set up in the state statute. It's three commissioners, the controller and the treasurer. They're all elected officials.

Q. Going forward, when I say Bucks County or the county, that will include the fund. Is that all right?

A. Yeah.

Q. And when I refer to employees of the county, that will refer to anybody who oversees the fund. Okay?

A. Okay.

MR. BRITTON: I'm going to object to that approach, Margot, just simply because they are independent entities. And to the extent, you know, one doesn't affect the other, it's going to create a convoluted record. But it's your approach. That's my objection.

BY MS. MOONEY:

Q. Ms. Doran, if I ever use the word county and it would be more appropriate to use the word fund, you can feel free to let

Page 51

me know if I've misstated or introduced anything that would cause confusion in that regard.

A. Okay.

Q. Does the retirement fund employ an administrator responsible for overseeing it?

A. The retirement fund employs an advisor. It employs is what is confusing me here. So we pay an advisor, PFM, an outside advisor. If you are to talk about an administrator of the fund being an employee, the employee that we have does not oversee the fund, only deals with the actual retirements of the county employees. That would be the employee in the controller's office. She's not an administrator, but she is paid in order to calculate the retirements. The fund itself, the Bucks County employees retirement fund, does not pay either for the advisor out of the fund or for the employee out of the fund.

Q. Who are the current members of the board?

Page 52

A. So the three commissioners currently are Commissioner Robert Harvey, Commissioner Diane Marseglia, and Commissioner Gene DiGirolamo. The controller is Pamela Van Blunk and the treasurer is Kris Ballerini.

Q. You mentioned before that Commissioner Marseglia is the only member of the board who is also a member of the board in 2019. Are there any other members of the current board who were members of the board at any time during the proposed class period?

A. So the three commissioners and the treasurer took office in January of 2020. That's when their election period. So January 2020 forward. And then the controller was just elected in January or took office in January of 2022. So she's been with us for a year.

Q. And so is it the case that Commissioner Marseglia was also on the board prior to January 2020?

A. Yes.

Q. Who were the board members -- who were the commissioner -- commissioners and

Page 53

treasurer prior to January 2020?

A. So prior to January 2020, the commissioners were Robert Loughery, Charles Martin and Commissioner Marseglia; Diane Marseglia. And the treasurer was Thomas Panzer.

Q. And who was the controller prior to Controller Van Blunk?

A. Neale Dougherty. Neale Dougherty was the controller.

Q. And was Neale the controller throughout the entire proposed class period?

A. So he was the controller, yes, during -- from -- let's see. He was elected in '18, 2018.

Q. What does the board do to manage the retirement funds?

A. So the board meets on a monthly basis and has a public retirement board meeting. It's open to the public and we have an agenda. They approve all of the retirements that occur in total. They approve all of the buybacks that are requested during the year or during the month, I should say,

14 (Pages 50 - 53)

Page 54

that are not part of like a prior service buyback. So all of the other buybacks require a board vote. They hired PFM, Spagnola-Cosack, to be our investment advisor in order to have an expert that knows the ins and outs of all the investments for our fund. They meet on a quarterly basis with PFM to discuss the fund, where it stands, the balance of the different kinds of portfolios that we have within the fund.

We have approval at a retirement board meeting of any new investment managers or any new investment categories that we're interested in investing within.

They also approve the custodian of our investment fund, which would be Wells Fargo at this point. They approve the actuary for the fund. That would the majority of their duties.

Q. I think you mentioned previously that the board owes a fiduciary duty. Is that correct?

A. Yes.

Q. To whom do they owe that

Page 55

fiduciary duty?

A. To the employees whose money is in that fund. They're the fiduciaries for all of the Bucks County employees, and their duty is to try to safeguard through diversification and having experts work on the fund to try to get the best returns and the safest returns for the fund. And they are also -- their investments are also part of the fund. They're required to withhold the nine percent out of their pay, too.

Q. Does the board comply with that duty in administering the fund?

A. Yes.

MR. BRITTON: Objection. Calls for a legal conclusion. Vague and ambiguous. You can answer, Kim.

THE WITNESS: Yes, I believe they do. They take it very seriously, their fiduciary duty. In our meetings with PFM, they'll ask questions about anything that they don't understand or that they feel are relevant topics for the fund. We definitely make sure

Page 56

we're well diversified so that if one class of our investments is up, like fixed assets -- fixed income investments are up, then another one would be complementary to it.

So, yes, they do. We're well diversified and they take their fiduciary duty very seriously.

BY MS. MOONEY:

Q. You mentioned that the board meets monthly. Is that correct?

A. Yes.

Q. Are minutes recorded at every meeting?

A. Yes.

Q. Who is responsible for recording the minutes?

A. So it's recorded by the controller's office. The controller is the secretary for the retirement fund by statute. And we provide draft minutes prior to the following month's meeting to each of the board members for them to review. As part of the agenda for each retirement board meeting, the

Page 57

prior month's minutes are approved.

Q. So there are written minutes for all of those?

A. Yes.

Q. How are those minutes stored once they are approved?

A. They're stored in paper format. There's a big book of minutes.

Q. And who holds on to the big book of minutes?

A. The controller's office.

Q. Is there a specific person within the controller's office who has that book?

A. So the person that takes up the minutes is -- her name is Donna, within our office. I review the minutes as well as the board members. And after they're approved, we maintain the paper files of the minutes. So the book is available in the controller's office.

Q. Have all of the Bucks County board meeting minutes during the relevant time been produced in this litigation?

15 (Pages 54 - 57)

Veritext Legal Solutions
212-279-9424     www.veritext.com     212-490-3430

Page 58

MR. BRITTON: Objection. Foundation.

THE WITNESS: They're available, but I believe the ones that discussed AdaptHealth were the ones that were pulled out, delivered.

BY MS. MOONEY:

Q. And who made the determination as to which minutes to pull out and deliver as you say?

MR. BRITTON: Objection. Calls for attorney-client privilege.

Kim, you can answer that question to the extent it does not involve conversations with counsel.

THE WITNESS: So I went back and I reviewed the minutes for the period of time and did a search on AdaptHealth within them, looking for them. We knew from our agenda that AdaptHealth was discussed as an item on our agenda in September of 2019, provided the minutes for that. And then the minutes for October, which was the following month,

Page 59

were also provided because they included, I believe, a short discussion on lead plaintiff for AdaptHealth.

BY MS. MOONEY:

Q. You said that minutes were produced regarding AdaptHealth, and it sounds like you looked for minutes that included the word AdaptHealth. Why not review minutes for responsiveness to the other document requests?

MR. BRITTON: Objection. Foundation. Same instruction. Kim, if you can answer that without revealing conversations with counsel, you can.

THE WITNESS: I'm not sure what your question was.

BY MS. MOONEY:

Q. Did you look for anything else in the minutes that might be responsive to any of the defendant's document requests other than the word AdaptHealth?

A. I'm not sure what topics I would look for in the minutes other than AdaptHealth to be responsive. That wouldn't be the place that I would go to look for the agreement with

Page 60

Emerald or -- is that the question?

Q. I think we had discussed earlier that you had reviewed defendants' requests for productions. And it's a list of several different topics. Did you look for or consider whether there were any discussions during board minutes that were responsive to any of those other requests?

MR. BRITTON: Objection. Same instruction. Calls for attorney-client privilege. You can answer without revealing communications with counsel.

THE WITNESS: So I did -- I mean, I had to go through all of those minutes from 2019 forward to look for the AdaptHealth. As I was reading those minutes looking for AdaptHealth, I didn't see anything else that I thought applied to this case. If that's the question. Our typical minutes are pretty short and they mostly center around the people that have retired, the amount of refunds we're making, the amount of

Page 61

contributions received. But I didn't see anything else that I thought belonged as something that would be used in this case.

MS. MOONEY: Let's go off the record.

MR. BRITTON: You want to take a break?

VIDEOGRAPHER: The time is now 10:56. This concludes media unit 1.

- - -

(A recess was taken.)

- - -

VIDEOGRAPHER: The time is now 11:09. This begins media unit 2.

BY MS. MOONEY:

Q. We've referred to AdaptHealth a few times so far. Just to be clear, when we refer to AdaptHealth, we're talking about AdaptHealth Corporation. Is that okay?

A. Yes.

Q. What is Bucks County's relationship with AdaptHealth?

A. We don't have any relation that

16 (Pages 58 - 61)

Page 62

I'm aware of other than one of our money managers purchased stocks that were AdaptHealth's. Other than that, other than this class action suit, we don't have any other relationship with them.

Q. Who brought the class action suit against AdaptHealth?

A. So the county and -- Delaware County and Bucks County are now co-lead plaintiffs in the AdaptHealth suit.

Q. Was there a plaintiff in the suit prior to AdaptHealth -- prior to Bucks County and Delaware County being co-lead plaintiffs?

A. Yes.

Q. Do you know who that was?

A. It was a guy named Robert Charles Faille, Faille.

Q. Has Bucks County ever purchased shares in AdaptHealth?

A. Bucks County itself has not, but one of our money managers has.

Q. Which money manager?

A. Emerald.

Page 63

Q. And when you say Emerald purchased shares in AdaptHealth, were those purchases made for the Bucks County Employees' Retirement System --

A. Yes.

Q. -- or fund?

A. Yes.

Q. Did Emerald make more than one purchase of AdaptHealth shares on behalf of Bucks County?

A. Yes. I was asked to verify the purchases and the sales that were part of Emerald, Emerald small cap, during the time period of -- the time period and -- yes.

Q. And did Emerald -- whose money did Emerald use to make those purchases?

A. So Emerald is one of our money managers and the county has given them funds in order that they're a small cap growth money manager, and so they make purchases on behalf of our investments.

Q. So Bucks County's money was used to purchase the AdaptHealth shares that we're talking about?

Page 64

A. Yes. And we are talking Bucks County Employees' Retirement System.

Q. Correct.

How many purchases did Bucks County make?

A. So I verified them --

MR. BRITTON: Hold on one second. Kim, let me correct -- lay a foundation. The question was how many purchases did Bucks County make? I want to object that that misstates the witness' testimony. You can answer.

THE WITNESS: Yes. So I was asked to verify Emerald's purchases on behalf of the county. They invest for us within that small cap growth area. I believe, and I don't obviously have it in front of me, but I believe there was probably six different occasions when they made purchases.

BY MS. MOONEY:

Q. When you say you were asked to verify the purchases, what do you mean by that?

Page 65

A. So within one of the Complaints that Commissioner Marseglia had signed I believe it was, there was an exhibit attached that had Bucks County Employees' Retirement System and the purchases made by Emerald and the sales by Emerald with the dates, the number of shares and the value of the cost per share. That -- I went back and verified that exhibit to the actual records of our custodian to make sure that they were accurate.

Q. When did the county first learn that Emerald had acquired shares in AdaptHealth on behalf of the county?

A. So I became aware of the Emerald purchase and of AdaptHealth, because I really wasn't aware of who AdaptHealth was, in September of '21 when Robbins Geller first brought to us the idea of becoming a participant.

Q. Does Bucks County still hold shares in AdaptHealth?

A. I don't believe so, but I don't know for sure. I haven't looked at that information.

17 (Pages 62 - 65)

Page 66

Q.   What is your understanding as to the claims that Bucks County has brought against AdaptHealth and the individual defendants?

A.   So the idea was that AdaptHealth during that time period had artificially inflated the value of their stock based on some misrepresentations of their growth versus their mergers and acquisitions. And they also -- the stock price was also inflated because they were touting their great experience, I guess is the way to put it, by having this guy Luke McGee as their CEO and he had done a lot of supposedly great things in the past and was a rock or whatever of the organization. And he actually had in Denmark allegations of fraud brought against him by the Danish government.

So we are bringing -- the whole idea is that the county was harmed, the county as well as other investors were harmed by these -- by AdaptHealth. Because the stock prices dropped when they shouldn't or they were artificially inflated in the beginning

Page 67

and when they fell back down to their actual, I guess, values after certain occurrences, the investors lost money.

Q.   When you say artificially inflated, what do you mean by that?

A.   So AdaptHealth was promoting an idea of something called organic growth. And organic growth was a growth that was business growth, not just mergers and acquisitions growth, because they were also acquiring a whole lot of companies during that time period. I think that's one of the ways that they grew so large. So they were putting out that their organic growth was in great shape, and in actuality it wasn't. So a lot of investors -- sorry.

MR. BRITTON:  You can continue.

THE WITNESS:  So a lot of investors invested thinking that the growth was huge in this area and it truly was a change in their formula or the way that they calculated it that they were showing people on their reports, and it truly wasn't just

Page 68

organic growth. It was -- they were convoluting it down by including growth from like mergers and acquisitions, other companies that they brought in, and they weren't really disclosing that at all. And then the other big point was that they had this guy named Luke McGee that was their CEO. He was supposedly a great -- like the rock or the foundation of the company and he had been around for a long time and had it grow and grow and grow. It turns out that I guess over in Denmark he had been doing some things that he was being looked at by the Danish government for fraud over there. He was actually getting refunds on dividends, taxes paid on dividends that weren't actually even true. They weren't his dividends. He didn't pay the taxes on the dividends.

BY MS. MOONEY:

Q.   So you mentioned misrepresentations of AdaptHealth's growth versus you said their

Page 69

mergers and acquisitions. Can you explain that to me a little bit more as well?

A.   Sure. So during the time period, like in 2020, especially I believe it's the fourth quarter of 2020, they began to -- they presented it one way prior to the fourth quarter of 2020 that they had growth based on growth of the industry, the healthcare industry and what they were doing. They were also having mergers and acquisitions which was part of their growth. But they would show those items separate so the general investor had an idea of what their true growth was based on that. In the fourth quarter of 2020 it seemed like they changed the metric or the formula for calculating that, and they began to meld the two together instead of reporting them separately. But they didn't disclose that they did that. They called it some other type of growth. I'm not saying that it wasn't organic growth anymore, but they called it like a growth, a net growth or something like that. And it truly was like a pro forma net growth I think they called it.

18 (Pages 66 - 69)

Page 70

But they didn't say, hey, we're not calculating it the same way.

Q. So you used the phrase, too, that the -- let me see -- I believe it was true growth. What is true growth?

A. Well, their growth, their organic growth, what they called organic growth and what they were known for and what they put out to the investors was our organic growth is growing and that would be growth based on their ability to provide services or goods to the industry versus buying other companies and growing that way.

So mergers and acquisitions growth would be the other piece. There's the growth of the company, but you're also buying other people so that it makes it look like you're growing.

Q. And where does your understanding of these alleged misrepresentations about AdaptHealth's organic growth come from?

MR. BRITTON: Hold on. I'm going to interpose an objection. You can answer that question to the extent

Page 71

it doesn't include communications with counsel. Go ahead.

THE WITNESS: So looking at some of the information that AdaptHealth put out in their quarterly reports, they had charts of growth in like 2019 or whatever you would see their growth metric. And then in the fourth quarter of 2020, they called it pro forma growth and they showed that the comparison of like '19 to '20, or quarters in '20, but it didn't say, hey, we changed, you know, it isn't really organic growth.

BY MS. MOONEY:

Q. And you weren't aware of these documents that you're referring to at the time that they were published, were you?

A. No. We don't go down that far in the weeds.

Q. So when did you become aware of these issues that you're describing?

A. When I began to prepare for the deposition, trying to understand the case.

Page 72

Q. So the issue that we've just been talking about, the alleged misrepresentations regarding AdaptHealth's organic growth, I will refer to that as the organic growth issue. Is that all right?

A. Yes.

Q. And then you also mentioned a second set of facts. You said about -- I believe you said that the company was touting great things about its co-CEO and you said when, in fact, he was involved in an alleged tax fraud in Denmark. Is it all right if I refer to that as the McGee issue?

A. Yes.

Q. And is that the same case there, that you were not aware of the McGee issue until preparing for your deposition today?

A. Yes.

MR. BRITTON: Are you talking -- Margot, are you asking her in her capacity as the fund witness or her personally?

BY MS. MOONEY:

Q. Why don't I ask you both. Was

Page 73

the fund aware of the McGee issue prior to your preparation for your deposition?

A. No. Okay. I -- the fund, you're talking about our money manager? Because they may have been. But the fund, the five member board, no.

Q. Just to make sure, I know we have Emerald and I know we have PFM. When you refer to the money manager, is that PFM?

A. The money manager is Emerald and the advisor is PFM.

Q. From whom did the county learn about the organic growth issue?

A. So the organic growth issue was information that I received or that we received as part of the question on AdaptHealth and doing the research on that.

Q. So did you learn about it through your review of documents?

A. Yes.

Q. We mentioned before that Mr. Faille, F-A-I-L-L-E, had brought a Complaint prior to Bucks County and Delaware County becoming the lead plaintiffs in this matter.

19 (Pages 70 - 73)

Page 74

Has Bucks County asserted the same claims as Mr. Faille?

A.   That as a result of that, of representations made by AdaptHealth that we have had a loss, yes.

Q.   Are there any differences between the claims that Mr. Faille asserted and the ones now asserted by Bucks County and Delaware County?

A.   His claim was much smaller than our claim.  I know that his claim was just for him.  Ours is -- we're looking out for our whole -- we're the lead plaintiff in the suit.

Q.   So your understanding is that he represented himself individually whereas Bucks County and Delaware are representing a proposed class, but that the claims are the same?

A.   The claim was that as a result of inflated prices, they have suffered a loss at the decline, yes.

Q.   And did they -- did Mr. Faille allege that the stock price was inflated for the same reasons that Bucks County and

Page 75

Delaware County now do?

A.   I don't think it went into the detail.  I don't remember the detail of what he alleged, whether it was -- I don't believe it was detailed out about the organic growth and the misrepresentation.  But I believe that he -- I mean, I know that within the claim he suffered a loss because it was artificially inflated.

Q.   Do you know if the Complaint that was filed by Mr. Faille was ever amended?

A.   I don't know.

MR. BRITTON:  Objection.  Vague.

BY MS. MOONEY:

Q.   What is the alleged class period in this matter?

A.   So the class period was from November 8 of 2019 to July 16 of 2021.

Q.   Is Bucks County a member of the alleged class?

A.   Yes.

Q.   Why is that?

A.   Because during that time period we acquired AdaptHealth stock and we suffered

Page 76

a loss.

Q.   When you say you suffered a loss, what do you mean by that?

A.   So we purchased AdaptHealth stock at one price, and as a result of occurrences within the case we sold it at a lesser rate.

Q.   When you say occurrences in the case, are you saying the organic growth issue?

A.   Both the fraud issue where in April it was brought out that -- I think it was brought out by AdaptHealth that they were going to put McGee on an unpaid leave because Denmark was looking into this fraud where he was involved.  And then our prices fell.  And then also the organic growth issue is another area --

Q.   Just to restate, your understanding is that Bucks County suffered a loss because it purchased stock of AdaptHealth that was inflated based on the McGee issue and also inflated based on the organic growth issue.  Is that correct?

A.   So Emerald purchased --

Page 77

MR. BRITTON:  Hold on. Objection.  Misstates testimony.  You can answer, Kim.

THE WITNESS:  So Emerald, our investment manager, purchased stock on behalf of the Bucks County Employees' Retirement System that was artificially inflated.  And as a result of those purchases and the later sales, the county incurred a loss.

BY MS. MOONEY:

Q.   And it was the stock that Emerald purchased on behalf of Bucks County was artificially inflated on account of both the McGee issue and the organic growth issue?

A.   I believe so.

Q.   And that's your understanding as to why Bucks County is a member of the alleged class?

MR. BRITTON:  Objection. Misstates testimony.  You can answer.

THE WITNESS:  Sorry.

So we're a member of the class because we purchased during that time

20 (Pages 74 - 77)

Page 78

period. That brings us in to be a member of the class. We being Emerald, our investment advisor -- our investment manager.

BY MS. MOONEY:

Q. And we mentioned before that there are more than one lead plaintiff in this action and it is Bucks County and also Delaware County. Why are there multiple lead plaintiffs?

A. So Delaware County and Bucks County are almost neighboring counties here. We decided that it would be better for the class if the two joined together. Our law departments with each other. Our controller's offices deal with each other. Delaware County is very close to us. They're very similar to us. We see each other at different kinds of meetings, controller's conference meeting and our employees' retirement funds are set up the same way. We're both county governments in Pennsylvania that have the same requirements for the fund. We also use the same custodian, and we both also use Emerald as one of our

Page 79

money managers. So the similarities bring us together and to be co-lead plaintiffs just made sense because we could probably do a better job that way.

Q. In what way do you think you could do a better job as co-lead plaintiffs?

A. So we both have similar retirement funds and we both -- the purchases and sales of the stocks through Emerald kind of complement each other or they bring out the same facts. So it just kind of was a natural fit. We both have losses.

Q. Did you ask any other counties in Pennsylvania if they would like to join the action?

A. So I was not part of that conversation. That was with our law department. Our law department and the law department at Delaware County discussed it. So I'm not aware of the answer to that.

It also makes sense because both of us, as part of our securities litigation, have Robbins Geller as our law firm. So it just seemed to be the good fit.

Page 80

Q. So when you say that it was the law department that discussed whether or not to bring other counties into the action, you're testifying on behalf of the county. Correct?

MR. BRITTON: Objection. Objection. Misstates testimony. She testified that she didn't know whether they talked to other counties.

BY MS. MOONEY:

Q. So you don't know whether they talked to other counties. But would anybody know that information? Would anybody at the county know that information?

A. So it's the Bucks County Employees' Retirement System that we're talking about, not the county in this case. I believe the person involved in the conversation was Amy Fitzpatrick as well as her counterpart at the Delaware County law department or solicitor's office, whichever they call it.

Q. And you're testifying on behalf of the Bucks County Employees' Retirement

Page 81

System, but you don't know this information?

A. I don't know their conversation, correct.

Q. What is -- what is the current status of the litigation?

A. So right now we're in the class period where we've asked to be classified as a class or certified as a class, and we're in discovery right now. So we've answered the Interrogatories and we've provided information to you, and we're in that discovery area.

Q. So the class has not yet been certified?

A. Correct.

Q. You mentioned earlier that Robbins Geller had reached out to the county in September of 2021. Is that correct?

A. They reached out to us in September of 2021 to put an item or to the law department. And the law department then told me that we wanted to put an item on our agenda in September, yes.

Q. Do you know who from Robbins Geller initiated that communication?

21 (Pages 78 - 81)

Page 82

A. Yes. It was Laura Stein.

Q. And what was the form of that communication? Was it call, email, letter?

A. I believe it was an email to our law department.

Q. Does the law department have a department wide email address or would it have gone to a specific individual there?

A. I believe it would have -- it would go to Amy, Amy Fitzpatrick. She's our law department contact for the retirement fund.

Q. What was the item that Robbins Geller asked to have added to the agenda?

A. So --

MR. BRITTON: Objection. Misstates testimony. You can answer.

THE WITNESS: So I know that they discussed on moving forward the action was to approved or, approve Robbins Geller to look further into the matter with the AdaptHealth issue.

BY MS. MOONEY:

Q. And when you say the AdaptHealth

Page 83

issue, what are you referring to?

A. The inflated stock, the issues surrounding it, whether it be the nondisclosure of information and also the lawsuit or the alleged fraud against one of their members, the CEO.

Q. When you say nondisclosure information, do you mean the alleged misrepresentations about the organic growth?

A. Yes.

MR. BRITTON: Objection. Misstates testimony.

BY MS. MOONEY:

Q. Did the board add an item to its agenda based on Robbins Geller's suggestion?

A. Yes.

MR. BRITTON: Objection. Misstates testimony.

BY MS. MOONEY:

Q. When was the first board meeting where AdaptHealth was discussed?

A. The September retirement board meeting which is the third Wednesday of the month.

Page 84

MS. MOONEY: I'd like to have our tab 3, Ben, marked as Exhibit 2.

- - -

(Bucks 0002, BCERS0000901 to BCERS0000903, marked for identification.)

- - -

MS. MOONEY: Jessica, if we can pull that up, please.

MS. REID: Absolutely. If no one is seeing it, you need to refresh it. Just one moment as I bring that up.

BY MS. MOONEY:

Q. Ms. Doran, are these the minutes of the September 15 board meeting that you just mentioned?

A. Yes.

Q. Do you know the date on which Robbins Geller first contacted Ms. Fitzpatrick about the AdaptHealth matter?

A. I believe it was probably the week before this because in order to get it on to the agenda, we have to post our agenda two days before the meeting, and I had been contacted to add it to the agenda. So it was

Page 85

probably the week before this.

Q. In that week or so, were there any communications between Bucks County and Robbins Geller regarding the county's participation in this action?

MR. BRITTON: Objection. Calls for attorney-client privilege. You can answer that question but don't reveal any communications.

THE WITNESS: I believe that Amy Fitzpatrick had some questions and talked to Robbins Geller about the case.

BY MS. MOONEY:

Q. Do you know how many times she talked with Robbins Geller about the case in that one week time frame approximately?

A. No.

Q. Do you know who from Robbins Geller was involved in those discussions?

A. It would have been Laura Stein.

Q. And was anybody besides Amy Fitzpatrick involved in those discussions on behalf of Bucks County?

22 (Pages 82 - 85)

Page 86

A.    So Amy Fitzpatrick working for the board would have gone to Commissioner Marseglia to see if she wanted it on the agenda.

Q.    Do you know if Commissioner Marseglia spoke with Robbins Geller at any time before the September 15 meeting with regards to AdaptHealth?

A.    I don't believe so.

Q.    Did Robbins Geller provide the county with any documents to review about this matter?

A.    Yes.  They would have provided Amy and the law department with documents.

Q.    Do you know what documents they provided?

A.    So they would have provided a retainer agreement I guess you would call it or an agreement for them to be able to move forward to help the county with this case.

Q.    Are there any other documents that Robbins Geller provided to Ms. Fitzpatrick about the case?

A.    Not that I'm aware of.

Page 87

Q.    Did Bucks County undertake any efforts to conduct its own research on the case?

A.    Not in that short time period that I'm aware of.

Q.    Do you know whether a Complaint had already been filed in this matter at this -- at the time, before the September 15 meeting?

A.    Not by Bucks County but by Robert Charles Faille.  He had provided a Complaint or filed a Complaint.

Q.    Did the county review that Complaint?

A.    I'm not aware that we did at that time.

Q.    Did Bucks County communicate with Robert Faille?

A.    Prior to this meeting?

Q.    Prior to or after this meeting.

A.    Not prior to the meeting I'm sure.  And I am not aware that they did after the meeting.

Q.    Prior to the meeting, did Bucks

Page 88

County discuss the case internally?

A.    The only discussion was should the item be on the agenda, and the law department asked Commissioner Marseglia if it should be on the board agenda.  So they would have discussed it, the merits of putting it on the agenda.

Q.    And what would -- what would have factored into the decision as to whether to put it on the agenda or not?

A.    The decision would have been made based on what is the best thing to do as a fiduciary for the Bucks County Employees' Retirement System.  Did the retirement system suffer a loss as a result of this and is there a reason why the retirement system as a fiduciary should get involved in this.

Q.    And what would be a reason why the system as a fiduciary should get involved?

A.    Because if our employees or members of our retirement system suffered a loss, that would be a reason for the board to look at recovering or doing the best possible job in order to provide, provide a better

Page 89

outcome in a case for the county.  So what we would do is we would hire the experts.  That's why we have securities litigation attorneys, because they're the experts in this area. It's not like any one of the five board members are experts.  So we hire a firm as we do with an investment advisor.  We would hire the securities litigation firm for us in order to get the best outcome.  And really that's part of the fiduciary duty.

Q.    And when you say to get the best outcome, would that be to recover the county's loss?

A.    That would be to recover a loss for the county or get the most benefit out of it that they possibly could.  It might not be the entire amount of the losses recovered but to get the best outcome for the employees that are involved with the retirement fund.

Q.    Okay.  So let's look at now what has been marked as Exhibit 2.  If we could go to page 2 and to the third paragraph down.  It says, "Commissioner Marseglia stated the next item of business is to approve the Robbins

23 (Pages 86 - 89)

Page 90

Geller Rudman & Dowd, LLP engagement to represent the Retirement System in AdaptHealth Corp. Securities class action. Commissioner Marseglia asked Mr. Dougherty if he wanted to introduce this. Mr. Dougherty stated that he would ask the Solicitor provide information on this to better inform us of this possible action."

MS. MOONEY: Jessica, are you able to highlight that section for us?

BY MS. MOONEY:

Q. So is the -- Ms. Doran, is the solicitor referred to there, is that Ms. Fitzpatrick?

A. Yes.

Q. Who is Mr. Dougherty?

A. He was the controller at the time.

Q. And why did Commissioner Marseglia ask if Mr. Dougherty wanted to introduce this?

A. Because we were the ones that actually prepared the agenda, so we put it on the agenda.

Page 91

Q. Continuing on, and if we could highlight as well, "Ms. Fitzpatrick stated this agreement is to secure Robbins Geller Rudman & Dowd as outside counsel to represent the Retirement System as it relates to securities fraud class action that has been filed against a Pennsylvania based home healthcare supplies and service company, Adapt Health Corporation."

This was the first time that the AdaptHealth litigation was brought to the board's attention. Is that right?

A. Yes. That I'm aware of.

Q. Does Bucks County typically document the approval of its participation in litigation?

A. Yes.

Q. And when was that approval provided for this action?

A. The approval was at this board meeting.

Q. Did Ms. Fitzpatrick or Mr. Dougherty provide any other information about the litigation against AdaptHealth other

Page 92

than what is reflected in the minutes?

A. The minutes are verbatim. We retype exactly what they say.

Q. Did Ms. Fitzpatrick reference any talking points at the meeting?

A. So --

MR. BRITTON: Objection. Asked and answered. You can answer.

THE WITNESS: This is exactly what she said, that she would be happy to answer any questions the board would have about either the engagement or what she knew about, you know, AdaptHealth.

BY MS. MOONEY:

Q. Did she have any notes with her at this meeting?

MR. BRITTON: Objection. Foundation.

THE WITNESS: I don't know if she would have or not. She sits at a podium desk and I couldn't tell you if she had any notes there or not.

BY MS. MOONEY:

Page 93

Q. Did she use any visuals when presenting to the board on this matter?

A. No, she didn't. She just sits at the desk and answers questions.

Q. You said that these minutes would verbatim reflect any discussion. So is it fair to say -- strike that question.

The only discussion about AdaptHealth litigation that would have taken place at the meeting is what is reflected here in the minutes. Is that correct?

A. Yes. This is exactly what they said at the meeting. It all centered around the loss and the cost.

Q. And no one from -- no one from Robbins Geller addressed the board. Correct?

A. No, they did not.

Q. If we look still in the second paragraph and go about ten lines down, it says, "Mr. Dougherty stated this is on a contingency basis."

MR. BRITTON: I'm not seeing where you're -- there it is. Okay.

BY MS. MOONEY:

24 (Pages 90 - 93)

Page 94

Q.    "He stated 28% gross recovery. Ms. Fitzpatrick stated that would be the maximum."

Is it correct that Robbins Geller is working on a contingency?

A.    Yes.

Q.    What does the county understand 28 percent gross recovery to mean?

A.    So that would be the maximum that they would be paid out of the recovery that is at some point possibly approved by a judge. So a judge would approve the recovery for the class action. And Robbins Geller, the maximum that they would be compensated would be 28 percent or less of the gross recovery that was approved by the judge. And the judge would also approve that.

Q.    And then looking about five lines further down, it says, "Mr. Dougherty stated given that our loss is fairly small and manageable within the context of our larger Fund, there must be larger players out there with bigger losses."

What did Mr. Dougherty mean that

Page 95

"our loss is fairly small and manageable within the context of our larger Fund"?

A.    I believe that he was trying to say that there probably was somebody that lost more money than the approximate 58,000 that our fund lost, and he thought we would get pushed out of the way or someone else would actually be the lead. But being that we're a big institutional investor, that probably would help the case.

Q.    And when you say pushed out of the way, what do you mean by that?

A.    That they would actually end up being the lead in the lawsuit rather than Bucks County.

Q.    Was he expressing doubt about becoming involved in the litigation?

A.    My belief is he was thinking there would be a lot of work and he wasn't sure that in the end, that we would be appointed the plaintiff.

Q.    How did others react to his statement?

A.    I'm sure they listened, but they

Page 96

all approved it. So I don't think that it really affected their decision.

Q.    So others on the board were not interested in his statement that the loss was fairly small and manageable?

A.    They all approved it, so I don't think it made any kind of impression on them. I think the idea is that we try to do the best for our employees with managing the retirement fund and every dollar counts.

Q.    Looking just a few rows down again, in response to Mr. Dougherty question, Ms. Fitzpatrick stated "the Retirement System has two different claims that are unique and if the Retirement System were able to secure the lead plaintiff position, it would broaden the case against Adapt Health which overall would benefit the class including the Retirement System and the potential for recovery."

What is the basis for Ms. Fitzpatrick's statement that the retirement system has two different claims that are unique?

Page 97

A.    So the two different claims in this case against AdaptHealth are one is the fraud case and that time period where the stock took a plunge because they had the announcement that McGee was going on an unpaid leave of absence because of the fraud allegations. And then the other claim would be during the period of time in July where it came out through the Jehosaphat report that possibly they were -- there was no organic growth, that it was actually a loss in organic growth and that they had been using a different formula to calculate that and not disclosing it. So we were involved during the period of -- both of those time periods. I think that's what she was trying to say.

Q.    What did Ms. Fitzpatrick mean by it would broaden the case against AdaptHealth?

MR. BRITTON:  Objection. Asked and answered.

THE WITNESS:  Do I answer again?

MR. BRITTON:  Yes, you can answer.

THE WITNESS:  So the broadening

25 (Pages 94 - 97)

Page 98

the case I think is that we could be a part of both the fraud, the McGee fraud, and the organic growth part. We could be part of both of those.

BY MS. MOONEY:

Q. Was there not previously a plaintiff who could be part of both of those?

MR. BRITTON: Objection. Foundation.

THE WITNESS: So our understanding was that we, along with Delaware County, would be a great representative in that because of our similarities that we both had concerns of the fraud and the organic growth claim.

BY MS. MOONEY:

Q. Does Ms. Fitzpatrick's statement, though, that it would broaden the case against AdaptHealth suggest that prior to Bucks County and Delaware County's involvement there was not a plaintiff who had both of those claims?

MR. BRITTON: Objection. Foundation. Calls for speculation.

Page 99

THE WITNESS: I'm not sure what she meant by that. At the time that question didn't even come into my mind.

BY MS. MOONEY:

Q. How would broadening the case against AdaptHealth help Bucks County in particular?

A. Well, again, during this, we were just becoming involved. So in order to broaden the case against AdaptHealth in her opinion I guess would result in a better outcome if we had more information against them or a bigger concern against them, a bigger complaint against them.

Q. The idea that it would benefit Bucks County because it would potentially increase Bucks County's recovery?

A. Well, our loss is our loss and whatever the recovery would be, would be approved by the judge. So I don't know if it would increase it, but the outcome or the ability to provide the resources with Robbins Geller and the county might help the case.

Q. So are you suggesting that it

Page 100

would -- when you say it would help the case, who would that be helping if not Bucks County?

A. So if we were --

MR. BRITTON: Objection to form. Vague and ambiguous. You can answer.

THE WITNESS: So the case would help any investors that were involved in this case against AdaptHealth. So it wouldn't just help Bucks County, it would help everyone that was involved. Bucks County has the resources and we have -- if we approve this, which we did, we would have the retainer agreement with Robbins Geller.

So I'm just -- her wording of broaden the case didn't occur to me at the time that -- what her meaning of it was.

BY MS. MOONEY:

Q. I'm looking now on page 3. "Mr. Dougherty asked if Adapt Health is still around. He asked if they are still a going concern. Ms. Fitzpatrick stated as she understands it, they still are a going

Page 101

concern."

Why did Mr. Dougherty want to know if AdaptHealth was still a going concern?

A. I believe his question was is there any -- is there any reason to move forward if they're not even still in business.

Q. And how would that have been relevant to the county's decision or the board's decision?

A. So if it AdaptHealth was not still in business, then bringing a class action against a business that isn't in business may be more difficult. That may be his concern because all along he was thinking about how much county resource would have to be put into being part of this class action. And I know that his understanding is if you're part of the class action, you're part of the class and you do what you have to do. I think he was trying to gauge resources there.

MS. MOONEY: I think we've been going for about another hour. If it works for everybody, should we take another short break?

26 (Pages 98 - 101)

Page 102

MR. BRITTON: We can. Let me ask about length of time and lunch. I know you guys are three hours ahead, so it's noon. How long do you plan on going, is it a full day and when should we take lunch?

MS. MOONEY: Should we go off the record?

MR. BRITTON: Yes, you can go off the record.

VIDEOGRAPHER: The time is now 12:04. This concludes media unit 2.

- - -

(A recess was taken.)

- - -

VIDEOGRAPHER: The time is now 12:17. This begins media unit 3.

MS. MOONEY: I'd like to mark as Exhibit 3 what we have as tab 4, Ben.

- - -

(Bucks 0003, BCERS0000912 to BCERS0000914, marked for identification.)

- - -

BY MS. MOONEY:

Page 103

Q. This is a September 15, 2021, letter from Robbins Geller to Joseph J. Khan of Bucks County Employees' Retirement System.

Ms. Doran, do you recognize this as the engagement letter between Robbins Geller and Bucks County Employees' Retirement System?

