UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DELAWARE COUNTY EMPLOYEES     :
RETIREMENT SYSTEM, ET AL.,      :  Case No. 21-CV-03382-HB
                             :
           Plaintiffs,   :
                           :  Philadelphia, Pennsylvania
        vs.             :  April 11, 2023
                           :  9:30 a.m.
ADAPTHEALTH CORP. F/K/A DFB    :
HEALTHCARE ACQUISITIONS CORP.,  :
ET AL.,                     :
                           :
           Defendants.  :
. . . . . . . . . . . . . . . . . . :

TRANSCRIPT OF DISCOVERY CONFERENCE
BEFORE THE HONORABLE HARVEY BARTLE III
UNITED STATES COURT DISTRICT JUDGE

<u>APPEARANCES:</u>

For Plaintiffs:           Douglas R. Britton, Esq.
                      Robbins Geller Rudman & Dowd LLP
                      655 W. Broadway, Suite 1900
                      San Diego, CA  92101

For Defendants:           Zeh S. Ekono, Esq.
                      Willkie Farr & Gallagher LLP
                      787 7th Avenue
                      New York, NY  10019

For Defendant Luke McGee:  Marjorie E. Sheldon, Esq.
                      Kramer Levin Naftalis & Frankel
                      1177 Avenue of the Americas
                      New York, NY  10036

Court Recorder:           Nicole Spicer
                      Clerk's Office
                      U.S. District Court

Transcription Service:    Jessica B. Cahill, CER/CET-708
                      Maukele Transcribers, LLC
                      467 Maukele Place
                      Wailuku, Maui, HI  96793
                      Telephone: (808)298-8633

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APRIL 11, 2023                                    9:30 A.M.

THE CLERK:  All rise.  Oyez, Oyez, Oyez.  All manner of persons having anything to say before the Honorable Harvey Bartle, II, Judge of the United States District Court in and for the Eastern District of Pennsylvania may at present appear, and they shall be heard.  God save the United States and this Honorable Court.  Court is now in session.  Please be seated.

THE COURT:  Good morning. You may be seated.

COUNSEL:  Good morning, Your Honor.

THE COURT:  The Court is holding a discovery conference this morning in this case, Delaware County Employees Retirement Systems, et al. v. Adapthealth Corp., et al.  Civil action,21-3382.

First, we have two motions before us, and we'll take them one at a time.  Now let's start with the lead Plaintiffs' motion to compel compliance with the Court scheduling order. I'll hear from lead Plaintiffs' counsel on that, and then I'll hear from Defense counsel, and we'll have some further discussion about the issue.  May proceed.

MR. BRITTON:  Thank you, Your Honor.  Doug Britton with Robbins Geller on behalf of Plaintiffs.

So, Your Honor, we've been at this now for ten months, and, unfortunately, I'm here today to tell you that we haven't gotten very far.  We went through a class discovery period where Adapthealth produced zero documents to Plaintiffs.  Eight months

into the discovery period, and they produced 14 substantive documents.  Nine months into the discovery period, we had 170 documents and now we have an interrogatory that's still unanswered ten months into this litigation.

So, Your Honor, we're trying to move this case along like Your Honor asked us to, and we're not getting anywhere, so our solution was to file this motion.  Now the papers from the other side seem to focus on, well, there's a priority for class certification.  And the problem with that is that's not what Your Honor ordered.  Your Honor ordered twice, and there's been admonishments, that merits discovery needs to go forward.  And the reason why it needs to go forward is that merits overlap with class discovery, with class issues.

So they haven't produced any documents relating to class issues, merits issues that overlap, and they've raised a host of merits issues in their opposition to motion for class certification.  So we're in a position now, Your Honor, where we're staring at affidavits, we're staring at expert reports, we're staring at all types of merits types arguments when they have documents in their possession relating to these issues that they haven't produced.

So we're here, Your Honor, on this motion to compel compliance with the Court's orders to produce merits discovery and to set a substantial completion deadline, because that's the only way we think that it's actually going to get done.  Now

there's been a production recently, this Friday, of 1,000 documents, but that's still a small, small fraction of what has been represented as the total universe of documents, 500,000 documents that has to be reviewed.

THE COURT:  Well, I want to talk about that issue, about 500,000 documents.  I just can't imagine there isn't some abuse of the discovery system if we're talking about 500,000 documents.  There's tremendous criticism of so called liberal discovery under the Federal Rules, and there have been attempts to limit it.  And how in the world can we be talking about 500,000 documents?

MR. BRITTON:  Your Honor --

THE COURT:  I mean that --

MR. BRITTON:  Yeah, and these -- and these cases --

THE COURT:  Not to exaggerate, it sounds ridiculous to me, and I think it's an abuse of the system.  And I think we're going to have to talk about how we're going to reduce that number.  You're going to go through 500,000 documents, they're going to go through 500,000 documents.  How can we run a court system?  How can we run litigation if we're going to be dealing with numbers of that magnitude?

MR. BRITTON:  Your Honor, it's a function of the way technology has enabled communications.

THE COURT:  Well, but that's why we're going to have to rein in technology.

MR. BRITTON:  Right.

THE COURT:  I mean, we can't let -- we can't be slaves to technology.

MR. BRITTON:  But technology helps you get through the 500,000.

THE COURT:  Well, it just seems to me -- we'll talk further about it later, but I was shocked when I saw that number.

MR. BRITTON:  Your Honor, to be in my experience, that's actually a lower type of number than I've seen in other cases.

THE COURT:  Well, if that's in your experience, I think there's something definitely awry with our system of justice.

MR. BRITTON:  Well, you've got to imagine, Your Honor, that you have employees that are sending emails back and forth so that the number of communications that exist in a corporation on a day to day basis is, you know, astronomical.

And so when you're using search terms in order to try to find relevant documents, you're using those search terms to try to narrow the universe.  And that's what those are for.  And then you have technology.  There's different programs that enable you to go through and, you know, condense it down to the most relevant type of information.  And that technology is in fact, used by both sides.

THE COURT:  Right.

MR. BRITTON:  So while the sheer number of it looks

large, there is technology that allows you to get through that type of information.

THE COURT:  Right.

MR. BRITTON:  So, Your Honor, we think we need a deadline, a substantial completion deadline in order to get discovery going.  In this case, we also have an issue with class certification.  So there's been an opposition to class certification, as I said, that raised a host of merits issues, price impact being one of them.  And the price impact argument is that these statements or these omissions didn't affect the price. There's been no production on those during the class certification discovery period.

And in the productions that have happened since the class discovery period closed, we're finding documents that hit on the search terms that would generate the price impact documents that we would need.

THE COURT:  When you say price impact, price impact on what?  Emerald Advisors.

MR. BRITTON:  The price impact so the argument is the statements that you allege are false --

THE COURT:  Right.

MR. BRITTON:  -- did not affect the stock price.  Did not impact the stock price.

THE COURT:  Right.  Right.  No what kind of documents would the Defendants have on that subject?  Just a statement?

Well, did affect the price?

MR. BRITTON:  The statement that it affected the price.

THE COURT:  Well, is --

MR. BRITTON:  There's -- oftentimes there's an analysis by the company that looks at what the analysts are saying in response to the release of information.  So you'll have internal communications about what, in fact, affected the stock price.  And those are the kind of documents that were seen that were produced after the class certification.

THE COURT:  So you're looking for documents that were -- the Defendant admits that a particular statement affected the stock price?

