# EXHIBIT F

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM and BUCKS COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> ADAPTHEALTH CORP. f/k/a DFB HEALTHCARE ACQUISITIONS CORP., LUKE MCGEE, STEPHEN P. GRIGGS, and JASON CLEMENS, FRANK J. MULLEN, RICHARD BARASCH, JOSHUA PARNES, ALAN QUASHA, TERENCE CONNORS, DR. SUSAN WEAVER, DALE WOLF, BRADLEY COPPENS, and DAVID S. WILLIAMS III, <br><br> Defendants. | Civ. Action No. 2:21-cv-03382-HB <br><br> <u>CLASS ACTION</u> |

[**REDACTED**]

EXPERT REPLY REPORT OF MATTHEW D. CAIN, PHD

May 22, 2023

**Table of Contents**

I.   Introduction and Summary of Opinions ................................................................................. 1

II.  Market Efficiency of AdaptHealth Common Stock ............................................................. 2

    A.   Overview ....................................................................................................................... 2

    B.   Market Efficiency Following the DeSPAC Merger ..................................................... 5

III. Artificial Inflation, Loss Causation, and Price Impact Issues ............................................. 9

    A.   The Opinions Relating to the Alleged Misrepresentations and Corrective Disclosures in the Turki Report, Markel Report, Savoldelli Report, and Lewis Report Relate to Analyses of Loss Causation ......................................................................................... 9

    B.   The Opinions on the Alleged Misrepresentations and Corrective Disclosures in the Turki Report, Markel Report, Savoldelli Report, and Lewis Report are Flawed and Ignore Important Evidence to the Contrary ................................................................. 10

        i.    *The Turki Report Fails to Consider Inflation Maintenance as well as Alleged Omissions* ............................................................................................................. 10

        ii.   *Dr. Turki Relies on a Flawed Event Study Analysis and Misstates the Results of His Own Event Study Analyses* ................................................................................. 11

        iii.  *The Turki Report and Savoldelli Report Improperly Dismiss Short-Seller Reports* 14

        iv.   *The Markel Report Analysis is Incomplete, Subjective, and Flawed* ....................... 21

        v.    *The Opinions in the Lewis Report are Incomplete, Subjective, and Contradicted by Factual Evidence and Dr. Lewis's Own Testimony* ................................................. 24

Appendix A ................................................................................................................................. 31

Appendix B ................................................................................................................................. 37

Exhibit 1 ..................................................................................................................................... 40

## I.    Introduction and Summary of Opinions

1.    On July 27, 2022, I submitted an expert report on market efficiency in this matter ("Efficiency Report"), in which I concluded that: a) the market for shares of AdaptHealth Common Stock was efficient throughout the Class Period; b) the value impact of any alleged misstatements or omissions would be reflected in AdaptHealth's Options prices because their pricing is derivative of and dependent upon AdaptHealth's Common Stock prices; and c) Common Stock and Options damages in this matter can be calculated on a class-wide basis subject to a common methodology.[1]

2.    Following the submission of my Efficiency Report, Counsel provided me with several expert reports, all dated March 29, 2023. I have been asked to review, evaluate, and respond to the opinions in the following four reports:

- Expert Report of L. Adel Turki ("Turki Report")

- Expert Report of Susan G. Markel ("Markel Report")

- Expert Report of Fabio Savoldelli ("Savoldelli Report")

- Expert Report of Dr. Craig Lewis ("Lewis Report")

3.    My qualifications and rate of compensation for work in this matter were identified in my Efficiency Report and I do not repeat them here. I have attached an updated version of my curriculum vitae as **Appendix A**. I reserve the right to amend this report to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

4.    In formulating my opinions set forth in this Expert Rebuttal Reply Report, I have relied upon the analyses already described in my Efficiency Report, as well as my knowledge,

---

[1] *See* Efficiency Report, ¶¶ 10, 11, 93. I continue to hold the opinions expressed in my Efficiency Report and reiterate them here. Capitalized terms in this report have the same meaning as in my Efficiency Report.

experience, and formal training in economics, finance, and statistics, in addition to the

allegations and facts set forth in this matter. I also performed additional research to evaluate

certain assertions made in the Turki Report, Markel Report, Savoldelli Report, and Lewis

Report. All of the materials I considered in forming my opinions are identified in **Appendix B** to

this report in addition to the similar Appendix to my Efficiency Report.

5.      My opinions can be summarized as follows:

a)  Dr. Turki assumes efficiency of the market for AdaptHealth Common Stock in
    his analyses and does not dispute my conclusions regarding AdaptHealth's
    Options, rendering his critiques of my market efficiency analyses irrelevant.
    Moreover, my efficiency analyses properly considered the first nine months of
    the deSPAC merger, supporting my conclusion of market efficiency
    *throughout* the Class Period.

b)  Many opinions in the Turki Report, Markel Report, Savoldelli Report, and
    Lewis Report relate to the types of analyses experts conduct when addressing
    questions of loss causation that I understand may take place at a later phase of
    the litigation.

c)  The opinions on the Alleged Misrepresentations and Alleged Corrective
    Disclosures in the Turki Report, Markel Report, Savoldelli Report, and Lewis
    Report are flawed and ignore important evidence to the contrary.

6.      Nothing in the Turki Report, Markel Report, Savoldelli Report, or Lewis Report

disturbs the opinions expressed in my Efficiency Report. In the following sections I address the

criticisms of my Efficiency Report and the other opinions expressed in the Turki Report, Markel

Report, Savoldelli Report, and Lewis Report.

## II.    Market Efficiency of AdaptHealth Common Stock

### A.    Overview

7.      In my Efficiency Report, I explained how the fraud-on-the-market theory relates

directly to the prices of a given security.[2] This theory posits that if a company's stock prices

---

[2] Efficiency Report, ¶¶ 17-19.

reflect all publicly-available information, then all purchasers of that company's stock are induced

into reliance on any misrepresentations or omissions because those statements or omissions have

distorted the value of each investor's purchase price. I further explained how the fraud-on-the-

market theory of reliance has been addressed by numerous courts over the years in relation to

Section 10(b) claims and was adopted by the U.S. Supreme Court in *Basic* and reaffirmed in its

*Halliburton II* decision.

8.       I analyzed the *Cammer*, *Krogman*, and other relevant factors relating to

AdaptHealth's Common Stock in my Efficiency Report, and I ultimately found that these factors

support a conclusion of market efficiency.[3] I then explained how AdaptHealth's Options prices

were derivative of its Common Stock prices during the Class Period.[4] As a result, if an alleged

misstatement or omission created or maintained artificial inflation in AdaptHealth Common

Stock, then it would also translate into the value of derivative instruments such as call and put

Options on AdaptHealth Common Stock. The fraud-on-the-market theory thus implies that

investors would be induced into reliance on such misstatements or omissions in the same

manner, regardless of whether those investors purchased AdaptHealth Common Stock or

Options.

