# EXHIBIT G

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

- - - - -

| Delaware County Employees' | ) Judge Harvey |
| Retirement System and Bucks | ) Bartle III |
| County Employees' Retirement | ) |
| System, Individually and on | ) |
| Behalf of All Others | ) |
| Similarly Situated, | ) Case No. |
|         Plaintiffs, | ) 2:21-cv-03382- |
| | ) HB |
|  vs. | ) |
| | ) |
| AdaptHealth Corp. fka DFB | ) |
| Healthcare Acquisitions | ) |
| Corp., Luke McGee, | ) |
| Stephen P. Griggs, Jason | ) |
| Clemens, Frank J. Mullen, | ) |
| Richard Barasch, Joshua | ) |
| Parnes, Alan Quasha, Terence | ) |
| Connors, Dr. Susan Weaver, | ) |
| Dale Wolf, Bradley Coppens, | ) |
| and David S. Williams III, | ) |
|         Defendants. | ) |

- - - - -

Videotaped Deposition of:
MATTHEW D. CAIN, Ph.D.
Appearing Remotely from
Cuyahoga County, Ohio

February 28, 2023
10:15 a.m.

Reporter:  Kristin Wegryn, RMR, CRR
Appearing Remotely from
Lorain County, Ohio

Page 2

REMOTE APPEARANCES:

On behalf of Lead Plaintiffs:
KEVIN A. LAVELLE, ESQ.
DOUGLAS R. BRITTON, ESQ.
JOSEPH TULL, ESQ.
Robbins Geller Rudman & Dowd LLP
655 West Broadway
Suite 1900
San Diego, California 92101
619.231.1058
klavelle@rgrdlaw.com
dougb@rgrdlaw.com
jtull@rgrdlaw.com

On behalf of Defendants AdaptHealth Corp.,
Stephen P. Griggs, Jason Clemens, Frank J.
Mullen, Richard Barasch, Joshua Parnes, Alan
Quasha, Terence Connors, Dr. Susan Weaver,
Dale Wolf, Bradley Coppens, and
David S. Williams III:
VINCENT P. IANNECE, ESQ.
ZEH S. EKONO, ESQ.
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
212.728.8000
viannece@willkie.com
zekono@willkie.com

On behalf of Defendant Luke McGee:
MARJORIE SHELDON, ESQ.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
Suite 1800
New York, New York 10036
212.715.9100
msheldon@kramerlevin.com

- - - - -

ALSO PRESENT:
Madeleine Tayer
Adel Turki
George Libbares, Concierge
Joe Vandetta, Videographer

Page 3

**I N D E X**

**EXAMINATION OF MATTHEW D. CAIN, Ph.D.**

                                    Page    Line
BY MR. IANNECE...................9      7


                AFTERNOON PROCEEDINGS
AFTERNOON SESSION................142     20


                EXHIBITS MARKED
Deposition Exhibit 1, Market .....13     25
Efficiency Report by Dr. Cain


                OBJECTIONS
MR. LAVELLE......................23     12
MR. LAVELLE......................23     20
MR. LAVELLE......................25      1
MR. LAVELLE......................32      6
MR. LAVELLE......................34     20
MR. LAVELLE......................35     21
MR. LAVELLE......................36     20
MR. LAVELLE......................38      3
MR. LAVELLE......................39     18
MR. LAVELLE......................40     10
MR. LAVELLE......................41      7
MR. LAVELLE......................42      4
MR. LAVELLE......................46      4
MR. LAVELLE......................46     19
MR. LAVELLE......................48      1
MR. LAVELLE......................49     22
MR. LAVELLE......................50     13
MR. LAVELLE......................52     20
MR. LAVELLE......................53      3
MR. LAVELLE......................53     17
MR. LAVELLE......................58     11
MR. LAVELLE......................62      2
MR. LAVELLE......................64     23

MR. LAVELLE.........................66    17
MR. LAVELLE.........................67    9
MR. LAVELLE.........................67    19
MR. LAVELLE.........................69    13
MR. LAVELLE.........................70    5
MR. LAVELLE.........................70    12
MR. LAVELLE.........................70    23
MR. LAVELLE.........................72    16
MR. LAVELLE.........................75    6
MR. LAVELLE.........................77    3
MR. LAVELLE.........................86    2
MR. LAVELLE.........................87    6
MR. LAVELLE.........................89    8
MR. LAVELLE.........................89    17
MR. LAVELLE.........................90    11
MR. LAVELLE.........................91    9
MR. LAVELLE.........................91    20
MR. LAVELLE.........................92    17
MR. LAVELLE.........................93    6
MR. LAVELLE.........................94    17
MR. LAVELLE.........................94    24
MR. LAVELLE.........................98    18
MR. LAVELLE........................102    10
MR. LAVELLE........................103    2
MR. LAVELLE........................103    12
MR. LAVELLE........................104    17
MR. LAVELLE........................106    5
MR. LAVELLE........................106    15
MR. LAVELLE........................107    13
MR. LAVELLE........................109    11
MR. LAVELLE........................110    6
MR. LAVELLE........................110    14
MR. LAVELLE........................110    20
MR. LAVELLE........................111    2
MR. LAVELLE........................111    10
MR. LAVELLE........................113    17
MR. LAVELLE........................114    7
MR. LAVELLE........................115    6
MR. LAVELLE........................117    21
MR. LAVELLE........................118    6
MR. LAVELLE........................119    11
MR. LAVELLE........................119    17
MR. LAVELLE........................121    5
MR. LAVELLE........................121    8
MR. LAVELLE........................121    21
MR. LAVELLE........................122    12
MR. LAVELLE........................124    17
MR. LAVELLE........................126    16
MR. LAVELLE........................128    4

Page 5

```
MR. LAVELLE........................128   15
MR. LAVELLE........................128   25
MR. LAVELLE........................130   3
MR. LAVELLE........................130   13
MR. LAVELLE........................135   4
MR. LAVELLE........................135   16
MR. LAVELLE........................137   3
MR. LAVELLE........................139   13
MR. LAVELLE........................140   23
MR. LAVELLE........................141   6
MR. LAVELLE........................141   21
MR. LAVELLE........................147   5
MR. LAVELLE........................148   15
MR. LAVELLE........................150   5
MR. LAVELLE........................150   19
MR. LAVELLE........................151   7
MR. LAVELLE........................152   20
MR. LAVELLE........................154   23
MR. LAVELLE........................155   8
MR. LAVELLE........................156   11
MR. LAVELLE........................157   17
MR. LAVELLE........................158   8
MR. LAVELLE........................160   4
MR. LAVELLE........................162   9
MR. LAVELLE........................163   14
MR. LAVELLE........................164   4
MR. LAVELLE........................165   3
MR. LAVELLE........................165   15
MR. LAVELLE........................165   22
MR. LAVELLE........................166   21
MR. LAVELLE........................167   25
MR. LAVELLE........................168   7
MR. LAVELLE........................168   18
MR. LAVELLE........................171   10
MR. LAVELLE........................172   13
MR. LAVELLE........................176   5
MR. LAVELLE........................178   9
MR. LAVELLE........................179   19
MR. LAVELLE........................180   17
MR. LAVELLE........................180   23
MR. LAVELLE........................181   6
MR. LAVELLE........................183   10
MR. LAVELLE........................187   21
MR. LAVELLE........................189   20
MR. LAVELLE........................195   7
MR. LAVELLE........................197   20
MR. LAVELLE........................200   20
MR. LAVELLE........................201   5
MR. LAVELLE........................202   13
```

Page 6

MR. LAVELLE........................203    12
MR. LAVELLE........................206    21
MR. LAVELLE........................209    4
MR. LAVELLE........................215    25
MR. LAVELLE........................217    5
MR. LAVELLE........................222    15
MR. LAVELLE........................223    14
MR. LAVELLE........................224    13
MR. LAVELLE........................225    3
MR. LAVELLE........................226    1
MR. LAVELLE........................229    5
MR. LAVELLE........................230    14
MR. LAVELLE........................230    23
MR. LAVELLE........................231    11
MR. LAVELLE........................235    2
MR. LAVELLE........................237    8
MR. LAVELLE........................239    9
MR. LAVELLE........................239    23
MR. LAVELLE........................241    9
MR. LAVELLE........................242    21
MR. LAVELLE........................244    11
MR. LAVELLE........................245    15
MR. LAVELLE........................247    13
MR. LAVELLE........................252    5
MR. LAVELLE........................254    5
MR. LAVELLE........................255    11
MR. LAVELLE........................258    6
MR. LAVELLE........................259    4
MR. LAVELLE........................259    19
MR. LAVELLE........................260    17
MR. LAVELLE........................261    7
MR. LAVELLE........................262    2
MR. LAVELLE........................262    18
MR. LAVELLE........................263    12
MR. LAVELLE........................264    11
MR. LAVELLE........................266    21
MR. LAVELLE........................267    3
MR. LAVELLE........................267    9
MR. LAVELLE........................267    25
MR. LAVELLE........................268    11
MR. LAVELLE........................268    22
MR. LAVELLE........................269    19
MR. LAVELLE........................270    18
MR. LAVELLE........................271    13
MR. LAVELLE........................272    20
MR. LAVELLE........................273    9
MR. LAVELLE........................275    10
MR. LAVELLE........................276    13
MR. LAVELLE........................277    20

Page 7

MR. LAVELLE.........................279    25
MR. LAVELLE.........................280    8
MR. LAVELLE.........................281    18
MR. LAVELLE.........................283    7
MR. LAVELLE.........................283    21
MR. LAVELLE.........................285    22
MR. LAVELLE.........................286    3
MR. LAVELLE.........................287    1
MR. LAVELLE.........................288    16
MR. LAVELLE.........................289    6
MR. LAVELLE.........................289    23
MR. LAVELLE.........................292    19
MR. LAVELLE.........................295    10
MR. LAVELLE.........................296    2
MR. LAVELLE.........................297    14
MR. LAVELLE.........................302    18
MR. LAVELLE.........................304    9
MR. LAVELLE.........................304    23
MR. LAVELLE.........................306    9
MR. LAVELLE.........................307    7
MR. LAVELLE.........................307    19
MR. LAVELLE.........................308    16
MR. LAVELLE.........................309    16
MR. LAVELLE.........................310    23
MR. LAVELLE.........................311    9
MR. LAVELLE.........................314    19
MR. LAVELLE.........................315    16

- - - - -

Page 8

REPORTING REMOTELY FROM LORAIN COUNTY, OHIO

Tuesday, February 28, 2023, 10:15 a.m.

- - - - -

VIDEOGRAPHER:  We are now on the record. The date is February 28th, 2023.  The time is 10:15 a.m.

The caption of this case is Delaware County Employees' Retirement System, et al., versus AdaptHealth Corporation, formerly known as DFB Healthcare Acquisitions Corporation, et al. The name of the witness is Dr. Matthew Cain.

At this time, the attorneys present will identify themselves for the record.

MR. IANNECE:  Hi.  This is Vincent Iannece with Willkie Farr & Gallagher on behalf of the AdaptHealth defendants.  I'm joined by my colleagues, Zeh Ekono, Madeleine Tayer, and Claire Brunner.

MS. SHELDON:  This is Marjorie Sheldon from Kramer Levin representing defendant Luke McGee.

MR. LAVELLE:  Good morning.  This is Kevin Lavelle from Robbins Geller representing the lead plaintiffs in the period of class.  With me are my colleagues, Doug Britton and Joseph

Page 9

Tull.

MATTHEW D. CAIN, Ph.D., of lawful age, called for examination, being by me first duly sworn, as hereinafter certified, deposed and said as follows:

EXAMINATION OF MATTHEW D. CAIN, Ph.D.

BY MR. IANNECE:

Q.    Good morning, Dr. Cain.

A.    Good morning.

Q.    My name is Vincent Iannece and I am with the law firm Willkie Farr & Gallagher and we represent the AdaptHealth defendants in this matter.

Can you please state your full name and address for the record.

A.    Matthew Douglas Cain, residing at 495 North Main Street, Chagrin Falls, Ohio 44022.

Q.    And are you serving as an expert in this case for lead plaintiffs?

A.    Yes.

Q.    Are you being represented by counsel today?

A.    Counsel is present.  He's representing lead plaintiffs, yes.

Q.    Based on your CV, you've been deposed

Page 10

before; is that correct?

A.    Yes.

Q.    How many times, approximately?

A.    Probably between ten and twenty times.

Q.    Of those times, were any of the depositions in securities actions?

A.    Yes.

Q.    How many of those?

A.    I would say probably all of those.

Q.    And in each of those you served as an expert, correct?

A.    Yes.

Q.    Do you recall what the subject matter of your testimony was?

A.    I've testified on market efficiency, loss causation, merits and damages issues.  I've also testified in securities cases involving allegations of insider trading, as well as I think a Delaware chancery case involving a merger or acquisition and just general issues of corporate disclosures.  I've done studies on other topics relating to finance.

Q.    Given your experience, I'm sure that you're very familiar with the ground rules of a deposition, but I will just run through some of

them quickly now so that they're fresh in your mind.

Is that okay?

A.    Yes.

Q.    You understand that you are under oath today?

A.    Yes.

Q.    As you know, it's important that there be a clear record of today's deposition.  I'm going to be asking you a series of questions, and to ensure that there is a clear transcript of your answers, please respond verbally to all of my questions.  So no head nods or headshakes.

Do you understand that?

A.    Yes.

Q.    So that the court reporter can accurately transcribe the deposition, let's try not to talk at the same time.  So please let me finish my question before you answer and I'll let you finish your answer before I ask my next question.

Do you understand that?

A.    Yes.

Q.    If you don't understand a question, just let me know and I will do my best to rephrase it.

If you don't say anything, I am going to assume that you understand the question.

Do you understand that?

A.    Yes.

Q.    At times, your counsel may object to some of my questions, but unless he instructs you not to answer, you can answer the question once he is finished stating his objection.

Do you understand that?

A.    Yes.

Q.    Finally, if at any point you'd like to take a break, just let your counsel or me know and we will accommodate you.  The only exception to that is if there is a question pending.  In that instance, I'll ask you to please answer the question before we take that break.

Do you understand that?

A.    Yes.

Q.    Do you have any questions about the procedures we will follow today?

A.    No.

Q.    Is there any reason that you cannot testify truthfully or accurately today?

A.    No.

Q.    Now, before we begin, I need to ask a

Page 13

few questions about your environment because we're doing this deposition from remote locations and by video.

Is there anybody else in the room with you?

A.   No.

Q.   Do you understand that when we're on the record, you're not allowed to communicate with anyone during the deposition?

A.   Yes.

Q.   So that means no messaging, texting, email or chatting in the Zoom function, right?

A.   Correct.

Q.   Finally, do you have any written, printed or electronic information with you in the deposition right now?

A.   I do have a clean unmarked copy of my expert report, my Market Efficiency Report on AdaptHealth.

Q.   Okay.  We're actually going to turn to that report.

MR. IANNECE:  Madeleine, can you please mark tab 1 as Cain 1.

MS. TAYER:  Yes.

(Deposition Exhibit 1, Market Efficiency

Report by Dr. Cain, was marked for purposes of identification.)

CONCIERGE:  Just to note, to view the exhibit, you will need to either click on the "marked exhibit" folder or refresh your browser. Also, larger files take longer to load.

MS. TAYER:  The exhibit has been introduced.

CONCIERGE:  Does everybody see the exhibit there?

MR. IANNECE:  Yes.

CONCIERGE:  Would you like it on screen, Counsel?

MR. IANNECE:  Yes, please.

CONCIERGE:  Stand by.

BY MR. IANNECE:

    Q.    Go to the next page.  Do you recognize this document, Dr. Cain?

    A.    Yes.

    Q.    Is this the report you submitted in this case on July 26th, 2022?

    A.    Yes, it is.

    Q.    So I want to turn to Appendix A, which is on page 42 of the document.  In the PDF, that's page 44.

A.    Okay.

Q.    Is this a true and correct copy of your CV?

A.    As of July 26th, 2022, yes.

Q.    Has anything occurred in the interim that's missing from this CV?

A.    There's been a few things that I've added to the CV since July 26th, 2022, yes.

Q.    And what -- do you recall what those are as you sit here today?

A.    Let me just scroll through here.  I think on, on page 42, under Publications, I've got one new publication for an academic study on fairness opinions that is forthcoming in the Journal of Law and Economics, I believe.

Under Teaching Experience, on page 44, I've taught additional courses for both of the two classes listed under UC Berkeley School of Law.  So I taught an additional section of law. 246.31 in the spring of 2023, that was about a month ago.  I also taught an additional section of law, 251.52.  That was in the fall of 2022.

And then at the -- towards the top of page 45, I've got a few additional expert reports or declarations for a few additional cases.  I'll

Page 16

do my best to remember those, but I, I don't have a current copy of my CV in front of me.  But just looking at this -- actually, and maybe a couple of updates, also.

So one of the bullet points about halfway down that page for In Re:  Oracle Corporation Derivative Litigation, I provided trial testimony in late July, early August 2022.

I believe that in a couple bullet points above, Bar Mandalevy -- or actually, sorry. Strike that.

Let me look up towards the top bullet point listed for Clover Health, I believe I had a deposition sometime after July 2022.  And I've got a few additional expert reports.

I've got a market efficiency expert report and a deposition and reply report on a case involving QuantumScape.

I've got a market efficiency report and a deposition on a case involving CBL.

I've got an expert report in a case involving Lyft.

I've got an expert report on market efficiency in a case involving Berry Corporation. B-E-R-R-Y.

Page 17

I'm trying to think.  It's possible that there may be one or two more, but that's all that I can recollect off the top of my head.

Q.    You seem to be keeping yourself very busy over the last several months, Dr. Cain.

A.    Continuing to do work, yes.

Q.    And, as you've testified earlier, all of these involve securities actions, right?

A.    They involve, involve securities.  Some of those are, you know, X(B) or Section XI claims.  Some of these cases involve, you know, the SEC or just other individual parties.  But I think that, broadly speaking, almost everything I work on involves securities in some aspect.

Q.    I want to focus on actions where there are securities class actions in which you have been retained as an expert.

In what proportion of those cases were you putting in an expert opinion on behalf of the plaintiff?

A.    I think, in terms of those cases that are class action -- securities class action cases, I think the vast majority of those cases in which my work has proceeded to the point of executing an expert report that goes into the

Page 18

record, the majority of those have been on the plaintiff side.

Q.    Have you -- have there been any instances where you served as an expert of the defendant in a securities class action?

A.    I have worked for defendants in securities class actions.  I think, in terms of those cases, the only one that's proceeded to the point of issuing and executing a report that's in the public record would be the Banc of California case, which is on the -- page 46, the last page of my CV.

Q.    Can you briefly describe that case.

A.    I believe that was a case involving allegations, I think, relating to some of the connections or relationships that people or executives at the Banc of California had with other individuals who were either alleged or known criminals.  And I believe that I provided a rebuttal report for defendants in rebuttal to an expert put forward by the plaintiffs.

I believe the expert may have been former SEC Chairman Harvey Pitt, but I'd have to go back and review my files to refresh my recollection on that.

Q.   Do you recall what opinion you were asked or what opinion you provided in that rebuttal?

A.   My recollection is that -- my opinion was that there are a variety of tools and techniques that a financial economist can employ to evaluate the importance of information to investors such as event studies, valuation analysis, academic literature, these types of tools and techniques that one can employ and that plaintiffs' expert had reached his opinions without employing those tools.

Q.   And what kinds of tools did you describe?

A.   I believe I described event studies, valuation analysis, analyst reports, and academic research or academic literature that can be used as some of the examples of tools.

Q.   Do you know what the outcome of that case was on class certification?

A.   I would assume that the case had already been certified by the time that I provided my report, and then I believe that after providing my report the case settled.

Q.   Other than in this present case, have

Page 20

you ever been asked as an expert to opine on whether the market was efficient for an issuer's public stock in a securities class action?

A.    Yes.  I've provided market efficiency analyses a number of times.

Q.    Looking at your list of expert witness experience, which cases -- in which of those cases were you asked to provide or opine on that question?

A.    I believe at the -- starting from the page 46 at the top, that would include the top bullet point on Toshiba, and then going and scrolling up to page 45, a case involving I believe -- I believe the case involving Deloitte & Touche; I believe a case involving Recro Pharma; a case involving BofI Holding; a case involving Under Armour; a case involving 2U; a case involving Clover Health and some additional cases that I mentioned earlier since July 26th, which would include CBL, QuantumScape, Berry Corporation.  Also, I think I forgot to mention earlier Interface.

So those, those are the ones that come to mind right now.

Q.    And in each of those, you were an expert

Page 21

on behalf of the plaintiff?

A.   Yes.

Q.   Other than in this case, have you been asked as an expert to opine on whether the value impact of any alleged misstatements or omissions would be reflected in an issuer's option prices?

A.   Yes.

Q.   How many times have you been asked to do that?

A.   I think a few times.  So I know that I gave that opinion or I made that assessment in QuantumScape.  I'd have to look.  It's possible that I made that assessment in the case involving Clover Health.

I've got another report that I'll be executing later this week in which I'm providing that assessment, as well.

Q.   And for these on behalf of the plaintiff, as well?

A.   Yes.

Q.   Other than in this case, have you been asked as an expert to opine on whether the calculation of damages on a class-wide basis for purchasers or acquirers of an issuer of stock for options is subject to a common methodology?

Page 22

A.    Yes.  I think that would be a question that I opined on, on each of the other market efficiency reports that I mentioned earlier.

Q.    In any of those cases, did you actually calculate class-wide damages?

A.    Well, when I, when I provide a merits report at the loss causation phase, I will provide an artificial inflation ribbon that can be used in the calculation of class-wide damages. But I -- in those reports, I typically do not actually provide a direct calculation of the class-wide damages because, as I understand it, that is a calculation that takes place at a later point in time through the claims administration process.

Q.    Even in reports at the merit stage, you haven't actually calculated the class-wide damages, correct?

THE REPORTER:  I'm sorry.  Could you repeat that.

MR. IANNECE:  Sure.

Q.    So even in reports at the merit stage, you've never actually calculated the class-wide damages, correct?

A.    Well, I've done some merits reports that

are for opt-out cases in which I will take the trading records of the plaintiff and calculate damages based off of the plaintiff's trading records for an opt-out case.

But for class, class action cases, I provide the inputs to that calculation at my -- within my loss causation report.

Q.    In calculating damages in a securities case, is it fair to say that there are different ways of doing it that can be biased towards either the plaintiff or the defendant?

MR. LAVELLE:  Object to form.

A.    I don't, I don't think that it would be accurate to say that one single approach is universally biased in a certain type of client's favor.

Q.    Are there calculations that yields more beneficial results for one party or the other, based on how it's calculated?

MR. LAVELLE:  Object to form.

A.    I do think there are different ways of conducting the calculations, and if you do a calculation differently, it will result in a different number.  So I would agree to that, I think.

Q.    Of the securities class actions in which you have been retained as an expert, did any involve a de-SPAC transaction?

A.    Yes.

Q.    Which ones?

A.    I believe that QuantumScape was a de-SPAC.  I believe the -- I'd have to go back and look, but I think that Clover Health at the top, the first bullet point on page 45, I believe that was a de-SPAC.  I know that this present case AdaptHealth involves a de-SPAC.

And then at least, at least one -- I think at least one of the others that I mentioned since July 26th, either CBL or -- no, not CBL. It's possible -- I'd have to go back and look. It's possible that Berry Corporation was, but I don't recall off the top of my head.

And then I've got another report that I'll be issuing later this week that involves a de-SPAC transaction.

Q.    Of the securities class actions in which you have been retained as an expert, did any involve an alleged misstatement concerning allegations of unrelated personal misconduct by a company's officer or director?

Page 25

MR. LAVELLE:  Object to form.

A.    Can you explain what you mean by "unrelated."

Q.    So unrelated to the performance within the issuing company.

A.    You mean the, the allegations of the prior misconduct relate to conduct that occurred outside of the scope of the present employment or present company?

Q.    Correct.

A.    Okay.  It's difficult for me to know the answer to that question, but I think it's possible that Banc of California may have an element of that in terms of allegations of personal relationships that I believe at least one executive at the Banc of California had with individuals who were alleged or known criminals which I believe may date back prior to conduct at the bank itself.  Beyond that, it's difficult for me to know the answer to that question.

Q.    Of the securities class actions in which you have been retained as an expert, did any involve an alleged corrective disclosure that was issued by an anonymous short seller rather than a disclosure by the company itself?

Page 26

A.    Yes.   I'm fairly certain that I've worked on at least some cases that involved alleged corrective disclosures from short seller reports.

Q.    Can you recall which ones specifically?

A.    Off the top of my head, I cannot recall which ones.  I'd have to go back and review the complaints in each of those cases to refresh my recollection of the alleged corrective disclosures.  But I do recall, like I said, working on some cases that involved a type of alleged corrective disclosure.

Q.    Has your expert opinion ever been subject to a Daubert challenge?

A.    I've worked on an insider trading case for the SEC a number of years ago in which the defendants filed or submitted a Daubert challenge, but they -- the judge and the court upheld the entirety of my opinion and ruled in my favor in that instance.

Q.    Do you recall what opinion you gave in that -- in the case that was challenged?

A.    I'd have to go back and review which of the cases it was.  But I recall that I was working on behalf of the Commission to provide

Page 27

opinions that either would have related to the value relevance of information involving mergers and acquisitions prior to their public announcement, as well as calculations of profits and ill-gotten gains, or it may have been a different case in which my opinions were a little more narrow in scope and relating to the calculation of profits and ill-gotten gains relating to nonpublic information.

Q.    Do you recall what the basis was for the Daubert challenge?

A.    Well, I don't believe there was any basis for it, but -- I don't recall what the actual -- what the content of the motion was off the top of my head.

Q.    Has your expert opinion ever been excluded in whole or in part by a court?

A.    No, I don't believe so.  I have had a couple of I think declarations or reports in which the court ruled that it was -- that the scheduling order did not allow for additional reply reports at that phase or that a declaration could not be attached to a complaint, but that ruling was not in any way related to the content of my opinions but rather due to technicalities

Page 28

involving scheduling orders or other legal aspects.

Q.   So for procedural reasons?

A.   Correct.

Q.   Your CV indicates that you are a senior fellow at Berkeley Center For Law and Business; is that right?

A.   Yes, it is.

Q.   And what courses have you taught in that role?

A.   The courses that I've taught in their entirety are listed at the bottom of page 44 and the top of page 45.  But in terms of UC Berkeley, at the bottom of page 44.  So that would be economic expert witnesses, depositions and testimony, as well as economics of corporate and securities litigation.  Then I've also provided guest lectures in other courses at UC Berkeley.

Q.   Do you discuss securities class actions in your courses?

A.   Yes, I do.

Q.   Have you discussed securities class actions in any of your guest lectures?

A.   I don't recall explicitly discussing them, but it's likely that I've at least

Page 29

mentioned them in some of the guest lectures.

Q.    In the courses in which you discussed securities class actions, what is it that, that you teach?

A.    So in Law 251.52 titled Economics of Corporate and Securities Litigation, I will teach the law students the mechanics of event studies, how event studies actually work, can we, we actually walk through and practice sort of a stripped-down or a scaled-down version of conducting and performing a basic event study. So I'm illustrating that sort of one of those tools that are employed by experts in class action types of cases.

We'll also typically walk through a hypothetical market efficiency report and discuss and talk about the various data sources and types of tests, the Cammer tests, the Krogman factors and how those are employed within a case.

And then I think within Law 246.31, that's more of an experiential course where we practice depositions, taking and defending depositions, and I'll sometimes illustrate and have the students role play, deposing an expert, using hypothetical examples, some of which come

Page 30

from securities class actions and either market efficiency or merits types of questions.

Q.    And in these courses, is the curricula guided from a particular perspective, either plaintiff or defendant?

A.    No.  I think my goal is, is, is to really tailor the content to the students who are law students.  And so it's really trying to teach the students these tools and techniques that they will encounter regardless of whether they're working on the plaintiff side or the defense side of a class action or if they're working well outside the boundaries of class action cases.

A wide variety of securities cases employ these tools, and also just a wide variety of rules within the legal profession employs these rules, as well, just general experience on depositions or trial testimony.

Q.    Dr. Cain, have you ever been sued?

A.    No, I don't believe so.

Q.    Have you ever been disciplined professionally?

A.    No.

Q.    Have any of your licenses or certifications ever been suspended or revoked?

Page 31

A.    No.

Q.    I'd like to talk a little bit about your preparation for this deposition today.

Did you meet with anyone in preparation for this deposition?

A.    I had a couple of video calls with counsel.

Q.    And when you say "counsel," who are you referring to?

A.    I'm referring to Robbins Geller, so that would include Kevin Lavelle and Doug Britton and maybe -- let me see.  I think maybe Joe Tull, as well.

Q.    And when you say "a couple of calls," do you recall how many times you had video calls?

A.    We had one yesterday and I believe one at the end of last week, as well.  So I believe, I believe just two calls, as far as I can recall.

Q.    And do you recall for how long each of those meetings lasted?

A.    I believe we spoke for about three hours at the end of last week, and then yesterday maybe 30 to 40 minutes.

Q.    Did you speak with anyone else about today's deposition?

Page 32

A.    No.

Q.    Did you review any documents in preparation for this deposition?

A.    Yes, I did.

Q.    What documents did you review?

MR. LAVELLE:   Object quickly on the basis of privilege.

Dr. Cain, don't reveal, obviously, the substance of what we discussed or any documents that we showed you.

THE WITNESS:   Okay.

A.    I reviewed my expert report in this case, as well as the complaint and I think the motion to dismiss order.

Q.    Did Robbins Geller provide any of these documents that you reviewed?

A.    So my report is -- was produced by me, and then they had provided the complaint and motion to dismiss order previously.

Q.    Did you do anything else to prepare for this deposition?

A.    Other than reviewing materials and having conversations with counsel, I don't believe so.

Q.    When were you retained in this matter?

A.   I believe it was probably the beginning of June 2022.

Q.   And who retained you?

A.   Robbins Geller.

Q.   How many times have you been retained by Robbins Geller to serve as an expert?

A.   I don't know, but I would guess that it is likely somewhere between, between ten and twenty times.

Q.   Did Robbins Geller retain you directly?

A.   Yes.

Q.   You've submitted a report in support of lead plaintiffs' motion to request certification in this matter, right?

A.   Yes.

MR. IANNECE:  Can we turn -- pull up again Cain 1.  Just go to that second page in the report.

Q.   What we're looking at here is the report you submitted in this action, correct?

A.   Yes.

Q.   Did you draft this report?

A.   Yes, I did.

Q.   Did anyone assist you in preparing this report?

Page 34

A.    Yes.

Q.    Who assisted you?

A.    One of my staff members.  His name is James Hicks.

Q.    Did anyone else participate in the preparation of the report?

A.    I don't believe so.

Q.    How many hours did you spend on the report?

A.    I would estimate that it was somewhere between 50 and 100 hours.

Q.    Did you consider the particular allegations and claims alleged in this action in preparing this report?

A.    Yes, I did.  Yes, I did.

Q.    Based on your prior experience as an expert in securities litigation, are the issues that you were asked to consider analogous to issues you've analyzed in other actions?

MR. LAVELLE:  Object to the form.

A.    Yes, I believe so.

Q.    When preparing your report on market efficiency issues like this, do you use any prewritten template or form?

A.    I will typically do a few things.  So

all of the data and analyses are unique to the particular subject company.  So the -- all of the -- my analyses of the Cammer factors and the Krogman factors and the additional factors would be unique to AdaptHealth in this case.  But in terms of the general write-up and the background, I provide a lot of background about my qualifications, the background behind -- the thought process behind the market theory, the general description of the out-of-pocket method for calculating damages, things like that.

A lot of that language is really common across reports, so I will frequently -- probably almost always, really -- for a market efficiency report use, as a starting point, that language from one of my other market efficiency reports.

Q.    Is it fair to say that you previously submitted reports with opinions that have substantially identical language to the report you submitted in this action?

MR. LAVELLE:  Object to form.

A.    Well, yeah, I do think because I'm being asked the exact same questions in this report as I'm asked in any other market efficiency reports, the language of my opinions is going to be very

similar to the language of my opinions in other reports in which I've reached the same types of conclusions.

Q.    Are you being compensated for providing your opinions in this matter?

A.    Yes.

Q.    Who is compensating you?

A.    Robbins Geller.

Q.    If we turn to page 4 of your report and paragraph 9.  Paragraph 9 states that you're compensated at a rate of $850 per hour for your work on this matter; is that right?

A.    Yes, it is.

Q.    Approximately how many hours have you spent on this matter to date?

A.    I would estimate that it's probably somewhere between 50 and 100 hours.

Q.    So 50 and 100 total for both the report and everything else?

MR. LAVELLE:  Objection.  Asked and answered.

A.    That's, that's my best guess, somewhere between those two numbers.

Q.    Paragraph 9 also states:  I have been assisted in this matter by staff at Cain Advisory

Page 37

Services, LLC, working under my direction.  I receive further compensation based on those billings.

Do you see that?

A.    Yes.

Q.    What does it mean that you receive further compensation based on those billings?

A.    Yes, so I -- I've got an LLC.  It was named Cain Advisory Services.  I changed the name sometime in the past year to Cleveland Analytics, LLC.  But, regardless, nothing else changed.

So the staff who work at my direction, which, as I mentioned earlier, was an individual named James Hicks, I, I bill his time at something like 500 or 550 an hour and then I pay him I think somewhere between 250 to 300 an hour.

Q.    Is this -- that's always the case in your engagements?

A.    No.  I have a variety of engagements in different matters.  And I frequently work with other consulting firms and so those engagements are different.

Q.    Approximately how many hours has Mr. Hicks worked on this matter?

A.    Probably fewer than 20 hours.

Page 38

Q.   Do you have any other financial interest in this matter?

MR. LAVELLE:  Objection to form.

A.   No, I don't have any financial interest in the matter.

As I described in paragraph 9, I'm being paid hourly for the time that I've worked on the case, but my compensation is not in any way contingent on my outcome -- on my opinions or on the outcome of the case.

Q.   Are all of the opinions reflected in the report your own?

A.   Yes.

Q.   Have there been any changes in your opinion since you submitted your report?

A.   No.

Q.   Your report states that you've been asked by lead plaintiffs to do three things: Determine whether the market for AdaptHealth Corp class A common stock was efficient during the period November 8th, 2019, through July 16, 2021, inclusive; assess whether the value impact of any alleged misstatements or omissions would be reflected in AdaptHealth's options prices; and opine on whether the calculation of damages on a

class-wide basis in this matter for purchasers or acquirers of AdaptHealth Common Stock options during the class period is subject to a common methodology.

Is that an accurate description of what you were asked to do?

A.    Yes, I believe so.

Q.    Were you asked to do anything else?

A.    No.  That's, I think, an accurate summary of what I was asked to do in this report.

Q.    And is that an accurate description of the work you actually performed?

A.    Yes.  I believe that's an accurate description of the work I've performed in connection with this report.

Q.    Have you done anything else other than what was asked here?

MR. LAVELLE:  Object to form.

A.    Nothing outside the scope of privileged conversations or work with counsel.

Q.    You didn't analyze whether the statements in the alleged corrective disclosures corrected any prior statements made by AdaptHealth, right?

A.    That is correct.  I've not conducted any

Page 40

sort of loss causation analysis like that.

Q.    You didn't analyze whether the information contained in the alleged corrective disclosures had been previously disclosed, right?

A.    That's -- I think that's correct.  Yes.

Q.    You didn't perform any analysis regarding whether any of the alleged misstatements affected the AdaptHealth stock price, correct?

MR. LAVELLE:  Object to form.

A.    Well, I, I do know just in the course of the analyses I've done in this report that there was statistically significant declines in the stock prices around the two alleged corrective disclosures, which is consistent with a back end price impact.

Which I do think that speaks to your question about any impact of the alleged misstatements or omissions.  But I've certainly not carried out any sort of analysis of actual artificial inflation or loss causation.

Q.    So it's your view that statistics of a decline means there was a price impact?

A.    Well, that's not what I said.  I think what I said is that it's consistent with the

price impact from, from those, but certainly not in any sort of a loss causation sort of framework.

Q.    You didn't analyze whether either of the alleged corrective disclosures can be connected to the alleged misstatements, correct?

MR. LAVELLE:  Object to form.

A.    Well, I think if we were to turn to the section of my report in which I ask whether damages can be calculated on a class-wide basis in a way that's consistent with plaintiffs' theory of liability, I do ask at a very high level, after reviewing the complaint, is there an economic coherence to the narrative of the story such that there are alleged misstatements or omissions at the beginning of the class period or throughout the class period and then alleged corrective disclosures that at least plaintiffs are alleging are connected to those things.

And so by just considering the allegations within the complaint, that allows me to opine on whether damages can be calculated on a class-wide basis.  But beyond that, I do not, at this stage of a case, conduct any sort of analysis to assess the causal connection of those

Page 42

things beyond what I've just described.

Q.    So you analyze the substance of the alleged misstatements, correct?

MR. LAVELLE:  Object to form.

A.    Well, like I said, I considered those in terms of plaintiffs' allegations, but I've not analyzed them to form any sort of opinion of whether they caused losses or damages at this point in time.

Q.    And you're not offering any opinion about what should have been disclosed at the start of or during the class period, right?

A.    That's correct.

Q.    Is there any study, test or analysis that you performed that is not included in your report?

A.    No, I don't believe so.

Q.    As we just discussed, in your report on pages 3 and 4, you state that you have been asked to determine whether the market for AdaptHealth Common Stock was efficient during the period November 8th, 2019, through July 16th, 2021.  And you define the period November 8th, 2019, through July 16, 2021, as the class period, right?

A.    That's right.  There's a footnote there

to just explain I think the first day of the class period, as I define it.  It starts on I think the first day of public trading after the close of the business accommodation.  So with that caveat that there's a footnote 1 there to give a further explanation of that class period, but overall, yes.

Q.    Are you aware of how the lead plaintiffs have defined the class period in their complaint?

A.    I think, I think I touch on that in footnote 1.  I believe that the complaint alleges the first misstatement or omission occurring after the close of regular trading on November 8th, 2019, which I believe was a Friday.  And so then I begin my analysis on November 11th, 2019, which is the first -- or the next available trading day.

And I believe, I believe that the complaint alleges a corrective disclosure -- the second corrective disclosure that occurred prior to the open of trading on July 19th, 2021, and so I've cut off my analysis on the previous trading day of July 16th, 2021.

Q.    In your prior experience, have you ever defined the class period as commencing before the

stock at issue was publicly traded?

A.    I'm not really sure what you mean by that.

Q.    I think you've just explained that AdaptHealth stock did not begin publicly trading until November 11th, 2019, and that the complaint alleges the start of the class period to be November 8th, 2019.

I'm just trying to understand, when we, when we talk about class period, what you were referring to today and throughout your report. Is it -- does the class period begin on November 11th or November 9th?

A.    Well, so the analysis that I've done starts on November 11th.  There's certainly no reason that -- you know, if we -- if I were to get to the loss causation stage and assess artificial inflation back to the start of the class period, that could certainly begin.  If anyone purchased the stock, the business, the closing of the business combination after the -- you know, after November 8th, 2019.

So I think this is more of like a -- in my mind, it's sort of a legal technicality just in terms of a single trading day.

Page 45

Q.   I just want to reframe.  I think I accidentally said "November 9th."  I meant November 8th.  So thank you for...

A.   Yeah.  Yeah.  I'm sorry.  I think it's the same answer for that.

Q.   In your prior experience, have you ever examined the market efficiency of the subject company stock for a subset of the class period as opposed to the entire class period?

A.   Well, it is common that I define my analysis of the class period to differ maybe by one trading day from what's alleged in the complaint just based on the actual timing and timestamps of alleged misstatements or omissions in certain filings or the timing of corrective disclosure.

So I do think it's really somewhat common to -- for me to define the analysis of the class period that may differ by one trading day from the complaint just based on those timing differences.

Q.   Understood.

Putting aside that distinction of the trading day difference, have you ever examined the market efficiency of a subject company's

Page 46

stock for any other subset of the class period as opposed to the entirety of the class action period?

MR. LAVELLE:  Objection.  Asked and answered.

A.    Yeah, so again, I think that I've done an analysis that's very similar to what I've done here in other cases.

As I also explain in this report, my analysis applies throughout the class period, so it -- my conclusions on efficiency are equally applicable over the entirety of the class period, as well as any subsets that are contained within the class period.

Q.    Have you ever found that there was not an efficient market for a subset of a class period?

A.    Well --

MR. LAVELLE:  Objection.

A.    I have conducted efficiency analyses on companies and determined that they were not efficient at certain points in time or over certain time periods, yes.

Q.    So your assignment or one of your assignments here was to determine whether the

Page 47

market for AdaptHealth Common Stock was efficient during the period of November 8th through July 16th, 2021 -- November 8th, 2019, through July 16th, 2021.

Did you reach a conclusion on that topic?

A.    Yes.  I think that my conclusions are contained in paragraphs 10 and 11 of this report.

Q.    And what was your conclusion?

A.    My conclusions are that the market for AdaptHealth's common stock was efficient during the class period.  Also, that the value impact of any alleged misstatements or omissions would be reflected in AdaptHealth's option prices because their pricing is a derivative of and dependent upon AdaptHealth's common stock prices which are efficient.  And, also, the damages can be calculated on a class-wide basis subject to a common methodology for both common stock and options.

Q.    Focusing specifically here on your opinion with respect to market efficiency for the common stock during the class period, what assumptions did you make in reaching that conclusion that the market was efficient?

Page 48

MR. LAVELLE:  Object to form.

A.    I'm not really sure what you mean in terms of actual assumptions.

Q.    Did you apply any assumptions when evaluating market efficiency?

A.    Well, I think there's a lot of analysis that's described throughout this report, so I'd probably point you to any assumptions that are described within each of the different Cammer, Krogman or additional factors that I've analyzed.

And I know you're in the middle of a line of questioning now, but whenever you get to a good stopping point, I'd like to take a quick break.

Q.    Yeah.  I think just one more question and then I think we'll all take a break.

A.    Okay.

Q.    Is your opinion regarding the market efficiency for AdaptHealth Common Stock based on any information not identified in your report?

A.    No, I don't believe so.

MR. IANNECE:  Okay.  Why don't we go off the record.

VIDEOGRAPHER:  Off the record, 11:13.

(A recess was taken.)

                                                           Page 49

VIDEOGRAPHER:  On the record, 11:24.

BY MR. IANNECE:

Q.    Dr. Cain, earlier today you testified that you were retained in early June on this particular action.  Do you know when you were first contacted?

A.    I don't recall, but I would guess that it was probably around the same time.  So either late May or early June 2022, to the best of my recollection.

Q.    And that contact was made by Robbins Geller?

A.    Yes.

Q.    And I think earlier you also testified that you estimated that Robbins Geller has retained you about ten to twenty times in previous actions as an expert; is that correct?

A.    That's my best guess.  Yes.

Q.    Is it the case that Robbins Geller has retained you each time that you've performed a market efficiency report?

MR. LAVELLE:  Objection.  Foundation.

A.    No.  I've provided market efficiency reports on a number of other cases for other law firms.

Page 50

Q.   What percentage of the cases in which you were retained would you say that you were retained by Robbins Geller?

A.   Overall, certainly less than 50 percent of projects I work on would come from Robbins Geller.

Q.   I think you also recently testified or just earlier today that you have conducted an analysis where for companies the market was not efficient during parts of the class period or different points in time within the class period; is that right?

MR. LAVELLE:   Objection.   Misstates prior testimony.

A.   I think I said I have looked at companies and determined that the market for their securities was not efficient at certain points in time, yes.

Q.   What does that -- what does it mean for the market to not be efficient at certain points in time?

A.   Yeah, so that, that means -- well, it's really the same framework that I'm talking about in this report.   I'm actually looking for those various indicia of market efficiency and not

Page 51

finding evidence in support of that overall for a given company.

So, for example, over a certain time period, seeing that the, the stock does not trade on a national exchange, that the stock may not have analysts following or analyst coverage; it may not have institutional ownership; it may have very thin or very little trading volume or high bid-ask spreads; it may have extreme volatility and does not really exhibit any difference on days in which the company puts out news or information versus other trading days in the absence of new company-specific information, a small market cap.  These tend to be much smaller companies often listed just in the over-the-counter, OTC, markets.  So it's sort of things, things of that nature.

Q.    And that's for a period of time within a class period those, those attributes existed?

A.    It could be for any period of time that I've evaluated in the past, yes.

Q.    And when you say "evaluated in the past," is that through your research or in your position as an expert in particular cases?

A.    I certainly recall seeing that several

Page 52

times while I was a financial economist at the US Securities and Exchange Commission.  I've seen it on cases that I've worked on since then in terms of working as an expert or on a consulting basis.

So those -- there are a handful of examples that come to mind that fit within those categories.

Q.   Any cases where -- or in which you submitted a report?

A.   Not up to this point in time at present. Those would be things that if I worked for the Commission, that I was not actually issuing a public report but rather an internal memorandum that would go to the commissioners.  And I have some current work, but it's not yet proceeded to the point of public disclosure.

Q.   In the instances where you were an expert and identified this or witnessed this, do you know which cases those were?

MR. LAVELLE:  Object to the form.

A.   So nothing to the -- up to this point in time in which I've issued a publicly available report.

Q.   In any cases that are -- that have been filed that you are currently engaged or reached a

Page 53

level of a report, can you identify any cases in which you identified this?

MR. LAVELLE:  Objection.

Matt, just -- I'll say the things that you're still working on and that you're bound by confidentiality, I would urge you not to violate that and abide by whatever terms you've agreed to in those cases.

Q.    I'm just asking you about things that are publicly filed, factual allegations.

A.    So I'm not at liberty to name any cases on which I'm currently working on and am bound by nondisclosure agreements and confidentiality agreements.

Q.    What type of information would be expected to have a price impact?

MR. LAVELLE:  Object to form.

A.    Can you give me a little more context on what you're trying to get at.

Q.    Sure.

Why don't we turn to paragraph 46 of your report.

MR. IANNECE:  Can we pull back up Cain 1.

Q.    Look in the first sentence.  It says:

Page 54

In an informationally efficient market, a company's stock price should rapidly incorporate the value of new company-specific information.

It goes on to say:  If the company stock price moves more on days in which new information is released relative to prior trading days, this would support a finding of market efficiencies. It is important to note that one would only expect to observe this pattern around the release of unexpected and unanticipated value-relevant company news.

So based on this statement, what would you expect -- what type of information would you expect to result in a price impact?

A.    Sure.

So just speaking very generally, I think that last sentence you read is a helpful starting point in the sense that I'm talking about information that is unexpected.  It's unanticipated and it's value relevant for a given company.

So that, that's I think a very high-level description of the types of information that I would expect to trigger a value impact for a company.  And then when you

Page 55

actually start to get more detailed, it really depends on the nature of a given company.

So just to use as an example, sometimes I'll look at earnings announcements.  And for some companies, earnings announcements may on a very regular basis provide investors with new information because the investors and analysts going into an earnings announcement may not have a very good expectation of what the reported earnings are going to be for a company, both on a historical basis and maybe forward-looking guidance that the company might provide.  And so for some companies, that can be a very common area where you would expect to see price impact.

But for other companies, the earnings announcements may not provide any new incremental information to investors and there can be a variety of reasons for that.  For example, some companies provide very consistent guidance prior to an earnings announcement.  And so when they report the earnings, it's not really new, unexpected information because the reported earnings were already fully anticipated by market participants.

You can have other companies that are

Page 56

pre-revenue companies and they don't have any
earnings.  And so on the earnings announcements,
you don't really expect to see any price impact
because everybody knows that it's a pre-revenue
company.  They're not generating any sales.
They're not generating any earnings.  And so, for
those types of companies, earnings announcements
may not be expected to have a price impact.

So it really I think starts with this
high-level description of talking about for a
given company what are the types of information
that could potentially present new value-relevant
information to investors that was not anticipated
or expected, and then taking that description and
applying it to the particularities of a given
company.

Q.    In paragraph 17 of your report, you
state that if a market is efficient, meaning that
widely available public information is quickly
incorporated into stock prices, then all
purchasers of the stock are induced to reliance
on any misrepresentations or omissions because
those statements or omissions have distorted the
value of each class member's purchase price.

Did I read that correctly?

Page 57

A.    Yes.

Q.    How would you define "widely available public information"?

A.    Sure.

So I think when you operationalize that to an individual company, it's important to evaluate the information environment for an individual company.  But at a very general high level, I would be referring to the types of things that I talked about in this report, which would be things like an SEC filing.

So if we're talking about a US company that's incorporated in the United States and traded on a national exchange in the United States and the company files an 8-K or a 10-Q or a 10-K, a quarterly or annual report with the SEC and the SEC's online EDGAR system, then those filings are almost immediately and simultaneously made available to any investors in the company's securities in the United States.  So that would be one example, SEC filings.

Another example would be the types of news that I've summarized and in this report through I think a Factiva news search which covers the major US-based news sources that are

Page 58

in English, such as the Wall Street Journal, the New York Times, Bloomberg, Reuters, company press releases that are disseminated by a news service like the Dow Jones news service, for example.

So those would be I think good examples of information that is, that is widely available and public.

Q.   Does all widely available public information get quickly incorporated into stock prices in an efficient market?

MR. LAVELLE:  Object to form.

A.   Well, I think, again, like I said earlier, you really have to look at the nuances of the information environment for a given company in order to really define what does it mean for information to be widely available. Because I've given I think some good examples of widely available information, but there can be other examples of information that is not as widely available.

But in terms of the types of information that I've described as being widely available and public, in my experience, if the market is efficient, then, in general, that information is quickly incorporated into the stock prices.  And

what I mean by "quickly" would typically be with -- usually within three trading days of that information becoming public.

Q.    And these articles that you say you identified on Factiva, are these public in the sense that the general public can access them, or do you need some sort of subscription?

A.    Right.  Well, I think it's a little bit of each.

But, generally, the Factiva news search is looking at public news such as the Wall Street Journal, the New York Times, Bloomberg News, Dow Jones news service, things like that.  So investors can access that through a variety of means.  It could access it the way I've summarized it, through a Factiva search, but in more realtime, they could have paid online subscriptions to Wall Street Journal, Bloomberg, New York Times, things like that.

So other times, you can access some of those articles for free.  So it kind of I think depends on the particular news outlet that we're talking about.

Q.    If it's not free or freely accessible, is it your opinion that that information would

Page 60

not be widely available?

A.    Not, not necessarily.  Again, I think it really depends on the particularities of a given piece of information that comes out.

And so just to explain or illustrate what I'm talking about, we could talk about an analyst's report.  Many analyst reports are available only to paying subscribers.  Some analyst reports are really only disseminated to high-net-worth institutional clients or high-net-worth individual clients.

And so the particular analyst report that may come out with new information may not, in and of itself, be widely available to the general public; however, sometimes you'll see within minutes of a -- sort of a bombshell analyst report coming out that the new information in the analyst report may be quickly picked up on and reported by other news services and it can start out with places like a flyonthewall.com that often very quickly, within a matter of minutes, will disseminate little snippets of that information to the public and then it may be picked up by larger news services like Reuters or Bloomberg or Dow Jones.

Page 61

So that can be sort of the way in which that new information can be widely disseminated even though the original source of that information may not be widely available.  So it really depends on the particular circumstances.

Q.   What is flyonthewall.com?

A.   That's a website and sort of a news service that a lot of stockbrokers and investment advisors and day traders and even some hedge funds follow and pay attention to because, in my experience, it's -- that's often one of the very first news services to pick up on information. Certainly not always and not all information, but a lot of information.

Like if an analyst will have an upgrade or a downgrade or a change in the price target for a company's stock, often I'll see -- you'll see a little -- a very short snippet of that change that will blast out from the Fly on the Wall shortly after the analyst --

Q.   So --

A.   -- takes place.

Q.   Sorry.  I apologize.

Does a major news source need to pick up a story in order for you to classify it as widely

Page 62

available?

MR. LAVELLE:  Object to form.

A.    Well, again, if I was to sort of conduct some sort of assessment of that, then I would, I would really need to look at the particularities of the actual circumstances and conduct an analysis.  So that's, that's not any sort of analysis that I've done in this report to date.

Q.    And what type of assessment would you need to conduct?

A.    You know, I would look at the form or the venue in which the information comes out.  Is it an SEC filing?  Is it, is it a transcript of an earnings call?  Is it something that's published on the Internet that's widely available?  Is it an analyst report?  So I would look at that.

If it is provided in a more limited forum, like an analyst report, I would probably look for evidence that that was reviewed by other market participants and commented on through news stories, maybe other analysts' reports, maybe other online forums.

I would also look at evidence of that information showing up in changes to the trading

volume for companies' securities or the prices of the securities.  So those would be some of the, the types of tools that I would employ in that type of analysis.

Q.    Is there an objective criteria for that sort of process?

A.    I think all of those tools are fairly objective.  Yes.

Q.    And how so?

A.    All of those tools are grounded in academic research, and those are also professional tools that industry professionals such as analysts, professional investors, institutional investors, employ.

Q.    I think earlier you said that the articles on Factiva would be in English.  Why does that matter?

A.    Yeah, so I think that it -- well, I guess it depends on the question that's being asked in terms of does it matter to that particular question.

But, in general, there's, there's academic research that indicates that international markets are often segmented, which means, for example, if you've got a news article

Page 64

that comes out in, let's say, Japan or China and it's a local news article that's written in Japanese or Chinese, then the typical investor in the United States, number one, is not following those local news stories; and, number two, may not be able to read Japanese or Chinese, and so the academic research shows that often that information does not affect prices of securities in the United States, for example; although, there can be exceptions to that if the company has stock with a dual listing and it's traded in both Japan or China, as well as in the United States through ADRs, then that can set up an arbitrage opportunity and that can be one mechanism by which the information is impounded into the stock prices because there can be an arbitrage opportunity if the prices diverge.

So, again, like I said a couple times, it really depends on the specific circumstances that you're talking about.

Q.    So is it your opinion that non-English news is ignored by US investors?

MR. LAVELLE:  Object to form.

A.    No.  I think, as I explained in my previous answer, it really depends on the

Page 65

circumstances.

So, for example, if there's a company with a dual listing, and we do typically see those things show up in prices because of the arbitrage opportunity.  But, like I also said, academic research has shown that it is also common that if we don't have that sort of setting, that there can be instances in which a foreign news or foreign language article will come out in a local newspaper in a different country and the impact of that news can be much more isolated to that country and not have any impact in the United States or other countries, despite the fact that the markets may be very efficient in each of those separate countries.

Q.    And what academic research are you referring to?

A.    Yeah, there's -- so there's academic research that's talking about the extent of market integration versus market segmentation. And they'll talk about things like price discovery or home bias, things like that.

So I think there's -- there was an article I think in the Journal of Banking and Finance in 2007 that looks at sovereign credit

ratings and whether there's information spillovers into other countries.

There was an article I think in the Journal of Business Finance and Accounting in 2010 that looks at, like, dual listings of companies I think in Asia, I think China versus the United States, and looking at how prices react differently.

So there's -- those are just a couple of the examples of the type of literature.

Q.    So what time period was that written in?

A.    Those two articles I think were 2007 and 2010.  I'm sure there are many other articles both before and after those.

Q.    Would you agree that the Internet access to information has changed since 2007?

MR. LAVELLE:  Object to the form.

A.    You know, I would say that, you know, for example, the SEC's EDGAR system came online in the -- I think the late 1990s, and by around -- I think by around 2001 -- somewhere between 2001, 2002, it was fully functional.

So yeah, I think that the nature of being able to have access to, for example, SEC filings for companies has remained fairly

Page 67

consistent probably for the past 20 years.

But, again, I guess, like I've said a few times, it really depends on the particular circumstances for a given situation.

Q.   Got it.

So is it your opinion that non-English news that is publicly accessible doesn't affect the US markets unless there is a dual listing?

MR. LAVELLE:  Object to the form.

A.   No, that's, that's not an opinion that I've been asked to evaluate for purposes of this report, but I'm just trying to answer your previous question by pointing out some of the academic research that speaks to these, these types of questions.

Q.   I understand you may not have offered an opinion in your report, but what do you -- is that what you believe?

MR. LAVELLE:  Object to form.  Asked and answered.

A.   Well, again, like I'd explained earlier, it really depends on the individual situation because you can have times where a piece of information comes out in a very -- a very small setting and it's, it's really contained to that

Page 68

setting.  But you can also have times when information comes out in a small setting but it's picked up by larger news reporting and then it is widely reported and disseminated within the United States, for example.  So it really depends on the individual piece of news or a circumstance that you'd want to evaluate.

Q.    I think you testified earlier that you would expect the information to get incorporated into stock prices in an efficient market within three trading days; is that correct?

A.    That's typically what I see on average, within, within three trading days.  Frequently, we expect it to start impounding into prices often almost immediately, virtually immediately, but it can take a couple of days for the price to fully impound the valuation impact of new information, particularly more complex information.  And there are times when it can take longer than three days, but there are also many times when it occurs within a matter of minutes or hours.

But, on average, I typically expect it to be fully reflected within two to three business trading days.

Page 69

Q.    And what's your basis for that?

A.    That's what I've seen in my over 20 years of professional experience as an analyst, as an academic, as a financial economist at the US Securities and Exchange Commission studying securities prices, as an expert working on a wide variety of cases.

Also, it's something that I think is consistent with academic research, as well.

Q.    Is that something you looked into with respect to any statements you analyzed in connection with this action?

MR. LAVELLE:  Object to the form.

A.    So I've -- I think in terms of information in stock prices, that would be limited in this report so far to a Cammer 5 analysis, which is really looking for evidence that new value-relevant and unexpected or unanticipated information starts to show up within one trading day.

So I think a higher level or a higher standard of testing for that in terms of the market efficiency analyses within this report, looking only within the first trading day.

Q.    So that's not something you've performed

Page 70

here?

A.    What is not something?  I'm not...

Q.    Analyzing how quickly it may have impounded the stock.

MR. LAVELLE:  Object.

A.    No, I do look to see whether new information starts to -- impounding the stock prices within one trading day in this report.

Q.    Is it fair to say that you did not analyze in this instance whether any non-English news was incorporated into the stock price?

MR. LAVELLE:  Object to form.

A.    I mean, it's very possible that some of my analyses may potentially speak to that question down the road in terms of documenting statistical significance of stock returns that I've got in my own study here, but I've not set out to answer that question in any way at this point in time.

Q.    Would you expect the company stock price to react to information that is not new or unexpected?

MR. LAVELLE:  Object to form.

A.    I think it probably depends on the circumstances.  So I've seen examples of cases in

Page 71

which certain allegations were made against a company, the company's executives deny those allegations, and then at a later point in time those allegations are made again but maybe from a different venue such as directly from a regulator, for example. And that can carry more weight.

And so, you know, you might look at it and think that, well, this is really the same information that came out twice, but from the perspective of an investor or from the marketplace, it's -- the nature of that information has a different interpretation because, previously, the company executives had denied it, but now when a regulator levels the same accusations, it carries more weight.

So, you know, it kind of depends, I think, on the information environment for a different company.

Q.    In that example, wouldn't that information be, be new information?

A.    Well, I've seen examples where it's very similar, right, where you may have someone in an earlier period say we think a company's engaging in accounting fraud, for example, and then the

Page 72

company denies it.

And then, at a later point in time, you've got the same allegation that -- the same exact allegation that comes out where someone says we think the company is engaged in accounting fraud.  But that could come from a more informed short seller.  It could come from a former employee of the company.  It could come from a regulator or some other source or an analyst that -- some other source that carries more weight than the original source, even though the actual information may seem to be the same.

Q.    If the market doesn't react to information, could one explanation be that it is not new information?

MR. LAVELLE:  Object to form.

A.    I do think that I've seen many examples that would fit within that, that type of description such as a new piece of information or an earnings announcement for a company coming out on one day and then maybe over the next seven to fourteen days you can see additional news outlets that continue to report on the earnings announcement and analysts who provide updated analyst reports, commenting on the earnings

announcement.

And even though there's new information coming out in terms of new news stories or new analyst reports, they're still commenting on the original earnings announcement and you don't necessarily expect to see a price reaction to each subsequent news story that's merely commenting on a previous earnings announcement.

Q.   Can you explain the meaning of value-relevant information?

A.   Yes.  That's information that we would expect to have a material or a significant impact on the valuation of a company.

So, for example, there's -- every day for many companies, there's new information coming out about the given company, but a lot of that information may be fairly minor in terms of the expected impact on what the company is worth.

So when I talk about value-relevant information, that's information where we would, we would clearly expect it to have a significant change or impact on the potential value of a given company.  And that I think can be very difficult to identify without a detailed analysis.  But that's at a high level what I'm

Page 74

talking about.

Q.    Is another way of defining value-relevant information as information that is likely to affect the future cash flows of the company?

A.    Well, that's -- that is one of the ways to describe value-relevant information, yes.

Q.    Would you expect the company stock price to react to information that is not value relevant?

A.    Well, I expect company stock prices to fluctuate from day to day just due to random chance, due to random volatility, due to macro economic news.

So the fact that a piece of information comes out that we may look at and say, well, this information is not value relevant, that certainly does not mean that the company stock price is going to remain constant because there are a wide variety of reasons for which company stock prices fluctuate from day to day.

But in terms of talking about information that is clearly not value relevant -- and, typically, I would say that that information probably did not contribute to the general

Page 75

fluctuations in the stock prices for a given company.

Q.     If the market doesn't react to new, unexpected information, would you agree that that information is not value relevant?

MR. LAVELLE:  Object to form.

A.     No.  And I think there are a variety of reasons for why we could have value-relevant information and yet we may not see a statistically significant change in the stock price for a company.

So one reason is that new information often has a mix of both positive and negative information.  For example, an earnings announcement, you may have positive information that a company exceeded the analyst expectations for its earnings per share for the prior quarter and yet the company lowers its guidance for the next quarter or the next year.

So that mix of positive and negative information, both of those pieces of information could be value relevant for a company and yet they may have offsetting impacts on each other and you may not observe a statistically significant change in the stock price.

Another example would be merger and acquisition announcements.  For acquirers, often it's very difficult to predict ex ante, whether that's going to produce an increase or a decrease in the valuation of the acquirer's stock price because you have to ask what's the price being asked for a target company?  What are the synergies?  What's the integration plan?  How large is the target relative to the acquirer?

So even though the acquisition itself may be highly value relevant, for the acquirer, if they're paying a price that's equal to the acquisition value of a target to the acquirer, you may not see a statistically significant change in the acquirer's stock price.  You may see a change in the trading volume for the acquirer or you may not.

So it depends on a lot of different factors in terms of whether you actually would see a change in the stock price for a given company, even though the value relevance of the information may not be in question.

Q.   What if there isn't the sort of positive and negative mix?  What if it is one piece of information that the market -- and the market

Page 77

doesn't react, would you agree that that information is not value relevant?

MR. LAVELLE:  Object to form.

A.    No, again, for a variety of reasons, like I've been talking about.  There can be other contributors to stock price fluctuations.  But, typically, if I'm working on a loss causation report, if we're talking about that type of setting and I'm looking at a corrective disclosure and the disclosure did not have a statistically significant change on the stock price of the company, then, typically, I will not assign any artificial inflation as having been dissipated from that disclosure.

It does not mean that the disclosure was not value relevant.  There may be other reasons for a lack of a price movement such as confounding information.  There could have been liquidity changes or other factors.  But there can be cases in which information is value relevant and yet does not have a statistically significant effect on the stock price.

Q.    What are these additional contributors or factors that you describe?

A.    Yeah, there can be -- there can be a

variety of reasons.  So one example would be I've seen cases in which a company -- and, actually, academics have studied this, as well, where a company has bad news and it -- the company knows that when they release the bad news, that it's going to cause a drop in the company stock price.

And so what executives will do, instead of just announcing the bad news all at once, which may cause the stock price to drop by 9 percent and 9 percent may be a statistically significant drop in the stock price, they'll actually divide that news up into three or four smaller announcements that they spread out over time.

And so for each of these separate announcements, the stock price may only drop by, say, 2 percent.  And 2 percent may not be a statistically significant change in the stock price, and so what executives may do is try to slow down or dribble out the bad news in order to avoid the statistically significant stock price change.  But when you add up the impacts of all of those, they may add up to a very large drop. And that's something that academics have documented that executives are prone to --

Page 79

trained to do.

Q.    Again, isn't that a different situation than I've asked about where there's just one disclosure of information?

A.    Well, again, if you were just focusing narrowly on one disclosure, you might be only looking at one of those days in which a certain disclosure was made.

But so if you're talking about a scenario in which there is only one disclosure, there are no other disclosures that have any relation or bearing on that, that information, then one -- there can be other, other reasons that you may not have statistical significance.

It could -- like I said earlier, it could take two or three trading days for the price impact to be fully impounded.  So if it, if it declines over two to three days, each of those individual days may not be statistically significant, whereas the two- or three-day cumulative abnormal return may be significant. It still may not be even though it may amount to a drop of, say, 6 percent which could still be meaningful for a company.

There could be other factors in terms of

Page 80

confounding information.  There may have been offsetting positive information at a macro academic level on a given day or information that could be expected to affect the company.  We try to control for macro economic information and in an event study framework through the market in the industry controls, but you can still have random variation from day to day.

Generally -- I think at a high level, generally, I do expect new, unexpected value-relevant information to have an impact on stock prices for companies.

Q.    In paragraph 17 of your report, you cite to the Supreme Court the basic decision and include a quote from that decision that says:  In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.

Do you see that?

A.    Yes.

Q.    How does the basic decision factor into your analysis?

A.    Yeah, so I think that what I'm quoting, this here is just explaining sort of the fraud on

Page 81

the market theory of reliance, which is that -- and that's I think really the driving factor for why we do a market efficiency analysis in a case like this, is to really ask this high-level question of does the stock price reflect information throughout a class period.

And if the answer is "yes," then what that implies is that any, any statements or information that came out before the start of a class period or at the beginning of a class period or during the class period, that that's going to be reflected in the stock prices of the company throughout the class period. And, as a result, any investors who purchase the stock during the class period are doing so at inflated -- artificially inflated prices because those prices reflect the previous misstatements or omissions made by defendants in the company.

So that's, that's really I think the motivation for asking the question of whether or not the market is efficient for a given company.

Q.   If your understanding of the basic decision is not correct, would that affect your analysis or conclusions here?

A.   So I'm not providing any sort of legal

interpretations or legal opinions within this report.  So my role within the report is that of a financial economist, which is to evaluate the Cammer factors, the Krogman factors, these other factors, and opine on damages calculations.

So my opinions are not premised upon any sort of legal interpretations or legal opinions. So I don't think that my analyses are contingent upon a certain understanding of the law.

Q.    The quote that we just read refers to available material information while, as we discussed earlier, you referred to widely available public information.

Why did you add the qualifier "widely"?

A.    Well, I'm talking about something different in my report.  I think what I'm trying to do is provide an explanation or a description of what it means for a stock market to be informationally efficient, which is that it reflects information that is widely available.

I think the quote from a basic decision is talking about something else.  It's I think pointing to this question of whether alleged misstatements or omissions would be expected to be reflected in the stock prices of a company

Page 83

throughout a class period.

Q.    Is your knowledge of market efficiency based on case law or economic principles?

A.    I think my expertise on market efficiency is based on my professional experience as an analyst; my academic experience as someone who has an undergrad and a Ph.D. in finance; as someone who has taught a variety of finance courses to undergraduate and graduate students; someone who has researched securities markets and securities, published economic studies in a wide variety of outlets, including peer-reviewed journals; as a financial economist who has worked at the Securities and Exchange Commission and an advisor to one of the commissioners; and also based on my professional experience in evaluating markets within market efficiency reports.

So I think it's based on my professional and academic experience.  It's not based on my expertise in the law.  I'm not a lawyer; although, I am guided by the relevance of what courts have said in terms of opining that the Cammer and Krogman factors are -- for example, are relevant to this question.

Q.    What is the economic basis for the

Page 84

Cammer or Krogman factors?

A.    Sure.  I think that I talk about it in my efficiency report.  I talk about this MRK study, which I think is a good way to describe the relevance of the Cammer and Krogman factors because, ultimately, at the end of the day, what we're really asking is this very simple question of are investors paying attention to this company's stock, to the securities of a given company.

And, as the MRK case study shows, there are a variety of ways that we can evaluate whether infor- -- whether investors are paying attention to a company's securities.  And those various ways that that study talks about are the same factors that are set forth by the Cammer and the Krogman courts, things like, you know, do we see the presence of institutional investors?  Do we see trading volume taking place for a given company?  Do we see analysts following a company?  Things, things of that nature.

Q.    And I understand sort of what the Cammer court laid out.  But, in your opinion, is that supported by economic principles?

A.    Yes.  And I think the previous answer

points you to one example from, from that academic study to illustrate that these factors are very well grounded in academic research and my own academic research and that of many others employs the same tools and looks at the same types of factors in a wide variety of settings.

Q.    Are there particular economists that founded the Cammer factors?

A.    Economists that founded the Cammer factors?

Q.    Was that something the court adopted from an economist?

A.    Well, I do think that these things are certainly grounded in many decades of academic research.

The court certainly didn't invent the idea of, you know, research analysts or the idea of stock prices and event studies and looking at whether stock prices react to new information. All of this -- these factors were -- I think have been shown to be relevant because of many decades of academic research that have studied these, these types of variables and this data in a wide variety of settings.

Q.    So is it your testimony that the Cammer

Page 86

factors are rooted in economic principles?

MR. LAVELLE:  Objection.  Asked and answered.

A.    Yes.  I do think that those factors are directly related to principles of finance and economics.

Q.    I'm going to turn to paragraph 19.  It states here:  As these cases indicate, stock prices quickly incorporate the valuation effects of public statements in an open, developed, and efficient market.  In finance, semi-strong-form market efficiency refers to a market in which publicly available information is quickly reflected in a security's market price.  Thus, if a company omits important information or provides misleading information to shareholders, the stock price will become distorted and either inflated or deflated relative to the price at which the stock would trade but for the misleading or omitted information.  Thus, in an efficient market, purchasers implicitly rely on companies' misrepresentations or omissions because they are impounded into the stock price in which trades are made.

Did I read that correctly?

Page 87

A.    Yes.

Q.    Again, here you preface this paragraph with "as these cases indicate."  Is your knowledge of market efficiency based on the case law?

MR. LAVELLE:  Objection.  Asked and answered.

A.    So I think my knowledge of market efficiency is consistent with the case law, but my expertise on market efficiency is based on the professional and academic experience that I described earlier.

Q.    What do you mean by "important information"?

A.    Are you looking at a paragraph 19 here?

Q.    Right.  I think it's the third sentence in paragraph 19 --

A.    Yeah.

Q.    -- beginning with "thus."

A.    Okay.  Yeah.

So I think this is just a general -- a very high-level general description of basically information that investors would find to be important to their buying or selling decisions or to the valuation of a company's securities.

Q.   And how do you determine what investors would believe to be important?

A.   Well, it depends on the particular type of case that I'm working on.  So if I'm working on an insider trading case, for example, then I would look at what happened to the securities once that information became public.  And I might do an event study around a merger announcement; I might do an event study on the stock price, as well as the abnormal trading volume, for example.

In a loss causation report, I typically would look at the back end of the class period when the alleged corrective disclosures came out.  I would ask are these disclosures related, are they actually connected to the alleged misstatements or omissions?  Did they reveal information that's tied to those?

And, if so, then when those came out, did they cause a statistically significant impact on the stock prices of the companies.

And I may also employ the tools of finance and valuation analysis.  So I'll look at analyst reports.  I'll look at what is implied by a discounted cash flow analysis or a multiples analysis, things of that nature, if that's

Page 89

necessary in order to help answer these types of questions, as well as looking at academic research or academic studies, too.

Q.    Will the stock price become distorted and either inflated or deflated if a company provides misleading information to shareholders on any topic?

MR. LAVELLE:  Objection to form.

A.    Well, I think it probably depends significantly on the actual facts or circumstances of a given case.  So I don't, I think, have a universal opinion on that without really evaluating the particularities of a given instance.

Q.    Does the stock price become distorted every time there is misleading information?

MR. LAVELLE:  Objection to form.

A.    I think my answer will be similar to the previous one.  I would really want to look at the individual facts or circumstances of a case in order to form an opinion.

Q.    Is it your opinion that a company's stock price would be artificially inflated by disclosing misleading information?

A.    I think it can.  I think that's

Page 90

certainly a possibility, but I would want to conduct a complete analysis of an information environment in order to reach any sort of opinions.

Q.    If that's the case and it does, if a class member sold stock during the class period prior to a corrective disclosure while the alleged fraud is still allegedly ongoing, wouldn't they actually benefit from the alleged inflation?

MR. LAVELLE:  Objection to form.

A.    There can be cases of that.  For example, if I've calculated an inflation ribbon throughout a class period and determined that the stock price was inflated, artificially inflated during a class period and an investor purchased before the start of the class period and before the alleged misstatements or omissions and then sold during the class period before the corrective disclosure had dissipated that artificial inflation, then, then the calculation would show a net benefit for that particular transaction.

Q.    Have you accounted for that possibility in your opinions here?

Page 91

A.    Yes.

Q.    Why does an investor have to purchase before the start of the class period to experience the benefit?

A.    Well, that was not my testimony.  I was just giving you one illustrative example.

Q.    So is it your opinion that an investor wouldn't have to purchase before?

MR. LAVELLE:  Objection to form.

A.    Well, it really depends on the -- it depends on the actual inflation ribbon and how that evolves throughout a class period.

So if the inflation ribbon is fluctuating during a class period, then you can also have instances where a particular transaction could, could have a benefit.

Q.    So if you sell during the alleged fraud, then your sale price reflects inflation, whatever that may be?

MR. LAVELLE:  Objection to form.

A.    Yes.  So I think you're talking about this section in my report that describes the out-of-pocket method of calculating damages.  And so it's -- that section explains that you take the artificial inflation at the time of purchase

Page 92

and the artificial inflation at the time of sale, and the difference between those would reflect damages.

And there can certainly be instances where individual transactions can be conducted where there's a purchase made with no inflation or a smaller amount of artificial inflation and then a subsequent sale with a larger amount of artificial inflation, which would be a net benefit or a net gain.

Q.   I'm not actually talking about the calculation of damages here, just generally about inflation ribbons.

So to ask it again:  If you sell during the alleged fraud, would your sale price reflect the inflation?

MR. LAVELLE:  Objection to form.  Asked and answered.

A.   Yes.  I think it's the same answer I just -- I just gave you before.  So I think there are times when that, that can be the case.

Q.   Is it your opinion that the market for AdaptHealth stock was characterized by semi-strong-form market efficiency?

A.   Yes.

Page 93

Q.    Does this mean that AdaptHealth's stock price quickly incorporated publicly available information and that subsequent disclosures of the same information would not have had an effect on its stock price?

MR. LAVELLE:  Objection to form.

A.    Well, what it means is that widely available public information would be quickly reflected in the securities of AdaptHealth.  Like I described earlier, there can be times when it looks like similar or even it looks like the same information is subsequently disclosed but there can be intervening events that would qualify that -- such that the information environment has changed and you would still expect to see a price impact from subsequent disclosures.

So it really depends on the specific facts or circumstances in terms of the implications of disclosures at some later point in time.

Q.    I'm going to paragraph 20.  You state that:  Courts and practitioners have argued that markets with continuous public reporting of stock prices and trading volume, such as the New York Stock Exchange and NASDAQ, should be granted a

Page 94

presumption of efficiency for virtually all securities traded on them.

Do you see that?

A.   Yes.

Q.   In making this statement, did you perform any legal analysis?

A.   No.  I'm not providing any sort of legal opinions.  I'm just pointing out what other people have said, which is also consistent with my professional experience that companies that trade on the New York Stock Exchange and NASDAQ do typically exhibit the characteristics of market efficiency.

Q.   So is it your understanding that the prevailing law is that lead plaintiffs should get presumption of market efficiency?

MR. LAVELLE:  Objection to form. Foundation.

A.   I don't have any sort of legal opinions about whether lead plaintiffs should be granted a presumption of efficiency.

Q.   Do you have any opinions at all on that?

A.   Well --

MR. LAVELLE:  Objection to form and foundation.

Page 95

A.    My opinions are what's stated in my report in terms of I've done an analysis and I've concluded that the market was efficient.

Q.    My question was a little different.

Is it your opinion that all stocks that trade on NASDAQ are always efficient all of the time?

A.    No.  That's not an opinion that I've provided in this report.

Q.    Is that one that you espouse?

A.    I guess I'd repeat what I said a couple of questions ago, which is that in my professional experience, companies that are traded on the New York Stock Exchange and NASDAQ do tend to exhibit characteristics that are consistent with market efficiency, but I don't have any stronger opinions than that.

Q.    Do you agree that -- strike that.

In paragraph 21, you state that: Numerous academics have studied the pricing behavior of stock markets and some have purported to identify anomalies that call into question the efficiency of markets.

Do you see that?

A.    I do.

Page 96

Q.    Which academics are you referring to?

A.    Well, there's a lot of academic studies. There's the whole -- there's a whole subclass of academic literature called the anomaly literature which, which looks at a wide variety of purported anomalies such as things like the January effect or the day of the week effect where you might see certain patterns that, you know, stock prices tend to behave a certain way in the month of January.  Like they might have positive returns in the month of January over some, some time period.  Or on certain days of the week, they have certain types of returns.  Or, as I discuss in this report, momentum or reversal strategies where you see a certain type of auto correlation and it looks like there could be a risk-free trading opportunity.

So there's a wide variety of academics who have documented what they purport to be these types of anomalies.  And that's, that's what I'm -- I don't list all of those, obviously, in this report, but I'm kind of referring to that line of literature in this section of my report.

Q.    Are the anomalies that you referred to observed with regard to a specific stock or to

Page 97

the market generally?

A.    I think probably, probably both.

Q.    With respect to specific stocks, you conclude that these anomalies do not undermine market efficiency generally, correct?

A.    Which, which sentence are you referring to?

Q.    I'm not referring to anything specific. I'm just asking --

A.    Okay.

Q.    -- your opinion.

A.    So can you ask again.

Q.    Sure.

With respect to a specific stock, do you agree that -- do you believe that these anomalies do not undermine market efficiency generally?

A.    I don't, I don't think that's an opinion that I've expressed here.  So I do think, for example, that I look at one type of anomaly in my market efficiency reports, which is auto correlation, which tests for either momentum or reversals, which means either under reaction or overreaction to information on a systematic basis for a given stock.

And if I were to find a persistent and

Page 98

consistent pattern like that for an individual stock, then that might give me some concern about market efficiency and I would want to investigate further to see whether that really is a persistent and consistent pattern and does it survive trading costs; does it persist over time; is it really just driven by a few outliers or is it a very regular pattern.

And if I were to conclude that the anomaly like that was persistent and presented a profitable arbitrage opportunity, then I would conclude that that would be evidence that would weigh against market efficiency.

Q.    So if you observed an anomaly for a specific stock, it could potentially undermine the efficiency of the market for that specific stock?

MR. LAVELLE:  Objection to form.

A.    Well, again, it depends on the particular anomaly.  So the one that I described for auto correlation that is -- if that were present over a long period of time and persistent and consistent and was in excess of trading costs and seemed to present an arbitrage opportunity, then I would, I would consider that as evidence

against market efficiency; however, I've encountered many examples of company stock prices, for example, just move on a certain day where there's no information on that day.  Some people might call that an anomaly, but I would, I would not describe that as an anomaly and I would not consider that to be evidence against market efficiency because we know that stock prices are always fluctuating from day to day.

So I think it really depends on the particular type of anomaly that we would be talking about.

MR. IANNECE:  I think we've been going for a little over an hour.  Why don't we go off the record.

VIDEOGRAPHER:  Off the record, 12:30.

(A recess was taken.)

VIDEOGRAPHER:  On the record, 12:43.

BY MR. IANNECE:

Q.   Dr. Cain, turning to paragraph 22 of your report.  You state here that courts developed various tests that attempt to weigh in favor of or against the presumption of market efficiency and that none of them are individually determinative of market efficiency.  But when

Page 100

viewed as a whole, they can be informative in supporting or abutting a presumption of market efficiency in relation to the reliance element of the fraud-on-the-market theory.

Do you see that?

A.   Yes.

Q.   What does "when viewed as a whole" mean?

A.   Yeah, that just means that I -- I'm not basing my ultimate opinion or conclusion of market efficiency on any one single factor but, rather, I look at them holistically.  I look at all of the factors in conjunction with one another.

Q.   So how many tests are needed to support or rebut the presumption?

A.   I'm not aware of any, any legal opinion that has articulated a bright-line threshold like that.

Q.   How do you personally decide how many are needed?

A.   I don't do it on a -- on an equal-weighted counting of the factors but rather looking, looking, like I said, at all of the factors holistically together to form a professional assessment of whether the company

Page 101

stock appears to trade in an efficient market.

Q.    What does it mean to do a holistic review?

A.    So like I've laid out in the report, looking at all of the factors, the Cammer, the Krogman, the additional factors, and looking at those -- and understanding that those factors are connected to one another, as I -- you can kind of see that in my descriptions of the different factors.

So I think it's somewhat impossible to actually isolate the different factors because they're connected for a given company, as well. So, really, we're just really evaluating the company's securities over a certain time period to ask whether the market seems to reflect information and be efficient.

Q.    So there's no objective measure that you follow?

A.    Well, I think, I think the objective measure is looking at the different factors, and then the conclusion is based on what those factors show.

And, again, each of the factors can weigh either for or against or sometimes a factor

Page 102

might be more inconclusive.  But the objective of the assessment is to be pointing to the analyses that come out of each of these factors.

Q.   Do you weigh any of these factors more heavily than any others?

A.   Personally, I do not.  I look at all of the factors.

Q.   So how do you determine whether there is enough support to support the presumption?

MR. LAVELLE:  Objection to form.

A.   So my conclusion of market efficiency is based on looking at all of the factors and then ultimately asking the fairly straightforward question which, which is, does this appear to be a company whose securities garner and generate interest from investors.  And is this a company whose prices appear to reflect public information.

And, ultimately, that's the question that I'm asking, and each of those factors speaks to that, that question.  And, ultimately, answering that question "yes" or "no" based on what the -- based on the review of these factors.

Q.   But you can't point to any specific criterion that will then let you -- lead you to

Page 103

decide one way or another?

MR. LAVELLE:  Object to form.

A.    Well, the criteria is the evaluation of the Cammer and the Krogman and the additional factors.

Q.    Right.  But you've testified that there doesn't need to be a -- there isn't a weight. There doesn't need to be a particular number of factors.  I just want to know what you yourself follow when making the decision.

A.    Uh-huh.

MR. LAVELLE:  Object to form.

A.    Yeah, I just -- I follow, I follow what the -- based on what the factors show.  I don't -- like I said, I don't count up and say, okay, there's -- let's say there's ten factors and, you know, five are in favor of and four -- sorry.  Five are in favor of and five are against market efficiency and what does that mean.

Because, like I said earlier, I'm not aware of any legal guidance that, that would dictate that type of a bright-line cutoff.  I think that if that were the case for a given company, then that would be consistent with more of like a continuum of market efficiency rather

Page 104

than a bright line.  Because market efficiency could be a continuum like that, then I would take that into consideration.

But, ultimately, I think if the, if the majority of factors weighed against market efficiency, then I would, I would not be able to conclude that a market was efficient for a given company.

Q.   As we'll discuss more shortly in your report, you looked at a series of factors in connection with your market efficiency analysis, right?

A.   Yes.

Q.   Would it be fair to say that these factors are all intended to assess informational efficiency?

MR. LAVELLE:  Objection to form.

A.   Are you contrasting that with another type of efficiency?  I'm not really sure what...

Q.   No, no contrast.  I just want to know if that's how you would characterize what these factors are assessing.

A.   Yeah.  I mean, I would say they assess market efficiency, but what I mean by that is described throughout the report.  We talked about

Page 105

that a little bit earlier in terms of reflecting widely available, clear public information, as well as, you know, generating and garnering investor attention and interest in a company's securities.

Q.    I think you just described that if a majority of the factors weighed against market efficiency, you'd have a difficult time finding that the market was efficient.

What do you mean by "majority"?

A.    Yeah.  So, again, I don't have a bright-line cutoff in terms of an actual counting up of the different factors, but I was just giving I think one hypothetical illustration.  So I don't, I don't have a definition of whether that's a simple majority of more than 50 percent or some sort of super majority.

But, you know, I guess just off the top of my head, if I was -- if I were to evaluate ten factors and five -- sorry.  Let's say ten factors and six weighed against market efficiency in a simple majority like that, I think it's unlikely that I would give an unqualified opinion that the market was efficient in that type of hypothetical scenario.

Q.    Do you have a standard methodology that you apply or can -- or does the rule that you apply change from case to case?

A.    No.

MR. LAVELLE:  Objection.

A.    The analysis is objective and it's consistent across every case in which I've conducted a market efficiency analysis.  That objective methodology is to evaluate the Cammer factors, the Krogman factors, and the additional factors that I analyze in my reports.

Q.    Then what is the objective rule for you to determine how many factors are required to find market efficiency?

MR. LAVELLE:  Objection.  Form.  Asked and answered.

A.    Like I said earlier, there is no rule that I'm aware of from any sort of case law in terms of counting up the factors.

And, as I understand it, that's the role of an expert witness, is to apply expertise that's derived from professional and academic experience to the output of each of these factors to reach a professional opinion and determination of market efficiency.

Page 107

Q.   Wouldn't that expert be expected to provide a consistent approach or methodology?

A.   You know, like I explained, that approach and methodology is consistent in its objective and it's to evaluate the Cammer and Krogman and additional factors like I've done here and in all of my expert reports.

Q.   So I understand what it is that you are evaluating, I'm trying to figure out what it is that you -- after you've done this analysis, how you determined that there is an efficient market based on that analysis.

MR. LAVELLE:  Objection to form.  Asked and answered.

A.   Yeah.  So, like I explained, the actual efficiency of the market for any given company, it depends on the circumstances for that company, and that can differ on different companies.

So, as we talked about earlier, the output of an auto correlation test, that can vary.  You may actually see auto correlation for some companies, but that in and of itself does not indicate that the market is inefficient. There can be other causes or underlying reasons or rationales for the presence of auto

Page 108

correlation.

So when I -- if I were to see that, I would investigate further and evaluate the company and its, its specific situation to make any -- make an assessment of how that factor should be interpreted.  And because of that, just illustrating with one of these factors, I think it's important that that illustrates why professional expertise and judgment comes into play when an expert witness evaluates each of these factors in order to reach a professional opinion on whether or not a market is efficient.

It's really to look at all of the information holistically for a company, apply these objective criteria in terms of these factors and the tools of financial analysis and economics in order to reach a professional opinion.

Q.   Okay.  Let me try to break it down.

There are 11 factors that you applied in this particular case, right?

A.   That sounds about right.  Yes.

Q.   And let's say, hypothetically, you applied the same 11 factors to a different case.  And, in this case, you found that all, that all

Page 109

five Cammer factors found in favor of market efficiency but none of the others do, and in the other case, you found the exact same -- you came to the exact same conclusion.  All five Cammer factors are in favor of market efficiency but the other six do not.

Is it your position here today that you may come to a different ultimate conclusion between those two cases, depending on the facts and circumstances?

MR. LAVELLE:  Objection to form.

A.    I don't have any reason to believe that I would come to a different conclusion in each of those two hypothetical scenarios.

Q.    So in a situation where the same factors weigh in favor of market efficiency across cases, you would imagine that you would come to the same conclusions?

A.    I would expect to come to the same conclusion most likely, yes.

Q.    What if it was only three of the Cammer factors?  Does that change your opinion?

A.    Well, I don't have an opinion on what I would conclude in terms of market efficiency. If, if only three of the factors weighed against

Page 110

market efficiency, I would need to evaluate that type of scenario.

Q.     I just mean whether your ultimate opinion would be different in one case versus the other.

MR. LAVELLE:  Objection.

A.     Yeah, I would -- really without, without looking at the individual cases and conducting that assessment, it's difficult for me to know what my opinions would actually be.

Q.     So as you go through your analysis, you are, you are not looking to hit some sort of minimum threshold in making your decisions?

MR. LAVELLE:  Objection to form.  Asked and answered.

A.     Like I said earlier, I'm not aware of any sort of bright-line threshold or benchmark in terms of just simply counting up the factors.

Q.     So you don't apply one?

MR. LAVELLE:  Object.

A.     No.  I think I answered that previously. I don't have a bright line just simply counting up the factors, but rather it's based on a professional assessment of information that's reflected in all of these factors.

Page 111

Q.    Is there a minimum threshold?

MR. LAVELLE:  Objection to form.  Asked and answered.

A.    You know, I think I've answered this question multiple times.  I'm probably going to just point you to my previous answers.

Q.    I don't believe that you have answered the question.  I'm going to ask you again:  Is there a minimum threshold?

MR. LAVELLE:  Objection to form.  Asked and answered.

You can answer the question, but then I think it's time to move on.  He's answered this question six, seven, eight times now.

A.    Yeah, I've answered this question a number of times.

Q.    Dr. Cain, it's a "yes" or a "no."

A.    Like I answered multiple times, I'm not aware of any, any case law that puts forward any sort of bright-line threshold and, also, which would just advocate simply counting up the numbers.

Q.    So you don't know if there's a minimum threshold?

A.    I don't believe -- I don't believe that

Page 112

there is a minimum threshold that's been articulated in the case law.

Q.    In your report, you note that AdaptHealth was taken public as part of a SPAC transaction, correct?

A.    Yes.

Q.    What is a SPAC?

A.    A SPAC stands for I believe special purpose acquisition company.  And it is, at a very general level, a pot of money.  When a sponsor raises capital from investors, typically, they'll sell shares of a SPAC company -- S-P-A-C, SPAC -- for $10 per share, and then the sponsor typically has two years to go out and look for a private acquisition target because the SPAC shares are publicly listed on a public stock exchange.

And if the SPAC is able to find a private target to acquire within that two-year window, they will -- and get an agreement, then they'll purchase the target company and the target becomes publicly listed by virtue of the SPAC's public listing.

Q.    And do you understand that to refer to a de-SPAC transaction or a de-SPAC merger?

Page 113

A.    Yes.

Q.    The beginning of the punitive class period in this case follows the AdaptHealth de-SPAC transaction; is that correct?

A.    Yes.

Q.    Are you aware that de-SPACs commonly involve lockup agreements?

A.    Yes.

Q.    And lockup agreements restrict shareholders from selling a company's stock, correct?

A.    For the, for the individuals who are subject to the lockups, yes.

Q.    And, therefore, if there is bad news about a company, holders of locked-up shares cannot sell their stock, right?

MR. LAVELLE:  Objection to form. Foundation.

A.    I believe that it would be difficult for the holders who are subject to a lockup to directly sell those locked-up shares during the lockup period.  There may be other situations in which they could still engage in short selling. They may be able to engage in other types of derivative trading, to either hedge or speculate

Page 114

outside of the locked-up shares.

But I, I do -- my general understanding is that when shares are locked up, they're not able to be sold.

Q.   So the lockup could prevent the stock price from falling, right?

MR. LAVELLE:  Same objections.

A.   No.  I don't think that's necessarily true.

Q.   Why not?

A.   Well, when, when negative -- you know, new negative value-relevant information comes out for a company that is trading in an efficient market, stock prices tend to react very quickly. They often start reacting within a number of minutes, and that's because of the presence of professional traders such as hedge funds, high-frequency traders, arbitragers who may sell stock.  Individuals may engage in short selling. Market makers may quickly update prices to reflect new information so that the market makers do not lose money based on their market-making activities.

And so prices can very easily still quickly react to new information even if large

Page 115

chunks of shares are subject to lockups.

Q.    But if, if there's a number of holders that are subject to lockups and that can't sell their shares, doesn't that affect informational efficiency?

MR. LAVELLE:  Objection to form. Foundation.

A.    Not necessarily.  And that's -- again, I think that's why we're evaluating all of the factors in a report like this.  So it's somewhat of an empirical question.  Do we see evidence of efficiency for a given company, you know, over a certain time period despite the fact that some shares may be locked up.

Q.    Are you aware of academic literature that finds, even for a company whose stock generally trades on an efficient market, there could be periods of time when stock may not be trading in an efficient market?

A.    I am generally aware of various types of literature that, again, it often talks about anomalies, which we talked about earlier today. But, frequently, when those academic studies talk about efficiency, they're often talking about something that's fundamentally different from

what we're talking about in a market efficiency report like this, even though they're using the same, same words of efficiency.

So they may -- they may say that the market is inefficient because instead of the price reacting, you know, within a matter of milliseconds, now it's taking a couple of minutes for the price to react, where the bid-ask spread widened from, say, .5 percent to .7 percent.  And they may call that evidence of inefficiency, whereas that's -- that's very unique to the academic setup, setting in which they're studying and yet those types of findings certainly would not imply that information fails to be rapidly incorporated into stock prices within one or two or three trading days.

So I think it's really important if you're talking about other academic literature on market efficiency to understand the context within which they're using those, those types of terms.

Q.   Specifically, are you aware of academic literature that find evidence of market inefficiency in the months following a company's initial public offering or de-SPAC merger because

of, in part, the existence of these locked-up agreements?

A.   I have seen some literature that does talk about, like, for example, following IPOs, you may get price support from the investment banks that took the company public and they may attempt to prop up the price.

I think, generally, what many other studies have found is even though the investment banks may attempt to prop up the price, they often fail to do so if bad news is actually coming out for a given company.

But, you know -- so I'm generally aware of different types of literature that debates some of these questions.  I don't think there's a clear consensus on findings for those types of studies.

Q.   So are you not aware of academic literature surrounding the existence of the locked-up agreements?

MR. LAVELLE:  Objection to form.

A.   No.  I think, as I explained in my previous answer, I am aware of this type of academic literature.

Q.   I think you said earlier some of it you

Page 118

believe it says that a market may not be efficient because, instead of minutes, it takes several days.

But isn't your market efficiency analysis here only looking at one day?

MR. LAVELLE:  Objection to form.

A.    I think the answer -- the illustration I gave was going from milliseconds to minutes in terms of information being impounded into stock prices.

But I also did earlier state that, in my experience, information, when I say it's quickly incorporated into stock prices, that that typically occurs in three trading days or less for the complete incorporation of information into stock prices.

In my report here, I do a couple of things.  So I'm really asking -- like I said earlier, also, I'm setting a high bar for the Cammer 5 analysis because I'm really asking is there evidence that within the first trading day the prices are reacting to new information.  So that's a very high bar.  I'm looking for a very quick type of reaction within the first available trading day.

But I also have an auto correlation test which really would ask does the market consistently underreact or consistently overreact to new information, which, which could then -- that could take a number of days.  And if I were to see that pattern in the auto correlation test, then I would want to investigate further.

Q.    So the answer was "yes," you do just look at the first trading day in your market efficiency analysis here?

MR. LAVELLE:  Objection to form. Misstates prior testimony.

A.    No.  That was not the answer I gave.

Q.    Didn't you just say you hold Cammer 5 to the high -- highest standard because you're only looking at the one trading day?

MR. LAVELLE:  Same objection.

A.    That was part of my answer.  But I also explained that if it consistently takes a number of days for information to be impounded into the stock price, then that would show up in my auto correlation test.

Q.    Did you look into whether there were any lockup agreements that expired in the months following the AdaptHealth de-SPAC merger?

Page 120

A.   I don't, I don't believe so.

Q.   Did you consider whether the presence of locked-up agreements affected the efficiency of the market for the AdaptHealth stock following the de-SPAC merger?

A.   Well, like I said earlier, I am aware that lockups are commonly present in both IPOs and SPAC transactions, so that's something I'm aware of and I do consider that.  And that's, that's why I look at all of the different Cammer and Krogman and additional factors in a market efficiency report because those span the entirety of the class period, which also includes the time period during which any shares were locked up.

Q.   So you considered the presence of locked-up agreements here?

A.   Yes.  In general, I do understand that there are lockups.  I don't recall the specific nature of the lockups for AdaptHealth's de-SPAC transaction, but it's something that I'm aware of and I consider it and, in my professional opinion, these factors are capable of incorporating that fact in a market efficiency evaluation.

Q.   So I'm not really asking in general.

Page 121

I'm asking specifically, in this matter, did you consider the presence of lockup agreements because you just testified that you weren't even aware that any were -- had existed.

MR. LAVELLE:  Objection to form. Misstates prior testimony.

A.    Yeah, so --

MR. LAVELLE:  Asked and answered.

A.    -- I don't think that's what I said, but I do consider that lockups are generally present. I did not specifically investigate the exact provisions or timing of AdaptHealth's lockup expiration.

But, like I said, that fact is fully incorporated in the efficiency tests that I've carried out across the various factors.

Q.    And you testified earlier you didn't analyze any subsets within the class period; you analyzed the class period as a whole when you looked at your factors, correct?

MR. LAVELLE:  Objection to form. Misstates prior testimony.

A.    No.  I think what I explained was that I've evaluated the full overarching class period; that I've also explained that the efficiency

Page 122

conclusions apply throughout the class period because the factors that I have analyzed are present throughout the class period.

Q.   I think you stated earlier that you use an academic study which you refer to as the MRK study for comparison purposes when walking through your factors; is that correct?

A.   Yes.

Q.   What is your basis for using the MRK study as the primary comparative measure?

A.   Well, it's --

MR. LAVELLE:  Object to form.

A.   It's certainly not the primary comparative measure.  So the starting point for me with the various factors is to ask whether the courts have provided a comparative benchmark for a given factor.

For example, if the Cammer court says that five or ten market makers would support market efficiency or traded -- weekly average trading volume of 1 to 2 percent over the class period would support market efficiency, then I compare it to those metrics that have been provided by the courts.

But for a number of factors, the courts

Page 123

have not provided a benchmark for comparison.  So for those metrics where I'm able to, I'm pointing to comparison benchmarks from that MRK study. And the basis for doing so, ultimately, is that the MRK study is based on samples of companies around the same time period that the Cammer decision came out.  So it's relevant in terms of time period.  And it's also talking about the same types of issues that we're talking about in a market efficiency analysis which, again, ultimately is asking whether investors are paying attention to a company's stock or securities.

Q.    You said just -- I believe earlier you testified that you aren't giving a legal opinion, so why does it matter whether courts provided benchmarks?

A.    Well, I think if the court says -- like, for example, I could jump down to average weekly trading volume in paragraph 28 where the Cammer court said turnover measured by average weekly trading of 2 percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one and 1 percent would justify a substantial presumption.

Page 124

So that's not my legal opinion.  That's something that a court has said.  And so I do my analysis as a financial expert, as a financial economist, to calculate the average weekly trading volume over the class period and I report that statistic and compare it to what the court has said is a relevant benchmark.

So I'm guided by what the courts say even though I'm not myself providing any legal opinions or conclusions.

Q.    Right.  You're applying what you understand the court said, correct?

A.    Yes.

Q.    And what I want to understand is, as an economist, why is it appropriate to follow a court measure as opposed to economic principles?

MR. LAVELLE:  Objection to form.  Asked and answered.

A.    Yeah, I think one of the things I explained earlier is that the -- that's important to consider is that these factors that the courts have given to us are -- they're grounded in the principles of finance and economics and financial analysis.

And these were not -- like, these were

Page 125

not variables or data sources that just popped into existence when the Cammer court issued its opinion but rather these were things that have been studied by academics for many decades leading up to the Cammer decision.

So when we talk about trading volume, that's something that's been around for, for many, many decades and it's something that's been measured and studied and evaluated by academics for many decades. So these, these were all relevant metrics that are grounded in finance and economics.

Q. What academic studies set the thresholds on weekly trading volume?

A. So I'm not aware of any academic studies that provide a bright-line threshold for any metric that an expert is supposed to apply in a market efficiency analysis.

That's why earlier when you were asking those repeated questions about what is the threshold for determining market efficiency, that it ultimately involves an opinion provided by an expert. It's not just something that spits out of a computer but, rather, an expert looks at the data, looks at the output of an analysis of the

Page 126

data and provides an assessment, a professional assessment and opinion of what the data reveal.

Q.   And what benchmark did you apply in this case?

A.   For trading volume?

Q.   Sure.

A.   Okay.  So I, I reported AdaptHealth's trading volume.  I compared that to both the benchmark from the Cammer opinion, that 1 to 2 percent benchmark, and also just the numbers of shares that were reported in the MRK study.  So I compared it to both the Cammer court as well as the MRK study.

Q.   Are the MRK-covered firms actually analogous to AdaptHealth?

MR. LAVELLE:  Objection to form.

A.   Well, I think, ultimately, that's the question I'm asking when I, when I point to those comparisons, is to really ask is AdaptHealth more comparable to those covered firms in the MRK study that elicit a high degree of investor attention and interest and are consistent with market efficiency or is AdaptHealth more consistent with the -- sort of the sample firms that do not have any analyst coverage from the

Page 127

MRK study where those firms do not seem to elicit a high degree of investor interests.  So that's kind of the empirical question that I'm asking.

And the conclusion that I reach in this report is that on each of the factors on which I'm pointing to the MRK study, AdaptHealth is much more comparable to those covered firms that elicit a high degree of investor interest and are -- seem to be consistent with market efficiency.

Q.    What are the MRK-covered firms?

A.    Those are firms that, that have analysts following analyst coverage of those firms.  And, as I think I explained, I have to look throughout my report and at the study to get into more details, but I think those are also firms that have higher market capitalizations; they have lower bid-ask spreads; they have higher trading volume; they have more institute -- institutions that own their stock.  These types of factors tend to be correlated with each other.

Q.    But do you know the specific firms?

A.    Well, it's a large sample of firms.  I think -- let me see.  I don't -- I'd have to turn back to their study and actually read through it

Page 128

to give you more details on the firms.

Q.    In what ways are those firms analogous to AdaptHealth?

MR. LAVELLE:  Objection to form.  Asked and answered.

A.    Yeah, it's like I explained.  These firms and AdaptHealth tend to have higher market capitalizations.  They tend to have lower bid-ask spreads.  They tend to have more institutional ownership.  They tend to have analyst coverage, a higher trading volume, those types of things.

Q.    Did you do anything to compare AdaptHealth to those firms before comparing the results of your factor analysis?

MR. LAVELLE:  Objection to form.

A.    I'm not, I'm not really sure what you mean by that.

Q.    It seems like your, your comparison of the firms in the MRK study and AdaptHealth are all on the back end after you've applied the MRK study.

Why did you think the MRK study was appropriate to apply before you had actually done the factor analysis as a comparison point?

MR. LAVELLE:  Objection.

A.    So I employ -- or I refer to these benchmarks from the MRK study in every market efficiency report that I do.  So it's, it's something that is applicable to any type of company because these are very large samples of companies spanning all industries in terms of publicly traded company stocks.

So, really, it's just a question, then, of looking at those, those samples -- those two samples within the MRK study on an ex ante basis and then applying and calculating the actual factors for a given company like AdaptHealth here, and then drawing that comparison.  So it's completely objective in every market efficiency report.

Q.    Did a court approve of the MRK study as one that is usable for an economist in a market efficiency analysis?

A.    I've -- like I said, I've employed that in all of my market efficiency reports, and several of the cases in which I've provided efficiency analyses have been approved for class certification on the basis of my market efficiency analyses.

Q.    Did you, did you apply this MRK study

because a court said this was an approved study, or was that just -- it was all after the fact?

MR. LAVELLE:  Objection to form.

A.    Well, I think, as you'll see in my report, I cite to many academic studies, and those are based on my professional expertise as an academic and a financial economist and not because I'm relying on any court for providing my opinions that relate to financial economics.

Q.    Well, you've testified a number of times that you take direction from the court, and so did a court tell you to apply the MRK study?

MR. LAVELLE:  Objection to form. Misstates testimony.

A.    No court has ever ordered me to consider any particular academic study, including the MRK study but, rather, I rely on the studies that I feel are most appropriate for a given circumstance.

Q.    And why is this study appropriate?

A.    Well, I think I've explained that several times, but I'll say it again.

The reason that it's appropriate is because it's asking the same fundamental question that we're asking in a market efficiency report

Page 131

or a market efficiency analysis, which is are investors paying attention to a given company?

And the way we assess that question is by looking at various indicia of market efficiency such as the size of the company:  The trading volume; the bid-ask spread; the presence of institutions; as owners, the presence of research analysts who are following a company and disseminating new information to investors.

Those are the factors that, as a financial economist, I would consider relevant to a market efficiency question.  Those are the factors that the Cammer and Krogman courts have instructed are relevant and those are the various factors that are studied and evaluated in the MRK study.

Q.    Did the MRK study actually analyze market efficiency?

A.    I think that they analyzed the factors that are consistent with market efficiency.  I don't think they used the phrase "market efficiency."  They tended to talk about investor interest or investor attention.  But I think, fundamentally, these are, these are two intertwined concepts, just using different

Page 132

phrases.

Q.    Did they come to any conclusion on market efficiency with respect to any of the firms that they analyzed?

A.    They, they concluded that their sample of covered firms elicit a high degree -- a much higher degree of investor attention and investor interest than the other firms, the sample firms.

And, like I said, that's, that's essentially the same thing as saying "market efficiency," where it's very closely tied to market efficiency, even though they don't use that phrase.

Q.    Why don't we walk through the factors that you relied on.

First, let's go through the Cammer factors.  You analyzed five factors described in the Cammer case for the market for AdaptHealth Class A Common Stock during the punitive class period, correct?

A.    Yes.

Q.    Turning to the first factor, which is average weekly trading volume.  Did you analyze this factor for the entire punitive class period?

A.    I believe so, as I've described it in my

Page 133

report.

Q.    All right.  Let's turn to Exhibit 2 of your report, which is I think on page 53.

A.    Okay.

Q.    This chart shows the average weekly trading volume over the entire punitive class period, right?

A.    Yes.

Q.    It measured the average weekly trading volume to be 3.56 percent, right?

A.    Yes.

Q.    And that's in that little box on the top left?

A.    Yes.

Q.    And this exceeds the 1 percent and 2 percent thresholds that you pointed to from the Cammer court?

A.    Yes.

Q.    Did the average weekly trading volume exceed the 1 percent and 2 percent thresholds at all times during the punitive class period?

A.    I don't know.  That's, that's not a question that I sought to answer.

Q.    If, for example, you found AdaptHealth's trading volume was below the 1 percent threshold

during the three months immediately following the de-SPAC merger, would you conclude that the three-month period was not efficient?

A.    No, of course not.

Q.    Why not?

A.    Because trading volume fluctuates.  And there's a reason that trading volume fluctuates, and the reason is that we tend to see spikes in trading volume when new information, particularly new value-relevant information comes, out for a given company.

And as I document later on in Cammer 5, it was -- it tended to be later on in the class period when we saw more value-relevant information coming out in terms of AdaptHealth and earnings growth or, or just earnings release growth and guidance and larger M&A transactions.

So we would certainly expect that on days or weeks or time periods in which less new information is coming out, that we're going to have lower trading volumes and that when we have days or weeks or time periods when more information is coming out, we have higher trading volumes.  And that's, that's consistent with market efficiency.

Page 135

Q.    What else would you need in order to conclude that the period following the de-SPAC is not efficient?

MR. LAVELLE:  Objection to form.

A.    I don't -- I'm not sure what you mean in terms of "what else."  I don't think I said anything in terms of evidence of inefficiency following the de-SPAC period.

Q.    You've stated that if the threshold -- if the trading volume was over 1 percent in the three months that followed de-SPAC, that wouldn't be enough.

I'm asking, what would you need in order for you to determine that that period was not efficient?

MR. LAVELLE:  Objection to form.

A.    Well, again, this -- so I think it's important to consider and to keep in mind that the trading volume benchmark, that's something to be applied -- that's intended to be applied over the full class period, and there's a reason for that, like I just explained, which is that trading volume tends to fluctuate with the extent of new information that's coming out.

So I would be looking at really over the

Page 136

full class period because we certainly expect to have periods where there's relatively little trading volume and there's valid reasons for that.

But, ultimately, I would be looking at just all the different factors and I would be asking myself, is there really strong evidence of, you know, market inefficiency during a particular sub period, like you're referring to.

So as you can see throughout the exhibits, I try to report to the best of my ability each of these exhibits throughout the full class period so that I can evaluate and consider whether there are significant differences at certain points during the class period. I won't waste your time with going through each of those other factors, but I have looked at each of the other factors -- each factor both over the full class period as well as during -- you know, concerning sub periods of the class period.

Q. So if you found that AdaptHealth's trading volume was below the 1 percent threshold during the three months immediately following the de-SPAC, would that mean that this factor does

not weigh in favor of market efficiency for that three-month period?

MR. LAVELLE:  Objection to form.

A.   No.  That would be an incorrect conclusion based on the lengthy explanation that I gave you with the previous two responses.

Q.   And why is that?

A.   Well, I don't want to repeat everything that I just said, but as I explained, we expect to see fluctuations in trading volume based on the amount of new information that's value relevant coming out for a given company.

And so, for example, we'll have days where there's relatively little trading volume. That does not mean that the stock was inefficient on that day.  It may just mean that there was no new information that investors wanted to trade on on a given day.

And so you can have that go well beyond a day.  You can have weeks or even months where there's relatively little new information, and that's coincidentally something that I observed going on with AdaptHealth when I carried out my Cammer 5 analysis.

And what else I explained was that, for

that reason, the average benchmark or trading volume is intended to be applied over a full class period and it's not intended to be applied for shorter sub periods within a class.

Q.    What is your basis for that understanding that it is not meant to be applied over --

A.    Yeah, that's --

THE REPORTER:  I couldn't hear.  Over...

Q.    -- a shorter time period?

A.    That's, that's based on my expertise as a financial economist; as one who has studied corporate disclosures, securities prices, the trading of securities; someone who has worked as an analyst; someone who has conducted academic research and taught on a variety of courses on finance, as well as someone who has carried out many market efficiency analyses.

Q.    Okay.  Can you point to a specific court ruling or study that demonstrates that this needs to be examined over the full class period?

A.    I do believe I've seen that in some court opinions around the class certification stage, but I don't have those memorized.

Q.    And I understand your testimony that,

you know, even though there may not be a high level of weekly trading volume, other factors may show that the market was still efficient.

But, with respect to this specific factor, putting aside your view that it's meant to be put over the entire class period, assuming it was only meant -- that you could apply it to sub periods and that -- and during that sub period, the average weekly trading volume was less than 1 percent, would that trading volume mean that this factor does not weigh in favor of market efficiency?

MR. LAVELLE:  Objection to form. Misstates prior testimony.  Asked and answered.

A.    So, again, I think I've explained that a number of times, so I'm not going to repeat the entirety of that response.

But I think that what you see for companies is that we do typically see large spikes in trading volume when new information comes out, and that's, that's part of the understanding of a Cammer 5 analysis and that's also part of what's driving the changes in fluctuations in trading volume for a given company.

Page 140

So when we look at a company like AdaptHealth, if there's a period during which relatively little new value-relevant information is coming out, then in no way would I be surprised that trading volume is relatively modest.

And I could then draw a comparison to that by pointing you to Exhibit 7 where we have some larger information events from larger acquisition announcements, the alleged corrective disclosures, bigger earnings, misses.  And around those, we see very large spikes in trading volume, and that's consistent with market efficiency.

So, like I said earlier on, it's important to understand that all of these factors are interconnected and tied together.  You cannot really look at any one factor in a vacuum, but you really have to consider them holistically.

Q.    Are you suggesting that there was no value-relevant information disclosed in the first three months after the de-SPAC?

MR. LAVELLE:  Objection to form. Misstates prior testimony.

A.    That's certainly not what I testified.

Q.    Then I'm just trying to understand for this specific factor, putting aside your views on the other factors, why this factor would weigh in favor of market efficiency if for a sub period it's below that 1 percent threshold.

MR. LAVELLE:  Objection to form. Misstates prior testimony.  Asked and answered.

Again, it's a question you've asked over and over again.  I think it's time we move on.

You can answer again, Dr. Cain.

A.    Yeah, I think I've answered the same question a number of times, so my answers are going to be quite repetitive at this point.

But --

Q.    I'm really just asking you a yes-or-no question and I've yet to receive an answer to.

The question is:  If the results are less than 1 percent, does that mean trading volume is not a factor in support of market efficiency here?

MR. LAVELLE:  Same -- excuse me.  Same objections.

A.    So what I would say is, over the full class period, if the average weekly trading volume was less than 1 percent, then I would

Page 142

conclude that that factor did not weigh in favor of market efficiency.

But, as I explained a number of times, I would fully expect to see daily fluctuations in trading volume. And for a wide variety of companies, we'll see plenty of days in which trading volume could fall well below 1 percent on fairly quiet days. And that does not mean that those individual days are inefficient. There's other reasons and causes and drivers for fluctuations in trading volume, and that applies not only to days but to weeks and even months for different companies.

MR. IANNECE: I think we've been going for about an hour. Why don't we go off the record.

MR. LAVELLE: Okay.

VIDEOGRAPHER: Off the record, 1:35.

(A recess was taken.)

AFTERNOON SESSION

VIDEOGRAPHER: On the record, 2:11.

BY MR. IANNECE:

Q. Dr. Cain, I believe the next factor that you discuss in your report is the analyst coverage, correct?

Page 143

A.    Yes.

Q.    And this factor looks at how many analysts cover a company's stock; is that right?

A.    Yeah.  It looks at both, both how many and how many reports were issued by the respective analysts.

Q.    Why is the number of reports issued relevant?

A.    I think that it's, it's relevant because there's this question of is, is information that's being generated about a given company, is that being disseminated or circulated out into the marketplace among investors, at least professional investors or institutions.

And so you can get some sense of that from looking at both the number of analysts covering a stock, as well as the number of reports that are issued, and with the caveat that this is a lower bound because a lot of analyst coverage is done on a confidential basis and through reports or interactions that are not publicly observable, even though they're still contributing to market efficiency.

Q.    And how would it be contributing to market efficiency if it's not widely publicly

Page 144

available?

A.    Because those interactions with professional investors still help them to become informed, and a lot of those professional investors are trading in large blocks and their trades can have very quick and significant impact on the prices.

So separately we talk about institutional investors and the presence of institutional investors and their importance and usefulness in market efficiency, and one of the ways that some of those institutional investors get informed is through their interactions with analysts even though those interactions and some of those reports are not publicly available.

Q.    And that's not observable to you from an economic standpoint, correct?

A.    Some of those are not publicly observable, that's correct.

Q.    Going to paragraph 31 of the report.  It states that, as part of your analysis of this factor:  The content of analyst reports includes information that the analyst believes is important for investors, right?

A.    Yep.

Page 145

Q.    What is your basis for that understanding?

A.    Well, I guess I would start with the fact that I myself was an analyst for a couple of years before pursuing a Ph.D. in finance, and so I have professional experience as an analyst in putting information into reports for investors on a confidential basis that I felt or the team felt or the company felt was important for investors.

And then analyst reports have been widely studied by academics.  There were a lot of academic studies that have shown that when analysts put out reports, that there's information content of those analyst reports, and that can be reflected in changes to the price target, changes to the buy/sell recommendations, but also the actual text of the commentary, the soft information that's contained within analyst reports.  So that's reflected or documented by a wide variety of academic studies.

And I've also interacted with analysts, research analysts, as well.  And, also, my professional experience as an expert witness who's -- as a financial expert in terms of evaluating the content, the actual content of

Page 146

analyst reports in a variety of cases.

Q.   What is the threshold for how many analysts is indicative of market efficiency?

A.   Yeah.  So I think, I think that the Cammer court, to the best of my knowledge, did not articulate an actual threshold, so I think that just documenting some degree of analyst coverage is useful in the context of the Cammer opinion.

And then, also, I note in paragraph 34 of my report, I also compare it to the MRK study, which found that almost 20 percent of US firms had no analyst coverage in a given year within that, that sample.

Then in a separate academic study, I point to documents that firms are covered between, you know, on average, fewer than one analyst up to about seven on average, based on the total number of analysts forecasts that are issued.

So I don't think there's one short and easy answer to that -- to your question in terms of an actual threshold, but in my professional experience, just knowing that almost 20 percent of companies don't have analyst coverage,

documenting any degree of analyst coverage I think weighs in favor of market efficiency.

Q.    So, in your opinion, one is enough?

A.    I think --

MR. LAVELLE:  Object to form.

A.    I think -- again, I -- as I described earlier, that I consider both the number of unique analyst firms as well as the number of reports.  So, for example, if we only had one analyst covering a firm and they only issued one report during a two-year class period, I think it's unlikely that I would count that as weighing in favor of market efficiency.

In contrast, if there was one analyst covering a firm and they issued a report every month during the class period, including reports, you know, that were concentrated around new information such as earnings releases or things like that, then it's more likely that I would view that as weighing in favor of market efficiency.  So it kind of depends on the actual context.

Q.    Paragraph 33 of your report, and also on -- in Exhibit 3, you note that you identified 95 reports issued by analysts at eight separate

Page 148

firms; is that correct?

A.    Yes.

Q.    How did you go about identifying these reports and analysts?

A.    I searched on a database called Investext, and I believe I also received some -- I may have received some batches of analyst reports from counsel, as well.

Q.    For what time period did you search?

A.    The class period that's indicated at the top of Exhibit 3, November 11th, 2019, through July 16th, 2021.

Q.    Is 95 all of the analyst reports over the entire punitive class period?

MR. LAVELLE:  Objection to form.

A.    Like I said earlier -- sorry.

Like I said earlier, that's likely -- that tends to be a lower bound.  So there's frequently additional analyst reports that I may not have access to through Investext or that counsel may not have access to through their database.  Some analysts produce reports that are only covered in certain databases.  Some analysts produce reports that are not covered in any databases but may be discoverable through a

Page 149

document request.

And, also, you know, analysts may have provided coverage before the start of a class period, but that's not part of what I'm counting here.

Q.    You say that the list analyst reports includes firms that conducted thorough and detailed research on AdaptHealth and its industry and that collectively this is a significant degree of analyst coverage?

A.    Yes.

Q.    That's correct?

A.    Yes, that's correct.

Q.    Did you review all 95 of these reports?

A.    I skimmed through some of the reports, but I did not review each one in detail.

Q.    So what is your basis to say that they are thorough and detailed?

A.    Yeah, so my basis is my familiarity with these firms.  So I say the list of analyst reports includes firms that conducted thorough and detailed research on AdaptHealth, as well as its industry.  I'm familiar with the firms that I've listed or named in paragraph 33, and I've also skimmed through a representative sampling of

Page 150

analyst reports.

Q.   So when you say "thorough and detailed," are you referring more to your sort of historical opinion of the analysts?

MR. LAVELLE:  Objection to form.

A.   Well, it includes my professional familiarity with these firms, as well as, like I said, a cursory review to confirm that these are -- you know, that we're talking about reports that discuss AdaptHealth or talk about issues related to AdaptHealth as opposed to -- you know, there are some analyst reports out there that are more quantitative in nature and do not provide as, as much of a thorough or detailed discussion of issues relating to companies.

Q.   Why is this, in your opinion, a significant degree of coverage?  Is it due solely to the number of reports?

MR. LAVELLE:  Objection to form.

A.   So, like I said, I looked at the analyst coverage of AdaptHealth and I noted that it included a number of different separate unique firms.  It included a number of analyst reports over the full class period and that those reports provided detailed and in-depth analysis and

discussion of AdaptHealth and its industry.

So my, my statement there, my conclusion that's included within that statement is based on my review of the actual analyst coverage.

Q.   And your view, as you testified earlier, was a skim of the reports?

MR. LAVELLE:  Objection.  Misstates prior testimony.

A.   I think I said I reviewed a sampling of the reports to ensure that -- to make sure that my description is accurate.

Q.   And these eight separate firms that you have listed in the exhibit, they covered AdaptHealth at some point during the punitive class period, right?

A.   That's, that's -- my recollection is that each of those provided some coverage at some point, yes.

Q.   Did they cover AdaptHealth for the entire punitive class period?

A.   I would assume that this started to build up throughout the class period because, typically, in my experience with SPAC or de-SPAC transactions is that the analyst coverage waits until a business combination has been completed

Page 152

and then it starts to ramp up in the weeks and months after that.

So I'd have to go back and review. I did not conduct a review to add a column to indicate the exact timing of each, each of these reports that's listed or counted in that final column of Exhibit 3. So I'd have to do some sort of more in-depth review in order to summarize the actual dates of each of the reports that are listed there.

Q. And why wasn't a column like that included?

A. It's not necessary. Like I said, I reviewed them to ensure that I was satisfied with my description that's provided in this section of my report.

Q. How would you measure the time period during which a specific analyst covered AdaptHealth?

MR. LAVELLE: Objection. Foundation.

A. So if I -- if I were to set out to ask, I think, what is a separate question, there's a couple ways that I would try to get at that answer. It's difficult to get a complete answer to that question because analyst coverage starts

Page 153

before the first report is publicly disseminated, typically.  So it will, it will typically begin with interactions between an analyst and management, and those analysts will then often have discussions with their subscribers or institutional investors, and it's difficult to capture all of that even though they're adding value and enhancing the market efficiency.

Analysts also participate in earnings calls and sometimes I'll document the time period during which given analysts participated in earnings calls and asked questions on earnings calls which also contributes to market efficiency.  And then I would also look at the dates of the actual public dissemination of publicly available analyst reports and summarize that, if I were to set out to try to do that.

But, like I said, it would still be somewhat of a lower bound of their actual time period providing coverage because it's difficult to really capture all of that through publicly reported metrics.

Q.    And you haven't done any of those things here, correct?

A.    I've not set out to systematically list

out every date of those types of interactions or reports.  Like I said, I did review a sampling of reports to ensure that there was analyst coverage during the class period, but beyond that, I've not taken it upon myself to list out every single date.

Q.    You pointed us earlier to paragraph 34 where you stated that AdaptHealth's analyst coverage is consistent with the MRK-covered firms which are listed as high investor interest; is that right?

A.    Yes.

Q.    What number of analysts did the MRK-covered firms have?

A.    Well, they had at least one, and that's ultimately drawing a comparison between that and the fact that they showed that 19 percent, almost 20 percent of US firms did not have any coverage in a given year.

Q.    Did you consider the number of reports the MRK-covered firms had issued by analysts at that point?

MR. LAVELLE:  Object to form.

A.    No.  I don't, I don't recall if they reported that statistic or not within their

Page 155

study.

Q.    Could you have figured that information out?

A.    I don't know.  I'd have to take a look at their study to see how they described it.

Q.    Is anything below the MRK-covered firms analyst coverage evidence of market inefficiency?

MR. LAVELLE:  Objection to form.

A.    I think that -- like I said, if AdaptHealth did not have any analyst coverage, then that would be consistent with their sample firms that did not elicit a high degree of investor interest.  And if I were to find that that were the case for AdaptHealth, then I would conclude that this factor did not weigh in favor of market efficiency.

Q.    Going to paragraph 35.  You state that: In addition to the analyst coverage, investors could access information about AdaptHealth from a variety of other sources, right?

A.    Yes.

Q.    What are you referring to when you say "a variety of other sources"?

A.    Yeah, I give, I give examples of that in the following sentences.  So I talk about news

Page 156

coverage, which includes widely disseminated public news sources such as Dow Jones, Newswires, PR Newswires, the Wall Street Journal, Reuters, MarketWatch, Investor's Business Daily.  I also mention SeekingAlpha.

And, and then I go on in paragraph 36 to mention all the SEC filings which are also publicly available.

Q.    And how would investors access these sources?

MR. LAVELLE:  Objection.  Foundation.

A.    In my experience, investors access sources through a variety of means.  So, for example, when we talk about SEC filings, you can go to the SEC website.  You can often go to company websites.  You may also have an FTP link that automatically delivers new SEC filings to a computer.

Some professional investors and high-frequency traders have algorithmic trading patterns that actually read SEC filings through the computer program and will initiate trades based on the text parsing of SEC filings.  So there's a variety of means by which investors can access SEC filings.

And I think it's a similar type of answer for news.  Different investors access news through different ways.  I've summarized it here through a Factiva search, a wide variety of news sources in the United States.

Investors, as we talked about earlier today, can have paid subscriptions.  Some of these things are then also picked up and reported on.  It might be behind a pay wall in one source but it's similarly reported on Yahoo! or some other freely available source.  I think similarly with SeekingAlpha and other, other types of Internet-based news services.

Q.    Can investors have that text-searching application you described work for news sources, as well as SEC filings?

MR. LAVELLE:  Objection.  Foundation.

A.    Some, some professional investors do, yes.

Q.    You've conducted a search of press and news articles which produced over 375 articles, right?

A.    Yes.

Q.    What were those articles about?

A.    Well, in a general very high level,

Page 158

those were about AdaptHealth.

Q. Did you review these articles?

A. Yes. I believe I skimmed through those.

Q. How closely would you say you reviewed them?

A. Some more closely than others.

Q. Did you review all 375?

MR. LAVELLE: Objection. Asked and answered.

A. I don't know that I -- I don't know that I necessarily reviewed all 375, but I do recall skimming through Factiva output from a new search, but I don't recall if it was that full batch of 375 or some subset.

Q. Were any of the 375 duplicates of each other?

A. That's possible, yes. That's one of the issues with the counting of new stories in Factiva, is that it includes duplicates.

Q. And how would you identify duplicates?

A. I don't, I don't really set out to try to do that for, you know, for any sort of purposes here.

Q. But if you had to, hypothetically, would you go about doing that -- would you have to

Page 159

review each of them and eliminate the duplicates?

A.    That would be one method that could be employed.  I think the Factiva search criteria does allow for flagging of either identical duplicates or near duplicates.  So there's some gray area in which articles may be almost duplicates but not 100 percent duplicates.  So Factiva has some different criteria for flagging those, I believe.

Q.    So this 375 number, it wasn't filtered for duplicates, correct?

A.    Off the top of my head, I don't recall one way or another.  I'd have to go back and look.

Q.    Did you evaluate whether any of these articles had an effect on the AdaptHealth stock?

A.    I think it's -- certainly, some of these articles correlate with the Cammer 5 analysis that I carry out later in the report.  And I did rely on some of those articles, I think, in identifying certain dates that are evaluated within the Cammer 5 analysis.

Q.    But outside of this specific disclosure, as you identified with respect to Cammer 5, did you evaluate whether any of the others had an

Page 160

effect on the AdaptHealth stock?

A.    I don't believe I did.

Q.    Is 375 articles a lot, in your opinion?

MR. LAVELLE:  Objection to form.

A.    I don't really have a benchmark that I compare the number of news articles to for a given company.  There's, there's a variety of reasons for really tremendous fluctuations in the amount of articles that are produced when you search for a given company.  So we could contrast this with some companies that are retail-oriented and retail-focused, will have multiple articles virtually every day talking about the sponsorships; they have the athletes that they may sponsor; new product lines and new, you know, T-shirts or lines of shoes, things of that nature.

And then other companies may be far more limited to, to really just giving updates on, you know, realized performance of a business like earnings updates and filings of 8-Ks, things of that nature.  So there's really a tremendous variation in the number of articles you see for any given company.

Q.    So you didn't use any benchmark from

Page 161

either the courts or from the MRK study?

A.    So, in this section, really, the benchmark is talking about analyst coverage. This is just -- we're in paragraph 35 and 36 talking about additional sources of information beyond -- above and beyond analyst coverage.  And for those additional sources of information, I'm just mentioning those which I think contribute to efficiency, but I'm not evaluating those as a separate factor, apart from analyst coverage.

Q.    Moving to paragraph 36.  You stated that AdaptHealth produced numerous filings containing company information which were immediately disseminated to the public through EDGAR during the class period.

Do you see that?

A.    I do.

Q.    You state that investors thus had access to publicly available information about AdaptHealth from a variety of sources during the class period and, as a result of the analyst coverage, a number of analyst research reports produced and substantial public dissemination of news, SEC filings, and information about AdaptHealth supports the conclusion that

Page 162

AdaptHealth Common Stock traded in a well developed and informationally efficient market during the class period.

Do you see that?

A.   Yes.

Q.   And I believe you testified earlier that you didn't specifically analyze the sources other than the analyst reports and articles, correct?

MR. LAVELLE:   Objection to form.

A.   So I think my answer before was referring to the last sentence of paragraph 34 where I state:  The significant analyst coverage of AdaptHealth during the class period supports the conclusion that AdaptHealth's common stock traded in an efficient market throughout the class period.

So what I was explaining is that for purposes of Cammer Factor 2:  Analyst Coverage, I'm able to opine on that factor on a standalone basis, as it pertains purely to analyst coverage, but that I then go on and add two additional paragraphs to summarize information and evidence that is further evidence of weighing in favor of market efficiency.

Q.   So did you analyze sources other than

Page 163

the analyst reports or articles discussed in the previous two paragraphs?

A.   So, again, I opine on analyst coverage on a standalone basis in paragraph 34.

And then in paragraph 35, I explain that the analyst coverage, the SEC filings, the news coverage all further supports the conclusion of market efficiency.  And that statement at the end of paragraph 36 is based on the sources that are discussed in this section of the report.

Q.   When conducting this search, did you look for publicly available information about AdaptHealth's officers and directors, as well?

MR. LAVELLE:  Objection to form.

A.   I did not look outside the scope of what's described here, which is SEC filings. It's the analyst reports and it's the news that I've talked about from a Factiva search which, again, covers major news sources within the United States that are printed in English.  So those are the -- and I think, you know, what I mentioned, like SeekingAlpha.  But those are the only things that I considered in supporting that sentence that's at the end of paragraph 36.

Q.   Right.

Page 164

So within that universe, did you look for publicly available information about AdaptHealth's officers and directors?

MR. LAVELLE:  Objection to form.  Asked and answered.

A.    I wasn't looking for any particular type of information or particular disclosure when I summarized these information sources, so I was not looking for information that was specific to AdaptHealth's officers and directors.  I'm sure, based on my professional experience, that the -- many of these sources would speak to questions that relate to the officers and directors, but that's not something that I set out to evaluate.

Q.    And why not?

A.    Because I'm not providing any opinions that are specific to AdaptHealth's officers or directors within this report at this point in time.

Q.    Let's turn to Exhibit 3.  Does this exhibit indicate when any of the analysts began covering AdaptHealth?

A.    Like we talked about earlier, that's, that's not something that I set out to identify.

Q.    So you don't know how many analysts were

Page 165

covering AdaptHealth in the first three months following the de-SPAC merger?

MR. LAVELLE: Objection to form. Asked and answered.

A. No, I don't. And like I said earlier, I think it's actually very difficult to get an accurate answer of analyst coverage on any specific date because it's very difficult to measure from any publicly available sources the interactions that analysts have with company executives and with their paying subscribers or institutional investors.

Q. Okay. Is it -- how about within the first six months after the de-SPAC?

MR. LAVELLE: Objection. Form. Asked and answered.

A. It's going to be the same answer for any, any time period.

Q. If this is so difficult to figure out, then why is this a factor that you're considering?

MR. LAVELLE: Objection to form. Asked and answered. Misstates prior testimony.

A. It's actually not difficult to assess this factor, and I actually have assessed the

Page 166

factor.  You're asking a really different question that I have not sought to answer in this report.

But the question that I've sought to answer is really Cammer Factor 2 on analyst coverage.  And the Cammer -- I've got a quote from the Cammer court on page 13 which says: It's persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period.

And that's, that's what I've done, and it's actually very straightforward and easy for me to document that we did have -- that AdaptHealth did have a significant number of securities analysts who followed and reported on AdaptHealth stock during the class period.

Q.    Didn't you just testify that it's difficult to isolate when analysts began covering or when analysts were covering within a limited time period?

MR. LAVELLE:  Objection to form. Misstates prior testimony.

A.    So what it said, it's very difficult to identify the first date that an analyst starts interacting with management and providing

Page 167

information to the institutional investors, and that's why I explained earlier the summary that I have in Exhibit 3 is really a lower bound of analyst coverage.  There may be additional analysts who are not captured in this table.  There may be additional analyst reports that are not captured in this table.  But what I do know is that at least eight different analysts covered and followed on AdaptHealth during the class period and that those eight analysts issued at least 95 different reports during this class period, and that is a significant degree of analyst coverage.

It's, like I explained, very likely impossible that there was additional analyst coverage above and beyond this, but even just looking at this lower bound, it's clear evidence that weighs in favor of market efficiency as it relates to the Cammer court's opinion that analyst coverage is relevant.

Q.    You don't know that there are any additional analyst reports that are on -- or analysts that aren't covered in this exhibit, right?

MR. LAVELLE:  Objection.  Form.

Page 168

A.    Right.   I don't know.   If I came across one, then I would include it in Exhibit 3.

Q.    And you didn't undertake to find whether there was any other analysts that were providing those private or nonpublic analyst reports, right?

MR. LAVELLE:  Objection to form.

A.    Well, I undertook to document analyst coverage to the best of my ability based on publicly available information.

Q.    Which led you to these specific eight, correct?

A.    Yes.

Q.    And you're not able to identify whether any of these eight recovering AdaptHealth stock during -- at any point during the first nine months following the de-SPAC, correct?

MR. LAVELLE:  Objection to form.  Asked and answered.

A.    Like I said earlier, I've not sought to provide a report, the specific dates of their reports or specific dates of their interactions with the companies or the investors, so I don't have that information summarized for any particular time period.

Page 169

Q.    The next factor you analyzed is market makers; is that right?

A.    Yes.

Q.    And turning to paragraph 40, which is on page 17 of the report.  You state that you understand that courts view large established stock exchanges with market makers as being informationally efficient; and that courts view institutional investors as potentially providing similar benefits to market makers by supplying trading liquidity and informationally efficient and informed trading.

Did I state that correctly?

A.    Yes.

Q.    What is your basis for this?

A.    Sure.  So I think the basis for that starts a little bit earlier in this section of the report and in paragraph 38.

So the starting point is that quote from the Cammer court which indicates that the court -- the Cammer court views market makers or the count of market makers as being an important criterion or consideration when a company stock is only traded in an over-the-counter market and it's not traded on a national stock exchange.

And so what that means, then, jumping back to where you started in paragraph 40, is that a company whose stock is traded on the NYSE or the NASDAQ, by virtue of that public listing already satisfies the intent of this Cammer factor for market makers because the court said that market maker counts are important when you're looking at a company whose stock is only traded over the counter.

And so that means by definition that if a company stock is not traded over the counter but rather on a large national exchange like the New York Stock Exchange or the NASDAQ, that it's far less necessary to document the extent of market-making activity.

But then I go on back to your question and I've got footnotes to cite what I'm pointing to when I explain these two sentences in the start of paragraph 40.  So I talk about the NYSE and the NASDAQ having very strong liquid markets with very strong market-making activities.  I cite some court decisions that talk about the presence of institutional investors, also serving a similar role or function in terms of providing, trading liquidity, and that's also consistent

with the MRK study that we talked about earlier today which documents that the presence of institutional investors is also correlated with these types of indicia of investor attention or what I'm describing as market efficiency.

Q. Separate from your understanding of the court's views on this topic, do you have an opinion as to whether established stock exchanges with market makers are informationally efficient?

MR. LAVELLE: Objection to form.

A. Well, I think that's, that's consistent with a lot of what I've been saying today. And let's -- that's described I think throughout my report. I think, in general, my experience is that at a high level, the NYSE and the NASDAQ do tend to be informationally efficient, and that's something I've kind of explained both throughout the report and in my, my answers today.

Q. And where is that -- so what is the basis for that opinion?

A. Yeah. So, again, the starting point is sort of this concept of, of arbitrage, which is that investors are motivated to earn profits. And so if there's a missed pricing opportunity that persists in the marketplace, that

Page 172

arbitragers will tend to quickly step in and arbitrage away those types of mispricings. That's kind of something that I explain in a couple of places of the report here and it's consistent with academic literature; it's consistent with my experience as an analyst and my academic experience, as well.

Q.   Separate from your understanding of the court's views on this topic, do you have an opinion as to whether institutional investors potentially provide similar benefits to market makers?

MR. LAVELLE:  Objection to form.

A.   Yeah, so I think, in addition to the court decisions that I cite to in footnote 38, I would also point you just to academic literature or academic research that I talk about that shows that institutional investors can facilitate trading liquidity and enhance the functioning of markets, and that includes the MRK study that I've talked about a bunch today.

Q.   You also say in paragraph 41 that AdaptHealth had at least 90 market makers and brokers providing similar activity over the class period; is that right?

Page 173

A.    Yes.

Q.    When you say "at least 90 market makers and brokers," do you mean 90 market makers and 90 brokers, or are you referring to it collectively?

A.    So the collective count was 90.  That was reported by the Bloomberg function that I reference in the footnote.

Q.    Do you know how many of the 90 were market makers versus how many were brokers?

A.    I don't think there's any longer a clear delineation between those, between those words. I think back when the Cammer court came out with their decision, there was a very -- a much clearer delineation of who was a market maker. But that markets have -- market structure has evolved to become far more electronic today and, as a result, there's, there's no longer a very clear definition of who is a market maker and who is not a market maker.

But, in my view, the Bloomberg capturing of this count is a reflection of entities that are serving that, that type of function in terms of providing trading liquidity for market participants.

Q.    How does the Bloomberg capturing

Page 174

function -- can you walk me through how you arrived at that number 90?

A.    Yeah.  So you -- it's very simple. it's -- you really just type in the word, the word "rank" and then it produces a list which I download in Excel and included it in the document production to you.  And it lists out each of those entities and the number of shares that they traded over the time period parameters that are set.

Bloomberg collects much of their data, including this data, from their own proprietary sources and their interactions with the financial markets and the participants and the professional institutional participants within financial markets.

Q.    Why is 90 market makers and brokers a significant number?

A.    Yeah, basically -- well, as I explained earlier, the Cammer court said that, you know, if you have at least five to ten market makers, that that's essentially significant for companies that are traded over the counter.  So I think before we even get to the count of market makers and brokers here, per the guidance provided by the

Page 175

Cammer court, AdaptHealth already fulfills the intent of that -- this factor by virtue of its national exchange listing.

Beyond that, it's almost icing on the cake to document the extent of market makers, but in doing so, within the parameters set by the Cammer court for over-the-counter markets, AdaptHealth has more than ten -- more than the five to ten market makers that the Cammer court listed out as a benchmark.  So 90 is obviously higher than five to ten.

Q.    And were there 90 on every day of the punitive class period?

A.    Probably not.  In my experience, these individuals or institutions will sort of come in and out at various points in time.  But, again, this is -- the Cammer court was not saying that you need to have a certain number on every day but, again, providing sort of at a high-level view, again, for over-the-counter stocks which, like I said, AdaptHealth already satisfies the intent by its Exchange listing.

Q.    Was there a time horizon that the Cammer court was considering?

A.    My recollection is that they were

Page 176

considering, like, the class period.

Q.    Is it your view that it wouldn't be applicable to a smaller subset within a class period?

MR. LAVELLE:  Objection.  Form.

A.    My view is that it's most applicable to over-the-counter markets over the full class period and, therefore, AdaptHealth easily satisfies the intent of this through its Exchange listing.

Q.    Did you analyze how many market makers and brokers AdaptHealth had in the first three months following the de-SPAC?

A.    No.

Q.    How about the first six months?

A.    No.  Only the full class period.

Q.    Now, the next factor that you considered was SEC Form S-3 filing eligibility; is that right?

A.    Yes.

Q.    And you state:  To the best of my knowledge, AdaptHealth made all required filings with the SEC on a timely manner during the class period.

Why does it matter if AdaptHealth made

all of the required filings?

A.    My general understanding of the S-3 filing eligibility is that the SEC sets forth several different criteria that companies have to meet in order to be eligible to file a shortened registration statement.  I think that's what the "S" stands for, that they can file a shortened form version of the registration statement just referencing back to the longer disclosures in previous prospectuses that have been filed with the Commission.

And so my understanding is that, from the SEC's perspective, if a company is -- has been unable to make its financial filings such as a 10-K or a 10-Q in a timely basis and they file notification of that through a Form NT-10-K or NT-10-Q to get that notification, then the company is no longer providing up-to-date financial information to investors.  Investors can no longer rely on the company's SEC filings because they don't have access to the current operating performance and financial information for a company, and then the SEC would say that that company is no longer eligible to file a shortened form of a registration statement

Page 178

because investors have been deprived of timely financial information for that company.

Q.    You note that AdaptHealth filed three Form S-3s with the SEC during the class period; is that right?

A.    Yeah.

Q.    Is three filings enough to demonstrate market efficiency?

MR. LAVELLE:  Objection to the form.

A.    In my opinion, the S-3 filing eligibility factor -- this Cammer factor relates to eligibility, not to a question of how many S-3s they actually filed.  So you could have plenty of companies that were fully eligible but did not file any S-3s during a class period, and this would still weigh in favor of market efficiency because they met the eligibility requirement, which means they were providing information to investors on a timely basis throughout the class period.

Q.    Do you know whether AdaptHealth was not eligible to file Forms S-3 at any point during the punitive class period?

A.    So I think there's like a legal question as to how that eligibility, that eligibility

Page 179

requirement applies to the filing of SEC filings for the past 12 months.  That includes the SPAC entity, and then that then is applied to AdaptHealth upon the de-SPAC merger transaction.

And I'm not a legal expert, so I don't know if that legal sort of nuance applies to AdaptHealth, but outside of that, to the best of my knowledge, they were eligible.  And the fact that they did file S-3s during the class period would be consistent with the idea that they were eligible.

Q.    So I'm not asking about a legal analysis.  You said that this factor is about eligibility.

So the question is:  Did you look at whether AdaptHealth was eligible at every point in time of the -- during the punitive class period?

MR. LAVELLE:  Objection.  Calls for a legal conclusion.

A.    So I looked for evidence that they were delinquent in the SEC filings, and I did not find any evidence of delinquency of SEC filings.  I did not find any evidence that they had failed to pay dividends or were in default of any material

Page 180

debts.

And that they had I think another component. I don't think I list it in the paragraph, but I think another component is that the company has to have a flow of at least $75 million. And so I did look for evidence of eligibility with these, these factors or with these eligibility criteria and, like I said, to the best of my knowledge, they were -- AdaptHealth was -- met those criteria.

And, like I explained, there's a legal question that I'm not opining on in terms of the first 12 months after a de-SPAC transaction, but beyond that, those are the eligibility criteria that I considered.

Q. You can't say for certain?

MR. LAVELLE: Objection to the form.

A. I'm sorry. I don't understand your question.

Q. You said to the best of your knowledge, but you can't state definitively that they were eligible at all points in time?

MR. LAVELLE: Objection to the form. Asked and answered.

A. Yes. You know, like I said, to the best

Page 181

of my knowledge, they were eligible and they, in fact, did file three Forms S-3 during the class period, which would also be consistent with my understanding that they were eligible.

Q.    So is that a "no"?

MR. LAVELLE:  Objection to the form. Misstates prior testimony.

A.    I'm just going to stick with the answer I gave you.

Q.    Did the MRK study discuss this factor?

A.    I don't believe so.

Q.    And moving to the last Cammer factor that you looked at is the cause-and-effect relationship between company information and stock prices, right?

A.    Yes.

Q.    Did you do a comparison to the MRK study firms for this factor?

A.    I'm not really sure what you mean.

Q.    Did you figure out whether the MRK study firms quickly responded to and incorporated new value-relevant information?

A.    I don't recall that study carrying out any sort of Cammer 5 analysis.  I don't believe that -- I don't believe that they did such an

Page 182

analysis within their study.

Q.    In paragraph 46 of your report, you say that:  The underlying logic of this test is that in an informationally efficient market, a company's stock price should rapidly incorporate the value of new company-specific information.

Is that correct?

A.    Yes.

Q.    What does "informationally efficient market" mean?

A.    That's basically the semi-strong form of market efficiency that we talked about earlier today.

Q.    Is there a difference between an informationally efficient market and an efficient market?

A.    I don't -- when I use those terms in my report or my opinions, I would use those terms interchangeably.  I think that if you were to start reading academic literature on market efficiency, you would see three different forms of market efficiency described, which are all very different from one another, those being the weak form, the semi-strong form, and the strong form of market efficiency.

So earlier in the report, I explained that throughout this report and what we're always talking about in the context of class certification and market efficiency is the semi-strong form of market efficiency, meaning that widely available public information is reflected in stock prices.

Q.    And that's if -- that's new company-specific information, correct?

MR. LAVELLE:  Objection to form.

A.    Well, I mean, ultimately, it would be -- when we talk about market efficiency, it would be all publicly available information.  But in the context here of Cammer 5, we try to test for that in the context of new value-relevant company-specific information.

Q.    How do you define "new" when you're looking for new information?

A.    You mean for purposes of constructing a Cammer 5 test?

Q.    Correct.

A.    So it depends on the company.  So the starting point for me is to really consider the nature of a company and its business and what types of information would be potentially new and

Page 184

value relevant for investors in that company's securities.

I think I described earlier that for many companies, the earnings announcements are a very nice objective set of pieces of new value-relevant information for companies to the extent that those are unexpected or unanticipated and you can test for the cause-and-effect relationship within earnings announcements. But for some companies, those are not a good testing ground because a company may provide guidance prior to those, and so what's announced is not really new and unexpected.

Some companies may be pre-revenue. They may not actually have any earnings and everybody knows that, so the earnings announcements are not really value relevant. And for those companies, I might look at product development milestones or drug development or things, things of that nature.

So the starting point is to try to understand the dynamics of a company and what that would dictate might be fruitful areas to look for potentially new value-relevant information for that given company.

Page 185

Q.    And how do you make that determination?

A.    I review the, the company.  I try to learn more about the company from, from the complaint in the matter.  I'll review, if necessary, review the company's financial filings like the annual reports during the class period, for example, or company press releases or news about a company during a class period.

Q.    And what did you do here with respect to AdaptHealth?

A.    So with respect to AdaptHealth, I, I reviewed the nature of the company's business, and a starting point for that was the, the complaint and the description of the company contained in the complaint, but also looking at, I believe, the annual report, as well as the -- I think the proxy statement that was sent to investors for voting approval on the de-SPAC merger transaction to -- and I kind of summarize some of this in, like, paragraph 47 and Section III(A) of this report and footnotes to those sections of the report and wherever else I've listed out those types of documents.

Q.    And what is it that you found would be value relevant to investors about AdaptHealth?

Page 186

A.    Yeah, so, so based on my review of the complaint on the -- I think the annual reports, on the proxy statement, on a transcript, at least one transcript of, of a conference presentation by AdaptHealth, I determined that the types of information that could be potentially new and value relevant to investors would be information that pertained to AdaptHealth's overarching business strategy.

So AdaptHealth, as I explained in Section III(A) and in paragraph 47, AdaptHealth really repeatedly emphasized to investors that it was a company that targeted organic growth of 6 to 8 percent per year, and also inorganic growth through acquisitions that could add, you know, roughly a million -- $100 million of revenue per year for the company.

So given that that was sort of a repeatedly emphasized strategy for the company, as I explain in paragraph 48, I considered disclosures that were related to AdaptHealth's growth strategy as being of potential interest to investors.  So I looked for any quarterly earnings announcements in which the company announced a real divergency either greatly

Page 187

exceeding or falling below that prior guidance of, like, organic growth or M&A, merger and acquisition, growth, and I also looked for any announcements of merger transactions, acquisition announcements that -- in particular, that significantly deviated from what they had previously guided to the investors in terms of adding up the $100 million per year of revenue.

And, also, I considered the alleged corrective disclosures as being directly tied to this guidance provided to investors through their, their business strategy and description of their business strategy and their growth to investors.

Q.   Let's try to take that one at a time here.

A.   Uh-huh.

Q.   What is your basis for finding that disclosures related to AdaptHealth's growth strategy would be of interest to investors?

MR. LAVELLE:   Objection to the form. Asked and answered.

A.   Yeah, so I think the basis is that investors could potentially be interested in the growth strategy because that's something that the

Page 188

company repeatedly emphasized to investors.  The company did so, and that's well documented I think in the complaint in this case.  It's documented in the earnings releases and in the transcripts of, for example, conference presentations and in, I think, the proxy statement mailed out to investors, so a lot of public SEC filings really document that type of emphasis.

Q.    Why did you decide to focus only on growth strategy?

A.    Well, basic principles of finance and valuation analysis really dictate that the value of a company is tied to the growth of a company, the growth of the revenues and, ultimately, the growth of the earnings and the cash flows that the company is going to generate.  And that's, that's the fundamental driving force behind a discounted cash flow analysis in terms of valuing the company and the value of the stock price.

And that's something that I've taught, something that I've researched, something that's in the corporate finance textbook or investment textbook; it's in analyst reports with their own valuation models and it's something that's

Page 189

repeatedly emphasized by AdaptHealth in this case.  So, really, when we talked about volume of companies, it's really driven by the growth of the companies.

Q.    And when you talk about growth strategy, is that equivalent to organic growth?

A.    So, as I explained in the report, there's -- we kind of break down growth for companies into two buckets.  One would be organic growth, which is generated internally from existing operations, and the other would be inorganic growth, which is when you go out and acquire other companies and you pay some price to add those companies to reflect inorganic growth.  So both of those types of growth can potentially be value relevant for investors.

Q.    Did you do any analysis on the company's disclosures concerning its key personnel or the strength of its management team?

MR. LAVELLE:  Object to the form.

A.    I think that's, that's related to the Cammer 5 somewhat in the sense that I do consider the corrective -- the alleged corrective disclosures as part of the Cammer 5.

And so when we talk about, we talk about

Page 190

the growth for a company that the company expects to generate -- I understand that the complaint has certain allegations that much of that growth for AdaptHealth may have been at least somewhat dependent upon defendant Luke McGee in the case, and so I do think that any disclosures that would update investor expectations about that growth could potentially be value relevant.  Not -- certainly not from a loss causation standpoint, but purely just from a Cammer 5 standpoint of testing for a cause-and-effect relationship between new information and movements in the stock price.

Q.    Other than that alleged corrective disclosure that you explained, do any of the other disclosures that you reviewed concern key personnel or the strength of management?

A.    You're asking if any of the -- any of the -- like the 12 -- sorry -- any of the 14 dates that I have in Exhibit 6 and 7, if any of those pertain to company management or personnel?

Q.    That's right.

A.    So I guess the, the things that jump out in my summary in Exhibit 6 would be probably on page 60, row 12, the alleged corrective

Page 191

disclosure which involved Mr. McGee; in the next page, row 13, I think at the end of the summary on the far right column of row 13, concern about no resolution around the leadership structure for AdaptHealth; and I think in row 14, through allegations from a short seller report which, in their opinion, the company's taking steps to obscure a decline in organic growth, which would relate directly to individual -- you know, alleged conduct of individuals.

So I think those are the things that jump out at me from the summaries of these 14 different dates that I include in Exhibit 6.

Q.   So nothing prior to the first alleged corrective disclosure?

A.   I mean, certainly, the complaint contains allegations of either misstatements or omissions that would speak to your question, but --

Q.   Dr. Cain, I'm not asking --

A.   Those are not -- those are not things that I included in my Cammer 5 analysis.

MR. LAVELLE:  Please don't interrupt the witness while he's giving an answer.

Q.   And why not, Dr. Cain?

Page 192

A.    When I set out to conduct the Cammer 5 analysis, I'm trying to be objective as possible. So, really, define a set of criteria and then, and then just put everything into the table that fits within that set of criteria so that I can be as objective as possible.

Like I said earlier, often, the starting point for me is earnings announcements, but then that can open the door to other things that are directly related, such as guidance updates which I'll often encounter in a variety of cases.

And, in this case, we had a guidance update around one of the M&A announcements.  And the M&A announcements are also directly related to the earnings announcements because these can reveal information about the growth strategy. And also in this case, the alleged corrective disclosures are also related to the -- sort of the growth strategy that's reflected in their earnings announcements.

So, like I said, my goal is to be as objective as possible.  And I'm not just throwing a bunch of other dates in there, even though there may be plenty of other dates in which the company announced new information or news and the

Page 193

stock price reacted to that.  That may be further evidence of a cause-and-effect relationship, but I try to be fairly narrow in scope and setting a very narrow objective set of criteria for purposes of a Cammer 5 analysis.

Q.    How do the alleged corrective disclosures relate to AdaptHealth's growth?

A.    Yeah, so I think I've put in Exhibit 6 my summary of the extent -- not the full extent, but some extent to which those are related to the, to the growth strategy.

So I think in row 12, on page 60, there's allegations within the complaint that much of this growth strategy for AdaptHealth hinged on Mr. McGee's involvement with AdaptHealth and was driven and advanced by Mr. McGee.  And so the announcement that he was being placed on unpaid leave from his roles as co-CEO and director of the company would be expected to have a potential impact on the growth strategy for the business.

And then on page 61, in row 14, there's direct allegations from a short seller's report that the organic growth that had been reported by AdaptHealth was, in fact, not correct and was, in

fact, much lower than what had previously been reported.  So both of those -- that's -- I think that would be the way that those would be tied into that overarching strategy, again, for purposes of a Cammer 5 analysis.

MR. IANNECE:  I think we've been going for a little over an hour.  Why don't we go off the record.

MR. LAVELLE:  Okay.

VIDEOGRAPHER:  Off the record, 3:19.

(A recess was taken.)

VIDEOGRAPHER:  On the record, 3:32.

BY MR. IANNECE:

Q.    Dr. Cain, I want to direct you to paragraph 51 of your report.  Here you say that you considered other news that potentially informed investors about AdaptHealth's growth strategy and ability to deliver organic growth and sustained growth through acquisitions, right?

A.    Yes.

Q.    And to do so, you evaluated the alleged corrective disclosures that we described earlier, right?

A.    Yes.

Q.    Have you evaluated both corrective

Page 195

disclosures?

A. Yes.

Q. Is it your view that these two disclosures were the only other news that potentially informed investors about AdaptHealth's growth strategy?

MR. LAVELLE: Object to the form.

A. No. That's not the opinion that I'm providing in this report.

Q. So why didn't you evaluate any other news that potentially informed investors about AdaptHealth's growth strategy?

A. Well, I did, and I explained both of those categories in the preceding two paragraphs.

Q. So I'm sorry. Outside of the earnings statements and the M&A statements.

A. Yeah, so I guess if I, if I go back up to -- I think it's the end of paragraph 47. Really, it's actually -- it starts with a quote at the bottom of page 20 where I explain, you know, really going back to -- you know, really going back, essentially, to the -- basically, the very beginning of the class period. The company provided investors with this overarching emphasis on a certain range of growth for the company's

Page 196

business strategy.

So my goal for purposes of the Cammer 5 analysis was to sit down and to come up with an objective set of criteria to evaluate or identify news or information that spoke to that growth strategy that might be potentially new and unexpected and value relevant for investors.

And so, really, what I'm looking for is are there clear types of news that may provide a deviation from that expectation, and I think one big deviation is towards the end of paragraph 47 where they increase the guidance range of growth up to 8 to 10 percent, which is a significant increase in the guidance range.  And I think that also was in conjunction with a very large acquisition which was much larger than the previous guidance of acquisition or inorganic growth.

So if -- under that objective set of criteria, if I had identified additional news or information that fits within that set of criteria, I would include that in the, in the Cammer 5 test and in the table of news events that I've listed out in Exhibit 6.

I reviewed the company SEC filings; I

Page 197

reviewed the news from that Factiva news search.
I've got a footnote 50 at the bottom of page 21
that explains how to identify acquisition
announcements through a Factiva news search using
the company's tag.

So I actually think this is a fairly
objective set of criteria, but I'm certainly not
trying to opine that nothing else mattered or
that there was no other value-relevant news.
Clearly, there could be many other types of
value-relevant news, but my goal is to be pretty
objective and just identifying a sample on an
ex ante basis without looking to see what the
actual impact on the stock price or trading
volume was for any one of these news events that
are listed in Exhibit 6.

Q.    So why didn't you evaluate any others
outside of those that are identified in your
report?

MR. LAVELLE:  Object to form.  Asked and
answered.

A.    Well, I did.  Like I said, I reviewed
the information environment to try to identify
any news events that would fit within the
criteria that I've expressed in the report here.

Page 198

So I looked to see if there were additional events that would fit within that objective set of criteria and, to the best of my knowledge, I did not see any others that met that criteria.

Q.    You say that:  In an efficient market, if investors interpreted these disclosures as unexpected and value relevant, then you would expect an increase or decrease in the stock price and an increase in trading volume following the disclosures, right?

A.    Which paragraph was that?

Q.    51, starting -- it's the third sentence. "In an efficient market, if investors interpreted these disclosures."

A.    Right.  Yes, that's -- that is correct.

Q.    Did you form an opinion whether investors interpreted the alleged corrective disclosures as unexpected and value relevant?

A.    No.  That's, that's not the opinion that I'm attempting to reach here.  Really, the inclusion of the alleged corrective disclosures is really for purposes of carrying out a Cammer 5 analysis to test for a cause-and-effect relationship between new information and company

Page 199

stock prices.

Q.    In paragraph 51, you state:  In evaluating the alleged corrective disclosures, for purposes of assessing market efficiency, I have not conducted any analysis relating to loss causation, merits or any connections between the alleged misstatements or omissions in this matter and the information revealed via the alleged corrective disclosures; is that right?

A.    Yes.

Q.    So you didn't do any analysis on loss causation?

A.    That is correct.

Q.    And you haven't offered any opinion on loss causation?

A.    Correct.

Q.    And you didn't do any analysis on merits?

A.    Correct.

Q.    And didn't -- you haven't offered any opinion on merits?

A.    Correct.

Q.    And you didn't do any analysis on whether there was a connection between the alleged misstatements or omissions in this matter

Page 200

and the information revealed via the alleged corrective disclosures, right?

A. Nothing beyond what I've explained in my report. And I know I mentioned this morning that in the Damages section, I do consider the economic adherence of the allegations contained within the complaint, is there an alleged misstatement or omission, is there an alleged corrective disclosure, are they alleged to tie together. But beyond that, I'm not offering any, any sort of opinions on that, that connection there.

Q. You're not opining on whether the alleged misstatements were actually false or misleading, correct?

A. That's correct.

Q. In fact, you haven't done any analysis of the alleged misstatements at all in this report, correct?

MR. LAVELLE: Object to form.

A. I've considered those, but I've not analyzed those in terms of, you know, listing out each alleged misstatement or omission and laying that out across -- before or during the class period. That's correct.

Q.   And you haven't offered an opinion on whether there was a connection between the alleged misstatements or omissions in this matter and the alleged corrective disclosure?

MR. LAVELLE:  Object to form.  Misstates prior testimony.

A.   Well, not beyond what I've previously described in terms of evaluating the economic coherence of the allegations for purposes of opining that damages can be calculated on a class-wide basis in a manner that's consistent with plaintiffs' theory of liability.

Q.   And this is true for both the April 13th, 2021, alleged corrective disclosure and the July 19th, 2021, alleged corrective disclosure, right?

A.   Yes.

Q.   And is it your understanding that plaintiffs allege a connection between the alleged misstatements and the alleged corrective disclosures?

A.   That is consistent with my understanding, yes.

Q.   In evaluating the cause-and-effect relationship between company information and

Page 202

stock prices, you performed an event study, right?

A.    Yes.

Q.    And the purpose of your event study was to evaluate whether AdaptHealth's common stock price and trading volume responded to certain information disclosures and then to assess whether these responses were of a greater magnitude following the disclosures that were potentially greater financial and economic significance to the value of the company, right?

A.    Yes.

MR. LAVELLE:  Object to the form.

A.    Yes.  I believe that is -- that's fairly accurate.

Q.    What is an event study?

A.    Basically, an event study is a tool to ask a fairly simple question, which is:  Did the company's securities prices move more on one day, which we would call the event day.  So we're studying that event.  Did they move more in relation or corresponding to that event or event date relative to their historical random movements over time.  So that's essentially the question we're trying to ask with an event study.

Page 203

To actually carry it out requires a number of more nuanced steps in terms of implementing that.  But at a high level, that's the question we're trying to answer with an event study.

Q.    And you performed an event study to analyze the daily return on shares of AdaptHealth's common stock, correct?

A.    Yes, I did.

Q.    Can an event study be used to determine whether an event is value relevant?

MR. LAVELLE:  Objection.

A.    I do think an event study is a tool that is employed in that -- in asking whether an event is value relevant.  Yes, it's one of the steps that can be involved.  It doesn't have to be, but it can be one of the steps that is employed.

Q.    But it doesn't determine that itself, correct?

A.    Well, I think that's correct because I think also consideration has to be given to the information environment and the nature of the information, the bigger-picture questions that fall outside the narrowly defined scope of the event study itself.

Q.    And in order to perform your event study here, you needed to calculate what you referred to as an abnormal return in the company's daily stock price movement; is that right?

A.    Yes.

Q.    And the abnormal return is the difference between a stock's actual return and its predicted return; is that right?

A.    Yes.

Q.    In paragraph 55 of your report, you describe your event study methodology and you state that you constructed a regression model using data from the prior 120 days, approximately six months, and further used a fixed estimation window for the first 120 days of the class period; is that correct?

A.    Yes.

Q.    What is an estimation window?

A.    Yeah, so what I described -- at a high level, the event study saying that we're looking at the change in the securities on the event date and then comparing that to the historical volatility.  The historical volatility is what we estimate during the estimation window.

So I could -- basically, that's the

benchmark of sort of normal day-to-day random fluctuations in the stock price or the trading volume.  That could be over a six-month period, a year, a three-month period.  Just some sort of baseline, benchmark of the historical day-to-day movements in the company's stock prices or trading volume.

Q.    What does it mean for an estimation window to be fixed?

A.    Yeah, so that -- so, so to start out with what I do typically for an event study is what I would call a rolling event study where each day that I want to predict a return, I'm estimating the event study parameters over the previous 120 days, and then I roll forward.  And tomorrow's return that I want to predict, I use the preceding 120 days and I keep rolling that window forward.

But for a company that's newly public, either through an IPO or a SPAC, then I might, I might say, well, there's no day one of the public listing, there may not be any historical prices, trading prices for, like, an IPO stock or for a SPAC, if I do not want to use the de-SPAC, you know, the actual SPAC shares before the de-SPAC

Page 206

merger transaction.

So, in that case, I would use an end sample period.  I would use the first 120 trading days of the class period to estimate those event study parameters for setting a benchmark or a baseline of historical volatility for the company, and that's what I'm going to compare against for each event date within that first 120 trading days.  And then once we get beyond that, then it starts to roll on a rolling basis.

Q.    Prior to this report, have you performed an event study for a company that, similar to AdaptHealth, had no historical trading data prior to the event date?

A.    Yes.

Q.    Other than the lack of historical trading data, are there any other factors once you take into account when conducting an event study for a company that recently started trading?

MR. LAVELLE:  Object to form.

A.    Well, I think for any company, I take into consideration any unique characteristics that would come to mind.  But off the top of my head, I'm not able to think of any that would be

Page 207

necessary to adjust for or incorporate into an event study model.

Q. You used 120 trading days as the estimation period for your event study, right?

A. Yes.

Q. How did you decide on the length of the estimation period?

A. Typically, my starting point for most event studies is 120 trading days. It's a very common methodology that's used. Sometimes I'll go shorter than that. Like, I'll use more like a 60-trading-day window for shorter class periods.

And -- let's see. So that -- so that I can ensure that the event study parameters are evolving sufficiently through time during shorter class periods. But this was a more normal class period length where I did not feel that it was necessary to go to a shorter class period.

So 120 days is typically the default starting point for me in a market efficiency report, and then I'll ask whether there's -- are any factors present that would push me towards either a longer or shorter estimation window.

Q. Did you run any statistical tests to examine what was the most appropriate estimation

Page 208

period for this event study?

A.    No.   And I don't think there's really one clear answer to that question of just one estimation window being more appropriate than another estimation window because, really, most event studies are fairly robust to different estimation windows, whether that's 60 or 120 days or even 252 trading days for a full year. Because what we're really benchmarking against is the random day-to-day volatility for a company stock when you don't have significant news events.  And that's fairly -- typically, that's typically fairly consistent regardless of the length of your estimation window.

Q.    Are you aware of any academic research that uses estimation periods other than 120 trading days?

A.    Yes.  I've used different estimation windows and different academic studies that I've carried out.  It's common to see a one-year estimation window.  It's common to see six months like we have here with 120 trading days.  So, again, there's not one clear consensus within academic studies, particularly as it would pertain to single firm event studies like this.

Page 209

Q.    Have you examined the robustness of the results of your event study to any alternative estimation periods?

MR. LAVELLE:  Object to form.

A.    No.  As far as I can recall, I just stuck with the defaults, 120 trading days.

Q.    And why, why haven't you examined and done so?

A.    Because, like I said earlier, I did not see any, any factors that would push me towards a different estimation period.

For example, like I mentioned earlier, a short class period would likely push me to a shorter estimation window, but I didn't see any obvious reasons to deviate from my default starting point in this case.

Q.    Would a one-year estimation period be appropriate in a case like this?

A.     I don't know whether it would be appropriate or not off the top of my head because I've not investigated that.  But one, one question -- I think the first question that would come to mind is, is whether it would be appropriate to start on day one of a class period with an estimation window that actually looks a

Page 210

year into the future.  I prefer to keep that a little bit shorter, like the six-month estimation window that I have here starting on day one of the class period.

Q.    And why is that?

A.    Because the farther you look into the future, the more you're incorporating information that would be unknown on the first day of the class period.

Q.    Isn't using more data preferable to using less data for an estimation period?

A.    Absolutely not.  I don't think that that would be an accurate universal statement to make. I mean, more, more data does increase the power of statistical tests, but it also introduces the potential for other issues such as potentially changing volatility over time.

So the longer the class -- the longer your estimation period, you're setting a longer time horizon within which you would incorporate changing volatility, and so that's a consideration that has to be taken into effect when you're selecting an estimation window.

Q.    And why is that problematic, in your view?

Page 211

A.    Yeah, so the benefit -- it would -- basically, what it would do is it would reduce the usefulness of a rolling event study window. So the benefit of a rolling event study window, as I've done it and as most experts do it in these types of cases, is that it allows for the event study model to change over time.  As the company's stock prices change and the relationship between the company stock and the overall market and industry may evolve and change over time and the company's -- the company's specific volatility may change over time, but if you have a very long fixed estimation window, you're not allowing any of that to change.

Q.    In your regression model to study changes in market-wide factors, you used the S&P 500 Total Return index, right?

A.    Yes.

Q.    And to study changes in industry-wide factors, you used the S&P 600 Health Care Equipment & Services Industry Group, right?

A.    Yes.

Q.    Why did you choose these S&P indexes?

A.    So the starting point for me is, in terms of the market index, is almost always

Page 212

either the S&P 500 or the S&P 1500.  In my experience, there's very little difference in terms of event study conclusions based on the market index that's used, so I stuck with the default starting point which, again, for me is usually one of those two.

On the industry index, what I typically try to do is line up with an index -- the industry index that I am able to identify that most closely resembles the industry in which the company describes itself as operating.

So I've got a footnote 55 on page 24 at the bottom which says:  AdaptHealth describes its business as including home healthcare equipment, medical supplies to the home, and related services in its 10-K filed the end of fiscal 2020.  And that I think very closely lines up with the description of the industry index that I've included in my event study here.

Q.    Return to Exhibit 4 of your report. This is on page 55.

A.    Okay.

Q.    Can you explain what Exhibit 4 shows.

A.    In Exhibit 4, I'm graphing out over time the coefficients from estimation windows for the

Page 213

event studies throughout the class period.  And so there's a line that's in either orange or red which graphs out the S&P 500, the coefficient which basically is the correlation between the daily returns for AdaptHealth, the daily returns for the S&P 500.  And then there's a dotted blue line that graphs out over time the coefficient on the S&P 600, which is the industry index.  So that's the correlation between AdaptHealth and the industry returns.

The first 120 trading days, those lines are constant lines because that's the fixed estimation window that I estimated from the -- from day one of the class period, and then the regressions start to roll.  They move forward each day on a rolling basis, estimated over the previous 120 trading days for the company.

And what you can see is that over time, the company's correlation with the market and the industry actually changes.  It evolves significantly over time, which is -- I think that's a benefit of my rolling regressions, which is that they explicitly account for that changing relationship between AdaptHealth and the overall market in the industry.

Page 214

Q.   Yeah.  Let's look at the -- it looks like red to me.  We'll look at the red.

As you explained, this is the coefficient on the market index, and this coefficient seems to fluctuate from below the .5 in the first half of the class period to below zero in the period from January 2021 to June 2021, and then increases to .5 towards the end of the punitive class period, right?

A.   That's correct, yes.

Q.   Why would the coefficient in the market fluctuate in such a fashion?

A.   Yeah, so it's actually fairly common that I see these types of patterns.  And, basically, what's happened -- what it looks like is happening from the graph here is that in the beginning of the class period through roughly maybe November of 2020, the company was -- had a positive correlation with the S&P 500, but it's still below one.

So, like, let's say that the S&P 500 on a given day might increase by 2 percent.  You might predict that AdaptHealth's stock price would go up by 1 percent or a little less than 1 percent, based on that correlation.  So it's

Page 215

moving with the overall market.  But then sometime around November 2020, AdaptHealth -- the company stock starts co-moving or correlating much more strongly with the overall industry and then the overall market has less of a correlation and it becomes a little bit negative for a few months, as well.

So, basically, this is just a reflection of what was going on with the stock price of AdaptHealth during particular points in time.  So you could have times when, say, maybe the market goes up by a lot during some time period but a company stock goes down by a lot, and so you've got a negative beta coefficient from that estimation period.  But that can then change in the future if the market goes up and the company stock both go up to a positive data.

So it's really dictated by, historically, what was going on with the company stock price, with the overall market, and with the industry on a day-to-day basis.

Q.    Can you draw any conclusions from these specific fluctuations?

A.    I mean --

MR. LAVELLE:  Object to form.

Page 216

A.   I think, really, the conclusion is just that it, that it -- their relationship between AdaptHealth and the market and the industry, that it, it was not constant.  It fluctuated over time, and that's something that I explicitly account for in my event study.

Ultimately, the goal of the event study is to ask on any given day when new information comes out, what was the return that's unique to the company after controlling for what happened with the market in the industry and what you would predict that would -- how that would drive the return for the given company.

So the goal is not to just ask over the long run how did this company co-move with the market or the industry but rather just to know that I'm controlling for those factors so that when I describe the abnormal returns in the Cammer 5 analysis, I'm talking about company-specific returns and not what happened to the market or the industry on any given day.

Q.   So looking at the industry index coefficient as compared to the market coefficient, they appear to be moving opposite one another throughout the punitive class period,

Page 217

meaning when one coefficient increases, the other
seems to be decreasing.

Why would we observe such a pattern?

A.    Well, I don't --

MR. LAVELLE:  Object to form.
Foundation.

A.    I don't think it's -- number one, I
don't think it's quite accurate to say that
they're opposite because if you look for the
first -- let's see -- first year -- basically,
the first year of the class period, both of those
coefficients are positive, for the most part.  So
they're not really opposite of one another.

But to the extent that you then do see
this, this divergence, the coefficients,
basically, it means that the company's co-moving
more strongly with one versus the other.  So
after about I'd say maybe about roughly December
of 2020, the company is moving more positively
with the industry and more of an inverse
relationship with the overall marketplace.

Q.    Let's turn to Exhibit 5.  What does this
exhibit show?

A.    Yeah, this is -- it's called the root
mean square error.  And, basically, what this is,

Page 218

it's like the residual variation in the company stock after controlling for the market in the industry.  It's basically like the residual volatility of a company's stock that comes out of a rolling regression.

So to the extent that that is declining a little bit -- now, it looks like it's declining a lot, but you also have to consider the scale of this as really .03 and .04 on the left-hand side. So, in actuality, it's not really changing by very much.  But to the extent that it is declining a little bit over time, what that implies is that the event study controls for the market and the industry are doing -- are co-moving more strongly with AdaptHealth stock prices over time.

So after, you know, October 2020 or maybe July 2020, somewhere between those two dates, the company stock prices is moving a little bit more closely with the overall market in the industry.

Q.    And in paragraph 58 of your report -- this is on page 25 -- you state:  To test for statistical significance, I calculated the T-statistic, which is the test that economists

use to determine whether randomness can be rejected as the explanation for an abnormal price movement.

Do you see that?

A.    Yes.

Q.    What does the T-statistic measure and how do you calculate it?

A.    Yeah.  So to calculate it, you divide the abnormal return by the standard deviation of the errors, which is this, this root mean square error from Exhibit 5.  So that's, that's how it's calculated.

And, basically, what you're asking is saying -- knowing that this company has a certain typical day-to-day volatility in the abnormal returns.  For every company, the stock price moves randomly from day to day to a certain extent.  There's a certain typical residual volatility in company stock prices.  And so then when, when news -- when new information comes out and the company stock price moves by a certain amount, we're asking, that amount that it moved by today, was that a larger movement either positive or negative than we typically observe on a day-to-day basis.

Page 220

And so when I say "on a day-to-day basis," we're measuring that by dividing by the root mean square error from Exhibit 5 to calculate that T-statistic.

Q.    Later on in that same paragraph -- this is going on to page 26 -- you say:  Probability theory suggests that under the standard assumption that abnormal returns will be normally distributed with a mean of zero in the absence of new value-relevant company-specific news, based purely on randomness, using a 95 percent confidence level and a sufficiently large sample size, an abnormal return should have a T-statistic greater than 1.96 or less than negative 1.96, approximately 5 percent of the time in the absence of new company-specific information.  In other words, there's a 95 percent chance that, barring some nonrandom explanation, the actual observed return will fall within 1.96 standard deviations of the predicted return.

Did I read that correctly?

A.    Yes.

Q.    So you're only using a 95 percent confidence level to test for statistical

significance, correct?

A.    No, that's not correct.

Q.    And why is that?

A.    So, really, in paragraph 58, I'm just trying to explain as best as I can how the econometrics and how the statistics actually work and how the calculations actually work. How they work.

The reality is that statistical significance is a continuum from zero all the way up to 100 percent. So on -- when we calculated a T-statistic or the significance of an abnormal return, that's going to correspond with some, some level of statistical significance. And it's -- like I said, it's a continuum.

What academics have sort of gravitated to are three sort of shorthand reference points to point to in terms of statistical significance, and those three reference points are 90 percent, 95 percent, and 99 percent. I'm just explaining this paragraph how you would calculate it under the 95 percent level for a sufficiently large sample size.

In my view and in the view of most academics, 90 percent or better is something

Page 222

that's supportive of statistical significance, but in order to be conservative for a report like this, I will commonly base a Cammer 5 test on the 95 percent level of statistical significance, but it by no means indicates that something that's only significant at the 93 percent level -- you know, it certainly doesn't mean that that, you know, was not value relevant or impactful information for investors; just merely that it did not quite meet that level of robustness to exceed the 95 percent level of significance.

Q.    So it's accurate to say, in this instance, you used the 95 percent confidence level?

MR. LAVELLE:  Object to form.

A.    Let me just skip -- let me just refresh my recollection for one second before I answer you.

Yes, that's -- my recollection is that I was referring to a 95 percent confidence level. And that's typically what I referred to for purposes of Cammer 5 out of a desire to be overly conservative.

Q.    What does it mean for a stock price movement to be statistically significant?

Page 223

A.    That -- what that means is that, on a given day, like an event date when some sort of information came out, the stock price moved by some magnitude, either positive or negative, that -- essentially, that it was larger in absolute value than the typical movement in 95 percent of the days during an estimation window. And we're talking about the residual return after controlling for the market in the industry.

Q.    Does a statistically significant stock price movement provide evidence that new and unexpected value-relevant information about the company at issue was disclosed on the event date?

MR. LAVELLE:  Object to form.

A.    I think that's, that's one of the steps that is typically considered in trying to reach sort of that type of conclusion.  I think it's really important also to consider the overall information environment.  But, commonly, that will be one of the steps used to assess the value impact or value relevance of new information.

Q.    What does it mean for the stock price movement to be statistically insignificant?

A.    Yeah, basically, that just means that the magnitude of the stock price movement was not

Page 224

large enough in absolute value to exceed a

certain threshold.

So, for example, if we're talking about

90 percent, then the stock price movement on the

event date, it may have still reacted to the

information, but the extent of that price change

was not large enough that it exceeded the typical

day-to-day volatility during 90 percent of the

days during an estimation window.

Q.    Does a statistically insignificant stock

price movement mean that the stock price movement

on that day cannot be distinguished from zero?

MR. LAVELLE:  Object to form.

A.    What it, what it means is that the stock

price change on that day is not -- from a

statistical perspective, it's not sufficiently

different from zero to reject that sort of null

hypothesis of a zero movement.  Obviously, it

does not mean that the price movement was

actually zero but rather -- essentially, what it

means is that that movement on that day was

within the more typical variation of stock price

movements from day to day within an event window.

Q.    Does the statistically insignificant

stock price movement suggest that there was no

Page 225

new and unexpected value-relevant information about the company disclosed on that day?

MR. LAVELLE:  Object to the form.

A.    No.  And I think you asked me about that this morning.  And, as I recall, what I explained was there can be a variety of factors that have to be considered in trying to draw that type of conclusion.  For example, there could be confounding information that came out from other sources that contributed to the stock price movement in another direction, sort of offsetting impacts.  There could be a mix of positive and negative information such as with an earnings announcement which we very commonly see.

So there can be other reasons for the lack of a statistically significant price movement on a given day.

Q.    Okay.  Hypothetically speaking, putting aside all confounding factors, positive and negative mix of information, if all we're looking at is a singular statement in a vacuum, nothing else happens and there is no -- there is a statistically insignificant stock price movement, does that suggest that information was not new, unexpected value-relevant information?

Page 226

MR. LAVELLE:  Object to the form.

A.    So, again, I think it would be really important to consider the information environment.  So I think even within this hypothetical, there are a lot of situations in which that would not be the case.

So, for example, if a company has an alleged omission on a date and there's no price movement or there's, there's a misstatement, but it's really just failing to give correct information or it's equivocating so that it's a very unclear disclosure and there's a lack of price movement, it doesn't mean that that omission or that misstatement was not important to investors but rather it could be maintaining artificial inflation in a stock price whereas, if the truth had come out, you would see a significant decline.

There could be other types of factors going on within the information environment, so I think it's important, again, to understand that the event study is really answering this question about what was the stock price movement on this day after controlling for market and industry effects, and is that movement large in magnitude

relative to the historical volatility for the company stock.  And there's a lot of steps that -- and parameters that have to be fine-tuned in order to move forward to that next step of trying to draw certain types of interpretations, especially value relevance of an event or information around an event, and also a consideration of the information environment before trying to move to that next step and answer the types of questions that you're asking about interpreting the value relevance of information.

Q.    In paragraph 60 of your report, you introduce Exhibit 6, which is the list of the 14 information disclosures you analyzed in your event study, right?

A.    Yes.

Q.    These are the seven purported earnings announcements, five purported M&A announcements, and the two alleged corrective disclosures, right?

A.    Correct.

Q.    Why would you not have analyzed the alleged misstatements themselves?

A.    Yeah, so one of the things that I

explained I think a couple times, including just a couple of questions ago, is that if there's an alleged misstatement or omission that merely serves to maintain artificial inflation in the stock price, then we don't necessarily expect to observe a statistically significant stock price reaction when that misstatement or omission is made.

And so that's, that's not really a very -- typically, that would not be an appropriate sort of news event to include in a Cammer 5 test.  It would not really meet those objective set of criteria that I described earlier.

And I think there could be other reasons.  If alleged misstatements or omissions, if they're made in the context of other forms of information dissemination such as earnings calls or conference presentations where the company's giving a lot of other information, then you may also have a lot of other confounding information produced that goes along with those.

So I think that would be -- those would be a few reasons to explain why I don't typically include alleged misstatements or omissions within

Page 229

a Cammer 5 analysis.

Q.   Are you aware of when the first alleged misstatement related to defendant McGee's alleged personal misconduct is alleged to have been made?

MR. LAVELLE:  Object to the form.

A.   I'd have to -- I want to go back to the complaint to refresh my recollection on the exact date of that.

Q.   But as you sit here today, you're not aware?

A.   I was aware at the time that I prepared this report, but I don't have the complaint memorized.  But I'd certainly be happy to turn to the complaint with you to refresh my recollection.

Q.   How about the first alleged misstatement related to AdaptHealth's organic growth?  Are you aware of when that was alleged to have been made?

A.   In terms of the first one, I'd like to return to the complaint to refresh my recollection, if you don't mind.

Q.   So you don't -- as you sit here today, you don't recall?

A.   Like I said, I don't have the complaint memorized.  There's a lot of pages and details in

Page 230

the complaint, so, I don't have it memorized.  I need to turn back to refresh my recollection.

Q.   You say that:  Among the earnings announcements, the majority either disclosed relatively little new information or information that was in line with prior guidance; is that right?

MR. LAVELLE:  Where are you reading?

MR. IANNECE:  It's page 27, paragraph 60.

A.   Yes, I do.

Q.   So those particular announcements can't be the cause of any price movement, right?

MR. LAVELLE:  Object to the form.

A.   I'm not really sure what you mean by that.

Q.   You say that the earnings announcements disclosed little new information or information that was in line with prior guidance.  So I'm asking, do those -- can those particular announcements be said to have caused any price movement?

MR. LAVELLE:  Objection.  Misstates the document.

A.   So I don't think that's exactly what I'm

saying in that sentence, and that's, that's not the type of conclusion that I'm attempting to draw from either that statement or the earnings announcements within Exhibit 6.

Q.   Why don't we turn to Exhibit 6.  It's on page 57.  These are the information disclosures you analyzed for your event study, correct?

A.   Yes.

Q.   And did you actually analyze the substance of these disclosures yourself?

MR. LAVELLE:  Object to the form.

A.   What do you mean by "analyzed the substance"?

Q.   Did you review the disclosures themselves?

A.   Yes, I did.

Q.   And the Headline column, is that the name or title of the specific disclosure that you analyzed?

A.   I believe so.

Q.   In the Selected Quotes column, are those quotes from the specific disclosures?

A.   Those quotes are either from the disclosures that are summarized in the Headline column or they may be from other commentary.

Page 232

So I think, for example -- let's see.  I think there's something from an earnings call transcript, and I thought -- I think that I had one from an analyst report, but I'm not seeing it at the moment.  Give me just a second to scroll through here.  I've got -- I mean, I've got one -- note 115 that's from a SeekingAlpha article.  There's a Deutsche Bank analyst report in footnote 112.

So everything is, I think, clearly explained in the footnotes what the sources are for those, those quotes in the Selected Quotes column.

Q.    Why would you include a quote from a separate disclosure?

A.    Yeah, I think it provides additional context within which to consider each of these information events or to the extent that, as I've described, some of them had relatively little new information pertaining to the actual growth strategy.

Obviously, I'm not opining on whether they omitted material information.  There may be allegations in the complaint that there were significant omissions or misstatements in some of

Page 233

these.  That's not what I'm attempting to evaluate.  Really, what I'm trying to look at is a summary of is there information that's disclosed in these that, that directly pertains to the growth story or the business strategy of AdaptHealth as I -- as we talked about earlier and summarized in the text.  And so I give for some of these quotes from the announcements themselves or the press releases themselves, some from the earnings call transcript, some from analysts or other sources that help to provide the context for the type of information that was given for each of these that may speak to that objective set of criteria revolving around the organic or inorganic growth strategy for AdaptHealth.

Q.   In each of those instances, were the extraneous disclosures made on the same day as the document identified in the headline column?

A.   So I wouldn't describe those selected quotes as extraneous disclosures but rather they're either examples of quotes from within the disclosures themselves or they're maybe third-party commentary that gives additional light on the type of information that was

Page 234

disclosed on the market impact date that's indicated in that first column.

So they -- the commentary could certainly come on different days.  It could come subsequent to the actual disclosures.  But, really, the purpose for the selected quotes is to just provide context for the types of information that was or were disclosed under each category.

Q.    So you're not making an assessment as to whether any of the substance of the information contained in the quote resulted in a resulting price reaction?

A.    Yeah, I think that's, that's generally correct.  That wasn't my goal with the Selected Quotes column.  My goal was to just provide some context for each of these rows of information.

Q.    Turning to the twelfth and fourteenth rows.  Those are the two alleged corrective disclosures from the complaint, right?

A.    Yes.

Q.    And the first alleged corrective disclosure is an April 13, 2021, AdaptHealth press release regarding Luke McGee, correct?

A.    Yes.

Q.    What is your understanding of what this

Page 235

press release disclosed?

MR. LAVELLE:  Object to the form.

A.    So I, I do give some select quotes from that disclosure, and those are -- there's a footnote 110 to point back to that.

So in the Selected Quotes column, it does give some examples of information that was disclosed, but I think at a high level, the way I would describe that and why that fits into the objective criteria that I've set forth for the Cammer 5 analysis is that AdaptHealth was a company that repeatedly touted their organic and inorganic growth strategy to investors, and investors understood that that was connected in part to the efforts of Mr. McGee and that this press release disclosed that Mr. McGee was being put on unpaid leave from his role as co-CEO and director of the company, which would be potentially relevant information for investors in evaluating that growth strategy for AdaptHealth.

Q.    And, in your view, this is relating to AdaptHealth's growth strategy?

A.    My view is that this fits the objective set of criteria that I laid out for a Cammer 5 analysis.

Page 236

Q.    Are you making any assessment as to whether any of the information contained in the Select Quotes column had been disclosed at some point sooner?

A.    No.  I'm not providing any sorts of opinions along those lines.

Q.    And then turning to the fourteenth row, this is the second alleged corrective disclosure, which is a short report published by Jehoshaphat Research on July 19, 2021; is that right?

A.    Yes.

Q.    And this was not a disclosure issued by AdaptHealth, correct?

A.    Correct.

Q.    It was issued by a short seller under the pseudonym Jehoshaphat Research, right?

A.    Yes.

Q.    What is your understanding of what the short report alleged?

A.    Yeah, the short report was somewhat lengthy, but I think a high-level summary would be that it alleged that AdaptHealth's organic growth was not nearly as high and robust as what the company had been representing to investors.

Q.    Have you made any attempt to verify the

Page 237

accuracy of the allegations in the short report?

A.    No, I have not.

Q.    On the day of each of these alleged corrective disclosures, as a general matter, any purported inflation in the stock due to the alleged misstatements is presumed to dissipate from the stock; is that right?

MR. LAVELLE:  Object to form.

A.    I think, at a high level, we would describe alleged corrective disclosures as dissipating artificial inflation once those disclosures come out.  If there are multiple disclosures, then we would say they're partially correct.  Only some portion of the artificial inflation is dissipated.  But I think that I would agree with your general description there.

Q.    I want to return quickly to the April 13, 2021, release.

A.    Okay.

Q.    You said that you considered this disclosure to relate to AdaptHealth's growth strategy.

On what do you base your conclusion that Mr. McGee's departure would affect the company's growth strategy?

Page 238

A.     Well, that's not, that's not an opinion that I've provided or a conclusion that I've provided in my report.  But, as I explained earlier, my assessment of this is that it fits within that objective set of criteria that I've articulated for purposes of carrying out a Cammer 5 analysis.  The complaint alleges in that -- I'm sorry.  The complaint alleges that the continued growth of AdaptHealth, both on an organic and an inorganic basis, was at least somewhat contingent on Mr. McGee.  And that's I think consistent with the quotes that I've given in the report.  Like, for example, in paragraph 47 where I quote from sort of the inorganic growth strategy that's being touted by the company on a number of occasions.

And so because of that, I think it's -- it fits within the Cammer 5 objective criteria. But, like I said, I've not sought to evaluate the accuracy of any alleged corrective disclosures. I've also not sought to evaluate the accuracy of previous earnings releases to ask whether any of those were false or misleading or inaccurate in the way that they presented earnings or growth or any -- anything along those lines.  I'm just

Page 239

taking them at face value what was told to investors and say does this fit within that Cammer 5 objective criteria, and if so, then I'll include it and look for that evidence of a cause-and-effect relationship.

Q.   Do you know whether Mr. McGee's departure from the company actually affected its growth strategy?

MR. LAVELLE:  Object to form.

A.   No.  That's -- like I said, I've not sought to evaluate -- you know, expose what happened after that due to the fact that the growth was the Jehoshaphat report; all the allegations come to fruition; were all of the previous earnings releases 100 percent accurate. Those are not questions that are necessary for me to entertain for purposes of a Cammer 5 analysis here.

Q.   Did you do any analysis into whether AdaptHealth stock was inflated for nonfraud reasons because of the market's confidence in Mr. McGee's ability?

MR. LAVELLE:  Object to the form.

A.   No, I've not sought to assess any type of artificial inflation at this point in time.

Page 240

Q.    Go back to paragraph 62.  The last sentence here is:  While I have not evaluated the accuracy of such disclosures, I would expect these negative-sentiment disclosures to generate an increase in trading volume and a potential price reduction in an efficient market.

Do you see that?

A.    Yes.

Q.    What do you mean by "negative-sentiment disclosures"?

A.    Uh-huh.  Yeah, so there's a lot of academic research on sentiment.  They call it sentiment analysis.  And so I'll just do a -- run a press release or an earnings call transcript or SEC filing or news stories through a computer algorithm that assigns a word.  It's like a word score or a sentiment score of either a positive or negative or neutral or there could be other nuances to that based on dictionaries of words, and then they'll explain how different disclosures or stories or filings or earnings calls may be more or less heavily tilted towards positive sentiment or negative sentiment.

So, you know, based on research, based on my own experience as a research analyst and as

Page 241

an academic and as an expert who has evaluated many corporate disclosures, looking at both the Jehoshaphat report, as well as AdaptHealth's press release on April 13th, 2021, those both have a very clear negative sentiment to those.

Q.   But just because they're negative, you would expect an increase in trading volume and a potential price reduction?

MR. LAVELLE:   Object to the form. Misstates testimony.

A.   I think that's a -- that's a typical prediction on an ex ante basis, the same way that I would predict on an ex ante basis that an acquisition announcement would tend to generate a large positive increase in the target company's stock price, since most acquisitions are announced with a large premium being paid for target company stock.

So based on my experience in evaluating corporate disclosures, I would expect a potential negative price reaction on AdaptHealth's common stock around both of these negative-sentiment disclosures.  And I would also expect a potential increase in trading volume just the same way that I would predict that around a mergers or

Page 242

acquisitions announcement for either a target or potentially an acquirer.

Q.    What if a negative-sentiment disclosure is not new, unexpected or unanticipated?

A.    Yeah, can you explain what you mean by, like, what type of a disclosure would in no way be new?

Q.    So if this information was already in the marketplace, disclosed potentially by someone else and then a company -- a hypothetical company issues a press release on that information that has already been publicly disclosed, may -- it may express a similar negative sentiment, would you expect that to increase trading volume?

I'm sorry.  Let's say that's done a separate day.

A.    Uh-huh.

Q.    Would you expect that to generate an increase in trading volume for a potential price reduction?

MR. LAVELLE:  Objection to the form.

A.    So I think it depends on a lot of the details of the hypothetical example.  So there's really a lot of potential scenarios that would have to be considered in order to give an answer

Page 243

to that.  But, for example, if we're talking about consecutive trading days, as I described earlier, in my experience, it can take up to three business trading days for information to be fully impounded into the stock price.

So if you have an additional news story on the next trading day commenting on it, you may still see a continued reaction in the stock price even though the market is perfectly efficient. And that's just consistent with price -- the price discovery process, how stock prices reflect information.

If we're talking about one news story comes out on day one, and then on day ten, the identical news story is printed again and there's no other new information that comes out, then it's unlikely that the stock price is going to react to the identical news story that's coming out on day ten if it's already reacted on, on day one.

But I think there's a lot of gray area in between where you may not have had a clear disclosure on day one or a widely available public forum, as we've talked about a lot today, such that there could be additional information

Page 244

disclosed on day ten or a clarification or a disclosure that's much more widely and broadly available.  So it really depends on a lot of the specifics of the hypothetical.

Q.    Does it matter at all who puts out the negative-sentiment disclosure?

For example, can a high school student write something seemingly negative about a company and expect to generate increased trading volume or a potential price reduction?

MR. LAVELLE:  Objection.

A.    So I do think that it matters.  The source or the identity of the source of that information or the forum in which that information is disseminated, I think clearly the answer is yes.  There's clearly a big difference.

You know, you have some drunk baseball fan standing up in the middle of a baseball game and yelling that they think some company's going to be an acquisition target, that's by no means the same as a company putting out a press release announcing that they're going to acquire company X for a 30 percent premium and, you know, even though somebody at a baseball game may have speculated the same thing, right?

Page 245

So, clearly, I would not say that, well, because somebody at a baseball game yelled this out, that it was publicly known and there was no new information when the company put out its press release subsequently, right?

So there's all sorts of, I think, nuances to -- really, like we've talked a lot about today, you really have to look at the information environment for a given disclosure if you really want to evaluate that.

Q.   Did you do any analysis on whether any of the information disclosed in either of the alleged corrective disclosures was already publicly available?

MR. LAVELLE:  Objection to the form. Asked and answered.

A.   So no.  When you look at the -- when you look at the 14 information events in Exhibit 6, I put everything in there if it met my criteria for inclusion in the Cammer 5 test because my goal was to be objective.  There are clearly things in there that I think are very much less likely to reveal new information that's tied to those growth expectations.  For example, row 1 where they're reporting results without even giving

effect to the actual acquisition of AdaptHealth. But I keep it in there just for purposes of remaining objective and agnostic and putting everything in there that fits the criteria.

I've not separately gone out row by row for these 14 rows and tried to look at whether any portion of that appeared at any previous point in time. That would be a very large undertaking in terms of evaluating the information environment for each of these working rows.

Q.    Turning to paragraph 64 of your report. You state that your event study resulting -- resulted in Exhibit 7 reveals statistically significant impacts on AdaptHealth's common stock following two large M&A transaction announcements and a large increase in trading volume for the earnings miss on May 6th, 2021; is that right?

A.    Yes.

Q.    And you find an abnormal stock return for the December 1, 2020, M&A transaction, the May 6th, 2021, earnings miss, both alleged corrective disclosures, right?

A.    Yes.

Q.    So you found trading volume impacts for

three events and abnormal stock returns for four events?

A.   So I think the trading volume is on four events.  It's May 26th, December 1st, and then April 13th and May 6th.  So that's the trading volume for those four events.  And then abnormal return is on four events.  That's -- abnormal return is December 1st, April 13th, May 6th, and July 19th.

Q.   Okay.  So four for each.

Isn't that just a small fraction of the statements you analyzed?

MR. LAVELLE:  Object to the form.

A.   No, because, again, this really ties back to what I explain in paragraph 60, which is that among -- for example, among the earnings announcements, the majority either disclosed relatively little new information or information that was largely in line with prior guidance provided by management or market expectations.

So I think it would be incorrect and inaccurate to somehow imply that, you know, all 14 of these should be associated with statistically significant stock returns, for example.  Because for many of these, what they

reported was largely, largely in line with the guidance the company had previously touted to investors.  A lot of these earlier mergers and acquisitions announcements were for very small target companies that would not be expected to have a significant impact on AdaptHealth's operations and they're also small and in line with that previous guidance the company had given to investors about targeting small acquisitions each year.

So, really, on an ex ante basis, the prediction would be we would expect to see a larger reaction around earnings announcements where there's either a big miss or a big win in terms of -- relative to expectations or a large unexpected M&A announcement or a large negative announcement pertaining to that, that growth strategy through the disclosures.

And so the fact that we do see evidence of that where it's predicted, and by contrast, we see relatively little stock movements for these smaller announcements, that's all very consistent with what I would expect to observe in an efficient market.

Q.    Can we turn to Exhibit 7, which is on

Page 249

page 62.

A.    Okay.

Q.    This is the results of your event study, right?

A.    Yes.

Q.    You calculated the abnormal return for the days on which each of these disclosures were made?

A.    Yes.

Q.    What is Ab. Ret. P-Value?

A.    That's the abnormal return P-value.

So earlier you asked about a T-statistic.  Once you calculated a T-statistic, you can then look it up or, as we all do, we have the computer, look it up on the P distribution based on the number of degrees of freedom, the size of the T-statistic, and then it returns what is a P-value which ranges between zero and 1.

So if the P-value is less than 10 percent, then we would say it's statistically at the 90 percent level.  If it's less than 5 percent, then it's statistically significant at the 95 percent level.  And if it's less than 1 percent, then it's statistically significant at the 99 percent level.

Page 250

Q.    So is it accurate to say that the lower the P-value, the more likely it is that some company's specific information caused the abnormal return?

A.    Well, what I would say is the lower the P-value, the more statistically significant was the stock return or the abnormal trading volume on that day.  And that's consistent with sort of the cause-and-effect relationship.

As I also have described, I've not attempted to assess whether there was confounding news on any of these dates or other, other factors that could have contributed in whole or in part to the stock price movements.

But, in general, I do think it's -- at a high level, it is consistent with the information that's indicated on these rows from Exhibit 6 as, as causing a change in the securities prices or volume for AdaptHealth.

Q.    Speaking of the T-statistic, I don't see a column for that here.  Why is that?

A.    It's in the -- it's in the Excel file that I turned over to you.  So it's -- that's all in the document production.  But, for brevity, I just report the P-value because the P-values are

Page 251

always something you can look at and interpret.

So if a P-value -- like, if I look at row 14 and the abnormal return P-value is .044, I can look at that and say, okay, that return is statistically significant at the 95 percent level.

But the T-statistic, the interpretation from a T-statistic actually depends on the actual distribution, the T distribution with a certain number of degrees of freedom, and that changes with each rolling regression window.  So, to me, the P-value is much, much easier and much more direct in terms of drawing those inferences of statistical significance.  But the P-value is derived from the T-statistic.

Q.    Okay.  Focusing on that row 14 that you just pointed out.  Let's assume that the stock price reaction on July 19, 2021, was insignificant at the 5 percent level when using an estimation period other than the 120-day trading estimation period that you used in your record.

For example, assume that the stock price reaction on July 19, 2021, was insignificant when using a one-year estimation period or the full

Page 252

punitive class period as the estimation period.

Wouldn't that suggest the stock price reaction on July 19, 2021, cannot be distinguished from zero?

MR. LAVELLE:  Object to the form.

A.    No.   That's -- I don't think that's a correct interpretation.  So, you know, I guess I'll repeat a few things that I've said today, which is, number one, it's important to look at your specification of the event study model, the parameters, what's the market index, what's the industry index, are those both chosen appropriately for the given company.

Number two, what's the estimation window?

Like I said, I typically go with an estimation window that's shorter than one year because it allows for changing volatility in a company stock and a changing relationship between the company and the market and the industry.  And you lose that if you, if you have a longer estimation window, particularly if it's longer than a year.

And so I think, you know, it's important to consider the specification of the event study

Page 253

parameters.  It would be important to consider the information environment and other factors. So I don't think that that would necessarily be -- you know -- well, it's certainly not my conclusion based on the event study that I've conducted in this report.

Q.    Paragraph 66 concludes that:  As a result, this price impact analysis supports the conclusion that AdaptHealth's common stock traded in an efficient market during the class period; is that right?

A.    Yes.

Q.    Is an analysis on statistical significance the same as a price impact analysis?

A.    So I guess -- I know that, you know, there's a legal term of price impact, and I'm not using the word -- the phrase "price impact" here in paragraph 66 without legal context in mind. I'm using the phrase "price impact" as a financial economist saying that I'm looking at the impact on the stock prices and the trading volume of these 14 different potential information events and that I find evidence that when the information came out, that the prices moved by significant amounts.  So that's just to

Page 254

make sure that that's clear.

Q.   Do you plan to use a different event study model in the damages phase of this matter compared to the model you used in this report?

MR. LAVELLE:  Object to the form.

A.   I've not thought at all about a loss causation report at this point in time.  So if I were asked to provide a loss causation report, then I would sit down and I would look very carefully at alleged misstatements and omissions, alleged corrective disclosures, the time period, the information environment, and I would decide what is the most appropriate event study specification to use for purposes of assessing artificial inflation and for use in damages calculations.

MR. IANNECE:  Okay.  We're a bit over an hour.  I apologize for that.  Why don't we go off the record.

MR. LAVELLE:  Okay.

VIDEOGRAPHER:  Off the record, 4:49.

(A recess was taken.)

VIDEOGRAPHER:  On the record, 5:02.

BY MR. IANNECE:

Q.   Dr. Cain, I believe earlier you said

Page 255

that you were also asked to opine on whether the calculation of damages on a class-wide basis in this matter for purchasers or acquirers of AdaptHealth common stock and options during the class period is subject to a common methodology; is that correct?

A.    Yes.

Q.    Did you tailor or adapt the Damages section of your report to reflect the specific issues in this case?

MR. LAVELLE:  Object to the form.

A.    So the -- at the beginning of the Damages section -- that's at paragraph 85 on page 37 of my report.  And the first sentence describes what you just said, or at least for starting off with common stock that I was asked whether this can be done based on the methodology that's common to all class members and consistent with lead plaintiffs' theory of liability.

So for me, then, really, the starting point for that goes back to Section III(A) in my report, which is paragraphs 13, 14, 15, and 16 of the report.  So that, that part of the report is where it's really very tailored and very specific and unique to AdaptHealth and the complaint

**Page 256**

allegations, the alleged misstatements, omissions, the alleged corrective disclosures. And what I do is summarize that there and I've thought through, ultimately, this question of whether there's, like, an economic coherence to the narrative to the story such that there are alleged misstatements that -- or omissions that were allegedly corrected through subsequent disclosures.

And I've determined that the answer is yes, there's, there's an economic coherence to the allegations. I've not evaluated whether those are true or not or loss causation, but just evaluating that, that story. Because the answer is yes, then what I'm explaining is that the out-of-pocket method for this calculation is applicable and can be used here. And because of that, as I also say in paragraph 85, it's standard. That methodology is standard. It's well accepted. It's formulaic. And I then go on in the subsequent paragraphs to just summarize that process, which is, is not unique in any way to this case.

So those paragraphs would I think look either very similar or almost identical to my

Page 257

description of that standard methodology that I've provided in other reports.

Q.     You used the term "economic coherence." Can you explain what you mean by that?

A.     Yeah.  So, ultimately, what I mean is are there allegations that would go into either the inflation -- either the creation or the maintenance of artificial inflation going back to the beginning of a class period.  And it could potentially be subsequently allegations such that artificial inflation could increase further.

And then there are allegations of corrective disclosures that would, would go back and correct the alleged misstatements or omissions that were made either at the beginning or earlier in the class period such that those alleged corrective disclosures would come subsequently and that that could then be used to generate an artificial inflation ribbon if -- down the road, if I were to determine that stock prices were artificially inflated by virtue of the allegations in the complaint.

So, ultimately, that's what I mean when I describe economic sort of cohesiveness or economic coherence to the allegations in the

Page 258

complaint.

Q.   So am I correct in saying that what you've done is you've taken the allegations in the complaint and assumed that they were true in order to come to a determination?

MR. LAVELLE:  Object to the form.

A.   Like I said, I've certainly not attempted to evaluate whether or not they were true.  So I guess for these -- for purposes of asking whether damages can be calculated based on a methodology that's common to all class members and consistent with the theory of liability, for those purposes, I've assumed that those allegations are, are true, yes.

Q.   And all of that is based on the information in the Background section of your report?

A.   Sorry.  The information in where?

Q.   In the sections of your report that you called out before, earlier.  The Damages section, I think you said it started on paragraph 13 in the case background.

A.   Right.  Yes, that's correct.

Q.   And so there aren't any edits to the language, the boilerplate language used in your

Page 259

prior reports to reflect your understanding of the particular facts with respect to this Damages section?

MR. LAVELLE:  Object to the form. Misstates prior testimony and the document.

A.    So, again, like I said, I have considered the unique circumstances of this case, and those are described -- and I'm really referencing and pointing back to those in Section III(A) when I opine that damages can be calculated on a class-wide basis subject to common methodology in this case.

So I do think that the text of the report is entirely unique to AdaptHealth for that portion of the damages consideration in which I'm considering the allegations of the complaint.

Q.    But not the text within the Damages section itself, correct?

MR. LAVELLE:  Objection.  Misstates the document.

A.    The remaining, the remaining text in which I described the out-of-pocket methodology, like I said earlier, that's a standard and well accepted methodology, and it's formulaic, so that description of the methodology is going to be

Page 260

either identical or very similar to other reports.

I've also got a paragraph 90 which pertains to AdaptHealth's options because that is not necessarily the case in every report, efficiency report that I analyze. So I -- like I said, I do think that the consideration that I've -- or the analysis that I've undertaken in order to form this opinion does take into consideration the unique circumstances of AdaptHealth and the allegations contained within the complaint.

Q. Outside of the reference to the options, where in the Damages section do you consider these unique circumstances to AdaptHealth that you just described?

MR. LAVELLE: Objection to form. Misstates the document.

A. So, again, at the beginning of the section, it talks about how I've been asked to evaluate whether damages can be calculated in a manner that's consistent with plaintiffs' theory of liability.

So I described plaintiffs' theory of liability in Section III(A) of the report, and so

Page 261

that's what I'm really pointing back to as the basis for the opinions that are expressed in Section VI of this report.

Q.    In reaching your damages opinion, did you do any analysis of lead plaintiffs' trading history in AdaptHealth stock?

MR. LAVELLE:  Object to the form.

A.    No, I did not.

Q.    Why not?

A.    It's not necessary for me to analyze their trading patterns in order to reach the opinions expressed in Section VI of the report.

Q.    Why is that?

A.    Because, as I explained throughout this section, the out-of-pocket methodology is flexible enough to accommodate any purchase dates and any sale dates occurring in connection with AdaptHealth securities that were purchased during the class period.  So I don't have to actually analyze their trading records because that's something that would take place in terms of an actual damages calculation down the road after a loss causation or merits report.

Q.    Did you separately consider the calculation of damages for the Exchange Act

Page 262

claims for the Securities Act claims?

MR. LAVELLE:  Object to form.

A.    Are you pointing to a particular paragraph within, within this section?

Q.    I'm just asking about your consideration of the fact that there are separate allegations under the Exchange Act and separate actions under the Securities Act and have you considered those in the calculation of damages for each separately.

A.    Could you, could you point me to those separate allegations?  I want to -- I'd like to refresh my recollection of those separate allegations before answering.

Q.    Are you, are you aware that the plaintiffs have alleged allegations under both the 33 and 34 act?

MR. LAVELLE:  Object to the form.

A.    Off the top of my head, I don't recall, so I'd like to review the complaint in order to refresh, refresh my recollection.

Q.    Let's turn to paragraph 85.  In there, you say:  Methodology comment to all class members.

What does that mean?

Page 263

A.    Yeah, basically, is there a formula that could be consistently applied to any, any class members such that you could take their trading records and their dates of purchase and dates of sale and number of shares purchased and sold and apply that formula for the calculation of damages.

Q.    And you say:  That needs to be consistent with lead plaintiffs' theory of liability.

What do you mean by "consistent"?

MR. LAVELLE:  Object to the form.

A.    So my understanding is that the damages methodology would be capable of calculating damages if plaintiffs' claims are proven correct, if the allegations are found to be correct.  So that's why I've summarized very concisely the theory of liability from the complaint in Section III(A) of this report.

Q.    What is your understanding of plaintiffs' theory of liability that you considered as part of your evaluation?

A.    Well, I considered the complaint and I've summarized that theory in Section III(A) of my report.  I can certainly read it back to you

Page 264

or just point you to those paragraphs 13 through 16 in my report.

Q. I'd like to know what your present understanding is of the allegations.

A. Okay.

Q. [Unintelligible]

A. I'm sorry. I didn't catch the last...

Q. I'd like to know what your present understanding is of the plaintiffs' theory of liability.

MR. LAVELLE: Object to the form.

A. Okay. So my understanding is that AdaptHealth is a business that specializes in home medical equipment which was founded by Mr. McGee in 2012, which then went public in November of 2019 on the NASDAQ through a de-SPAC transaction. And that a significant part of AdaptHealth's business strategy that was represented to investors came through growth, both organic and inorganic growth with the company growing its business through at least 59 acquisitions from 2012 through 2019 which grew revenues by roughly 200 percent in the three years leading up to the public de-SPAC transaction in 2019.

Page 265

That AdaptHealth allegedly touted or represented to investors that it anticipated that this significant growth trajectory would continue going forward but that throughout the class period, the defendants in this case misled investors through false and misleading statements and omissions relating to that growth story that they had touted to investors, which included that Mr. McGee was important and his leadership was important to the continuation of AdaptHealth's growth strategy, yet the defendants allegedly failed to disclose to investors that he was involved in a very large tax fraud involving billions of dollars, leading to criminal investigation, prosecution, penalties, settlements and, ultimately, Mr. McGee being placed on unpaid leave as the company's CEO.

I understand plaintiffs' theory of liability also includes that AdaptHealth's organic growth had stalled in late 2020 and that the defendants attempted to cover up this fact by altering or changing the definition of how they calculated organic growth as they disclosed it and discussed it with investors.

Plaintiffs further allege that the

Page 266

relevant truth was partially revealed on April 13th, 2021, when the company announced that it was placing Mr. McGee on unpaid leave after claiming that the company had learned that authorities in Denmark had formally charged him with alleged tax fraud.

In the complaint, plaintiffs also alleged that the relevant truth is further revealed on July 19th, 2021, when Jehoshaphat Research published a report which claimed that AdaptHealth's true organic growth was much lower than what the company had told investors.  And, in fact, it may have been negative.

So that's, I think, a summary, or at least my understanding as a summary of the plaintiffs' theory of liability in this case.

Q.    And you just read that directly out of your report here today, correct?

A.    Not verbatim, no.

Q.    Near verbatim, correct?

MR. LAVELLE:  Object to the form.

A.    Like I told you, I summarized to the best of my ability their theory of liability in Section III(A) of the report.  I'd be happy to turn to the complaint if you want to dig into any

Page 267

specifics or particularities of it further.

Q.   And then read aloud here today, correct?

MR. LAVELLE:  Object to the form.

A.   I'm sorry.  I don't understand.

Q.   Would you agree that plaintiffs alleged two different theories of liability, each with unique alleged misstatements that were allegedly corrected by separate disclosures?

MR. LAVELLE:  Object to the form of the question.

A.   I do agree with the latter part of your question, which is that -- my recollection is that there are two alleged corrective disclosures.  But I think the first part of your question is really more of a legal question as to whether there are two separate theories of liability.  And that's, that's not something that I've opined on in this report.

Q.   So you don't have a view as to whether there is a theory of liability with respect to allegations concerning -- or disclosures concerning Mr. McGee, then a theory of liability with respect to disclosures concerning organic growth?

MR. LAVELLE:  Object to the form.  Asked

Page 268

and answered.  Calls for a legal conclusion.

A.    Well, I do agree that there are alleged corrective disclosures relating to Mr. McGee and corrective disclosure relating to the organic growth through the Jehoshaphat report, but I've not been asked to opine or form any sort of legal opinions on whether those are two separate theories of liability from a legal perspective.

Q.    Or whether each of those theories of liability alleged unique misstatements?

MR. LAVELLE:  Object to the form of the question.

A.    That's -- yeah, again, I've not been asked to assess whether the alleged misstatements were, were particular to one versus another corrective disclosure.

Q.    So your understanding of plaintiffs' theory of liability which you used to evaluate damages is that there's one theory of liability that covers both the McGee and inorganic growth issues?

MR. LAVELLE:  Object to the form of the question.  It calls for a legal conclusion. Asked and answered.

A.    I don't, I don't think that you

Page 269

accurately described my previous responses, so I've not opined on whether there's one theory of liability or multiple theories of liability.  But I gave you my summary of plaintiffs' theory of liability, which is that there are these allegations of misstatements or omissions; there are alleged corrective disclosures and that that can ultimately be used at a loss causation stage to form an inflation ribbon that would be driven by alleged misstatements or omissions and alleged corrective disclosures that could then be applied for anyone who purchased stock or options in AdaptHealth during the class period.

Q.    So when concluding that there can be a common -- a methodology for damages common to all class members and consistent with lead plaintiffs' theory, how many theories of liability did you assume?

MR. LAVELLE:  Object to the form of the question.

A.    That's -- there's no assumption on my part in terms of asking this sort of legal question about is this all under one theory or are these separate theories.

For me, when I talked about the economic

Page 270

coherence of the allegations, the question is are there alleged misstatements and are there alleged corrective disclosures subsequently that are allegedly tied back and connected to those alleged misstatements or omissions.

And I've worked on a variety of merits reports in which you've got different corrective disclosures that are tied back to different alleged misstatements, and that can all be incorporated into an artificial inflation ribbon that can then be applied to any -- anyone who purchased stock or options during a class period for a given company.

Q.   So when concluding that there could be a methodology common to all class members, you didn't have any understanding at all as to how many periods of liability were being alleged?

MR. LAVELLE:  Object to the form of the question.  Asked and answered.  Misstates prior testimony.

A.   So when I reached the conclusion, that's based on asking whether there's an economic coherence to the allegations in the complaint such that an inflation ribbon could be constructed that would run between alleged

**Page 271**

misstatements or omissions and subsequent

corrective disclosures.  There may be other legal

questions that are outside the scope of that sort

of analysis, but the answers to those legal

questions would not have an impact on the

analysis that I've undertaken in order to opine

that there is a formula that can be applied

class-wide and common to any purchasers of

AdaptHealth stock or options.

Q.    Won't you ultimately need to connect the

alleged corrective disclosure to the alleged

misstatements?

MR. LAVELLE:  Object to the form.

A.    So if this were to proceed to the loss

causation stage and I were asked to provide an

expert report on loss causation, merits and

damages, then I would consider the information

environment throughout the class period.  I would

consider the specifics of the alleged

misstatements and omissions.  I would then

consider the nature of the corrective disclosures

and I would evaluate whether those disclosures

actually corrected information that had

previously been misrepresented to the

marketplace.  Did the corrective disclosures

Page 272

provide new information that ties back to alleged misstatements or omissions at some earlier portion during the class period.

That analysis would be based on my review of the complaint, its allegations, my review of all available news coverage throughout the relevant time period, my review of analyst reports, my event studies.  It could rely on academic research if necessary.

So it's a -- it's a long report that takes place at a later stage in order to ask whether those are ultimately corrective and dissipated artificial inflation at that point in time.

Q.    How can you be sure that your proposed methodology will work on a class-wide basis if you don't even have an understanding as to which alleged misstatements are even alleged to be connected to the alleged corrective disclosures?

MR. LAVELLE:  Object to the form. Misstates prior testimony.

A.    Yeah, so it seems like you're trying to suggest that I don't have any understanding of what's going on in the case, which is certainly not true.  But --

Page 273

Q.    I'm not trying to suggest anything.

You've testified that you don't -- you haven't looked into which misstatements are alleged to be connected to which alleged corrective disclosures and whether there are separate misstatements for each corrective disclosure.  So that's what I'm trying to figure out.

MR. LAVELLE:  Objection.  Misstates prior testimony.

A.    Yeah, so I don't, I don't think that's what I previously testified.

But what I -- you know, maybe -- it might be helpful if I just explain that I've worked on a variety of merits reports and I've worked on cases that had two or three separate types of alleged corrective disclosures that were tied back to separate alleged misstatements or omissions.  And that's in no way a problem for estimating or calculating an inflation ribbon that runs throughout a class period.

Because, ultimately, at that loss causation stage of producing the report, I will look at a corrective disclosure, I'll tie it back to the specific alleged misstatements or

**Page 274**

omissions that are alleged to be tied to or connected to that corrective disclosure, I'll evaluate the information environment to determine whether it truly did provide corrective information. And there are times when I decide and I opine that it did not provide any corrective information and, therefore, no artificial inflation was dissipated. And then there are times when I decide that it did provide corrective information and artificial inflation was dissipated, and then that builds into the inflation ribbon.

So, ultimately, if I at the loss causation stage conduct an exhaustive analysis of the information environment for loss causation purposes and I determine that these things were not connected or were not corrective, then artificial inflation is zero around those allegations. So inflation at time of purchase is zero; inflation at time of sale is zero for those investors and there's no damages.

The thing to remember is that just goes into the same formula that I've described. You look at the -- in terms of the out-of-pocket method for calculating damages, it's the

Page 275

inflation at time of purchase and inflation at time of sale, and that formula is capable of handling any conclusions that come about at the loss causation stage of a case.

Q.   What have you done here to assure yourself that your proposed methodology will work on a class-wide basis in this specific action, regardless of how it may have worked in prior actions?

MR. LAVELLE:  Object to the form.  Asked and answered.

A.   Yeah, I've done what I do in every single case, which is I review the complaint allegations and I consider whether there's an economic coherence to the narrative or the story of the allegation such that there are certain alleged misstatements and omissions that were then subsequently corrected through corrective disclosures.

And like I explained earlier, it's not at all uncommon for me to encounter complaints in cases that have different categories or different types of allegations and different categories or different types of corrective disclosures.  So that's something that I've experienced in other

cases.

I brought that knowledge, that experience, my professional experience to bear when I read through the complaint in this case and I summarized the theory of liability in Section III(A) of this report.  So I did the same thing in this case that I've done in every market efficiency report in terms of considering plaintiffs' theory of liability that's unique to each case.

Q.    Are there any objective criteria for determining economic coherence?

MR. LAVELLE:  Object to the form.

A.    Yeah, I think that the evaluation is really reading through the complaint and asking from the perspective of a qualified financial economist, are there alleged misstatements and omissions that are then alleged to have been corrected at some subsequent point in time.

So I look at the alleged misstatements or omissions; I look at the alleged corrective disclosures.  I do not at this stage evaluate whether those were true or not but rather are they talking about the same types of information or is there a complete disconnect where there's,

Page 277

there's really no -- they're not talking about apples and oranges and there's really no connection there between those two things.

But if there is a connection, then that's, that's what I'm looking for. And that, that evaluation is based on, you know, like I said earlier, roughly 20 years of experience as an analyst, as a Ph.D. in finance, as an academic, as a financial economist with the SEC. I've studied corporate disclosures of information and I've studied information environments in a wide variety of cases for many years.

So that's, ultimately, the role of an expert is to take those qualifications and that experience and then apply it to, you know, a given case like this.

Q.    That sounds like this would be based on your experience rather than any sort of objective criterion, correct?

MR. LAVELLE:  Object to form.  Misstates prior testimony.

A.    No, I don't think so.  I think there's -- it's very objective because I'm looking very objectively at the allegations in the complaint and the alleged corrective

Page 278

disclosures within the complaint and asking are they talking about the same thing, essentially.

And, like I said, I'm being objective. I'm not trying to figure out whether these things are true or not at this point in time but just, rather, remain completely objective and agnostic to ask whether these two things are ultimately talking about the same underlying information set.

Q.   You've stated a number of times today and in your report that you understand the out-of-pocket methodology to be standard and well accepted.  What is your basis for that understanding?

A.   Yeah, so that's, that's the methodology that I've seen applied almost universally in securities class action cases.  I've applied it in, in opt-out cases in which I actually applied it to individual plaintiff's trading records.

And, also, there's a footnote pointing to the PSLRA, footnote 85, which also talks about this, this methodology.  So it's my understanding, based on my experience and, also, my review of other expert reports in a wide variety of cases, that this is the most generally

Page 279

accepted approach for damages calculations in these types of cases.

Q.    Did you consider whether the out-of-pocket methodology was appropriate for the specific allegations in this action?

A.    Yes.

Q.    How so?

A.    So I looked through the complaint and, as I've summarized in Section III(A) of the report, I'm asking is it alleged that there would be artificial inflation present from day one of the class period and potentially fluctuating during the class period through alleged corrective disclosures that would dissipate that artificial inflation.

So are there alleged misstatements and omissions; are there alleged corrective disclosures that are connected to the alleged misstatements and omissions?  And, if so, then this is a methodology that's fully capable of calculating damages based on that -- based on the approach.

Q.    When you say "connected to," do you mean alleged to have been connected to?

MR. LAVELLE:  Object to the form.

Page 280

A.    Well, again, I'm, I'm asking -- like I said earlier, I'm accepting as true the allegations, so I'm not opining on the truth.  So everything, everything I think that I would describe as coming from the complaint is alleged.

Q.    Did you consider whether any other methodology was more appropriate here?

MR. LAVELLE:  Object to the form.

A.    No.  I did not come across any evidence or reasons for trying to pursue other types of methodologies.

Q.    In prior securities class actions where you have been asked to analyze whether there is a class-wide damages methodology, have you ever considered a methodology other than the out-of-pocket methodology?

A.    Yes, I have.

Q.    In which actions?

A.    I don't recall specifically.  I don't recall specifically which actions but, you know, there's been academic research in which some people have advocated, instead of using this methodology, that you could apply a discounted cash flow analysis on a daily basis.

For example, I think Professor Frank

Page 281

Partnoy has published academic research in I think The Business Lawyer sometime in the past couple years that's advocated for a discounted cash flow modeling to be carried out on a daily basis throughout a class period.

There are certainly other types of methodologies that I've considered, particularly in times when, when the alleged corrective disclosures may have been subject to confounding information within the allegations.  But, but typically, in my experience, so far to date, I've typically not seen any reasons -- I've not come across any compelling reasons to deviate from the standard out-of-pocket methodology in these types of cases.

Q.    Did you consider whether there was any confounding information here?

MR. LAVELLE:  Objection to the form.

A.    I did not come across any allegations of confounding information in this case.

Q.    So the confounding information would have to be alleged in the complaint by the plaintiffs?

A.    So I don't -- I'm not really opining that any certain thing has to happen.  But, like

Page 282

I said, that's something I have considered in the past, but I've never actually adopted it up to this point in time.

But -- I'm getting a little feedback on the --

Q.    Yeah.  I heard that, as well.

A.    -- audio from the court reporter, I think.

But, basically, what I'm looking for, is there any, any reason that I'm coming across in the complaint that would -- that would cause me to have concern that the out-of-pocket methodology would not be appropriate in a given case.  And, ultimately, even in previous cases when I've thought about other methodologies, up to this point in time, like I said, I've still come to the conclusion that the out-of-pocket methodology is, is appropriate.

Q.    I'd like to --

THE REPORTER:  Could we go off the record for a minute?

MR. IANNECE:  Sure.

VIDEOGRAPHER:  Off the record, 5:40.

(A recess was taken.)

VIDEOGRAPHER:  On the record, 5:44.

Page 283

BY MR. IANNECE:

Q. Dr. Cain, I'd like to figure out how this methodology, this out-of-pocket method would work here in practice.

So, first, do you intend to analyze one punitive class period here?

MR. LAVELLE: Object to the form.

A. As opposed to what? I'm not really sure what you mean otherwise.

Q. I just want to know the framework. There's one punitive class period that gets analyzed; is that right?

A. Yeah, I don't really -- I'm not sure that I understand your question. I mean, it's -- the whole report is about one class period, so I don't really see what the alternative would be.

Q. And so it's -- it was -- I thought it was a pretty simple question, whether there's one class period or multiple, but it sounds like you're analyzing one?

MR. LAVELLE: Objection to the form.

A. Yeah, there's one, one class period. There's stock and options, but it's the same class period.

Q. And then -- so for a given class member,

Page 284

you would take the difference between artificial inflation at the time of the purchase and artificial inflation at the time of the sale; is that right?

A.    Yes.

Q.    And if the shares are not sold prior to the full revelation of the fraud, what is the calculation?

A.    If the shares are held beyond the end of the class period, is that --

Q.    Yeah.

A.    Yes, so it's the same calculation.  It's just that you use the -- you would just use the -- the artificial inflation at the time of sale would be zero.  And so you would call those retained shares, but the inflation would be zero. You would call it "retained shares" instead of "sold shares," but the artificial inflation would be zero.

Q.    Are you familiar with what's called a lookback period?

A.    Yes.

Q.    Why would you use a 90- -- or when would you use a 90-day lookback period?

A.    Yeah, so that -- I think I described

Page 285

that in footnote 85.  So that's like a cap on the damages.  And so -- so, basically, my understanding is the intention of that is to try to avoid potentially abusive tactics by say, like, short sellers who might put out a false report to temporarily depress or drive down the stock price, and then the investors learn that that was not true and the price kind of bounces back up.

And so that 90-day lookback price, it starts calculating on the last -- right after the end of the class period up through 90 days.  You take the average of that price and then that caps damages based on the difference between the purchase price, and then for shares that are retained, the 90-day lookback price, because that could then be -- that could then be higher, which would, which would potentially eliminate any damages that they could claim.

Q.    Is that approach consistent with plaintiffs' theory of liability?

MR. LAVELLE:  Object to the form.

A.    I think that approach can be applied in any out-of-pocket calculation.

Q.    How are you accounting for the two

Page 286

alleged corrective disclosure dates?  Would there be separate lookback periods?

MR. LAVELLE:  Objection to the form.

A.    So I think that's actually a legal question as to whether the legal interpretation of the PSLRA would apply the lookback cap on corrective disclosures that occurred during a class period or if it only applies to the last alleged corrective disclosure.  Either way that the court would rule, it could be implemented formulaically.

Q.    So, as you sit here today, you're not aware of whether it would need to be applied twice?

A.    No.  Again, I think that's a legal question as to -- and I think people debate that legal question.  But either way, under either approach, that could be applied formulaically.

Q.    And so your testimony is that you would wait for instruction from the court as to when and how many lookback periods to apply?

A.    Either from the court or from counsel, per guidance or input from counsel.

Q.    How are you proposing to calculate artificial inflation in this matter?

Page 287

MR. LAVELLE:  Objection to the form.

Asked and answered.

A.    It would, it would be -- well, I guess I would probably start with paragraph --

Q.    I'll direct you, if helpful.

A.    Yeah, I think I'd probably start with paragraph 87, which it says the quantification of artificial inflation per share is based on a detailed loss causation analysis, and I've not been asked to, you know, conduct that analysis at this point in time.

So I'm not proposing a specific calculation of artificial inflation, but I then go on to explain that, you know, one very common tool that's used is the event study.  So you look at corrective disclosures; you calculate the abnormal return, convert that to a dollar exchange on a per-share basis, and then that can be backcast through the class period back to the first alleged misstatement or omission pertaining to -- that's connected to that corrective disclosure.

Q.    Is it your understanding that an event study is a form of a loss causation analysis?

A.    Well, I think I would describe an event

Page 288

study as a tool that can be employed in a loss causation analysis.  There are other approaches such as valuation models or other techniques that can be employed, as well, in a loss causation analysis.

Q.    And is it your expectation that you would apply an event study here?

A.    I think that's, that's possible, but I've not reached a conclusion on the specific calculation that I would enter into if I were asked to do a loss causation report in order to estimate an artificial inflation and damages calculation.

Q.    So you don't know what formula you would intend to use?

MR. LAVELLE:  Object to the form.

A.    Well, again, I'd point you back to paragraph 87 where I say that I've not been asked to perform a loss causation analysis at this time, but I then go on to describe the tools that are commonly used that I use in loss causation analyses.

And, again, those, those tools estimate artificial inflation in a very formulaic way that can then be applied in the out-of-pocket method

Page 289

of calculating damages.

Q.    If you can't explain or if you don't know the formula that you intend to use, how do you know that it can be applied on a class-wide basis?

MR. LAVELLE:  Objection to form. Misstates prior testimony.

A.    So, based on my review of plaintiffs' theory of liability, I'm confident that the tools that I've described in this section are capable of estimating artificial inflation, but I've not done that yet at this point in time.  But I'm confident that those tools are capable of doing so.  And knowing that, I can conclude that calculation can then be applied formulaically on a class-wide basis and common to all class members.

Q.    Do event studies measure price reactions to statements that are not corrective disclosures which reveal the relevant truth that was concealed by alleged material omissions and/or misrepresentations?

MR. LAVELLE:  Object.

A.    I'm not, I'm not -- I don't really understand the question.  Does that come from a

Page 290

paragraph in my report?

Q.    Yeah.  If we turn to paragraph 88, you state that:  Event studies measure stock price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged material omissions and/or misrepresentations.

A.    Okay.  I see it.  Thanks.

So what was your question?

Q.    I'll start with a new question which may help.

Is it your understanding that an event study measures price reactions?

A.    It can.  I mean, there can be other uses of event studies such as, as I've used in this report, to look at abnormal trading volume.  But one of the applications of event studies is to measure price reactions, yes.

Q.    And can event studies measure price reactions to statements other than alleged corrective disclosures?

A.    Absolutely.  I've employed event studies in a wide variety of my own academic research in contexts that have nothing to do with alleged corrective disclosures.

Page 291

Q. How does an event study show that a statement had a price reaction?

A. Well, so an event study is, is, is a tool that is used to assess by how much did a stock price move at a given point in time.

So, you know, obviously, I go on to explain some of these things, but I'll just kind of summarize these things. But it's only one step in the process at that loss causation stage. So we have to look at the entirety of the information, environment. You have to look at whether there was confounding information that came out at the same time that also contributed to the stock price reaction.

So the event study will tell us by how much did the stock price move at a certain point in time when a certain disclosure was made. But that disclosure may have multiple pieces of information and only some of those may be alleged to be corrective. And some of those other statements that came out in a disclosure may not be corrective but may have contributed to the stock price movement and so then it may be necessary to disaggregate, to strip out the impact of that type of confounding information.

Page 292

So that's a separate step that takes place after the actual event study.  And all of this is done in conjunction with an evaluation and a consideration of the full information environment or a given alleged misstatement or omission and an alleged collective disclosure.

Q.    How do you determine that there was confounding information that impacted the stock price?

A.    I'll review the information environment; I'll review all of the information that came out, and then I'll apply tools of finance, a valuation analysis and economics to determine whether any of that other information would be expected to contribute to the stock price reaction on that given date.

Q.    So does that require any adjustments to a class-wide damages calculation?

MR. LAVELLE:  Objection to the form.

A.    So the calculation is formulaic.  You're just feeding into that, the artificial inflation that has been determined to have come out on a given date.  That's all done formulaically and class-wide.  And it doesn't -- it does not vary by class member.  It only varies based on the

Page 293

purchase and sale date and the number of securities purchased or sold.

But the -- I think the step you're asking about is how do you determine what amount of artificial inflation was actually dissipated at a certain point in time, and that's where that disaggregation of confounding information takes place.  There are a variety of tools to -- that can be employed to do that.  But whatever the determination is, that's the amount of artificial inflation that's remaining, and that's -- that just plugs right into the formula and it's applied to the entirety of a class.

Q.    Have you ever had to account for confounding news when calculating class-wide damages in your prior experience?

A.    Yes.  I've had to make adjustments for confounding information around corrective disclosures in order to adjust the actual amount of artificial inflation that was dissipated on a given corrective disclosure.

Q.    And in which cases?

A.    I believe that on page 46 of my report, there's a bullet point under my CV that involves Patterson Companies.  I believe that I had to

**Page 294**

disaggregate for some confounding information for a corrective disclosure in that report.

I believe that I, I did a merits report I think in Mylan, towards the bottom of page 45, but I don't recall off the top of my head whether, whether I had to disaggregate.  But I do recall that there were separate categories of alleged misstatements and alleged corrective disclosures that connected to different alleged misstatements or omissions.

And then I believe I did a merits report on -- midway up page 45 in a case involving Recro Pharma, but I think that I -- I think in that case there was a corrective disclosure in which I determined that, essentially, the entirety of it was confounding and none of it actually was truly corrective.  So the amount of artificial inflation that was, was dissipated pertaining to one of the alleged misstatements would have, would have been zero as it pertained to one of the alleged misstatements; although, there may have been -- the rest of the stock price impact may have related to different alleged misstatements, but I'd have to go back and review to refresh my memory.

Page 295

Q.    And were those actions class actions?

A.    Patterson was a class action, Recro Pharma was a class action, and Mylan was an opt-out, I believe.

Q.    Focusing on the two class actions, didn't you testify earlier that you've never calculated class-wide damages or never been asked to calculate class-wide damages in a class action?

MR. LAVELLE:  Objection to the form. Misstates prior testimony.

A.    So what I'm talking about right now is artificial inflation which, which then goes into this out-of-pocket formula.  And then after a case is resolved, that gets sent to a claims administrator who actually does the, the damages calculation.  So I think we're talking about similar but slightly different things here.

Q.    Have you reached an opinion regarding whether there was any confounding information that impacted the stock price on the alleged corrective disclosure dates here?

A.    No, I've not sought to conduct that type of analysis at this point in time.

Q.    If you ultimately do, how would you

control for the confounding information?

MR. LAVELLE:  Objection to the form.

A.    I would -- so I would apply the tools and the techniques that I describe in this section of the report.  Let's see.  So that would be at the end of paragraph 89 of my report.  It's, it's based on a specific set of facts and circumstances in the case.  It can involve valuation techniques such as discounted cash flow analysis or earnings-per-share calculations or multiples analysis.  It can involve event studies.  It could involve academic research studies or analyst report or other case-specific documents.

So I've employed a lot of these techniques already in my merits reports when I've evaluated for the need to disaggregate confounding information.

Q.    I think you'd mentioned earlier the term "backcasting methodology."

A.    Yeah.

Q.    Can you explain what that is.

A.    Yeah.  That basically just means that if, if I determine that a corrective disclosure has dissipated artificial inflation, that I would

Page 297

take that amount of artificial inflation and I would backcast that or apply it to an inflation ribbon that goes back to an earlier part of the class period, back to alleged misstatements or omissions.  And that backcasting can be done on either a constant-dollar basis or a constant-percentage basis or some other basis that's informed by valuation analysis or financial analysis.

Q.    Would you agree that a backcasting methodology can only work if the alleged corrective disclosures can be matched to the alleged misstatements?

MR. LAVELLE:  Objection to the form.

A.    What do you mean when you say they have to be "matched"?

Q.    Meaning there has to be a connection between the specific alleged misstatements and the alleged corrective disclosures.

A.    So I think you're -- my understanding is, if there's no connection, then I would, I would likely determine that there was no artificial inflation that was dissipated at a corrective disclosure, so there would be nothing to actually backcast.

Page 298

Q.    And you've yet to do that analysis here, correct?

A.    Right.  I've not performed a loss causation analysis at this point in time.

MR. IANNECE:  Let's go off the record.

VIDEOGRAPHER:  Off the record, 6:05.

(A recess was taken.)

VIDEOGRAPHER:  On the record, 6:15.

BY MR. IANNECE:

Q.    Dr. Cain, I believe earlier you said that you were also asked to assess whether the value impact of any alleged misstatements or omissions would be reflected in AdaptHealth's options prices, right?

A.    Yes.

Oh, by the way, I, I think I misunderstood one of the questions you asked before the break when you were asking about Section 33 versus 34 claims.

I didn't -- I think you were maybe trying to get at the fact that I'm talking about Section X(B) damages in this section of my report as opposed to Section XI damages.  So I, I just wanted to clarify in case my previous answer didn't -- wasn't quite right.

Page 299

But the damages calculation that I explained pertains to X(B) claims, but that Section XI claims, as I understand it, those are handled under a separate statutory calculation. So I just wanted to clarify in case I wasn't, wasn't clear before.

Q.    Did you come to that realization on your own?

A.    So I've dealt with X(B) and Section XI claims separately but, in my mind, I don't think of those as the 33 act versus the 34 act.  So counsel kind of helped me to connect the dots there that that's what you were probably trying to get at.

But I certainly have worked on cases with both Section X(B) or Section XI claims previously.

Q.    Got it.

So I believe earlier you said you were asked to assess whether the value impact of any alleged misstatements or omissions would be reflected in AdaptHealth's options, right?

A.    Yes.

Q.    What does "value impact" mean?

A.    Yeah, so I think it's got a similar

Page 300

meaning in terms of how I would describe it for stock prices, which, you know, ultimately, is, as I've described throughout this Damages section of my report, that I can estimate artificial inflation by looking at corrective disclosures and I can backcast that throughout the class period, through the construction of an artificial inflation ribbon. The same type of approach can also be done, also, for options because the options prices are a derivative of the stock prices.

Q.   Other than in this case, have you been asked as an expert to opine on whether the value impact of any alleged misstatements or omissions would be reflected in an issuer's options prices?

A.   Yes, I have a few times. I'd have to go back and check, but one example would be QuantumScape, which was recently certified. And then I've opined along those lines, I think, in at least a couple of other expert reports, but I'd have to go back and review those.

Q.   Have you ever concluded that an issuer's options prices did not reflect the alleged misstatements or omissions?

A.   No, I don't believe that I've come to

that conclusion up to this point in time.

Q.   How do you determine whether value-relevant information is reflected in the options price?

A.   So this is kind of -- in I think Section V of my report, which kind of goes through an explanation of the fact that options are derivatives and meaning that they derive their prices from an underlying asset, which in this case would be the AdaptHealth common stock.

So that's, that's basically formulaic. It's a basic principle of finance.  There are options models such that I mentioned the Black-Scholes options model that explicitly demonstrates how the price of an option is formulaically tied to the price of an underlying stock.

So that really is just a formula showing that any change in the implied value of a stock price would then formulaically feed right into the options, as well.

Q.   Did you perform any analysis here as to whether value-relevant information was reflected in the options price?

A.   Well, I think it would be the analysis

Page 302

that I described in the report, which is that I have conducted that type of analysis for the common stock because the common stock is efficient and because options are priced derivatively off of the common stock.  By definition, the option prices would reflect that type of information.

Q.    Did you actually look at the options prices to confirm?

A.    I've not conducted an assessment in this case yet of the actual options prices to calculate the amount of artificial inflation in those.  I've also not done that type of calculation for the stock prices either.

Q.    Going back to -- did you even -- sorry. Did you even look at the options prices at all for AdaptHealth?

MR. LAVELLE:  Object to the form.

A.    I did download and look at data on options.  That's summarized in paragraph 79 of the report.

Q.    I see a reference to the number of options contracts, but is there -- is there a price that you observed?

A.    I observed pricing data when I was

Page 303

accessing option metrics.  I don't recall whether that pricing data was included in the download of the contracts traded.

Q.    Going to paragraph 89 of your report. You state that:  A loss causation analysis must also document how artificial inflation per share evolved throughout the class period.  This determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery.  One frequent method for modeling the evolution of inflation is to assume constant dollar inflation.

Do you see that?

A.    Yes.

Q.    Can you explain the constant dollar inflation method.

A.    Yes.  So let's suppose, hypothetically, I evaluated a corrective disclosure and I determined that it dissipated three dollars of artificial inflation per share when that disclosure was made, then I would put that three dollars of artificial inflation into the inflation ribbon above the stock price all the way back to the first alleged misstatement or

Page 304

omission, or let's say back to the beginning of the class period, if that's the date that the alleged misstatement or omission was made.

So the artificial inflation ribbon remains constant for that amount of artificial inflation at three dollars per share under the constant dollar methodology.

Q.   Inflation was not constant, right?

MR. LAVELLE:  Object to the form.

A.   I'm not sure what you mean by that.

Q.   Wouldn't the inflation per share evolve over time?

A.   In the hypothetical I just gave?

Q.   Generally.

A.   No.  In the hypothetical I just gave and very frequently, the amount of artificial inflation would be constant at that amount that I -- in the hypothetical example I gave, it would be three dollars per share over the full class period in that hypothetical.

Q.   Are there ways to determine whether inflation evolves throughout the class period?

MR. LAVELLE:  Objection to form.

A.   Yeah.  So I kind of go on to explain that -- the calculation of artificial inflation

Page 305

that's based on the specific facts and circumstances of a given case.  And you can look at principles of valuation analysis, academic research studies, analyst reports, case-specific documents to determine -- really, what you're -- I think what you're trying to get at is this question of if, if this alleged information that was allegedly misstated or omitted at the beginning of a class period and did not come out until a corrective disclosure, if that had been provided to the market at the beginning of the class period, would we have expected that that would have a valuation impact that's different from three dollars per share in the hypothetical example I gave you.

Where three dollars per share is dissipated at the end of a class period, is there a reason to believe that the value impact of that information would have differed at an earlier point in time.  And, again, you know, this is -- when we talk about something like a discounted cash flow analysis or a valuation model for a given company, if we're talking about the valuation of a particular piece of information from any companies, we would expect or assume

Page 306

that that information would have the same economic significance or economic magnitude even if it had been disclosed at an earlier point in time.

Q.    So is there any reason, from your perspective, that plaintiffs' theory of liability would affect the artificial inflation calculation here?

MR. LAVELLE:  Object to form.

A.    Do you mean in terms of just whether it's a constant-dollar or a constant-percentage or a different approach?

Q.    Yep, that's right.

A.    So that's a, that's a determination that I make at the loss causation stage.  What's the most appropriate backcasting methodology, whether it's constant-dollar or constant-percentage or a different approach, based on all the evidence that's been gathered up to that point in time.

But regardless of how the inflation ribbon is constructed, that is -- again, that's all done at the loss causation stage once I evaluate the corrective disclosures.  But that inflation ribbon, whether it's constant-dollar, constant-percentage or something else, it's all

Page 307

applied in the same formulaic manner across every member of a class.

Q.    Under your proposed method or methodology for calculating damages, when does artificial inflation associated with the alleged misstatements enter AdaptHealth's stock price?

MR. LAVELLE:  Objection to the form.

A.    So I've not conducted an assessment of artificial inflation to calculate when it entered, when it exited, what amount it was. That's all -- those are all steps that I would carry out at a loss causation phase.

Q.    Would your ultimate determination on this be different if we were only considering the Luke McGee tax issue, for example?

THE REPORTER:  The what issue?

MR. IANNECE:  "The Luke McGee tax issue, for example."

MR. LAVELLE:  Objection to the form.

A.    So the amount of artificial inflation, it could certainly differ based on the corrective disclosure tied to the Luke McGee corrective disclosure versus the stock price impact from the Jehoshaphat report disclosure and then the backcasting of those.  It's going to depend on

Page 308

those circumstances.

But regardless of what I -- if I were asked to evaluate those at a loss causation stage, regardless of my conclusions of what amount of artificial inflation was present throughout the class period for each of those sets of allegations, that would just plug right into that out-of-pocket formula that we've been talking about.

Q.   So if there are different amounts of inflation for the McGee corrective disclosure versus the organic growth corrective disclosure, how are you going to account for that in your calculation of damages?

A.   I will --

MR. LAVELLE:  Objection to form.

A.   That's, that's the same way that I account for it in any merits report that has multiple corrective disclosures.

So each corrective disclosure dissipates a certain amount of artificial inflation, and then you backcast that back to an earlier part of the class period.  It could be the beginning of a class period or it could be the date in which the first alleged misstatement or omission was made

Page 309

that's connected to that corrective disclosure.

So it's really the same approach as any case that has multiple alleged misstatements, omissions, and multiple alleged corrective disclosures.

Q.    Is it fair to say that your report identifies a few different methods for calculating inflation?

A.    I think I do explain that there are various methodologies that can be employed in order to calculate what amount of artificial inflation was dissipated upon a given corrective disclosure.

Q.    Do you know which you intend to use here?

MR. LAVELLE:  Objection to the form.

A.    No.  I've not carried out an actual loss causation analysis at this point in time.

Q.    How are you going to decide which one to use?

A.    I think I described that in this section of the report, as well as, you know, in particular, towards the end of paragraph 89.

The starting point is the specific set of facts and circumstances for a given case, so

Page 310

that would include not only the complaint and the motion to dismiss order, but, also, any other evidence that's produced up to that point in time, any evidence that is gathered in the document discovery process and turned over.

And then I would, I would look at the information environment.  I would look at the information that was allegedly disclosed and ask whether it corrected prior misstatements or omissions, as it can -- you know, is it actually corrective.  I would look at potential news stories, analyst reports, things of that nature, and then, and then determine whether the most appropriate methodology would be to rely on an event study, whether any other information needs to be disaggregated that was unrelated to the, to the allegations but yeah, contributed to the stock price impact.

So those are all the steps that would be involved.

Q.   What happens if not all of the necessary information is available?

MR. LAVELLE:  Objection to the form.

A.   What type of information do you mean would not be available?

Page 311

Q.    Well, the information you just described as potentially factoring into your analysis, whether it's through articles or documents produced in discovery.

A.    Uh-huh.

Q.    If information that you think is necessary to employ any of these methodologies, what happens then?

MR. LAVELLE:  Objection.

A.    So I already know that adequate information is available to deploy most of the tools in terms of an event study or evaluation analysis or relying on analyst reports, because I've already talked about those tools in this report and I've already evaluated the class period and I know that I have the necessary data to carry out an event study that there was news that there were analyst reports, all those types of tools or inputs.

So I think that, ultimately, if I were working on a case and I was unable to determine that information that came out was truly corrective of previous misstatements or omissions, then I would, I would not be able to opine that they were corrective and, therefore, I

Page 312

would not be able to assess any amount of artificial inflation as coming out of the stock price on those corrective disclosures.  So that's, that's something that I've encountered at certain points in time.

And then, ultimately, there's, there's no inflation in the inflation ribbon pertaining to that set of allegations or corrective disclosure.  It still just goes into the formula zero zero, and there's no damages that come out of that.

Q.    In paragraph 90, you say that there are various options pricing methodologies that can be implied to infer inflation at the time of each class member's purchase in sale.

Is that correct?

A.    Yes.

Q.    What methodologies other than the Black-Scholes model can be employed?

A.    So I think the Black-Scholes model is the most common, but there are also other options, valuation models such as binomial option tree pricing models.  But the model that I've seen employed and that I'm currently employing in other work relies on the Black-Scholes option

Page 313

pricing model.

Q.   What information would you need to decide which of these to employ?

A.   I would need information about the options in terms of their, their trading dates, their prices, their strike prices, their expiration dates, implied volatility, risk-free interest rates, current market price of the underlying common stock.  Those are, those are the main factors that come to mind at this point in time.

But, like I said -- like I've said throughout this section, I would, I would look at all available information at the point in time that I was carrying out a loss causation report in order to make an assessment of the most appropriate approach in modeling artificial inflation for any security.

MR. IANNECE:  Can we go off the record.

VIDEOGRAPHER:  Off the record, 6:36.

(A recess was taken.)

VIDEOGRAPHER:  On the record, 6:43.

BY MR. IANNECE:

Q.   Doctor, I have just a few final quick questions.

Page 314

Does your report, your report contain a complete description of the opinions you're offering in this case?

A.   Yes.

Q.   Does it contain a complete explanation of the reasons for holding those opinions?

A.   I believe it's complete.  Obviously, we've talked about additional things today that underlie, or sort of background experience, but I believe that the report is accurate in terms of the underlying rationale for my opinions, yes.

Q.   Does it contain a complete disclosure of the facts or data you considered in forming those opinions?

A.   Yes, I believe so.

Q.   If a fact is not mentioned in your report, is that because you didn't consider that fact?

MR. LAVELLE:  Objection to the form.

A.   I think it would indicate that it's -- that would be something that I've not relied upon in providing the opinions to date.

Q.   Similarly, are you aware of any data that you relied on in drafting your report that is not identified in your report?

Page 315

A.    None that I can think of off the top of my head.

Q.    Do you have a new opinion regarding any aspect of this case that is not explicitly stated in your expert report?

A.    No.

Q.    Are there any statements in your expert report that you wish to withdraw?

A.    No.

Q.    Any statements in your expert report that you wish to modify?

A.    No.

Q.    In connection with your work in this case, did you consider any materials that are not explicitly identified in your report?

MR. LAVELLE:  Objection to form.

A.    At some point, I received a motion to dismiss order.  That's not listed in Appendix B. It's -- and it's not something that I've explicitly relied upon, so I'll mention that.  I don't know if I received that before or after this report was signed, but that's the only document that comes to mind.

MR. IANNECE:  Great.  Well, thank you for your time, Dr. Cain.  I don't have any other

**Page 316**

questions at this time, though we'll reserve the right to -- in the event that you are redirected by counsel.

Thank you.

MR. LAVELLE:  Nothing here.

VIDEOGRAPHER:  Off the record, 6:45.

(A recess was taken.)

MR. BRITTON:  Doug Britton.  Yes, go ahead and order the transcript expedited.

(Signature is not waived.)

(Deposition concluded at 6:47 p.m.)

- - - - -

CERTIFICATE

The State of Ohio,    )
                      )        SS:
County of Cuyahoga.   )


          I, Kristin Wegryn, a Notary Public within and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within-named witness, MATTHEW D. CAIN, Ph.D., was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth in the cause aforesaid; that the testimony then given by the above-referenced witness was by me reduced to stenotypy in the presence of said witness; afterwards transcribed, and that the foregoing is a true and correct transcription of the testimony so given by the above-referenced witness.

          I do further certify that this deposition was taken remotely at the time and place in the foregoing caption specified and was completed without adjournment.  I do further certify that I am not a relative, counsel, or attorney for either party, or otherwise interested in the event of this action.

          IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Cleveland, Ohio, on this 1st day of March 2023.

Kristin Wegryn, RMR, CRR
Notary Public State of Ohio
Commission expiration:  July 23, 2023

Page 318

Kevin A. Lavelle, Esq.,

klavelle@rgrdlaw.com

March 1, 2023

RE: Delaware County Employees v. Adapthealth Corp., Et Al.

2/28/2023, Matthew D. Cain , Ph.D. (#5681484)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-ny@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

**Page 319**

Delaware County Employees v. Adapthealth Corp., Et Al.

Matthew D. Cain , Ph.D. (#5681484)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____    _____

Matthew D. Cain , Ph.D.              Date

**Page 320**

Delaware County Employees v. Adapthealth Corp., Et Al.

Matthew D. Cain , Ph.D. (#5681484)

**ACKNOWLEDGEMENT OF DEPONENT**

I, Matthew D. Cain , Ph.D., do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____     _____

Matthew D. Cain , Ph.D.          Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20____.

_____

NOTARY PUBLIC

**[& - 16th]**                                                    Page 1

| & | | | |
| --- | --- | --- | --- |

**&**

**&**  2:4,13,18
8:15 9:11
20:15 211:21

**0**

**03**  218:9
**03382**  1:7
**04**  218:9
**044**  251:3

**1**

**1**  3:11,15,21 6:5
7:4 13:23,23,25
33:17 43:5,11
53:24 122:21
123:24 126:9
133:15,20,25
135:10 136:23
139:10 141:5
141:18,25
142:7 214:24
214:24 245:24
246:21 249:18
249:23 318:3
**1.96**  220:14,15
220:20
**10**  3:18 4:12,18
5:17,21 6:24
7:7 47:8 57:15
57:16 112:13
177:15,15,16
177:17 196:13
212:16 249:19
**100**  34:11 36:17
36:18 159:7

186:16 187:8
221:11 239:15
**10019**  2:14
**10036**  2:19
**102**  4:12
**103**  4:12,13
**104**  4:13
**106**  4:14,14
**107**  4:15
**109**  4:15
**10:15**  1:19 8:2
8:6
**11**  3:24 4:8,15
4:21 5:10 6:7
6:11,13,18,20
47:8 108:20,24
**110**  4:16,16,17
235:5
**111**  4:17,18
**112**  232:9
**113**  4:18
**114**  4:19
**115**  4:19 232:7
**117**  4:20
**1177**  2:18
**118**  4:20
**119**  4:21,21
**11:13**  48:24
**11:24**  49:1
**11th**  43:15 44:6
44:13,15
148:11
**12**  3:14 4:3,13
4:23 6:1,17
179:2 180:13

190:19,25
193:12
**120**  204:13,15
205:15,17
206:3,8 207:3,9
207:19 208:7
208:16,22
209:6 213:11
213:17 251:20
**121**  4:22,22,23
**122**  4:23
**124**  4:24
**126**  4:24
**128**  4:25 5:1,1
**12:30**  99:16
**12:43**  99:18
**13**  3:11,22 4:2
4:15 5:2,4,18
5:25 6:4,12,22
6:24 166:7
191:2,3 234:22
237:18 255:22
258:21 264:1
**130**  5:2,2
**135**  5:3,3
**137**  5:4
**139**  5:4
**13th**  201:14
241:4 247:5,8
266:2
**14**  4:16 5:13
6:4,6 7:8
190:19 191:5
191:12 193:22
227:14 245:18

246:6 247:23
251:3,16
253:22 255:22
**140**  5:5
**141**  5:5,6
**142**  3:8
**147**  5:6
**148**  5:7
**15**  4:14 5:1,7,14
6:3,11 255:22
**150**  5:7,8
**1500**  212:1
**151**  5:8
**152**  5:9
**154**  5:9
**155**  5:10
**156**  5:10
**157**  5:11
**158**  5:11
**16**  4:4,24 5:3
7:5,11,12,14
38:21 42:24
255:22 264:2
**160**  5:12
**162**  5:12
**163**  5:13
**164**  5:13
**165**  5:14,14,15
**166**  5:15
**167**  5:16
**168**  5:16,17
**16th**  42:22
43:23 47:3,4
148:12

**[17 - 254]**                                                    Page 2

**17**  3:23 4:1,7,9
  4:10,13,18,21
  4:24 5:11,20
  6:15 56:17
  80:13 169:5
**171**  5:17
**172**  5:18
**176**  5:18
**178**  5:19
**179**  5:19
**18**  3:18 4:11
  5:17 6:17,22
  7:2,8
**180**  5:20,20
**1800**  2:19
**181**  5:21
**183**  5:21
**187**  5:22
**189**  5:22
**19**  3:20 4:2 5:8
  5:19 6:15,21
  7:6,11,13 86:7
  87:15,17
  154:17 236:10
  251:18,24
  252:3
**1900**  2:5
**195**  5:23
**197**  5:23
**1990s**  66:20
**19th**  43:21
  201:15 247:9
  266:9
**1:35**  142:18

**1st**  247:4,8
  317:19

**2**

**2**  3:24 4:6,12,17
  6:8,16 7:7
  78:17,17
  122:21 123:21
  126:9 133:2,15
  133:20 162:18
  166:5 214:22
**2/28/2023**  318:5
**20**  3:8,14,16,17
  3:22 4:9,17 5:9
  5:22,23,24 6:23
  6:25 37:25
  67:1 69:2
  93:21 146:12
  146:24 154:18
  195:20 277:7
  320:15
**200**  5:24 264:23
**2001**  66:21,22
**2002**  66:22
**2007**  65:25
  66:12,16
**201**  5:24
**2010**  66:5,13
**2012**  264:15,22
**2019**  38:21
  42:22,23 43:14
  43:16 44:6,8,22
  47:3 148:11
  264:16,22,25
**202**  5:25

**2020**  212:17
  214:18 215:2
  217:19 218:17
  218:18 246:21
  265:20
**2021**  38:21
  42:22,24 43:21
  43:23 47:3,4
  148:12 201:14
  201:15 214:7,8
  234:22 236:10
  237:18 241:4
  246:18,22
  251:18,24
  252:3 266:2,9
**2022**  14:21 15:4
  15:8,22 16:8,14
  33:2 49:9
**2023**  1:19 8:2,5
  15:20 317:19
  317:25 318:3
**203**  6:1
**206**  6:1
**209**  6:2
**21**  3:16 4:20,23
  5:6,15,22 6:1
  6:10,18 7:3
  95:19 197:2
**212.715.9100**
  2:20
**212.728.8000**
  2:14
**215**  6:2
**217**  6:3

**22**  3:21 5:15
  6:21 7:3 99:20
**222**  6:3
**223**  6:4
**2232**  317:23
**224**  6:4
**225**  6:5
**226**  6:5
**229**  6:6
**23**  3:14,14,25
  4:4 5:5,9,20
  6:7,9 7:6,9,12
  317:25
**230**  6:6,7
**231**  6:7
**235**  6:8
**237**  6:8
**239**  6:9,9
**24**  4:11 212:12
**241**  6:10
**242**  6:10
**244**  6:11
**245**  6:11
**246.31**  15:20
  29:20
**247**  6:12
**25**  3:11,15 5:1
  5:16 6:2,20 7:1
  218:23
**250**  37:16
**251.52**  29:5
**251.52.**  15:22
**252**  6:12 208:8
**254**  6:13

**[255 - 5]**                                                                 Page 3

| | | | |
|---|---|---|---|
| **255** 6:13 | **289** 7:5,6 | **32** 3:15 | **44** 14:25 15:16 |
| **258** 6:14 | **28th** 8:5 | **33** 147:23 | 28:12,14 |
| **259** 6:14,15 | **292** 7:6 | 149:24 262:17 | **44022** 9:17 |
| **26** 220:6 | **295** 7:7 | 298:19 299:11 | **45** 15:24 20:13 |
| **260** 6:15 | **296** 7:7 | **34** 3:16 146:10 | 24:9 28:13 |
| **261** 6:16 | **297** 7:8 | 154:7 162:11 | 294:4,12 |
| **262** 6:16,17 | **2:11** 142:21 | 163:4 262:17 | **46** 3:20,20 |
| **263** 6:17 | **2:21** 1:7 | 298:19 299:11 | 18:11 20:11 |
| **264** 6:18 | **2u** 20:17 | **35** 3:16 155:17 | 53:21 182:2 |
| **266** 6:18 | **3** | 161:4 163:5 | 293:23 |
| **267** 6:19,19,20 | | **36** 3:17 156:6 | **47** 185:20 |
| **268** 6:20,21 | **3** 3:17,23 4:5 | 161:4,11 163:9 | 186:11 195:18 |
| **269** 6:21 | 5:2,4,14 6:5,19 | 163:24 | 196:11 238:13 |
| **26th** 14:21 15:4 | 7:4 42:19 | **37** 255:14 | **48** 3:21 186:20 |
| 15:8 20:20 | 147:24 148:11 | **375** 157:21 | **49** 3:21 |
| 24:14 247:4 | 152:7 164:20 | 158:7,11,14,15 | **495** 9:16 |
| **27** 230:9 | 167:3 168:2 | 159:10 160:3 | **4:49** 254:21 |
| **270** 6:22 | 176:18 177:2 | **38** 3:17 169:18 | **5** |
| **271** 6:22 | 178:10,22 | 172:15 | |
| **272** 6:23 | 181:2 | **39** 3:18 | **5** 4:3,14,22 5:6 |
| **273** 6:23 | **3.56** 133:10 | **3:19** 194:10 | 5:7,18,24 6:3,6 |
| **275** 6:24 | **30** 31:23 244:23 | **3:32** 194:12 | 6:12,13 69:16 |
| **276** 6:24 | 318:17 | **3s** 178:4,13,15 | 116:9 118:20 |
| **277** 6:25 | **300** 37:16 | 179:9 | 119:14 134:12 |
| **279** 7:1 | **302** 7:8 | **4** | 137:24 139:22 |
| **28** 1:19 8:2 | **304** 7:9,9 | | 159:18,22,24 |
| 123:19 | **306** 7:10 | **4** 3:19,20 4:25 | 181:24 183:14 |
| **280** 7:1 | **307** 7:10,11 | 5:3,12,13 6:2 | 183:20 189:22 |
| **281** 7:2 | **308** 7:11 | 6:14 36:9 | 189:24 190:10 |
| **283** 7:2,3 | **309** 7:12 | 42:19 212:20 | 191:22 192:1 |
| **285** 7:3 | **31** 144:20 | 212:23,24 | 193:5 194:5 |
| **286** 7:4 | **310** 7:12 | **40** 3:18 31:23 | 196:2,23 |
| **287** 7:4 | **311** 7:13 | 169:4 170:2,19 | 198:23 214:5,8 |
| **288** 7:5 | **314** 7:13 | **41** 3:19 172:22 | 216:19 217:22 |
| | **315** 7:14 | **42** 3:19 14:24 | 219:11 220:3 |
| | | 15:12 | 220:15 222:3 |

**[5 - able]**                                                                                  Page 4

222:22 228:12
229:1 235:11
235:24 238:7
238:18 239:3
239:17 245:20
249:21 251:19
**50** 3:22 34:11
36:17,18 50:4
105:16 197:2
**500** 37:15
211:17 212:1
213:3,6 214:19
214:21
**51** 194:15
198:13 199:2
**52** 3:22
**53** 3:23,23
133:3
**55** 204:10
212:12,21
**550** 37:15
**5681484** 318:5
319:2 320:2
**57** 231:6
**58** 3:24 218:22
221:4
**59** 264:21
**5:02** 254:23
**5:40** 282:23
**5:44** 282:25

**6**

**6** 3:15 4:5,6,10
4:16,19,20 5:5
5:21 6:14 7:5
79:23 186:13

190:20,24
191:13 193:8
196:24 197:16
227:14 231:4,5
245:18 250:17
**60** 190:25
193:12 207:12
208:7 227:13
230:10 247:15
**600** 211:20
213:8
**61** 193:22
**619.231.1058**
2:6
**62** 3:24 240:1
249:1
**64** 3:25 246:12
**655** 2:4
**66** 4:1 253:7,18
**67** 4:1,2
**69** 4:2
**6:05** 298:6
**6:15** 298:8
**6:36** 313:20
**6:43** 313:22
**6:45** 316:6
**6:47** 316:11
**6th** 246:18,22
247:5,8

**7**

**7** 3:5,19 4:19
5:8,16,23 6:16
7:2,10 116:9
140:8 190:20
246:14 248:25

**70** 4:3,3,4
**72** 4:4
**75** 4:5 180:5
**77** 4:5
**787** 2:13
**79** 302:20

**8**

**8** 4:7,22 5:10,11
6:8 7:1 57:15
160:21 186:14
196:13
**85** 255:13
256:18 262:22
278:21 285:1
**850** 36:11
**86** 4:6
**87** 4:6 287:7
288:18
**88** 290:2
**89** 4:7,7 296:6
303:4 309:23
**8th** 38:21 42:22
42:23 43:14
44:8,22 45:3
47:2,3

**9**

**9** 3:5 4:1,8 5:12
5:19 6:9,10,19
6:23 7:9,10,13
36:10,10,24
38:6 78:9,10
**90** 4:8 172:23
173:2,3,3,5,8
174:2,17

175:10,12
221:19,25
224:4,8 249:21
260:3 284:23
284:24 285:10
285:12,16
312:12
**91** 4:8,9
**92** 4:9
**92101** 2:5
**93** 4:10 222:6
**94** 4:10,11
**95** 147:25
148:13 149:14
167:11 220:11
220:17,24
221:20,22
222:4,11,13,20
223:6 249:23
251:5
**98** 4:11
**99** 221:20
249:25
**9th** 44:13 45:2

**a**

**a.m.** 1:19 8:2,6
**ab** 249:10
**abide** 53:7
**ability** 136:12
168:9 194:18
239:22 266:23
**able** 64:6 66:24
104:6 112:18
113:24 114:4
123:2 162:19

**[able - action]** Page 5

168:14 206:25 212:9 311:24 312:1

**abnormal** 79:21 88:10 204:3,6 216:18 219:2,9,15 220:8,13 221:12 246:20 247:1,6,7 249:6 249:11 250:4,7 251:3 287:17 290:16

**above** 16:10 161:6 167:16 303:24 317:10 317:12 318:6 320:7

**absence** 51:13 220:9,16

**absolute** 223:6 224:1

**absolutely** 210:12 290:22

**abusive** 285:4

**abutting** 100:2

**academic** 15:13 19:9,16,17 63:11,23 64:7 65:6,16,18 67:14 69:4,9 80:3 83:6,19 85:2,3,4,14,22 87:11 89:2,3 96:2,4 106:22

115:15,23 116:12,18,22 117:18,24 122:5 125:13 125:15 130:5,7 130:16 138:15 145:12,20 146:15 172:5,7 172:16,17 182:20 208:15 208:19,24 240:12 241:1 272:9 277:9 280:21 281:1 290:23 296:12 305:3

**academics** 78:3 78:24 95:20 96:1,18 125:4,9 145:11 221:16 221:25

**accepted** 256:20 259:24 278:13 279:1

**accepting** 280:2

**access** 59:6,14 59:15,20 66:15 66:24 148:20 148:21 155:19 156:9,12,25 157:2 161:18 177:21

**accessible** 59:24 67:7

**accessing** 303:1

**accidentally** 45:2

**accommodate** 12:13 261:16

**accommodati...** 43:4

**account** 206:18 213:23 216:6 293:14 308:13 308:18

**accounted** 90:24

**accounting** 66:4 71:25 72:6 285:25

**accuracy** 237:1 238:20,21 240:3 318:9

**accurate** 23:14 39:5,9,11,13 151:11 165:7 202:15 210:13 217:8 222:12 239:15 250:1 314:10

**accurately** 11:17 12:23 269:1

**accusations** 71:16

**acknowledge...** 320:3

**acknowledg...** 318:12

**acquire** 112:19 189:13 244:22

**acquirer** 76:9 76:11,13,17 242:2

**acquirer's** 76:5 76:15

**acquirers** 21:24 39:2 76:2 255:3

**acquisition** 10:20 76:2,10 76:13 112:9,15 140:10 187:3,4 196:16,17 197:3 241:14 244:20 246:1

**acquisitions** 1:9 8:10 27:3 186:15 194:19 241:16 242:1 248:4,9 264:22

**act** 261:25 262:1,7,8,17 299:11,11

**action** 17:22,22 18:5 20:3 23:5 29:14 30:12,13 33:20 34:13 35:20 46:2 49:5 69:12 275:7 278:17 279:5 295:2,3,9 317:17

**[actions - add]** Page 6

| | | | |
|---|---|---|---|
| **actions** 10:6 | 39:12 50:24 | 126:19,23 | 239:20 246:1 |
| 17:8,15,16 18:7 | 52:12 55:1 | 127:6 128:3,7 | 250:19 255:4 |
| 24:1,21 25:21 | 76:19 78:2,12 | 128:13,19 | 255:25 259:14 |
| 28:19,23 29:3 | 88:15 90:9 | 129:12 132:18 | 260:11,15 |
| 30:1 34:19 | 92:11 101:12 | 134:15 137:23 | 261:6,18 |
| 49:17 262:7 | 107:21 110:10 | 140:2 149:8,22 | 264:13 265:1 |
| 275:9 280:12 | 117:11 126:14 | 150:10,11,21 | 269:13 271:9 |
| 280:18,20 | 127:25 128:23 | 151:1,14,19 | 301:10 302:17 |
| 295:1,1,5 | 131:17 156:21 | 152:19 155:10 | 318:4 319:1 |
| **activities** | 165:6,24,25 | 155:14,19 | 320:1 |
| 114:23 170:21 | 166:12 178:13 | 158:1 159:16 | **adapthealth's** |
| **activity** 170:15 | 184:15 195:19 | 160:1 161:12 | 38:24 47:11,14 |
| 172:24 | 197:6 200:14 | 161:20,25 | 47:16 93:1 |
| **actual** 27:14 | 203:1 209:25 | 162:1,13 | 120:19 121:12 |
| 40:20 45:13 | 213:20 214:13 | 164:22 165:1 | 126:7 133:24 |
| 48:3 62:6 | 221:6,7 224:20 | 166:14,16 | 136:22 154:8 |
| 72:12 89:10 | 231:9 239:7 | 167:9 168:15 | 162:14 163:13 |
| 91:11 105:12 | 251:8 261:19 | 172:23 175:1,8 | 164:3,10,17 |
| 107:15 129:11 | 271:23 278:18 | 175:21 176:8 | 186:8,21 |
| 145:17,25 | 282:2 286:4 | 176:12,22,25 | 187:19 193:7 |
| 146:6,23 | 293:5 294:16 | 178:3,21 179:4 | 194:17 195:6 |
| 147:21 151:4 | 295:16 297:25 | 179:7,16 | 195:12 202:5 |
| 152:9 153:15 | 302:8 310:10 | 180:10 185:10 | 203:8 214:23 |
| 153:19 197:14 | **adapt** 255:8 | 185:11,25 | 229:17 235:22 |
| 204:7 205:25 | **adapthealth** | 186:5,10,11 | 236:22 237:21 |
| 220:19 232:20 | 1:9 2:9 8:9,16 | 189:1 190:4 | 241:3,21 |
| 234:5 246:1 | 9:12 13:19 | 191:5 193:14 | 246:15 248:6 |
| 251:8 261:22 | 24:11 35:5 | 193:16,25 | 253:9 260:4 |
| 292:2 293:19 | 38:19 39:2,24 | 206:13 212:13 | 264:18 265:10 |
| 302:11 309:17 | 40:8 42:20 | 213:5,9,24 | 265:19 266:11 |
| **actuality** | 44:5 47:1 | 215:2,10 216:3 | 298:13 299:22 |
| 218:10 | 48:19 92:23 | 218:15 233:6 | 307:6 |
| **actually** 13:20 | 93:9 112:4 | 233:16 234:22 | **add** 78:22,23 |
| 16:3,10 22:4,11 | 113:3 119:25 | 235:11,20 | 82:14 152:4 |
| 22:17,23 29:8,9 | 120:4 126:15 | 236:13 238:9 | 162:21 186:15 |

**[add - alleged]**

| | | | |
|---|---|---|---|
| 189:14 | **administrator** | 267:5,11 268:2 | 260:11 262:6 |
| **added** 15:8 | 295:16 | 297:10 | 262:12,14,16 |
| **adding** 153:7 | **adopted** 85:11 | **agreed** 53:7 | 263:16 264:4 |
| 187:8 | 282:2 | **agreement** | 267:21 269:6 |
| **addition** 155:18 | **adrs** 64:13 | 112:20 | 270:1,23 272:5 |
| 172:14 | **advanced** | **agreements** | 274:19 275:14 |
| **additional** | 193:16 | 53:13,14 113:7 | 275:23 277:24 |
| 15:17,19,21,24 | **advisor** 83:15 | 113:9 117:2,20 | 279:5 280:3 |
| 15:25 16:15 | **advisors** 61:9 | 119:24 120:3 | 281:10,19 |
| 20:19 27:21 | **advisory** 36:25 | 120:16 121:2 | 308:7 310:17 |
| 35:4 48:10 | 37:9 | **ahead** 316:9 | 312:8 |
| 72:22 77:23 | **advocate** | **al** 8:8,10 318:4 | **allege** 166:8 |
| 101:6 103:4 | 111:21 | 319:1 320:1 | 201:19 265:25 |
| 106:10 107:6 | **advocated** | **alan** 1:12 2:10 | **alleged** 18:18 |
| 120:11 148:19 | 280:22 281:3 | **algorithm** | 21:5 24:23 |
| 161:5,7 162:21 | **affect** 64:8 67:7 | 240:16 | 25:17,23 26:3,9 |
| 167:4,6,15,22 | 74:4 80:4 | **algorithmic** | 26:12 34:13 |
| 196:20 198:2 | 81:23 115:4 | 156:20 | 38:23 39:22 |
| 232:16 233:24 | 237:24 306:7 | **allegation** 72:3 | 40:3,7,14,18 |
| 243:6,25 314:8 | **affected** 40:8 | 72:4 275:16 | 41:5,6,15,17 |
| **additions** 320:6 | 120:3 239:7 | **allegations** | 42:3 45:12,14 |
| **address** 9:15 | **affixed** 317:18 | 10:18 18:15 | 47:13 82:23 |
| **adel** 2:23 | **aforesaid** | 24:24 25:6,14 | 88:13,15 90:8,9 |
| **adequate** | 317:10 | 34:13 41:21 | 90:18 91:17 |
| 311:10 | **afternoon** 3:7,8 | 42:6 53:10 | 92:15 140:10 |
| **adherence** | 142:20 | 71:1,3,4 190:3 | 187:9 189:23 |
| 200:6 | **age** 9:2 | 191:6,17 | 190:14,25 |
| **adjournment** | **agnostic** 246:3 | 193:13,23 | 191:10,14 |
| 317:15 | 278:6 | 200:6 201:9 | 192:17 193:6 |
| **adjust** 207:1 | **ago** 15:21 26:16 | 232:24 237:1 | 194:21 198:18 |
| 293:19 | 95:12 228:2 | 239:14 256:1 | 198:22 199:3,7 |
| **adjustments** | **agree** 23:24 | 256:12 257:6 | 199:8,25 200:1 |
| 292:17 293:17 | 66:15 75:4 | 257:10,12,22 | 200:7,8,9,14,18 |
| **administration** | 77:1 95:18 | 257:25 258:3 | 200:23 201:3,4 |
| 22:14 | 97:15 237:16 | 258:14 259:16 | 201:14,15,20 |

**[alleged - analyst]** Page 8

201:20 226:8
227:20,24
228:3,16,25
229:2,3,4,16,18
234:18,21
236:8,19,22
237:3,6,10
238:20 245:13
246:22 254:10
254:11 256:1,2
256:7 257:14
257:17 262:16
266:6,8 267:5,7
267:13 268:2
268:10,14
269:7,10,10
270:2,2,5,9,17
270:25 271:11
271:11,19
272:1,18,18,19
273:4,4,17,18
273:25 274:1
275:17 276:17
276:18,20,21
277:25 279:10
279:13,16,17
279:18,24
280:5 281:8,22
286:1,9 287:20
289:21 290:6
290:20,24
291:19 292:5,6
294:8,8,9,19,21
294:23 295:21
297:4,11,13,18

297:19 298:12
299:21 300:14
300:23 303:25
304:3 305:7
307:5 308:25
309:3,4
**allegedly** 90:8
256:8 265:1,11
267:7 270:4
305:8 310:8
**alleges** 43:11
43:19 44:7
238:7,8
**alleging** 41:19
**allotted** 318:20
**allow** 27:21
159:4
**allowed** 13:8
**allowing**
211:14
**allows** 41:21
211:6 252:18
**aloud** 267:2
**altering** 265:22
**alternative**
209:2 283:16
**americas** 2:18
**amount** 79:22
92:7,8 137:11
160:9 219:22
219:22 293:4
293:10,19
294:17 297:1
302:12 304:5
304:16,17

307:10,20
308:5,21
309:11 312:1
**amounts**
253:25 308:10
**analogous**
34:18 126:15
128:2
**analyses** 20:5
35:1,3 40:12
46:20 69:23
70:14 82:8
102:2 129:22
129:24 138:18
288:22
**analysis** 19:9
19:16 40:1,6,20
41:25 42:14
43:15,22 44:14
45:11,18 46:7
46:10 48:6
50:9 62:7,8
63:4 69:17
73:25 80:23
81:3,24 88:22
88:24,25 90:2
94:6 95:2
104:11 106:6,8
107:10,12
108:16 110:11
118:5,20
119:10 123:10
124:3,24
125:18,25
128:14,24

129:18 131:1
137:24 139:22
144:21 150:25
159:18,22
179:13 181:24
182:1 188:13
188:19 189:17
191:22 192:2
193:5 194:5
196:3 198:24
199:5,11,17,23
200:17 216:19
229:1 235:11
235:25 238:7
239:17,19
240:13 245:11
253:8,13,14
260:8 261:5
271:4,6 272:4
274:14 280:24
287:9,10,24
288:2,5,19
292:13 295:24
296:10,11
297:8,9 298:1,4
301:22,25
302:2 303:5
305:3,22
309:18 311:2
311:13
**analyst** 19:16
51:6 60:7,9,12
60:17,18 61:15
61:20 62:16,19
69:3 72:10,25

**[analyst - answered]**                                                    Page 9

| | | | |
|---|---|---|---|
| 73:4 75:16 | 127:12 131:8 | **analyzing** 70:3 | 115:22 |
| 83:6 88:23 | 143:3,6,16 | 283:20 | **anomaly** 96:4 |
| 126:25 127:13 | 144:14 145:13 | **announced** | 97:19 98:10,14 |
| 128:10 138:15 | 145:21,22 | 184:12 186:25 | 98:20 99:5,6,11 |
| 142:24 143:19 | 146:3,19 | 192:25 241:17 | **anonymous** |
| 144:22,23 | 147:25 148:4 | 266:2 | 25:24 |
| 145:4,6,10,14 | 148:22,23 | **announcement** | **answer** 11:19 |
| 145:18 146:1,7 | 149:2 150:4 | 27:4 55:8,20 | 11:20 12:7,7,15 |
| 146:13,18,25 | 153:4,9,11 | 72:20,24 73:1,5 | 25:12,20 45:5 |
| 147:1,8,10,14 | 154:13,21 | 73:8 75:15 | 64:25 67:12 |
| 148:7,13,19 | 164:21,25 | 88:8 193:17 | 70:18 81:7 |
| 149:6,10,20 | 165:10 166:9 | 225:14 241:14 | 84:25 89:1,18 |
| 150:1,12,20,23 | 166:15,18,19 | 242:1 248:16 | 92:19 111:12 |
| 151:4,24 | 167:5,8,10,23 | 248:17 | 117:23 118:7 |
| 152:18,25 | 168:4 233:11 | **announcements** | 119:8,13,18 |
| 153:3,16 154:3 | **analytics** 37:10 | 55:4,5,16 56:2 | 133:23 141:10 |
| 154:8 155:7,10 | **analyze** 39:21 | 56:7 76:2 | 141:16 146:22 |
| 155:18 161:3,6 | 40:2 41:4 42:2 | 78:13,16 | 152:24,24 |
| 161:10,21,22 | 70:10 106:11 | 140:10 184:4,9 | 157:2 162:10 |
| 162:8,12,18,20 | 121:18 131:17 | 184:16 186:24 | 165:7,17 166:2 |
| 163:1,3,6,17 | 132:23 162:7 | 187:4,5 192:8 | 166:5 181:8 |
| 165:7 166:5,24 | 162:25 176:11 | 192:13,14,15 | 191:24 203:4 |
| 167:4,6,13,15 | 203:7 231:9 | 192:20 197:4 | 208:3 222:17 |
| 167:20,22 | 260:6 261:10 | 227:19,19 | 227:10 242:25 |
| 168:5,8 172:6 | 261:20 280:13 | 230:4,12,17,21 | 244:16 256:10 |
| 188:24 232:4,8 | 283:5 | 231:4 233:8 | 256:14 298:24 |
| 240:25 272:7 | **analyzed** 34:19 | 246:16 247:17 | **answered** |
| 277:8 296:13 | 42:7 48:10 | 248:4,13,22 | 36:21 46:5 |
| 305:4 310:12 | 69:11 121:19 | **announcing** | 67:20 86:3 |
| 311:13,18 | 122:2 131:19 | 78:8 244:22 | 87:7 92:18 |
| **analyst's** 60:7 | 132:4,17 169:1 | **annual** 57:16 | 106:16 107:14 |
| **analysts** 51:6 | 200:22 227:15 | 185:6,16 186:2 | 110:15,21 |
| 55:7 62:22 | 227:23 231:7 | **anomalies** | 111:3,4,7,11,13 |
| 63:13 72:24 | 231:12,19 | 95:22 96:6,20 | 111:15,18 |
| 84:20 85:17 | 247:12 283:12 | 96:24 97:4,15 | 121:8 124:18 |

**[answered - artificial]**

128:5 139:14 141:7,11 158:9 164:5 165:4,16 165:23 168:19 180:24 187:22 197:21 245:16 268:1,24 270:19 275:11 287:2

**answering** 102:22 226:22 262:14

**answers** 11:12 111:6 141:12 171:18 271:4

**ante** 76:3 129:10 197:13 241:12,13 248:11

**anticipated** 55:23 56:13 265:2

**anybody** 13:4

**apart** 161:10

**apologize** 61:23 254:18

**appear** 102:14 102:17 216:24

**appearances** 2:1

**appeared** 246:7

**appearing** 1:17 1:23

**appears** 101:1

**appended** 320:7

**appendix** 14:23 315:18

**apples** 277:2

**applicable** 46:12 129:4 176:3,6 256:17 318:8

**application** 157:15

**applications** 290:17

**applied** 108:20 108:24 128:20 135:20,20 138:2,3,6 179:3 263:2 269:11 270:11 271:7 278:16,17,18 285:23 286:13 286:18 288:25 289:4,15 293:13 307:1

**applies** 46:10 142:11 179:1,6 286:8

**apply** 48:4 106:2,3,21 108:14 110:19 122:1 125:17 126:3 128:23 129:25 130:12 139:7 263:6 277:15 280:23

286:6,21 288:7 292:12 296:3 297:2

**applying** 56:15 124:11 129:11

**approach** 23:14 107:2,4 279:1,22 285:20,23 286:18 300:8 306:12,18 309:2 313:17

**approaches** 288:2

**appropriate** 124:15 128:23 130:18,20,23 207:25 208:4 209:18,20,24 228:11 254:13 279:4 280:7 282:13,18 306:16 310:14 313:17

**appropriately** 252:13

**approval** 185:18

**approve** 129:16

**approved** 129:22 130:1

**approximately** 10:3 36:14 37:23 204:13 220:15

**april** 201:14 234:22 237:18 241:4 247:5,8 266:2

**arbitrage** 64:14 64:17 65:5 98:11,24 171:22 172:2

**arbitragers** 114:18 172:1

**area** 55:14 159:6 243:21

**areas** 184:23

**argued** 93:22

**armour** 20:17

**arrived** 174:2

**article** 63:25 64:2 65:9,24 66:3 232:8

**articles** 59:4,21 63:16 66:12,13 157:21,21,24 158:2 159:6,16 159:18,20 160:3,6,9,12,23 162:8 163:1 311:3

**articulate** 146:6

**articulated** 100:17 112:2 238:6

**artificial** 22:8 40:21 44:18 77:13 90:21

91:25 92:1,7,9
226:16 228:4
237:11,14
239:25 254:15
257:8,11,19
270:10 272:13
274:8,10,18
279:11,15
284:1,3,14,18
286:25 287:8
287:13 288:12
288:24 289:11
292:21 293:5
293:10,20
294:17 295:13
296:25 297:1
297:23 300:4,7
302:12 303:6
303:21,23
304:4,5,16,25
306:7 307:5,9
307:20 308:5
308:21 309:11
312:2 313:17
**artificially**
81:16 89:23
90:15 257:21
**asia** 66:6
**aside** 45:23
139:5 141:2
225:19
**asked** 19:2 20:1
20:8 21:4,8,22
34:18 35:23,24
36:20 38:18

39:6,8,10,17
42:19 46:4
63:20 67:11,19
76:7 79:3 86:2
87:6 92:17
106:15 107:13
110:14 111:2
111:10 121:8
124:17 128:4
139:14 141:7,8
153:12 158:8
164:4 165:3,15
165:22 168:18
180:24 187:22
197:20 225:4
245:16 249:12
254:8 255:1,16
260:20 267:25
268:6,14,24
270:19 271:15
275:10 280:13
287:2,10
288:11,18
295:7 298:11
298:17 299:20
300:13 308:3
**asking** 11:10
53:9 81:20
84:7 97:9
102:13,20
118:18,20
120:25 121:1
123:11 125:19
126:18 127:3
130:24,25

135:13 136:7
141:15 166:1
179:12 190:18
191:20 203:14
219:13,22
227:10 230:20
258:10 262:5
269:22 270:22
276:15 278:1
279:10 280:1
293:4 298:18
**aspect** 17:14
315:4
**aspects** 28:2
**assess** 38:22
41:25 44:17
104:15,23
131:3 165:24
202:7 223:20
239:24 250:11
268:14 291:4
298:11 299:20
312:1
**assessed** 165:25
**assessing**
104:22 199:4
254:14
**assessment**
21:11,13,17
62:4,9 100:25
102:2 108:5
110:9,24 126:1
126:2 234:9
236:1 238:4
302:10 307:8

313:16
**asset** 301:9
**assign** 77:13
**assignment**
46:24
**assignments**
46:25
**assigns** 240:16
**assist** 33:24
**assisted** 34:2
36:25
**associated**
247:23 307:5
**assume** 12:1
19:21 151:21
251:17,23
269:18 303:12
305:25
**assumed** 258:4
258:13
**assuming** 139:6
**assumption**
220:8 269:21
**assumptions**
47:24 48:3,4,8
**assure** 275:5
**athletes** 160:14
**attached** 27:23
318:11
**attempt** 99:22
117:7,10
236:25
**attempted**
250:11 258:8
265:21

**[attempting - based]** Page 12

**attempting** 198:21 231:2 233:1

**attention** 61:10 84:8,14 105:4 123:12 126:22 131:2,23 132:7 171:4

**attorney** 317:16 318:13

**attorneys** 8:12

**attributes** 51:19

**audio** 282:7

**august** 16:8

**authorities** 266:5

**auto** 96:15 97:20 98:21 107:20,21,25 119:1,6,21

**automatically** 156:17

**available** 43:16 52:22 56:19 57:2,19 58:6,8 58:16,18,20,22 60:1,8,14 61:4 62:1,16 80:18 82:11,13,20 86:13 93:2,8 105:2 118:24 144:1,15 153:16 156:8 157:11 161:19

163:12 164:2 165:9 168:10 183:6,13 243:23 244:3 245:14 272:6 310:22,25 311:11 313:14 318:6

**avenue** 2:13,18

**average** 68:12 68:23 122:20 123:18,20 124:4 132:23 133:5,9,19 138:1 139:9 141:24 146:17 146:18 285:13

**avoid** 78:21 285:4

**aware** 43:8 100:16 103:21 106:18 110:16 111:19 113:6 115:15,20 116:22 117:13 117:18,23 120:6,9,20 121:4 125:15 208:15 229:2 229:10,11,18 262:15 286:13 314:23

**b**

**b** 16:25 17:10 298:22 299:2,9 299:16 315:18

**back** 18:24 24:7,15 25:18 26:7,23 40:15 44:18 53:23 88:12 127:25 128:20 152:3 159:13 170:2 170:16 173:12 177:9 195:17 195:21,22 229:6 230:2 235:5 240:1 247:15 255:21 257:8,13 259:9 261:1 263:25 270:4,8 272:1 273:18,24 285:9 287:19 288:17 294:24 297:3,4 300:17 300:21 302:15 303:25 304:1 308:22

**backcast** 287:19 297:2 297:25 300:6 308:22

**backcasting** 296:20 297:5 297:10 306:16 307:25

**background** 35:6,7,8 258:16 258:22 314:9

**bad** 78:4,5,8,20 113:14 117:11

**banc** 18:10,17 25:13,16

**bank** 25:19 232:8

**banking** 65:24

**banks** 117:6,10

**bar** 16:10 118:19,23

**barasch** 1:11 2:10

**barring** 220:18

**bartle** 1:4

**base** 222:3 237:23

**baseball** 244:17 244:18,24 245:2

**based** 9:25 23:3 23:19 34:16 37:2,7 45:13,20 48:19 54:12 57:25 83:3,5,16 83:18,19 87:4 87:10 101:22 102:12,22,23 103:14 107:12 110:23 114:22 123:5 130:6 137:5,10 138:11 146:18

**[based - best]**                                    Page 13

151:3 156:23
157:13 163:9
164:11 168:9
186:1 212:3
214:25 220:10
240:19,24,24
241:19 249:16
253:5 255:17
258:10,15
270:22 272:4
277:6,17
278:23 279:21
279:21 285:14
287:8 289:8
292:25 296:7
305:1 306:18
307:21
**baseline**  205:5
206:6
**basic**  29:11
80:14,22 81:22
82:21 188:12
301:12
**basically**  87:22
174:19 182:11
195:22 202:17
204:25 211:2
213:4 214:15
215:8 217:10
217:16,25
218:3 219:13
223:24 263:1
282:9 285:2
296:23 301:11

**basing**  100:9
**basis**  21:23
27:10,13 32:7
39:1 41:10,23
47:18 52:4
55:6,11 69:1
83:25 97:23
122:9 123:4
129:10,23
138:5 143:20
145:1,8 149:17
149:19 162:20
163:4 169:15
169:16 171:20
177:15 178:19
187:18,23
197:13 201:11
206:10 213:16
215:21 219:25
220:2 238:10
241:12,13
248:11 255:2
259:11 261:2
272:16 275:7
278:13 280:24
281:5 287:18
289:5,16 297:6
297:7,7
**batch**  158:14
**batches**  148:7
**bear**  276:3
**bearing**  79:12
**becoming**  59:3
**began**  164:21
166:18

**beginning**  33:1
41:16 81:10
87:19 113:2
195:23 214:17
255:12 257:9
257:15 260:19
304:1 305:9,11
308:23
**behalf**  1:6 2:2,9
2:17 8:15
17:19 21:1,18
26:25
**behave**  96:9
**behavior**  95:21
**believe**  15:15
16:9,13 18:14
18:19,22 19:15
19:23 20:10,14
20:14,15 24:6,7
24:9 25:15,18
27:12,18 30:20
31:16,17,18,21
32:24 33:1
34:7,21 39:7,13
42:17 43:11,14
43:18,18 48:21
67:18 88:2
97:15 109:12
111:7,25,25
112:8 113:19
118:1 120:1
123:13 132:25
138:22 142:23
148:6 158:3
159:9 160:2

162:6 181:11
181:24,25
185:16 202:14
231:20 254:25
293:23,25
294:3,11 295:4
298:10 299:19
300:25 305:18
314:7,10,15
**believes**  144:23
**benchmark**
110:17 122:16
123:1 124:7
126:3,9,10
135:19 138:1
160:5,25 161:3
175:10 205:1,5
206:5
**benchmarking**
208:9
**benchmarks**
123:3,16 129:2
**beneficial**
23:18
**benefit**  90:9,22
91:4,16 92:10
211:1,4 213:22
**benefits**  169:10
172:11
**berkeley**  15:18
28:6,13,18
**berry**  16:24
20:21 24:16
**best**  11:25 16:1
36:22 49:9,18

**[best - calculated]**                                      Page 14

136:11 146:5 168:9 176:21 179:7 180:9,20 180:25 198:3 221:5 266:23

**beta** 215:14

**better** 221:25

**beyond** 25:19 41:23 42:1 137:19 154:4 161:6,6 167:16 175:4 180:14 200:3,10 201:7 206:9 284:9

**bias** 65:22

**biased** 23:10,15

**bid** 51:9 116:8 127:18 128:8 131:6

**big** 196:11 244:16 248:14 248:14

**bigger** 140:11 203:23

**bill** 37:14

**billings** 37:3,7

**billions** 265:14

**binomial** 312:22

**bit** 31:2 59:8 105:1 169:17 210:2 215:6 218:7,12,20 254:17

**black** 301:14 312:19,20,25

**blast** 61:19

**blocks** 144:5

**bloomberg** 58:2 59:12,18 60:25 173:6,20 173:25 174:11

**blue** 213:6

**bofi** 20:16

**boilerplate** 258:25

**bombshell** 60:16

**bottom** 28:12 28:14 195:20 197:2 212:13 294:4

**bounces** 285:8

**bound** 53:5,12 143:19 148:18 153:19 167:3 167:17

**boundaries** 30:13

**box** 133:12

**bradley** 1:13 2:11

**break** 12:12,16 48:14,16 108:19 189:8 298:18

**brevity** 250:24

**briefly** 18:13

**bright** 100:17 103:22 104:1 105:12 110:17 110:22 111:20 125:16

**britton** 2:3 8:25 31:11 316:8,8

**broadly** 17:13 244:2

**broadway** 2:4

**brokers** 172:24 173:3,4,9 174:17,25 176:12

**brought** 276:2

**browser** 14:5

**brunner** 8:18

**buckets** 189:9

**bucks** 1:4

**build** 151:22

**builds** 274:11

**bullet** 16:5,9,12 20:12 24:9 293:24

**bunch** 172:21 192:23

**business** 28:6 43:4 44:20,21 66:4 68:25 80:19 151:25 156:4 160:20 183:24 185:12 186:9 187:12 187:13 193:21 196:1 212:14

233:5 243:4 264:13,18,21 281:2

**busy** 17:5

**buy** 145:16

**buying** 87:24

**c**

**c** 112:12

**cain** 1:16 3:3 3:11 8:11 9:2,6 9:8,16 13:23 14:1,18 17:5 30:19 32:8 33:17 36:25 37:9 49:3 53:24 99:20 111:17 141:10 142:23 191:20 191:25 194:14 254:25 283:2 298:10 315:25 317:8 318:5 319:2,24 320:2 320:4,12

**cake** 175:5

**calculate** 22:5 23:2 124:4 204:2 219:7,8 220:4 221:21 286:24 287:16 295:8 302:12 307:9 309:11

**calculated** 22:17,23 23:19 41:10,22 47:18

**[calculated - case]**

90:13 201:10 218:24 219:12 221:11 249:6 249:13 258:10 259:11 260:21 265:23 295:7

**calculating** 23:8 35:11 91:23 129:11 263:14 273:20 274:25 279:21 285:11 289:1 293:15 307:4 309:8

**calculation** 21:23 22:9,11 22:13 23:6,23 27:8 38:25 90:21 92:12 255:2 256:16 261:22,25 262:9 263:6 284:8,12 285:24 287:13 288:10,13 289:15 292:18 292:20 295:17 299:1,4 302:14 304:25 306:7 308:14

**calculations** 23:17,22 27:4 82:5 221:7 254:16 279:1 296:10

**california** 2:5 18:10,17 25:13 25:16

**call** 62:14 95:22 99:5 116:10 202:20 205:12 232:2 233:10 240:12,14 284:15,17

**called** 9:3 96:4 148:5 217:24 258:20 284:20

**calls** 31:6,14,15 31:18 153:10 153:12,13 179:19 228:18 240:22 268:1 268:23

**cammer** 29:18 35:3 48:9 69:16 82:4 83:23 84:1,5,16 84:22 85:8,9,25 101:5 103:4 106:9 107:5 109:1,4,21 118:20 119:14 120:10 122:18 123:6,19 125:2 125:5 126:9,12 131:13 132:16 132:18 133:17 134:12 137:24 139:22 146:5,8 159:18,22,24

162:18 166:5,6 166:7 167:19 169:20,21 170:5 173:12 174:20 175:1,7 175:9,17,23 178:11 181:12 181:24 183:14 183:20 189:22 189:24 190:10 191:22 192:1 193:5 194:5 196:2,23 198:23 216:19 222:3,22 228:12 229:1 235:11,24 238:6,18 239:3 239:17 245:20

**cap** 51:14 285:1 286:6

**capable** 120:22 263:14 275:2 279:20 289:10 289:13

**capital** 112:11

**capitalizations** 127:17 128:8

**caps** 285:13

**caption** 8:7 317:15

**capture** 153:7 153:21

**captured** 167:5 167:7

**capturing** 173:20,25

**care** 211:20

**carefully** 254:10

**carried** 40:20 121:16 137:23 138:17 208:20 281:4 309:17

**carries** 71:16 72:10

**carry** 71:6 159:19 203:1 307:12 311:17

**carrying** 181:23 198:23 238:6 313:15

**case** 1:6 8:7 9:19 10:19 14:21 16:18,20 16:21,24 18:11 18:13,14 19:20 19:21,24,25 20:13,14,15,16 20:17,17,18 21:3,13,21 23:4 23:9 24:11 26:15,22 27:6 29:19 32:13 35:5 37:17 38:8,10 41:24 49:19 81:3 83:3 84:11 87:4,9 88:4,5 89:11,20 90:5

92:21 103:23
106:3,3,7,18
108:21,24,25
109:3 110:4
111:19 112:2
113:3 126:4
132:18 155:14
188:3 189:2
190:5 192:12
192:17 206:2
209:16,18
226:6 255:10
256:23 258:22
259:7,12 260:5
265:5 266:16
272:24 275:4
275:13 276:4,7
276:10 277:16
281:20 282:14
294:12,14
295:15 296:8
296:13 298:24
299:5 300:12
301:10 302:11
303:9 305:2,4
309:3,25
311:21 314:3
315:4,14
**cases** 10:17
15:25 17:11,18
17:21,23,23
18:8 20:7,8,19
22:4 23:1,5
26:2,8,11,24
29:14 30:13,14

46:8 49:24
50:1 51:24
52:3,8,19,24
53:1,8,11 69:7
70:25 77:20
78:2 86:8 87:3
90:12 109:9,16
110:8 129:21
146:1 192:11
211:6 273:16
275:22 276:1
277:12 278:17
278:18,25
279:2 281:15
282:14 293:22
299:15
**cash** 74:4 88:24
188:16,19
280:24 281:4
296:9 305:22
**catch** 264:7
**categories** 52:7
195:14 275:22
275:23 294:7
**category** 234:8
**causal** 41:25
**causation** 10:16
22:7 23:7 40:1
40:21 41:2
44:17 77:7
88:11 190:9
199:6,12,15
254:7,8 256:13
261:23 269:8
271:15,16

273:23 274:14
274:15 275:4
287:9,24 288:2
288:4,11,19,21
291:9 298:4
303:5 306:15
306:22 307:12
308:3 309:18
313:15
**cause** 78:6,9
88:19 181:13
184:8 190:11
193:2 198:24
201:24 230:13
239:5 250:9
282:11 317:10
**caused** 42:8
230:21 250:3
**causes** 107:24
142:10
**causing** 250:18
**caveat** 43:5
143:18
**cbl** 16:20 20:20
24:14,14
**center** 28:6
**ceo** 193:19
235:17 265:17
**certain** 23:15
26:1 45:15
46:22,23 50:17
50:20 51:3
71:1 79:7 82:9
96:8,9,12,13,15
99:3 101:15

115:13 136:15
148:23 159:21
175:18 180:16
190:3 195:25
202:6 219:14
219:17,18,21
224:2 227:5
251:9 275:16
281:25 291:16
291:17 293:6
308:21 312:5
**certainly** 40:19
41:1 44:15,19
50:4 51:25
61:13 74:17
85:14,16 90:1
92:4 116:13
122:13 134:18
136:1 140:25
159:17 190:9
191:16 197:7
222:7 229:13
234:4 253:4
258:7 263:25
272:24 281:6
299:15 307:21
**certificate**
317:1
**certification**
19:20 33:13
129:23 138:23
183:4
**certifications**
30:25

**[certified - class]**

| | | | |
|---|---|---|---|
| **certified** 9:4 19:22 300:18 | 320:6 | 303:9 305:2 308:1 309:25 | 50:10,11 51:19 56:24 81:6,10 |
| **certify** 317:8,14 317:16 | **changing** 210:17,21 213:23 218:10 | **cite** 80:13 130:5 170:17,22 172:15 | 81:10,11,13,15 83:1 88:12 90:6,6,14,16,17 |
| **chagrin** 9:17 | 252:18,19 265:22 | **claim** 285:19 | 90:19 91:3,12 91:14 113:2 |
| **chairman** 18:23 | **characteristics** 94:12 95:15 | **claimed** 266:10 **claiming** 266:4 | 120:13 121:18 121:19,24 |
| **challenge** 26:14 26:18 27:11 | 206:23 | **claims** 17:11 22:14 34:13 | 122:1,3,21 124:5 129:22 |
| **challenged** 26:22 | **characterize** 104:21 | 262:1,1 263:15 295:15 298:19 | 132:19,19,24 133:6,21 |
| **chance** 74:13 220:18 | **characterized** 92:23 | 299:2,3,10,16 **claire** 8:18 | 134:13 135:21 136:1,13,15,19 |
| **chancery** 10:19 | **charged** 266:5 | **clarification** 244:1 | 136:21 138:3,4 138:21,23 |
| **change** 61:16 61:19 73:22 | **chart** 133:5 **chatting** 13:12 | **clarify** 298:24 299:5 | 139:6 141:24 147:11,16 |
| 75:10,25 76:15 76:16,20 77:11 | **check** 300:17 **china** 64:1,12 66:6 | **class** 8:24 17:16 17:22,22 18:5,7 | 148:10,14 149:3 150:24 |
| 78:18,22 106:3 109:22 204:21 | **chinese** 64:3,6 | 19:20 20:3 21:23 22:5,9,12 | 151:15,20,22 154:4 161:15 |
| 211:7,8,10,12 211:14 215:15 | **choose** 211:23 **chosen** 252:12 | 22:17,23 23:5,5 24:1,21 25:21 | 161:21 162:3 162:13,16 |
| 224:6,15 250:18 301:19 | **chunks** 115:1 **circulated** | 28:19,22 29:3 29:13 30:1,12 | 166:10,16 167:9,11 |
| 319:4,7,10,13 319:16,19 | 143:12 **circumstance** | 30:13 38:20 39:1,3 41:10,16 | 172:24 175:13 176:1,3,7,16,23 |
| **changed** 37:9 37:11 66:16 | 68:6 130:19 **circumstances** | 41:17,23 42:12 42:24 43:2,6,9 | 178:4,15,20,23 179:9,17 181:2 |
| 93:15 | 61:5 62:6 64:19 65:1 | 43:25 44:7,10 44:12,19 45:8,9 | 183:3 185:6,8 195:23 200:24 |
| **changes** 38:14 62:25 77:19 | 67:4 70:25 89:11,20 93:18 | 45:11,19 46:1,2 46:10,12,14,16 | 201:11 204:15 206:4 207:12 |
| 139:23 145:15 145:16 211:16 | 107:17 109:10 259:7 260:10 | 47:12,18,23 | |
| 211:19 213:20 251:10 318:10 | 260:15 296:8 | | |

[class - commentary]                                                    Page 18

207:16,16,18
209:13,24
210:4,9,18
213:1,14 214:6
214:9,17
216:25 217:11
252:1 253:10
255:2,5,18
257:9,16
258:11 259:11
261:19 262:23
263:2 265:4
269:13,16
270:12,15
271:8,18 272:3
272:16 273:21
275:7 278:17
279:12,13
280:12,14
281:5 283:6,11
283:15,19,22
283:24,25
284:10 285:12
286:8 287:19
289:4,16,16
292:18,24,25
293:13,15
295:1,2,3,5,7,8
295:8 297:4
300:6 303:7
304:2,19,22
305:9,12,17
307:2 308:6,23
308:24 311:15
312:15

**classes** 15:18
**classify** 61:25
**clean** 13:17
**clear** 11:9,11
  105:2 117:16
  167:17 173:10
  173:18 196:9
  208:3,23 241:5
  243:22 254:1
  299:6
**clearer** 173:14
**clearly** 73:21
  74:23 197:10
  232:10 244:15
  244:16 245:1
  245:21
**clemens** 1:11
  2:9
**cleveland** 37:10
  317:19
**click** 14:4
**client's** 23:15
**clients** 60:10,11
**close** 43:4,13
**closely** 132:11
  158:4,6 212:10
  212:17 218:20
**closing** 44:21
**clover** 16:13
  20:18 21:14
  24:8
**coefficient**
  213:3,7 214:4,5
  214:11 215:14
  216:23,24

217:1
**coefficients**
  212:25 217:12
  217:15
**coherence**
  41:14 201:9
  256:5,11 257:3
  257:25 270:1
  270:23 275:15
  276:12
**cohesiveness**
  257:24
**coincidentally**
  137:22
**colleagues** 8:17
  8:25
**collective** 173:5
  292:6
**collectively**
  149:9 173:4
**collects** 174:11
**column** 152:4,7
  152:11 191:3
  231:17,21,25
  232:13 233:19
  234:2,15 235:6
  236:3 250:21
**combination**
  44:21 151:25
**come** 20:23
  29:25 50:5
  52:6 60:13
  65:10 72:6,7,8
  102:3 109:8,13
  109:17,19

132:2 175:15
196:3 206:24
209:23 226:17
234:4,4 237:12
239:14 257:17
258:5 275:3
280:9 281:12
281:19 282:17
289:25 292:22
299:7 300:25
305:9 312:10
313:10
**comes** 60:4
  62:12 64:1
  67:24 68:2
  72:4 74:16
  108:9 114:12
  134:10 139:21
  216:9 218:4
  219:20 243:14
  243:16 315:23
**coming** 60:17
  72:20 73:3,16
  117:12 134:15
  134:20,23
  135:24 137:12
  140:4 243:18
  280:5 282:10
  312:2
**commencing**
  43:25
**comment**
  262:23
**commentary**
  145:17 231:25

233:24 234:3
**commented**
62:21
**commenting**
72:25 73:4,8
243:7
**commission**
26:25 52:2,12
69:5 83:14
177:11 317:25
**commissioned**
317:8
**commissioners**
52:14 83:15
**common**   21:25
35:12 38:20
39:2,3 42:21
45:10,18 47:1
47:11,16,19,19
47:23 48:19
55:13 65:7
132:19 162:1
162:14 202:5
203:8 207:10
208:20,21
214:13 241:21
246:15 253:9
255:4,5,16,18
258:11 259:12
269:15,15
270:15 271:8
287:14 289:16
301:10 302:3,3
302:5 312:21
313:9

**commonly**
113:6 120:7
222:3 223:19
225:14 288:21
**communicate**
13:8
**companies**
46:21 50:9,16
51:15 55:5,13
55:15,19,25
56:1,7 63:1
66:6,25 73:15
80:12 86:21
88:20 94:10
95:13 107:18
107:22 123:5
129:6 139:19
142:6,13
146:25 150:15
160:11,18
168:23 174:22
177:4 178:14
184:4,6,10,14
184:17 189:3,4
189:9,13,14
248:5 293:25
305:25
**company**   25:5
25:9,25 35:2
45:8 51:2,11,13
54:3,4,11,21,25
55:2,10,12 56:5
56:11,16 57:6,8
57:12,15 58:2
58:15 64:10

65:2 70:20
71:2,14,19 72:1
72:5,8,20 73:13
73:16,18,23
74:5,8,11,18,20
75:2,11,16,18
75:22 76:7,21
77:12 78:2,4,4
78:6 79:24
80:4,19 81:13
81:18,21 82:25
84:10,20,20
86:15 89:5
99:2 100:25
101:13 102:15
102:16 103:24
104:8 107:16
107:17 108:4
108:14 112:9
112:12,21
113:15 114:13
115:12,16
117:6,12 129:5
129:7,12 131:2
131:5,8 134:11
137:12 139:25
140:1 143:11
145:9 156:16
160:7,10,24
161:13 165:10
169:23 170:3,8
170:11 177:13
177:18,23,24
178:2 180:5
181:14 182:6

183:9,16,22,24
184:11,22,25
185:2,3,7,8,14
186:13,17,19
186:24 188:1,2
188:14,14,17
188:20 190:1,1
190:21 192:25
193:19 195:23
196:25 198:25
201:25 202:11
205:19 206:7
206:12,19,22
208:10 211:9
212:11 213:17
214:18 215:3
215:13,16,19
216:10,13,15
216:20 217:19
218:1,19
219:14,16,19
219:21 220:10
220:16 223:13
225:2 226:7
227:2 235:12
235:18 236:24
238:15 239:7
241:18 242:10
242:10 244:9
244:21,22
245:4 248:2,8
252:13,19,20
264:21 266:2,4
266:12 270:13
305:23

**company's**
24:25 45:25
54:2 57:19
61:17 71:2,24
80:17 84:9,14
87:25 89:22
101:15 105:4
113:10 116:24
123:12 143:3
166:10 177:20
182:5 184:1
185:5,12
189:17 191:7
195:25 197:5
202:19 204:3
205:6 211:8,11
211:11 213:19
217:16 218:4
228:19 237:24
241:15 244:19
250:3 265:17
**comparable**
126:20 127:7
**comparative**
122:10,14,16
**compare**
122:23 124:6
128:12 146:11
160:6 206:7
**compared**
126:8,12
216:23 254:4
**comparing**
128:13 204:22

**comparison**
122:6 123:1,3
128:18,24
129:13 140:7
154:16 181:17
**comparisons**
126:19
**compelling**
281:13
**compensated**
36:4,11
**compensating**
36:7
**compensation**
37:2,7 38:8
**complaint**
27:23 32:13,18
41:13,21 43:9
43:11,19 44:6
45:13,20 185:4
185:14,15
186:2 188:3
190:2 191:16
193:13 200:7
229:7,12,14,20
229:24 230:1
232:24 234:19
238:7,8 255:25
257:22 258:1,4
259:16 260:12
262:20 263:18
263:23 266:7
266:25 270:23
272:5 275:13
276:4,15

277:25 278:1
279:8 280:5
281:22 282:11
310:1
**complaints**
26:8 275:21
**complete**   90:2
118:15 152:24
276:25 314:2,5
314:7,12 320:8
**completed**
151:25 317:15
318:17
**completely**
129:14 278:6
**complex**   68:18
**component**
180:3,4
**computer**
125:24 156:18
156:22 240:15
249:15
**concealed**
289:21 290:5
**concentrated**
147:17
**concept**   171:22
**concepts**
131:25
**concern**   98:2
190:16 191:3
282:12
**concerning**
24:23 136:20
189:18 267:21

267:22,23
**concierge**   2:24
14:3,9,12,15
**concisely**
263:17
**conclude**   97:4
98:9,12 104:7
109:24 134:2
135:2 142:1
155:15 289:14
**concluded**   95:3
132:5 300:22
316:11
**concludes**
253:7
**concluding**
269:14 270:14
**conclusion**   47:5
47:9,25 100:9
101:22 102:11
109:4,8,13,20
127:4 132:2
137:5 151:2
161:25 162:14
163:7 179:20
216:1 223:17
225:8 231:2
237:23 238:2
253:5,9 268:1
268:23 270:21
282:17 288:9
301:1
**conclusions**
36:3 46:11
47:7,10 81:24

109:18 122:1
124:10 212:3
215:22 275:3
308:4
**conduct** 25:7
25:18 41:24
62:3,6,10 90:2
152:4 191:10
192:1 274:14
287:10 295:23
**conducted**
39:25 46:20
50:8 92:5
106:8 138:15
149:7,21
157:20 199:5
253:6 302:2,10
307:8
**conducting**
23:22 29:11
110:8 163:11
206:18
**conference**
186:4 188:5
228:19
**confidence**
220:12,25
222:13,20
239:21
**confident** 289:9
289:13
**confidential**
143:20 145:8
**confidentiality**
53:6,13

**confirm** 150:8
302:9
**confounding**
77:18 80:1
225:9,19
228:21 250:11
281:9,17,20,21
291:12,25
292:8 293:7,15
293:18 294:1
294:16 295:20
296:1,18
**conjunction**
100:12 196:15
292:3
**connect** 271:10
299:12
**connected** 41:5
41:19 88:15
101:8,13
235:14 270:4
272:19 273:4
274:2,17
279:18,23,24
287:21 294:9
309:1
**connection**
39:15 41:25
69:12 104:11
199:24 200:11
201:2,19
261:17 277:3,4
297:17,21
315:13

**connections**
18:16 199:6
**connors** 1:12
2:10
**consecutive**
243:2
**consensus**
117:16 208:23
**conservative**
222:2,23
**consider** 34:12
34:18 98:25
99:7 120:2,9,21
121:2,10
124:21 130:15
131:11 135:18
136:14 140:19
147:7 154:20
183:23 189:22
200:5 218:8
223:18 226:3
232:17 252:25
253:1 260:14
261:24 271:17
271:19,21
275:14 279:3
280:6 281:16
314:17 315:14
**consideration**
104:3 169:23
203:21 206:23
210:22 227:8
259:15 260:7
260:10 262:5
292:4

**considered**
42:5 120:15
163:23 176:17
180:15 186:20
187:9 194:16
200:21 223:16
225:7 237:20
242:25 259:7
262:8 263:22
263:23 280:15
281:7 282:1
314:13
**considering**
41:20 165:21
175:24 176:1
259:16 276:8
307:14
**consistent**
40:15,25 41:11
55:19 67:1
69:9 87:9 94:9
95:16 98:1,5,23
103:24 106:7
107:2,4 126:22
126:24 127:9
131:20 134:24
140:13 154:9
155:11 170:25
171:11 172:5,6
179:10 181:3
201:11,22
208:13 238:11
243:10 248:22
250:8,16
255:18 258:12

**[consistent - correct]** Page 22

260:22 263:9
263:11 269:16
285:20
**consistently**
119:3,3,19
263:2
**constant** 74:19
213:12 216:4
297:6,7 303:12
303:16 304:5,7
304:8,17
306:11,11,17
306:17,24,25
**constructed**
204:12 270:25
306:21
**constructing**
183:19
**construction**
300:7
**consulting**
37:21 52:4
**contact** 49:11
**contacted** 49:6
**contain** 314:1,5
314:12
**contained** 40:3
46:13 47:8
67:25 145:18
185:15 200:6
234:11 236:2
260:11
**containing**
161:12

**contains** 191:17
**content** 27:14
27:24 30:7
144:22 145:14
145:25,25
**context** 53:18
116:19 146:8
147:22 183:3
183:14,15
228:17 232:17
233:12 234:7
234:16 253:18
**contexts** 290:24
**contingent** 38:9
82:8 238:10
**continuation**
265:10
**continue** 72:23
265:3
**continued**
238:8 243:8
**continuing** 17:6
**continuous**
93:23
**continuum**
103:25 104:2
221:10,15
**contracts**
302:23 303:3
**contrast** 104:20
147:14 160:10
248:20
**contrasting**
104:18

**contribute**
74:25 161:8
292:15
**contributed**
225:10 250:13
291:13,22
310:17
**contributes**
153:13
**contributing**
143:23,24
**contributors**
77:6,23
**control** 80:5
296:1
**controlling**
216:10,17
218:2 223:9
226:24
**controls** 80:7
218:13
**conversations**
32:23 39:20
**convert** 287:17
**copies** 318:14
**coppens** 1:13
2:11
**copy** 13:17 15:2
16:2
**corp** 1:9,10 2:9
38:19 318:4
319:1 320:1
**corporate**
10:21 28:16
29:6 138:13

188:23 241:2
241:20 277:10
**corporation** 8:9
8:10 16:7,24
20:21 24:16
**correct** 10:1,11
13:13 15:2
22:18,24 25:10
28:4 33:20
39:25 40:5,9
41:6 42:3,13
49:17 68:11
81:23 97:5
112:5 113:4,11
121:20 122:7
124:12 132:20
142:25 144:17
144:19 148:1
149:12,13
153:24 159:11
162:8 168:12
168:17 182:7
183:9,21
193:25 198:16
199:13,16,19
199:22 200:15
200:16,19,25
203:8,19,20
204:16 214:10
221:1,2 226:10
227:22 231:7
234:14,23
236:13,14
237:14 252:7
255:6 257:14

**[correct - court]**                                           Page 23

258:2,23
259:18 263:15
263:16 266:18
266:20 267:2
277:19 298:2
312:16 317:12
320:8
**corrected**  39:23
256:8 267:8
271:23 275:18
276:19 310:9
**corrections**
320:6
**corrective**
25:23 26:3,9,12
39:22 40:3,14
41:5,18 43:19
43:20 45:15
77:9 88:13
90:7,20 140:10
187:10 189:23
189:23 190:14
190:25 191:15
192:17 193:6
194:22,25
198:18,22
199:3,9 200:2,9
201:4,14,15,20
227:20 234:18
234:21 236:8
237:4,10
238:20 245:13
246:23 254:11
256:2 257:13
257:17 267:13

268:3,4,16
269:7,11 270:3
270:7 271:2,11
271:21,25
272:12,19
273:5,6,17,24
274:2,4,7,10,17
275:18,24
276:21 277:25
279:14,17
281:8 286:1,7,9
287:16,21
289:19 290:4
290:21,25
291:20,22
293:18,21
294:2,8,14,17
295:22 296:24
297:12,19,24
300:5 303:19
305:10 306:23
307:21,22
308:11,12,19
308:20 309:1,4
309:12 310:11
311:23,25
312:3,8
**correctly**  56:25
86:25 169:13
220:22
**correlate**
159:18
**correlated**
127:21 171:3

**correlating**
215:3
**correlation**
96:15 97:21
98:21 107:20
107:21 108:1
119:1,6,22
213:4,9,19
214:19,25
215:5
**correspond**
221:13
**corresponding**
202:22
**costs**  98:6,23
**counsel**  9:21,23
12:5,12 14:13
31:7,8 32:23
39:20 148:8,21
286:22,23
299:12 316:3
317:16 318:14
**count**  103:15
147:12 169:22
173:5,21
174:24
**counted**  152:6
**counter**  51:16
169:24 170:9
170:11 174:23
175:7,20 176:7
**counting**
100:22 105:12
106:19 110:18
110:22 111:21

149:4 158:18
**countries**  65:13
65:15 66:2
**country**  65:11
65:12
**counts**  170:7
**county**  1:4,5,17
1:24 8:1,8
317:5 318:4
319:1 320:1
**couple**  16:3,9
27:19 31:6,14
64:18 66:9
68:16 95:11
116:7 118:17
145:4 152:23
172:4 228:1,2
281:3 300:20
**course**  29:21
40:11 134:4
**courses**  15:17
28:9,11,18,20
29:2 30:3 83:9
138:16
**court**  1:1 11:16
26:18 27:17,20
80:14 84:23
85:11,16
122:18 123:17
123:20 124:2,6
124:12,16
125:2 126:12
129:16 130:1,8
130:11,12,15
133:17 138:19

**[court - data]**                                                      Page 24

138:23 146:5
166:7 169:20
169:21,21
170:6,22
172:15 173:12
174:20 175:1,7
175:9,17,24
282:7 286:10
286:20,22
**court's** 167:19
171:7 172:9
**courts** 83:22
84:17 93:22
99:21 122:16
122:24,25
123:15 124:8
124:21 131:13
161:1 169:6,8
**cover** 143:3
151:19 265:21
**coverage** 51:6
126:25 127:13
128:10 142:25
143:20 146:8
146:13,25
147:1 149:3,10
150:17,21
151:4,17,24
152:25 153:20
154:3,9,18
155:7,10,18
156:1 161:3,6
161:10,22
162:12,18,20
163:3,6,7 165:7

166:6 167:4,13
167:16,20
168:9 272:6
**covered** 126:14
126:20 127:7
127:11 132:6
146:16 148:23
148:24 151:13
152:18 154:9
154:14,21
155:6 167:8,23
**covering**
143:17 147:10
147:15 164:22
165:1 166:18
166:19
**covers** 57:25
163:19 268:20
**creation** 257:7
**credit** 65:25
**criminal**
265:14
**criminals** 18:19
25:17
**criteria** 63:5
103:3 108:15
159:3,8 177:4
180:8,10,14
192:3,5 193:4
196:4,20,22
197:7,25 198:3
198:5 228:13
233:14 235:10
235:24 238:5
238:18 239:3

245:19 246:4
276:11
**criterion**
102:25 169:23
277:19
**crr** 1:23 317:24
**cs** 318:15
**cumulative**
79:21
**current** 16:2
52:15 177:21
313:8
**currently** 52:25
53:12 312:24
**curricula** 30:3
**cursory** 150:8
**cut** 43:22
**cutoff** 103:22
105:12
**cuyahoga** 1:17
317:5
**cv** 1:7 9:25 15:3
15:6,8 16:2
18:12 28:5
293:24

**d**

**d** 1:16 3:1,3 9:2
9:6 317:8
318:5 319:2,24
320:2,4,12
**daily** 142:4
156:4 203:7
204:3 213:5,5
280:24 281:4

**dale** 1:13 2:11
**damages** 10:16
21:23 22:5,9,12
22:18,24 23:3,8
35:11 38:25
41:10,22 42:8
47:17 82:5
91:23 92:3,12
200:5 201:10
254:3,15 255:2
255:8,13
258:10,20
259:2,10,15,17
260:14,21
261:4,22,25
262:9 263:7,13
263:15 268:19
269:15 271:17
274:21,25
279:1,21
280:14 285:2
285:14,19
288:12 289:1
292:18 293:16
295:7,8,16
298:22,23
299:1 300:3
307:4 308:14
312:10
**data** 29:17 35:1
85:23 125:1,25
126:1,2 174:11
174:12 204:13
206:13,17
210:10,11,14

**[data - decrease]** Page 25

215:17 302:19 302:25 303:2 311:16 314:13 314:23
**database** 148:5 148:22
**databases** 148:23,25
**date** 8:5 25:18 36:15 62:8 154:1,6 165:8 166:24 177:18 202:23 204:21 206:8,14 223:2 223:13 224:5 226:8 229:8 234:1 281:11 292:16,23 293:1 304:2 308:24 314:22 319:24 320:12
**dates** 152:9 153:15 159:21 168:21,22 190:20 191:13 192:23,24 218:19 250:12 261:16,17 263:4,4 286:1 295:22 313:5,7
**daubert** 26:14 26:17 27:11
**david** 1:13 2:11
**day** 43:1,3,17 43:23 44:25

45:12,19,24 61:9 69:20,24 70:8 72:21 73:14 74:12,12 74:21,21 79:20 80:3,8,8 84:6 96:7 99:3,4,9,9 118:5,21,25 119:9,16 137:16,18,20 160:13 175:12 175:18 202:19 202:20 205:1,1 205:5,5,13,21 207:12 208:10 208:10 209:24 210:3,8 213:14 213:16 214:22 215:21,21 216:8,21 219:15,15,17 219:17,25,25 220:1,1 223:2 224:8,8,12,15 224:21,23,23 225:2,17 226:24 233:18 237:3 242:16 243:7,14,14,19 243:19,23 244:1 250:8 251:20 279:11 284:24 285:10 285:16 317:19 320:15

**days** 51:11,12 54:5,6 59:2 68:11,13,16,20 68:25 72:22 79:7,16,18,19 96:12 116:16 118:3,14 119:5 119:20 134:19 134:22 137:13 142:6,8,9,12 204:13,15 205:15,17 206:4,9 207:3,9 207:19 208:7,8 208:17,22 209:6 213:11 213:17 223:7 224:9 234:4 243:2,4 249:7 285:12 318:17
**de** 24:3,7,10,11 24:20 112:25 112:25 113:4,6 116:25 119:25 120:5,19 134:2 135:2,8,11 136:25 140:22 151:23 165:2 165:14 168:17 176:13 179:4 180:13 185:18 205:24,25 264:16,24
**dealt** 299:9

**debate** 286:16
**debates** 117:14
**debts** 180:1
**decades** 85:14 85:21 125:4,8 125:10
**december** 217:18 246:21 247:4,8
**decide** 100:19 103:1 188:10 207:6 254:12 274:5,9 309:19 313:3
**decision** 80:14 80:15,22 81:23 82:21 103:10 123:7 125:5 173:13
**decisions** 87:24 110:13 170:22 172:15
**declaration** 27:22
**declarations** 15:25 27:19
**declare** 320:4
**decline** 40:23 191:8 226:18
**declines** 40:13 79:18
**declining** 218:6 218:7,12
**decrease** 76:4 198:9

**decreasing** 217:2

**deemed** 320:6

**default** 179:25 207:19 209:15 212:5

**defaults** 209:6

**defendant** 2:17 8:20 18:5 23:11 30:5 190:5 229:3

**defendants** 1:14 2:9 8:16 9:12 18:6,20 26:17 81:18 265:5,11,21

**defending** 29:22

**defense** 30:11

**define** 42:23 43:2 45:10,18 57:2 58:15 183:17 192:3

**defined** 43:9,25 203:24

**defining** 74:2

**definition** 105:15 170:10 173:18 265:22 302:6

**definitively** 180:21

**deflated** 86:18 89:5

**degree** 126:21 127:2,8 132:6,7 146:7 147:1 149:10 150:17 155:12 167:12

**degrees** 249:16 251:10

**delaware** 1:4 8:7 10:19 318:4 319:1 320:1

**delineation** 173:11,14

**delinquency** 179:23

**delinquent** 179:22

**deliver** 194:18

**delivers** 156:17

**deloitte** 20:15

**demonstrate** 178:7

**demonstrates** 138:20 301:15

**denied** 71:15

**denies** 72:1

**denmark** 266:5

**deny** 71:2

**departure** 237:24 239:7

**depend** 307:25

**dependent** 47:15 190:5

**depending** 109:9

**depends** 55:2 59:22 60:3 61:5 63:19 64:19,25 67:3 67:22 68:5 70:24 71:17 76:18 88:3 89:9 91:10,11 93:17 98:19 99:10 107:17 147:21 183:22 242:22 244:3 251:8 303:8

**deploy** 311:11

**deponent** 318:13 320:3

**deposed** 9:4,25

**deposing** 29:24 318:13

**deposition** 1:16 3:11 10:25 11:9,17 13:2,9 13:16,25 16:14 16:17,20 31:3,5 31:25 32:3,21 316:11 317:14

**depositions** 10:6 28:15 29:22,23 30:18

**depress** 285:6

**deprived** 178:1

**depth** 150:25 152:8

**derivative** 16:7 47:15 113:25

300:10

**derivatively** 302:5

**derivatives** 301:8

**derive** 301:8

**derived** 106:22 251:15

**describe** 18:13 19:14 74:7 77:24 84:4 99:6 204:11 216:18 233:20 235:9 237:10 257:24 280:5 287:25 288:20 296:4 300:1

**described** 19:15 38:6 42:1 48:7,9 58:22 87:12 93:10 98:20 104:25 105:6 132:17,25 147:6 155:5 157:15 163:16 171:13 182:22 184:3 194:22 201:8 204:19 228:13 232:19 243:2 250:10 259:8,22 260:16,24 269:1 274:23 284:25 289:10

300:3 302:1
309:21 311:1
**describes** 91:22
212:11,13
255:15
**describing**
171:5
**description**
35:10 39:5,11
39:14 54:23
56:10,14 72:19
82:17 87:22
151:11 152:15
185:14 187:12
212:18 237:16
257:1 259:25
314:2
**descriptions**
101:9
**desire** 222:22
**despite** 65:14
115:13
**detail** 149:16
**detailed** 55:1
73:24 149:8,18
149:22 150:2
150:14,25
287:9
**details** 127:16
128:1 229:25
242:23
**determination**
106:24 185:1
258:5 293:10
303:8 306:14

307:13
**determinative**
99:25
**determine**
38:19 42:20
46:25 88:1
102:8 106:13
135:14 203:10
203:18 219:1
257:20 274:3
274:16 292:7
292:13 293:4
296:24 297:22
301:2 304:21
305:5 310:13
311:21
**determined**
46:21 50:16
80:17 90:14
107:11 186:5
256:10 292:22
294:15 303:20
**determining**
125:21 276:12
**deutsche** 232:8
**developed**
80:16 86:10
99:22 162:2
**development**
184:18,19
**deviate** 209:15
281:13
**deviated** 187:6
**deviation**
196:10,11

219:9
**deviations**
220:20
**dfb** 1:9 8:10
**dictate** 103:22
184:23 188:13
**dictated** 215:18
**dictionaries**
240:19
**diego** 2:5
**differ** 45:11,19
107:18 307:21
**differed** 305:19
**difference**
45:24 51:10
92:2 182:14
204:7 212:2
244:16 284:1
285:14
**differences**
45:21 136:15
**different** 23:9
23:21,24 27:6
37:20,22 48:9
50:11 65:10
71:5,13,19
76:18 79:2
82:16 95:4
101:9,12,21
105:13 107:18
108:24 109:8
109:13 110:4
115:25 117:14
120:10 131:25
136:6 142:13

150:22 157:2,3
159:8 166:1
167:8,11 177:4
182:21,23
191:13 208:6
208:18,19
209:11 224:17
234:4 240:20
253:22 254:2
267:6 270:7,8
275:22,22,23
275:24 294:9
294:23 295:18
305:13 306:12
306:18 307:14
308:10 309:7
**differently**
23:23 66:8
**difficult** 25:11
25:19 73:24
76:3 105:8
110:9 113:19
152:24 153:6
153:20 165:6,8
165:19,24
166:18,23
**dig** 266:25
**direct** 22:11
193:23 194:14
251:13 287:5
**direction** 37:1
37:12 130:11
225:11
**directly** 33:10
71:5 86:5

113:21 187:10
191:9 192:10
192:14 233:4
266:17
**director** 24:25
193:19 235:18
**directors**
163:13 164:3
164:10,13,18
**disaggregate**
291:24 294:1,6
296:17
**disaggregated**
310:16
**disaggregation**
293:7
**disciplined**
30:21
**disclose** 265:12
**disclosed** 40:4
42:11 93:12
140:21 223:13
225:2 230:4,18
233:4 234:1,8
235:1,8,16
236:3 242:9,12
244:1 245:12
247:17 265:23
306:3 310:8
**disclosing**
89:24
**disclosure**
25:23,25 26:12
43:19,20 45:16
52:16 77:10,10

77:14,15 79:4,6
79:8,10 90:7,20
159:23 164:7
190:15 191:1
191:15 200:9
201:4,14,16
226:12 231:18
232:15 234:22
235:4 236:8,12
237:21 242:3,6
243:23 244:2,6
245:9 268:4,16
271:11 273:7
273:24 274:2
286:1,9 287:22
291:17,18,21
292:6 293:21
294:2,14
295:22 296:24
297:24 303:19
303:22 305:10
307:22,23,24
308:11,12,20
309:1,13 312:9
314:12
**disclosures**
10:21 26:3,10
39:22 40:4,15
41:5,18 79:11
88:13,14 93:3
93:16,19
138:13 140:11
177:9 186:21
187:10,19
189:18,24

190:6,16
192:18 193:7
194:22 195:1,4
198:7,11,15,19
198:22 199:3,9
200:2 201:21
202:7,9 227:15
227:20 231:6
231:10,14,22
231:24 233:18
233:21,23
234:5,19 237:4
237:10,12,13
238:20 240:3,4
240:10,21
241:2,20,23
245:13 246:23
248:18 249:7
254:11 256:2,9
257:13,17
267:8,14,21,23
268:3 269:7,11
270:3,8 271:2
271:21,22,25
272:19 273:5
273:17 275:19
275:24 276:22
277:10 278:1
279:14,18
281:9 286:7
287:16 289:19
290:4,21,25
293:19 294:9
297:12,19
300:5 306:23

308:19 309:5
312:3
**disconnect**
276:25
**discounted**
88:24 188:19
280:23 281:3
296:9 305:21
**discoverable**
148:25
**discovery** 65:22
243:11 303:11
310:5 311:4
**discuss** 28:19
29:16 96:13
104:9 142:24
150:10 181:10
**discussed** 28:22
29:2 32:9
42:18 82:12
163:1,10
265:24
**discussing**
28:24
**discussion**
150:14 151:1
**discussions**
153:5
**dismiss** 32:14
32:19 310:2
315:18
**disseminate**
60:22
**disseminated**
58:3 60:9 61:2

**[disseminated - duplicates]** Page 29

68:4 143:12 153:1 156:1 161:14 244:15

**disseminating** 131:9

**dissemination** 153:15 161:23 228:18

**dissipate** 237:6 279:14

**dissipated** 77:14 90:20 237:15 272:13 274:8,11 293:5 293:20 294:18 296:25 297:23 303:20 305:17 309:12

**dissipates** 308:20

**dissipating** 237:11

**distinction** 45:23

**distinguished** 224:12 252:4

**distorted** 56:23 86:17 89:4,15

**distributed** 220:9

**distribution** 249:15 251:9,9

**district** 1:1,1

**diverge** 64:17

**divergence** 217:15

**divergency** 186:25

**divide** 78:12 219:8

**dividends** 179:25

**dividing** 220:2

**doctor** 313:24

**document** 14:18,24 134:12 149:1 153:10 166:13 168:8 170:14 174:6 175:5 188:8 230:24 233:19 250:24 259:5,20 260:18 303:6 310:5 315:23

**documented** 78:25 96:19 145:19 188:2,4

**documenting** 70:15 146:7 147:1

**documents** 32:2,5,9,16 146:16 171:2 185:23 296:14 305:5 311:3

**doing** 13:2 23:10 81:15 123:4 158:25

175:6 218:14 289:13

**dollar** 287:17 297:6 303:13 303:16 304:7 306:11,17,24

**dollars** 265:14 303:20,23 304:6,19 305:14,16

**door** 192:9

**dots** 299:12

**dotted** 213:6

**doug** 8:25 31:11 316:8

**dougb** 2:7

**douglas** 2:3 9:16

**dow** 58:4 59:12 60:25 156:2

**dowd** 2:4

**downgrade** 61:16

**download** 174:6 302:19 303:2

**dr** 1:12 2:10 3:11 8:11 9:8 14:1,18 17:5 30:19 32:8 49:3 99:20 111:17 141:10 142:23 191:20 191:25 194:14 254:25 283:2

298:10 315:25

**draft** 33:22

**drafting** 314:24

**draw** 140:7 215:22 225:7 227:5 231:3

**drawing** 129:13 154:16 251:13

**dribble** 78:20

**drive** 216:12 285:6

**driven** 98:7 189:3 193:16 269:9

**drivers** 142:10

**driving** 81:2 139:23 188:18

**drop** 78:6,9,11 78:16,23 79:23

**drug** 184:19

**drunk** 244:17

**dual** 64:11 65:3 66:5 67:8

**due** 27:25 74:12,13,13 150:17 237:5 239:12

**duly** 9:3 317:7 317:9

**duplicates** 158:15,19,20 159:1,5,5,7,7 159:11

**[dynamics - efficiency]**

**dynamics**
184:22

**e**

**e** 3:1 16:25
319:3,3,3
**earlier** 17:7
20:19,22 22:3
37:13 49:3,14
50:8 58:13
63:15 67:21
68:8 71:24
79:15 82:12
87:12 93:10
103:20 105:1
106:17 107:19
110:16 115:22
117:25 118:11
118:19 120:6
121:17 122:4
123:13 124:20
125:19 140:15
147:7 148:16
148:17 151:5
154:7 157:6
162:6 164:23
165:5 167:2
168:20 169:17
171:1 174:20
182:12 183:1
184:3 192:7
194:22 209:9
209:12 228:14
233:6 238:4
243:3 248:3
249:12 254:25

257:16 258:20
259:23 272:2
275:20 277:7
280:2 295:6
296:19 297:3
298:10 299:19
305:19 306:3
308:22
**early** 16:8 49:4
49:9
**earn** 171:23
**earnings** 55:4,5
55:8,10,15,20
55:21,23 56:2,2
56:6,7 62:14
72:20,23,25
73:5,8 75:14,17
134:16,16
140:11 147:18
153:9,12,12
160:21 184:4,9
184:15,16
186:24 188:4
188:16 192:8
192:15,20
195:15 225:13
227:18 228:18
230:3,17 231:3
232:2 233:10
238:22,24
239:15 240:14
240:21 246:18
246:22 247:16
248:13 296:10

**easier** 251:12
**easily** 114:24
176:8
**eastern** 1:1
**easy** 146:22
166:12
**econometrics**
221:6
**economic** 28:15
41:14 74:14
80:5 83:3,11,25
84:24 86:1
124:16 144:17
200:6 201:8
202:10 256:5
256:11 257:3
257:24,25
269:25 270:22
275:15 276:12
306:2,2
**economics**
15:15 28:16
29:5 86:6
108:17 124:23
125:12 130:9
292:13
**economist** 19:6
52:1 69:4 82:3
83:13 85:12
124:4,15
129:17 130:7
131:11 138:12
253:20 276:17
277:9

**economists**
85:7,9 218:25
**edgar** 57:17
66:19 161:14
**edits** 258:24
**effect** 77:22
93:4 96:6,7
159:16 160:1
181:13 184:8
190:11 193:2
198:24 201:24
210:22 239:5
246:1 250:9
**effects** 86:9
226:25
**efficiencies**
54:7
**efficiency** 3:11
10:15 13:18,25
16:16,19,24
20:4 22:3
29:16 30:2
34:23 35:14,16
35:24 45:7,25
46:11,20 47:22
48:5,19 49:21
49:23 50:25
69:23 81:3
83:2,5,17 84:3
86:12 87:4,9,10
92:24 94:1,13
94:16,21 95:16
95:23 97:5,16
97:20 98:3,13
98:16 99:1,8,24

| | | | |
|---|---|---|---|
| 99:25 100:3,10 | 167:18 171:5 | **either** 14:4 | 180:14 |
| 102:11 103:19 | 178:8,17 | 18:18 23:11 | **eligible** 177:5 |
| 103:25 104:1,6 | 182:12,21,22 | 24:14 27:1 | 177:24 178:14 |
| 104:11,16,19 | 182:25 183:4,5 | 30:1,4 41:4 | 178:22 179:8 |
| 104:24 105:8 | 183:12 199:4 | 49:8 86:17 | 179:11,16 |
| 105:21 106:8 | 207:20 260:6 | 89:5 97:21,22 | 180:22 181:1,4 |
| 106:14,25 | 276:8 | 101:25 113:25 | **eliminate** 159:1 |
| 107:16 109:2,5 | **efficient** 20:2 | 159:4 161:1 | 285:18 |
| 109:16,24 | 38:20 42:21 | 186:25 191:17 | **email** 13:12 |
| 110:1 115:5,12 | 46:16,22 47:1 | 205:20 207:23 | **emphasis** 188:9 |
| 115:24 116:1,3 | 47:11,17,25 | 212:1 213:2 | 195:24 |
| 116:19 118:4 | 50:10,17,20 | 219:23 223:4 | **emphasized** |
| 119:10 120:3 | 54:1 56:18 | 230:4 231:3,23 | 186:12,19 |
| 120:12,23 | 58:10,24 65:15 | 233:22 240:17 | 188:1 189:1 |
| 121:15,25 | 68:10 81:21 | 242:1 245:12 | **empirical** |
| 122:20,22 | 82:19 86:11,20 | 247:17 248:14 | 115:11 127:3 |
| 123:10 125:18 | 95:3,6 101:1,17 | 256:25 257:6,7 | **employ** 19:6,10 |
| 125:21 126:23 | 104:7 105:9,24 | 257:15 260:1 | 30:15 63:3,14 |
| 127:10 129:3 | 107:11 108:12 | 286:9,17,17,22 | 88:21 129:1 |
| 129:14,18,20 | 114:13 115:17 | 297:6 302:14 | 311:7 313:3 |
| 129:22,24 | 115:19 118:2 | 317:16 | **employed** |
| 130:25 131:1,5 | 123:23 134:3 | **ekono** 2:12 | 29:13,19 |
| 131:12,18,20 | 135:3,15 139:3 | 8:17 | 129:19 159:3 |
| 131:22 132:3 | 162:2,15 169:8 | **electronic** | 203:14,17 |
| 132:11,12 | 169:11 171:9 | 13:15 173:16 | 288:1,4 290:22 |
| 134:25 137:1 | 171:16 182:4,9 | **element** 25:14 | 293:9 296:15 |
| 138:18 139:12 | 182:15,15 | 100:3 | 309:10 312:19 |
| 140:14 141:4 | 198:6,14 240:6 | **elicit** 126:21 | 312:24 |
| 141:20 142:2 | 243:9 248:24 | 127:1,8 132:6 | **employee** 72:8 |
| 143:23,25 | 253:10 302:4 | 155:12 | **employees** 1:4 |
| 144:11 146:3 | **efforts** 235:15 | **eligibility** | 1:5 8:8 318:4 |
| 147:2,13,21 | **eight** 111:14 | 176:18 177:3 | 319:1 320:1 |
| 153:8,14 | 147:25 151:12 | 178:11,12,17 | **employing** |
| 155:16 161:9 | 167:8,10 | 178:25,25 | 19:12 312:24 |
| 162:24 163:8 | 168:11,15 | 179:14 180:7,8 | |

**employment** 25:8

**employs** 30:16 85:5

**encounter** 30:10 192:11 275:21

**encountered** 99:2 312:4

**engage** 113:23 113:24 114:19

**engaged** 52:25 72:5

**engagements** 37:18,19,21

**engaging** 71:24

**english** 58:1 63:16 64:21 67:6 70:10 163:20

**enhance** 172:19

**enhancing** 153:8

**ensure** 11:11 151:10 152:14 154:3 207:14

**enter** 288:10 307:6

**entered** 307:10

**entertain** 239:17

**entire** 45:9 132:24 133:6 139:6 148:14 151:20

**entirely** 259:14

**entirety** 26:19 28:12 46:2,12 120:12 139:17 291:10 293:13 294:15

**entities** 173:21 174:8

**entity** 179:3

**environment** 13:1 57:7 58:14 71:18 90:3 93:14 197:23 203:22 223:19 226:4 226:20 227:8 245:9 246:10 253:2 254:12 271:18 274:3 274:15 291:11 292:5,10 310:7

**environments** 277:11

**equal** 76:12 100:22

**equally** 46:11

**equipment** 211:21 212:14 264:14

**equivalent** 189:6

**equivocating** 226:11

**errata** 318:11 318:13,17

**error** 217:25 219:11 220:3

**errors** 219:10

**especially** 227:6

**espouse** 95:10

**esq** 2:2,3,3,12 2:12,17 318:1

**essentially** 132:10 174:22 195:22 202:24 223:5 224:20 278:2 294:15

**established** 169:6 171:8

**estimate** 34:10 36:16 204:24 206:4 288:12 288:23 300:4

**estimated** 49:15 213:13 213:16

**estimating** 205:14 273:20 289:11

**estimation** 204:14,18,24 205:8 207:4,7 207:23,25 208:4,5,7,14,16 208:18,21 209:3,11,14,17 209:25 210:2 210:11,19,23 211:13 212:25

213:13 215:15 223:7 224:9 251:20,21,25 252:1,14,17,22

**et** 8:8,10 318:4 319:1 320:1

**evaluate** 19:7 57:7 67:11 68:7 82:3 84:12 105:19 106:9 107:5 108:3 110:1 136:13 159:15 159:25 164:14 195:10 196:4 197:17 202:5 233:2 238:19 238:21 239:11 245:10 258:8 260:21 268:18 271:22 274:3 276:22 306:23 308:3

**evaluated** 51:21,22 121:24 125:9 131:15 159:21 194:21,25 240:2 241:1 256:12 296:17 303:19 311:15

**evaluates** 108:10

**evaluating** 48:5 83:16 89:13

101:14 107:9
115:9 145:25
161:9 199:3
201:8,24
235:20 241:19
246:9 256:14
**evaluation**
103:3 120:24
263:22 276:14
277:6 292:3
311:12
**event** 19:8,15
29:7,8,11 80:6
85:18 88:8,9
202:1,4,16,17
202:20,21,22
202:22,25
203:4,6,10,11
203:13,14,25
204:1,11,20,21
205:11,12,14
206:4,8,12,14
206:18 207:2,4
207:9,14 208:1
208:6,25 209:2
211:3,4,7 212:3
212:19 213:1
216:6,7 218:13
223:2,13 224:5
224:23 226:22
227:6,7,16
228:11 231:7
246:13 249:3
252:10,25
253:5 254:2,13

272:8 287:15
287:23,25
288:7 289:18
290:3,12,15,17
290:19,22
291:1,3,15
292:2 296:11
310:15 311:12
311:17 316:2
317:17
**events** 93:13
140:9 196:23
197:15,24
198:2 208:12
232:18 245:18
247:1,2,4,6,7
253:23
**everybody** 14:9
56:4 184:15
**evidence** 51:1
62:20,24 69:17
98:12,25 99:7
115:11 116:10
116:23 118:21
135:7 136:7
155:7 162:22
162:23 167:17
179:21,23,24
180:6 193:2
223:11 239:4
248:19 253:23
280:9 306:18
310:3,4
**evolution**
303:12

**evolve** 211:10
304:11
**evolved** 173:16
303:7
**evolves** 91:12
213:20 304:22
**evolving** 207:15
**ex** 76:3 129:10
197:13 241:12
241:13 248:11
**exact** 35:23
72:4 109:3,4
121:11 152:5
229:7
**exactly** 230:25
**examination**
3:3 9:3,6
**examine** 207:25
**examined** 45:7
45:24 138:21
209:1,7
**example** 51:3
55:3,18 57:21
57:22 58:4
63:25 64:9
65:2 66:19,24
68:5 71:6,20,25
73:14 75:14
76:1 78:1
83:23 85:1
88:5,10 90:13
91:6 97:19
99:3 117:4
122:18 123:18
133:24 137:13

147:9 156:14
185:7 188:5
209:12 224:3
225:8 226:7
232:1 238:13
242:23 243:1
244:7 245:24
247:16,25
251:23 280:25
300:17 304:18
305:15 307:15
307:18
**examples** 19:18
29:25 52:6
58:5,17,19
66:10 70:25
71:22 72:17
99:2 155:24
233:22 235:7
**exceed** 133:20
222:11 224:1
**exceeded** 75:16
224:7
**exceeding**
187:1
**exceeds** 133:15
**excel** 174:6
250:22
**exception** 12:13
**exceptions**
64:10
**excess** 98:23
**exchange** 51:5
52:2 57:14
69:5 83:14

**[exchange - explain]**                                                 Page 34

93:25 94:11
95:14 112:17
169:25 170:12
170:13 175:3
175:22 176:9
261:25 262:7
287:18
**exchanges**
169:7 171:8
**excluded** 27:17
**excuse** 141:21
**executing** 17:25
18:9 21:16
**executive** 25:16
**executives**
18:17 71:2,14
78:7,19,25
165:11
**exhaustive**
274:14
**exhibit** 3:11
13:25 14:4,5,7
14:10 51:10
94:12 95:15
133:2 140:8
147:24 148:11
151:13 152:7
164:20,21
167:3,23 168:2
190:20,24
191:13 193:8
196:24 197:16
212:20,23,24
217:22,23
219:11 220:3

227:14 231:4,5
245:18 246:14
248:25 250:17
**exhibits** 3:10
136:11,12
**existed** 51:19
121:4
**existence** 117:1
117:19 125:2
**existing** 189:11
**exited** 307:10
**expect** 54:9,13
54:14,24 55:14
56:3 68:9,14,23
70:20 73:6,12
73:21 74:8,11
80:10 93:15
109:19 134:18
136:1 137:9
142:4 198:9
228:5 240:3
241:7,20,23
242:14,18
244:9 248:12
248:23 305:25
**expectation**
55:9 196:10
288:6
**expectations**
75:16 190:7
245:24 247:20
248:15
**expected** 53:16
56:8,14 73:18
80:4 82:24

107:1 193:20
248:5 292:14
305:12
**expects** 190:1
**expedited**
316:9
**experience**
10:23 15:16
20:7 30:17
34:16 43:24
45:6 58:23
61:11 69:3
83:5,6,16,19
87:11 91:4
94:10 95:13
106:23 118:12
145:6,23
146:24 151:23
156:12 164:11
171:14 172:6,7
175:14 212:2
240:25 241:19
243:3 276:3,3
277:7,15,18
278:23 281:11
293:16 314:9
**experienced**
275:25
**experiential**
29:21
**expert** 9:18
10:11 13:18
15:24 16:15,16
16:21,23 17:17
17:19,25 18:4

18:21,22 19:11
20:1,6,25 21:4
21:22 24:2,22
25:22 26:13
27:16 28:15
29:24 32:12
33:6 34:17
49:17 51:24
52:4,18 69:6
106:21 107:1,7
108:10 124:3
125:17,23,24
145:23,24
179:5 241:1
271:16 277:14
278:24 300:13
300:20 315:5,7
315:10
**expertise** 83:4
83:20 87:10
106:21 108:9
130:6 138:11
**experts** 29:13
211:5
**expiration**
121:13 313:7
317:25
**expired** 119:24
**explain** 25:2
43:1 46:9 60:5
73:9 163:5
170:18 172:3
186:20 195:20
212:23 221:5
228:24 240:20

242:5 247:15
257:4 273:14
287:14 289:2
291:7 296:22
303:16 304:24
309:9
**explained** 44:4
64:24 67:21
107:3,15
117:22 119:19
121:23,25
124:20 127:14
128:6 130:21
135:22 137:9
137:25 139:15
142:3 167:2,14
171:17 174:19
180:11 183:1
186:10 189:7
190:15 195:13
200:3 214:3
225:5 228:1
232:11 238:3
261:14 275:20
299:2
**explaining**
80:25 162:17
221:20 256:15
**explains** 91:24
197:3
**explanation**
43:6 72:14
82:17 137:5
219:2 220:19
301:7 314:5

**explicitly** 28:24
213:23 216:5
301:14 315:4
315:15,20
**expose** 239:11
**express** 242:13
**expressed**
97:18 197:25
261:2,12
**extent** 65:19
135:23 170:14
175:5 184:7
193:9,9,10
217:14 218:6
218:11 219:18
224:6 232:18
**extraneous**
233:18,21
**extreme** 51:9

**f**

**face** 239:1
**facilitate**
172:18
**fact** 65:14
74:15 115:13
120:23 121:14
130:2 145:4
154:17 179:8
181:2 193:25
194:1 200:17
239:12 248:19
262:6 265:21
266:13 298:21
301:7 314:16
314:18

**factiva** 57:24
59:5,10,16
63:16 157:4
158:12,19
159:3,8 163:18
197:1,4
**factor** 80:22
81:2 100:10
101:25 108:5
122:17 128:14
128:24 132:22
132:24 136:19
136:25 139:5
139:11 140:18
141:2,3,19
142:1,23 143:2
144:22 155:15
161:10 162:18
162:19 165:20
165:25 166:1,5
169:1 170:6
175:2 176:17
178:11,11
179:13 181:10
181:12,18
**factoring** 311:2
**factors** 29:18
35:3,4,4 48:10
76:19 77:19,24
79:25 82:4,4,5
83:23 84:1,5,16
85:2,6,8,10,20
86:1,4 100:12
100:22,24
101:5,6,7,10,12

101:21,23,24
102:3,4,7,12,20
102:23 103:5,9
103:14,16
104:5,10,15,22
105:7,13,20,20
106:10,10,11
106:13,19,23
107:6 108:7,11
108:16,20,24
109:1,5,15,22
109:25 110:18
110:23,25
115:10 120:11
120:22 121:16
121:20 122:2,7
122:15,25
124:21 127:5
127:20 129:12
131:10,13,15
131:19 132:14
132:17,17
136:6,17,18
139:2 140:16
141:3 180:7
206:17 207:22
209:10 211:16
211:20 216:17
225:6,19
226:19 250:13
253:2 313:10
**facts** 89:10,20
93:18 109:9
259:2 296:7
303:9 305:1

309:25 314:13
**factual** 53:10
**fail** 117:11
**failed** 179:24
  265:12
**failing** 226:10
**fails** 116:14
  318:19
**fair** 23:9 35:17
  70:9 104:14
  309:6
**fairly** 26:1 63:7
  66:25 73:17
  102:13 142:8
  193:3 197:6
  202:14,18
  208:6,12,13
  214:13
**fairness** 15:14
**fall** 15:22 142:7
  203:24 220:19
**falling** 114:6
  187:1
**falls** 9:17
**false** 200:14
  238:23 265:6
  285:5
**familiar** 10:24
  149:23 284:20
**familiarity**
  149:19 150:7
**fan** 244:18
**far** 31:18 69:16
  160:18 170:14
  173:16 191:3

209:5 281:11
**farr** 2:13 8:15
  9:11
**farther** 210:6
**fashion** 214:12
**favor** 23:16
  26:20 99:23
  103:17,18
  109:1,5,16
  137:1 139:11
  141:4 142:1
  147:2,13,20
  155:15 162:23
  167:18 178:16
**february** 1:19
  8:2,5
**feed** 301:20
**feedback** 282:4
**feeding** 292:21
**feel** 130:18
  207:17
**fellow** 28:6
**felt** 145:8,8,9
**fewer** 37:25
  146:17
**figure** 107:9
  165:19 181:20
  273:7 278:4
  283:2
**figured** 155:2
**file** 177:5,7,15
  177:24 178:15
  178:22 179:9
  181:2 250:22

**filed** 26:17
  52:25 53:10
  177:10 178:3
  178:13 212:16
**files** 14:6 18:24
  57:15
**filing** 57:11
  62:13 176:18
  177:3 178:10
  179:1 240:15
**filings** 45:15
  57:18,21 66:25
  156:7,14,17,21
  156:23,25
  157:16 160:21
  161:12,24
  163:6,16
  176:22 177:1
  177:14,20
  178:7 179:1,22
  179:23 185:5
  188:8 196:25
  240:21
**filtered** 159:10
**final** 152:6
  313:24
**finally** 12:11
  13:14
**finance** 10:22
  65:25 66:4
  83:7,8 86:5,11
  88:22 124:23
  125:11 138:17
  145:5 188:12
  188:23 277:8

292:12 301:12
**financial** 19:6
  38:1,4 52:1
  69:4 82:3
  83:13 108:16
  124:3,3,23
  130:7,9 131:11
  138:12 145:24
  174:13,15
  177:14,19,22
  178:2 185:5
  202:10 253:20
  276:16 277:9
  297:9
**find** 87:23
  97:25 106:14
  112:18 116:23
  155:13 168:3
  179:22,24
  246:20 253:23
**finding** 51:1
  54:7 105:8
  187:18
**findings** 116:13
  117:16
**finds** 115:16
**fine** 227:3
**finish** 11:19,20
**finished** 12:8
**firm** 9:11
  147:10,15
  208:25
**firms** 37:21
  49:25 126:14
  126:20,24

**[firms - form]**                                                    Page 37

127:1,7,11,12
127:13,16,22
127:23 128:1,2
128:7,13,19
132:4,6,8,8
146:12,16
147:8 148:1
149:7,20,21,23
150:7,23
151:12 154:9
154:14,18,21
155:6,12
181:18,21
**first**  9:3 24:9
  43:1,3,12,16
  49:6 53:25
  61:12 69:24
  118:21,24
  119:9 132:16
  132:22 140:21
  153:1 165:1,14
  166:24 168:16
  176:12,15
  180:13 191:14
  204:15 206:3,8
  209:22 210:8
  213:11 214:6
  217:10,10,11
  229:2,16,19
  234:2,21
  255:14 267:14
  283:5 287:20
  303:25 308:25
  317:9

**fiscal**  212:16
**fit**  52:6 72:18
  197:24 198:2
  239:2
**fits**  192:5
  196:21 235:9
  235:23 238:4
  238:18 246:4
**five**  103:17,18
  103:18 105:20
  109:1,4 122:19
  132:17 174:21
  175:9,11
  227:19
**fixed**  204:14
  205:9 211:13
  213:12
**fka**  1:9
**flagging**  159:4
  159:8
**flexible**  261:16
**flow**  88:24
  180:5 188:19
  280:24 281:4
  296:9 305:22
**flows**  74:4
  188:16
**fluctuate**  74:12
  74:21 135:23
  214:5,12
**fluctuated**
  216:4
**fluctuates**
  134:6,7

**fluctuating**
  91:14 99:9
  279:12
**fluctuations**
  75:1 77:6
  137:10 139:24
  142:4,11 160:8
  205:2 215:23
**fly**  61:19
**flyonthewall....**
  60:21 61:6
**focus**  17:15
  188:10
**focused**  160:12
**focusing**  47:21
  79:5 251:16
  295:5
**folder**  14:5
**follow**  12:20
  61:10 101:19
  103:10,13,13
  124:15
**followed**
  135:11 166:9
  166:15 167:9
**following**  51:6
  64:4 84:20
  116:24 117:4
  119:25 120:4
  127:13 131:8
  134:1 135:2,8
  136:24 155:25
  165:2 168:17
  176:13 198:10
  202:9 246:16

**follows**  9:5
  113:3
**footnote**  42:25
  43:5,11 172:15
  173:7 197:2
  212:12 232:9
  235:5 278:20
  278:21 285:1
**footnotes**
  170:17 185:21
  232:11
**force**  188:18
**forecasts**
  146:19
**foregoing**
  317:12,15
  320:5
**foreign**  65:9,9
**forgot**  20:21
**form**  23:12,20
  25:1 34:20,24
  35:21 38:3
  39:18 40:10
  41:7 42:4,7
  48:1 52:20
  53:17 58:11
  62:2,11 64:23
  66:17 67:9,19
  69:13 70:12,23
  72:16 75:6
  77:3 86:11
  89:8,17,21
  90:11 91:9,20
  92:17,24 93:6
  94:17,24 98:18

**[form - free]** Page 38

100:24 102:10
103:2,12
104:17 106:15
107:13 109:11
110:14 111:2
111:10 113:17
115:6 117:21
118:6 119:11
121:5,21
122:12 124:17
126:16 128:4
128:15 130:3
130:13 135:4
135:16 137:3
139:13 140:23
141:6 147:5
148:15 150:5
150:19 154:23
155:8 160:4
162:9 163:14
164:4 165:3,15
165:22 166:21
167:25 168:7
168:18 171:10
172:13 176:5
176:18 177:8
177:16,25
178:4,9 180:17
180:23 181:6
182:11,24,24
182:25 183:5
183:10 187:21
189:20 195:7
197:20 198:17
200:20 201:5

202:13 206:21
209:4 215:25
217:5 222:15
223:14 224:13
225:3 226:1
229:5 230:14
231:11 235:2
237:8 239:9,23
241:9 242:21
245:15 247:13
252:5 254:5
255:11 258:6
259:4 260:9,17
261:7 262:2,18
263:12 264:11
266:21 267:3,9
267:25 268:6
268:11,22
269:9,19
270:18 271:13
272:20 275:10
276:13 277:20
279:25 280:8
281:18 283:7
283:21 285:22
286:3 287:1,24
288:16 289:6
292:19 295:10
296:2 297:14
302:18 304:9
304:23 306:9
307:7,19
308:16 309:16
310:23 314:19
315:16

**formally** 266:5
**former** 18:23
72:8
**formerly** 8:9
**forming** 314:13
**forms** 178:22
181:2 182:21
228:17
**formula** 263:1
263:6 271:7
274:23 275:2
288:14 289:3
293:12 295:14
301:18 308:8
312:9
**formulaic**
256:20 259:24
288:24 292:20
301:11 307:1
**formulaically**
286:11,18
289:15 292:23
301:16,20
**forth** 84:16
177:3 235:10
**forthcoming**
15:14
**forum** 62:19
243:24 244:14
**forums** 62:23
**forward** 18:21
55:11 111:19
205:15,18
213:15 227:4
265:4

**found** 46:15
108:25 109:1,3
117:9 133:24
136:22 146:12
185:24 246:25
263:16
**foundation**
49:22 94:18,25
113:18 115:7
152:20 156:11
157:17 217:6
**founded** 85:8,9
264:14
**four** 78:12
103:17 247:1,3
247:6,7,10
**fourteen** 72:22
**fourteenth**
234:17 236:7
**fraction** 247:11
**framework**
41:3 50:23
80:6 283:10
**frank** 1:11 2:9
280:25
**frankel** 2:18
**fraud** 71:25
72:6 80:25
90:8 91:17
92:15 100:4
265:13 266:6
284:7
**free** 59:21,24
96:16 313:7

**freedom** 249:16 251:10
**freely** 59:24 157:11
**frequency** 114:18 156:20
**frequent** 303:11
**frequently** 35:13 37:20 68:13 115:23 148:19 304:16
**fresh** 11:1
**friday** 43:14
**front** 16:2
**fruitful** 184:23
**fruition** 239:14
**ftp** 156:16
**fulfills** 175:1
**full** 9:14 121:24 135:21 136:1 136:13,19 138:2,21 141:23 150:24 158:13 176:7 176:16 193:9 208:8 251:25 284:7 292:4 304:19
**fully** 55:23 66:22 68:17,24 79:17 121:14 142:4 178:14 243:5 279:20

**function** 13:12 170:24 173:6 173:22 174:1
**functional** 66:22
**functioning** 172:19
**fundamental** 130:24 188:18
**fundamentally** 115:25 131:24
**funds** 61:10 114:17
**further** 37:2,7 43:6 98:4 108:3 119:7 162:23 163:7 193:1 204:14 257:11 265:25 266:8 267:1 317:14,15
**future** 74:4 210:1,7 215:16

**g**

**gain** 92:10
**gains** 27:5,8
**gallagher** 2:13 8:15 9:11
**game** 244:18,24 245:2
**garner** 102:15
**garnering** 105:3
**gathered** 306:19 310:4

**geller** 2:4 8:23 31:10 32:15 33:4,6,10 36:8 49:12,15,19 50:3,6
**general** 10:20 30:17 35:6,10 57:8 58:24 59:6 60:15 63:22 74:25 87:21,22 112:10 114:2 120:17,25 157:25 171:14 177:2 237:4,16 250:15
**generally** 54:16 59:10 80:9,10 92:12 97:1,5,16 115:17,20 117:8,13 121:10 234:13 278:25 304:14
**generate** 102:15 188:17 190:2 240:4 241:14 242:18 244:9 257:19
**generated** 143:11 189:10
**generating** 56:5 56:6 105:3
**george** 2:24
**getting** 282:4

**give** 43:6 53:18 98:2 105:23 128:1 155:24 155:24 226:10 232:5 233:7 235:3,7 242:25
**given** 10:23 51:2 54:20 55:2 56:11,15 58:14,17 60:3 67:4 73:16,23 75:1 76:20 80:3 81:21 84:9,19 89:11 89:13 97:24 101:13 103:23 104:7 107:16 115:12 117:12 122:17 124:22 129:12 130:18 131:2 134:11 137:12,18 139:24 143:11 146:13 153:11 154:19 160:7 160:10,24 184:25 186:18 203:21 214:22 216:8,13,21 223:2 225:17 233:13 238:12 245:9 248:8 252:13 270:13 277:16 282:13 283:25 291:5

**[given - guidance]**                                                    Page 40

292:5,16,23
293:21 303:9
305:2,23
309:12,25
317:10,12
320:9
**gives** 233:24
**giving** 91:6
105:14 123:14
160:19 191:24
228:20 245:25
**go** 14:17 18:24
24:7,15 26:7,23
33:17 48:22
52:14 99:14
110:11 112:14
132:16 137:19
142:15 148:3
152:3 156:6,15
156:15 158:25
159:13 162:21
170:16 189:12
194:7 195:17
207:11,18
214:24 215:17
229:6 240:1
252:16 254:18
256:20 257:6
257:13 282:20
287:14 288:20
291:6 294:24
298:5 300:16
300:21 304:24
313:19 316:8

**goal** 30:6
192:21 196:2
197:11 216:7
216:14 234:14
234:15 245:20
**goes** 17:25 54:4
215:12,13,16
228:22 255:21
274:22 295:13
297:3 301:6
312:9
**going** 11:10
12:1 13:20
20:12 35:25
55:8,10 74:19
76:4 78:6
81:12 86:7
93:21 99:13
111:5,8 118:8
134:20 136:16
137:23 139:16
141:13 142:14
144:20 155:17
165:17 181:8
188:17 194:6
195:21,22
206:7 215:9,19
220:6 221:13
226:20 243:17
244:19,22
257:8 259:25
265:4 272:24
302:15 303:4
307:25 308:13
309:19

**good** 8:22 9:8,9
48:13 55:9
58:5,17 84:4
184:10
**gotten** 27:5,8
**graduate** 83:9
**granted** 93:25
94:20
**graph** 214:16
**graphing**
212:24
**graphs** 213:3,7
**gravitated**
221:16
**gray** 159:6
243:21
**great** 315:24
**greater** 202:8
202:10 220:14
**greatly** 186:25
**grew** 264:22
**griggs** 1:10 2:9
**ground** 10:24
184:11
**grounded**
63:10 85:3,14
124:22 125:11
**group** 211:21
**growing** 264:21
**growth** 134:16
134:17 186:13
186:14,22
187:2,3,13,19
187:25 188:11
188:14,15,16

189:3,5,6,8,10
189:12,14,15
190:1,3,7 191:8
192:16,19
193:7,11,14,20
193:24 194:17
194:18,19
195:6,12,25
196:5,12,18
229:17 232:20
233:5,15
235:13,20,22
236:23 237:21
237:25 238:9
238:14,24
239:8,13
245:24 248:17
264:19,20
265:3,7,11,20
265:23 266:11
267:24 268:5
268:20 308:12
**guess** 33:7
36:22 49:7,18
63:19 67:2
95:11 105:18
145:3 190:23
195:17 252:7
253:15 258:9
287:3
**guest** 28:18,23
29:1
**guidance** 55:12
55:19 75:18
103:21 134:17

**[guidance - hypothetical]**

174:25 184:11
187:1,11
192:10,12
196:12,14,17
230:6,19
247:19 248:2,8
286:23
**guided** 30:4
83:21 124:8
187:7

**h**

**h** 319:3
**half** 214:6
**halfway** 16:6
**hand** 218:9
317:18
**handful** 52:5
**handled** 299:4
**handling** 275:3
**happen** 281:25
**happened** 88:6
214:15 216:10
216:20 239:12
**happening**
214:16
**happens**
225:22 310:21
311:8
**happy** 229:13
266:24
**harvey** 1:4
18:23
**hb** 1:7
**head** 11:13
17:3 24:17

26:6 27:15
105:19 159:12
206:25 209:20
262:19 294:5
315:2
**headline**
231:17,24
233:19
**headshakes**
11:13
**health** 16:13
20:18 21:14
24:8 211:20
**healthcare** 1:9
8:10 212:14
**hear** 138:9
**heard** 282:6
**heavily** 102:5
240:22
**hedge** 61:9
113:25 114:17
**held** 284:9
**help** 89:1 144:3
233:11 290:11
**helped** 299:12
**helpful** 54:17
273:14 287:5
**hereinafter** 9:4
**hereto** 320:7
**hereunto**
317:18
**hi** 8:14
**hicks** 34:4
37:14,24

**high** 41:12 51:8
54:23 56:10
57:8 60:10,11
73:25 80:9
81:4 87:22
114:18 118:19
118:23 119:15
126:21 127:2,8
132:6 139:1
154:10 155:12
156:20 157:25
171:15 175:19
203:3 204:19
235:8 236:21
236:23 237:9
244:7 250:16
**higher** 69:21,21
127:17,18
128:7,11 132:7
134:23 175:11
285:17
**highest** 119:15
**highly** 76:11
**hinged** 193:15
**historical** 55:11
150:3 202:23
204:22,23
205:5,22 206:6
206:13,16
227:1
**historically**
215:19
**history** 261:6
**hit** 110:12

**hold** 119:14
**holders** 113:15
113:20 115:2
**holding** 20:16
314:6
**holistic** 101:2
**holistically**
100:11,24
108:14 140:19
**home** 65:22
212:14,15
264:14
**horizon** 175:23
210:20
**hour** 36:11
37:15,16 99:14
142:15 194:7
254:18
**hourly** 38:7
**hours** 31:21
34:8,11 36:14
36:17 37:23,25
68:22
**huh** 103:11
187:17 240:11
242:17 311:5
**hypothesis**
224:18
**hypothetical**
29:16,25
105:14,24
109:14 226:5
242:10,23
244:4 304:13
304:15,18,20

**[hypothetical - include]**                                    Page 42

305:14
**hypothetically**
  108:23 158:24
  225:18 303:18

**i**

**iannece**  2:12
  3:5 8:14,15 9:7
  9:10 13:22
  14:11,14,16
  22:21 33:16
  48:22 49:2
  53:23 99:13,19
  142:14,22
  194:6,13 230:9
  254:17,24
  282:22 283:1
  298:5,9 307:17
  313:19,23
  315:24
**icing**  175:4
**idea**  85:17,17
  179:10
**identical**  35:19
  159:4 243:15
  243:18 256:25
  260:1
**identification**
  14:2
**identified**  48:20
  52:18 53:2
  59:5 147:24
  159:24 196:20
  197:18 233:19
  314:25 315:15

**identifies**  309:7
**identify**  8:13
  53:1 73:24
  95:22 158:20
  164:24 166:24
  168:14 196:4
  197:3,23 212:9
**identifying**
  148:3 159:21
  197:12
**identity**  244:13
**ignored**  64:22
**iii**  1:4,13 2:11
  185:21 186:11
  255:21 259:10
  260:25 263:19
  263:24 266:24
  276:6 279:9
**illustrate**  29:23
  60:5 85:2
**illustrates**
  108:8
**illustrating**
  29:12 108:7
**illustration**
  105:14 118:7
**illustrative**
  91:6
**imagine**  109:17
**immediately**
  57:18 68:15,15
  134:1 136:24
  161:13
**impact**  21:5
  38:22 40:16,18

40:23 41:1
  47:12 53:16
  54:14,25 55:14
  56:3,8 65:11,13
  68:17 73:12,18
  73:22 79:17
  80:11 88:19
  93:16 144:6
  193:20 197:14
  223:21 234:1
  248:6 253:8,14
  253:16,17,19
  253:21 271:5
  291:25 294:22
  298:12 299:20
  299:24 300:14
  305:13,18
  307:23 310:18
**impacted**  292:8
  295:21
**impactful**
  222:8
**impacts**  75:23
  78:22 225:12
  246:15,25
**implemented**
  286:10
**implementing**
  203:3
**implications**
  93:19
**implicitly**  86:21
**implied**  88:23
  301:19 312:14
  313:7

**implies**  81:8
  218:13
**imply**  116:14
  247:22
**importance**
  19:7 144:10
**important**  11:8
  54:8 57:6
  86:15 87:13,24
  88:2 108:8
  116:17 124:20
  135:18 140:16
  144:24 145:9
  169:22 170:7
  223:18 226:3
  226:14,21
  252:9,24 253:1
  265:9,10
**impossible**
  101:11 167:15
**impound**  68:17
**impounded**
  64:15 70:4
  79:17 86:23
  118:9 119:20
  243:5
**impounding**
  68:14 70:7
**inaccurate**
  238:23 247:22
**include**  20:11
  20:20 31:11
  80:15 168:2
  191:13 196:22
  228:11,25

232:14 239:4
310:1
**included** 42:15
150:22,23
151:3 152:12
174:6 191:22
212:19 265:8
303:2
**includes** 120:13
144:22 149:7
149:21 150:6
156:1 158:19
172:20 179:2
265:19
**including** 83:12
130:16 147:16
174:12 212:14
228:1
**inclusion**
198:22 245:20
**inclusive** 38:22
**inconclusive**
102:1
**incorporate**
54:2 86:9
182:5 207:1
210:20 303:10
**incorporated**
56:20 57:13
58:9,25 68:9
70:11 93:2
116:15 118:13
121:15 181:21
270:10

**incorporating**
120:23 210:7
**incorporation**
118:15
**incorrect** 137:4
247:21
**increase** 76:4
196:12,14
198:9,10
210:14 214:22
240:5 241:7,15
241:24 242:14
242:19 246:17
257:11
**increased** 244:9
**increases** 214:8
217:1
**incremental**
55:16
**index** 211:17
211:25 212:4,7
212:8,9,18
213:8 214:4
216:22 252:11
252:12
**indexes** 211:23
**indicate** 86:8
87:3 107:23
152:5 164:21
314:20
**indicated**
148:10 234:2
250:17
**indicates** 28:5
63:23 169:20

222:5
**indicative**
146:3
**indicia** 50:25
131:4 171:4
**individual**
17:12 37:13
57:6,8 60:11
67:22 68:6
79:19 89:20
92:5 98:1
110:8 142:9
191:9 278:19
**individually**
1:5 99:24
**individuals**
18:18 25:17
113:12 114:19
175:15 191:10
**induced** 56:21
**industries**
129:6
**industry** 63:12
80:7 149:8,23
151:1 211:10
211:19,21
212:7,9,10,18
213:8,10,20,25
215:4,21 216:3
216:11,16,21
216:22 217:20
218:3,14,21
223:9 226:24
252:12,20

**inefficiency**
116:10,24
135:7 136:8
155:7
**inefficient**
107:23 116:5
137:15 142:9
**infer** 312:14
**inferences**
251:13
**inflated** 81:16
81:16 86:17
89:5,23 90:15
90:15 239:20
257:21
**inflation** 22:8
40:21 44:18
77:13 90:10,13
90:21 91:11,13
91:18,25 92:1,6
92:7,9,13,16
226:16 228:4
237:5,11,15
239:25 254:15
257:7,8,11,19
269:9 270:10
270:24 272:13
273:20 274:8
274:10,12,18
274:19,20
275:1,1 279:11
279:15 284:2,3
284:14,16,18
286:25 287:8
287:13 288:12

288:24 289:11
292:21 293:5
293:11,20
294:18 295:13
296:25 297:1,2
297:23 300:5,8
302:12 303:6
303:12,13,17
303:21,23,24
304:4,6,8,11,17
304:22,25
306:7,20,24
307:5,9,20
308:5,11,21
309:8,12 312:2
312:7,7,14
313:18
**infor** 84:13
**information**
 13:15 19:7
 27:2,9 40:3
 48:20 51:12,13
 53:15 54:3,5,13
 54:19,24 55:7
 55:17,22 56:11
 56:13,19 57:3,7
 58:6,9,14,16,18
 58:19,21,24
 59:3,25 60:4,13
 60:18,23 61:2,4
 61:12,13,14
 62:12,25 64:8
 64:15 66:1,16
 67:24 68:2,9,18
 68:19 69:15,19

70:7,21 71:10
71:13,18,21,21
72:12,14,15,19
73:2,10,11,15
73:17,20,20
74:3,3,7,9,15
74:17,23,24
75:4,5,9,12,14
75:15,21,21
76:22,25 77:2
77:18,20 79:4
79:12 80:1,2,3
80:5,11,18 81:6
81:9 82:11,13
82:20 85:19
86:13,15,16,20
87:14,23 88:7
88:17 89:6,16
89:24 90:2
93:3,4,8,12,14
97:23 99:4
101:17 102:18
105:2 108:14
110:24 114:12
114:21,25
116:14 118:9
118:12,15,22
119:4,20 131:9
134:9,10,15,20
134:23 135:24
137:11,17,21
139:20 140:3,9
140:21 143:10
144:23 145:7
145:14,18

147:18 155:2
155:19 161:5,7
161:13,19,24
162:22 163:12
164:2,7,8,9
167:1 168:10
168:24 177:19
177:22 178:2
178:19 181:14
181:22 182:6
183:6,9,13,16
183:18,25
184:6,25 186:6
186:7 190:12
192:16,25
196:5,21
197:23 198:25
199:8 200:1
201:25 202:7
203:22,23
210:7 216:8
219:20 220:17
222:9 223:3,12
223:19,21
224:6 225:1,9
225:13,20,24
225:25 226:3
226:11,20
227:7,8,12,15
228:18,20,21
230:5,5,18,18
231:6 232:18
232:20,23
233:3,12,25
234:7,10,16

235:7,19 236:2
242:8,11 243:4
243:12,16,25
244:14,15
245:4,9,12,18
245:23 246:10
247:18,18
250:3,16 253:2
253:23,24
254:12 258:16
258:18 271:17
271:23 272:1
274:3,5,7,10,15
276:24 277:10
277:11 278:8
281:10,17,20
281:21 291:11
291:12,19,25
292:4,8,10,11
292:14 293:7
293:18 294:1
295:20 296:1
296:18 301:3
301:23 302:7
303:10 305:7
305:19,24
306:1 310:7,8
310:15,22,24
311:1,6,11,22
313:2,4,14
**informational**
 104:15 115:4
**informationally**
 54:1 82:19
 162:2 169:8,11

**[informationally - investor]** Page 45

171:9,16 182:4
182:9,15
**informative**
100:1
**informed** 72:7
144:4,13
169:12 194:17
195:5,11 297:8
**initial** 116:25
**initiate** 156:22
**inorganic**
186:14 189:12
189:14 196:17
233:15 235:13
238:10,14
264:20 268:20
**input** 286:23
**inputs** 23:6
311:19
**insider** 10:18
26:15 88:5
**insignificant**
223:23 224:10
224:24 225:23
251:19,24
**instance** 12:15
26:20 70:10
89:14 222:13
**instances** 18:4
52:17 65:8
91:15 92:4
233:17
**institute** 127:19
**institutional**
51:7 60:10

63:14 84:18
128:9 144:9,10
144:12 153:6
165:12 167:1
169:9 170:23
171:3 172:10
172:18 174:15
**institutions**
127:19 131:7
143:14 175:15
**instructed**
131:14
**instruction**
286:20
**instructs** 12:6
**integration**
65:20 76:8
**intend** 283:5
288:15 289:3
309:14
**intended**
104:15 135:20
138:2,3
**intent** 170:5
175:2,22 176:9
**intention** 285:3
**interacted**
145:21
**interacting**
166:25
**interactions**
143:21 144:2
144:13,14
153:3 154:1
165:10 168:22

174:13
**interchangea...**
182:19
**interconnected**
140:17
**interest** 38:1,4
102:16 105:4
126:22 127:8
131:23 132:8
154:10 155:13
186:22 187:20
313:8
**interested**
187:24 317:17
**interests** 127:2
**interface** 20:22
**interim** 15:5
**internal** 52:13
**internally**
189:10
**international**
63:24
**internet** 62:15
66:15 157:13
**interpret** 251:1
**interpretation**
71:13 251:7
252:7 286:5
**interpretations**
82:1,7 227:5
**interpreted**
108:6 198:7,14
198:18
**interpreting**
227:11

**interrupt**
191:23
**intertwined**
131:25
**intervening**
93:13
**introduce**
227:14
**introduced**
14:8
**introduces**
210:15
**invent** 85:16
**inverse** 217:20
**investext** 148:6
148:20
**investigate** 98:3
108:3 119:7
121:11
**investigated**
209:21
**investigation**
265:15
**investment**
61:8 117:5,9
188:23
**investor** 64:3
71:11 90:16
91:2,7 105:4
126:21 127:2,8
131:22,23
132:7,7 154:10
155:13 171:4
190:7

**[investor's - justify]**                                              Page 46

**investor's**
  156:4
**investors**  19:8
  55:6,7,17 56:13
  57:19 59:14
  63:13,14 64:22
  81:14 84:8,13
  84:18 87:23
  88:1 102:16
  112:11 123:11
  131:2,9 137:17
  143:13,14
  144:3,5,9,10,12
  144:24 145:7,9
  153:6 155:18
  156:9,12,19,24
  157:2,6,14,18
  161:18 165:12
  167:1 168:23
  169:9 170:23
  171:3,23
  172:10,18
  177:19,19
  178:1,19 184:1
  185:18,25
  186:7,12,23
  187:7,11,14,20
  187:24 188:1,7
  189:16 194:17
  195:5,11,24
  196:7 198:7,14
  198:18 222:9
  226:15 235:13
  235:14,19
  236:24 239:2

  248:3,9 264:19
  265:2,6,8,12,24
  266:12 274:21
  285:7
**involve**  17:8,9
  17:9,11 24:3,23
  25:23 113:7
  296:8,11,12
**involved**  26:2
  26:11 191:1
  203:16 265:13
  310:20
**involvement**
  193:15
**involves**  17:14
  24:11,19
  125:22 293:24
**involving**  10:17
  10:19 16:18,20
  16:22,24 18:14
  20:13,14,15,16
  20:17,17,18
  21:13 27:2
  28:1 265:13
  294:12
**ipo**  205:20,23
**ipos**  117:4
  120:7
**isolate**  101:12
  166:18
**isolated**  65:12
**issue**  44:1
  223:13 307:15
  307:16,17

**issued**  25:24
  52:22 125:2
  143:5,7,18
  146:20 147:10
  147:15,25
  154:21 167:10
  236:12,15
**issuer**  21:24
**issuer's**  20:2
  21:6 300:15,22
**issues**  10:16,20
  34:17,19,23
  123:9 150:10
  150:15 158:18
  210:16 242:11
  255:10 268:21
**issuing**  18:9
  24:19 25:5
  52:12

**j**

**j**  1:11 2:9
**james**  34:4
  37:14
**january**  96:6
  96:10,11 214:7
**japan**  64:1,12
**japanese**  64:3,6
**jason**  1:10 2:9
**jehoshaphat**
  236:9,16
  239:13 241:3
  266:9 268:5
  307:24
**joe**  2:24 31:12

**joined**  8:16
**jones**  58:4
  59:13 60:25
  156:2
**joseph**  2:3 8:25
**joshua**  1:11
  2:10
**journal**  15:15
  58:1 59:12,18
  65:24 66:4
  156:3
**journals**  83:13
**jtull**  2:7
**judge**  1:4 26:18
**judgment**
  108:9
**july**  14:21 15:4
  15:8 16:8,14
  20:20 24:14
  38:21 42:22,24
  43:21,23 47:3,4
  148:12 201:15
  218:18 236:10
  247:9 251:18
  251:24 252:3
  266:9 317:25
**jump**  123:18
  190:23 191:12
**jumping**  170:1
**june**  33:2 49:4
  49:9 214:7
**justify**  123:22
  123:24

**[k - lavelle]**                                                Page 47

| k | | | |
|---|---|---|---|
| **k** | | | |

**k** 57:15,16 177:15,16 212:16

**keep** 135:18 205:17 210:1 246:2

**keeping** 17:4

**kevin** 2:2 8:23 31:11 318:1

**key** 189:18 190:16

**kind** 59:21 71:17 96:22 101:8 127:3 147:21 171:17 172:3 185:19 189:8 285:8 291:7 299:12 301:5,6 304:24

**kinds** 19:13

**klavelle** 2:6 318:2

**know** 11:8,25 12:12 17:10,11 19:19 21:10 24:10 25:11,20 33:7 40:11 44:16,22 48:11 49:5 52:19 62:11 66:18,18 71:8,17 84:17 85:17 96:8 99:8 103:9,17 104:20 105:3

105:18 107:3 110:9 111:4,23 114:11 115:12 116:6 117:13 127:22 133:22 136:8,20 139:1 146:17 147:17 149:2 150:9,11 155:4 158:10 158:10,22 160:15,20 163:21 164:25 167:7,21 168:1 173:8 174:20 178:21 179:6 180:25 186:15 191:9 195:21 195:21 200:4 200:22 205:25 209:19 216:16 218:17 222:7,8 239:6,11 240:24 244:17 244:23 247:22 252:7,24 253:4 253:15,15 264:3,8 273:13 277:6,15 280:20 283:10 287:10,14 288:14 289:3,4 291:6 300:2 305:20 309:14 309:22 310:10 311:10,16

315:21

**knowing** 146:24 219:14 289:14

**knowledge** 83:2 87:4,8 146:5 176:22 179:8 180:9,20 181:1 198:4 276:2

**known** 8:9 18:19 25:17 245:3

**knows** 56:4 78:4 184:16

**kramer** 2:18 8:20

**kramerlevin....** 2:20

**kristin** 1:23 317:7,24

**krogman** 29:18 35:4 48:10 82:4 83:23 84:1,5,17 101:6 103:4 106:10 107:6 120:11 131:13

**ks** 160:21

| l | | | |
|---|---|---|---|

**lack** 77:17 206:16 225:16 226:12

**laid** 84:23 101:4 235:24

**language** 35:12 35:15,19,25 36:1 65:9 258:25,25

**large** 76:9 78:23 114:25 127:23 129:5 139:19 140:12 144:5 169:6 170:12 196:15 220:12 221:22 224:1,7 226:25 241:15,17 246:8,16,17 248:15,16 265:13

**largely** 247:19 248:1,1

**larger** 14:6 60:24 68:3 92:8 134:17 140:9,9 196:16 219:23 223:5 248:13

**lasted** 31:20

**late** 16:8 49:9 66:20 265:20

**lavelle** 2:2 3:14 3:14,15,15,16 3:16,17,17,18 3:18,19,19,20 3:20,21,21,22 3:22,23,23,24 3:24,25 4:1,1,2 4:2,3,3,4,4,5,5

**[lavelle - lawyer]**                                                    Page 48

| | | | |
|---|---|---|---|
| 4:6,6,7,7,8,8,9 | 23:12,20 25:1 | 141:6,21 | 260:17 261:7 |
| 4:9,10,10,11,11 | 31:11 32:6 | 142:17 147:5 | 262:2,18 |
| 4:12,12,13,13 | 34:20 35:21 | 148:15 150:5 | 263:12 264:11 |
| 4:14,14,15,15 | 36:20 38:3 | 150:19 151:7 | 266:21 267:3,9 |
| 4:16,16,17,17 | 39:18 40:10 | 152:20 154:23 | 267:25 268:11 |
| 4:18,18,19,19 | 41:7 42:4 46:4 | 155:8 156:11 | 268:22 269:19 |
| 4:20,20,21,21 | 46:19 48:1 | 157:17 158:8 | 270:18 271:13 |
| 4:22,22,23,23 | 49:22 50:13 | 160:4 162:9 | 272:20 273:9 |
| 4:24,24,25 5:1 | 52:20 53:3,17 | 163:14 164:4 | 275:10 276:13 |
| 5:1,2,2,3,3,4,4 | 58:11 62:2 | 165:3,15,22 | 277:20 279:25 |
| 5:5,5,6,6,7,7,8 | 64:23 66:17 | 166:21 167:25 | 280:8 281:18 |
| 5:8,9,9,10,10 | 67:9,19 69:13 | 168:7,18 | 283:7,21 |
| 5:11,11,12,12 | 70:5,12,23 | 171:10 172:13 | 285:22 286:3 |
| 5:13,13,14,14 | 72:16 75:6 | 176:5 178:9 | 287:1 288:16 |
| 5:15,15,16,16 | 77:3 86:2 87:6 | 179:19 180:17 | 289:6,23 |
| 5:17,17,18,18 | 89:8,17 90:11 | 180:23 181:6 | 292:19 295:10 |
| 5:19,19,20,20 | 91:9,20 92:17 | 183:10 187:21 | 296:2 297:14 |
| 5:21,21,22,22 | 93:6 94:17,24 | 189:20 191:23 | 302:18 304:9 |
| 5:23,23,24,24 | 98:18 102:10 | 194:9 195:7 | 304:23 306:9 |
| 5:25 6:1,1,2,2,3 | 103:2,12 | 197:20 200:20 | 307:7,19 |
| 6:3,4,4,5,5,6,6 | 104:17 106:5 | 201:5 202:13 | 308:16 309:16 |
| 6:7,7,8,8,9,9,10 | 106:15 107:13 | 203:12 206:21 | 310:23 311:9 |
| 6:10,11,11,12 | 109:11 110:6 | 209:4 215:25 | 314:19 315:16 |
| 6:12,13,13,14 | 110:14,20 | 217:5 222:15 | 316:5 318:1 |
| 6:14,15,15,16 | 111:2,10 | 223:14 224:13 | **law** 9:11 15:15 |
| 6:16,17,17,18 | 113:17 114:7 | 225:3 226:1 | 15:19,19,22 |
| 6:18,19,19,20 | 115:6 117:21 | 229:5 230:8,14 | 28:6 29:5,7,20 |
| 6:20,21,21,22 | 118:6 119:11 | 230:23 231:11 | 30:8 49:24 |
| 6:22,23,23,24 | 119:17 121:5,8 | 235:2 237:8 | 82:9 83:3,20 |
| 6:24,25 7:1,1,2 | 121:21 122:12 | 239:9,23 241:9 | 87:5,9 94:15 |
| 7:2,3,3,4,4,5,5 | 124:17 126:16 | 242:21 244:11 | 106:18 111:19 |
| 7:6,6,7,7,8,8,9 | 128:4,15,25 | 245:15 247:13 | 112:2 |
| 7:9,10,10,11,11 | 130:3,13 135:4 | 252:5 254:5,20 | **lawful** 9:2 |
| 7:12,12,13,13 | 135:16 137:3 | 255:11 258:6 | **lawyer** 83:20 |
| 7:14 8:22,23 | 139:13 140:23 | 259:4,19 | 281:2 |

**[laying - little]**                                                    Page 49

laying  200:23
lead  2:2 8:24
  9:19,24 33:13
  38:18 43:8
  94:15,20
  102:25 255:19
  261:5 263:9
  269:16
leadership
  191:4 265:9
leading  125:5
  264:24 265:14
learn  185:3
  285:7
learned  266:4
leave  193:18
  235:17 265:17
  266:3
lectures  28:18
  28:23 29:1
led  168:11
left  133:13
  218:9
legal  28:1 30:16
  44:24 81:25
  82:1,7,7 94:6,7
  94:19 100:16
  103:21 123:14
  124:1,9 178:24
  179:5,6,12,20
  180:11 253:16
  253:18 267:15
  268:1,6,8,23
  269:22 271:2,4
  286:4,5,15,17

318:23
length  207:6,17
  208:14
lengthy  137:5
  236:21
level  41:13 53:1
  54:23 56:10
  57:9 69:21
  73:25 80:3,9
  81:4 87:22
  112:10 139:2
  157:25 171:15
  175:19 203:3
  204:20 220:12
  220:25 221:14
  221:22 222:4,6
  222:10,11,14
  222:20 235:8
  236:21 237:9
  249:21,23,25
  250:16 251:6
  251:19
levels  71:15
levin  2:18 8:20
liability  41:12
  201:12 255:19
  258:12 260:23
  260:25 263:10
  263:18,21
  264:10 265:19
  266:16,23
  267:6,17,20,22
  268:8,10,18,19
  269:3,3,5,18
  270:17 276:5,9

285:21 289:9
  306:6
libbares  2:24
liberty  53:11
licenses  30:24
light  233:25
likely  28:25
  33:8 74:4
  109:20 147:19
  148:17 167:14
  209:13 245:22
  250:2 297:22
limited  62:18
  69:16 160:19
  166:19
line  3:4 48:12
  96:23 100:17
  103:22 104:1
  105:12 110:17
  110:22 111:20
  125:16 212:8
  213:2,7 230:6
  230:19 247:19
  248:1,7 319:4,7
  319:10,13,16
  319:19
lines  160:15,16
  212:17 213:11
  213:12 236:6
  238:25 300:19
link  156:16
liquid  170:20
liquidity  77:19
  169:11 170:25
  172:19 173:23

list  20:6 96:21
  149:6,20
  153:25 154:5
  174:5 180:3
  227:14
listed  15:18
  16:13 28:12
  51:15 112:16
  112:22 149:24
  151:13 152:6
  152:10 154:10
  175:10 185:23
  196:24 197:16
  315:18
listing  64:11
  65:3 67:8
  112:23 170:4
  175:3,22
  176:10 200:22
  205:22
listings  66:5
lists  174:7
literature  19:9
  19:17 66:10
  96:4,4,23
  115:15,21
  116:18,23
  117:3,14,19,24
  172:5,16
  182:20
litigation  16:7
  28:17 29:6
  34:17
little  27:6 31:2
  51:8 53:18

**[little - lot]** Page 50

59:8 60:22
61:18 95:4
99:14 105:1
133:12 136:2
137:14,21
140:3 169:17
194:7 210:2
212:2 214:24
215:6 218:7,12
218:20 230:5
230:18 232:19
247:18 248:21
282:4
**llc** 37:1,8,11
**llp** 2:4,13,18
**load** 14:6
**local** 64:2,5
65:10
**locations** 13:2
**locked** 113:15
113:21 114:1,3
115:14 117:1
117:20 120:3
120:14,16
**lockup** 113:7,9
113:20,22
114:5 119:24
121:2,12
**lockups** 113:13
115:1,3 120:7
120:18,19
121:10
**logic** 182:3
**long** 31:19
98:22 211:13

216:15 272:10
**longer** 14:6
68:20 173:10
173:17 177:9
177:18,20,24
207:23 210:18
210:18,19
252:21,22
**look** 16:12
21:12 24:8,15
53:25 55:4
58:13 62:5,11
62:17,20,24
70:6 71:8
74:16 88:6,12
88:22,23 89:19
97:19 100:11
100:11 102:6
108:13 112:14
119:9,23
120:10 127:14
140:1,18
153:14 155:4
159:14 163:12
163:15 164:1
179:15 180:6
184:18,24
210:6 214:1,2
217:9 233:2
239:4 245:8,17
245:18 246:6
249:14,15
251:1,2,4 252:9
254:9 256:24
273:24 274:24

276:20,21
287:15 290:16
291:10,11
302:8,16,19
305:2 310:6,7
310:11 313:13
**lookback**
284:21,24
285:10,16
286:2,6,21
**looked** 50:15
69:10 104:10
121:20 136:18
150:20 179:21
181:13 186:23
187:3 198:1
273:3 279:8
**looking** 16:3
20:6 33:19
50:24 55:11
59:11 66:7
69:17,24 77:9
79:7 85:18
87:15 89:2
100:23,23
101:5,6,21
102:12 110:8
110:12 118:5
118:23 119:16
129:9 131:4
135:25 136:5
143:16 164:6,9
167:17 170:8
183:18 185:15
196:8 197:13

204:20 216:22
225:20 241:2
253:20 277:5
277:24 282:9
300:5
**looks** 65:25
66:5 85:5
93:11,11 96:5
96:16 125:24
125:25 143:2,4
209:25 214:1
214:15 218:7
**lorain** 1:24 8:1
**lose** 114:22
252:21
**loss** 10:16 22:7
23:7 40:1,21
41:2 44:17
77:7 88:11
190:9 199:5,11
199:15 254:6,8
256:13 261:23
269:8 271:14
271:16 273:22
274:13,15
275:4 287:9,24
288:1,4,11,19
288:21 291:9
298:3 303:5
306:15,22
307:12 308:3
309:17 313:15
**losses** 42:8
**lot** 35:7,12 48:6
61:8,14 73:16

**[lot - market]**                                                    Page 51

76:18 96:2
143:19 144:4
145:11 160:3
171:12 188:7
215:12,13
218:8 226:5
227:2 228:20
228:21 229:25
240:11 242:22
242:24 243:21
243:24 244:3
245:7 248:3
296:15
**lower**  127:18
128:8 134:21
143:19 148:18
153:19 167:3
167:17 194:1
250:1,5 266:11
**lowers**  75:18
**luke**  1:10 2:17
8:20 190:5
234:23 307:15
307:17,22
**lyft**  16:22

**m**

**m&a**  134:17
187:2 192:13
192:14 195:16
227:19 246:16
246:21 248:16
**macro**  74:13
80:2,5
**made**  21:11,13
39:23 49:11

57:19 71:1,4
79:8 81:18
86:24 92:6
176:22,25
228:8,17 229:4
229:18 233:18
236:25 249:8
257:15 291:17
303:22 304:3
308:25 320:5
**madeleine**  2:23
8:17 13:22
**magnitude**
202:9 223:4,25
226:25 306:2
**mailed**  188:7
**main**  9:17
313:10
**maintain**  228:4
**maintaining**
226:15
**maintenance**
257:8
**major**  57:25
61:24 163:19
**majority**  17:23
18:1 104:5
105:7,10,16,17
105:22 230:4
247:17
**make**  47:24
108:4,5 151:10
177:14 185:1
210:13 254:1
293:17 306:15

313:16
**maker**  170:7
173:14,18,19
**makers**  114:20
114:21 122:19
169:2,7,10,21
169:22 170:6
171:9 172:12
172:23 173:2,3
173:9 174:17
174:21,24
175:5,9 176:11
**making**  94:5
103:10 110:13
114:22 170:15
170:21 234:9
236:1
**management**
153:4 166:25
189:19 190:17
190:21 247:20
**mandalevy**
16:10
**manner**  176:23
201:11 260:22
307:1
**march**  317:19
318:3
**marjorie**  2:17
8:19
**mark**  13:23
**marked**  3:10
14:1,5
**market**  3:11
10:15 13:18,25

16:16,19,23
20:2,4 22:2
29:16 30:1
34:22 35:9,14
35:16,24 38:19
42:20 45:7,25
46:16 47:1,10
47:22,25 48:5
48:18 49:21,23
50:9,16,20,25
51:14 54:1,7
55:23 56:18
58:10,23 62:21
65:20,20 68:10
69:23 72:13
75:3 76:25,25
80:6,16 81:1,3
81:21 82:18
83:2,4,17 86:11
86:12,12,14,21
87:4,8,10 92:22
92:24 94:13,16
95:3,16 97:1,5
97:16,20 98:3
98:13,16 99:1,7
99:23,25 100:2
100:4,10 101:1
101:16 102:11
103:19,25
104:1,5,7,11,24
105:7,9,21,24
106:8,14,25
107:11,16,23
108:12 109:1,5
109:16,24

**[market - mean]** Page 52

| | | | |
|---|---|---|---|
| 110:1 114:14 | 174:17,21,24 | 173:15 174:14 | **mcgee** 1:10 |
| 114:20,21,22 | 175:5,9 176:11 | 174:16 175:7 | 2:17 8:21 |
| 115:17,19 | 178:8,16 182:4 | 176:7 | 190:5 191:1 |
| 116:1,5,19,23 | 182:10,12,15 | **marketwatch** | 193:17 234:23 |
| 118:1,4 119:2,9 | 182:16,20,22 | 156:4 | 235:15,16 |
| 120:4,11,23 | 182:25 183:4,5 | **matched** | 238:11 264:15 |
| 122:19,20,22 | 183:12 198:6 | 297:12,16 | 265:9,16 266:3 |
| 123:10,23 | 198:14 199:4 | **material** 73:12 | 267:22 268:3 |
| 125:18,21 | 207:20 211:10 | 80:18 82:11 | 268:20 307:15 |
| 126:23 127:9 | 211:16,25 | 179:25 232:23 | 307:17,22 |
| 127:17 128:7 | 212:4 213:19 | 289:21 290:6 | 308:11 |
| 129:2,14,17,20 | 213:25 214:4 | **materials** 32:22 | **mcgee's** 193:15 |
| 129:23 130:25 | 214:11 215:1,5 | 315:14 | 229:3 237:24 |
| 131:1,4,12,18 | 215:11,16,20 | **matt** 53:4 | 239:6,22 |
| 131:20,21 | 216:3,11,16,21 | **matter** 9:13 | **mean** 25:2,6 |
| 132:3,10,12,18 | 216:23 218:2 | 10:13 32:25 | 37:6 44:2 48:2 |
| 134:25 136:8 | 218:14,20 | 33:14 36:5,12 | 50:19 58:16 |
| 137:1 138:18 | 223:9 226:24 | 36:15,25 37:24 | 59:1 70:13 |
| 139:3,12 | 234:1 240:6 | 38:2,5 39:1 | 74:18 77:15 |
| 140:13 141:4 | 243:9 247:20 | 60:22 63:17,20 | 87:13 93:1 |
| 141:19 142:2 | 248:24 252:11 | 68:21 116:6 | 100:7 101:2 |
| 143:23,25 | 252:20 253:10 | 121:1 123:15 | 103:19 104:23 |
| 144:11 146:3 | 276:7 305:11 | 176:25 185:4 | 104:24 105:10 |
| 147:2,13,20 | 313:8 | 199:7,25 201:3 | 110:3 128:17 |
| 153:8,13 155:7 | **market's** | 237:4 244:5 | 135:5 136:25 |
| 155:16 162:2 | 239:21 | 254:3 255:3 | 137:15,16 |
| 162:15,24 | **marketplace** | 286:25 | 139:11 141:18 |
| 163:8 167:18 | 71:12 143:13 | **mattered** 197:8 | 142:8 173:3 |
| 169:1,7,10,21 | 171:25 217:21 | **matters** 37:20 | 181:19 182:10 |
| 169:22,24 | 242:9 271:25 | 244:12 | 183:11,19 |
| 170:6,7,15,21 | **markets** 51:16 | **matthew** 1:16 | 191:16 205:8 |
| 171:5,9 172:11 | 63:24 65:14 | 3:3 8:11 9:2,6 | 210:14 215:24 |
| 172:23 173:2,3 | 67:8 83:10,17 | 9:16 317:8 | 217:25 219:10 |
| 173:9,14,15,18 | 93:23 95:21,23 | 318:5 319:2,24 | 220:3,9 222:7 |
| 173:19,23 | 170:20 172:20 | 320:2,4,12 | 222:24 223:22 |

**[mean - metric]** Page 53

224:11,19
226:13 230:15
231:12 232:6
240:9 242:5
257:4,5,23
262:25 263:11
279:23 283:9
283:14 290:14
297:15 299:24
304:10 306:10
310:24
**meaning** 56:18
73:9 183:5
217:1 297:17
300:1 301:8
**meaningful**
79:24
**means** 13:11
40:23 50:22
59:15 63:25
82:18 93:7
97:22 100:8
156:13,24
170:1,10
178:18 217:16
222:5 223:1,24
224:14,21
244:20 296:23
**meant** 45:2
138:6 139:5,7
**measure**
101:18,21
122:10,14
124:16 152:17
165:9 219:6

289:18 290:3
290:18,19
**measured**
123:20 125:9
133:9
**measures**
290:13
**measuring**
220:2
**mechanics** 29:7
**mechanism**
64:15
**medical** 212:15
264:14
**meet** 31:4
177:5 222:10
228:12
**meetings** 31:20
**member** 90:6
283:25 292:25
307:2
**member's**
56:24 312:15
**members** 34:3
255:18 258:11
262:24 263:3
269:16 270:15
289:17
**memorandum**
52:13
**memorized**
138:24 229:13
229:25 230:1
**memory** 294:25

**mention** 20:22
156:5,7 315:20
**mentioned**
20:19 22:3
24:13 29:1
37:13 163:22
200:4 209:12
296:19 301:13
314:16
**mentioning**
161:8
**merely** 73:7
222:9 228:3
**merger** 10:19
76:1 88:8
112:25 116:25
119:25 120:5
134:2 165:2
179:4 185:19
187:2,4 206:1
**mergers** 27:2
241:25 248:3
**merit** 22:16,22
**merits** 10:16
22:6,25 30:2
199:6,18,21
261:23 270:6
271:16 273:15
294:3,11
296:16 308:18
**messaging**
13:11
**met** 178:17
180:10 198:4
245:19

**method** 35:10
91:23 159:2
256:16 274:25
283:3 288:25
303:11,17
307:3
**methodologies**
280:11 281:7
282:15 309:10
311:7 312:13
312:18
**methodology**
21:25 39:4
47:19 106:1,9
107:2,4 204:11
207:10 255:5
255:17 256:19
257:1 258:11
259:12,22,24
259:25 261:15
262:23 263:14
269:15 270:15
272:16 275:6
278:12,15,22
279:4,20 280:7
280:14,15,16
280:23 281:14
282:13,18
283:3 296:20
297:11 304:7
306:16 307:4
310:14
**methods** 309:7
**metric** 125:17

**[metrics - morning]** Page 54

| | | | |
|---|---|---|---|
| **metrics** 122:23 123:2 125:11 153:22 303:1 | 200:15 238:23 265:6 | 256:1,7 257:14 267:7 268:10 268:14 269:6 | 225:20 |
| **middle** 48:11 244:18 | **misled** 265:5 | 269:10 270:2,5 270:9 271:1,12 | **model** 204:12 207:2 211:7,15 252:10 254:3,4 301:14 305:22 312:19,20,23 313:1 |
| **midway** 294:12 | **mispricings** 172:2 | 271:20 272:2 | |
| **milestones** 184:18 | **misrepresent...** 56:22 86:22 289:22 290:7 | 272:18 273:3,6 273:18,25 275:17 276:17 276:20 279:16 | **modeling** 281:4 303:11 313:17 |
| **million** 180:6 186:16,16 187:8 | **misrepresented** 271:24 | 279:19 294:8 294:10,19,21 | **models** 188:25 288:3 301:13 312:22,23 |
| **milliseconds** 116:7 118:8 | **missed** 171:24 **misses** 140:11 | 294:24 297:4 297:13,18 | **modest** 140:6 |
| **mind** 11:2 20:24 44:24 52:6 135:18 206:24 209:23 229:21 253:18 299:10 313:10 315:23 | **missing** 15:6 **misstated** 305:8 **misstatement** 24:23 43:12 200:8,23 226:9 226:14 228:3,7 229:3,16 287:20 292:5 303:25 304:3 308:25 | 298:12 299:21 300:14,24 307:6 309:3 310:9 311:23 | **modify** 315:11 **moment** 232:5 **momentum** 96:14 97:21 **money** 112:10 114:22 |
| **minimum** 110:13 111:1,9 111:23 112:1 | | **misstates** 50:13 119:12 121:6 121:22 130:14 139:14 140:24 141:7 151:7 165:23 166:22 181:7 201:5 230:23 241:10 259:5,19 260:18 270:19 272:21 273:9 277:20 289:7 295:11 | **month** 15:21 96:9,11 134:3 137:2 147:16 205:3,4 210:2 |
| **minor** 73:17 **minute** 282:21 **minutes** 31:23 60:16,22 68:22 114:16 116:7 118:2,8 | **misstatements** 21:5 38:23 40:8,19 41:6,15 42:3 45:14 47:13 81:17 82:24 88:16 90:18 191:17 199:7,25 200:14,18 201:3,20 227:24 228:16 228:25 232:25 237:6 254:10 | | **months** 17:5 116:24 119:24 134:1 135:11 136:24 137:20 140:22 142:12 152:2 165:1,14 168:17 176:13 176:15 179:2 180:13 204:14 208:21 215:7 |
| **misconduct** 24:24 25:7 229:4 | | **misunderstood** 298:17 | |
| **misleading** 86:16,19 89:6 89:16,24 | | **mix** 75:13,20 76:24 225:12 | **morning** 8:22 9:8,9 200:4 |

225:5
**motion** 27:14
  32:14,19 33:13
  310:2 315:17
**motivated**
  171:23
**motivation**
  81:20
**move** 99:3
  111:13 141:9
  202:19,21
  213:15 216:15
  227:4,9 291:5
  291:16
**moved** 219:22
  223:3 253:25
**movement**
  77:17 204:4
  219:3,23
  222:25 223:6
  223:11,23,25
  224:4,11,11,18
  224:19,21,25
  225:11,17,23
  226:9,13,23,25
  230:13,22
  291:23
**movements**
  190:12 202:24
  205:6 224:23
  248:21 250:14
**moves** 54:5
  219:17,21
**moving** 161:11
  181:12 215:1,3

216:24 217:16
  217:19 218:15
  218:19
**mrk** 84:3,11
  122:5,9 123:3,5
  126:11,13,14
  126:20 127:1,6
  127:11 128:19
  128:20,22
  129:2,10,16,25
  130:12,16
  131:15,17
  146:11 154:9
  154:14,21
  155:6 161:1
  171:1 172:20
  181:10,17,20
**msheldon** 2:20
**mullen** 1:11
  2:10
**multiple** 111:5
  111:18 160:12
  237:12 269:3
  283:19 291:18
  308:19 309:3,4
**multiples** 88:24
  296:11
**mylan** 294:4
  295:3

---

**n**

**n** 3:1
**naftalis** 2:18
**name** 8:11 9:10
  9:14 34:3 37:9
  53:11 231:18

**named** 37:9,14
  149:24 317:8
**narrative** 41:14
  256:6 275:15
**narrow** 27:7
  193:3,4
**narrowly** 79:6
  203:24
**nasdaq** 93:25
  94:11 95:6,14
  170:4,13,20
  171:15 264:16
**national** 51:5
  57:14 169:25
  170:12 175:3
**nature** 51:17
  55:2 66:23
  71:12 84:21
  88:25 120:19
  150:13 160:17
  160:22 183:24
  184:20 185:12
  203:22 271:21
  310:12
**near** 159:5
  266:20
**nearly** 236:23
**necessarily**
  60:2 73:6
  114:8 115:8
  158:11 228:5
  253:3 260:5
**necessary** 89:1
  152:13 170:14
  185:5 207:1,18

239:16 261:10
  272:9 291:24
  310:21 311:7
  311:16 320:6
**need** 12:25 14:4
  59:7 61:24
  62:5,10 103:7,8
  110:1 135:1,13
  175:18 230:2
  271:10 286:13
  296:17 313:2,4
**needed** 100:14
  100:20 204:2
**needs** 138:20
  263:8 310:15
**negative** 75:13
  75:20 76:24
  114:11,12
  215:6,14
  219:24 220:15
  223:4 225:13
  225:20 240:4,9
  240:18,23
  241:5,6,21,22
  242:3,13 244:6
  244:8 248:16
  266:13
**net** 60:10,11
  90:22 92:9,10
**neutral** 240:18
**never** 22:23
  282:2 295:6,7
**new** 2:14,14,19
  2:19 15:13
  51:13 54:3,5

**[new - numbers]**                                                    Page 56

55:6,16,21
56:12 58:2
59:12,19 60:13
60:17 61:2
68:17 69:18
70:6,21 71:21
72:15,19 73:2,3
73:3,15 75:3,12
80:10 85:19
93:24 94:11
95:14 114:12
114:21,25
118:22 119:4
131:9 134:9,10
134:19 135:24
137:11,17,21
139:20 140:3
147:17 156:17
158:12,18
160:15,15
170:13 181:21
182:6 183:8,15
183:17,18,25
184:5,13,24
186:6 190:12
192:25 196:6
198:25 216:8
219:20 220:10
220:16 223:11
223:21 225:1
225:24 230:5
230:18 232:19
242:4,7 243:16
245:4,23
247:18 272:1

290:10 315:3
**newly** 205:19
**news** 51:11
54:11 57:23,24
57:25 58:3,4
59:10,11,12,13
59:22 60:19,24
61:7,12,24
62:21 63:25
64:2,5,22 65:9
65:11 67:7
68:3,6 70:11
72:22 73:3,7
74:14 78:4,5,8
78:12,20
113:14 117:11
155:25 156:2
157:2,2,4,13,15
157:21 160:6
161:24 163:6
163:17,19
185:7 192:25
194:16 195:4
195:11 196:5,9
196:20,23
197:1,1,4,9,11
197:15,24
208:11 219:20
220:10 228:11
240:15 243:6
243:13,15,18
250:12 272:6
293:15 310:11
311:17

**newspaper**
65:10
**newswires**
156:2,3
**nice** 184:5
**nine** 168:16
**nods** 11:13
**non** 64:21 67:6
70:10
**nondisclosure**
53:13
**nonfraud**
239:20
**nonpublic** 27:9
168:5
**nonrandom**
220:18
**normal** 205:1
207:16
**normally** 220:8
**north** 9:17
**notary** 317:7
317:24 320:13
320:19
**note** 14:3 54:8
112:3 146:10
147:24 178:3
232:7 318:10
**noted** 150:21
320:7
**notification**
177:16,17
**november**
38:21 42:22,23
43:14,15 44:6,8

44:12,13,15,22
45:2,3 47:2,3
148:11 214:18
215:2 264:16
**nt** 177:16,17
**nuance** 179:6
**nuanced** 203:2
**nuances** 58:13
240:19 245:7
**null** 224:17
**number** 20:5
23:24 26:16
49:24 64:4,5
103:8 111:16
114:15 115:2
119:5,19
122:25 130:10
139:16 141:12
142:3 143:7,16
143:17 146:19
147:7,8 150:18
150:22,23
154:13,20
159:10 160:6
160:23 161:22
166:8,14 174:2
174:8,18
175:18 203:2
217:7 238:15
249:16 251:10
252:9,14 263:5
278:10 293:1
302:22
**numbers** 36:23
111:22 126:10

## [numerous - occurred]

**numerous**
95:20 161:12
**ny** 318:15
**nyse** 170:3,19
171:15

**o**

**oath** 11:5
**object** 12:5
23:12,20 25:1
32:6 34:20
35:21 39:18
40:10 41:7
42:4 48:1
52:20 53:17
58:11 62:2
64:23 66:17
67:9,19 69:13
70:5,12,23
72:16 75:6
77:3 103:2,12
110:20 122:12
147:5 154:23
189:20 195:7
197:20 200:20
201:5 202:13
206:21 209:4
215:25 217:5
222:15 223:14
224:13 225:3
226:1 229:5
230:14 231:11
235:2 237:8
239:9,23 241:9
247:13 252:5
254:5 255:11

258:6 259:4
261:7 262:2,18
263:12 264:11
266:21 267:3,9
267:25 268:11
268:22 269:19
270:18 271:13
272:20 275:10
276:13 277:20
279:25 280:8
283:7 285:22
288:16 289:23
302:18 304:9
306:9
**objection** 12:8
36:20 38:3
46:4,19 49:22
50:13 53:3
86:2 87:6 89:8
89:17 90:11
91:9,20 92:17
93:6 94:17,24
98:18 102:10
104:17 106:5
106:15 107:13
109:11 110:6
110:14 111:2
111:10 113:17
115:6 117:21
118:6 119:11
119:17 121:5
121:21 124:17
126:16 128:4
128:15,25
130:3,13 135:4

135:16 137:3
139:13 140:23
141:6 148:15
150:5,19 151:7
152:20 155:8
156:11 157:17
158:8 160:4
162:9 163:14
164:4 165:3,15
165:22 166:21
167:25 168:7
168:18 171:10
172:13 176:5
178:9 179:19
180:17,23
181:6 183:10
187:21 203:12
230:23 242:21
244:11 245:15
259:19 260:17
273:9 281:18
283:21 286:3
287:1 289:6
292:19 295:10
296:2 297:14
304:23 307:7
307:19 308:16
309:16 310:23
311:9 314:19
315:16
**objections** 3:13
114:7 141:22
**objective** 63:5
63:8 101:18,20
102:1 106:6,9

106:12 107:5
108:15 129:14
184:5 192:2,6
192:22 193:4
196:4,19 197:7
197:12 198:3
228:13 233:14
235:10,23
238:5,18 239:3
245:21 246:3
276:11 277:18
277:23 278:3,6
**objectively**
277:24
**obscure** 191:8
**observable**
143:22 144:16
144:19
**observe** 54:9
75:24 217:3
219:24 228:6
248:23
**observed** 96:25
98:14 137:22
220:19 302:24
302:25
**obvious** 209:15
**obviously** 32:8
96:21 175:10
224:18 232:22
291:6 314:7
**occasions**
238:16
**occurred** 15:5
25:7 43:20

**[occurred - opinions]**                                          Page 58

| | | | |
|---|---|---|---|
| 286:7 | 264:5,12 290:8 | 306:22 | 42:7,10 47:22 |
| **occurring** | **omission** 43:12 | **ones** 20:23 24:5 | 48:18 59:25 |
| 43:12 261:17 | 200:8,23 226:8 | 26:5,7 | 64:21 67:6,10 |
| **occurs** 68:21 | 226:14 228:3,7 | **ongoing** 90:8 | 67:17 84:23 |
| 118:14 | 287:20 292:6 | **online** 57:17 | 89:12,21,22 |
| **october** 218:17 | 304:1,3 308:25 | 59:17 62:23 | 91:7 92:22 |
| **offered** 67:16 | **omissions** 21:5 | 66:19 | 95:5,8 97:11,17 |
| 199:14,20 | 38:23 40:19 | **open** 43:21 | 100:9,16 |
| 201:1 | 41:16 45:14 | 80:16 86:10 | 105:23 106:24 |
| **offering** 42:10 | 47:13 56:22,23 | 192:9 | 108:12,18 |
| 116:25 200:10 | 81:18 82:24 | **operating** | 109:22,23 |
| 314:3 | 86:22 88:16 | 177:22 212:11 | 110:4 120:22 |
| **office** 317:18 | 90:18 191:18 | **operationalize** | 123:14 124:1 |
| **officer** 24:25 | 199:7,25 201:3 | 57:5 | 125:3,22 126:2 |
| **officers** 163:13 | 228:16,25 | **operations** | 126:9 146:9 |
| 164:3,10,13,17 | 232:25 254:10 | 189:11 248:7 | 147:3 150:4,16 |
| **offsetting** 75:23 | 256:2,7 257:15 | **opine** 20:1,8 | 160:3 167:19 |
| 80:2 225:11 | 265:7 269:6,10 | 21:4,22 38:25 | 171:8,20 |
| **oh** 298:16 | 270:5 271:1,20 | 41:22 82:5 | 172:10 178:10 |
| **ohio** 1:17,24 | 272:2 273:19 | 162:19 163:3 | 191:7 195:8 |
| 8:1 9:17 317:3 | 274:1 275:17 | 197:8 255:1 | 198:17,20 |
| 317:7,19,24 | 276:18,21 | 259:10 268:6 | 199:14,21 |
| **okay** 11:3 | 279:17,19 | 271:6 274:6 | 201:1 238:1 |
| 13:20 15:1 | 289:21 290:6 | 300:13 311:25 | 260:9 261:4 |
| 25:11 32:11 | 294:10 297:5 | **opined** 22:2 | 295:19 315:3 |
| 48:17,22 87:20 | 298:13 299:21 | 267:18 269:2 | **opinions** 15:14 |
| 97:10 103:16 | 300:14,24 | 300:19 | 19:11 27:1,6,25 |
| 108:19 126:7 | 309:4 310:10 | **opining** 83:22 | 35:18,25 36:1,5 |
| 133:4 138:19 | 311:24 | 180:12 200:13 | 38:9,11 82:1,6 |
| 142:17 165:13 | **omits** 86:15 | 201:10 232:22 | 82:7 90:4,25 |
| 194:9 212:22 | **omitted** 86:20 | 280:3 281:24 | 94:8,19,22 95:1 |
| 225:18 237:19 | 232:23 305:8 | **opinion** 17:19 | 95:17 110:10 |
| 247:10 249:2 | **once** 12:7 78:8 | 19:1,2,4 21:11 | 124:10 130:9 |
| 251:4,16 | 88:7 206:9,17 | 26:13,19,21 | 138:23 164:16 |
| 254:17,20 | 237:11 249:13 | 27:16 38:15 | 182:18 200:11 |

**[opinions - paid]**                                                    Page 59

236:6 261:2,12
268:7 314:2,6
314:11,14,22
**opportunity**
64:14,17 65:5
96:17 98:11,24
171:24
**opposed**  45:9
46:2 124:16
150:11 283:8
298:23
**opposite**  216:24
217:9,13
**opt**  23:1,4
278:18 295:4
**option**  21:6
47:14 301:15
302:6 303:1
312:22,25
**options**  21:25
38:24 39:2
47:20 255:4
260:4,13
269:12 270:12
271:9 283:23
298:14 299:22
300:9,10,15,23
301:4,7,13,14
301:21,24
302:4,8,11,16
302:20,23
312:13,22
313:5
**oracle**  16:6

**orange**  213:2
**oranges**  277:2
**order**  27:21
32:14,19 58:15
61:25 78:20
89:1,21 90:3
108:11,17
135:1,13 152:8
177:5 204:1
222:2 227:4
242:25 258:5
260:9 261:11
262:20 271:6
272:11 288:11
293:19 309:11
310:2 313:16
315:18 316:9
**ordered**  130:15
**orders**  28:1
**organic**  186:13
187:2 189:6,9
191:8 193:24
194:18 229:17
233:15 235:12
236:22 238:9
264:20 265:20
265:23 266:11
267:23 268:4
308:12
**oriented**  160:11
**original**  61:3
72:11 73:5
**otc**  51:16
**outcome**  19:19
38:9,10

**outlet**  59:22
**outlets**  72:22
83:12
**outliers**  98:7
**output**  106:23
107:20 125:25
158:12
**outside**  25:8
30:13 39:19
114:1 159:23
163:15 179:7
195:15 197:18
203:24 260:13
271:3
**outstanding**
123:21
**overall**  43:7
50:4 51:1
211:10 213:24
215:1,4,5,20
217:21 218:20
223:18
**overarching**
121:24 186:8
194:4 195:24
**overly**  222:22
**overreact**  119:3
**overreaction**
97:23
**own**  38:12
70:17 85:4
127:20 174:12
188:24 240:25
290:23 299:8

**owners**  131:7
**ownership**  51:7
128:10

**p**

**p**  1:10 2:9,12
112:12 249:10
249:11,15,18
249:19 250:2,6
250:25,25
251:2,3,12,14
**p.m.**  316:11
**page**  3:4 14:17
14:24,25 15:12
15:16,24 16:6
18:11,11 20:11
20:13 24:9
28:12,13,14
33:17 36:9
133:3 166:7
169:5 190:25
191:2 193:12
193:22 195:20
197:2 212:12
212:21 218:23
220:6 230:9
231:6 249:1
255:13 293:23
294:4,12 319:4
319:7,10,13,16
319:19
**pages**  42:19
229:25
**paid**  38:7 59:17
157:7 241:17

**[paragraph - percent]** Page 60

**paragraph**
36:10,10,24
38:6 53:21
56:17 80:13
86:7 87:2,15,17
93:21 95:19
99:20 123:19
144:20 146:10
147:23 149:24
154:7 155:17
156:6 161:4,11
162:11 163:4,5
163:9,24 169:4
169:18 170:2
170:19 172:22
180:4 182:2
185:20 186:11
186:20 194:15
195:18 196:11
198:12 199:2
204:10 218:22
220:5 221:4,21
227:13 230:9
238:13 240:1
246:12 247:15
253:7,18
255:13 256:18
258:21 260:3
262:4,22 287:4
287:7 288:18
290:1,2 296:6
302:20 303:4
309:23 312:12
**paragraphs**
47:8 162:22

163:2 195:14
255:22 256:21
256:24 264:1
**parameters**
174:9 175:6
205:14 206:5
207:14 227:3
252:11 253:1
**parnes** 1:12
2:10
**parsing** 156:23
**part** 27:17
112:4 117:1
119:18 139:21
139:23 144:21
149:4 189:24
217:12 235:15
250:14 255:23
263:22 264:17
267:11,14
269:22 297:3
308:22
**partially**
237:13 266:1
**participants**
55:24 62:21
173:24 174:14
174:15
**participate**
34:5 153:9
**participated**
153:11
**particular** 30:4
34:12 35:2
49:5 51:24

59:22 60:12
61:5 63:21
67:3 85:7 88:3
90:22 91:15
98:20 99:11
103:8 108:21
130:16 136:9
164:6,7 168:25
187:5 215:10
230:12,20
259:2 262:3
268:15 305:24
309:23
**particularities**
56:15 60:3
62:5 89:13
267:1
**particularly**
68:18 134:9
208:24 252:22
281:7
**parties** 17:12
**partnoy** 281:1
**parts** 50:10
**party** 23:18
233:24 317:16
**past** 37:10
51:21,23 67:1
179:2 281:2
282:2
**pattern** 54:9
98:1,5,8 119:6
217:3
**patterns** 96:8
156:21 214:14

261:11
**patterson**
293:25 295:2
**pay** 37:15
61:10 157:9
179:25 189:13
**paying** 60:8
76:12 84:8,13
123:11 131:2
165:11
**pdf** 14:24
**peer** 83:12
**penalties**
265:15
**pending** 12:14
**pennsylvania**
1:1
**people** 18:16
94:9 99:5
280:22 286:16
**percent** 50:4
78:10,10,17,17
79:23 105:16
116:9,9 122:21
123:21,24
126:10 133:10
133:15,16,20
133:20,25
135:10 136:23
139:10 141:5
141:18,25
142:7 146:12
146:24 154:17
154:18 159:7
186:14 196:13

**[percent - pertained]**

214:22,24,25
220:11,15,18
220:24 221:11
221:19,20,20
221:22,25
222:4,6,11,13
222:20 223:7
224:4,8 239:15
244:23 249:20
249:21,22,23
249:24,25
251:5,19
264:23
**percentage**
  50:1 297:7
  306:11,17,25
**perfectly** 243:9
**perform** 40:6
  94:6 204:1
  288:19 301:22
**performance**
  25:4 160:20
  177:22
**performed**
  39:12,14 42:15
  49:20 69:25
  202:1 203:6
  206:11 298:3
**performing**
  29:11
**period** 8:24
  38:21 39:3
  41:16,17 42:12
  42:21,23,24
  43:2,6,9,25

44:7,10,12,19
45:8,9,11,19
46:1,3,10,12,14
46:17 47:2,12
47:23 50:10,11
51:4,18,19,20
66:11 71:24
81:6,10,11,11
81:13,15 83:1
88:12 90:6,14
90:16,17,19
91:3,12,14
96:12 98:22
101:15 113:3
113:22 115:13
120:13,14
121:18,19,24
122:1,3,22
123:6,8 124:5
132:20,24
133:7,21 134:3
134:14 135:2,8
135:14,21
136:1,9,13,16
136:19,21
137:2 138:3,10
138:21 139:6,9
140:2 141:4,24
147:11,16
148:9,10,14
149:4 150:24
151:15,20,22
152:17 153:10
153:20 154:4
161:15,21

162:3,13,16
165:18 166:10
166:16,20
167:10,12
168:25 172:25
174:9 175:13
176:1,4,8,16,24
178:4,15,20,23
179:9,18 181:3
185:6,8 195:23
200:25 204:16
205:3,4 206:3,4
207:4,7,17,18
208:1 209:11
209:13,17,24
210:4,9,11,19
213:1,14 214:6
214:7,9,17
215:12,15
216:25 217:11
251:20,21,25
252:1,1 253:10
254:11 255:5
257:9,16
261:19 265:5
269:13 270:12
271:18 272:3,7
273:21 279:12
279:13 281:5
283:6,11,15,19
283:22,24
284:10,21,24
285:12 286:8
287:19 297:4
300:7 303:7

304:2,20,22
305:9,12,17
308:6,23,24
311:16
**periods** 46:23
  115:18 134:19
  134:22 136:2
  136:20 138:4
  139:8 207:12
  207:16 208:16
  209:3 270:17
  286:2,21
**persist** 98:6
**persistent**
  97:25 98:5,10
  98:22
**persists** 171:25
**personal** 24:24
  25:15 229:4
**personally**
  100:19 102:6
**personnel**
  189:18 190:17
  190:21
**perspective**
  30:4 71:11
  177:13 224:16
  268:8 276:16
  306:6
**persuasive**
  166:8
**pertain** 190:21
  208:25
**pertained**
  186:8 294:20

**[pertaining - points]**                                                    Page 62

**pertaining**
232:20 248:17
287:20 294:18
312:7
**pertains** 162:20
233:4 260:4
299:2
**ph.d.** 1:16 3:3
9:2,6 83:7
145:5 277:8
317:9 318:5
319:2,24 320:2
320:4,12
**pharma** 20:16
294:13 295:3
**phase** 22:7
27:22 254:3
307:12
**phrase** 131:21
132:13 253:17
253:19
**phrases** 132:1
**pick** 61:12,24
**picked** 60:19
60:24 68:3
157:8
**picture** 203:23
**piece** 60:4
67:23 68:6
72:19 74:15
76:24 305:24
**pieces** 75:21
184:5 291:18
**pitt** 18:23

**place** 22:13
61:22 84:19
261:21 272:11
292:2 293:8
317:15
**placed** 193:18
265:17
**places** 60:20
172:4
**placing** 266:3
**plaintiff** 17:20
18:2 21:1,19
23:2,11 30:5,11
**plaintiff's** 23:3
278:19
**plaintiffs** 1:7
2:2 8:24 9:19
9:24 18:21
19:11 33:13
38:18 41:11,18
42:6 43:8
94:15,20
201:12,19
255:19 260:22
260:24 261:5
262:16 263:9
263:15,21
264:9 265:18
265:25 266:7
266:16 267:5
268:17 269:4
269:17 276:9
281:23 285:21
289:8 306:6

**plan** 76:8 254:2
**play** 29:24
108:10
**please** 9:14
11:12,18 12:15
13:22 14:14
191:23
**plenty** 142:6
178:14 192:24
**plug** 308:7
**plugs** 293:12
**pocket** 35:10
91:23 256:16
259:22 261:15
274:24 278:12
279:4 280:16
281:14 282:12
282:17 283:3
285:24 288:25
295:14 308:8
**point** 12:11
16:13 17:24
18:9 20:12
22:14 24:9
35:15 42:9
48:8,13 52:10
52:16,21 54:18
70:19 71:3
72:2 93:19
102:24 111:6
122:14 126:18
128:24 138:19
141:13 146:16
151:14,18
154:22 164:18

168:16 169:19
171:21 172:16
178:22 179:16
183:23 184:21
185:13 192:8
207:8,20
209:16 211:24
212:5 221:18
235:5 236:4
239:25 246:8
254:7 255:21
262:11 264:1
272:13 276:19
278:5 282:3,16
287:11 288:17
289:12 291:5
291:16 293:6
293:24 295:24
298:4 301:1
305:20 306:3
306:19 309:18
309:24 310:3
313:10,14
315:17
**pointed** 133:16
154:7 251:17
**pointing** 67:13
82:23 94:8
102:2 123:2
127:6 140:8
170:17 259:9
261:1 262:3
278:20
**points** 16:5,9
46:22 50:11,18

50:20 85:1
136:15 175:16
180:22 215:10
221:17,19
312:5
**popped** 125:1
**portion** 237:14
246:7 259:15
272:3
**position** 51:24
109:7
**positive** 75:13
75:15,20 76:23
80:2 96:10
214:19 215:17
217:12 219:24
223:4 225:12
225:19 240:17
240:23 241:15
**positively**
217:19
**possibility** 90:1
90:24
**possible** 17:1
21:12 24:15,16
25:13 70:13
158:17 192:2,6
192:22 288:8
**pot** 112:10
**potential** 73:22
186:22 193:20
210:16 240:5
241:8,20,23
242:19,24
244:10 253:22

310:11
**potentially**
56:12 70:14
98:15 169:9
172:11 183:25
184:24 186:6
187:24 189:15
190:8 194:16
195:5,11 196:6
202:10 210:16
235:19 242:2,9
257:10 279:12
285:4,18 311:2
**power** 210:14
**pr** 156:3
**practice** 29:9
29:22 283:4
**practitioners**
93:22
**pre** 56:1,4
184:14
**preceding**
195:14 205:17
**predict** 76:3
205:13,16
214:23 216:12
241:13,25
**predicted** 204:8
220:20 248:20
**prediction**
241:12 248:12
**preface** 87:2
**prefer** 210:1
**preferable**
210:10

**premised** 82:6
**premium**
241:17 244:23
**preparation**
31:3,4 32:3
34:6
**prepare** 32:20
**prepared**
229:11
**preparing**
33:24 34:14,22
**presence** 84:18
107:25 114:16
120:2,15 121:2
131:6,7 144:9
170:23 171:2
317:11
**present** 2:22
8:12 9:23
19:25 24:10
25:8,9 52:10
56:12 98:22,24
120:7 121:10
122:3 207:22
264:3,8 279:11
308:5
**presentation**
186:4
**presentations**
188:6 228:19
**presented**
98:10 238:24
**press** 58:2
157:20 185:7
233:9 234:23

235:1,16
240:14 241:4
242:11 244:21
245:5
**presumed**
237:6
**presumption**
94:1,16,21
99:23 100:2,15
102:9 123:22
123:25
**pretty** 197:11
283:18
**prevailing**
94:15
**prevent** 114:5
**previous** 43:22
49:17 64:25
67:13 73:8
81:17 84:25
89:19 111:6
117:23 137:6
163:2 177:10
196:17 205:15
213:17 238:22
239:15 246:7
248:8 269:1
282:14 298:24
311:23
**previously**
32:19 35:17
40:4 71:14
110:21 187:7
194:1 201:7
248:2 271:24

**[previously - probably]**                                    Page 64

| | | | |
|---|---|---|---|
| 273:12 299:17 | 224:25 225:10 | 81:17 82:25 | **printed**  13:15 |
| **prewritten** | 225:16,23 | 85:18,19 86:9 | 163:20 243:15 |
| 34:24 | 226:8,13,16,23 | 88:20 93:24 | **prior**  25:7,18 |
| **price**  40:9,16 | 228:5,6 230:13 | 96:8 99:3,8 | 27:3 34:16 |
| 40:23 41:1 | 230:21 234:12 | 102:17 114:14 | 39:23 43:20,24 |
| 53:16 54:2,5,14 | 240:6 241:8,16 | 114:20,24 | 45:6 50:14 |
| 55:14 56:3,8,24 | 241:21 242:19 | 116:15 118:10 | 54:6 55:19 |
| 61:16 65:21 | 243:5,8,10,11 | 118:13,16,22 | 75:17 90:7 |
| 68:16 70:11,20 | 243:17 244:10 | 138:13 144:7 | 119:12 121:6 |
| 73:6 74:8,18 | 250:14 251:18 | 181:15 183:7 | 121:22 139:14 |
| 75:11,25 76:5,6 | 251:23 252:2 | 199:1 202:1,19 | 140:24 141:7 |
| 76:12,15,20 | 253:8,14,16,17 | 205:6,22,23 | 151:8 165:23 |
| 77:6,12,17,22 | 253:19 285:7,8 | 211:8 218:16 | 166:22 181:7 |
| 78:6,9,11,16,19 | 285:10,13,15 | 218:19 219:19 | 184:12 187:1 |
| 78:21 79:17 | 285:16 289:18 | 243:11 250:18 | 191:14 201:6 |
| 80:17 81:5 | 290:3,13,18,19 | 253:21,24 | 204:13 206:11 |
| 86:14,17,18,23 | 291:2,5,14,16 | 257:21 298:14 | 206:13 230:6 |
| 88:9 89:4,15,23 | 291:23 292:9 | 300:2,10,11,15 | 230:19 247:19 |
| 90:15 91:18 | 292:15 294:22 | 300:23 301:9 | 259:1,5 270:19 |
| 92:15 93:2,5,15 | 295:21 301:4 | 302:6,9,11,14 | 272:21 273:10 |
| 114:6 116:6,8 | 301:15,16,20 | 302:16 313:6,6 | 275:8 277:21 |
| 117:5,7,10 | 301:24 302:24 | **pricing**  47:15 | 280:12 284:6 |
| 119:21 145:15 | 303:24 307:6 | 95:20 171:24 | 289:7 293:16 |
| 182:5 188:20 | 307:23 310:18 | 302:25 303:2 | 295:11 310:9 |
| 189:13 190:13 | 312:3 313:8 | 312:13,23 | **private**  112:15 |
| 193:1 197:14 | **priced**  302:4 | 313:1 | 112:19 168:5 |
| 198:9 202:6 | **prices**  21:6 | **primary**  122:10 | **privilege**  32:7 |
| 204:4 205:2 | 38:24 40:14 | 122:13 | **privileged** |
| 214:23 215:9 | 47:14,16 56:20 | **principle** | 39:19 |
| 215:20 219:2 | 58:10,25 63:1 | 301:12 | **probability** |
| 219:16,21 | 64:8,16,17 65:4 | **principles**  83:3 | 220:6 |
| 222:24 223:3 | 66:7 68:10,14 | 84:24 86:1,5 | **probably**  10:4 |
| 223:11,22,25 | 69:6,15 70:8 | 124:16,23 | 10:9 33:1 |
| 224:4,6,11,11 | 74:11,20 75:1 | 188:12 305:3 | 35:13 36:16 |
| 224:15,19,22 | 80:12 81:12,16 | | 37:25 48:8 |

**[probably - public]**

49:8 62:19
67:1 70:24
74:25 89:9
97:2,2 111:5
175:14 190:24
287:4,6 299:13
**problem**
273:19
**problematic**
210:24
**procedural**
28:3
**procedures**
12:20
**proceed**  271:14
**proceeded**
17:24 18:8
52:16
**proceedings**
3:7
**process**  22:15
35:9 63:6
243:11 256:22
291:9 310:5
**produce**  76:4
148:22,24
**produced**
32:17 157:21
160:9 161:12
161:23 228:22
303:10 310:3
311:4
**produces**  174:5
**producing**
273:23

**product**  160:15
184:18
**production**
174:7 250:24
**profession**
30:16
**professional**
63:12,13 69:3
83:5,16,18
87:11 94:10
95:13 100:25
106:22,24
108:9,11,17
110:24 114:17
120:21 126:1
130:6 143:14
144:3,4 145:6
145:23 146:23
150:6 156:19
157:18 164:11
174:14 276:3
**professionally**
30:22
**professionals**
63:12
**professor**
280:25
**profitable**
98:11
**profits**  27:4,8
171:23
**program**
156:22
**projects**  50:5

**prone**  78:25
**prop**  117:7,10
**proportion**
17:18
**proposed**
272:15 275:6
307:3
**proposing**
286:24 287:12
**proprietary**
174:12
**prosecution**
265:15
**prospectuses**
177:10
**proven**  263:15
**provide**  20:8
22:6,8,11 23:6
26:25 32:15
35:7 55:6,12,16
55:19 72:24
82:17 107:2
125:16 150:13
168:21 172:11
184:11 196:9
223:11 233:11
234:7,15 254:8
271:15 272:1
274:4,6,9
**provided**  16:7
18:19 19:2,22
20:4 28:17
32:18 49:23
62:18 95:9
122:16,24

123:1,15
125:22 129:21
149:3 150:25
151:17 152:15
174:25 187:11
195:24 238:2,3
247:20 257:2
305:11
**provides**  86:15
89:6 126:1
232:16
**providing**
19:23 21:16
36:4 81:25
94:7 124:9
130:8 153:20
164:16 166:25
168:4 169:9
170:24 172:24
173:23 175:19
177:18 178:18
195:9 236:5
314:22
**provisions**
121:12
**proxy**  185:17
186:3 188:6
**pseudonym**
236:16
**pslra**  278:21
286:6
**public**  18:10
20:3 27:3 43:3
52:13,16 56:19
57:3 58:7,8,23

**[public - question]**

59:3,5,6,11
60:15,23 82:13
86:10 88:7
93:8,23 102:17
105:2 112:4,16
112:23 116:25
117:6 153:15
156:2 161:14
161:23 170:4
183:6 188:8
205:19,21
243:24 264:15
264:24 317:7
317:24 320:19
**publication**
15:13
**publications**
15:12
**publicly** 44:1,5
52:22 53:10
67:7 86:13
93:2 112:16,22
129:7 143:22
143:25 144:15
144:18 153:1
153:16,21
156:8 161:19
163:12 164:2
165:9 168:10
183:13 242:12
245:3,14
**published**
62:15 83:11
236:9 266:10
281:1

**pull** 33:16
53:23
**punitive** 113:2
132:19,24
133:6,21
148:14 151:14
151:20 175:13
178:23 179:17
214:9 216:25
252:1 283:6,11
**purchase** 56:24
81:14 91:2,8,25
92:6 112:21
261:16 263:4
274:19 275:1
284:2 285:15
293:1 312:15
**purchased**
44:20 90:16
261:18 263:5
269:12 270:12
293:2
**purchasers**
21:24 39:1
56:21 86:21
255:3 271:8
**purely** 162:20
190:10 220:11
**purport** 96:19
**purported**
95:21 96:5
227:18,19
237:5
**purpose** 112:9
202:4 234:6

**purposes** 14:2
67:11 122:6
158:23 162:18
183:19 193:5
194:5 196:2
198:23 199:4
201:9 222:22
238:6 239:17
246:2 254:14
258:9,13
274:16
**pursue** 280:10
**pursuing** 145:5
**push** 207:22
209:10,13
**put** 18:21 139:6
145:13 192:4
193:8 235:17
245:4,19 285:5
303:22
**puts** 51:11
111:19 244:5
**putting** 17:19
45:23 139:5
141:2 145:7
225:18 244:21
246:3

**q**

**qualifications**
35:8 277:14
**qualified**
276:16 317:8
**qualifier** 82:14
**qualify** 93:13

**quantification**
287:7
**quantitative**
150:13
**quantumscape**
16:18 20:20
21:12 24:6
300:18
**quarter** 75:17
75:19
**quarterly** 57:16
186:23
**quasha** 1:12
2:10
**question** 11:19
11:21,24 12:2,7
12:14,16 20:9
22:1 25:12,20
40:18 48:15
63:19,21 67:13
70:15,18 76:22
81:5,20 82:23
83:24 84:7
95:4,22 102:14
102:19,21,22
111:5,8,12,14
111:15 115:11
126:18 127:3
129:8 130:24
131:3,12
133:23 141:8
141:12,16,17
143:10 146:22
152:22,25
166:2,4 170:16

178:12,24
179:15 180:12
180:19 191:18
202:18,25
203:4 208:3
209:22,22
226:22 256:4
267:10,12,15
267:15 268:12
268:23 269:20
269:23 270:1
270:19 283:14
283:18 286:5
286:16,17
289:25 290:9
290:10 305:7
**questioning**
48:12
**questions** 11:10
11:13 12:6,19
13:1 30:2
35:23 67:15
89:2 95:12
117:15 125:20
153:12 164:12
203:23 227:10
228:2 239:16
271:3,5 298:17
313:25 316:1
**quick** 48:13
118:24 144:6
313:24
**quickly** 11:1
32:6 56:19
58:9,25 59:1

60:18,21 70:3
86:9,13 93:2,8
114:14,20,25
118:12 172:1
181:21 237:17
**quiet** 142:8
**quite** 141:13
217:8 222:10
298:25
**quote** 80:15
82:10,21 166:6
169:19 195:19
232:14 234:11
238:13
**quotes** 231:21
231:22,23
232:12,12
233:8,21,22
234:6,15 235:3
235:6 236:3
238:12
**quoting** 80:24

**r**

**r** 2:3 16:25,25
319:3,3
**raises** 112:11
**ramp** 152:1
**random** 74:12
74:13 80:8
202:23 205:1
208:10
**randomly**
219:17
**randomness**
219:1 220:11

**range** 195:25
196:12,14
**ranges** 249:18
**rank** 174:5
**rapidly** 54:2
116:14 182:5
**rate** 36:11
**rates** 313:8
**rather** 25:24
27:25 52:13
100:11,22
103:25 110:23
125:3,24
130:17 170:12
216:16 224:20
226:15 233:21
276:23 277:18
278:6
**ratings** 66:1
**rationale**
314:11
**rationales**
107:25
**reach** 47:5 90:3
106:24 108:11
108:17 127:4
198:21 223:16
261:11
**reached** 19:11
36:2 52:25
270:21 288:9
295:19
**reaching** 47:24
261:4

**react** 66:8
70:21 72:13
74:9 75:3 77:1
85:19 114:14
114:25 116:8
243:18
**reacted** 193:1
224:5 243:19
**reacting** 114:15
116:6 118:22
**reaction** 73:6
97:22 118:24
228:7 234:12
241:21 243:8
248:13 251:18
251:24 252:3
291:2,14
292:15
**reactions**
289:18 290:4
290:13,18,20
**read** 54:17
56:25 64:6
82:10 86:25
127:25 156:21
220:22 263:25
266:17 267:2
276:4 318:9
320:5
**reading** 182:20
230:8 276:15
**real** 186:25
**reality** 221:9
**realization**
299:7

**[realized - red]**

Page 68

**realized** 160:20
**really** 30:7,8
35:12,14 44:2
45:17 48:2
50:23 51:10
55:1,21 56:3,9
58:13,15 60:3,9
61:5 62:5
64:19,25 67:3
67:22,25 68:5
69:17 71:9
81:2,4,19 84:7
89:13,19 91:10
93:17 98:4,7
99:10 101:14
101:14 104:19
108:13 110:7
116:17 118:18
118:20 119:2
120:25 126:19
128:16 129:8
135:25 136:7
140:18,19
141:15 153:21
158:21 160:5,8
160:19,22
161:2 166:1,5
167:3 174:4
181:19 183:23
184:13,17
186:12 188:8
188:13 189:2,3
192:3 195:19
195:21,21
196:8 198:21

198:23 208:2,5
208:9 215:18
216:1 217:13
218:9,10 221:4
223:18 226:2
226:10,22
228:9,12
230:15 233:2
234:6 242:24
244:3 245:7,8
245:10 247:14
248:11 255:20
255:24 259:8
261:1 267:15
276:15 277:1,2
281:24 283:8
283:13,16
289:24 301:18
305:5 309:2
**realtime** 59:17
**reason** 12:22
44:16 75:12
109:12 130:23
134:7,8 135:21
138:1 282:10
305:18 306:5
318:11 319:6,9
319:12,15,18
319:21
**reasons** 28:3
55:18 74:20
75:8 77:4,16
78:1 79:13
107:24 136:3
142:10 160:8

209:15 225:15
228:16,24
239:21 280:10
281:12,13
314:6
**rebut** 100:15
**rebuttal** 18:20
18:20 19:3
**recall** 10:13
15:9 19:1
24:17 26:5,6,10
26:21,24 27:10
27:13 28:24
31:15,18,19
49:7 51:25
120:18 154:24
158:11,13
159:12 181:23
209:5 225:5
229:23 262:19
280:19,20
294:5,7 303:1
**receipt** 318:18
**receive** 37:2,6
141:16
**received** 148:6
148:7 315:17
315:21
**recently** 50:7
206:19 300:18
**recess** 48:25
99:17 142:19
194:11 254:22
282:24 298:7
313:21 316:7

**recognize** 14:17
**recollect** 17:3
**recollection**
18:25 19:4
26:9 49:10
151:16 175:25
222:17,19
229:7,15,21
230:2 262:13
262:21 267:12
**recommendat...**
145:16
**record** 8:4,13
9:15 11:9 13:8
18:1,10 48:23
48:24 49:1
99:15,16,18
142:16,18,21
194:8,10,12
251:22 254:19
254:21,23
282:21,23,25
298:5,6,8
313:19,20,22
316:6
**records** 23:2,4
261:20 263:4
278:19
**recovering**
168:15
**recro** 20:16
294:12 295:2
**red** 213:2 214:2
214:2

**redirected** 316:2

**reduce** 211:2

**reduced** 317:11

**reduction** 240:6 241:8 242:20 244:10

**refer** 112:24 122:5 129:1

**reference** 173:7 221:17,19 260:13 302:22

**referenced** 317:10,12 318:6

**referencing** 177:9 259:9

**referred** 82:12 96:24 204:2 222:21

**referring** 31:9 31:10 44:11 57:9 65:17 96:1,22 97:6,8 136:9 150:3 155:22 162:11 173:4 222:20

**refers** 82:10 86:12

**reflect** 81:5,17 92:2,15 101:16 102:17 114:21 189:14 243:11 255:9 259:1 300:23 302:6

**reflected** 21:6 38:11,24 47:14 68:24 81:12 82:25 86:14 93:9 110:25 145:15,19 183:7 192:19 298:13 299:22 300:15 301:3 301:23

**reflecting** 105:1

**reflection** 173:21 215:8

**reflects** 82:20 91:18

**reframe** 45:1

**refresh** 14:5 18:24 26:8 222:16 229:7 229:14,20 230:2 262:13 262:21,21 294:25

**regard** 96:25

**regarding** 40:7 48:18 80:18 234:23 295:19 315:3

**regardless** 30:10 37:11 208:13 275:8 306:20 308:2,4

**registration** 177:6,8,25

**regression** 204:12 211:15 218:5 251:11

**regressions** 213:15,22

**regular** 43:13 55:6 98:8

**regulator** 71:6 71:15 72:9

**reject** 224:17

**rejected** 219:2

**relate** 25:7 130:9 164:13 191:9 193:7 237:21

**related** 27:1,24 86:5 88:14 150:11 186:21 187:19 189:21 192:10,14,18 193:10 212:15 229:3,17 294:23

**relates** 167:19 178:11

**relating** 10:22 18:15 27:7,9 150:15 199:5 235:21 265:7 268:3,4

**relation** 79:12 100:3 202:22

**relationship** 181:14 184:9 190:11 193:2

198:25 201:25 211:9 213:24 216:2 217:21 239:5 250:9 252:19

**relationships** 18:16 25:15

**relative** 54:6 76:9 86:18 202:23 227:1 248:15 317:16

**relatively** 136:2 137:14,21 140:3,5 230:5 232:19 247:18 248:21

**release** 54:9 78:5 134:16 234:23 235:1 235:16 237:18 240:14 241:4 242:11 244:21 245:5

**released** 54:6

**releases** 58:3 147:18 185:7 188:4 233:9 238:22 239:15

**relevance** 27:2 76:21 83:21 84:5 223:21 227:6,11

**relevant** 54:10 54:20 56:12 69:18 73:10,19

74:3,7,10,17,23
75:5,8,22 76:11
77:2,16,21
80:11 83:24
85:21 114:12
123:7 124:7
125:11 131:11
131:14 134:10
134:14 137:12
140:3,21 143:8
143:9 167:20
181:22 183:15
184:1,6,17,24
185:25 186:7
189:16 190:8
196:7 197:9,11
198:8,19
203:11,15
220:10 222:8
223:12 225:1
225:25 235:19
266:1,8 272:7
289:20 290:5
301:3,23
**reliance**  56:21
81:1 100:3
**relied**  132:15
314:21,24
315:20
**relies**  312:25
**rely**  86:21
130:17 159:20
177:20 272:8
310:14

**relying**  130:8
311:13
**remain**  74:19
278:6
**remained**  66:25
**remaining**
246:3 259:21
259:21 293:11
**remains**  304:5
**remember**  16:1
274:22
**remote**  2:1 13:2
**remotely**  1:17
1:23 8:1
317:14
**repeat**  22:20
95:11 137:8
139:16 252:8
**repeated**
125:20
**repeatedly**
186:12,19
188:1 189:1
235:12
**repetitive**
141:13
**rephrase**  11:25
**reply**  16:17
27:22
**report**  3:11
13:18,18,21
14:1,20 16:17
16:17,19,21,23
17:25 18:9,20
19:23,24 21:15

22:7 23:7
24:18 29:16
32:12,17 33:12
33:18,19,22,25
34:6,9,14,22
35:15,19,23
36:9,18 38:12
38:15,17 39:10
39:15 40:12
41:9 42:16,18
44:11 46:9
47:8 48:7,20
49:21 50:24
52:9,13,23 53:1
53:22 55:21
56:17 57:10,16
57:23 60:7,12
60:17,18 62:8
62:16,19 67:12
67:17 69:16,23
70:8 72:23
77:8 80:13
82:2,2,16 84:3
88:11 91:22
95:2,9 96:14,22
96:23 99:21
101:4 104:10
104:25 112:3
115:10 116:2
118:17 120:12
124:5 127:5,15
129:3,15 130:5
130:25 133:1,3
136:11 142:24
144:20 146:11

147:11,15,23
152:16 153:1
159:19 163:10
164:18 166:3
168:21 169:5
169:18 171:14
171:18 172:4
182:2,18 183:1
183:2 185:16
185:21,22
189:7 191:6
193:23 194:15
195:9 197:19
197:25 200:4
200:19 204:10
206:11 207:21
212:20 218:22
222:2 227:13
229:12 232:4,8
236:9,19,20
237:1 238:3,12
239:13 241:3
246:12 250:25
253:6 254:4,7,8
255:9,14,22,23
255:23 258:17
258:19 259:14
260:5,6,25
261:3,12,23
263:19,25
264:2 266:10
266:18,24
267:18 268:5
271:16 272:10
273:23 276:6,8

**[report - resulting]** Page 71

278:11 279:10
283:15 285:6
288:11 290:1
290:16 293:23
294:2,3,11
296:5,6,13
298:22 300:4
301:6 302:1,21
303:4 307:24
308:18 309:6
309:22 311:15
313:15 314:1,1
314:10,17,24
314:25 315:5,8
315:10,15,22
**reported** 55:9
55:22 60:19
68:4 126:7,11
153:22 154:25
157:8,10 166:9
166:15 173:6
193:24 194:2
248:1
**reporter** 1:23
11:16 22:19
138:9 282:7,20
307:16
**reporting** 8:1
68:3 93:23
245:25
**reports** 15:24
16:15 19:16
22:3,10,16,22
22:25 26:4
27:19,22 35:13

35:16,18,24
36:2 49:24
60:7,9 62:22
72:25 73:4
83:17 88:23
97:20 106:11
107:7 129:20
143:5,7,18,21
144:15,22
145:7,10,13,14
145:19 146:1
147:9,16,25
148:4,8,13,19
148:22,24
149:6,14,15,21
150:1,9,12,18
150:23,24
151:6,10 152:6
152:9 153:16
154:2,3,20
161:22 162:8
163:1,17 167:6
167:11,22
168:5,22 185:6
186:2 188:24
257:2 259:1
260:2 270:7
272:8 273:15
278:24 296:16
300:20 305:4
310:12 311:13
311:18
**represent** 9:12
**representative**
149:25

**represented**
9:21 264:19
265:2
**representing**
8:20,23 9:23
236:24
**request** 33:13
149:1
**require** 292:17
**required**
106:13 176:22
177:1 320:13
**requirement**
178:18 179:1
**requires** 203:1
**research** 19:17
51:23 63:11,23
64:7 65:6,16,19
67:14 69:9
85:3,4,15,17,22
89:3 131:8
138:16 145:22
149:8,22
161:22 172:17
208:15 236:10
236:16 240:12
240:24,25
266:10 272:9
280:21 281:1
290:23 296:12
305:4
**researched**
83:10 188:22
**resembles**
212:10

**reserve** 316:1
**residing** 9:16
**residual** 218:1
218:3 219:18
223:8
**resolution**
191:4
**resolved** 295:15
**respect** 47:22
69:11 97:3,14
132:3 139:4
159:24 185:9
185:11 259:2
267:20,23
**respective**
143:6
**respond** 11:12
**responded**
181:21 202:6
**response**
139:17
**responses**
137:6 202:8
269:1
**rest** 294:22
**restrict** 113:9
**result** 23:23
54:14 81:14
161:21 173:17
253:8
**resulted** 234:11
246:14
**resulting**
234:11 246:13

results  23:18
128:14 141:17
209:2 245:25
249:3
ret  249:10
retail  160:11,12
retain  33:10
retained  17:17
24:2,22 25:22
32:25 33:3,5
49:4,16,20 50:2
50:3 284:16,17
285:16
retirement  1:4
1:5 8:8
return  79:21
203:7 204:3,6,7
204:8 205:13
205:16 211:17
212:20 216:9
216:13 219:9
220:13,19,21
221:13 223:8
229:20 237:17
246:20 247:7,8
249:6,11 250:4
250:7 251:3,4
287:17 318:13
318:17
returns  70:16
96:10,13 213:5
213:5,10
216:18,20
219:16 220:8
247:1,24

249:17
reuters  58:2
60:25 156:3
reveal  32:8
88:16 126:2
192:16 245:23
289:20
revealed  199:8
200:1 266:1,9
290:5
reveals  246:14
revelation
284:7
revenue  56:1,4
184:14 186:16
187:8
revenues
188:15 264:23
reversal  96:14
reversals  97:22
review  18:24
26:7,23 32:2,5
101:3 102:23
149:14,16
150:8 151:4
152:3,4,8 154:2
158:2,7 159:1
185:2,4,5 186:1
231:14 262:20
272:5,6,7
275:13 278:24
289:8 292:10
292:11 294:24
300:21 318:7

reviewed  32:12
32:16 62:20
83:12 151:9
152:14 158:4
158:11 185:12
190:16 196:25
197:1,22
reviewing
32:22 41:13
revoked  30:25
revolving
233:14
rgrdlaw.com
2:6,7,7 318:2
ribbon  22:8
90:13 91:11,13
257:19 269:9
270:10,24
273:20 274:12
297:3 300:8
303:24 304:4
306:21,24
312:7
ribbons  92:13
richard  1:11
2:10
right  13:12,16
17:8 20:24
28:7 33:14
36:12 39:24
40:4 42:12,24
42:25 50:12
59:8 71:23
87:16 103:6
104:12 108:21

108:22 113:16
114:6 124:11
133:2,7,10
143:3 144:24
151:15 154:11
155:20 157:22
163:25 167:24
168:1,6 169:2
172:25 176:19
178:5 181:15
190:22 191:3
194:19,23
198:11,16
199:9 200:2
201:16 202:2
202:11 204:4,8
207:4 211:17
211:21 214:9
227:16,21
230:7,13
234:19 236:10
236:16 237:7
244:25 245:5
246:18,23
249:4 253:11
258:23 283:12
284:4 285:11
293:12 295:12
298:3,14,25
299:22 301:20
304:8 306:13
308:7 316:2
risk  96:16
313:7

**[rmr - sec]** Page 73

**rmr** 1:23 317:24
**road** 70:15 257:20 261:22
**robbins** 2:4 8:23 31:10 32:15 33:4,6,10 36:8 49:11,15 49:19 50:3,5
**robust** 208:6 236:23
**robustness** 209:1 222:10
**role** 28:10 29:24 82:2 106:20 170:24 235:17 277:13
**roles** 193:18
**roll** 205:15 206:10 213:15
**rolling** 205:12 205:17 206:10 211:3,4 213:16 213:22 218:5 251:11
**room** 13:4
**root** 217:24 219:10 220:3
**rooted** 86:1
**roughly** 186:16 214:17 217:18 264:23 277:7
**row** 190:25 191:2,3,5 193:12,22

236:7 245:24 246:5,5 251:3 251:16
**rows** 234:16,18 246:6,11 250:17
**rudman** 2:4
**rule** 106:2,12 106:17 286:10
**ruled** 26:19 27:20
**rules** 10:24 30:16,17
**ruling** 27:24 138:20
**run** 10:25 207:24 216:15 240:13 270:25
**runs** 273:21

**s**

**s** 1:13 2:11,12 112:12 176:18 177:2,7 178:4 178:10,13,15 178:22 179:9 181:2 319:3
**s&p** 211:16,20 211:23 212:1,1 213:3,6,8 214:19,21
**sale** 91:18 92:1 92:8,15 261:17 263:5 274:20 275:2 284:3,15 293:1 312:15

**sales** 56:5
**sample** 126:24 127:23 132:5,8 146:14 155:11 197:12 206:3 220:12 221:23
**samples** 123:5 129:5,9,10
**sampling** 149:25 151:9 154:2
**san** 2:5
**satisfied** 152:14
**satisfies** 170:5 175:21 176:9
**saw** 134:14
**saying** 132:10 171:12 175:17 204:20 219:14 231:1 253:20 258:2
**says** 53:25 72:5 80:15 118:1 122:18 123:17 166:7 212:13 287:7
**scale** 218:8
**scaled** 29:10
**scenario** 79:10 105:25 110:2
**scenarios** 109:14 242:24
**scheduling** 27:21 28:1

**scholes** 301:14 312:19,20,25
**school** 15:18 244:7
**scope** 25:8 27:7 39:19 163:15 193:3 203:24 271:3
**score** 240:17,17
**screen** 14:12
**scroll** 15:11 232:5
**scrolling** 20:13
**seal** 317:18
**search** 57:24 59:10,16 148:9 157:4,20 158:13 159:3 160:10 163:11 163:18 197:1,4
**searched** 148:5
**searching** 157:14
**sec** 17:12 18:23 26:16 57:11,16 57:21 62:13 66:24 156:7,14 156:15,17,21 156:23,25 157:16 161:24 163:6,16 176:18,23 177:3,20,23 178:4 179:1,22 179:23 188:8

196:25 240:15
277:9
**sec's** 57:17
66:19 177:13
**second** 33:17
43:20 222:17
232:5 236:8
**section** 15:19
15:21 17:10
41:9 91:22,24
96:23 152:15
161:2 163:10
169:17 185:20
186:11 200:5
255:9,13,21
258:16,20
259:3,9,18
260:14,20,25
261:3,12,15
262:4 263:18
263:24 266:24
276:6 279:9
289:10 296:5
298:19,22,22
298:23 299:3,9
299:16,16
300:3 301:5
309:21 313:13
**sections** 185:22
258:19
**securities** 10:6
10:17 17:8,9,14
17:16,22 18:5,7
20:3 23:8 24:1
24:21 25:21

28:17,19,22
29:3,6 30:1,14
34:17 50:17
52:2 57:20
63:1,2 64:8
69:5,6 80:16
83:10,11,14
84:9,14 87:25
88:6 93:9 94:2
101:15 102:15
105:5 123:12
138:13,14
166:9,15 184:2
202:19 204:21
250:18 261:18
262:1,8 278:17
280:12 293:2
**security** 123:23
313:18
**security's** 86:14
**see** 14:9 31:12
37:4 55:14
56:3 60:15
61:17,18 65:3
68:12 70:6
72:22 73:6
75:9 76:14,16
76:20 80:20
84:18,19,20
93:15 94:3
95:24 96:7,15
98:4 100:5
101:9 107:21
108:2 115:11
119:6 127:24

130:4 134:8
136:10 137:10
139:18,19
140:12 142:4,6
155:5 160:23
161:16 162:4
182:21 197:13
198:1,4 207:13
208:20,21
209:10,14
213:18 214:14
217:10,14
219:4 225:14
226:17 232:1
240:7 243:8
248:12,19,21
250:20 283:16
290:8 296:5
302:22 303:14
**seeing** 51:4,25
232:4
**seekingalpha**
156:5 157:12
163:22 232:7
**seem** 17:4
72:12 127:1,9
**seemed** 98:24
**seemingly**
244:8
**seems** 101:16
128:18 214:5
217:2 272:22
**seen** 52:2 69:2
70:25 71:22
72:17 78:2

117:3 138:22
278:16 281:12
312:24
**segmentation**
65:20
**segmented**
63:24
**select** 235:3
236:3
**selected** 231:21
232:12 233:20
234:6,14 235:6
**selecting**
210:23
**sell** 91:17 92:14
112:12 113:16
113:21 114:18
115:3 145:16
**seller** 25:24
26:3 72:7
191:6 236:15
**seller's** 193:23
**sellers** 285:5
**selling** 87:24
113:10,23
114:19
**semi** 86:11
92:24 182:11
182:24 183:5
**senior** 28:5
**sense** 54:18
59:6 143:15
189:22
**sent** 185:17
295:15 318:14

**[sentence - shows]**

sentence  53:25
  54:17 87:16
  97:6 162:11
  163:24 198:13
  231:1 240:2
  255:14
sentences
  155:25 170:18
sentiment
  240:4,9,12,13
  240:17,23,23
  241:5,22 242:3
  242:13 244:6
separate  65:15
  78:15 146:15
  147:25 150:22
  151:12 152:22
  161:10 171:6
  172:8 232:15
  242:16 262:6,7
  262:12,13
  267:8,16 268:7
  269:24 273:6
  273:16,18
  286:2 292:1
  294:7 299:4
separately
  144:8 246:5
  261:24 262:10
  299:10
series  11:10
  104:10
serve  33:6
served  10:10
  18:4

serves  228:4
service  58:3,4
  59:13 61:8
services  37:1,9
  60:19,24 61:12
  157:13 211:21
  212:16
serving  9:18
  170:23 173:22
session  3:8
  142:20
set  64:13 70:17
  84:16 125:13
  152:21 153:17
  153:25 158:21
  164:14,24
  174:10 175:6
  184:5 192:1,3,5
  193:4 196:4,19
  196:21 197:7
  198:3 228:13
  233:14 235:10
  235:24 238:5
  278:9 296:7
  303:8 309:24
  312:8 317:18
sets  177:3
  308:7
setting  65:8
  67:25 68:1,2
  77:9 116:12
  118:19 193:3
  206:5 210:19
settings  85:6,24

settled  19:24
settlements
  265:16
setup  116:12
seven  72:21
  111:14 146:18
  227:18
seventh  2:13
several  17:5
  51:25 118:3
  129:21 130:22
  177:4
share  75:17
  112:13 287:8
  287:18 296:10
  303:6,21 304:6
  304:11,19
  305:14,16
shareholders
  86:16 89:6
  113:10
shares  112:12
  112:16 113:15
  113:21 114:1,3
  115:1,4,14
  120:14 123:22
  126:11 174:8
  203:7 205:25
  263:5 284:6,9
  284:16,17,18
  285:15
sheet  318:11
sheldon  2:17
  8:19,19

shirts  160:16
shoes  160:16
short  25:24
  26:3 61:18
  72:7 113:23
  114:19 146:21
  191:6 193:23
  209:13 236:9
  236:15,19,20
  237:1 285:5
shortened
  177:5,7,25
shorter  138:4
  138:10 207:11
  207:12,15,18
  207:23 209:14
  210:2 252:17
shorthand
  221:17
shortly  61:20
  104:9
show  65:4
  69:19 90:22
  101:23 103:14
  119:21 139:3
  217:23 291:1
showed  32:10
  154:17
showing  62:25
  301:18
shown  65:6
  85:21 145:12
shows  64:7
  84:11 133:5
  172:17 212:23

**[side - sort]**                                                            Page 76

**side** 18:2 30:11
  30:11 218:9
**sign** 318:12
**signature**
  316:10 317:23
**signed** 315:22
  318:20
**significance**
  70:16 79:14
  202:11 218:24
  221:1,10,12,14
  221:18 222:1,4
  222:11 251:14
  253:14 306:2
**significant**
  40:13 73:12,21
  75:10,25 76:14
  77:11,22 78:11
  78:18,21 79:20
  79:21 88:19
  136:14 144:6
  149:9 150:17
  162:12 166:8
  166:14 167:12
  174:18,22
  196:13 208:11
  222:6,25
  223:10 225:16
  226:18 228:6
  232:25 246:15
  247:24 248:6
  249:22,24
  250:6 251:5
  253:25 264:17
  265:3

**significantly**
  89:10 187:6
  213:21
**similar** 36:1
  46:7 71:23
  89:18 93:11
  157:1 169:10
  170:24 172:11
  172:24 206:12
  242:13 256:25
  260:1 295:18
  299:25
**similarly** 1:6
  157:10,11
  314:23
**simple** 84:7
  105:16,22
  174:3 202:18
  283:18
**simply** 110:18
  110:22 111:21
**simultaneously**
  57:18
**single** 23:14
  44:25 100:10
  154:5 208:25
  275:13
**singular** 225:21
**sit** 15:10 196:3
  229:9,22 254:9
  286:12
**situated** 1:6
**situation** 67:4
  67:22 79:2
  108:4 109:15

**situations**
  113:22 226:5
**six** 105:21
  109:6 111:14
  165:14 176:15
  204:14 205:3
  208:21 210:2
**size** 131:5
  220:13 221:23
  249:17
**skim** 151:6
**skimmed**
  149:15,25
  158:3
**skimming**
  158:12
**skip** 222:16
**slightly** 295:18
**slow** 78:20
**small** 51:14
  67:24 68:2
  247:11 248:4,7
  248:9
**smaller** 51:14
  78:13 92:7
  176:3 248:22
**snippet** 61:18
**snippets** 60:23
**soft** 145:18
**sold** 90:6,19
  114:4 263:5
  284:6,18 293:2
**solely** 150:17
**solutions**
  318:23

**somebody**
  244:24 245:2
**somewhat**
  45:17 101:11
  115:10 153:19
  189:22 190:4
  236:20 238:10
**sooner** 236:4
**sorry** 16:10
  22:19 45:4
  61:23 103:18
  105:20 148:16
  180:18 190:19
  195:15 238:8
  242:15 258:18
  264:7 267:4
  302:15
**sort** 29:9,12
  40:1,20 41:2,2
  41:24 42:7
  44:24 51:16
  59:7 60:16
  61:1,7 62:3,4,7
  63:6 65:7
  76:23 80:25
  81:25 82:7
  84:22 90:3
  94:7,19 105:17
  106:18 110:12
  110:17 111:20
  126:24 150:3
  152:7 158:22
  171:22 175:15
  175:19 179:6
  181:24 186:18

192:18 200:11 205:1,4 221:16 221:17 223:2 223:17 224:17 225:11 228:11 238:14 250:8 257:24 268:6 269:22 271:3 277:18 314:9

**sorts** 236:5 245:6

**sought** 133:23 166:2,4 168:20 238:19,21 239:11,24 295:23

**sounds** 108:22 277:17 283:19

**source** 61:3,24 72:9,10,11 157:9,11 244:13,13

**sources** 29:17 57:25 125:1 155:20,23 156:2,10,13 157:5,15 161:5 161:7,20 162:7 162:25 163:9 163:19 164:8 164:12 165:9 174:13 225:10 232:11 233:11

**sovereign** 65:25

**spac** 24:3,7,10 24:11,20 112:4 112:7,8,12,13 112:15,18,25 112:25 113:4 116:25 119:25 120:5,8,19 134:2 135:2,8 135:11 136:25 140:22 151:23 151:23 165:2 165:14 168:17 176:13 179:2,4 180:13 185:18 205:20,24,24 205:25,25 264:16,24

**spac's** 112:23

**spacs** 113:6

**span** 120:12

**spanning** 129:6

**speak** 31:24 70:14 164:12 191:18 233:13

**speaking** 17:13 54:16 225:18 250:20

**speaks** 40:17 67:14 102:20

**special** 112:8

**specializes** 264:13

**specific** 51:13 54:3 64:19 93:17 96:25

97:3,8,14 98:15 98:16 102:24 108:4 120:18 127:22 138:19 139:4 141:2 152:18 159:23 164:9,17 165:8 168:11,21,22 182:6 183:9,16 211:12 215:23 216:20 220:10 220:16 231:18 231:22 250:3 255:9,24 273:25 275:7 279:5 287:12 288:9 296:7,13 297:18 303:8 305:1,4 309:24

**specifically** 26:5 47:21 116:22 121:1 121:11 162:7 280:19,20

**specification** 252:10,25 254:14

**specifics** 244:4 267:1 271:19

**specified** 317:15

**speculate** 113:25

**speculated** 244:25

**spend** 34:8

**spent** 36:15

**spikes** 134:8 139:20 140:12

**spillovers** 66:2

**spits** 125:23

**spoke** 31:21 196:5

**sponsor** 112:11 112:13 160:15

**sponsorships** 160:14

**spread** 78:13 116:8 131:6

**spreads** 51:9 127:18 128:9

**spring** 15:20

**square** 217:25 219:10 220:3

**ss** 317:4

**staff** 34:3 36:25 37:12

**stage** 22:16,22 41:24 44:17 138:24 269:8 271:15 272:11 273:23 274:14 275:4 276:22 291:9 306:15 306:22 308:4

**stalled** 265:20

**stand** 14:15

**standalone** 162:19 163:4

**[standard - stock]**                                    Page 78

**standard**  69:22
  106:1 119:15
  219:9 220:7,20
  256:19,19
  257:1 259:23
  278:12 281:14
**standing**
  244:18
**standpoint**
  144:17 190:9
  190:10
**stands**  112:8
  177:7
**start**  42:12 44:7
  44:18 55:1
  60:20 68:14
  81:9 90:17
  91:3 114:15
  145:3 149:3
  170:19 182:20
  205:10 209:24
  213:15 287:4,6
  290:10
**started**  151:21
  170:2 206:19
  258:21
**starting**  20:10
  35:15 54:17
  122:14 169:19
  171:21 183:23
  184:21 185:13
  192:7 198:13
  207:8,20
  209:16 210:3
  211:24 212:5

  255:16,20
  309:24
**starts**  43:2
  44:15 56:9
  69:19 70:7
  152:1,25
  166:24 169:17
  195:19 206:10
  215:3 285:11
**state**  9:14 42:19
  56:18 93:21
  95:19 99:21
  118:11 155:17
  161:18 162:12
  169:5,13
  176:21 180:21
  199:2 204:12
  218:23 246:13
  290:3 303:5
  317:3,7,24
**stated**  95:1
  122:4 135:9
  154:8 161:11
  278:10 315:4
**statement**
  54:12 94:5
  151:2,3 163:8
  177:6,8,25
  185:17 186:3
  188:7 210:13
  225:21 231:3
  291:2
**statements**
  39:22,23 56:23
  69:11 81:8

  86:10 195:16
  195:16 247:12
  265:6 289:19
  290:20 291:21
  315:7,10
**states**  1:1 36:10
  36:24 38:17
  57:13,15,20
  64:4,9,13 65:13
  66:7 68:5 86:8
  144:21 157:5
  163:20
**stating**  12:8
**statistic**  124:6
  154:25 218:25
  219:6 220:4,14
  221:12 249:13
  249:13,17
  250:20 251:7,8
  251:15
**statistical**  70:16
  79:14 207:24
  210:15 218:24
  220:25 221:9
  221:14,18
  222:1,4 224:16
  251:14 253:13
**statistically**
  40:13 75:10,24
  76:14 77:11,21
  78:10,18,21
  79:19 88:19
  222:25 223:10
  223:23 224:10
  224:24 225:16

  225:23 228:6
  246:14 247:24
  249:20,22,24
  250:6 251:5
**statistics**  40:22
  221:6
**statutory**  299:4
**stenotypy**
  317:11
**step**  172:1
  227:4,9 291:9
  292:1 293:3
**stephen**  1:10
  2:9
**steps**  191:7
  203:2,15,17
  223:15,20
  227:2 307:11
  310:19
**stick**  181:8
**stock**  20:3
  21:24 38:20
  39:2 40:8,14
  42:21 44:1,5,20
  45:8 46:1 47:1
  47:11,16,19,23
  48:19 51:4,5
  54:2,4 56:20,21
  58:9,25 61:17
  64:11,16 68:10
  69:15 70:4,7,11
  70:16,20 74:8
  74:11,18,20
  75:1,10,25 76:5
  76:15,20 77:6

77:11,22 78:6,9
78:11,16,18,21
80:12,17 81:5
81:12,14 82:18
82:25 84:9
85:18,19 86:8
86:16,19,23
88:9,20 89:4,15
89:23 90:6,15
92:23 93:1,5,23
93:25 94:11
95:14,21 96:8
96:25 97:14,24
98:2,15,17 99:2
99:8 101:1
112:16 113:10
113:16 114:5
114:14,19
115:16,18
116:15 118:9
118:13,16
119:21 120:4
123:12 127:20
132:19 137:15
143:3,17
159:16 160:1
162:1,14
166:10,16
168:15 169:7
169:23,25
170:3,8,11,13
171:8 181:15
182:5 183:7
188:20 190:13
193:1 197:14

198:9 199:1
202:1,5 203:8
204:4 205:2,6
205:23 208:11
211:8,9 214:23
215:3,9,13,17
215:20 218:2,4
218:15,19
219:16,19,21
222:24 223:3
223:10,22,25
224:4,10,11,14
224:22,25
225:10,23
226:16,23
227:2 228:5,6
237:5,7 239:20
241:16,18,22
243:5,8,11,17
246:15,20
247:1,24
248:21 250:7
250:14 251:17
251:23 252:2
252:19 253:9
253:21 255:4
255:16 257:20
261:6 269:12
270:12 271:9
283:23 285:7
290:3 291:5,14
291:16,23
292:8,15
294:22 295:21
300:2,10

301:10,17,19
302:3,3,5,14
303:24 307:6
307:23 310:18
312:2 313:9
**stock's** 204:7
**stockbrokers**
61:8
**stocks** 95:5
97:3 129:7
175:20
**stopping** 48:13
**stories** 62:22
64:5 73:3
158:18 240:15
240:21 310:12
**story** 41:14
61:25 73:7
233:5 243:6,13
243:15,18
256:6,14 265:7
275:15
**straightforward**
102:13 166:12
**strategies** 96:14
**strategy** 186:9
186:19,22
187:12,13,20
187:25 188:11
189:5 192:16
192:19 193:11
193:14,21
194:4,18 195:6
195:12 196:1,6
232:21 233:5

233:15 235:13
235:20,22
237:22,25
238:14 239:8
248:18 264:18
265:11
**street** 9:17 58:1
59:11,18 156:3
**strength** 189:19
190:17
**strike** 16:11
95:18 313:6
**strip** 291:24
**stripped** 29:10
**strong** 86:11
92:24 123:22
136:7 170:20
170:21 182:11
182:24,24
183:5
**stronger** 95:17
**strongly** 215:4
217:17 218:15
**structure**
173:15 191:4
**stuck** 209:6
212:4
**student** 244:7
**students** 29:7
29:24 30:7,8,9
83:9
**studied** 78:3
85:22 95:20
125:4,9 131:15
138:12 145:11

**[studied - supplying]**                                              Page 80

277:10,11
**studies** 10:21
19:8,15 29:7,8
83:11 85:18
89:3 96:2
115:23 117:9
117:17 125:13
125:15 130:5
130:17 145:12
145:20 207:9
208:6,19,24,25
213:1 272:8
289:18 290:3
290:15,17,19
290:22 296:12
296:13 305:4
**study** 15:13
29:11 42:14
70:17 80:6
84:4,11,15 85:2
88:8,9 122:5,6
122:10 123:3,5
126:11,13,21
127:1,6,15,25
128:19,21,22
129:2,10,16,25
130:1,12,16,17
130:20 131:16
131:17 138:20
146:11,15
155:1,5 161:1
171:1 172:20
181:10,17,20
181:23 182:1
202:1,4,16,17

202:25 203:5,6
203:10,13,25
204:1,11,20
205:11,12,14
206:5,12,19
207:2,4,14
208:1 209:2
211:3,4,7,15,19
212:3,19 216:6
216:7 218:13
226:22 227:16
231:7 246:13
249:3 252:10
252:25 253:5
254:3,13
287:15,24
288:1,7 290:13
291:1,3,15
292:2 310:15
311:12,17
**studying** 69:5
116:12 202:21
**sub** 136:9,20
138:4 139:8,8
141:4
**subclass** 96:3
**subject** 10:13
21:25 26:14
35:2 39:3 45:7
45:25 47:18
113:13,20
115:1,3 255:5
259:11 281:9
**submitted**
14:20 26:17

33:12,20 35:18
35:20 38:15
52:9
**subscribed**
320:14
**subscribers**
60:8 153:5
165:11
**subscription**
59:7
**subscriptions**
59:18 157:7
**subsequent**
73:7 92:8 93:3
93:16 234:5
256:8,21 271:1
276:19
**subsequently**
93:12 245:5
257:10,18
270:3 275:18
**subset** 45:8
46:1,16 158:14
176:3
**subsets** 46:13
121:18
**substance** 32:9
42:2 231:10,13
234:10
**substantial**
123:24 161:23
**substantially**
35:19
**sued** 30:19

**sufficiently**
207:15 220:12
221:22 224:16
**suggest** 224:25
225:24 252:2
272:23 273:1
**suggesting**
140:20
**suggests** 220:7
**suite** 2:5,19
**summaries**
191:12
**summarize**
152:8 153:16
162:22 185:19
256:3,21 291:8
**summarized**
57:23 59:16
157:3 164:8
168:24 231:24
233:7 263:17
263:24 266:22
276:5 279:9
302:20
**summary** 39:10
167:2 190:24
191:2 193:9
233:3 236:21
266:14,15
269:4
**super** 105:17
**supplies** 212:15
**supplying**
169:10

**[support - target]**                                     Page 81

**support** 33:12
  51:1 54:7
  100:14 102:9,9
  117:5 122:19
  122:22 141:19
**supported**
  84:24
**supporting**
  100:2 163:23
**supportive**
  222:1
**supports**
  161:25 162:13
  163:7 253:8
**suppose** 303:18
**supposed**
  125:17
**supreme** 80:14
**sure** 10:23
  22:21 44:2
  48:2 53:20
  54:15 57:4
  66:13 84:2
  97:13 104:19
  126:6 128:16
  135:5 151:10
  164:10 169:16
  181:19 230:15
  254:1 272:15
  282:22 283:8
  283:13 304:10
**surprised** 140:5
**surrounding**
  117:19

**survive** 98:6
**susan** 1:12 2:10
**suspended**
  30:25
**sustained**
  194:19
**sworn** 9:4
  317:9 320:14
**synergies** 76:8
**system** 1:4,5
  8:8 57:17
  66:19
**systematic**
  97:23
**systematically**
  153:25

**t**

**t** 160:16 218:25
  219:6 220:4,14
  221:12 249:13
  249:13,17
  250:20 251:7,8
  251:9,15 319:3
  319:3
**tab** 13:23
**table** 167:5,7
  192:4 196:23
**tactics** 285:4
**tag** 197:5
**tailor** 30:7
  255:8
**tailored** 255:24
**take** 12:12,16
  14:6 23:1
  48:13,16 68:16

68:20 79:16
  91:24 104:2
  119:5 130:11
  155:4 187:15
  206:18,22
  243:3 260:9
  261:21 263:3
  277:14 284:1
  285:13 297:1
**taken** 48:25
  99:17 112:4
  142:19 154:5
  194:11 210:22
  254:22 258:3
  282:24 298:7
  313:21 316:7
  317:14
**takes** 22:13
  61:22 118:2
  119:19 272:11
  292:1 293:7
**talk** 11:18
  29:17 31:2
  44:10 60:6
  65:21 73:19
  84:2,3 115:23
  117:4 125:6
  131:22 144:8
  150:10 155:25
  156:14 170:19
  170:22 172:17
  183:12 189:5
  189:25,25
  305:21

**talked** 57:10
  104:25 107:19
  115:22 157:6
  163:18 164:23
  171:1 172:21
  182:12 189:2
  233:6 243:24
  245:7 269:25
  311:14 314:8
**talking** 50:23
  54:18 56:10
  57:12 59:23
  60:6 64:20
  65:19 74:1,22
  77:5,8 79:9
  82:15,22 91:21
  92:11 99:12
  115:24 116:1
  116:18 123:8,9
  150:9 160:13
  161:3,5 183:3
  216:19 223:8
  224:3 243:1,13
  276:24 277:1
  278:2,8 295:12
  295:17 298:21
  305:23 308:9
**talks** 84:15
  115:21 260:20
  278:21
**target** 61:16
  76:7,9,13
  112:15,19,21
  112:22 145:16
  241:15,18

**[target - theories]** Page 82

242:1 244:20 248:5

**targeted** 186:13

**targeting** 248:9

**taught** 15:17,19 15:21 28:9,11 83:8 138:16 188:21

**tax** 265:13 266:6 307:15 307:17

**tayer** 2:23 8:17 13:24 14:7

**teach** 29:4,6 30:8

**teaching** 15:16

**team** 145:8 189:19

**technicalities** 27:25

**technicality** 44:24

**techniques** 19:6 19:10 30:9 288:3 296:4,9 296:16

**tell** 130:12 291:15

**template** 34:24

**temporarily** 285:6

**ten** 10:4 33:8 49:16 103:16 105:19,20 122:19 174:21

175:8,9,11 243:14,19 244:1

**tend** 51:14 95:15 96:9 114:14 127:21 128:7,8,9,10 134:8 171:16 172:1 241:14

**tended** 131:22 134:13

**tends** 135:23 148:18

**terence** 1:12 2:10

**term** 253:16 257:3 296:19

**terms** 17:21 18:7 25:14 28:13 35:6 42:6 44:25 48:3 52:3 53:7 58:21 63:20 69:14,22 70:15 73:3,17 74:22 76:19 79:25 83:22 93:18 95:2 105:1,12 106:19 108:15 109:24 110:18 116:21 118:9 123:7 129:6 134:15 135:6,7 145:24 146:22 170:24 173:22

180:12 182:17 182:18 187:7 188:19 200:22 201:8 203:2 211:25 212:3 221:18 229:19 246:9 248:15 251:13 261:21 269:22 274:24 276:8 300:1 306:10 311:12 313:5 314:10

**test** 42:14 107:20 119:1,6 119:22 182:3 183:14,20 184:8 196:23 198:24 218:23 218:25 220:25 222:3 228:12 245:20

**testified** 10:15 10:17 17:7 49:3,14 50:7 68:8 103:6 121:3,17 123:14 130:10 140:25 151:5 162:6 273:2,12

**testify** 12:23 166:17 295:6 317:9

**testimony** 10:14 16:8 28:16 30:18

50:14 85:25 91:5 119:12 121:6,22 130:14 138:25 139:14 140:24 141:7 151:8 165:23 166:22 181:7 201:6 241:10 259:5 270:20 272:21 273:10 277:21 286:19 289:7 295:11 317:10 317:12 318:9 318:18 320:8

**testing** 69:22 184:10 190:11

**tests** 29:18,18 97:21 99:22 100:14 121:15 207:24 210:15

**text** 145:17 156:23 157:14 233:7 259:13 259:17,21

**textbook** 188:23,24

**texting** 13:11

**thank** 45:3 315:24 316:4

**thanks** 290:8

**theories** 267:6 267:16 268:8,9 269:3,17,24

**[theory - think]**

| | | | |
|---|---|---|---|
| **theory** 35:9 | 190:23 191:11 | 80:9,24 81:2,19 | 169:16 171:11 |
| 41:12 81:1 | 191:21 192:9 | 82:8,16,21,22 | 171:13,14 |
| 100:4 201:12 | 227:25 245:21 | 83:4,18 84:2,4 | 172:14 173:10 |
| 220:7 255:19 | 252:8 274:16 | 84:25 85:13,20 | 173:12 174:23 |
| 258:12 260:22 | 277:3 278:4,7 | 86:4 87:8,16,21 | 177:6 178:24 |
| 260:24 263:9 | 291:7,8 295:18 | 89:9,12,18,25 | 180:2,3,4 |
| 263:18,21,24 | 310:12 314:8 | 89:25 91:21 | 182:19 184:3 |
| 264:9 265:18 | **think** 10:19 | 92:19,20 97:2 | 185:17 186:2 |
| 266:16,23 | 15:12 17:1,13 | 97:17,18 99:10 | 187:23 188:3,6 |
| 267:20,22 | 17:21,23 18:7 | 99:13 101:11 | 189:21 190:6 |
| 268:18,19 | 18:15 20:21 | 101:20,20 | 191:2,5,11 |
| 269:2,4,17,23 | 21:10 22:1 | 103:23 104:4 | 193:8,12 194:2 |
| 276:5,9 285:21 | 23:13,21,25 | 105:6,14,22 | 194:6 195:18 |
| 289:9 306:6 | 24:8,13 25:12 | 108:7 110:21 | 196:10,14 |
| **thin** 51:8 | 27:19 29:20 | 111:4,13 114:8 | 197:6 203:13 |
| **thing** 132:10 | 30:6 31:12 | 115:9 116:17 | 203:20,21 |
| 244:25 274:22 | 32:13 35:22 | 117:8,15,22,25 | 206:22,25 |
| 276:7 278:2 | 37:16 39:9 | 118:7 121:9,23 | 208:2 209:22 |
| 281:25 | 40:5,17,24 41:8 | 122:4 123:17 | 210:12 212:17 |
| **things** 15:7 | 43:1,3,10,10 | 124:19 126:17 | 213:21 216:1 |
| 34:25 35:11 | 44:4,23 45:1,4 | 127:14,16,24 | 217:7,8 223:15 |
| 38:18 41:19 | 45:17 46:6 | 128:22 130:4 | 223:17 225:4 |
| 42:1 51:17,17 | 47:7 48:6,15,16 | 130:21 131:19 | 226:2,4,21 |
| 52:11 53:4,9 | 49:14 50:7,15 | 131:21,23 | 228:1,15,23 |
| 57:10,11 59:13 | 54:16,22 56:9 | 133:3 135:6,17 | 230:25 232:1,2 |
| 59:19 65:4,21 | 57:5,24 58:5,12 | 139:15,18 | 232:3,10,16 |
| 65:22 84:17,21 | 58:17 59:8,21 | 141:9,11 | 234:13 235:8 |
| 84:21 85:13 | 60:2 63:7,15,18 | 142:14 143:9 | 236:21 237:9 |
| 88:25 96:6 | 64:24 65:23,24 | 146:4,4,6,21 | 237:15 238:11 |
| 118:18 124:19 | 66:3,6,6,12,20 | 147:2,4,6,11 | 238:17 241:11 |
| 125:3 128:11 | 66:21,23 68:8 | 151:9 152:22 | 242:22 243:21 |
| 147:18 153:23 | 69:8,14,21 | 155:9 157:1,11 | 244:12,15,19 |
| 157:8 160:16 | 70:24 71:9,18 | 159:3,17,20 | 245:6,22 247:3 |
| 160:21 163:23 | 71:24 72:5,17 | 161:8 162:10 | 247:21 250:15 |
| 184:19,19 | 73:23 75:7 | 163:21 165:6 | 252:6,24 253:3 |

**[think - times]** Page 84

256:24 258:21 259:13 260:7 266:14 267:14 268:25 273:11 276:14 277:22 277:22 280:4 280:25 281:2 282:8 284:25 285:23 286:4 286:15,16 287:6,25 288:8 293:3 294:4,13 294:13 295:17 296:19 297:20 298:16,20 299:10,25 300:19 301:5 301:25 305:6 309:9,21 311:6 311:20 312:20 314:20 315:1

**third** 87:16 198:13 233:24

**thorough** 149:7 149:18,21 150:2,14

**thought** 35:9 232:3 254:6 256:4 282:15 283:17

**three** 31:21 38:18 59:2 68:11,13,20,24 78:12 79:16,18 79:20 109:21

109:25 116:16 118:14 134:1,3 135:11 136:24 137:2 140:22 165:1 176:12 178:3,7 181:2 182:21 205:4 221:17,19 243:4 247:1 264:23 273:16 303:20,22 304:6,19 305:14,16

**threshold** 100:17 110:13 110:17 111:1,9 111:20,24 112:1 125:16 125:21 133:25 135:9 136:23 141:5 146:2,6 146:23 224:2

**thresholds** 125:13 133:16 133:20

**throwing** 192:22

**tie** 200:9 273:24

**tied** 88:17 132:11 140:17 187:10 188:14 194:3 245:23 270:4,8 273:18 274:1 301:16

307:22

**ties** 247:14 272:1

**tilted** 240:22

**time** 8:5,12 11:18 19:22 22:14 37:14 38:7 42:9 46:22,23 49:8 49:20 50:11,18 50:21 51:3,18 51:20 52:10,22 66:11 70:19 71:3 72:2 78:14 89:16 91:25 92:1 93:20 95:7 96:11 98:6,22 101:15 105:8 111:13 115:13 115:18 120:13 123:6,8 134:19 134:22 136:16 138:10 141:9 148:9 152:17 153:10,19 164:19 165:18 166:20 168:25 174:9 175:16 175:23 179:17 180:22 187:15 202:24 207:15 210:17,20 211:7,11,12 212:24 213:7

213:18,21 215:10,12 216:5 218:12 218:16 220:16 229:11 239:25 246:8 254:7,11 272:7,14 274:19,20 275:1,2 276:19 278:5 282:3,16 284:2,3,14 287:11 288:20 289:12 291:5 291:13,17 293:6 295:24 298:4 301:1 304:12 305:20 306:4,19 309:18 310:4 312:5,14 313:11,14 315:25 316:1 317:14 318:19

**timeframe** 318:8

**timely** 176:23 177:15 178:1 178:19

**times** 10:3,4,5 12:5 20:5 21:8 21:10 31:15 33:5,9 49:16 52:1 58:2 59:12,19,20 64:18 67:3,23

**[times - trading]**

68:1,19,21
92:21 93:10
111:5,14,16,18
130:10,22
133:21 139:16
141:12 142:3
215:11 228:1
274:5,9 278:10
281:8 300:16
**timestamps**
45:14
**timing** 45:13,15
45:20 121:12
152:5
**title** 231:18
**titled** 29:5
**today** 9:22 11:6
12:20,23 15:10
31:3 44:11
49:3 50:8
109:7 115:22
157:7 171:2,12
171:18 172:21
173:16 182:13
219:23 229:9
229:22 243:24
245:8 252:8
266:18 267:2
278:10 286:12
314:8
**today's** 11:9
31:25
**together** 100:24
140:17 200:10

**told** 239:1
266:12,22
**tomorrow's**
205:16
**took** 117:6
**tool** 202:17
203:13 287:15
288:1 291:4
**tools** 19:5,10,12
19:13,18 29:13
30:9,15 63:3,7
63:10,12 85:5
88:21 108:16
288:20,23
289:9,13
292:12 293:8
296:3 311:12
311:14,19
**top** 15:23 16:12
17:3 20:11,11
24:9,17 26:6
27:15 28:13
105:18 133:12
148:11 159:12
206:24 209:20
262:19 294:5
315:1
**topic** 47:6 89:7
171:7 172:9
**topics** 10:22
**toshiba** 20:12
**total** 36:18
146:19 211:17
**touch** 43:10

**touche** 20:15
**touted** 235:12
238:15 248:2
265:1,8
**towards** 15:23
16:12 23:10
196:11 207:22
209:10 214:8
240:22 294:4
309:23
**trade** 51:4
86:19 94:11
95:6 101:1
137:17
**traded** 44:1
57:14 64:11
94:2 95:14
122:20 129:7
162:1,15
169:24,25
170:3,9,11
174:9,23 253:9
303:3
**traders** 61:9
114:17,18
156:20
**trades** 86:23
115:17 144:6
156:22
**trading** 10:18
23:2,3 26:15
43:3,13,17,21
43:22 44:5,25
45:12,19,24
51:8,12 54:6

59:2 62:25
68:11,13,25
69:20,24 70:8
76:16 79:16
84:19 88:5,10
93:24 96:17
98:6,23 113:25
114:13 115:19
116:16 118:14
118:21,25
119:9,16
122:21 123:19
123:21 124:5
125:6,14 126:5
126:8 127:18
128:11 131:6
132:23 133:6,9
133:19,25
134:6,7,9,21,23
135:10,19,23
136:3,23
137:10,14
138:1,14 139:2
139:9,10,20,24
140:5,12
141:18,24
142:5,7,11
144:5 156:20
169:11,12
170:25 172:19
173:23 197:14
198:10 202:6
205:2,7,23
206:3,9,13,17
206:20 207:3,9

**[trading - type]**                                                    Page 86

207:12 208:8
208:17,22
209:6 213:11
213:17 240:5
241:7,24
242:14,19
243:2,4,7 244:9
246:17,25
247:3,5 250:7
251:21 253:21
261:5,11,20
263:3 278:19
290:16 313:5
**trained**  79:1
**trajectory**
  265:3
**transaction**
  24:3,20 90:23
  91:16 112:5,25
  113:4 120:20
  179:4 180:13
  185:19 206:1
  246:16,21
  264:17,25
**transactions**
  92:5 120:8
  134:17 151:24
  187:4
**transcribe**
  11:17
**transcribed**
  317:11
**transcript**
  11:11 62:13
  186:3,4 232:3

233:10 240:14
316:9 318:6,20
320:5,8
**transcription**
  317:12
**transcripts**
  188:5
**tree**  312:23
**tremendous**
  160:8,22
**trial**  16:8 30:18
**tried**  246:6
**trigger**  54:24
**true**  15:2 114:9
  201:13 256:13
  258:4,9,14
  266:11 272:25
  276:23 278:5
  280:2 285:8
  317:12 320:8
**truly**  274:4
  294:16 311:22
**truth**  226:17
  266:1,8 280:3
  289:20 290:5
  317:9,9,9
**truthfully**
  12:23
**try**  11:17 78:19
  80:4 108:19
  136:11 152:23
  153:17 158:21
  183:14 184:21
  185:2 187:15
  193:3 197:23

212:8 285:3
**trying**  17:1
  30:8 44:9
  53:19 67:12
  82:16 107:9
  141:1 192:2
  197:8 202:25
  203:4 221:5
  223:16 225:7
  227:5,9 233:2
  272:22 273:1,7
  278:4 280:10
  298:21 299:13
  305:6
**tuesday**  8:2
**tull**  2:3 9:1
  31:12
**tuned**  227:3
**turki**  2:23
**turn**  13:20
  14:23 33:16
  36:9 41:8
  53:21 86:7
  127:24 133:2
  164:20 217:22
  229:13 230:2
  231:5 248:25
  262:22 266:25
  290:2
**turned**  250:23
  310:5
**turning**  99:20
  132:22 169:4
  234:17 236:7
  246:12

**turnover**
  123:20
**twelfth**  234:17
**twenty**  10:4
  33:9 49:16
**twice**  71:10
  286:14
**two**  15:18 17:2
  31:18 36:23
  40:14 64:5
  66:12 68:24
  79:16,18,20
  109:9,14
  112:14,19
  116:15 129:9
  131:24 137:6
  147:11 162:21
  163:2 170:18
  189:9 195:3,14
  212:6 218:18
  227:20 234:18
  246:16 252:14
  267:6,13,16
  268:7 273:16
  277:3 278:7
  285:25 295:5
**type**  23:15
  26:11 53:15
  54:13 62:9
  63:4 66:10
  72:18 77:8
  88:3 96:15
  97:19 99:11
  103:22 104:19
  105:24 110:2

**[type - understanding]** Page 87

117:23 118:24
129:4 157:1
164:6 173:22
174:4 188:8
223:17 225:7
231:2 233:12
233:25 239:24
242:6 291:25
295:23 300:8
302:2,7,13
310:24
**types** 19:9
29:14,17 30:2
36:2 54:23
56:7,11 57:9,22
58:21 63:3
67:15 85:6,23
89:1 96:13,20
113:24 115:20
116:13,20
117:14,16
123:9 127:20
128:11 154:1
157:12 171:4
172:2 183:25
185:23 186:5
189:15 196:9
197:10 211:6
214:14 226:19
227:5,10 234:7
273:17 275:23
275:24 276:24
279:2 280:10
281:6,14
311:18

**typical** 64:3
219:15,18
223:6 224:7,22
241:11
**typically** 22:10
29:15 34:25
59:1 65:3
68:12,23 74:24
77:7,12 88:11
94:12 112:11
112:14 118:14
139:19 151:23
153:2,2 205:11
207:8,19
208:12,13
212:7 219:24
222:21 223:16
228:10,24
252:16 281:11
281:12

**u**

**uc** 15:18 28:13
28:18
**uh** 103:11
187:17 240:11
242:17 311:5
**ultimate** 100:9
109:8 110:3
307:13
**ultimately** 84:6
102:13,19,21
104:4 123:4,11
125:22 126:17
136:5 154:16
183:11 188:15

216:7 256:4
257:5,23
265:16 269:8
271:10 272:12
273:22 274:13
277:13 278:7
282:14 295:25
300:2 311:20
312:6
**unable** 177:14
311:21
**unanticipated**
54:10,20 69:19
184:7 242:4
**unclear** 226:12
**uncommon**
275:21
**under** 11:5
15:12,16,18
20:17 37:1
97:22 196:19
220:7 221:21
234:8 236:15
262:7,7,16
269:23 286:17
293:24 299:4
304:6 307:3
**undergrad**
83:7
**undergraduate**
83:9
**underlie** 314:9
**underlying**
107:24 182:3
278:8 301:9,16

313:9 314:11
**undermine**
97:4,16 98:15
**underreact**
119:3
**understand**
11:5,14,22,24
12:2,3,9,17
13:7 22:12
44:9 67:16
84:22 106:20
107:8 112:24
116:19 120:17
124:12,14
138:25 140:16
141:1 169:6
180:18 184:22
190:2 226:21
265:18 267:4
278:11 283:14
289:25 299:3
**understanding**
81:22 82:9
94:14 101:7
114:2 138:6
139:22 145:2
171:6 172:8
177:2,12 181:4
201:18,23
234:25 236:18
259:1 263:13
263:20 264:4,9
264:12 266:15
268:17 270:16
272:17,23

**[understanding - value]** Page 88

278:14,23
285:3 287:23
290:12 297:20
**understood**
45:22 235:14
**undertake**
168:3
**undertaken**
260:8 271:6
**undertaking**
246:9
**undertook**
168:8
**unexpected**
54:10,19 55:22
69:18 70:22
75:4 80:10
184:7,13 196:7
198:8,19
223:12 225:1
225:25 242:4
248:16
**unintelligible**
264:6
**unique** 35:1,5
116:11 147:8
150:22 206:23
216:9 255:25
256:22 259:7
259:14 260:10
260:15 267:7
268:10 276:9
**united** 1:1
57:13,14,20
64:4,9,12 65:13

66:7 68:5
157:5 163:20
**universal** 89:12
210:13
**universally**
23:15 278:16
**universe** 164:1
**unknown** 210:8
**unmarked**
13:17
**unpaid** 193:18
235:17 265:17
266:3
**unqualified**
105:23
**unrelated**
24:24 25:3,4
310:16
**update** 114:20
190:7 192:13
**updated** 72:24
**updates** 16:4
160:19,21
192:10
**upgrade** 61:15
**upheld** 26:19
**urge** 53:6
**usable** 129:17
**use** 34:23 35:15
55:3 122:4
132:12 160:25
182:17,18
205:16,24
206:2,3 207:11
219:1 254:2,14

254:15 284:13
284:13,23,24
288:15,21
289:3 309:14
309:20
**used** 19:17 22:9
131:21 203:10
204:14 207:3
207:10 208:18
211:16,20
212:4 222:13
223:20 251:21
254:4 256:17
257:3,18
258:25 268:18
269:8 287:15
288:21 290:15
291:4 318:20
**useful** 146:8
**usefulness**
144:11 211:3
**uses** 208:16
290:14
**using** 29:25
116:2,20 122:9
131:25 197:4
204:13 210:10
210:11 220:11
220:24 251:19
251:25 253:17
253:19 280:22
**usually** 59:2
212:6

**v**

**v** 301:6 318:4
319:1 320:1
**vacuum** 140:18
225:21
**valid** 136:3
**valuation** 19:8
19:16 68:17
73:13 76:5
86:9 87:25
88:22 188:13
188:25 288:3
292:12 296:9
297:8 305:3,13
305:22,24
312:22
**value** 21:4 27:2
38:22 47:12
54:3,10,20,25
56:12,24 69:18
73:10,19,22
74:3,7,9,17,23
75:5,8,22 76:11
76:13,21 77:2
77:16,20 80:11
114:12 134:10
134:14 137:11
140:3,21 153:8
181:22 182:6
183:15 184:1,6
184:17,24
185:25 186:7
188:13,20
189:16 190:8
196:7 197:9,11

**[value - volume]** Page 89

198:8,19
202:11 203:11
203:15 220:10
222:8 223:6,12
223:20,21
224:1 225:1,25
227:6,11 239:1
249:10,11,18
249:19 250:2,6
250:25 251:2,3
251:12,14
298:12 299:20
299:24 300:13
301:3,19,23
305:18
**values** 250:25
**valuing** 188:19
**vandetta** 2:24
**variables** 85:23
125:1
**variation** 80:8
160:23 218:1
224:22
**varies** 292:25
**variety** 19:5
30:14,15 37:19
55:18 59:14
69:7 74:20
75:7 77:4 78:1
83:8,12 84:12
85:6,24 96:5,18
138:16 142:5
145:20 146:1
155:20,23
156:13,24

157:4 160:7
161:20 192:11
225:6 270:6
273:15 277:12
278:25 290:23
293:8
**various** 29:17
50:25 84:15
99:22 115:20
121:16 122:15
131:4,14
175:16 309:10
312:13
**vary** 107:21
292:24
**vast** 17:23
**venue** 62:12
71:5
**verbally** 11:12
**verbatim**
266:19,20
**verify** 236:25
318:9
**veritext** 318:14
318:23
**veritext.com**
318:15
**version** 29:10
177:8
**versus** 8:9
51:12 65:20
66:6 110:4
173:9 217:17
268:15 298:19
299:11 307:23

308:12
**vi** 261:3,12
**viannece** 2:15
**video** 13:3 31:6
31:15
**videographer**
2:24 8:4 48:24
49:1 99:16,18
142:18,21
194:10,12
254:21,23
282:23,25
298:6,8 313:20
313:22 316:6
**videotaped**
1:16
**view** 14:3 40:22
139:5 147:20
151:5 169:6,8
173:20 175:20
176:2,6 195:3
210:25 221:24
221:24 235:21
235:23 267:19
**viewed** 100:1,7
**views** 141:2
169:21 171:7
172:9
**vincent** 2:12
8:14 9:10
**violate** 53:6
**virtually** 68:15
94:1 160:13
**virtue** 112:22
170:4 175:2

257:21
**volatility** 51:9
74:13 204:23
204:23 206:6
208:10 210:17
210:21 211:12
218:4 219:15
219:19 224:8
227:1 252:18
313:7
**volume** 51:8
63:1 76:16
84:19 88:10
93:24 122:21
123:19 124:5
125:6,14 126:5
126:8 127:19
128:11 131:6
132:23 133:6
133:10,19,25
134:6,7,9
135:10,19,23
136:3,23
137:10,14
138:2 139:2,9
139:10,20,24
140:5,13
141:19,25
142:5,7,11
189:2 197:15
198:10 202:6
205:3,7 240:5
241:7,24
242:14,19
244:10 246:17

**[volume - window]**                                          Page 90

246:25 247:3,6
250:7,19
253:22 290:16
**volumes**  134:21
134:24
**voting**  185:18
**vs**  1:8

| **w** |
|---|

**wait**  286:20
**waits**  151:24
**waived**  316:10
**walk**  29:9,15
132:14 174:1
**walking**  122:6
**wall**  58:1 59:11
59:18 61:20
156:3 157:9
**want**  14:23
17:15 45:1
68:7 89:19
90:1 98:3
103:9 104:20
119:7 124:14
137:8 194:14
205:13,16,24
229:6 237:17
245:10 262:12
266:25 283:10
**wanted**  137:17
298:24 299:5
**waste**  136:16
**way**  27:24 38:8
41:11 59:15
61:1 70:18
74:2 84:4 96:9

103:1 131:3
140:4 159:13
194:3 221:10
235:8 238:24
241:12,24
242:6 256:22
273:19 286:9
286:17 288:24
298:16 303:25
308:17
**ways**  23:10,21
74:6 84:12,15
128:2 144:12
152:23 157:3
304:21
**we've**  99:13
142:14 194:6
243:24 245:7
308:8 314:8
**weak**  182:24
**weaver**  1:12
2:10
**website**  61:7
156:15
**websites**  156:16
**week**  21:16
24:19 31:17,22
96:7,12
**weekly**  122:20
123:18,20
124:4 125:14
132:23 133:5,9
133:19 139:2,9
141:24

**weeks**  134:19
134:22 137:20
142:12 152:1
**wegryn**  1:23
317:7,24
**weigh**  98:13
99:22 101:25
102:4 109:16
137:1 139:11
141:3 142:1
155:15 178:16
**weighed**  104:5
105:7,21
109:25
**weighing**
147:12,20
162:23
**weighs**  147:2
167:18
**weight**  71:7,16
72:11 103:7
**weighted**
100:22
**went**  264:15
**west**  2:4
**whereof**  317:18
**wide**  21:23 22:5
22:9,12,17,23
30:14,15 39:1
41:10,23 47:18
69:6 74:19
83:11 85:6,23
96:5,18 142:5
145:20 157:4
201:11 211:16

211:19 255:2
259:11 271:8
272:16 275:7
277:12 278:24
280:14 289:4
289:16 290:23
292:18,24
293:15 295:7,8
**widely**  56:19
57:2 58:6,8,16
58:18,20,22
60:1,14 61:2,4
61:25 62:15
68:4 82:12,14
82:20 93:7
105:2 143:25
145:11 156:1
183:6 243:23
244:2
**widened**  116:9
**williams**  1:13
2:11
**willkie**  2:13
8:15 9:11
**willkie.com**
2:15,15
**win**  248:14
**window**  112:20
204:15,18,24
205:9,18
207:12,23
208:4,5,14,21
209:14,25
210:3,23 211:3
211:4,13

**[window - zero]**

213:13 223:7 224:9,23 251:11 252:15 252:17,22

**windows** 208:7 208:19 212:25

**wish** 315:8,11

**withdraw** 315:8

**witness** 8:11 20:6 32:11 106:21 108:10 145:23 191:24 317:8,10,11,13 317:18 318:8 318:10,12,19

**witnessed** 52:18

**witnesses** 28:15

**wolf** 1:13 2:11

**word** 174:4,5 240:16,16 253:17

**words** 116:3 173:11 220:17 240:19

**work** 17:6,14 17:24 29:8 36:12 37:12,20 39:12,14,20 50:5 52:15 157:15 221:6,7 221:8 272:16 275:6 283:4 297:11 312:25

315:13

**worked** 18:6 26:2,15 37:24 38:7 52:3,11 83:13 138:14 270:6 273:15 273:16 275:8 299:15

**working** 26:11 26:25 30:11,12 37:1 52:4 53:5 53:12 69:6 77:7 88:4,4 246:10 311:21

**worth** 60:10,11 73:18

**write** 35:6 244:8

**written** 13:14 64:2 66:11

**x**

**x** 3:1 17:10 244:23 298:22 299:2,9,16

**xi** 17:10 298:23 299:3,9,16

**y**

**y** 16:25

**yahoo** 157:10

**yeah** 35:22 45:4 45:4 46:6 48:15 50:22 63:18 65:18 66:23 77:25

80:24 87:18,20 100:8 103:13 104:23 105:11 107:15 110:7 111:15 121:7 124:19 128:6 138:8 141:11 143:4 146:4 149:19 155:24 171:21 172:14 174:3,19 178:6 186:1 187:23 193:8 195:17 204:19 205:10 211:1 214:1,13 217:24 219:8 223:24 227:25 232:16 234:13 236:20 240:11 242:5 257:5 263:1 268:13 272:22 273:11 275:12 276:14 278:15 282:6 283:13,22 284:11,25 287:6 290:2 296:21,23 299:25 304:24 310:17

**year** 37:10 75:19 112:19 146:13 147:11 154:19 186:14 186:17 187:8

205:4 208:8,20 209:17 210:1 217:10,11 248:10 251:25 252:17,23

**years** 26:16 67:1 69:3 112:14 145:5 264:24 277:7 277:12 281:3

**yelled** 245:2

**yelling** 244:19

**yep** 144:25 306:13

**yesterday** 31:16,22

**yields** 23:17

**york** 2:14,14,19 2:19 58:2 59:12,19 93:24 94:11 95:14 170:13

**z**

**zeh** 2:12 8:17

**zekono** 2:15

**zero** 214:7 220:9 221:10 224:12,17,18 224:20 249:18 252:4 274:18 274:20,20 284:15,16,19 294:20 312:10 312:10

**[zoom - zoom]**                                        Page 92

**zoom**   13:12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.