IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DELAWARE COUNTY EMPLOYEES    .    Case No. 21-CV-3382-HB
RETIREMENT SYSTEM,. *et al.,* .
                             .
    Plaintiffs,             .
                             .
         v.                  .
                             .
ADAPTHEALTH CORP.            .
F/K/A DFB HEALTHCARE         .
ACQUISITIONS CORP., *et al.,* .
                             .
    Defendants.             .    Thursday, June 20, 2024
. . . . . . . . . . . . . . .    2:05 A.M.


TRANSCRIPT OF FINAL APPROVAL HEARING
BEFORE THE HONORABLE HARVEY BARTLE, III
UNITED STATES DISTRICT COURT SENIOR JUDGE


APPEARANCES ON NEXT PAGE.


Deputy Clerk:              Nicole Spicer
                           James A. Byrne U.S. Courthouse
                           601 Market Street
                           Philadelphia, Pennsylvania 19106


Transcription Service:     Liberty Transcripts
                           9107 Topridge Drive
                           Austin, Texas 78750
                           (847) 848-4907
                           DBPATEL1180@GMAIL.COM
                           www.libertytranscripts.com


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES:

| For the Plaintiffs: | Robbins Gellar Rudman & Dowd LLP |
| | BY: ELLEN GUSIKOFF STEWAR, ESQUIRE |
| | 655 West Broadway, Suite 1900 |
| | San Diego, California 92101 |
| | (619) 231-1058 |
| | elleng@rgrdlaw.com |

Kessler Topaz Meltzer Check, LLP
BY: ANDREW L. ZIVITZ, ESQUIRE
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706
azivitz@ktmc.com

For the Defendants:    Willkie Farr & Gallagher LLP
BY: ZEH S. EKONO, ESQUIRE
787 7th Avenue
New York, NY 10019
(212) 728-8166
zekono@willkie.com

For Defendant          Kramer Levin Naftalis & Frankel LLP
Luke McGee:            BY: RYAN GANDER, ESQUIRE
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
rgander@kramerlevin.com

* * * * *

(Whereupon, at 1:30 p.m., the hearing was commenced.)

THE CLERK:  Court is now in session, please be seated.

THE COURT:  You may be seated.  Good afternoon.

COUNSEL:  Good afternoon, Your Honor.

THE COURT:  The Court is holding a hearing this afternoon in the case of the Delaware County Employees Retirement System, *et al*. versus AdaptHealth Corporation, *et al*., Civil Action 21-3382.

Specifically, before the Court this afternoon is the motion of lead counsel for attorneys' fees and litigation expenses and award to lead plaintiffs and, of course, the motion for the approval of the class settlement.  That's also before the Court.

All right.  We'll hear for argument.

MS. STEWART:  Good morning, Your Honor.  Would you -- good afternoon.  Would you like me to go to the podium?

THE COURT:  You may.  Just introduce yourself for the record, please.

MS. STEWART:  I will.  Thank you, Your Honor.

Good afternoon. I'm Ellen Gusikoff Stewart of Robbins Gellar Rudman & Dowd --

THE COURT:  Thank you.

MS. STEWART:  -- on behalf of the lead plaintiffs and the class.  We are here, Your Honor, for final approval

of this class action settlement, which consists of $51 million in cash and including a $1 million payment by individual defendant McGee, which is not a common occurrence in these kinds of settlements.

THE COURT:  Right.

MS. STEWART:  Getting an individual contribution is a big deal.

THE COURT:  And that's part of the $51 million?

MS. STEWART:  Is part of the $51 million, Your Honor.

We also obtained $1 million freely tradable shares of Adaptic Health stock.  Stock was trading at seven --

THE COURT:  Well, tell me about that.  Are these Treasury shares?  Are these going to be newly issued shares?

MS. STEWART:  They are Treasury shares, I believe. They're going to be freely traded.  They are going to be transferred to the escrow agent within 14 days of the date the Court finally approves the settlement.

THE COURT:  Well, that's going to reduce the value of each share, is it not, by issuing a million dollars, or a million new shares?

MS. STEWART:  If they're Treasury shares, they're already existing shares, Your Honor.

THE COURT:  Who owns them?  The company?

MS. STEWART:  The company owns them.

THE COURT:  But they're not being traded now, is that correct?

MS. STEWART:  Well, they are not being traded right now.  I assume --

THE COURT:  So if you're --

MS. STEWART:  I assume that's correct.  The company can speak more broadly to what's going to the company.

THE COURT:  So now if you're going to issue a million more shares on the market, that's going to obviously reduce the value of all the shares.

MS. STEWART:  There will be no more shares issued, Your Honor.  There will be --

THE COURT:  I'm not saying issued, but aren't there going to be a million shares more tradable on the market than there have been heretofore?

MS. STEWART:  It's not going to change the number of shares that are tradable because those shares already exist. And I don't --

THE COURT:  Listen, is it going to reduce the market of each share, market value of a share when you put a million more shares on the market?

MS. STEWART:  Well, there are limits.  There are limits to how many shares can be traded each day.  So that we avoid that situation, there is a limit that we cannot sell more than 250,000 shares on any one day.

THE COURT:  Well, that's a lot of shares added to the market.

MS. STEWART:  Given the float, it should not affect, it should not negatively affect the --

THE COURT:  How many total shares are there being traded now?

MS. STEWART:  There are about 40-something, I believe.