A. Yes.

Q. If we could quickly go to the last page which is the third page. Right below the signature it says, "Enclosures"?

A. Yes.

Q. What are the enclosures?

A. I don't know what the enclosures are.

Q. So even though you're representing the county, you don't know what the enclosures are?

A. I don't know what the enclosures were.

Q. Is there somebody at the county who would know what those enclosures were?

A. Amy Fitzpatrick, I believe.

Q. Putting aside any enclosures,

Page 104

does this appear to be the complete and accurate contents of the letter? And we can scroll back up if you want to take a look at the other pages.

MR. BRITTON: Take as much time you need to review. You can also review the one on the exhibit tab.

BY MS. MOONEY:

Q. Has Bucks County entered any other agreements governing its legal representation in this action?

A. So Robbins Geller is our lead counsel. And I believe we are also using another firm, Kessler Topaz, as part of one of our other securities litigation attorneys.

Q. And has Bucks County entered an agreement with Kessler Topaz?

A. We have a securities litigation monitoring agreement with them, but not an agreement that I'm aware of as this agreement, no.

Q. So there's no agreement with them for their representation of Bucks County in this matter?

Page 105

A. I'm not aware of or haven't seen a written representation letter.

Q. And you mentioned a securities monitoring agreement with Kessler Topaz. What is that?

A. So the county, the Bucks County Employees' Retirement System has a number of securities litigation monitoring agreements with firms basically that will provide information on the county's investments to the firms, some on a monthly or quarterly basis. And they will review them to see if there are any filings needed or possibilities for class action suits, further litigation. So -- and they report back to us periodically, some quarterly, some monthly, on items where the county should file and we -- yeah, file just the normal status reports. And we have our investment custodian, Wells Fargo, do that on our behalf.

Q. So the law firms with whom you have securities monitoring agreements look for potential securities class action or securities claims that the county might bring?

27 (Pages 102 - 105)

Page 106

A. Yes. And they also advise us if there is any kind of filings that are due in order for us to recover on any of the suits that are out there.

Q. Does the county do any independent monitoring of whether there are any -- whether it has any securities claims based on its investments?

A. So --

MS. REID: Sorry to interrupt. Was it Doug who just left the Zoom?

MS. EKONO: I think it was. He may have gotten knocked out of Zoom.

MS. REID: Should we go off the record quickly?

MS. EKONO: I would.

VIDEOGRAPHER: The time is 12:24. Off the video record.

- - -

(A recess was taken.)

- - -

VIDEOGRAPHER: The time is now 12:30. Back on the video record.

BY MS. MOONEY:

Page 107

Q. Before going off the record, we had been discussing securities monitoring agreements that Bucks County has with various law firms. And you had mentioned that one of the things these law firms do pursuant to these agreements is inform Bucks County of securities claims that the county may have based on its investments. I asked, does the county do any independent monitoring to determine whether it has any securities claims based on its investments?

A. So we rely on our securities litigation monitoring firms. We don't really have the expertise or the staff to do the monitoring. So we have our investment advisor and we also have our securities litigation groups that do the monitoring for us. We let the experts do what the experts do.

Q. So Bucks County doesn't review its investments to identify potential securities claims?

A. At one point our fund was a billion dollars. We don't go in and take a look at every single security that we have.

Page 108

We rely on PFM, our investment advisor, to make us aware of anything. They have the resources. We also rely on our securities monitoring firms, their law firms, and they have many more resources than what we have and the expertise to review for us. We rely on our custodian. They fill out the paperwork as far as recoveries. So the five member board, we do not go that granular into our retirement fund to review unless something is brought up to us from one of the firms or the parties that I mentioned.

Q. Other than Robbins Geller and Kessler Topaz, has Bucks County retained any other counsel to represent it in this action?

A. No.

Q. Do any employees of Bucks County have other agreements with Robbins Geller?

A. Not that I'm aware of.

Q. Why did Bucks County select Robbins Geller as its counsel?

A. You did say in the last question employees, right?

Q. I did.

Page 109

A. We have 2500 employees. Okay. I'm sorry. What was the question?

Q. Why did Bucks County select Robbins Geller as its counsel?

A. So, well, we've had a relationship with Robbins Geller and worked with them in the past. We know they're an expert in what they do. They provide us with monitoring reports. And did they have a relationship with our law department? As far as they've worked with them in the past and they're basically an expert in the field.

Q. When you say you have a prior relationship with Robbins Geller, what is that prior relationship?

A. We were involved in a securities litigation suit, the Endo matter, with Robbins Geller.

Q. Is that the only matter that you've been involved with Robbins Geller with previously?

A. No. We were involved with them with other matters also.

Q. What were those matters?

28 (Pages 106 - 109)

Page 110

A.   We're involved in I think it's called like the Sunshine matter.  It's a current area where we're looking at some information.

Q.   Is the Sunshine matter a securities case as well?

A.   Yes.

Q.   And that's a current --

A.   Yes.  It's -- sorry.

Q.   Has a Complaint been filed in that case?

A.   I believe that we're looking at that.  I don't know where we are in the grand scheme of things.

Q.   Other than the Endo matter and the sunshine matter, has Robbins Geller represented the county in any other litigation?

A.   Yes.  Yes.

Q.   What are those?

A.   Probably we've been involved with them in so many, I can't remember the names of them at this point.  But there's quite a few.

Page 111

Q.   Would they have been securities litigations?

A.   Yes.

Q.   And what was the county's role in those litigations?

MR. BRITTON:  Objection. Foundation.  You can answer.

THE WITNESS:  Some of the other matters we may have applied to be lead plaintiff and not been awarded lead plaintiff.  Some of them were settled.

BY MS. MOONEY:

Q.   And Bucks County, though, would have been a plaintiff in all of those litigations?

A.   We would have been a plaintiff.

Q.   Does Bucks County expect Robbins Geller to act in its best interest?

A.   Yes.

Q.   Does Bucks County expect Robbins Geller to protect its best interest?

A.   I don't know what you mean by protect.

Q.   Does Bucks County expect Robbins

Page 112

Geller to look out for Bucks County's best interest?

MR. BRITTON:  Objection.  Vague and ambiguous as to look out for.

THE WITNESS:  Can I answer?

MR. BRITTON:  Yes, you can answer.

THE WITNESS:  So Bucks County expects Robbins Geller to do the best job that they can for the entire class.  Not just Bucks County and Delaware County, but the entire class.  And represent us in the best manner possible and come out with the best outcome for the class; not just Bucks County Employees' Retirement Fund itself, or not just Delaware County Retirement Fund itself, but the entire class.

BY MS. MOONEY:

Q.   If there is a conflict of interested between Bucks County's interest and Delaware County's interest, whose interest does Bucks County expect Robbins Geller to

Page 113

protect?

MR. BRITTON:  Objection. Incomplete hypothetical.

THE WITNESS:  Can I answer?

MR. BRITTON:  Yes, you can answer.

THE WITNESS:  So Robbins Geller is going to protect and do what is best for the entire class.  Not just for Bucks County or not just for Delaware County, but the best thing for the entire class.  Because we're kind of a fiduciary for the class, so we represent the entire class.

BY MS. MOONEY:

Q.   And what if the best thing for Bucks County differs from the best thing for Delaware County, in that case, whose interest would you expect Robbins Geller to act on?

MR. BRITTON:  Objection. Incomplete hypothetical.  Calls for speculation.  You can answer, if you know.

THE WITNESS:  I would still

29 (Pages 110 - 113)

Page 114

expect them to do the right thing for the class. Whatever is the right thing is the right thing. Bucks County and Delaware County are in this together. We decided to join together because we both have common interests. And I believe we both expect the -- to do the best that we can for the class because that's why we signed up for this.

BY MS. MOONEY:

Q.    If a conflict of interest, though, were to arise between Bucks County and other members of the proposed class, whose interest would Bucks County expect Robbins Geller to protect?

MR. BRITTON: Objection. Asked and answered. Same objections. Incomplete hypothetical and calls for speculation.

BY MS. MOONEY:

Q.    Perhaps a bit of clarity. I think, Ms. Doran, your answer is assuming that Bucks County's interest and Delaware County and the other class members' interest, that

Page 115

they're all aligned. I'm asking if that is not the case and a conflict of interest were to arise such that Bucks County's interest diverged from other members of the class, in that case, whose interest does Bucks County expect Robbins Geller to protect?

MR. BRITTON: Same objections. You can answer.

THE WITNESS: So Robbins Geller should protect the class. They're not just in it for Bucks County. So if our interest was different than the rest of the class' interest, they should do what is right for the entire class. Does that make sense? I mean, we're -- I can't think of a situation where we would not do what is best for the class.

BY MS. MOONEY:

Q.    Did Bucks County consider any other law firms for this engagement?

A.    So Robbins Geller presented in the September correspondence with the law department, the solicitor's office, that they

Page 116

wanted to represent us. And we chose Robbins Geller.

Q.    So no other firms were considered?

A.    We always -- whichever would be the first firm that would reach out to us and could competently and best handle the situation is who the Bucks County Employees' Retirement System would go with.

Q.    Did any other firms reach out to the Bucks County Employees' Retirement System about AdaptHealth?

A.    Not that I'm aware of for being our counsel.

Q.    Just to make sure I'm clear, you mentioned that Robbins Geller represented Bucks County in several other securities class actions previously. And I know you said that most of the representation were securities cases. I just want to make sure. Were there any that were not securities cases?

A.    Not that I'm aware of.

Q.    We looked previously at the September 15 board minutes. I guess we have them up still on the screen. And during that

Page 117

meeting, Bucks County determined to engage Robbins Geller in connection with the litigation against AdaptHealth. Does that meeting describe or encompass whatever process the county has for determining whether to file a lawsuit?

A.    So the law department would be the major factor in determining whether to suggest that the board would file a lawsuit. I'm not sure if that is exactly the question or not, but the information is first presented to the law department and they come to the board with the item on agenda to follow forward with approving it.

Q.    Understood. So the law department first considers whether it's an action that the county might want to pursue if it determined that it does, that the company might want to, that they would place it on the board agenda and the board members would vote on it?

A.    Yes.

Q.    And that's the process that we talked about before, the law department spends

30 (Pages 114 - 117)

Page 118

approximately a week considering the action and then the approval -- any discussion around the approval is captured in this September 15 board meeting?

A. Yes, other than they asked Commissioner Marseglia if it should be put on the agenda being that she is the chair of the board.

Q. Does the Bucks County retirement board have to approve the county's engagement in any class action lawsuits?

A. Yes. They would not move forward without the board approval.

Q. How frequently does the board discuss ongoing or potential class action lawsuits?

A. The board would discuss it as part of their agenda items if the law department feels that the Bucks County Employees' Retirement System should be a participant in a class action. So it would depend on the number of class action items out there that the Bucks County Employees' Retirement System was involved in at the time.

Page 119

Q. How does the board determine which lawsuits are worth pursuing?

A. The board would rely on the experts which would be the lawyers.

Q. So meaning the law department?

A. Yes.

Q. So if the law department presents a potential securities litigation to the board, the board would approve it?

A. The board would make up their own mind and they would vote on approving it.

Q. What would the board determine in making up its own mind? Sorry. What would the board consider in making up its own mind?

MR. BRITTON: Objection. Vague and ambiguous. You can answer.

THE WITNESS: So the board would have questions back and forth as they did in the minutes from September 15. What was the Bucks County Employees' Retirement System's loss. How much effort or work is it going to take for county staff or county resources? What kind of costs are involved? Is there

Page 120

any kind of cost involved with the county paying a law firm for this work, retaining them? Is it on a contingency basis? What is the contingency basis? They would ask those kind of questions. They're becoming much more familiar now than they were in the past with what it all means and what the securities monitoring agreements are all about.

BY MS. MOONEY:

Q. And when the board asks those type of questions, what are they ultimately trying to determine?

MR. BRITTON: Objection. Compound.

THE WITNESS: I think, I believe they're trying to determine if the county has the resources in order to become involved in this. In the past, before the Endo matter, we really hadn't been involved very often. We hadn't had to provide as much as -- as much information maybe because we hadn't gotten as far along, either

Page 121

settlements occurred -- but after being involved in the Endo matter and the outcome that occurred, I believe that the retirement board now has a better understanding of how it works and looks at it in a more positive manner.

BY MS. MOONEY:

Q. Why, based on the Endo matter, do they now look at involvement in securities litigations as a more positive matter?

A. Because they now know what is involved as far as what resources would be needed from the county and what information people would be looking for. We know now how to use our IT department to go about doing searches, committing searches and searching certain words to find information. So it's just they've become more familiar with what the whole securities litigation area is about. And they also now understand what the contingent fee award is.

Q. And you mentioned the outcome in the Endo matter. What was the outcome there?

A. There was a settlement.

31 (Pages 118 - 121)

Page 122

Q. And was the settlement part of what caused the county to view involvement in securities litigations more -- in a more positive manner?

A. I think they -- I don't think it was the settlement. I think it was actually the process leading up to it. And finding out the amount of, again, how they work, what the resources were. Who would be involved. What would be involved. What would we have to provide. How much staff time would it take. Would there be any real cost to the county that wasn't reimbursed. I think that's where they were looking because there is not a separate county employee that just does retirement fund for their job.

Q. Does any board member in particular oversee class action lawsuits?

A. No.

Q. Does any individual in particular report on class action lawsuits to the board?

A. It would be the law department.

Q. And I know we've spoken about

Page 123

Ms. Fitzpatrick. Would she be the one who reports on class action lawsuits or might there be others from the law department?

A. Currently it would be Ms. Fitzpatrick. Prior to that it was Mr. Klumpp. He's no longer with the county. So currently it would be Ms. Fitzpatrick.

Q. Why did Bucks County decide to pursue a securities litigation against AdaptHealth?

MR. BRITTON: Objection. Asked and answered. You can answer.

THE WITNESS: So the county decided to pursue it based on the information provided to us through our law department and through Robbins Geller about the occurrences within AdaptHealth and the counties and the class action ability to move forward with this suit and what the outcome would be.

BY MS. MOONEY:

Q. Looking now at the engagement letter that we marked as Exhibit 3, in the

Page 124

first paragraph it says, "We will prosecute the action on a contingency fee and cost basis."

Is this the only way that Robbins Geller will be compensated for prosecuting this case on Bucks County's behalf?

A. They are only receiving a contingency fee up to a maximum of 28 percent of the gross recovery and it would be approved by the court.

Q. Robbins Geller is only compensated if Bucks County recovers in the litigation. Correct?

A. If the class recovers in the litigation, yes.

Q. Looking at paragraph 2, it says, "We will advance all fees and expenses necessary to prosecute the case regardless of whether the case ultimately proceeds as a class action or individual action. Bucks County will have no responsibility for legal fees and expenses."

Does this mean that Robbins

Page 125

Geller is paying for all fees or expenses?

A. They're paying anything that is involved in the litigation at this point, yes. The county isn't putting out any additional money, yes.

Q. Paragraph 3, "Bucks County agrees that we may divide fees with other attorneys for serving as local counsel, as referral fees or for other services performed."

We discussed that Kessler Topaz is local counsel. Are there any attorneys who are entitled to referral fees?

A. Not that I'm aware of. Just Kessler Topaz would be the local firm and that would be something that they can divide their fees with.

Q. And are there any attorneys who have performed other services on this matter?

A. Not that I'm aware of.

Q. Looking at page 2, paragraph 9, it says, "Robbins Geller will defend and indemnify Bucks County for any claims asserted against Bucks County for its institution, prosecution and/or resolution of this action

32 (Pages 122 - 125)

Page 126

including, but not limited to, claims or sanctions involving attorneys' fees or costs."

What does this mean?

A.    It means that Robbins Geller would defend the county, the employees' retirement fund if there was any kind of claim against the retirement fund for its work in this suit, this action. And they would -- it wouldn't cost the county anything additional. They would defend us.

Q.    And in addition to defending the county, they would also indemnify the county for any -- for any damages ultimately awarded against the county. Is that right?

A.    Yes.

Q.    So Robbins Geller is the only potentially liable party with respect to the prosecution of this action?

A.    Yes. In this document, yes.

MS. MOONEY:  I'd like to mark as Exhibit 4, tab 5.

- - -

(Bucks 0004, BCERS0000908 to B CERS00009011, marked for identification.)

Page 127

- - -

BY MS. MOONEY:

Q.    Do you see at the top it says, "Bucks County Employees Retirement Fund, Engagement Agreement For Portfolio Monitoring"?

A.    Yes.

Q.    On the second page it lists that it's with Robbins Geller Rudman & Dowd?

A.    Yes.

Q.    Is this one of the securities monitoring agreements that we discussed previously?

A.    Yes.

Q.    Is this agreement in effect as of today?

A.    Yes.

Q.    If we can go to the last page. You see the signature there for Bucks County. Whose signature is that?

A.    It says Robert Loughery. He was the chairman of the Bucks County retirement board at that point.

Q.    Looking at the Robbins Geller signatures, we have Sandra D. Stein, Laura S.

Page 128

Stein and a member of the firm. Do you know whose signature that top one that is listed as a member of the firm is?

A.    No.

Q.    Is the Laura Stein that's listed here the same Laura Stein who initially reached out to Bucks County about the AdaptHealth litigation?

A.    I'm only aware of one Laura Stein, so I would believe so.

Q.    Does this agreement mean that Robbins Geller was tasked with analyzing Bucks County's losses to determine after the fact whether it could bring a securities fraud or other claim?

A.    So they're not tasked --

MR. BRITTON:  Hold on. Objection. The document speaks for itself. Calls for a legal conclusion. You can answer.

THE WITNESS:  So they're not tasked with looking at it for us. Each one of the securities litigation firms that we've signed an agreement with

Page 129

provides information on possible securities litigation lawsuits. The Bucks County Employees' Retirement Fund would want to know about or could want to know about it, but I wouldn't say that they are tasked with it. And they're an additional layer for the board of looking at information, gaining information in order to be the best fiduciaries of the fund, but I think tasked with it is a strong word.

BY MS. MOONEY:

Q.    Has Bucks County ever declined to bring a potential lawsuit that was recommended by Robbins Geller?

A.    I'm going to say I don't remember them not attempting to at least do research, and in the past we've actually asked some of our firms to do research for us when they bring up a possibility of a suit and we don't end up moving forward to it -- with it. So I couldn't tell you exactly which ones, but in the past we have had some that we either haven't moved forward on or they've been

33 (Pages 126 - 129)

Page 130

settled prior to us becoming involved.

Q.    I believe you said before that the number -- strike that.

How many potential lawsuits originating from this agreement were actually pursued by Bucks County?

A.    I could not --

MR. BRITTON: Objection. Vague and ambiguous. You can answer.

THE WITNESS: I have -- I could not tell you how many without doing research, additional research.

BY MS. MOONEY:

Q.    Did Bucks County's involvement in the AdaptHealth litigation originate from this agreement?

MR. BRITTON: Objection. Vague and ambiguous.

THE WITNESS: So the information -- can I answer?

MR. BRITTON: Yes, you can answer.

THE WITNESS: So the information about the Bucks County Employees'

Page 131

Retirement System is provided to Robbins Geller as one of our securities litigation monitoring firms because of this agreement. They have the ability to see what we've invested in through our different money managers. So this agreement provided the information to Robbins Geller to provide them reports back to the law department that would say this is a possibility that we think you should be involved in the securities litigation.

BY MS. MOONEY:

Q.    And as we discussed, Robbins Geller did reach out to the law department about the AdaptHealth litigation?

A.    Correct.

Q.    How much has Bucks County received from settlements and damages awards in securities class actions where Bucks County served as a lead plaintiff?

A.    I don't know how much off the top of my head. Again, I would have to research to see how much we've received over

Page 132

the years.

Q.    That's not something that the county pays attention to in the ordinary course?

A.    So in the ordinary course of business, the county looks at all funding sources within the funds. And a lot of our class action proceeds are received through our custodian, Wells Fargo. So the detail for that would be included in the Wells Fargo custodial reports. We would not be looking at the one offs usually on that. So we can go back and pull the information and pull that number out, but it wouldn't be something that would be -- that I would have knowledge of without looking back.

Q.    And it's not something that you looked into in preparation of your representation of the county here today?

A.    I did not look at or calculate the amount that we've received in the past, no.

Q.    We talked earlier about Bucks County's communications with Robbins Geller

Page 133

since Bucks County retained Robbins Geller to represent it in this matter. And I believe that you had mentioned two attorneys from Robbins Geller who those communications had been with. I know it was Doug and I forget who the other one was that you mentioned?

A.    It would be Kevin.

Q.    Kevin. What is Kevin's last name?

A.    Kevin is on the Zoom with us. It's Lavelle.

Q.    And who on behalf of Bucks County communicated with Robbins Geller?

A.    The law department would be the main source of communications with Robbins Geller. It would be specifically Amy, but the law department as a whole. And then anything came in there, Amy would be the main contact for the retirement fund.

Q.    You said that you thought it was approximately ten times between the retention of Robbins Geller and today that Bucks County communicated with Robbins Geller about the matter?

34 (Pages 130 - 133)

Page 134

A.    I believe it was a number of times that they communicated with Robbins Geller about the matter.  The law department would receive emails as well as phone calls.  So I wouldn't know the number.

Q.    Do you know approximately how many times prior to the motion to dismiss Bucks County communicated with Robbins Geller?

A.    I don't know.

Q.    Do you know approximately how many times after the motion to dismiss Bucks County communicated with Robbins Geller?

A.    I would not know the number of times.

Q.    And does anybody at the county have that information?

A.    So I know that I've communicated with Robbins Geller in preparation for this, also in asking questions.  And Amy from the law department would know the number of times that she's communicated with Robbins Geller as a part of the securities litigation suit.

Q.    And you didn't inquire with Amy prior to your deposition as to her

Page 135

communications with Robbins Geller?

A.    Not for the exact number, no.  I mean, I do know at any point when there is any question or concern, they're available to either email to us, talk to us on the phone.  When we had the questions about gathering the documentation, we have, like I said, a conference phone call with them where we discussed search terms and items that we would need to prepare and get ready for.  But I didn't ask her the specific number of times she reached out to them or they reached out to her.

I know every step along the way, if a document was sent, there was some back and forth about should this word be in there, should we include Wells Fargo as a custodian.  That kind of information.  So there's always been a back and forth with that kind of information.  I don't know if you would count the number of those type calls or questions, but there's been back and forth with them and I don't know the number.

Q.    When you say communication might

Page 136

have been about, I think you said a document was sent and the question was should this word be in there, what did you mean by that?

A.    When we had to at one point include --

MR. BRITTON:  Hold on one second.  I'm going to caution you not to reveal any communication with counsel on this.  It could call for attorney-client communications.  Limit your discussion to the existence of a communication and don't reveal the content.

THE WITNESS:  Okay.

MR. BRITTON:  You can answer the question.

THE WITNESS:  So I think at one point there was a question about different entities or whatever that might have had something to do with AdaptHealth.  And in the end, the decision was to add the name of that one entity into the document because they were involved.  And they were

Page 137

included in there.  So it was just -- I think it was the person from the firm that we wanted to add the name in to be involved.

BY MS. MOONEY:

Q.    Taking into consideration all of the communications between Bucks County and Robbins Geller, do you know roughly what percentage of those communications were initiated by Robbins Geller versus initiated by Bucks County?

MR. BRITTON:  Objection.  Vague and ambiguous.

THE WITNESS:  I don't know, but my educated guess would be 50 percent, because if there was a question that was asked, there was an answer that would be a response.

MS. MOONEY:  If we could introduce as Exhibit 5, tab 7.

- - -

(Bucks 0005, BCERS0000898 to BCERS0000900, marked for identification.)

- - -

35 (Pages 134 - 137)

Page 138

BY MS. MOONEY:

Q. These are the October 20, 2021, board minutes. And I wanted to look at the second page. The second sentence in the last paragraph, it starts, "Ms. Fitzpatrick stated she is pleased to report to the Board that the Retirement System had two great wins."

And then if we go to the next page, four lines down, "Ms. Fitzpatrick stated second, the Retirement System was named as Co-lead Plaintiff in another securities class action related to fraud against Adapt Health."

MR. BRITTON: Take a moment to review the exhibit and familiarize yourself with the discussion here that is being referenced on both pages.

THE WITNESS: Okay.

BY MS. MOONEY:

Q. Why did Bucks County consider this a great win?

A. So it was a great win because Bucks County and Delaware County would get to work together and be co-lead plaintiffs in this suit and provide the resource to move

Page 139

forward with this securities litigation matter. So that was a positive in the board's estimation.

Q. And why was that a positive in the board's estimation?

A. Because we were selected or named as co-lead plaintiffs with one of our fellow counties. And we got to represent a class as being the lead plaintiff because we're the larger institutional investors and it's a positive thing to the board.

Q. In the second highlighted sentence there, "in another securities class action related to fraud against Adapt Health." What did Ms. Fitzpatrick mean by another securities class action related to fraud against AdaptHealth?

A. So I believe she was talking about what she had talked about previously when she discussed that the Endo matter was concluded and that was a securities fraud litigation.

Q. What is Bucks County's expected amount of recovery in this litigation?

Page 140

MR. BRITTON: Objection. Vague and ambiguous. Objection. Vague and ambiguous as to amount of recovery. You can answer, Kim.

THE WITNESS: So our expected recovery is our pro rata share of whatever the judge says the recovery is. I believe in these type matters, the court decides what the recovery is and then each person involved gets their pro rata share of that recovery.

BY MS. MOONEY:

Q. Has Bucks County estimated its losses that it's seeking to recover?

MR. BRITTON: Objection. Asked and answered.

THE WITNESS: So our estimated losses in this were 57 or $58,000. Again, we don't know what the recovery is going to be, but we know what our loss was that was calculated.

BY MS. MOONEY:

Q. And when did the county first calculate its loss from the alleged

Page 141

AdaptHealth fraud?

A. So the loss was actually calculated for us by the lawyers, and we verified the amount of purchases and sales that we had. And -- but the loss itself was calculated for us. And we realized it or understood it at the September 15 retirement board meeting where it was first presented to us.

Q. So the loss presented of $58,000 in the September 15, 2021, board meeting minutes was a loss as calculated by Robbins Geller that had been presented to the Bucks County Employees' Retirement System?

A. Yes.

Q. Is Bucks County's expected -- strike that.

If Bucks County were compensated for its alleged losses, would that satisfy its interest in pursuing this action?

A. Well, we're here to represent the whole class now. So Bucks County is part of a bigger Complaint now or a bigger -- it's a class action. So we're not just looking out

36 (Pages 138 - 141)

Page 142

for Bucks County, we're looking out for the entire class at this point.

Q.   Any outcome been promised to Bucks County?

A.   No.

Q.   Has Bucks County received any compensation for its service as lead plaintiff?

A.   No.

Q.   Does Bucks County expect to be reimbursed for its costs and expenses?

A.   So as part of the agreement, Bucks County expects to be reimbursed for any costs, like time I guess, costs related to it.

Q.   When you say the agreement, are you referring to the engagement with Robbins Geller?

A.   Bucks County would be reimbursed for any actual costs related to our time, yes.

Q.   I'd like to go back quickly to Exhibit 2, which was the September 15, 2021, board meeting minutes.  And on page 2, in the third paragraph, the same one that we looked at previously but just looking at a different

Page 143

portion of this.  Right in the middle of the paragraph it says, "Mr. Dougherty asked if there was much work required of the County to provide them all the information they need. Mr. Dougherty asked if this was worth it."

And in response "Ms. Fitzpatrick stated she would represent that it is worth it and she anticipates there will be very little work for the County, in fact less than there has been in prior and recent securities actions they have endeavored to pursue."

What did she mean when she said there will be very little work for the county?

MR. BRITTON:  Objection. Foundation.  You can answer, if you know.

THE WITNESS:  So my belief is that she anticipates that as a result of being in other class actions lawsuits, we now understand how to go about searching for documents in an easier way.  We have software now that we can put in search terms and pull up information.  As opposed to before, it

Page 144

was much more cumbersome and time consuming to find documents.  It's just based on that, we have a better understanding, better equipment, and I think that's what she meant by it would be a lot more manageable or whatever -- very little work for the county.  I think she's talking overall we've become more familiar with the -- what we have and our way of analyzing it.

BY MS. MOONEY:

Q.   Can you estimate or quantify in hours what the county would consider very little work?

A.   I believe it depends on the department.

MR. BRITTON:  Hold on one second.  Objection.  Calls for speculation.  You can answer.

THE WITNESS:  It would depend on the department.  Some departments would think very little work is an hour.  So it would totally depend on the department that you're talking about.

Page 145

BY MS. MOONEY:

Q.   What is your understanding of approximately how many hours very little work would encompass?

A.   So for very little work, it would to me mean that it would be something that a person would be able to do that would not affect their regular duties or what they regularly -- their regular job would have been in their office.  So it wouldn't be quantified in hours as much as it would be that it wouldn't affect what they have to get down in a normal workweek.

Q.   Did the county pursue lead plaintiff status in this action with the expectation that it would be very little work?

A.   No.

MR. BRITTON:  Objection. Argumentative.

THE WITNESS:  No.  I don't believe they pursued it because of that.

BY MS. MOONEY:

Q.   Even though that was the

37 (Pages 142 - 145)

Page 146

response that Ms. Fitzpatrick gave to Mr. Dougherty when he asked if this was worth it?

A.   Even though that was the response, I don't believe that was --

MR. BRITTON:  Hold on a second. Objection.  Calls for speculation.  You can answer.

THE WITNESS:  I don't believe that that was the reason that they pursued it.

BY MS. MOONEY:

Q.   Not the reason that they pursued it, but was it one of their expectations when pursuing it that it would be very little work?

A.   I don't believe so, because in order to do it right, you're going to do what you need to do to get it done the right way. So whether it be very little work in one person's mind or a lot of work in another person's mind, I think the county just wants to do what is right.

Q.   So do you think that Ms. Fitzpatrick misspoke when she represented

Page 147

to the board that she anticipates there will be very little work for the county?

MR. BRITTON: Objection.  Calls for speculation.  Asked and answered.

THE WITNESS:  So I don't think she misrepresented.  I think she was trying to let Mr. Dougherty know that we had gotten a lot better at doing what we had done as far as researching the information and pulling together all the documents.  And he was worried that it would take a great amount of time and searching.  We have paper records in a warehouse that's a couple of miles away from here, and in the past we had to go and search through the records that are there.  Since then we've come up with a better filing system.  We spent a lot of time in the past looking through emails and trying to search people's emails individually. And now the county has the ability to, through our IT department, search for the terms within people's emails and to

Page 148

their drives.  So I think she was trying to comfort Mr. Dougherty and let him know that it wasn't going to be as cumbersome as it had been in the past.

BY MS. MOONEY:

Q.   You had said before that these minutes are verbatim records of what was said at the meeting.  And that is not what Ms. Fitzpatrick said in response to Mr. Dougherty's question.  Correct?

A.   The words were very little work. They are verbatim.  But I think she was trying to let him know that it would be less work than in the past.

MR. BRITTON:  I'm also going to -- I'm also going to object to the preamble, that it misstates the document.

BY MS. MOONEY:

Q.   You said before that Bucks County is not just looking out for the county but also for the rest of the class.  How is that consistent with the fund's fiduciary duty to county employees?

Page 149

A.   So it's pretty much the same as the county's fiduciary -- or the fund's fiduciary duties to the county employees.  But we're looking out now as a fiduciary to a bigger group of people.  We're trying to get the best outcome for all funds, not just our own.  So it's just an expansive role.

MS. MOONEY:  I think it's been about an hour.  If we can go off the record and take a break.

VIDEOGRAPHER:  The time is now 1:28.  This concludes media unit 3.

- - -

(A recess was taken.)

- - -

VIDEOGRAPHER:  The time is now 2:13.  This begins media unit 4.

MS. MOONEY:  I'd like to mark as Exhibit 6, tab 11.

- - -

(Bucks 0006, Memorandum, marked for identification.)

- - -

BY MS. MOONEY:

38 (Pages 146 - 149)

Page 150

Q. Ms. Doran, this is the court's June 9, 2022, motion to dismiss decision. Has Bucks County reviewed this document before?

A. Yes.

Q. Who reviewed the document?

A. I reviewed it as well as our law department.

Q. And when was the document reviewed? Well, when did you review the document?

A. I reviewed the document I'm going to say -- I'm going to say maybe in December. It seems like a while ago.

Q. And do you know when the law department would have reviewed the document?

A. I'm sure they would have reviewed it before I did. I don't know when, what the date was.

Q. Did you discuss this document with anybody at Robbins Geller?

MR. BRITTON: Objection. Calls for attorney-client privilege. I instruct you not to answer that question.

Page 151

THE WITNESS: Okay.

MS. MOONEY: I'd like to mark as Exhibit 7, tab 14.

- - -

(Bucks 0007, Motion to Certify Class, marked for identification.)

- - -

BY MS. MOONEY:

Q. You can see here that this is lead plaintiffs' motion to certify class. If you look up at the very top of the page, it says filed on July 28, 2022.

Has Bucks County reviewed this document before?

A. Yes.

Q. Who reviewed the document?

A. I believe Amy and the law department has -- I know Amy and the law department has reviewed it as well as myself.

Q. And would you also have reviewed this in December of 2022?

A. I'm going to say probably it was around, yeah, December.

Q. Do you know when Amy and the law

Page 152

department would have reviewed it?

A. She would have reviewed it before myself I'm sure.

Q. Would she have reviewed it before it was filed?

A. She definitely would have reviewed it before it was filed.

MS. MOONEY: I'd like to mark as Exhibit 8, tab 16.

- - -

(Bucks 0008, Exhibit B to Motion, marked for identification.)

- - -

MS. MOONEY: If we can go to the second page.

MR. BRITTON: I'm going to object to the presentation of this document as separate from the last one. I'm assuming these are the exhibits that we saw to the previous exhibit. Is that correct, Margot?

MS. MOONEY: I believe this is an exhibit to the motion for appointment as lead plaintiff, not an

Page 153

exhibit to the motion to certify the class.

MR. BRITTON: Right. And the previous one was lead plaintiff, the previous exhibit. Right?

MS. MOONEY: No, the previous exhibit was the motion to certify the class.

MR. BRITTON: Oh, it was. Okay. You're right. Okay. So I still lodge an objection that this is an incomplete document. These are exhibits to the motion for lead plaintiff.

BY MS. MOONEY:

Q. Ms. Doran, do you recognize this document?

A. Yes.

MR. BRITTON: Take your time to review the full document before you answer any questions about it.

BY MS. MOONEY:

Q. Is this a certification that Bucks County submitted as an exhibit to its motion for appointment as lead plaintiff?

Veritext Legal Solutions

212-279-9424                  www.veritext.com                  212-490-3430

Page 154

A.    Yes.

Q.    Did you review this document previously?

A.    Yes, I did.  This is the schedule or the exhibit that was attached where I looked at the date of acquisitions of the shares of the stock and also the disposal of the stock and the prices to verify it.  So yes, I did review this document before it was filed and signed.

MS. MOONEY:  Could we go down actually to the fourth page.

BY MS. MOONEY:

Q.    And looking at 5(a) on the fourth page, do you see the matter Franchi versus SmileDirectClub?

A.    Yes.

Q.    That's listed under -- in response to the -- well, that's listed as one of the matters where plaintiff has been asserted to serve as a representative party for a class.  Is that correct?

A.    Correct.

Q.    Does that mean that Bucks County

Page 155

was the lead plaintiff in that matter?

A.    Bucks County was appointed to or wanted to be the lead plaintiff in that matter.

Q.    Well, I think that question 5(a) is asking about or listing cases where Bucks County has been appointed?

A.    Yes.  That's correct.  Yes. Yes.  So SmileDirect and this case we were lead plaintiffs, yes.

Q.    And what is your understanding that Bucks County was the lead plaintiff in that matter based on?

MR. BRITTON:  Objection to that matter.  Which one are you referring to?

MS. MOONEY:  Apologies.  The Franchi versus SmileDirectClub.

MR. BRITTON:  Okay.

THE WITNESS:  The question was why did we want to be lead plaintiff in that matter?

BY MS. MOONEY:

Q.    What is your basis for

Page 156

understanding that Bucks County was the lead plaintiff in that matter?

A.    They provided information to our law department, Amy Fitzpatrick, and she would be involved in determining if the county should move forward with that.

MS. MOONEY:  I just want to quickly introduce another exhibit as Exhibit 9, which is 16(a).

- - -

(Bucks 0009, Order, marked for identification.)

- - -

BY MS. MOONEY:

Q.    If you -- if we can look at the case number here, start with the parties' names.  You see Franchi, Adam Franchi versus SmileDirectClub, and then we see the case number on the right-hand side, 3:19-cv-00962.

MS. MOONEY:  Jessica, if you wouldn't mind going back to Exhibit 8 quickly.

BY MS. MOONEY:

Q.    Would you agree that this is the

Page 157

same matter listed on the certification in response to 5(a), Franchi versus SmileDirectClub, 3:19-cv-00962?

A.    Yes.

Q.    If we can go back to Exhibit 9 and scroll to the -- underneath "INTRODUCTION AND BACKGROUND," it says, "These securities class actions are before the Court upon motions for consolidation and competing motions for appointment as lead plaintiff and lead counsel."  And then if I could just ask you to review this paragraph.

MR. BRITTON:  Which paragraph are you talking about?

MS. MOONEY:  The paragraph that begins "These securities class actions are before the court."

MR. BRITTON:  Okay.

THE WITNESS:  Can you scroll up? The bottom was getting cut off.

BY MS. MOONEY:

Q.    And it says in this paragraph that SEIU's motion is granted at the very bottom of the paragraph we were reading?

40 (Pages 154 - 157)

Page 158

A.   Yes.

Q.   And that motion -- I'm just looking for the language.  That motion is a motion for appointment as lead plaintiff.  Correct?