MR. BRITTON:  Correct.  Or a particular piece of information.

THE COURT:  Okay.  Well, let's take the McGee side of the situation.  You have the April 13th, 2021, press release.

MR. BRITTON:  Correct.

THE COURT:  And as I recall from the Defendants' papers, the stock price went down, what, $7.30 a share?

MR. BRITTON:  About 20 percent, Your Honor.

THE COURT:  Yeah.  Okay.  All right.  Now what type of documents would they have that might help you?

MR. BRITTON:  So they've submitted expert reports --

THE COURT:  Right.

MR. BRITTON:  -- that analyzed the disclosures.

THE COURT:  Right.

MR. BRITTON:  And the experts say that's not -- the information that was released that day is not what affected the stock price.  This other information affected the stock price.

THE COURT:  Okay.  All right.

MR. BRITTON:  Okay.

THE COURT:  So would the --

MR. BRITTON:  And they have -- there's going to be internal communications.

THE COURT:  I'm just trying to understand.  I mean, what type of evidence would be probative of what affected the stock?  I mean, we have the release saying that Mr. McGee was going to be on unpaid leave and that he had been indicted by the Danish authorities for tax fraud.  It's not surprising to me that the price of the stock would fall if you have an announcement like that.

MR. BRITTON:  Right.

THE COURT:  Now -- so what other documents -- what difference does it make whether Adapt thought it fell for X reason or Y reason?  That's just their internal opinion.  Are they experts on what causes a stock to rise and fall?

MR. BRITTON:  Well, they're focusing on, they know their company, they know how their information is reflected in the market.  And there's typically analysis and conclusions about what affected the stock price.  So if I'm being presented --

THE COURT:  My question is, I assume there are experts out there, economic experts, who can opine on why the price of a stock fell or rose on a particular date or during a particular period.  I've seen some of that in the Defendants' papers, and I assume you have people that are going to opine on that subject, also.  But what -- I just don't know why the -- what Adapt says -- I mean, it's like my opining on a medical condition.  Well, this is the reason why somebody isn't feeling well today.  You know, that's for the physician to testify as an expert what the condition is.

MR. BRITTON:  Right.

THE COURT:  So are they -- is it -- I'm asking, is it probative?

MR. BRITTON:  Your Honor, I think it's probative from two grounds.  One, it would be support for our expert's opinion that the information that was disclosed, in fact, affected the stock price, or it would be probative --

THE COURT:  Because they thought it did.

MR. BRITTON:  Because they analyzed it contemporaneously --

THE COURT:  As opposed to an economist or professional who's out there who knows a lot about how the markets work and can opine on that subject.

MR. BRITTON:  But you have a contemporaneous record about what the company thinks affected the stock price after they

analyzed it themselves.

THE COURT:  Well, let's take the medical.  Let's say I say I think I have a heart attack.

MR. BRITTON:  Right.

THE COURT:  Now the doctor may hear what I say, but it's his opinion whether I had a heart attack or not.  I may not have.  It may have just been heartburn.  It may have been something I ate.  Is it really relevant?  Can you go to the jury and say, well, I thought it was a heart attack?  Would a judge allow a witness to say, I think I had a heart attack.  I'm opining that I had a heart attack.

MR. BRITTON:  But if there's information, Your Honor, that in addition to thinking you had a heart attack, you had, you know, a bunch of greasy food during the particular day, it would be probative evidence to the jury to present that to say, okay, you didn't have a heart attack.  And so --

THE COURT:  Could a jury make -- really a jury could make a determination whether I did or not based on my testimony as a layperson?

MR. BRITTON:  And the contemporaneous record.

THE COURT:  Well -- all right.

MR. BRITTON:  So, anyway, Your Honor, the issue is there's a number of merits issues that have been raised in the class certification opposition, and there's been no production of documents in the class certification period, and there's been a

very, very minor production post class certification period. We're on this for ten months.

THE COURT:  What are the nature of the documents you've received?  I mean, just generally.

MR. BRITTON:  We've had internal communications about -- like I said, there's been internal communications about what affected the stock price.  What the company got --

THE COURT:  You received some of them?

MR. BRITTON:  Yeah, we received them after the class certification deadline.  They were going to be produced on February --

THE COURT:  And these are statements by management of Adapthealth?

MR. BRITTON:  Correct, Your Honor.

THE COURT:  So the stock price falls on April 13th, and people are opining about why the stock price fell?

MR. BRITTON:  Yeah.  Your Honor, that's a typical -- it's a typical practice in corporate America right now.

THE COURT:  Well, I'm sure they do.  I wondered why.

MR. BRITTON:  Right.  So it's a typical practice.  And, yeah, so we think that's probative of what, in fact, affected the stock price because it's contemporaneous discussions about what impacted the stock price.

THE COURT:  Okay.

MR. BRITTON:  So we received two email chains about

those.

THE COURT:  Right.

MR. BRITTON:  And that's largely what we received until Friday.  We haven't been through those documents yet.

THE COURT:  Right.

MR. BRITTON:  We've been through some.  There's some budgets, and I've got an example here that relates to the other motion that we have pending.  So we'll have some finance documents that have been product.

THE COURT:  So you have -- okay, you have documents that the price fell. We're still on the McGee aspect of the case.

MR. BRITTON:  Right.

THE COURT:  You have documents that -- internal documents of Adapt opining why the stock price fell $7.30 on April 13th or 14th or whatever the date was.  And do they connect the fallen price with the statements, which you allege were material misrepresentations about how great the management staff was in the prior months and so forth?

MR. BRITTON:  No, I believe it's just -- the ones that I've seen, Your Honor --

THE COURT:  Right.

MR. BRITTON:  -- are just contemporaneous discussions about this information was released this day and the stock dropped.

THE COURT:  And they say the stock fell because of

McGee having been indicted and McGee going on unpaid leave?

MR. BRITTON:  There's a discussion about the information that were released.  I don't know.  I don't have the specifics--

THE COURT:  Right.

MR. BRITTON:  -- with me, but there's discussions about the information that was released about McGee today, and the stock price is down X amount.  Those are the communications that I've seen.

THE COURT:  All right.  Now what about on the organic growth side?

MR. BRITTON:  I believe there is one email chain about the Jehoshaphat report --

THE COURT:  Right.

MR. BRITTON:  -- came out and the stock is down --

THE COURT:  Right.

MR. BRITTON:  -- a particular amount.  Right.

THE COURT:  What was the price decline after that report?

MR. BRITTON:  That was about 6 percent.

THE COURT:  Which would be what, about?

MR. BRITTON:  I believe it was --

THE COURT:  I don't remember seeing that in the Defendants' papers.

MR. BRITTON:  Yeah, let me look, Your Honor.  I have it

here real quick.  It fell a dollar 51 or 5.93 percent.  It's paragraph 37.

THE COURT:  And what did the -- just generally, what did these documents say?

MR. BRITTON:  That was the same thing.  This is the information that was out, and it's -- you know, our stock is down.

THE COURT:  And they say, of course, that Jehoshaphat report didn't contain any information that wasn't public.

MR. BRITTON:  Correct.  That's true.  That's what --

THE COURT:  So what other types of documents are you looking for?  You want internal documents about -- that may -- that relate to the fall in the price of the stock?

MR. BRITTON:  Correct.

THE COURT:  That's the essence of it?

MR. BRITTON:  That's the example that I'm using on a merits issue that's relevant to class certification --

THE COURT:  Right.