9.       Dr. Turki does not dispute the widely-held presumption that "markets with

continuous public reporting of stock prices and trading volume, such as the New York Stock

Exchange ("NYSE") and NASDAQ, should be granted a presumption of efficiency for virtually

all securities traded on them."[5] Furthermore, he does not dispute my assessment that "[t]he fact

---

[3] Efficiency Report, ¶¶ 27-79.
[4] Efficiency Report, ¶¶ 80-84.
[5] Efficiency Report, ¶ 20.

that AdaptHealth's Common Stock traded in such a well-developed market (under the trading symbol "AHCO" on the NASDAQ) leads to a strong presumption of market efficiency."[6]

10. ███████████████████████████████████████████████████████████

██████████████████████████████████████ In fact, Dr. Turki *assumes market efficiency* for AdaptHealth's Common Stock because he performs multiple event studies, which can only be interpreted if stock prices efficiently react to potentially new, value-relevant information. As Dr. Turki states: "An event study evaluates whether, ***assuming an efficient market***, a particular event may be associated with a statistically significant change in the stock price."[8]

11. Dr. Turki also does not dispute my conclusion that "the value impact of any alleged misstatements or omissions would be reflected in AdaptHealth's Options prices because their pricing is derivative of and dependent upon AdaptHealth's Common Stock prices."[9] Finally, he does not dispute my opinion that "Common Stock and Options damages in this matter can be calculated on a class-wide basis utilizing a common methodology."[10]

12. In my Efficiency Report, I also tested AdaptHealth's Common Stock market efficiency by evaluating 11 separate factors (including the *Cammer* and *Krogman* factors). Taken together, the factors I analyzed in my report provide strong economic evidence that AdaptHealth Common Stock traded in an efficient market ***throughout the entire Class Period***. Despite assuming efficiency of the Common Stock for purposes of conducting his event studies, Dr. Turki claims that I "failed to analyze market efficiency for AdaptHealth's stock following the

---

[6] Efficiency Report, ¶ 20.
[7] ████████████████
[8] Turki Report, ¶ 36 (emphasis added).
[9] Efficiency Report, ¶ 93.
[10] Efficiency Report, ¶ 93.

4

deSPAC merger."[11] He opines that the average values of several efficiency factor over the full Class Period differed from the values during the first three, six, or nine months following the deSPAC merger.[12] In the following section, I explain the flaws in this opinion.

### B.    Market Efficiency Following the DeSPAC Merger

13.    As noted above, Dr. Turki assumes the efficiency of the market for AdaptHealth Common Stock in conducting his event studies. As a result, his critiques of my market efficiency analyses are irrelevant. Nonetheless, below I show that Dr. Turki's claim that I "failed to analyze market efficiency for AdaptHealth's stock following the deSPAC merger"[13] is incorrect.

14.    My Efficiency Report makes clear that my efficiency analyses of AdaptHealth's Common Stock demonstrate that it was efficient ***throughout*** the Class Period, which includes the first nine months following the deSPAC merger.[14] I further testified that my efficiency analyses were conducted both across the full Class Period, as well as during shorter periods:

> "But, ultimately, I would be looking at just all the different factors and I would be asking myself, is there really strong evidence of, you know, market inefficiency during a particular sub period, like you're referring to. So as you can see throughout the exhibits, I try to report to the best of my ability each of these exhibits throughout the full class period so that I can evaluate and consider whether there are significant differences at certain points during the class period. I won't waste your time with going through each of those other factors, but I have looked at each of the other factors – each factor both over the full class period as well as during -- you know, concerning sub periods of the class period."[15]

15.    Dr. Turki opines that "the Cain Report concludes that the market for AdaptHealth's stock was efficient for the entire Putative Class Period while ignoring the three, six, and nine months following the deSPAC merger and the markedly different findings with

---

[11] Turki Report, ¶ 28.
[12] Turki Report, ¶ 28.
[13] Turki Report, ¶ 28.
[14] Efficiency Report, ¶¶ 29, 30, 34, 39, 68, 73, 93. At ¶ 93: "In conclusion, based on the market efficiency factors considered by courts and in academia, upon which I conducted my analyses, it is my opinion that AdaptHealth's Common Stock traded in an efficient market ***throughout*** the Class Period" (emphasis added).
[15] Cain Tr., 135:9-136:21.

respect to market efficiency indicators during these periods."[16] As explained above, my

Efficiency Report includes and properly considers these time periods within the efficiency

analyses. Moreover, I testified that one would expect to observe fluctuations over time in the

efficiency factor averages, caused for example, by differences in the amount of new information

coming out during different time periods:

> "…we expect to see fluctuations in trading volume based on the amount of new
> information that's value relevant coming out for a given company. And so, for
> example, we'll have days where there's relatively little trading volume. That does
> not mean that the stock was inefficient on that day. It may just mean that there
> was no new information that investors wanted to trade on on a given day. And so
> you can have that go well beyond a day. You can have weeks or even months
> where there's relatively little new information, and that's coincidentally something
> that I observed going on with AdaptHealth when I carried out my Cammer 5
> analysis. And what else I explained was that, for that reason, the average
> benchmark or trading volume is intended to be applied over a full class period and
> it's not intended to be applied for shorter sub periods within a class."[17]

16.     Dr. Turki asserts that several market efficiency factors differed over the first

three, six, and nine months following the deSPAC merger, though the Turki Report does not

conclude that this evidence indicates market inefficiency.[18] As explained in my report and

testimony, I observed in my *Cammer* Factor 5 analysis that the most value-relevant news dates

occurred later in the Class Period, and this coincides with the statistics regarding trading volume

and stock returns. The timing of these significant information disclosures does not indicate that

the market was inefficient during the first nine months of the Class Period, simply that the first

---

[16] Turki Report, ¶ 49.
[17] Cain Tr., 136:22-138:4.
[18] Turki Report, ¶¶ 28; 49. Dr. Turki provided contradictory answers about his opinions on AdaptHealth's efficiency during his testimony.

6

nine months represented a period of smaller earnings surprises and no large unexpected merger and acquisition announcements.

17.    Moreover, despite the different averages during these first nine months regarding analyst coverage, number of market makers, market capitalization, bid-ask spreads, public float, and institutional holdings, these averages nonetheless weigh strongly in favor of market efficiency in the months following the deSPAC merger. The Turki Report also understates the level of analyst coverage following the deSPAC merger, incorrectly claiming, for example, that only two analysts covered AdaptHealth in the first three months. In fact, I count at least four different analyst reports produced during this period – double the number claimed in the Turki Report.[19] Nonetheless, as explained in my report and testimony, the average levels of the efficiency factors are intended to be evaluated over a full Class Period given the fluctuations in new information announcements during shorter time windows.

18.    Dr. Turki also highlights the existence of AdaptHealth stock lockup agreements during the first nine months after the deSPAC merger and claims that my analyses fail to consider the impact of these lockups on market efficiency.[20] This is incorrect. For example, as explained in my Efficiency Report, the *Cammer* court held that average weekly trading volume of "1% would justify a substantial presumption" of market efficiency.[21] My *Cammer* Factor 1 analysis of weekly trading volume was intentionally conservative in dividing trading volume by total shares outstanding. If I subtract the 12.5 million Class A Common Stock shares subject to a

---

[19]  "Technology disruption is shaking up DMEs, yielding an innovative model," Dec. 9, 2019, Deutsche Bank; "Home is where the health is: A compelling roll up opp. in an attractive market," Dec. 11, 2019, SVB Leerink; "A new top growth player emerges from ashes of the DME industry; initiate at buy," Jan. 7, 2020, Jefferies; "Built to win: A unique asset benefiting from secular shift to home health care; initiating coverage with a buy rating and $17 target price," Jan. 30, 2020, Stifel.