MS. EKONO:  I think that's what -- that's a course number.

MS. STEWART:  There are more than --

MS. EKONO:  I don't -- hi, this is Zeh Ekono from Willkie Farr --

THE COURT:  Yes.

MS. EKONO:  -- on behalf of AdaptHealth and AdaptHealth defendants.  I don't actually have the exact count of the number of outstanding shares.  I think as Counsel was explaining, these shares will be newly transferred to lead plaintiffs' account.  They provided that information to us.  We do not expect that issuing a million shares is going to have any adverse impact on the company's stock.

From our perspective, this was an essential part of the settlement in terms of assuring that it's fair and adequate and reasonable, including because of the company's

own restraints with respect to the value of the overall settlement.  I think it's also important for you to recognize that at the time that we agreed to have a stock component in the settlement, the value of the stock at that time was about $7.  It has since gone up significantly.

THE COURT:  All right.

MS. STEWART:  So, Your Honor, we've added -- so it's $51 million in cash, plus hopefully by the time we get the shares --

THE COURT:  Right.

MS. STEWART:  -- it will still be in 11.  And that's --

THE COURT:  Now, how many shareholders are there now?

MS. STEWART:  Well, there are --

THE COURT:  How many notices did you send out?

MS. STEWART:  We sent out about 20,000 notices.

THE COURT:  That's what I thought, 19,000 something.

MS. STEWART:  How many of those class members will ultimately make claims?  There's still another month --

THE COURT:  Right.

MS. STEWART:  -- to go to the claims deadline, but

we've got about 900 claims in right now.

THE COURT:  Representing how many shares?

MS. STEWART:  I don't know the answer to that.  They haven't been vetted yet.  They've just been submitted.

THE COURT:  But how are you going to divide up the shares among the current stockholders?

MS. STEWART:  The --

THE COURT:  I mean, it's one thing to divide up the dollars, but shares is another thing.

MS. STEWART:  It's quite possible, Your Honor, that we will sell.  We have the ability to sell the shares before they're distributed to class members.  A decision will be made on the shares when we see how -- you know, it's possible the stock could go to 22, but it's also possible it could go to 2.  And so we want to protect the class members.

So we're going to do -- we have the ability to sell shares before they're distributed to class members and distribute the cash to them.  And then if those class members want to use their cash --

THE COURT:  Who is the "we" that's going to make the decision?

MS. STEWART:  That will be lead counsel, our chief financial officer, our managing partner.

THE COURT:  So you're going to have the lawyers make the decision as to when stocks should be sold?

MS. STEWART:  As fiduciaries of the class, when we're holding this stock on behalf of class members, we want to make sure that we are maximizing the recovery for the class.  So if we see that the stock is starting to dive, we may start to sell it so that we can at least maintain as much of the value of the stock as we can in cash.  If class members want to use their cash to purchase more Adaptic Health, they can certainly do that.

THE COURT:  Now, will you be subject to being second-guessed by the stockholders if you're selling a million shares?

MS. STEWART:  By current shareholders or by class members?

THE COURT:  Well, either way.  In other words, let's just say you guessed wrong, and it started to go down, and you sell them.  And then three days later, the price goes way up.

MS. STEWART:  Well, the benefit of not being able to sell more than 250,000 shares in any one day is we're protected from that.

THE COURT:  Well, that's still -- well, you could do it four times, make the mistake.  I mean, I've never seen anything like this.  And here, lawyers are going to make the decision.  I mean, even some of the best investment advisors make mistakes.  And here, we're talking about lawyers.

And as good as you are at your trade, that's not your expertise, is it?

MS. STEWART:  Well, we have a chief financial officer who is a CPA who is --

THE COURT:  A chief financial officer of what?

MS. STEWART:  A chief financial officer of our law firm.

THE COURT:  Well, that doesn't mean simply because you're a CPA that you have any expertise in buying and selling stock.  I'm really concerned about this.  It's very unusual, and I could just see it now.  You guessed wrong, and then we have a big problem on our hands, don't we?  At least with dollars, we know what the value is.

MS. STEWART:  Well, if we sell all the shares over time, then we won't have this problem.

THE COURT:  Why do you say that?

MS. STEWART:  Because the shareholders will have their cash.

THE COURT:  Yeah, but they may have had a lot more if you had sold it at a different time.

MS. STEWART:  One thing we have to keep in mind, Your Honor, is if we have a million shares or we have -- you award our fees and we take part of the fee in stock so we have a --

THE COURT:  Well, that's another problem that we'll

get to.

MS. STEWART:  But it's very expensive to distribute stock to class members.  It's --

THE COURT:  Which leads me to the question why are you even -- that's even part of the deal.  I mean, there's so much -- with 51 million, you know what the dollar amount is. everybody sees it and can make an evaluation.  But when you're talking about taking shares and second-guessing the stock market, and your CPA may be great, but he may make -- that's not his -- he's not buying and selling stocks every day, is he?

MS. STEWART:  He is moving -- in our securities settlements, he's moving millions of dollars in Treasuries every day.  He is.  He is.  I --

THE COURT:  Well, a Treasury isn't quite as volatile as a stock.

MS. STEWART:  No.  Your Honor, it's very difficult administratively to distribute the stock.

THE COURT:  I agree with that.

MS. STEWART:  You have fractional shares.  You have things.  And so my supposition, unless the stock starts to go to the moon, that over the next month or so after we get the stock, that it will be sold.  I could be wrong, and I will come back and let you know if I'm wrong.  But I think it makes --

THE COURT:  It will be a little late then.  We'll just have to wait for the second lawsuit.