A.   That's what it says.

MR. BRITTON:  Objection.  Calls for speculation.  Foundation.

BY MS. MOONEY:

Q.   If we go back to the first paragraph, it says, "before the Court upon motions for consolidations and competing motions for appointment as lead plaintiff and lead counsel"?

A.   I see that.

Q.   We don't see AdaptHealth mentioned as having filed one of these motion for appointment as lead plaintiff, do we?  I'm sorry Bucks County.

MR. BRITTON:  Hold on a second.  Let me object as foundation.  Calls for speculation.  I'm also referencing the sentence starts with "Five groups of plaintiffs."  So are you representing

Page 159

that all of the plaintiffs in these individual groups are all listed here?

BY MS. MOONEY:

Q.   Is Bucks County a member of one of these groups of plaintiffs?

MR. BRITTON:  Objection.  Calls for speculation.  You can answer, if you know.

THE WITNESS:  I don't know.

BY MS. MOONEY:

Q.   If we could just turn quickly to page 10, the "CONCLUSION."  Do you see the language in the middle of the paragraph, it says, These actions -- I'll skip the parenthetical -- will be consolidated with SEIU serving as lead plaintiff represented by Robbins Geller?

A.   Yes, I --

MR. BRITTON:  That's the same -- hold on a second.  Let me object.  I ask the same -- to make the same representation that this document lists all of the members of the SEIU group in this motion for appointment as lead

Page 160

plaintiff.

BY MS. MOONEY:

Q.   I have the same question as to whether Bucks County is a member of SEIU's group.

MR. BRITTON:  Objection.  Calls for speculation.  You can answer, if you know, Kim.

THE WITNESS:  I don't know.

BY MS. MOONEY:

Q.   So you would agree that Bucks County could only have been a lead plaintiff in this action if it was a member of SEIU's group, assuming that SEIU was a group of plaintiffs?

MR. BRITTON:  Objection.  Foundation.  Calls for speculation.  You can answer.

THE WITNESS:  Again, I don't know if we were a member of SEIU's group.

BY MS. MOONEY:

Q.   It doesn't say that Bucks County was appointed as lead plaintiff?

Page 161

MR. BRITTON:  Counsel, I would ask you to make the same representation to the witness that this document lists all of the members of the SEIU group.

BY MS. MOONEY:

Q.   Sorry.  So this does not state that Bucks County served as lead plaintiff in this matter unless it's to be determined that Bucks County is a member of SEIU group?

MR. BRITTON:  My objection stands.

BY MS. MOONEY:

Q.   Agreed?

A.   The question was?  I'm sorry, I didn't know there was a question out there.

Q.   That's all right.  We can move on.

A.   Sorry.

Q.   During each year of the alleged class period, what was the approximate amount of the plan's assets?

A.   During each year of the class period?  So the overall Bucks County Employees' Retirement Fund in 2021, and it

41 (Pages 158 - 161)

Page 162

depends on what month you pick, but we had about a billion dollars in assets. We've since dropped just based on the market. But in 2019 the county was around $900 million worth of assets.

Q. During the alleged -- I'm sorry, did you have more?

A. I was going to say we report our -- in our retirement board meeting each month there is a portion where they approve the report that lists the total assets of the fund at market value.

Q. During the alleged class period, was any portion of the asset's funds invested in US equities?

A. Yes.

Q. Who was responsible for making investment decisions with respect to plan assets that were invested in US equities during the alleged class period?

A. So the Bucks County Employees' Retirement System has our investment advisor who helps us determine what percentages or target amounts are in each one of the

Page 163

different categories, including domestic equities, international equities, fixed income. And then within each one of those areas, we select money managers that are, again, vetted totally by PFM. They send us information, the board members information about those money managers, and then we select the money managers to invest for us. So in this case there would be a number of money managers that were under the domestic equity guidelines. Emerald was one of them.

Q. Were there any county employees who were responsible for making investment decisions with respect to plan assets?

A. No. We don't go down --

MR. BRITTON: Objection. Hold on one second. Objection. Vague as to making investment decisions. You can answer.

THE WITNESS: So we don't go down to the level of selecting investments. The board selects money managers after, again, they've been vetted by PFM, our investment advisor.

Page 164

But we don't go down to the level of deciding what stocks or what they invest in. They each have a set of guidelines and they follow those guidelines. They're responsible for the investments.

BY MS. MOONEY:

Q. Were there any county employees responsible for overseeing the investment decisions that the money managers made?

A. So the investment advisor, PFM, they oversee the money managers and they report to the board on a quarterly basis if any of the money managers should be on the watch list or terminated because of investment decisions. So they're actually the set of eyes, I guess, for the Bucks County Employees' Retirement Fund board, and they report back to the board if investment managers aren't investing and meeting their required -- they compare them to all the different investment benchmarks that they have.

Q. You may have mentioned this previously, but was Emerald Advisers, Inc. one

Page 165

of Bucks County's money managers?

A. Yes. Actually they are two of our money managers. We have Emerald with a small cap and Emerald with a mid cap.

Q. Do you know which of those two funds Bucks County's investment in AdaptHealth was made through?

A. Yes, it was the Emerald small cap.

Q. What portion of the fund's assets were managed by Emerald either through the small cap or the mid cap?

A. So Emerald usually --

MR. BRITTON: Hold on. Let me pose an objection. Objection. Compound. You can answer.

THE WITNESS: Okay. So Emerald generally has between 15 and $20 million in each one of their strategies, so small cap and mid cap. We try to compare between the two, is mid cap outperforming small cap or small cap outperforming mid cap.

BY MS. MOONEY:

42 (Pages 162 - 165)

Page 166

Q.    Who decided to appoint Emerald as a money manager?

A.    So Emerald was brought to us by PFM as our advisor back when Bucks County first started developing our investment strategy of as much diversification as we have at this point.  So Emerald was brought to us by PFM as an investment manager to take a look at.

Q.    Do you know when that was?

A.    It was back in the late '90s.  Like '99, I believe.

Q.    Was Emerald money manager for the entirety of the class period?

A.    Yes.

Q.    Why doesn't Emerald manage all of the fund's assets?

A.    Well, we believe in total diversification so that if one manager or their strategy is having a downtime, we have other managers that would counterbalance it.  Fixed income may be down, so equities may be up.  So we have a diversified portfolio with probably, depending on the time period, 26, 27

Page 167

money managers.  Emerald is just two of those money managers, one in the small cap and one in the mid cap.

Q.    Does the fund have confidence in Emerald's decision-making?

MR. BRITTON:  Objection.  Vague as to time.

THE WITNESS:  Yes.  We, again, rely on our investment advisor PFM.  They have the staffing to go out and they actually not only -- like sometimes interview the money managers.  If they don't think that they're performing the way they should, they'll put them on the watch list.  We let them know they're on the watch list, if they're not meeting their benchmark for some period of time without a consistent reason as to why.  But PFM is basically the one that would watch over Emerald for us and keep us abreast of any problems, as they do with all our money managers.

BY MS. MOONEY:

Page 168

Q.    Is the fund satisfied with Emerald's performance?

MR. BRITTON:  Objection.

THE WITNESS:  Yes.

MR. BRITTON:  Vague as to time.  You can answer.

THE WITNESS:  Yes.  Over the complete time period that we've had Emerald, yes.

BY MS. MOONEY:

Q.    Why?

MR. BRITTON:  Objection.

THE WITNESS:  Well, because --

MR. BRITTON:  You can answer.

THE WITNESS:  -- PFM has not -- if PFM is unhappy with the performance of one of our managers, they let us know.  We then call in that money manager and we tell them that we're not happy with them as PFM is there with us.  And they have to explain their strategies and what they're going to do to improve.  If they don't improve, they're terminated and a new manager is

Page 169

selected to replace them in that style of investing.  So we still have Emerald.

BY MS. MOONEY:

Q.    And PFM has never let the county know that they have any issues with Emerald's investment decisions?

A.    Throughout the years PFM has put different people on the watch list, kept an eye on them, pulled them off of the watch list.  Currently Emerald is still with us and they're, as of the last time I met with them, not on our watch list.

Q.    Do you know if they were on the watch list at any time during the proposed class period?

A.    So Emerald was not called in for a meeting with the retirement board during that time period or since that time period.  So they did not -- they weren't on the watch list to that regard that we would call them in and talk about actions to either have them improve or terminate.

Q.    Is it fair to say that Emerald has a fiduciary duty to Bucks County?

43 (Pages 166 - 169)

Page 170

A. Yes.

Q. And that means that Emerald has a duty to act in the best interest of Bucks County?

A. Correct.

Q. Has Bucks County provided Emerald with any instructions regarding how to invest the plan's assets?

A. Yes. As part of our investment management agreement, the county put forth that they have to invest in the best regard possible for the county, provide transactions, invest methodology for the county, so at the least cost for trades or the best trades necessary I should say. And it has to be in certain legal tender for the county that would be in accordance with our Act 96, which is the state statute that guides the retirement fund.

Q. Do you know whether any changes were made to the instructions regarding investment of the plan's assets to Emerald during the alleged class period?

A. Throughout the years the county has changed its asset breakdown or its

Page 171

investment guidelines as far as different items that we've been allowed to invest in or amounts of cash allowed to be held depending on what was happening in the market. So our target percentages may have changed or, like in the past, the board didn't have -- when they first started, they didn't know anything about, like, real estate investment trusts. And subsequent to that, PFM has advised the county and instructed the county, informed the county about different opportunities within the investment world. So we have changed the percentages allowable for the different strategies within the fund.

Q. Is PFM the entity that would be responsible for ensuring that Emerald followed any instructions from the county?

A. Yes. PFM, like I said, they're analysts. They question. They receive information. They meet with different money managers and they make sure that they stay within their targeted areas.

Q. Now, focusing just on Emerald's small cap growth money manager, what is your

Page 172

understanding of that money manager's investment strategy?

A. So they're looking at this small cap growth area which they are then compared to the benchmark for small cap growth. They're basically looking for investments that they would invest in where they see that they fit that strategy and the companies involved would meet the criteria that they've set. And it's totally up to them as to what kind of stocks within that criteria that they invest in. But they are responsible for the investing and that's kind of where they -- that's their expertise.

Q. So you're saying Emerald is responsible for all of the investments in its small cap growth strategy?

A. Yes. And it stays within the small cap growth strategy, yes. And mid cap for their other investments.

Q. And Bucks County is not familiar with what that strategy is?

A. Well, we understand that --

MR. BRITTON: Objection.

Page 173

Objection. Mischaracterizes testimony. You can answer.

THE WITNESS: They're in the small cap growth strategy and they're compared to the benchmark for the small cap growth strategy. So that's what we're looking at to see how they performed compared to the index in that strategy.

MS. MOONEY: I'd like to mark as Exhibit 10 tab 20.

MR. BRITTON: Margot, so the exhibit in the folder, they've been renamed. They started with exhibit Bucks and then went 1 through 5. And then they dropped the exhibit bucks and it just says Exhibit 6 through 10. Is there an inconsistency or are there differences between these categories of exhibits?

MS. MOONEY: I think that's just a clerical area we'll clear up and they should all be Bucks exhibit numbers.

MR. BRITTON: Thank you.

44 (Pages 170 - 173)

Page 174

- - -

(Bucks 0010, EMERALDADV-00000311 to EMERALDADV-00000317, marked for identification.)

- - -

BY MS. MOONEY:

Q.    Ms. Doran, do you recognize this document?

A.    It's old.  Yeah.

Q.    What is this?

A.    This is our investment management agreement with Emerald Advisers, the original one from when there was just Emerald Advisers.

Q.    Was this agreement in effect during the alleged class period?

A.    There's been -- yes, that is still in effect during the class period. During that time period, they were -- when they initiated with them, they were just small cap and then at another point they separated it to also being a mid cap.  But the billing and everything is the same.

Q.    Can we look at page 2,

Page 175

paragraph 4.

MR. BRITTON:  Again, Kim, I advise you to read the paragraphs before you answer questions about it.

BY MS. MOONEY:

Q.    I want to look specifically at the language, "EMERALD shall have sole discretion with respect to investments of funds in the Account as to purchases and sales without prior consultation."

A.    I see the sentence.

Q.    What does sole discretion mean?

MR. BRITTON:  Hold on one second.  The document is jumping around.

MS. REID:  I'm sorry.  Because it's old, the text couldn't be highlighted.

MR. BRITTON:  So, Kim, do you have the document from Docu Share?

THE WITNESS:  Yes.

MR. BRITTON:  Take a look at that one and read paragraph 4 before you answer any questions about it.

Page 176

MS. REID:  Sorry.  It's finished.

THE WITNESS:  I see the sentence.

BY MS. MOONEY:

Q.    My question was what does sole discretion in that first sentence mean?

A.    It means that the county, Bucks County Employees' Retirement Fund, approves Emerald to be our money manager and they have the sole discretion to invest in the investments that their strategy, they're the experts, and that they don't ask us about stock selection.  They invest, they're reviewed by an investment manager, and, again, they have to perform.

Q.    So you would not -- Emerald would not consult with Bucks County before deciding to purchase a stock?

A.    They would not.

Q.    And would they consult with Bucks County before making a sale of stock?

A.    They would not.

Q.    Bucks County has no role in Emerald's investment decisions on its behalf?

A.    We hire Emerald to be --

Page 177

MR. BRITTON:  Hold on one second.  Objection.  Misstates testimony.  You can answer.

THE WITNESS:  We hire all of our money managers, but Emerald does the money manager as their own investment decisions to make.  And, again, they're supposed to select the best strategies for or the best investments for the County of Bucks.  But they have the discretion.  We don't get that far down into stock selection or the weeds.  We select the managers and they select the investment, the stock selection.

BY MS. MOONEY:

Q.    Looking at the next sentence, it says, "EMERALD shall, however, be bound by such written guidelines for the management of the Account as shall from time to time be provided."

Did Bucks County provide written guidelines for management of the account for Emerald?

A.    Their guidelines would be that

45 (Pages 174 - 177)

Page 178

they are in the small cap strategy, and they're supposed to provide the best transactions for the county. So that would be pretty much it.

Q.    Looking at page 3, paragraph 7, EMERALD shall provide such reports regarding the Account quarterly and as may be agreed upon by the parties from time to time. [As read].

Focusing on the alleged class period, who would receive these reports?

A.    So Emerald, as well as a lot of our money managers, provide periodic reports to the county and they also have to provide all of the information and reports to our custodian and to our advisor. And then our advisor takes all of their information and combines it into I think quarterly report for the board for our quarterly meetings with PFM. So there is a number of people that receive information from Emerald.

Q.    Of those people who receive information from Emerald, who would actually read and review that information?

A.    That would be PFM.

Page 179

Q.    Were there any communications other than these quarterly reports between Bucks County employees and Emerald about the small cap growth fund?

A.    So Emerald --

MR. BRITTON: Objection. Vague and ambiguous as to communications. You can answer.

THE WITNESS: So Emerald, back in the olden days, used to send paper documents to the county to review. They send out emails and notices about different things to the county on a periodic basis. They have Emerald Groundhog Day which is an investment forum that they invite the county to. They have various reports that they -- or information or fact sheets, I guess, that they would send to the county but really the county relies on our investment advisor, which is PFM, to provide all of the information for all of the county's money managers to the board in a concise, quarterly meeting

Page 180

and reports. If PFM finds that there is a problem with one of our money managers, between our quarterly meetings they either provide us -- or call a special meeting or they provide us with what they call a PFM manager alert and they'll email that. I always get a copy of it and distribute it to the board. Sometimes it's an alert about one of the top people in the firm is leaving or if there is anything that they need the board to know about a manager, PFM would be the one that would carry it forward to the board.

BY MS. MOONEY:

Q.    Just going back to the question which was whether other than these quarterly reports Bucks County had any other communications with Emerald, is your answer that they would not have, but PFM may have had, communications?

A.    So the county would receive various items from Emerald. Like in the past, it was paper reports or whatever. And more

Page 181

than likely now it would be emailed documents. All kind of documents. Sometimes including they're, you know, what they think about different, different happenings within the investment environment. Some of them are about their investment day forum, inviting the county, if they would like to, come and see speakers. It's usually -- I think they call it the Groundhog Day forum, so it's around Groundhog Day. There would be different information that Emerald would send to the county. But, again, we rely on PFM to boil that information down for us and let us know if there is anything that we need to know positive or negative about Emerald.

Q.    And did Emerald ever send any, you know, follow-up questions or raise any questions based on the documents that it received -- apologize.

Did Bucks County ever raise any questions about the documents that it received from Emerald?

A.    No, because we pretty much filed them or whatever. Other than if it was

46 (Pages 178 - 181)

Page 182

something that was a money manager alert about Emerald or PFM. So the actual Emerald documents -- again, we have 26 different money managers, they're all sending us different information. But we rely on the expert, PFM, to take all that information and provide us with a more concise report of how the overall fund is doing. And they take a look at each one of our managers to see how they're compared to their benchmark and then they provide us with a concise quarterly report about that.

Q.    Emerald never had any in-person meetings with Bucks County?

MR. BRITTON: Objection. Vague as to time.

THE WITNESS: As far as I can remember, we have never called Emerald in to say we are unhappy with you and you're on the watch list. That would have been something where PFM would have been involved, the county would have been involved and Emerald would have been involved to call them in and

Page 183

kind of shake them up. But I don't recall ever having a meeting like that with Emerald.

BY MS. MOONEY:

Q.    And Emerald never made any presentations to the board?

A.    So Emerald --

MR. BRITTON: Objection. Vague as to time. You can answer.

THE WITNESS: So -- and this is a while ago -- Emerald created a new investment strategy called Mstone that they presented to the county that would be in addition to Emerald small and Emerald mid. They had something called Mstone, and that was a fixed income strategy. They did come in to talk to us about that strategy to see if we wanted to be involved in or invest in that strategy. Again, PFM reviews everything that the county would even consider and PFM actually would have to approve that as something the county should do, would complement the

Page 184

county's portfolio and that kind of stuff. They did meet with us about the Mstone strategy.

BY MS. MOONEY:

Q.    Looking at paragraph 9, "EMERALD shall not be liable for any loss incurred with respect to the Account when it has not been negligent..."

Why would Emerald want to limit its liability?

MR. BRITTON: Objection. Calls for speculation. You can answer, if you know.

THE WITNESS: I believe all money managers put something similar to this in their management agreement because, of course, they don't want to be liable for losses incurred when it hasn't been negligent. So I've seen the negligent or the non-liability for not being negligent in each one I think of our investment manager agreements. It seems to be standard.

BY MS. MOONEY:

Page 185

Q.    Is that because there is always a risk that investments will lose money?

A.    I believe --

MR. BRITTON: Objection. Calls for expert opinion. You can answer, if you know.

THE WITNESS: I'm not an expert, but, you know, thinking about the money manager, I think that they would want to try to protect themselves as much as possible. So it's just a standard piece of each one of these money manager contracts about the liability and the negligence.

MS. MOONEY: I'd like to mark as Exhibit 11, tab 22.

MS. REID: Ms. Mooney, this is Jessica, the concierge, can you hear me?

MS. MOONEY: Yes, I can.

MS. REID: I did rename all the other exhibits so that they're in the correct order. I just didn't rename number 10 since we were in it at the

47 (Pages 182 - 185)

Page 186

time.

MS. MOONEY:  Thank you very much.

MR. BRITTON:  So we're on Exhibit 11 now?

MS. REID:  Yes.  It should be at the end.

MR. BRITTON:  Got it.

- - -

(Bucks 0011, EMERALDADV-00000302 to EMERALDADV-00000309, marked for identification.)

- - -

BY MS. MOONEY:

Q.    This, Ms. Doran, is the Investment Policy Statement for Bucks County Employees' Retirement Fund to Emerald.  At the bottom of the page you see it says, "Submitted by Spagnola-Cosack," which you said before was the predecessor to PFM.  Is that right?

A.    Yes, correct.  Spagnola-Cosack became part of PFM.  Yes.

Q.    Is this one of the written guidelines that Bucks County would provide to

Page 187

Emerald that we saw referenced earlier in the investment agreement?

A.    Yes.

MS. MOONEY:  I'd like now to mark as Exhibit 12, tab 23.

- - -

(Bucks 0012, EMERALDADV-00000289 to EMERALDADV-00000301, marked for identification.)

- - -

BY MS. MOONEY:

Q.    We see here a November 28, 2001, letter from Spagnola-Cosack to Emerald Asset Management.  It says, "Enclosed is a copy of the Investment Policy Statement of the Bucks County Employees's Retirement Plan..."

If we go to the second page, at the top it says, "ADDENDUM TO INVESTMENT POLICY STATEMENT."  Is this another piece of written guidance that Bucks County would have provided to Emerald Asset Management?

A.    Yes, I believe we provide that through PFM, which I think Marie, Marina Savage, she was part of PFM, she provided that

Page 188

to -- she was Spagnola-Cosack and now she's part of PFM.  So yes, she provided that to the money managers, yes.

Q.    How does this relate to the policy statement that we just looked at?  Does this replace it or is it in addition to it?

A.    It would be in addition to it.

Q.    Looking on the second page under the heading "INVESTMENT GUIDELINES" and the "Allocation of Assets," it says, "The Investment Manager has been retained to invest the assets of the Fund under its management in Domestic Small Cap Growth Equity Investments."

So this is the small cap growth fund that we were talking about before?

A.    Yes.

Q.    What was Bucks County's understanding of how assets would be invested by selecting the domestic small cap equity portfolio?

MR. BRITTON:  Objection.  Asked and answered multiple times.  You can answer.

THE WITNESS:  So the county,

Page 189

again, uses PFM, selects its strategy.  PFM helps us select an investment manager within that strategy.  That strategy is then what that investment manager is supposed to invest in.  At different times throughout our history there have been times where people have been -- where managers have been allowed to hold more cash than would normally be necessary.  So I think this one might have mentioned that they're not restricted from investing in cash equivalents but temporary in nature.  And then the target allocation is compared by PFM to how the benchmark in the fund is doing.  So we compare each one of our money managers to a different benchmark in order to see how they're doing and compare them to the benchmark.  And that's how PFM would let us know if we should look at a different money manager as opposed to having this money manager.  We always try to outperform the benchmark.

48 (Pages 186 - 189)

Page 190

BY MS. MOONEY:

Q.   Was Bucks County expecting an individualized securities selection for the fund's assets?

MR. BRITTON:  Objection. Foundation.  Calls for speculation.

THE WITNESS:  The county individualized, you mean just invested for Bucks County?  The county wants the best investment possible at the least cost possible to the fund.  So the guidelines are the investments that the money managers are supposed to make, are supposed to weigh out the cost versus the return on the asset and get the best transaction for the county.

BY MS. MOONEY:

Q.   So was it Bucks County's understanding that the fund's assets would be invested in accordance with whatever securities were selected for the entire investment strategy?

A.   Yes.  So Emerald's investment strategy, Emerald's small cap growth

Page 191

investment strategy is where Bucks County's funds would be invested.

Q.   Has Bucks County ever specifically directed Emerald to buy or sell a particular security, whether AdaptHealth or another stock?

A.   No, we don't go down that far into the stock selection or the weeds, no.

Q.   Did Bucks County ever request any deviations from Emerald's investment strategy?

A.   No.  We've never called on them to purchase anything special for us or to do anything special for us, no.

Q.   Did Bucks County ever place restrictions on which US companies Emerald could invest in?

A.   No.

Q.   Not even after the alleged class period?

A.   No.

Q.   In investing in the small cap portfolio, did Bucks County understand that its assets would be exposed to risk?

Page 192

A.   I believe all investments are subject to some type of risk.  But the idea is to have safe investments that are best for the county.  So we're not into -- you're not allowed to invest in derivatives.  It has to be safe investments for the county.  And that's basically what our guidelines say, I believe.

Q.   When you say that the guidelines say that they have to be safe investments, is there a particular --

A.   The investment policy itself I believe says that the investments have to be with maximize return with reasonable and prudent levels of risk.  The investments, you can't have any more than 5 percent of total stock in our portfolio.  So within the overall investment guidelines there's what we would expect their performance should follow.

Q.   And did Bucks County understand that the small cap portfolio could perform badly and result in losses?

A.   So with any -- with any stock purchase, that's a possibility.

Page 193

MS. MOONEY:  I'd like to mark as Exhibit 13, tab 24.

- - -

(Bucks 0013, BCERS0000915 to BCERS0000926, marked for identification.)

- - -

BY MS. MOONEY:

Q.   This is the Investment Policy Statement for Bucks County Employees' Retirement Fund dated February 14, 2005.

Do you recognize this document?

A.   Yes.

Q.   Is this, again, in addition to the other policy statements that we've reviewed?

A.   So the Investment Policy Statement for the Employees' Retirement Fund has changed over time, especially in the asset allocation area.  Kind of like I said before, throughout the time period, they started in '99 with the board and we were pretty simplistic.  And then PFM, Spagnola-Cosack, introduced what international equity was.  And then they educated the board about what REITs

49 (Pages 190 - 193)

Page 194

were so that we could purchase REITs. So some of the asset classes and the ranges and targets changed throughout the years so that we could add on international equity or real estate equity. And pretty much that's what -- so it's been updated, the policy guidelines have been updated throughout the years.

Q. And is this policy statement, is this still active, still governs?

A. Yes. The policy statement still governs.

MS. MOONEY: I'd like to mark as Exhibit 14, tab 26.

- - -

(Bucks 0014, BCERS0001030 to BCERS0001079, marked for identification.)

- - -

MS. MOONEY: If we can maybe enlarge that a little bit, Jessica.

BY MS. MOONEY:

Q. You'll see this is an email from mjboparai@teamemerald.com --

A. Yes.

Q. -- to yourself, and it includes

Page 195

a number -- it includes four attachments. But if we could just look at the client account review attachment which begins on page 31 of the PDF.

MR. BRITTON: Kim, I advise you to flip through the whole document so you're familiar with its contents before you answer any questions.

BY MS. MOONEY:

Q. Ms. Doran, I actually just have one question about this, which is whether --

A. I'm still --

Q. I just wanted to ask specifically about that one attachment, whether this is one of the quarterly reports that we had talked about previously --

A. Yes, this is one of the reports.

Q. -- client account review?

A. They sent on a quarterly basis a multitude of reports. And yes, this is one of the reports. Again, we rely on PFM to boil it down to the information that we need out of these reports.

MS. MOONEY: Can we go off the

Page 196

record?

VIDEOGRAPHER: The time is now 3:16. This concludes media unit 4.

- - -

(A recess was taken.)

- - -

VIDEOGRAPHER: The time is now 3:33. This begins media unit 5.

BY MS. MOONEY:

Q. I'd like to go back to what we previously marked as Exhibit 8, which was the certification submitted as an exhibit to the motion for appointment. And if we could look at Schedule A.

Do you see here, Ms. Doran, three columns, "Date Acquired," "Amount of Shares Acquired" and "Price"?

A. I'm not sure that is Bucks County's or Delaware County's. I think ours might be after that.

Q. You're correct. Thank you. It's the last page of the exhibit.

A. Okay. Cool.

Q. And we see those same three

Page 197

columns, "Date Acquired" "Amount of Shares Acquired" and "Price." Correct?

A. Yes.

Q. And are these the days on which Emerald made purchases of AdaptHealth stock on behalf of Bucks County Employees' Retirement System?

A. Yes.

MR. BRITTON: Objection.

THE WITNESS: The date acquired --

MR. BRITTON: Objection.

Misstates the document. It also has -- for the record, it also has disposed dates as well on it.

BY MS. MOONEY:

Q. Focusing just on the purchases to start. Did Bucks County direct Emerald to make any of these purchases?

A. No. The date acquired was totally up to Emerald. Emerald, again, has their own stock selection and their own policies that they looked at. No, we didn't direct them to acquire it.

Q. And separate from the date,

50 (Pages 194 - 197)

Page 198

Bucks County did not direct Emerald to purchase AdaptHealth stock, period. Correct?

A.    We did not, no. Bucks County Employees' Retirement did not tell Emerald to purchase a stock.

Q.    And did Bucks County communicate with Emerald regarding any of these purchases before they were made?

MR. BRITTON: Objection. Asked and answered several times. You can answer.

THE WITNESS: No, Bucks County did not.

BY MS. MOONEY:

Q.    Did Bucks County have any knowledge of the purchase before it was made?

MR. BRITTON: Objection. Asked and answered many times. You can answer.

THE WITNESS: No, Bucks County does not. Emerald is the only one that actually does stock selection within their category, and they're the investment manager, they're supposed to

Page 199

make the best stock selections on behalf of the county. But not as directed by the county.

BY MS. MOONEY:

Q.    Focusing now on the next set of columns, we have "Date Disposed," "Amount of Shares Disposed" and "Price." Are these all -- does this list the sales of AdaptHealth stock that Emerald made on behalf of Bucks County Employees' Retirement System?

A.    So the dates disposed were the dates of the sale of the AdaptHealth stock that Emerald had purchased on behalf of the county, yes. The county didn't tell them to sell it.

Q.    You anticipated what I was going to ask.

A.    Yeah, I thought that was going to be...

Q.    Just to clear for all of these dates listed, Bucks County never directed Emerald to make any of these sales?

A.    No. Emerald makes their own decisions. That's why they're our investment

Page 200

manager. The managers make the decisions on their own.

Q.    And Bucks County did not know that AdaptHealth -- apologies. Bucks County did not know that Emerald planned to make these sales before they were made?

MR. BRITTON: Objection. Asked and answered.

THE WITNESS: No. Bucks County did not, no. Both the county and -- well, PFM and the county don't get down to this area of acquisitions and sales of any of the shares for any of our securities.

BY MS. MOONEY:

Q.    Did any Bucks County employees have direct contact with any AdaptHealth employees?

MR. BRITTON: Objection. This is one of those questions where I think you need to clarify between county and retirement system.

BY MS. MOONEY:

Q.    I'll ask both questions.

Page 201

Did Bucks County Employees' Retirement System have any direct contact with any AdaptHealth employees?

A.    So Bucks County Employees' Retirement System does not have any contact with AdaptHealth.

Q.    Do you know if any other county employees had direct contact with any AdaptHealth employees?

A.    Other Bucks County employees or Bucks County employees would not have any communication with AdaptHealth employees about any of the investments.

Q.    Was Bucks County aware of any nonpublic information about AdaptHealth?

MR. BRITTON: Objection. Vague as to time. You can answer.

THE WITNESS: No. Bucks County was, during this period, not even aware of AdaptHealth.

BY MS. MOONEY:

Q.    Has Bucks County ever reviewed any public documents provided by AdaptHealth?

A.    Not that I'm aware of. During

51 (Pages 198 - 201)

Page 202

this time period?

Q. From the time that AdaptHealth became a public corporation, which should also be around the start of our alleged class period, so yes.

A. So during the time period of the acquisitions and disposals, Bucks County was not aware of anything with AdaptHealth. Looks like the last disposal here on this schedule was July 9 of '21. AdaptHealth wasn't on our radar at that point. Subsequent to that, the county has reviewed documents that were prepared by AdaptHealth but not as part of the securities transaction schedule.

MS. REID: I think our court reporter got bumped.

VIDEOGRAPHER: The time is 3:42. Off the video record.

- - -

(A discussion off the record occurred.)

- - -

VIDEOGRAPHER: The time is now 3:47. Back on the video record.

Page 203

BY MS. MOONEY:

Q. Earlier we discussed that the county is alleging security fraud based on two separate categories of misstatements, the organic growth misrepresentation and the McGee issue misrepresentation. I would like to look at a couple of these in the Consolidated Complaint.

MS. MOONEY: If we could introduce as Exhibit 15, tab 9.

- - -

(Bucks 0015, Consolidated Complaint, marked for identification.)

- - -

BY MS. MOONEY:

Q. Do you recognize this, Ms. Doran, as the Consolidated Complaint for violation of federal securities laws that was filed by Delaware County and Bucks County in this action?

A. Yes.

Q. Could we go to paragraph 116 which is on page 49 of the document as marked on the document. I'd like to look at the

Page 204

indented text in paragraph 116. The paragraph says -- comes from a March 4, 2021, earnings call.

It says, "To emphasize all of the trends above and as detailed in the slide in our Q4 2020 earnings supplement, our organic growth for full year 2020 was 8.6% including the COVID B2B business and 5.6% when excluding B2B. For the fourth quarter, organic growth was 5.7% when compared to the fourth quarter of 2019, including the COVID B2B business and 4.9% when excluding B2B.

"With our PAP census rebuilding after the depressed new starts in midyear, increase in oxygen business in Q4, continued market expansion in CGM, we remain confident in our organic growth prospects between 8% and 10% for 2021."

Have you reviewed this statement before?

A. Yes, I read this before.

Q. Had you reviewed it prior to reviewing the Complaint?

A. I reviewed it as part of the

Page 205

Complaint.

Q. Is the county alleging that this statement is false or that it's misleading?

A. So this statement would be false and misleading based on -- if you go back to the fourth quarter 2020 actual information provided by AdaptHealth, within there they changed their metric, their formula for calculating the organic growth to include a formula, a different formula than what had been used in the past.

So in 2019, or whatever, they actually had true organic growth and then in the fourth quarter of 2020 they began to include -- somehow in that formula the acquisitions growth was included in there, and they began to call it pro forma net growth instead of organic growth. But they didn't really say, hey, this is a different calculation, this is a different way of doing it. And in looking at it, it looked like the actual growth, organic growth for that time period was actually negative. It wasn't actually a positive. It was declining. And

52 (Pages 202 - 205)

Page 206

looking at further information, it looked like their subsequent reports continued to use that pro forma growth metric which included kind of a convoluted way of having organic growth and the acquisition growth together until I believe it was the third quarter of '21 where they began to clear that up or record it separately again.

Q.    Did you ever review financial statement, AdaptHealth's financial statement from the time of this call that you mentioned in your answer?

MR. BRITTON:  Objection.  Asked and answered.  Are you talking about during this litigation or at the time of the statement?

BY MS. MOONEY:

Q.    I'm actually asking at any point have you looked at AdaptHealth's financial statements either from March 4, 2021, or any other financial statements?

A.    So during the time period of the class, I didn't look at anything with AdaptHealth at all.  But after the Complaint

Page 207

was filed in -- probably in December of '21 or sometime I guess in '22, I actually looked at information about AdaptHealth to find out what it was or what it was about.  And that's when I reviewed obviously like the statement that was for the fourth quarter and I guess AdaptHealth had put it out there, and it definitely changed the way that it looked on the statements by including -- it wasn't just organic growth anymore.

Q.    So you reviewed the, I believe the correct term is actually the financial supplement for March 4, 2021?

A.    So it was actually the Q4 information.  I don't know when it was actually submitted.  I don't know if it was dated March 4, 2021, or not.  But it was the Q4 information, the fourth quarter information and it was put out by AdaptHealth.

Q.    And when was it that you reviewed this?

A.    I reviewed it I'm going to say it was sometime in '22.  2022.

Q.    And I believe you said earlier

Page 208

that the financial supplement didn't say this is a new calculation.  Do you know that to be true?

A.    It didn't disclose that it was a different calculation than organic growth.  I didn't see anything on there that said this is not organic growth.  They called it pro forma net growth something, pro forma net revenue, pro forma something.  But it didn't say, hey, you know, we changed the way our methodology is for calculating it and it's not just straight organic growth anymore.  We've now combined the two together, acquisition growth and organic growth, and now it's a weird calculation.

Q.    And so based on your review of that Q4 2020 financial supplement, what in this statement that we are looking at in the Complaint is false or misleading?

A.    So the --

MR. BRITTON:  Objection.  Hold on.  Objection.  Asked and answered.  You can answer.

THE WITNESS:  So it was saying

Page 209

that -- it was saying that the growth for the fourth quarter was -- the organic growth for that quarter was 5.7 percent.  But really that wasn't strictly organic growth in there.  If you looked at the calculation of it, it had additional items in that calculation.  That wasn't just what they used to call organic growth which would be like growth of the business just by additional sales.

BY MS. MOONEY:

Q.    And you referred to it I think as weird calculation for organic growth.  In what way was it weird?  Why weird?

A.    It wasn't what you would call strict organic growth.  They added other elements into it which would not have been part of organic growth under the old methodology or the old formula for calculating it.  It added the acquisition revenue in as part of the numerator and the denominator I think in it.

Q.    Do you know how other companies

53 (Pages 206 - 209)

Page 210

calculate the organic growth?

MR. BRITTON: Objection. Calls for speculation. Foundation. You can answer, if you know. Vague as to other companies as well.

THE WITNESS: I don't know how other companies have done it, but when you say something is organic growth, the calculation would, just by definition of the word organic growth, just include organic growth, would be the normal person's understanding.

BY MS. MOONEY:

Q.    Where do you -- where do you get your understanding of what organic growth is?

A.    So the definition of organic growth, or I guess I get it from accounting background, organic growth is usually the growth of the company, but not by -- it's by product.

Q.    And is there only one way to calculate organic growth?

MR. BRITTON: Objection. Calls for legal conclusion -- calls for

Page 211

expert opinion.

THE WITNESS: I'm not an expert in it, so I'll not answer that.

BY MS. MOONEY:

Q.    You used the term true organic growth I think earlier. What did you mean by that?

MR. BRITTON: Objection. Asked and answered many times. Margot, really, you're rehashing the same ground. She's told you what she means by that. So move on to another question because you're wasting the witness' time right now.

MS. MOONEY: I'm sorry, I think she might have said organic growth means organic growth, but I don't know what that means.