MR. BRITTON:  -- that they've raised in their papers that we've asked for and that was not produced during the class certification discovery period.  We have those two email chains, and we don't have any other information relating to that.

THE COURT:  And are these email chains by people in upper management of the company?

MR. BRITTON:  I believe so, Your Honor.  Yes.

THE COURT:  Now, are you asking for discovery of opinions by everyone associated with Adapt, lower level employees and so forth?  Are you limiting it to just the top people?

MR. BRITTON:  Yeah.  We've limited it to a core universe of senior executives, board members.  So there's a core universe of--

THE COURT:  How many people are you talking about?

MR. BRITTON:  Twenty custodians total.

THE COURT:  And you have gotten discovery from Emerald Advisors; is that correct?

MR. BRITTON:  The Defendants got discovery from Emerald Advisors, yes.

THE COURT:  Well, if they have it, you have it.

MR. BRITTON:  They produced it to us, correct.

THE COURT:  So you have everything that Emerald had about the price of the stock, and what they did to buy and sell --

MR. BRITTON:  Correct.

MR. BRITTON:  -- and what they relied on and what they didn't rely on, because they referred a lot of that in their recent filings about.

MR. BRITTON:  Right.

THE COURT:  And that Emerald Advisors was making all the decisions according to their papers as to the purchases and sales.

MR. BRITTON:  That's correct, Your Honor.

THE COURT:  Okay.

MR. BRITTON:  Yeah.

THE COURT:  So you just want -- they've only produced, did you say, part of what you have asked for.

MR. BRITTON:  Correct.  A very small part of the universe of total documents that have to be reviewed.

THE COURT:  Is based on the protocol that you've agreed to; is that correct?

MR. BRITTON:  Correct, Your Honor.

THE COURT:  All right.  Let's hear from -- we may be back to you again.  All right, go ahead.  Good morning.

MS. SHELDON:  Good morning, Your Honor.  I just want to start by --

THE COURT:  Just identify yourself, please.

MS. EKONO:  Oh, sure.  Zeh Ekono, Willkie Farr --

THE COURT:  Okay.

MS. EKONO:  -- on behalf of the Adapthealth Defendants. So first I just want to run through some of the points that opposing counsel raised regarding price impact and our recent class certification filing.  And then if the Court allows, I can talk more broadly about what's been happening with respect to the merits review.

With respect to price impact, I do think it's important for us to reset, to be clear about what price impact means.

Price impact does not mean what caused the stocks to climb on a particular day.  Price impact arises in the context of the basic presumption.  The basic presumption is about market efficiency.  If the market is efficient, which the Plaintiffs alleged, and there's information being disseminated, and it's automatically reflected in the price.

THE COURT:  Right.

MS. EKONO:  That allows them to assume or presume that all investors in the market had access to certain information they alleged was false or misleading.

THE COURT:  And presumably their experts are going to say it is an efficient market so that they can benefit from the presumption.

MS. EKONO:  Their expert has said that it was an efficient market and then we've obviously put in our papers raising issues about whether or not that's in fact the case.

THE COURT:  Right.

MS. EKONO:  So price impact only comes in the mix here when Defendants either assume or they lose on the market efficiency point and the presumption applies.  Price impact is the way that Defendants show the Court why they should -- why that presumption should be rebutted.  Okay.  And what price impact is about is whether the misrepresentations that lead Plaintiffs have identified were the actual cause of the decline.  So it's not just like what on earth was the cause of the decline

that day?  Was the decline due to the very misrepresentations that lead Plaintiffs have identified?

THE COURT:  Right.

MS. EKONO:  It's a very narrow issue.  For that issue -- that is an issue which Your Honor sort of hit on the point exactly.  That issue is an issue for experts.  It's an issue for economists.  It's an issue for experts on investor decision making.  All the types of experts that we put in.  Now I'm not quite clear when lead counsel talks about --

THE COURT:  But now -- you know, you may be right, but you have not objected to producing documents that relate to what your management thought caused the -- start the decline, correct?

MS. EKONO:  Yes.  So that's correct, Your Honor.  And I think it's also important for you to understand that when lead counsel says, oh, we need documents about price impact, whether as the term is actually used in the law or more broadly, what impacted the stock price --

THE COURT:  Right.

MS. EKONO:  -- we already did that review.  So this is the review that --

THE COURT:  You produced everything you have?

MS. EKONO:  Yes.  So let me be clear.

THE COURT:  So there are no more --

MS. EKONO:  They --

THE COURT:  -- wait a minute.  Just a minute.

MS. EKONO:  Yeah.

THE COURT:  There are no more emails back and forth among and between management as to what caused the stock price to decline in April of 2021 or July of 2021?

MS. EKONO:  So, Your --

THE COURT:  That's all been produced?

MS. EKONO:  So, Your Honor, there's a set of 500,000 documents.  I can't make that representation, but this is what I can tell you.  When the lead Plaintiffs made clear to us that they wanted us to search for, quote, price impact documents --

THE COURT:  Right.

MS. EKONO:  --  that issue was raised in November, we discussed a specific search protocol, meaning custodians, of which there are 19 and search terms that would be used to identify price impact documents.  That is --

THE COURT:  All right.  And so you've done that.

MS. EKONO:  -- separate --

THE COURT:  Okay.  You have the protocol now --

MS. EKONO:  Yes.

THE COURT:  -- and you plug that into the computer, whatever you do --

MS. EKONO:  Yeah.

THE COURT:  -- and it spit out the documents?

MS. EKONO:  The ones that hit on the price impact term, yes.

THE COURT:  Yeah.  And they've all been produced?

MS. EKONO:  We have -- so we have reviewed all of those documents and there were no documents within that set that fall within a price impact scope.  Meaning there are no documents --

THE COURT:  Are you using it in a narrow sense or a broader sense?

MS. EKONO:  So that's correct.  So, Your Honor --

THE COURT:  Which is correct?

MS. EKONO:  -- I just want to be clear.  We did the review.  There were no documents that hit on price impact, as we understand the term in the law.  However, we nevertheless turned around and produced the full set of documents that hit on the broader term of is there a communication --

THE COURT:  Right.

MS. EKONO:  -- talking about any explanation for the client.

THE COURT:  Okay.

MS. EKONO:   We produced those to them.

THE COURT:  Okay.  So when did you produce those?

MS. EKONO:  So those were produced at the beginning of March.

THE COURT:  Okay.  So all -- so you can --

MS. EKONO:  I don't have the exact date in front of me, but it was the beginning of March.

THE COURT:  I mean, obviously, you can't say that there

isn't some other document out there somewhere.  But you, as an officer of the court, are telling me that as far as you know --

MS. EKONO:  Yeah.

THE COURT:  -- all the documents relating to price impact in the common parlance have been produced?

MS. EKONO:  To the extent they fell within the search protocol that we agreed with lead Plaintiffs on --

THE COURT:  Yeah.

MS. EKONO:  -- meaning search terms and custodians, yes.

THE COURT:  Yeah.  Using the broader definition of price impact as opposed to the narrower definition?

MS. EKONO:  That's correct.  Yes, Your Honor.

THE COURT:  All right.  So they've all been produced?

MS. EKONO:  Yes.  But I --

THE COURT:  So what else do you have to produce, in your view?  Have you produced everything that deals with the protocol that you two agreed to or both sides have agreed to?