[20] Turki Report, ¶45.

[21] Efficiency Report, ¶28 and fn. 24.

lockup agreement[22] from shares available for trading, then Dr. Turki's calculations of the weekly trading volume averages equate to 1.41% over the first three months, 1.51% over the first six months, and 2.19% over the first nine months following the deSPAC merger, all exceeding the *Cammer* court's 1% threshold justifying a "substantial presumption" of market efficiency.

19.    Finally, Dr. Turki cites several *unpublished* research papers to suggest that many SPACs may trade in inefficient markets because there are a "considerable number of days in which the stock does not trade at all."[23] One unpublished paper relied on by Dr. Turki states that "There are days, even around the announcement of a deal—the most important piece of information a SPAC can announce to the market, that it has in fact found a target—when not a single SPAC share trades."[24]

20.    AdaptHealth Common Stock experienced trades on *every single trading day* during the Class Period, with a minimum of over 4,500 shares traded during a single day.[25] Moreover, prior to the Class Period, the SPAC "DFB Healthcare Acquisitions Corp." experienced trading volume of over 1 million shares upon the AdaptHealth business combination announcement on July 8, 2019.[26] This evidence refutes Dr. Turki's unfounded assertion that academic "literature makes clear that for companies like AdaptHealth, which underwent a deSPAC merger on November 8, 2019, and began publicly trading on November 11, 2019, the

---

[22] AdaptHealth 10-K, Mar. 6, 2020, available at:
https://www.sec.gov/Archives/edgar/data/1725255/000155837020002146/0001558370-20-002146-index.htm. At p. 34: "Deerfield and Richard Barasch collectively own 12,500,000 shares of Class A Common Stock that are subject to restrictions on transfer under the terms of the Amended and Restated Subscription Agreement entered into on October 15, 2019 between the Company, Deerfield and RAB Ventures (DFB) LLC."

[23] Turki Report, ¶34, quoting: A.M. Rose, 2021, "SPAC Mergers, IPOs, and the PSLRA's Safe Harbor: Unpacking Claims of Regulatory Arbitrage," Working Paper, 1–49, at 41.

[24] Turki Report, ¶34, quoting: U. Rodrigues & M. Stegemoller, 2021, "Redeeming SPACs," Working Paper, 1–57, at 32–33.

[25] *Source*: Efficiency Report, backup materials. As explained in my Efficiency Report at fn. 1, my efficiency analyses cover the time period Nov. 11, 2019 through Jul. 16, 2019, inclusive.

[26] *Sources*: Bloomberg; "Press Release: AdaptHealth to Become a Public Company via Business Combination With DFB Healthcare," Jul. 8, 2019 (8:00am ET), *Dow Jones*.

stock price may not be trading in an efficient market in the months immediately following the deSPAC merger."[27]

21.    In summary, Dr. Turki assumes efficiency of the market for AdaptHealth Common Stock when he conducts his event studies (which I discuss further in the following section). Moreover, my efficiency analyses properly considered the first nine months of the deSPAC merger, supporting my conclusion of market efficiency throughout the Class Period. Dr. Turki also does not dispute my conclusion that the value impact of any alleged misstatements or omissions would be reflected in AdaptHealth's Options prices because their pricing is derivative of and dependent upon AdaptHealth's Common Stock prices. Moreover, Dr. Turki does not dispute my opinion that Common Stock and Options damages in this matter can be calculated on a class-wide basis utilizing a common methodology.

## III.    Artificial Inflation, Loss Causation, and Price Impact Issues

### A.    The Opinions Relating to the Alleged Misrepresentations and Corrective Disclosures in the Turki Report, Markel Report, Savoldelli Report, and Lewis Report Relate to Analyses of Loss Causation

22.    Dr. Turki opines that the stock price reactions following the two Alleged Corrective Disclosures were not related to certain aspects of the Alleged Misrepresentations and that certain elements of the disclosed information were previously publicly-available.[28] Ms. Markel opines that certain calculations within the Jehoshaphat Report can be reproduced using information that was publicly-available prior to its publication.[29] Mr. Savoldelli and Dr. Turki both opine that AdaptHealth's stock price decline following the publication of the Jehoshaphat Report was due to the mere publication of the report and not attributable to the content or factual

---

[27] Turki Report, ¶35.
[28] Turki Report, ¶¶ 28; 55-59; 69-80.
[29] Markel Report, ¶ 14.

underpinnings of the report.[30] Dr. Lewis opines that investors would not have considered many

of the Alleged Misrepresentations to be important to their investment decisions.[31]

23.    These opinions relate to the types of analyses experts conduct when addressing

questions of loss causation that I understand may take place at a later phase of the litigation. As a

result, the opinions relating to loss causation provided by Dr. Turki, Ms. Markel, Mr. Savoldelli,

and Dr. Lewis in no way disturb the opinions expressed in my Efficiency Report. Nonetheless, I

have reviewed the opinions provided within their respective reports, and have noted a number of

flaws. Below, I summarize these flaws and further explain that the experts ignore evidence which

contradicts their opinions.

**B.    The Opinions on the Alleged Misrepresentations and Corrective Disclosures in the Turki Report, Markel Report, Savoldelli Report, and Lewis Report are Flawed and Ignore Important Evidence to the Contrary**

*i.    The Turki Report Fails to Consider Inflation Maintenance as well as Alleged Omissions*

24.    Dr. Turki states the following basis upon which he forms his opinions about

artificial inflation, loss causation, and price impact:

> "Only statistically significant price increases related to the alleged misrepresentations would provide reliable economic evidence that the alleged misrepresentations may have contained new and unexpected value-relevant information. Furthermore, if the alleged misrepresentations contained new and unexpected value-relevant information, the stock price will exhibit statistically significant price increases on the days of the alleged misrepresentations *and* statistically significant price decreases on the days of the alleged corrective disclosures."[32]

25.    Dr. Turki does not cite to any authority in providing this novel opinion. My

understanding of loss causation, including both inflation creation and inflation maintenance

---

[30] Savoldelli Report, ¶ 18; Turki Report, ¶ 60.
[31] Lewis Report, ¶ 17.
[32] Turki Report, ¶ 39.

theories, as well as the Alleged Misrepresentations (including both misstatements and omissions) in this matter, contradicts the above assertion made by Dr. Turki. Based on my professional experience, it is commonplace for experts to demonstrate price impact at the class certification stage by documenting statistically significant price declines upon alleged corrective disclosures without regard to stock price movements upon dates of alleged misstatements or alleged omissions.

26.    In my Efficiency Report, I conducted an event study designed to assess market efficiency. Nonetheless, I note that my event study documented statistically significant declines in AdaptHealth Common Stock following each of the Alleged Corrective Disclosures:[33]

- **April 13, 2021**: Abnormal return of -19.79%, statistically significant at the 99% level.