MS. STEWART:  I'm hopeful that that doesn't happen. I think when we settled the case, we were not satisfied with $51 million.  But at the time, that was what we could obtain in cash.  And so by taking an equity stake and hopefully achieving the appreciation of the stock, which we already have.  I mean, we've already gotten -- it's already worth $4 million more today than it was on the day that we reached an agreement in principle to settle the case.

So now we don't have a $51 million settlement.  We have a $62 million settlement.  And that is the settlement that we've brought before you, which in addition to the corporate governance reforms that we've obtained, which we could never have obtained after a trial --

THE COURT:  Right.

MS. STEWART:  -- we believe that this is an outstanding settlement.  And we will, as in the other cases, and we have had a number of cases that have settled where there have been stock components.  And we look very hard and we have our brokers at Merrill Lynch who will assist us in determining whether and how the best use of -- what the best way to either distribute or sell those shares are without impacting negatively the stock price.

Because obviously as shareholders now, we're all in

the same boat.  And we don't want to do anything that's going to jeopardize the company.

THE COURT:  What are the tax implications of all this?

MS. STEWART:  They are the same.  The tax implications are the same with respect to the cash as with respect to the stock.

THE COURT:  All right.

MS. STEWART:  So, Your Honor, after sending out over 20,000 notices, we received no objections and we received not a single opt-out from the class.  Obviously, the class believes that this is a fair, reasonable, and adequate settlement.

We ask that the Court find that this settlement, which was reached following arm's-length mediation with David Murphy of Judge Phillips' firm in California, has no indicia of any collusion.  There was -- settlement negotiations took place over about seven months.  And there were a number of offers and counter-offers.

And we did not -- as you know from the papers, we did not settle the case after the first mediation, and we kept going.  And so this settlement, which we're very pleased and proud to bring before the Court, meets all the requirements of Rule 23(e)(2) and the Third Circuit's Girsh factors.  It adequately balances the objective of obtaining

the highest possible recovery against the risk of further litigation. It also meets the applicable prudential factors.

And as Warfarin and its progeny make clear, a class-action settlement is entitled to an initial presumption of fairness if the settlement negotiations occurred at arm's length, which it did here. There is sufficient discovery.

And as our documents make clear, we went through document -- at least class certification discovery, our class certification motion was before the Court when we settled. We had done some document discovery on merits, though we had not done depositions per the Court's order.

The proponents of the settlement are experienced in similar litigation. And I think it's beyond question that our plaintiffs' firms and defendants' firms are well experienced in this kind of litigation.

THE COURT: I would agree with that.

MS. STEWART: And only a small fraction of the class objected. And here, none of the class objected. So the Warfarin -- I believe that the initial presumption of fairness is entitled to a presumption of fairness.

Would you like me to go through the Rule 23(e)?

THE COURT: Whatever you wish.

MS. STEWART: Well, I don't want to waste the Court's time, and I assume that --

THE COURT: You're not wasting my time.

MS. STEWART:  Okay.

THE COURT:  It's an important case.

MS. STEWART:  Okay.  Thank you, Your Honor.

THE COURT:  We're not in the Court of Appeals where you get 15 minutes a side.

MS. STEWART:  And I'm hopeful, because we had no objections, that we will not be in the court of appeals at all.

With respect to the Rule 23(e)(2) and Girsh factors, the lead plaintiffs and lead counsel adequately represented the class.  Given the stage of the proceedings and the amount of discovery, there's no question that we were adequately informed before we reached the settlement.  The settlement was negotiated at arm's length before Mr. Murphy.  The settlement is adequate considering the costs, risks, and delays of trial and appeal.

As the Court's aware, the case has been pending for over two years, about three years almost now.  Discovery is still underway.  We had to resolve the class-certification motion and then any appeals or 23(f) litigation with respect to any order that the Court issued, and then we would have to finish merits deposition, summary judgment, and trial.

The defendants were, though we were confident that we were going to establish our claims, the defendants were very confident that we would not be able to establish

falsity, materiality, loss causation, or scienter.  We would be faced with a battle of experts here and without any guarantee that the plaintiffs' experts would be accepted by the court or the jury and that the defendants' experts would not find favor with their theories.

We had a big loss causation issue in this case.  The question of whether the disclosures that we alleged were corrective revealed that any prior statements were materially false and misleading.  If the information was already in the market with respect to the short seller report or the press with respect to Mr. McGee's tax issues in Denmark, if any of those items were found by the Court or the jury to have already been in the market, we would not be able to establish loss causation for the stock drops and the case would be over.

The settlement also eliminates the risks of proceeding, the risks of maintaining the class.  The class, as I mentioned a couple of times, the class certification motion was pending.  Even if the Court certified the class and 23(f) was denied, the Court may always alter or change a class definition up through entry of judgment.

The ability of the defendants to withstand a greater judgment I think is neutral here, but since all the other factors argue in favor of settlement, I don't think the Court needs to consider that.

The settlement falls within the range of reasonableness.  It was about 10 percent, the recovery of 10 percent when we were at 51 million, and we're at about over 12 percent of recovery of estimable maximum damages if we hit a home run.

THE COURT:  Right.

MS. STEWART:  And that as the cornerstone in NERA studies that we've submitted to the Court indicate, that is a -- our recovery far exceeds those percentages.