MR. BRITTON: You asked her specifically earlier what do you mean by true organic growth. And she told you that they added acquisition revenue to it. That's her definition. So now you're wasting her time. It's late,

Page 212

it's getting late. Please move on to areas you haven't covered.

MS. MOONEY: Doug, I apologize. This is my examination and even from what you just said, I'm not sure you said that she told me that they added acquisition revenue to it. I don't know what it is. I'm going to continue with my questions.

MR. BRITTON: You have -- this is your examination, but you don't have the right to waste the witness' time. So I'm going to -- I'll allow her to answer it. But, please, the other questions were exactly the same ones you asked earlier in the day. So, please, cover new ground so we're not wasting the witness' time.

Go ahead, Ms. Doran, answer the question again.

THE WITNESS: So organic growth is growth of a company just by growing its actual business. So if you're selling more supplies and services,

Page 213

you're growing based on that. You're not growing based on you bought other companies and that those other companies are attributing to why your growth is increasing. Organic growth would be just you, just the company and actual services and goods that you provide without the acquisition growth included in there. The new metric included a formula, a metric that had organic growth and acquisition growth both in the same formula.

BY MS. MOONEY:

Q.    And what is your -- what is the source of your knowledge about organic growth?

MR. BRITTON: She testified that it was her accounting background. So do you want to ask her another question that covers different ground? You're asking the same questions. I haven't interrupted all day, but you're asking the exact same questions that you asked earlier. So, please, cover new ground. If you have anything to add, Ms. Doran,

54 (Pages 210 - 213)

Page 214

you can add it.

THE WITNESS: I don't have anything to add.

BY MS. MOONEY:

Q. So, Ms. Doran, is it correct that the source of your knowledge about organic growth is your accounting background, when you say that, do you mean your college experience, something subsequent to that?

A. So it would be my overall experience. College, work, just reading basic accounting literature. Reading the information as part of AdaptHealth's definition of organic growth. It would be everything combined.

Q. Looking at paragraph 117 just below, we see "Later, during the scripted portion of the Q4 2020 Earnings Call, Defendant McGee stated: '[W]e will continue to find ways to drive organic growth.'"

A. I see it.

Q. You had not previously been aware of that statement prior to reviewing the Complaint?

Page 215

MR. BRITTON: Objection. Asked and answered.

THE WITNESS: No. I was not aware of AdaptHealth or anything prior to us being involved. So I was not involved in the call.

BY MS. MOONEY:

Q. Is the county alleging that that statement is false or misleading?

A. I'm not saying that that is a misleading statement. I think their metric or how they showed their organic growth may have been somewhat misleading.

Q. If we can go earlier in the Complaint to paragraph 86. And if you see under, again, the indented text, the quoted text, it says, "Proposal No. 1 - Election of Directors." And this comes from an April 29, 2020, Schedule 14D proxy statement.

It says, "Luke McGee has served as the Chief Executive Officer of AdaptHealth Holdings since 2012 and as a member of our board of directors since the Closing."

I want to just take these

Page 216

statements one by one. Is this a statement that Bucks County is alleging is false or misleading?

A. No. He was the chief executive office of AdaptHealth.

Q. Looking at the next line, "Mr. McGee joined Quadrant Management, Inc. in 2010 and holds director positions in certain of Quadrant's portfolio companies along with executive level roles at certain times."

Is Bucks County alleging that that statement is false or misleading?

MR. BRITTON: Objection. Calls for a legal conclusion. You can answer it, if you know.

THE WITNESS: I don't believe that is misleading.

BY MS. MOONEY:

Q. Looking at the next statement, "Prior to joining Quadrant, Mr. McGee was in the investment banking group at Deutsche Bank and before that Merrill Lynch."

Is Bucks County alleging that that statement is false or misleading?

Page 217

MR. BRITTON: Same objection.

THE WITNESS: To the best of my knowledge, I don't believe that is false or misleading.

BY MS. MOONEY:

Q. The last sentence, "He holds a bachelor's degree in Economics from Duke University."

Is Bucks County alleging that that is false or misleading?

MR. BRITTON: Same objection.

THE WITNESS: I don't believe that that is false or misleading.

MS. MOONEY: I'd like to introduce as Exhibit 16, tab 33.

- - -

(Bucks 0016, Exhibit 51, marked for identification.)

- - -

BY MS. MOONEY:

Q. Do you recognize this document, Ms. Doran?

A. Yes.

Q. What is it?

Page 218

A.    This is AdaptHealth's statement that when they published or let everyone know that Mr. McGee had been placed on an unpaid leave of absence because of a tax case in Denmark for the fraud of the refund of taxes on dividends.

Q.    And based on your prior testimony about AdaptHealth not having been on your radar prior to it being brought to your attention by Robbins Geller, is it fair to say that you and Bucks County did not review this document at the time that it was published?

A.    We did not review it at the time it was published.

MS. MOONEY:  I'd like to introduce tab 35 as Exhibit 17.

- - -

(Bucks 0017, Jehoshaphat Research Report, marked for identification.)

- - -

BY MS. MOONEY:

Q.    Do you recognize this document, Ms. Doran?

A.    Yes, I do.

Page 219

Q.    What is this one?

A.    This is the Jehosaphat report where they came out and they said that AdaptHealth was actually misrepresenting their organic growth by not calculating it in the same way they had in the past and that actually their organic growth had stalled or actually maybe declined.  I think they said double digit decline or something.  Double digit organic growth decline.  This is the report that came out in July I believe and after that, the stock dropped again.

Q.    When did the county first learn about the Jehosaphat report?

A.    I'm going to say probably after we joined, sometime after September of '21 when we decided to become part of the lead plaintiff or part of the securities litigation matter and to hire Robbins Geller to represent us in it.

Q.    Does the county know who operates Jehosaphat Research as you can see at the top of this document is the entity that put out this report?

Page 220

A.    Do we know who owns it?

Q.    Who operates it or do you know anything about Jehosaphat Research?

A.    No, just that it provides reports.  No.

Q.    Did the county know about the information that was contained in the Jehosaphat report before it was issued?

A.    No, it did not.

Q.    Did the Jehosaphat report factor into Bucks County's investment in AdaptHealth in any way?

MR. BRITTON:  Objection.  Vague.  You can answer.

THE WITNESS:  So the county did not dictate that we invest in AdaptHealth.  So it didn't play any kind of role in the county or money manager -- us telling our money manager to buy AdaptHealth, although the information in the Jehosaphat report was looked at by our lawyers and their experts.

BY MS. MOONEY:

Page 221

Q.    Has Bucks County Employees' Retirement System had any communication with anybody at Jehosaphat Research?

A.    No.  We have -- our retirement system has not.

MS. MOONEY:  I'd like to take a short break and go off the record.

MR. BRITTON:  How long -- go ahead.

VIDEOGRAPHER:  The time is now 4:14.  Going off the video record.

- - -

(A recess was taken.)

- - -

VIDEOGRAPHER:  The time is now 4:32.  Back on the video record.

BY MS. MOONEY:

Q.    Mr. Doran, does Bucks County maintain a physical office?

A.    Yes.  Bucks County Employees' Retirement Fund is part of the controller's office.

Q.    And does Bucks County keep physical files related to its retirement fund?

56 (Pages 218 - 221)

Page 222

A.    Yes.  Some of the files are physical, yes.

Q.    Where are those files kept?

A.    We have a safe in the controller's office.  We keep our minute books in the safe.  We also have, for the retirement fund, employee folders for past employees that are now retirees.  Those folders are also -- they're personnel files.  They're kept in the safe, also, in fireproof filing cabinets.

Q.    Who is responsible for overseeing those files?

A.    Ultimately the board, but the controller is the secretary of the board.

Q.    Does Bucks County have its own email domain?

A.    Yes.

Q.    What is it?

A.    The retirement fund doesn't, but Bucks County has its own.

Q.    What is the Bucks County retirement -- what is the Bucks County email domain?

A.    It's buckscounty.org.

Page 223

Q.    And does the retirement fund board use that email domain as well?

A.    Yes.

Q.    Who is responsible for overseeing Bucks County's email network?

A.    The IT department is responsible for the network.

Q.    And is that Bucks County's IT department?

A.    Yes.

Q.    Is your network hosted by Outlook, do you know?

A.    Yes, we have an Outlook network, yes.

Q.    How long are emails stored on the system?

A.    So it depends is the answer.  Are we talking about an employee who is no longer with the county or an employee that is with the county?

Q.    If you could answer both of those, that would be helpful.

A.    So if an employee is no longer with the county, the department head that

Page 224

works -- that that person worked for would contact the IT department if they needed any information off of that person's emails or their -- what we call the H drive, which is their drive that they should save information to.  If they did not request that information, I believe it would be destroyed within -- after the 30th day after they've left.

Q.    For a current employee, how long are emails kept?

A.    So current employees, they maintain their own Outlooks.  Some people delete them as soon as they've read them.  Some people maintain them for longer than that.  There is a size limit with the Outlook.  And if you have too much information within your Outlook, you'll get messages that you can't send or receive messages anymore because you've come close to the maximum.  There is also -- you can take it out of your Outlook and park it off to the side so that it would be in a separate folder if you want to maintain your emails that way.  So it really depends on the person.

Page 225

Q.    In the event that somebody's inbox were to hit that size limit, what happens then?

A.    So they aren't [sic] able to send out any emails, but people that try to send them emails get a rejection saying they've exceeded the limit or that the mailbox is full.

Q.    So then they're responsible for deleting items from their inbox until they come back below that?

A.    Correct.

Q.    So there is no auto delete of emails at any point?

A.    So the auto delete would be when somebody leaves, it would be auto deleted, yes.

Q.    Are current employees ever instructed not to delete emails from their inboxes or to be sure to retain emails, for example, in connection with the litigation?

A.    Yes, in connection with the litigation they would receive something from the law department or their department head,

57 (Pages 222 - 225)

Page 226

whoever it may be, saying do not delete anything in this subject matter. But the litigation hold is what we call it.

Q. Right. And in connection with this litigation, was there a litigation hold that was issued?

A. Yes. We didn't delete anything to do with AdaptHealth.

Q. When emails are deleted from an inbox by an individual employee, are they still maintained on the system in any way?

A. So you can delete and it goes to your delete folder. And then if your delete folder is emptied, it's taken off of the system. Some people hold -- I believe it's control delete and they're deleted permanently also.

Q. So in that case there would be no way for the county to recover that email?

A. So the county does do backups. Sometimes people's systems crash. So they do a backup to the system. But I believe that that is overwritten every month. I believe they start with like the first day of the

Page 227

month and go through the month and then they override their backups. And that would be assuming that they maintain their documents on an H drive, which is a drive that is backed up. If people store their documents on their C drive, it's not backed up.

Q. So assuming that, you know, 30 days has passed since an email was deleted, it would no longer be retained anywhere. Correct?

A. So IT, with their backups, they back up every day for 30 days and they begin to override what they had backed up within the 30 days.

Q. Right. So if somebody had deleted an email, it's gone from their inbox, it would be on the backup for 30 days. After those 30 days, there would no longer be a record of that email?

A. It could also be in their delete folder if they haven't emptied it. But most people empty their delete folders. So within Outlook there is your regular folder, your junk folder, your delete folder. So if you

Page 228

just delete and don't clean out your delete folder, it would stay in there.

Q. Do you know how long files stay in a delete folder?

A. So I don't know the answer to that, but I believe that that would be the first place people would go when they reach the max on their Outlook. That would be the easiest place to delete from so they would be able to receive emails again.

Q. And the 30-day backup that you referred to, is that the only way that emails are retained separate from employees' individual file management?

A. If the department head contacts the IT department or the HR department, if they're having an issue with an employee, they can request that they receive a copy of that information from the IT department and then they would maintain that in order to view it. But there's rules around that and it has to be approved by both the HR department and the IT department. But there would be a copy in that case that is outside of the normal saving and

Page 229

deleting process.

Q. And was there a litigation hold issued in connection with -- apologize, I think you may have already answered this. But was there a litigation hold issued in connection with the AdaptHealth litigation?

MR. BRITTON: Objection. Asked and answered. You can answer.

THE WITNESS: Yes, we did receive -- yes.

BY MS. MOONEY:

Q. And so were any of these retention policies that you've just described changed as a result of the litigation hold that was issued or modified?

A. So none of us deleted anything that was in our email boxes as a result of this. So everything is still in my email box that had to do with AdaptHealth is the easy way to say it.

Q. It's up to the individual employee to ensure that nothing from their email gets deleted. There's no policy change or system change that would prevent the

58 (Pages 226 - 229)

Page 230

deletion of documents?

A.    The person would have to disregard the litigation hold if they were going to delete anything. So I don't think they would. But it's up to the individual, yes.

Q.    How were employees notified of the litigation hold in connection with AdaptHealth?

A.    So I believe the law department sent forward a notice that we were to maintain everything as part of the AdaptHealth case. And we also talked about it during our meeting where we talked about how we were going to search for different information. We all gave access to our email drives as well as our H drives where a number of things could be stored.

Q.    Who did you give access to email drives to?

A.    IT. They're the ones that have the search terms and the ability to do major searches within the county's IT system.

Q.    And was the litigation hold

Page 231

issued to all employees?

A.    No, just the ones that would have information that would be -- the solicitor's office and myself would be the major people that would have any kind of information.

Q.    Was the board provided the litigation hold?

A.    I don't know if the board was provided the litigation hold. Because anything that the board would have received would have come either from the law department or me. So it would have kind of been the same information.

Q.    And who made the decision as to which individuals received the litigation hold?

A.    I believe the law department.

Q.    And is there any way for anybody to verify that the litigation hold is being adhered to?

A.    I wouldn't think that anybody here would not adhere to it. That would be wrong. But IT would also have, I guess, the

Page 232

ability to go back and at the time review all of the information that they had on the saved files.

Q.    Would that ability -- would that ability only extend 30 days until they do their next backup, or is there --

A.    So the IT department would have the ability to go back to any item that they saved along the way and verify if there was anything in their search terms for AdaptHealth or anything in anybody's email boxes.

Again, Amy from the solicitor's office or Joe or myself, we're not going to delete anything because it would be wrong.

Q.    How do you know that -- putting aside yourself, you wouldn't delete anything, how do you know that others wouldn't delete anything?

A.    Well, because they're law abiding people. They're part of our law department. They're not the type of people that would do anything like that. They're the ones that are telling us not to delete things, so they wouldn't do it.

Page 233

MS. MOONEY:  I'd like to introduce as Exhibit 18, tab 37.
- - -
(Bucks 0018, Defendants' First Set of Requests For Production of Documents, marked for identification.)
- - -
BY MS. MOONEY:

Q.    While that is coming up actually, when was the litigation hold issued in connection with AdaptHealth?

A.    I would have to go back and look. I believe that it was -- I'm going to say sometime last year, but I don't know when. I've known not to -- ever since we've become involved in the case, not to delete anything that has to do with AdaptHealth.

Q.    So we see on the screen now what is being marked as Exhibit 18. And this is Defendants' First Set of Requests For Production of Documents. You can see the case caption is for this matter. Have you reviewed these requests?

A.    Yes. I looked at the request,

59 (Pages 230 - 233)

Page 234

yes.

Q.    Did Bucks County review them before it served responses and objections on August 18, 2022?

A.    So the Bucks County law department did review this.

Q.    Prior to the responses and objections being served?

A.    Prior to.  Yes.

Q.    When did you review this?

A.    I believe shortly after they received it, they forwarded it to me to take a look at and see if I had any questions.

Q.    You referred a couple of times to a meeting where you talked about search terms.  Were those search terms in connection with identifying documents responsive to these requests?

A.    Yes.

MR. BRITTON:  Kim, this line of questioning, I'm going to caution you not to reveal any communications with counsel, be it the solicitor's office or us.  If you can answer the questions

Page 235

without reference to those, then you can answer.

THE WITNESS:  Okay.

BY MS. MOONEY:

Q.    What are the search terms that the county used for searching its emails?

A.    So Mike Gallagher from our IT department actually would have those terms, but we talked about Adapt, AdaptHealth, healthcare.  The ticker symbol for it.  McGee.  Anything to do with, I guess it was -- anything to do with AdaptHealth.  Any version of what their corporate name was.

Q.    And were there any other terms that you can remember?

A.    They talked about I believe, because some of the terms were tough, like they would have to do with the full name of the person within the request.  Like we have an employee here whose last name is Griggs, but it's Bernard.  So they were going to look for, like, Stephen Griggs rather than -- they talked about the search terms and how far they can go in looking for that information.

Page 236

Q.    Could you describe the efforts that the county undertook to search for documents responsive to these requests?

A.    So looking for the hard copy documents, we reviewed the minutes of the retirement board meetings, the retirement board agendas.  We looked through our contract.  We looked through any -- like for the Emerald agreement, that we had the Emerald agreement, the PFM agreement.  We looked at our Wells Fargo statements.  Wells Fargo is our custodian.  We went through any of the older records that we might have that would have been -- anything that would have been requested.  So any of the contracts.  We made sure that none of our other managers -- we looked for AdaptHealth within our other managers and their investments.  Looked at PFM reports.  That was the -- like the paper version.  And then the IT version, again, we left it up to the deputy CIO, Mike Gallagher.  He took the search terms and he worked with his staff and whatever equipment they have up there to actually do searches on people's

Page 237

shared drives or H drives, their Outlook and to verify if there was anything there.

Q.    Do you know, did he search across all emails that would be on the Bucks County email system or did he limit it to certain custodians?

A.    I think he limited it to the custodians which would have been like the law department, Amy and Joe, myself.  Because, again, anything that has to do pretty much with the Bucks County Employees' Retirement System would have come in or out through one of us dealing with money managers, dealing with the legal matters, would have all come through us first.  PFM, when they send out their PFM updates, they would give them to me and I would give them to the board.  It would pretty much be in one of our worlds, if you want to call it.

Q.    Focusing just on the hard copy search you just described, who actually conducted that search?

A.    I did.

Q.    And about how long did it take?

60 (Pages 234 - 237)

Page 238

A.    Well, so luckily, as a result of past suits or whatever that we've looked at, we know exactly where to go for the folders. We have a safe here which includes all of the minutes and all of the board agendas. And luckily the time period didn't go back for looking for AdaptHealth prior to 2019. So the hard copies were all in this office for that time period. So on and off, I mean, I looked on and off throughout a couple of days probably for the paper trail.

Q.    Did anybody else help you with that search?

A.    So, I mean, I asked Donna for the minutes. Again, I looked through the minutes myself.

Q.    What precautions were taken to ensure that documents relevant to the requests weren't overlooked?

A.    So based on the request for the documents, it kind of gave us an idea of where to look. We would just -- I went through the drawers of the filing cabinets or whatever and looked at papers or reports that we had in

Page 239

hard copy. A lot of them, like I said, are somewhat older based on now most of the correspondence we receive is via email. So some of the documents were old and dusty, but the minutes are still, like I said, maintained in paper form. We also have the paper agendas.

Q.    With regard to the electronic documents, do you know how long it took Mike Gallagher to do his search?

A.    I don't know. Most of his would have been done by a program. So it would be, I don't want to say fairly simplistic, but I believe we bought software that makes searching through for this information easier.

Q.    We talked about the solicitor's office or the law department before. How many employees are part of that office?

A.    The law department has, I'm going to say, between support staff and attorneys, I got to say the attorneys come and go frequently, so I'm going to say we probably have ten employees.

Q.    Would all of those employees have been included in the search?

Page 240

A.    I believe that only Joe and Amy would have been included in the search because all of the -- they're at the top of the department. They're the department heads. Everything runs through them. And Amy is the retirement board law solicitor. She comes to the retirement board meetings. They're all kind of niched. So there is a children and youth lawyer. Amy is, besides being the second in the command, she is the retirement board solicitor.

Q.    I think you explained before the logic behind only searching Joe's emails, Amy emails, and your emails is that you would have been copied on anything related to AdaptHealth and that any communications with the board would have gone through one of you. How can you be sure that there wouldn't be communications between board members about AdaptHealth or that are otherwise responsive to the document requests?

A.    So a lot of the board members have left. They're not with the county anymore. Just by -- they were voted out of

Page 241

office and we have new board members in. So basically the person that was the treasurer, when he left, there was nothing in his office when the new treasurer came in. Anything correspondence wise that she receives comes either from myself as part of the being the secretary of the retirement board or she would receive it directly from the law department. They all have their treasurer jobs or their commissioner jobs to do as well as being members of the retirement board. So they rely on the experts, the lawyers, or for the accounting stuff, myself, to do that for them. And then we provide them with the information.

Q.    So would the county have had any emails from the prior board members to be able to search even if it had chosen to?

A.    I don't believe that there was anything left from the prior board members. They were gone.

Q.    But Commissioner Marseglia's emails would presumably still be available?

A.    Yes.

Q.    One point I wanted to clarify,

61 (Pages 238 - 241)

Page 242

we may have touched on earlier, but is there an individual at Bucks County, either at Bucks County or as part of the Bucks County Employees' Retirement System, who is responsible for overseeing this litigation?

A.   So at Bucks County, our person responsible would be Amy in the solicitor's office.

Q.   And what specifically does Amy do to oversee the litigation?

A.   Amy --

MR. BRITTON:  Hold on one section.  Objection.  Calls for attorney-client privilege.  Kim, you can testify about what she does, but nothing about communications.

THE WITNESS:  So Amy receives information and reviews it.  And any questions that she would have, she would find out the answers to.  She would also provide the documents to myself and answer any questions that I would have about any documents as well as she is the main contact and myself

Page 243

with Robbins Geller and keeping -- she would keep the board abreast of what is occurring within the case.

BY MS. MOONEY:

Q.   So she receives -- when you say she receives information and reviews it, you mean she receives information from Robbins Geller and reviews it, and if she has any questions, she raises that to Robbins Geller?

A.   Yes.  Or if she needs information from the Bucks County Employees' Retirement System, she would ask questions about that.

Q.   Is there anything else that she does to oversee the litigation?

A.   I'm not sure what else you mean besides being the main -- she is the main contact person and the main reviewer.  She provides information about it and she receives information about it.  So she is our main contact person.

Q.   Would the county continue serving as lead plaintiff in this action even if it wouldn't recover anything?

MR. BRITTON:  Objection.  Vague.

Page 244

Hold on a second.  Objection.  Vague and ambiguous as to recover anything.  You can answer.

THE WITNESS:  Yes, because going into it we don't know if we're going to recover what is out there.  So yes.  I mean, we've signed on and yes, we would still remain, yes.

BY MS. MOONEY:

Q.   If the county, I guess, knew that, it wouldn't recover any of its alleged losses, would it still continue serving as lead plaintiff?

MR. BRITTON:  Objection.  Calls for speculation.  You can answer.

THE WITNESS:  Yes.  I mean the county wouldn't give up.  They signed on to be the lead plaintiff.  We're not quitters.  So we would continue.  We have a fiduciary duty at this point.  I think the board has approved that we have the fiduciary duty as well as Delaware County, and we would continue to go forward.

Page 245

BY MS. MOONEY:

Q.   Who is the fiduciary duty that you just described owed to?

A.   The fiduciary duty would be owed to the members of the class, which includes us, the Bucks County Employees' Retirement System, and the Delaware County Employees' Retirement System.

Q.   Has the county ever pursued litigation in the securities context or otherwise that was contrary to its own interests?

A.   Not that I'm aware of.

MR. BRITTON:  Objection.  Vague and ambiguous.  Calls for speculation.  You can answer.

THE WITNESS:  Not that I'm aware of.  I don't know.

MS. MOONEY:  I think that's it for our questions, but we may have follow-up questions if Doug is planning to do any redirect.

MR. BRITTON:  Can we take a quick five-minute break and let us put

62 (Pages 242 - 245)

Page 246

our heads together and see if we have anything.

VIDEOGRAPHER:  The time is now 5:04.  Going off the video record.

- - -

(A recess was taken.)

- - -

VIDEOGRAPHER:  The time is now 5:09.  Back on the video record.

MR. BRITTON:  We're not going to have any questions for today.  I did want to say Margot, thank you for being respectful of the witness' time and ending when you did.

MS. MOONEY:  We appreciate your time very much, Ms. Doran, and hope you have a good weekend.

THE WITNESS:  Go Eagles.

MR. BRITTON:  Go Eagles.

VIDEOGRAPHER:  The time is now 5:10.  This concludes this video deposition.

- - -

(Witness excused at 5:10 p.m.)

Page 247

C E R T I F I C A T E

I do hereby certify that I am a Notary Public in good standing, that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

WITNESS my hand and official seal this 12th day of February 2023.

Linda Rossi-Rios, RPR, CSR
Notary Public

Page 248

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 249

- - - - -

E R R A T A

- - - - -

PAGE  LINE  CHANGE
___ ___ _____
Reason for Change:
_____
___ ___ _____
Reason for Change:
_____
___ ___ _____
Reason for Change:
_____
___ ___ _____
Reason for Change:
_____
___ ___ _____
Reason for Change:
_____
___ ___ _____
Reason for Change:
_____
___ ___ _____
Reason for Change:
_____

63 (Pages 246 - 249)

Page 250

ACKNOWLEDGMENT OF DEPONENT

I, _____, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____          _____
DATE                    SIGNATURE

Subscribed and sworn to before me this _____ day of _____, 2023.

My commission expires: _____

_____
Notary Public

Assignment: 5681517

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

**[& - 2020]**                                                                 Page 1

**&**

**&**   2:3,9,17 7:6
14:19 90:1
91:4 127:8

**0**

**00000289**   3:23
187:7
**00000301**   3:23
187:8
**00000302**   3:21
186:10
**00000309**   3:22
186:11
**00000311**   3:20
174:2
**00000317**   3:20
174:3
**0001**   3:8 21:21
**0002**   3:9 84:4
**0003**   3:11
102:21
**0004**   3:12
126:23
**0005**   3:14
137:22
**0006**   3:15
149:21
**0007**   3:16
151:5
**0008**   3:18
152:11
**0009**   3:19
156:11
**0010**   3:20
174:2

**0011**   3:21
186:10
**0012**   3:23
187:7
**0013**   4:1 193:4
**0014**   4:2
194:15
**0015**   4:4
203:12
**0016**   4:5
217:17
**0017**   4:6
218:18
**0018**   4:7 233:4
**00962**   156:19
157:3
**03382**   1:4 6:12

**1**

**1**   6:5 21:15,16
21:24 22:11
33:14 61:10
173:15 215:17
**10**   1:17 5:18
23:6,6 24:3
159:12 173:11
173:17 185:24
204:18
**1001**   247:21
**10019**   2:12
**10036**   2:18
**102**   3:11
**10:56**   61:10
**11**   149:19
185:16 186:5

**116**   203:22
204:1
**117**   214:16
**1177**   2:18
**11:09**   61:15
**12**   187:5
**126**   3:12
**12:04**   102:12
**12:17**   102:17
**12:24**   106:18
**12:30**   106:23
**12th**   247:19
**13**   23:8 24:3
193:2
**137**   3:14
**14**   151:3
193:10 194:13
**149**   3:15
**14d**   215:19
**15**   84:14 86:7
87:8 103:1
116:23 118:3
119:19 141:7
141:11 142:21
165:18 203:10
**151**   3:16
**152**   3:18
**156**   3:19
**16**   75:18 152:9
156:9 217:15
**17**   218:16
**174**   3:20
**18**   53:15 233:2
233:19 234:4

**186**   3:21
**187**   3:23
**18901**   8:10
**19**   71:11
**1900**   2:5
**193**   4:1
**194**   4:2
**1971**   17:11
**1983**   14:9
**1990**   13:22
14:20
**1999**   47:2,15
**1:28**   149:12

**2**

**2**   61:15 84:2
89:21,22
102:12 124:17
125:20 142:21
142:22 174:24
**20**   71:11,12
138:2 165:19
173:11
**2001**   187:12
**2005**   193:10
**2010**   216:8
**2012**   215:22
**2018**   53:15
**2019**   27:23
52:9 58:22
60:15 71:6
75:18 162:4
204:11 205:12
238:7
**2020**   52:13,15
52:21 53:1,2

**[2020 - able]**

Page 2

69:4,5,7,15
71:9 204:6,7
205:6,14
208:17 214:18
215:19
**2021** 75:18
81:17,19 103:1
138:2 141:11
142:21 161:24
204:2,18
206:20 207:13
207:17
**2022** 37:22
52:17 150:2
151:12,21
207:23 234:4
**2023** 1:17 5:18
247:19 250:15
**203** 4:4
**21** 3:8 28:17
30:9 65:17
202:10 206:6
207:1 219:16
**217** 4:5
**218** 4:6
**22** 185:16
207:2,23
**23** 187:5
**233** 4:7
**24** 193:2
**25** 19:11
**2500** 18:14
109:1
**26** 166:24
182:3 194:13

**27** 166:24
**28** 94:1,8,15
124:9 151:12
187:12
**29** 215:18
**2:13** 149:17
**2:21** 1:4 6:12

**3**

**3** 84:2 100:20
102:17,19
123:24 125:6
149:12 178:4
**30** 1:20 10:3
17:20,22 24:12
227:8,12,14,17
227:18 228:11
232:5 248:14
**30th** 224:8
**31** 195:3
**32** 13:23
**33** 217:15
**35** 218:16
**37** 233:2
**3:16** 196:3
**3:19** 156:19
157:3
**3:33** 196:8
**3:42** 202:17
**3:47** 202:24

**4**

**4** 102:19
126:21 149:17
175:1,23 196:3
204:2 206:20

207:13,17
**4.9** 204:12
**49** 203:23
**4:14** 221:11
**4:32** 221:16

**5**

**5** 126:21
137:20 154:14
155:5 157:2
173:15 192:16
196:8
**5.6** 204:8
**5.7** 204:10
209:3
**50** 137:15
**51** 4:5 217:17
**54** 18:18
**55** 8:9
**5681517** 250:22
**57** 140:18
**58,000** 95:5
140:18 141:10
**5:04** 246:4
**5:09** 246:9
**5:10** 246:21,24

**6**

**6** 1:20 10:3
24:12 149:19
173:17
**655** 2:5

**7**

**7** 3:4 137:20
151:3 178:4

**787** 2:12

**8**

**8** 75:18 152:9
156:21 196:11
204:17
**8.6** 204:8
**84** 3:9
**86** 215:15

**9**

**9** 125:20 150:2
156:9 157:5
184:5 202:10
203:10
**900** 162:4
**90s** 166:11
**92101** 2:5
**96** 15:22 17:10
21:10 46:12
48:24 170:17
**99** 166:12
193:21
**9:53** 1:21 5:17

**a**

**a.m.** 1:21
**abiding** 232:19
**ability** 70:11
99:22 123:19
131:4 147:22
230:22 232:1,4
232:5,8
**able** 22:3,5,16
86:19 90:10
96:15 145:7
225:4 228:10

**[able - adapthealth]**

241:16
**above** 204:5
**abreast** 167:21
243:2
**absence** 16:17
97:6 218:4
**absolutely** 84:9
**access** 27:1
230:16,19
**accommodate**
12:11
**accordance**
170:17 190:20
**account** 77:14
175:9 177:19
177:22 178:6
184:7 195:2,18
**accountants**
20:2
**accounting**
13:20,20 14:2
14:4,17 15:3
18:8,20,22
20:1 210:17
213:17 214:7
214:12 241:13
**accounts** 18:8
18:22 19:15,16
**accurate** 65:10
104:2 248:17
**accurately**
11:13 12:21
**acknowledge**
5:4,8

**acknowledg...**
250:1
**acquire** 197:23
**acquired** 65:12
75:24 196:16
196:17 197:1,2
197:10,19
**acquiring**
67:10
**acquisition**
206:5 208:13
209:21 211:22
212:7 213:8,11
**acquisitions**
1:10 66:9 67:9
68:3 69:1,10
70:14 154:6
200:12 202:7
205:16
**act** 15:22 17:10
21:10 46:12
48:23 111:18
113:19 170:3
170:17
**action** 1:4 6:20
9:15,18 62:4,6
78:8 79:15
80:3 82:20
85:5 90:3,8
91:6,19 94:13
101:12,16,18
104:11 105:14
105:23 108:15
117:17 118:1
118:11,15,21

118:22 122:18
122:21 123:2
123:19 124:2
124:21,21
125:24 126:8
126:18 132:8
138:12 139:14
139:16 141:20
141:24 145:15
160:13 203:20
243:22 247:16
**actions** 9:8
116:17 131:20
143:11,19
157:8,16
159:14 169:21
**active** 194:9
**actual** 41:12
51:14 65:9
67:1 142:19
182:2 205:6,22
212:23 213:7
**actuality** 67:15
**actually** 17:22
19:23 30:24
31:21 34:10
40:10 46:14
48:2 66:16
68:17,19 90:23
95:8,13 97:11
122:6 129:18
130:5 141:2
154:12 164:16
165:2 167:11
178:22 183:22

195:10 198:22
205:13,23,24
206:18 207:2
207:12,14,16
219:4,7,8
233:10 235:8
236:24 237:21
**actuary** 54:17
**adam** 156:17
**adapt** 91:8
96:17 100:21
138:12 139:14
235:9
**adapthealth**
1:9 2:9 6:9 7:2
8:4 28:21
30:15 41:24
42:1,21 58:5
58:18,20 59:3
59:6,8,20,22
60:16,17 61:17
61:19,20,23
62:7,10,12,20
63:2,9,23
65:13,15,16,21
66:3,5,22 67:6
71:4 73:17
74:4 75:24
76:4,12,20
82:22,24 83:21
84:19 86:8
90:2 91:11,24
92:14 93:9
97:2,18 98:19
99:6,10 100:8

**[adapthealth - alleged]** Page 4

101:3,10 116:11 117:3 123:10,18 128:8 130:15 131:16 136:21 139:17 141:1 158:16 165:6 191:5 197:5 198:2 199:8,12 200:4,17 201:3 201:6,9,12,15 201:20,23 202:2,8,10,13 205:7 206:24 207:3,7,19 215:4,21 216:5 218:8 219:4 220:11,17,20 226:8 229:6,19 230:9,12 232:10 233:11 233:17 235:9 235:12 236:17 238:7 240:15 240:20

**adapthealth's** 62:3 68:24 70:21 72:3 206:10,19 214:13 218:1

**add** 83:14 84:24 136:22 137:3 194:4 213:24 214:1,3

**added** 31:2 82:14 209:17 209:21 211:22 212:6

**addendum** 187:18

**addition** 126:11 183:14 188:6,7 193:13

**additional** 125:4 126:9 129:7 130:12 209:7,11

**address** 8:7,9 8:11 82:7

**addressed** 93:16

**adhere** 231:23

**adhered** 231:21

**administer** 5:10 6:19

**administered** 5:9

**administering** 55:13

**administrator** 51:6,12,17

**advance** 124:18

**advise** 106:1 175:3 195:5

**advised** 171:9

**advisers** 164:24 174:12,14

**advisor** 44:8 47:5,13,15

48:6 51:9,10 51:11,20 54:4 73:11 78:3 89:7 107:15 108:1 162:22 163:24 164:11 166:4 167:9 178:15,16 179:21

**advisors** 47:11

**affect** 50:17 145:8,12

**affected** 96:2

**aforesaid** 247:4

**agenda** 28:19 28:20 30:8 31:3,9 53:21 56:24 58:20,21 81:21 82:14 83:15 84:22,22 84:24 86:4 88:3,5,7,10 90:23,24 117:13,20 118:7,18

**agendas** 16:3 236:7 238:5 239:6

**ago** 20:7 150:13 183:11

**agree** 6:3 156:24 160:11

**agreed** 161:13 178:6

**agreement** 44:1 44:1 46:21 59:24 86:18,19 91:3 100:14 104:17,19,20 104:20,22 105:4 127:5,14 128:11,24 130:5,16 131:4 131:7 142:12 142:15 170:10 174:12,15 184:16 187:2 236:9,10,10

**agreements** 104:10 105:8 105:22 107:3,6 108:18 120:9 127:11 184:22

**agrees** 125:7

**ahead** 35:2 71:2 102:3 212:19 221:9

**aided** 247:12

**al** 6:8,9

**alan** 1:12

**alert** 180:7,9 182:1

**aligned** 115:1

**allegations** 66:16 97:7

**allege** 74:23

**alleged** 70:20 72:2,11 75:4 75:15,20 77:18

**[alleged - appearance]** Page 5

83:5,8 140:24
141:19 161:19
162:6,13,20
170:22 174:16
178:9 191:19
202:4 244:11
**alleging** 203:3
205:2 215:8
216:2,11,23
217:9
**allocation**
188:10 189:14
193:19
**allow** 212:13
**allowable**
171:13
**allowed** 13:7
171:2,3 189:9
192:5
**ambiguous**
9:21 49:17
55:17 100:5
112:4 119:16
130:9,18
137:13 140:2,3
179:7 244:2
245:15
**amended** 75:11
**americas** 2:18
**amount** 42:24
47:13 60:23,24
89:17 122:8
132:21 139:24
140:3 141:4
147:12 161:20

196:16 197:1
199:6
**amounts**
162:24 171:3
**amy** 28:10,22
29:1 40:21
46:8,8 80:19
82:10,10 85:10
85:22 86:1,14
103:23 133:16
133:18 134:19
134:23 151:17
151:18,24
156:4 232:12
237:9 240:1,5
240:9,13 242:7
242:9,11,17
**analyst** 38:21
**analysts** 171:19
**analyzing**
128:12 144:10
**announce** 6:22
**announcement**
97:5
**annuity** 18:16
**answer** 9:22
11:16,17 12:5
12:5,13 24:17
31:5 32:16,18
35:2 37:5,6,9
37:11 38:15
40:15 49:17
55:17 58:13
59:12 60:11
64:12 70:24