MS. EKONO:  So, no, your Honor.  Let me just -- two points I would like to make.  One is, you know, the notion that lead Plaintiffs need further document discovery from the Defendants in order to respond to class certification is just completely specious.  I mean, at this point, the only thing that they can do is review our papers, review our experts, and review the information that Emerald and others produced, and they can

respond.  We are past the point of them putting in new evidence, putting in new experts, putting in supplemental experts.  Their opportunity to do all of that was in their opening brief, and they chose not to.  There are no further documents within the outstanding review that would touch upon class certification issues.  And the reason for that is because price impact is not an issue that turns on merits discovery or the internal communications of Defendants.  The reason for that price impact, as I said at the top of my remarks --

THE COURT:  But regardless --

MS. EKONO:  Yesh.

THE COURT:  -- putting aside your legal theory, you've produced the documents.  They may have a different view about it, but you produced what you said you were going to produce according to the protocol, correct?

MS. EKONO:  Regarding price impact, that is correct.

THE COURT:  All right.

MS. EKONO:  Yes.

THE COURT:  Now what else, in your view, has yet to be produced on the merit side?

MS. EKONO:  Right.  So I would say that there are -- we have a population of 500,000 documents that we have to review, not necessarily produce.  We review them to determine if they're responsive.  And those documents --

THE COURT:  And you do that with the help of a

computer, I assume?  You're not going to spend the next few months yourself personally staying up till midnight to review each document?

MS. EKONO:  Well --

THE COURT:  I know you have to review documents.  You don't depend totally on the computer, but that's the first step, correct?

MS. EKONO:  Well, I guess I'm getting lost without review of the computer.  I mean, a human --

THE COURT:  Right.

MS. EKONO:  -- has to look at every single document within the population, the 500,000 population.  A human has to look at it, and sometimes multiple humans might have to look at it --

THE COURT:  Well --

MS. EKONO:  --for it to go out the door.  So this idea of a computer is reviewing, I don't really know what that means.

THE COURT:  Well, let's go back to the 500,000.

MS. EKONO:  Yeah.

THE COURT:  These are 500,000 you say that under the protocol have been identified?

MS. EKONO:  Correct.

THE COURT:  In other words, so you put all the search terms into the computer based on the protocol, and you come up with 500,000 documents.  Is that what you're saying?

MS. EKONO:  That's correct.

THE COURT:  So at that point, you're obviously not going to turn them over unless you review them?  Somebody has to review?

MS. EKONO:  Right.  And I think the other layer to that is we can only produce what is responsive and not privileged. And so one of the issues we have here, as well, is because the search terms are so broad, because they capture 500,000 documents, it is inevitable that we are going to run across a large number of documents that are not responsive at all.

So that's, you know, one issue where lead Plaintiffs are saying, well, we're looking at their flow of productions, it's slow.  You know, I do think the pace of productions will escalate now that we've passed class certification.  But they also have to keep in mind, at the end of the day, they're not going to walk away with the 500,000 documents, just based upon what I know we've reviewed thus far.  It's only if it's responsive --

THE COURT:  So what --

MS. EKONO:  -- and not privileged.

THE COURT:  That really, in a sense, shows the -- I'll use the word inadequacy of the protocol.  In other words, if you're going to have hundreds of thousands, possibly, that aren't relevant or not to be produced -- putting aside privilege.

MS. EKONO:  Right.

THE COURT:  I understand that's a separate subject.

MS. EKONO:  Right.  I completely agree.

THE COURT:  The question is whether or not the parties can narrow the protocol so that we're not talking about 500,000 documents.

MS. EKONO:  I completely agree, Your Honor.  I mean we, Adapthealth Defendants, we did our best in negotiating to try to limit a certain --

THE COURT:  Well, I know it was a long -- I don't want to have a debate --

MS. EKONO:  Yes, sir.  Understood.  Yes.

THE COURT:  -- about who's right, who's wrong, who didn't cooperate, who stalled.

MS. EKONO:  Right.

THE COURT:  We're beyond that point now.  We're going to look forward now.

MS. EKONO:  But I agree.  I think the parties -- I think we would be in favor of a process whereby we would renegotiate the protocol --

THE COURT:  Well, that's --

MS. EKONO:  -- to limit the population.

THE COURT:  Well, what would be some of the recommendations?  The number of people?  In other words, you're putting the names of people in.  That's one of the factors, right?

MS. EKONO:  Yeah.  So limiting the custodians.

THE COURT:  Documents between to and from Mr. McGee and all the other people?

MS. EKONO:  Right.  So limiting the custodian.  Right now there are 19 custodians.  All 19 people, I don't think, have uniquely relevant documents.  As you would expect in a company this large, people are CC'ing people.  And so it's not necessary to have, you know, all of these people.  There are only certain people I think we can identify who are key, knowledgeable individuals who are involved in the issues that are relevant here.

So narrowing the custodians.  Also, making sure that we have custodians for the McGee tax issue, and then potentially a separate group of custodians for the organic growth --

THE COURT:  Right.

MS. EKONO:  -- so we're not duly searching them, if that's not, you know, appropriate.

THE COURT:  Right.

MS. EKONO:  But also, the search terms.  I mean, I know you don't want to hear all the back and forth, but there was a lot of work that went into the search terms.  We weren't able to narrow them.  At the end of the day, we agreed in order to just move forward with the process.  But I do think more work could be done by both parties to limit the search terms, which will inevitably limit the population.  And again, we can have specific

search terms for McGee tax issue and different search terms for organic growth.

THE COURT:  Well, it seems to me that that's something that should be explored, Mr. Britton.  I think that just -- I understand we live in the world of technology, but 500,000 documents?

MR. BRITTON:  Your Honor --

THE COURT:  It's just -- I mean, I understand you want to catch every -- but there comes a limit here.  Discovery is not a perfect vehicle.  I mean, it beats the system we had before 1938, I agree, but this is --

MR. BRITTON:  Your Honor --

THE COURT:  -- I mean maybe you miss one document somewhere, but that's life.  You know, we live in a finite world, an imperfect world, but it's just the amount of money and expense.  No wonder the public has a not particularly favorable view of litigation, what lawyers do.  I mean, I understand you want to represent your client zealously, and you want to find every piece of paper, every needle in the haystack.

MR. BRITTON:  Your Honor, I think --

THE COURT:  There is such a thing as a rule of reason in the law.

MR. BRITTON:  And I agree with that, Your Honor.  I think what's being discounted here is the technology assisted review.  There's technology that allows for deduplication.

There's technology that allows for certain, you know, universes to be searched.  There's technology that allows you to educate the computer in order -- so you capture a big universe of documents and then you use the technology.  What I'm concerned about, your Honor, is if you start plucking out custodians, you're plucking out relevant individuals.

THE COURT:  But you've got an email that ten people are copied on --

MR. BRITTON:  There's a --

THE COURT:  -- so then you're going to get -- you're going to get the original plus 11 -- plus 10.  You're going to get eleven copies of it and somebody's going to have to go through that.

MR. BRITTON:  But there's a way, Your Honor --

THE COURT:  And they've got to dub all 11.

MR. BRITTON:  Let me respond.  There's a way --

THE COURT:  Go ahead.  Maybe there's a way to deal with it, I don't know.

MR. BRITTON:  There's a way to deal with that, Your Honor, and we negotiate those very issues to where you produce the last in line of all that.  You don't produce the 11.  You produce the last in line to give yourself the full chain.  So there's an entire industry that's developed around technology assisted review and discovery.

And so there's -- I mean, it's very complicated.  We

have our own department of individuals that deal with it.