- **July 19, 2021**: Abnormal return of -4.97%, statistically significant at the 95% level.

I further noted in my Efficiency Report that my event study was not intended to quantify artificial inflation.[34] Nonetheless, that event study clearly demonstrates a statistically significant price impact related to each of the Alleged Corrective Disclosures.

ii.    *Dr. Turki Relies on a Flawed Event Study Analysis and Misstates the Results of His Own Event Study Analyses*

27.    My Efficiency Report event study documented price impact in AdaptHealth's Common Stock following each of the two Alleged Corrective Disclosures. That event study properly controlled for the changing relationship over time between AdaptHealth, the overall Market Index, and the Industry Index.[35] Moreover, it also properly controlled for the evolution in AdaptHealth's company-specific volatility over time.[36]

---

[33] Source: Efficiency Report, backup materials.

[34] Efficiency Report, fn. 86.

[35] Efficiency Report, ¶ 56: "…the relation between the Company and the overall market fluctuated over time."; Exhibit 4.

[36] Efficiency Report, ¶ 57: "My rolling regression event study adjusts for changing volatility in AdaptHealth's Common Stock over time."; Exhibit 5.

28.    Dr. Turki's primary event study fails to account for changes in these relationships or changes in AdaptHealth's volatility over time, because he uses a non-standard approach by estimating one single event study over 424 trading days – *i.e.*, over a year and a half of stock returns. He relies on this flawed event study to conclude that "the movement in AdaptHealth's stock price on the date of the alleged corrective disclosure, July 19, 2021, was neither statistically significant nor due to the factual underpinnings of the Jehoshaphat Report…"[37] The Turki Report does not report the level of statistical significance associated with Dr. Turki's event study result on this date. Based on my review of the Turki Report backup materials, his event study indicated that AdaptHealth's abnormal stock decline of over -6% was statistically significant at the 89% level.[38] Statistical theory explains that an "effect best supported by the data from a given experiment is always the observed effect, regardless of its significance."[39] ▮



---

[37] Turki Report, ¶ 28.

[38] Turki Report, backup materials.

[39] Alon Brav and J.B. Heaton, 2015, Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias, *Washington University Law Review* 93, at fn. 24, quoting Steven Goodman, *A Dirty Dozen: Twelve P-Value Misconceptions*, 45 SEMINARS IN HEMATOLOGY 135, 136 (2008) ("A nonsignificant [effect] merely means that a null effect [here, no price impact] is statistically consistent with the observed results, together with the range of effects included in the confidence interval. It does not make the null effect [i.e., the hypothesis of no price impact] the most likely. The effect best supported by the data from a given experiment is always the observed effect, regardless of its significance.").



29.    Not only is Dr. Turki's opinion on statistical significance being binary (yes/no) at the 95% level unsupported by statistical theory, it is contradicted by Dr. Turki's own prior academic work, which relies on and interprets economic effects despite statistical significance below the 95% level. For example, in one study, Dr. Turki wrote: "By the end of five years, the Biotech IPOs had lost 32.4% against the market in spite of initial returns of 18.7%."[41] However, the $t$-test associated with this -32.4% return was -1.62,[42] almost identical to the $t$-statistic of -1.60 from his AdaptHealth event study which he opined was not statistically significant.[43] The Turki Report opinions are thus contradicted and undermined by Dr. Turki's own prior academic research.

30.    Moreover, his event study approach is flawed because he compares AdaptHealth's stock return on July 19, 2021 to a baseline of volatility that extends back in time over a year and a half. As my Efficiency Report documented, AdaptHealth's volatility at the beginning of the Class Period was *almost twice as high* as that at the end of the Class Period.[44] AdaptHealth's volatility at the beginning of the Class Period is not a relevant baseline for measuring statistical significance of an Alleged Corrective Disclosure over a year and a half later

---

[40] ███████████████

[41] Christopher B. Barry and L. Adel Turki, Initial Public Offerings by Development Stage Companies, 1998, *Journal of Small & Emerging Business Law* 2, at p. 119.

[42] *Id.*, at p. 118 (Table 5).

[43] Turki Report, ¶ 53.

[44] Efficiency Report, Exhibit 5.

at the end of the Class Period.[45] Dr. Turki's own report highlights the different dynamics in AdaptHealth Common Stock during the first nine months of the Class Period,[46] emphasizing the need for an event study that controls for these changes over time. Dr. Turki's event study result relating to the July 19, 2021 Alleged Corrective Disclosure is thus flawed and unreliable.

31.     Furthermore, Dr. Turki's alternative event study models demonstrate that AdaptHealth's Common Stock abnormal return following the July 19, 2021 Alleged Corrective Disclosure was *negative and statistically significant at the 94% level* using a 250-day rolling window and *negative and statistically significant at the 97% level* using a 120-day rolling window.[47] Dr. Turki thus misstates the results of his own event study analyses when he concludes that AdaptHealth's stock price movement was not statistically significant following the July 19, 2021 Alleged Corrective Disclosure, rendering his opinions flawed and irrelevant.

*iii.     The Turki Report and Savoldelli Report Improperly Dismiss Short-Seller Reports*

32.     Dr. Turki opines that any decline in AdaptHealth's stock price following the July 19, 2021 Alleged Corrective Disclosure "could only be attributable to the publication of the Jehoshaphat Report, not its factual underpinnings." He motivates this conclusion by citing academic literature which documents that negative stock price reactions following publication of anonymous short-seller reports frequently reverse over the subsequent five trading days.[48] Dr. Turki *does not conduct any analysis* to evaluate whether AdaptHealth's stock price reversed in

---

[45] *See, e.g.*: A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35, at 15 ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event.").

[46] Turki Report, ¶ 49.

[47] Turki Report, backup materials.

[48] Turki Report, ¶¶ 60-63, citing: Joshua Mitts, 2020, "Short and Distort," *Journal of Legal Studies*, Vol. 49(2), 287–334 ["Mitts Study"].

this manner following publication of the Jehoshaphat Report. Thus, his opinion lacks any methodology or substance, rendering it irrelevant.

33.    Mr. Savoldelli provides a similar opinion to the one provided by Dr. Turki: that any decline in AdaptHealth's Common Stock price following publication of the Jehoshaphat Report would be "attributable to the mere publication of the Jehoshaphat Report, not its content."[49] He reaches this opinion by citing to academic literature, such as the Mitts Study, which "has observed that pseudonymity allows short sellers to exploit investors' trust and to profitably distort stock prices."[50] However, Mr. Savoldelli does not evaluate the accuracy of the Jehoshaphat Report allegations,[51] nor does he examine potential stock price reversal patterns documented in the Mitts Study he relies on.[52] Rather, Mr. Savoldelli looks at short sale volumes up through the July 19, 2021 date of publication of the Jehoshaphat Report, but he explicitly ignores any stock price, options, or short-selling behavior in the days following July 19, 2021. He ultimately concludes that his "review of short selling data did not uncover any out of the ordinary short selling activity on July 19, 2021."[53] He also supports this opinion by documenting four additional subjectively-chosen characteristics of the report, including pseudonymous authorship, use of sensationalistic language, absence of material nonpublic information, and skepticism by sell-side analysts.