Also, I don't want to lose sight of the fact that we obtained corporate governance that will improve the way the company is governed going forward.  And while it's very difficult to put a dollar amount on that, we've improved the company.  And so we believe that that's a factor that the Court should consider in determining whether the settlement is fair, reasonable, and adequate.

The proposed method for distributing relief to the class I think we've talked about.  But class members have to submit claim forms and provide information regarding their purchases or with respect to their put options, writing their sales of AdaptHealth securities.  The company, the claims administrator, plaintiffs, we don't have that information and so it's important that there's a claims process.

The requested attorneys' fees, which we'll get to, are reasonable, we believe, at 25 percent.  And other than

the standard supplemental agreement with respect to the defendants' ability to terminate the settlement if opt-outs reach or exceed a certain threshold, which obviously since we had no opt-outs --

THE COURT:  Right.

MS. STEWART:  -- we did not trigger any below provision.

Settlement members are treated equitably.  Every class member is subject to the same plan of allocation. Their claims will be determined subject to that plan of allocation, which we would ask that the court approve.  And the class reaction is ultimately very important, as well, and there were no objections here.

So, finally, the prudential factors, which not all apply, but the lead plaintiffs were well informed of the strengths and weaknesses of the case after extensive investigation and discovery.  They were also deposed and provided discovery.  Settlement class members were provided the opportunity to opt-out of the class, and none did.  The method for processing claims is fair and reasonable, and the requested fees are fair and reasonable.

So we would ask that the Court find that the 23(e), Girsh, and prudential factors are all met and that the settlement itself is fair, reasonable, and adequate and deserves approval by the Court.

Similarly, the plan of allocation, which is set forth in the notice --

THE COURT:  Very complicated.

MS. STEWART:  It is, but, you know, most -- it's really just plugging in numbers once --

THE COURT:  As long as you have a good computer program.

MS. STEWART:  Yes.  And you plug in your purchases and you plug in your sales into the form, and the claims administrators have their computers and they will spit out recognized losses for each authorized claimant.  To the extent any claim form is deficient, those class members will be given the opportunity to cure their deficiencies because obviously the goal is to get as many class members paid as possible as long as we're convinced and satisfied that there's no fraud or duplication in those claim forms.

Plans of allocation are held to the same standard as settlements.  They should be fair, reasonable, and adequate.  This plan was developed by our loss causation and damages expert and there have been no objections to the plan.  We would ask that the Court approve the plan of allocation as fair, reasonable, and adequate.

Finally, Your Honor, we're requesting a 25 percent fee here, 25 percent of the cash, 25 percent of the stock.

THE COURT:  Any reason you didn't do the

multiplication?

MS. STEWART:  Oh, of what --

THE COURT:  Twenty-five percent of 51 million, that number, you never go that step.

MS. STEWART:  Well, the reason we didn't do that is because we were wondering what the stock component would be. I guess it's something less than 13 million.

THE COURT:  Well, you can certainly calculate the 25 percent of the 51 million.

MS. STEWART:  Yes, and it was --

THE COURT:  It's about 12 million something.

MS. STEWART:  Yes, it's -- yes, Your Honor.  We're asking, of course, that the Court approve our fee on a percentage basis, finding that 25 percent is within the range of fees that have been awarded in courts throughout the Third Circuit and that it's reasonable here given the amount of work, the stage of the case, the difficulty, the contingent nature of the fee.

And then if you were to do a lodestar crosscheck --

THE COURT:  Right.

MS. STEWART:  -- which you are not obligated under Third Circuit law, but obviously the numbers --

THE COURT:  We generally do do that.

MS. STEWART:  -- the numbers are in there.  And at the time we filed our motion for final approval and our fee

motion, the multiplier was 2.56.

THE COURT:  Right.

MS. STEWART:  And with the increase in the stock price, it's 2.62, which is well within the range of multipliers that have been awarded.

We believe that the fee is reasonable under all of the Gunter factors, the size of the fund created and the number of persons benefited, the presence or absence of objections, the skill and efficiency of counsel.  And I guess a lot of these factors overlap the Girsh factors, the complexity and the duration of the litigation, the risk of nonpayment, the amount of time devoted to the case, over 8,500 hours in the last two-plus years, and awards in similar cases.

So we would ask -- and there are no objections to our fee, we would ask that the Court award 25 percent.

THE COURT:  What about the issue of a law firm owning stock in a party?  I mean, you're going to be owning, your firm's going to own 25 percent, or not -- 250,000 shares, rather, of the defendant.  That's kind of puzzling to me.

I can understand your argument that you're going to accept stock and then sell it, and the money will go to the class members.  But here's a firm that are going to be owners of the defendant, the part owner.

MS. STEWART: Well, assuming the Court approves the settlement, there won't be defendants anymore. We won't -- you know, they won't be parties to any litigation in any --

THE COURT: Well, but I understand that, but I think that's a -- here you are, you've sued Adapt, and then you're certainly entitled to an attorneys' fee, and from what I see, you've done a very good job. But to be owning stock in a party that you sued, and having a governance responsibility for Adapt, I mean, isn't that -- it's hard for me to wrap my hands around that to be --

MS. STEWART: Well --

THE COURT: I don't know whether this is -- maybe there are a lot of cases where this has happened. I have never seen it before. Obviously, in this day and age, after the reforms in the securities laws, we don't see as many cases as we used to.