77:3,21 79:20
82:17 85:8
92:8,11 97:21
97:23 100:5
111:7 112:5,7
113:4,6,22
114:22 115:8
119:16 123:12
128:20 130:9
130:20,22
136:15 137:17
140:4 143:15
144:19 146:8
150:23 153:20
159:7 160:7,18
163:19 165:16
168:6,14 173:2
175:4,24 177:3
179:8 180:19
183:9 184:12
185:5 188:23
195:8 198:11
198:19 201:17
206:12 208:23
210:4 211:3
212:14,19
216:14 220:14
223:17,21
228:5 229:8
234:24 235:2
242:22 244:3
244:15 245:16
**answered**
48:17 81:9
92:8 97:20

114:17 123:12
140:16 147:4
188:22 198:10
198:18 200:8
206:14 208:22
211:9 215:2
229:4,8
**answers** 11:7
93:4 242:20
250:5
**anticipated**
199:16
**anticipates**
143:8,18 147:1
**anybody** 19:6
27:6 33:18
34:3 50:10
80:12,13 85:22
134:15 150:20
221:3 231:19
231:22 238:12
**anybody's**
232:11
**anymore** 69:21
207:10 208:12
224:18 240:24
**apologies**
155:17 200:4
**apologize** 26:12
181:19 212:3
229:3
**appear** 7:9
104:1
**appearance**
6:23

**[appearing - attributing]**

**appearing** 10:9 24:1

**applied** 60:19 111:9

**appoint** 166:1

**appointed** 95:21 155:2,7 160:24

**appointment** 152:24 153:24 157:10 158:4 158:13,18 159:24 196:13

**appreciate** 246:15

**approach** 50:14,19

**appropriate** 50:23 248:4

**approval** 54:11 91:15,18,20 118:2,3,13

**approve** 53:21 53:22 54:15,17 82:20 89:24 94:12,17 100:12 118:10 119:9 162:10 183:23

**approved** 1:22 57:1,6,18 82:20 94:11,16 96:1,6 99:20 124:10 228:22 244:21

**approves** 176:7

**approving** 117:14 119:11

**approximate** 95:5 161:20

**approximately** 85:17 118:1 133:21 134:6 134:10 145:3

**april** 76:11 215:18

**area** 64:16 67:20 76:17 81:11 89:4 110:3 121:19 172:4 173:22 193:19 200:12

**areas** 163:4 171:22 212:2

**argumentative** 145:19

**article** 39:16

**articles** 38:17

**artificially** 66:6 66:24 67:4 75:8 77:7,14

**aside** 103:24 232:16

**asked** 25:21 28:18 41:4 42:2,12 43:2 45:1 48:16 63:11 64:14,22 81:7 82:14 88:4 90:4 92:7

97:19 100:21 100:22 107:8 114:16 118:5 123:11 129:18 137:17 140:15 143:2,5 146:2 147:4 188:21 198:9,17 200:7 206:13 208:22 211:8,19 212:16 213:22 215:1 229:7 238:14

**asking** 11:5 24:23 25:2 34:17 40:10 72:20 115:1 134:19 155:6 206:18 213:20 213:21

**asks** 120:11

**asserted** 74:1,7 74:8 125:22 154:21

**asset** 170:24 187:13,21 190:15 193:18 194:2

**asset's** 162:14

**assets** 21:7 56:3 161:21 162:2,5 162:11,19 163:14 165:11 166:17 170:8 170:21 188:10

188:12,18 190:4,19 191:24

**assignment** 250:22

**assume** 11:23

**assuming** 114:22 152:19 160:14 227:3,7

**attached** 41:2 42:18 65:3 154:5 248:11 250:8

**attachment** 195:3,14

**attachments** 195:1

**attempting** 129:17

**attended** 13:18

**attention** 91:12 132:3 218:10

**attorney** 58:12 60:10 85:7 136:10 150:22 242:14 248:13

**attorneys** 5:2 34:13 89:3 104:15 125:8 125:11,17 126:2 133:3 239:20,20

**attributing** 213:4

**[audio - bcers0001079]**

**audio** 6:1

**audit** 15:8 18:8 19:21,23

**audited** 18:21 20:5

**auditor** 14:16 14:24 15:2,5

**auditors** 19:22

**audits** 18:17

**august** 234:4

**author** 42:5

**authorized** 6:18

**auto** 225:13,15 225:16

**automatically** 16:2

**available** 21:19 49:3 57:20 58:3 135:4 241:22

**avenue** 2:12,18

**award** 121:21

**awarded** 111:10 126:13

**awards** 131:19

**aware** 62:1 65:14,16 71:16 71:21 72:16 73:1 79:20 86:24 87:5,15 87:22 91:13 104:20 105:1 108:2,19 116:12,21

125:13,19 128:9 201:14 201:19,24 202:8 214:23 215:4 245:13 245:17

**b**

**b** 1:20 3:6,18 10:3 24:12 126:23 152:11

**b2b** 204:8,9,12 204:12

**bachelor's** 217:7

**back** 14:19 21:8 27:11,16 43:15 46:17 47:2,21,23,24 58:16 65:8 67:1 104:3 105:15 106:23 119:18 131:9 132:13,16 135:15,19,22 142:20 156:21 157:5 158:10 164:18 166:4 166:11 179:9 180:16 196:10 202:24 205:5 221:16 225:11 227:12 232:1,8 233:12 238:6 246:9

**backed** 227:4,6 227:13

**background** 157:7 210:18 213:17 214:7

**backup** 226:22 227:17 228:11 232:6

**backups** 226:20 227:2 227:11

**badly** 192:22

**balance** 54:8

**ballerini** 52:5

**ballpark** 34:16

**bank** 216:21

**banking** 216:21

**barankovich** 2:22 6:13

**barasch** 1:12

**based** 39:14 66:7 69:8,14 70:11 76:21,22 83:15 88:12 91:7 106:8 107:8,11 121:8 123:14 144:3 155:13 162:3 181:18 203:3 205:5 208:16 213:1,2 218:7 238:20 239:2

**basic** 214:11

**basically** 105:9 109:12 167:20

172:6 192:7 241:2

**basis** 18:13,15 19:18 20:24 53:19 54:7 93:21 96:21 105:11 120:4,4 124:3 155:24 164:13 179:14 195:19

**bcers0000898** 3:14 137:22

**bcers0000900** 3:14 137:23

**bcers0000901** 3:9 84:4

**bcers00009011** 3:13

**bcers0000903** 3:10 84:5

**bcers0000908** 3:12 126:23

**bcers0000912** 3:11 102:21

**bcers0000914** 3:11 102:22

**bcers0000915** 4:1 193:4

**bcers0000926** 4:1 193:5

**bcers0001030** 4:2 194:15

**bcers0001079** 4:3 194:16

**[becoming - board]**

**becoming** 28:13 65:18 73:24 95:17 99:9 120:6 130:1

**began** 69:5,17 71:23 205:14 205:17 206:7

**beginning** 1:21 66:24

**begins** 61:15 102:17 149:17 157:16 195:3 196:8

**behalf** 1:5 7:1,7 7:12,14 36:1,9 63:9,20 64:15 65:13 77:6,13 80:4,23 85:24 105:20 124:7 133:12 176:23 197:6 199:2,9 199:13

**belief** 95:18 143:17

**believe** 37:13 37:23 39:22 41:9,20 46:21 47:2 55:18 58:4 59:2 64:17,18 65:3 65:22 69:4 70:4 72:9 75:4 75:6 77:16 80:18 82:4,9

84:20 85:10 86:9 95:3 101:4 103:23 104:13 110:12 114:7 120:16 121:3 128:10 130:2 133:2 134:1 139:18 140:8 144:15 145:21 146:5,9 146:16 151:17 152:22 166:12 166:18 184:14 185:3 187:22 192:1,8,13 206:6 207:11 207:24 216:16 217:3,12 219:11 224:7 226:15,22,23 228:6 230:10 231:18 233:13 234:11 235:16 239:13 240:1 241:18

**belonged** 61:3

**ben** 7:3 21:16 84:2 102:19

**benchmark** 167:17 172:5 173:5 182:10 189:15,18,20 189:24

**benchmarks** 164:22

**benefit** 89:15 96:18 99:15

**benefits** 36:6

**benjamin** 2:10

**bernard** 235:21

**best** 11:22 35:24 36:9 44:24 55:7 88:12,23 89:9 89:11,18 96:8 111:18,21 112:1,9,13,14 113:8,11,16,17 114:8 115:17 116:6 129:10 149:6 170:3,11 170:14 177:8,9 178:2 190:10 190:16 192:3 199:1 217:2

**better** 78:13 79:4,6 88:24 90:7 99:11 121:4 144:3,4 147:8,18

**big** 57:8,9 68:6 95:9

**bigger** 94:23 99:13,14 141:23,23 149:5

**billing** 174:22

**billion** 107:23 162:2

**bit** 16:7 20:6 40:10 47:23 69:2 114:21 194:19

**biweekly** 18:13 49:7

**blunk** 19:5 52:5 53:8

**board** 15:23,23 16:3,9,11,16,18 16:21,24 20:8 20:11,12,15,16 20:17,19,23 21:4 27:18,21 27:22 28:4,18 28:20 30:9 31:10 44:7 45:12 46:11,13 47:2 49:19,22 51:24 52:8,8 52:10,10,20,23 53:16,18,19 54:3,12,21 55:12 56:10,22 56:24 57:18,23 60:7 73:6 83:14,20,22 84:14 86:2 88:5,22 89:5 91:20 92:11 93:2,16 96:3 108:8 116:23 117:9,13,20,20 118:4,8,10,13 118:14,17

**[board - bucks]**                                                     Page 9

119:1,3,9,9,10
119:12,14,17
120:11 121:4
122:17,22
127:22 129:8
138:3,6 139:11
141:8,11
142:22 147:1
162:9 163:6,22
164:13,18,19
169:17 171:6
178:18 179:24
180:9,12,14
183:6 193:21
193:24 215:23
222:13,14
223:2 231:7,9
231:11 236:6,7
237:17 238:5
240:6,7,11,16
240:19,22
241:1,7,11,16
241:19 243:2
244:21
**board's**  91:12
  101:9 139:2,5
**boil**  181:12
  195:21
**book**  57:8,9,14
  57:20
**books**  222:5
**boss**  15:24
**bottom**  157:20
  157:24 186:18

**bought**  213:2
  239:13
**bound**  177:17
**box**  229:18
**boxes**  229:17
  232:11
**bradley**  1:14
**break**  12:10,14
  16:6 61:8
  101:24 149:10
  221:7 245:24
**breakdown**
  170:24
**bring**  22:5 79:1
  79:10 80:3
  84:11 105:24
  128:14 129:14
  129:20
**bringing**  66:19
  101:11
**brings**  78:1
**britton**  2:3 7:8
  7:11 9:19 10:4
  22:6,9 23:14
  24:16 26:3,12
  30:17 31:4,19
  32:15,17 35:1
  36:15 37:2,6
  38:11 39:19
  40:14 41:7
  42:7 43:7
  44:13 46:4
  47:16 48:16
  49:16 50:13
  55:15 58:1,11

59:10 60:9
61:7 64:7
67:17 70:22
72:19 75:13
77:1,20 80:6
82:16 83:11,17
85:6 92:7,18
93:22 97:19,22
98:8,23 100:4
102:1,9 104:5
111:6 112:3,6
113:2,5,20
114:16 115:7
119:15 120:14
123:11 128:17
130:8,17,21
136:6,15
137:12 138:13
140:1,15
143:14 144:17
145:18 146:6
147:3 148:15
150:21 152:16
153:3,9,18
155:14,19
157:13,18
158:7,20 159:6
159:19 160:6
160:16 161:1
161:10 163:16
165:14 167:6
168:3,5,12,14
172:24 173:12
173:24 175:2
175:13,19,22

177:1 179:6
182:15 183:8
184:11 185:4
186:4,8 188:21
190:5 195:5
197:9,11 198:9
198:17 200:7
200:19 201:16
206:13 208:21
210:2,23 211:8
211:19 212:10
213:16 215:1
216:13 217:1
217:11 220:13
221:8 229:7
234:20 242:12
243:24 244:14
245:14,23
246:10,19
**broaden**  96:16
  97:18 98:18
  99:10 100:16
**broadening**
  97:24 99:5
**broadway**  2:5
**brought**  62:6
  65:18 66:2,17
  68:4 73:22
  76:11,12 91:11
  108:10 166:3,7
  218:9
**bs**  14:2,4
**bucks**  1:4,20
  3:8,9,11,12,14
  3:15,16,18,19

**[bucks - calculated]**

| | | | |
|---|---|---|---|
| 3:20,21,23 4:1 | 105:6 107:3,6 | 155:12 156:1 | 222:15,20,21 |
| 4:2,4,5,6,7 9:3 | 107:19 108:14 | 156:11 158:19 | 222:22 223:5,8 |
| 9:4,11,17 | 108:17,20 | 159:4 160:4,11 | 233:4 234:2,5 |
| 10:13 13:22 | 109:3 111:13 | 160:23 161:7,9 | 237:4,11 242:2 |
| 14:15,22 15:15 | 111:17,20,24 | 161:23 162:21 | 242:2,3,6 |
| 15:18,19,20 | 112:1,8,11,15 | 164:17 165:1,6 | 243:11 245:6 |
| 16:7 17:2,3,5,8 | 112:22,24 | 166:4 169:24 | **buckscounty....** |
| 17:16,17 20:7 | 113:10,17 | 170:3,6 172:21 | 222:24 |
| 20:14 21:10,21 | 114:3,12,14,23 | 173:15,16,23 | **bumped**  202:16 |
| 23:1 24:1 | 115:3,5,11,20 | 174:2 176:6,16 | **business**  67:8 |
| 25:11,23 26:18 | 116:7,10,16 | 176:20,22 | 89:24 101:6,11 |
| 26:23 27:7 | 117:1 118:9,19 | 177:10,21 | 101:12,13 |
| 31:2 36:1,4 | 118:23 119:20 | 179:3 180:18 | 132:6 204:8,12 |
| 42:19 43:17 | 123:8 124:6,13 | 181:20 182:14 | 204:15 209:10 |
| 48:20 49:6,11 | 124:21 125:6 | 186:10,16,24 | 212:23 |
| 50:5 51:19 | 125:22,23 | 187:7,15,20 | **buy**  21:8 191:4 |
| 55:4 57:22 | 126:23 127:4 | 188:17 190:2,9 | 220:20 |
| 61:22 62:9,12 | 127:18,21 | 190:18 191:1,3 | **buyback**  54:2 |
| 62:19,21 63:3 | 128:7,12 129:3 | 191:9,15,23 | **buybacks**  21:7 |
| 63:10,22 64:1 | 129:13 130:6 | 192:20 193:4,9 | 53:23 54:2 |
| 64:4,10 65:4 | 130:14,24 | 194:15 196:18 | **buying**  70:12 |
| 65:20 66:2 | 131:18,20 | 197:6,17 198:1 | 70:16 |
| 73:23 74:1,8 | 132:23 133:1 | 198:3,6,12,15 | **bwolters**  2:13 |
| 74:15,24 75:19 | 133:12,22 | 198:20 199:9 | **c** |
| 76:19 77:6,13 | 134:8,11 137:7 | 199:21 200:3,4 | |
| 77:18 78:8,11 | 137:11,22 | 200:9,16 201:1 | **c**  2:1 227:6 |
| 80:15,24 84:4 | 138:19,22 | 201:4,10,11,14 | 247:1,1 |
| 85:3,24 87:1 | 139:23 140:13 | 201:18,22 | **ca**  2:5 |
| 87:10,17,24 | 141:13,16,18 | 202:7 203:12 | **cabinets**  222:10 |
| 88:13 91:14 | 141:22 142:1,4 | 203:19 216:2 | 238:23 |
| 95:15 98:20 | 142:6,10,13,18 | 216:11,23 | **calculate**  45:18 |
| 99:6,16,17 | 148:20 149:21 | 217:9,17 | 51:18 97:13 |
| 100:2,9,11 | 150:3 151:5,13 | 218:11,18 | 132:20 140:24 |
| 102:21 103:3,6 | 152:11 153:23 | 220:11 221:1 | 210:1,22 |
| 104:9,16,23 | 154:24 155:2,6 | 221:18,20,23 | **calculated** |
| | | | 67:22 140:21 |

**[calculated - changed]**                                          Page 11

141:3,6,12
**calculating**
69:16 70:1
205:9 208:11
209:20 219:5
**calculation**
45:19 205:20
208:2,5,15
209:6,8,14
210:9
**call**   20:16
37:15 49:10
80:22 82:3
86:18 135:8
136:9 168:18
169:20 180:5,6
181:8 182:24
204:3 205:17
206:11 209:9
209:16 214:18
215:6 224:4
226:3 237:19
**called**   14:18
20:11,12,14
46:24 47:8
49:11 67:7
69:19,22,24
70:7 71:9
110:2 169:16
182:18 183:12
183:15 191:12
208:7
**calls**   10:4 29:17
29:19 55:15
58:11 60:10

85:6 98:24
113:21 114:18
128:19 134:4
135:21 144:18
146:7 147:3
150:21 158:7
158:21 159:6
160:6,17
184:11 185:4
190:6 210:2,23
210:24 216:13
242:13 244:14
245:15
**camera**   5:22
**cap**   63:13,19
64:16 165:4,4
165:9,12,12,20
165:20,22,22
165:23,23
167:2,3 171:24
172:4,5,17,19
172:19 173:4,6
174:21,22
178:1 179:4
188:13,14,19
190:24 191:22
192:21
**capacity**   10:8
24:13,13 30:16
45:24 72:21
**caption**   233:22
**captured**   118:3
**carefully**   248:3
**carry**   180:14

**case**   6:11 9:24
25:14,21 28:13
28:15,17 31:3
31:11 32:4,5
38:18 39:7,11
40:5 44:21
52:19 60:19
61:4 71:24
72:15 76:6,9
80:17 85:13,16
86:20,23 87:3
88:1 89:1
95:10 96:17
97:2,3,18 98:1
98:19 99:5,10
99:23 100:1,6
100:8,16 110:6
110:11 113:18
115:2,5 124:6
124:19,20
155:9 156:16
156:18 163:9
218:4 226:18
228:24 230:12
233:16,21
243:3
**cases**   116:19,20
155:6
**cash**   171:3
189:9,12
**categories**
54:13 163:1
173:19 203:4
**category**
198:23

**cause**   51:2
**caused**   122:2
**caution**   26:4
31:20 38:11
136:7 234:21
**census**   204:13
**center**   60:22
**centered**   93:13
**ceo**   66:13 68:8
72:10 83:6
**cers00009011**
126:24
**certain**   67:2
121:17 170:16
216:8,10 237:6
**certification**
153:22 157:1
196:12
**certified**   1:22
81:8,13
**certify**   3:16
151:5,10 153:1
153:7 247:3
250:3
**cgm**   204:16
**chair**   118:7
**chairman**
127:21
**chance**   9:20
**change**   67:21
229:23,24
249:3,5,8,11,14
249:17,20,23
**changed**   47:14
69:15 71:13

**[changed - commissioners]**

170:24 171:5 171:12 193:18 194:3 205:8 207:8 208:10 229:14

**changes** 170:19 248:10 250:7

**charles** 53:3 62:18 87:11

**chart** 41:14

**charts** 71:6

**chatting** 13:10

**checks** 18:16

**chief** 26:22 215:21 216:4

**children** 240:8

**choice** 17:12

**chose** 116:1

**chosen** 241:17

**cio** 26:21 236:21

**cited** 47:19

**civ** 1:4

**claim** 74:10,11 74:11,19 75:7 97:7 98:15 126:6 128:15

**claims** 66:2 74:1,7,17 96:14,23 97:1 98:22 105:24 106:7 107:7,10 107:21 125:22 126:1

**clarify** 200:21 241:24

**clarity** 114:21

**class** 3:17 10:15 27:11,17 52:11 53:12 56:2 62:4,6 74:17 75:15,17 75:20 77:19,23 78:2,14 81:6,8 81:8,12 90:3 91:6 94:13 96:18 101:11 101:16,18,19 105:13,23 112:10,12,15 112:19 113:9 113:12,13,14 114:2,8,13,24 115:4,10,13,14 115:18 116:16 118:11,15,21 118:22 122:18 122:21 123:2 123:19 124:15 124:21 131:20 132:8 138:11 139:9,13,16 141:22,24 142:2 143:19 148:22 151:6 151:10 153:2,8 154:22 157:8 157:16 161:20 161:22 162:13

162:20 166:14 169:15 170:22 174:16,18 178:9 191:19 202:4 206:23 245:5

**classes** 194:2

**classified** 81:7

**clean** 228:1

**clear** 11:4,7 30:24 40:24 61:18 116:14 173:22 199:20 206:7

**clemens** 1:11

**clerical** 173:22

**client** 58:12 60:10 85:7 136:10 150:22 195:2,18 242:14

**clients** 15:8

**close** 78:17 224:19

**closing** 215:23

**colleague** 7:3

**collectors** 18:18 19:24

**college** 13:18 15:1 214:8,11

**columns** 196:16 197:1 199:6

**combined** 208:13 214:15

**combines** 178:17

**come** 19:18 47:21 70:21 99:3 112:14 117:12 147:18 181:7 183:17 224:19 225:11 231:12 237:12 237:14 239:20

**comes** 204:2 215:18 240:6 241:5

**comfort** 148:2

**coming** 233:9

**command** 240:10

**commission** 250:17

**commission's** 43:19

**commissioner** 27:9 42:3,13 52:2,3,3,7,20 52:24 53:4 65:2 86:2,5 88:4 89:23 90:3,19 118:6 241:10,21

**commissioners** 15:24 16:12,13 16:22 20:13 27:15 50:3 52:1,12,24 53:3

**[committing - consolidated]**                                    Page 13

**committing**
  121:16
**common**  114:6
**communicate**
  13:8 87:17
  198:6
**communicated**
  133:13,23
  134:2,8,12,17
  134:21
**communication**
  26:8 29:18
  41:2,6,8 81:24
  82:3 135:24
  136:8,12
  201:12 221:2
**communicati...**
  32:10 38:14
  39:18,20 60:12
  71:1 85:3,9
  132:24 133:4
  133:15 135:1
  136:10 137:7,9
  179:1,7 180:19
  180:21 234:22
  240:16,19
  242:16
**companies**
  67:11 68:4
  70:13 172:8
  191:16 209:24
  210:5,7 213:3
  213:4 216:9
**company**  68:10
  70:16 72:9

  91:8 117:18
  210:19 212:22
  213:6
**compare**
  164:21 165:21
  189:16,19
**compared**
  172:4 173:5,8
  182:10 189:15
  204:10
**comparison**
  71:11
**compensated**
  45:8 94:14
  124:5,13
  141:18
**compensation**
  142:7
**competently**
  116:6
**competing**
  157:9 158:12
**complaint**  4:4
  32:24 40:6
  73:22 75:10
  87:6,12,12,14
  99:14 110:10
  141:23 203:8
  203:13,17
  204:23 205:1
  206:24 208:19
  214:24 215:15
**complaints**
  40:2,18 42:19
  65:1

**complement**
  79:10 183:24
**complementary**
  56:5
**complete**  104:1
  168:8
**comply**  55:12
**compound**
  120:15 165:16
**comprised**
  16:11
**computer**
  247:12
**concern**  99:13
  100:23 101:1,3
  101:14 135:4
**concerns**  29:9
  98:14
**concierge**  2:21
  185:18
**concise**  179:24
  182:7,11
**concluded**
  139:21
**concludes**
  61:10 102:12
  149:12 196:3
  246:21
**conclusion**  10:5
  55:16 128:19
  159:12 210:24
  216:14
**conduct**  87:2
**conducted**  5:20
  237:22

**conference**
  37:14 78:19
  135:8
**confidence**
  167:4
**confident**
  204:16
**conflict**  112:21
  114:11 115:2
**confusing**  51:9
**confusion**  51:2
**connection**
  5:22 117:2
  225:21,22
  226:4 229:3,6
  230:8 233:11
  234:16
**connors**  1:13
**consider**  60:6
  115:20 119:14
  138:19 144:13
  183:22
**consideration**
  137:6
**considered**
  116:3
**considering**
  118:1
**considers**
  117:16
**consistent**
  27:12 148:23
  167:19
**consolidated**
  4:4 159:15

203:7,12,17
**consolidation**
157:9
**consolidations**
158:12
**consult** 176:16
176:19
**consultation**
175:10
**consuming**
144:2
**contact** 34:4
82:11 133:18
200:17 201:2,5
201:8 224:2
242:24 243:17
243:20
**contacted**
84:18,24
**contacts** 228:15
**contained**
220:7
**content** 136:13
**contents** 104:2
195:7
**context** 94:21
95:2 245:10
**contingency**
93:21 94:5
120:3,4 124:2
124:9
**contingent**
121:21
**continue** 6:2
67:17 212:8

214:19 243:21
244:12,19,23
**continued**
204:15 206:2
**continuing**
91:1
**contract** 236:8
**contracts**
185:13 236:15
**contrary**
245:11
**contributions**
61:1
**control** 49:14
226:16
**controller**
13:23 14:22
15:24 16:1,14
16:17,24 18:2
18:5,7 19:2
20:20 27:15
50:3 52:4,15
53:7,8,10,11,13
56:19 90:17
222:14
**controller's** 9:5
14:15 15:15,18
16:4 18:6,11
19:7 45:14
51:16 56:19
57:11,13,20
78:15,19
221:21 222:5
**conversation**
30:1 79:17

80:19 81:2
**conversations**
30:2,6 31:22
33:23 34:11
58:15 59:13
**convoluted**
50:18 206:4
**convoluting**
68:2
**cool** 196:23
**copied** 240:15
**copies** 238:8
**coppens** 1:14
**copy** 180:8
187:14 228:18
228:23 236:4
237:20 239:1
**corp** 1:9,10 6:9
90:3
**corporate** 9:1
9:11 24:13
235:13
**corporation**
61:20 91:9
202:3
**correct** 10:3
14:6 16:10
17:21,22 19:2
19:3 20:21,22
27:19,23 48:2
54:22 56:11
64:3,8 76:23
80:5 81:3,14
81:17 93:11,16
94:4 124:14

131:17 148:10
152:21 154:22
154:23 155:8
158:5 170:5
185:23 186:21
196:21 197:2
198:2 207:12
214:5 225:12
227:10 247:13
250:4
**corrections**
248:3,5 250:7
**correctly**
247:10
**corresponden...**
47:19 115:23
239:3 241:5
**cosack** 47:1,8,9
47:10,22 48:3
54:3 186:19,21
187:13 188:1
193:22
**cost** 21:6 42:23
43:1 65:7
93:14 120:1
122:12 124:2
126:9 170:14
190:11,14
**costs** 119:24
126:2 142:11
142:14,14,19
**counsel** 6:22
12:3,10 27:24
38:3,6,10
39:18 43:12

**[counsel - county]**

| | | | |
|---|---|---|---|
| 58:15 59:13 | 42:20 43:17,18 | 109:3 110:17 | 144:13 145:14 |
| 60:12 71:2 | 43:20 48:11,15 | 111:13,17,20 | 146:21 147:2 |
| 91:4 104:13 | 48:20,21 49:6 | 111:24 112:8 | 147:22 148:21 |
| 108:15,21 | 49:11,14,18,22 | 112:11,12,16 | 148:21,24 |
| 109:4 116:13 | 50:1,6,6,10,23 | 112:17,24 | 149:3 150:3 |
| 125:8,11 136:9 | 51:15,19 55:4 | 113:10,11,17 | 151:13 153:23 |
| 157:11 158:14 | 57:22 62:8,9,9 | 113:18 114:3,4 | 154:24 155:2,7 |
| 161:1 234:23 | 62:13,13,19,21 | 114:12,14,23 | 155:12 156:1,5 |
| 247:15 | 63:3,10,18 | 115:5,11,20 | 158:19 159:4 |
| **count** 135:20 | 64:2,5,10,15 | 116:7,10,16 | 160:4,12,23 |
| **counterbalance** | 65:4,11,13,20 | 117:1,5,17 | 161:7,9,23 |
| 166:21 | 66:2,20,20 | 118:9,19,23 | 162:4,21 |
| **counterpart** | 73:12,23,23 | 119:20,23,23 | 163:12 164:8 |
| 80:20 | 74:1,8,9,16,24 | 120:2,18 | 164:17 166:4 |
| **counties** 78:12 | 75:1,19 76:19 | 121:13 122:2 | 169:4,24 170:4 |
| 79:13 80:3,9 | 77:6,10,13,18 | 122:12,15 | 170:6,10,12,13 |
| 80:12 123:18 | 78:8,9,11,12,16 | 123:6,8,13 | 170:16,23 |
| 139:8 | 78:21 79:19 | 124:13,22 | 171:10,10,11 |
| **counts** 96:10 | 80:4,14,15,17 | 125:4,6,22,23 | 171:17 172:21 |
| **county** 1:3,4,20 | 80:20,24 81:16 | 126:5,9,12,12 | 176:6,7,16,20 |
| 6:7 9:3,4,11,17 | 85:3,24 86:11 | 126:14 127:4 | 176:22 177:10 |
| 10:13 13:22 | 86:20 87:1,10 | 127:18,21 | 177:21 178:3 |
| 14:15,20,22 | 87:13,17 88:1 | 128:7 129:3,13 | 178:13 179:3 |
| 15:15,18,19,20 | 88:13 89:1,15 | 130:6,24 | 179:11,13,16 |
| 16:7 17:2,3,5,8 | 91:14 94:7 | 131:18,20 | 179:19,20 |
| 17:11,13,14,16 | 95:15 98:12,20 | 132:3,6,19 | 180:18,22 |
| 17:17,17,20 | 99:6,16,23 | 133:1,13,22 | 181:7,12,20 |
| 18:14,14,17,24 | 100:2,9,11 | 134:8,12,15 | 182:14,22 |
| 20:3,7,14 | 101:15 103:3,6 | 137:7,11 | 183:13,21,23 |
| 21:10 23:1 | 103:17,21 | 138:19,22,22 | 186:16,24 |
| 25:11,23 26:18 | 104:9,16,23 | 140:13,23 | 187:16,20 |
| 26:23 27:7 | 105:6,6,17,24 | 141:14,18,22 | 188:24 190:2,7 |
| 28:13,14 31:2 | 106:5 107:3,6 | 142:1,4,6,10,13 | 190:9,9,16 |
| 33:13 35:6 | 107:7,9,19 | 142:18 143:3,9 | 191:3,9,15,23 |
| 36:1,4,7,10 | 108:14,17,20 | 143:13 144:7 | 192:4,6,20 |

**[county - deals]**

193:9 197:6,17
198:1,3,6,12,15
198:20 199:2,3
199:10,14,14
199:21 200:3,4
200:9,10,11,16
200:21 201:1,4
201:7,10,11,14
201:18,22
202:7,12 203:3
203:19,19
205:2 215:8
216:2,11,23
217:9 218:11
219:13,21
220:6,15,18
221:1,18,20,23
222:15,20,21
222:22 223:19
223:20,24
226:19,20
234:2,5 235:6
236:2 237:5,11
240:23 241:15
242:2,3,3,6
243:11,21
244:10,17,23
245:6,7,9
**county's** 18:21
19:20 24:2,23
43:16 61:22
63:22 85:4
89:12 98:20
99:17 101:8
105:10 111:4

112:1,22,23
114:23 115:3
118:10 124:6
128:13 130:14
132:24 139:23
141:16 149:2
165:1,6 179:23
184:1 188:17
190:18 191:1
196:19,19
220:11 223:5,8
230:23
**couple** 13:21
14:18 147:14
203:7 234:14
238:10
**course** 44:8
132:4,5 184:17
**court** 1:1,22
5:2 6:10,15
7:16 8:10
11:12 124:11
140:9 157:8,17
158:11 202:15
248:17
**court's** 150:1
**cover** 212:17
213:23
**covered** 20:5
212:2
**covers** 213:19
**covid** 204:8,11
**cpa** 14:3
**crash** 226:21

**create** 50:18
**created** 183:11
**criteria** 172:9
172:11
**csr** 247:22
**cumbersome**
144:1 148:4
**current** 27:21
51:23 52:10
81:4 110:3,8
224:9,11
225:18
**currently** 15:13
52:2 123:4,6
169:10
**custodial**
132:11
**custodian**
54:15 65:9
78:23 105:19
108:7 132:9
135:17 178:15
236:12
**custodians**
237:6,8
**cut** 157:20
**cv** 1:4 6:12
156:19 157:3

**d**

**d** 3:1 127:24
**daily** 18:6,11
18:12 19:18
20:24 21:12
35:22

**dale** 1:13
**damages**
126:13 131:19
**danish** 66:17
68:15
**date** 36:12
42:22,24 84:17
150:18 154:6
196:16 197:1
197:10,19,24
199:6 248:8
250:12
**dated** 193:10
207:17
**dates** 65:6
197:14 199:11
199:12,21
**david** 1:14
**day** 21:1,1 37:9
102:5 179:15
181:6,9,10
212:16 213:21
224:8 226:24
227:12 228:11
247:19 250:15
**days** 84:23
179:10 197:4
227:8,12,14,17
227:18 232:5
238:10 248:14
**deal** 78:16
**dealing** 237:13
237:13
**deals** 51:14

**[december - depends]**

**december** 150:13 151:21 151:23 207:1

**decide** 45:21 123:8

**decided** 47:3 78:13 114:5 123:14 166:1 219:17

**decides** 140:9

**deciding** 164:2 176:17

**decision** 35:23 88:9,11 96:2 101:8,9 136:22 150:2 167:5 231:15

**decisions** 162:18 163:14 163:18 164:10 164:16 169:6 176:23 177:7 199:24 200:1

**decline** 74:21 219:9,10

**declined** 129:13 219:8

**declining** 205:24

**deduction** 48:24 49:8

**deemed** 248:16

**defend** 125:21 126:5,10

**defendant** 2:16 7:7 214:19

**defendant's** 59:19

**defendants** 1:15 2:9 7:2,9 8:4 23:4 43:6 44:11 46:21 60:3 66:4 233:20

**defendants'** 4:7 233:4

**defending** 126:11

**definitely** 33:15 55:24 152:6 207:8

**definition** 210:10,16 211:23 214:14

**degree** 13:19 217:7

**degrees** 13:24

**delaware** 1:3 6:7 62:8,13 73:23 74:9,16 75:1 78:9,11 78:16 79:19 80:20 98:11,20 112:11,17,23 113:10,18 114:4,23 138:22 196:19 203:19 244:23 245:7

**delete** 224:13 225:13,15,19 226:1,7,12,13 226:13,16 227:20,22,24 228:1,1,4,9 230:4 232:14 232:16,17,23 233:16

**deleted** 225:16 226:9,16 227:8 227:16 229:16 229:23

**deleting** 225:10 229:1

**deletion** 230:1

**deliver** 58:9

**delivered** 58:6

**denied** 39:2

**denmark** 38:19 39:8,11,13 66:16 68:13 72:12 76:14 218:5

**denominator** 209:22

**department** 25:12 28:4,5,9 29:7 33:19 37:16 38:24 39:4,5 40:2,4 40:22 45:2 46:9 79:18,18 79:19 80:2,21 81:20,20 82:5

82:6,7,11 86:14 88:4 109:10 115:24 117:7,12,16,24 118:19 119:5,7 121:15 122:23 123:3,16 131:9 131:15 133:14 133:17 134:3 134:20 144:16 144:21,24 147:23 150:7 150:15 151:18 151:19 152:1 156:4 223:6,9 223:24 224:2 225:24,24 228:15,16,16 228:19,22,23 230:10 231:12 231:18 232:7 232:20 234:6 235:8 237:9 239:16,18 240:4,4 241:8

**departments** 18:17 19:24 20:3 78:15 144:21

**depend** 118:22 144:20,23

**depending** 166:24 171:3

**depends** 5:21 144:15 162:1

223:17 224:24
**deponent** 247:7
247:9 250:1
**deposed** 8:17
8:21,24,24 9:7
**deposing**
248:13
**deposition** 1:20
3:8 5:3,5,7,19
6:6 10:2,3,8
11:4,14 13:1,8
13:14 17:15
21:22 23:21
24:4,15,22
25:7 28:24
29:3,6,12
30:14,23 31:14
31:17 32:3,14
33:8,13,20
34:8,18,23
35:18 37:24
43:13 44:18
46:19 71:24
72:17 73:2
134:24 246:22
247:13 248:2
248:11,15,16
**depositions** 9:8
32:7
**depressed**
204:14
**deputy** 13:23
18:2,5 25:16
26:21 236:21

**derivatives**
192:5
**describe** 13:16
14:13 38:9
117:4 236:1
**described**
229:13 237:21
245:3
**describing**
71:22
**description** 3:7
**designated**
24:22
**desk** 92:22 93:4
**destroyed**
224:7
**detail** 10:18
75:3,3 132:9
**detailed** 75:5
204:5
**determination**
58:8
**determine** 36:8
107:10 119:1
119:12 120:13
120:17 128:13
162:23
**determined**
117:1,18 161:8
**determining**
117:5,8 156:5
**deutsche**
216:21
**developing**
166:5