THE COURT:  Right.

MR. BRITTON:  So there's ways -- so I know that the number is startling, but you're trying to capture a broader universe of documents to look for the relevant information.  And it's just a function of the way we work today in society.  How many emails are being sent day by day by day.

THE COURT:  Many.  Too many, in my view, but that's --

MR. BRITTON:  I know, and I agree with that, Your Honor, but you're trying -- it's like trying to find a needle in the haystack.  Not, I want every single document.  You're trying to capture a universe.

THE COURT:  I think that's part of the problem, that we have to find the needle in the haystack.  I don't think the discovery was ever designed to be that refined.  All right. Anyway.  All right.  Let's hear from Ms. Ekono again.  So where are you on your production?

MS. EKONO:  So, to date, we have produced 1,208 documents.  Our last production was this past Friday.  What we told Plaintiffs, I think well over a month ago, if not, you know, a month and a half ago, was that we would continue making rolling productions every two to three weeks, and we have.  We made productions on March 3rd, March 17th, April 7th.  There will be another one coming out in two to three weeks.  And as I said before, now that we have gotten over the hump of putting in our

class certification opposition, the pace of review will increase.

THE COURT:  And when do you anticipate producing everything that you are obligated to produce?

MS. EKONO:  Right.  So if we're just focusing on the 500,000 documents, and the reason I say that is because just two weeks ago we received another request for production of documents, meaning we're going to have to start this process all over again.  Negotiating the scope of those requests, potentially having to collect more documents.  Potentially having to re-review documents we already reviewed.  So if we're just focusing on the 500,000, right now we expect it will be September.

So that's about eight months from when we first started in January, for that review to be complete.  I would like to just -- I understand that that may seem like a long time horizon, but it is actually quite quick.  That would be a review rate of about 60 to 70,000 documents a month.  And we think that that is -- you know, while we think the population is excessive, and we would like to renegotiate it, that is a lot of work that we are agreeing to do within a very short time horizon.  And having to do it any sooner would require us to incur a substantial amount of time and expense in order to make that happen, which would make this case astronomically expensive, and we're just not aware of any urgency or need to do it any faster.

I would also just flag, Your Honor, that the rate that we're talking about producing documents between -- reviewing

between 60 and 70,000 a month is much faster than what Defendant McGee has done with respect to his population.  As Your Honor may be aware, he agreed to review about 50,000 documents in a period of about three to four months.  That puts him about 15 to 16,000 documents a month in terms of review, not production.  Lead Plaintiffs were apparently okay with that.  So we're talking about doing something four times as fast.

THE COURT:  Who's representing Mr. McGee here?

MS. SHELDON:  I am, Your Honor.  Marjorie Sheldon from Kramer Levin.

THE COURT:  What's the schedule for your production?

MS. SHELDON:  Your Honor, pursuant to your order, in December, I believe, or it was November, we produced the first phase of our production --

THE COURT:  Excuse me.  Nicole, are you able to hear her?  Are you able to hear her?  Are you near a microphone?

MS. SHELDON:  Is that better?

THE COURT:  Pull the microphone up a little bit.  Thank you.

MS. SHELDON:  How's that?

THE COUR REPORTER:  That's fine.

MS. SHELDON:  We produced the first phase of our production by the end of February.  That was the 50,000 documents that Ms. Ekono is referencing that we reviewed that were the result of the negotiated search terms.

THE COURT:  Right.

MS. SHELDON:  We still have to review and produce documents in response to -- that production concerned what Your Honor is referring to as the McGee issues.  There are other requests that concern the organic growth issues in which Mr. McGee is unlikely to have much that's not duplicative of what the Adapthealth Defendants are producing.

THE COURT:  Right.

MS. SHELDON:  So we've agreed to do a review for non-duplicative documents.  That's underway.  We have search terms, so that may be impacted as well if Mr. --

THE COURT:  Have you agreed on search terms with the Plaintiffs?

MS. SHELDON:  What we agreed is that we would run, essentially, the search terms --

THE COURT:  Right.

MS. SHELDON:  -- that the Adapthealth Defendants are running through Mr. McGee's emails to find things that are non-duplicative.

THE COURT:  And when were you -- yeah.

MS. SHELDON:  And we also received a second set of document requests last month.

THE COURT:  So when do you anticipate completing your obligations?

MS. SHELDON:  We are still trying to get to the precise

number of documents that we have to review.  I don't want to pin us down without having that number, but I would say a few months.

THE COURT:  So we're now almost mid-April.  So you're talking about sometime in the summer?

MS. SHELDON:  I think that's right, Your Honor.

THE COURT:  All right.  Thank you.

MS. SHELDON:  Thank you.

THE COURT:  And you have no problem with that, Mr. Britton?

MR. BRITTON:  Yeah, we're fine with mid-July production.  Yes, Your Honor.

THE COURT:  From McGee?

MR. BRITTON:  Yes, from McGee.  We would also be fine with a July production from the company as well.

THE COURT:  Well, they say they're going to have difficulty with the size of the protocol.  And how am I going to decide that?

MR. BRITTON:  Your Honor, there's -- Your Honor commented that there's reason in the law -- there's reason within the law, and we've been under a discovery order for merits discovery to proceed since July.

THE COURT:  I understand, but there was a long delay in agreeing on the protocol.  I'm not going to sit here and decide whose fault that is.  So that caused a lot of the delay.  There's no question about it.  My question is whether there's any way to

narrow the protocol in some fashion and be realistic?

Now if you're going into it with the idea that you have to get the needle in the haystack then, you know, we could be here for five more years, because you could keep saying, well, I'm still looking for the needle.  Really?

MR. BRITTON:  Well, that's --

THE COURT:  I mean, look, you know, you know what this case is about.  You have your experts.  A lot of it depends on the experts.  You know, we have the basic rules of law, you know, the presumption that exists, it's rebuttable, the mismatch issue. I mean, these things are -- I don't know that it's going to -- in my view it's going to turn on what the CFO of Adapt thought was the cause of the price decline.  I mean, really?  There's a big market out there.  It's very complicated.

And to have him say, what kind of expertise does the CFO have as to what the impact of something is going to be on the price?  You might say, well, if we issue a press release that says X, it may help the price, or if we issue the press release about McGee being indicted, I mean, common sense tells you that's going to affect the price.  It's not going to be good.  And why do you need a lot of documents to confirm that?  I mean, it's common sense.  If somebody's -- even though it may have nothing to do with your company, if you got a CEO who's under indictment for tax fraud, who wouldn't think it would -- the price stock isn't going to go up because of that, do you think?

MR. BRITTON:  Your Honor, I agree with that, but I just read an expert report presented by the other side where there's a very qualified individual --

THE COURT:  Right.

MR. BRITTON:  -- who's saying that's not true.

THE COURT:  Well --

MR. BRITTON:  So what you and I --

THE COURT:  You know, there's something about expert reports, you don't have to accept everything an expert says.

MR. BRITTON:  And I agree with that, but if there's --

THE COURT:  I tell a jury that every time.  You hear the expert; you use your common sense.

MR. BRITTON:  Right.  But if there is information that the company --

THE COURT:  Let's say they have an expert that says it. How's the statement by somebody inside the company going to affect that?  What kind of expertise does that person have?

MR. BRITTON:  If you're talking -- if we're talking about --

THE COURT:  I mean, I'm just -- I'm asking.

MR. BRITTON:  Yeah.