34.    Mr. Savoldelli



---

[49] Savoldelli Report, ¶ 18.
[50] Savoldelli Report, ¶ 43.
[51] Savoldelli Report, fn. 16: "I have not been asked by counsel to analyze the accuracy of the allegations regarding the Organic Growth Issue raised by Jehoshaphat."
[52] Savoldelli Report, ¶¶ 35; 43; Mitts Study.
[53] Savoldelli Report, ¶ 81.
[54]



35.    Moreover, academic research cited by Mr. Savoldelli demonstrates the typical

stock price pattern that is present when investors overreact to the mere publication of a short

seller report without regard to the content. The Mitts Study documents a pattern of a short-term

drop in stock price that is quickly reversed over the next five trading days.[58] That study

illustrates this pattern for an example company in its Figure 1, reproduced as **Figure 1** below:[59]

### Figure 1



36.    However, as shown in **Figure 2** below, this reversal pattern was not present in

AdaptHealth Common Stock around the July 19, 2021 Alleged Corrective Disclosure:[60]

---

[58] Mitts Study, at p. 306: "However, returns of firms targeted by pseudonymous articles decline further on the day of publication ($t_0$) and display a sharp pattern of reversal…from day 1 to day 5 following publication." *See also*: pp. 302-310; Figure 3; Table 4.
[59] Mitts Study, Figure 1.
[60] Source: Bloomberg.

16

**Figure 2**



As can be seen, rather than reversing, AdaptHealth's Common Stock price continued to decline in the subsequent days following the publication of the Jehoshaphat Report. This pattern is inconsistent with Mr. Savoldelli's opinion that the July 19, 2021 decline was unrelated to the content and was merely caused by the publication of a pseudonymous short seller report.[61]

37.    Mr. Savoldelli bases his conclusion on his review of short selling data which "did not uncover any out of the ordinary short selling activity on July 19, 2021. If stock traders were reacting to the content of the Jehoshaphat Report… [Mr. Savoldelli] would expect to see large and increasing short positions… Instead, [Mr. Savoldelli observed] short positions that were not

---

[61] I understand Mr. Savoldelli ███████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████████
████████████████████████████████ Yet, even the first sentence of the abstract in the Mitts Study demonstrates that the lines of inquiry are not different, as claimed by Mr. Savoldelli: "Pseudonymous attacks on public companies are followed by stock price declines and sharp reversals." (Mitt Study, at p. 287).

17

materially different from those in the month before the publication of the Jehoshaphat Report."[62]

Mr. Savoldelli only reviewed short selling activity through July 19, 2021.[63]

38.     I examined his underlying short selling data and have produced a chart of daily total short selling volume in AdaptHealth Common Stock for the entire month of July 2021. This chart is shown in **Exhibit 1**, and reveals a large spike in short selling activity on July 20, 2021 – *the day after Mr. Savoldelli cut off the short selling data shown in his report*. According to the criteria articulated by Mr. Savoldelli in forming his opinions, such a large spike in short selling volume the day after publication of the Jehoshaphat Report would constitute "out of the ordinary short selling activity," thus contradicting his conclusions.[64]

39.     Mr. Savoldelli also opines that the Jehoshaphat Report contains no "material nonpublic information."[65] However, he concedes that it contained nonpublic information within selected quotes from "interviews with unnamed, former AdaptHealth employees."[66] Yet he dismisses the materiality of these quotes because the Jehoshaphat Report did not disclose other details such as how many employees it spoke with, when it spoke with them, their current or former positions, etc.[67] He provides no discrete analysis capable of assessing whether all of the content in the Jehoshaphat Report was previously public or not; he testified that he is not providing a price impact opinion or a materiality opinion;[68] and his report does not conduct a discrete analysis of materiality of each component of the information contained in the

---

[62] Savoldelli Report, ¶¶ 81-82.
[63] Savoldelli Report, ¶ 83; Appendices D-F.
[64] The Savoldelli Report at fn. 16 states: "I have also not been asked by counsel to analyze AdaptHealth's stock price beyond July 19, 2021." ███████████████████████████████████████████████████
█████████████████. As discussed previously, numerous academic studies, such as the Mitts Study relied on by Mr. Savoldelli, find it relevant to consider data for several trading days beyond a given event date.
[65] Savoldelli Report, ¶¶ 72-77.
[66] Savoldelli Report, ¶ 74.
[67] *Id.*
[68] ████████████████████

Jehoshaphat Report. His opinion regarding "material nonpublic information" thus appears to be a legal conclusion without any reliable economic methodology, analysis, or basis. Moreover, as explained previously, this would represent the type of analysis experts conduct when addressing questions of loss causation that I understand may take place at a later phase of the litigation.

40.      Similarly, Dr. Turki opines that: "Because AdaptHealth disclosed its organic growth methodology and the market understood that methodology prior to the publication of the Jehoshaphat Report, the 'truth' allegedly revealed by the Jehoshaphat Report was stale information, and thus AdaptHealth's stock price would not react to the information in the Jehoshaphat Report. Hence, any stock price decline on July 19, 2021, is not due to the factual underpinnings of the Jehoshaphat Report."[69] He supports this opinion by claiming that analysts "understood that AdaptHealth's organic growth metric disclosed starting from March 4, 2021, included revenue from recent acquisitions."[70] However, none of the analysts Dr. Turki quotes in this section of his report provide any indication that they understood that AdaptHealth's new pro forma organic growth metric included historical revenues from acquired companies as if they had been owned by the Company in the prior year. As the Complaint alleges:

> Defendants' new metric measured "Pro forma net revenue" which measured revenue growth "*as if* acquired companies were owned by the Company" in the prior year. Defendants then labeled this "pro forma" revenue metric as "organic revenue," by claiming that the metric showed, hypothetically, how much the Company's *organic* revenue *would have* grown *if* the Company had owned these newly acquired businesses in the prior year. This hypothetical growth analysis was materially different than the calculation to derive organic revenue growth utilized by the Company historically, as well as the calculation commonly used by other companies in AdaptHealth's industry and throughout the corporate finance world (*i.e.*, *organic* revenue growth excludes revenue growth attributable to recent acquisitions).[71]

---

[69] Turki Report, ¶ 59.
[70] Turki Report, ¶ 58.
[71] Complaint, fn. 13 (emphasis in original).

41.    Dr. Turki

Dr. Turki's opinion that "the 'truth' allegedly revealed by the Jehoshaphat Report was stale information" is thus unsupported by his testimony or by any reliable analysis of the information environment during the Class Period, rendering his opinion flawed.

42.    In summary, both the Turki Report and the Savoldelli Report fail to consider the types of analyses relied upon by academics, experts, and professionals in studying investor reactions to new information, including any analysis of the content of such information disclosed, resulting stock price returns, and option trading. The Savoldelli Report's conclusions are further contradicted by a large spike in short selling volume the day after publication of the Jehoshaphat Report. Ultimately, neither the Turki Report nor the Savoldelli Report provide reliable evidence to support their opinion that AdaptHealth's stock drop following the second Alleged Corrective Disclosure was caused by the mere publication of a short seller report rather than the actual content of the Jehoshaphat Report.