MS. STEWART: We've had a number of settlements where we have had stock, and some, as soon as we get the stock as part of our fee, it's sold. It's sold within the rubric of how we can dispose of the stock.

THE COURT: Right.

MS. STEWART: And in other cases, the stock is distributed to the partners. It's very rare that that happens. I would say in 99 percent of the cases, we sell the stock, and so we don't become shareholders. However, we do

believe that given the corporate governance reforms that we obtained as part of the settlement, we would be shareholders of a better company.

THE COURT:  Well, you could always go out and buy the shares if you think it's such a great company.

MS. STEWART:  We could, and if it's --

THE COURT:  Take your money and buy it.  It just seems -- there's just something troubling about that.  It's one thing to get your fee, to which you're entitled, and then to become owners of a company that you sued.  It really is somewhat troubling to me.  It's hard to put my finger on it, but --

MS. STEWART:  We would not have enough of an equity interest to make any -- there would be no power.  You're very, very, very minority shareholders of the company, so we would not have any power to nominate directors or make any demands on the board.

THE COURT:  Well, of course, if there's a contested election, that may be far-fetched, but you have 250,000 shares to vote, it could possibly make the difference.  Maybe that's all theoretical, but it just seems a little unseemly to me for law firms to be --

MS. STEWART:  I understand.  I hear --

THE COURT:  -- getting involved in the stock of a company.  I don't know, lawyers can now have investment

advisors.  The practice of law has changed dramatically, I understand that.  That may not be for the good, but that may be the reality.  But this is taking it a step further.

MS. STEWART:  It's interesting, Your Honor.  I guess I had never really considered it, and I think there are -- on the defense side, I know that there are sort of limited partnerships where defense firms take pre-IPO stock and they become partners and they benefit --

THE COURT:  Well, it's a brave new world out there, I must say.  I'm not sure I like it, but.

MS. STEWART:  And so, but I think that we're -- I had not spoken to my CFO before I got on the plane, but I think that there's a very good chance that at least some of the stock would be sold before it was distributed in my firm, and the equity interest would be so low for each individual partner.

THE COURT:  Now, we've got a quarter of the shares.  Now, which quarter are you going to get?  The first quarter that's sold, or are you going to get a quarter of each piece that's sold?  How are you going to -- which quarter do you get?

MS. STEWART:  We are not going to put our interests in front of the classes.  We're going to get a million shares on a particular day, 14 days from the day --

THE COURT:  Right.

MS. STEWART: And if the decision is made on the -- we will not put -- let me just say that. We will not put our firm's interests ahead of the interests of the class.

THE COURT: Well, but how is it going to work? Take me through the steps. You get a million shares. You're entitled to a quarter of them.

MS. STEWART: Yes.

THE COURT: All right. Then what happens? When do you get your piece of the action, and when do the class members get -- how do you decide which are which?

MS. STEWART: Well, we're entitled -- if the Court approves the settlement and the terms of the settlement provide that we can take our fee immediately upon entry of the order approving our fees. So, we could theoretically, I guess, take that first 250,000 shares because until claims administration is complete, we won't know who -- if we decide to distribute the 750,000 shares, we won't know who's going to get them and in what quantities.

THE COURT: Yeah, and it may be pretty hard because it's one thing to refine down to a dollar or ten dollars, as you say, but a share is a little different. It's --

MS. STEWART: Well, it would be no fractional shares would be interest --

THE COURT: Sure, right.

MS. STEWART: And we would cash out the -- so,

there's a lot of administration that has to be done and it's just -- it seems like a lot of shares, but it's not -- given the size of the class, it just may not be cost efficient.

THE COURT:  But, see, I'm worried whether there isn't going to be some tension between -- if you start selling these shares between what you get and what the class members get because you're not going to sell them all in one day.  Clearly, that would really --

MS. STEWART:  We're not --

THE COURT:  -- rattle the market.

MS. STEWART:  Right.  We're not permitted to do that anyway.

THE COURT:  I mean, if you did that, then it's easy. You get one quarter or whatever it is, but there are serious problems with that.

MS. STEWART:  Right, and we're prohibited by the settlement agreement from doing that in any event.

THE COURT:  I understand that, but even if you -- I'm just not clear how it's going to work.  And I think it's important for me to know that.  When do you get your share and when do the class members get theirs?  In terms of being sold in different dates, the sale price may be different.  I don't think the plan covers this detail.

MS. STEWART:  The plan of allocation doesn't cover that.  The shares, when they're distributed to the escrow

agent --

THE COURT:  Right.

MS. STEWART:  -- in 14 days, they're going into a Merrill Lynch account.

THE COURT:  Right.

MS. STEWART:  All one million shares.

THE COURT:  And then your law firm, your CPA is going to decide when those shares are going to be sold?

MS. STEWART:  Yes, yes.

THE COURT:  And you're limited as to how many you can sell at one time?

MS. STEWART:  Correct.

THE COURT:  So he or she is on the hook for that. All right.  So they're all sold at different prices.

MS. STEWART:  Once the shares are sold and there's cash, that cash will go into the same fund that's holding the 51 million.

THE COURT:  Right.

MS. STEWART:  And they will all be together.  And so --

THE COURT:  What if they're not sold?