**deviations**
191:10
**dfb** 1:9
**diane** 52:3 53:4
**dictate** 220:16
**diego** 2:5
**differences**
74:6 173:19
**different** 25:19
29:6 36:17
38:23 40:2,5
40:11 54:8
60:5 64:19
78:18 96:14,23
97:1,13 115:12
131:6 136:19
142:24 163:1
164:21 169:8
171:1,11,13,20
179:13 181:4,4
181:10 182:3,4
189:6,18,22
205:10,19,20
208:5 213:19
230:15
**differs** 113:17
**difficult** 101:13
**digirolamo**
52:4
**digit** 219:9,10
**direct** 197:17
197:23 198:1
200:17 201:2,8
**directed** 191:4
199:3,21

**directives** 44:7
**directly** 241:8
**director** 25:17
25:17 216:8
**directors** 20:8
20:12,16
215:18,23
**disbursement**
18:23
**disclose** 31:20
69:19 208:4
**disclosing** 68:5
97:14
**discovery** 40:7
81:9,11
**discretion**
175:8,12 176:5
176:9 177:11
**discuss** 54:7
88:1 118:15,17
150:19
**discussed** 44:19
45:12 58:4,21
60:2 79:19
80:2 82:19
83:21 88:6
125:10 127:11
131:14 135:9
139:20 203:2
**discussing**
22:17 107:2
**discussion**
47:24 59:2
88:2 93:6,8
118:2 136:11

138:15 202:20
**discussions**
36:22 60:6
85:20,23
**dismiss** 39:2,2
40:3 134:7,11
150:2
**disposal** 154:7
202:9
**disposals** 202:7
**disposed**
197:13 199:6,7
199:11
**disregard**
230:3
**distribute**
180:8
**distric** 1:1
**district** 1:1
6:10,10
**diverged** 115:4
**diversification**
47:7 55:5
166:6,19
**diversified** 56:1
56:7 166:23
**divide** 125:7,15
**dividends**
39:14 68:18,18
68:20,21 218:6
**docu** 175:20
**document**
22:21 23:6,15
23:19 41:3
47:18 59:9,19

91:15 126:19
128:18 135:15
136:1,23
148:18 150:3,5
150:8,10,11,15
150:19 151:14
151:16 152:18
153:12,16,19
154:2,9 159:22
161:3 174:8
175:14,20
193:11 195:6
197:12 203:23
203:24 217:21
218:12,22
219:23 240:21
**documentation**
16:4 135:7
**documents** 4:9
22:24 25:19
29:6 32:23
33:4 35:5,8,10
37:17 38:1,4,7
38:9,13,17,24
39:3,10,17
40:5,9,12
41:12,13,13
43:4,11,14
44:4,5,10,21
46:18 71:17
73:19 86:11,14
86:15,21
143:21 144:2
147:11 179:11
181:1,2,18,21

182:3 201:23
202:12 227:3,5
230:1 233:6,21
234:17 236:3,5
238:18,21
239:4,8 242:21
242:23
**doing** 12:24
68:14 69:9
73:17 88:23
121:15 130:11
147:8 182:8
189:16,19
205:20 248:7
**dollar** 96:10
**dollars** 107:23
162:2
**domain** 222:16
222:23 223:2
**domestic** 163:1
163:10 188:13
188:19
**donna** 57:16
238:14
**doran** 1:21 3:3
6:6 7:19 8:2,9
26:6 37:7
50:22 84:13
90:12 103:4
114:22 150:1
153:15 174:7
186:15 195:10
196:15 203:16
212:19 213:24
214:5 217:22

218:23 221:18
246:16
**double** 219:9,9
**doubt** 95:16
**doug** 7:11 34:2
34:6 106:11
133:5 212:3
245:21
**dougb** 2:6
**dougherty** 53:9
53:9 90:4,5,16
90:20 91:23
93:20 94:19,24
96:12 100:21
101:2 143:2,5
146:2 147:7
148:2
**dougherty's**
148:10
**douglas** 2:3
**dowd** 2:3 90:1
91:4 127:8
**downtime**
166:20
**doylestown**
8:10
**dozen** 34:19
**dr** 1:13
**draft** 56:21
**drawers** 238:23
**drive** 26:24
214:20 224:4,5
227:4,4,6
**drives** 148:1
230:16,17,20

**[drives - emerald's]**                                                    Page 20

237:1,1
**dropped**  66:23
  162:3 173:16
  219:12
**due**  106:2
**duke**  217:7
**duly**  7:20 247:7
**dusty**  239:4
**duties**  14:23
  15:6 18:3
  54:19 145:8
  149:3
**duty**  54:21 55:1
  55:4,13,20
  56:8 89:10
  148:23 169:24
  170:3 244:20
  244:22 245:2,4

**e**

**e**  2:1,1,20,20
  3:1,6 73:22
  214:19 247:1,1
  249:1
**eagles**  246:18
  246:19
**earlier**  60:2
  81:15 132:23
  187:1 203:2
  207:24 211:6
  211:20 212:16
  213:23 215:14
  242:1
**earnings**  204:2
  204:6 214:18

**easier**  22:15
  143:22 239:14
**easiest**  228:9
**east**  8:9
**eastern**  1:1
  6:10
**easy**  229:19
**economics**
  217:7
**educated**
  137:15 193:24
**education**
  13:17
**educational**
  13:24
**effect**  127:14
  174:15,18
**effort**  119:22
**efforts**  87:2
  236:1
**either**  29:19
  51:20 92:12
  120:24 129:23
  135:5 165:11
  169:21 180:4
  206:20 231:12
  241:6 242:2
**ekono**  2:11
  106:12,16
**elected**  16:13
  16:14,14,23
  27:13 49:24
  50:4 52:16
  53:14

**election**  52:14
  215:17
**electronic**
  13:13 239:7
**elements**
  209:18
**email**  26:24
  39:18,20,22
  40:4,9,20 41:1
  41:3,5,8,10,11
  82:3,4,7 135:5
  180:7 194:21
  222:16,22
  223:2,5 226:19
  227:8,16,19
  229:17,18,23
  230:16,19
  232:11 237:5
  239:3
**emailed**  181:1
**emailing**  13:9
**emails**  39:24
  40:13 134:4
  147:20,21,24
  179:12 223:15
  224:3,10,23
  225:5,6,14,19
  225:20 226:9
  228:10,12
  235:6 237:4
  240:13,14,14
  241:16,22
**emerald**  44:2
  60:1 62:24
  63:1,8,13,13,15

63:16,17 65:5
65:6,12,14
73:8,10 76:24
77:4,13 78:2
78:24 79:9
163:11 164:24
165:3,4,8,11,13
165:17 166:1,3
166:7,13,16
167:1,21 168:9
169:2,10,16,23
170:2,7,21
171:16 172:15
174:12,14
175:7 176:8,15
176:24 177:5
177:17,23
178:5,11,20,22
179:3,5,9,14
180:19,23
181:11,15,16
181:22 182:2,2
182:13,18,23
183:3,5,7,11,14
183:15 184:5,9
186:17 187:1
187:13,21
191:4,16 197:5
197:17,20,20
198:1,4,7,21
199:9,13,22,23
200:5 236:9,9
**emerald's**
  64:14 167:5
  168:2 169:5

**[emerald's - established]** Page 21

171:23 176:23 190:23,24 191:10

**emeraldadv** 3:20,20,21,22 3:23,23 174:2 174:3 186:10 186:11 187:7,8

**emphasize** 204:4

**employ** 51:5

**employed** 15:13

**employee** 45:15 48:5 51:12,13 51:16,21 122:15 222:7 223:18,19,23 224:9 226:10 228:17 229:22 235:20

**employees** 1:3 1:20 6:7 9:3 10:13 15:19,21 16:7 17:2,8,14 18:15 20:15 21:7,11 23:1 25:11,24 26:18 27:7 31:2 36:1 36:4 42:20 45:11,18,21 46:1,2,6 48:20 48:21,22 49:3 49:6,12 50:9 51:15,19 55:2

55:4 63:3 64:2 65:4 77:6 78:20 80:16,24 88:13,20 89:18 96:9 103:3,6 105:7 108:17 108:23 109:1 112:16 116:7 116:10 118:20 118:23 119:20 126:5 127:4 129:3 130:24 141:14 148:24 149:3 161:24 162:21 163:12 164:8,17 176:7 179:3 186:17 193:9,17 197:6 198:4 199:10 200:16,18 201:1,3,4,8,9 201:10,11,12 221:1,20 222:7 224:11 225:18 228:13 230:7 231:1 237:11 239:17,22,23 242:4 243:11 245:6,7

**employees's** 187:16

**employees'** 1:4

**employment** 14:11,13

**employs** 51:8,9

**emptied** 226:14 227:21

**empty** 227:22

**enclosed** 187:14

**enclosures** 103:11,13,14 103:18,19,22 103:24

**encompass** 117:4 145:4

**endeavored** 143:11

**endo** 9:16,24 10:14,17,20 109:17 110:15 120:20 121:2,8 121:23 139:20

**engage** 117:1

**engagement** 90:1 92:12 103:5 115:21 118:10 123:23 127:5 142:16

**enlarge** 194:19

**ensure** 11:6 229:22 238:18

**ensuring** 171:16

**entered** 104:9 104:16

**entire** 53:12 89:17 112:10 112:12,18

113:9,12,14 115:14 142:2 190:21

**entirety** 166:14

**entities** 50:16 136:19

**entitled** 125:12

**entity** 48:10 49:10 136:23 171:15 219:23

**environment** 13:3 181:5

**equipment** 144:4 236:23

**equities** 162:15 162:19 163:2,2 166:22

**equity** 163:10 188:13,19 193:23 194:4,5

**equivalents** 189:13

**erp** 19:21

**errata** 248:5,7 248:10,13 250:9

**especially** 69:4 193:18

**esquire** 2:3,4,4 2:10,10,11,11 2:17

**established** 17:7 44:7 48:19

**[estate - fairly]**

**estate** 171:8 194:5
**estimate** 32:11 144:12
**estimated** 140:13,17
**estimation** 139:3,5
**et** 6:8,9
**event** 225:1
**everybody** 101:23
**exact** 34:15 135:2 213:22
**exactly** 33:2 92:3,9 93:12 117:10 129:22 212:15 238:3
**examination** 7:23 23:12,22 24:3,9 25:14 32:3,22,23 44:22 212:4,11
**examined** 7:20
**example** 225:21
**exceeded** 225:7
**except** 250:6
**exception** 12:12
**excluding** 204:9,12
**excused** 246:24
**executive** 215:21 216:4

216:10
**exert** 49:14
**exhibit** 3:18 4:5 21:16,18,24 22:1,11 33:14 42:18 65:3,9 84:2 89:21 102:19 104:7 123:24 126:21 137:20 138:14 142:21 149:19 151:3 152:9,11 152:20,23 153:1,5,7,23 154:5 156:8,9 156:21 157:5 173:11,13,14 173:16,17,23 185:16 186:5 187:5 193:2 194:13 196:11 196:12,22 203:10 217:15 217:17 218:16 233:2,19
**exhibits** 152:19 153:12 173:20 185:22
**existence** 26:7 136:11
**expansion** 204:16
**expansive** 149:7

**expect** 111:17 111:20,24 112:24 113:19 114:1,7,14 115:6 142:10 192:19
**expectation** 145:16
**expectations** 146:14
**expected** 139:23 140:5 141:16
**expecting** 190:2
**expects** 112:9 142:13
**expenses** 124:18,23 125:1 142:11
**experience** 66:11 214:9,11
**expert** 47:3,5 54:5 109:8,12 182:5 185:5,7 211:1,2
**expertise** 107:14 108:6 172:14
**experts** 48:7,9 55:6 89:2,4,6 107:18,18 119:4 176:11 220:23 241:12

**expires** 250:17
**explain** 69:1 168:21
**explained** 20:18 240:12
**exposed** 191:24
**expressing** 95:16
**extend** 232:5
**extent** 50:16 58:14 70:24
**eye** 169:9
**eyes** 164:17

**f**

**f** 1:9 73:22 247:1
**fact** 72:11 128:13 143:9 179:18
**factor** 117:8 220:10
**factored** 88:9
**facts** 72:8 79:11
**fail** 248:15
**faille** 62:18,18 73:22 74:2,7 74:22 75:11 87:11,18
**fair** 93:7 169:23 218:10
**fairly** 94:20 95:1 96:5 239:12

**[fall - fitzpatrick]**

**fall** 37:13,21
**falls** 16:4
**false** 205:3,4
  208:19 215:9
  216:2,12,24
  217:4,10,13
**familiar** 10:23
  23:16 120:6
  121:18 144:9
  172:21 195:7
**familiarize**
  25:13 138:14
**familiarized**
  44:20
**far** 35:10 61:18
  71:19 108:8
  109:10 120:24
  121:12 147:9
  171:1 177:11
  182:17 191:7
  235:23
**fargo** 54:17
  105:19 132:9
  132:10 135:17
  236:11,11
**farr** 2:9 7:1 8:4
**february** 1:17
  5:18 193:10
  247:19
**federal** 203:18
**federally** 1:22
**fee** 121:21
  124:2,9
**feel** 45:4 50:24
  55:23

**feels** 118:19
**fees** 124:18,23
  125:1,7,9,12,16
  126:2
**fell** 67:1 76:15
**fellow** 139:8
**fiduciaries** 55:3
  129:10
**fiduciary** 46:12
  46:15 54:21
  55:1,20 56:8
  88:13,17,19
  89:10 113:13
  148:23 149:2,3
  149:4 169:24
  244:20,22
  245:2,4
**field** 109:12
**file** 105:17,17
  117:5,9 228:14
**filed** 6:9 75:11
  87:7,12 91:7
  110:10 151:12
  152:5,7 154:10
  158:17 181:23
  203:18 207:1
**files** 57:19
  221:24 222:1,3
  222:9,12 228:3
  232:3
**filing** 147:18
  222:10 238:23
**filings** 105:13
  106:2

**fill** 108:7
**finally** 12:9
  13:12
**finance** 18:21
**financial** 15:9
  17:6 20:4
  206:9,10,19,21
  207:12 208:1
  208:17
**financially** 6:21
**find** 35:12
  121:17 144:2
  207:3 214:20
  242:20
**finding** 122:7
**finds** 180:1
**finish** 11:15,16
**finished** 176:1
**finishes** 12:6
**fireproof**
  222:10
**firm** 6:16 13:21
  14:18 15:3,11
  18:22 79:23
  89:6,8 104:14
  116:5 120:2
  125:14 128:1,3
  137:2 180:10
**firms** 105:9,11
  105:21 107:4,5
  107:13 108:4,4
  108:11 115:21
  116:3,9 128:23
  129:19 131:3

**first** 4:7 10:24
  14:21 28:16
  30:7 31:2 32:9
  33:6,10 34:22
  34:24 35:3,13
  35:16 36:24
  37:14 40:6,6
  65:11,17 83:20
  84:18 91:10
  116:5 117:11
  117:16 124:1
  140:23 141:8
  158:10 166:5
  171:7 176:5
  219:13 226:24
  228:7 233:4,20
  237:15
**fit** 79:12,24
  172:8
**fitzpatrick**
  28:10,23 29:13
  30:13 31:16
  32:2,11 33:7
  46:9 80:19
  82:10 84:18
  85:11,23 86:1
  86:23 90:14
  91:2,22 92:4
  94:2 96:13
  97:17 100:23
  103:23 123:1,5
  123:7 138:5,9
  139:15 143:6
  146:1,24 148:9
  156:4

**[fitzpatrick's - fund]**

**fitzpatrick's** 96:22 98:17

**five** 15:23 16:9 16:24 45:12 49:19,21 73:6 89:5 94:18 108:8 158:23 245:24

**fixed** 56:3,3 163:2 166:22 183:16

**flip** 195:6

**focusing** 32:9 171:23 178:9 197:16 199:5 237:20

**folded** 47:11

**folder** 173:13 224:22 226:13 226:14 227:21 227:23,24,24 228:2,4

**folders** 222:7,8 227:22 238:3

**follow** 12:18 117:13 164:4 181:17 192:19 245:21

**followed** 171:16

**following** 56:22 58:24

**follows** 7:21 43:18

**foregoing** 250:3

**forget** 133:5

**form** 29:17 82:2 100:4 239:6 250:7

**forma** 69:24 71:9 205:17 206:3 208:7,8 208:9

**formal** 13:16

**format** 57:7

**formula** 45:19 67:21 69:16 97:13 205:8,10 205:10,15 209:20 213:10 213:12

**forth** 119:18 135:16,19,22 170:10

**forum** 179:16 181:6,9

**forward** 50:5 52:15 60:15 82:19 86:20 101:6 117:14 118:13 123:19 129:21,24 139:1 156:6 180:14 230:11 244:24

**forwarded** 234:12

**foundation** 42:8 43:8 44:14 58:2 59:11 64:9 68:10 92:19 98:9,24 111:7 143:15 158:8 158:21 160:17 190:6 210:3

**four** 138:9 195:1

**fourth** 11:20 69:5,7,14 71:8 154:12,15 204:9,11 205:6 205:14 207:6 207:18 209:2

**frame** 85:17

**franchi** 154:15 155:18 156:17 156:17 157:2

**frank** 1:11

**frankel** 2:17 7:6

**fraud** 38:18 39:7,11,13 66:17 68:16 72:12 76:10,14 83:5 91:6 97:3 97:6 98:2,3,14 128:14 138:12 139:14,16,21 141:1 203:3 218:5

**free** 50:24

**frequently** 118:14 239:21

**front** 64:18

**full** 8:6 48:22 102:5 153:19 204:7 225:8 235:18

**functions** 18:7 18:11,12

**fund** 21:2 28:7 35:23 43:22 45:13,17,21,23 45:24 46:3,7 46:10,15 47:4 47:5 48:1,4,8 48:10,15,18,20 49:1,2,7,9,15 49:23 50:1,7 50:11,24 51:5 51:8,12,14,18 51:20,21,22 54:6,7,10,16,18 55:3,6,8,9,13 55:24 56:20 63:6 72:21 73:1,3,5 78:23 82:12 89:19 94:22 95:2,6 96:10 107:22 108:10 112:16 112:18 122:16 126:6,7 127:4 129:3,10 133:19 161:24

**[fund - going]**                                                              Page 25

162:11 164:18
167:4 168:1
170:18 171:14
176:7 179:4
182:8 186:17
188:12,15
189:16 190:11
193:10,17
221:21,24
222:7,19 223:1
**fund's** 148:23
149:2 165:10
166:17 190:4
190:19
**funding** 132:6
**funds** 20:3
53:17 63:18
78:20 79:8
132:7 149:6
162:14 165:6
175:9 191:2
**further** 5:8
82:21 94:19
105:14 206:1

**g**

**gaining** 129:9
**gallagher** 2:9
26:20 37:16
235:7 236:21
239:9
**gander** 2:17 7:5
7:5
**gathering** 32:5
135:6

**gauge** 101:20
**geller** 2:3 7:11
8:15 25:13
29:10 32:1
33:24 34:1,7
34:13 37:15
45:3 65:17
79:23 81:16,24
82:14,21 84:18
85:4,12,16,20
86:6,10,22
90:1 91:3
93:16 94:5,13
99:23 100:14
103:2,6 104:12
108:13,18,21
109:4,6,14,18
109:20 110:16
111:18,21
112:1,9,24
113:7,19
114:15 115:6,9
115:22 116:2
116:15 117:2
123:17 124:5
124:12 125:1
125:21 126:4
126:16 127:8
127:23 128:12
129:15 131:2,8
131:15 132:24
133:1,4,13,16
133:22,23
134:3,8,12,18
134:21 135:1

137:8,10
141:13 142:17
150:20 159:17
218:10 219:19
243:1,8,9
**geller's** 83:15
**gene** 52:4
**general** 32:6
69:12
**generally**
165:18
**getting** 68:17
157:20 212:1
**give** 9:20 26:4
34:16 40:24
230:19 237:16
237:17 244:17
**given** 63:18
94:20 247:14
250:5
**go** 6:3 10:21
19:22 20:13
22:16 23:5
29:8 35:2,7,9
43:2 46:17
59:24 60:14
61:5 71:2,19
82:10 89:21
93:19 102:7,9
103:9 106:14
107:23 108:9
116:8 121:15
127:17 132:12
138:8 142:20
143:20 147:16

149:9 152:14
154:11 157:5
158:10 163:15
163:20 164:1
167:10 187:17
191:7 195:24
196:10 203:22
205:5 212:19
215:14 221:7,8
227:1 228:7
232:1,8 233:12
235:24 238:3,6
239:21 244:24
246:18,19
**goes** 49:9
226:12
**going** 5:17 7:9
11:5 15:12
22:13 29:14
33:9 34:19
35:19 36:11
37:8 47:23,24
50:5,13,18
70:23 76:13
97:5 100:22,24
101:3,22 102:5
107:1 113:8
119:22 129:16
136:7 140:20
146:17 148:3
148:15,16
150:12,12
151:22 152:16
156:21 162:8
168:22 180:16

**[going - happening]**                                            Page 26

199:16,18
207:22 212:8
212:13 219:15
221:11 230:4
230:14 232:13
233:13 234:21
235:21 239:19
239:21 244:4,5
246:4,10
**good** 5:16 8:2
79:24 246:17
247:4
**goods** 70:12
213:7
**gotten** 106:13
120:24 147:8
**governing**
104:10
**government**
17:4,13 66:18
68:16
**government's**
17:6
**governments**
17:11 43:21
78:21
**governs** 194:9
194:11
**graduate** 14:7
**graduated**
13:19 14:12,14
**grand** 110:13
**granted** 157:23
**granular** 108:9

**graph** 41:15,19
41:20
**great** 66:11,14
67:14 68:9
72:10 98:12
138:7,20,21
147:12
**grew** 67:13
**griggs** 1:11
235:20,22
**gross** 48:24
94:1,8,15
124:10
**ground** 10:22
211:11 212:17
213:19,23
**groundhog**
179:15 181:9
181:10
**group** 47:8
149:5 159:23
160:5,14,14,21
161:4,9 216:21
**groups** 107:17
158:23 159:2,5
**grow** 68:12,12
68:12
**growing** 47:4
70:10,13,18
212:22 213:1,2
**growth** 63:19
64:16 66:8
67:7,8,8,9,10
67:14,20 68:1
68:2,24 69:7,8

69:11,13,20,21
69:22,22,24
70:5,5,6,7,8,10
70:10,15,16,21
71:6,7,10,14
72:4,5 73:13
73:14 75:5
76:9,16,22
77:15 83:9
97:11,12 98:3
98:15 171:24
172:4,5,17,19
173:4,6 179:4
188:13,14
190:24 203:5
204:7,10,17
205:9,13,16,17
205:18,22,22
206:3,4,5
207:10 208:5,7
208:8,12,13,14
209:1,3,5,9,10
209:14,17,19
210:1,8,10,11
210:15,17,18
210:19,22
211:6,16,17,21
212:21,22
213:5,5,8,11,11
213:15 214:7
214:14,20
215:12 219:5,7
219:10
**guess** 66:12
67:2 68:13

86:18 99:11
116:23 137:15
142:14 164:17
179:18 207:2,6
210:17 231:24
235:11 244:10
**guidance**
187:20
**guidelines**
43:20,24 44:6
163:11 164:4,5
171:1 177:18
177:22,24
186:24 188:9
190:12 192:7,9
192:18 194:6
**guides** 170:18
**guy** 62:17
66:12 68:7
**guys** 47:17,19
102:3

**h**

**h** 3:6 26:24
224:4 227:4
230:16 237:1
**half** 34:19
**hall** 29:23
**hallway** 29:24
**hand** 156:19
247:18
**handle** 21:12
116:6
**handles** 21:1
**happening**
171:4

**[happenings - including]**                                              Page 27

**happenings**
181:4
**happens**  225:3
**happy**  92:10
168:20
**hard**  236:4
237:20 238:8
239:1
**harmed**  66:20
66:21
**harvey**  52:2
**hb**  1:4 6:12
**head**  11:9
131:23 223:24
225:24 228:15
**heading**  188:9
**heads**  240:4
246:1
**health**  91:9
96:17 100:21
138:12 139:14
**healthcare**  1:9
69:9 91:8
235:10
**hear**  185:18
**heard**  5:24
**held**  171:3
**help**  20:4 44:8
48:7 86:20
95:10 99:6,23
100:1,7,9,10
238:12
**helpful**  30:19
31:18 223:22

**helping**  100:2
**helps**  45:18
162:23 189:2
**hey**  70:1 71:13
205:19 208:9
**high**  13:17
**highlight**  90:10
91:2
**highlighted**
139:12 175:18
**hire**  47:5 89:2,6
89:7 176:24
177:4 219:19
**hired**  47:7 54:3
**historic**  43:19
**history**  14:11
14:13 189:6
**hit**  225:2
**hold**  14:1,2
37:7 64:7
65:20 70:22
77:1 128:17
136:6 144:17
146:6 158:20
159:20 163:16
165:14 175:13
177:1 189:9
208:21 226:3,5
226:15 229:2,5
229:14 230:3,8
230:24 231:8
231:10,17,20
233:10 242:12
244:1

**holdings**
215:22
**holds**  57:9
216:8 217:6
**home**  8:11 91:7
**hope**  246:16
**horwath**  14:19
**hosted**  223:11
**hour**  101:22
144:22 149:9
**hours**  17:9
48:23 49:5
102:3 144:13
145:3,11
**hr**  228:16,22
**huge**  67:20
**hypothetical**
113:3,21
114:18

**i**

**iannece**  2:11,14
**idea**  65:18 66:5
66:20 67:7
69:13 96:8
99:15 192:2
238:21
**identification**
21:22 84:5
102:22 126:24
137:23 149:22
151:6 152:12
156:12 174:4
186:12 187:9
193:5 194:16
203:13 217:18

218:19 233:6
**identify**  38:12
107:20
**identifying**
234:17
**iii**  1:14
**imperative**
248:12
**important**  11:3
**impression**
96:7
**improve**
168:23,23
169:22
**inbox**  225:2,10
226:10 227:16
**inboxes**  225:20
**include**  18:12
18:18 50:6
71:1 135:17
136:5 205:9,15
210:11
**included**  59:2,7
132:10 137:1
205:16 206:3
213:9,10
239:24 240:2
**includes**  13:9
43:21 194:24
195:1 238:4
245:5
**including**  68:2
96:18 126:1
163:1 181:2
204:8,11 207:9

income   56:3
  163:3 166:22
  183:16
incomplete
  113:3,21
  114:18 153:11
inconsistency
  173:18
increase   99:17
  99:21 204:15
increasing
  213:5
incurred   77:10
  184:6,18
indemnify
  125:22 126:12
indented   204:1
  215:16
independent
  50:15 106:6
  107:9
index   173:8
indicated   247:6
individual   66:3
  82:8 122:20
  124:21 159:2
  226:10 228:14
  229:21 230:5
  242:2
individualized
  190:3,8
individually
  1:5 74:15
  147:21

individuals
  231:16
industry   69:8,9
  70:12
inflated   66:7
  66:10,24 67:5
  74:20,23 75:9
  76:21,22 77:8
  77:14 83:2
inform   38:18
  90:7 107:6
information
  13:13 19:23
  20:23 23:3
  25:15,18,20
  26:22 32:5
  35:5,13 36:17
  36:23 40:17
  42:2,12 43:2
  45:1 48:8
  65:24 71:4
  73:15 80:13,14
  81:1,10 83:4,8
  90:6 91:23
  99:12 105:10
  110:4 117:11
  120:23 121:13
  121:17 123:15
  129:1,8,9
  130:19,23
  131:7 132:13
  134:16 135:18
  135:20 143:4
  143:24 147:10
  156:3 163:6,6

  171:20 178:14
  178:16,20,22
  178:23 179:18
  179:22 181:11
  181:13 182:5,6
  195:22 201:15
  205:6 206:1
  207:3,15,18,18
  214:13 220:7
  220:21 224:3,5
  224:6,16
  228:19 230:15
  231:3,6,14
  232:2 235:24
  239:14 241:14
  242:18 243:6,7
  243:10,18,19
informed   29:5
  171:10
initially   128:6
initiated   81:24
  137:10,10
  174:20
inquire   134:23
ins   54:5
instance   12:13
institution
  125:23
institutional
  95:9 139:10
instruct   150:23
instructed
  171:10 225:19
instruction
  59:11 60:10

instructions
  170:7,20
  171:17 248:1
instructs   12:4
interest   111:18
  111:21 112:2
  112:22,23,23
  113:18 114:11
  114:14,23,24
  115:2,3,5,12,13
  141:20 170:3
interested   6:21
  54:14 96:4
  112:22 247:16
interests   114:6
  245:12
internal   14:24
  15:1 18:17
  19:21,22
internally   88:1
international
  163:2 193:23
  194:4
internet   5:22
interpose   70:23
interrogatories
  81:10
interrupt
  106:10
interrupted
  213:21
interrupting
  26:13
interview
  167:12

**introduce** 90:5 90:21 137:20 156:8 203:10 217:15 218:16 233:2

**introduced** 51:1 193:23

**introduction** 157:6

**invest** 64:15 163:8 164:3 170:8,11,13 171:2 172:7,11 176:9,12 183:19 188:11 189:5 191:17 192:5 220:16

**invested** 67:19 131:5 162:14 162:19 188:18 190:8,20 191:2

**investing** 54:14 164:20 169:2 172:13 189:12 191:22

**investment** 43:23,24 46:20 47:11,13 54:4 54:12,13,16 77:5 78:3,4 89:7 105:19 107:15 108:1 162:18,22 163:13,18,24 164:9,11,15,19

164:21 165:6 166:5,8 167:9 169:6 170:9,21 171:1,8,12 172:2 174:11 176:13,23 177:6,14 179:15,21 181:5,6 183:12 184:22 186:16 187:2,15,18 188:9,11 189:2 189:4 190:10 190:22,23 191:1,10 192:12,18 193:8,16 198:24 199:24 216:21 220:11

**investments** 47:7 54:6 55:9 56:2,4 63:21 105:10 106:8 107:8,11,20 163:22 164:6 172:6,16,20 175:8 176:10 177:9 185:2 188:13 190:12 192:1,3,6,10,13 192:15 201:13 236:18

**investor** 69:13 95:9

**investors** 66:21 67:3,16,19 70:9 100:7 139:10

**invite** 179:16

**inviting** 181:6

**invoices** 19:17

**involve** 58:15

**involved** 9:2 10:19 27:11,16 28:13,15,17 35:21 36:4 39:1 45:20,23 72:11 76:15 80:18 85:20,23 88:17,19 89:19 95:17 97:14 99:9 100:7,10 109:16,20,22 110:1,21 118:24 119:24 120:1,19,21 121:2,12 122:9 122:10 125:3 130:1 131:11 136:24 137:4 140:10 156:5 172:8 182:22 182:23,24 183:19 215:5,6 233:16

**involvement** 98:20 121:9 122:2 130:14

**involving** 126:2

**issue** 72:1,5,13 72:16 73:1,13 73:14 76:9,10 76:16,21,23 77:15,15 82:22 83:1 203:6 228:17

**issued** 220:8 226:6 229:3,5 229:15 231:1 233:10

**issues** 71:22 83:2 169:5

**item** 28:18 30:8 31:8 42:16 58:21 81:19,21 82:13 83:14 88:3 89:24 117:13 232:8

**items** 25:20 42:3,13 69:12 105:16 118:18 118:22 135:9 171:2 180:23 209:7 225:10

**j**

**j** 1:11 103:2

**january** 52:13 52:15,16,17,21 53:1,2

**jason** 1:11

**jehosaphat** 38:20 97:9 219:2,14,22

220:3,8,10,21
221:3
**jehoshaphat**
4:6 218:18
**jessica** 2:21
22:2,16 84:7
90:9 156:20
185:18 194:19
**job** 14:15,23
15:6 18:3 79:4
79:6 88:24
112:10 122:16
145:9
**jobs** 241:9,10
**joe** 232:13
237:9 240:1
**joe's** 240:13
**john** 26:22 47:9
47:9,12
**join** 79:14
114:5
**joined** 78:14
216:7 219:16
**joining** 216:20
**joseph** 2:4 7:14
103:2
**joshua** 1:12
**jtull** 2:7
**judge** 94:12,12
94:16,16 99:20
140:7
**july** 75:18 97:8
151:12 202:10
219:11

**jump** 26:3
**jumping**
175:14
**june** 150:2
**junk** 227:24

**k**

**k** 1:9
**keep** 167:21
221:23 222:5
243:2
**keeping** 243:1
**kept** 29:5 169:8
222:3,9 224:10
**kessler** 104:14
104:17 105:4
108:14 125:10
125:14
**kevin** 2:4 7:13
34:5,6 133:7,8
133:10
**kevin's** 133:8
**khan** 103:2
**kim** 9:20 22:9
23:14 24:17
35:2 55:17
58:13 59:11
64:8 77:3
140:4 160:8
175:2,19 195:5
234:20 242:14
**kimberly** 1:21
3:3 6:6 7:19
8:8
**kin** 247:15

**kind** 21:1 79:9
79:11 96:7
106:2 113:12
119:24 120:1,5
126:6 135:18
135:19 172:10
172:13 181:2
183:1 184:1
193:19 206:3
220:18 231:5
231:13 238:21
240:8
**kinds** 54:9
78:18
**klavelle** 2:6
**klumpp** 123:5
**knew** 58:19
92:13 244:10
**knocked**
106:13
**know** 11:21
12:11 14:10
22:2 33:16
34:14 36:12
37:8 42:9 47:6
50:16 51:1
62:16 65:23
71:13 73:7,8
74:11 75:7,10
75:12 80:8,11
80:13,14 81:1
81:2,23 82:18
84:17 85:15,19
86:5,15 87:6
92:13,20 99:20

101:3,17 102:3
103:14,17,19
103:22 109:7
110:13 111:22
113:23 116:17
121:11,14
122:24 128:1
129:4,5 131:22
133:5 134:5,6
134:9,10,13,17
134:20 135:3
135:14,20,23
137:8,14
140:19,20
143:16 147:7
148:3,13
150:14,17
151:18,24
159:8,9 160:8
160:9,20
161:15 165:5
166:10 167:16
168:18 169:5
169:13 170:19
171:7 180:12
181:3,13,14,17
184:13 185:6,8
189:21 200:3,5
201:7 207:15
207:16 208:2
208:10 209:24
210:4,6 211:17
212:8 216:15
218:2 219:21
220:1,2,6

**[know - limit]** Page 31

223:12 227:7 228:3,5 231:9 232:15,17 233:14 237:3 238:3 239:8,10 244:5 245:18

**knowledge** 24:24,24 25:3 45:1 132:15 198:16 213:15 214:6 217:3

**known** 70:8 233:15

**knows** 54:5

**kramer** 2:17 7:6

**kramerlevin....** 2:19

**kris** 52:5

**l**

**l** 2:20 73:22,22

**language** 158:3 159:13 175:7

**large** 67:13

**larger** 94:21,22 95:2 139:10

**late** 166:11 211:24 212:1

**laura** 82:1 85:21 127:24 128:5,6,9

**lavelle** 2:4 7:13 133:11

**laventhol** 14:19

**law** 25:12 28:4 28:5,9 29:7 33:19 37:16 38:23 39:3,5 40:1,3,22 45:2 46:9 78:14 79:17,18,18,23 80:2,20 81:19 81:20 82:5,6 82:11 86:14 88:3 105:21 107:4,5 108:4 109:10 115:21 115:23 117:7 117:12,15,24 118:18 119:5,7 120:2 122:23 123:3,16 131:9 131:15 133:14 133:17 134:3 134:20 150:6 150:14 151:17 151:18,24 156:4 225:24 230:10 231:12 231:18 232:19 232:20 234:5 237:8 239:16 239:18 240:6 241:8

**laws** 203:18

**lawsuit** 83:5 95:14 117:6,9 129:14

**lawsuits** 118:11 118:16 119:2 122:18,21 123:2 129:2 130:4 143:20

**lawyer** 240:9

**lawyers** 119:4 141:3 220:22 241:12

**lay** 64:8

**layer** 129:7

**lead** 9:23 10:15 59:3 62:9,13 73:24 74:13 78:7,9 79:2,6 95:8,14 96:16 104:12 111:9 111:10 131:21 138:11,23 139:7,9 142:7 145:14 151:10 152:24 153:4 153:13,24 155:1,3,10,12 155:21 156:1 157:10,11 158:4,13,14,18 159:16,24 160:12,24 161:7 219:17 243:22 244:13 244:18

**leading** 122:7

**learn** 65:11 73:12,18

219:13

**learning** 36:17

**leave** 76:13 97:6 218:4

**leaves** 225:16

**leaving** 180:11

**left** 14:17 106:11 224:8 236:21 240:23 241:3,19

**legal** 10:5 28:6 55:16 104:10 124:22 128:19 170:16 210:24 216:14 237:14

**length** 102:2

**lesser** 76:7

**letter** 82:3 103:2,5 104:2 105:2 123:24 187:13

**level** 163:21 164:1 216:10

**levels** 192:15

**levin** 2:17 7:6

**liability** 184:10 184:20 185:13

**liable** 126:17 184:6,18

**license** 14:3

**lieu** 5:9 20:20

**likely** 10:22 181:1

**limit** 136:10 184:9 224:15

**[limit - looks]**                                                    Page 32

225:2,7 237:5
**limited** 126:1
  237:7
**linda** 1:21 6:16
  247:22
**line** 216:6
  234:20 249:3
**lines** 93:19
  94:19 138:9
**list** 19:12 24:6
  60:4 164:15
  167:15,16
  169:8,10,12,14
  169:20 182:20
  199:8
**listed** 23:23
  128:2,5 154:18
  154:19 157:1
  159:2 199:21
**listened** 95:24
**listing** 155:6
**lists** 127:7
  159:22 161:3
  162:11
**literature**
  214:12
**litigation** 9:16
  10:20 57:24
  79:22 81:5
  89:3,8 91:11
  91:16,24 93:9
  95:17 104:15
  104:18 105:8
  105:14 107:13
  107:16 109:17