THE COURT:  You may be right.

MR. BRITTON:  If we're talking about a jury now.  So an expert is presented to a juror --

THE COURT:  Yeah.

MR. BRITTON:  -- and they're presented as somebody that's more highly qualified than your typical individual --

THE COURT:  Right.

MR. BRITTON:  -- so it carries more weight.

THE COURT:  Right.  It may or may not

MR. BRITTON:  So if I have an expert that's very persuasive.

THE COURT:  You have dueling experts, and the jury has to make a decision just as they do if two lay witnesses, one says, I ran the red light, and the other one says, I didn't run the -- and, you know --

MR. BRITTON:  And I get that, Your Honor.

THE COURT:  That's what a jury does every day.

MR. BRITTON:  But if there's a juror there that's influenced by an expert that says something other than what you and I think is common sense --

THE COURT:  Right.

MR. BRITTON:  -- and they buy it, if there's a document out there from the CFO contemporaneously saying something different than what his own expert is saying --

THE COURT:  That's assuming.

MR. BRITTON:  -- I should be able to present that to the jury.

THE COURT:  That's assuming it's going to be admissible.  I don't know whether it would be.  Well, I mean, I

don't know why -- I don't want to argue the evidentiary issue. I'm just -- I'm having a little trouble putting a lot of weight on that. I'm not saying you're not entitled to it in discovery, believe me. I'm not saying they shouldn't produce it. If you've asked for it, I would obviously order it produced. But I just think that it would be helpful if you sat down with your opposing counsel and try to narrow this protocol --

MR. BRITTON: Your Honor --

THE COURT: -- with the idea that we're going to do the best we can to produce relevant non-privileged documents. But if the idea is to produce every possible document that could be helpful to your case, then why not give them another year? I mean, if you really want to make sure they get them all, but let's give them until September 2024. I mean, you've got to make a decision. You know, you want the case to move, you're the Plaintiff, but yet you can't ask the impossible of them.

If we're talking about 500,000 documents, and they're right, they have to review them. They're not just going to -- the computer isn't going to just identify them, and they turn them over. They've got to look at them for privilege, just as you would have to look at documents for privilege if there are any. So, I mean, that's the choice you have to make here.

MR. BRITTON: I understand, Your Honor.

THE COURT: So I suggest you sit down and try to work out something to narrow the protocol and not take six months to

do it.  I know you're in the process of working on your brief.  I mean, they -- are the depositions taking place too, of their experts, are they all complete?

MR. BRITTON:  No, we have to take their expert depositions.  They've submitted five experts in support of their opposition.

THE COURT:  So you're going to be pretty busy the next -- so it seems to me that -- they say you have everything you need for class certification.

MR. BRITTON:  And we disagree with that, Your Honor.

THE COURT:  Well, how am I going to decide that?  What don't you have?

MR. BRITTON:  We've had, like, the price impact documents.  Representation was made --

THE COURT:  You say the --

MR. BRITTON:  -- the representation was made that all of those documents were produced on March 3rd.  We received the production just this past Friday that had more documents that hit on those search terms as of this past Friday.

THE COURT:  What about that, Ms. Ekono?

MS. EKONO:  That's inconsistent with my understanding.  We focused on the search terms and the custodians that we agreed upon.

THE COURT:  Well, what did you give them this Friday or last Friday?

MS. EKONO:  So I don't have specific details, but my understanding is those are documents that fell outside of the specific price impact protocol.  So there's a larger protocol that we agreed for the merits issues and then there was a separate protocol in terms of search terms for custodians for price impact.  So what was produced this past Friday was everything else.

As I represented earlier, we did the price impact review using those search terms and custodians.  There was nothing within our understanding of what price impact means, nevertheless, we produced all of those documents.  So they have all of the, quote, "price impact documents."

THE COURT:  Well, they say you have them all as of now.  What more can I do?  In other words, the discovery, as we all know, depends on the good faith of the lawyers.

MR. BRITTON:  Correct.

THE COURT:  The judge doesn't -- in the old days you don't go to the warehouse or the offices of a party and search the file cabinets and the boxes.  Doesn't it depend on the good faith of counsel?

MR. BRITTON:  I agree with that, Your Honor.

THE COURT:  Now they're telling me now, that at least as of -- you have everything now that relates to class certification.  You may not have had them a few weeks ago.  They say as of now you have them.  And I, obviously, will give a

lawyer the benefit of the doubt.  Ms. Ekono says they are produced.  Now if you come back a month from now, and she gives you 10,000 documents that relate to price impact, having told me what she's told me here, then I'm not going to be very happy.  I mean, I assume when the lawyer gets up and says something, it's accurate.  So I'll give her the benefit of the doubt, take her word for it.  She's an officer of the court.  So you have everything that relates to that.

Now it seems to me that what needs to be done is to look at the protocol again and let's apply the rule of reason here to see if it can be narrowed.

MR. BRITTON:  I would request, your Honor, if we do that, that a time limit be put on that so we can get it done expeditiously.

THE COURT:  I agree with that.  I don't want it --

MR. BRITTON:  And then also what they call a hit report, so we can tell how many documents per custodian are being generated and that way we can see, independently, what is happening in those searches and try to narrow it down that way.

THE COURT:  Well, I don't want this to interfere -- I mean, you have a lot to do between now and what was it, May 22nd?

MR. BRITTON:  Correct, Your Honor.  Yes.

THE COURT:  Yeah.  The depositions, and writing your brief, and they, of course, asked for a delay in this hearing because they're working on their brief, and I want to give you

the opportunity too.

So the protocol after the 22nd of May, sit down and work that out. And what do you need, two or three weeks? Let's say -- I mean you have May 22nd, you have Memorial Day weekend. Toward the end of June, would that be enough time to sit down and work it out?

MS. EKONO: I think end of June would work for us as well.

THE COURT: All right. And then at that point, we will see where everything is, and then I will set a deadline. Now, I know that's a little time off, but I think you're going to have your hands full, Mr. Britton, I would think, responding to the 75 page document that they -- and plus the depositions of experts, and you probably want to get an expedited copy and review those.

And then what I think we -- based on the history of this case, I hate to bring you in again, I think what we'll do is, toward the end of June, we'll come back together again. I know it's expensive. I'd like things to go a lot more smoothly than they have in this case, but I think we're going to get a lot more accomplished. Toward the end of June, we set another conference on discovery, and then I will set some deadlines, and I want the case to move forward. I do. That's why I ordered merits discovery to continue.

Now, of course, it's complicated because in a class action, merits and class action issues are intermingled. It's

hard to separate them.  And I didn't allow any depositions on merits just to kind of move this thing forward.  So I think -- yes.

MS. SHELDON:  Your Honor, if I may?  Unfortunately, Mr. McGee's production in response to the remaining request is dependent on what the Adapthealth Defendant agree to search for --

THE COURT:  Right.

MS. SHELDON:  -- because we've agreed to look for non-duplicative documents.  So I think if they are going to renegotiate the protocol, we're going to have to run new searches.

THE COURT:  Okay.  That's fair enough.

MS. SHELDON:  So I think we're going to have to be on a similar schedule.

THE COURT:  Are you in on the negotiations of the protocol?

MS. SHELDON:  We were not in the past.  We simply agreed to duplicate the searches.

THE COURT:  You'll follow their lead?

MS. SHELDON:  Correct, Your Honor.

THE COURT:  Okay.  Is that agreeable, Mr. Britton?