---

72

*iv.    The Markel Report Analysis is Incomplete, Subjective, and Flawed*

43.    Ms. Markel reviewed the Jehoshaphat Report and focused on a subset of sentences and graphics that related to organic growth.[73] For this subset of the report's contents, she grouped each sentence or graphic relating to organic growth into five categories: facts, Organic Growth Calculations, assumptions, opinions, and estimates.[74] For the further subset of the report's contents relating to the Organic Growth Calculations, she opines that she was able to reproduce these calculations based on publicly available information.[75] She also opines that she identified a potential error in **one out of the 138** Organic Growth Calculations.[76]

44.    The Markel Report is incomplete because it ignores all of the Jehoshaphat Report's contents that fall outside Ms. Markel's narrowly-defined scope of the Organic Growth Calculations, including facts, assumptions, opinions, and estimates. ███████████████

████████████████████████████████████

████████████████████████████████

███████████████████████████.[77] For example, the Jehoshaphat Report explains:

> We found that former employees were unimpressed with how things were run at AHCO. Former M&A or Financial Planning & Analysis executives were the most informed, so we present only comments from such individuals here. These quotes are paraphrased closely and we will not disclose additional identifying information in order to protect our sources.
>
> 1. *They weren't doing any calculation of their own organic growth. It was like a barn fire. There were acquisitions happening at the rate of two a month. They didn't have the ability to disaggregate organic from inorganic, trust me. They had no f*****g clue. There was NO concept of what organic growth actually was.*

---

[73] Markel Report, ¶ 16.
[74] *Id.*
[75] Markel Report, ¶ 14.
[76] Markel Report, ¶¶ 15; 16; 17.
[77] *See also*: ████████████████

2. *The entire HME/DME industry CAGR has been 2.9%. How can Adapt's be much different? They're in all the same lines.*

3. *They just wanted to get deals done.*

4. *Luke knew what he was doing. He was going to push this to the limits of the envelope.*

5. [Different source than #4 who said essentially the same thing] *They will run this business into the ground if they have to [in order to lever up and buy things as fast as they can].*

6. *This company is a house of cards.* [Explains in a disjointed way across different comments how this is meant to communicate too much debt, too rapid an acquisition strategy, too much claimed organic growth that isn't justifiable, and a collection of assets put together by an untrustworthy CEO.]

7. *Adapt would tell you they have the scale and infrastructure to drive growth higher than the 3% - but are you gonna get [multiple times] that growth? It's almost mathematically impossible.*

8. *When Adapt saw a target it wanted, the decision was made pretty quickly to buy them. By the time it got to [those of us tasked with underwriting the deal] they had decided they wanted to buy it anyway.*[78]

45.    A second flaw in the Markel Report is the subjectivity with which Ms. Markel interprets differences between her calculations and those of the Jehoshaphat Report. On four separate occasions, Ms. Markel's calculations produce a different number from what is shown in the Jehoshaphat Report and she assumes that the Jehoshaphat Report must have rounded its number "for reasons unknown to [Ms. Markel]."[79] On a fifth occasion, Ms. Markel's calculation differs by about 2%, which she attributes to rounding.[80] On a sixth occasion, Ms. Markel's calculations differ by about 2%, yet she describes this difference as a potential "error" in the Jehoshaphat Report's Organic Growth Calculations.[81] Ms. Markel's opinions are thus subjective because she provides no reliable methodology or basis upon which she assesses any calculation

---

[78] Jehoshaphat Report, at p. 40.
[79] Markel Report, ¶ 16; fn. 8; 36; 40; 43.
[80] Markel Report, ¶ 16; fn. 49: (-14.7% / -15.0%) – 1 = 2% difference.
[81] Markel Report, ¶ 17: ($8.7 million / $450.2 million) = 2% difference.

differences as being caused by rounding, by errors, or by other nonpublic information incorporated into the Jehoshaphat Report.

46.    The Markel Report also implies that the Jehoshaphat Report did not provide investors with new information because the Organic Growth Calculations can be (mostly) reproduced using publicly available information. As explained above, this interpretation would not be warranted by the Markel Report because it fails to consider or evaluate many pieces of information in the Jehoshaphat Report that fall outside the narrowly-defined scope of the Organic Growth Calculations analyzed by Ms. Markel. However, she provides no evidence that prior to publication of the Jehoshaphat Report, analysts or investors in the public domain had concluded that AdaptHealth's organic growth had turned negative, nor that the Company's calculation of organic growth had fundamentally changed, as alleged in the Complaint.[82]

47.    Moreover, as demonstrated by the Turki Report and the Savoldelli Report, analysts initially expressed skepticism about the Organic Growth Calculations immediately following publication of the Jehoshaphat Report (*e.g.*, *Deutsche Bank*: "We simply don't see a rational scenario where AHCO's organic growth rate could crater in the manner alleged in the [Jehoshaphat Report]").[83] The initial analyst reactions documented in the Turki Report and Savoldelli Report suggest that the Organic Growth Calculations revealed in the Jehoshaphat Report represented new and unexpected information for market participants. As Ms. Markel testified, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[84]

---

[82] For purposes of my report and opinions, I assume that Plaintiffs allegations are true.
[83] Turki Report, ¶ 64; Savoldelli Report, ¶¶ 78-80.
[84] ███████████.

23

> v.    *The Opinions in the Lewis Report are Incomplete, Subjective, and Contradicted by Factual Evidence and Dr. Lewis's Own Testimony*

48.    Dr. Lewis provides seven opinions in the Lewis Report: 1) investors do not consider generic, boilerplate, and redundant statements of historical fact to be pertinent to their investment decisions; 2) the Alleged Key Person Misrepresentations are generic, boilerplate, and/or redundant statements of historical fact, and therefore do not contain information that would be pertinent to investors; 3) the first Alleged Corrective Disclosure is not connected to the Alleged Key Person Misrepresentations; 4) The Alleged Legal Proceeding Misrepresentations are generic or redundant statements of historical fact, and therefore do not contain information that would be pertinent to investors; 5) the first Alleged Corrective Disclosure is not connected to the Alleged Legal Proceeding Misrepresentations; 6) the Alleged Business Performance and Strategy Misrepresentations are generic or redundant statements of historical fact, and therefore do not contain information that would be pertinent to investors; and 7) the first Alleged Corrective Disclosure is not connected to the Alleged Business Performance and Strategy Misrepresentations.[85]

49.    As a preliminary matter, Dr. Lewis provides opinions on whether the Alleged Misrepresentations would be important to investors, which is the type of analysis experts conduct when addressing questions of loss causation that I understand may take place at a later phase of the litigation.[86] He also provides opinions on the connection between the Alleged Misrepresentations and the first Alleged Corrective Disclosure. As I explained in my testimony,

---

[85] Lewis Report, ¶ 17.