MS. STEWART:  If they're not sold, then nine months from now or 12 months from now, when we're ready to distribute the settlement fund, it will be $51 million plus the interest that's earned plus some number of shares.  And

we may give people the option to take the shares or take the money.  We have to see where the stock is when we're ready to distribute if we haven't made the decision to sell it --

THE COURT:  But you get your shares immediately, correct?  You can -- in other words, if I approve this and you get 250,000 and the class gets 750 --

MS. STEWART:  Yes.

THE COURT:  -- so you get yours immediately and you can do whatever you want with it.

MS. STEWART:  Yes.

THE COURT:  You can sell it, correct?

MS. STEWART:  Yes, Your Honor.

THE COURT:  And those shares, theoretically, are going to be -- I don't know how you determine which of the 250 are yours but, obviously if you sell them, they have to be specific shares, correct?

In the old days when you had certificates, they had numbers on them.  So you would have your certificate and it would have a number on it.  I don't know what happens now. That's all done electronically.

MS. STEWART:  Right.

THE COURT:  You don't get those beautiful shares anymore.

MS. STEWART:  No, you don't.

THE COURT:  They're engraved.

MS. STEWART: There's nothing to frame.

THE COURT: Right.

MS. STEWART: There's nothing to frame, Your Honor.

THE COURT: Right.

MS. STEWART: So we advise Merrill Lynch sell 250,000.

THE COURT: Okay.

MS. STEWART: And then Merrill Lynch, then they try and get the best price for those 250.

THE COURT: All right. Let's say you do that. You have your 250.

MS. STEWART: Yeah.

THE COURT: And they're sold and you get X dollars. And then two months later, when you sell the others, you get X minus Y dollars. You're selling yours immediately and the next $750,000 are sold on the market, but they don't sell for as good a price. So you've gotten your 250 and the shareholders or stockholders, class members, whatever you want to call them, are going to get less dollars, correct? Or fewer dollars is the right word.

MS. STEWART: Yes.

THE COURT: Not less. Fewer dollars.

MS. STEWART: Yes. Yes. But as I said, if we see -- let's just say that for argument's sake that we've decided that we think that the company is going to go gangbusters and

the stock's going to go to 20. So we're not going to sell those 750,000 shares. And they're sitting at Merrill Lynch. But something happens, you know, over the next three, four months --

THE COURT: Yeah, another October 1929 occurs.

MS. STEWART: Right. And hopefully, we have a little more, you know, insight into that.

THE COURT: I would hope so.

MS. STEWART: And so, you know, then we --

THE COURT: I'm not saying it's going to happen, but I'm just --

MS. STEWART: No, and I hope --

THE COURT: I'm trying to posit hypotheticals here.

MS. STEWART: Right. And so if we see -- you know, let's say the stock has gone to 20, great news.

THE COURT: Right.

MS. STEWART: And -- but then we see it's 19, 18-1/2, 17. You know, we're not going to penalize the class. If we think that 17 is really like as high as it's going to be for the next eight, nine months because of macro or microeconomic issues, we'll then, you know, over the course of those few days that we're entitled, we can't get rid of all 750 in one day. So we --

THE COURT: I understand. And all I'm concerned about is that the appearance of it, if nothing else, that

because you're the one that's controlling when the stock is tolled.  When I say you, I mean, is it your law firm?  Who is it that's deciding?  I mean, who gives the authority to your CPA to make those decisions?  Does your firm do it? Does the partnership vote to do that or what?

MS. STEWART:  I would guess that the executive committee of my firm would do that.

THE COURT:  Firm, right.

MS. STEWART:  Yes.

THE COURT:  So under the agreement, it's the law firm that sells the stock.  Is that right?  Under the plan of allocation?

MS. STEWART:  Yes, through Merrill Lynch.   Yes.

THE COURT:  But I mean, it's the law firm --

MS. STEWART:  Gives the instruction.

THE COURT:  You obviously delegate somebody.  It's not anyone else.

MS. STEWART:  Correct.  Correct.

THE COURT:  So you sell on day one when you decide your partners want the cash and not the stock.  And then you start at 20.  We'll just pick a number.  And then the stock goes down, even if it's only a couple of dollars.  And so it's 18.  You think, well, we better start selling, so you sell 250 for 18.  And then whatever the time frame is, 250 for 17.  And 250 for 16.

So you have made out better than the class members based on decisions that your firm made. Now, you know, it has an appearance, doesn't it, of -- I'm not saying you're doing anything illegal, please. But it doesn't have the appearance of you're besting your clients.

If this was Microsoft or some big firm, some big company that had hundreds of millions of dollars, hundreds of millions of shares in the float that traded every day, this limitation on the number of shares that we could sell every day wouldn't exist.

THE COURT: I understand.

MS. STEWART: And so we also have an obligation as our clients are now shareholders of the company, assuming that we don't sell the shares. We're not going to do anything to jeopardize them. And if we saw when the stock was at 20 and it was going to 19.5, if we could sell -- and we felt like it was necessary, if we could sell the whole 750, we would, but we can't. And so --

THE COURT: I understand all that. I'm going to assume you're acting in good faith. I'm just talking about the appearance of it. You get your 250 and you sell it at 20. And through no fault of yours, there's limitations in the agreement, the stock begins to decrease in value and you follow the market and what the clients get is fewer dollars per share than what your firm got.

It just doesn't have a good look to it that you got your 250, you sold them and you pocketed your money and then the Delaware County employees and the Bucks County employees sold and less money goes into their pocket. I mean, can't you see that we're talking a lot these days about appearance of impropriety as opposed to impropriety? And I think it has a bad look to it.