110:18 117:3
119:8 121:19
123:9 124:14
124:16 125:3
128:8,23 129:2
130:15 131:3
131:12,16
134:22 139:1
139:22,24
206:15 219:18
225:21,23
226:3,5,5
229:2,5,6,14
230:3,8,24
231:8,10,16,20
233:10 242:5
242:10 243:14
245:10
**litigations**
  111:2,5,15
  121:10 122:3
**little** 10:17 16:7
  40:10 47:23
  69:2 143:8,13
  144:7,14,22
  145:3,5,16
  146:15,19
  147:2 148:11
  194:19
**llp** 2:3,9,17
  90:1
**load** 21:17
**local** 125:8,11
  125:14

**locations** 13:1
**lodge** 153:10
**logic** 240:13
**long** 29:20,22
  68:11 102:4
  221:8 223:15
  224:9 228:3
  237:24 239:8
**longer** 30:3
  123:6 223:19
  223:23 224:14
  227:9,18
**longest** 36:3
**look** 19:17 41:5
  43:23 59:17,22
  59:24 60:5,15
  70:17 82:21
  88:23 89:20
  93:18 104:3
  105:22 107:24
  112:1,4 121:9
  132:20 138:3
  151:11 156:15
  166:8 174:24
  175:6,22 182:8
  189:21 195:2
  196:13 203:6
  203:24 206:23
  233:13 234:13
  235:21 238:22
**looked** 24:8
  33:14 41:15
  59:7 65:23
  68:15 116:22
  132:18 142:23

154:6 188:5
197:22 205:21
206:1,19 207:2
207:8 209:6
220:22 233:24
236:7,8,10,17
236:18 238:2,9
238:15,24
**looking** 22:20
  37:17 46:20
  58:19 60:17
  71:3 74:12
  76:14 94:18
  96:11 100:20
  110:3,12
  121:14 122:14
  123:23 124:17
  125:20 127:23
  128:22 129:8
  132:11,16
  141:24 142:1
  142:24 147:20
  148:21 149:4
  154:14 158:3
  172:3,6 173:7
  177:16 178:4
  184:5 188:8
  205:21 206:1
  208:18 214:16
  216:6,19
  235:24 236:4
  238:7
**looks** 121:5
  132:6 202:8

**lose** 185:2

**loss** 74:5,20
75:8 76:1,3,20
77:10 88:15,22
89:13,14 93:14
94:20 95:1
96:4 97:11
99:18,18
119:21 140:21
140:24 141:2,5
141:10,12
184:6

**losses** 79:12
89:17 94:23
128:13 140:14
140:18 141:19
184:18 192:22
244:12

**lost** 67:3 95:4,6

**lot** 25:20 35:22
66:13 67:11,15
67:18 95:19
132:7 144:6
146:20 147:8
147:19 178:11
239:1 240:22

**loughery** 53:3
127:20

**luckily** 238:1,6

**luke** 1:10 2:16
7:7 39:11,11
66:13 68:7
215:20

**lunch** 102:2,6

**lynch** 216:22

**m**

**machine**
247:10

**made** 58:8 63:3
64:20 65:5
74:4 79:3
88:12 96:7
164:10 165:7
170:20 183:5
197:5 198:8,16
199:9 200:6
231:15 236:15
248:6

**mailbox** 225:7

**main** 34:4,10
133:15,18
242:24 243:16
243:16,17,19

**maintain** 57:19
221:19 224:12
224:14,23
227:3 228:20
230:11

**maintained**
226:11 239:5

**major** 35:13
36:24 37:3
117:8 230:22
231:5

**majority** 32:20
40:16 54:18

**make** 44:23
46:23 55:24
63:8,16,20

64:5,10 65:10
73:7 108:2
115:15 116:14
116:19 119:10
159:21 161:2
171:21 177:7
190:13 197:18
199:1,22 200:1
200:5 248:3

**makes** 70:17
79:21 199:23
239:13

**making** 60:24
119:13,14
162:17 163:13
163:18 167:5
176:20

**manage** 53:16
166:16

**manageable**
94:21 95:1
96:5 144:6

**managed** 16:8
165:11

**management**
43:24 170:10
174:12 177:18
177:22 184:16
187:14,21
188:12 216:7
228:14

**manager** 62:23
63:20 73:4,9
73:10 77:5
78:4 166:2,8

166:13,19
168:19,24
171:24 176:8
176:13 177:6
180:6,13 182:1
184:22 185:9
185:13 188:11
189:3,5,22,23
198:24 200:1
220:19,19

**manager's**
172:1

**managers**
54:12 62:2,22
63:18 79:1
131:6 163:4,7
163:8,10,23
164:10,12,14
164:19 165:1,3
166:21 167:1,2
167:12,23
168:17 171:21
177:5,13
178:12 179:23
180:3 182:4,9
184:15 188:3
189:8,17
190:13 200:1
236:16,18
237:13

**managing** 96:9

**manner** 5:12
112:13 121:6
122:4

**march** 204:2
206:20 207:13
207:17
**margot** 2:10
6:24 8:3 26:4
47:16 50:14
72:20 152:21
173:12 211:9
246:12
**marie** 187:23
**marina** 187:23
**mark** 21:14,16
102:18 126:20
149:18 151:2
152:8 173:10
185:15 187:5
193:1 194:12
**marked** 3:7
21:22 84:2,5
89:21 102:22
123:24 126:24
137:23 149:21
151:6 152:12
156:11 174:3
186:11 187:8
193:5 194:16
196:11 203:13
203:23 217:17
218:19 233:6
233:19
**market** 162:3
162:12 171:4
204:16
**marseglia**
27:10 42:4,14

52:3,7,20 53:4
53:5 65:2 86:3
86:6 88:4
89:23 90:4,20
118:6
**marseglia's**
241:21
**martin** 53:4
**matter** 6:7
10:11 30:15
73:24 75:16
82:22 84:19
86:12 87:7
93:2 104:24
109:17,19
110:2,5,15,16
120:20 121:2,8
121:10,23
125:18 133:2
133:24 134:3
139:2,20
154:15 155:1,4
155:13,15,22
156:2 157:1
161:8 219:19
226:2 233:22
**matters** 109:23
109:24 111:9
140:8 154:20
237:14
**max** 228:8
**maximize**
192:14
**maximum** 94:3
94:9,14 124:9

224:19
**mcgee** 1:10
2:16 39:12
66:13 68:8
72:13,16 73:1
76:13,21 77:15
97:5 98:2
203:5 214:19
215:20 216:7
216:20 218:3
235:10
**mckee** 7:7
**mdj's** 19:24
**mdjs** 18:19
**mean** 27:17
60:14 64:23
67:5 75:7 76:3
83:8 94:8,24
95:12 97:17
111:22 115:15
124:24 126:3
128:11 135:3
136:3 139:15
143:12 145:6
154:24 175:12
176:5 190:8
211:6,20 214:8
238:9,14 243:7
243:15 244:7
244:16
**meaning**
100:17 119:5
**means** 120:8
126:4 170:2
176:6 211:11

211:17,18
**meant** 33:3
99:2 144:5
**media** 6:5
61:10,15
102:12,17
149:12,17
196:3,8
**meet** 34:22
54:6 171:20
172:9 184:2
**meeting** 28:20
30:9 31:10
35:14 36:24
37:3 53:20
54:12 56:14,22
56:24 57:23
78:19 83:20,23
84:14,23 86:7
87:9,19,20,21
87:23,24 91:21
92:5,17 93:10
93:13 117:1,4
118:4 141:8,11
142:22 148:8
162:9 164:20
167:17 169:17
179:24 180:5
183:2 230:13
234:15
**meetings** 29:16
29:21 55:20
78:19 178:18
180:4 182:14
236:6 240:7

**[meets - money]** Page 35

meets  53:18
  56:11
meld  69:17
member  15:9
  15:22 16:15,24
  27:18 47:10
  49:19,22 52:7
  52:8 73:6
  75:19 77:18,23
  78:2 108:8
  122:17 128:1,3
  159:4 160:4,13
  160:20 161:9
  215:22
members  16:20
  19:9,11 20:17
  27:20,22 45:12
  49:5,21 51:23
  52:9,10,23
  56:23 57:18
  83:6 88:21
  89:6 114:13,24
  115:4 117:20
  159:23 161:4
  163:6 240:19
  240:22 241:1
  241:11,16,19
  245:5
memorandum
  3:15 149:21
mentioned
  25:22 27:24
  33:23 36:21
  42:11 46:18,20
  52:6 54:20

56:10 68:23
  72:7 73:21
  78:6 81:15
  84:15 105:3
  107:4 108:12
  116:15 121:22
  133:3,6 158:17
  164:23 189:11
  206:11
mergers  66:9
  67:9 68:3 69:1
  69:10 70:14
merits  88:6
merrill  216:22
messages  13:9
  224:17,18
met  34:24
  169:11
methodology
  170:13 208:10
  209:20
metric  69:15
  71:8 205:8
  206:3 213:9,10
  215:11
michael  2:22
  6:13
mid  165:4,12
  165:20,22,23
  167:3 172:19
  174:22 183:15
middle  143:1
  159:13
midyear
  204:14

mike  26:20
  37:15 47:8
  235:7 236:21
  239:8
miles  147:15
million  162:4
  165:19
mind  99:3
  119:11,13,14
  146:20,21
  156:21
minute  20:7
  21:17 29:24
  46:18 222:5
  245:24
minutes  16:3
  30:3 56:13,17
  56:21 57:1,2,5
  57:8,10,16,17
  57:19,23 58:9
  58:17,22,23
  59:5,7,8,18,22
  60:7,15,17,21
  84:13 92:1,2
  93:5,11 116:23
  119:19 138:3
  141:12 142:22
  148:7 236:5
  238:5,15,16
  239:5
mischaracteri...
  173:1
misleading
  205:3,5 208:19
  215:9,11,13

216:3,12,17,24
  217:4,10,13
misrepresent...
  75:6 203:5,6
misrepresent...
  66:8 68:23
  70:20 72:3
  83:9
misrepresented
  147:6
misrepresenti...
  219:4
missing  45:6
misspoke
  146:24
misstated  51:1
misstatements
  203:4
misstates  46:5
  64:11 77:2,21
  80:7 82:17
  83:12,18
  148:17 177:2
  197:12
mjboparai
  194:22
mmooney  2:13
modified
  229:15
moment  84:11
  138:13
money  45:22
  47:14 55:2
  62:1,22,23
  63:15,17,19,22

**[money - moving]** Page 36

67:3 73:4,9,10
79:1 95:5
125:5 131:6
163:4,7,8,9,22
164:10,12,14
165:1,3 166:2
166:13 167:1,2
167:12,23
168:18 171:20
171:24 172:1
176:8 177:5,6
178:12 179:23
180:2 182:1,3
184:15 185:2,8
185:12 188:3
189:17,22,23
190:13 220:18
220:19 237:13
**monitoring**
104:19 105:4,8
105:22 106:6
107:2,9,13,15
107:17 108:4
109:9 120:9
127:5,11 131:3
**month** 21:6
53:24 58:24
83:24 162:1,9
226:23 227:1,1
**month's** 56:22
57:1
**monthly** 18:15
20:24 53:18
56:11 105:11
105:16

**mooney** 2:10
3:4 6:24 7:1
8:1,3 10:1,6
21:14,24 22:13
22:19 23:5,10
23:20 24:20
26:16 30:18,20
31:12 32:8
33:5 35:15
36:20 37:4,20
39:6,23 40:23
41:17 42:10
43:10 44:16
46:16 47:20
49:13,20 50:21
56:9 58:7 59:4
59:16 61:5,16
64:21 68:22
71:15 72:23
75:14 77:11
78:5 80:10
82:23 83:13,19
84:1,7,12
85:14 90:9,11
92:15,24 93:24
98:5,16 99:4
100:19 101:21
102:7,18,24
104:8 106:24
111:12 112:20
113:15 114:10
114:20 115:19
120:10 121:7
123:22 126:20
127:2 129:12

130:13 131:13
137:5,19 138:1
138:18 140:12
140:22 144:11
145:1,23
146:12 148:5
148:19 149:8
149:18,24
151:2,8 152:8
152:14,22
153:6,14,21
154:11,13
155:17,23
156:7,14,20,23
157:15,21
158:9 159:3,10
160:2,10,22
161:5,12 164:7
165:24 167:24
168:10 169:3
173:10,21
174:6 175:5
176:3 177:15
180:15 183:4
184:4,24
185:15,17,20
186:2,14 187:4
187:11 190:1
190:17 193:1,7
194:12,18,20
195:9,24 196:9
197:15 198:14
199:4 200:15
200:23 201:21
203:1,9,15

206:17 209:12
210:13 211:4
211:15 212:3
213:13 214:4
215:7 216:18
217:5,14,20
218:15,21
220:24 221:6
221:17 229:11
233:1,8 235:4
243:4 244:9
245:1,19
246:15
**morning** 5:16
8:2
**motion** 3:16,18
39:1,2 134:7
134:11 150:2
151:5,10
152:12,23
153:1,7,13,24
157:23 158:2,3
158:4,17
159:24 196:13
**motions** 33:1
40:3 157:9,10
158:12,13
**move** 86:19
101:5 118:12
123:19 138:24
156:6 161:16
211:12 212:1
**moved** 129:24
**moving** 82:19
129:21

**[mstone - objection]**

**mstone** 183:12
  183:16 184:3
**mullen** 1:11
**multiple** 78:9
  188:22
**multitude**
  195:20
**museum** 43:19

**n**

**n** 2:1,20 3:1
**naftalis** 2:17
  7:6
**name** 6:13 8:3
  8:7,8 9:14 19:4
  19:5 20:13
  57:16 133:9
  136:22 137:3
  235:13,18,20
**named** 39:12
  62:17 68:7
  138:10 139:7
**names** 110:23
  156:17
**natural** 79:11
**nature** 189:13
**neale** 53:9,9,11
**necessary**
  124:19 170:15
  189:10 248:3
**need** 8:11 13:2
  23:15,17 84:10
  104:6 135:10
  143:4 146:18
  180:12 181:14
  195:22 200:21

**needed** 105:13
  121:13 224:2
**needs** 243:10
**negative**
  181:15 205:23
**negligence**
  185:14
**negligent** 184:8
  184:19,20,21
**neighboring**
  78:12
**neither** 247:15
**net** 69:22,24
  205:17 208:8,8
**network** 223:5
  223:7,11,13
**never** 169:4
  182:13,18
  183:5 191:12
  199:21
**new** 2:12,18
  54:12,13
  168:24 183:11
  204:14 208:2
  212:17 213:9
  213:23 241:1,4
**newspaper**
  39:16
**niched** 240:8
**nine** 55:10
**nods** 11:9
**non** 184:20
**nondisclosure**
  83:4,7

**nonpublic**
  201:15
**noon** 102:4
**normal** 105:18
  145:13 210:12
  228:24
**normally**
  189:10
**notary** 1:23
  247:3,22
  250:20
**note** 5:19
**noted** 248:10
  250:8
**notes** 92:16,23
**notice** 3:8
  21:21 23:2
  24:4,15 25:7
  33:13 230:11
  247:6
**notices** 179:12
**notified** 230:7
**november**
  75:18 187:12
**number** 6:11
  21:5 31:23
  32:22 34:14,15
  48:13 65:7
  105:7 118:22
  130:3 132:14
  134:1,5,13,20
  135:2,11,21,23
  156:16,19
  163:9 178:19
  185:24 195:1

  230:17
**numbers**
  173:23
**numerator**
  209:22
**ny** 2:12,18

**o**

**o** 2:20
**oath** 5:9,10
  6:19 11:1
**object** 9:20
  12:3 50:14
  64:11 148:16
  152:17 158:21
  159:20
**objected** 37:10
**objecting** 37:8
**objection** 5:12
  9:19,21 10:4
  12:6 24:16
  30:17 31:4
  32:15 35:1
  36:15 37:2
  39:19 40:14
  41:7 42:7 43:7
  44:13 46:4
  48:16 49:16
  50:20 55:15
  58:1,11 59:10
  60:9 70:23
  75:13 77:2,20
  80:6,7 82:16
  83:11,17 85:6
  92:7,18 97:19
  98:8,23 100:4

**[objection - organic]**

111:6 112:3 113:2,20 114:16 119:15 120:14 123:11 128:18 130:8 130:17 137:12 140:1,2,15 143:14 144:18 145:18 146:7 147:3 150:21 153:11 155:14 158:7 159:6 160:6,16 161:10 163:16 163:17 165:15 165:15 167:6 168:3,12 172:24 173:1 177:2 179:6 182:15 183:8 184:11 185:4 188:21 190:5 197:9,11 198:9 198:17 200:7 200:19 201:16 206:13 208:21 208:22 210:2 210:23 211:8 215:1 216:13 217:1,11 220:13 229:7 242:13 243:24 244:1,14 245:14

**objections**  5:14 114:17 115:7 234:3,8
**obviously** 64:17 207:5
**occasions**  64:19
**occur**  53:22 100:16
**occurred**  121:1 121:3 202:21
**occurrences** 67:2 76:6,8 123:17
**occurring** 243:3
**october**  58:24 138:2
**office**  9:5 14:16 15:16,18 16:5 18:6,11 19:8 26:6 28:1,2,3,5 28:19 45:15 51:16 52:13,16 56:19 57:11,13 57:17,21 80:21 115:24 145:10 216:5 221:19 221:22 222:5 231:4 232:13 234:23 238:8 239:16,17 241:1,3 242:8
**officer**  26:23 215:21

**offices**  18:19 20:1 35:10 78:16
**official**  18:1 247:18
**officials**  27:14 36:3 49:24 50:4
**offs**  132:12
**oh**  153:9
**okay**  17:17 22:18 25:4,5 31:6 36:16 50:11,12 51:4 61:20 73:3 89:20 93:23 109:1 136:14 138:17 151:1 153:9,10 155:19 157:18 165:17 196:23 235:3
**old**  174:9 175:17 209:19 209:20 239:4
**olden**  179:10
**older**  236:13 239:2
**once**  57:6
**ones**  58:4,5 74:8 90:22 129:22 212:15 230:21 231:2 232:22

**ongoing**  118:15
**open**  22:12 53:20
**operates** 219:22 220:2
**operations**  21:2
**opinion**  99:11 185:5 211:1
**opportunities** 171:11
**opposed**  143:24 189:22
**order**  3:19 17:7 32:2 35:12 48:19 49:1 51:17 54:4 63:19 84:21 88:24 89:8 99:9 106:3 120:18 129:9 146:17 156:11 185:23 189:18 228:20
**ordinarily** 20:19
**ordinary**  132:3 132:5
**organic**  67:7,8 67:14 68:1 69:21 70:7,7,9 70:21 71:14 72:4,5 73:13 73:14 75:5 76:9,16,22 77:15 83:9

**[organic - part]**                                                    Page 39

97:10,11 98:3
98:15 203:5
204:7,10,17
205:9,13,18,22
206:4 207:10
208:5,7,12,14
209:3,5,9,14,17
209:19 210:1,8
210:10,11,15
210:16,18,22
211:5,16,17,21
212:21 213:5
213:11,15
214:7,14,20
215:12 219:5,7
219:10
**organization**
66:15
**original** 47:1
174:13 248:13
**originally** 39:4
41:24
**originate**
130:15
**originating**
130:5
**outcome** 6:21
89:1,9,12,18
99:12,21
112:15 121:3
121:22,23
123:20 142:3
149:6 247:17
**outlook** 223:12
223:13 224:15

224:17,20
227:23 228:8
237:1
**outlooks**
224:12
**outperform**
189:24
**outperforming**
165:22,23
**outs** 54:5
**outside** 18:22
51:10 91:4
228:24
**overall** 96:17
144:8 161:23
182:7 192:17
214:10
**overlooked**
238:19
**override** 227:2
227:13
**oversee** 45:13
46:3,7,11
51:13 122:18
164:12 242:10
243:14
**overseeing** 51:6
164:9 222:12
223:5 242:5
**oversees** 45:17
48:1,3 50:11
**overwritten**
226:23
**owe** 54:24

**owed** 245:3,4
**owes** 54:21
**own** 87:2
119:11,13,14
149:7 177:6
197:21,21
199:23 200:2
222:15,20
224:12 245:11
**owns** 220:1
**oxygen** 204:15

**p**

**p** 1:10 2:1,1,20
**p.m.** 246:24
**pa** 8:10
**page** 3:2,7 23:6
89:22 100:20
103:10,10
125:20 127:7
127:17 138:4,9
142:22 151:11
152:15 154:12
154:15 159:12
174:24 178:4
186:18 187:17
188:8 195:3
196:22 203:23
249:3
**pages** 23:6 24:3
104:4 138:16
250:4
**paid** 51:17
68:18 94:10
**pamela** 19:5
52:4

**panzer** 53:6
**pap** 204:13
**paper** 57:7,19
147:13 179:10
180:24 236:19
238:11 239:6,6
**papers** 238:24
**paperwork**
108:7
**paragraph**
89:22 93:19
124:1,17 125:6
125:20 138:5
142:23 143:2
157:12,13,15
157:22,24
158:11 159:13
175:1,23 178:4
184:5 203:22
204:1,1 214:16
215:15
**paragraphs**
175:3
**parenthetical**
159:15
**park** 224:21
**parnes** 1:12
**parole** 18:19
**part** 14:10
15:20 17:3
25:15 27:15
42:3,12 44:21
49:4 54:1 55:9
56:23 63:12
69:11 73:16

79:16,22 89:10
98:2,3,4,7
101:16,18,18
104:14 118:18
122:1 134:22
141:22 142:12
170:9 186:22
187:24 188:2
202:13 204:24
209:19,22
214:13 219:17
219:18 221:21
230:12 232:20
239:17 241:6
242:3
**participant**
65:19 118:21
**participants**
5:23 21:19
**participating**
5:3
**participation**
85:5 91:15
**particular** 99:7
122:18,21
191:4 192:11
**parties** 6:3
108:11 156:16
178:7
**party** 5:11 6:20
48:3,5 126:17
154:21 247:16
**passed** 227:8
**past** 66:14
109:7,11 120:7

120:19 129:18
129:23 132:21
147:16,20
148:4,14 171:6
180:23 205:11
219:6 222:7
238:2
**pay** 18:24
47:14 48:7
49:1 51:10,20
55:11 68:20
**payable** 18:8
18:23 19:16,16
**paycheck** 49:8
**paying** 120:2
125:1,2
**payroll** 18:8,14
19:18,19
**pays** 132:3
**pdf** 195:4
**pending** 12:12
**pennsylvania**
1:1 6:11 16:19
17:11 43:19
46:13 78:22
79:14 91:7
**pension** 17:7,9
48:19
**people** 25:10,23
26:18 34:7
39:12 45:16
60:22 67:23
70:17 121:14
149:5 169:8
178:19,21

180:10 189:7
224:12,14
225:5 226:15
227:5,22 228:7
231:5 232:20
232:21
**people's** 147:21
147:24 226:21
236:24
**percent** 55:10
94:8,15 124:9
137:15 192:16
209:4
**percentage**
137:9
**percentages**
162:23 171:5
171:13
**perfect** 17:18
**perform** 176:14
192:21
**performance**
168:2,16
192:19
**performed**
125:9,18 173:8
**performing**
167:14
**period** 27:12,17
29:5 30:7
33:16 35:20,22
52:11,14 53:12
58:17 63:14,14
66:6 67:12
69:4 75:15,17

75:23 78:1
81:7 87:4 97:3
97:8,15 161:20
161:23 162:13
162:20 166:14
166:24 167:18
168:8 169:15
169:18,18
170:22 174:16
174:18,19
178:10 191:20
193:20 198:2
201:19 202:1,5
202:6 205:23
206:22 238:6,9
**periodic** 178:12
179:14
**periodically**
105:15
**periods** 97:15
**permanently**
226:16
**perpetrated**
39:13
**person** 5:9
15:23 16:9
27:10 29:16,19
35:21,24 36:9
57:12,15 80:18
137:2 140:10
145:7 182:13
224:1,24 230:2
235:19 241:2
242:6 243:17
243:20

**person's** 146:20,21 210:12 224:3

**personal** 24:24 25:3

**personally** 72:22

**personnel** 222:9

**pfm** 43:24 44:1 46:20 47:1,10 47:11,23 51:10 54:3,7 55:21 73:8,9,11 108:1 163:5,24 164:11 166:4,8 167:9,19 168:15,16,20 169:4,7 171:9 171:15,18 178:18,24 179:21 180:1,6 180:13,20 181:12 182:2,5 182:21 183:20 183:22 186:20 186:22 187:23 187:24 188:2 189:1,2,15,20 193:22 195:21 200:11 236:10 236:18 237:15 237:16

**pharmaceutical** 10:20

**phone** 29:17,19 35:4 134:4 135:5,8

**phrase** 70:3

**physical** 221:19 221:24 222:2

**physically** 5:4

**pick** 162:1

**piece** 70:15 185:12 187:19

**place** 6:2 59:23 93:10 117:19 191:15 228:7,9 247:6

**placed** 218:3

**plaintiff** 7:12 9:24 10:15 59:3 62:11 74:13 78:7 95:21 96:16 98:7,21 111:10 111:11,14,16 131:21 138:11 139:9 142:8 145:15 152:24 153:4,13,24 154:20 155:1,3 155:12,21 156:2 157:10 158:4,13,18 159:16 160:1 160:12,24 161:7 219:18 243:22 244:13 244:18

**plaintiffs** 1:7 2:2 7:15 62:10 62:14 73:24 78:10 79:2,6 138:23 139:7 151:10 155:10 158:24 159:1,5 160:15

**plan** 17:8,10 102:4 162:18 163:14 187:16

**plan's** 161:21 170:8,21

**planned** 200:5

**planning** 245:21

**play** 220:17

**players** 94:22

**please** 5:13,19 6:22 7:17 8:6 11:8,15 13:16 26:8 84:8 212:1,14,17 213:23 248:2,7

**pleased** 138:6

**plunge** 97:4

**podium** 92:22

**point** 12:9 40:6 40:7 54:17 68:6 94:11 107:22 110:23 125:3 127:22 135:3 136:4,18 142:2 166:7 174:21 202:11

206:18 225:14 241:24 244:20

**points** 92:5

**policies** 25:18 26:24 43:18 44:6 197:22 229:13

**policy** 43:16 186:16 187:15 187:19 188:5 192:12 193:8 193:14,16 194:6,8,10 229:23

**portfolio** 127:5 166:23 184:1 188:20 191:23 192:17,21 216:9

**portfolios** 54:9

**portion** 22:17 143:1 162:10 162:14 165:10 214:18

**pose** 165:15

**position** 96:16

**positions** 216:8

**positive** 121:6 121:10 122:4 139:2,4,11 181:15 205:24

**possibilities** 105:13

**possibility** 129:20 131:10

**[possibility - program]** Page 42

192:24

**possible** 88:23
90:7 112:14
129:1 170:12
185:11 190:10
190:11

**possibly** 89:16
94:11 97:10

**post** 84:22

**potential** 96:19
105:23 107:20
118:15 119:8
129:14 130:4

**potentially**
99:16 126:17

**preamble**
148:17

**precautions**
238:17

**predecessor**
186:20

**preparation**
28:23 30:13,23
31:14 32:13,13
32:21 33:8,19
34:17 37:24
43:13 46:19
73:2 132:18
134:18

**prepare** 15:8
18:14,20 20:4
25:6,9 32:2
34:23 44:18
71:23 135:10

**prepared** 24:7
24:10,11,18
45:4 90:23
202:13

**prepares** 28:19

**preparing**
29:11 36:14
72:17

**present** 5:5

**presentation**
152:17

**presentations**
183:6

**presented** 23:1
69:6 115:22
117:11 141:8
141:10,13
183:13

**presenting** 31:9
93:2

**presents** 119:8

**presumably**
241:22

**pretty** 40:21
60:21 149:1
178:3 181:23
193:21 194:5
237:10,18

**prevent** 229:24

**previous**
152:20 153:4,5
153:6

**previously** 8:24
9:7 40:12
54:20 98:6

109:21 116:17
116:22 127:12
139:19 142:24
154:3 164:24
195:16 196:11
214:22

**price** 66:10
74:23 76:5
196:17 197:2
199:7

**prices** 66:23
74:20 76:15
154:8

**printed** 13:13

**prior** 21:9
23:21 52:21
53:1,2,7 54:1
56:21 57:1
62:12,12 69:6
73:1,23 87:19
87:20,21,24
98:19 109:13
109:15 123:5
130:1 134:7,24
143:10 175:10
204:22 214:23
215:4 216:20
218:7,9 234:7
234:9 238:7
241:16,19

**privilege** 58:12
60:11 85:7
150:22 242:14

**pro** 69:24 71:9
140:6,11

205:17 206:3
208:7,8,9

**probably** 8:22
29:14 32:20
35:19 36:2,18
64:19 79:3
84:20 85:1
95:4,9 110:21
151:22 166:24
207:1 219:15
238:11 239:21

**problem** 26:17
180:2

**problems**
167:22

**procedures**
12:18

**proceeds**
124:20 132:8

**process** 19:20
28:12 29:11
117:4,23 122:7
229:1

**produced** 43:5
44:11 46:23
57:24 59:6

**product** 210:20

**production** 4:8
233:5,21

**productions**
60:4

**professional**
1:22

**program**
239:11

**[promised - quarterly]**

**promised** 142:3
**promoting** 67:6
**proposal**
  215:17
**proposed** 52:11
  53:12 74:17
  114:13 169:14
**propounded**
  250:6
**prosecute**
  124:1,19
**prosecuting**
  124:6
**prosecution**
  125:24 126:18
**prospects**
  204:17
**protect** 111:21
  111:23 113:1,8
  114:15 115:6
  115:10 185:10
**provide** 10:17
  17:7 18:15
  20:23 23:3
  38:3,6 40:1
  43:12 56:21
  70:11 86:10
  88:24,24 90:6
  91:23 99:22
  105:9 109:8
  120:22 122:11
  131:8 138:24
  143:4 170:12
  177:21 178:2,5
  178:12,13

179:22 180:4,5
182:6,11
186:24 187:22
213:8 241:14
242:21
**provided** 38:10
38:13,16,19,22
39:18 40:9
43:6 58:22
59:1 81:10
86:13,16,17,22
87:11 91:19
123:15 131:1,7
156:3 170:6
177:20 187:21
187:24 188:2
201:23 205:7
231:7,10
**provides** 129:1
220:4 243:18
**proxy** 215:19
**prudent** 192:15
**public** 1:23
13:20 14:17
53:19,20
201:23 202:3
247:4,22
250:20
**published** 22:1
71:18 218:2,12
218:14
**pull** 20:2 22:3
58:9 84:8
132:13,13
143:23

**pulled** 58:6
169:9
**pulling** 147:10
**purchase** 21:9
42:22,23 63:9
63:23 65:15
176:17 191:13
192:24 194:1
198:2,5,16
**purchased**
41:24 62:2,19
63:2 76:4,20
76:24 77:5,13
77:24 199:13
**purchases** 21:7
42:22 63:3,12
63:16,20 64:4
64:10,14,20,23
65:5 77:9 79:8
141:4 175:9
197:5,16,18
198:7
**pursuant** 107:5
247:5
**pursue** 117:17
123:9,14
143:11 145:14
**pursued** 130:6
145:21 146:11
146:13 245:9
**pursuing** 119:2
141:20 146:15
**pushed** 95:7,11
**put** 28:18 30:8
45:23 49:1

66:12 70:9
71:4 76:13
81:19,21 88:10
90:23 101:16
118:6 143:23
167:15 169:7
170:10 184:15
207:7,19
219:24 245:24
**putting** 31:8
67:13 88:6
103:24 125:4
232:15

**q**

**q4** 204:6,15
207:14,18
208:17 214:18
**quadrant** 216:7
216:20
**quadrant's**
216:9
**quality** 5:20,21
**quantified**
145:10
**quantify**
144:12
**quarter** 69:5,7
69:14 71:8
204:9,11 205:6
205:14 206:6
207:6,18 209:2
209:3
**quarterly** 54:7
71:5 105:11,16
164:13 178:6

178:17,18
179:2,24 180:3
180:17 182:11
195:15,19
**quarters** 71:12
**quasha** 1:12
**question** 11:15
  11:17,21,24
  12:4,5,12,14
  26:15 37:5,10
  37:11 40:11
  58:14 59:15
  60:1,20 64:9
  70:24 73:16
  85:8 93:7
  96:12 99:3
  101:4 108:22
  109:2 117:10
  135:4 136:2,16
  136:18 137:16
  148:10 150:24
  155:5,20 160:3
  161:14,15
  171:19 176:4
  180:16 195:11
  211:13 212:20
  213:18
**questioning**
  234:21
**questions** 11:6
  11:9 12:17
  13:2 21:1,3
  23:8 24:23
  25:2 29:9 32:4
  32:6 45:3

55:21 85:11
92:11 93:4
119:18 120:5
120:12 134:19
135:6,21
153:20 175:4
175:24 181:17
181:18,21
195:8 200:20
200:24 212:9
212:15 213:20
213:22 234:13
234:24 242:19
242:22 243:9
243:12 245:20
245:21 246:11
250:6
**quick** 26:4
  245:24
**quickly** 103:9
  106:15 142:20
  156:8,22
  159:11
**quite** 110:24
**quitters** 244:19
**quoted** 215:16

**r**

**r** 2:1,20 247:1
  249:1,1
**radar** 202:11
  218:9
**raise** 181:17,20
**raises** 243:9
**ranges** 194:2

**rata** 140:6,11
**rate** 76:7
**rather** 95:14
  235:22
**reach** 116:5,9
  131:15 228:7
**reached** 81:16
  81:18 128:7
  135:12,12
**react** 95:22
**read** 25:20
  32:22 39:10,15
  41:11,12 44:21
  44:23 175:3,23
  178:8,23
  204:21 224:13
  248:2 250:3
**reading** 60:16
  157:24 214:11
  214:12
**ready** 135:10
**real** 26:4
  122:12 171:8
  194:4
**realized** 141:6
**really** 39:15
  65:15 68:5
  71:14 89:9
  96:2 107:13
  120:20 179:20
  205:19 209:4
  211:10 224:23
**reason** 12:20
  88:16,18,22
  101:5 146:10

146:13 167:19
248:4 249:5,8
249:11,14,17
249:20,23
**reasonable**
  192:14
**reasons** 74:24
**rebuilding**
  204:13
**recall** 9:14
  33:10 41:18
  183:2
**receipt** 248:14
**receive** 134:4
  171:19 178:10
  178:19,21
  180:22 224:18
  225:23 228:10
  228:18 229:10
  239:3 241:8
**received** 33:13
  33:17 36:23
  40:13,17,21
  41:12 46:22
  61:1 73:15,16
  131:19,24
  132:8,21 142:6
  181:19,21
  231:11,16
  234:12
**receives** 241:5
  242:17 243:5,6
  243:7,18
**receiving** 124:8

**[recent - remind]**

**recent** 143:10
**recess** 61:12
  102:14 106:20
  149:14 196:5
  221:13 246:6
**recognize**
  22:21 103:4
  153:15 174:7
  193:11 203:16
  217:21 218:22
**recommended**
  129:15
**record** 5:17 6:4
  6:23 8:7 11:4
  13:7 50:18
  61:6 102:8,10
  106:15,18,23
  107:1 149:10
  196:1 197:13
  202:18,20,24
  206:7 221:7,11
  221:16 227:19
  246:4,9 247:14
**recorded** 6:1
  56:13,18
  247:10
**recording** 5:21
  6:2 56:16
**records** 65:9
  147:14,17
  148:7 236:13
**recover** 89:12
  89:14 106:3
  140:14 226:19
  243:23 244:2,6

244:11
**recovered**
  89:17
**recoveries**
  108:8
**recovering**
  88:23
**recovers**
  124:13,15
**recovery** 94:1,8
  94:10,12,15
  96:20 99:17,19
  124:10 139:24
  140:3,6,7,9,11
  140:19
**redirect** 245:22
**refer** 17:16
  24:12 25:4
  50:9,10 61:19
  72:4,13 73:9
**reference** 92:4
  235:1
**referenced**
  138:16 187:1
**referencing**
  158:22
**referral** 125:9
  125:12
**referred** 30:12
  61:17 90:13
  209:13 228:12
  234:14
**referring** 39:8
  42:16 71:17
  83:1 142:16

155:15
**reflect** 93:6
**reflected** 92:1
  93:10
**refresh** 84:10
**refund** 45:22
  218:5
**refunds** 39:14
  60:23 68:17
**regard** 51:3
  169:20 170:11
  239:7
**regarding**
  25:18 59:6
  72:3 85:4
  170:7,20 178:5
  198:7
**regardless**
  124:19
**regards** 86:8
**registered** 1:22
**regula** 26:22
**regular** 145:8,9
  227:23
**regularly** 145:9
**rehashing**
  211:10
**reid** 2:21 22:4,8
  84:9 106:10,14
  175:16 176:1
  185:17,21
  186:6 202:15
**reimbursed**
  122:13 142:11
  142:13,18