MR. BRITTON:  Yes.

THE COURT:  Okay.  So that's what we're going to do. So after the 22nd, take a day off, and if you get your brief in,

and then you can sit down, and I'll schedule something toward the end of June.

MR. BRITTON:  Okay.

THE COURT:  We'll come back in person so we can get this thing moving.  This is a major piece of litigation, and I just think it's better to try to do it in person.

MR. BRITTON:  That's fair, Your Honor.

THE COURT:  All right.

MR. BRITTON:  I think it will help if Your Honor is involved and sets the hearing at the end of June.  I think that will.

THE COURT:  Okay.  Is that real with you, Ms. Ekono?

MS. EKONO:  Yes.  Thank you, Your Honor.

THE COURT:  And let's try to be reasonable on this protocol now.  All right.  Now that takes care of that for the moment.

Now we have a second issue, the Plaintiffs' motion to compel responses to their first set of interrogatories dealing with revenue production.  All right, Mr. Britton?

MR. BRITTON:  So, Your Honor, just briefly, we've asked for a statement of what the organic revenue was in each quarter during the class period, and we sent that interrogatory out in July.  We've gotten three responses, and those three responses didn't answer the interrogatory.  We were given some information about what the organic growth numbers were for fiscal year '19

and the first three quarters of 2020, but there was no information provided for the fourth quarter of 2020.  And then the information that was provided for the quarters after, there was representations that that information did not reflect what the organic growth was during that period of time as calculated during the class period.

So what we're asking for, Your Honor, is just a statement of the underlying organic revenue during the quarter -- each quarter during this period of time.  And it's roughly 2020 and 2021.  And that way, we'll be able to make the calculations to figure out what organic growth was in the fourth quarter of 2020, when they changed the definition --

THE COURT:  Right.

MR. BRITTON:  -- and what it was in the subsequent quarters.  Now what we've seen in response is that we don't know what organic growth is.  We don't understand that term.  We don't use that term.  And it was a really important metric for Adapthealth, and McGee even said it's one of the most important metrics we have.

THE COURT:  Did Adapthealth use that term, organic growth throughout the relevant time period?

MR. BRITTON:  They did, yes.  And --

THE COURT:  And in their public statements, they used that term, too?

MR. BRITTON:  Yes, they did, Your Honor.  And one of

the things we got in the most recent production was an October 19, 2020, Adapthealth annual budget, and the second entry talks about organic versus inorganic revenue.  So they're using those terms internally.

THE COURT:  Right.

MR. BRITTON:  So we're just asking what those numbers were for each quarter during that relevant period.

THE COURT:  Ms. Ekono?

MS. EKONO:  Yes.  So organic growth, Your Honor, is a very complex issue, and I think that it's important that we understand --

THE COURT:  It's a very what issue?

MS. EKONO:  Organic growth --

THE COURT:  Is what?

MS. EKONO:  -- it's a complex issue.  And by that, I mean there's no definition or universal way of calculating it or defining it.  It's up for a company to determine how it does it.

THE COURT:  Well, how did the company define it?  I mean, you're using a term.  If they're telling the world we have organic growth, or we have inorganic growth, or whatever, what do they mean by that?

MS. EKONO:  Right.  So I think that the best way to answer that would be to say it generally refers to growth that is due to the company's own efforts.  However, here what lead Plaintiffs are asking for, by the plain language of their

interrogatory, is not about organic growth, but organic revenue. And the term organic revenue is not a term that my client, Adapthealth, understands or uses.

THE COURT:  I thought they used it in some of their internal documents?

MS. EKONO:  I'm not familiar with what this document says, but based on the timing of that document, the problem here is that their interrogatory, they're not asking about what was the organic growth that Adapt Health calculated and reported to the market.  That's not the question here.  Their question is, what would organic growth have been had the company calculated it a different way than they actually calculated it.  So it's a counterfactual.

THE COURT:  Okay.

MS. EKONO:  They want us to provide what the information would have been had we done a different calculation. At the time period when that document is dated -- did you say October 2019?

MR. BRITTON:  October 2020.

MS. EKONO:  So October 2020.  So, again, I'm not familiar with that document, so I can't speak to that, but I do know that when we had this interrogatory, you know, we met and conferred with them many times, asking not only what they mean by that term because we don't understand it, but also, just more generally, what information that you're looking for.  And we did

our best to provide them what they wanted.

So the information we last gave them, this is in November of 2022, was an organic growth rate. The interesting thing about that is they say they want to be able to calculate what the organic growth rate was prior to the implementation of the refined methodology.

THE COURT: Right.

MS. EKONO: We gave them the organic growth rate, so there's nothing for them to calculate. We went back through our records. We found the information that was -- contemporaneously existed, and we gave them what the organic growth rate would have been had the company not changed its methodology.

The other interesting thing to note, Your Honor, is that when they reached out to us, they waited three months. They waited until we were in the throes of class certification discovery and briefing. February of 2022 or 2023, at the end of the month, reached out to us and said, hey, there's a problem with your interrogatories.

That obviously took us by surprise, both because they were asking for a third amendment of this very interrogatory, and interrogatories are not supposed to be a back end way to a written deposition. And, two, because, again, we've had multiple conversations about what they're asking for. Notably, if I refer Your Honor to, I believe it's Exhibit A, page 6, that they attach to their motion. You can see the email that they --

THE COURT:  Just a minute.  Exhibit A, page 6?

MS. EKONO:  Exhibit A, page 6.  You can see the email that they sent us.

THE COURT:  I don't have page -- Exhibit A to --

MS. EKONO:  To their motion --

THE COURT:  Is this the declaration?

MS. EKONO:  I have it as an exhibit document, docket number 110-5.

THE COURT:  I'm looking for it.  I don't think I have it in front of me.  Do you have it?  Okay.

MS. EKONO:  Okay.  Well, I just want to --

THE COURT:  We'll get it.  Go ahead.

MS. EKONO:  The reason I call your attention to that is because you can see the email that they sent us when they reached out at the end of February of this year.  In that email, it's notable because they don't complain about the fact that we gave them an organic growth rate.  That's not their complaint.  Their complaint there is you didn't provide the organic growth rate for two particular quarters.

Now, they never asked us why.  And there's a legitimate reason for why we gave annual numbers.  One, because in one particular quarter, the company didn't exist.  The company began operating November 11, 2019.  So there isn't a quarterly number.

THE COURT:  All right.

MS. EKONO:  There's only an annual number.  Okay.

THE COURT:  All right.  That takes care of that one.

MS. EKONO:  And with respect to the other quarter, my understanding is we wanted to be consistent with the types of information that the company publicly disclosed.  But at the end of the day, if what they want is a quarterly number for that other -- the other quarter, and I don't want to get the quarter wrong, I don't have it in front of me, but we have that information and can give that to them.

But their complaint here in this email is entirely different than what they say their complaint is in their motion to compel.  In their motion to compel, they are again reverting back to talking about organic revenue, meaning they want apparently the inputs so they can perform the calculation.  That is not the complaint that they raised to us.  That is something that we submit, we should have had an opportunity to meet and confer about.

THE COURT:  Okay.  So what you're saying is you're going to give them information about organic growth rate.

MS. EKONO:  That's the information we already gave them.  And if what they are missing at this point is one particular quarter --

THE COURT:  Yeah, so you'll give --

MS. EKONO:  -- we can give them that particular.

THE COURT:  You're going to give them that for that one quarter.

MS. EKONO:  Yes.