[86] *See also*: MTD Order, at p. 17: "This court cannot say as a matter of law that McGee's alleged criminal and civil involvement in tax fraud would be obviously unimportant to a reasonable investor. While the court acknowledges that the investigation involved McGee personally and entities which he controlled rather than AdaptHealth itself, it did involve a key officer of AdaptHealth and allegedly fraudulent conduct. The investigation and litigation are closely enough related to AdaptHealth that a jury could reasonably determine that a reasonable investor would want to know this information. The question of materiality must therefore be left to the jury as the trier of fact."

damages in this matter are able to be calculated on a class-wide basis in a manner consistent with Plaintiffs' theory of liability because of the "economic coherence" of the Alleged Misstatements as they tie to the Alleged Corrective Disclosures.[87]

50.    The first flaw in the Lewis Report is that it ignores the price maintenance theory of artificial inflation. Dr. Lewis dismisses the value-relevance of the Alleged Misrepresentations for being "redundant," ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████[88] Under the price maintenance theory of artificial inflation, any prior misstatements or omissions can maintain artificial inflation in the stock price, including misstatements that are repeated in the future, until corrective information dissipates the inflation. The fact that Dr. Lewis dismisses repeated or "redundant" misstatements renders his opinions flawed, as does his failure to consider the alleged omissions.

51.    The second flaw in Dr. Lewis's opinions is that they are incomplete because he did not consider all of Plaintiff's allegations. In his report, he explains that he only considered alleged misstatements related to the McGee Tax Issue.[89] Moreover, in defining the subset of Plaintiffs' allegations relating to this issue, Dr. Lewis defines those allegations as the ones contained in the Complaint at paragraphs 76, 77, 78, 80, 81, 82, 86, 88, 89, 90, 93, 94, 95, 96, 99,

---

[87] Cain Tr., 41:4-42:1 ("Q. You didn't analyze whether either of the alleged corrective disclosures can be connected to the alleged misstatements, correct? MR. LAVELLE: Object to form. A. Well, I think if we were to turn to the section of my report in which I ask whether damages can be calculated on a class-wide basis in a way that's consistent with plaintiffs' theory of liability, I do ask at a very high level, after reviewing the complaint, is there an economic coherence to the narrative of the story such that there are alleged misstatements or omissions at the beginning of the class period or throughout the class period and then alleged corrective disclosures that at least plaintiffs are alleging are connected to those things. And so by just considering the allegations within the complaint, that allows me to opine on whether damages can be calculated on a class-wide basis. But beyond that, I do not, at this stage of a case, conduct any sort of analysis to assess the causal connection of those things beyond what I've just described.)

[88] Lewis Report, ¶ 17; ████████████████

[89] Lewis Report, fn. 10.

100, 101, 102, 105, 106, 108, 109, 110, and 112.[90] The Lewis report provides no discussion or consideration of the other allegations discussed in the Complaint, for example paragraphs 79, 84, 85, 87, 91, 92, 97, 98, 103, 104, 107, 113, 114, and all of the allegations involving organic growth at paragraphs 115-127. ███████████████████████████████████████

███████████████████████████████████████.[91] For these reasons, his opinions regarding the importance of the Alleged Misrepresentations to investors and their connection to the Alleged Corrective Disclosures are flawed and incomplete, rendering them irrelevant.

52.    For example, the allegations in the Complaint discuss AdaptHealth's 2019 Form 10-K, Q1 2020 Form 10-Q, Q2 2020 Form 10-Q, Q3 2020 Form 10-Q, and 2020 Form 10-K certifications signed by Defendant McGee pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), attesting that each report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."[92] The Lewis Report does not cite to or discuss any of these allegations in the Complaint, undermining the conclusions reached in the Lewis Report. ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████[93] Applying Dr. Lewis's logic ████████████████, a corrective disclosure on prior repeated or "redundant" misstatements would also be important to investors.

---

[90] Lewis Report, fn. 11; 12; 13.
[91] ████████████████████████████████████████████████
████████████████████
[92] Complaint, ¶¶ 84-85; 91-92; 97-98; 103-104; 113-114.
[93] ████████████████████

53.     The third flaw in Dr. Lewis's opinions relates to his subjective opinion that the Alleged Misrepresentations are generic or boilerplate in nature. He claims they are generic or boilerplate because they follow a format that is similar to that of other company filings in presenting information. For example, Dr. Lewis documents that in a sample of 13 comparable companies, "the general structure of the statements is similar…"[94] His opinions are subjective and are not based on any methodology that is capable of objectively differentiating between similar versus dissimilar disclosures across companies. For example, company-reported income statements and balance sheets follow nearly identical structures for reporting purposes, but differ in the actual numbers reported each quarter. Dr. Lewis's purported methodology would imply that financial statements are "generic" and "boilerplate" because they follow a similar reporting structure across companies.

54.     ███████████████████████████████████████████
████████████████████████████████[95] ██████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████[97] Dr. Lewis's opinions are inconsistent and contradictory, they lack a reliable methodology, and ultimately they imply that he views some of the Alleged Misrepresentations relating to AdaptHealth's SOX certifications as being important to investors despite their nonspecific language.

---

[94] Lewis Report, ¶¶ 45-52.
[95] ████████████████████
[96] ████████████████████
[97] ███

55.    Dr. Lewis also opines that several of the Alleged Misrepresentations are contained within the Risk Factors section of AdaptHealth's Form 10-K, and that in general, company Risk Factor disclosures "are notoriously boilerplate and generic."[98] He claims that academic research establishes that "Risk Factor disclosures only impact investors' valuation of a firm when they have 'specificity'" and that the Alleged Misrepresentations contained within AdaptHealth's Risk Factor disclosures "do not contain information or the specificity characteristics necessary to make them pertinent to investors making equity investment decisions."[99] However, Dr. Lewis ignores academic evidence which establishes that even in the absence of the type of specificity considered by Dr. Lewis, firm Risk Factor disclosures are not "notoriously boilerplate" as claimed by Dr. Lewis, but rather are informative to investors. For example:

> This suggests that—contrary to critics' assertions—risk factor disclosures are *not* boilerplate. Instead, managers appear to provide informative disclosures. Second, we find that risk factor disclosures are positively associated with *post-disclosure* market-based measures of firm risk. This suggests that market participants incorporate the information conveyed by risk factor disclosures into their assessments of firm risk.[100]

56.    Finally, the fourth flaw in the Lewis Report is that Dr. Lewis claims that information was unimportant to investors because analysts failed to discuss the Alleged Misrepresentations. However, Dr. Lewis's review of analyst reports failed to identify multiple instances of analysts discussing these issues. A few examples of the analyst discussions, which Dr. Lewis failed to identify, include:

> Deutsche Bank: "M&A Contribution: Adapt aims to add at least $100m in acquired revenue per year over the next few years at a cost of $60m per year (typically). The fragmentation of the DME industry and management's experience give us confidence in the company's ability to continue successfully integrating

---

[98] Lewis Report, ¶ 41.
[99] Lewis Report, ¶¶ 41-43.
[100] John L. Campbell, Hsinchun Chen, Dan S. Dhaliwal, Hsin-min Lu, and Logan B. Steele, 2014, The Information Content of Mandatory Risk Factor Disclosures in Corporate Filings, *Review of Accounting Studies* 19, At p. 438.

acquisitions."[101]… "Adapt's M&A integration capability is a core part of the investment proposition and will be [among] the top areas of focus for management. After a deal is completed, Adapt immediately begins the integration process and looks to drive cost synergies."[102]
…