MS. STEWART: I hear you, Your Honor. It's also possible that we'll sell at 20 and the stock will go to 27.

THE COURT: I understand, but I'm not going to be deciding in two months or nine months. I've got to make a decision now and I'm concerned about that.

And I think as lawyers, we ought to be very concerned about that. I mean, there's enough attacks on the legal profession and the courts now about things like this, and here we are asking me to approve something that could result in something that's not going to look very good.

MS. STEWART: I suppose if the Court wants to put some limitations on when counsel can sell their shares --

THE COURT: Well, the other possibility is not to approve any shares for the firm. I mean, it just really concerns me deeply or I wouldn't be spending so much time talking about it.

MS. STEWART: I understand, and I'm appreciative. And, look, we don't want to do anything that has --

THE COURT:  I mean, your firm has a wonderful reputation.  I mean --

MS. STEWART:  Thank you.

THE COURT:  There would be -- what kind of an attack could there be by some shareholder looking at this or some newspaper articles, these people who report on these settlements and so forth, and it turns out that happened.

MS. STEWART:  Obviously, the award of the fees is left to your sound discretion.  And we will --

THE COURT:  Yeah.  Well, that's why I'm probing it with you.  I'm trying to understand it.

MS. STEWART:  It's --

THE COURT:  Because these things are complicated.  And I'm not saying you haven't done a superb job in the way you've resolved this matter.

MS. STEWART:  Thank you, Your Honor.  And, look, I suppose if we were entitled to -- if you felt that we were entitled to a 25-percent fee, you could value the stock on a particular day and award us the cash value from the cash value of the settlement.

THE COURT:  See, that's not my job to sit here and tell you what day to sell it and then it would be the day that the market tanks.  I mean, that's not my job as a judge to tell you when to sell and when to buy stock.  I get myself sued.

MS. STEWART:  I'm very sympathetic, empathetic.  I understand the Court's concern.  I just want -- and I think the court knows the reputations of our firms.

THE COURT:  Absolutely, it's wonderful.

MS. STEWART:  And we would never ever do anything that would put our own interests over the interests of the class.

THE COURT:  All I'm saying is, I'm not saying -- I'm not even intimating you would do that.  I'm just saying the way this thing is structured, there's a real possibility that it wouldn't appear -- it wouldn't look good.  And I think lawyers have to be very concerned about that these days, with all the attacks on the legal profession and the Judiciary.  And I can't predict the future of the stock market.  Nobody can.  We don't have inside information.  We're not doing that sort of thing.

MS. STEWART:  Right, Your Honor.  Right.

THE COURT:  And anyway, it's deeply concerning to me.  And as I say, I have -- we have a limited number of these cases these days.  So that issue has never come before me before.  And I don't know whether any court has ever dealt with this issue before.

MS. STEWART:  Well, I can tell you that there are a number of cases that my firm has done, I assume the Kessler firm has done, where we have gotten stock as part of a

settlement because there's just been a cash issue and the company just can't pay anymore or there's no more insurance.

THE COURT:  Has any court ever -- they may have approved it.  Has any court ever discussed this issue in detail as far as you know?

MS. STEWART:  Not to my knowledge.  But I do know that in other cases we have received shares.  When there's a cash and stock component, we have received shares as part of our fees.

THE COURT:  The problem, of course, is this is really an ex parte proceeding.  Although our friends from Willkie Farr & Gallagher are here, I doubt very much they're going to get up and say anything in opposition to the settlement because they participated in it.  That's why the Court's in a tough spot here.

We don't have the normal adversary system where we have people on both sides and then the court has to make a decision.

MS. STEWART:  Would it be helpful if we submitted a supplemental brief to the Court where we identify other settlements where there have been cash and stock components where the stock has been awarded as a fee?

THE COURT:  That would certainly be helpful.

MS. STEWART:  We will do that.

THE COURT:  I don't want a hundred page memorandum.

I want a --

MS. STEWART:  No, no, no.  We'll try and do it in five, seven pages.

THE COURT:  Yeah, just you could identify the cases and I assume there were opinions written by the court.  But I'd be really anxious to see what the judges said specifically except this is a fair and reasonable and all that sort of thing.  The plaintiffs' firm did a great job and you're entitled to your fee.

MS. STEWART:  Well, I just got an email from the person who's running our summer associate program and they're looking for summer associate projects.

THE COURT:  Well, that's a good project.

MS. STEWART:  So it looks like I have got something for our summer associates to start working on.

THE COURT:  How soon will you have that by?

MS. STEWART:  I think we can get something in like the next 10 days to two weeks.

THE COURT:  Well, that's fine.  That's all right.

MS. STEWART:  I would like to, you know, I don't want to --

THE COURT:  And if there is any other learning on that subject, I'd be happy for you to cite it to me because this may be a matter of first impression.  I don't know.

MS. STEWART:  We want the Court to feel comfortable,

obviously.  We are really proud of this settlement, and --

THE COURT:  Well, I think you should be.

MS. STEWART:  And so --

THE COURT:  I don't have any problems with it except in this one area.  It's very troubling.

MS. STEWART:  I understand.  And we want the Court to feel comfortable in whatever fee the Court awards that --

THE COURT:  Yeah.  Well, you're certainly entitled to a generous fee.  I mean, you've done an excellent job. I've read all the papers.  I remember this case.  It had been off my mind for a few months since we haven't had much to do with it, but it is certainly a highly contested matter and a lot of very interesting issues.