**reits** 193:24
  194:1
**rejection** 225:6
**relate** 188:4
**related** 6:19
  32:23 138:12
  139:14,16
  142:14,19
  221:24 240:15
**relates** 91:5
**relation** 61:24
**relationship**
  15:17 47:22
  48:14 61:23
  62:5 109:6,10
  109:14,15
**relevant** 55:23
  57:23 101:8
  238:18
**relies** 28:4
  179:20
**rely** 107:12
  108:1,3,6
  119:3 167:9
  181:12 182:5
  195:21 241:11
**remain** 204:16
  244:8
**remember**
  23:18 35:14
  75:3 110:22
  129:17 182:18
  235:15
**remind** 10:24

**[remote - responsive]**

| | | | |
|---|---|---|---|
| **remote** 13:1 | 195:15,17,20 | 235:19 238:20 | 119:23 120:18 |
| **remotely** 5:7,10 | 195:21,23 | **requested** | 121:12 122:9 |
| **rename** 185:21 | 206:2 220:5 | 35:12 37:18 | **respect** 126:17 |
| 185:23 | 236:19 238:24 | 53:23 236:15 | 162:18 163:14 |
| **renamed** | **represent** | **requests** 4:8 | 175:8 184:7 |
| 173:14 | 47:17 90:2 | 36:23 59:9,19 | **respectful** |
| **rephrase** 11:22 | 91:4 108:15 | 60:3,8 233:5 | 246:13 |
| 30:18 | 112:13 113:13 | 233:20,23 | **respond** 11:8 |
| **replace** 169:1 | 116:1 133:2 | 234:18 236:3 | **responding** |
| 188:6 | 139:8 141:21 | 238:18 240:21 | 21:4 |
| **report** 4:6 | 143:7 219:19 | **require** 54:2 | **response** 96:12 |
| 18:21 19:1,6 | **representation** | **required** 48:23 | 137:18 143:6 |
| 38:20,21 39:16 | 104:11,23 | 55:10 143:3 | 146:1,5 148:9 |
| 97:9 105:15 | 105:2 116:18 | 164:20 | 154:19 157:2 |
| 122:21 138:6 | 132:19 159:22 | **requirements** | **responses** |
| 162:8,11 | 161:2 | 78:22 | 234:3,7 |
| 164:13,18 | **representations** | **research** 4:6 | **responsibilities** |
| 178:17 182:7 | 74:4 | 38:20 39:9 | 14:23 15:7 |
| 182:11 218:19 | **representative** | 73:17 87:2 | 18:4 |
| 219:2,11,14,24 | 9:1,12 10:15 | 129:18,19 | **responsibility** |
| 220:8,10,21 | 24:2,14,22 | 130:12,12 | 124:22 |
| **reporter** 1:22 | 98:12 154:21 | 131:24 218:18 | **responsible** |
| 1:23 5:2 6:15 | **represented** | 219:22 220:3 | 18:6,7 21:11 |
| 7:17 11:13 | 8:14 9:11 | 221:3 | 46:14 50:1 |
| 202:16 | 74:15 110:17 | **researched** | 51:6 56:16 |
| **reporting** 5:6 | 116:15 146:24 | 24:8 | 162:17 163:13 |
| 5:12 69:18 | 159:16 | **researching** | 164:5,9 171:16 |
| **reports** 19:8 | **representing** | 147:9 | 172:12,16 |
| 67:24 71:5 | 2:2,9,16 6:14 | **resolution** | 222:11 223:4,6 |
| 105:18 109:9 | 8:4 74:16 | 125:24 | 225:9 242:5,7 |
| 123:2 131:8 | 103:17 158:24 | **resource** | **responsive** |
| 132:11 178:5 | **request** 25:15 | 101:15 138:24 | 59:18,23 60:7 |
| 178:10,12,14 | 35:5 46:23 | **resources** | 234:17 236:3 |
| 179:2,17 180:1 | 191:9 224:6 | 99:22 100:11 | 240:20 |
| 180:18,24 | 228:18 233:24 | 101:20 108:3,5 | |

| | | | |
|---|---|---|---|
| **responsiveness** 59:9 | 20:7,15 21:11 21:13 23:2 | 170:18 176:7 186:17 187:16 | 104:6,7 105:12 107:19 108:6 |
| **rest** 115:12 148:22 | 25:11,24 26:19 27:7 28:7,18 | 193:10,17 197:6 198:4 | 108:10 138:14 150:9 153:19 |
| **restate** 76:18 | 28:20 30:8 | 199:10 200:22 | 154:2,9 157:12 |
| **restricted** 189:12 | 31:3,10 36:2,5 36:6,7 42:20 | 201:2,5 221:2 221:4,21,24 | 178:23 179:11 195:3,18 206:9 |
| **restrictions** 191:16 | 43:21 45:13,16 45:17,24 46:3 | 222:6,19,22 223:1 236:6,6 | 208:16 218:11 218:13 232:1 |
| **result** 74:3,19 76:5 77:8 | 46:7,10 48:1,4 48:8 49:7,9,12 | 237:11 240:6,7 240:10 241:7 | 234:2,6,10 **reviewed** 25:19 |
| 88:15 99:11 143:18 192:22 | 49:15 51:5,8 51:19 53:17,19 | 241:11 242:4 243:11 245:6,8 | 38:4,7 40:12 42:6 43:5,12 |
| 229:14,17 238:1 | 54:11 56:20,24 63:4 64:2 65:4 | **retirements** 21:5,6 45:18 | 43:15 44:4,6 46:19 58:17 |
| **retain** 225:20 | 77:7 78:20 | 51:14,18 53:22 | 60:3 150:3,5,6 |
| **retained** 108:14 133:1 | 79:8 80:16,24 82:11 83:22 | **retires** 45:20 **return** 190:15 | 150:9,11,15,17 151:13,16,19 |
| 188:11 227:9 228:13 | 88:14,14,16,21 89:19 90:2 | 192:14 248:12 **returns** 55:7,7 | 151:20 152:1,2 152:4,7 176:13 |
| **retainer** 86:18 100:13 | 91:5 96:9,13 96:15,19,23 | **retype** 92:3 **reveal** 85:8 | 193:15 201:22 202:12 204:19 |
| **retaining** 120:3 | 103:3,6 105:7 108:9 112:16 | 136:8,12 234:22 | 204:22,24 207:5,11,21,22 |
| **retention** 25:18 27:1 43:16,17 | 112:18 116:8 116:10 118:9 | **revealing** 59:12 60:12 | 233:22 236:5 **reviewer** |
| 43:20 133:21 229:13 | 118:20,24 119:21 121:4 | **revenue** 208:8 209:21 211:22 | 243:17 **reviewing** |
| **retired** 60:23 | 122:16 126:6,7 127:4,21 129:3 | 212:7 **review** 19:23 | 204:23 214:23 **reviews** 183:20 |
| **retirees** 222:8 **retirement** 1:3 | 131:1 133:19 138:7,10 141:7 | 23:15,22 38:1 41:1,10 48:7 | 242:18 243:6,8 **rgander** 2:19 |
| 1:4,20 6:8 9:3 9:17 10:14 | 141:14 161:24 162:9,22 | 56:23 57:17 59:8 73:19 | **rgrdlaw.com** 2:6,6,7 |
| 15:19,21 16:2 16:5,8 17:3,14 17:16 18:9,16 | 164:18 169:17 | 86:11 87:13 | |

**[richard - says]**

**richard** 1:12
**right** 7:10 8:13
  10:21 13:14
  15:1 20:9
  29:22 37:22
  50:7 72:5,12
  81:6,9 91:12
  103:10 108:23
  114:1,2,3
  115:14 126:14
  143:1 146:17
  146:18,22
  153:3,5,10
  156:19 161:16
  186:20 211:14
  212:12 226:4
  227:15
**rios** 1:22 6:16
  247:22
**risk** 185:2
  191:24 192:2
  192:15
**robbins** 2:3
  7:11 8:15
  25:13 29:10
  32:1 33:23,24
  34:7,13 37:15
  45:3 65:17
  79:23 81:16,23
  82:13,21 83:15
  84:18 85:4,12
  85:16,19 86:6
  86:10,22 89:24
  91:3 93:16
  94:4,13 99:22

  100:14 103:2,5
  104:12 108:13
  108:18,21
  109:4,6,14,17
  109:20 110:16
  111:17,20,24
  112:9,24 113:7
  113:19 114:14
  115:6,9,22
  116:1,15 117:2
  123:16 124:5
  124:12,24
  125:21 126:4
  126:16 127:8
  127:23 128:12
  129:15 131:2,8
  131:14 132:24
  133:1,4,13,15
  133:22,23
  134:2,8,12,18
  134:21 135:1
  137:8,10
  141:12 142:16
  150:20 159:17
  218:10 219:19
  243:1,7,9
**robert** 52:2
  53:3 62:17
  87:11,18
  127:20
**rock** 66:15 68:9
**role** 9:18 15:7
  18:4 111:4
  149:7 176:22
  220:18

**roles** 19:14
  216:10
**rollover** 45:22
**room** 5:5 13:4
**rossi** 1:22 6:16
  247:22
**roughly** 137:8
**rows** 96:11
**rpr** 247:22
**rudman** 2:3
  90:1 91:4
  127:8
**rules** 10:22
  228:21
**run** 18:23
**running** 21:13
**runs** 240:5
**ryan** 2:17 7:5
**ryder** 13:18
  14:5,8,14

**s**

**s** 1:14,21 2:1,20
  2:20 3:3,6 7:19
  8:8 127:24
**safe** 192:3,6,10
  222:4,6,10
  238:4
**safeguard** 55:5
**safest** 55:7
**sale** 176:20
  199:12
**sales** 42:24,24
  43:1 63:12
  65:6 77:9 79:9
  141:4 175:9

  199:8,22 200:6
  200:12 209:11
**san** 2:5
**sanctions** 126:2
**sandra** 127:24
**sat** 37:14
**satisfied** 168:1
**satisfy** 141:19
**savage** 187:24
**save** 224:5
**saved** 232:2,9
**saving** 228:24
**saw** 152:20
  187:1
**saying** 30:21,24
  40:8 69:20
  76:9 172:15
  208:24 209:1
  215:10 225:6
  226:1
**says** 23:11
  89:23 93:20
  94:19 103:11
  124:1,17
  125:21 127:3
  127:20 140:7
  143:2 151:12
  157:7,22 158:6
  158:11 159:14
  173:17 177:17
  186:18 187:14
  187:18 188:10
  192:13 204:2,4
  215:17,20

| | | | |
|---|---|---|---|
| **schedule** 154:5 | **second** 11:3 | 129:2 131:2,12 | **seeking** 140:14 |
| 196:14 202:9 | 37:7 64:8 72:8 | 131:20 134:22 | **seemed** 69:15 |
| 202:14 215:19 | 93:18 127:7 | 138:11 139:1 | 79:24 |
| **scheme** 110:14 | 136:7 138:4,4 | 139:13,16,21 | **seems** 150:13 |
| **school** 13:17 | 138:10 139:12 | 143:10 157:7 | 184:23 |
| **screen** 5:24 | 144:18 146:6 | 157:16 190:3 | **seen** 5:23 105:1 |
| 22:14 116:24 | 152:15 158:20 | 190:21 200:14 | 184:19 |
| 233:18 | 159:20 163:17 | 202:14 203:18 | **seiu** 159:16,23 |
| **scripted** 214:17 | 175:14 177:2 | 219:18 245:10 | 160:14 161:4,9 |
| **scroll** 23:7 | 187:17 188:8 | **security** 107:24 | **seiu's** 157:23 |
| 104:3 157:6,19 | 240:10 244:1 | 191:5 203:3 | 160:4,13,20 |
| **seal** 247:18 | **secretary** 16:2 | **see** 22:2,4 | **select** 44:3 |
| **search** 35:11 | 56:20 222:14 | 23:11 53:14 | 108:20 109:3 |
| 36:22 37:18 | 241:7 | 60:18 61:2 | 163:4,7 177:8 |
| 58:18 135:9 | **section** 19:16 | 70:4 71:7 | 177:13,13 |
| 143:23 147:16 | 19:19,21 20:1 | 78:18 86:3 | 189:2 |
| 147:21,23 | 90:10 242:13 | 105:12 127:3 | **selected** 139:6 |
| 230:15,22 | **secure** 91:3 | 127:18 131:5 | 169:1 190:21 |
| 232:10 234:15 | 96:15 | 131:24 151:9 | **selecting** |
| 234:16 235:5 | **securities** 9:8 | 154:15 156:17 | 163:21 188:19 |
| 235:23 236:2 | 10:19 39:14 | 156:18 158:15 | **selection** 47:6 |
| 236:22 237:3 | 44:22 79:22 | 158:16 159:12 | 176:12 177:12 |
| 237:21,22 | 89:3,8 90:3 | 172:7 173:7 | 177:14 190:3 |
| 238:13 239:9 | 91:6 104:15,18 | 175:11 176:2 | 191:8 197:21 |
| 239:24 240:2 | 105:3,8,22,23 | 181:7 182:9 | 198:22 |
| 241:17 | 105:24 106:7 | 183:18 186:18 | **selections** |
| **searches** | 107:2,7,10,12 | 187:12 189:18 | 199:1 |
| 121:16,16 | 107:16,21 | 194:21 196:15 | **selects** 163:22 |
| 230:23 236:24 | 108:3 109:16 | 196:24 208:6 | 189:1 |
| **searching** 35:7 | 110:6 111:1 | 214:17,21 | **sell** 191:4 |
| 35:9 121:16 | 116:16,18,20 | 215:15 219:22 | 199:15 |
| 143:21 147:13 | 119:8 120:8 | 233:18,21 | **selling** 212:24 |
| 235:6 239:14 | 121:9,19 122:3 | 234:13 246:1 | **send** 163:5 |
| 240:13 | 123:9 127:10 | **seeing** 84:10 | 179:10,12,19 |
| | 128:14,23 | 93:22 | 181:11,16 |

**[send - small]**                                                    Page 50

224:18 225:5,6
237:15
**sending**  182:4
**sense**  31:14
  79:3,21 115:15
**sent**  29:7 40:13
  41:3 135:15
  136:2 195:19
  230:11
**sentence**  138:4
  139:13 158:23
  175:11 176:2,5
  177:16 217:6
**separate**  48:10
  48:12 49:10
  69:12 122:15
  152:18 197:24
  203:4 224:22
  228:13
**separated**
  174:21
**separately**
  69:18 206:8
**september**
  28:17,21 30:9
  58:22 65:17
  81:17,19,22
  83:22 84:14
  86:7 87:8
  103:1 115:23
  116:23 118:3
  119:19 141:7
  141:11 142:21
  219:16

**series**  11:5
**seriously**  55:19
  56:8
**serve**  20:19
  154:21
**served**  131:21
  161:7 215:20
  234:3,8
**service**  21:9
  54:1 91:8
  142:7
**services**  70:11
  125:9,18
  212:24 213:7
**serving**  125:8
  159:16 243:22
  244:12
**set**  4:7 15:21
  16:18 17:10
  21:10 46:12
  50:1 72:8
  78:20 164:3,16
  172:9 199:5
  233:5,20
**settled**  111:11
  130:1
**settlement**
  121:24 122:1,6
**settlements**
  121:1 131:19
**seventh**  2:12
**several**  60:4
  116:16 198:10
**shake**  183:1

**shakes**  11:9
**shape**  67:14
**share**  21:18
  22:1,14 29:8
  65:8 140:6,11
  175:20
**shared**  237:1
**shares**  43:1
  62:20 63:2,9
  63:23 65:7,12
  65:21 154:7
  196:17 197:1
  199:7 200:13
**sheet**  248:5,8
  248:10,13
  250:9
**sheets**  179:18
**short**  59:2
  60:21 87:4
  101:24 221:7
**shorthand**
  247:10
**shortly**  234:11
**show**  23:8
  69:12
**showed**  42:19
  71:10 215:12
**showing**  67:23
**sic**  225:4
**side**  156:19
  224:21
**sign**  248:7
**signature**
  103:11 127:18
  127:19 128:2

247:21 250:12
**signatures**
  127:24
**signed**  42:4,14
  43:3 65:2
  114:9 128:24
  154:10 244:7
  244:17
**signing**  248:9
**similar**  78:17
  79:7 184:15
**similarities**
  79:1 98:13
**similarly**  1:6
**simple**  31:8
**simplistic**
  193:22 239:12
**simply**  50:15
**single**  107:24
**sits**  92:21 93:3
**situated**  1:6
**situation**
  115:16 116:7
**six**  64:19
**size**  224:15
  225:2
**skip**  159:14
**slide**  204:5
**small**  63:13,19
  64:16 94:20
  95:1 96:5
  165:4,8,12,20
  165:22,23
  167:2 171:24
  172:3,5,17,19

173:4,5 174:20
178:1 179:4
183:14 188:13
188:14,19
190:24 191:22
192:21

**smaller** 74:10

**smiledirect**
155:9

**smiledirectclub**
154:16 155:18
156:18 157:3

**software**
143:22 239:13

**sold** 42:1 43:1
76:6

**sole** 175:7,12
176:4,9

**solicitor** 26:9
46:10 90:6,13
240:6,11

**solicitor's** 26:6
28:1,1,3,5
80:21 115:24
231:4 232:12
234:23 239:15
242:7

**somebody** 95:4
103:21 225:16
227:15

**somebody's**
225:1

**somewhat**
215:13 239:2

**soon** 224:13

**sorry** 26:15
67:16 77:22
106:10 109:2
110:9 119:13
158:19 161:6
161:14,18
162:6 175:16
176:1 211:15

**sounds** 10:22
59:6

**source** 133:15
213:15 214:6

**sources** 132:7

**space** 248:5

**spagnola** 47:1
47:8,9,9,10,12
47:22 48:3
54:3 186:19,21
187:13 188:1
193:22

**speak** 27:2,6
28:8,11,22
29:2 33:18,24
34:3,12 35:16

**speakers** 181:8

**speaks** 128:18

**special** 180:5
191:13,14

**specialists**
19:17,19

**specific** 57:12
82:8 135:11

**specifically**
28:23 29:3

31:17 33:8
34:17 133:16
175:6 191:3
195:13 211:20
242:9

**speculation**
98:24 113:22
114:19 144:19
146:7 147:4
158:8,22 159:7
160:7,17
184:12 190:6
210:3 244:15
245:15

**spends** 117:24

**spent** 147:19

**spoke** 25:10
29:1,13 30:12
31:6,16 32:12
33:7,10 34:2,7
86:6

**spoken** 30:14
30:22 31:1
122:24

**staff** 19:7,10
107:14 119:23
122:11 236:23
239:19

**staffing** 167:10

**stalled** 219:7

**standard**
184:23 185:11

**standing** 247:4

**stands** 54:8
161:11

**start** 14:12
156:16 197:17
202:4 226:24

**started** 166:5
171:7 173:14
193:20

**starts** 138:5
158:23 204:14

**state** 5:13 8:6
15:22 16:19,19
17:10 50:2
161:6 170:18
248:4

**stated** 89:23
90:5 91:2
93:20 94:1,2
94:20 96:13
100:23 138:5,9
143:7 214:19

**statement** 17:6
95:23 96:4,22
98:18 186:16
187:15,19
188:5 193:9,17
194:8,10
204:19 205:3,4
206:10,10,16
207:5 208:18
214:23 215:9
215:11,19
216:1,12,19,24
218:1

**statements**
15:9 20:4
193:14 206:20

206:21 207:9 216:1 236:11

**states** 1:1

**stating** 12:6

**status** 81:5 105:18 145:15

**statute** 15:22 16:19,19 17:10 46:13 50:2 56:20 170:18

**stay** 171:21 228:2,3

**stays** 172:18

**stein** 82:1 85:21 127:24 128:1,5,6,10

**step** 135:14

**stephen** 1:10 235:22

**stock** 41:24 42:1,21 47:6 66:7,10,22 74:23 75:24 76:5,20 77:5 77:12 83:2 97:4 154:7,8 176:12,17,20 177:12,14 191:6,8 192:17 192:23 197:5 197:21 198:2,5 198:22 199:1,9 199:12 219:12

**stocks** 62:2 79:9 164:2

172:11

**store** 227:5

**stored** 57:5,7 223:15 230:18

**straight** 208:12

**strategies** 165:20 168:22 171:14 177:8

**strategy** 166:6 166:20 172:2,8 172:17,19,22 173:4,6,9 176:10 178:1 183:12,17,18 183:20 184:3 189:1,3,4 190:22,24 191:1,11

**street** 8:10

**strict** 209:17

**strictly** 209:5

**strike** 93:7 130:3 141:17

**strong** 129:11

**stuff** 184:2 241:13

**style** 169:1

**subject** 10:11 192:2 226:2 248:9

**submitted** 44:9 153:23 186:18 196:12 207:16

**subscribed** 250:14

**subsequent** 171:9 202:11 206:2 214:9

**substance** 250:8

**suffer** 88:15

**suffered** 74:20 75:8,24 76:2 76:19 88:21

**suggest** 98:19 117:9

**suggesting** 99:24

**suggestion** 83:15

**suit** 10:20 62:4 62:7,10,12 74:13 109:17 123:20 126:8 129:20 134:22 138:24

**suite** 2:5

**suits** 105:14 106:3 238:2

**sunshine** 110:2 110:5,16

**supervision** 247:12

**supplement** 204:6 207:13 208:1,17

**supplies** 91:8 212:24

**support** 239:19

**supposed** 177:8 178:2 189:5 190:13,14 198:24

**supposedly** 66:14 68:9

**sure** 8:8 14:14 18:2 19:15 31:24 32:19 33:2 44:23 55:24 59:14,21 65:10,23 69:3 73:7 87:22 95:20,24 99:1 116:14,19 117:10 150:16 152:3 171:21 196:18 212:5 225:20 236:16 240:18 243:15

**surrounding** 26:24 83:3

**susan** 1:13

**swear** 7:17

**switch** 33:22

**switched** 27:13 27:14

**sworn** 7:20 247:7 250:14

**symbol** 235:10

**system** 1:3,4,20 6:8 9:4 10:14 15:19,21 16:5 16:8 17:3,12 17:14,16 18:16

**[system - testify]** Page 53

19:21 20:8,15
21:11,13 23:2
25:12,24 26:19
27:8 31:3 35:8
36:2,5,7 42:20
49:12 63:4
64:2 65:5 77:7
80:16 81:1
88:14,14,16,19
88:21 90:2
91:5 96:13,15
96:19,23 103:3
103:7 105:7
116:8,10
118:20,24
131:1 138:7,10
141:14 147:19
162:22 197:7
199:10 200:22
201:2,5 221:2
221:5 223:16
226:11,15,22
229:24 230:23
237:5,12 242:4
243:12 245:7,8
**system's** 9:18
119:21
**systems** 43:17
226:21

**t**

**t** 2:20 3:6 247:1
247:1 249:1
**tab** 21:15 84:2
102:19 104:7
126:21 137:20

149:19 151:3
152:9 173:11
185:16 187:5
193:2 194:13
203:10 217:15
218:16 233:2
**take** 6:2 12:10
12:14 19:17,20
21:17 23:16
55:19 56:7
61:7 101:23
102:6 104:3,5
107:23 119:22
122:11 138:13
147:12 149:10
153:18 166:8
175:22 182:6,8
215:24 221:6
224:20 234:12
237:24 245:23
**taken** 1:21
61:12 93:9
102:14 106:20
149:14 196:5
221:13 226:14
238:17 246:6
247:5
**takes** 57:15
178:16
**talk** 11:14 26:1
26:7,8,19 27:9
34:21 37:17
38:13 47:21
51:11 135:5
169:21 183:17

**talked** 20:6
25:16,22 26:9
26:17,20,21
27:4 32:1 35:4
35:6 45:2,3
80:9,12 85:12
85:16 117:24
132:23 139:19
195:15 230:13
230:14 234:15
235:9,16,23
239:15
**talking** 26:5
61:19 63:24
64:1 72:2,19
73:4 80:17
92:5 139:18
144:8,24
157:14 188:15
206:14 223:18
**target** 162:24
171:5 189:14
**targeted**
171:22
**targets** 194:3
**tasked** 128:12
128:16,22
129:6,11
**tax** 18:18 19:24
48:12 72:12
218:4
**taxes** 68:18,21
218:5
**team** 15:9

**teamemerald....**
194:22
**tell** 17:24 19:13
31:15 92:22
129:22 130:11
168:19 198:4
199:14 247:7
**telling** 220:19
232:23
**temporary**
189:13
**ten** 29:14 30:11
30:22 31:1
32:20 93:19
133:21 239:22
**tender** 170:16
**terence** 1:13
**term** 207:12
211:5
**terminate**
169:22
**terminated**
164:15 168:24
**terms** 35:11
36:22 37:19
135:9 143:23
147:24 230:22
232:10 234:16
234:16 235:5,8
235:14,17,23
236:22
**testified** 7:21
80:8 213:16
**testify** 12:21
24:7,11,19

**[testify - times]** Page 54

25:6 31:23
35:24 36:9,14
242:15
**testifying** 35:17
45:9 80:4,23
**testimony**
10:12 46:5
64:12 77:2,21
80:7 82:17
83:12,18 173:1
177:3 218:8
247:5,9,14
**text** 175:17
204:1 215:16
215:17
**texting** 13:9
**thank** 8:13
173:24 186:2
196:21 246:12
**thereof** 247:17
**thing** 88:12
113:11,16,17
114:1,2,3
139:11
**things** 41:4
66:14 68:14
72:10 107:5
110:14 179:13
230:17 232:23
**think** 20:5 34:9
40:19 45:7
54:20 60:2
67:12 69:24
75:2 76:11
79:5 96:1,7,8

97:16 98:1
101:19,21
106:12 110:1
114:22 115:16
120:16 122:5,5
122:6,13
129:11 131:10
136:1,17 137:2
144:5,8,22
146:21,23
147:5,6 148:1
148:12 149:8
155:5 167:13
173:21 178:17
181:3,8 184:21
185:9 187:23
189:10 196:19
200:20 202:15
209:13,23
211:6,15
215:11 219:8
229:4 230:4
231:22 237:7
240:12 244:21
245:19
**thinking** 67:19
95:18 101:14
185:8
**third** 11:12
48:5 83:23
89:22 103:10
142:23 206:6
**thirty** 248:14
**thomas** 53:5

**thought** 60:19
61:2 95:6
133:20 199:18
**thousand** 17:9
48:23 49:4
**three** 8:22,23
9:6 15:12,23
16:12,13,22
50:2 52:1,12
102:3 196:16
196:24
**ticker** 235:10
**time** 9:2,2,4
11:15 18:1
19:20 21:8,9
23:15,16 27:18
27:21 28:16
29:5 33:6,10
33:16 35:20,22
36:14,19 48:22
49:4 52:11
57:23 58:18
61:9,14 63:13
63:14 66:6
67:11 68:11
69:3 71:17
75:23 77:24
85:17 86:7
87:4,8,16
90:18 91:10
97:3,8,15 99:2
100:17 102:2
102:11,16
104:5 106:17
106:22 118:24

122:11 142:14
142:19 144:1
147:13,19
149:11,16
153:18 166:24
167:7,18 168:5
168:8 169:11
169:14,18,18
174:19 177:19
177:19 178:7,7
182:16 183:9
186:1 193:18
193:20 196:2,7
201:17 202:1,2
202:6,17,23
205:22 206:11
206:15,22
211:14,24
212:12,18
218:12,13
221:10,15
232:1 238:6,9
246:3,8,13,16
246:20 247:6
**timeline** 41:21
41:22,23 42:6
**times** 8:20,22
8:23 9:6 12:3
29:12,15 30:11
30:12,14,22
31:1,11,16,23
32:12,20 34:12
34:14,20,22
61:18 85:15
133:21 134:2,7

134:11,14,20
135:11 188:22
189:6,7 198:10
198:18 211:9
216:10 234:14
**title** 15:4 18:1
22:20
**today** 7:13 8:5
8:15 10:9 11:1
12:18,22 24:1
28:24 30:10
31:15 34:18
35:17 36:14
38:1 43:13
45:9 72:17
127:15 132:19
133:22 246:11
**today's** 11:4,13
23:21
**together** 20:2
69:17 78:14
79:2 114:4,5
138:23 147:10
206:5 208:13
246:1
**told** 81:20
211:11,21
212:6
**took** 43:23
52:13,16 97:4
236:22 239:8
**top** 127:3 128:2
131:23 151:11
180:10 187:18
219:23 240:3

**topaz** 104:14
104:17 105:4
108:14 125:10
125:14
**topic** 37:1
**topics** 23:11,22
24:3,9,14 25:7
25:14 28:6
31:7 36:18
44:22 55:23
59:21 60:5
**total** 53:22
162:11 166:18
192:16
**totally** 144:23
163:5 172:10
197:20
**touched** 242:1
**tough** 235:17
**touting** 66:11
72:9
**trades** 170:14
170:14
**trail** 238:11
**transaction**
10:14,16
190:16 202:14
**transactions**
21:12 35:23
42:21 170:12
178:2
**transcribe**
11:13
**transcribed**
247:11

**transcript** 11:7
248:15,16
**transcription**
247:12 250:5
**treasurer** 16:1
16:14,23 50:4
52:5,13 53:1,5
241:2,4,9
**treasurers**
27:14
**trends** 204:5
**tried** 44:24
**true** 68:19
69:13 70:5,5
205:13 208:3
211:5,21
247:13
**truly** 67:21,24
69:23
**trusts** 171:8
**truth** 247:8,8,9
**truthfully**
12:21
**try** 11:14 55:5
55:6 96:8
165:21 185:10
189:24 225:5
**trying** 31:13
40:19 71:24
95:3 97:16
101:20 120:13
120:17 147:7
147:20 148:2
148:12 149:5

**tull** 2:4 7:14
**turn** 159:11
**turns** 68:12
**two** 14:16,21
16:20 29:24
30:3 34:7,10
69:17 78:14
84:22 96:14,23
97:1 133:3
138:7 165:2,5
165:21 167:1
203:3 208:13
**type** 21:3 43:14
69:20 120:12
135:21 140:8
192:2 232:21
**typical** 60:20
**typically** 91:14

**u**

**ultimately**
120:12 124:20
126:13 222:13
**under** 11:1
154:18 163:10
188:8,12
209:19 215:16
247:11
**underneath**
157:6
**understand**
11:1,10,18,20
11:23 12:1,7
12:15 13:6
24:21 44:24
55:22 71:24

94:7 121:20
143:20 172:23
191:23 192:20
**understanding**
36:5 66:1
70:19 74:14
76:19 77:17
98:10 101:17
121:5 144:4
145:2 155:11
156:1 172:1
188:18 190:19
210:12,15
**understands**
100:24
**understood**
17:1,1 26:11
30:21 33:2
37:12 40:8
44:23 117:15
141:7
**undertake** 87:1
**undertook**
236:2
**unhappy**
168:16 182:19
**unique** 96:14
96:24
**unit** 6:5 61:10
61:15 102:12
102:17 149:12
149:17 196:3,8
**united** 1:1
**university**
13:19 14:5

217:8
**unpaid** 76:13
97:5 218:3
**updated** 194:6
194:7
**updates** 237:16
**use** 25:3 35:11
50:22,24 63:16
78:23,24 93:1
121:15 206:2
223:2
**used** 49:2 61:4
63:22 70:3
179:10 205:11
209:9 211:5
235:6 248:17
**uses** 189:1
**using** 97:12
104:13
**usually** 132:12
165:13 181:8
210:18

**v**

**v** 1:8
**vague** 9:19,21
24:16 30:17
32:15 35:1
36:15 37:2
39:19 40:14
41:7 49:16
55:16 75:13
100:5 112:3
119:15 130:8
130:17 137:12
140:1,2 163:17

167:6 168:5
179:6 182:15
183:8 201:16
210:4 220:13
243:24 244:1
245:14
**value** 21:6 65:7
66:7 162:12
**values** 67:2
**van** 19:5 52:4
53:8
**various** 20:3
25:10,23 26:18
107:3 179:17
180:23
**vendor** 48:6
**vendors** 18:24
**verbally** 11:8
**verbatim** 92:2
93:6 148:7,12
**verified** 64:6
65:8 141:4
**verify** 42:2,12
43:2 63:11
64:14,23 154:8
231:20 232:9
237:2
**veritext** 6:14,17
**version** 235:12
236:20,20
**versus** 6:8 66:8
68:24 70:12
137:10 154:16
155:18 156:17
157:2 190:15

**vetted** 163:5,24
**video** 6:1 13:1
106:18,23
202:18,24
221:11,16
246:4,9,21
**videographer**
2:22 5:16 6:15
7:16 61:9,14
102:11,16
106:17,22
149:11,16
196:2,7 202:17
202:23 221:10
221:15 246:3,8
246:20
**videotaped**
1:20
**view** 22:15
122:2 228:20
**vincent** 2:11
**violation**
203:17
**virtually** 5:20
**visuals** 93:1
**vote** 16:18
20:20 54:3
117:20 119:11
**voted** 240:24

**w**

**w** 214:19
**want** 10:21,24
16:6 19:12
21:8,8 46:17
49:10 61:7

64:11 101:2
104:3 116:19
117:17,19
129:4,4 155:21
156:7 175:6
184:9,17 185:9
213:18 215:24
224:22 237:19
239:12 246:12
**wanted** 33:1
81:21 86:3
90:4,20 116:1
137:3 138:3
155:3 183:19
195:13 241:24
**wants** 146:21
190:9
**warehouse**
147:14
**waste** 212:12
**wasting** 211:13
211:24 212:18
**watch** 164:15
167:15,16,20
169:8,9,12,14
169:19 182:20
**way** 22:15 30:9
36:6 66:12
67:22 69:6
70:2,13 78:21
79:4,5 95:7,12
124:4 135:14
143:22 144:10
146:18 167:14
205:20 206:4

207:8 208:10
209:15 210:21
219:6 220:12
224:23 226:11
226:19 228:12
229:20 231:19
232:9
**ways** 67:12
214:20
**we've** 27:14
61:17 72:1
81:7,9,10
101:21 109:5
110:21 122:24
128:24 129:18
131:5,24
132:21 144:8
147:18 162:2
168:8 171:2
191:12 193:14
208:12 233:15
238:2 244:7
**weaver** 1:13
**wednesday**
83:23
**weeds** 71:20
177:12 191:8
**week** 84:21
85:1,2,17
118:1
**weekend**
246:17
**weekly** 18:23
**weigh** 190:14

**weird** 208:14
209:14,15,15
**wells** 54:16
105:19 132:9
132:10 135:17
236:11,11
**went** 14:17
43:15 58:16
65:8 75:2
173:15 236:12
238:22
**west** 2:5
**whichever**
80:21 116:4
**wide** 82:7
**williams** 1:14
**willkie** 2:9 7:1
8:3
**willkie.com**
2:13,13,14,14
**win** 138:20,21
**wins** 138:7
**wise** 241:5
**withhold** 55:10
**witness** 3:2
5:24 7:12,15
7:17 9:23 10:7
10:9 22:11,18
23:8,18 24:18
26:5,11,14
31:6,20,24
32:16,19 35:3
36:16 37:12
38:12,16 39:21
40:16 41:9

42:9 43:9
44:15 46:6
48:18 49:18
55:18 58:3,16
59:14 60:13
64:12,13 67:18
71:3 72:21
77:4,22 82:18
85:10 92:9,20
97:21,24 98:10
99:1 100:6
111:8 112:5,8
113:4,7,24
115:9 119:17
120:16 123:13
128:21 130:10
130:19,23
136:14,17
137:14 138:17
140:5,17
143:17 144:20
145:20 146:9
147:5 151:1
155:20 157:19
159:9 160:9,19
161:3 163:20
165:17 167:8
168:4,7,13,15
173:3 175:21
176:2 177:4
179:9 182:17
183:10 184:14
185:7 188:24
190:7 197:10
198:12,20

**[witness - zoom]**                                                      Page 58

200:9 201:18
208:24 210:6
211:2,14
212:12,18,21
214:2 215:3
216:16 217:2
217:12 220:15
229:9 235:3
242:17 244:4
244:16 245:17
246:13,18,24
247:14,18
248:1
**wolf** 1:14
**wolters** 2:10
  7:3
**word** 50:23,24
  59:8,20 129:11
  135:16 136:2
  210:10
**wording** 33:3
  100:15
**words** 121:17
  148:11
**work** 8:9 17:8
  48:22 49:4,22
  49:23 55:6
  95:19 119:22
  120:2 122:8
  126:7 138:23
  143:3,9,13
  144:7,14,22
  145:3,5,16
  146:15,19,20
  147:2 148:11

148:13 214:11
**worked** 13:20
  17:20 25:12
  109:6,11 224:1
  236:22
**working** 46:1
  86:1 94:5
**works** 29:22
  36:7 45:15
  101:23 121:5
  224:1
**workweek**
  145:13
**world** 171:12
**worlds** 237:18
**worried** 147:11
**worth** 119:2
  143:5,7 146:2
  162:5
**written** 13:13
  57:2 105:2
  177:18,21
  186:23 187:20
**wrong** 231:24
  232:14

|   x   |
|-------|

**x** 3:1,6

|   y   |
|-------|

**yeah** 50:8
  105:17 151:23
  174:9 199:18
**year** 14:7 17:9
  36:12 49:5
  52:18 53:24

161:19,22
  204:7 233:14
**years** 13:21,23
  14:16,18,21
  15:10 17:20,22
  47:15 132:1
  169:7 170:23
  194:3,7
**york** 2:12,18
**youth** 240:9

|   z   |
|-------|

**zeh** 2:11
**zekono** 2:14
**zoom** 1:21
  13:10 106:11
  106:13 133:10

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.