THE COURT:  All right.  That takes care of organic growth rate.  Now we get the question of -- but if you say growth rate, what does that mean?

MS. EKONO:  Right.  So --

THE COURT:  It's a percentage of something.

MS. EKONO:  It's a percentage associated with what we gave them.

THE COURT:  Percentage of what?

MS. EKONO:  It's a percentage of revenue.  So basically you're looking at what the revenue was at the start of a quarter --

THE COURT:  You mean --

MS. EKONO:  -- and what the revenue --

THE COURT:  -- the revenue of the company in a quarter?

MS. EKONO:  Revenues that are due to what the company deems to be organic growth.

THE COURT:  All right.  Now wait a minute.  All right.  So let's just pick a number.

MS. EKONO:  Okay.

THE COURT:  Let's say there's a million dollars of organic growth rate in a quarter; is that right?  I mean, organic growth, a million dollars.  Is that revenue?  What is that when you have a number?

MS. EKONO:  So the numbers -- again, I don't want to

get -- I'm not sure I understand it enough to be -- to answer your question precisely.  The numbers we gave them were a growth rate.  So it's the same type of number that the company publicly reported.

THE COURT:  Now when you say a growth rate, give me a percentage that you use.

MS. EKONO:  So three percent, five percent.

THE COURT:  Okay.

MS. EKONO:  That's the type of number.

THE COURT:  So there's an organic growth rate of three percent.  Now, is that three percent from the prior month?  It increased three percent over the prior month or -- three percent of -- in other words, you have a bank account, and you earn three percent.  All right.  That's three percent annually, right?

MS. EKONO:  So we're talking about on a quarterly -- so unless we said we were giving annual numbers, which we did in two instances, we were providing quarterly numbers, we're very clear in our answers that were provided.

THE COURT:  Okay.  It's --

MS. EKONO:  It's about growth in that period.

THE COURT:  Yeah, but I'm trying to understand.  You gave an organic growth rate, let's say, of three percent.  Now, as I say, if I have a bank account and the bank tells me I'm going to get -- I have, you know, $1,000 in the bank, in my savings account, I'm going to get three percent.  All right,

that's $30, right?  Do I have that right?  So I'm getting $30 annually.  I put $1,000 in a savings account.  January 1 to December 31st, I'm going to have 30 extra dollars in my pocket, three percent.  And that's what that means.

Now you have -- so my account -- my bank account has grown by three percent, putting aside inflation that may eat it all up.  But anyhow so my bank account -- my little savings account, I have a growth -- my account grows by three percent.

Now, you have an organic growth rate of three percent in a quarter.  So it's three percent of what?  It must be three percent of some number.

MS. EKONO:  Of revenues that are deemed to be generated by organic, meaning internal, the company's own efforts.

THE COURT:  All right.  So then if it's three percent -- but it has to be three percent of something.  So why don't you give them that?  You don't have the number.

MS. EKONO:  Right.

THE COURT:  So in other words, it grows by three percent, but we don't know whether it's three percent of a million dollars or --

MR. BRITTON:  If I may, Your Honor --

THE COURT:  Yeah.

MR. BRITTON:  -- real quick.  And here's why we're asking for the -- first, we were like, okay, willing to consider the growth rate, okay.  We want to know what the growth was in

the fourth quarter because that's the operative quarter.  It's when they changed the definition.  We wanted to know what would the fourth quarter have been if you didn't change the definition?  That's what we wanted to know what.

THE COURT:  You mean, what the percentage would have been?

MR. BRITTON:  What the percentage would have been.  But this is what we were told.  Here it is in exhibit B, page 7.  "However, the pre-Q four 2020 component, by itself, does not reflect what organic growth as Adapthealth used that term, was during the relevant quarters.  So now we're asking for the revenue.

THE COURT:  I understand.  A percentage number means nothing by itself.  I mean, somebody says, I'm getting three percent on my little savings account.  Well, that's great, but it doesn't mean anything unless in terms of what the number is.  Do I have a million dollars in that account, or do I have $1,000 in?  If it's 1,000, it's $30.  And you want to know what the number is --

MR. BRITTON:  Right.

THE COURT:  -- because percentage means --

MR. BRITTON:  Right.  And that's what --

THE COURT:  -- it doesn't mean a lot.

MR. BRITTON:  And that's what the interrogatory asks for.

THE COURT: So you're just giving misconduct. It's got to be a percentage of something.

MS. EKONO: Right. No, Your Honor, you're correct. So one, I think it's important for you to understand that when Adapthealth disclosed an organic growth information to the market, they always did so with a rate. So it's not fair to say that that rate number is not meaningful. But I hear Your Honor. You're correct. It is a percentage of something.

THE COURT: Yeah.

MS. EKONO: And the company -- so in preparation for today's hearing, the company obviously took a very close look with the new information that we learned from their motion to compel, and it's filed, and it does believe that it has contemporaneous information that would reflect how that particular percentage --

THE COURT: Have you given that to them yet?

MS. EKONO: So we have not. To be frank, we didn't even know that that's what they were asking for until we read their motion to compel, because that's how disjointed the process has been in terms of meeting and conferring. We gave them what we thought they wanted. We got more clarity from their motion to compel. We have never actually refused to provide them what they wanted. We never met and conferred at all about this particular motion.

Regardless, we have the information. You know, we're

willing to put that in a written form and give it to them.  We are going to need a few weeks to put that together, but we have it, and we'll give it to them.

THE COURT:  Okay.  Well, that's helpful.  So what I will do with respect to that, again, Ms. Ekono said she is going to provide that to you.  I'll deny your motion without prejudice, and so you will be getting that information, and you'll have some numbers and not just percentages.  All right.

MR. BRITTON:  So we're going to get that the revenue numbers per quarter, as well as --

THE COURT:  That's my understanding.

MR. BRITTON:  -- the percentage for the fourth quarter of 2020.

THE COURT:  Right.

MS. EKONO:  That's correct.

THE COURT:  Perfect.  Very good.  All right.  I think that can -- that concludes our business for the day.

MR. BRITTON:  Thank you, Your Honor.

THE COURT:  And I thank you all for coming in.  I think it would have been impossible to do this over the phone.

MS. EKONO:  Agreed.

THE COURT:  So there is some benefit to doing it the old fashioned way, right.

MR. BRITTON:  I agree, Your Honor.

THE COURT:  Person to person as opposed to over the

phone, or Zoom, or whatever all this other technology is.

MR. BRITTON:  And the one at the end -- the conference at the end of June is going to be in person as well?

THE COURT:  Yes, I think that would be helpful.

MR. BRITTON:  I agree.

THE COURT:  And I'll have to look at my calendar.  Is anybody going to be away toward the end of June?  Unable to be here?  We'll just set a date.  If it's a major problem -- and I know you're coming from California.  Is it better to do it in the morning, so you can -- I assume you come in the night before, obviously.

MR. BRITTON:  Correct, Your Honor.  Yes.

THE COURT:  You're not at the point where you're still taking the read eye, I hope.

MR. BRITTON:  No.  I'm not doing that, Your Honor.

THE COURT:  All right.  Thank you all very much for coming, and I appreciate it very much.

MR. BRITTON:  Thank you, Your Honor.

THE CLERK:    All rise.

(Proceedings concluded at 10:37 a.m.)

CERTIFICATE

I, Jessica B. Cahill, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Dated: April, 20, 2023

_____
Jessica B. Cahill, CER/CET-708