RBC Capital Markets: "Company management brings extensive leadership experience, particularly in healthcare. Luke McGee, CEO and Director: Has served as CEO since 2012 and also serves as a Director; Joined Quadrant Management, Inc. in 2010; Prior to joining Quadrant, served in investment banking at Deutsche Bank and Merrill Lynch; Bachelor's degree in Economics from Duke University."[103]… "Management's stated target is to add ~$100MM in revenue each year through acquisitions."[104] … "Scalable platform; Able to support future organic growth; Also enables improved margin performance from acquired operations."[105]
…

Jefferies: "One of the key drivers of AHCO's investment story is mgmt's acquisition track record (80+ deals completed since 2012) and their ability to boost already-robust organic EBITDA growth through deals."[106]
…

SVB Leerink: "Success is highly dependent on management, especially if/as AHCO looks to become a more valued partner in the context of value-based care arrangements. Regardless, management's ability to foster strong partnerships with referral sources and payors will be crucial to success over the long-term."[107]
…

BofA Securities: "Yesterday, AHCO's stock traded off 20% on news that Luke McGee, the company's co-CEO, was being placed on leave after being indicted for personal tax fraud by the Danish government related to stock trades in the 2014/15 time period. We view McGee as a driving force behind the company's growth and the potential that this temporary leave becomes permanent is a clear negative for the company, in our view."[108]

---

[101] "Technology disruption is shaking up DMEs, yielding an innovative model," Dec. 9, 2019, Deutsche Bank, at p. 7.

[102] *Id.*, at p. 35.

[103] "Delivering impressive growth to your door; Initiating at Outperform," Jun. 9, 2020, RBC Capital Markets, at p. 42.

[104] *Id.*, at p. 31.

[105] *Id.*, at p. 18.

[106] "Underfollowed ($3B Cap) Stock Growing '21 EBITDA >40% With Compelling Valuation," Nov. 11, 2020, Jefferies, at p. 1.

[107] "AdaptHealth Corp. takeaways from conversations with management," Nov. 17, 2020, SVB Leerink, at p. 4.

[108] "Co-CEO removal doesn't create leadership void," Apr. 14, 2021, BofA Securities, at p. 1.

57.

58.    I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 22, 2023

Matthew D. Cain



**Appendix A**

# Matthew D. Cain, Ph.D.                                              May 2023

E-mail: mdcain@outlook.com                                          Homepage
Mobile: 574-485-8065                                                    SSRN

## Education

Ph.D., Finance, August 2007                    Purdue University, West Lafayette, IN
B.S., Finance, May 2001                        Grove City College, Grove City, PA

## Professional and Academic Experience

*Senior Fellow*, Berkeley Center for Law and Business, 2019-Present

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

## Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics*, forthcoming.

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

**Presentations**

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group

- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**: *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management*, *Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law
    LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2023
    LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2022

University of Notre Dame, Mendoza College of Business
    FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

33

FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management
   MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008
   MGMT 610: Financial Management I (MBA Core), Fall: 2007


**Expert Witness Experience**

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. Ny.). Rebuttal Report April 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. Ny.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. Ny.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

34

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. Ny). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. Ny). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. Ny). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

35

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

## Appendix B

### Documents Considered

**Court Documents:**

- Consolidated Complaint for Violations of the Federal Securities Laws, *DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM, et al. v. ADAPTHEALTH CORP. f/k/a DFB HEALTHCARE ACQUISITIONS CORP., et al.*, No. 2:21-cv-03382-HB.

- Deposition of Craig Lewis, Ph.D., dated May 10, 2023, *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB.

- Deposition of Fabio Savoldelli, dated May 12, 2023, *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB.

- Deposition of L. Adel Turki, Ph.D., dated May 2, 2023, *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB.

- Deposition of Matthew D. Cain, Ph.D., dated February 28, 2023, *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB.

- Deposition of Susan G. Markel, dated May 4, 2023, *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB.

- Expert Report of Craig Lewis, Ph.D, dated March 29, 2023, *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB, and related exhibits and backup materials.

- Expert Report of Fabio Savoldelli, dated March 29, 2023, *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB, and related exhibits and backup materials.

- Expert Report of L. Adel Turki, Ph.D, dated March 29, 2023, *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB, and related exhibits and backup materials.

- Expert Report of Matthew D. Cain, Ph.D, dated July 26, 2022, *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB, and related exhibits and backup materials.

- Expert Report of Susan G. Markel, dated March 29, 2023, *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB, and related exhibits and backup materials.

- Motion to Dismiss Order, dated June 9, 2022, *DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM, et al. v. ADAPTHEALTH CORP. f/k/a DFB HEALTHCARE ACQUISITIONS CORP., et al.*, No. 2:21-cv-03382-HB.

**Academic Literature:**

- Christopher B. Barry and L. Adel Turki, Initial Public Offerings by Development Stage Companies, 1998, *Journal of Small & Emerging Business Law* 2.

- Alon Brav and J.B. Heaton, 2015, Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias, *Washington University Law Review* 93.

- John L. Campbell, Hsinchun Chen, Dan S. Dhaliwal, Hsin-min Lu, and Logan B. Steele, 2014, The Information Content of Mandatory Risk Factor Disclosures in Corporate Filings, *Review of Accounting Studies* 19.

- A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35.

- Joshua Mitts, 2020, "Short and Distort," *Journal of Legal Studies*, Vol. 49.

- U. Rodrigues & M. Stegemoller, 2021, "Redeeming SPACs," Working Paper.

- A.M. Rose, 2021, "SPAC Mergers, IPOs, and the PSLRA's Safe Harbor: Unpacking Claims of Regulatory Arbitrage," Working Paper.

**Analyst Reports:**

- "A new top growth player emerges from ashes of the DME industry; initiate at buy," Jan. 7, 2020, Jefferies.

- "AdaptHealth Corp. takeaways from conversations with management," Nov. 17, 2020, SVB Leerink.

- "Built to win: A unique asset benefiting from secular shift to home health care; initiating coverage with a buy rating and $17 target price," Jan. 30, 2020, Stifel.

- "Co-CEO removal doesn't create leadership void," Apr. 14, 2021, BofA Securities.

- "Delivering impressive growth to your door; Initiating at Outperform," Jun. 9, 2020, RBC Capital Markets.

- "Home is where the health is: A compelling roll up opp. in an attractive market," Dec. 11, 2019, SVB Leerink.

- "Technology disruption is shaking up DMEs, yielding an innovative model," Dec. 9, 2019, Deutsche Bank.

- "Underfollowed ($3B Cap) Stock Growing '21 EBITDA >40% With Compelling Valuation," Nov. 11, 2020, Jefferies.

**Data:**

- Bloomberg.

**Other:**

- AdaptHealth SEC Filings

- Short Report on AdaptHealth (AHCO): Not Just a Roll-Up, But a Coverup: Is AHCO the Next MDCA?, Jul. 19, 2021, Jehoshaphat Research.

- "Press Release: AdaptHealth to Become a Public Company via Business Combination With DFB Healthcare," Jul. 8, 2019, *Dow Jones*.

- All other documents cited or referred to within this report.

**Exhibit 1**



Source: Savoldelli Report, backup materials.