MS. STEWART:  So we'll provide something in the next ten days to two weeks to the Court.

THE COURT:  Okay.  Now we're stretching it to two weeks, are we?

MS. STEWART:  Ten days.

THE COURT:  Two weeks, that's fine.

MS. STEWART:  Well, I don't know what today is. Today is Thursday.

THE COURT:  Whatever it is.

MS. STEWART:  I guess a week, hopefully a week from Monday.

THE COURT:  If you need two weeks --

MS. STEWART: But we will get something. Obviously, we want to get this --

THE COURT: If your summer associates need two weeks, that's fine.

MS. STEWART: Yeah, they probably do.

Your Honor, finally, and obviously you're not going to issue an order, but we would ask that the Court pay the expenses of $669,833.09 --

THE COURT: Yes.

MS. STEWART: -- and then awards to --

THE COURT: In these days, the depositions were taken mostly remotely, I take. The old days, you'd be traveling and having large fees or expenses for that.

MS. STEWART: You know, it's funny. I was going through these documents yesterday and the expenses, given the amount of work and --

THE COURT: I know.

MS. STEWART: -- given the size of the settlement, the expenses are like one percent of the amount of the settlement, which is unusual.

THE COURT: It is, right.

MS. STEWART: And it's definitely, I think, pandemic.

THE COURT: Right.

MS. STEWART: It's all experts and very, very little

in the way of travel.

And, finally, Your Honor, lead plaintiff awards under --

THE COURT: Yes.

MS. STEWART: -- 15 U.S.C 78u-4(a)(4) to Delaware County and to Bucks County.

THE COURT: All right.

MS. STEWART: We'd ask that the Court approve those based on the declarations each of those plaintiffs has submitted to the Court.

THE COURT: Thank you. I think we need to hear Mr. Zivitz, who has a fee petition, also.

MS. STEWART: Thank you, Your Honor.

THE COURT: Thank you.

MR. ZIVITZ: Yes, Your Honor. Again, Andy Zivitz from Kessler Topaz Meltzer Check. Our fees are contained within what lead counsel is asking for, so I don't think there's anything separate that we have to put forward.

THE COURT: So your fee is in addition to the 25 percent?

MR. ZIVITZ: No.

THE COURT: It's part of, so you will receive --

MR. ZIVITZ: A percentage of what lead counsel is awarded.

THE COURT: What did you ask for, 168?

MR. ZIVITZ: We put forward our lodestar just as part of the lodestar crosscheck for purposes of determining whether a fee is fair, reasonable, and adequate.

THE COURT: So you don't have a separate motion. In other words --

MR. ZIVITZ: Correct.

THE COURT: You'll work it out among yourselves as to what you get. Is that --

MR. ZIVITZ: That is correct, Your Honor.

THE COURT: All right. All right.

All right. We need to hear from our friends from Willkie Farr & Gallagher.

MS. EKONO: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MS. EKONO: As you know, I represent AdaptHealth and the AdaptHealth individual defendants. Mr. McGee is represented by separate counsel.

THE COURT: All right. We'll hear from him.

MS. EKONO: So to the extent you have any questions for them, just refer to them.

THE COURT: Right.

MS. EKONO: So, obviously, we join in lead plaintiffs' request for final approval of the settlement. We think it is a good resolution of this matter. And beyond that, I'm happy to answer any questions that you may have.

THE COURT:  What about the $250,000 shares that are supposed to go to lead counsel?

MS. EKONO:  So the AdaptHealth defendants take no position regarding that issue.  I mean, we understand the Court's concerns.  But from our perspective, having stock as a component of the consideration was a material and necessary aspect of the settlement.

THE COURT:  Yeah, you mean -- well, it's one thing to have it as a component for what the class members receive. What about as part of the attorney fee?

MS. EKONO:  So with respect to attorneys' fees, Your Honor, I'll refer you to the stipulation of settlement. There are two provisions in there that make clear that the defendants take no position with respect or involvement with respect to any fees or expenses that lead plaintiffs' counsel may request.  It also provides in there that any sort of request regarding fees is not material to the settlement.

So with respect to that, we take no position on how the 25 percent works, whether that's 25 percent of the settlement fund, whether it does or doesn't include the stock.  We take no position with respect to that issue.

THE COURT:  All right.  We'll hear from Mr. McGee's counsel.

MR. GANDER:  Good afternoon, Your Honor.  Excuse me. Good afternoon, Your Honor.

Ryan Gander from the K Kramer Levin Law Firm on behalf of Mr. McGee.  We share the positions expressed by the AdaptHealth defendants.  We join in lead counsel's request for approval of the settlement, and we do not take any position on the plaintiffs' fee application.

We're happy to answer any questions the Court may have for Mr. McGee.

THE COURT:  Thank you.  No questions.

Any further comments by anyone?

(No audible response)

THE COURT:  All right.  Thank you very much. I look forward to receiving your memorandum.

MS. STEWART:  Thank you, Your Honor.

THE COURT:  Thank you.

COUNSEL:  Thank you, Your Honor.

THE CLERK:  All rise.

(Whereupon, at 3:06 p.m. the hearing was adjourned.)

* * * * *

44

<u>CERTIFICATION</u>

I, DIPTI PATEL, court-approved transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____     June 21, 2024

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

LIBERTY TRANSCRIPTS